UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| WESTCHESTER PUTNAM COUNTIES HEAVY & HIGHWAY LABORERS LOCAL 60 BENEFITS FUND, individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>  vs.<br><br>SHOALS TECHNOLOGIES GROUP, INC., JASON WHITAKER, JEFFREY TOLNAR, BRANDON MOSS, DOMINIC BARDOS, and KEVIN HUBBARD,<br><br>        Defendants. | CASE NO:<br><br>CLASS ACTION<br><br>COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>DEMAND FOR A JURY TRIAL |

Plaintiff Westchester Putnam Counties Heavy & Highway Laborers Local 60 Benefits Fund ("Plaintiff"), by and through its attorneys, alleges the following upon information and belief, except as to allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief are based upon, among other things, its counsel's investigation, which includes, without limitation: (a) review and analysis of public filings made by Shoals Technologies Group, Inc. ("Shoals" or the "Company") with the U.S. Securities and Exchange Commission (the "SEC"); (b) review and analysis of press releases and other publications disseminated by Defendants (defined below) and other parties; (c) review of news articles, shareholder communications, conference calls, and postings on the Shoals website concerning the Company's public statements; and (d) review of other publicly available information concerning the Company and the Individual Defendants.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of all persons and entities that purchased Shoals common stock between May 17, 2022 and November 7, 2023, inclusive (the "Class Period") against Shoals and certain of its officers (collectively "Defendants") seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

2.     Shoals purports to be a leading provider of electrical balance of system ("EBOS") products for solar power generation, battery storage, and electric vehicle charging infrastructure. In the context of solar power generation, Shoals EBOS products encompass all of the components necessary to transport electric currents produced by solar panels to an inverter, allowing the current to be delivered to a power grid or an energy storage product.

1

3. Prior to, and during the Class Period, Shoals used polymer-insulated copper wires, which it purchased from a number of different suppliers, in its EBOS products. The wires served a critical role in Shoals EBOS products as part of custom wire harnesses that are used to aggregate electricity from multiple solar panels and deliver that electricity to inverters.

4. Throughout the Class Period, Defendants touted the Company's "focus on quality and reliability" with regard to its EBOS components, from which Shoals generated the majority of its revenue during the Class Period. These components were backed by a product warranty Shoals provided to its customers. Shoals highlighted that its products "meet [the Company's] stringent quality requirements." As the Company's warranty supported the products meeting "stringent quality requirements," Shoals assured investors throughout the Class Period that its reported "Cost of Revenue" included costs related to product warranty liability.

5. In Shoals' Quarterly Report on Form 10-Q for the first quarter of 2023, filed with the SEC on May 8, 2023 (the "1Q23 10-Q"), investors were first informed of a potential issue involving "a subset of wire harnesses used in [Shoals'] EBOS solutions [] presenting excessive pull back of wire insulation at connection points," which Shoals dubbed "shrinkback." Shoals also sought to ease investors' concerns by reporting that it had "substantially ceased use of the related wire."

6. Then, on August 1, 2023, Shoals filed its Quarterly Report on Form 10-Q for the second quarter of 2023 ("2Q23 10-Q") with the SEC and held a conference call with analysts to discuss its results for the quarter. The 2Q23 10-Q disclosed that Shoals had recorded a warranty liability of $9.3 million related to the shrinkback issue. During the corresponding call with analysts, Oppenheimer analyst Colin Rusch asked Defendants to "talk a little bit about the wire issues . . . how extensive it was in terms of the number of customers and number of shipments and

2

how much time it was spread over?"  In response, Chief Financial Officer ("CFO") Dominic Bardos stated, "We've communicated pretty much everything we can."  CFO Bardos also confirmed that "[t]he charge that we booked in the quarter we believe is adequate to do the remediation required, and that's why we booked it."

7.     In reality, and as remained undisclosed to investors, Shoals learned of customers experiencing wire insulation shrinkback by no later than March 2022.  For example, in March 2022, Shoals learned of exposed copper conduit resulting from shrinkback in EBOS wire harnesses at a customer's solar field in Arizona.  Indeed, throughout 2022, Shoals learned of numerous customers experiencing similar copper conduit exposure, or shrinkback.  As investors belatedly found out, Shoals had installed defective wire harnesses in at least 300 solar fields.  These harnesses represented approximately 30% of the total amount of Shoals harnesses manufactured between 2020 and 2022.  As a result, Defendants' positive statements about the Company's financial guidance, business, operations, and prospects during the Class Period were materially false and/or misleading.

8.     On November 7, 2023, Shoals stunned the market by revealing that the Company had been forced to take an additional $50.2 million charge for warranty expense as result of the wire shrinkback issue.  Shoals further advised that it expected the wire shrinkback issue to cost between $59.7 million and $184.9 million dollars to remedy.

9.     On this news, Shoals' stock price fell more than 20%, from a closing price of $16.23 per share on November 7, 2023, to a closing price of $12.95 per share on November 9, 2023, wiping out approximately $550 million in market capitalization.

10.     Securities analysts were shocked by the disclosure and linked Shoals' sharp stock price decline to the warranty charge.  For example, in a report dated November 10, 2023, analysts

3

at Barclays declared that "the upper end of the $60-$185mm came as surprise to investors and has contributed to the underperformance of the stock." Similarly, analysts at Truist noted that the third-quarter results "were heavily impacted by a ~$50mm warranty charge that drove unadjusted 3Q [gross margins] well below our/street estimates."

11. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in market value of the Company's common stock when the truth was disclosed, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

12. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

13. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 27 of the Exchange Act (15 U.S.C. § 78aa).

14. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b), Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts and omissions charged herein, including the dissemination of materially false and misleading information to the investing public, and the omission of material information, occurred in substantial part in this Judicial District, as Shoals is headquartered in this Judicial District.

15. In connection with the acts, transactions, and conduct alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the U.S. Mail, interstate telephone communications, and the facilities of a national securities exchange.

4

16.     Based in Hawthorne, New York, Plaintiff provides pension and other benefits for union members.  Plaintiff is responsible for the retirement income of these employees and their beneficiaries.  Plaintiff manages approximately $300 million in assets for the benefit of more than 1,500 participants. As set forth in the accompanying certification, incorporated by reference herein, Plaintiff purchased Shoals common stock during the Class Period and suffered damages as a result of the federal securities laws violations and false and/or misleading statements and/or material omissions alleged herein.

17.     Defendant Shoals is incorporated under the laws of Delaware, with its principal executive offices located in Portland, Tennessee.  The Company's common stock trades on the Nasdaq Global Market (the "Nasdaq") under the ticker symbol "SHLS."

18.     Defendant Jason Whitaker ("Whitaker") served as the Company's Chief Executive Officer ("CEO") from January 2020 to March 15, 2023.

19.     Defendant Jeffrey Tolnar ("Tolnar") has served as the Company's President since December 19, 2022 and also served as Interim CEO from March 16, 2023 to July 16, 2023.

20.     Defendant Brandon Moss ("Moss") has served as the Company's CEO since July 17, 2023.

21.     Defendant Dominic Bardos ("Bardos") has served as the Company's CFO since October 3, 2022.

22.     Defendant Kevin Hubbard ("Hubbard") served as the Company's Interim CFO from May 5, 2022 to October 2, 2022.

23.     Defendants Whitaker, Tolnar, Moss, Bardos, and Hubbard (collectively, the "Individual Defendants"), because of their positions with the Company, possessed the power and

authority to control the contents of the Company's reports to the SEC, shareholder letters, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations that were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

24. The Company and the Individual Defendants are collectively referred to as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

25. Founded by Dean Solon in 1996, Shoals is based in Portland, Tennessee and provides EBOS products for solar energy projects in the United States. The Company sells solar products principally to engineering, procurement, and construction firms ("EPCs") that build such solar energy projects. The Company designs, manufactures, and sells systems for two types of wiring architectures used by the U.S. solar industry: Homerun EBOS and Combine-as-you-go EBOS. In 2021 and 2022, Shoals derived 73% and 77.8% of its revenues, respectively, from the sales of these systems. By 2023, those products provided 81.5% of Shoals' revenues.

26. A critical part of these EBOS systems is a custom wire harness that is used to aggregate electricity from multiple solar panels and deliver that electricity to inverters. The wires

6

in these harnesses act as conductors, intended to carry high-voltage electricity. Shoals purchases these wires from a number of different suppliers to manufacture its EBOS products.

27. By March 2022, at the latest, Shoals received a report from a customer of exposed copper conductors on wire harnesses installed at the customer's Arizona solar field. Shoals, at its own expense, replaced the affected harnesses on the end-user's site. Numerous other Shoals customers reported similar instances of exposed cooper conductors in solar fields throughout 2022.

28. Shoals installed EBOS systems with defective wire harnesses at approximately 300 solar fields, representing approximately 30% of all wire harnesses installed by Shoals between 2020 and 2022.

### Defendants' Materially False and Misleading Statements
### Issued During the Class Period

29. On May 17, 2022, Shoals filed its Quarterly Report on Form 10-Q for the first quarter of 2022 (the "1Q22 10-Q"). The 1Q22 10-Q explained that "[w]hen we sell a system solution, we enter into a contract with our customers" that included a "warranty for the products being purchased," and falsely assured investors that the Company's reported "Cost of Revenue" included costs related to the "product warranty." Shoals also provided generic and boilerplate warnings that any "defects or performance problems in our products *could* result in loss of customers" and that the Company "*may* face warranty, indemnity and product liability claims arising from defective products."[1]

30. Meanwhile, throughout the Class Period, the Company touted on its website that it "focus[ed] on [the] [q]uality and [r]eliability" of its EBOS components and that "Shoals products are built in a factory[-]controlled environment with calibrated machines and rigorous quality

_____

[1] All emphases are added.

7

standards. Every component is fully tested using our in-house testing chambers to ensure that our EBOS solutions deliver the highest levels of quality and reliability."

31.     Likewise, Shoals' Quarterly Reports on Forms 10-Q for the second and third quarters of 2022, respectively filed after the markets closed on August 15, 2022 and November 14, 2022 (the "2Q22 10-Q" and "3Q22 10-Q," respectively), repeated the same statements referenced in ¶ 29 verbatim, including the generic and boilerplate warnings that any "defects or performance problems in our products ***could*** result in loss of customers" and the Company "***may*** face warranty, indemnity and product liability claims arising from defective products."

32.     On February 28, 2023, after the market closed, Shoals filed its Annual Report on Form 10-K for 2022 ("2022 10-K"). The 2022 10-K reported that "as of December 31, 2022 and 2021 our estimated accrued warranty reserve was $0.6 million and $0.1 million, respectively."

33.     With regard to product quality, the 2022 10-K assured investors that Shoals' "products meet our stringent quality requirements" and touted the Company's focus on "making quality foremost in all we do, make, and sell."

34.     On May 8, 2023, Shoals filed its Quarterly Report on Form 10-Q for the first quarter of 2023 (the "1Q23 10-Q"). The 1Q23 10-Q publicly disclosed for the first time that the "[C]ompany has been notified by certain customers that a subset of wire harnesses used in its EBOS solutions is presenting excessive pull back of wire insulation at connection points." However, Shoals downplayed the issue, stating that it was only "probable that the Company will incur costs related to the repair or replacement of the impacted wire harnesses," but that "it is not possible to reasonably estimate those costs."

35.     On August 1, 2023, Shoals filed its quarterly report for the second quarter of 2023, *i.e.*, the 2Q23 10-Q, and held a call with analysts to discuss the results. The 2Q23 10-Q disclosed

that Shoals had recorded a $9.4 million charge for warranty expense due to the previously disclosed wire issue. Despite the charge, the 2Q23 10-Q continued to describe quality control problems as a mere risk that ***could*** potentially materialize in the future, stating that "we ***may*** experience delays, disruptions or quality control problems in our manufacturing operations."

36.     The 2Q23 10-Q also repeated the generic and boilerplate warnings that:

> Any actual or perceived errors, defects or poor performance in our products ***could*** result in the replacement or recall of our products, shipment delays, rejection of our products, damage to our reputation, lost revenue, diversion of our engineering personnel from our product development efforts and increases in customer service and support costs, all of which could have a material adverse effect on our business, financial condition and results of operations. . . . defective components may give rise to warranty, indemnity or product liability claims against us.

37.     At the same time, the 2Q23 10-Q reassured investors that Shoals "conduct[s] quality assessments on [its] products and these products have stringent quality requirements."

38.     During the accompanying earnings call for the second quarter of 2023 held that same day, Oppenheimer analyst Colin Rusch asked Defendants to "talk a little bit about the wire issues . . . how extensive it was in terms of the number of customers and number of shipments and how much time it was spread over?" In response, Defendant Bardos stated, "[w]e've communicated pretty much everything we can," and "[t]he charge that we booked in the quarter we believe is adequate to do the remediation required, and that's why we booked it."

39.     The above statements identified in ¶¶ 29-38 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects to make the statements made, in light of the circumstances under which they were made, not false and misleading. Specifically, Defendants failed to disclose to investors that: (1) Shoals did not deliver EBOS products that met the highest levels of quality and reliability; (2) Shoals had received reports of exposed copper conduit in EBOS wire harnessess in a large number of solar

9

fields and was aware that a significant portion of its wire harnesses had defects; (3) Shoals would have to incur between $60 million to $185 million in costs to remediate the wire shrinkback issue; and (4) Shoals had understated its cost of revenue by millions of dollars. As a result, Defendants' positive statements about the Company's financial guidance, business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### The Truth Is Revealed

40.     The truth regarding Shoals' fraudulent conduct was revealed after the close of the markets on November 7, 2023. That day, Shoals filed its Quarterly Report on Form 10-Q for the third quarter of 2023 ("2Q23 10-Q") and held an accompanying earnings call in which Defendants revealed that the wire shrinkback issue was far more severe than previously disclosed. Specifically, the Company reported that the shrinkback issue affected 30% of Shoals' wire harnesses installed between 2020 and 2022, booked a $50.2 million warranty expense for the second quarter of 2023 related to the shrinkback issue, and provided a range of potential loss related to the shrinkback issue of $59.7 million and $184.9 million.

41.     Notably, documents from litigation Shoals brought against the supplier of the wire related to the defective wire harnesses show Shoals knew of significant issues with shrinkback by at least March 2022—more than one and a half years before it disclosed the huge liability it would entail to investors. As Shoals itself alleged in that action, in March 2022, the Company received information about exposed copper conduit on wire installed in Shoals EBOS components at a customer's solar field in Arizona. On March 24, 2022, Shoals representatives and others visited the solar field and inspected the defective wire harnesses. Thereafter, Shoals replaced those harnesses at its own expense. In addition, as Shoals admits, by "late 2022 . . . numerous other Shoals' customers began reporting similar instances of cooper conductor exposure."

10

42. Similarly, in the counterclaim filed by the wire supplier, the supplier stated that, in April 2022, Shoals conceded that the wires used in the harnesses were not in any way defective, but instead, that Shoals' installation or cable management issues had caused the shrinkback in the harnesses. Further, the counterclaim alleged that no other customer of the wire supplier had reported any issue with shrinkback.

43. Following the November 7, 2023 disclosures, the price of Shoals' stock dropped $3.28 per share, or more than 20%, to close at $12.95 per share on November 9, 2023, wiping out approximately $550 million in market capitalization.

44. Analysts were stunned by the disclosure and linked Shoals' sharp stock price decline directly to the revised warranty expense range. For example, on November 10, 2023, analysts at Barclays reported that "the upper end of the $60-$185mm *came as a surprise* to investors and has contributed to the underperformance of the stock." Similarly, analysts at Truist noted that third-quarter results "were heavily impacted by a ~$50mm warranty charge that drove unadjusted 3Q GMs well below our/street estimates."

## CLASS ACTION ALLEGATIONS

45. Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class, consisting of all persons and entities that purchased Shoals common stock between May 17, 2022 and November 7, 2023, inclusive, and were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

11

46.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.  Throughout the Class Period, common stock of Shoals actively traded on the Nasdaq (an open and efficient market) under the ticker symbol "SHLS."  Millions of Shoals shares were traded publicly during the Class Period on the Nasdaq.  As of February 26, 2024, Shoals had more than 170 million shares of Class A common stock outstanding.  Record owners and other members of the Class may be identified from records maintained by Shoals or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

47.     Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

48.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests that conflict with those of the Class.

49.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

        a.      whether Defendants violated the Exchange Act by the acts and omissions as alleged herein;

        b.      whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

12

c.      whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders during the Class Period misrepresented material facts about the business, operations, and prospects of Shoals;

d.      whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted to disclose material facts about the business, operations, and prospects of Shoals;

e.      whether the market price of Shoals common stock during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

f.      the extent to which the members of the Class have sustained damages and the proper measure of damages.

50.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this suit as a class action.

## UNDISCLOSED ADVERSE INFORMATION

51.     The market for Shoals common stock was an open, well-developed, and efficient market at all relevant times.  As a result of the materially false and/or misleading statements and/or omissions particularized in this Complaint, the Company's common stock traded at artificially inflated prices during the Class Period.  Plaintiff and the other members of the Class purchased the Company's common stock relying upon the integrity of the market price of the Company's common stock and market information relating to Shoals and have been damaged thereby.

13

52.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of the Company's common stock, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about the Company's business, operations, and prospects as alleged herein.  These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its business, thus causing the Company's common stock to be overvalued and artificially inflated or maintained at all relevant times.  Defendants' materially false and/or misleading statements during the Class Period directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class who purchased the Company's common stock at artificially inflated prices and were harmed when the truth was revealed.

## SCIENTER ALLEGATIONS

53.     As alleged herein, Defendants acted with scienter in that Defendants knew or were reckless as to whether the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew or were reckless as to whether such statements or documents would be issued or disseminated to the investing public, and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

54.     As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Shoals, their control over, receipt, and/or modification of the Company's allegedly materially misleading statements and omissions, and/or

14

their positions with the Company that made them privy to confidential information concerning

Shoals, participated in the fraudulent scheme alleged herein.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

55.     The federal statutory safe harbor provided for forward-looking statements under

certain circumstances does not apply to any of the allegedly false statements pleaded in this

Complaint.  The statements alleged to be false and misleading herein all relate to then-existing

facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be

characterized as forward-looking, they were not identified as "forward-looking statements" when

made, and there were no meaningful cautionary statements identifying important factors that could

cause actual results to differ materially from those in the purportedly forward-looking statements.

56.     In the alternative, to the extent that the statutory safe harbor is determined to apply

to any forward-looking statements pleaded herein, Defendants are liable for those false forward-

looking statements because at the time each of those forward-looking statements was made, the

speaker had actual knowledge that the forward-looking statement was materially false or

misleading, and/or the forward-looking statement was authorized or approved by an executive

officer of Shoals who knew that the statement was false when made.

## LOSS CAUSATION

57.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused

the economic loss, *i.e.*, damages, suffered by Plaintiff and the Class.

58.     During the Class Period, as detailed herein, Defendants made materially false and

misleading statements and omissions and engaged in a scheme to deceive the market.  This

artificially inflated the prices of the Company's common stock and operated as a fraud or deceit

on the Class.  When Defendants' prior misrepresentations, information alleged to have been

15

concealed, fraudulent conduct, and/or the effect thereof were disclosed to the market, the price of the Company's stock fell precipitously, as the prior artificial inflation came out of the price.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

59.     The market for Shoals common stock was open, well-developed, and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose particularized in this Complaint, Shoals common stock traded at artificially inflated and/or maintained prices during the Class Period.  Plaintiff and other members of the Class purchased the Company's common stock relying upon the integrity of the market price of Shoals common stock and market information relating to Shoals and have been damaged thereby.

60.     At all times relevant, the market for Shoals common stock was an efficient market for the following reasons, among others:

        a.      Shoals was listed and actively traded on Nasdaq, a highly efficient and automated market;

        b.      As a regulated issuer, Shoals filed periodic public reports with the SEC and/or Nasdaq;

        c.      Shoals regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

        d.      Shoals was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

16

61. As a result of the foregoing, the market for Shoals common stock promptly digested current information regarding Shoals from all publicly available sources and reflected such information in the Company's stock price. Under these circumstances, all purchasers of Shoals common stock during the Class Period suffered similar injury through their purchase of stock at artificially inflated prices, and a presumption of reliance applies.

62. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded in Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business, operations, and prospects—information that Defendants were obligated to disclose during the Class Period but did not—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## COUNTS AGAINST DEFENDANTS

### COUNT I

**For Violations of Section 10(b) of the Exchange Act and
Rule 10b-5 Promulgated Thereunder Against All Defendants**

63. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

64. During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain

17

the market price of Shoals common stock; and (iii) cause Plaintiff and other members of the Class to purchase Shoals common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

65.     Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of conduct that operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Shoals common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

66.     Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's business, operations, and prospects, as specified herein. Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of the Company's business, operations, and prospects, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Shoals and its business, operations, and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of conduct

18

of business that operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

67. Each of the Individual Defendants' primary liability and controlling-person liability, arises from the following facts: (i) each of the Individual Defendants was a high-level executive and/or director at the Company during the Class Period and a member of the Company's management team or had control thereof; (ii) each of the Individual Defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development, and reporting of the Company's business, operations, and prospects; (iii) each of the Individual Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to, other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (iv) each of the Individual Defendants was aware of the Company's dissemination of information to the investing public, which they knew and/or recklessly disregarded was materially false and misleading.

68. Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing the Company's operating condition, business practices, and prospects from the investing public and supporting the artificially inflated and/or maintained price of its common stock. As demonstrated by Defendants' overstatements and misstatements of the Company's business, operations, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were

19

reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

69.     As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Shoals common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants or upon the integrity of the market in which the shares and stock traded or trades, and/or in the absence of material adverse information that was known or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class purchased Shoals common stock during the Class Period at artificially inflated prices and were damaged thereby.

70.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity and believed them to be true.  Had Plaintiff, the other members of the Class, and the marketplace known of the truth regarding the problems that Shoals was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased Shoals common stock, or, if they had purchased such shares or stock during the Class Period, they would not have done so at the artificially inflated prices that they paid.

71.     By virtue of the foregoing, Shoals and the Individual Defendants each violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

72.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

**For Violations of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

73.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

74.     The Individual Defendants acted as controlling persons of Shoals within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions with the Company, participation in, and/or awareness of the Company's operations, and intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.  Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

75.     In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

76.     As set forth above, Shoals and the Individual Defendants each violated § 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their position as controlling persons, the Individual Defendants are liable pursuant to § 20(a) of the Exchange Act. As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and other

members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## PRAYER FOR RELIEF

77.     WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for relief and judgment as follows:

a)      Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b)      Awarding Plaintiff and the other members of the Class damages in an amount that may be proven at trial, together with interest thereon;

c)      Awarding Plaintiff and the members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

d)      Awarding such other relief as this Court deems appropriate.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: March 21, 2024                    Respectfully submitted,

**STRANCH, JENNINGS & GARVEY PLLC**

By: */s/ J. Gerard Stranch IV*
J. Gerard Stranch IV (BPR 23045)
The Freedom Center
223 Rosa L. Parks Avenue
Suite 200
Nashville, TN 37203
Tel.: (615) 254-8801
gstranch@stranchlaw.com

*Local Counsel for Plaintiff Westchester Putnam Counties Heavy & Highway Laborers Local 60*

22

*Benefits Fund*

**SAXENA WHITE P.A.**

Lester Hooker (*pro hac vice forthcoming*)
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Tel.: (561) 394-3399
Fax: (561) 394-3382
lhooker@saxenawhite.com

-and-

Rachel Avan (*pro hac vice forthcoming*)
Marco A. Dueñas (*pro hac vice forthcoming*)
10 Bank Street, Suite 882
White Plains, NY 10606
Tel.: (914) 437-8551
Fax: (888) 216-2220
ravan@saxenawhite.com
mduenas@saxenawhite.com

*Counsel for Plaintiff Westchester Putnam Counties*
*Heavy & Highway Laborers Local 60 Benefits Fund*

23