# EXHIBIT F

Case 3:24-cv-00334     Document 31-6     Filed 06/04/24     Page 1 of 420 PageID #: 505

| | |
|---|---|
| In re SHOALS TECHNOLOGIES GROUP, INC. SECURITIES LITIGATION | Case No. 3:24-cv-00334-AAT <br><br> <u>CLASS ACTION</u> |
| This Document Relates To: All Actions | |

## <u>DECLARATION OF PROFESSOR CHRIS THOMALE</u>

I, Chris Thomale, hereby declare as follows:

## I. PROFESSIONAL BACKGROUND AND QUALIFICATIONS

1. I am a full professor in the Department of International Company and Business Law at the University of Vienna. I also hold a tenured professorship for Comparative Law at the University Roma Tre in Rome, Italy. Previously, I was a professor for Private and International Business Law at the University of Bremen, Germany. I have also held academic posts at the University of Heidelberg and at the University of Freiburg. The details of my education, work experience, research, and publications are summarized in my curriculum vitae attached hereto as Appendix A of this Report. They are also publicly available online at: https://c3fl.univie.ac.at/fileadmin/user_upload/p_c3fl/Thomale_CV_english_2024.pdf.

2. I am fluent in English and German, in addition to French, Spanish and Italian.

3. My scholarship focuses on business law, private international law and comparative law, on which I have published four monographs and more than 100 articles, mostly in editor- or peer-reviewed journals. I frequently appear before courts as an expert witness on German, private international and other European civil laws. I am also hired on a regular basis as an academic consultant by several of the few German advocates admitted to the German Federal Court for civil matters.

4. In 2012, I received a PhD in law from the Free University of Berlin and graduated *summa cum laude*. Two years later, I received an LL.M. degree from Yale Law School, graduating first of my class. I am a holder of the Diploma of the Hague Academy of International Law in private international law with honours, which, to my knowledge, has only been awarded seven times since the establishment of the Hague Academy in 1928.

1

5. I have received several awards and recognitions relating to my work in international law, including the Otto Schmidt Award for the Internationalisation and Europeanisation of the Law at the Frankfurt Book Fair in 2015.

6. I have published, lectured and shared expertise extensively on Austrian and German law, notably on capital markets law, investment law and the law of torts connected with both. On the tort of securities fraud, I have published the leading comparative monograph in the German language: See *Thomale*, Der gespaltene Emittent*, Mohr Siebeck Publishers, Tübingen 2018.

7. A list of cases in which I have testified at deposition, trial or in written reports during at least the past five years is attached as Appendix B of this Report.

8. I am receiving compensation for my work in this case. My compensation is not dependent on the outcome of this matter and is without regard to the substance of my opinion.

## II. SCOPE OF THIS DECLARATION

9. I have been asked by Saxena White P.A., counsel for the Oklahoma Police Pension and Retirement System ("Oklahoma Police"), to opine on whether Erste Asset Management GmbH ("Erste AM") has authority under Austrian law to assert securities claims that have been asserted in the following three securities actions (the "Actions") against Shoals Technologies Group, Inc. and certain of officers, directors, and underwriters that have been consolidated and are pending in the U.S. District Court for the Middle District of Tennessee:

    a. *Westchester Putnam Cntys. Heavy & Highway Laborers Local 60 Benefits Fund v. Shoals Techs. Grp., Inc.*, No. 3:24-cv-00334 (M.D. Tenn.);

    b. *Okla. Police Pension & Ret. Sys. v. Shoals Techs. Grp., Inc.*, No. 3:24-cv-00580 (M.D. Tenn.); and

    c. *Kissimmee Utility Auth. Emps. Ret. Plan v. Shoals Techs. Grp., Inc.*, No. 3:24-cv-00598 (M.D. Tenn.).

10. The Actions allege violations of Sections 11, 12(a)(2), 15 of the Securities Act of 1933 (the "Securities Act") and of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder. Erste AM avails itself of the right to sue and litigate claims based on these alleged violations on behalf of a series of funds and the funds' unit holders: Erste Responsible Stock America, Erste Responsible Stock Global, Erste WWF Stock Environment, Erste Green Invest and Erste Green Invest Mix ("Funds"). Based on this assertion, Erste AM submits that it is the appropriate party to litigate the Actions on behalf of the Funds while also being an adequate representative and lead plaintiff of the entire class of plaintiffs in the Actions. I have been asked to assess if Erste AM under Austrian law has the right to sue and litigate the Actions on behalf of the Funds. I have also been asked to review the Declaration of *Dr. Leopold Specht* dated May 21, 2024 ("Specht Declaration," attached as Exhibit F to the Wood Declaration in Support of Erste AM's Motion, *Westchester Putnam Cntys. Heavy & Highway Laborers Local 60 Benefits Fund v. Shoals Techs. Grp., Inc.*, No. 3:24-cv-00334 (M.D. Tenn.), ECF No. 23-6), and evaluate *Dr. Specht's* opinions regarding applicable Austrian law.

11. Erste AM claims that under Austrian law it has the statutory authority and legal capacity to pursue the Actions on behalf of the Funds and their unit holders. *Dr. Specht* has put forward a declaration supporting that view.

## III. MATERIAL CONSIDERED

12. In forming my opinions, I have reviewed the relevant Austrian statutes and related academic literature and relied on my own experience. I also requested, reviewed, and considered additional materials, information, and documents in order to form the opinions I express in this declaration. A list of the materials I considered in forming my opinions as far as not cited in this report is attached hereto as Appendix C.

3

## IV.  SUMMARY OF OPINIONS

13.     Based on my academic training, review of Austrian statutes and academic literature and other materials identified in the Appendix C, I conclude that, under Austrian law, Erste AM has no statutory authority or legal capacity to pursue the Actions on behalf of the Funds and their individual unit holders. I also conclude that *Dr. Specht's* opinions to the contrary, if not erroneous, are inconclusive and that the argument in his report is unconvincing. At a minimum, the contention made by *Dr. Specht* is unsettled as a matter of Austrian law. I reach these conclusions for substantially the following reasons:

a.      Under Austrian law, an investment fund, like the Funds under consideration, is not a legal entity with its own interests. The assets in the fund are, instead, jointly owned by the fund's investors, known as "unit holders", and are managed by a fund manager (here, Erste AM).

b.      Under the Austrian Civil Code ("ABGB"), co-owners of assets have the individual right to pursue tort claims for money damages in their own names for their respective shares of damages to co-owned assets. While this right can be assigned, I have seen no evidence of such an assignment in the particular case, and *Dr. Specht* identifies no such evidence.

c.      In concluding that Erste AM nevertheless has standing to bring the claims it asserts in the Actions, and indeed, that it has sole standing to assert those claims to the exclusion of any right on the part of the Funds' unit holders to do so, *Dr. Specht* relies on his own personal interpretation of the language of Section 52 of the Austrian Investment Fund Act ("*InvFG 2011*"). *Dr. Specht* does not cite a single court decision and only sparse, partly outdated and only general scholarship, which does not even address the concrete issue

4

at hand. I am not aware of any case law or authoritative academic writing supporting his contention.

d. *Dr. Specht's* interpretation of Section 52 is flawed in several respects:

*First*, the relevant language of Section 52 of *InvFG 2011* authorizes fund managers, such as Erste AM, "to exercise the rights to the assets." As I discuss below, the statutory language "rights to the assets" by its terms pertains to rights that are tied to current ownership of the assets (such as the right to receive dividends). It does not apply to tort claims, such as those asserted in the Actions here, that are not tied to continuing ownership of the fund assets.

*Second*, *Dr. Specht's* interpretation of Section 52 is inconsistent with the purpose of Section 52. Section 52 is designed to assure the efficient management of fund assets by professional managers. Pursuit of liability claims in tort does not fall within the core area of portfolio management or the core competence of fund management companies.

*Third*, *Dr. Specht's* interpretation would divest individual unit holders of the right to pursue claims, such as those asserted in the Actions here, which violates a fundamental Austrian legal principle that tort victims should not be precluded from asserting claims on their own behalf. Austrian law is restrictive in allowing one party to sue in that party's own name on behalf of another party. I am aware of no provision in Austrian business law in which actual victims of a tort are precluded as a matter of law from litigating their own claims.

*Fourth*, *Dr. Specht's* position would have the economically irrational result that former unit holders who held fund units at the time of the alleged securities violations, and who accordingly suffered losses as a result of such violations, cannot be compensated through an action asserting claims for such securities violations, while current unit holders, who may not have been unit holders at the time the claim arose and thus would have suffered no damages, could receive a windfall recovery.

e. Accordingly, based on standard Austrian legal methodology of statutory interpretation, I conclude that Erste AM does not have standing under Section 52 of *InvFG 2011* to litigate in its own name the claims asserted in the Actions on behalf of the unit holders of the funds it manages.

f. At a minimum, in light of the absence of controlling case law or authoritative academic writing on the issue, I conclude that Erste AM's standing in the Actions is an unsettled issue under Austrian law.

14. I address these issues further below at recital 54 seqq.

15. My work on this matter is continuing, and I reserve the right to expand my analysis or revise my conclusions based upon additional information that may become available to me.

## V. OVERVIEW OF ARGUMENT

16. The remainder of my opinion is organized as follows: I start with listing the specific Austrian funds that are relevant to this litigation before the US District Court (VI.). I will then move on to describe the general structure of Austrian investment law (VII.) as well as identifying the pending cause of action as being, both from an US and from an Austrian perspective, one in tort (VIII.). This sets the stage for an in-depth analysis of Section 52 *InvFG 2011*, which is the central, albeit not the only, source of law upon which this opinion is based. I will show that, under

this provision, Erste AM has no right to represent the Funds' unit holders for claims based on the violations of U.S. securities laws allegedly committed by Shoals Technologies Group, Inc. and other named defendants. Instead, the unit holders, by default, are entitled to pursue their supposed tort claims individually and personally (IX.). As a matter both of purposive statutory construction and economic logic, this is also the only economically viable solution, as I will move on to show (X.). At the end of my opinion, I provide some final conclusions (XI.).

## VI.     OVERVIEW OF THE RELEVANT ERSTE FUNDS

17.     Erste AM has identified five funds that held Shoals common stock during the class period: Erste Responsible Stock America, Erste Responsible Stock Global, Erste WWF Stock Environment, Erste Green Invest, and Erste Green Invest Mix.

18.     Erste AM is the management company of the Funds. Erste AM has delegated compliance, internal audit, and regulatory reporting of the Funds to Erste Group Bank AG. As depositary bank for the Funds, Erste Group Bank AG's tasks include holding the assets of the Funds that are eligible to be held in custody and managing the monetary and securities accounts of the Funds.

19.     Erste Responsible Stock America is a sustainability equity ordinary fund that primarily invests in shares of selected companies based or listed on a stock exchange in North America.

20.     Erste Responsible Stock Global is a sustainable equity ordinary fund that primarily invests worldwide in shares of selected companies in the developed markets.

21.     Erste WWF Stock Environment is an ordinary fund that invests worldwide primarily in companies in the field of environmental technology.

22.     Erste Green Invest is an ordinary fund that invests worldwide primarily in companies in the field of environmental technology.

7

23. Erste Green Invest Mix is an ordinary fund that invests in stocks, focusing on companies that contribute positively to ecological trends, and bonds that finance sustainable projects.

## VII. GENERAL AUSTRIAN LEGAL FRAMEWORK

24. In this section, I provide a high-level overview of the *InvFG 2011* and related European Union Directives. I further address the management and legal nature of investment funds under *InvFG 2011*. This section lays out the background to my analysis set forth in subsequent sections of this declaration.

### <u>Applicable Law</u>

25. Austrian investment funds are regulated by the *InvFG 2011*. According to its Section 1, the *InvFG 2011* regulates the requirements for the establishment, management and marketing of undertakings for collective investment in transferable securities ("*UCITS*" or "ordinary funds") as well as other Austrian alternative investment funds such as special funds.[1] Thus, funds subdivide into ordinary funds defined as *UCITS* and Austrian alternative investment funds like special funds.[2] Whether a fund is an ordinary or a special fund must be set forth in the regulations of the particular fund. Upon the consent of all unit holders, an ordinary fund is transferrable into a special fund so long as the statutory requirements for a special fund are satisfied.[3]

---

[1]   *Leixner* in Bollenberger/Kellner (eds.), InvFG (2016) s. 1 recitals 1 et seq., 4.

[2]   *Leixner* in Bollenberger/Kellner (eds.), InvFG (2016) s. 1 recitals 1 et seq.; see further s. 3 para. 2 lit. 19 *InvFG 2011*: „19. funds: UCITS in the form of a portfolio of assets in accordance with Section 2 (2) and alternative investment funds (AIF) in accordance with Section 3 (2) no. 31;".

[3]   See further s. 64 *InvFG 2011*: "The conversion of a UCITS whose fund rules have been approved in accordance with Section 50 into a special fund (Section 163) shall only be permissible, subject to an application pursuant to Section 29 of the Alternative Investment Fund Managers Act being filed at the Financial Market Authority ("FMA") at the same time, if there is evidence that all unit holders agree, the UCITS has not been notified for marketing in another Member State in accordance with Section 139 and the requirements of Section 163 regarding the minimum amount invested have been met, the UCITS is not marketed in another Member State and all unit holders have received prior information from the management company on all legal consequences resulting from the conversion in respect of the unit holders. The unit holders shall be informed in accordance with Section 133. In the event of delegations referred to in Section 28 that have already been notified, the management company

8

26.     Ordinary funds have an unlimited number of unit holders who may buy into the fund or sell their units at any time.[4] By contrast, special funds may not have more than ten unit holders, who must be individually known to the management company and may be subject to a minimum investment amount.[5]

27.     A large part of the *InvFG 2011* addressing ordinary funds equally applies to special funds.[6] The management companies of special funds are, however, regulated by special statutory law, notably by the "Alternative Investmentfonds Manager-Gesetz"[7] ("*AIFMG*" = Federal Act on Alternative Investment Managers),[8] implementing EU Directive 2011/61/EU[9] regulating alternative investment fund managers.

---

shall notify the FMA without delay on whether such delegations continue to remain in place. If, at the same time, management is transferred to another management company, that management company shall notify the FMA."

[4]  S. 2 para 1 lit. 2 InvFG: "(2) In Austria, a UCITS may be established only as a portfolio of assets according to Section 46, which is divided into equal units evidenced by securities and co-owned by the unit holders. If this Federal Act stipulates obligations of a UCITS, any obligation to act arising therefrom shall relate to the management company managing the UCITS." and s. 55 para. 2 InvFG 2011: "(2) At the request of a unit holder, however, his or her unit shall be redeemed out of the UCITS against surrender of the unit certificate, the coupons and the renewal certificate. The conditions of redemption shall be laid down in the fund rules (Section 53). The unit holders' co-ownership of the assets of the UCITS may be cancelled only in accordance with Section 63."; see additional the explanatory comments of the historic legislator to BGBl 1963/192, 171BlgNr X. GP 9 and to BGBl 2011/77, BlgNr 1254 XXIV. GP pp. 7 et seqq.

[5]  S. 163 para. 1 InvFG 2011 (special funds): "(1) A special fund is a portfolio of assets consisting of liquid financial assets as defined in Section 67 (1) that is divided into equal units evidenced by securities and co-owned by unit holders and that is established pursuant to the provisions laid down in this Federal Act; according to the fund rules, the unit certificates of a special fund must not be held by more than ten unit holders each, who must be identified to the management company."

[6]  S. 164 para. 3 *InvFG 2011* (special funds).

[7]  BGBl I 2013/135.

[8]  *Leixner* in Bollenberger/Kellner (eds.), InvFG (2016) s. 1 recital 2.

[9]  Directive 2011/61/EU of the European Parliament and of the Council of 8 June 2011 on Alternative Investment Fund Managers and amending Directives 2003/41/EC and 2009/65/EC and Regulations (EC) No 1060/2009 and (EU) No 1095/2010, L 174/1.

28.     Although there are differences between the rules and policies applicable to ordinary and special funds, for purposes of the principal issues addressed in my report, the applicable Austrian law for both types of funds is the same.[10]

29.     The *InvFG 2011* implements directive 2009/65/EC[11] by the European Union. The *AIFMG* implements Directive 2011/61/EU by the European Union.[12] According to Art 288 of the Treaty on the Functioning of the European Union ("TFEU"), directives are binding upon Member States as to the result to be achieved but not as to the form and method of implementation. Any national law implementing a directive has to be interpreted in conformity with the respective directive.[13] It follows that the *InvFG 2011* has to be interpreted in line with the purpose and wording of Directive 2009/65/EC[14] insofar as it implements this very directive. Similarly, the AIFMG has to be interpreted in line with Directive 2011/61/EU.[15]

<u>**Rules Governing the Management of Investment Funds Under *InvFG 2011***</u>

30.     In this section, I explain how the *InvFG 2011* informs the manner in which investment funds are managed under Austrian law.

---

[10]    I mainly elaborate on s. 52 of *InvFG 2011*. 164 para. 3 lit. 1-2 of *InvFG 2011* regulating special funds refers to this provision: „ (3) The provisions of (1) Sections 46 (1) to (4), 47 to 48, 52, 53 (1) and (3), 54, 55, 63 and 85 to 92 shall be applied; and (2) Sections 49, 136 and 137 shall be applied subject to the proviso that the fund rules may be ommitted in the anual report […]".

[11]    Directive 2009/65/EC of the European Parliament and of the Council of 13 July 2009 on the coordination of laws, regulations and administrative provisions relating to undertakings for collective investment in transferable securities (UCITS), L 302/32.

[12]    See footnote 21.

[13]    EuGH 10.04.1984, C-14/83, *Von Colson and Kamann v Land Nordrhein-Westfalen* [1984] ECR 1891, para. 26, 28: „ […] It follows that, in applying the national law and in particular the provisions of a national law specifically introduced in order to implement Directive No 76/207, national courts are required to interpret their national law in the light of the wording and the purpose of the directive in order to achieve the result referred to in the third paragraph of Article 189 [now Art 288]".

[14]    See footnote 1111.

[15]    See footnote 99.

31. Funds are managed by the management company, the governance of which is based on the fund regulations as well as on statutory law.[16] The regular business of a management company is the management of the fund.[17] This activity is also called portfolio management as further described by Annex II of Directive EC/65/2009[18] as well as Annex I of Directive 2011/61/EU[19].

32. According to Section 5 para. 2 of *InvFG 2011*, a management company may only perform the following activities:[20]

    a. It may manage a fund in the context of portfolio management, which includes the activities of investment management, administration and

---

[16]   S. 5 *InvFG 2011* (ordinary fund): "Section 5. (1) Performing the activities of a management company with its registered office in Austria shall require a licence by the FMA in accordance with Section 1 (1) no. 13 of the Banking Act in connection with Section 6 (2) of this Federal Act. A management company shall not perform any activities other than the activities referred to in subsection (2) and transactions required for the investment of its own assets, as well as activities that are directly related to the licence requirement. (2) A management company may perform the following activities: *1.* the management of UCITS in the context of collective portfolio management, which includes the following activities: a) investment management; b) administration: aa) legal and fund management accounting services, bb) customer inquiries, cc) valuation and pricing (including tax returns), dd) regulatory compliance monitoring, ee) maintenance of the unit holder register, ff) distribution of income, gg) unit issues and repurchases, hh) contract settlements (including certificate dispatch), ii) record keeping; c) marketing; *2.* in addition to the management of UCITS in accordance with no. 1, the management of AIF in accordance with the Alternative Investment Fund Managers Act if the management company was granted a licence under the Alternative Investment Fund Managers Act in that respect; *3.* in addition to the management of UCITS in accordance with no. 1 the management of portfolios of investments, including those owned by pension funds, in accordance with mandates given by investors on a discretionary, client-by-client basis, where such portfolios include one or more of the instruments listed in Annex I Section C to Directive 2004/39/EC (Section 3 (2) no. 2 of the Securities Supervision Act 2018); *4.* the following non-core activities: a) investment advice concerning one or more of the instruments listed in Annex I Section C to Directive 2004/39/EC; b) safe custody and administration in relation to units of UCITS. (…)" emphasis added by the authors of this declaration; s 164 para 1 *InvFG 2011* (special funds); See the explanatory comments of the historic legislator to BGBl 1963/192, 171 BlgNr X. GP 7.

[17]   S. 3 para 2 lit. 1 *InvFG 2011* as well as Art. 2 1. (b) of Directive 2009/65/EC and s. 2 para 1 lit. 2 AIFMG and Art 4 1. (b) of Directive 2011/61/EU; *Buchbauer* in Macher/Buchberger/Kalss/Oppitz (eds.) Kommentar zum Investmentfondsgesetz, 2nd ed. (2013) s. 2 recital 16.

[18]  See footnote 1111.

[19]  See footnote 99.

[20] See further *Oppitz* in Macher/Buchberger/Kalss/Oppitz (eds.) Kommentar zum Investmentfondsgesetz, 2nd ed. (2013) s. 2 recital 14.

11

marketing.[21] Administration comprises legal and fund management accounting services, customer inquiries, valuation and pricing, regulatory compliance monitoring, maintenance of unit holder register, distribution of income, unit issues and redemptions, contract settlements and record keeping.[22]

      b.    Management companies may perform certain non-core activities[23] including giving investment advice or providing safe custody and administration for units of UCITS.[24]

33.    The management of *UCITS* does not per se exclude a management company from managing an alternative investment fund, if the management company has the authority to do so.[25]

34.    The statute does not identify pursuit of litigation on behalf of the fund or the unit holders as part of the activities a management company may pursue.[26]

35.    The power of the management company to represent the unit holders is regulated by Section 52 of *InvFG 2011*. According to its wording, only the management company is entitled to dispose of the assets of a fund it manages and to exercise the rights to the assets. In doing so, it acts in its own name, but on behalf of the unit holders, co-owning the fund assets. This provision by its terms covers ordinary funds. However, by reference in Section 164 para. 3 lit. 1, it also applies to

---

[21] See *Oppitz* in Macher/Buchberger/Kalss/Oppitz (eds.) Kommentar zum Investmentfondsgesetz, 2nd ed. (2013) s. 5 recitals 19 et seqq.

[22] See further s. 5 para. 1. lit. 1 *InvFG 2011*.

[23] See further s. 5 para. 1. lit. 4 *InvFG 2011*.

[24] See further *Oppitz* in Macher/Buchberger/Kalss/Oppitz (eds.) Kommentar zum Investmentfondsgesetz, 2nd ed. (2013) s. 5 recitals 17 et seqq., 28 et seqq.

[25] See further s. 5 para. 1. lit. 2, 3 *InvFG 2011*, fn. 16; see further *Oppitz* in Macher/Buchberger/Kalss/Oppitz (eds.) Kommentar zum Investmentfondsgesetz, 2nd ed. (2013) s. 5 recitals 26 et seqq.

[26] See s. 5 *InvFG 2011*.

special funds.[27]  I address Section 52 of *InvFG 2011* in further detail in recitals 59 seqq. of this declaration.

<div align="center">**Legal Nature of Investment Funds Under *InvFG 2011***</div>

36.    In this section, I explain the legal status of investment funds under the *InvFG 2011*. I then explain how unit holders of the funds are the true owners of the fund assets. I additionally show that partnership law is not applicable to investment funds.

37.    It is undisputed—neither in general nor, specifically, by *Dr. Specht* in his opinion, who, to the contrary, expressly concedes this at Specht Declaration, Recital 5—that investment funds based on Austrian law have no legal personality.[28] According to Section 2 para. 2[29] and Section 46 para. 1[30] of the *InvFG 2011*, an Austrian ordinary fund is only a portfolio of assets, which is divided into equal units evidenced by securities and co-owned by the unit holders.[31]

---

[27]    See further *Buchbauer* in Macher/Buchberger/Kalss/Oppitz (eds.) Kommentar zum Investmentfondsgesetz, 2nd ed. (2013) s. 52 recital 10.

[28]    S. 46 *InvFG 2011*; see further *Leixner* in Bollenberger/Kellner (eds.), InvFG (2016) s. 2 recitals 15, 18; *Schredl* in Macher/Buchberger/Kalss/Oppitz (eds.) Kommentar zum Investmentfondsgesetz, 2nd ed. (2013) s. 2 recital 31.

[29]    See the english translation of s 2 para. 2 *InvFG 2011*: "(2) In Austria, a UCITS may be established only as a portfolio of assets according to Section 46, which is divided into equal units evidenced by securities and co-owned by the unit holders. If this Federal Act stipulates obligations of a UCITS, any obligation to act arising therefrom shall relate to the management company managing the UCITS".

[30]    See s 46 para. 1 InvFG: "(1) A UCITS in the form of a portfolio of assets in accordance with Section 2 (2) has no legal personality of its own; the portfolio of assets is divided into equal units evidenced by securities (unit certificates). The unit certificates are financial instruments (Section 1 no. 7 (c) of the Securities Supervision Act 2018); they evidence co-ownership of the assets of the UCITS and the rights of the unit holders in relation to the management company and the custodian bank. The unit certificates may be in bearer form or in registered form. Unit certificates in bearer form shall be placed in safe custody in a securities account, with delivery to the unit holders not being permissible. Registered certificates shall be subject, mutatis mutandis, to Sections 61 (2) to (5), 62 and 63 of the Stock Corporation Act (Federal Law Gazette No. 98/1965)".

[31]    See the explanatory comments of the historic legislator to BGBl 2011/77, BlgNr 1254XXIV. GP p. 8.

<div align="center">13</div>

Section 163 para. 1[32] of *InvFG 2011* holds the same for special funds.[33]  Thus, Austrian funds are not considered independent legal entities, but are mere legal objects, in the form of an aggregate portfolio of assets, the shares or units of which can be securitized.[34]

38.     The deliberate choice of Austrian regulators to institute a co-ownership structure for funds, instead of granting funds legal personality, coincides with Austrian investment law choosing the co-ownership model ("Miteigentumsmodell") over the trust model ("Treuhandmodell").[35] Austrian investment law does not recognize the management company as a fully fledged trustee endowed with a legal title to the trust or fund assets. Instead, both legal and equitable title—for lack of any other interposed legal subject, the funds themselves being construed as legal objects— rests with the unit holders. Management companies only act as mandatees, enabled by statutory authority.

---

[32]    See s. 163 para. 1 *InvFG 2011*: "(1) A special fund is a portfolio of assets consisting of liquid financial assets as defined in Section 67 (1) that is divided into equal units evidenced by securities and jointly owned by unit holders and that is established pursuant to the provisions laid down in this Federal Act; according to the fund rules, the unit certificates of a special fund must not be held by more than ten unit holders each, who must be identified to the management Company".

[33]    See *Schredl* in Macher/Buchberger/Kalss/Oppitz (eds.) Kommentar zum Investmentfondsgesetz, 2nd ed. (2013) s. 2 recital 30.

[34]    See the explanatory comments of the historic legislator to BGBl 1963/192, 171 BlgNr X. GP 7.

[35] Cf. *Jan-Michael Klett*, Die Prozessführungsbefugnis von Kapitalverwaltungsgesellschaften unter deutschem und US-amerikanischem Recht, Zeitschrift für Wirtschafts- und Bankrecht (WM), 2018, p. 892 on German investment law, in which both models are recognized, while Austrian investment law only recognizes the co-ownership model.

14

39. Investors in the funds are co-owners of the fund assets. Under Section 2 para. 2[36], Section 46 para. 1[37] and Section 163 para. 1[38] of the *InvFG 2011*, the fund assets are co-owned by the unit holders. The fund assets thus form the object of a co-ownership of unit holders. This characterization is also reflected in the explanatory notes given by the Austrian legislator.[39]

40. Unit certificates evidence the co-ownership of the assets of the fund and comprise the rights of the unit holders with respect to the management company and the custodian bank. Academic literature describes the legal rights of unit holders of an Austrian investment fund as being very strong when compared to the rights of investors in stock companies or real estate funds because, in contrast to those entities, investment funds have no legal personality and unit holders of such funds are the direct owners of the fund's assets.[40]

41. The strong legal position of unit holders of ordinary and special investment funds under *InvFG 2011* is highlighted by comparison with unit holders of real estate investment funds governed by the *Immobilien-Investmentfondsgesetz* ("*ImmInvFG*"), i.e. the Austrian Federal Act

---

[36] See the english translation of s. 2 para. 2 *InvFG 2011*: "(2) In Austria, a UCITS may be established only as a portfolio of assets according to Section 46, which is divided into equal units evidenced by securities and co-owned by the unit holders. If this Federal Act stipulates obligations of a UCITS, any obligation to act arising therefrom shall relate to the management company managing the UCITS".

[37] See the english translation of s. 2 para. 2 *InvFG 2011*: "(2) In Austria, a UCITS may be established only as a portfolio of assets according to Section 46, which is divided into equal units evidenced by securities and co-owned by the unit holders. If this Federal Act stipulates obligations of a UCITS, any obligation to act arising therefrom shall relate to the management company managing the UCITS".

[38] See s. 163 para. 1 *InvFG 2011*: "(1) A special fund is a portfolio of assets consisting of liquid financial assets as defined in Section 67 (1) that is divided into equal units evidenced by securities and jointly owned by unit holders and that is established pursuant to the provisions laid down in this Federal Act; according to the fund rules, the unit certificates of a special fund must not be held by more than ten unit holders each, who must be identified to the management Company".

[39] See the explanatory comments of the historic legislator to BGBl 2011/77, BlgNr 1254XXIV. GP p. 8.

[40] See *Leixner* in Bollenberger/Kellner (eds.), InvFG (2016) s. 2 recital 17; *Schredl* in Macher/Buchberger/Kalss/Oppitz (eds.) Kommentar zum Investmentfondsgesetz, 2nd ed. (2013) s. 2 recital 34: „Im Konfliktfall hat der Investor durch die im InvFG verankerte Miteigentumslösung eine bessere Rechtsstellung gegenüber der Verwaltungsgesellschaft, der Verwahrstelle, der anteilsverwahrenden Stelle und allfälligen Dritten", translated as „In case of conflict, the investor has a better legal position versus the management company, the custodian bank and the depository of the units as well ay as any third parties due to the co-ownership approach of the InvFG."

15

on Real Estate Investment Funds.[41] According to Section 1 para. 2 *ImmInvFG*[42], the fund assets of a real estate fund are owned by the management company, acting in the capacity of a trustee to the unit holders. Thus, *here*, contrary to ordinary and special investment funds, the units of a real estate investment fund do not reflect the unit holders' ownership of the fund assets.[43]

42. Since the assets of ordinary and special funds are co-owned by the unit holders, an investment fund is covered by the general rules on co-ownership under Sections 833 seqq. of Austrian Civil Code ("ABGB"), to the extent that the *InvFG 2011* does not provide more specific or more recent rules amending and supplementing the general rules on co-ownership.[44] This conclusion is underpinned by Section 55 para. 2[45] of *InvFG 2011*, which precludes the unit holders from dissolving an investment fund unless the fund is wound up, a right they would otherwise have

---

[41] Explainatory notice of the Austrian legislator with respect to s. 6 of ImmInvFG: ErläutRV zu BGBl I 2003/80, 97 BlgNr XXII. GP 5: "Die Anteilscheine verbriefen allerdings im Gegensatz zu § 5 InvFG nicht Miteigentumsanteile, sondern eine schuldrechtliche Teilhabe an den Vermögenswerten des im Treuhandeigentum der Kapitalanlagegesellschaft für Immobilien stehenden Immobilienfonds." translated as: „Contrary to s. 5 *InvFG 2011* the units (of a real estate fund) do not securitize the co-ownership in the fund assets but an obligatory interest in the fund assets held by the management company as trustee."

[42] S. 1 para. 2 *ImmInvFG*: "(2) The fund assets of a real estate fund are owned by the real estate investment management company which in a fiduciary capacity holds and manages these for the unit holders.".

[43] S. 6 para. 1 *ImmInvFG*: (1) The unit certificates are securities; they evidence the rights of the unit holders in relation to the real estate investment management company and the custodian bank which result from the investment and from the management of the money invested by the unit holder with the real estate investment management Company and from the provisions of this federal act and from the fund rules. They document a contractual participating interest in the assets of the real estate fund held as trust property by the real estate investment management company. The unit certificates may be in bearer or registered form. If they are registered certificates, they shall be subject, mutatis mutandis, to the provisions of § 61 to § 63 of the Stock Corporation Act.".

[44] Methodologically see *F. Bydlinski*, Juristische Methodenlehre und Rechtsbegriff, 2nd ed (1991) pp. 465, 572 et seq.

[45] See s. 55 para. 2 *InvFG 2011*: "(2) At the request of a unit holder, however, his or her unit shall be redeemed out of the UCITS against surrender of the unit certificate, the coupons and the renewal certificate. The conditions of redemption shall be laid down in the fund rules (Section 53). The unit holders' co-ownership of the assets of the UCITS may be cancelled only in accordance with Section 63".

16

Case 3:24-cv-00334 Document 31-6 Filed 06/04/24 Page 18 of 420 PageID #: 522

under the general rules covering co-ownership.[46] This shows that, by default, investment funds are considered to fall into the category of co-ownership.

43.     Under Austrian Law, investment funds do not qualify as partnerships, but rather only and exclusively as co-owned assets.

44.     Austrian partnerships, according to Sections 1175 et seqq. of *ABGB,* are established by the conclusion of a partnership agreement with the intent to pursue a common purpose.[47] They lack legal personality,[48] but are subject to a special set of statutory default rules. Partnership agreements may be concluded explicitly, informally, or impliedly. According to Section 863 of *ABGB*, the requirements of an implied agreement of partnership are, however, very strict: There must not remain any reasonable doubt that the alleged partners intended to conclude a partnership agreement with a certain content.[49] Furthermore, according to Section 826 *ABGB*, co-owners intending to establish a partnership would have to do so explicitly.[50]

45.     Unit holders in investment funds like the Funds do not per se form a partnership under Sections 1175 seqq. of *ABGB* for the mere management of their co-owned assets unless they explicitly enter into a partnership agreement.[51]

46.     The structure of an investment fund also differs fundamentally from that of a partnership.  In contrast to a partnership, the unit holders of an investment fund do not engage with

---

[46]   See the explanatory comments of the historic legislator to BGBl 2011/77, BlgNr 1254 XXIV. GP pp. 36 et seqq.; see further *Oppitz* in Apathy/Iro/Koziol, Bankvertragrecht VI, 2nd ed. (2007) recitals 3/115; *Kalss*, Anlegerinteressen (2001) p. 426.

[47]   OGH 17.07.2018, 10 Ob 53/18v. See further *Artmann* in Fenyves/Kerschner/Vonkilch, ABGB, 3rd ed. (2016) s. 1175 recital 30; *Rauter* in Rummel/Lukas, ABGB, 4th ed. (2019) § 1175 recitals 22-27; see further *Told*, Hauptfragen einer Reform der Gesellschaft bürgerlichen Rechts (2011) pp. 9 et seqq..

[48]   See further *Artmann* in Fenyves/Kerschner/Vonkilch, ABGB, 3rd eds (2016) s. 1175 recital 15; *Told*, Hauptfragen einer Reform der Gesellschaft bürgerlichen Rechts (2011) pp. 12.

[49]   OGH 17.07.2018, 10 Ob 53/18v; *Told*, Hauptfragen einer Reform der Gesellschaft bürgerlichen Rechts (2011) pp. 10 et seqq..

[50]   See further *Artmann* in Fenyves/Kerschner/Vonkilch, ABGB, 3rd ed. (2016) s. 1175 recital 34.

[51]   See *Artmann* in Fenyves/Kerschner/Vonkilch, ABGB, 3rd ed. (2016) s. 1175 recitals 33, 34.

17

each other in any substantial way. Instead, while unit holders in an investment fund directly own the fund assets, the management of the assets is delegated to a management company. In order to rebut this presumption, there needs to be clear language to the contrary, for which I have no indication. Thus, the minimum requirements of an explicit conclusion of a partnership agreement are not met.

47.     Furthermore, the statutory default rules on partnerships do not fit investment funds on a general level:

   a.     Unit holders of ordinary investment funds, e.g., may disinvest at any time[52], while a partner cannot leave without dissolving the partnership (Sections 1208 et seqq. of ABGB).

   b.     Furthermore, under Section 1199 of ABGB, partners bear personal joint and several liability for partnership debt, while unit holders limit their liability to the fund assets.

48.     This context explains why the *InvFG 2011* does not mention civil partnerships. Consequently, funds do not constitute civil partnerships under Austrian law and the general rules on partnerships do not apply to investment funds.[53]

## VIII.   THE NATURE OF SECURITIES CLAIMS ACCORDING TO AUSTRIAN LAW

### Tort Law as the Presumptive Category for non-contractual Damage Claims

49.     In this section, I explain how the claims at issue in the Actions would be characterised by an Austrian court. This is important, because, as will be shown, claims in tort do not become part of the fund assets and hence do not, under Section 52 of the *InvFG 2011,* bestow

---

[52]    S. 55 para. 2 *InvFG 2011*, see fn. 45.

[53]    For a concurring view see *Kalss*, Anlegerinteressen (2001) p. 427.

any power of representation upon the management company. In the following sections, I will show that the claims asserted in this action are characterized by Austrian law as claims in tort.

50.     Austrian private law draws a distinction between contractual and non-contractual liability claims. Generally speaking, contractual liability claims are any claims flowing from a breach of contract, while tort law covers any liability claims not resulting from something other than a breach of contract.[54]

51.     Austrian tort law, thus, is the residual category for non-contractual claims. Liability claims in tort, however, do not cover all kinds of damages. In order to be compensatable in tort, damages have to result from an infringement of a legal position protected by the law of torts. Notably, these include:

a.     A violation of rights *protected erga omnes* (e.g. rights *in rem*) or

b.     a breach of certain statutory rules commonly referred to as "Schutzgesetz" (Section 1311 *ABGB*). A "Schutzgesetz" is a statute that intends to protect certain assets of certain persons from being harmed by a particularly dangerous conduct through forbidding this dangerous conduct.[55] A breach of a "Schutzgesetz" results in a tort claim for damages, if a protected person suffers a damage resulting from the prohibited conduct.[56]

c.     Any harm caused intentionally and in bad faith (Section 1295 para. 2 *ABGB*).

---

[54]     *Welser/Zöchling-Jud*, Bürgerliches Recht II, 14th ed. (2015) pp. 362 et seqq.

[55]     See further OGH 20.03.2007, 4 Ob 31/07y recital 2; OGH 22.10.2015 10 Ob 86/14s, recital 3.2.; *Koziol*, Österreichisches Haftpflichtrecht, Band II, 3rd ed. (2018) pp. 272 et seqq.; *Karollus*, Funktion und Dogmatik der Haftung aus Schutzgesetzverletzung (1992) pp. 90 et seqq.

[56]     Ris Justiz RS0106152; see e.g. OGH 18.12.1996,7 Ob 2395/96y.

19

52.     The distinction between contractual claims and non-contractual claims becomes most evident from the fact that the elements of those two types of claims differ as a matter of statutory law:[57]

53.     For example, in asserting a tort claim, the plaintiff generally has to prove the defendant's fault (Section 1296 *ABGB*), while for the purposes of contractual liability that fault is presumed (Section 1298 *ABGB*). Furthermore, vicarious liability rules differ: Section 1313a *ABGB* stipulates a far-reaching attribution of an agent's fault to the principal, if the plaintiff and the principal share a contractual relationship. Otherwise, notably in tort, Section 1315 *ABGB* applies, allowing only for a much narrower attribution.[58]

<div align="center">**Securities Claims are Claims in Tort under Austrian Law**</div>

54.     I understand that U.S. law characterizes private claims for damages for securities laws violations, including but not limited to those under Section 10(b) of the Exchange Act and Rule 10b-5 therunder as sounding in tort.[59] Austrian law shares this view:

55.     "Tort" is the Austrian default characterization of claims for damages. Further, the Austrian statutory rules that govern market manipulation and false market disclosures—specifically, Art. 12, 15 and 17 of the European Regulation No. 596/2014 ("Market Abuse Regulation" or "*MAR*")—grant private claims in damages in connection with Section 1311 *ABGB* and hence are also characterized as law of torts.

56.     In order to provide additional background, the following shall be noted:

---

[57]     *Welser/Zöchling-Jud*, Bürgerliches Recht II, 14th ed. (2015) pp. 362 et seqq.

[58]     *Koziol*, Österreichisches Haftpflichtrecht, Band II, 3rd ed. (2018) pp. 867 et seqq., 872, 918 et seq..

[59]     *Thomale*, Der gespaltene Emittent (2018) 90 et seq. with further references and detail.

a.     Art. 12, 15 of *MAR* prohibit market manipulation just as Art. 17 obliges an issuer to provide the market with fast, correct and complete continuous public disclosure of any inside information available to the issuer.

b.     According to Austrian settled case law[60] dealing with previous versions of these provisions, any provisions prohibiting fraud on the market fall within the category of "Schutzgesetze" in the sense of Section 1311 *ABGB*, since they also intend to protect investors.[61] As Art. 1[62] clarifies that the *MAR* intends to enhance investor protection, the qualification as "Schutzgesetz" stays the same under the *MAR* regime.[63] As discussed in the preceding section, violations of a "Schutzgesetz" are deemed to give rise to claims in tort.

---

[60]   OGH 14.01.2016, 6 Ob 98/15b; OGH 22.12.2015, 9 Ob 27/15h; OGH 12.11.2015, 9 Ob 27/15h; OGH 22.10.2015 10 Ob 86/14s; OGH 20.03.2015, 9 Ob 26/14k; OGH 24.01.2013, 8 Ob 104/12w; OGH 15.03.2012, 6 Ob 28/12d; see further RIS-Justiz: RS0127724: „Wenngleich das BörseG wegen Verletzung der Ad-Hoc-Publizitätspflicht (§ 48d Abs 1 BörseG) oder wegen marktmanipulativer Handlungen (§ 48a Abs 1 Z 2 BörseG) nur verwaltungsstrafrechtliche Sanktionen vorsieht (§ 48 Abs 1 Z 2, § 48c BörseG), die gemäß § 9 Abs 1 VStG gegen die Vorstandsmitglieder zu verhängen sind, sind diese Bestimmungen als Schutzgesetze zu qualifizieren"; further RIS-Justiz: RS0128527: „Die Bestimmungen des Börsegesetzes wegen marktmanipulativer Handlungen (§ 48a Abs 1 Z 2 BörseG) sind als Schutzgesetze zu qualifizieren. In den Schutzbereich sind jedenfalls Kunden der Bank einzubeziehen, die über einen von dieser vorgesehenen Vertriebsweg betreut werden. Werden von der Bank Informationen zur Weiterleitung (jedenfalls) an Kunden im Weg eines vorgesehenen Vertriebswegs bereitgestellt, so hat sie für Schäden aus falschen bzw irreführenden Nachrichten oder aus falschen oder irreführenden Signalen mit Eignung zur Kursbeeinflussung einzustehen, wenn den für sie handelnden Personen diese Umstände bekannt waren oder hätten bekannt sein müssen.".

[61]   Cf. *Koziol*, Österreichisches Haftpflichtrecht, Band II, 3rd ed. (2018) pp. 289; *Thomale*, Der gespaltene Emittent (2018) 35 et seqq, 102 et seq. offering a comparative legal assessment and further references; *Rüffler*, Kapitalmarktrechtliche Informations- und Verhaltenspflichten als Schutzgesetze? GES 2010, pp. 115 et seqq.; critical *Schopper*, Ad-hoc-Meldepflicht als Schutzgesetz, ÖBA 2014, pp. 497 et seqq..

[62]   Art 1 MAR: "Subject matter: This Regulation establishes a common regulatory framework on insider dealing, the unlawful disclosure of inside information and market manipulation (market abuse) as well as measures to prevent market abuse to ensure the integrity of financial markets in the Union and to enhance investor protection and confidence in those markets.".

[63]   *Thomale*, Der gespaltene Emittent (2018) 102 et seq.; *Kalss/Hasenauer* in Kalss/Oppitz/U. Torggler/Winner (eds.), Börsegesetz 2018/Marktmissbrauchsverordnung (2019) Art 17 recitals 5, 119.

21

c. Against this backdrop, under Austrian law, Art. 12, 15 and 17 of *MAR*, although they are European rather than Austrian statutory rules, qualify as statutory rules under Section 1311 *ABGB* and, thus as "Schutzgesetze".[64] This means that by infringing the statutory prohibition on securities fraud, the tortfeasor is bound to make whole all damages resulting from their breach of applicable security laws irrespectively of a contract being concluded.[65] As a result, the duty to communicate honestly with and to not commit any fraud on the market is a non-contractual duty, enforced by the law of torts. This tort character of liability claims for fraud on the market is further underscored by the fact that secondary market investors do not enter into any contractual relationship with the issuer.[66]

57. As a consequence, the securities laws violations alleged in the Complaints in this case, if, hypothetically, it were judged before Austrian courts and by Austrian substantive law, would give rise to claims for damages under Section 1311 *ABGB*, which form an integral part of Austrian law of torts.

58. Therefore, if characterized according to Austrian law, the alleged claims of plaintiffs in this case are claims in tort.

---

[64] *Thomale*, Der gespaltene Emittent (2018) 102 et seq; *Rüffler*, Kapitalmarktrechtliche Informations- und Verhaltenspflichten als Schutzgesetze? GES 2010, pp. 115 et seqq.; critical *Schopper*, Ad-hoc-Meldepflicht als Schutzgesetz, ÖBA 2014, pp. 497 et seqq..

[65] OGH 22.10.2015, 10 Ob 86/14s, *Rüffler*, Kapitalmarktrechtliche Informations- und Verhaltenspflichten als Schutzgesetze? GES 2010, pp. 115 et seqq..

[66] See e.g. *Koziol*, Österreichisches Haftpflichtrecht, Band II, 3rd ed. (2018) p. 874.

22

## IX. INTERPRETATION OF SECTION 52 *INVFG 2011* BASED ON AUSTRIAN RULES ON STATUTORY CONSTRUCTION

### The Statutory Provision of Section 52 *InvFG 2011*

59.     As funds have no legal personality,[67] any power to represent them, strictly speaking, is a legal impossibility under Austrian law. Instead, the only option is to represent the unit holders "behind" the funds, i.e. the legal subjects to whom the fund assets belong. The power of the management company to represent the unit holders is regulated by Section 52 *InvFG 2011*. According to the statute's wording, only the management company is entitled to "dispose of the assets" of a fund it manages and "to exercise the rights to the assets."[68]   In doing so, the management company acts in its own name, but on behalf of the unit holders, co-owning the fund assets. Section 57 *InvFG 2011* addresses fund assets to be taken into account when calculating the value of the fund, including "claims and other rights" belonging to the fund.[69]

60.     *Dr. Specht* relies on Section 52 of *InvFG 2011* to support his opinion that Erste AM has exclusive authority to assert the claims being asserted in the Actions for the Funds.  His opinion relies largely on his personal interpretation of the wording of this section of the Investment Funds Act. *Dr. Specht* cites neither case-law nor pertinent academic literature in support of his view. To my knowledge, there are no Austrian cases or academic literature addressing this issue.

---

[67] See above at recital 37 of this declaration.

[68]     S. 52 of *InvFG 2011*: "Only the management company is entitled to dispose of the assets of a UCITS it manages and to exercise the rights to the assets; it acts in its own name for the account of the unitholders. It must protect the interests of the unitholders, exercise the diligence of a prudent manager within the meaning of Section 84 (1) of the Stock Corporation Act and comply with the provisions of this federal law and the ordinances issued on the basis of this federal law as well as the fund regulations*".*

[69]     See s. 57 *InvFG 2011*: "(1) The value of a unit is obtained by dividing the total value of the UCITS including income by the number of units. According to the fund regulations, the total value of the UCITS is to be determined by the management company based on the respective market values of the securities, money market instruments and subscription rights belonging to it plus the value of the liquid financial assets belonging to the UCITS pursuant to Section 67(1), sums of money, credit balances, claims and other rights, less liabilities. If no market price or no current market price is available for a security, the market value, which is appropriate after careful assessment taking into account the overall circumstances, is to be used"; *Pálffy* in Macher/Buchberger/Kalss/Oppitz (eds.) Kommentar zum Investmentfondsgesetz, 2nd ed. (2013) s. 57 recital 1.

23

61.     In this section, I show that, contrary to *Dr. Specht's* opinion, Erste AM does not have any power to assert the claims upon which the Actions are based. Rather, those claims immediately accrue to the individual unit holders and may be asserted only by them (or by someone else with their express consent). My analysis starts with a textual and contextual interpretation of Section 52 of *InvFG 2011*. I also make a broader argument based on general principles of Austrian law and economic logic: As I will discuss, neither Section 52 nor Section 57 of *InvFG 2011* explicitly confers to the management company the right to litigate on behalf of the unitholders with respect to tort claims. Under general principles of Austrian law, this means that neither tort claims per se nor the right to assert such claims in litigation are granted to the management company by Section 52 of *InvFG 2011*. As I also discuss, any other construction of the statute would also lead to economically irrational results.

### Within Its Ambit, Section 52 *InvFG 2011* Provides for an Exclusive and Indirect Power of Representation

62.     Contrary to *Dr. Specht's* assertion at Specht Declaration, Recital 44, that Erste AM has standing under Austrian law based on a face-value interpretation of Section 52 of *InvFG 2011*, the wording of Section 52 in conjunction with Section 57 of *InvFG 2011* does not provide Erste AM or other Austrian asset management companies with the exclusive right to pursue tort claims.

63.     Section 52 of *InvFG 2011* contains two prongs conferring authority on the asset management company: Under the first prong, the asset management company is entitled to "über die Vermögenswerte […] verfügen." In English, the quoted passage means to "dispose of the fund assets," i.e., financial instruments and other investment objects which are contained in a fund investment portfolio. Under the second prong of Section 52 of *InvFG 2011*, the management company is also entitled to "die Rechte an den Vermögenswerten auszuüben." This means the second prong of Section 52 of *InvFG 2011* posits the right of the management company "to exercise

24

the rights to the fund assets" or, virtually equivalent, "to exercise the rights in the fund assets". In the following, I will elaborate on each prong and the interpretative challenges connected with it separately.

64. The phrase "to dispose of the fund assets" states that the management company has the exclusive competence to sell and buy or otherwise dispose of the fund assets. *Dr. Specht* takes it for granted that the claims, upon which the Actions are based, are a part of those mentioned "fund assets". However, the term "fund assets" does not explain in which circumstances a particular asset belongs to the fund. Rather, such classification has to be established in order for Section 52 *InvFG 2011* to apply in the first place.

65. For many assets, the fact that they pertain to the fund will be obvious. This is notably the case for those assets, such as financial instruments, acquired by the management company on behalf of the fund's unit holders.[70]

66. Beyond that, Section 57 *InvFG 2011*, by listing the various rights and positions that have to be taken into account when assessing a fund's unit value, does give certain guidance with respect to the kinds of assets that can potentially become fund assets. Section 57 *InvFG 2011* posits that "claims", as a class of assets, can be part of a fund. *Dr. Specht* tacitly implies that any claims, including those for damages based on securities laws violations, have to be considered fund assets.

67. *Dr. Specht's* conclusion does not follow from the language of the statute. Section 57 *InvFG 2011*, like Section 52 *InvFG 2011*, does not identify which conditions have to be fulfilled in order for a given asset to belong to the fund. To the contrary, it expressly reiterates the condition that all asset classes listed can only be considered for the calculation of unit value if and when they

---

[70] *Heidinger/Paul*, Kommentar zum Investmentfondsgesetz (2005) s. 3 recital 3; *Buchbauer* in Macher/Buchberger/Kalss/Oppitz (eds.) Kommentar zum Investmentfondsgesetz, 2nd ed. (2013) s. 52 recital 14; *Oppitz* in Apathy/Iro/Koziol, Bankvertragrecht VI, 2nd ed. (2007) recital 3/87; *Pálffy* in Macher/Buchberger/Kalss/Oppitz (eds.) Kommentar zum Investmentfondsgesetz, 2nd ed. (2013) s. 57 recital 9.

25

are "zu ihm gehörend", i.e. "belonging to the fund". Thus, with respect to the claims, Section 57 *InvFG 2011* provides that claims "belonging to the fund" must be included in the fund's unit value. It does not identify the conditions in which claims are deemed to belong to the fund as distinct from the unit holders.

68.     As a result, the question of which assets belong to the fund has to be resolved by resorting to general principles as set out above. Investment fund and special fund unit holders have a particularly strong right, in rem, to tort claims that accrue to them as a compensation for the loss they have suffered. Those claims are not to be assigned to a third party like the management company without the explicit consent of the individual unit holders.

69.     All claims arising from ownership of a given asset, such as claims for dividends, will themselves belong to the fund assets. The same can be said of claims flowing from a contract concluded by the management company acting on behalf of the unit holders of a certain fund.[71]

70.     When it comes to claims in tort, however, these claims result from the co-owning unit holders being harmed by unlawful conduct such as securities laws violations. Therefore, for the purposes of Sections 52, 57 *InvFG 2011*, tort claims are not considered fund assets. For that reason, the management company does not enjoy the right to dispose of those claims and they are not incorporated into the calculation of a fund's unit value.

71.     The second prong of Section 52 *InvFG 2011* posits the right of the management company "to exercise the rights to the fund assets" or "to exercise the rights in the fund assets". A commonsensical interpretation of the German version "die Rechte an den Vermögenswerten ausüben"[72] would not cover any claims, which are not in rem, since the prefix "an" is usually only used to refer to rights in rem. The legislator purposefully used "die Rechte an den

---

[71]   *Oppitz* in Apathy/Iro/Koziol, Bankvertragrecht VI, 2nd ed. (2007) recital 3/89.

[72]   S. 3 InvFG 1993 and s. 3 InvFG 1963.

26

Vermögenswerten ausüben" as a substantial equivalent to the earlier version of "die Rechte aus den Vermögenswerten auszuüben," or rights arising out of fund assets.[73] These rights arise "out of" the assets in the sense that they derive from the ownership of those assets. Indeed, an "asset" can be thought of as a bundle of these rights. Therefore, rights in rem, as well as rights "ex re", i.e. "Rechte aus" or, in English, "rights out of fund assets" are covered by this prong. The prefix "aus" demonstrates that rights immediately connected with and embodied in the fund assets, such as, paradigmatically, claims to dividends or voting rights, which directly flow from the ownership of a security, are covered by Section 52 *InvFG 2011*.[74]

72. Even under this broader construction of the German preposition "an" to include rights "aus", claims in tort would not be covered by the second prong. Therefore, claims in tort conventionally are not mentioned in the context of Section 52 *InvFG 2011*[75]: Claims in tort are neither rights in rem, nor rights arising out of fund assets. Once a loss is suffered, claims in tort for securities laws violations are not attached to any fund assets or to the ownership of such assets. Instead, they constitute an independent asset accruing to one person suffering a loss as a consequence of another person committing an illicit act. The fund assets on their own remain unaffected by securities laws violations as they continue to be part of the fund assets. Securities laws violations merely cause a deception with respect to an asset's true value, which, in turn, can translate into an economic loss of the former or latter unit holder.

---

[73] S. 3 InvFG 1993 and s. InvFG 1963.

[74] See e.g. *Heidinger/Paul*, Kommentar zum Investmentfondsgesetz (2005) s. 3 recital 3 with further references; *Berger* in Bollenberger/Kellner (eds.), InvFG (2016) s. 52 recital 3; *Buchbauer* in Macher/Buchberger/Kalss/Oppitz (eds.) Kommentar zum Investmentfondsgesetz, 2nd ed. (2013) s. 52 recital 15; *Oppitz* in Apathy/Iro/Koziol, Bankvertragrecht VI, 2nd ed. (2007) recitals 3/89, 3/102 till 3/109.

[75] See e.g. *Heidinger/Paul*, Kommentar zum Investmentfondsgesetz (2005) s. 3 recital 3 with further references; *Berger* in Bollenberger/Kellner (eds.), InvFG (2016) s. 52 recital 3; *Buchbauer* in Macher/Buchberger/Kalss/Oppitz (eds.) Kommentar zum Investmentfondsgesetz, 2nd ed. (2013) s. 52 recital 15; *Oppitz* in Apathy/Iro/Koziol, Bankvertragrecht VI, 2nd ed. (2007) recitals 3/89, 3/102 till 3/109.

27

73. While ownership or co-ownership of a given asset at the time of the unlawful act can give rise to a claim, it does not create any continuing link between the asset and the claim in tort. The claim in tort constitutes a new asset of its own, which can accrue, be assigned or otherwise be disposed of independently from an ongoing ownership of the original asset. This distinguishes claims in tort from claims "*ex re*": Claims to dividends generally come into being at the time of the published annual financial statement, accruing to the holder of a given share at that record date. Future claims to dividends cannot accrue or be assigned independently from the ongoing holding of the share of which they are considered a legal fruit. Voting rights neither can be severed from the underlying share. Conversely, claims in tort, even if based on tortious behavior incidentally affecting shareholders as it affects share prices, exist completely independently from the share or financial instrument itself. They accrue independently of a continued holding of the shares. As a result, they are no legal fruit of the asset and, in this sense, are not rights "to" or "out of" that asset.

74. Thus, the wording of Section 52 *InvFG 2011* does not confer the right of the management company to pursue tort claims of the unit holders. As a result, the wording of Section 52 *InvFG 2011* does not support *Dr. Specht's* view that Erste AM has standing before court with respect to claims resulting from securities laws violations.

### Exclusiveness of Section 52 *InvFG 2011* Requires its Confinement to Core Management Activities

75. In this section I demonstrate that Section 52 of *InvFG 2011* provides for an exclusive and indirect power of representation. I also show that the purpose of the statute demonstrates that the provision should be narrowly construed to avoid providing standing to management companies like Erste AM.

76. Any form of representation in one's own name but on behalf of somebody else is conventionally referred to as "indirect". Since Section 52 *InvFG 2011* confers the right of the

28

management company to act in its own name on behalf of the unit holders, the management company is granted the right to indirectly represent the unit holders.[76] This means the actions and dispositions undertaken by the management company with respect to fund assets are not per se attributed to the co-owning unit holders, but, on a formal level, only to the management company itself.[77] At the same time, however, the management company has the power to effectuate such actions and dispositions with respect to the fund assets despite the fact that the assets belong to the co-owning unit holders.[78] As a result, the co-owning unit holders are represented economically with their assets being affected by the management company, while these acts are not immediately attributable to them. By comparison, "direct" representation would mean that the management company acted in the co-owning unit holders' names, which would be the case, if, e.g., the management company were endowed with a power of attorney.[79]

77.      The power of indirect representation bestowed upon the management company by Section 52 *InvFG 2011* is exclusive, for it is "only" the management company that can dispose of the fund assets, at the exclusion of the co-owning unit holders who would normally be able to dispose of their own assets.[80] This exclusivity intends to assure an efficient management of the fund assets by a professional manager.[81] Unit holders, thus, can neither influence nor instruct the

---

[76]   See also *Oppitz* in Apathy/Iro/Koziol, Bankvertragrecht VI, 2nd ed. (2007) recitals 3/88, 3/104.

[77]   *Buchbauer* in Macher/Buchberger/Kalss/Oppitz (eds.) Kommentar zum Investmentfondsgesetz, 2nd ed. (2013) s. 52 recital 8; for indirect representation see generally *Welser/Kletečka*, Bürgerliches Recht I, 15. ed. (2018) p. 218.

[78]   *Oppitz* in Apathy/Iro/Koziol, Bankvertragrecht VI, 2nd ed. (2007) recitals 3/87 and 3/102 till 3/10.

[79]   See for the distinction *Oppitz* in Apathy/Iro/Koziol, Bankvertragrecht VI, 2nd ed. (2007) recital 3/88. For direct representation, see generally *Welser/Kletečka*, Bürgerliches Recht I, 15. ed. (2018) pp. 219 et seq..

[80]   See *Buchbauer* in Macher/Buchberger/Kalss/Oppitz (eds.) Kommentar zum Investmentfondsgesetz, 2nd ed. (2013) s. 52 recital 7; *Oppitz* in Apathy/Iro/Koziol, Bankvertragrecht VI, 2nd ed. (2007) recital 3/87.

[81]   *Buchbauer* in Macher/Buchberger/Kalss/Oppitz (eds.) Kommentar zum Investmentfondsgesetz, 2nd ed. (2013) s. 52 recital 7; *Oppitz* in Apathy/Iro/Koziol, Bankvertragrecht VI, 2nd ed. (2007) recital 3/87; See the explanatory comments of the historic legislator to BGBl 1963/192, 171 BlgNr X. GP 8: "Dadurch wird sichergestellt, daß die Verwaltung des Fondsvermögens durch Fachleute für Rechnung der Sparer, denen zur Verwaltung Zeit und meist auch die erforderlichen Kenntnisse fehlen, besorgt wird. Die Investmentgesellschaft übt alle Rechte aus den

29

management company on how to manage the fund assets.[82] In order to balance out this power of the management company, the unit holders of ordinary funds have the right to divest at any time.[83]

78.    The purpose of this exclusive power is to assure the efficient management of the fund assets.  However, the pursuit of claims in tort does not fall within the core area of portfolio management or the core area of professionalism of management companies as addressed in Section 52 *InvFG 2011*.[84] If management companies had the exclusive power to pursue tort claims of the unit holders, this would mean they had to conduct an activity outside their professional purview.

79.    Thus, the purpose of the exclusive power of representation of the management company under Section 52 *InvFG 2011* suggests that its scope be limited to activities strictly necessary for the efficient management of fund assets. Those are:

a.    the activity to take investment decisions, i.e. to buy and sell investment products, as well as

b.    to exercise rights attached to these investment products, like to claim dividends or pursue voting rights[85] and

c.    to perform necessary ancillary activities with respect to the management of the fund.

---

Fondswerten auf Grund ihrer Betrauung mit der Verwaltung als Treuhänder der Investmentsparer aus. Es bedarf keiner weiteren Rechthandlungen, um der Investmentgesellschaft diese Rechte einzuräumen".

[82]  *Heidinger/Paul*, Kommentar zum Investmentfondsgesetz (2005) s. 3 recital 1; *Berger* in Bollenberger/Kellner (eds.), InvFG (2016) s. 52 recital 2; *Buchbauer* in Macher/Buchberger/Kalss/Oppitz (eds.) Kommentar zum Investmentfondsgesetz, 2nd ed. (2013) s. 52 recital 9; *Kalss*, Anlegerinteressen (2001) p. 426.

[83]  See s 55 para. 2 *InvFG 2011*.

[84]  Cf. *Oppitz* in Apathy/Iro/Koziol, Bankvertragrecht VI, 2nd ed. (2007) recital 3/89: "Da ihr aber die Verfügungsmacht zum Zwecke der Verwaltung des Fondvermögens mit der Sorgfalt eines ordentlichen Unternehmers eingeräumt wird, geht diese im Einzelfall nur so weit, als es zur Durchführung dieser Aufgabe erforderlich ist (§ 1029 ABGB); dabei sind auch die Interessen der Anteilinhaber zu berücksichtigen (§ 3 Satz 2 InvFG)".

[85]  Addressing these rights only *Berger* in Bollenberger/Kellner (eds.), InvFG (2016) s. 52 recital 3; *Oppitz* in Apathy/Iro/Koziol, Bankvertragrecht VI, 2nd ed. (2007) recitals 3/106 till 3/107.

80.     The professional and efficient management of fund assets, however, does not require the exclusive right of management companies to pursue claims in tort. Thus, the exclusiveness of the power of the management company according to Section 52 *InvFG 2011* implies a narrow interpretation of these powers with respect to activities not necessary to manage a fund. By this standard, Section 52 *InvFG 2011* does not extend to tort claims.

81.     Hence, the exclusivity of the power granted by Section 52 *InvFG 2011* makes it particularly unlikely that an Austrian court would extend this power to tort claims as they arise from securities laws violations. Section 52 *InvFG 2011* does not empower an asset management company to unilaterally extend the scope of its mandate beyond activities necessary for the efficient management of, specifically and exclusively, *fund* assets.

**<u>General Rules on Co-Ownership Leave Right to Tort Claims with Each Individual Co-Owner</u>**

82.     In this section, I put Section 52 *InvFG 2011* into the general context of co-ownership. I reason that, by general default, the right to pursue tort claims lies with each individual co-owner. As neither the language nor the legislative materials of Section 52 *InvFG 2011* indicate any intention to deviate from this default, it also applies in the context of investment funds. Consequently, it is the individual unit holders—not the management company—that have the right to litigate their alleged tort claims:

83.     As fund assets are co-owned by the unit holders of the fund, the general rules of co-ownership are the applicable default rule behind Section 52 *InvFG 2011*.[86] This default provides further perspective, commanding a narrow construction of that statute:

---

[86]     See above recitals 36 seqqVII.42.

a. Claims of co-owners are addressed by Section 848 ABGB. This section provides that claims of co-owners may only be paid to the co-owners as a group or a representative of the group.

b. Case law[87] and academic literature[88] interpret this provision narrowly in the sense that it does not cover divisible claims of co-owners. Monetary claims are divisible by nature.[89] Thus, co-owners of divisible claims are competent to individually pursue their part in the given claim: The idealized group of co-owners yields back to each individual co-owner, who is entitled to independently litigate—or not to litigate—their share in the damages.

c. This further underscores that it is principally up to the individual co-owners to independently pursue their divisible claims in tort.

84. As Section 52 *InvFG 2011* does not expressly deviate from this general rule, it has to be understood to be in line with this default co-ownership rule.

85. The claims in tort, upon which Actions are based, are monetary and hence divisible. Under general rules of Austrian co-ownership law, it would be up to each individual co-owning unit holder to pursue and litigate their own tort claim based on the alleged securities law violations. It is highly unlikely that an Austrian court would read Section 52 *InvFG 2011* such as to cover these claims. To the contrary, a court would likely interpret the statute to allow the unit holders to

---

[87] OGH 16.12.2008, 1 Ob 105/08k; OGH 26.08.2003, 5 Ob 142/03y; OGH 20.06.2018, 7 Ob 48/18m; RIS-Justiz RS0013214: „Bei der Verfolgung teilbarer Ansprüche ist jeder Miteigentümer einer Liegenschaft auf die Geltendmachung seines Anteiles beschränkt. Zu den teilbaren Ansprüchen zählen Schadenersatzansprüche in Geld." = "With respect to the pursuit of divisible claims every co-owner of an immobile/real estate is limited to his/her stake. Divisible claims especially comprise of monetary claims for damage".

[88] See *Parapatits* in Kletečka/Schauer (eds.), ABGB-ON[1.03] (2016) § 848 recital 5; *Egglmeier-Schmolke* in Schwimann/Kodek (eds.), ABGB: Praxiskommentar, 5th ed. (2018) recitals 6 et seq.

[89] RIS-Justiz RS0017118: ‚Anders als beim Erfüllungsanspruch selbst, der die Errichtung eines Hauses und damit eine unteilbare Leistung beinhaltet, die nur der Gesamtheit der Wohnungseigentümer dieses Hauses zusteht, ist der an seine Stelle getretene Schadenersatzanspruch wegen Nichterfüllung auf Geldersatz gerichtet und damit seiner Natur nach teilbar; es kann daher auch jeder Gläubiger nur auf Ersatz seines Interesses klagen.'

decide individually if they intend to pursue these claims at all, and, if so, if they want that done by the management company or another agent, supposedly more specialized and sophisticated in the area of foreign litigation and class representation.

### **General Rules Allow No Mandatory Agency in the Enforcement of Tort Claims**

86. Under the broad reading that *Dr. Specht* urges, Section 52 of *InvFG 2011* would effectively operate to exclude the actual victims of a tort, the unit holders, from pursuing legal remedies of their own and instead to force them into a mandatory principal-agent relationship with the management company in regard to litigating such claims. I will show that this result would sit uneasily with the general principle of Austrian law that tort law should personally enfranchise tort victims.

87. If Section 52 *InvFG 2011* were read to grant the exclusive power of indirect representation for claims in tort to the management company, it would oust the actual tort victims, namely the co-owning unit holders, from disposing or litigating their very own claims in tort.

88. Such a result would render Section 52 *InvFG 2011* a singularity in Austrian business law, since Austrian business law follows a restrictive approach to ousting tort victims from the right to pursue their claims in tort:

  a. It is a recognized doctrine of Austrian company law that damages from breaches of fiduciary duty suffered by shareholders, which are entirely based on the fact that the damage suffered by their company is reflected in a diminished share price (so-called "Reflexschaden"), cannot be recovered by them personally, but have to be recovered derivatively by the company acting through its competent representatives.[90] This extraordinary

---

[90] OGH 28.03.2018, 6 Ob 41/18z. For further references, see: *Trenker*, Reflexvorteil" und "Reflexschaden" im Gesellschaftsrecht, GesRZ 2014, 10 at 12 et seq.

33

preclusion, however, hinges on the the fact that a company is regarded a separate entity and legal person, acting as a claimant in tort in its own right, and that shareholders "behind" that very company, through their shares representing the company assets in their personal assets, should not fictitiously multiply the damages recoverable from the tortfeasor and instead leave the field to the company only.

b.      As discussed above, investment funds, in contrast to companies, do not have any legal personality separate from the co-owning unit holders. As a result, the only persons—natural or legal—suffering any damage are the co-owning unit holders. There is, by implication, no justification to preclude the individual co-owning unit holder from disposing of, as well as litigating and executing, a divisible claim of his own.

89.     The general reluctance of Austrian business law to oust tort victims from pursuing their claims in tort renders it highly unlikely that Section 52 *InvFG 2011* would be interpreted by an Austrian court to grant the management company the exclusive right to pursue these claims.

**<u>Restrictive Approach to Legal Standing or Loss Recovery on Behalf of a Third Party</u>**

90.     General principles of Austrian law on standing to sue on behalf of others also militate against the broad construction of Section 52 *InvFG 2011* that *Dr. Specht* urges. There are only two legal constructions under Austrian law through which one could sue in one's own name in order to recover the loss suffered by a third party: "Prozessstandschaft"[91] and "Drittschadensliquidation".[92] Both are narrowly construed. This is consistent with general

---

[91]   Prozessstandschaft denotes the procedural configuration that a litigating party is litigating in its own name, but on behalf and for the benefit of another party who is thereby deemed to be indirectly represented before court.

[92]   Drittschadensliquidation denotes an institution of substantive law of obligations, according to which, in exceptional circumstances, one party can recover another party's damages from the debtor, hence "liquidate" a

34

principles of Austrian law, which support that a management company would also not be entitled to sue in its own name and recover losses suffered by the co-owning unit holders.

91.     Austrian law is restrictive when it comes to allowing one party to sue in his or her own name on behalf of another party. Such indirect representation before a court, so-called "Prozessstandschaft", according to Austrian law, cannot be authorized through contractual agreement nor through unilateral acts between the party litigating and the indirectly represented party.[93]

    a.     When Austrian law recognizes the competence to indirect representation before a court, it generally does so in clear and unambiguous terms:

    (a)     Section 84 para. 5 *AktG*[94] (Austrian Public Company Code) explicitly confers the power of corporate creditors to indirectly represent the corporation before court.

    (b)     Section 48 *GmbHG*[95] (Austrian Closed Corporation Code), Section 1188 *ABGB*[96] and Section 18 para. 2 sentence 2 *WEG*[97] (Austrian Homeowners'

---

"third" party's "damages". For a comparative discussion of the doctrine, see the English House of Lords decision in: White v Jones, [1995] 2 A.C. 207.

[93]    RIS-Justiz RS0053157, based upon OGH 22.2.1995, 3 Ob 522/95. Recently: OGH 26.5.2021, 7 Ob 220/20h. See also RIS-Justiz RS0032788, based upon OGH 2.7.1969, 7 Ob 99/69.

[94]    S. 84 para. 5 *AktG*: "(5) Der Ersatzanspruch der Gesellschaft kann auch von den Gläubigern der Gesellschaft geltend gemacht werden, soweit sie von dieser keine Befriedigung erlangen können. Dies gilt jedoch in anderen Fällen als denen des Abs. 3 nur dann, wenn die Vorstandsmitglieder die Sorgfalt eines ordentlichen und gewissenhaften Geschäftsleiters gröblich verletzt haben; Abs. 2 Satz 2 gilt sinngemäß. Den Gläubigern gegenüber wird die Ersatzpflicht weder durch einen Verzicht oder Vergleich der Gesellschaft noch dadurch aufgehoben, daß die Handlung auf einem Beschluß der Hauptversammlung beruht oder der Aufsichtsrat die Handlung gebilligt hat. Ist über das Vermögen der Gesellschaft das Insolvenzverfahren eröffnet, so übt während dessen Dauer der Masse- oder Sanierungsverwalter das Recht der Gläubiger gegen die Vorstandsmitglieder aus".

[95]    S. 48 para. 1 *GmbHG*: "(1) Die der Gesellschaft gegen die Gesellschafter, Geschäftsführer und Mitglieder des Aufsichtsrats zustehenden Ansprüche können auch von Gesellschaftern, deren Stammeinlagen den zehnten Teil des Stammkapitals oder den Nennbetrag von 700 000 Euro oder den im Gesellschaftsvertrag festgesetzten geringeren Betrag erreichen, geltend gemacht werden, wenn die Verfolgung dieser Ansprüche für die Gesellschaft durch Beschluß der Gesellschafter abgelehnt oder wenn ein darauf abzielender Antrag, obwohl er rechtzeitig (§ 38 Abs. 3) bei den Geschäftsführern angemeldet war, nicht zur Beschlußfassung gebracht worden ist".

[96]    S. 1188 *ABGB*: "Die Erfüllung gesellschaftsbezogener Verpflichtungen eines Gesellschafters kann von jedem Gesellschafter zugunsten aller Gesellschafter gemeinsam eingefordert werden. Davon abweichende Vereinbarungen sind unwirksam".

[97]    S. 18 para. 2 sentence 2 *WEG*: "(2) Die Wohnungseigentümer können der Eigentümergemeinschaft aus ihrem Miteigentum erfließende Unterlassungsansprüche sowie die Liegenschaft betreffende Gewährleistungs- und

---

35

Association Code) stipulate an equally clear conferral of power to shareholders as well as partners with respect to the so-called *actio pro socio* and to homeowners.

92.     Given the restrictive approach of Austrian law to indirect representation before court,[98] the general language of Section 52 *InvFG 2011* is insufficient to justify an exception to the general rule: The management company's power to "exercise the rights to the assets" on behalf of the co-owning unit holders under Section 52 *InvFG 2011*, by its bare language, does not confer the right to sue. Notably, the regular activity of investment management as addressed by Annex II of Directive 2009/65/EC and Annex I of Directive 2011/61/EC does not entail litigation. The Austrian legislator, when forging what is now Section 52 *InvFG 2011*, only had professional activities of management companies – i.e. portfolio management – in mind.[99] Section 52 *InvFG 2011* does not address pursuit of litigation, and there is no indication the legislator intended to address it. This complete lack of statutory language and the exceptional nature of indirect representation before Austrian courts outweigh the sweeping contrary assertion made by *Dr. Specht*. It should be noted that the paper by *Kammel/Thierrichter*, cited by *Dr. Specht* at Specht Declaration, Recital 25 predates the current version of the *InvFG 2011*. What is more, the authors in the passage cited by *Dr. Specht* merely share the general observation that funds under *InvFG 2011* lack legal personality and conclude therefrom, that the management company has to step in and were endowed with the power to indirectly represent "the fund" before court. The authors themselves point to no Austrian

---

Schadenersatzansprüche abtreten, wodurch die Eigentümergemeinschaft diese Ansprüche erwirbt und in eigenem Namen geltend machen kann. Unterlässt die Eigentümergemeinschaft die Geltendmachung eines ihr abgetretenen Anspruchs und droht dadurch eine Frist für die Anspruchsverfolgung abzulaufen, so kann der betreffende Wohnungseigentümer den Anspruch für die Eigentümergemeinschaft geltend machen."

[98]     See recital 91IX.90 of this declaration.

[99]     See the explanatory comments of the historic legislator to BGBl 1963/192, 171 BlgNr X. GP 8: "Dadurch wird sichergestellt, daß die Verwaltung des Fondsvermögens durch Fachleute für Rechnung der Sparer, denen zur Verwaltung Zeit und meist auch die erforderlichen Kenntnisse fehlen, besorgt wird. Die Investmentgesellschaft übt alle Rechte aus den Fondswerten auf Grund ihrer Betrauung mit der Verwaltung als Treuhänder der Investmentsparer aus. Es bedarf keiner weiteren Rechthandlungen, um der Investmentgesellschaft diese Rechte einzuräumen".

36

case law to support this contention. Neither do they specify which legal actions count as belonging "to the fund" let alone do they include damage claims for securities law violations into their analysis. As a result, *Dr. Specht* shows no sufficient evidence to deviate from general respected methods of statutory construction. Thus, as Section 52 *InvFG 2011* does not entail the right to sue before court, it cannot overcome the general restrictive approach of Austrian law towards any indirect representation before court.

93. Austrian law is equally reluctant to allow one party to pursue damages based on a loss borne by another party, so-called "Drittschadensliquidation":[100]

  a. This instrument developed by case law is predicated on the asymmetrical setting that one party suffers a loss, but does not have a claim covering that loss as damages, while conversely another party has not suffered a loss of her own, but is vested with a cause of action against the debtor.

  b. In such situations, when a coincidental loss-shifting would lead to an undeserved windfall profit to the benefit of the debtor, Austrian law recognizes the power of the party endowed with a cause of action, be it in contract or in tort, to claim the injured party's loss as her own, in other words, to pursue a claim based upon somebody else's damages.

  c. However, if a party may pursue a claim for damages on her own, nobody else may pursue that claim in their own name on behalf of somebody else.

94. If Section 52 *InvFG 2011* were to grant the management company a right to sue in its own name with respect to tort claims, the management company would be vested with a cause of action, e.g. against the tortfeasor of securities law violations, while claiming the co-owning unit

---

[100] OGH 07.03.1973, 1 Ob 30/73, SZ 46/31.

holders' losses. Such extraordinary power, however, is not recognized when the actually injured, indirectly represented party has her own cause of action and hence could file a lawsuit herself – unless otherwise explicitly stated by statute.[101] Section 52 *InvFG 2011* is too vague as to cover an indirect representation before court with respect to tort claims. Instead of relying on that provision, the unit holders would have to assign their claims to the asset management company, endowing the asset management company with power of attorney in order to allow for direct representation, or themselves pursue their claim.

95.     Due to the general restrictive approach of Austrian law towards the liquidation of another party's losses as damages and, specifically, towards the indirect representation of another party before court, there is a strong presumption against any statutory provision granting such power. Accordingly, Section 52 *InvFG 2011* also has to be narrowly construed in this respect. This context makes it even less likely that any Austrian court would interpret Section 52 *InvFG 2011* broadly, beyond its deductive meaning, such as to grant the asset management company with the power to indirectly represent co-owning unit holders before court with regard to their claims in tort.

## X.     AVOIDING ILLOGICAL DISTRIBUTIVE EFFECTS BETWEEN FORMER AND CURRENT UNIT HOLDERS

96.     The interpretation outlined above is not only justified based on principles of statutory construction and expectations of legal realists, but also because it is economically sound. Conversely, *Dr. Specht's* interpretation produces an economically irrational result. It would have the irrational consequence of depriving former unit holders of remediable losses while potentially granting a windfall profit to current unit holders:

---

[101]   OGH 07.03.1973, 1 Ob 30/73, SZ 46/31.

38

97. If the power to dispose of, litigate and enforce the co-owning unit holders' claims in tort lay with the management company, which would request payment to "the fund" rather than to the individual unit holders, this would raise a two-fold problem.

98. *First*, a potential eventual recovery on the claims would not benefit the co-owning unit holders at the time the tort was committed and the loss was suffered. This is because a unit holder might have divested from the fund in the meantime. To be sure, under Section 57 *InvFG 2011,* assets of any kind as they pertain to the fund have to be taken into account when calculating the unit price. However, uncertain and heavily context-dependent pay-offs from securities litigation cannot be included in that consolidated calculation.[102] As a result, unit holders who may divest after the tort has happened and after the loss has been suffered, but before damages are actually recovered, will suffer a definitive loss.

99. Conversely, *second*, whoever happens to acquire the units in that same time period, will pay a unit price that does not reflect the claims in tort, but will then profit from any pay-offs of those claims.

100. The only efficient way to prevent this simultaneous over- and under-compensation of unit holders is to leave claims in tort entirely with the co-owning unit holders affected at the time the securities law violations were committed.

101. The key efficiency of depriving unit holders of the right to dispose of and pursue claims in tort is the well-known collective action problem: It usually creates synergetic added value to combine and consolidate the claims of each unit holder and jointly pursue them, rather than to have e.g., as an extreme case, each unit holder to file a separate lawsuit against the alleged

---

[102] *Pálffy* in Macher/Buchberger/Kalss/Oppitz (eds.) Kommentar zum Investmentfondsgesetz, 2nd ed. (2013) s. 57 recital 9: "Sichteinlagen/kündbare Einlagen/Bankguthaben sind zum Nennwert (zuzüglich angefallener Zinsen) nach dem sogenannten „Nominalwerprinzip" zu bewerten."

tortfeasor. However, Austrian law offers two separate ways to accommodate that interest and to reduce collective action costs: Unit holders can either assign their claims to a common trustee or they can choose to be directly represented by giving power of attorney to a joint agent. In doing so, unit holders can make their own choices, e.g. if they want to act jointly or not, in one group or in several groups or who they would like to act as their trustee or agent. To be sure, unit holders *may* choose to be represented by the asset management company, despite the fact that the regular activity of investment management—as addressed, e.g. by Annex II of Directive 2009/65/EC and Annex I of Directive 2011/61/EC—is portfolio management and not litigation or execution of tort claims. However, it seems by no means evident that it should be necessarily in their interest for all (i.e. each and every one) individual unit holders to make that one identical choice.

## XI.  CONCLUSION

102.    Neither a textual, nor a contextual or a functional interpretation indicates that Section 52 *InvFG 2011* could possibly confer on asset management companies the power to sue in their own name on behalf of the individual unit holders with respect to their divisible claims in tort. The wording of Section 52 *InvFG 2011* and its specific managerial function do not support such an extensive reading.

103.    To the contrary, the language used by Section 52 *InvFG 2011* does not mention the right to litigate nor does it extend the asset management company's power of indirect representation beyond immediate rights *in rem* with respect to the fund assets. This *textual* account is further underscored with respect to the broader systematic context of the statute:

> a.      *First*, general rules on co-ownership indicate a narrow construction of Section 52 *InvFG 2011*, recognizing the co-owners' right to pursue divisible claims individually.

b. *Second*, Austrian law tends to avoid ousting tort victims from the right to independently pursue their claims in tort. A contrary rule is only upheld under the special circumstance that the common concern is endowed with legal personality as is the case with companies. Investment funds, however, are not companies or partnerships and they have no legal personality. Therefore, the general rule applies, and the co-owning individual unit holders are entitled to their tort claims.

c. *Third*, Austrian law is distinctly restrictive with respect to filing claims in one's own name on another person's behalf. The wording of Section 52 *InvFG 2011*, notably when compared with numerous other provisions of Austrian business law expressly granting such a right, is too vague and indeterminate in order to reverse that general rule. Consequently, it does not confer to the asset management company the right to sue in its own name on behalf of its unit holders, at least with respect to divisible claims in tort.

d. *Finally*, from an economic perspective, granting legal standing to asset management companies with respect to tort claims of individual unit holders would result in an overcompensation of some unit holders to the detriment of other unit holders.

104. Based on these reasons, I conclude that it is highly unlikely that an Austrian court would find Section 52 *InvFG 2011* to confer any right to asset management companies to sue with respect to divisible claims in tort of individual unit holders. Further, it is strictly impossible for Austrian courts to recognize any right of a management company to represent a fund as such, i.e. as a legal subject, because funds are not legal subjects, but legal objects.

41

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct to the best of my knowledge.

Executed on the 4th day of June 2024 in Vienna, Austria

_____

Professor Chris Thomale

# APPENDIX A

**Curriculum vitae / Publications / Papers presented**

**Univ.-Prof. Dr. Chris Thomale, LL.M. (Yale)**
born 26 February 1982 in Münster, Germany
phone:        +43-1-4277-35224
email:        chris.thomale@univie.ac.at
ORCID:      0000-0002-0878-9910
           https://orcid.org/0000-0002-0878-9910
homepage:  https://unternehmensrecht.univie.ac.at/en/team/thomale-chris/

## I. Academic Positions and Education

| | |
|---|---|
| 2020-now | Full Professor of International Commercial and Business Law University of Vienna, Austria Founder and Director of the Vienna Centre for Comparative Corporate Finance Law (C3FL) since 2022 |
| 2020-now | Full Professor of Comparative Law (Professore ordinario, chiamata diretta di chiara fama) University Roma Tre, Italy |
| 2016-now | Visiting professorships at Georgetown School of Law (USA), Université Toulouse 1 Capitole (France), NTU Taipei (Taiwan), Universidade Federal Fluminense (Rio de Janeiro, Brazil), University of Tucumán (Argentina) |
| 2017 | Habiliation at Heidelberg University; *Venia legendi* for Civil Law, Commercial and Company law, Civil Procedure, Private International Law, Philosophy of Law and Comparative Law |
| 2014-2018 | Post-doctoral lecturer at the Heidelberg Institute for Comparative Law, Conflict of Laws and International Business Law Equal Opportunity Officer of the Law School (2015-2018), Collaboration with *Marc-Philippe Weller* |
| 2013-2014 | LL.M. Program Yale Law School, USA Collaboration with *Ian Ayres*, *Henry Hansmann* and *Alan Schwartz* |
| 2011-2013 | Post-Doc at the University of Freiburg, Germany |
| 2007-2011 | Doctoral studies at the Free University of Berlin, Germany Supervisors: *Martin Schwab* and *Christian Kirchner* |
| 2002-2006 | Studies of Law and Philosophy at the Universities of Heidelberg, Cambridge (Clare College) and Geneva |

## II. Working languages

English, German, French, Spanish, Italian, Portuguese

## III. Degrees

− Dr. iur. of the Free University of Berlin, grade: summa cum laude (first of class, faculty award)
− LL.M. Yale Law School, grade: H (first of class)
− Diploma of the Hague Academy for International Law, IPR session, "cum laude" (7th award of this kind since the Academy was founded in 1928)
− Certificat de Droit Transnational, Université de Genève, grade: "excellent" (first of class)
− First State Exam of the State of Baden-Württemberg, grade: 12.29 "good" (top 2%)
− Second State Exam of the State of Baden-Württemberg, grade: 12.25 "good" (top 1%)
− Abitur of the State of Baden-Württemberg, grade: 1.0 (top 1%)

## IV. Selected Awards, grants and functions

− University of Vienna: Starting Grant C3FL (EUR 600000)
− B&C Privatstiftung: "International company mobility" (EUR 300000)
− Deutsche Forschungsgemeinschaft: "Limited liability for torts" (EUR 270000)
− Heidelberg Academy of Sciences and Humanities: "Metaphors and models" (EUR 120000)
− The Young Academy, Berlin: fellowship (EUR 100000)
− Director of Studies of the Hague Academy of International Law (appointed for 2020 and 2021)
− Regular consultations at the European Parliament and for the Austrian and German Ministries of Economic Affairs
− Otto Schmidt Prize for the Promotion of the Europeanization and Internationalization of Law
− Walter Witzenmann Science Prize of the Heidelberg Academy of Sciences and Humanities
− Scholarship of the German Academic Scholarship Foundation

## V. Research methods

− Comparative law (esp. Roman, German and Anglo-American legal systems)
− History of law (dogmatic evolution; legal transplants)
− Institutional economics (classical and behavioral)
− Empirical legal studies (event studies; surveys)

## VI. Comparative Law publications, selection sorted by area

### Civil Law

− Leistung als Freiheit – Erfüllungsautonomie im Bereicherungsrecht – Dissertation Freie Universität Berlin, Mohr Siebeck Publishers, Series „Studien zum Privatrecht" Tübingen 2012, XXXVI + 467 pages

− Schmerzensgeld nach Flugzeugunglücken, in: NJW 2015, 1909-1914 (co-authored with *Marc-Philippe Weller* and *Bettina Rentsch*)

− Comparative Comparativism – A Lawyer's Epilogue, in: *Stroumsa* (Hrsg.), Comparative Studies in the Humanities, 2018, 240-243

− La disciplina della prescrizione – Die Verjährung im Spiegel des Schuldrechtsmodernisierungsgesetzes, in: Granelli/Patti/Sirena (Ed.), Il diritto privato tedesco vent'anni dopo la Schuldrechtsmodernisierung: un modello per i giuristi europei?, 2024, 157-180

− Die Anatomie des Verjährungseinwands, in: AcP 224 (2024), in print

### Commercial and Company Law

− Kapital als Verantwortung – Rechtsvergleichende und rechtsökonomische Kritik der haftungsbeschränkten juristischen Person, Habilitation Thesis Heidelberg, 2017, manuscript available with the author

− Die Pflichtenstruktur des Maklervertrags in BGB und DCFR - Methodologische, historische und rechtsvergleichende Skizzen, in: *Jung* (Ed.), Richterliche Eingriffe in den Vertrag / L'intervention du juge dans le contrat, 2013, 169-196

− Verstärkte Zusammenarbeit als Einigungsersatz? – Eine Erwiderung am Beispiel des Europäischen Privat- und Gesellschaftsrechts, in: ZEuP 2015, 517-545

− Wissenszurechnung im Gesellschaftsstrafrecht – deutsche Unternehmen vor französischen Strafgerichten, in: AG 2015, 641-652

− La représentation dans les contrats de distribution – une perspective allemande, in: *Wicker* et al. (Ed.), La Représentation en droit privé, 2017, 137-172

− Sovereign Wealth and Social Responsibility, in: Wake Forest Law Review 52 (2017), 981-993

− Zivilgerichtliche Durchsetzung transnationaler Unternehmensverantwortung, in: JZ 2017, 385-397 (co-authored with *Leonhard Hübner*)

− Anlegerschutz bei treuhänderischen Auslandsinvestitionen – Österreichische Treuhand an deutschen Kommanditgesellschaften, in: VbR 2019, 204-207

− Gewerbemietrecht – Mietminderung in der Corona-Krise, in: BB 2020, 962-966

− Unternehmerische Haftung für Menschenrechte in transnationalen Lieferketten, in: EuZA 2021, 40-60 (co-authored with *Marina Murko*)

− Die Scheinauslandsgesellschaft in der Krise – Gläubigerschutz zwischen Gesellschafts- und Insolvenzstatut, in: JBl 2021, 14-27, 83-98

− Air Berlin: Close corporation und PLC & Co. KG – Rechtsformenarbitrage mit angloamerikanischen Scheinauslandsgesellschaften, in: *Mock/Fleischer* (Ed.), Große Gesellschaftsverträge aus Geschichte und Gegenwart (2021), 1105-1168 (co-authored with *Jonathan Pock*)

− Pakistanisches Recht vor europäischen Gerichten: Transnationale Menschenrechtsklagen aus Sicht eines Produktionslands, in: ZVglRWiss 120 (2021), 127-

Case 3:24-cv-00334   Document 31-6   Filed 06/04/24   Page 48 of 420 PageID #: 552

158 (co-authored with *Marina Murko*)
- Gemeinschaftliche Gesamtvermögenshaftung – Zur ausnahmslosen Geltung der Gesellschafterhaftung nach §§ 128, 171 HGB (zugleich Besprechung von BGH, Urt. v. 15.12.2020 – II ZR 108/19 und Urt. v. 28.1.2021 – IX ZR 54/20), in: ZGR 2021, 643-680
- Unionale Vorgaben für nationale Rechtsformen – Zum Anwendungsbereich des europäischen Gesellschaftsrechts anlässlich des Vorschlags zur Einführung einer Austrian Limited, in: JBl 2021, 621-636
- Rechtsvergleichende Anmerkungen zur „Austrian Limited", in: *Kalss/Torggler* (Ed.), Beiträge zum 9. Wiener Unternehmensrechtstag (2021), 9-42
- Der Mitverschuldenseinwand des Abschlussprüfers – eine historische, rechtsvergleichende und ökonomische Analyse, in: ZGR 2023, 1-47
- Der Name vertritt im Rubrum die Partei(en), in: ecolex 2023, 51-54
- Business and Human Rights: making the legally binding instrument work in public, private and criminal law, in: ZaöRV 83 (2023), 415-459 (co-authored with *Anne Peters*, *Sabine Gless* and *Marc-Philippe Weller*)
- Die Exempted Limited Partnership der Cayman Islands vor deutschen Gerichten, in: RIW 2023, 169-178
- Vom Entrepreneur Individuel à Responsabilité Limitée (2010) zur Haftungsbeschränkung ex lege beim Entrepreneur Individuel (2022), in: Fleischer (Ed.), Rechtsformneuschöpfungen im in- und ausländischen Gesellschaftsrecht, 2024 (co-authored with *Philipp Hülse* and *Holger Fleischer*), in print

**Banks and capital markets**
- Der gespaltene Emittent – Ad-hoc-Publizität, Schadenersatz und Wissenszurechnung – Mohr Siebeck Publishers, Series „Schriften zum Unternehmens- und Kapitalmarktrecht" Tübingen 2018, XII + 204 pages
- Delisting als Regulierungsaufgabe, in: ZGR 2016, 679-728 (co-authored with *Andreas Walter*)
- Crypto-Securities Regulation: ICOs, Token Sales and Cryptocurrencies under EU Financial Law, in: ECFR 2018, 645-696 (co-authored with *Philipp Hacker*)
- The Crypto-Security: Initial Coin Offerings and Securities Regulation, in: *Hacker* et al. (Ed.), Regulating Blockchain. Techno-Social and Legal Challenges, OUP 2019, 229-248 (co-authored with *Philipp Hacker*)
- Ad hoc-Publizitätshaftung – § 97 WpHG im Rechtsvergleich, in: *Hoffmann-Becking/Hommelhoff* (Ed.) Festschrift für Gerd Krieger zum 70. Geburtstag (2020), 1009-1023 (co-authored with *Marc-Philippe Weller)*
- Zahlungsmanagement und Malversationsprävention als Organisationspflichten der Geschäftsleitung, in: ÖBA 2021, 233-250 (co-authored with *Julia Told*)
- Payment Management and Siphoning Prevention as Directors' duties of care - A study on fake president fraud, in: Rivista Corporate Governance 2022, 595-620

**Private International Law**
- Mietmutterschaft – Eine international-privatrechtliche Kritik, Mohr Siebeck Publishers, Tübingen 2015, X + 154 pages

- Deutsches Betriebsverfassungsrecht und österreichisches Arbeitsvertragsstatut – intertemporale Dimensionen ausländischer Eingriffsnormen, in: IPRax 2013, 375-380
- Private International Law *sans frontiers,* in: Hague Yearbook of International Law (2013), 1-21

4

- Harmonisation over Maximisation: European choice of law solutions to aviation accidents, in: The Aviation & Space Journal, XIV (2015) No. 3, 2-11
- Griechische Spargesetze vor deutschen Arbeitsgerichten – Verwirrung um Art. 9 Abs. 3 Rom I-VO, in: EuZA 2016, 116-125
- The forgotten discipline of Private International Law: Lessons from Kiobel v. Royal Dutch Petroleum, in: Transnational Legal Theory, 7:2 and 7:3 (2016), 155-180 and 287-312
- State of play of cross-border surrogacy arrangements – Is there a case for regulatory intervention by the EU?, in: JPIL 2017, 463-473
- La gestation pour autrui en droit international privé allemand, in: Revue de Droit International d'Assas 1 (2018), 499-507
- A Situação dos Negócios de Sub-rogação de Útero Transfronteiriços na Europa e Noções sobre a Gestação de Substituição em Portugal e no Brasil, in: Grundmann et al. (Ed.), Direito privado e desenvolvimento econômico, 2018, 69-85
- The Kiobel tragedy: Missed chances for corporate social responsibility, in: Muir Watt et al. (Ed.), Global Private International Law, 2019, 310-319
- Herstellerhaftungsklagen – Internationaler Deliktsgerichtsstand und anwendbares Recht bei reinen Vermögensschäden wegen versteckter Produktmängel, in: ZVglRWiss 119 (2020), 59-110

**Civil Procedure**
- Internationale Menschenrechtsklagen gegen europäische Gesellschaften vor US- amerikanischen Gerichten, in: ZIP 2014, 1158-1164
- Rechtsschutz bei Nichtvorlage an den EuGH – Das Recht auf den gesetzlichen Richter im europäischen Verfassungsverbund, in: *Ahrens/Lipp/Varga* (Ed.), Grundrechte im Zivilprozess, 2015, 97-115
- Schiedsrichterhaftung in der internationalen Schiedsgerichtsbarkeit, in: IPRax 2015, 462-465 (co-authored with *Miguel Gomez-Jene*)
- Anerkennung kalifornischer Leihmutterschaftsdekrete in der Schweiz, in: IPRax 2016, 177-181
- The Lugano model – cooperative enhancement over enhanced cooperation, in: *Franzina* (Ed..), The external dimension of EU Private International Law after Opinion 1/13, 2016, 131-148
- Die subjektivrechtliche Durchsetzung der Vorlagepflicht zum EuGH als Verfassungsproblem, in: Europarecht 2016, 510-529
- Internationale Rechtskraft und nationale Kognition, in: IPRax 2017, 463-466
- Insolvenzbezogene Lösungsklauseln - § 119 insO im Spiegel rechtsvergleichender und ökonomischer Analyse, in: KTS 2024, in print

**VII. Papers presented (2014-2024)**

**2014**

‒ Delisting from the Frankfurt Stock Exchange – Going private as a case for going empirical, Yale Law School, New Haven

‒ Public and private international perspectives on Kiobel v. Royal Dutch Elon Law School, Greensboro (North Carolina)

‒ The forgotten discipline of Private International Law Yale Law School, New Haven

‒ Metaphors and Models – Reflecting the relationship between scientific language and knowledge, German-Russian Young Researchers' Forum, St. Petersburg

‒ Kiobel v Royal Dutch Petroleum (SCOTUS) – Das US-amerikanische IPR zwischen weltrechtlichem Anspruch und territorialistischer Wirklichkeit, Heidelberg Institute for Comparative Law, Conflict of Laws and International Business Law

‒ Richterrecht und Rechtserkenntnis, Gesellschaft Junger Zivilrechtswissenschaftler, Köln

‒ Grundrechte und Grundpflichten juristischer Personen, Kolloquium held by *Barbara Dauner-Lieb*, Cologne

‒ Savignys ‚Beruf unserer Zeit', Max-Planck-Institute for comparative public law and international law, Heidelberg

‒ Die diachrone Rechtsperson – rechtsvergleichende Skizzen im brasilianischen und deutschen Recht, German-Lusitanian lawyers' association, Salzburg (with *Paula M. Nasser Cury*)

‒ The End of Consideration, Max-Planck-Institute for comparative and international Private Law, Hamburg

‒ Nach der *Vale*-Entscheidung: formwechselnde, grenzüberschreitende Sitzverlegung von Gesellschaften, ERA-Meeting, Trier

‒ Haftungsdurchgriff für Delikt, Heidelberg Institute for Comparative Law, Conflict of Laws and International Business Law

‒ Die diachrone Rechtsperson, Forum Junge Rechtswissenschaft, Tübingen

**2015**

‒ Die juristische Person im Kontext – für eine rechtsmorphologische Neuordnung des Personenrechts, Daimler und Benz Foundation, Ladenburg

‒ The Lugano model – cooperative enhancement over enhanced cooperation, Università degli Studi di Ferrara

‒ Kant, Savigny and the BGB – Intellectual History and the Unification of European Law, Humboldt Private Law Forum, Berlin

‒ Zur Versicherung der Kapitalgesellschafter durch die Gesellschaftsgläubiger, 16th Gradute Meeting international Business Law, Munich

‒ Schmerzensgeld nach Flugzeugunglücken – der Fall Germanwings, Summer Academy of the German national research foundation, St. Johann

‒ Damage claims after international aircrashes – using choice of law as an anti-discriminatory tool, 10th Munich Liability Seminar of the European Air Law Association (EALA)

‒ La représentation dans les contrats de distribution, 6ème Journées franco-allemandes, Bordeaux

‒ Gesellschaftsmobilität in Europa, German-Lusitanian lawyers' association, Porto Alegre, Brazil

Case 3:24-cv-00334   Document 31-6   Filed 06/04/24   Page 51 of 420 PageID #: 555

- L'apport d'une réforme de la filiation internationale encadrant les GPA étrangères, présentation des travaux menés en Allemagne, Université Panthéon-Assas (Paris II), Paris

**2016**

- Children on Demand – Private international legal responses to global mother surrogacy, Max-Planck-Institute for comparative public law and international law, Heidelberg
- Rechtsprechung als öffentliches Gut – Über die gesellschaftlichen Kosten der Schiedsgerichtsbarkeit, German national research foundation, „Forum Rechtswissenschaft", Bureau of Hengeler Müller Partners, Frankfurt
- Grundlegung zu einer Theorie des Rechtsscheins, Institute for legal history, University of Münster
- Dreiecksverhältnisse im Bereicherungsrecht, Heidelberg Institute for Comparative Law, Conflict of Laws and International Business Law
- State of play of cross-border surrogacy arrangements – Is there a case for regulatory intervention by the EU?, European Parliament, Brussels
- Cuius regnum eius iudicium – hacia la emancipación del discurso privatista de los derechos humanos, Universidad Nacional de Tucumán, Argentina
- Eficácia dos direitos fundamentais no direito privado: uma crítica epistemológica, Universidade Federal da Bahia, Brazil
- Quem é responsável por Mariana? A responsabilidade ilimitada dos grupos societários, Universidade Federal do Rio de Janeiro, Brazil
- El levantamiento del velo y el desastre de Mariana, Universidade Federal Fluminense, Brazil
- Das Rechtssubjekt als ‚individualitätsloses Individuum' (Rechtsphilosophie, § 17): Radbruchs Personenbegriff in kantischer Perspektive, Heidelberg Centre, Santiago de Chile
- Das Kind im Zeitalter seiner technischen Produzierbarkeit, Medical law conference, Bucerius Law School, Hamburg

**2017**

- Sovereign Wealth and Social Responsibility, Wake Forest University School of Law Spring Symposium, Winston-Salem (NC), USA
- Implementing transnational CSR through unlimited liability for corporate torts, SciencesPo, PILAGG seminar (*Horatia Muir-Watt*), Paris
- Die Germanwings-Katastrophe in den französischen Alpen: Schmerzensgeld für Angehörige im deutschen und französischen Recht, German-French Lawyers' Association, Marseilles
- Haftungsbeschränkung bei Kapitalgesellschaften, Max-Planck-Institute for comparative and international Private Law, Hamburg
- Die institutionelle Haftungsbeschränkung als Grenze der unternehmerischen Menschenrechtshaftung, Law & Society Institute Berlin
- Die Präklusion von Gestaltungsrechten als materielle Rechtswirkung, Habilitation, Faculty of law, Heidelberg University
- Gesellschaftsrechtliche Prämissen unternehmerischer Verantwortung, Kulturwissenschaftliches Kolleg, University of Konstanz
- New approaches to Corporate Social Responsibility, CDEA of UFRGS, Porto Alegre
- Piercing the veil of ignorance – Does consumer protection exert unlimited liability?, 16th IACL Conference, Porto Alegre
- Capital as a responsibility – Corporate limited liability revisited, Università degli Studi di Firenze

- Capital as a responsibility – Corporate limited liability revisited, European University Institute, Florence

**2018**

- The political economy of CMU, Responsio to Georg Ringe, Imperial College, London
- Die gesellschaftsrechtliche Haftungsbeschränkung in institutionen- und verhaltensökonomischer Perspektive, Centre for Advanced Studies in Law and Economics, Bonn
- Initial Coin Offerings: Die Rolle des Internationalen Privatrechts, WM Praxisforum „Recht der FinTechs", Frankfurt
- Book presentation: „Kapital als Verantwortung – Kritik der institutionellen Haftungsbeschränkung", Roma Tre, Università degli studi
- Seminario: Las sociedades mercantiles en Derecho Internacional Privado, Universidad de Sevilla
- Private Enforcement of Continuous Disclosure Obligations – An Economic Comparative Perspective on EU Capital Markets Law, Max-Planck-Institute for comparative and international Private Law, Hamburg
- Umfang und Durchsetzung menschenrechtlicher Sorgfaltspflichten von Unternehmen, Humboldt University, Berlin
- Anfechtung, Verjährung und Rechtskraft: Zum Umgang der Zivilrechtsdogmatik mit Irrtümern, Junges Forum Rechtsphilosophie, Annual Meeting, Freiburg i. Br.
- Das Kapital im 21. Jahrhundert – Eine juristische Erwiderung auf Thomas Piketty, German-French Lawyers' Association, Heidelberg
- Die Legitimität der beschränkten Haftung, Working Group „Wirtschaft und Recht", Mannheim

**2019**

- Herstellerhaftung: Deliktsgerichtsstand und anwendbares Recht, Annual Meeting Verbraucher & Recht, Vienna
- EU Overseas Companies in Germany, France and Monaco, Séminare franco-allemand dur l'actualité du droit des sociétés et du droit des marchés financiers, Paris
- Blockchain und Gesellschaftsrecht, Conference: Gesellschaftsrecht im digitalen Zeitalter, Marburg
- Cybersecurity and Cyberfraud, Universities of Treviso and Venice
- Private enforcement of Art. 17 MAR – lessons from comparative law and economics, International Hellenic University, Thessaloniki

**2020**

- Internationale Kapitalmarktinformationshaftung, ZGR-Symposium, Glashütten, Germany
- EU Conflict of Laws for Companies: Acquis and Beyond, European Law Institute, Annual Meeting, Vienna
- Die Scheinauslandsgesellschaft in der Krise – Gläubigerschutz zwischen Gesellschafts- und Insolvenzstatut, University of Vienna
- Financial intermediaries and corporate governance – a comparative perspective, University of Vienna
- Derechos humanos en el discurso privatista, Conference: Ius commune ¿Hacia un ordenamiento jurídico global?, Tucumán, Argentina

**2021**

- GameStop and the Political Economy of the Short-Squeeze, Grandangolo Centro di ricerca Paolo Ferro-Luzzi sul Diritto della Banca e della Finanza in Europa, Rome

- Ökonomische Rechtsvergleichung im Wirtschaftsrecht, Doctorate School Ars Iuris, University of Vienna
- Rechtsvergleichende Anmerkungen zur „Austrian Limited", Österreichischer Unternehmensrechtstag, Vienna
- Enhanced Cooperation – Private international and business law experiences, 2nd Austrian-Slowenian Layers' meeting, Ljubljana
- Institutionen-ökonomische Betrachtungen zum Übernahmerecht, Conference Take-over law, Vienna University of Economics and Business

**2022**
- Enhanced Cooperation, Università Bocconi, Milano
- GmbH & Still als Finanzierungsinstrument, GVÖ-Conference, Vienna
- Internationale Umgründungen nach der Mobilitätsrichtlinie, University of Innsbruck
- Bereicherungsrechtliche Dreiecksverhältnisse, Traunkirchen Forum for Civil Law
- Die Sanierungstreuhand, RuSt Business Circle
- La disciplina della prescrizione, Università di Pavia, Italy
- Comparative Corporate Finance, HSG St. Gallen, Switzerland
- Die deliktsrechtliche Forderung – Ein Sonderling des Privat- und Zivilverfahrensrechts, European Centre of Tort and Insurance Law (ECTIL), Vienna
- Das Haftungsprivileg des Einzelkaufmanns, University of Vienna

**2023**
- Kampf um die GmbH, University of Vienna
- Digital assets in private law, Roma Tre University
- Der Einzelkaufmann mit beschränkter Haftung bei Oskar Pisko, University of Vienna
- Die Sitztheorie zwischen Anknüpfungsmoment und Inlandsbezug, University of Innsbruck
- Confronto tra la disciplina delle crypto-attività negli Stati Uniti a nell'Unione europea, Asociazione Bancaria Italiana, Rome
- Die Sitztheorie zwischen Anknüpfungsmoment und Inlandsbezug, Max-Planck-Institute for comparative and international Private Law, Hamburg
- Zivilrechtliche Haftungsfragen zur Sorgfalt in der Lieferkette, University of Vienna
- Causation and attribution as key concepts of climate change regulation and litigation, Waseda University,Tokyo
- Der zivilrechtliche Haftungstatbestand in der EU-Lieferkettenrichtlinie, Ryukoku University, Kyoto
- Der Verjährungseinwand – Dogmatische und rechtsvergleichende Skizzen, Kyoto University
- Asset partitioning without legal personality, Cambridge University

**2024**
- Wie verändert die Digitalisierung juristische Berufsbilder?, Annual meeting of German civil procedure professors, Göttingen

# APPENDIX B

**Chris Thomale**
born 02/26/1982 at Münster (Germany)
Hetzgasse 45/12, 1030 Vienna, Austria
phone:       + 49 176 24667008
e-mail:       chris.thomale@univie.ac.at

**Additional information to CV/resume**

I. Employers

I am currently employed by:

a) University of Vienna, Faculty of Law, Chair for International Company and Business Law (full-time)

and

b) University of Roma Tre, Faculty of Law, Chair for Comparative law (part-time, 50%)

II. Private persons or entities from whom I have received compensation or funding for work in my areas of expertise or to whom I have provided professional services, including in connection with a litigation since 2016

a) Schilling, Zutt & Anschütz Rechtsanwaltsgesellschaft mbH, Mannheim

b) Korch Legal Rechtsanwälte, Frankfurt

c) EY Law, Vienna

d) GÖRG Partnerschaft von Rechtsanwälten mbB, Berlin

e) Dr. Robert Schiebe, attorney at law, Frankfurt

f) Dr. Jörg Semmler, attorney at law, Stuttgart

g) AC Tischendorf Rechtsanwälte Partnerschaft mbB, Frankfurt

h) Gasser Partner Rechtsanwälte, Vaduz

i) Wolf Theiss Rechtsanwälte, Vienna

j) Kramer Levin Naftalis & Frankel LLP, New York

k) Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York

l) Volkswagen AG

m) Swarovski Group

n) BBBank, Karlsruhe (Germany)

o) Taylor Wessing Associates, Vienna

p) Porsche Group

q) Christian Rabel, Vienna

r) Paul Hastings (Europe) LLP, Frankfurt


III. Litigation in connection with which I have offered expert testimony, including through a declaration, report, or testimony at a deposition or trial since 2016

a) Landgericht Heidelberg, Germany, case No. Az. 1 O 68/14, declaration filed 2nd of August 2016

b) Landgericht München I, Germany, case No. Az. 10 HK O13290/13, declaration filed 30th of January 2018

c) Landgericht Mannheim, Germany, case No. Az. 3 O 54/16, declaration filed 11th of April 2018

d) Landgericht Lüneburg, Germany, case No. Az. 6 O 106/15, declaration filed 14th of March 2019

e) Landgericht Bielefeld, Germany, case No. Az 8 O 69/17, declaration filed 2nd of August 2019

f) US District Court for the District of Delaware, C.A. No. 17-184-JFB-SRF

g) US District Court for the District of Connecticut, Civ: No. 3:16-cv-2127 (AWT)

h) Handelsgericht Wien, case No. GZ 11 Cg 40/21a, declaration filed 6th of August 2022


I assure the statements made above are correct.

Vienna, 23rd of May 2024

# APPENDIX C

**Table of Contents**

| Description | Page No. |
|---|---|
| Complaint, *Westchester Putnam Counties Heavy & Highway Laborers Local 60 Benefits Fund v. Shoals Technologies Group, Inc.*, No. 3:24-cv-00334 (M.D. Tenn.), ECF No. 1 | 3 (of 363) |
| Complaint, *Oklahoma Police Pension & Retirement System v. Shoals Technologies Group, Inc.*, No. 3:24-cv-00580 (M.D. Tenn.) , ECF No. 1 | 32 (of 363) |
| Complaint, *Kissimmee Utility Authority Employees' Retirement Plan v. Shoals Technologies Group, Inc.*, No. 3:24-cv-00598 (M.D. Tenn.) , ECF No. 1 | 77 (of 363) |
| Erste AM's Motion for Consolidation of Related Actions, Appointment as Lead Plaintiff, and Approval of Lead Plaintiff's Selection of Lead Counsel, ECF No. 21 | 131 (of 363) |
| Erste AM's Memorandum of Law in Support of Motion for Consolidation of Related Actions, Appointment as Lead Plaintiff, and Approval of Lead Plaintiff's Selection of Lead Counsel, ECF No. 22 | 141 (of 363) |
| Erste AM's Declaration of Christopher M. Wood in Support of Motion for Consolidation of Related Actions, Appointment as Lead Plaintiff, and Approval of Lead Plaintiff's Selection of Lead Counsel, ECF No. 23 | 165 (of 363) |

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| WESTCHESTER PUTNAM COUNTIES HEAVY & HIGHWAY LABORERS LOCAL 60 BENEFITS FUND, individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> vs. <br><br> SHOALS TECHNOLOGIES GROUP, INC., JASON WHITAKER, JEFFREY TOLNAR, BRANDON MOSS, DOMINIC BARDOS, and KEVIN HUBBARD, <br><br> Defendants. | CASE NO: <br><br> <u>CLASS ACTION</u> <br><br> COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS <br><br><br> DEMAND FOR A JURY TRIAL |

Plaintiff Westchester Putnam Counties Heavy & Highway Laborers Local 60 Benefits Fund ("Plaintiff"), by and through its attorneys, alleges the following upon information and belief, except as to allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief are based upon, among other things, its counsel's investigation, which includes, without limitation: (a) review and analysis of public filings made by Shoals Technologies Group, Inc. ("Shoals" or the "Company") with the U.S. Securities and Exchange Commission (the "SEC"); (b) review and analysis of press releases and other publications disseminated by Defendants (defined below) and other parties; (c) review of news articles, shareholder communications, conference calls, and postings on the Shoals website concerning the Company's public statements; and (d) review of other publicly available information concerning the Company and the Individual Defendants.

## **NATURE OF THE ACTION**

1. This is a federal securities class action on behalf of all persons and entities that purchased Shoals common stock between May 17, 2022 and November 7, 2023, inclusive (the "Class Period") against Shoals and certain of its officers (collectively "Defendants") seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

2. Shoals purports to be a leading provider of electrical balance of system ("EBOS") products for solar power generation, battery storage, and electric vehicle charging infrastructure. In the context of solar power generation, Shoals EBOS products encompass all of the components necessary to transport electric currents produced by solar panels to an inverter, allowing the current to be delivered to a power grid or an energy storage product.

1

3. Prior to, and during the Class Period, Shoals used polymer-insulated copper wires, which it purchased from a number of different suppliers, in its EBOS products. The wires served a critical role in Shoals EBOS products as part of custom wire harnesses that are used to aggregate electricity from multiple solar panels and deliver that electricity to inverters.

4. Throughout the Class Period, Defendants touted the Company's "focus on quality and reliability" with regard to its EBOS components, from which Shoals generated the majority of its revenue during the Class Period. These components were backed by a product warranty Shoals provided to its customers. Shoals highlighted that its products "meet [the Company's] stringent quality requirements." As the Company's warranty supported the products meeting "stringent quality requirements," Shoals assured investors throughout the Class Period that its reported "Cost of Revenue" included costs related to product warranty liability.

5. In Shoals' Quarterly Report on Form 10-Q for the first quarter of 2023, filed with the SEC on May 8, 2023 (the "1Q23 10-Q"), investors were first informed of a potential issue involving "a subset of wire harnesses used in [Shoals'] EBOS solutions [] presenting excessive pull back of wire insulation at connection points," which Shoals dubbed "shrinkback." Shoals also sought to ease investors' concerns by reporting that it had "substantially ceased use of the related wire."

6. Then, on August 1, 2023, Shoals filed its Quarterly Report on Form 10-Q for the second quarter of 2023 ("2Q23 10-Q") with the SEC and held a conference call with analysts to discuss its results for the quarter. The 2Q23 10-Q disclosed that Shoals had recorded a warranty liability of $9.3 million related to the shrinkback issue. During the corresponding call with analysts, Oppenheimer analyst Colin Rusch asked Defendants to "talk a little bit about the wire issues . . . how extensive it was in terms of the number of customers and number of shipments and

2

how much time it was spread over?" In response, Chief Financial Officer ("CFO") Dominic Bardos stated, "We've communicated pretty much everything we can." CFO Bardos also confirmed that "[t]he charge that we booked in the quarter we believe is adequate to do the remediation required, and that's why we booked it."

7. In reality, and as remained undisclosed to investors, Shoals learned of customers experiencing wire insulation shrinkback by no later than March 2022. For example, in March 2022, Shoals learned of exposed copper conduit resulting from shrinkback in EBOS wire harnesses at a customer's solar field in Arizona. Indeed, throughout 2022, Shoals learned of numerous customers experiencing similar copper conduit exposure, or shrinkback. As investors belatedly found out, Shoals had installed defective wire harnesses in at least 300 solar fields. These harnesses represented approximately 30% of the total amount of Shoals harnesses manufactured between 2020 and 2022. As a result, Defendants' positive statements about the Company's financial guidance, business, operations, and prospects during the Class Period were materially false and/or misleading.

8. On November 7, 2023, Shoals stunned the market by revealing that the Company had been forced to take an additional $50.2 million charge for warranty expense as result of the wire shrinkback issue. Shoals further advised that it expected the wire shrinkback issue to cost between $59.7 million and $184.9 million dollars to remedy.

9. On this news, Shoals' stock price fell more than 20%, from a closing price of $16.23 per share on November 7, 2023, to a closing price of $12.95 per share on November 9, 2023, wiping out approximately $550 million in market capitalization.

10. Securities analysts were shocked by the disclosure and linked Shoals' sharp stock price decline to the warranty charge. For example, in a report dated November 10, 2023, analysts

3

at Barclays declared that "the upper end of the $60-$185mm came as surprise to investors and has contributed to the underperformance of the stock." Similarly, analysts at Truist noted that the third-quarter results "were heavily impacted by a ~$50mm warranty charge that drove unadjusted 3Q [gross margins] well below our/street estimates."

11. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in market value of the Company's common stock when the truth was disclosed, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

12. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

13. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 27 of the Exchange Act (15 U.S.C. § 78aa).

14. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b), Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts and omissions charged herein, including the dissemination of materially false and misleading information to the investing public, and the omission of material information, occurred in substantial part in this Judicial District, as Shoals is headquartered in this Judicial District.

15. In connection with the acts, transactions, and conduct alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the U.S. Mail, interstate telephone communications, and the facilities of a national securities exchange.

4

16. Based in Hawthorne, New York, Plaintiff provides pension and other benefits for union members. Plaintiff is responsible for the retirement income of these employees and their beneficiaries. Plaintiff manages approximately $300 million in assets for the benefit of more than 1,500 participants. As set forth in the accompanying certification, incorporated by reference herein, Plaintiff purchased Shoals common stock during the Class Period and suffered damages as a result of the federal securities laws violations and false and/or misleading statements and/or material omissions alleged herein.

17. Defendant Shoals is incorporated under the laws of Delaware, with its principal executive offices located in Portland, Tennessee. The Company's common stock trades on the Nasdaq Global Market (the "Nasdaq") under the ticker symbol "SHLS."

18. Defendant Jason Whitaker ("Whitaker") served as the Company's Chief Executive Officer ("CEO") from January 2020 to March 15, 2023.

19. Defendant Jeffrey Tolnar ("Tolnar") has served as the Company's President since December 19, 2022 and also served as Interim CEO from March 16, 2023 to July 16, 2023.

20. Defendant Brandon Moss ("Moss") has served as the Company's CEO since July 17, 2023.

21. Defendant Dominic Bardos ("Bardos") has served as the Company's CFO since October 3, 2022.

22. Defendant Kevin Hubbard ("Hubbard") served as the Company's Interim CFO from May 5, 2022 to October 2, 2022.

23. Defendants Whitaker, Tolnar, Moss, Bardos, and Hubbard (collectively, the "Individual Defendants"), because of their positions with the Company, possessed the power and

5

authority to control the contents of the Company's reports to the SEC, shareholder letters, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations that were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

24. The Company and the Individual Defendants are collectively referred to as the "Defendants."

<div align="center"><strong><u>SUBSTANTIVE ALLEGATIONS</u></strong></div>

<div align="center"><strong><u>Background</u></strong></div>

25. Founded by Dean Solon in 1996, Shoals is based in Portland, Tennessee and provides EBOS products for solar energy projects in the United States. The Company sells solar products principally to engineering, procurement, and construction firms ("EPCs") that build such solar energy projects. The Company designs, manufactures, and sells systems for two types of wiring architectures used by the U.S. solar industry: Homerun EBOS and Combine-as-you-go EBOS. In 2021 and 2022, Shoals derived 73% and 77.8% of its revenues, respectively, from the sales of these systems. By 2023, those products provided 81.5% of Shoals' revenues.

26. A critical part of these EBOS systems is a custom wire harness that is used to aggregate electricity from multiple solar panels and deliver that electricity to inverters. The wires

<div align="center">6</div>

in these harnesses act as conductors, intended to carry high-voltage electricity. Shoals purchases these wires from a number of different suppliers to manufacture its EBOS products.

27.    By March 2022, at the latest, Shoals received a report from a customer of exposed copper conductors on wire harnesses installed at the customer's Arizona solar field. Shoals, at its own expense, replaced the affected harnesses on the end-user's site. Numerous other Shoals customers reported similar instances of exposed cooper conductors in solar fields throughout 2022.

28.    Shoals installed EBOS systems with defective wire harnesses at approximately 300 solar fields, representing approximately 30% of all wire harnesses installed by Shoals between 2020 and 2022.

### Defendants' Materially False and Misleading Statements Issued During the Class Period

29.    On May 17, 2022, Shoals filed its Quarterly Report on Form 10-Q for the first quarter of 2022 (the "1Q22 10-Q"). The 1Q22 10-Q explained that "[w]hen we sell a system solution, we enter into a contract with our customers" that included a "warranty for the products being purchased," and falsely assured investors that the Company's reported "Cost of Revenue" included costs related to the "product warranty." Shoals also provided generic and boilerplate warnings that any "defects or performance problems in our products *could* result in loss of customers" and that the Company "*may* face warranty, indemnity and product liability claims arising from defective products."[1]

30.    Meanwhile, throughout the Class Period, the Company touted on its website that it "focus[ed] on [the] [q]uality and [r]eliability" of its EBOS components and that "Shoals products are built in a factory[-]controlled environment with calibrated machines and rigorous quality

---

[1] All emphases are added.

standards.  Every component is fully tested using our in-house testing chambers to ensure that our EBOS solutions deliver the highest levels of quality and reliability."

31.     Likewise, Shoals' Quarterly Reports on Forms 10-Q for the second and third quarters of 2022, respectively filed after the markets closed on August 15, 2022 and November 14, 2022 (the "2Q22 10-Q" and "3Q22 10-Q," respectively), repeated the same statements referenced in ¶ 29 verbatim, including the generic and boilerplate warnings that any "defects or performance problems in our products ***could*** result in loss of customers" and the Company "***may*** face warranty, indemnity and product liability claims arising from defective products."

32.     On February 28, 2023, after the market closed, Shoals filed its Annual Report on Form 10-K for 2022 ("2022 10-K").  The 2022 10-K reported that "as of December 31, 2022 and 2021 our estimated accrued warranty reserve was $0.6 million and $0.1 million, respectively."

33.     With regard to product quality, the 2022 10-K assured investors that Shoals' "products meet our stringent quality requirements" and touted the Company's focus on "making quality foremost in all we do, make, and sell."

34.     On May 8, 2023, Shoals filed its Quarterly Report on Form 10-Q for the first quarter of 2023 (the "1Q23 10-Q").  The 1Q23 10-Q publicly disclosed for the first time that the "[C]ompany has been notified by certain customers that a subset of wire harnesses used in its EBOS solutions is presenting excessive pull back of wire insulation at connection points." However, Shoals downplayed the issue, stating that it was only "probable that the Company will incur costs related to the repair or replacement of the impacted wire harnesses," but that "it is not possible to reasonably estimate those costs."

35.     On August 1, 2023, Shoals filed its quarterly report for the second quarter of 2023, *i.e.*, the 2Q23 10-Q, and held a call with analysts to discuss the results.  The 2Q23 10-Q disclosed

that Shoals had recorded a $9.4 million charge for warranty expense due to the previously disclosed wire issue. Despite the charge, the 2Q23 10-Q continued to describe quality control problems as a mere risk that *could* potentially materialize in the future, stating that "we *may* experience delays, disruptions or quality control problems in our manufacturing operations."

36. The 2Q23 10-Q also repeated the generic and boilerplate warnings that:

Any actual or perceived errors, defects or poor performance in our products *could* result in the replacement or recall of our products, shipment delays, rejection of our products, damage to our reputation, lost revenue, diversion of our engineering personnel from our product development efforts and increases in customer service and support costs, all of which could have a material adverse effect on our business, financial condition and results of operations. . . . defective components may give rise to warranty, indemnity or product liability claims against us.

37. At the same time, the 2Q23 10-Q reassured investors that Shoals "conduct[s] quality assessments on [its] products and these products have stringent quality requirements."

38. During the accompanying earnings call for the second quarter of 2023 held that same day, Oppenheimer analyst Colin Rusch asked Defendants to "talk a little bit about the wire issues . . . how extensive it was in terms of the number of customers and number of shipments and how much time it was spread over?" In response, Defendant Bardos stated, "[w]e've communicated pretty much everything we can," and "[t]he charge that we booked in the quarter we believe is adequate to do the remediation required, and that's why we booked it."

39. The above statements identified in ¶¶ 29-38 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects to make the statements made, in light of the circumstances under which they were made, not false and misleading. Specifically, Defendants failed to disclose to investors that: (1) Shoals did not deliver EBOS products that met the highest levels of quality and reliability; (2) Shoals had received reports of exposed copper conduit in EBOS wire harnessess in a large number of solar

9

fields and was aware that a significant portion of its wire harnesses had defects; (3) Shoals would have to incur between $60 million to $185 million in costs to remediate the wire shrinkback issue; and (4) Shoals had understated its cost of revenue by millions of dollars.  As a result, Defendants' positive statements about the Company's financial guidance, business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

<u>**The Truth Is Revealed**</u>

40.    The truth regarding Shoals' fraudulent conduct was revealed after the close of the markets on November 7, 2023.  That day, Shoals filed its Quarterly Report on Form 10-Q for the third quarter of 2023 ("2Q23 10-Q") and held an accompanying earnings call in which Defendants revealed that the wire shrinkback issue was far more severe than previously disclosed. Specifically, the Company reported that the shrinkback issue affected 30% of Shoals' wire harnesses installed between 2020 and 2022, booked a $50.2 million warranty expense for the second quarter of 2023 related to the shrinkback issue, and provided a range of potential loss related to the shrinkback issue of $59.7 million and $184.9 million.

41.    Notably, documents from litigation Shoals brought against the supplier of the wire related to the defective wire harnesses show Shoals knew of significant issues with shrinkback by at least March 2022—more than one and a half years before it disclosed the huge liability it would entail to investors.  As Shoals itself alleged in that action, in March 2022, the Company received information about exposed copper conduit on wire installed in Shoals EBOS components at a customer's solar field in Arizona.  On March 24, 2022, Shoals representatives and others visited the solar field and inspected the defective wire harnesses.  Thereafter, Shoals replaced those harnesses at its own expense.  In addition, as Shoals admits, by "late 2022 . . . numerous other Shoals' customers began reporting similar instances of cooper conductor exposure."

10

42. Similarly, in the counterclaim filed by the wire supplier, the supplier stated that, in April 2022, Shoals conceded that the wires used in the harnesses were not in any way defective, but instead, that Shoals' installation or cable management issues had caused the shrinkback in the harnesses. Further, the counterclaim alleged that no other customer of the wire supplier had reported any issue with shrinkback.

43. Following the November 7, 2023 disclosures, the price of Shoals' stock dropped $3.28 per share, or more than 20%, to close at $12.95 per share on November 9, 2023, wiping out approximately $550 million in market capitalization.

44. Analysts were stunned by the disclosure and linked Shoals' sharp stock price decline directly to the revised warranty expense range. For example, on November 10, 2023, analysts at Barclays reported that "the upper end of the $60-$185mm *came as a surprise* to investors and has contributed to the underperformance of the stock." Similarly, analysts at Truist noted that third-quarter results "were heavily impacted by a ~$50mm warranty charge that drove unadjusted 3Q GMs well below our/street estimates."

## CLASS ACTION ALLEGATIONS

45. Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class, consisting of all persons and entities that purchased Shoals common stock between May 17, 2022 and November 7, 2023, inclusive, and were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

46. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Throughout the Class Period, common stock of Shoals actively traded on the Nasdaq (an open and efficient market) under the ticker symbol "SHLS." Millions of Shoals shares were traded publicly during the Class Period on the Nasdaq. As of February 26, 2024, Shoals had more than 170 million shares of Class A common stock outstanding. Record owners and other members of the Class may be identified from records maintained by Shoals or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

47. Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

48. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests that conflict with those of the Class.

49. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a. whether Defendants violated the Exchange Act by the acts and omissions as alleged herein;

b. whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

12

c.      whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders during the Class Period misrepresented material facts about the business, operations, and prospects of Shoals;

d.      whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted to disclose material facts about the business, operations, and prospects of Shoals;

e.      whether the market price of Shoals common stock during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

f.      the extent to which the members of the Class have sustained damages and the proper measure of damages.

50.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this suit as a class action.

<u>**UNDISCLOSED ADVERSE INFORMATION**</u>

51.    The market for Shoals common stock was an open, well-developed, and efficient market at all relevant times.  As a result of the materially false and/or misleading statements and/or omissions particularized in this Complaint, the Company's common stock traded at artificially inflated prices during the Class Period.  Plaintiff and the other members of the Class purchased the Company's common stock relying upon the integrity of the market price of the Company's common stock and market information relating to Shoals and have been damaged thereby.

13

52. During the Class Period, Defendants materially misled the investing public, thereby inflating the price of the Company's common stock, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about the Company's business, operations, and prospects as alleged herein. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its business, thus causing the Company's common stock to be overvalued and artificially inflated or maintained at all relevant times. Defendants' materially false and/or misleading statements during the Class Period directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class who purchased the Company's common stock at artificially inflated prices and were harmed when the truth was revealed.

## SCIENTER ALLEGATIONS

53. As alleged herein, Defendants acted with scienter in that Defendants knew or were reckless as to whether the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew or were reckless as to whether such statements or documents would be issued or disseminated to the investing public, and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

54. As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Shoals, their control over, receipt, and/or modification of the Company's allegedly materially misleading statements and omissions, and/or

14

their positions with the Company that made them privy to confidential information concerning Shoals, participated in the fraudulent scheme alleged herein.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

55. The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

56. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Shoals who knew that the statement was false when made.

## LOSS CAUSATION

57. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss, *i.e.*, damages, suffered by Plaintiff and the Class.

58. During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions and engaged in a scheme to deceive the market. This artificially inflated the prices of the Company's common stock and operated as a fraud or deceit on the Class. When Defendants' prior misrepresentations, information alleged to have been

15

concealed, fraudulent conduct, and/or the effect thereof were disclosed to the market, the price of the Company's stock fell precipitously, as the prior artificial inflation came out of the price.

<div align="center">

**APPLICABILITY OF PRESUMPTION OF RELIANCE**
**(FRAUD-ON-THE-MARKET DOCTRINE)**

</div>

59. The market for Shoals common stock was open, well-developed, and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose particularized in this Complaint, Shoals common stock traded at artificially inflated and/or maintained prices during the Class Period. Plaintiff and other members of the Class purchased the Company's common stock relying upon the integrity of the market price of Shoals common stock and market information relating to Shoals and have been damaged thereby.

60. At all times relevant, the market for Shoals common stock was an efficient market for the following reasons, among others:

a. Shoals was listed and actively traded on Nasdaq, a highly efficient and automated market;

b. As a regulated issuer, Shoals filed periodic public reports with the SEC and/or Nasdaq;

c. Shoals regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

d. Shoals was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

<div align="center">16</div>

61.     As a result of the foregoing, the market for Shoals common stock promptly digested current information regarding Shoals from all publicly available sources and reflected such information in the Company's stock price.  Under these circumstances, all purchasers of Shoals common stock during the Class Period suffered similar injury through their purchase of stock at artificially inflated prices, and a presumption of reliance applies.

62.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded in Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business, operations, and prospects—information that Defendants were obligated to disclose during the Class Period but did not—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

<u>**COUNTS AGAINST DEFENDANTS**</u>

<u>**COUNT I**</u>

**For Violations of Section 10(b) of the Exchange Act and
Rule 10b-5 Promulgated Thereunder Against All Defendants**

63.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

64.     During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain

17

the market price of Shoals common stock; and (iii) cause Plaintiff and other members of the Class to purchase Shoals common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

65. Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of conduct that operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Shoals common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

66. Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's business, operations, and prospects, as specified herein. Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of the Company's business, operations, and prospects, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Shoals and its business, operations, and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of conduct

18

of business that operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

67. Each of the Individual Defendants' primary liability and controlling-person liability, arises from the following facts: (i) each of the Individual Defendants was a high-level executive and/or director at the Company during the Class Period and a member of the Company's management team or had control thereof; (ii) each of the Individual Defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development, and reporting of the Company's business, operations, and prospects; (iii) each of the Individual Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to, other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (iv) each of the Individual Defendants was aware of the Company's dissemination of information to the investing public, which they knew and/or recklessly disregarded was materially false and misleading.

68. Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing the Company's operating condition, business practices, and prospects from the investing public and supporting the artificially inflated and/or maintained price of its common stock. As demonstrated by Defendants' overstatements and misstatements of the Company's business, operations, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were

19

reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

69. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Shoals common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants or upon the integrity of the market in which the shares and stock traded or trades, and/or in the absence of material adverse information that was known or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class purchased Shoals common stock during the Class Period at artificially inflated prices and were damaged thereby.

70. At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity and believed them to be true. Had Plaintiff, the other members of the Class, and the marketplace known of the truth regarding the problems that Shoals was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased Shoals common stock, or, if they had purchased such shares or stock during the Class Period, they would not have done so at the artificially inflated prices that they paid.

71. By virtue of the foregoing, Shoals and the Individual Defendants each violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

72. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

20

## COUNT II

### For Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

73. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

74. The Individual Defendants acted as controlling persons of Shoals within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions with the Company, participation in, and/or awareness of the Company's operations, and intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading. Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

75. In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

76. As set forth above, Shoals and the Individual Defendants each violated § 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, the Individual Defendants are liable pursuant to § 20(a) of the Exchange Act. As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and other

21

members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## PRAYER FOR RELIEF

77. WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for relief and judgment as follows:

a) Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b) Awarding Plaintiff and the other members of the Class damages in an amount that may be proven at trial, together with interest thereon;

c) Awarding Plaintiff and the members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

d) Awarding such other relief as this Court deems appropriate.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: March 21, 2024

Respectfully submitted,

**STRANCH, JENNINGS & GARVEY PLLC**

By: */s/ J. Gerard Stranch IV*
J. Gerard Stranch IV (BPR 23045)
The Freedom Center
223 Rosa L. Parks Avenue
Suite 200
Nashville, TN 37203
Tel.: (615) 254-8801
gstranch@stranchlaw.com

*Local Counsel for Plaintiff Westchester Putnam
Counties Heavy & Highway Laborers Local 60*

*Benefits Fund*

**SAXENA WHITE P.A.**

Lester Hooker (*pro hac vice forthcoming*)
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Tel.: (561) 394-3399
Fax: (561) 394-3382
lhooker@saxenawhite.com

-and-

Rachel Avan (*pro hac vice forthcoming*)
Marco A. Dueñas (*pro hac vice forthcoming*)
10 Bank Street, Suite 882
White Plains, NY 10606
Tel.: (914) 437-8551
Fax: (888) 216-2220
ravan@saxenawhite.com
mduenas@saxenawhite.com

*Counsel for Plaintiff Westchester Putnam Counties*
*Heavy & Highway Laborers Local 60 Benefits Fund*

23

# CERTIFICATION AND AUTHORIZATION

I, Christine P. Costa, on behalf of Westchester Putnam Counties Heavy & Highway Laborers Local 60 Benefits Fund ("Local 60"), hereby certify, as to the claims asserted under the federal securities laws, that:

1. I have reviewed a complaint prepared against Shoals Technologies Group, Inc. ("Shoals") alleging violations of the federal securities laws and authorized its filing. I am authorized in my capacity as Fund Manager to initiate litigation and to execute this Certification on behalf of Local 60.

2. Local 60 did not purchase the securities that are the subject of this action at the direction of counsel, or in order to participate in any action arising under the federal securities laws.

3. Local 60 is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4. Local 60's transactions in Shoals common stock during the Class Period are set forth in the attached Schedule A.

5. Local 60 has sought to serve and was appointed as lead plaintiff and/or representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification: *None*.

6. Local 60 has sought to serve as a lead plaintiff or representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification, but either withdrew its motion for lead plaintiff appointment, was not appointed lead plaintiff, or the lead plaintiff decision is still pending:

   *Peneycad v. RTX Corp.*, No. 3:23-cv-1035 (D. Conn.).

7. Local 60 will not accept any payment for serving as a representative party on behalf of the Class beyond Local 60's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

1

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 21ˢᵗ day of March, 2024.

*Westchester Putnam Counties Heavy &*
*Highway Laborers Local 60 Benefits Fund*

Christine P. Costa, Fund Manager

## SCHEDULE A
### Westchester Putnam Counties Heavy & Highway Laborers Local 60 Benefits Fund
### Transactions in Shoals Technologies Group, Inc.

| Common Stock Purchases | | |
|---|---|---|
| Date | Shares | Price |
| 01/12/23 | 3,000 | $26.5668 |
| 01/13/23 | 3,000 | $27.7205 |
| 01/18/23 | 1,300 | $28.6950 |
| 01/30/23 | 150 | $26.2727 |

| Common Stock Sales | | |
|---|---|---|
| Date | Shares | Price |
| 04/26/23 | 800 | $20.7213 |
| 05/04/23 | 1,800 | $18.0317 |
| 05/22/23 | 2,500 | $23.9805 |
| 05/22/23 | 2,350 | $24.1816 |

3

JS 44 (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
WESTCHESTER PUTNAM COUNTIES HEAVY & HIGHWAY LABORERS LOCAL 60 BENEFITS FUND, individually and on behalf of all others similarly situated

## DEFENDANTS
SHOALS TECHNOLOGIES GROUP, INC., JASON WHITAKER, JEFFREY TOLNAR, BRANDON MOSS, DOMINIC BARDOS, and KEVIN HUBBARD

**(b)** County of Residence of First Listed Plaintiff  Westchester Co, NY
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
J. Gerard Stranch, IV, Stranch, Jennings & Garvey PLLC, The Freedom Center, 223 Rosa L. Parks Avenue, Suite 200, Nashville, TN 37203, Tel.: (615) 254-8801

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question *(U.S. Government Not a Party)*
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers' Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury<br>☐ 362 Personal Injury - Medical Malpractice<br><br>**PERSONAL INJURY**<br>☐ 365 Personal Injury - Product Liability<br>☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability<br>☐ 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 690 Other<br><br>**LABOR**<br>☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Management Relations<br>☐ 740 Railway Labor Act<br>☐ 751 Family and Medical Leave Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Employee Retirement Income Security Act | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br>**INTELLECTUAL PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 835 Patent - Abbreviated New Drug Application<br>☐ 840 Trademark<br>☐ 880 Defend Trade Secrets Act of 2016<br>**SOCIAL SECURITY**<br>☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)) | ☐ 375 False Claims Act<br>☐ 376 Qui Tam (31 USC 3729(a))<br>☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and Corrupt Organizations<br>☐ 480 Consumer Credit (15 USC 1681 or 1692)<br>☐ 485 Telephone Consumer Protection Act<br>☐ 490 Cable/Sat TV<br>☒ 850 Securities/Commodities/ Exchange<br>☐ 890 Other Statutory Actions<br>☐ 891 Agricultural Acts<br>☐ 893 Environmental Matters<br>☐ 895 Freedom of Information Act<br>☐ 896 Arbitration<br>☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision<br>☐ 950 Constitutionality of State Statutes |
| **REAL PROPERTY**<br>☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | **CIVIL RIGHTS**<br>☐ 440 Other Civil Rights<br>☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/ Accommodations<br>☐ 445 Amer. w/Disabilities - Employment<br>☐ 446 Amer. w/Disabilities - Other<br>☐ 448 Education | **PRISONER PETITIONS**<br>**Habeas Corpus:**<br>☐ 463 Alien Detainee<br>☐ 510 Motions to Vacate Sentence<br>☐ 530 General<br>☐ 535 Death Penalty<br>**Other:**<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br>☐ 560 Civil Detainee - Conditions of Confinement | **IMMIGRATION**<br>☐ 462 Naturalization Application<br>☐ 465 Other Immigration Actions<br>**FEDERAL TAX SUITS**<br>☐ 870 Taxes (U.S. Plaintiff or Defendant)<br>☐ 871 IRS—Third Party 26 USC 7609 | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Private Securities Litigation Reform Act, 15 U.S.C. § 78j(b) and 78t(a) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5)
Brief description of cause:
Securities Fraud - Violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and SEC Rule 10b-5

## VII. REQUESTED IN COMPLAINT:
☒ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE _____  DOCKET NUMBER _____

DATE: Mar 21, 2024

SIGNATURE OF ATTORNEY OF RECORD: /s/ J. Gerard Stranch IV

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

Case 3:24-cv-00334 Document 1-2 Filed 03/21/24 Page 87 of 420 PageID #: 2591

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed.  The attorney filing a case should complete the form as follows:

**I.(a)** **Plaintiffs-Defendants.**  Enter names (last, first, middle initial) of plaintiff and defendant.  If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

  **(b)** **County of Residence.**  For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

  **(c)** **Attorneys.**  Enter the firm name, address, telephone number, and attorney of record.  If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** **Jurisdiction.**  The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings.  Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff.  (1) Jurisdiction based on 28 U.S.C. 1345 and 1348.  Suits by agencies and officers of the United States are included here.
United States defendant.  (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question.  (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship.  (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states.  When Box 4 is checked, the citizenship of the different parties must be checked**.  (See Section III below; NOTE: federal question actions take precedence over diversity cases.)**

**III.** **Residence (citizenship) of Principal Parties.**  This section of the JS 44 is to be completed if diversity of citizenship was indicated above.  Mark this section for each principal party.

**IV.** **Nature of Suit.**  Place an "X" in the appropriate box.  If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable.  Click here for: Nature of Suit Code Descriptions.

**V.** **Origin.**  Place an "X" in one of the seven boxes.
Original Proceedings.  (1) Cases which originate in the United States district courts.
Removed from State Court.  (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court.  (3) Check this box for cases remanded to the district court for further action.  Use the date of remand as the filing date.
Reinstated or Reopened.  (4) Check this box for cases reinstated or reopened in the district court.  Use the reopening date as the filing date.
Transferred from Another District.  (5) For cases transferred under Title 28 U.S.C. Section 1404(a).  Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer.  (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File.  (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.**  Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

**VI.** **Cause of Action.**  Report the civil statute directly related to the cause of action and give a brief description of the cause.  **Do not cite jurisdictional statutes unless diversity.**  Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.** **Requested in Complaint.**  Class Action.  Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand.  In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand.  Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** **Related Cases.**  This section of the JS 44 is used to reference related pending cases, if any.  If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.**  Date and sign the civil cover sheet.

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| OKLAHOMA POLICE PENSION AND RETIREMENT SYSTEM, individually and on behalf of all others similarly situated, | CASE NO: |
| | CLASS ACTION |
| Plaintiff, | |
| | COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| vs. | |
| SHOALS TECHNOLOGIES GROUP, INC., JASON WHITAKER, DOMINIC BARDOS, BRAD FORTH, PETER WILVER, TY DAUL, TONI VOLPE, LORI SUNDBERG, JEANNETTE MILLS, ROBERT JULIAN, JEFFREY TOLNAR, BRANDON MOSS, KEVIN HUBBARD, J.P. MORGAN SECURITIES LLC, GUGGENHEIM SECURITIES, LLC, MORGAN STANLEY & CO. LLC, UBS SECURITIES LLC, GOLDMAN SACHS & CO. LLC, BARCLAYS CAPITAL INC., CREDIT SUISSE SECURITIES (USA) LLC, COWEN AND COMPANY, LLC, OPPENHEIMER & CO. INC., PIPER SANDLER & CO., ROTH CAPITAL PARTNERS, LLC, JOHNSON RICE & COMPANY L.L.C., NORTHLAND SECURITIES, INC., DEAN SOLON, SOLON HOLDCO I, LLC, and SOLON HOLDCO II, LLC, | DEMAND FOR A JURY TRIAL |
| Defendants. | |

## I. INTRODUCTION

Plaintiff Oklahoma Police Pension and Retirement System ("Plaintiff"), by and through its attorneys, alleges the following upon information and belief, except as to allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief are based upon, among other things, its counsel's investigation, which includes, without limitation: (a) review and analysis of public filings made by Shoals Technologies Group, Inc. ("Shoals" or the "Company") with the U.S. Securities and Exchange Commission (the "SEC"); (b) review and analysis of press releases and other publications disseminated by Defendants (defined below) and other parties; (c) review of news articles, shareholder communications, conference calls, and postings on the Shoals website concerning the Company's public statements; and (d) review of other publicly available information concerning the Company and the Individual Defendants. Plaintiff believes that substantial additional evidentiary support exists for the allegations set forth herein, which evidence will be developed after a reasonable opportunity for discovery.

## II. SUMMARY OF THE ACTION

1. This federal securities class action asserts both strict liability claims under the Securities Act of 1933 (the "Securities Act") and fraud-based claims under the Securities Exchange Act of 1934 (the "Exchange Act"). These claims arise from Defendants' (as defined herein) materially false and misleading statements and omissions concerning Shoals' electrical balance of system ("EBOS") products, related "shrinkback" issues, and cost of revenue.

2. This federal securities class action is brought on behalf of a "Class" of:

(a) All persons and entities that purchased Shoals common stock pursuant, or traceable, or both, to the SPO Materials (as defined herein) issued in connection with Shoals' December 2022 secondary public offering (the "SPO") against Shoals and the Securities Act

1

Defendants (as defined herein) for violations of Sections 11, 12(a)(2), and 15 of the Securities Act; and

(b)     All persons and entities that purchased Shoals common stock between May 17, 2022 and November 7, 2023, inclusive (the "Class Period"), against Shoals and the Exchange Act Individual Defendants (as defined herein) for violations of Sections 10(b) and 20(a) of the Exchange Act and Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder.

3.     Under Sections 11, 12(a)(2), and 15 of the Securities Act, the Securities Act Defendants are liable for materially false and misleading statements contained in the SPO Materials. Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct as to the Securities Act claims.

4.     Shoals purports to be a leading provider of electrical balance of system or EBOS products for solar power generation, battery storage, and electric vehicle charging infrastructure. In the context of solar power generation, Shoals EBOS products encompass all of the components necessary to transport electric currents produced by solar panels to an inverter, allowing the current to be delivered to a power grid or an energy storage product.

5.     Prior to, and during the Class Period, Shoals used polymer-insulated copper wires, which it purchased from a number of different suppliers, in its EBOS products. The wires served a critical role in Shoals EBOS products as part of custom wire harnesses that are used to aggregate electricity from multiple solar panels and deliver that electricity to inverters.

6.     Throughout the Class Period and in the SPO Materials, Defendants misled investors about Shoals' electrical balance of system ("EBOS") products, related "shrinkback" issues, and cost of revenue by failing to disclose that: (1) Shoals did not deliver EBOS products that met the

2

highest levels of quality and reliability; (2) Shoals had received reports of exposed copper conduit in EBOS wire harnesses in a large number of solar fields and was aware that a significant portion of its wire harnesses had defects; (3) Shoals would have to incur between $60 million to $185 million in costs to remediate the wire shrinkback issue; and (4) Shoals had understated its cost of revenue by millions of dollars.

7. As a result of Defendants' materially false and misleading statements and omissions, Shoals stock traded at artificially inflated prices during the Class Period because in reality, and as remained undisclosed to investors, Shoals learned of customers experiencing wire insulation shrinkback by no later than March 2022. For example, in March 2022, Shoals learned of exposed copper conduit resulting from shrinkback in EBOS wire harnesses at a customer's solar field in Arizona. Indeed, throughout 2022, Shoals learned of numerous customers experiencing similar copper conduit exposure, or shrinkback. As investors belatedly found out, Shoals had installed defective wire harnesses in at least 300 solar fields. These harnesses represented approximately 30% of the total amount of Shoals harnesses manufactured between 2020 and 2022. As a result, Defendants' positive statements about the Company's financial guidance, business, operations, and prospects during the Class Period were materially false and/or misleading.

8. On November 7, 2023, Shoals stunned the market by revealing that the Company had been forced to take an additional $50.2 million charge for warranty expense as result of the wire shrinkback issue. Shoals further advised that it expected the wire shrinkback issue to cost between $59.7 million and $184.9 million dollars to remedy.

9. On this news, Shoals' stock price fell more than 20%, from a closing price of $16.23 per share on November 7, 2023, to a closing price of $12.95 per share on November 9, 2023, wiping out approximately $550 million in market capitalization.

Case 3:24-cv-00358 Document 61 Filed 05/08/24 Page 92 of 420 PageID #: 4596

10.     Securities analysts were shocked by the disclosure and linked Shoals' sharp stock price decline to the warranty charge.  For example, in a report dated November 10, 2023, analysts at Barclays declared that "the upper end of the $60-$185mm came as surprise to investors and has contributed to the underperformance of the stock."  Similarly, analysts at Truist noted that the third-quarter results "were heavily impacted by a ~$50mm warranty charge that drove unadjusted 3Q [gross margins] well below our/street estimates."

11.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in market value of the Company's common stock when the truth was disclosed, Plaintiff and other Class members have suffered significant losses and damages.

## III.     JURISDICTION AND VENUE

12.     The claims asserted herein arise under Sections 11, 12, and 15 of the Securities Act (15 U.S.C. §§ 77k, 77*l*, and 77o), and Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

13.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

14.     Personal jurisdiction and venue are proper in this Judicial District pursuant to Section 22 of the Securities Act (15 U.S.C. § 77v(c)), Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)), and 28 U.S.C. § 1391(b).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts and omissions charged herein, including the dissemination of materially false and misleading information to the investing

4

public, and the omission of material information, occurred in substantial part in this Judicial District, as Shoals is headquartered in this Judicial District.

15. Because the Underwriter Defendants (as defined herein) were counterparties to the Underwriting Agreement and each of the Securities Act Individual Defendants (as defined herein) authorized the execution of the Underwriting Agreement by Shoals, each of them also submitted to the jurisdiction of this Court by directing acts within this Judicial District out of which this action arises.

16. In connection with the acts, transactions, and conduct alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the U.S. Mail, interstate telephone communications, and the facilities of a national securities exchange.

## IV. COMPANY BACKGROUND

17. Founded by Dean Solon ("Solon") in 1996, Shoals is based in Portland, Tennessee and provides EBOS products for solar energy projects in the United States. The Company sells solar products principally to engineering, procurement, and construction firms ("EPCs") that build such solar energy projects. The Company designs, manufactures, and sells systems for two types of wiring architectures used by the U.S. solar industry: Homerun EBOS and Combine-as-you-go EBOS. In 2021 and 2022, Shoals derived 73% and 77.8% of its revenues, respectively, from the sales of these systems. By 2023, those products provided 81.5% of Shoals' revenues.

18. A critical part of these EBOS systems is a custom wire harness that is used to aggregate electricity from multiple solar panels and deliver that electricity to inverters. The wires in these harnesses act as conductors, intended to carry high-voltage electricity. Shoals purchases these wires from a number of different suppliers to manufacture its EBOS products.

5

19. By March 2022, at the latest, Shoals received a report from a customer of exposed copper conductors on wire harnesses installed at the customer's Arizona solar field. Shoals, at its own expense, replaced the affected harnesses on the end-user's site. Numerous other Shoals customers reported similar instances of exposed cooper conductors in solar fields throughout 2022.

20. Shoals installed EBOS systems with defective wire harnesses at approximately 300 solar fields, representing approximately 30% of all wire harnesses installed by Shoals between 2020 and 2022.

## V. SUBSTANTIVE ALLEGATIONS – SECURITIES ACT CLAIMS

21. The claims set forth herein pursuant to Sections 11, 12(a)(2), and 15 of the Securities Act are brought on behalf of persons or entities who purchased Shoals common stock in the SPO. The Securities Act claims are based solely on strict liability and negligence, and are not based on any knowing or reckless conduct by or on behalf of any Defendant—*i.e.*, they do not allege, and do not sound in, fraud—and Plaintiff specifically disclaims any allegations of fraud, scienter, or recklessness in these non-fraud claims.

### A. Securities Act Parties

#### 1. Plaintiff

22. Based in Oklahoma City, Oklahoma, Plaintiff Oklahoma Police Pension and Retirement System provides retirement and related benefits for qualified police officers and their beneficiaries in the State of Oklahoma. Plaintiff manages over $3 billion in assets for the benefit of more than 10,500 participants. As set forth in the accompanying certification, incorporated by reference herein, Plaintiff purchased Shoals common stock in the SPO from J.P. Morgan Securities LLC and suffered damages as a result of the violations of the federal securities laws alleged herein.

6

## 2. Defendants

### a. Corporate Defendant

23. Defendant Shoals is incorporated under the laws of Delaware, with its principal executive offices located in Portland, Tennessee. The Company's common stock trades on the Nasdaq Global Market (the "Nasdaq") under the ticker symbol "SHLS." Shoals offered and sold 2,000,000 shares of Shoals common stock in the SPO.

### b. The Securities Act Individual Defendants

24. Defendant Jason Whitaker ("Whitaker") served as the Company's Chief Executive Officer ("CEO") from January 2020 to March 15, 2023, and served as a member of Shoals' board of directors (the "Board") from January 2021 to March 15, 2023. Defendant Whitaker signed the Registration Statement (as defined herein) in connection with the SPO, which was filed with the SEC.

25. Defendant Dominic Bardos ("Bardos") has served as the Company's CFO since October 3, 2022. Defendant Bardos signed the Registration Statement in connection with the SPO, which was filed with the SEC.

26. Defendant Brad Forth ("Forth") has served as a member of Shoals' Board since June 2017. Defendant Forth signed the Registration Statement in connection with the SPO, which was filed with the SEC.

27. Defendant Peter Wilver ("Wilver") has served as a member of Shoals' Board since January 2021. Defendant Wilver signed the Registration Statement in connection with the SPO, which was filed with the SEC.

28. Defendant Ty Daul ("Daul") has served as a member of Shoals' Board since March 2021. Defendant Daul signed the Registration Statement in connection with the SPO, which was filed with the SEC.

29. Defendant Toni Volpe ("Volpe") has served as a member of Shoals' Board since March 2021. Defendant Volpe signed the Registration Statement in connection with the SPO, which was filed with the SEC.

30. Defendant Lori Sundberg ("Sundberg") has served as a member of Shoals' Board since March 2021. Defendant Sundberg signed the Registration Statement in connection with the SPO, which was filed with the SEC.

31. Defendant Jeannette Mills ("Mills") has served as a member of Shoals' Board since August 2022. Defendant Mills signed the Registration Statement in connection with the SPO, which was filed with the SEC.

32. Defendant Robert Julian ("Julian") has served as a member of Shoals' Board since August 2022. Defendant Julian signed the Registration Statement in connection with the SPO, which was filed with the SEC.

33. Defendants Whitaker, Bardos, Forth, Wilver, Daul, Volpe, Sundberg, Mills, and Julian are collectively referred to herein as the "Securities Act Individual Defendants."

34. Each of the Securities Act Individual Defendants participated in the preparation of the SPO Materials and in the making of the materially inaccurate, misleading, and incomplete statements alleged herein. In particular, the Securities Act Individual Defendants reviewed, edited, and approved the SPO Materials, participated in the SPO, and solicited the purchase of Shoals common stock in the SPO to serve their financial interests and those of Shoals.

8

35.     Defendant J.P. Morgan Securities LLC ("JPMorgan") served as an underwriter for the SPO.  JPMorgan maintains an office and conducts business operations in this District.

36.     Defendant Guggenheim Securities, LLC ("Guggenheim") served as an underwriter for the SPO.  Guggenheim maintains an office and conducts business operations in this District.

37.     Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") served as an underwriter for the SPO.  Morgan Stanley maintains an office and conducts business operations in this District.

38.     Defendant UBS Securities LLC ("UBS") served as an underwriter for the SPO.  UBS maintains an office and conducts business operations in this District.

39.     Defendant Goldman Sachs & Co. LLC ("GS&Co.") served as an underwriter for the SPO.  GS&Co. maintains an office and conducts business operations in this District.

40.     Defendant Barclays Capital Inc. ("Barclays") served as an underwriter for the SPO.  Barclays maintains an office and conducts business operations in this District.

41.     Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") served as an underwriter for the SPO.  Credit Suisse conducts business operations in this District.

42.     Defendant Cowen and Company, LLC ("Cowen") served as an underwriter for the SPO.  Cowen maintains an office and conducts business operations in this District.

43.     Defendant Oppenheimer & Co. Inc. ("Oppenheimer") served as an underwriter for the SPO.  Oppenheimer maintains an office and conducts business operations in this District.

44.     Defendant Piper Sandler & Co. ("Piper Sandler") served as an underwriter for the SPO.  Piper Sandler maintains an office and conducts business operations in this District.

45.     Defendant Roth Capital Partners, LLC ("Roth") served as an underwriter for the SPO.  Roth conducts business operations in this District.

46.     Defendant Johnson Rice & Company L.L.C. ("Johnson Rice") served as an underwriter for the SPO.  Johnson Rice conducts business operations in this District.

47.     Defendant Northland Securities, Inc. ("Northland") served as an underwriter for the SPO.  Northland conducts business operations in this District.

48.     The Defendants listed in ¶¶ 35-47 are referred to herein as the "Underwriter Defendants."  The Underwriter Defendants sold 29,900,000 shares of Shoals common stock in the SPO—including the Underwriter Defendants' firm commitment to purchase and offer 26,000,000 shares of Shoals common stock and the full exercise of the Underwriter Defendants' option to purchase and offer up to 3,900,000 additional shares of Shoals common stock (15% of the firm shares offered)—at $22.25 per share and shared $23,284,625 in underwriting discounts and commissions.   The Underwriter Defendants' failure to conduct adequate due diligence in connection with the SPO and the preparation of the SPO Materials was a substantial factor leading to the harm complained of herein.

### d.     The Selling Stockholder Defendants

49.     Defendant Dean Solon founded Shoals in 1996, was Shoals' CEO between November 1996 and December 2019, and served as a member of Shoals' Board until his resignation on February 21, 2022.  Solon owned Shoals stock during the relevant period and offered and sold 564,668 shares of Shoals stock in the SPO.  Specifically, Solon owned 627,168 shares of Shoals Class A common stock prior to the SPO and owned 62,500 shares of Shoals Class A common stock after the SPO.

10

50. Defendant Solon Holdco I, LLC ("Solon Holdco I") is controlled by its managing member, Dean Solon, who had beneficial ownership of the shares of Shoals common stock held directly by Solon Holdco I. Solon Holdco I owned Shoals stock during the relevant period and offered and sold 9,111,777 shares of Shoals stock in the SPO. Specifically, Solon Holdco I owned 9,111,777 shares of Shoals Class A common stock prior to the SPO and—following the full exercise of the underwriters' option to purchase up to an additional 1,300,000 shares of Shoals common stock from Solon Holdco I—owned zero (0) shares of Shoals Class A common stock after the SPO.

51. Defendant Solon Holdco II, LLC ("Solon Holdco II") is controlled by its managing member, Dean Solon, who had beneficial ownership of the shares of Shoals common stock held directly by Solon Holdco II. Solon Holdco II owned Shoals stock during the relevant period and offered and sold 18,223,555 shares of Shoals stock in the SPO. Specifically, Solon Holdco I owned 18,223,555 shares of Shoals Class A common stock prior to the SPO and—following the full exercise of the underwriters' option to purchase up to an additional 2,600,000 shares of Shoals common stock from Solon Holdco II—owned zero (0) shares of Shoals Class A common stock after the SPO.

52. The Defendants listed in ¶¶ 49-51 are referred to herein as the "Selling Stockholder Defendants."

53. For the purposes of the Securities Act claims alleged herein, Defendant Shoals, the Securities Act Individual Defendants, the Underwriter Defendants, and the Selling Stockholder Defendants are collectively referred to herein as the "Securities Act Defendants."

11

## B. Material Misrepresentations and Omissions in the SPO Materials

54. On or about December 6, 2022, Shoals conducted the SPO, in which Shoals and the Selling Stockholder Defendants sold 29,900,000 shares of Shoals common stock to the public at $22.25 per share for gross proceeds of $665,275,000 (including the Underwriter Defendants' option to purchase and offer 3,900,000 additional shares of Shoals common stock).

55. The SPO was conducted pursuant to, and the sale of common stock was solicited by, several documents that were filed by Shoals and the Underwriter Defendants with the SEC and disseminated to the investing public, including (i) a November 30, 2022 automatic shelf registration statement on Form S-3, which was declared effective by the SEC on November 30, 2022 (the "Registration Statement"), and (ii) a November 30, 2022 preliminary prospectus supplement and a December 5, 2022 final prospectus supplement filed pursuant to Rule 424(b)(5), which forms part of the Registration Statement (the "Prospectus" and, together with the Registration Statement and attendant materials filed or published with these forms, the "SPO Materials").

56. The SPO Materials explained that "[w]hen we sell a system solution, we enter into a contract with our customers" that included a "warranty for the products being purchased," and falsely assured investors that the Company's reported "Cost of Revenue" included costs related to the "product warranty." Shoals also provided generic and boilerplate warnings that the Company "*may* experience . . . quality control problems," that any "defects or performance problems in our products *could* result in loss of customers" and that the Company "*may* face warranty, indemnity and product liability claims arising from defective products."[1]

---

[1] All emphases are added.

57.     The statements referenced above in ¶ 56 were each inaccurate statements of material fact when made because while noting only the potential negative impacts on Shoals' business, financial condition, and results of operations, the SPO Materials failed to disclose the following significant, then-existing material events, trends, and uncertainties that Shoals had already been facing at the time of the SPO: (1) Shoals did not deliver EBOS products that met the highest levels of quality and reliability; (2) Shoals had received reports of exposed copper conduit in EBOS wire harnesses in a large number of solar fields and was aware that a significant portion of its wire harnesses had defects; (3) Shoals would have to incur between $60 million to $185 million in costs to remediate the wire shrinkback issue; and (4) Shoals had understated its cost of revenue by millions of dollars.

### C.     Post-Offering Events

58.     On November 7, 2023, Shoals filed its Quarterly Report on Form 10-Q for the third quarter of 2023 ("2Q23 10-Q") and held an accompanying earnings call in which Defendants revealed that the wire shrinkback issue was far more severe than previously disclosed. Specifically, the Company reported that the shrinkback issue affected 30% of Shoals' wire harnesses installed between 2020 and 2022, booked a $50.2 million warranty expense for the second quarter of 2023 related to the shrinkback issue, and provided a range of potential loss related to the shrinkback issue of $59.7 million and $184.9 million.

59.     Notably, documents from litigation Shoals brought against the supplier of the wire related to the defective wire harnesses show Shoals knew of significant issues with shrinkback by at least March 2022—more than one and a half years before it disclosed the huge liability it would entail to investors.  As Shoals itself alleged in that action, in March 2022, the Company received information about exposed copper conduit on wire installed in Shoals EBOS components at a

13

customer's solar field in Arizona. On March 24, 2022, Shoals representatives and others visited the solar field and inspected the defective wire harnesses. Thereafter, Shoals replaced those harnesses at its own expense. In addition, as Shoals admits, by "late 2022 . . . numerous other Shoals' customers began reporting similar instances of cooper conductor exposure."

60. Similarly, in the counterclaim filed by the wire supplier, the supplier stated that, in April 2022, Shoals conceded that the wires used in the harnesses were not in any way defective, but instead, that Shoals' installation or cable management issues had caused the shrinkback in the harnesses. Further, the counterclaim alleged that no other customer of the wire supplier had reported any issue with shrinkback.

61. Analysts were stunned by the disclosure and linked Shoals' sharp stock price decline directly to the revised warranty expense range. For example, on November 10, 2023, analysts at Barclays reported that "the upper end of the $60-$185mm *came as a surprise* to investors and has contributed to the underperformance of the stock." Similarly, analysts at Truist noted that third-quarter results "were heavily impacted by a ~$50mm warranty charge that drove unadjusted 3Q GMs well below our/street estimates."

62. Since the SPO, the value of Shoals common stock shares has declined substantially from the SPO price of $22.25 per share to an all-time low of $7.51 per share on May 8, 2024 (a 66% decline from the SPO price), the date this Action was filed.

63. As a result of the Securities Act Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock, Class members have suffered significant losses and damages.

14

**For Violation of Section 11 of the Securities Act**
**Against Shoals, the Securities Act Individual Defendants, and the Underwriter Defendants**

64. Plaintiff repeats, incorporates, and realleges each and every allegation above as if fully set forth herein, except any allegation of fraud, recklessness, or intentional misconduct.

65. This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class, against Defendant Shoals, each of the Securities Act Individual Defendants, and each of the Underwriter Defendants. This Count does not allege, and does not intend to allege, fraud or fraudulent intent, which is not a required element of Section 11, and any implication of fraud or fraudulent intent is hereby expressly disclaimed.

66. The SPO Materials issued in connection with the SPO were inaccurate and misleading, contained inaccurate and misleading statements of material facts, omitted to state material facts necessary to render the statements therein not misleading, and omitted to state material facts required to be stated therein.

67. Shoals is the registrant and issuer of the common stock sold pursuant to the SPO Materials. The Securities Act Defendants named herein were responsible for the contents and dissemination of the SPO Materials. Each of the Securities Act Individual Defendants signed or authorized the signing of the SPO Materials on their own behalf. The Underwriter Defendants marketed and underwrote the SPO and sold the Shoals common stock issued in the SPO to the Class.

68. As the issuer of the shares of Shoals common stock sold pursuant to the SPO Materials, Shoals is strictly liable to the Class for the SPO Materials' material misstatements and omissions. Signatories of the SPO Materials, and possibly other Securities Act Defendants, may also be strictly liable to the Class for such material misstatements and omissions.

69.     None of the Securities Act Defendants named herein made a reasonable investigation or possessed reasonable grounds to believe that the statements in the SPO Materials were true, complete, accurate, without omissions of any materials facts, or not misleading.

70.     By reasons of the conduct alleged herein, each of the Securities Act Defendants named herein violated and/or controlled a person who violated Section 11 of the Securities Act.

71.     None of the untrue statements or omissions of material fact in the SPO Materials alleged herein was a forward-looking statement.  Rather, each such statement concerned existing facts.  Moreover, the SPO Materials did not properly identify any of the untrue statements as forward-looking statements and did not disclose information that undermined the putative validity of those statements.

72.     Less than one year has elapsed from the time that Plaintiff discovered, or reasonably could have discovered, the facts upon which these claims are based to the time that Plaintiff filed this action.  Less than three years have elapsed between the time that the securities upon which this Count is brought were offered to the public and the time Plaintiff filed this action.

73.     Plaintiff and the Class have sustained damages.  The value of Shoals common stock has declined substantially subsequent to and due to violations by the Securities Act Defendants named in this Count.

74.     At the time of their purchases of Shoals common stock, Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures alleged herein.

## COUNT II

### For Violation of Section 12(a)(2) of the Securities Act
### Against the Securities Act Defendants

75.     Plaintiff repeats, incorporates, and realleges each and every allegation above as if fully set forth herein, except any allegation of fraud, recklessness, or intentional misconduct.

76.     This Count is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77*l*(a)(2), on behalf of the Class, against Defendant Shoals, the Securities Act Individual Defendants, the Underwriter Defendants, and the Selling Stockholder Defendants.  This Count does not allege, and does not intend to allege, fraud or fraudulent intent, which is not a required element of Section 12(a)(2), and any implication of fraud or fraudulent intent is hereby expressly disclaimed.

77.     Each of the Defendants named in this Count were sellers, offerors, or solicitors of purchases of the Company's common stock pursuant to the defective Prospectus that respectively formed in relevant part the SPO Materials.  The actions of solicitation by these Securities Act Defendants include participating in the preparation of the false and misleading Prospectus and marketing the common stock to investors, including members of the Class.

78.     The Prospectus contained untrue statements of material fact, omitted to state other facts necessary to make statements made therein not misleading, and omitted to state material facts required to be stated therein.

79.     Each of the Securities Act Defendants named in this Count owed Plaintiff and other members of the Class that purchased Shoals common stock pursuant to the Prospectus a duty to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.  By virtue

17

of each of the Securities Act Defendants' failure to exercise reasonable care, the Prospectus contained misrepresentations of material fact and omissions of material fact necessary to make the statements therein not misleading.

80. Plaintiff and the members of the Class did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the Prospectus issued in connection with the SPO at the time they purchased Shoals common stock.

81. By reason of the conduct alleged herein, the Securities Act Defendants violated Section 12(a)(2) of the Securities Act. As a direct and proximate result of such violations, Plaintiff and the other members of the Class that purchased Shoals common stock pursuant to the Prospectus issued in connection with the SPO Materials sustained substantial damages in connection therewith. Accordingly, Plaintiff and the other members of the Class that hold the common stock issued pursuant to the Prospectus issued in connection with the SPO Materials have the right to rescind and recover the consideration paid for their shares with interest thereon or damages as allowed by law or in equity. Class members that have sold their Shoals common stock seek damages to the extent permitted by law.

82. Less than one year has elapsed from the time that Plaintiff discovered, or reasonably could have discovered, the facts upon which these claims are based to the time that Plaintiff filed this action. Less than three years have elapsed between the time that the securities upon which this Count is brought were offered to the public and the time Plaintiff filed this action.

**For Violation of Section 15 of the Securities Act**
**Against the Securities Act Individual Defendants and the Selling Stockholder Defendants**

83. Plaintiff repeats, incorporates, and realleges each and every allegation above as if fully set forth herein, except any allegation of fraud, recklessness, or intentional misconduct.

84. This Count is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of the Class, against each of the Securities Act Individual Defendants and the Selling Stockholder Defendants. This Count does not allege, and does not intend to allege, fraud or fraudulent intent, which is not a required element of Section 15, and any implication of fraud or fraudulent intent is hereby expressly disclaimed.

85. As detailed above, the Securities Act Individual Defendants named herein committed primary violations of the Securities Act by engaging in conduct in contravention of Section 11 of the Securities Act.

86. The Securities Act Individual Defendants and the Selling Stockholder Defendants each were control persons of Shoals by virtue of their positions as directors, senior officers, and/or significant shareholders of Shoals. The Securities Act Individual Defendants and the Selling Stockholder Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors, officers, and/or significant shareholders of Shoals. Shoals also controlled the Securities Act Individual Defendants, given the influence and control the Company possessed and exerted over the Securities Act Individual Defendants and all its employees. The Selling Stockholder Defendants were control persons of Shoals by virtue of their significant influence over the Company's management and Board and their significant ownership of Shoals common stock, including through Dean Solon who as managing member controlled Solon Holdco I and Solon Holdco II.

87. By reason of the conduct alleged herein, the Securities Act Individual Defendants and the Selling Stockholder Defendants violated Section 15 of the Securities Act, and Plaintiff and other members of the Class have suffered harm as a result.

## VI. SUBSTANTIVE ALLEGATIONS – EXCHANGE ACT CLAIMS

### A. Exchange Act Parties

88. Based in Oklahoma City, Oklahoma, Plaintiff Oklahoma Police Pension and Retirement System provides retirement and related benefits for qualified police officers and their beneficiaries in the State of Oklahoma. Plaintiff manages over $3 billion in assets for the benefit of more than 10,500 participants. Plaintiff manages over $3 billion in assets for the benefit of more than 10,500 participants. As set forth in the accompanying certification, incorporated by reference herein, Plaintiff purchased Shoals common stock during the Class Period and suffered damages as a result of the federal securities laws violations and false and/or misleading statements and/or material omissions alleged herein.

89. Defendant Shoals is incorporated under the laws of Delaware, with its principal executive offices located in Portland, Tennessee. The Company's common stock trades on the Nasdaq under the ticker symbol "SHLS."

90. Defendant Jason Whitaker served as the Company's CEO from January 2020 to March 15, 2023.

91. Defendant Jeffrey Tolnar ("Tolnar") has served as the Company's President since December 19, 2022 and also served as Interim CEO from March 16, 2023 to July 16, 2023.

92. Defendant Brandon Moss ("Moss") has served as the Company's CEO since July 17, 2023.

20

93. Defendant Dominic Bardos has served as the Company's CFO since October 3, 2022.

94. Defendant Kevin Hubbard ("Hubbard") served as the Company's Interim CFO from May 5, 2022 to October 2, 2022.

95. Defendants Whitaker, Tolnar, Moss, Bardos, and Hubbard are collectively referred to herein as the "Exchange Act Individual Defendants." The Exchange Act Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, shareholder letters, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. The Exchange Act Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Exchange Act Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations that were being made were then materially false and/or misleading. The Exchange Act Individual Defendants are liable for the false statements pleaded herein.

96. For the purposes of the Exchange Act claims alleged herein, Defendant Shoals and the Exchange Act Individual Defendants are collectively referred to herein as the "Exchange Act Defendants." The Securities Act Defendants and the Exchange Act Defendants are collectively referred to herein as "Defendants."

### B. Materially False and Misleading Statements Issued During the Class Period

97. The Class Period for Plaintiff's Exchange Act claims begins on May 17, 2022 and runs through November 7, 2023, inclusive.

98. On May 17, 2022, Shoals filed its Quarterly Report on Form 10-Q for the first quarter of 2022 (the "1Q22 10-Q"). The 1Q22 10-Q explained that "[w]hen we sell a system solution, we enter into a contract with our customers" that included a "warranty for the products being purchased," and falsely assured investors that the Company's reported "Cost of Revenue" included costs related to the "product warranty." Shoals also provided generic and boilerplate warnings that any "defects or performance problems in our products ***could*** result in loss of customers" and that the Company "***may*** face warranty, indemnity and product liability claims arising from defective products."

99. Meanwhile, throughout the Class Period, the Company touted on its website that it "focus[ed] on [the] [q]uality and [r]eliability" of its EBOS components and that "Shoals products are built in a factory[-]controlled environment with calibrated machines and rigorous quality standards. Every component is fully tested using our in-house testing chambers to ensure that our EBOS solutions deliver the highest levels of quality and reliability."

100. Likewise, Shoals' Quarterly Reports on Forms 10-Q for the second and third quarters of 2022, respectively filed after the markets closed on August 15, 2022 and November 14, 2022 (the "2Q22 10-Q" and "3Q22 10-Q," respectively), repeated the same statements referenced in ¶ 98 verbatim, including the generic and boilerplate warnings that any "defects or performance problems in our products ***could*** result in loss of customers" and the Company "***may*** face warranty, indemnity and product liability claims arising from defective products."

101.    On February 28, 2023, after the market closed, Shoals filed its Annual Report on Form 10-K for 2022 ("2022 10-K").  The 2022 10-K reported that "as of December 31, 2022 and 2021 our estimated accrued warranty reserve was $0.6 million and $0.1 million, respectively."

102.    With regard to product quality, the 2022 10-K assured investors that Shoals' "products meet our stringent quality requirements" and touted the Company's focus on "making quality foremost in all we do, make, and sell."

103.    On May 8, 2023, Shoals filed its Quarterly Report on Form 10-Q for the first quarter of 2023 (the "1Q23 10-Q").  The 1Q23 10-Q publicly disclosed for the first time that the "[C]ompany has been notified by certain customers that a subset of wire harnesses used in its EBOS solutions is presenting excessive pull back of wire insulation at connection points." However, Shoals downplayed the issue, stating that it was only "probable that the Company will incur costs related to the repair or replacement of the impacted wire harnesses," but that "it is not possible to reasonably estimate those costs."

104.    On August 1, 2023, Shoals filed its quarterly report for the second quarter of 2023, *i.e.*, the 2Q23 10-Q, and held a call with analysts to discuss the results.  The 2Q23 10-Q disclosed that Shoals had recorded a $9.4 million charge for warranty expense due to the previously disclosed wire issue.  Despite the charge, the 2Q23 10-Q continued to describe quality control problems as a mere risk that *could* potentially materialize in the future, stating that "we *may* experience delays, disruptions or quality control problems in our manufacturing operations."

105.    The 2Q23 10-Q also repeated the generic and boilerplate warnings that:

> Any actual or perceived errors, defects or poor performance in our products *could* result in the replacement or recall of our products, shipment delays, rejection of our products, damage to our reputation, lost revenue, diversion of our engineering personnel from our product development efforts and increases in customer service and support costs, all of which *could* have a material adverse effect on our business,

23

financial condition and results of operations. . . . defective components **_may_** give rise to warranty, indemnity or product liability claims against us.

106. At the same time, the 2Q23 10-Q reassured investors that Shoals "conduct[s] quality assessments on [its] products and these products have stringent quality requirements."

107. During the accompanying earnings call for the second quarter of 2023 held that same day, Oppenheimer analyst Colin Rusch asked Defendants to "talk a little bit about the wire issues . . . how extensive it was in terms of the number of customers and number of shipments and how much time it was spread over?" In response, Defendant Bardos stated, "[w]e've communicated pretty much everything we can," and "[t]he charge that we booked in the quarter we believe is adequate to do the remediation required, and that's why we booked it."

108. The above statements identified in ¶¶ 98-107 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects to make the statements made, in light of the circumstances under which they were made, not false and misleading. Specifically, Defendants failed to disclose to investors that: (1) Shoals did not deliver EBOS products that met the highest levels of quality and reliability; (2) Shoals had received reports of exposed copper conduit in EBOS wire harnesses in a large number of solar fields and was aware that a significant portion of its wire harnesses had defects; (3) Shoals would have to incur between $60 million to $185 million in costs to remediate the wire shrinkback issue; and (4) Shoals had understated its cost of revenue by millions of dollars. As a result, Defendants' positive statements about the Company's financial guidance, business,

operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### C. The Truth Is Revealed

109. The truth regarding Shoals' fraudulent conduct was revealed after the close of the markets on November 7, 2023. That day, Shoals filed its Quarterly Report on Form 10-Q for the third quarter of 2023 ("2Q23 10-Q") and held an accompanying earnings call in which Defendants revealed that the wire shrinkback issue was far more severe than previously disclosed. Specifically, the Company reported that the shrinkback issue affected 30% of Shoals' wire harnesses installed between 2020 and 2022, booked a $50.2 million warranty expense for the second quarter of 2023 related to the shrinkback issue, and provided a range of potential loss related to the shrinkback issue of $59.7 million and $184.9 million.

110. Notably, documents from litigation Shoals brought against the supplier of the wire related to the defective wire harnesses show Shoals knew of significant issues with shrinkback by at least March 2022—more than one and a half years before it disclosed the huge liability it would entail to investors. As Shoals itself alleged in that action, in March 2022, the Company received information about exposed copper conduit on wire installed in Shoals EBOS components at a customer's solar field in Arizona. On March 24, 2022, Shoals representatives and others visited the solar field and inspected the defective wire harnesses. Thereafter, Shoals replaced those harnesses at its own expense. In addition, as Shoals admits, by "late 2022 . . . numerous other Shoals' customers began reporting similar instances of cooper conductor exposure."

111. Similarly, in the counterclaim filed by the wire supplier, the supplier stated that, in April 2022, Shoals conceded that the wires used in the harnesses were not in any way defective, but instead, that Shoals' installation or cable management issues had caused the shrinkback in the

25

harnesses.  Further, the counterclaim alleged that no other customer of the wire supplier had reported any issue with shrinkback.

112.    Following the November 7, 2023 disclosures, the price of Shoals' stock dropped $3.28 per share, or more than 20%, to close at $12.95 per share on November 9, 2023, wiping out approximately $550 million in market capitalization.

113.    Analysts were stunned by the disclosure and linked Shoals' sharp stock price decline directly to the revised warranty expense range.  For example, on November 10, 2023, analysts at Barclays reported that "the upper end of the $60-$185mm came as a surprise to investors and has contributed to the underperformance of the stock."  Similarly, analysts at Truist noted that third-quarter results "were heavily impacted by a ~$50mm warranty charge that drove unadjusted 3Q GMs well below our/street estimates."

### D.    Undisclosed Adverse Information

114.    The market for Shoals common stock was an open, well-developed, and efficient market at all relevant times.  As a result of the materially false and/or misleading statements and/or omissions particularized in this Complaint, the Company's common stock traded at artificially inflated prices during the Class Period.  Plaintiff and the other members of the Class purchased the Company's common stock relying upon the integrity of the market price of the Company's common stock and market information relating to Shoals and have been damaged thereby.

115.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of the Company's common stock, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or

26

misrepresented the truth about the Company's business, operations, and prospects as alleged herein. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its business, thus causing the Company's common stock to be overvalued and artificially inflated or maintained at all relevant times. Defendants' materially false and/or misleading statements during the Class Period directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class who purchased the Company's common stock at artificially inflated prices and were harmed when the truth was revealed.

### E. Scienter Allegations

116. As alleged herein, Defendants acted with scienter in that Defendants knew or were reckless as to whether the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew or were reckless as to whether such statements or documents would be issued or disseminated to the investing public, and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

117. As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Shoals, their control over, receipt, and/or modification of the Company's allegedly materially misleading statements and omissions, and/or their positions with the Company that made them privy to confidential information concerning Shoals, participated in the fraudulent scheme alleged herein.

### F. Inapplicability of Statutory Safe Harbor

118. The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this

Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

119. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Shoals who knew that the statement was false when made.

### G. Loss Causation

120. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss, *i.e.*, damages, suffered by Plaintiff and the Class.

121. During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions and engaged in a scheme to deceive the market. This artificially inflated the prices of the Company's common stock and operated as a fraud or deceit on the Class. When Defendants' prior misrepresentations, information alleged to have been concealed, fraudulent conduct, and/or the effect thereof were disclosed to the market, the price of the Company's stock fell precipitously, as the prior artificial inflation came out of the price.

### H. Applicability of Presumption of Reliance (Fraud-on-the-Market Doctrine)

122. The market for Shoals common stock was open, well-developed, and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to

28

disclose particularized in this Complaint, Shoals common stock traded at artificially inflated and/or maintained prices during the Class Period. Plaintiff and other members of the Class purchased the Company's common stock relying upon the integrity of the market price of Shoals common stock and market information relating to Shoals and have been damaged thereby.

123. At all times relevant, the market for Shoals common stock was an efficient market for the following reasons, among others:

(a) Shoals was listed and actively traded on Nasdaq, a highly efficient and automated market;

(b) As a regulated issuer, Shoals filed periodic public reports with the SEC and/or Nasdaq;

(c) Shoals regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d) Shoals was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

124. As a result of the foregoing, the market for Shoals common stock promptly digested current information regarding Shoals from all publicly available sources and reflected such information in the Company's stock price. Under these circumstances, all purchasers of

29

Shoals common stock during the Class Period suffered similar injury through their purchase of stock at artificially inflated prices, and a presumption of reliance applies.

125. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded in Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business, operations, and prospects—information that Defendants were obligated to disclose during the Class Period but did not—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## COUNT IV

### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### Against Shoals and the Exchange Act Individual Defendants

126. Plaintiff repeats, incorporates, and realleges each and every allegation above as if fully set forth herein.

127. During the Class Period, Defendant Shoals and the Exchange Act Individual Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Shoals common stock; and (iii) cause Plaintiff and other members of the Class to purchase Shoals common stock at

30

artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, the Exchange Act Defendants took the actions set forth herein.

128.    Defendant Shoals and the Exchange Act Individual Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of conduct that operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Shoals common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  The Exchange Act Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

129.    Defendant Shoals and the Exchange Act Individual Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's business, operations, and prospects, as specified herein. The Exchange Act Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of the Company's business, operations, and prospects, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Shoals and its business, operations, and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein,

31

and engaged in transactions, practices, and a course of conduct of business that operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

130. Each of the Exchange Act Individual Defendants' primary liability and controlling-person liability, arises from the following facts: (i) each of the Exchange Act Individual Defendants was a high-level executive and/or director at the Company during the Class Period and a member of the Company's management team or had control thereof; (ii) each of the Exchange Act Individual Defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development, and reporting of the Company's business, operations, and prospects; (iii) each of the Exchange Act Individual Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to, other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (iv) each of the Exchange Act Individual Defendants was aware of the Company's dissemination of information to the investing public, which they knew and/or recklessly disregarded was materially false and misleading.

131. Defendant Shoals and the Exchange Act Individual Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. The Exchange Act Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing the Company's operating condition, business practices, and prospects from the investing public and supporting the artificially inflated and/or maintained price of its common stock. As demonstrated by the Exchange Act Defendants' overstatements and misstatements of

32

the Company's business, operations, and prospects throughout the Class Period, the Exchange Act Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

132. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Shoals common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants or upon the integrity of the market in which the shares and stock traded or trades, and/or in the absence of material adverse information that was known or recklessly disregarded by the Exchange Act Defendants, but not disclosed in public statements by the Exchange Act Defendants during the Class Period, Plaintiff and the other members of the Class purchased Shoals common stock during the Class Period at artificially inflated prices and were damaged thereby.

133. At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity and believed them to be true. Had Plaintiff, the other members of the Class, and the marketplace known of the truth regarding the problems that Shoals was experiencing, which were not disclosed by the Exchange Act Defendants, Plaintiff and other members of the Class would not have purchased Shoals common stock, or, if they had purchased

33

such shares or stock during the Class Period, they would not have done so at the artificially inflated prices that they paid.

134. By virtue of the foregoing, Shoals and the Exchange Act Individual Defendants each violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

135. As a direct and proximate result of the Exchange Act Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

<div align="center">

**COUNT V**

**For Violations of Section 20(a) of the Exchange Act**
**Against the Exchange Act Individual Defendants**

</div>

136. Plaintiff repeats, incorporates, and realleges each and every allegation above as if fully set forth herein.

137. The Exchange Act Individual Defendants acted as controlling persons of Shoals within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions with the Company, participation in, and/or awareness of the Company's operations, and intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Exchange Act Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading. Each of the Exchange Act Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements

<div align="center">34</div>

were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

138. In particular, the Exchange Act Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

139. As set forth above, Shoals and the Exchange Act Individual Defendants each violated § 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, the Exchange Act Individual Defendants are liable pursuant to § 20(a) of the Exchange Act. As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## VII. CLASS ACTION ALLEGATIONS

140. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of:

(a) All persons and entities that purchased Shoals common stock pursuant, or traceable, or both, to the SPO Materials issued in connection with Shoals' December 2022 SPO, except those who are excluded below, against Shoals and the Securities Act Defendants for violations of Sections 11, 12(a)(2), and 15 of the Securities Act; and

(b) All persons and entities that purchased Shoals common stock during the Class Period between May 17, 2022 and November 7, 2023, inclusive, except those who are excluded below, against Shoals and the Exchange Act Individual Defendants for violations of Sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

35

141. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Throughout the Class Period, common stock of Shoals actively traded on the Nasdaq (an open and efficient market) under the ticker symbol "SHLS." Millions of Shoals shares were traded publicly during the Class Period on the Nasdaq. As of February 26, 2024, Shoals had more than 170 million shares of Class A common stock outstanding. Record owners and other members of the Class may be identified from records maintained by Shoals or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

142. Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

143. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests that conflict with those of the Class.

144. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) Whether Defendants violated the Securities Act or Exchange Act, or both, by the acts and omissions as alleged herein;

36

(b)     Whether Defendants omitted or misrepresented material facts, including whether the SPO Materials misrepresented and/or omitted material information in violation of the Securities Act;

(c)     Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     Whether, with respect to the Exchange Act claims only, the Exchange Act Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

(e)     Whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders during the Class Period misrepresented material facts about the business, operations, and prospects of Shoals;

(f)     Whether the market price of Shoals common stock during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

(g)     The extent to which the members of the Class have sustained damages and the proper measure of damages.

145.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress

the wrongs done to them. There will be no difficulty in the management of this suit as a class action.

## PRAYER FOR RELIEF

146. WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for relief and judgment as follows:

(a) Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

(b) Awarding Plaintiff and the other members of the Class damages in an amount that may be proven at trial, together with interest thereon;

(c) Awarding Plaintiff and the members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

(d) Awarding such other relief as this Court deems appropriate.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: May 8, 2024          Respectfully submitted,

**STRANCH, JENNINGS & GARVEY PLLC**

By: */s/ J. Gerard Stranch, IV*
J. Gerard Stranch, IV (BPR 23045)
The Freedom Center
223 Rosa L. Parks Avenue
Suite 200
Nashville, TN 37203
Tel.: (615) 254-8801
gstranch@stranchlaw.com

*Local Counsel for Plaintiff Oklahoma Police Pension and Retirement System*

38

**SAXENA WHITE P.A.**

Lester Hooker (*pro hac vice* forthcoming)
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Tel.: (561) 394-3399
Fax: (561) 394-3382
lhooker@saxenawhite.com

-and-

Rachel Avan (*pro hac vice* forthcoming)
Marco A. Dueñas (*pro hac vice* forthcoming)
10 Bank Street, Suite 882
White Plains, NY 10606
Tel.: (914) 437-8551
Fax: (888) 216-2220
ravan@saxenawhite.com
mduenas@saxenawhite.com

*Counsel for Plaintiff Oklahoma Police Pension and Retirement System*

39

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

OKLAHOMA POLICE PENSION AND RETIREMENT SYSTEM, individually and on behalf of all others similarly situated

**DEFENDANTS**

SHOALS TECHNOLOGIES GROUP, INC., et al.

**(b)** County of Residence of First Listed Plaintiff    Oklahoma County, OK
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Stranch, Jennings & Garvey PLLC, The Freedom Center, 223 Rosa L. Parks Avenue, Suite 200, Nashville, TN 37203, Tel.: (615) 254-8801

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government Plaintiff
- [x] 3 Federal Question *(U.S. Government Not a Party)*
- [ ] 2 U.S. Government Defendant
- [ ] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane / [ ] 365 Personal Injury - Product Liability | [ ] 690 Other | [ ] 423 Withdrawal 28 USC 157 | [ ] 376 Qui Tam (31 USC 3729(a)) |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability / [ ] 367 Health Care/ | | **INTELLECTUAL PROPERTY RIGHTS** | [ ] 400 State Reapportionment |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel & Slander / Pharmaceutical Personal Injury | | [ ] 820 Copyrights | [ ] 410 Antitrust |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | [ ] 330 Federal Employers' Liability / Product Liability | | [ ] 830 Patent | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 340 Marine / [ ] 368 Asbestos Personal Injury Product Liability | | [ ] 835 Patent - Abbreviated New Drug Application | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans) | [ ] 345 Marine Product Liability / **PERSONAL PROPERTY** | | [ ] 840 Trademark | [ ] 460 Deportation |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 350 Motor Vehicle / [ ] 370 Other Fraud | **LABOR** | [ ] 880 Defend Trade Secrets Act of 2016 | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle Product Liability / [ ] 371 Truth in Lending | [ ] 710 Fair Labor Standards Act | | [ ] 480 Consumer Credit (15 USC 1681 or 1692) |
| [ ] 190 Other Contract | [ ] 360 Other Personal Injury / [ ] 380 Other Personal Property Damage | [ ] 720 Labor/Management Relations | **SOCIAL SECURITY** | [ ] 485 Telephone Consumer Protection Act |
| [ ] 195 Contract Product Liability | [ ] 362 Personal Injury - Medical Malpractice / [ ] 385 Property Damage Product Liability | [ ] 740 Railway Labor Act | [ ] 861 HIA (1395ff) | [ ] 490 Cable/Sat TV |
| [ ] 196 Franchise | | [ ] 751 Family and Medical Leave Act | [ ] 862 Black Lung (923) | [x] 850 Securities/Commodities/ Exchange |
| | | [ ] 790 Other Labor Litigation | [ ] 863 DIWC/DIWW (405(g)) | [ ] 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** / **PRISONER PETITIONS** | [ ] 791 Employee Retirement Income Security Act | [ ] 864 SSID Title XVI | [ ] 891 Agricultural Acts |
| [ ] 210 Land Condemnation | [ ] 440 Other Civil Rights / **Habeas Corpus:** | | [ ] 865 RSI (405(g)) | [ ] 893 Environmental Matters |
| [ ] 220 Foreclosure | [ ] 441 Voting / [ ] 463 Alien Detainee | | **FEDERAL TAX SUITS** | [ ] 895 Freedom of Information Act |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment / [ ] 510 Motions to Vacate Sentence | | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | [ ] 896 Arbitration |
| [ ] 240 Torts to Land | [ ] 443 Housing/ Accommodations / [ ] 530 General | | [ ] 871 IRS—Third Party 26 USC 7609 | [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| [ ] 245 Tort Product Liability | [ ] 445 Amer. w/Disabilities - Employment / [ ] 535 Death Penalty | **IMMIGRATION** | | [ ] 950 Constitutionality of State Statutes |
| [ ] 290 All Other Real Property | [ ] 446 Amer. w/Disabilities - Other / **Other:** / [ ] 462 Naturalization Application | | | |
| | [ ] 448 Education / [ ] 540 Mandamus & Other / [ ] 465 Other Immigration Actions | | | |
| | [ ] 550 Civil Rights | | | |
| | [ ] 555 Prison Condition | | | |
| | [ ] 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
15 U.S.C. §§ 77k, 77l, and 77o; 15 U.S.C. §§ 78j(b) and 78t(a)

Brief description of cause:
Violations of the federal securities laws

## VII. REQUESTED IN COMPLAINT:

- [x] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: [x] Yes [ ] No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*

JUDGE    Aleta A. Trauger

DOCKET NUMBER    3:24-cv-00334

DATE    May 8, 2024

SIGNATURE OF ATTORNEY OF RECORD    /s/ J. Gerard Stranch IV

**FOR OFFICE USE ONLY**

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

## Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b) County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c) Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II. Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III. Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV. Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V. Origin.** Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.

Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.

**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

**VI. Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII. Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII. Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

# CERTIFICATION AND AUTHORIZATION

I, Ginger Sigler, on behalf of Oklahoma Police Pension and Retirement System ("Oklahoma Police"), hereby certify, as to the claims asserted under the federal securities laws, that:

1. I have reviewed a complaint prepared against Shoals Technologies Group, Inc. ("Shoals") alleging violations of the federal securities laws and authorized its filing. I am authorized in my capacity as Executive Director to initiate litigation and to execute this Certification on behalf of Oklahoma Police.

2. Oklahoma Police did not purchase the securities that are the subject of this action at the direction of counsel, or in order to participate in any action arising under the federal securities laws.

3. Oklahoma Police is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4. Oklahoma Police's transactions in Shoals common stock during the Class Period are set forth in the attached Schedule A.

5. Oklahoma Police has sought to serve and was appointed as lead plaintiff and/or representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification:

   *In re Inotiv, Inc. Sec. Litig.*, No. 4:22-cv-00045 (N.D. Ind.); and

   *Plumbers & Pipefitters Local Union #295 Pension Fund v. CareDx, Inc.*, No. 3:22-cv-03023 (N.D. Cal.).

6. Oklahoma Police has sought to serve as a lead plaintiff or representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification, but either withdrew its motion for lead plaintiff appointment, was not appointed lead plaintiff, or the lead plaintiff decision is still pending:

   *Marquez v. Bright Health Grp., Inc.*, No. 1:22-cv-00101 (E.D.N.Y.).

7. Oklahoma Police will not accept any payment for serving as a representative party on behalf of the Class beyond Oklahoma Police's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this ___6^th___ day of May, 2024.

*Oklahoma Police Pension and Retirement System*

Ginger Sigler, Executive Director

## SCHEDULE A
### Oklahoma Police Pension and Retirement System
### Transactions in Shoals Technologies Group, Inc.

| Common Stock Purchases | | |
|---|---|---|
| **Date** | **Shares** | **Price** |
| 10/26/22 | 5,447 | $22.8555 |
| 10/26/22 | 11,981 | $23.7500 |
| 10/27/22 | 7,666 | $23.0636 |
| 11/01/22 | 5,685 | $23.5643 |
| 11/09/22 | 14,403 | $21.6064 |
| 12/02/22 | 2,202 | $22.2500 [1] |
| 12/02/22 | 3,304 | $22.9000 |
| 12/02/22 | 9,910 | $22.5194 |
| 05/09/23 | 3,961 | $22.8356 |
| 06/12/23 | 8,063 | $26.0481 |
| 09/14/23 | 9,232 | $21.7991 |
| 10/10/23 | 10,163 | $16.7169 |

| Common Stock Sales | | |
|---|---|---|
| **Date** | **Shares** | **Price** |
| 01/24/23 | 12,432 | $28.9420 |

[1] Purchased from J.P. Morgan Securities LLC

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF TENNESSEE

NASHVILLE DIVISION

| | | |
|---|---|---|
| KISSIMMEE UTILITY AUTHORITY EMPLOYEES' RETIREMENT PLAN, on Behalf of Itself and All Others Similarly Situated, | ) ) ) ) | Civil Action No. <u>CLASS ACTION</u> |
| Plaintiff, | ) ) ) | COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| vs. | ) ) ) | |
| SHOALS TECHNOLOGIES GROUP, INC., JASON R. WHITAKER, JEFFERY TOLNAR, BRANDON MOSS, PHILIP GARTON, KEVIN HUBBARD, DOMINIC BARDOS, BRAD FORTH, PETER WILVER, TY DAUL, TONI VOLPE, LORI SUNDBERG, JEANETTE MILLS, ROBERT JULIAN, DEAN SOLON, J.P. MORGAN SECURITIES LLC, GUGGENHEIM SECURITIES, LLC, MORGAN STANLEY & CO. LLC, UBS SECURITIES LLC, GOLDMAN SACHS & CO. LLC, BARCLAYS CAPITAL INC., CREDIT SUISSE SECURITIES (USA) LLC, COWEN AND COMPANY, LLC, OPPENHEIMER & CO. INC., PIPER SANDLER & CO., ROTH CAPITAL PARTNERS, LLC, JOHNSON RICE & COMPANY L.L.C., and NORTHLAND SECURITIES, INC., | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | <u>DEMAND FOR JURY TRIAL</u> |

Plaintiff Kissimmee Utility Authority Employees' Retirement Plan ("plaintiff"), on behalf of itself and all others similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to plaintiff and

- 1 -

plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of certain U.S. Securities and Exchange Commission ("SEC") filings by Shoals Technologies Group, Inc. ("Shoals" or the "Company"), Company press releases and earning calls, court filings in related litigation, and analyst and media reports about the Company.[1]  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a securities class action on behalf of all purchasers of Shoals Class A common stock between January 27, 2021 and May 7, 2024 inclusive (the "Class Period"), including purchases directly in Shoals' December 2022 secondary public offering of Class A common stock (the "SPO"). Plaintiff seeks to pursue remedies under §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") and §§11, 12(a)(2), and 15 of the Securities Act of 1933 (the "1933 Act"), against Shoals, certain of the Company's senior officers and directors, and the underwriters for the SPO.

## JURISDICTION AND VENUE

2. The claims asserted herein arise under and pursuant to §§11, 12(a)(2), and 15 of the 1933 Act, 15 U.S.C. §§77k, 77l(a)(2), and 77o, and §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder.

3. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331, §27 of the 1934 Act, 15 U.S.C. §78aa, and §22 of the 1933 Act, 15 U.S.C. §77v.

4. Venue is proper in this District pursuant to §27 of the 1934 Act, §22 of the 1933 Act, and 28 U.S.C. §1391(b) because the Company resides and is headquartered in this District, and the

---

[1] Emphasis has been added throughout unless otherwise noted.

events and omissions giving rise to the claims asserted herein occurred in substantial part in this District, including the dissemination of false and misleading statements in and from this District.

5.      In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

6.      Plaintiff Kissimmee Utility Authority Employees' Retirement Plan, as set forth in the accompanying certification incorporated by reference herein, purchased Shoals Class A common stock during the Class Period, including directly in the SPO, and has been damaged thereby.

7.      Defendant Shoals is a provider of electrical balance of systems ("EBOS") solutions used in solar, storage, and electrical vehicle charging infrastructure.  The Company is headquartered in Portland, Tennessee.  Shoals Class A common stock is listed on the NASDAQ Global Market ("NASDAQ") under the ticker symbol "SHLS."

8.      Defendant Jason R. Whitaker ("Whitaker") served as Shoals' Chief Executive Officer ("CEO") from January 2020 until March 2023, and held the position of President from December 2017 to December 2022.  Defendant Whitaker also served as a member of Shoals' Board of Directors ("Board") from January 2021 until March 2023.

9.      Defendant Jeffery Tolnar ("Tolnar") served as Shoals' Interim CEO from March 2023 until July 2023, and has served as the Company's President since December 2022.

10.     Defendant Brandon Moss ("Moss") has served as Shoals' CEO since July 2023.

11.     Defendant Philip Garton ("Garton") served as Shoals' Chief Financial Officer ("CFO") from December 2017 until his departure from the Company in May 2022.

- 3 -

12. Defendant Kevin Hubbard ("Hubbard") served as Shoals' Interim CFO from May 2022 until October 2022. Prior to his role as Interim CFO, Hubbard served as Shoals' outside financial reporting consultant.

13. Defendant Dominic Bardos ("Bardos") has served as Shoals' CFO since October 2022.

14. Defendants referenced above in ¶¶8-13 are referred to herein as the "1934 Act Individual Defendants." Each of the 1934 Act Individual Defendants was directly involved in the management and day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, services, products, and present and future business prospects during the time of their employment with the Company. In addition, the 1934 Act Individual Defendants were involved in drafting, producing, reviewing, and disseminating the false and misleading statements and information alleged herein, were aware of, or recklessly disregarded, the false and misleading statements being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

15. As officers and controlling persons of a publicly held company whose securities are registered with the SEC pursuant to the 1934 Act and traded on the NASDAQ, which is governed by the provisions of the federal securities laws, the 1934 Act Individual Defendants each had a duty to promptly disseminate accurate, truthful, and complete information with respect to the Company's operations, business, products, and present and future business prospects during the time of their employment with the Company. In addition, the 1934 Act Individual Defendants each had a duty to correct any previously issued statements that were materially misleading or untrue, so that the market price of the Company's publicly traded shares would be based upon truthful, accurate, and

complete information. These defendants' false and misleading misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

16. The 1934 Act Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to, and did, control the contents of various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period. Each 1934 Act Individual Defendant was provided with copies of the documents alleged herein to be false and/or misleading before or shortly after their issuance, participated in conference calls with investors during which false and misleading statements were made, and had the ability and opportunity to prevent their issuance or cause them to be corrected. Accordingly, each 1934 Act Individual Defendant is responsible for the accuracy of the public statements as detailed herein and is, therefore, primarily liable for the representations contained therein.

17. The 1934 Act Individual Defendants together with Shoals are referred to herein as the "1934 Act Defendants."

18. Defendant Brad Forth ("Forth") served as Chairman of the Company at the time of the SPO.

19. Defendant Peter Wilver ("Wilver") served as a director of the Company at the time of the SPO.

20. Defendant Ty Daul ("Daul") served as a director of the Company at the time of the SPO.

21. Defendant Toni Volpe ("Volpe") served as a director of the Company at the time of the SPO.

22. Defendant Lori Sundberg ("Sundberg") served as a director of the Company at the time of the SPO.

23. Defendant Jeanette Mills ("Mills") served as a director of the Company at the time of the SPO.

24. Defendant Robert Julian ("Julian") served as a director of the Company at the time of the SPO.

25. Defendant Dean Solon ("Solon") founded Shoals in 1996 and served as the Company's CEO and President from November 1996 until December 2019. Thereafter, defendant Solon served as a director of the Company until February 2022. Defendant Solon was a controlling shareholder of the Company during the Class Period and held approximately 40% of the voting power of Shoals stock at the time of the Company's initial public offering (the "IPO"). As stated in its IPO offering documents, Shoals was "currently controlled, and after this offering is completed will continue to be controlled, by Oaktree and the Continuing Equity Owners," which included defendant Solon. Defendant Solon, together with other Shoals executives and major Shoals shareholders, caused the Company to enter into various transactions and agreements prior to the IPO to increase his power and control over the Company and its affairs out of proportion with his share ownership and to provide him with certain preferential financial benefits. These transactions and agreements included, *inter alia*, a registration rights agreement, a stockholders agreement, and a tax receivable agreement. Prior to the SPO, defendant Solon owned nearly 34% of the combined voting power of Shoals stock. Defendant Solon sold 27.9 million shares of Shoals stock in the SPO for more than $620 million in gross offering proceeds.

26. The defendants referenced in ¶¶18-25 above, together with defendants Whitaker and Bardos, are collectively referred to herein as the "1933 Act Individual Defendants." Each of the 1933 Act Individual Defendants other than defendant Solon signed the registration statement for the

- 6 -

SPO and solicited investors for the SPO and otherwise participated in the SPO for their own financial benefit and/or the financial benefit of Shoals and defendant Solon.

27.    Defendants J.P. Morgan Securities LLC, Guggenheim Securities, LLC, Morgan Stanley & Co. LLC, UBS Securities LLC, Goldman Sachs & Co. LLC, Barclays Capital Inc., Credit Suisse Securities (USA) LLC, Cowen and Company, LLC, Oppenheimer & Co. Inc., Piper Sandler & Co., Roth Capital Partners, LLC, Johnson Rice & Company L.L.C., and Northland Securities, Inc. are referred to herein as the "Underwriter Defendants." The Underwriter Defendants are all investment banking houses with operations in the United States. The Underwriter Defendants served as underwriters for the SPO. The Underwriter Defendants purported to conduct a due diligence investigation in connection with the SPO and gained access to information regarding the Company, its business, operations, financial results, and prospects. The Underwriter Defendants solicited investors for the SPO and otherwise participated in the SPO for their own financial benefit, sharing over $23 million in underwriting discounts and commissions for the SPO, which included a full exercise of the underwriters' overallotment option.

## BACKGROUND

28.    Founded in 1996, Shoals is a provider of EBOS solutions and components for solar, battery storage, and electrical vehicle charging applications. Shoals' EBOS provides components necessary for the transfer of electrical power produced by solar panels to intermediate locations within a solar project and ultimately to the power grid. Shoals employs a proprietary EBOS system, which it dubs a "combine-as-you-go" solution, which the Company claims offers several advantages over conventional EBOS systems using "homerun" wiring architecture. In contrast to conventional EBOS systems, Shoals' combine-as-you-go solution uses specialized wire harnesses to connect multiple strings of solar panels to Shoals' proprietary above-ground feeder cable known as a "Big Lead Assembly" ("BLA"). The BLA is Shoals' core combine-as-you-go product.

29. Shoals claims that its proprietary wire system requires less wires and wire connections than other offerings and eliminates altogether the need for other materials utilized in homerun wiring architecture, which the Company states results in lower labor and material costs. Of particular importance to investors, Shoals purports that its proprietary solutions have greater reliability and lower maintenance costs than conventional EBOS systems.

30. Shoals offers its customers an assurance type warranty that protects against manufacturer defects. The Company accounts for warranty liabilities by recording a reserve provision for estimated future costs related to warranty remediation expenses. Since Shoals' IPO in January 2021 until the revelations detailed herein, the Company recorded only modest amounts in warranty-related reserves. For example, for fiscal years ending December 31, 2021 and 2022 Shoals' estimated accrued warranty reserve was $100,000 and $600,000, respectively.

31. Shoals generates the majority of its revenue from the sale of "system solutions," which are complete EBOS systems that employ several of the Company's EBOS components. Shoals also generates revenue from the sale of individual EBOS components, as well as other components used for battery storage and EV charging applications. In fiscal year 2022, Shoals derived approximately 88% and 22% of its revenue from the sale of system solutions and from the sale of components, respectively. During the Class Period, Shoals' combine-as-you-go system solutions carried higher margins than its other products and was therefore the most profitable source of revenue for the Company.

32. Shoals provides investors with measures of client demand and anticipated future business through two operational metrics: (i) backlog; and (ii) awarded orders. The Company defines "backlog" as "signed purchase orders or contractual minimum purchase commitments with take-or-pay provisions." "Awarded orders" is defined as orders that Shoals is in the "process of

CaseCase 3:24-cv-00330-059Document 34-61 Filed 06/04/24 Page 141 of 542 PageID #: 645

documenting a contract but for which a contract has not been signed." Shoals often reports its backlog and awarded orders through a single monetary figure representing the total sum of future expected revenue. Accordingly, Shoals' backlog and awarded orders are each important forward indicators of the Company's future financial, operational, and business performance.

33. Throughout the Class Period, defendants emphasized the purported "quality," "reliability," and "safety" of Shoals' EBOS products and claimed these purported advantages were critical to the Company's ability to generate business. For example, speaking during an August 2022 conference call, defendant Whitaker emphasized the "performance, quality, reliability, [and] installation savings" of Shoals' offerings and represented that these benefits served as a launch pad for the Company's "long-term" relationships with its clients, stating in pertinent part as follows:

> Components revenue increased 97% year-over-year, driven by increases in shipments of battery storage products as well as shipments of solar products to a significant number of new customers. New customers projects are typically designed to timeline systems and they generally start the relationship with Shoals by buying components that will work with these types of systems.
>
> ***Re-fixing the performance, quality, reliability, installation savings and customer service that Shoals offers***, they become open to trying our combine-as-you-go architecture and buy the BLA. ***Once customers make the transition, this usually marks the start of a long-term relationship***.

34. Defendants' filings with the SEC likewise highlighted the "several advantages" that Shoals' products purportedly enjoyed over conventional EBOS systems with claims that Shoals' combine-as-you-go system had "greater reliability," "lower maintenance costs," and "lower[] material and shipping costs" as compared to competing products.

35. Due in substantial part to the "value proposition" that Shoals' products purported to offer, defendants claimed throughout the Class Period that demand for Shoals' products was "robust" and "continue[d] to grow," and highlighted the Company's "record" breaking revenue and earnings. For example, in connection with Shoals' fourth quarter 2022 earnings announcement, the

Company boasted that it had "'set new records for revenue, gross profit, net income, adjusted EBITDA and adjusted net income'" for both the fourth quarter and full year 2022. Further emphasizing Shoals' performance, defendant Whitaker represented that Shoals was "'commercially, operationally and financially'" the strongest "'it ha[d] ever been.'"

36. Unbeknownst to investors, however, during the Class Period Shoals was suffering from a massive, undisclosed warranty problem that impacted approximately 30% of wire harnesses Shoals had manufactured during the 2020 through 2022 time period. Beginning several months prior to the start of the Class Period, Shoals had utilized defective specialty wires manufactured by a third party in a substantial portion of its wire harnesses, resulting in excessive "shrinkback" whereby insulating material surrounding wires at connection points improperly contracted, leaving live wires exposed and creating serious risks of fire, injury, or death to Shoals' customers. As a result, Shoals was liable for millions of dollars in undisclosed warranty remediation costs, which the Company has ultimately estimated could cost as much as $185 million. The widespread use of defective wires in its projects has also significantly damaged Shoals' reputational standing among its customers. As a result, Shoals' ability to competitively differentiate its offerings has been materially impaired, exposing the Company's business, finances, and operations to significant disruption and reputational harm, as well as the material undisclosed risks of lost sales, increased costs, and other negative consequences.

37. In May 2023 – approximately three years after the Company began utilizing defective and potentially dangerous wiring in its harness installations – Shoals first mentioned the shrinkback issue in a Form 10-Q quarterly report for its first fiscal quarter ended March 31, 2023. The report materially misrepresented the scope of the issue, stating the Company only had $400,000 in accrued warranty liability at quarter end, a $200,000 decrease from the prior quarter. The quarterly report

also misleadingly downplayed the harm to the Company by describing the shrinkback issue as impacting only "a subset of specific colored wire provided by one specific supplier."

38.     Then, on August 1, 2023, in connection with reporting its second fiscal quarter 2023 results, Shoals revealed that it was recording a $9.4 million warranty expense to reflect costs primarily related to shrinkback remediation, offsetting other claimed improvements in the Company's margin profile and causing its gross margins to decline sequentially to 42.4% from 45.9% in the prior quarter.  During the corresponding conference call, defendant Bardos sought to assuage investor concerns regarding the Company's warranty expense exposure, falsely stating that the warranty expense incurred within the quarter was "adequate to do the remediation required."

39.     Contrary to this representation, Shoals would go on to announce an additional $50 million in shrinkback warranty expenses the following quarter, representing a more than five-fold increase.  Shoals would likewise disclose that 30% of its wire harnesses manufactured from 2020 to 2022 had been impacted by the shrinkback issue and that ultimate remediation costs could reach as high as $185 million.

40.     As would subsequently be revealed, the installation of defective – and potentially dangerous – wire harnesses on so many of the Company's projects has also negatively impacted Shoals' customer relationships.  For example, a November 10, 2023 Roth MKM analyst report stated their "checks" with Shoals' customers

> suggest that since receiving the safety notice from SHLS regarding shrinkback . . . , customers are likely scrambling to identify any instances of the issue.  ***Critical concerns we have heard include (1) Serious injury or death, (2) The exposed wiring may cause fire and property damage, and (3) PUCs may get involved with increased scrutiny***.

(Emphasis in original.)  Moreover, at least one affected site has already reported property damage arising from a brush fire believed to have ignited as a result of contact with a defective, Shoals-installed wire harness.

41. In subsequent quarters, Shoals has revealed dramatically deteriorating results, reflecting in part the effects of the shrinkback issue on the Company's customer relationships, and the materialization of the risks concealed by defendants' materially misleading misstatements and omissions as detailed herein. In reporting its fourth fiscal quarter of 2023 results, Shoals revealed a sequential quarterly decline of $2 million in the Company's backlog and awarded orders. The Company also issued disappointing revenue guidance for fiscal year 2024 of $480 million to $520 million that was approximately 19% below consensus estimates at the midpoint. Shoals' business further deteriorated in its first fiscal quarter of 2024, with backlog and awarded orders falling sequentially by over $16 million and the Company reducing its already disappointing guidance to a range of $440 million to $490 million due in part to an "unprecedented" customer cancellation and project delays. In a Form 10-Q quarterly report the Company filed with the SEC, Shoals has also disclosed that the Company "may increase" its estimated warranty liability a "material" amount.

42. As a result of these disclosures, the price of Shoals Class A common stock has declined from a Class Period high of over $40 per share to less than $8 per share by the end of the Class Period, causing plaintiff and the Class (defined below) to suffer hundreds of millions of dollars in losses and economic damages under the federal securities laws.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ISSUED DURING THE CLASS PERIOD

43. The Class Period begins on January 27, 2021, the day after the Company's registration statement for its IPO was declared effective by the SEC. On December 30, 2020, Shoals filed with the SEC a registration statement on Form S-1 for the IPO (the "IPO Registration Statement"). On January 28, 2021, Shoals filed with the SEC a prospectus on Form 424B4 for the IPO (the "IPO Prospectus"), which incorporated and formed part of the IPO Registration Statement. In the IPO, Shoals and one of the Company's private equity owners, an affiliate of Oaktree Capital

Management, L.P., collectively sold more than 88.5 million shares of Shoals Class A common stock, which included a full exercise of the underwriters' overallotment option, at $25 per share for over $2.2 billion in gross offering proceeds.

44. The IPO Registration Statement highlighted the purported "reliability and safety" of Shoals' products, stating that the Company was "founded" to provide EBOS solutions that "improve reliability and safety" and that its solutions were "more reliable" than "any other" solar EBOS system that was commercially available. The IPO Registration Statement further represented that Shoals' combine-as-you-go solution had "greater reliability and lower maintenance costs" than competing products and claimed that its "reliability advantages" had contributed to the adoption of its products in the marketplace. The IPO Registration Statement also stated that Shoals "prioritize[d]" developing products that improved the "reliability and safety" of renewable energy, which it claimed had contributed to Shoals' "[l]ongstanding reputation for differentiated products" within the industry.

45. The IPO Registration Statement stated that for its fiscal year ended December 31, 2020: (i) Shoals' preliminary unaudited annual revenue had increased 21% to an estimated range of $174 million to $176 million at the midpoint, up from $145 million in the prior fiscal year; and (ii) the Company's annual net income had increased 32% to an estimated range of $32 million to $34.5 million at the midpoint, up from $25 million in the prior fiscal year.

46. On March 15, 2021, Shoals issued a press release reporting the Company's financial results for its fourth fiscal quarter and year ended December 31, 2020 ("4Q20 Release"). The 4Q20 Release stated that Shoals' quarterly revenue had increased year-over-year to $39 million from $38 million in the prior year period. The 4Q20 Release further stated that Shoals' quarterly gross profit

- 13 -

had increased 19% year-over-year to $15 million from $12.5 million in the prior year period. In addition, the 4Q20 Release stated that Shoals achieved quarterly net income of $4.2 million.

47. On March 16, 2021, Shoals filed with the SEC an annual report on Form 10-K for its fiscal year ended December 31, 2020 ("FY20 Form 10-K"), which was signed by defendants Whitaker, Garton, and Solon, among others. The FY20 Form 10-K contained the same financial information regarding Shoals' revenue, gross profit, and net income that was reported in the 4Q20 Release.

48. On May 3, 2021, Shoals issued a press release reporting the Company's financial results for its first fiscal quarter ended March 31, 2021 ("1Q21 Release"). The 1Q21 Release stated that Shoals' quarterly revenue had increased 12% year-over-year to a "record" $45.6 million up from $41 million in the prior year period. The 1Q21 Release also stated that the Company's quarterly gross profit had increased 32% year-over-year to $19 million, up from $14 million in the prior year period, and that its gross margin in the quarter had expanded by 635 basis points year-over-year to 41.2% from 34.8% in the prior year period. In addition, the 1Q21 Release stated that Shoals had recorded a quarterly net loss of $8.3 million. The 1Q21 Release highlighted the purported "safety" and "reliability" of Shoals' products, representing that the Company's "mission" was to provide products that improved "system performance, reliability and safety."

49. On May 4, 2021, Shoals filed with the SEC a quarterly report on Form 10-Q for the quarter ended March 31, 2021 ("1Q21 Form 10-Q"), which was signed by defendants Whitaker and Garton. The 1Q21 Form 10-Q contained the same financial information regarding Shoals' revenue, gross profit, and net income that was reported in the 1Q21 Release.

50. On August 10, 2021, Shoals issued a press release reporting the Company's financial results for its second fiscal quarter ended June 30, 2021 ("2Q21 Release"). The 2Q21 Release stated

that Shoals' quarterly revenue had grown 38% year-over-year to $60 million from $43.4 million in the prior year period. The 2Q21 Release further stated that Shoals' quarterly gross profit had increased 56% year-over-year to $26 million from $17 million in the prior year period. The 2Q21 Release also stated that Shoals' quarterly net income had increased to $9 million up from $5 million in the prior year period. The 2Q21 Release quoted defendant Whitaker who emphasized Shoals' combine-as-you-go solution, claiming that demand for the Company's product "'continue[d] to . . . grow[].'" In addition, the 2Q21 Release highlighted the purported "safety" and "reliability" of Shoals' products, representing that the Company's "mission" was to provide products that improved "system performance, reliability and safety."

51. On August 11, 2021, Shoals filed with the SEC a quarterly report on Form 10-Q for the quarter ended June 30, 2021 ("2Q21 Form 10-Q"), which was signed by defendants Whitaker and Garton. The 2Q21 Form 10-Q contained the same financial information regarding the Company's revenue, gross profit, and net income that was reported in the 2Q21 Release.

52. On November 9, 2021, Shoals issued a press release reporting the Company's financial results for its third fiscal quarter ended September 30, 2021 ("3Q21 Release"). The 3Q21 Release stated that Shoals' quarterly revenue had increased 14% year-over-year to $60 million from $53 million in the prior year period. The 3Q21 Release further stated that Shoals' quarterly gross profit had increased 5% to $22 million from $21 million in the prior year period. In addition, the 3Q21 Release stated that Shoals had achieved quarterly net income of $5 million. The 3Q21 Release quoted defendant Whitaker who represented that Shoals was growing "'faster than the market'" and taking "'share'" from conventional EBOS providers. In addition, the 3Q21 Release highlighted the purported "safety" and "reliability" of Shoals' products, representing that the Company's "mission" was to provide products that improved "system performance, reliability and safety."

53. On November 10, 2021, Shoals filed with the SEC a quarterly report on Form 10-Q for the quarter ended September 30, 2021 ("3Q21 Form 10-Q"), which was signed by defendants Whitaker and Garton. The 3Q21 Form 10-Q contained the same financial information regarding the Company's revenue, gross profit, and net income that was reported in the 3Q21 Release.

54. On March 10, 2022, Shoals issued a press release reporting the Company's financial results for its fourth fiscal quarter and year ended December 31, 2021 ("4Q21 Release"). The 4Q21 Release stated that Shoals' quarterly revenue had increased 24% year-over-year to $48 million from $39 million in the prior year period. The 4Q21 Release further stated that Shoals' quarterly gross profit had increased 7% year-over-year to $16 million up from $15 million in the prior year period. The 4Q21 Release also stated that Shoals had recorded a quarterly net loss of $2.2 million. In addition, the 4Q21 Release highlighted the purported "safety" and "reliability" of Shoals' products, representing that the Company's "mission" was to provide products that improved "system performance, reliability and safety."

55. On March 11, 2022, Shoals filed with the SEC an annual report on Form 10-K for its fiscal year ended December 31, 2021 ("FY21 Form 10-K"), which was signed by defendants Whitaker and Garton, among others. The FY21 Form 10-K contained the same financial information regarding Shoals' revenue, gross profit, and net income that was reported in the 4Q21 Release.

56. On May 16, 2022, Shoals issued a press release reporting the Company's financial results for its first fiscal quarter ended March 31, 2022 ("1Q22 Release"). The 1Q22 Release stated that Shoals' quarterly revenue had increased 49% year-over-year to a "record" $68 million up from $45.6 million in the prior year period. The 1Q22 Release also stated that the Company's quarterly gross profit had increased 40% year-over-year to $26 million, up from $19 million in the prior year

period, and that its gross margin in the quarter had "expanded" more than 550 basis points to 38.7% on a sequential basis. The 1Q22 Release further stated that Shoals' quarterly net income had improved year-over-year to $5 million from a net loss of $8 million. The 1Q22 Release highlighted the purported "safety" and "reliability" of Shoals' products, representing that the Company's "mission" was to provide products that improved "system performance, safety, and reliability."

57.     Also on May 16, 2022, Shoals held a conference call with analysts to discuss the Company's financial and operational results for the first quarter of 2022 hosted by defendants Whitaker and Hubbard. During the call, defendant Whitaker emphasized the purported "reliability" and "quality" of Shoals' products and claimed they were generating "a lot of opportunities" for the Company, stating in pertinent part as follows:

> And also, when you look at the case – the use case in the international market, obviously, the higher the labor, the higher the value proposition. But the reality is, even outside of that, there's a lot of opportunities. We're seeing places that have very low – or relatively low labor rates that we're seeing success with as well. ***So there's more than just the labor aspect when you look at the quality and the reliability of our product offerings out there***.

58.     On May 17, 2022, Shoals filed with the SEC a quarterly report on Form 10-Q for the quarter ended March 31, 2022 ("1Q22 Form 10-Q"), which was signed by defendants Whitaker and Hubbard. The 1Q22 Form 10-Q contained the same financial information regarding Shoals' revenue, gross profit, and net income that was reported in the 1Q22 Release.

59.     On August 15, 2022, Shoals issued a press release reporting the Company's financial results for its second fiscal quarter ended June 30, 2022 ("2Q22 Release"). The 2Q22 Release stated that Shoals' quarterly revenue had grown 23% year-over-year to $73.5 million from $60 million in the prior year period. The 2Q22 Release further stated that Shoals' quarterly gross profit had increased 9% year-over-year to $29 million from $26 million in the prior year period and that it had achieved $7.3 million in quarterly net income. The 2Q22 Release quoted defendant Whitaker who

emphasized Shoals' combine-as-you-go solution, claiming that demand for the Company's product "'continue[d] to grow.'" In addition, the 2Q22 Release highlighted the purported "safety" and "reliability" of Shoals' products, representing that "[s]ince its founding in 1996, the Company has introduced innovative technologies and systems solutions that allow its customers to substantially increase installation efficiency and safety while improving system performance and reliability."

60.     Also on August 15, 2022, Shoals held a conference call with analysts to discuss the Company's financial and operational results for the second quarter of 2022, hosted by defendants Whitaker and Hubbard. During his prepared remarks, defendant Whitaker highlighted the "performance, quality, reliability, [and] installation savings" of Shoals' products and claimed these benefits were the basis of the Company's "long-term relationship[s]" with its clients, stating in pertinent part as follows:

> Re-fixing **the performance, quality, reliability, installation savings and customer service that Shoals offers, they become open to trying our combine-as-you-go architecture and buy the BLA. Once customers make the transition, this usually marks the start of a long-term relationship**.

61.     In response to a question from an analyst, defendant Whitaker emphasized the purported "value" of Shoals' products, including specifically their "quality" and "reliability," stating: "BLA can reduce labor costs, improve safety, increase reliability and reduce maintenance expenses."

62.     On August 16, 2022, Shoals filed with the SEC a quarterly report on Form 10-Q for the quarter ended June 30, 2022 ("2Q22 Form 10-Q"), which was signed by defendants Whitaker and Hubbard. The 2Q22 Form 10-Q contained the same financial information regarding the Company's revenue, gross profit, and net income that was reported in the 2Q22 Release.

63.     On November 14, 2022, Shoals issued a press release disclosing the Company's financial results for its third fiscal quarter ended September 30, 2022 ("3Q22 Release"). The 3Q22 Release stated that Shoals' quarterly revenue had increased 52% year-over-year to $91 million from

$60 million in the prior year period. The 3Q22 Release further stated that Shoals' "record" quarterly gross profit had increased 66% to $36 million from $22 million in the prior year period due primarily to a higher proportion of revenue earned from Shoals' combine-as-you-go system, which the 3Q22 Release represented carried "higher margins" relative to the Company's other products. In addition, the 3Q22 Release stated that Shoals' quarterly net income had improved year-over-year to $13 million from $5 million in the prior year period. The 3Q22 Release also quoted defendant Whitaker who highlighted the purported "'performance'" of Shoals' products as enabling the Company to capitalize on improving market trends, stating in pertinent part as follows:

> "At the same time as we are taking share and introducing new products, conditions in our core solar market are improving. The two-year tariff exemption for Chinese solar panels, the recently passed Inflation Reduction Act and higher energy prices have given ***our customers and end-users the confidence to reinitiate previously delayed projects, make multi-year commitments to invest in solar generation and prioritize product availability and performance over price*** . . . ."

64. In addition, the 3Q22 Release highlighted the purported "safety" and "reliability" of Shoals' products, representing that "[s]ince its founding in 1996, the Company has introduced innovative technologies and systems solutions that allow its customers to substantially increase installation efficiency and safety while improving system performance and reliability."

65. Also on November 14, 2022, Shoals held a conference call with analysts to discuss the Company's financial and operational results for the third quarter of 2022, hosted by defendants Whitaker and Bardos. During his prepared remarks, defendant Whitaker highlighted the purported "value proposition" offered by Shoals' combine-as-you-go system, which he claimed as enabling Shoals to capitalize on favorable market trends, stating in pertinent part as follows:

> In addition, the prevailing wage provision of the IRA is expected to compound wage pressure in the U.S. market, which further reinforces the value proposition of our combine-as-you-go system. From day 1, we set out to create products that can be installed by anyone as a response to the disproportionately high cost of installing EBOS, which can be equal to or in excess of the cost of the product itself. ***In environments where labor is more expensive, our solutions are especially***

*attractive as they take less time to install and are installable by general labor. We anticipate the prevailing wage provision will provide a significant tailwind for years to come.*

66. That same day, Shoals filed with the SEC a quarterly report on Form 10-Q for the quarter ended September 30, 2022 ("3Q22 Form 10-Q"), which was signed by defendants Whitaker and Bardos. The 3Q22 Form 10-Q contained the same financial information regarding the Company's revenue, gross profit, and net income that was reported in the 3Q22 Release.

67. On November 30, 2022, Shoals filed with the SEC a registration statement for the SPO on Form S-3, which was also declared effective on that date (the "SPO Registration Statement"). On December 5, 2022, Shoals filed with the SEC a prospectus on Form 424B4, which incorporated and formed part of the SPO Registration Statement (the "SPO Prospectus"). In the SPO, Shoals and defendant Solon collectively sold 29.9 million shares of Shoals Class A common stock at $22.25 per share, which included a full exercise of the underwriters' overallotment option, for over $665 million in gross offering proceeds.

68. The SPO Registration Statement highlighted the purported "safety" and "reliability" of Shoals' products, representing that the Company's "mission" was to provide products that improved the "reliability and safety" of client projects. In addition, the SPO Registration Statement listed "converting customers" to Shoals' proprietary combine-as-you-go system as a "core" element of the Company's growth strategy. In particular, the SPO Registration Statement claimed that Shoals was "in the process of transitioning" an additional 14 customers to the Company's combine-as-you-go system, and that Shoals' was "currently prospecting" 72 other customers to make the same transition.

69. The SPO Registration Statement also represented that for the nine months ended September 30, 2022: (i) Shoals' revenue had increased nearly 41% to $232 million, up from $165 million in the prior year period; (ii) the Company's gross profit had increased 36% to $91 million up

from $67 million in the prior year period; and (ii) its net income had increased more than 300% to $25 million up from $6 million in the prior year period. In addition, the SPO Registration Statement incorporated by reference the 3Q22 Form 10-Q and repeated the statements identified in ¶66.

70. On February 28, 2023, Shoals issued a press release reporting the Company's financial results for its fourth fiscal quarter and year ended December 31, 2022 ("4Q22 Release"). The 4Q22 Release stated that Shoals' quarterly revenue had increased 97% year-over-year to $95 million from $48 million in the prior year period. The 4Q22 Release further stated that Shoals' quarterly gross profit had increased 154% year-over-year to $40.4 million from $16 million in the prior year period. In addition, the 4Q22 Release stated that Shoals' quarterly net income had increased year-over-year to $118 million from $2 million in the prior year period.

71. The 4Q22 Release quoted defendant Whitaker who represented that Shoals was "commercially, operationally, and financially" the strongest "it ha[d] ever been," stating in pertinent part as follows:

> The strength of demand for our products is underscored by the $428.6 million of backlog and awarded orders that we ended the year with, which represented growth of 43% compared to the same time last year. As a matter of fact, in just the first few weeks of the new year, *backlog and awarded orders has hit record levels yet again*, as we have continued to win new customers. I am incredibly proud of what Shoals has accomplished over the past several years and that *I will leave the Company commercially, operationally and financially stronger than it has ever been*.

72. The 4Q22 Release highlighted the purported "safety" and "reliability" of Shoals products, representing that "since its founding in 1996, the Company has introduced innovative technologies and systems solutions that allow its customers to substantially increase installation efficiency and safety while improving system performance and reliability."

73. That same day, Shoals filed with the SEC an annual report on Form 10-K for its fiscal year ended December 31, 2022 ("FY22 Form 10-K"), which was signed by defendants Whitaker and

Bardos, among others. The FY22 Form 10-K contained the same financial information regarding the Company's revenue, gross profit, and net income that was reported in 4Q22 Release. In addition, the FY22 Form 10-K stated that Shoals' provision for accrued warranty liability was $600,000 as of December 31, 2022. The FY22 Form 10-K further represented that Shoals' use of "interconnect harnesses" and BLA as part of its combine-as-you-go architecture resulted in "greater reliability" and "lower maintenance costs" as compared to conventional "homerun" systems, stating in pertinent part as follows:

> Connection points are often the source of failure in EBOS systems and must be inspected regularly. ***A solar energy project that uses our interconnect harness and BLA will have significantly fewer connections and, as a result, fewer failure points to inspect*** and maintain than the same project would using a conventional homerun system. ***We believe fewer potential failure points contributes to higher reliability and lower maintenance costs for solar energy projects that use our combine-as-you-go system when compared to a conventional homerun system***.

74. On May 8, 2023, Shoals issued a press release reporting the Company's financial results for its first fiscal quarter ended March 31, 2023 ("1Q23 Release"). The 1Q23 Release stated that Shoals' quarterly revenue had increased 55% year-over-year to $105 million from $68 million in the prior year period. The 1Q23 Release further stated that Shoals' quarterly gross profit had increased 84% year-over-year to $48 million from $26 million in the prior year period. The 1Q23 Release also stated that Shoals' quarterly net income had increased 265% year-over-year to $17 million from $4.6 million in the prior year period. The 1Q23 Release quoted defendant Tolnar who emphasized Shoals' "'exceptional first quarter'" and "'record revenue and earnings'" and represented that the Company experienced "'continued robust demand'" for its products. The 1Q23 Release highlighted the purported "'safety'" and "'reliability'" of Shoals' products, representing that "[s]ince its founding in 1996, the Company has introduced innovative technologies and systems solutions that allow its customers to substantially increase installation efficiency and safety while improving system performance and reliability."

75. Also on May 8, 2023, Shoals held a conference call with analysts to discuss the Company's financial and operational results for the first quarter of 2023, hosted by defendants Tolnar and Bardos. During his prepared remarks, defendant Tolnar represented that Shoals "set a new record[] for revenue" in the quarter that was driven by "increased demand for Solar EBOS generally and [Shoals'] combine-as-you-go system solutions specifically." Defendant Tolnar also stated that demand for Shoals' products "remained very strong" and that the Company observed an "acceleration" in quoting activity from prospective clients that broke "new records" in the quarter. Defendant Tolnar highlighted the purported "safety" and "reliability" of Shoals' products, claiming the Company had "invested millions of dollars" over the "last 27 years" to develop its EBOS solutions that "significantly increased installation efficiency and safety" and "improving system performance and reliability for the utility scale solar" market, among others.

76. That same day, Shoals filed with the SEC a quarterly report on Form 10-Q for the quarter ended March 31, 2023 ("1Q23 Form 10-Q"), which was signed by defendants Tolnar and Bardos. The 1Q23 Form 10-Q contained the same financial information regarding the Company's revenue, gross profit, and net income that was reported in 1Q23 Release. In addition, the 1Q23 Form 10-Q stated that Shoals' provision for accrued warranty liability was $400,000 as of March 31, 2023.

77. In addition, the 1Q23 Form 10-Q listed as one of several "contingencies" facing the Company that Shoals had been "notified by certain customers" that "a subset of specific colored wire provided by one specific supplier" used in its EBOS systems were "presenting excessive pull back of wire insulation," and that, while it was "probable" the Company would incur costs related to the impacted wire harnesses, the Company could not "reasonably estimate those costs," stating in pertinent part as follows:

The Company has been notified by certain customers that a subset of wire harnesses used in its EBOS solutions is presenting excessive pull back of wire insulation at connection points ("shrinkback"). ***Based upon the Company's initial assessment, the Company believes the shrinkback is related to a subset of specific colored wire provided by one specific supplier. While it is probable that the Company will incur costs related to the repair or replacement of the impacted wire harnesses, based on the limited information available as of the date of this Quarterly Report, including the scope of affected sites, potential solutions and the possibility of recovery from the wire supplier, it is not possible to reasonably estimate those costs***. The Company is continuing its investigation of this matter to determine a course of action, and has substantially ceased use of the related wire from this supplier.

78. The statements referenced in ¶¶44-66 and 68-77 above were materially false and/or misleading when made because they failed to disclose the following adverse facts pertaining to the Company's business, operations, and financial condition, which were known to defendants or recklessly disregarded by them as follows:

(a) that between 2020 and the end of 2022, Shoals had installed defective wires at approximately 300 sites impacting approximately 30% of all wire harnesses manufactured by the Company during this time period;

(b) that, as a result of (a) above, Shoals was facing tens of millions of dollars in shrinkback warranty liabilities;

(c) that Shoals had not booked a sufficient warranty expense provision to cover the remediation costs for the shrinkback issue;

(d) that Shoals' historical reported revenue, gross profit, and net income had been generated in substantial part through the sale of defective products posing a risk of injury, death, and fire damage to Shoals' customers;

(e) that Shoals' ability to competitively differentiate its products through representations regarding the reliability, safety, and quality of its offerings had become materially impaired; and

(f)     that, as a result of (a)-(e) above, Shoals' business and operations were acutely exposed to material, undisclosed risks of reputational harm and negative impacts to the Company's business, financial results, and prospects.

79.     In addition, Shoals' periodic SEC filings contained materially misleading discussions regarding the Company's warranty liabilities and potential product defects, misleadingly mentioning potential *future* contingent possibilities while failing to disclose adverse events that had *already* occurred. For example, Shoals' periodic SEC filings stated that "defects" or "performance problems" in Shoals' products "*could* result in loss of customers, reputational damage and decreased revenue, and we may face warranty, indemnity and product liability claims arising from defective products," but failed to disclose that the Company had been installing defective products since 2020 and that by at least March 2022 Shoals had *already* received customer complaints regarding specialty wires impacting 30% of the wire harnesses the Company had manufactured during the 2020 to 2022 time frame.

80.     Then, on August 1, 2023, Shoals issued a press release disclosing the Company's financial results for its second fiscal quarter ended June 30, 2023 ("2Q23 Release"). The 2Q23 Release and a related earnings call unexpectedly revealed that Shoals was recording a $9.4 million warranty expense primarily due to the shrinkback insulation issue. As a result, the 2Q23 Release reported that Shoals' quarterly gross profit margin had declined sequentially to 42.4% from approximately 46% reported in the prior quarter.

81.     On this news, the price of Shoals Class A common stock fell from $26.11 per share on August 1, 2023 to $24.51 per share on August 2, 2023, or approximately 6%, on above-average trading volume of over 6 million shares traded. However, the price of Shoals Class A common stock continued to be artificially inflated as defendants continued to make material misstatements and

omissions and to conceal the full truth regarding the Company's business, operations, and financial results.

82. The 2Q23 Release stated that Shoals' quarterly revenues had increased 62% year-over-year to $119 million from $73.5 million in the prior year period. The 2Q23 Release further stated that Shoals' quarterly gross profit had increased 77% year-over-year to $50.5 million from $28.6 million in the prior year period. The 2Q23 Release also stated that Shoals' quarterly net income had increased 159% year-over-year to $19 million from $7.3 million in the prior year period. The 2Q23 Release quoted defendant Tolnar who highlighted Shoals' purported "'outstanding performance'" and the "'records for revenue and earnings'" purportedly achieved during the quarter and claimed that demand for Shoals' products was "'robust'" and "'remained strong.'"

83. On August 1, 2023, Shoals held a conference call with analysts to discuss the Company's financial and operational results for the second quarter of 2023, hosted by defendants Moss, Bardos, and Tolnar. During his prepared remarks, defendant Tolnar represented that Shoals' "record" financial performance in the quarter was driven by "increased demand for solar EBOS generally and [Shoals'] combine-as-you-go System Solutions specifically." Defendant Tolnar further stated that demand for Shoals' products "remains very strong" and that the Company's system solutions experienced "continued share gains."

84. During the call, an analyst from Oppenheimer & Co. Inc. inquired regarding the scope of the warranty expense issue, including the number of customers and shipments impacted, as well as how long these issues had occurred. In response, defendant Bardos represented that the charge was "limited to one of [Shoals'] suppliers" and that the warranty expense incurred in the quarter was "***adequate to do the remediation required***."

85.     That same day, Shoals filed with the SEC a quarterly report on Form 10-Q for the quarter ended June 30, 2023 ("2Q23 Form 10-Q"), which was signed by defendants Moss and Bardos.  The 2Q23 Form 10-Q contained the same financial information regarding the Company's revenue, gross profit, and net income that was reported in 2Q23 Release.  The 2Q23 Form 10-Q stated that Shoals' provision for accrued warranty expense was $9.4 million as of June 30, 2023.

86.     The statements referenced in ¶¶82-85 above were materially false and/or misleading when made because they failed to disclose the following adverse facts pertaining to the Company's business, operations, and financial condition, which were known to defendants or recklessly disregarded by them as follows:

(a)     that between 2020 and the end of 2022, Shoals had installed defective wires at approximately 300 sites impacting approximately 30% of all wire harnesses manufactured by the Company during this time period;

(b)     that, as a result of (a) above, Shoals was facing tens of millions of dollars in shrinkback warranty liabilities;

(c)     that Shoals' $9.4 million provision for accrued warranty expense was insufficient to cover the remediation costs for the shrinkback issue;

(d)     that Shoals' historical reported revenue, gross profit, and net income had been generated in substantial part through the sale of defective products posing a risk of injury, death, and fire damage to Shoals' customers;

(e)     that Shoals' ability to competitively differentiate its products through representations regarding the reliability, safety, and quality of its offerings had become materially impaired; and

(f)     that, as a result of (a)-(e) above, Shoals' business and operations were acutely exposed to material, undisclosed risks of reputational harm and negative impacts to the Company's business, financial results, and prospects.

87.     Then, on November 7, 2023, Shoals issued a press release disclosing the Company's financial results for its third fiscal quarter ended September 30, 2023 ("3Q23 Release").  Despite assurances from defendant Bardos that the $9.4 million warranty expense incurred in the second quarter was "adequate" to cover shrinkback remediation costs, the 3Q23 Release surprisingly revealed that Shoals' shrinkback warranty expenses had ballooned in the quarter to more than $50 million – representing a greater than five-fold increase.  As a result, the 3Q23 Release revealed that Shoals' quarterly gross profit had declined more than 60% to $14 million from $36 million in the prior year quarter and that the Company had suffered a net loss of $10 million in the quarter compared to net income of $13 million in the prior year period.  During the corresponding conference call, defendant Moss further revealed that the estimated range for potential loss was now $60 million at the low end and up to $185 million at the high end, reflecting the total potential remediation costs at impacted sites.

88.     On this news, the price of Shoals Class A common stock fell from $16.23 per share on November 7, 2023 to $12.95 per share on November 9, 2023, or approximately 20%, over a two-day trading period, on above-average trading volume.  However, the price of Shoals Class A common stock continued to be artificially inflated as defendants continued to make material misstatements and omissions and to conceal the full truth regarding the Company's business, operations, and financial results.

89.     The 3Q23 Release stated that Shoals' quarterly revenue had increased 48% year-over-year to $134 million from $91 million.  The 3Q23 Release also quoted defendant Moss who

highlighted Shoals' "'record'" backlog and awarded orders and claimed that the Company's purportedly "'strong value proposition'" would continue to "'drive order growth,'" stating in pertinent part as follows:

> "Backlog and awarded orders increased 34% year-over-year and 16% sequentially to a Company record of $633.3 million as the Company added over $220 million in orders in the quarter. ***While the domestic utility scale solar market is currently experiencing slower growth, we believe our strong value proposition and the emerging strength from our international business will continue to drive order growth***. We are pleased that international now represents more than 10% of our backlog and awarded orders."

90.     On November 7, 2023, Shoals held a conference call with analysts to discuss the Company's financial and operational results for the third quarter of 2023, hosted by defendants Moss and Bardos. During the call, defendant Moss highlighted Shoals' purportedly "industry-leading margins" and "significant cash flow generation," and represented that he could "not be more excited" and "optimistic" about what could be achieved in the coming quarters.

91.     During the Q&A portion of the call, an analyst from Morgan Stanley inquired directly whether any customer projects had been "tripped offline" as a result of the shrinkback issues. In response, defendant Moss assured investors that Shoals had not observed any impacts and that customers were "appreciative" of Shoals handling of the issue, stating in pertinent part as follows:

> ***Just to add to that, as Meghan said, we're proactively reaching out to our customers. We have not seen any project movement specific to the warranty issue. I think the customers understand that this is a supplier issue***. And as Meghan said, taking care of them is our top priority. So I think everybody is appreciative of how we're communicating and working in the marketplace around this issue.

92.     That same day, Shoals filed with the SEC a quarterly report on Form 10-Q for the quarter ended September 30, 2023 ("3Q23 Form 10-Q"), which was signed by defendants Moss and Bardos. The 3Q23 Form 10-Q contained the same financial information that was reported in the 3Q23 Release.

93.     The statements referenced in ¶¶89-92 above were materially false and/or misleading when made because they failed to disclose the following adverse facts pertaining to the Company's business, operations, and financial condition, which were known to defendants or recklessly disregarded by them as follows:

(a)     that several of Shoals' customers had expressed concerns regarding the Company's defective wiring given the attendant risks of serious injury or death, fires, property damage, and increased governmental scrutiny;

(b)     that Shoals' ability to competitively differentiate its products through representations regarding the reliability, safety, or quality of its offerings had become materially impaired;

(c)     that, as a result of (a)-(b) above, Shoals' business and operations were acutely exposed to material, undisclosed risks of reputational harm and negative impacts to the Company's business, financial results, and prospects; and

(d)     that Shoals' sale of defective wire harnesses had negatively impacted the Company's sales, customer relationships, and financial results and that defendants' representations regarding Shoals' business, sales, and prospects were materially misleading.

94.     As would be subsequently revealed, the installation of defective – and potentially dangerous – wire harnesses on so many of the Company's projects negatively impacted Shoals' customer relationships.  For example, a November 10, 2023 Roth MKM analyst report stated that the analysts' "checks" with Shoals' customers

> suggest that since receiving the safety notice from SHLS regarding shrinkback . . . , customers are likely scrambling to identify any instances of the issue. ***Critical concerns we have heard include (1) Serious injury or death, (2) The exposed wiring may cause fire and property damage, and (3) PUCs may get involved with increased scrutiny***.

(Emphasis in original.)  According to the report, at least one affected site had already suffered property damage arising from a brush fire believed to have ignited as a result of contact with a defective, Shoals-installed wire harness.

95.     Then, on February 28, 2024, Shoals issued a press release disclosing the Company's financial results for its fourth fiscal quarter and year ended December 31, 2023 ("4Q23 Release"). The 4Q23 Release revealed that growth in Shoals' backlog and awarded orders had materially deteriorated, falling sequentially by $2 million to $631.3 million, down from $633.3 million in the prior quarter.  In addition, the 4Q23 Release issued disappointing financial guidance for Shoals' first fiscal quarter and full year 2024.  In particular, the 4Q23 Release issued quarterly revenue guidance of $90 million to $100 million, revealing that quarterly revenue was projected to decline sequentially by more than $35 million at the midpoint of the range.  In addition, the 4Q23 Release provided 2024 annual revenue guidance for the Company of $480 to $520 million, which at the midpoint was approximately 19% below consensus analyst estimates of approximately $620 million.

96.     On this news, the price of Shoals Class A common stock fell from $15.39 per share on February 28, 2024 to $12.83 per share on February 29, 2024, or more than 16%, on above-average trading volume of over 15 million shares traded.  However, the price of Shoals Class A common stock continued to be artificially inflated as defendants continued to make material misstatements and omissions and to conceal the full truth regarding the Company's business, operations, and financial results.  For example, defendants' statements identified in ¶95 above materially understated and misrepresented the negative impact of the wire shrinkback issue on Shoals' business, financial results, and prospects.

97.     On May 7, 2024, Shoals issued a press release disclosing the Company's financial results for its first fiscal quarter ended March 31, 2024 ("1Q24 Release").  The 1Q24 Release

revealed that Shoals' business deterioration as a result of the fallout from the shrinkback remediation issue was much more severe than previously disclosed. Specifically, the 1Q24 Release revealed that Shoals' backlog and awarded orders had fallen more than $16 million on a sequential basis to $615.2 million. The 1Q24 Release also lowered the Company's 2024 annual revenue guidance by 7% at the midpoint to a range of $440 million to $490 million. During a related earnings call, Shoals executives revealed that the Company had suffered an "unprecedented" project cancellation and several order delays during the quarter.

98. That same day, Shoals filed with the SEC a quarterly report on Form 10-Q for the first quarter of 2024 that stated that the Company's estimate of shrinkback remediation and warranty costs "may increase" and that such increase "may be material."

99. On this news, the price of Shoals Class A common stock fell from $8.80 per share on May 7, 2024 to $7.51 per share on May 8, 2024, or approximately 15%, on above-average trading volume of over 13 million shares traded.

100. In total, the price of Shoals' Class A common stock has fallen over 80% from the Class Period high, inflicting hundreds of millions of dollars in financial losses and economic damages under the federal securities laws on investors.

**ADDITIONAL SCIENTER ALLEGATIONS**

101. As alleged herein, the 1934 Act Defendants acted with scienter in that these defendants knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the investing public in the name of the Company, or in their own name, during the Class Period were materially false and misleading. The 1934 Act Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws. The 1934 Act Defendants, by virtue of their receipt of information reflecting the true facts regarding Shoals, and their control over and/or

receipt and/or modification of Shoals' materially false and misleading statements, were active and culpable participants in the fraud alleged herein.

102. The 1934 Act Defendants knew or recklessly disregarded the false and misleading nature of the information they caused to be disseminated to the investing public. The fraud described herein could not have been perpetrated during the Class Period without the knowledge and complicity of, or at least the reckless disregard by, personnel at the highest levels of the Company, including the 1934 Act Individual Defendants.

103. The 1934 Act Individual Defendants, because of their positions with Shoals and during the time of their employment at Shoals, controlled the contents of Shoals' public statements. The 1934 Act Individual Defendants were each provided with or had access to the information alleged herein to be false and misleading prior to or shortly after its issuance and had the ability and opportunity to prevent its issuance or cause it to be corrected. Because of their positions and access to material, non-public information, the 1934 Act Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made by defendants during the Class Period and identified herein were materially false and misleading.

104. Notably, Shoals has admitted that beginning in 2020 (roughly a year before the start of the Class Period) the Company installed defective wires in approximately 30% of the harnesses it manufactured over a three-year period. The Company has also estimated that remediation costs could rise to $185 million – more than double the Company's revenue during the most recent fiscal quarter – and acknowledged that even this sum could be understated. The magnitude of the problem and its ubiquity in Shoals' wire harnesses, which impacted approximately 300 sites and a large proportion of Shoals' client base, during a multi-year period indicates that the issue was known to or

at the very least recklessly disregarded by the Company's most senior executives. Furthermore, the Company has stated in ancillary litigation that it received customers' complaints about the issue by at least March 2022, after which the Company has stated it took a variety of investigative and remedial actions that were not revealed to investors until the latter part of 2023. These actions could not have reasonably been taken without the involvement, or at the very least knowledge or reckless disregard, of the 1934 Act Individual Defendants.

105. The 1934 Act Defendants and other Company insiders to whom they were beholden also had the motive and opportunity to commit fraud. While the price of Shoals Class A common stock was artificially inflated, defendants conducted the IPO in January 2021 and two registered secondary public offerings in December 2022 (referred to herein as the SPO) and in March 2023. In the IPO, Shoals and one of the Company's private equity owners, an affiliate of Oaktree Capital Management, L.P., collectively sold more than 88.5 million shares of Shoals Class A common stock at $25 per share for over $2.2 billion in gross offering proceeds. In total, defendant Solon sold nearly ***$1.2 billion*** worth of Shoals Class A common stock at artificially inflated prices during the Class Period. In a subsequent stock offering, conducted in March 2023, defendant Solon sold an additional 24.5 million shares of Shoals Class A common stock at $24.70 per share for over $600 million in gross offering proceeds. In total, defendant Solon sold nearly $1.2 billion worth of Shoals Class A common stock during the Class Period. During the Class Period, defendant Whitaker likewise sold more than $14.4 million in Shoals stock at prices as high as $31 per share, and defendant Garton sold more than $4.8 million worth of Shoals stock. These sales were highly suspicious in both timing and amount. Notably, all of these sales occurred after the Company began installing harnesses with wires subject to excessive shrinkback, and the insider selling spree abruptly ended after the Company first disclosed the shrinkback issue to investors in May 2023.

106. The exit of numerous Shoals' executives during the Class Period around the time that the Company was dealing with excessive shrinkback issues further bolsters an already compelling inference of scienter. For example, in November 2022, Shoals announced that defendant Whitaker would be stepping down as CEO in March 2023 – right before the Company first publicly disclosed the shrinkback issue even existed. Similarly, on April 8, 2022, Shoals announced that defendant Garton would be stepping down as CFO, an announcement that came soon after Shoals (belatedly) acknowledged it had received customer complaints regarding the shrinkback issue. Likewise, in February 2022 Shoals announced that its founder, defendant Solon, had resigned from the Company's Board, a resignation which occurred approximately two years after the Company had first begun installing defective wire harnesses but before this issue was disclosed to investors. In between those two events, defendant Solon sold nearly $1.2 billion worth of Shoals stock.

107. The 1934 Act Defendants' scienter is further underscored by the mandated certifications of the 1934 Act Individual Defendants under the Sarbanes-Oxley Act of 2002, filed during the Class Period, which acknowledged their responsibility to investors for establishing and maintaining controls to ensure that material information about Shoals was made known to them and that the Company's disclosure-related controls were operating effectively.

## NO SAFE HARBOR

108. Shoals' "Safe Harbor" warnings accompanying its reportedly forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability. To the extent that projected revenue and earnings were included in the Company's financial reports prepared in accordance with Generally Accepted Accounting Principles, including those filed with the SEC on Form 8-K, they are excluded from the protection of the statutory Safe Harbor. 15 U.S.C. §78u-5(b)(2)(A).

109. The 1934 Act Defendants are also liable for any false or misleading FLS pled because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and approved by an executive officer of Shoals who knew that the FLS was false. None of the historic or present tense statements made by these defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by these defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## APPLICATION OF PRESUMPTION OF RELIANCE;
## FRAUD ON THE MARKET

110. At all relevant times, the market for Shoals Class A common stock was an efficient market for the following reasons, among others:

(a) Shoals Class A common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) according to the Company's Form 10-K for the fiscal year ended December 31, 2023, Shoals had over 170 million shares of Class A common stock outstanding as of February 26, 2024;

(c) as a regulated issuer, Shoals filed periodic public reports with the SEC;

(d) Shoals regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services, the Internet, and other wide-ranging public disclosures; and

(e) unexpected material news about Shoals was rapidly reflected in and incorporated into prices for the Company's shares of Class A common stock during the Class Period.

- 36 -

111. As a result of the foregoing, the market for Shoals Class A common stock promptly digested current information regarding Shoals from publicly available sources and reflected such information in the price of Shoals Class A common stock. Under these circumstances, all purchasers of Shoals Class A common stock during the Class Period suffered similar injury through their purchases of Shoals Class A common stock at artificially inflated prices, and a presumption of reliance applies.

112. A presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because plaintiff's claims are based, in significant part, on defendants' material omissions. Because this action involves defendants' failure to disclose material adverse information regarding Shoals' business, operations, defective products, and risks, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of defendants' material misstatements and omissions set forth above, that requirement is satisfied here.

<div align="center">LOSS CAUSATION/ECONOMIC LOSS</div>

113. During the Class Period, as detailed herein, the 1934 Act Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Shoals Class A common stock and operated as a fraud or deceit on Class Period purchasers of Shoals Class A common stock by misrepresenting the value of the Company's business and prospects in the Company's operations. As these defendants' misrepresentations and fraudulent conduct became apparent to the market and previously undisclosed material risks materialized, the price of the Company's stock fell precipitously on numerous occasions as the prior artificial inflation came out of the stock's price, as detailed herein.

As a result of their purchases of Shoals Class A common stock during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## CLASS ACTION ALLEGATIONS

114. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of Shoals Class A common stock during the Class Period (the "Class"), including shares purchased directly in the SPO. Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families, and their legal representatives, heirs, successors, or assigns, and any entity in which defendants have or had a controlling interest.

115. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Shoals Class A common stock was actively traded on the NASDAQ. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there could be hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Shoals or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

116. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law as complained of herein.

117. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

118.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the SPO Registration Statement was materially false and misleading;

(b)     whether statements made by defendants during the Class Period misrepresented material facts about the business, financials, and operations of Shoals;

(c)     whether the 1934 Act Defendants acted with scienter; and

(d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

119.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violation of §11 of the 1933 Act
### Against Shoals, the 1933 Act Individual Defendants Except Defendant Solon, and the Underwriter Defendants

120.     Plaintiff incorporates ¶¶1-8, 13, 18-42, 67-69, and 114-119 by reference.

121.     Plaintiff asserts this Count on behalf of itself and the Class against Shoals, the 1933 Act Individual Defendants except defendant Solon, and the Underwriter Defendants.

122.     Section 11 of the 1933 Act does not require a showing of scienter or fraudulent intent, and Plaintiff disavows all averments of fraud for purposes of this Count.

123.     The SPO Registration Statement was negligently prepared and as a result inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary

- 39 -

to make the statements made not misleading, and omitted to state material facts required to be stated therein including as required by Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(b)(2)(ii) and Item 105 of SEC Regulation S-K, 17 C.F.R. §229.105.

124. Specifically, the SPO Registration Statement failed to disclose the following material adverse facts which existed at the time of the SPO:

(a) that between 2020 and the end of 2022, Shoals had installed defective wires at approximately 300 sites impacting approximately 30% of all wire harnesses manufactured by the Company during this time period;

(b) that, as a result of (a) above, Shoals was facing tens of millions of dollars in shrinkback warranty liabilities;

(c) that Shoals had not booked a sufficient warranty expense provision to cover the remediation costs for the shrinkback issue;

(d) that Shoals' historical reported revenue, gross profit, and net income had been generated in substantial part through the sale of defective products posing a risk of injury, death, and fire damage to Shoals' customers;

(e) that Shoals' ability to competitively differentiate its products through representations regarding the reliability, safety, and quality of its offerings had become materially impaired; and

(f) that, as a result of (a)-(e) above, Shoals' business and operations were acutely exposed to material, undisclosed risks of reputational harm and negative impacts to the Company's business, financial results, and prospects.

125. Defendant Shoals is strictly liable to plaintiff and the Class for the misstatements and omissions contained in the SPO Registration Statement.

126. None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the SPO Registration Statement that are herein alleged to be materially false and misleading were true and without omissions of any material facts and were not misleading.

127. By reason of the conduct herein alleged, each defendant named herein violated, and/or controlled a person who violated, §11 of the 1933 Act.

128. Plaintiff purchased Shoals Class A common stock directly in the SPO as detailed herein.

129. Plaintiff and the Class have sustained damages. The value of the Shoals Class A common stock issued in the SPO has declined substantially subsequent to and due to defendants' violations.

130. At the time of their purchases of Shoals Class A common stock, plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein. Less than one year has elapsed from the time that plaintiff discovered or reasonably could have discovered the facts upon which this complaint is based to the time that plaintiff commenced this action. Less than three years has elapsed between the time that the securities upon which this Count is brought were offered to the public.

## COUNT II

**For Violation of §12(a)(2) of the 1933 Act**
**Against Shoals, the 1933 Act Individual Defendants,**
**and the Underwriter Defendants**

131. Plaintiff incorporates ¶¶1-8, 13, 18-42, 67-69, and 114-130 by reference.

132. Plaintiff asserts this Count on behalf of itself and the Class against Shoals, the 1933 Act Individual Defendants, and the Underwriter Defendants (collectively, the "Solicitor-Seller Defendants").

133. Section 12(a)(2) of the 1933 Act does not require a showing of scienter or fraudulent intent, and plaintiff disavows all averments of fraud for purposes of this Count.

134. By means of the defective SPO Prospectus and other conduct alleged herein, the Solicitor-Seller Defendants promoted and sold the Shoals Class A common stock sold in the SPO to plaintiff and other members of the Class.

135. The SPO Prospectus contained untrue statements of material fact and concealed and failed to disclose material facts, as detailed above. The defendants named herein owed plaintiff and the other members of the Class who purchased Shoals Class A common stock pursuant to the SPO Prospectus the duty to make a reasonable and diligent investigation of the statements contained in the SPO Prospectus to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. These defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the SPO Prospectus as set forth above.

136. Plaintiff did not know, nor in the exercise of reasonable diligence could plaintiff have known, of the untruths and omissions contained in the SPO Prospectus at the time plaintiff acquired Shoals Class A common stock.

137. By reason of the conduct alleged herein, the Solicitor-Seller Defendants violated §12(a)(2) of the 1933 Act. As a direct and proximate result of such violations, plaintiff and the other members of the Class who purchased Shoals Class A common stock pursuant to the Prospectus sustained substantial damages in connection with their purchases of the stock. Accordingly, plaintiff

and the other members of the Class who hold the common stock issued pursuant to the Prospectus have the right to rescind and recover the consideration paid for their shares, and hereby tender their common stock to defendants sued herein. Class members who have sold their common stock seek damages to the extent permitted by law.

## COUNT III

### For Violation of §15 of the 1933 Act
### Against Shoals and the 1933 Act Individual Defendants

138. Plaintiff incorporates ¶¶1-8, 13, 18-42, 67-69, and 114-137 by reference.

139. Plaintiff asserts this Count on behalf of itself and the Class against Shoals and the 1933 Act Individual Defendants.

140. The 1933 Act Individual Defendants acted as controlling persons of Shoals within the meaning of §15 of the 1933 Act. By reason of their positions with the Company, agreements and course of dealings with the Company, and/or their ownership of Shoals stock, the 1933 Act Individual Defendants had the power and authority to cause Shoals to engage in the wrongful conduct complained of herein and were culpable participants in the violations of law described herein. Shoals controlled the 1933 Act Individual Defendants who were the Company's employees at the time of the SPO. By reason of such conduct, defendants are liable pursuant to §15 of the 1933 Act.

## COUNT IV

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against Shoals and the 1934 Act Individual Defendants

141. Plaintiff incorporates ¶¶1-119 by reference.

142. Plaintiff asserts this Count on behalf of itself and the Class against Shoals and the 1934 Act Individual Defendants.

143. During the Class Period, the defendants named herein disseminated or approved the statements specified above, which they knew or deliberately disregarded were false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

144. The defendants named herein violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a) employed devices, schemes, and artifices to defraud;

(b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Shoals Class A common stock during the Class Period.

145. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Shoals common stock. Plaintiff and the Class would not have purchased Shoals Class A common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

## COUNT V

**For Violation of §20(a) of the 1934 Act**
**Against Shoals, the 1934 Act Individual Defendants,**
**and Defendant Solon**

146. Plaintiff incorporates ¶¶1-119 and 141-145 by reference.

- 44 -

147. Plaintiff asserts this Count on behalf of itself and the Class against Shoals, the 1934 Act Individual Defendants, and defendant Solon.

148. The 1934 Act Individual Defendants and defendant Solon acted as controlling persons of Shoals within the meaning of §20(a) of the 1934 Act. By reason of their positions with the Company, agreements and course of dealings with the Company, and/or their ownership of Shoals stock, the 1934 Act Individual Defendants and defendant Solon had the power and authority to cause Shoals to engage in the wrongful conduct complained of herein and were culpable participants in the violations of law described herein. Shoals controlled the 1934 Act Individual Defendants and all of its employees. By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

<div align="center">

**PRAYER FOR RELIEF**

</div>

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A. Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B. Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D. Awarding rescission or a rescissory measure of damages; and

E. Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: May 13, 2024

ROBBINS GELLER RUDMAN
  & DOWD LLP
CHRISTOPHER M. WOOD, #032977

s/ Christopher M. Wood
CHRISTOPHER M. WOOD

200 31st Avenue North
Nashville, TN 37203
Telephone: 615/244-2203
615/252-3798 (fax)
cwood@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
BRIAN E. COCHRAN
FRANCISCO J. MEJIA
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
bcochran@rgrdlaw.com
fmejia@rgrdlaw.com

CHRISTIANSEN & DEHNER, P.A.
SCOTT R. CHRISTIANSEN
63 Sarasota Center Blvd., Suite 107
Sarasota, FL 34240
Telephone: 941/377-2200
941/377-4848 (fax)
scott@cdpension.com

Attorneys for Plaintiff

DocuSign Envelope ID: EEE10E98-5790-4DE1-A84F-2B105C4C3CCF

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

Kissimmee Utility Authority Employees' Retirement Plan ("Plaintiff") declares:

1.      Plaintiff has reviewed a complaint and authorized its filing.

2.      Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:  *See* attached Schedule A.

5.      Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

*Ryan v. FIGS, Inc.,* No. 2:22-cv-07939 (C.D. Cal.)

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this __10th__ day of May, 2024.

<div style="margin-left:40%">

Kissimmee Utility Authority Employees'
Retirement Plan

By: _Larry Mattern_
    879C1416B26E405...
Its:  Larry Mattern, Chairman

By: _____
Its:  Barbara Gonzales, Secretary

</div>

SHOALS

DocuSign Envelope ID: 5E6A784F-4F85-452D-80C0-64658A902CE0

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

Kissimmee Utility Authority Employees' Retirement Plan ("Plaintiff") declares:

1.      Plaintiff has reviewed a complaint and authorized its filing.

2.      Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action: *See* attached Schedule A.

5.      Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

*Ryan v. FIGS, Inc.,* No. 2:22-cv-07939 (C.D. Cal.)

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _13_ day of May, 2024.

Kissimmee Utility Authority Employees'
Retirement Plan


By: _____
Its:  Larry Mattern, Chairman

By: [*Barbara Gonzales*]
F8A92D1FDEC745C...
Its:  Barbara Gonzales, Secretary

SHOALS

DocuSign Envelope ID: EEE10E98-5790-4DE1-A84F-2B105C4C3CCF

# SCHEDULE A

## SECURITIES TRANSACTIONS

### Stock

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 01/27/2021 | 406 | $25.00 |
| 03/04/2021 | 360 | $32.47 |
| 03/18/2021 | 100 | $32.76 |
| 03/18/2021 | 580 | $30.63 |
| 03/25/2021 | 250 | $28.85 |
| 03/30/2021 | 80 | $30.44 |
| 03/30/2021 | 90 | $30.48 |
| 04/15/2021 | 200 | $32.47 |
| 04/19/2021 | 20 | $30.96 |
| 04/19/2021 | 150 | $31.78 |
| 04/20/2021 | 10 | $31.00 |
| 05/03/2021 | 120 | $30.97 |
| 05/03/2021 | 270 | $30.77 |
| 05/07/2021 | 150 | $30.39 |
| 05/20/2021 | 50 | $23.41 |
| 05/20/2021 | 290 | $23.30 |
| 07/14/2021 | 150 | $28.95 |
| 07/15/2021 | 430 | $27.48 |
| 07/16/2021 | 270 | $27.78 |
| 07/19/2021 | 160 | $25.38 |
| 08/16/2021 | 160 | $29.83 |
| 08/17/2021 | 30 | $28.69 |
| 08/17/2021 | 190 | $28.83 |
| 09/10/2021 | 280 | $29.96 |
| 09/28/2021 | 230 | $28.89 |
| 10/01/2021 | 10 | $27.24 |
| 10/01/2021 | 10 | $27.28 |
| 10/01/2021 | 60 | $27.25 |
| 10/04/2021 | 210 | $27.24 |
| 12/09/2021 | 2,590 | $28.51 |
| 01/27/2022 | 32 | $13.47 |
| 10/12/2022 | 550 | $20.65 |
| 10/13/2022 | 370 | $20.28 |
| 10/14/2022 | 440 | $20.18 |
| 10/19/2022 | 330 | $20.43 |
| 10/20/2022 | 260 | $19.82 |
| 10/21/2022 | 30 | $19.50 |
| 11/07/2022 | 210 | $18.95 |
| 11/15/2022 | 170 | $26.66 |
| 11/15/2022 | 580 | $28.04 |
| 12/01/2022 | 360 | $24.03 |
| 12/02/2022 | 310 | $23.80 |
| 12/02/2022 | 1,500 | $22.25 |
| 12/06/2022 | 220 | $23.73 |
| 01/25/2023 | 460 | $27.69 |

DocuSign Envelope ID: EEE10E98-5790-4DE1-A84F-2B105C4C3CCF

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 01/26/2023 | 230 | $26.51 |
| 02/09/2023 | 260 | $25.31 |
| 02/22/2023 | 350 | $24.13 |
| 03/08/2023 | 950 | $24.35 |
| 03/09/2023 | 70 | $24.12 |
| 03/09/2023 | 250 | $24.14 |
| 03/09/2023 | 430 | $23.19 |
| 03/10/2023 | 260 | $21.92 |
| 03/13/2023 | 400 | $20.82 |
| 03/13/2023 | 530 | $20.98 |
| 03/14/2023 | 600 | $21.39 |
| 03/15/2023 | 180 | $19.53 |
| 03/15/2023 | 200 | $19.51 |
| 03/15/2023 | 450 | $20.50 |
| 03/17/2023 | 340 | $20.07 |
| 03/21/2023 | 490 | $21.85 |
| 04/05/2023 | 550 | $21.82 |
| 04/26/2023 | 541 | $20.67 |
| 04/26/2023 | 650 | $20.19 |
| 07/06/2023 | 779 | $22.78 |
| 08/07/2023 | 414 | $22.42 |
| 08/08/2023 | 409 | $21.81 |
| 08/09/2023 | 563 | $21.87 |
| 08/15/2023 | 450 | $20.64 |
| 08/22/2023 | 259 | $19.03 |
| 12/18/2023 | 2,739 | $15.80 |

| Date Disposed | Amount of Shares Disposed | Price |
|---|---|---|
| 11/10/2021 | 310 | $28.79 |
| 01/04/2022 | 670 | $22.37 |
| 01/19/2022 | 770 | $17.92 |
| 01/21/2022 | 570 | $15.84 |
| 01/24/2022 | 790 | $16.20 |
| 01/25/2022 | 20 | $14.96 |
| 01/25/2022 | 20 | $15.01 |
| 01/25/2022 | 890 | $15.00 |
| 03/08/2022 | 1,300 | $15.78 |
| 03/23/2022 | 370 | $22.45 |
| 03/25/2022 | 920 | $19.91 |
| 03/28/2022 | 1,308 | $18.89 |
| 10/30/2023 | 702 | $15.04 |
| 11/01/2023 | 762 | $14.52 |
| 11/02/2023 | 705 | $15.24 |
| 11/02/2023 | 1,672 | $15.11 |
| 11/03/2023 | 84 | $16.25 |
| 11/03/2023 | 619 | $16.01 |
| 11/07/2023 | 466 | $16.11 |
| 11/08/2023 | 815 | $14.60 |
| 11/09/2023 | 2,935 | $13.12 |
| 11/13/2023 | 1,104 | $13.64 |

DocuSign Envelope ID: EEE10E98-5790-4DE1-A84F-2B105C4C3CCF

| Date Disposed | Amount of Shares Disposed | Price |
|---|---|---|
| 11/14/2023 | 759 | $14.98 |
| 11/21/2023 | 751 | $14.34 |
| 11/27/2023 | 513 | $13.68 |
| 11/28/2023 | 755 | $13.84 |
| 01/16/2024 | 1,311 | $13.09 |
| 01/17/2024 | 996 | $13.13 |
| 02/21/2024 | 570 | $15.14 |
| 02/22/2024 | 901 | $14.73 |
| 02/23/2024 | 1,295 | $14.54 |
| 02/28/2024 | 709 | $15.72 |
| 03/04/2024 | 710 | $12.94 |

Prices listed are rounded to two decimal places.

JS 44 (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**I. (a) PLAINTIFFS**
KISSIMMEE UTILITY AUTHORITY EMPLOYEES' RETIREMENT PLAN, on Behalf of Itself and All Others Similarly Situated

**DEFENDANTS**
SHOALS TECHNOLOGIES GROUP, INC., JASON R. WHITAKER, JEFFERY TOLNAR, BRANDON MOSS, PHILIP GARTON, KEVIN HUBBARD, DOMINIC BARDOS, BRAD FORTH, PETER WILVER, TY DAUL, (See Attachment A)

**(b)** County of Residence of First Listed Plaintiff    Osceola County, FL
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Christopher M. Wood, Robbins Geller Rudman & Dowd LLP
200 31st Avenue North
Nashville, TN  37203   615/244-2203

Attorneys *(If Known)*

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government Plaintiff
- [X] 3 Federal Question *(U.S. Government Not a Party)*
- [ ] 2 U.S. Government Defendant
- [ ] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)*    Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane / [ ] 365 Personal Injury - Product Liability | [ ] 690 Other | [ ] 423 Withdrawal 28 USC 157 | [ ] 376 Qui Tam (31 USC 3729(a)) |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability / [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | **INTELLECTUAL PROPERTY RIGHTS** | [ ] 400 State Reapportionment |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel & Slander | | [ ] 820 Copyrights | [ ] 410 Antitrust |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | [ ] 330 Federal Employers' Liability / [ ] 368 Asbestos Personal Injury Product Liability | | [ ] 830 Patent | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 340 Marine | | [ ] 835 Patent - Abbreviated New Drug Application | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans) | [ ] 345 Marine Product Liability | **PERSONAL PROPERTY** | [ ] 840 Trademark | [ ] 460 Deportation |
| | | | [ ] 880 Defend Trade Secrets Act of 2016 | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 350 Motor Vehicle / [ ] 370 Other Fraud | **LABOR** | | [ ] 480 Consumer Credit (15 USC 1681 or 1692) |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle Product Liability / [ ] 371 Truth in Lending | [ ] 710 Fair Labor Standards Act | **SOCIAL SECURITY** | [ ] 485 Telephone Consumer Protection Act |
| [ ] 190 Other Contract | [ ] 360 Other Personal Injury / [ ] 380 Other Personal Property Damage | [ ] 720 Labor/Management Relations | [ ] 861 HIA (1395ff) | [ ] 490 Cable/Sat TV |
| [ ] 195 Contract Product Liability | | [ ] 862 Black Lung (923) | [X] 850 Securities/Commodities/ Exchange |
| [ ] 196 Franchise | [ ] 362 Personal Injury - Medical Malpractice / [ ] 385 Property Damage Product Liability | [ ] 740 Railway Labor Act | [ ] 863 DIWC/DIWW (405(g)) | |
| | | [ ] 751 Family and Medical Leave Act | [ ] 864 SSID Title XVI | [ ] 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | [ ] 865 RSI (405(g)) | [ ] 891 Agricultural Acts |
| [ ] 210 Land Condemnation | [ ] 440 Other Civil Rights | **Habeas Corpus:** | | [ ] 893 Environmental Matters |
| [ ] 220 Foreclosure | [ ] 441 Voting | [ ] 463 Alien Detainee | **FEDERAL TAX SUITS** | [ ] 895 Freedom of Information Act |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment | [ ] 510 Motions to Vacate Sentence | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | |
| [ ] 240 Torts to Land | [ ] 443 Housing/ Accommodations | [ ] 530 General | [ ] 871 IRS—Third Party 26 USC 7609 | [ ] 896 Arbitration |
| [ ] 245 Tort Product Liability | [ ] 445 Amer. w/Disabilities - Employment | [ ] 535 Death Penalty | | [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| [ ] 290 All Other Real Property | [ ] 446 Amer. w/Disabilities - Other | **Other:** | **IMMIGRATION** | [ ] 950 Constitutionality of State Statutes |
| | [ ] 448 Education | [ ] 540 Mandamus & Other | [ ] 462 Naturalization Application | |
| | | [ ] 550 Civil Rights | [ ] 465 Other Immigration Actions | |
| | | [ ] 555 Prison Condition | | |
| | | [ ] 560 Civil Detainee - Conditions of Confinement | | |

**V. ORIGIN** *(Place an "X" in One Box Only)*
- [X] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

**VI. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
15 U.S.C. §§77k, 77l(a)(2), and 77o; 15 U.S.C. §§78j(b) and 78t(a)
Brief description of cause:
Complaint for Violations of the Federal Securities Laws

**VII. REQUESTED IN COMPLAINT:**
[X] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND:  [X] Yes  [ ] No

**VIII. RELATED CASE(S) IF ANY**
*(See instructions):*
JUDGE   Aleta A. Trauger; Waverly D. Crenshaw, Jr.
DOCKET NUMBER   3:24-cv-00334; 3:24-cv-00580

DATE
5/13/2024

SIGNATURE OF ATTORNEY OF RECORD
s/ Christopher M. Wood

**FOR OFFICE USE ONLY**
RECEIPT #      AMOUNT      APPLYING IFP      JUDGE      MAG. JUDGE

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b) County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c) Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II. Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked**.** (See Section III below**; NOTE: federal question actions take precedence over diversity cases.**)

**III. Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV. Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V. Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

**VI. Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII. Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII. Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

**ATTACHMENT A (CCS)**

**DEFENDANTS (cont.)**

TONI VOLPE, LORI SUNDBERG, JEANETTE MILLS, ROBERT JULIAN, DEAN SOLON, J.P. MORGAN SECURITIES LLC, GUGGENHEIM SECURITIES, LLC, MORGAN STANLEY & CO. LLC, UBS SECURITIES LLC, GOLDMAN SACHS & CO. LLC, BARCLAYS CAPITAL INC., CREDIT SUISSE SECURITIES (USA) LLC, COWEN AND COMPANY, LLC, OPPENHEIMER & CO. INC., PIPER SANDLER & CO., ROTH CAPITAL PARTNERS, LLC,  JOHNSON RICE & COMPANY L.L.C., and NORTHLAND SECURITIES, INC.

| | |
|---|---|
| WESTCHESTER PUTNAM COUNTIES HEAVY & HIGHWAY LABORERS LOCAL 60 BENEFITS FUND, Individually and on Behalf of All Others Similarly Situated,<br><br>              Plaintiff,<br><br>    vs.<br><br>SHOALS TECHNOLOGIES GROUP, INC., et al.,<br><br>              Defendants. | Civil Action No. 3:24-cv-00334<br><br>Judge Aleta A. Trauger<br><br><u>CLASS ACTION</u> |
| OKLAHOMA POLICE PENSION AND RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,<br><br>              Plaintiff,<br><br>    vs.<br><br>SHOALS TECHNOLOGIES GROUP, INC., et al.,<br><br>              Defendants. | Civil Action No. 3:24-cv-00580<br><br>Judge Waverly D. Crenshaw, Jr.<br>Magistrate Judge Jeffery S. Frensley<br><br><u>CLASS ACTION</u> |
| KISSIMMEE UTILITY AUTHORITY EMPLOYEES' RETIREMENT PLAN, on Behalf of Itself and All Others Similarly Situated<br><br>              Plaintiff,<br><br>    vs.<br><br>SHOALS TECHNOLOGIES GROUP, INC., et al.,<br><br>              Defendants. | Civil Action No. 3:24-cv-00598<br><br>Judge Waverly D. Crenshaw, Jr.<br>Magistrate Judge Jeffery S. Frensley<br><br><u>CLASS ACTION</u> |

MOTION FOR CONSOLIDATION OF RELATED ACTIONS, APPOINTMENT AS LEAD PLAINTIFF, AND APPROVAL OF LEAD PLAINTIFF'S SELECTION OF LEAD COUNSEL

4890-2224-1727.v1

Class member and proposed lead plaintiff Erste Asset Management GmbH ("Erste AM"), joined by plaintiff Kissimmee Utility Authority Employees' Retirement Plan, moves this Court pursuant to Federal Rule of Civil Procedure 42 and the Securities Exchange Act of 1934 and Securities Act of 1933 (as amended by the Private Securities Litigation Reform Act of 1995, 15 U.S.C. §78u-4(a)(3) and 15 U.S.C. §77z-1(a)(3)), for an Order: (1) consolidating the Related Actions[1]; (2) appointing Erste AM as Lead Plaintiff; and (3) approving proposed Lead Plaintiff's selection of Robbins Geller Rudman & Dowd LLP and Motley Rice LLC as Lead Counsel.[2] In support of this Motion, Erste AM submits a Memorandum of Points and Authorities and the Declaration of Christopher M. Wood.

DATED: May 21, 2024          BARRETT JOHNSTON MARTIN
                   & GARRISON, PLLC
                JERRY E. MARTIN, #20193


                   s/ Jerry E. Martin
                   JERRY E. MARTIN

---

[1] The Related Actions are: *Westchester Putnam Cntys. Heavy & Highway Laborers Local 60 Benefits Fund v. Shoals Techs. Grp., Inc.*, No. 3:24-cv-00334 (M.D. Tenn.); *Okla. Police Pension and Ret. Sys. v. Shoals Techs. Grp., Inc.*, No. 3:24-cv-00580 (M.D. Tenn.); and *Kissimmee Utility Auth. Emps. Ret. Plan v. Shoals Techs. Grp., Inc.*, No. 3:24-cv-00598 (M.D. Tenn.).

[2] Pursuant to LR7.01(a)(1), the undersigned counsel conferred with plaintiffs' counsel and defendants' counsel regarding the relief requested in this motion. Defense counsel and plaintiffs' counsel concur that the cases should be consolidated. Because the PSLRA permits any "purported class member . . . including any motion by a class member who is not individually named as a plaintiff in the complaint" to file a motion for appointment as lead plaintiff, 15 U.S.C. §78u-4(a)(3)(B)(i) and 15 U.S.C. §77z-1(a)(3)(B)(i), Erste AM cannot ascertain whether any other parties will also seek appointment as lead plaintiff until after the deadline expires on May 21. Accordingly, Erste AM's counsel respectfully requests that compliance with LR7.01(a)(1) be waived as to the unknown movants. *See Franchi v. SmileDirectClub, Inc.*, 2020 WL 6479561, at *2 (M.D. Tenn. Jan. 27, 2020) (recognizing that "requirement comes into conflict with the provisions of the PSLRA" because "no prospective lead plaintiff can determine which, if any, other parties will also move for appointment until after the deadline to file has expired" and "waiv[ing] the requirement to comply with LR 7.01(a) in this instance").

- 1 -

Case 3:24-cv-00334 Document 31-1 Filed 05/21/24 Page 129 of 420 PageID #: 1693

200 31st Avenue North
Nashville, TN  37203
Telephone:  615/244-2202
615/252-3798 (fax)
jmartin@barrettjohnston.com

Local Counsel

MOTLEY RICE LLC
GREGG S. LEVIN (*pro hac vice* forthcoming)
CHRISTOPHER F. MORIARTY (*pro hac vice*
forthcoming)
28 Bridgeside Blvd.
Mount Pleasant, SC  29464
Telephone:  843/216-9000
843/216-9450 (fax)
glevin@motleyrice.com
cmoriarty@motleyrice.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
DARREN J. ROBBINS (*pro hac vice*
forthcoming)
DANIELLE S. MYERS (*pro hac vice*
forthcoming)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
darrenr@rgrdlaw.com
dmyers@rgrdlaw.com

CHRISTOPHER M. WOOD, #032977
200 31st Avenue North
Nashville, TN  37203
Telephone:  615/244-2203
615/252-3798 (fax)
cwood@rgrdlaw.com

Proposed Lead Counsel for Proposed Lead
Plaintiff

- 2 -

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on May 21, 2024, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

<div style="margin-left:50%">

s/ Jerry E. Martin
JERRY E. MARTIN

BARRETT JOHNSTON MARTIN
    & GARRISON, PLLC
200 31st Avenue North
Nashville, TN 37203
Telephone: 615/244-2202
615/252-3798 (fax)
jmartin@barrettjohnston.com

</div>

# Mailing Information for a Case 3:24-cv-00334 Westchester Putnam Counties Heavy & Highway Laborers Local 60 Benefits Fund v. Shoals Technologies Group, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Rachel A. Avan**
  ravan@labaton.com

- **Margaret V. Dodson**
  margaret.dodson@bassberry.com

- **Marco A. Dueas**
  mduenas@saxenawhite.com

- **Renatta A. Gorski**
  renatta.gorski@lw.com

- **Lester R. Hooker**
  lhooker@saxenawhite.com

- **Michele D. Johnson**
  michele.johnson@lw.com

- **Britt K. Latham**
  blatham@bassberry.com,renatta.gorski@lw.com,lauren.fane@lw.com,heather.waller@lw.com,llewis@bassberry.com,lbilbrey@bassberry.com,christian.beveridge@lw.

- **James Gerard Stranch , IV**
  gstranch@stranchlaw.com,complexlit@stranchlaw.com

- **Heather A. Waller**
  heather.waller@lw.com,chefiling@lw.com,heather-waller-8915@ecf.pacerpro.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)

Case 3:24-cv-00334 Document 31-21 Filed 06/24/24 Page 192 of 420 PageID #: 4696

# Mailing Information for a Case 3:24-cv-00580 Oklahoma Police Pension and Retirement System v. Shoals Technologies Group, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Rachel A. Avan**
  ravan@labaton.com

- **Marco A. Dueas**
  mduenas@saxenawhite.com

- **Lester R. Hooker**
  lhooker@saxenawhite.com

- **James Gerard Stranch , IV**
  gstranch@stranchlaw.com,complexlit@stranchlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)

Case 3:24-cv-00334 Document 31-21 Filed 06/24/24 Page 193 of 420 PageID #: 5697

# Mailing Information for a Case 3:24-cv-00598 Kissimmee Utility Authority Employees' Retirement Plan v. Shoals Technologies Group, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Scott R. Christiansen**
  scott@cdpension.com

- **Brian E. Cochran**
  bcochran@rgrdlaw.com

- **Francisco J. Mejia**
  fmejia@rgrdlaw.com

- **Christopher M. Wood**
  cwood@rgrdlaw.com,CWood@ecf.courtdrive.com,e_file_sd@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)

Case 3:24-cv-00334 Document 31-21 Filed 06/24/24 Page 194 of 420 PageID 6698

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| WESTCHESTER PUTNAM COUNTIES HEAVY & HIGHWAY LABORERS LOCAL 60 BENEFITS FUND, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>SHOALS TECHNOLOGIES GROUP, INC., et al.,<br><br>Defendants. | Civil Action No. 3:24-cv-00334<br><br>Judge Aleta A. Trauger<br><br>CLASS ACTION |
| OKLAHOMA POLICE PENSION AND RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>SHOALS TECHNOLOGIES GROUP, INC., et al.,<br><br>Defendants. | Civil Action No. 3:24-cv-00580<br><br>Judge Waverly D. Crenshaw, Jr.<br>Magistrate Judge Jeffery S. Frensley<br><br>CLASS ACTION |
| KISSIMMEE UTILITY AUTHORITY EMPLOYEES' RETIREMENT PLAN, on Behalf of Itself and All Others Similarly Situated<br><br>Plaintiff,<br><br>vs.<br><br>SHOALS TECHNOLOGIES GROUP, INC., et al.,<br><br>Defendants. | Civil Action No. 3:24-cv-00598<br><br>Judge Waverly D. Crenshaw, Jr.<br>Magistrate Judge Jeffery S. Frensley<br><br>CLASS ACTION |

[PROPOSED] ORDER GRANTING MOTION FOR CONSOLIDATION OF RELATED
ACTIONS, APPOINTMENT AS LEAD PLAINTIFF, AND APPROVAL OF LEAD
PLAINTIFF'S SELECTION OF LEAD COUNSEL

- 1 -

Having considered Erste Management GmbH's Motion for Consolidation of Related Actions, Appointment as Lead Plaintiff, and Approval of Lead Plaintiff's Selection of Lead Counsel (the "Motion"), and good cause appearing therefor, the Court ORDERS as follows:

1.     The Motion is GRANTED;

2.     Pursuant to Rule 42(a) of the Federal Rules of Civil Procedure, *Westchester Putnam Cntys. Heavy & Highway Laborers Local 60 Benefits Fund v. Shoals Techs. Grp., Inc.*, No. 3:24-cv-00334 (M.D. Tenn.); *Okla. Police Pension and Ret. Sys. v. Shoals Techs. Grp., Inc.*, No. 3:24-cv-00580 (M.D. Tenn.); and *Kissimmee Utility Auth. Emps. Ret. Plan v. Shoals Techs. Grp., Inc.*, No. 3:24-cv-00598 (M.D. Tenn.) are hereby consolidated for all purposes as:

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| In re SHOALS TECHNOLOGIES GROUP, INC. SECURITIES LITIGATION | ) ) ) | No. 3:24-cv-00334 |
| | ) | <u>CLASS ACTION</u> |
| This Document Relates To: | ) ) ) ) | |

(a)     The file in Case No. 3:24-cv-00334 shall be the master file for every action in the consolidated action. The Clerk shall administratively close the other actions. When the document being filed pertains to all actions, the phrase "All Actions" shall appear immediately after the phrase "This Document Relates To:". When a pleading applies to some, but not all, of the actions, the document shall list, immediately after the phrase "This Document Relates To:", the docket number for each individual action to which the document applies, along with the last name of the first-listed plaintiff in said action.

(b)     All related securities class actions against any or all of the defendants subsequently filed in, or transferred to, this District shall be consolidated into this action. This Order

- 1 -

Case 3:24-cv-00334   Document 81-1   Filed 06/04/24   Page 196 of 420 PageID #: 10700

shall apply to every such action, absent an order of the Court. A party objecting to such consolidation, or to any other provisions of this Order, must file an application for relief from this Order within ten days after the action is consolidated into this action; and

(c)     This Order is entered without prejudice to the rights of any party to apply for severance of any claim or action, with good cause shown;

3.     Kissimmee Utility Authority Employees' Retirement Plan is a plaintiff in the action;

4.     The Court, having considered the provisions of the Private Securities Litigation Reform Act of 1995, 15 U.S.C. §78u-4(a)(3)(B) and 15 U.S.C. §77z-1(a)(3)(B), hereby appoints Erste Asset Management GmbH as Lead Plaintiff;

5.     The Court, having considered the provisions of the Private Securities Litigation Reform Act of 1995, 15 U.S.C. §78u-4(a)(3)(B)(v) and 15 U.S.C. §77z-1(a)(3)(B)(v), hereby approves Motley Rice LLC and Robbins Geller Rudman & Dowd LLP as Lead Counsel. Lead Counsel shall have the following responsibilities and duties on behalf of Lead Plaintiff and the putative class: (a) the preparation and filing of all pleadings; (b) the briefing and argument of all motions; (c) the conduct of all discovery proceedings and depositions; (d) settlement negotiations; (e) the pretrial discovery proceedings and the preparation for trial and the trial of this matter; and (f) the supervision of all other matters concerning the prosecution or resolution of this action.

IT IS SO ORDERED.

DATED:_____

_____
THE HONORABLE ALETA A. TRAUGER
UNITED STATES DISTRICT JUDGE

4861-4737-4271.v1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| WESTCHESTER PUTNAM COUNTIES HEAVY & HIGHWAY LABORERS LOCAL 60 BENEFITS FUND, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>SHOALS TECHNOLOGIES GROUP, INC., et al.,<br><br>Defendants. | Civil Action No. 3:24-cv-00334<br><br>Judge Aleta A. Trauger<br><br>CLASS ACTION |
| OKLAHOMA POLICE PENSION AND RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>SHOALS TECHNOLOGIES GROUP, INC., et al.,<br><br>Defendants. | Civil Action No. 3:24-cv-00580<br><br>Judge Waverly D. Crenshaw, Jr.<br>Magistrate Judge Jeffery S. Frensley<br><br>CLASS ACTION |
| KISSIMMEE UTILITY AUTHORITY EMPLOYEES' RETIREMENT PLAN, on Behalf of Itself and All Others Similarly Situated<br><br>Plaintiff,<br><br>vs.<br><br>SHOALS TECHNOLOGIES GROUP, INC., et al.,<br><br>Defendants. | Civil Action No. 3:24-cv-00598<br><br>Judge Waverly D. Crenshaw, Jr.<br>Magistrate Judge Jeffery S. Frensley<br><br>CLASS ACTION |

MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR CONSOLIDATION OF
RELATED ACTIONS, APPOINTMENT AS LEAD PLAINTIFF, AND APPROVAL OF
LEAD PLAINTIFF'S SELECTION OF LEAD COUNSEL

**TABLE OF CONTENTS**

|  |  |  | **Page** |
|---|---|---|---|
| I. | INTRODUCTION | | 1 |
| II. | STATEMENT OF FACTS | | 2 |
| III. | ARGUMENT | | 7 |
| | A. | The Related Actions Should Be Consolidated | 7 |
| | B. | Erste AM Is the "Most Adequate Plaintiff" and Should Be Appointed Lead Plaintiff | 8 |
| | | 1. Erste AM's Motion Is Timely | 9 |
| | | 2. Erste AM Has the Largest Financial Interest in the Relief Sought by the Class | 9 |
| | | 3. Erste AM Is Typical and Adequate of the Putative Class | 9 |
| | C. | The Court Should Approve Erste AM's Selection of Counsel | 11 |
| IV. | CONCLUSION | | 14 |

4888-4051-0655.v1

**CASES**

*Bennet v. Sprint Nextel Corp.*,
    No. 2:09-cv-02122 (D. Kan.) ...................................................................................12

*Boston Ret. Sys. v. Alexion Pharms., Inc.*,
    2023 WL 2932485 (D. Conn. Apr. 13, 2023) ...................................................10, 11

*Burges v. Bancorpsouth, Inc.*,
    2017 WL 2772122 (M.D. Tenn. June 26, 2017) ...................................................13

*City of Sterling Heights Gen.Ret. Sys. v. Hospira, Inc.*,
    No. 1:11-cv-08332 (N.D. Ill.) ...............................................................................12

*Garden City Emps.' Ret. Sys. v. Psychiatric Sols., Inc.*,
    2010 WL 1790763 (M.D. Tenn. Apr. 30, 2010) ..................................................13

*HsingChing Hsu v. Puma Biotechnology, Inc.*,
    No. 8:15-cv-00865-AG-JCG (C.D. Cal.) ..............................................................14

*In re Am. Realty Cap. Props., Inc. Litig.*,
    No. 1:15-mc-00040 (S.D.N.Y.) .............................................................................12

*In re Barrick Gold Sec. Litig.*,
    No. 1:13-cv-03851 (S.D.N.Y.).................................................................................12

*In re Cardinal Health, Inc. Sec. Litig.*,
    No. 2:04-cv-00575-ALM (S.D. Ohio) ...................................................................13

*In re Enron Corp. Sec.*,
    No. 4:01cv-03624 (S.D. Tex.) ................................................................................13

*In re HealthSouth Corp. Sec. Litig.*,
    No. 2:03-cv-01500-KOB-TMP (N.D. Ala.)...........................................................14

*In re National Prescription Opiate Litigation*,
    MDL 2804 (N.D. Ohio) ...........................................................................................12

*In re Qwest Commc'ns Int'l, Inc. Sec. Litig.*,
    No. 1:01-cv-01451-REB-KLM (D. Colo.) .............................................................14

*In re Twitter, Inc. Sec. Litig.*,
    No. 4:16-cv-05314 (N.D. Cal.) ..............................................................................12

Case 2:24-cv-00083-34 Document 31-2 Filed 06/04/24 Page 200 of 420 PageID #: 1704

*In re UnitedHealth Group Inc. Sec. Litig.*,
    No. 0:06-cv-01691-JMR-FLN (D. Minn.) ....................................................................14

*In re Vivendi Universal, S.A. Sec. Litig.*,
    605 F. Supp. 2d 570 (S.D.N.Y. 2009).......................................................................10

*Jones v. Pfizer*,
    No. 1:10-cv-03864 (S.D.N.Y.)..................................................................................12

*Kissimmee Utility Auth. Emps. Ret. Plan v. Shoals Techs. Grp., Inc.*,
    No. 3:24-cv-00598 (M.D. Tenn.).......................................................................... *passim*

*Lawrence E. Jaffe Pension Plan v. Household Int'l Inc.*,
    No. 1:02-cv-05893 (N.D. Ill.) ...................................................................................14

*Okla. Police Pension & Ret. Sys. v. Shoals Techs. Grp., Inc.*,
    No. 3:24-cv-00580 (M.D. Tenn.)..................................................................................1

*OSI Risk Arbritrages v. Cooper Tire & Rubber Co.*,
    63 F. Supp. 3d 394 (D. Del. 2014).............................................................................11

*Schuh v. HCA Holdings, Inc.*,
    No. 3:11-cv-01033, ECF 567 (M.D. Tenn. Apr. 11, 2016) .......................................13

*St. Clair Cnty. Emps.'Ret. Sys. v. Acadia Healthcare Co., Inc.*,
    2019 WL 494129 (M.D. Tenn. Jan. 9, 2019)..............................................................13

*W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*,
    325 F.R.D. 280 (D. Minn. 2018)................................................................................12

*W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*,
    549 F.3d 100 (2d Cir. 2008).................................................................................10, 11

*Washtenaw Cnty. Emps. Ret. Sys. v. Dollar Gen. Corp.*,
    2024 WL 1468982 (M.D. Tenn. Apr. 4, 2024).......................................................8, 9, 10

*Westchester Putnam Cntys. Heavy & Highway Laborers Local 60
    Benefits Fund v. Shoals Techs. Grp., Inc.*,
    No. 3:24-cv-00334 (M.D. Tenn.)..........................................................................1, 8, 9

4888-4051-0655.v1

**STATUTES, RULES, AND REGULATIONS**

15 U.S.C.
§77z-1(a)(1) ...................................................................................................................8
§77z-1(a)(3)(A) ..............................................................................................................9
§77z-1(a)(3)(A)(i) ..........................................................................................................8
§77z-1(a)(3)(B)(i) ......................................................................................................1, 8
§77z-1(a)(3)(B)(ii) .....................................................................................................1, 7
§77z-1(a)(3)(B)(iii) ........................................................................................................1
§77z-1(a)(3)(B)(iii)(I) ....................................................................................................8
§77z-1(a)(3)(B)(iii)(I)(cc) ..............................................................................................9
§77z-1(a)(3)(B)(v) ....................................................................................................2, 11

Federal Rules of Civil Procedure
Rule 23 ................................................................................................................8, 9, 10
Rule 42(a) ....................................................................................................................1, 7

4888-4051-0655.v1

Case 2:24-cv-00384 Document 31-2 Filed 06/24/24 Page 202 of 420 PageID #:1406

## I.  INTRODUCTION

Presently pending before this Court are three related securities class actions (the "Related Actions") brought on behalf of purchasers of Shoals Technologies Group, Inc. ("Shoals" or the "Company") common stock between January 27, 2021 and May 7, 2024 (the "Class Period"), including purchases directly in Shoals' December 2022 secondary public offering of Class A common stock (the "SPO") against the Company, certain senior officers, directors, and underwriters for alleged violations of the Securities Act of 1933 (the "1933 Act") and Securities Exchange Act of 1934 (the "1934 Act").[1]  The PSLRA requires district courts to resolve consolidation before appointing a lead plaintiff in securities cases like this.  *See* 15 U.S.C. §77z-1(a)(3)(B)(ii).[2]  Here, the Related Actions should be consolidated because they each involve substantially similar issues of law and fact.  *See* Fed. R. Civ. P. 42(a).

As soon as practicable after its decision on consolidation, the court "shall appoint the most adequate plaintiff as lead plaintiff for the consolidated actions." 15 U.S.C. §77z-1(a)(3)(B)(ii).  The lead plaintiff is the member "of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of class members."  15 U.S.C. §77z-1(a)(3)(B)(i).  Erste Asset Management GmbH ("Erste AM") should be appointed lead plaintiff because it filed a timely motion, has a substantial financial interest in the outcome of this litigation, and will typically and adequately represent the class's interests.  *See* 15 U.S.C. §77z-1(a)(3)(B)(iii).  In addition, Erste

---

[1]  The Related Actions are: *Westchester Putnam Cntys. Heavy & Highway Laborers Local 60 Benefits Fund v. Shoals Techs. Grp., Inc.*, No. 3:24-cv-00334 (M.D. Tenn.); *Okla. Police Pension & Ret. Sys. v. Shoals Techs. Grp., Inc.*, No. 3:24-cv-00580 (M.D. Tenn.); and *Kissimmee Utility Auth. Emps. Ret. Plan v. Shoals Techs. Grp., Inc.*, No. 3:24-cv-00598 (M.D. Tenn.).  All emphasis is added and all citations are omitted unless otherwise indicated.

[2]  Because the Private Securities Litigation Reform Act of 1995's ("PSLRA") lead plaintiff provisions applicable to the 1933 Act and 1934 Act are virtually identical, only the 1933 Act provisions are cited herein.

4888-4051-0655.v1

Case 3:24-cv-00334  Document 31-2  Filed 06/21/24  Page 203 of 420 PageID #: 1507

AM's selection of Motley Rice LLC and Robbins Geller Rudman & Dowd LLP as lead counsel for the putative class should be approved.  15 U.S.C. §77z-1(a)(3)(B)(v).

## II.  STATEMENT OF FACTS

Founded in 1996, Shoals is a provider of electrical balance of systems ("EBOS") solutions and components for solar, battery storage, and electrical vehicle charging applications.  Shoals' EBOS provides components necessary for the transfer of electrical power produced by solar panels to intermediate locations within a solar project and ultimately to the power grid.  Shoals employs a proprietary EBOS system, which it dubs a "combine-as-you-go" solution, which the Company claims offers several advantages over conventional EBOS systems using "homerun" wiring architecture.  In contrast to conventional EBOS systems, Shoals' combine-as-you-go solution uses specialized wire harnesses to connect multiple strings of solar panels to Shoals' proprietary above-ground feeder cable known as a "Big Lead Assembly" ("BLA").  The BLA is Shoals' core combine-as-you-go product.

Shoals claims that its proprietary wire system requires fewer wires and wire connections than other offerings and eliminates altogether the need for other materials utilized in homerun wiring architecture, which the Company states results in lower labor and material costs.  Of particular importance to investors, Shoals purports that its proprietary solutions have greater reliability and lower maintenance costs than conventional EBOS systems.

Shoals offers its customers an assurance type warranty that protects against manufacturer defects.  The Company accounts for warranty liabilities by recording a reserve provision for estimated future costs related to warranty remediation expenses.  Since Shoals' initial public offering in January 2021 until the revelations detailed herein, the Company recorded only modest amounts in warranty-related reserves.  For example, for fiscal years ending December 31, 2021 and 2022 Shoals' estimated accrued warranty reserve was $100,000 and $600,000, respectively.

Shoals generates the majority of its revenue from the sale of "system solutions," which are complete EBOS systems that employ several of the Company's EBOS components. Shoals also generates revenue from the sale of individual EBOS components, as well as other components used for battery storage and EV charging applications. In fiscal year 2022, Shoals derived approximately 88% and 22% of its revenue from the sale of system solutions and from the sale of components, respectively. During the Class Period, Shoals' combine-as-you-go system solutions carried higher margins than its other products and was therefore the most profitable source of revenue for the Company.

Shoals provides investors with measures of client demand and anticipated future business through two operational metrics: (i) backlog; and (ii) awarded orders. The Company defines "backlog" as "signed purchase orders or contractual minimum purchase commitments with take-or-pay provisions." *Kissimmee* Action, ECF 1 at ¶32. "Awarded orders" is defined as orders that Shoals is in the "process of documenting a contract but for which a contract has not been signed." *Id.* Shoals often reports its backlog and awarded orders through a single monetary figure representing the total sum of future expected revenue. Accordingly, Shoals' backlog and awarded orders are each important forward indicators of the Company's future financial, operational, and business performance.

Throughout the Class Period, Defendants emphasized the purported "quality," "reliability," and "safety" of Shoals' EBOS products and claimed these purported advantages were critical to the Company's ability to generate business. For example, speaking during an August 2022 conference call, Defendant Jason R. Whitaker emphasized the "performance, quality, reliability, [and] installation savings" of Shoals' offerings and represented that these benefits served as a launch pad for the Company's "long-term" relationships with its clients, stating in pertinent part as follows:

- 3 -

Components revenue increased 97% year-over-year, driven by increases in shipments of battery storage products as well as shipments of solar products to a significant number of new customers. New customers projects are typically designed to timeline systems and they generally start the relationship with Shoals by buying components that will work with these types of systems.

***Re-fixing the performance, quality, reliability, installation savings and customer service that Shoals offers***, they become open to trying our combine-as-you-go architecture and buy the BLA. ***Once customers make the transition, this usually marks the start of a long-term relationship***.

*Kissimmee* Action, ECF 1 at ¶33.

Defendants' filings with the Securities and Exchange Commission ("SEC") likewise highlighted the "several advantages" that Shoals' products purportedly enjoyed over conventional EBOS systems with claims that Shoals' combine-as-you-go system had "greater reliability," "lower maintenance costs," and "lower[] material and shipping costs" as compared to competing products. *Kissimmee* Action, ECF 1 at ¶34.

Due in substantial part to the "value proposition" that Shoals' products purported to offer, Defendants claimed throughout the Class Period that demand for Shoals' products was "robust" and "continue[d] to grow," and highlighted the Company's "record" breaking revenue and earnings. *Kissimmee* Action, ECF 1 at ¶35. For example, in connection with Shoals' fourth quarter 2022 earnings announcement, the Company boasted that it had "'set new records for revenue, gross profit, net income, adjusted EBITDA and adjusted net income'" for both the fourth quarter and full year 2022. *Id.* Further emphasizing Shoals' performance, Defendant Whitaker represented that Shoals was "'commercially, operationally and financially'" the strongest "'it ha[d] ever been.'" *Id.*

Unbeknownst to investors, however, during the Class Period Shoals was suffering from a massive, undisclosed warranty problem that impacted approximately 30% of wire harnesses Shoals had manufactured during the 2020 through 2022 time period. Beginning several months prior to the start of the Class Period, Shoals had utilized defective specialty wires manufactured by a third party

- 4 -

in a substantial portion of its wire harnesses, resulting in excessive "shrinkback" whereby insulating material surrounding wires at connection points improperly contracted, leaving live wires exposed and creating serious risks of fire, injury, or death to Shoals' customers. As a result, Shoals was liable for millions of dollars in undisclosed warranty remediation costs, which the Company has ultimately estimated could cost as much as $185 million. The widespread use of defective wires in its projects has also significantly damaged Shoals' reputational standing among its customers. As a result, Shoals' ability to competitively differentiate its offerings has been materially impaired, exposing the Company's business, finances, and operations to significant disruption and reputational harm, as well as the material undisclosed risks of lost sales, increased costs, and other negative consequences.

In May 2023 – approximately three years after the Company began utilizing defective and potentially dangerous wiring in its harness installations – Shoals first mentioned the shrinkback issue in a Form 10-Q quarterly report for its first fiscal quarter ended March 31, 2023. The report materially misrepresented the scope of the issue, stating the Company only had $400,000 in accrued warranty liability at quarter end, a $200,000 decrease from the prior quarter. The quarterly report also misleadingly downplayed the harm to the Company by describing the shrinkback issue as impacting only "a subset of specific colored wire provided by one specific supplier." *Kissimmee Action*, ECF 1 at ¶37.

Then, on August 1, 2023, Shoals reported its second fiscal quarter 2023 results and revealed that it was recording a $9.4 million warranty expense to reflect costs primarily related to shrinkback remediation, offsetting other claimed improvements in the Company's margin profile and causing its gross margins to decline sequentially to 42.4% from 45.9% in the prior quarter. During the corresponding conference call, Defendant Dominic Bardos sought to assuage investor concerns

- 5 -

regarding the Company's warranty expense exposure, falsely stating that the warranty expense incurred within the quarter was "adequate to do the remediation required." *Kissimmee* Action, ECF 1 at ¶38. Contrary to this representation, Shoals would go on to announce an additional $50 million in shrinkback warranty expenses the following quarter, representing a more than five-fold increase. Shoals would likewise disclose that 30% of its wire harnesses manufactured from 2020 to 2022 had been impacted by the shrinkback issue and that ultimate remediation costs could reach as high as $185 million.

As would later be revealed, the installation of defective – and potentially dangerous – wire harnesses on so many of the Company's projects has also negatively impacted Shoals' customer relationships. For example, a November 10, 2023 Roth MKM analyst report stated their "checks" with Shoals' customers

> suggest that since receiving the safety notice from SHLS regarding shrinkback . . . , customers are likely scrambling to identify any instances of the issue. ***Critical concerns we have heard include (1) Serious injury or death, (2) The exposed wiring may cause fire and property damage, and (3) PUCs may get involved with increased scrutiny***.

Moreover, at least one affected site has already reported property damage arising from a brush fire believed to have ignited as a result of contact with a defective, Shoals-installed wire harness.

In subsequent quarters, Shoals has revealed dramatically deteriorating results, reflecting in part the effects of the shrinkback issue on the Company's customer relationships, and the materialization of the risks concealed by Defendants' materially misleading misstatements and omissions as detailed herein. In reporting its fourth fiscal quarter of 2023 results, Shoals revealed a sequential quarterly decline of $2 million in the Company's backlog and awarded orders. The Company also issued disappointing revenue guidance for fiscal year 2024 of $480 million to $520 million that was approximately 19% below consensus estimates at the midpoint. Shoals' business

- 6 -

further deteriorated in its first fiscal quarter of 2024, with backlog and awarded orders falling sequentially by over $16 million and the Company reducing its already disappointing guidance to a range of $440 million to $490 million due in part to an "unprecedented" customer cancellation and project delays. In a Form 10-Q quarterly report the Company filed with the SEC, Shoals has also disclosed that the Company "may increase" its estimated warranty liability a "material" amount. *Kissimmee* Action, ECF 1 at ¶41.

As a result of these disclosures, the price of Shoals Class A common stock has declined from a Class Period high of over $40 per share to less than $8 per share by the end of the Class Period, causing Erste AM's funds and the proposed class members to suffer hundreds of millions of dollars in losses and economic damages under the federal securities laws.

## III. ARGUMENT

### A. The Related Actions Should Be Consolidated

The PSLRA provides that "[i]f more than one action on behalf of a class asserting substantially the same claim or claims arising under this chapter has been filed," the Court shall not make the determination of the most adequate plaintiff until "after the decision on the motion to consolidate is rendered." 15 U.S.C. §77z-1(a)(3)(B)(ii). Consolidation is appropriate where actions involve common questions of law or fact. *See* Fed. R. Civ. P. 42(a).

Consolidation is appropriate because the Related Actions rely on the same underlying facts and assert the same false and misleading statements and omissions. Moreover, the Related Actions all bring claims under the federal securities laws against substantially overlapping defendants.[3] Consolidation would preserve judicial resources and promote efficient prosecution of the litigation. Accordingly, the Court should consolidate the Related Actions.

---

[3] Any minor differences between the Related Actions will be reconciled with the filing of a consolidated complaint.

- 7 -

## B. Erste AM Is the "Most Adequate Plaintiff" and Should Be Appointed Lead Plaintiff

The PSLRA establishes the procedure for the appointment of a lead plaintiff in "each private action arising under [the 1933 or 1934 Act] that is brought as a plaintiff class action pursuant to the Federal Rules of Civil Procedure." 15 U.S.C. §77z-1(a)(1); *see also* 15 U.S.C. §77z-1(a)(3)(B)(i). First, "[n]ot later than 20 days" after the complaint is filed, a notice must be published "in a widely circulated national business-oriented publication or wire service" advising members of the purported plaintiff class "of the pendency of the action, the claims asserted therein, and the purported class period" and that "not later than 60 days after the date on which the notice is published, any member of the purported class may move the court to serve as lead plaintiff." 15 U.S.C. §77z-1(a)(3)(A)(i). The statutory notice in the first-filed *Westchester* action was published on March 22, 2024. *See* Declaration of Christopher M. Wood in Support of Motion for Consolidation of Related Actions, Appointment as Lead Plaintiff, and Approval of Lead Plaintiff's Selection of Lead Counsel ("Wood Decl."), Ex. A.

Next, the PSLRA provides that the Court shall adopt a presumption that the most adequate plaintiff is the person that –

(aa) has either filed the complaint or made a motion in response to a notice . . . ;

(bb) in the determination of the court, has the largest financial interest in the relief sought by the class; and

(cc) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.

15 U.S.C. §77z-1(a)(3)(B)(iii)(I); *Washtenaw Cnty. Emps. Ret. Sys. v. Dollar Gen. Corp.*, 2024 WL 1468982, at *1 (M.D. Tenn. Apr. 4, 2024). Erste AM meets these requirements and should be appointed Lead Plaintiff.

- 8 -

### 1. Erste AM's Motion Is Timely

The March 22, 2024, statutory notice published in connection with the filing of the first-filed *Westchester* complaint advised class members of the pendency of the action, the claims asserted, and the right to move the Court for appointment as lead plaintiff within 60 days, or by May 21, 2024. *See* Wood Decl., Ex. A; 15 U.S.C. §77z-1(a)(3)(A). In addition, on May 8, 2024 and May 15, 2024, notices were published in connection with the filing of the *Oklahoma Police* and *Kissimmee* complaints, respectively, informing class members of the pendency of the actions, the claims asserted (including the 1933 Act claims and the class periods associated therewith) and the right to seek appointment as lead plaintiff by May 21, 2024. *See* Wood Decl., Exs. B-C. This Motion is timely filed and Erste AM is eligible for appointment as lead plaintiff.

### 2. Erste AM Has the Largest Financial Interest in the Relief Sought by the Class

As evidenced by its Certification, Erste AM's funds purchased or acquired over 3.1 million shares of Shoals common stock during the Class Period and suffered over $33 million in losses as a result of Defendants' alleged misconduct. *See* Wood Decl., Exs. D, E. To the best of its counsel's knowledge, there are no other named plaintiffs with a larger financial interest. Therefore, Erste AM satisfies the PSLRA's prerequisite of having the largest financial interest.

### 3. Erste AM Is Typical and Adequate of the Putative Class

In addition to possessing a significant financial interest, a lead plaintiff must also "otherwise satisf[y] the requirements of Rule 23." 15 U.S.C. §77z-1(a)(3)(B)(iii)(I)(cc). "Under Rule 23, there are two requirements for establishing one's status as the lead plaintiff: (1) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (2) the representative parties will fairly and adequately protect the interests of the class." *Washtenaw*, 2024 WL 1468982, at *1 (cleaned up).

4888-4051-0655.v1

"The typicality requirement of Rule 23 'insures that the representatives' interests are aligned with the interests of the represented class members so that, by pursuing their own interests, the class representatives also advocate the interests of the class members.'" *Washtenaw*, 2024 WL 1468982, at *2. Here, if appointed, Erste AM intends to allege that Defendants violated the federal securities laws by disseminating materially false and misleading statements and omissions and that Erste AM's funds were harmed in connection therewith, just like all of the other putative class members. Therefore, the Court should find its claims are typical to the claims of the other class members.

"In order to adequately represent a class, 'the representative must have common interests with unnamed members of the class, and . . . it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel.'" *Washtenaw*, 2024 WL 1468982, at *3. Erste AM is an Austrian asset management company with billions of Euros of assets under management. As described in the accompanying Declaration of Dr. Leopold Specht, Erste AM serves as the investment management company for the funds listed in Erste AM's accompanying Certification. *See* Wood Decl., Ex. F at ¶¶28-41. None of the funds are independant legal entities and they do not have the legal capacity to sue or be sued in their own name. *See id.* at ¶5 ("The fund is not a legal entity."). As the funds' investment management company, Erste AM (and only Erste AM) is authorized to act on behalf of the funds, including bringing claims for losses incurred by the funds in this Action. *See id.* at ¶¶21-45; *see also Boston Ret. Sys. v. Alexion Pharms., Inc.*, 2023 WL 2932485, at *6-*9 (D. Conn. Apr. 13, 2023) (holding, at the more rigorous class certification stage, that Erste AM has standing to represent its funds and appointing Erste AM as class representative in securities class action); *In re Vivendi Universal, S.A. Sec. Litig.*, 605 F. Supp. 2d 570, 581-82 (S.D.N.Y. 2009) (finding "that the relationship between Austrian funds and their management companies qualifies for the *Huff* exception" and that an Austrian management company was

- 10 -

"authorized to sue as a matter of law")[4]; *OSI Risk Arbritrages v. Cooper Tire & Rubber Co.*, 63 F.
Supp. 3d 394, 404 (D. Del. 2014) (finding investment manager had standing to sue where funds have
"'no legal personality and cannot on their own'" and where manager had "'exclusive right'" and
"'legal mandate'" to "engage in litigation on behalf of the . . . funds"). Erste AM is familiar with the
requirements and responsibilities of being a lead plaintiff in a securities class action and is willing to
undertake those responsibilities on behalf of the putative class in this case. *See* Wood Decl., Ex. D.
Last year, Erste AM served as a lead plaintiff and later class representative in *Alexion*, which
resulted in a $125 million recovery for investors. Moreover, Erste AM is not aware of any potential
conflicts of interest or any matters that would preclude it from fulfilling its duties as lead plaintiff.
Additionally, as explained below, Erste AM has selected experienced and qualified counsel with an
office in this District, further evidencing its ability to fairly and competently represent the interests
of the class.

Because Erste AM filed a timely motion, has a large financial interest in the relief sought by
the class, and demonstrated its typicality and adequacy, the Court should adopt the presumption that
it is the "most adequate plaintiff."

### C. The Court Should Approve Motley Rice and Robbins Geller As Lead Counsel

The PSLRA vests authority in the lead plaintiff to select and retain lead counsel, subject to
the Court's approval. *See* 15 U.S.C. §77z-1(a)(3)(B)(v). Erste AM requests the Court to approve

---

[4] The so-called prudential (or "*Huff*") exception allows third-party standing "where the plaintiff
can demonstrate (1) a close relationship to the injured party and (2) a barrier to the injured party's
ability to assert its own interests." *W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549
F.3d 100, 109 (2d Cir. 2008). Erste AM has a close relationship to its funds, as evidenced by the fact
it serves as their management company, and there is a barrier to the funds asserting the claims given
they do not have the capacity to bring suit. *See Alexion*, 2023 WL 2932485, at *7 ("Erste has
demonstrated 'a close relationship to the injured party,' *Huff*, 549 F.3d at 109 – i.e., to investors in
the funds that Erste manages – akin to that which allows '[t]rustees [to] bring suits to benefit their
trusts'") (alterations in original).

- 11 -

Motley Rice and Robbins Geller as Lead Counsel for the class. These firms have substantial experience representing defrauded investors and a demonstrated history of success serving as lead counsel in numerous securities fraud class actions, including in this District. *See* Wood Decl., Exs. G-H (firm resumes). Motley Rice and Robbins Geller have a history of successfully prosecuting securities class actions together, including *In re Am. Realty Cap. Props., Inc. Litig.*, No. 1:15-mc-00040 (S.D.N.Y.) ($1.025 billion recovery), *In re Twitter, Inc. Sec. Litig.*, No. 4:16-cv-05314 (N.D. Cal.) ($809.5 million recovery); *Jones v. Pfizer*, No. 1:10-cv-03864 (S.D.N.Y.) ($400 million recovery); *In re Barrick Gold Sec. Litig.*, No. 1:13-cv-03851 (S.D.N.Y.) ($140 million recovery); *Bennet v. Sprint Nextel Corp.*, No. 2:09-cv-02122 (D. Kan.) ($131 million recovery); and *City of Sterling Heights Gen. Emps.' Ret. Sys. v. Hospira, Inc.*, No. 1:11-cv-08332 (N.D. Ill.) ($60 million recovery).

As discussed above and in its accompanying resume, Motley Rice has recovered billions of dollars for shareholders in numerous securities fraud actions. *See* Wood Decl., Ex. G; *see also W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*, 325 F.R.D. 280, 287 (D. Minn. 2018) ("Plaintiffs' counsel – lawyers from Robbins Geller Rudman & Dowd LLP and Motley Rice LLC – is well-qualified to serve as class counsel in this case. First, the filings in this case demonstrate that counsel has sufficiently investigated and identified potential claims in this case. . . . Second, counsel has experience serving as class counsel in other disputes. . . . Third, counsel has demonstrated in this case and others that they have significant knowledge of securities law. . . . Finally, the Court is persuaded that counsel has sufficient resources to serve as class counsel in this case."). In addition, Motley Rice currently serves as lead counsel in the multi-district litigation captioned *In re National Prescription Opiate Litigation*, MDL 2804 (N.D. Ohio), which is pending in this Circuit. That

- 12 -

litigation – which has to-date seen the recovery of tens of billions of dollars – has been described as "the most complex civil action ever tackled by any American court."

Robbins Geller, a 200-attorney firm with an office in this District, regularly represents institutional and individual investors in nationwide securities litigation, including within the Sixth Circuit and this District. *See* Wood Decl., Ex. H. District courts throughout the country, including the judges of this Court, have noted Robbins Geller's reputation for excellence in prosecuting securities class actions. *See, e.g.*, *St. Clair Cnty. Emps.' Ret. Sys. v. Acadia Healthcare Co., Inc.*, 2019 WL 494129, at *6 (M.D. Tenn. Jan. 9, 2019) (appointing Robbins Geller as lead counsel, finding that "this Court has previously found Robbins Geller to be 'well qualified' for the task of representing a class in a securities action"); *Burges v. Bancorpsouth, Inc.*, 2017 WL 2772122 (M.D. Tenn. June 26, 2017) (certifying class and appointing Robbins Geller as class counsel); *Garden City Emps.' Ret. Sys. v. Psychiatric Sols., Inc.*, 2010 WL 1790763, at *4 (M.D. Tenn. Apr. 30, 2010) (finding Robbins Geller attorneys to be "well qualified and experienced to represent the class"). Notably, Robbins Geller attorneys involved in this case are responsible for obtaining each of the three largest securities fraud class action recoveries ever obtained in this District. *See, e.g.*, *Schuh v. HCA Holdings, Inc.*, No. 3:11-cv-01033, ECF 567 at 12-13 (M.D. Tenn. Apr. 11, 2016) (in granting final approval to a $215 million recovery, the largest securities class action recovery ever in Tennessee, while recognizing that Robbins Geller and its local counsel "were gladiators" and expressing the court's "appreciat[ion for] the work that you all have done on this"). Robbins Geller attorneys have also obtained the largest securities fraud class action recovery in this Circuit as well as in the Fifth, Seventh, Eighth, Tenth, and Eleventh Circuits.[5]

---

[5] *See In re Enron Corp. Sec.*, No. 4:01cv-03624 (S.D. Tex.) ($7.3 billion recovery is largest securities class action recovery in U.S. history and in the ***Fifth Circuit***); *In re Cardinal Health, Inc. Sec. Litig.*, No. 2:04-cv-00575-ALM (S.D. Ohio) ($600 million recovery is the largest securities

- 13 -

4888-4051-0655.v1
Case: 3:24-cv-00334 Document: 31-2 Filed: 05/24/24 Page 215 of 420 PageID #: 2719

Robbins Geller's securities department includes numerous trial attorneys and many former federal and state prosecutors, and utilizes an extensive group of in-house experts to aid in the prosecution of complex securities issues. And, while trials in shareholder class actions are rare, Robbins Geller has tried several shareholder class actions to verdict including a trial earlier this year in *HsingChing Hsu v. Puma Biotechnology, Inc.*, No. 8:15-cv-00865-AG-JCG (C.D. Cal.), in which the jury returned a verdict in favor of the shareholder class, finding that defendants Puma Biotechnology, Inc. and its CEO committed securities fraud.

Erste AM's selection of counsel is highly qualified and thus reasonable. Accordingly, Motley Rice and Robbins Geller should be approved as lead counsel.

## IV. CONCLUSION

The Court should consolidate the Related Actions because they share overlapping questions of law and fact. In addition, Erste AM has satisfied each of the PSLRA's requirements for appointment as lead plaintiff. As such, Erste AM respectfully requests that the Court appoint it as Lead Plaintiff and approve its selection of Lead Counsel.

DATED: May 21, 2024

Respectfully submitted,

BARRETT JOHNSTON MARTIN
 & GARRISON, PLLC
JERRY E. MARTIN, #20193

s/ Jerry E. Martin
JERRY E. MARTIN

---

class action recovery in the **Sixth Circuit**); *Lawrence E. Jaffe Pension Plan v. Household Int'l Inc.*, No. 1:02-cv-05893 (N.D. Ill.) ($1.575 billion recovery is the largest securities class action recovery following a trial as well as the largest securities class action recovery in the **Seventh Circuit**); *In re UnitedHealth Group Inc. Sec. Litig.*, No. 0:06-cv-01691-JMR-FLN (D. Minn.) ($925 million recovery is the largest securities class action recovery in the **Eighth Circuit**); *In re Qwest Commc'ns Int'l, Inc. Sec. Litig.*, No. 1:01-cv-01451-REB-KLM (D. Colo.) ($445 million recovery is the largest securities class action recovery in the **Tenth Circuit**); *In re HealthSouth Corp. Sec. Litig.*, No. 2:03-cv-01500-KOB-TMP (N.D. Ala.) ($671 million recovery is the largest securities class action recovery in the **Eleventh Circuit**).

- 14 -

200 31st Avenue North
Nashville, TN  37203
Telephone:  615/244-2202
615/252-3798 (fax)
jmartin@barrettjohnston.com

Local Counsel

MOTLEY RICE LLC
GREGG S. LEVIN (*pro hac vice* forthcoming)
CHRISTOPHER F. MORIARTY (*pro hac vice* forthcoming)
28 Bridgeside Blvd.
Mount Pleasant, SC  29464
Telephone:  843/216-9000
843/216-9450 (fax)
glevin@motleyrice.com
cmoriarty@motleyrice.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
DARREN J. ROBBINS (*pro hac vice* forthcoming)
DANIELLE S. MYERS (*pro hac vice* forthcoming)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
darrenr@rgrdlaw.com
dmyers@rgrdlaw.com

CHRISTOPHER M. WOOD, #032977
200 31st Avenue North
Nashville, TN  37203
Telephone:  615/244-2203
615/252-3798 (fax)
cwood@rgrdlaw.com

Proposed Lead Counsel for Proposed Lead Plaintiff

- 15 -

4888-4051-0655.v1

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on May 21, 2024, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

<div style="margin-left:50%">

s/ Jerry E. Martin
JERRY E. MARTIN

BARRETT JOHNSTON MARTIN
    & GARRISON, PLLC
200 31st Avenue North
Nashville, TN  37203
Telephone:  615/244-2202
615/252-3798 (fax)
jmartin@barrettjohnston.com

</div>

4888-4051-0655.v1

# Mailing Information for a Case 3:24-cv-00334 Westchester Putnam Counties Heavy & Highway Laborers Local 60 Benefits Fund v. Shoals Technologies Group, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Rachel A. Avan**
  ravan@labaton.com

- **Margaret V. Dodson**
  margaret.dodson@bassberry.com

- **Marco A. Dueas**
  mduenas@saxenawhite.com

- **Renatta A. Gorski**
  renatta.gorski@lw.com

- **Lester R. Hooker**
  lhooker@saxenawhite.com

- **Michele D. Johnson**
  michele.johnson@lw.com

- **Britt K. Latham**
  blatham@bassberry.com,renatta.gorski@lw.com,lauren.fane@lw.com,heather.waller@lw.com,llewis@bassberry.com,lbilbrey@bassberry.com,christian.beveridge@lw.

- **James Gerard Stranch , IV**
  gstranch@stranchlaw.com,complexlit@stranchlaw.com

- **Heather A. Waller**
  heather.waller@lw.com,chefiling@lw.com,heather-waller-8915@ecf.pacerpro.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)

Case 3:24-cv-00334 Document 31-2 Filed 05/24/24 Page 219 of 420 PageID #: 3723

# Mailing Information for a Case 3:24-cv-00580 Oklahoma Police Pension and Retirement System v. Shoals Technologies Group, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Rachel A. Avan**
  ravan@labaton.com

- **Marco A. Dueas**
  mduenas@saxenawhite.com

- **Lester R. Hooker**
  lhooker@saxenawhite.com

- **James Gerard Stranch , IV**
  gstranch@stranchlaw.com,complexlit@stranchlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)

Case 3:24-cv-00334 Document 31-2 Filed 05/24/24 Page 220 of 420 PageID #: 3724

# Mailing Information for a Case 3:24-cv-00598 Kissimmee Utility Authority Employees' Retirement Plan v. Shoals Technologies Group, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Scott R. Christiansen**
  scott@cdpension.com

- **Brian E. Cochran**
  bcochran@rgrdlaw.com

- **Francisco J. Mejia**
  fmejia@rgrdlaw.com

- **Christopher M. Wood**
  cwood@rgrdlaw.com,CWood@ecf.courtdrive.com,e_file_sd@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)

Case 3:24-cv-00598 Document 31-2   Filed 05/24/24   Page 221 of 420 PageID #: 3725

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| WESTCHESTER PUTNAM COUNTIES HEAVY & HIGHWAY LABORERS LOCAL 60 BENEFITS FUND, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> SHOALS TECHNOLOGIES GROUP, INC., et al., <br><br> Defendants. | Civil Action No. 3:24-cv-00334 <br><br> Judge Aleta A. Trauger <br><br> <u>CLASS ACTION</u> |
| OKLAHOMA POLICE PENSION AND RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> SHOALS TECHNOLOGIES GROUP, INC., et al., <br><br> Defendants. | Civil Action No. 3:24-cv-00580 <br><br> Judge Waverly D. Crenshaw, Jr. <br> Magistrate Judge Jeffery S. Frensley <br><br> <u>CLASS ACTION</u> |
| KISSIMMEE UTILITY AUTHORITY EMPLOYEES' RETIREMENT PLAN, on Behalf of Itself and All Others Similarly Situated <br><br> Plaintiff, <br><br> vs. <br><br> SHOALS TECHNOLOGIES GROUP, INC., et al., <br><br> Defendants. | Civil Action No. 3:24-cv-00598 <br><br> Judge Waverly D. Crenshaw, Jr. <br> Magistrate Judge Jeffery S. Frensley <br><br> <u>CLASS ACTION</u> |

DECLARATION OF CHRISTOPHER M. WOOD IN SUPPORT OF MOTION FOR
CONSOLIDATION OF RELATED ACTIONS, APPOINTMENT AS LEAD PLAINTIFF, AND
APPROVAL OF LEAD PLAINTIFF'S SELECTION OF LEAD COUNSEL

I, Christopher M. Wood, declare as follows:

1. I am an attorney duly licensed to practice before all of the courts of the State of Tennessee and this Court. I am a partner of Robbins Geller Rudman & Dowd LLP, proposed lead counsel for proposed lead plaintiff Erste Asset Management GmbH ("Erste AM") in the above-captioned related securities class actions. This declaration is made in support of Erste AM's Motion for Consolidation of Related Actions, Appointment as Lead Plaintiff, and Approval of Lead Plaintiff's Selection of Lead Counsel. I have personal knowledge of the matters stated herein and, if called upon, I could and would competently testify thereto.

2. Attached are true and correct copies of the following exhibits:

Exhibit A: Notice of pendency of first-filed class action published in *Globe Newswire* on March 22, 2024;

Exhibit B: Notice of pendency of *Oklahoma Police* action published in *Globe Newswire* on May 8, 2024;

Exhibit C: Notice of pendency of *Kissimmee* action published in *Globe Newswire* on May 15, 2024;

Exhibit D: Erste AM's Certification;

Exhibit E: Erste AM funds' estimated losses, prepared by counsel;

Exhibit F: Declaration of Dr. Leopold Specht in Support of Lead Plaintiff's Motion for Consolidation of Related Actions, Appointment as Lead Plaintiff, and Approval of Lead Plaintiff's Selection of Lead Counsel;

Exhibit G: Motley Rice LLC securities resume; and

Exhibit H: Robbins Geller Rudman & Dowd LLP firm resume.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 21st day of May, 2024.

_____
CHRISTOPHER M. WOOD

- 1 -

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on May 21, 2024, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ Christopher M. Wood
CHRISTOPHER M. WOOD

ROBBINS GELLER RUDMAN
   & DOWD LLP
200 31st Avenue North
Nashville, TN 37203
Telephone: 615/244-2203
615/252-3798 (fax)
Email: cwood@rgrdlaw.com

4855-9103-9167.v1

Case 3:24-cv-00304-334 Document 31-23 Filed 06/54/24 Page 224 of 420 PageID 36728

# Mailing Information for a Case 3:24-cv-00334 Westchester Putnam Counties Heavy & Highway Laborers Local 60 Benefits Fund v. Shoals Technologies Group, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Rachel A. Avan**
  ravan@labaton.com

- **Margaret V. Dodson**
  margaret.dodson@bassberry.com

- **Marco A. Dueas**
  mduenas@saxenawhite.com

- **Renatta A. Gorski**
  renatta.gorski@lw.com

- **Lester R. Hooker**
  lhooker@saxenawhite.com

- **Michele D. Johnson**
  michele.johnson@lw.com

- **Britt K. Latham**
  blatham@bassberry.com,renatta.gorski@lw.com,lauren.fane@lw.com,heather.waller@lw.com,llewis@bassberry.com,lbilbrey@bassberry.com,christian.beveridge@lw.

- **James Gerard Stranch , IV**
  gstranch@stranchlaw.com,complexlit@stranchlaw.com

- **Heather A. Waller**
  heather.waller@lw.com,chefiling@lw.com,heather-waller-8915@ecf.pacerpro.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)

Case 3:24-cv-00334 Document 31-23 Filed 06/24/24 Page 225 of 420 PageID #: 7729

# Mailing Information for a Case 3:24-cv-00580 Oklahoma Police Pension and Retirement System v. Shoals Technologies Group, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Rachel A. Avan**
  ravan@labaton.com

- **Marco A. Dueas**
  mduenas@saxenawhite.com

- **Lester R. Hooker**
  lhooker@saxenawhite.com

- **James Gerard Stranch , IV**
  gstranch@stranchlaw.com,complexlit@stranchlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)

Case 3:24-cv-00334 Document 31-23   Filed 06/24/24   Page 226 of 420 PageID #: 33730

# Mailing Information for a Case 3:24-cv-00598 Kissimmee Utility Authority Employees' Retirement Plan v. Shoals Technologies Group, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Scott R. Christiansen**
  scott@cdpension.com

- **Brian E. Cochran**
  bcochran@rgrdlaw.com

- **Francisco J. Mejia**
  fmejia@rgrdlaw.com

- **Christopher M. Wood**
  cwood@rgrdlaw.com,CWood@ecf.courtdrive.com,e_file_sd@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)

Case 3:24-cv-00334 Document 31-23 Filed 06/24/24 Page 227 of 420 PageID 39731

# EXHIBIT A

# Saxena White P.A. Files New Securities Fraud Class Action

globenewswire.com/news-release/2024/03/22/2851158/0/en/Saxena-White-P-A-Files-New-Securities-Fraud-Class-Action-Against-Shoals-Technologies-Group-Inc.html



BOCA RATON, Fla., March 22, 2024 (GLOBE NEWSWIRE) -- Saxena White P.A. has filed a securities fraud class action lawsuit (the "Class Action") in the United States District Court for the Middle District of Tennessee against Shoals Technologies Group, Inc. ("Shoals" or the "Company") (NASDAQ: SHLS) and certain of its executive officers (collectively, "Defendants"). The Class Action asserts claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder on behalf of all persons and entities that purchased Shoals common stock between May 17, 2022 and November 7, 2023, inclusive (the "Class Period"), and were damaged thereby (the "Class"). The Class Action filed by Saxena White P.A. is captioned: *Westchester Putnam Counties Heavy & Highway Laborers Local 60 Benefits Fund v. Shoals Technologies Group, Inc. et al*., No. 3:24-cv-00334 (M.D. Tenn.).

Shoals, which is headquartered in Portland, Tennessee, purports to be a leading provider of electrical balance of systems ("EBOS") products used in generating solar power, among other uses. Throughout the Class Period, Defendants touted the Company's "focus on quality and reliability" with regard to its EBOS components, backed up by a warranty Shoals provided customers for its products. Shoals further highlighted that its products met "stringent quality requirements" and assured investors throughout the Class Period that its reported "Cost of Revenue" included costs related to product warranty liability. In reality, by no later than March 2022, Shoals learned of customers experiencing excessive pull back of wire insulation, or "shrinkback," in wire harnesses used in the EBOS products.

The Class Action alleges that, during the Class Period, Defendants made materially false and misleading statements and failed to disclose material adverse facts about the Company's business, operations, and prospects in violation of the Exchange Act and SEC Rule 10b-5. Specifically, Defendants failed to disclose that: (1) Shoals did not deliver EBOS products that met the highest levels of quality and reliability; (2) Shoals had received reports of exposed copper conduit in EBOS wire harnesses in a large number of solar fields and was aware that a significant portion of its wire harnesses had defects; (3) Shoals would have to incur between $60 million to $185 million in costs to remediate the wire shrinkback issue; and (4) Shoals had understated its cost of revenue by millions of dollars. As a result,

Defendants' positive statements about the Company's financial guidance, business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

The truth was revealed after the close of markets on November 7, 2023. That day, Shoals filed its Quarterly Report on Form 10-Q for the third quarter of 2023 with the SEC and held an accompanying earnings call in which Defendants revealed that the wire shrinkback issue was far more severe than previously disclosed. Specifically, the Company reported that the shrinkback issue affected 30% of Shoals' harnesses installed between 2020 and 2022, booked a $50.2 million warranty expense for the quarter related to the shrinkback issue, and provided a range of potential loss related to the shrinkback issue of $59.7 million to $184.9 million. In reaction to these revelations, the price of Shoals' stock dropped $3.28 per share, or more than 20%, over the next two trading days, from a closing price of $16.23 per share on November 7, 2023 to a closing price of $12.95 per share on November 9, 2023, wiping out approximately $550 million in market capitalization.

If you purchased Shoals common stock during the Class Period and were damaged thereby, you are a member of the "Class" and may be able to seek appointment as lead plaintiff. If you wish to apply to be lead plaintiff, a motion on your behalf must be filed with the U.S. District Court for the Middle District of Tennessee no later than May 21, 2024. The lead plaintiff is a court-appointed representative for absent members of the Class. You do not need to seek appointment as lead plaintiff to share in any Class recovery in the Class Action. If you are a Class member and there is a recovery for the Class, you can share in that recovery as an absent Class member.

You may contact Marco A. Dueñas (mduenas@saxenawhite.com), an attorney at Saxena White P.A., to discuss your rights regarding the appointment of lead plaintiff or your interest in the Class Action. You also may retain counsel of your choice to represent you in the Class Action. You may obtain a copy of the Complaint and inquire about actively joining the Class Action at www.saxenawhite.com.

Saxena White P.A., with offices in Florida, New York, California, and Delaware, is a leading national law firm focused on prosecuting securities class actions and other complex litigation on behalf of injured investors. Currently serving as lead counsel in numerous securities fraud class actions nationwide, Saxena White has recovered billions of dollars on behalf of injured investors.

CONTACT INFORMATION
Marco A. Dueñas, Esq.
mduenas@saxenawhite.com
Saxena White P.A.
10 Bank Street, Suite 882
White Plains, New York 10606

Tel.: (914) 437-8551
Fax: (888) 631-3611
www.saxenawhite.com

# EXHIBIT B

# Saxena White P.A. Files New Securities Class Action Lawsuit

globenewswire.com/news-release/2024/05/09/2878395/0/en/Saxena-White-P-A-Files-New-Securities-Class-Action-Lawsuit-Against-Shoals-Technologies-Group-Inc-and-Related-Parties-Expanding-the-Claims-Asserted.html

Saxena White P.A.

BOCA RATON, Fla., May 08, 2024 (GLOBE NEWSWIRE) -- Saxena White P.A. has filed a securities class action lawsuit (the "Class Action") in the United States District Court for the Middle District of Tennessee against Shoals Technologies Group, Inc. ("Shoals" or the "Company") (NASDAQ: SHLS) and certain of its executive officers, directors, underwriters, Shoals' founder Dean Solon, and two companies controlled by Solon (collectively, "Defendants"). The Class Action asserts claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder on behalf of all persons and entities that purchased Shoals common stock between May 17, 2022 and November 7, 2023, inclusive (the "Class Period"), and were damaged thereby. Separately, the Class Action asserts claims under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act") on behalf of all persons and entities that purchased Shoals common stock pursuant, or traceable, or both to the Company's secondary public offering of common stock conducted on or about December 6, 2022 (the "SPO"), and were damaged thereby. A previous securities class action complaint filed by Saxena White P.A. against Shoals asserted only Exchange Act claims for the same Class Period. The Class Action filed by Saxena White P.A. is captioned: *Oklahoma Police Pension and Retirement System v. Shoals Technologies Group, Inc. et al.*, No. 3:24-cv-00580 (M.D. Tenn.).

Shoals, which is headquartered in Portland, Tennessee, purports to be a leading provider of electrical balance of systems ("EBOS") products used in generating solar power, among other uses. Throughout the Class Period, Defendants touted the Company's "focus on quality and reliability" with regard to its EBOS components, backed up by a warranty Shoals provided customers for its products. Shoals further highlighted that its products met "stringent quality requirements" and assured investors throughout the Class Period that its reported "Cost of Revenue" included costs related to product warranty liability. In connection with the SPO, Shoals filed a registration statement and prospectus with the SEC (the "SPO Materials"), which made similar representations. In reality, by no later than March 2022, Shoals learned of customers experiencing excessive pull back of wire insulation, or "shrinkback," in wire harnesses used in the EBOS products.

The Class Action alleges that, during the Class Period, the Exchange Act Defendants made materially false and misleading statements and failed to disclose material adverse facts about the Company's business, operations, and prospects in violation of the Exchange Act and SEC Rule 10b-5. Additionally, the Class Action alleges that the SPO Materials contained

inaccurate statements of material fact and failed to disclose significant, then-existing material events, trends, and uncertainties about the Company's business that Shoals had already been facing at the time of the SPO. Specifically, Defendants failed to disclose that: (1) Shoals did not deliver EBOS products that met the highest levels of quality and reliability; (2) Shoals had received reports of exposed copper conduit in EBOS wire harnesses in a large number of solar fields and was aware that a significant portion of its wire harnesses had defects; (3) Shoals would have to incur between $60 million to $185 million in costs to remediate the wire shrinkback issue; and (4) Shoals had understated its cost of revenue by millions of dollars. As a result, the Exchange Act Defendants' positive statements about the Company's financial guidance, business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times. Similarly, the SPO Materials contained material misrepresentations and omissions about Shoals' business, financial condition, and results of operations.

The truth was revealed after the close of markets on November 7, 2023. That day, Shoals filed its Quarterly Report on Form 10-Q for the third quarter of 2023 with the SEC and held an accompanying earnings call in which Defendants revealed that the wire shrinkback issue was far more severe than previously disclosed. Specifically, the Company reported that the shrinkback issue affected 30% of Shoals' harnesses installed between 2020 and 2022, booked a $50.2 million warranty expense for the quarter related to the shrinkback issue, and provided a range of potential loss related to the shrinkback issue of $59.7 million to $184.9 million. In reaction to these revelations, the price of Shoals' stock dropped $3.28 per share, or more than 20%, over the next two trading days, from a closing price of $16.23 per share on November 7, 2023 to a closing price of $12.95 per share on November 9, 2023, wiping out approximately $550 million in market capitalization. Since the SPO, the value of Shoals common stock shares has declined substantially from the SPO price of $22.25 per share to $7.51 per share on May 8, 2024 (a 66% decline), the date the Class Action was filed.

If you: (1) purchased Shoals common stock during the Class Period and were damaged thereby, or (2) purchased Shoals common stock pursuant and/or traceable to the SPO and were damaged thereby, you are a member of the "Class" and may be able to seek appointment as lead plaintiff. If you wish to apply to be lead plaintiff, a motion on your behalf must be filed with the U.S. District Court for the Middle District of Tennessee no later than May 21, 2024. The lead plaintiff is a court-appointed representative for absent members of the Class. You do not need to seek appointment as lead plaintiff to share in any Class recovery in the Class Action. If you are a Class member and there is a recovery for the Class, you can share in that recovery as an absent Class member.

You may contact Marco A. Dueñas (mduenas@saxenawhite.com), an attorney at Saxena White P.A., to discuss your rights regarding the appointment of lead plaintiff or your interest in the Class Action. You also may retain counsel of your choice to represent you in the Class

Action. You may obtain a copy of the Complaint and inquire about actively joining the Class Action at www.saxenawhite.com.

Saxena White P.A., with offices in Florida, New York, California, and Delaware, is a leading national law firm focused on prosecuting securities class actions and other complex litigation on behalf of injured investors. Currently serving as lead counsel in numerous securities class actions nationwide, Saxena White has recovered billions of dollars on behalf of injured investors.

CONTACT INFORMATION
Marco A. Dueñas, Esq.
mduenas@saxenawhite.com
Saxena White P.A.
10 Bank Street, Suite 882
White Plains, New York 10606
Tel.: (914) 437-8551
Fax: (888) 631-3611
www.saxenawhite.com

# EXHIBIT C

# Robbins Geller Rudman & Dowd LLP Files

globenewswire.com/news-release/2024/05/15/2882710/0/en/SHLS-INVESTOR-ALERT-Robbins-Geller-Rudman-Dowd-LLP-Files-Class-Action-Lawsuit-Against-Shoals-Technologies-Group-Inc-and-Announces-Opportunity-for-Investors-with-Substantial-Losses-.html

Robbins Geller Rudman & Dowd LLP

SAN DIEGO, May 15, 2024 (GLOBE NEWSWIRE) -- **Robbins Geller Rudman & Dowd LLP** announces that purchasers of Shoals Technologies Group, Inc. (NASDAQ: SHLS) Class A common stock between January 27, 2021 and May 7, 2024, inclusive (the "Class Period") including purchases directly in Shoals' December 2022 secondary public offering of Class A common stock (the "SPO") have until May 21, 2024 to seek appointment as lead plaintiff of the *Shoals* class action lawsuit. Captioned *Kissimmee Utility Authority Employees' Retirement Plan v. Shoals Technologies Group, Inc.*, No. 24-cv-00598 (M.D. Tenn.), the *Shoals* class action lawsuit charges Shoals, certain of Shoals' current and former executives and directors, and underwriters of the SPO with violations of the Securities Act of 1933 and/or the Securities Exchange Act of 1934. A previously filed complaint is captioned *Westchester Putnam Counties Heavy & Highway Laborers Local 60 Benefits Fund v. Shoals Technologies Group, Inc.*, No. 24-cv-00334 (M.D. Tenn.).

**If you suffered substantial losses and wish to serve as lead plaintiff of the *Shoals* class action lawsuit, please provide your information here:**

**https://www.rgrdlaw.com/cases-shoals-technologies-group-inc-class-action-lawsuit-shls.html**

**You can also contact attorneys J.C. Sanchez or Jennifer N. Caringal of Robbins Geller by calling 800/449-4900 or via e-mail at info@rgrdlaw.com. Lead plaintiff motions for the *Shoals* class action lawsuit must be filed with the court no later than May 21, 2024.**

**CASE ALLEGATIONS**: Shoals is a provider of electrical balance of systems solutions used in solar, storage, and electrical vehicle charging infrastructure.

The *Shoals* class action lawsuit alleges that defendants throughout the Class Period made false and/or misleading statements and/or failed to disclose that: (i) between 2020 and the end of 2022, Shoals had installed defective wires at approximately 300 sites impacting approximately 30% of all wire harnesses manufactured by Shoals during this time period; (ii) as a result, Shoals was facing tens of millions of dollars in shrinkback warranty liabilities; (iii) Shoals had not booked a sufficient warranty expense provision to cover the remediation costs for the shrinkback issue; (iv) Shoals' historical reported revenue, gross profit, and net income had been generated in substantial part through the sale of defective products posing a risk of injury, death, and fire damage to Shoals' customers; (v) Shoals' ability to competitively differentiate its products through representations regarding the reliability,

safety, and quality of its offerings had become materially impaired; (vi) several of Shoals' customers had expressed concerns regarding Shoals' defective wiring given the attendant risks of serious injury or death, fires, property damage, and increased governmental scrutiny; (vii) consequently, Shoals' business and operations were acutely exposed to material, undisclosed risks of reputational harm and negative impacts to Shoals' business, financial results, and prospects; and (viii) Shoals' sale of defective wire harnesses had negatively impacted Shoals' sales, customer relationships, and financial results and that defendants' representations regarding Shoals' business, sales, and prospects were materially misleading.

On August 1, 2023, Shoals revealed that it was recording a $9.4 million warranty expense primarily due to the shrinkback insulation issue. As a result, Shoals reported that its quarterly second quarter of 2023 gross profit margin had declined sequentially to 42.4% from approximately 46% reported in the prior quarter. On this news, the price of Shoals Class A common stock fell approximately 6%.

Then, on November 7, 2023, Shoals disclosed that its shrinkback warranty expenses had ballooned in the third quarter of 2023 to more than $50 million – representing a greater than five-fold increase. As a result, Shoals' quarterly gross profit had declined more than 60% to $14 million from $36 million in the prior year quarter and Shoals suffered a net loss of $10 million in the quarter compared to net income of $13 million in the prior year period. On this news, the price of Shoals Class A common stock fell approximately 20% over two trading sessions.

Thereafter, on February 28, 2024, Shoals revealed that growth in its backlog and awarded orders had materially deteriorated in the fourth quarter of 2023, falling sequentially by $2 million to $631.3 million, down from $633.3 million in the prior quarter. In addition, Shoals issued quarterly revenue guidance of $90 million to $100 million, revealing that quarterly revenue was projected to decline sequentially by more than $35 million at the midpoint of the range. Shoals also provided 2024 annual revenue guidance of $480 to $520 million, which at the midpoint was approximately 19% below consensus analyst estimates of approximately $620 million. On this news, the price of Shoals Class A common stock fell more than 16%.

Finally, on May 7, 2024, Shoals disclosed that its backlog and awarded orders had fallen more than $16 million on a sequential basis to $615.2 million in the first quarter of 2024. Shoals also lowered its 2024 annual revenue guidance by 7% at the midpoint to a range of $440 million to $490 million. On this news, the price of Shoals Class A common stock fell nearly 15%, further damaging investors.

The plaintiff is represented by Robbins Geller, which has **extensive experience** in prosecuting investor class actions including actions involving financial fraud. You can view a copy of the complaint **by clicking here**.

**THE LEAD PLAINTIFF PROCESS**: The Private Securities Litigation Reform Act of 1995 permits any investor who purchased Shoals Class A common stock during the Class Period, including purchases directly in the SPO, to seek appointment as lead plaintiff in the *Shoals* class action lawsuit. A lead plaintiff is generally the movant with the greatest financial interest in the relief sought by the putative class who is also typical and adequate of the putative class. A lead plaintiff acts on behalf of all other class members in directing the *Shoals* class action lawsuit. The lead plaintiff can select a law firm of its choice to litigate the *Shoals* class action lawsuit. An investor's ability to share in any potential future recovery is not dependent upon serving as lead plaintiff of the *Shoals* class action lawsuit.

**ABOUT ROBBINS GELLER**: Robbins Geller Rudman & Dowd LLP is one of the world's leading complex class action firms representing plaintiffs in securities fraud cases. The Firm was ranked #1 on the ISS Securities Class Action Services Top 50 Report for recovering more than $1.75 billion for investors in 2022 – the third year in a row Robbins Geller topped the list. And in those three years alone, Robbins Geller recovered nearly $5.3 billion for investors, more than double the amount recovered by any other plaintiffs' firm. With 200 lawyers in 10 offices, Robbins Geller is one of the largest plaintiffs' firms in the world and the Firm's attorneys have obtained many of the largest securities class action recoveries in history, including the largest securities class action recovery ever – $7.2 billion – in *In re Enron Corp. Sec. Litig*. Please visit the following page for more information:

**https://www.rgrdlaw.com/services-litigation-securities-fraud.html**

Attorney advertising.
Past results do not guarantee future outcomes.
Services may be performed by attorneys in any of our offices.

Contact:
Robbins Geller Rudman & Dowd LLP
J.C. Sanchez, Jennifer N. Caringal
655 W. Broadway, Suite 1900, San Diego, CA 92101
800-449-4900
**info@rgrdlaw.com**

# EXHIBIT D

Case 3:24-cv-00334 Document 123-4 Filed 06/04/24 Page 240 of 420 PageID #5244

## PLAINTIFF'S CERTIFICATION
## PURSUANT TO FEDERAL SECURITIES LAWS

The undersigned, Winfried Buchbauer and Magdalena Reischl, on behalf of Erste Asset Management GmbH ("Erste AM"), on account of its funds listed in Schedule A (the "Funds"), declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1.     We have reviewed a complaint against Shoals Technologies Group, Inc. ("Shoals").

2.     We are duly authorized to institute legal action on behalf of Erste AM and the Funds, including litigation against Shoals and any other defendants.

3.     Erste AM and the Funds did not purchase or sell the security that is the subject of this litigation at the direction of plaintiff's counsel or in order to participate in any private action under the federal securities laws.

4.     Erste AM is willing to serve as lead plaintiff and understands that a lead plaintiff is a representative party who acts on behalf of other class members in directing the action, and whose duties may include testifying at deposition and trial.  Erste AM also understands that it is subject to the jurisdiction of the Court and will be bound by all rulings of the Court, including rulings regarding any judgments.

5.     Erste AM will not accept any payment for serving as a representative party beyond the Funds' *pro rata* share of any recovery, except reasonable costs and expenses, such as lost wages and travel expenses, directly related to the class representation, as ordered or approved by the Court.

6.     Erste AM has not sought to serve as a lead plaintiff or representative party on behalf of a class in any action under the federal securities laws filed during the three-year period preceding the date of this Certification, except as detailed below:

   *Theodore v. PureCycle Technologies, Inc. et al.*, No. 6:21-cv-00809 (M.D. Fla. July 12, 2021); and

   *Plymouth County Retirement Association v. Array Technologies, Inc. et al.*, No. 1:21-cv-04390 (S.D.N.Y. July 13, 2021).

7.     Erste AM understands that this is not a claim form, and that the Funds' ability to share in any recovery as a member of the class is unaffected by Erste AM's decision to serve as a representative party.

8.     Attached hereto as Schedule A is a complete listing of all transactions the Funds made during the Class Period in the security that is the subject of this litigation.  Erste AM will provide records of those transactions upon request.

9.     Erste AM is also represented and counseled in this matter by its attorney, Deborah M. Sturman of Sturman LLC.

We declare under penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct to the best of our knowledge, information and belief.

Executed this 14th day of May, 2024.

For Erste Asset Management GmbH:


Winfried Buchbauer
Managing Director

Magdalena Reischl
Head of Legal

## Schedule A

### Erste Asset Management GmbH

### Shoals Technologies Group, Inc. (SHLS)

Class Period: 01/27/2021 - 05/07/2024

|  | | Date | Shares | Price |
|---|---|---|---|---|
| **ERSTE GREEN INVEST** | | | | |
| | Purchases: | 5/21/2021 | 100,000.00 | 24.45 |
| | | 5/28/2021 | 9,600.00 | 27.60 |
| | | 6/10/2021 | 55,000.00 | 29.99 |
| | | 7/8/2021 | 3,270.00 | 35.66 |
| | | 7/13/2021 | 3,900.00 | 32.00 |
| | | 7/23/2021 | 3,990.00 | 27.46 |
| | | 9/13/2021 | 8,000.00 | 31.48 |
| | | 9/28/2021 | 17,380.00 | 28.68 |
| | | 10/11/2021 | 10,800.00 | 28.90 |
| | | 11/4/2021 | 8,140.00 | 32.41 |
| | | 11/30/2021 | 8,620.00 | 29.23 |
| | | 12/17/2021 | 41,230.00 | 26.17 |
| | | 12/20/2021 | 2,610.00 | 24.39 |
| | | 12/20/2021 | 19,400.00 | 24.44 |
| | | 12/29/2021 | 2,610.00 | 24.17 |
| | | 2/3/2022 | 30,000.00 | 15.96 |
| | | 3/11/2022 | 95,000.00 | 17.96 |
| | | 4/20/2022 | 38,500.00 | 12.91 |
| | | 5/8/2023 | 60,689.00 | 20.04 |
| | | 10/3/2023 | 8,801.00 | 16.51 |
| | | 10/4/2023 | 5,307.00 | 15.71 |
| | | 10/9/2023 | 38,337.00 | 15.27 |
| | | 1/2/2024 | 50,803.00 | 15.86 |
| | | 1/10/2024 | 65,002.00 | 13.88 |
| | | 1/17/2024 | 36,177.00 | 13.25 |
| | | 3/26/2024 | 61,664.00 | 11.71 |
| | | 4/2/2024 | 26,604.00 | 10.87 |
| | | 4/16/2024 | 74,659.00 | 8.56 |
| | Sales: | 8/20/2021 | -30,000.00 | 30.19 |

|  |  | Date | Shares | Price |
|---|---|---|---|---|
|  |  | 8/1/2022 | -60,637.00 | 21.22 |
|  |  | 1/22/2024 | -13,641.00 | 14.20 |
|  |  | 2/15/2024 | -6,200.00 | 16.55 |
|  |  | 3/4/2024 | -10,540.00 | 12.89 |

**ERSTE GREEN INVEST MIX**

|  |  | Date | Shares | Price |
|---|---|---|---|---|
|  | Purchases: | 5/21/2021 | 26,600.00 | 24.39 |
|  |  | 6/10/2021 | 18,500.00 | 30.02 |
|  |  | 7/14/2021 | 4,000.00 | 28.41 |
|  |  | 7/16/2021 | 5,000.00 | 27.11 |
|  |  | 9/28/2021 | 5,200.00 | 28.19 |
|  |  | 10/5/2021 | 5,400.00 | 27.67 |
|  |  | 10/28/2021 | 12,000.00 | 29.40 |
|  |  | 1/18/2022 | 23,000.00 | 18.83 |
|  |  | 1/19/2022 | 32,000.00 | 17.52 |
|  |  | 10/9/2023 | 42,000.00 | 15.24 |
|  | Sales: | 8/7/2023 | -37,000.00 | 21.99 |

**ERSTE RESPONSIBLE STOCK AMERICA**

|  |  | Date | Shares | Price |
|---|---|---|---|---|
|  | Purchases: | 6/18/2021 | 20,000.00 | 30.97 |
|  |  | 10/22/2021 | 12,000.00 | 25.93 |
|  |  | 3/16/2022 | 20,000.00 | 19.24 |
|  |  | 6/29/2022 | 3,600.00 | 15.12 |
|  |  | 7/20/2022 | 1,949.00 | 18.66 |
|  |  | 7/21/2022 | 6,681.00 | 18.54 |
|  |  | 8/10/2022 | 2,200.00 | 26.62 |
|  |  | 10/11/2022 | 3,400.00 | 22.15 |
|  |  | 6/13/2023 | 3,000.00 | 25.50 |
|  | Sales: | 8/25/2022 | -10,000.00 | 25.84 |

**ERSTE RESPONSIBLE STOCK GLOBAL**

|  |  | Date | Shares | Price |
|---|---|---|---|---|
|  | Purchases: | 6/18/2021 | 40,000.00 | 30.98 |
|  |  | 11/4/2021 | 12,000.00 | 32.75 |

|  | Date | Shares | Price |
|---|---|---|---|
|  | 1/25/2022 | 35,000.00 | 14.90 |
|  | 5/11/2022 | 45,000.00 | 10.74 |
|  | 7/21/2022 | 5,199.00 | 18.55 |
|  | 8/10/2022 | 4,600.00 | 26.62 |
|  | 10/11/2023 | 50,000.00 | 17.60 |
| Sales: | 9/13/2021 | -4,800.00 | 32.05 |
|  | 9/22/2022 | -20,000.00 | 21.18 |

**ERSTE WWF STOCK ENVIRONMENT**

|  | Date | Shares | Price |
|---|---|---|---|
| Purchases: | 5/24/2021 | 250,000.00 | 24.88 |
|  | 6/10/2021 | 25,000.00 | 30.03 |
|  | 6/16/2021 | 25,000.00 | 30.00 |
|  | 6/18/2021 | 55,200.00 | 31.18 |
|  | 6/25/2021 | 40,000.00 | 32.32 |
|  | 7/14/2021 | 40,000.00 | 28.91 |
|  | 9/13/2021 | 50,000.00 | 32.07 |
|  | 11/10/2021 | 35,000.00 | 28.71 |
|  | 12/16/2021 | 54,300.00 | 26.22 |
|  | 12/20/2021 | 3,300.00 | 23.91 |
|  | 12/29/2021 | 17,019.00 | 23.91 |
|  | 1/3/2022 | 14,981.00 | 23.91 |
|  | 1/14/2022 | 20,000.00 | 21.17 |
|  | 1/21/2022 | 50,000.00 | 16.28 |
|  | 1/24/2022 | 30,000.00 | 14.21 |
|  | 1/26/2022 | 14,020.00 | 15.37 |
|  | 1/26/2022 | 14,020.00 | 15.81 |
|  | 1/27/2022 | 30,000.00 | 13.60 |
|  | 2/3/2022 | 25,000.00 | 15.98 |
|  | 3/11/2022 | 160,000.00 | 17.96 |
|  | 3/15/2022 | 50,000.00 | 17.53 |
|  | 12/16/2022 | 120,692.00 | 26.55 |
|  | 12/29/2022 | 47,576.00 | 24.87 |
|  | 1/25/2023 | 49,894.00 | 27.97 |
|  | 5/8/2023 | 59,027.00 | 20.03 |

| | Date | Shares | Price |
|---|---|---|---|
| | 8/24/2023 | 35,967.00 | 20.53 |
| | 10/3/2023 | 17,803.00 | 16.43 |
| | 10/3/2023 | 13,456.00 | 16.46 |
| | 10/4/2023 | 10,261.00 | 15.84 |
| | 10/5/2023 | 18,870.00 | 15.66 |
| | 10/6/2023 | 14,878.00 | 15.02 |
| | 10/12/2023 | 33,255.00 | 17.11 |
| | 10/23/2023 | 27,251.00 | 15.42 |
| | 11/8/2023 | 18,203.00 | 14.78 |
| | 11/9/2023 | 18,512.00 | 13.18 |
| | 1/3/2024 | 80,532.00 | 14.57 |
| | 1/17/2024 | 32,722.00 | 13.22 |
| | 1/19/2024 | 45,496.00 | 13.19 |
| | 3/1/2024 | 54,503.00 | 13.44 |
| | 3/19/2024 | 45,177.00 | 11.77 |
| | 4/2/2024 | 41,200.00 | 10.85 |
| Sales: | 8/20/2021 | -82,311.00 | 30.70 |
| | 8/23/2021 | -17,689.00 | 31.35 |
| | 11/26/2021 | -4,850.00 | 29.33 |
| | 12/15/2021 | -9,880.00 | 25.84 |
| | 8/1/2022 | -154,931.00 | 21.77 |
| | 6/16/2023 | -15,715.00 | 26.11 |
| | 1/12/2024 | -11,610.00 | 13.87 |
| | 2/15/2024 | -5,000.00 | 16.54 |
| | 2/29/2024 | -13,560.00 | 13.00 |
| | 3/13/2024 | -10,250.00 | 12.16 |
| | 4/18/2024 | -11,120.00 | 8.14 |

# EXHIBIT E

# Shoals Technologies Group, Inc. (SHLS)
## Erste Asset Management GmbH

**Class Period: 1/27/2021 - 5/7/2024**  **Hold Price: $ 6.9917**

| ERSTE GREEN INVEST | | | | |
|---|---|---|---|---|
| Transaction Type | Date | Quantity | Price[a] | Amount |
| Purchase | 5/21/2021 | 100,000 | $ 24.4450 | ($ 2,444,504.60) |
| Purchase | 5/28/2021 | 9,600 | $ 27.6027 | ($ 264,986.22) |
| Purchase | 6/10/2021 | 55,000 | $ 29.9861 | ($ 1,649,237.59) |
| Purchase | 7/8/2021 | 3,270 | $ 35.6609 | ($ 116,611.00) |
| Purchase | 7/13/2021 | 3,900 | $ 32.0038 | ($ 124,815.00) |
| Purchase | 7/23/2021 | 3,990 | $ 27.4606 | ($ 109,567.84) |
| Sale | 8/20/2021 | (30,000) | $ 30.1895 | $ 905,684.64 |
| Purchase | 9/13/2021 | 8,000 | $ 31.4766 | ($ 251,813.15) |
| Purchase | 9/28/2021 | 17,380 | $ 28.6832 | ($ 498,513.91) |
| Purchase | 10/11/2021 | 10,800 | $ 28.8976 | ($ 312,094.02) |
| Purchase | 11/4/2021 | 8,140 | $ 32.4056 | ($ 263,781.39) |
| Purchase | 11/30/2021 | 8,620 | $ 29.2310 | ($ 251,970.90) |
| Purchase | 12/17/2021 | 41,230 | $ 26.1655 | ($ 1,078,803.57) |
| Purchase | 12/20/2021 | 19,400 | $ 24.4405 | ($ 474,145.70) |
| Purchase | 12/20/2021 | 2,610 | $ 24.3944 | ($ 63,669.32) |
| Purchase | 12/29/2021 | 2,610 | $ 24.1695 | ($ 63,082.30) |
| Purchase | 2/3/2022 | 30,000 | $ 15.9615 | ($ 478,844.70) |
| Purchase | 3/11/2022 | 95,000 | $ 17.9556 | ($ 1,705,782.00) |
| Purchase | 4/20/2022 | 38,500 | $ 12.9068 | ($ 496,911.80) |
| Sale | 8/1/2022 | (60,637) | $ 21.2151 | $ 1,286,420.02 |
| Purchase | 5/8/2023 | 60,689 | $ 20.0360 | ($ 1,215,964.80) |
| Purchase | 10/3/2023 | 8,801 | $ 16.5147 | ($ 145,345.52) |
| Purchase | 10/4/2023 | 5,307 | $ 15.7137 | ($ 83,392.73) |
| Purchase | 10/9/2023 | 38,337 | $ 15.2698 | ($ 585,398.32) |
| Purchase | 1/2/2024 | 50,803 | $ 15.8638 | ($ 805,930.97) |
| Purchase | 1/10/2024 | 65,002 | $ 13.8765 | ($ 902,000.25) |
| Purchase | 1/17/2024 | 36,177 | $ 13.2498 | ($ 479,338.77) |
| Sale | 1/22/2024 | (13,641) | $ 14.1967 | $ 193,656.99 |

| Sale | 2/15/2024 | (6,200) | $ 16.5507 | $ 102,614.39 |
| Sale | 3/4/2024 | (10,540) | $ 12.8874 | $ 135,833.01 |
| Purchase | 3/26/2024 | 61,664 | $ 11.7084 | ($ 721,986.78) |
| Purchase | 4/2/2024 | 26,604 | $ 10.8714 | ($ 289,222.27) |
| Purchase | 4/16/2024 | 74,659 | $ 8.5628 | ($ 639,290.09) |
| Net Proceeds of Transactions | | | | ($ 13,892,796.47) |
| Value of 765,075 retained shares @ $ 6.9917 per share | | | | $ 5,349,149.38 |
| (Loss)/Gain for ERSTE GREEN INVEST[b] | | | | ($ 8,543,647.09) |

| ERSTE GREEN INVEST MIX | | | | |
| --- | --- | --- | --- | --- |
| Transaction Type | Date | Quantity | Price[a] | Amount |
| Purchase | 5/21/2021 | 26,600 | $ 24.3900 | ($ 648,774.00) |
| Purchase | 6/10/2021 | 18,500 | $ 30.0200 | ($ 555,370.00) |
| Purchase | 7/14/2021 | 4,000 | $ 28.4100 | ($ 113,640.00) |
| Purchase | 7/16/2021 | 5,000 | $ 27.1100 | ($ 135,550.00) |
| Purchase | 9/28/2021 | 5,200 | $ 28.1900 | ($ 146,588.00) |
| Purchase | 10/5/2021 | 5,400 | $ 27.6700 | ($ 149,418.00) |
| Purchase | 10/28/2021 | 12,000 | $ 29.4000 | ($ 352,800.00) |
| Purchase | 1/18/2022 | 23,000 | $ 18.8300 | ($ 433,090.00) |
| Purchase | 1/19/2022 | 32,000 | $ 17.5200 | ($ 560,640.00) |
| Sale | 8/7/2023 | (37,000) | $ 21.9863 | $ 813,493.10 |
| Purchase | 10/9/2023 | 42,000 | $ 15.2395 | ($ 640,059.00) |
| Net Proceeds of Transactions | | | | ($ 2,922,435.90) |
| Value of 136,700 retained shares @ $ 6.9917 per share | | | | $ 955,760.83 |
| (Loss)/Gain for ERSTE GREEN INVEST MIX[b] | | | | ($ 1,966,675.07) |

| ERSTE RESPONSIBLE STOCK AMERICA | | | | |
| --- | --- | --- | --- | --- |
| Transaction Type | Date | Quantity | Price[a] | Amount |
| Purchase | 6/18/2021 | 20,000 | $ 30.9734 | ($ 619,468.92) |
| Purchase | 10/22/2021 | 12,000 | $ 25.9300 | ($ 311,160.00) |
| Purchase | 3/16/2022 | 20,000 | $ 19.2400 | ($ 384,800.00) |
| Purchase | 6/29/2022 | 3,600 | $ 15.1200 | ($ 54,432.00) |
| Purchase | 7/20/2022 | 1,949 | $ 18.6605 | ($ 36,369.31) |

| Purchase | 7/21/2022 | 6,681 | $ 18.5420 | ($ 123,879.03) |
| Purchase | 8/10/2022 | 2,200 | $ 26.6200 | ($ 58,564.00) |
| Sale | 8/25/2022 | (10,000) | $ 25.8386 | $ 258,385.76 |
| Purchase | 10/11/2022 | 3,400 | $ 22.1500 | ($ 75,310.00) |
| Purchase | 6/13/2023 | 3,000 | $ 25.5000 | ($ 76,500.00) |
| Net Proceeds of Transactions | | | | ($ 1,482,097.50) |
| Value of 62,830 retained shares @ $ 6.9917 per share | | | | $ 439,286.42 |
| (Loss)/Gain for ERSTE RESPONSIBLE STOCK AMERICA[b] | | | | ($ 1,042,811.09) |

| ERSTE RESPONSIBLE STOCK GLOBAL | | | | |
|---|---|---|---|---|
| Transaction Type | Date | Quantity | Price[a] | Amount |
| Purchase | 6/18/2021 | 40,000 | $ 30.9842 | ($ 1,239,368.00) |
| Sale | 9/13/2021 | (4,800) | $ 32.0500 | $ 153,840.00 |
| Purchase | 11/4/2021 | 12,000 | $ 32.7500 | ($ 393,000.00) |
| Purchase | 1/25/2022 | 35,000 | $ 14.9013 | ($ 521,545.50) |
| Purchase | 5/11/2022 | 45,000 | $ 10.7357 | ($ 483,106.50) |
| Purchase | 7/21/2022 | 5,199 | $ 18.5512 | ($ 96,447.50) |
| Purchase | 8/10/2022 | 4,600 | $ 26.6200 | ($ 122,452.00) |
| Sale | 9/22/2022 | (20,000) | $ 21.1818 | $ 423,636.74 |
| Purchase | 10/11/2023 | 50,000 | $ 17.5992 | ($ 879,960.00) |
| Net Proceeds of Transactions | | | | ($ 3,158,402.76) |
| Value of 166,999 retained shares @ $ 6.9917 per share | | | | $ 1,167,601.34 |
| (Loss)/Gain for ERSTE RESPONSIBLE STOCK GLOBAL[b] | | | | ($ 1,990,801.42) |

| ERSTE WWF STOCK ENVIRONMENT | | | | |
|---|---|---|---|---|
| Transaction Type | Date | Quantity | Price[a] | Amount |
| Purchase | 5/24/2021 | 250,000 | $ 24.8793 | ($ 6,219,837.00) |
| Purchase | 6/10/2021 | 25,000 | $ 30.0310 | ($ 750,774.68) |
| Purchase | 6/16/2021 | 25,000 | $ 29.9995 | ($ 749,987.90) |
| Purchase | 6/18/2021 | 55,200 | $ 31.1784 | ($ 1,721,045.86) |
| Purchase | 6/25/2021 | 40,000 | $ 32.3239 | ($ 1,292,954.20) |
| Purchase | 7/14/2021 | 40,000 | $ 28.9086 | ($ 1,156,345.84) |
| Sale | 8/20/2021 | (82,311) | $ 30.7040 | $ 2,527,273.73 |

| | | | | |
|---|---|---|---|---|
| Sale | 8/23/2021 | (17,689) | $ 31.3523 | $ 554,591.65 |
| Purchase | 9/13/2021 | 50,000 | $ 32.0655 | ($ 1,603,275.80) |
| Purchase | 11/10/2021 | 35,000 | $ 28.7121 | ($ 1,004,923.50) |
| Sale | 11/26/2021 | (4,850) | $ 29.3277 | $ 142,239.43 |
| Sale | 12/15/2021 | (9,880) | $ 25.8351 | $ 255,250.46 |
| Purchase | 12/16/2021 | 54,300 | $ 26.2157 | ($ 1,423,512.51) |
| Purchase | 12/20/2021 | 3,300 | $ 23.9100 | ($ 78,903.00) |
| Purchase | 12/29/2021 | 17,019 | $ 23.9100 | ($ 406,924.29) |
| Purchase | 1/3/2022 | 14,981 | $ 23.9093 | ($ 358,184.61) |
| Purchase | 1/14/2022 | 20,000 | $ 21.1676 | ($ 423,352.00) |
| Purchase | 1/21/2022 | 50,000 | $ 16.2818 | ($ 814,089.20) |
| Purchase | 1/24/2022 | 30,000 | $ 14.2126 | ($ 426,376.98) |
| Purchase | 1/26/2022 | 14,020 | $ 15.3660 | ($ 215,432.01) |
| Purchase | 1/26/2022 | 14,020 | $ 15.8125 | ($ 221,690.83) |
| Purchase | 1/27/2022 | 30,000 | $ 13.6029 | ($ 408,087.00) |
| Purchase | 2/3/2022 | 25,000 | $ 15.9771 | ($ 399,427.50) |
| Purchase | 3/11/2022 | 160,000 | $ 17.9556 | ($ 2,872,896.00) |
| Purchase | 3/15/2022 | 50,000 | $ 17.5329 | ($ 876,645.00) |
| Sale | 8/1/2022 | (154,931) | $ 21.7703 | $ 3,372,894.35 |
| Purchase | 12/16/2022 | 120,692 | $ 26.5543 | ($ 3,204,891.58) |
| Purchase | 12/29/2022 | 47,576 | $ 24.8674 | ($ 1,183,091.42) |
| Purchase | 1/25/2023 | 49,894 | $ 27.9676 | ($ 1,395,415.43) |
| Purchase | 5/8/2023 | 59,027 | $ 20.0285 | ($ 1,182,222.27) |
| Sale | 6/16/2023 | (15,715) | $ 26.1100 | $ 410,318.65 |
| Purchase | 8/24/2023 | 35,967 | $ 20.5346 | ($ 738,567.96) |
| Purchase | 10/3/2023 | 13,456 | $ 16.4559 | ($ 221,430.12) |
| Purchase | 10/3/2023 | 17,803 | $ 16.4265 | ($ 292,441.41) |
| Purchase | 10/4/2023 | 10,261 | $ 15.8377 | ($ 162,510.91) |
| Purchase | 10/5/2023 | 18,870 | $ 15.6573 | ($ 295,453.59) |
| Purchase | 10/6/2023 | 14,878 | $ 15.0177 | ($ 223,433.55) |
| Purchase | 10/12/2023 | 33,255 | $ 17.1078 | ($ 568,919.89) |
| Purchase | 10/23/2023 | 27,251 | $ 15.4189 | ($ 420,180.85) |
| Purchase | 11/8/2023 | 18,203 | $ 14.7765 | ($ 268,975.96) |

| | | | | |
|---|---|---|---|---|
| Purchase | 11/9/2023 | 18,512 | $ 13.1783 | ($ 243,956.15) |
| Purchase | 1/3/2024 | 80,532 | $ 14.5746 | ($ 1,173,721.69) |
| Sale | 1/12/2024 | (11,610) | $ 13.8678 | $ 161,005.10 |
| Purchase | 1/17/2024 | 32,722 | $ 13.2216 | ($ 432,637.29) |
| Purchase | 1/19/2024 | 45,496 | $ 13.1886 | ($ 600,027.82) |
| Sale | 2/15/2024 | (5,000) | $ 16.5425 | $ 82,712.51 |
| Sale | 2/29/2024 | (13,560) | $ 13.0000 | $ 176,280.00 |
| Purchase | 3/1/2024 | 54,503 | $ 13.4399 | ($ 732,514.87) |
| Sale | 3/13/2024 | (10,250) | $ 12.1589 | $ 124,628.54 |
| Purchase | 3/19/2024 | 45,177 | $ 11.7716 | ($ 531,805.57) |
| Purchase | 4/2/2024 | 41,200 | $ 10.8516 | ($ 447,087.57) |
| Sale | 4/18/2024 | (11,120) | $ 8.1395 | $ 90,511.18 |
| Net Proceeds of Transactions | | | | ($ 29,846,245.98) |
| Value of 1,451,199 retained shares @ $ 6.9917 per share | | | | $ 10,146,299.68 |
| (Loss)/Gain for ERSTE WWF STOCK ENVIRONMENT[b] | | | | ($ 19,699,946.31) |

| | |
|---|---|
| Grand Total for 5 Funds | |
| (Loss)/Gain[b] | ($ 33,243,880.97) |

[a] Any shares sold within 90 days after the end of the class period have been valued at the higher price between the actual sale price and the average closing price from the end of the class period to the date of the sale.

[b] Losses calculated on a last-in first-out (LIFO) basis.

# EXHIBIT F

Case 3:24-cv-00334 Document 128-6 Filed 06/21/24 Page 253 of 420 PageID #: 6757

**DECLARATION OF DR. LEOPOLD SPECHT**
**IN SUPPORT OF LEAD PLAINTIFF'S MOTION FOR CONSOLIDATION OF**
**RELATED ACTIONS, APPOINTMENT AS LEAD PLAINTIFF, AND APPROVAL OF**
**LEAD PLAINTIFF'S SELECTION OF LEAD COUNSEL**

## TABLE OF CONTENTS

I.     RETAINMENT AND SCOPE OF THIS DECLARATION...................................................3

II.    PERSONAL QUALIFICATIONS.............................................................................................3

III.   MATERIALS CONSIDERED ...................................................................................................3

IV.    LEGAL AUTHORITY OF AUSTRIAN MANAGEMENT COMPANIES IN GENERAL
       TO ACT ON BEHALF OF THE FUNDS THEY MANAGE............................................5

       A.    The authority of the Austrian fund management companies to make
             investment decisions on behalf of the fund they manage.......................................8

       B.    The Authority of the Management Company to Bring Suit on Behalf of the
             Funds ....................................................................................................................................9

V.     LEGAL AUTHORITY OF ERSTE ASSET MANAGEMENT GMBH TO MANAGE, TO
       TAKE INVESTMENT DECISIONS AND TO SUE ON BEHALF OF THE
       FOLLOWING FUNDS ...........................................................................................................11

       A.    Erste Responsible Stock America...........................................................................11

       B.    Erste Responsible Stock Global ..............................................................................11

       C.    Erste WWF Stock Environment ..............................................................................12

       D.    Erste Green Invest ......................................................................................................13

       E.    Erste Green Invest Mix.............................................................................................13

VI.    CONCLUSION ........................................................................................................................14

VII.   EXHIBITS ................................................................................................................................15

I, DR. LEOPOLD SPECHT, hereby declare as follows:

## I.     RETAINMENT AND SCOPE OF THIS DECLARATION

1.     I have been asked by the law firm of Motley Rice LLC to express my opinion as to whether, under applicable Austrian law, Erste Asset Management GmbH ("Erste AM") has the legal authority to bring suit on behalf of the following Funds:

-   Erste Responsible Stock America,
-   Erste Responsible Stock Global,
-   Erste WWF Stock Environment,
-   Erste Green Invest and
-   Erste Green Invest Mix

(all five collectively referred to as the "Funds") and, in particular, to express an opinion as to whether Erste AM has the legal authority to bring suit on behalf of these Funds in the United States to recover damages suffered by the Funds as a result of allegedly fraudulent action by Shoals Technologies Group, Inc. ("Shoals") and several other defendants. I have also been asked to express my opinion as to the extent to which Erste AM had the authority to make investment decisions on behalf of these Funds.

## II.    PERSONAL QUALIFICATIONS

2.     I am a partner of Specht & Partner Rechtsanwalt GmbH, a law firm licensed under Austrian law. I was admitted to the bar in Austria in 1990, and have specialized in International Contracts (Mergers and Acquisitions), International Arbitration, Finance, Corporate and Commercial Law. I graduated from the University of Vienna in 1981 (J.D. Law), and thereafter earned my masters (LL.M.) and doctoral (S.J.D.) degrees from Harvard Law School in 1988 and 1994, respectively. My detailed curriculum vitae is attached as Exhibit A to this declaration.

## III.   MATERIALS CONSIDERED

3.     I have examined the following documents in preparation of this Declaration:

(a)   Complaint against Shoals Technologies Group, Inc. dated 21 March 2024

(b)   Ruling on Motion for Class Certification against Alexion Pharmaceuticals, Inc. by the U.S. District Court for the District of Connecticut dated 23 April 2013

(c)   Firmenbuchauszug von Erste Asset Management GmbH vom 17.05.2024 mit aktuellen und historischen Daten (Excerpt from company register of Erste Asset Management GmbH with present and historical data dated 17 May 2024)

(d)   Jahresbericht 2022/23 Erste Green Invest – Miteigentumsfonds gemäß InvFG 2011 (Annual Report 2022/23 Erste Green Invest – Joint Ownership Fund according to InvFG 2011)

(e)   Jahresbericht 2022/23 Erste Green Invest Mix – Miteigentumsfonds gemäß InvFG 2011 (Annual Report 2022/23 Erste Green Invest Mix – Joint Ownership Fund according to

InvFG 2011)

(f) Jahresbericht 2022/23 Erste Responsible Stock America – Miteigentumsfonds gemäß InvFG 2011 (Annual Report 2022/23 Erste Responsible Stock America – Joint Ownership Fund according to InvFG 2011)

(g) Jahresbericht 2022/23 Erste Responsible Stock Global – Miteigentumsfonds gemäß InvFG 2011 (Annual Report 2022/23 Erste Responsible Stock Global – Joint Ownership Fund according to InvFG 2011)

(h) Jahresbericht 2022/23 Erste WWF Stock Environment – Miteigentumsfonds gemäß InvFG 2011 (Annual Report 2022/23 Erste WWF Stock Environment – Joint Ownership Fund according to InvFG 2011)

(i) Halbjahresbericht 2023 Erste Green Invest – Miteigentumsfonds gemäß InvFG 2011 (Semi-Annual Report 2023 Erste Green Invest – Joint Ownership Fund according to InvFG 2011)

(j) Halbjahresbericht 2023 Erste Green Invest Mix – Miteigentumsfonds gemäß InvFG 2011 (Semi-Annual Report 2023 Erste Green Invest Mix – Joint Ownership Fund according to InvFG 2011)

(k) Halbjahresbericht 2023 Erste Responsible Stock America – Miteigentumsfonds gemäß InvFG 2011 (Semi-Annual Report 2023 Erste Responsible Stock America – Joint Ownership Fund according to InvFG 2011)

(l) Halbjahresbericht 2023 Erste Responsible Stock Global – Miteigentumsfonds gemäß InvFG 2011 (Semi-Annual Report 2023 Erste Responsible Stock Global – Joint Ownership Fund according to InvFG 2011)

(m) Halbjahresbericht 2023 Erste WWF Stock Environment – Miteigentumsfonds gemäß InvFG 2011 (Semi-Annual Report 2023 Erste WWF Stock Environment – Joint Ownership Fund according to InvFG 2011)

(n) Informationen gemäß Art 10 Offenlegungsverordnung zu Erste Green Invest vom 31.01.2024 (Information according to Art 10 disclosure regulation on Erste Green Invest, dated 31 January 2024)

(o) Informationen gemäß Art 10 Offenlegungsverordnung zu Erste Green Invest Mix vom 15.03.2024 (Information according to Art 10 disclosure regulation on Erste Green Invest Mix, dated 15 March 2024)

(p) Informationen gemäß Art 10 Offenlegungsverordnung zu Erste Responsible Stock America vom 26.04.2024 (Information according to Art 10 disclosure regulation on Erste Responsible Stock America, dated 26 April 2024)

(q) Informationen gemäß Art 10 Offenlegungsverordnung zu Erste Responsible Stock Global vom 26.04.2024 (Information according to Art 10 disclosure regulation on Erste Responsible Stock Global, dated 26 April 2024)

(r) Informationen gemäß Art 10 Offenlegungsverordnung zu Erste WWF Stock Environment vom 29.03.2024 (Information according to Art 10 disclosure regulation on Erste WWF Stock Environment, dated 29 March 2024).

4.    The following Austrian and European laws were considered in this regard:

(a) Austrian Investment Fund Act (Investmentfondsgesetz or "InvFG", BGBl I Nr. 77/2011, last amended by BGBl. I Nr. 111/2023)

(b) Austrian Civil Code ("ABGB") (JGS Nr. 946/1811, last amended by BGBl I Nr. 33/2024)

(c) Austrian Banking Code (Bankwesengesetz) (BGBl I Nr. 532/1993, last amended by BGBl I Nr. 106/2023)

(d) Austrian Law regulating Real Estate Investment Funds (in German: Bundesgesetz über Immobilieninvestmentfondsgesetz - ImmoInvFG) (BGBl I Nr. 80/2003, last amended by BGBl I Nr. 112/2022)

(e) Austrian Code of Civil Procedure (Zivilprozessordnung – ZPO), (RGBl 113/1895, last amended by BGBl I Nr. 77/2023)

(f) Directive 2009/65/EC of the European Parliament and of the Council of 13 July 2009 ("Directive 2009/65/EC"), last amended by ABl. L 2023/2864 on the 20 December 2023.

## IV.  LEGAL AUTHORITY OF AUSTRIAN MANAGEMENT COMPANIES IN GENERAL TO ACT ON BEHALF OF THE FUNDS THEY MANAGE

5.    General legislation concerning investment funds was first enacted in Austria in 1963: The Austrian Investment Fund Act of 1963[1] ("InvFG 1963"). The InvFG 1963 already established the basic elements of the current legislation on funds: a fund is a portfolio of assets[2] which is divided into equal units evidenced by securities, which are referred to as "unit certificates". The portfolio of assets of a fund is jointly owned by the unit holders (investors; in the terminology of the InvFG 1963: "savers") of that fund. The fund is not a legal entity. It is not managed by and does not act through its own executive organs, such as a board of directors. Rather, the fund is managed by a management company[3], or "Fund Manager". Only the management company is entitled to dispose of the fund's assets and to exercise the rights resulting from these assets. In this context, the management company acts in its own name but on account of the unit holders (investors) as a whole.

6.    The law's intention is set forth in the explanatory notes to § 3 of InvFG 1963: *"Only the*

---

[1] In German: Investmentfondsgesetz 1963, abbreviated InvFG 1963.

[2] In German: "Vermögensmasse".

[3] In German: in InvFG 2011: "Verwaltungsgesellschaft"; in InvFG 1963: "Kapitalanlagegesellschaft" or "Investmentgesellschaft".

*investment company is entitled to dispose of the fund assets. <u>The unit-holders have neither individually nor jointly the right of disposal</u>; the appointment of a curator is also excluded. This ensures that the management of the fund assets is conducted by experts for the account of the savers, who lack time and usually also the necessary qualifications for such management. <u>The investment company exercises all rights arising from the fund assets</u> on the basis of being entrusted with the management as trustee of the savers. <u>No further legal acts are required to grant these rights</u> to the investment company.*" [emphasis added][4]

7.      The language of § 3 InvFG 1963 and the explanatory notes to the bill submitted by the government to the legislature, clarify that the management company holds the exclusive power to exercise all rights pertaining to the management of assets of funds. The unit holders have no such right, neither individually nor jointly. The explanatory notes furthermore underline that the management company's rights to manage the assets of funds are conferred by operation of law. No separate agreement between the management company and the investors to this effect must be entered into, or power of attorney granted. The government bill sets out its intention when conceiving of this structure: While the management company uses investment experts who are under the supervision of the appropriate regulatory authority, the investors typically lack time and in most cases the knowledge to make informed decisions.

8.      This structure – to entrust a management company with the right to dispose of a fund's assets and to confer all powers necessary to do so onto the management company – remained in place during later amendments of the law. In 1993, the legislature adopted InvFG 1993. As to the management and the right to dispose of a fund's assets, the structure set forth in InvFG 1963 remained unchanged: § 3 InvFG 1993 confers the right to exclusively dispose of the assets in an investment fund to the management company. The terminology remained largely unchanged. InvFG 1993 uses the term "*Kapitalanlagegesellschaft*" (capital investment company) for fund management companies, whereas the InvFG 2011 uses the term "*Verwaltungsgesellschaft*" (management company). § 3 InvFG 1993 defines, in its first part, the powers of the management company. This first part of § 3 InvFG 1993 remained unchanged. It contains the same wording as § 3 InvFG 1963.

9.      The current version of the law regulating investment funds and their activities is the Austrian Investment Fund Act of 2011[5] ("InvFG 2011"), which is based upon Directive 2009/65/EC of the European Parliament and of the Council of 13 July 2009 ("Directive 2009/65/EC") on the coordination of laws, regulations and administrative provisions relating to Undertakings for Collective Investment in Transferable Securities (UCITS = funds).

---

[4] Explanatory Notes to § 3 InvFG 1963 in German: "Über die Fondswerte kann nur die Investmentgesellschaft verfügen. Die Anteilinhaber haben weder einzeln noch gemeinsam das Verfügungsrecht; auch die Bestellung eines Kurators ist ausgeschlossen. Dadurch wird sichergestellt, dass die Verwaltung des Fondsvermögens durch Fachleute für Rechnung der Sparer, denen zur Verwaltung die Zeit und meist auch die erforderlichen Kenntnisse fehlen, besorgt wird. Die Investmentgesellschaft übt alle Rechte aus den Fondswerten aufgrund ihrer Betrauung mit der Verwaltung als Treuhänder der Investmentsparer aus. Es bedarf keiner weiteren Rechtshandlungen, um der Investmentgesellschaft diese Rechte einzuräumen".
[5] In German: Investmentfondsgesetz 2011.

10.    The most common form of the investment fund is now called "Undertaking for Collective Investment in Transferable Securities (UCITS)".[6]

11.    The current provision regulating the powers of the management company to manage the assets of UCITS is § 52 InvFG 2011. While the terminology has changed to a certain extent, the basic content of this provision remains the same, and provides the management company with a clear and broad mandate to manage the UCITS's assets and to exercise all rights resulting therefrom. This is to say a UCITS must act exclusively through its management company.

12.    In this context, the relevant section of the InvFG 2011 reads as follows (following the unofficial translation by the Austrian Association of Investment Companies[7]):

> *"Power of disposal over the assets of a UCITS*
>
> *§ 52 Only the management company shall be authorized to dispose over assets belonging to a UCITS managed by it and to exercise the rights in such assets; in doing so, the management company acts in its own name for the account of the unit holders. The management company [in this declaration also called the "Fund Manager"] shall safeguard the unit holders' interests, use the care and diligence of a prudent director within the meaning of Section 84 (1) of the [Austrian] Stock Corporation Act and observe the provisions of this federal act and the regulations adopted pursuant to this federal act as well as the Fund Rules".[8]* Therefore, the unit holder in a UCITS does not have the right to instruct or otherwise influence the management company with respect to the management of the assets pertaining to the UCITS.

13.    § 3 (2) 1 InvFG 2011 defines the term "management company" as applied throughout the InvFG. Accordingly, <u>a management company</u> (*Verwaltungsgesellschaft, Kapitalanlagegesellschaft*) <u>is an undertaking</u> in accordance with § 5 InvFG 2011 or Article 6 of Directive 2009/65/EC, <u>the regular business of which is the management of UCITS</u> (funds) in accordance with § 2 InvFG 2011, and, to the extent applicable, of Alternative Investment Funds, in accordance with § 3 InvFG 2011.

14.    § 52 InvFG 2011 sets forth the exclusive authority of the management company to dispose of the assets in an UCITS. This authority includes the authority, indeed the obligation, if such course of action is in the best interest of the unit holders and the fund, to pursue claims, such as the claims against Shoals. Such claims constitute assets of the UCITS (fund). The obligation results from the reference in § 52 InvFG 2011, to § 84 (1) of the Austrian Joint Stock Company Law (Aktiengesetz, AktG). § 84 (1) AktG stipulates the fiduciary obligation of the

---

[6] In German: "Organismus zur gemeinsamen Veranlagung in Wertpapieren (OGAW)".

[7] In German: "Vereinigung Österreichischer Investmentgesellschaften (VÖIG)."

[8] In German: Verfügungsrecht über das Vermögen des OGAW - § 52 InvFG 2011: Nur die Verwaltungsgesellschaft ist berechtigt, über die Vermögenswerte eines von ihr verwalteten OGAW zu verfügen und die Rechte an den Vermögenswerten auszuüben; sie handelt dabei im eigenen Namen auf Rechnung der Anteilinhaber. Sie hat die Interessen der Anteilinhaber zu wahren, die Sorgfalt eines ordentlichen Geschäftsleiters im Sinne von § 84 Abs. 1 AktG anzuwenden und die Bestimmungen dieses Bundesgesetzes und der auf der Grundlage dieses Bundesgesetzes erlassenen Verordnungen sowie die Fondsbestimmungen einzuhalten.

members of a management board of a joint stock company. The standard of care is the standard of a well-organized and conscientious director of a business. § 52 InvFG 2011 defines the authority of the management company as acting "*in its own name but for the account of the unit holders*" in the fund.

**A.      The authority of the Austrian fund management companies to make investment decisions on behalf of the fund they manage.**

15.      The authority of the management company, or Fund Manager, is regulated quite clearly in § 52 InvFG 2011. The comprehensive management of the funds' assets is the core task of the management company. It includes of course the devisal of an investment strategy, the making of individual investment decisions and their implementation (i.e. the buying and selling of specific assets). In doing so, the management company is bound by the provisions of the InvFG 2011 and the fund rules. The unit holders do not have a right to instruct, or otherwise exert any influence on, the management company, including with respect to investment decisions. The unit holders have the right to divest from the fund by selling their unit certificates.

16.      An authorization or the consent of the unit holders for any decision of the management company exercising its powers to manage the fund, is not required. The power of discretion of the management company is however subject to certain restrictions. The management company has, under § 52 InvFG, the duty to act in the best interest of the unit holders ("*to safeguard the unit holders' interests*"). Further, the management company has to meet the standard of a well-organized and conscientious director under § 84 (1) of the Austrian Stock Corporations' Act (*Aktiengesetz*). Said provision sets forth the standard of diligence owed by the managing directors of an Austrian joint stock corporation. Thereby the legislature implies that the management company is granted broad powers, as the managing directors of an Austrian joint stock company are in a position to act autonomously, not being bound by any directions of the shareholders.

17.      As to further statutory restrictions on investment decisions, §§ 74 through 79 InvFG 2011, provide for quantitative limitations to certain investments in order to avoid cluster risks. Further, according to § 80 InvFG 2011, the management company is not entitled – with certain limited exceptions – to take out a loan or to grant a loan on account of the fund (i.e. using the fund's assets). According to § 81 InvFG, the assets of the fund must not – with certain exceptions – be pledged or otherwise encumbered, or given in security or assigned. Further, according to § 82 InvFG, the management company must not carry out uncovered sales (short selling). Finally, §84 InvFG 2011 provides for certain limitations on securities lending. Some of these transactions are permitted, if the fund rules expressly allow for them. The rationale behind all these provisions is that certain potentially risky transactions shall either be prohibited at all, or permitted only if explicitly authorized in the fund rules.

18.      The fund rules (*Fondsbestimmungen*, see § 53 InvFG 2011) shall be drawn up by the management company, and must be approved by the Austrian Financial Market Authority (FMA). They must set forth, among other items, "*the principles according to which the*

*securities, money market instruments and liquid financial assets purchased for the fund are selected*".

19.     Therefore, it can be said that the management company has broad discretion to make investment decisions on behalf of an Austrian investment fund (or UCITS), under the InvFG 2011. The management company's discretion is limited only by the restrictions imposed by the InvFG 2011 itself and the general guidelines as laid down in the fund rules. A right of the unit holders to participate in investment decisions is not provided for in said act.

20.     The management company may mandate an agent to buy or sell certain assets, either in a given case or on an ongoing basis. However, such an agent would act in the name of the management company, and the agent's decisions would be treated as decisions of the management company. The management company has the power of discretion to mandate the agent, to give him specific instructions, and to terminate their cooperation. Therefore, the authority to make investment decisions for the fund, at least in the last instance, remains at all times with the management company. The acts of the agent are treated as acts of the management company, which is exercising its power of discretion through an agent. In any case, the unit holders of the fund are not involved in making decisions concerning the fund, including investment decisions.

**B.      The Authority of the Management Company to Bring Suit on Behalf of the Funds**

21.     The authority of the management company to dispose of the fund's assets is regulated in § 52 of the Austrian Investment Fund Act of 2011 ("InvFG 2011"), which states that only the management company is authorized to dispose of the assets of a fund (UCITS) and to exercise the rights to these assets; the management company acts in this context in its own name but on account of the unit holders.

22.     The wording of this provision confers the exclusive right to dispose of the assets pertaining to the fund and to exercise all rights relating to these assets upon the management company. This – verbatim – interpretation refers to the wording "*only the management company shall be authorized*"[9], and is further supported by the explanatory notes to the government bills to the Austrian Investment Fund Acts of 1963[10], 1993[11] and 2011[12], and by the commentaries to InvFG 2011[13].

---

[9] In German: "Nur die Verwaltungsgesellschaft ist berechtigt…".
[10] See recital 6, above, and footnote 3.
[11] See recital 19 and footnote 14, below.
[12] Explanatory notes to §52 InvFG 2011: "*Clarifies that only an externally managed UCITS [Undertakings for Collective Investments in Transferable Securities] is provided for under this Federal Act. The provision largely corresponds to the content of § 3 para 1 InvFG 1993*". In German: EB zu § 52 InvFG 2011: "Stellt klar, dass gemäß diesem Bundesgesetz nur ein fremdverwalteter OGAW vorgesehen ist. Die Bestimmung entspricht inhaltlich weitgehend § 3 Abs. 1 InvFG 1993".
[13] Leixner, InvFG 2011, first editon, § 52 InvFG. Leixner expressly states that the unit holders do not have any rights to dispose of assets. In German: "Keinerlei Dispositionsrechte habe die Anteilsinhaber"; *Berger in Bollenberger/ Kellner, first edition (2016) § 52 InvFG recitals 1 to 3; Buchbauer in Macher/*
(continued)

23.    The explanatory note to § 3 InvFG 1993, which corresponds to § 52 InvFG 2011, reads as follows:

*"Only the <u>investment company</u> is entitled to dispose of the assets held by the investment funds. <u>It alone can assert the rights arising from the fund assets.</u> The joint ownership of the unit-holders does <u>not</u> give them <u>any possibility whatsoever to influence the management of the assets.</u> The investment company exercises the rights arising from the fund assets as trustee for the account of the respective fund, being obliged to act in accordance with the statutory mandate and the fund rules. In managing the investment fund, the investment company shall be guided exclusively by the interests of the unit-holders and shall exert the diligence of a prudent and conscientious manager". [emphasis added]*[14]

24.    The right of the management company to bring suit is not specifically mentioned in the InvFG 2011, probably because investment litigation is quite rare in Austria. However, § 52 InvFG 2011 comprises the right to bring a suit for the fund, i.e. a suit concerning the fund's assets. Such legal actions are brought in the name of the management company, since the fund has no legal personality and therefore cannot be a party to Austrian court proceedings, but on account of the fund.

25.    While all commentaries to § 52 InvFG 2011 agree on the concept that the management company has exclusive powers to manage the fund assets, the question whether these powers include the power to bring legal action is addressed only in one paper published in a legal journal named *Österreichisches Bank Archiv* (*Austrian Bank Archive*). This paper, published in 2011 by *Kammel/Thierrichter*, analyzes the issue of standing in legal proceeding to the benefit of the unit holders in a fund:

*"According to the prevailing opinion, it is characteristic that the special assets [i.e. the fund] have no legal personality, from which follows, that they have no right of legal action, neither actively nor passively [i.e. neither to sue nor to be sued]. Since the entitlement or obligation of the special assets as the subject of a legal dispute does not exist, the <u>management company acts as an indirect representative, i.e. in its own name and for the account of the unit holders.</u> Thus, both <u>the active and passive right of legal action for the investment fund is vested in the management company</u> as the statutory representative".*[15] *[emphasis added]*

---

*Buchberger/ Kalss/ Oppitz, Kommentar zum InvFG, second edition (2013) recitals 7 to 13.*

[14] In German: Erläuternde Bemerkungen zu §3 InvFG 1993 – Finanzmarktanpassungsgesetz 1993: "Nur die Kapitalanlagegesellschaft ist über die in den Kapitalanlagefonds enthaltenen Vermögenswerte verfügungsberechtigt. Sie allein kann die Rechte aus den Fondswerten geltend machen. Das Miteigentum der Anteilinhaber gibt diesen keine wie immer geartete Einflussmöglichkeit auf die Verwaltung der Vermögenswerte. Die Kapitalanlagegesellschaft übt die Rechte aus den Fondswerten als Treuhänder für Rechnung des jeweiligen Fonds aus, wobei sie hiebei entsprechend dem gesetzlichen Auftrag und gemäß den Fondsbestimmungen vorzugehen hat. Die Kapitalanlagegesellschaft hat bei der Verwaltung der Kapitalanlagefonds ausschließlich die Interessen der Anteilinhaber zu vertreten und hiebei die Sorgfalt eines ordentlichen und gewissenhaften Geschäftsleiters anzuwenden".

[15] Kammel/Thierrichter, The concept of special assets against the background of investment fund law, ÖBA 2011, 237, Page 6. In German: Kammel/Thierrichter, Der Begriff des Sondervermögens vor einem (continued)

26.     One commentary[16] expressly mentions that the fund (UCITS) has no right to sue or be sued, and refers to the article by Kammel/Thierrichter in ÖBA, quoted above.

27.     Therefore, only the management company is entitled in its own name to sue or be sued regarding the fund's assets, whereas the fund (UCITS) itself, or its unit holders, have no such right.

## V.     LEGAL AUTHORITY OF ERSTE ASSET MANAGEMENT GMBH TO MANAGE, TO TAKE INVESTMENT DECISIONS AND TO SUE ON BEHALF OF THE FOLLOWING FUNDS

### A.  Erste Responsible Stock America

28.     Erste Responsible Stock America is a retail fund, more precisely a *"undertaking for collective investment in transferable securities (UCITS)"* under § 2 InvFG 2011. Its fund rules have been approved by the Austrian Financial Market Authority (FMA) and it was launched on 1 March 1990. It is an active fund. Its management company according to §§ 5 through 38 InvFG is Erste AM, which has its registered office in Vienna, Austria. The fund is therefore established under Austrian Law. Its depositary bank is Erste Group Bank AG, Vienna.

29.     Erste AM is, as the fund's management company, exclusively authorized to dispose over the fund's assets, to take all investment decisions, and to exercise all rights relating to the fund's assets (please see paras 5 through 19, above), including the right to sue or to be sued (please see paras 21 through 27, above). In this context, Erste AM acts in its own name, but on account of Erste Responsible Stock America.

30.     According to the fund rules, Erste Responsible Stock America invests at least 51 % of its assets in stocks from companies that are registered in America, listed on a securities exchange in America, or that are traded on a regularly operating securities market in America in the form of purchased individual instrument and that have been identified as providing a particular benefit to the environment and have been classified as sustainable.

### B.  Erste Responsible Stock Global

---

investmentfondsrechtlichen Hintergrund, ÖBA 2011, 237, Seite 6.

"Charakteristisch ist nach hM, dass dem Sondervermögen keine Rechtspersönlichkeit zukommt, was zur Folge hat, dass es weder aktiv noch passiv klagelegitimiert ist. Da somit die Berechtigung oder Verpflichtung des Sondervermögens als Gegenstand eines Rechtsstreits nicht gegeben ist, tritt die KAG als indirekter Stellvertreter, also im eigenen Namen und auf Rechnung der Anteilinhaber auf). Somit kommt die aktive wie auch passive Klagelegitimation für das Sondervermögen der KAG als gesetzlicher Vertreterin zu".

[16] Kalss in Macher/Buchberger/Kalss/Oppitz, Kommentar zum InvFG, 2013, 2nd edition.

31.    Erste Responsible Stock Global is a retail fund, more precisely a *"undertaking for collective investment in transferable securities (UCITS)"* under § 2 InvFG 2011. Its fund rules have been approved by the Austrian Financial Market Authority (FMA) and it was launched on 15 July 2003. It is an active fund. Its management company according to §§ 5 through 38 InvFG is Erste AM, which has its registered office in Vienna, Austria. The fund is therefore established under Austrian Law. Its depositary bank is Erste Group Bank AG, Vienna.

32.    Erste AM is, as the fund's management company, exclusively authorized to dispose over the fund's assets, to take all investment decisions, and to exercise all rights relating to the fund's assets (please see paras 5 through 19, above), including the right to sue or to be sued (please see paras 21 through 27, above). In this context, Erste AM acts in its own name, but on account of Erste Responsible Stock Global.

33.    According to the fund rules, Erste Responsible Stock Global invests at least 51% of its assets in stocks from companies around the world that have been identified as providing a particular benefit to the environment and have been classified as sustainable.

## C.  Erste WWF Stock Environment

34.    Erste WWF Stock Environment is a retail fund, more precisely a *"undertaking for collective investment in transferable securities (UCITS)"* under § 2 InvFG 2011. Its fund rules have been approved by the Austrian Financial Market Authority (FMA) and it was launched on 2 July 2001. It is an active fund. Its management company according to §§ 5 through 38 InvFG is Erste AM, which has its registered office in Vienna, Austria. The fund is therefore established under Austrian Law. Its depositary bank is Erste Group Bank AG, Vienna.

35.    Erste AM is, as the fund's management company, exclusively authorized to dispose over the fund's assets, to take all investment decisions, and to exercise all rights relating to the fund's assets (please see paras 5 through 19, above), including the right to sue or to be sued (please see paras 21 through 27, above). In this context, Erste AM acts in its own name, but on account of Erste WWF Stock Environment.

36.    According to the fund rules, Erste WWF Stock Environment invests at least 51% of its assets in stocks from companies that have been identified as providing a particular benefit to the environment and have been classified as sustainable.

## D. Erste Green Invest

37.    Erste Green Invest is a retail fund, more precisely a *"undertaking for collective investment in transferable securities (UCITS)"* under § 2 InvFG 2011. Its fund rules have been approved by the Austrian Financial Market Authority (FMA) and it was launched on 3 August 2020. It is an active fund. Its management company according to §§ 5 through 38 InvFG is Erste AM, which has its registered office in Vienna, Austria. The fund is therefore established under Austrian Law. Its depositary bank is Erste Group Bank AG, Vienna.

38.    Erste AM is, as the fund's management company, exclusively authorized to dispose over the fund's assets, to take all investment decisions, and to exercise all rights relating to the fund's assets (please see paras 5 through 19, above), including the right to sue or to be sued (please see paras 21 through 27, above). In this context, Erste AM acts in its own name, but on account of Erste Green Invest.

39.    According to the fund rules, Erste Green Invest invests at least 51% of its assets in stocks from companies that have been identified as providing a particular benefit to the environment and have been classified as sustainable.

## E. Erste Green Invest Mix

40.    Erste Green Invest Mix is a retail fund, more precisely a *"undertaking for collective investment in transferable securities (UCITS)"* under § 2 InvFG 2011. Its fund rules have been approved by the Austrian Financial Market Authority (FMA) and it was launched on 13 October 2020. It is an active fund. Its management company according to §§ 5 through 38 InvFG is Erste AM, which has its registered office in Vienna, Austria. The fund is therefore established under Austrian Law. Its depositary bank is Erste Group Bank AG, Vienna.

41.    Erste AM is, as the fund's management company, exclusively authorized to dispose over the fund's assets, to take all investment decisions, and to exercise all rights relating to the fund's assets (please see paras 5 through 19, above), including the right to sue or to be sued (please see paras 21 through 27, above). In this context, Erste AM acts in its own name, but on account of Erste Green Invest Mix.

42.    According to the fund rules, Erste Green Invest Mix invests at least 51% of its assets in stocks from companies that have been identified as providing a particular benefit to the environment and have been classified as sustainable.

## VI. CONCLUSION

43.      I have reviewed the documents referenced in recital 3 above. None of these materials contain any language that purports to limit in any way Erste AM's legal authority, as the management company of the Funds, to bring a lawsuit on behalf of said funds.

44.      Accordingly, based on the foregoing, it is my opinion that Erste AM has statutory authority and legal capacity to pursue this lawsuit on behalf of the Funds. The right to dispose of the assets of a UCITS includes the right to conduct legal proceedings in relation to all assets of the respective fund. Therefore, only Erste AM is entitled to initiate legal proceedings pertaining to the Funds' assets.

45.      Erste AM is the appropriate party to bring the lawsuit on behalf of the Funds.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and accurately sets forth my opinions on the matters discussed.

Vienna, 21 May 2024

_____

Dr. Leopold Specht, LL.M, SJ.D.
Specht &Partner Rechtsanwalt GmbH
Rooseveltplatz 4-5 / 8
A-1090 Vienna, Austria
T. + 43 1/219 68 69
leopold.specht@specht-partner.com

240521-49-24 Declaration of Dr. Specht          15

**EXHIBITS**

Exhibit A:          CV of Dr. Leopold Specht

**Exhibt ./A**

**to**

**DECLARATION OF DR. LEOPOLD SPECHT**

# Dr. Leopold Specht, LL.M. SJD

Rooseveltplatz 4-5/8
1090 Vienna, Austria
T: +43 1 / 219 68 69
leopold.specht@specht-partner.com

## AREAS OF EXPERTISE

- Mergers & Acquisitions
- Corporate Commercial Law
- Regulatory Compliance
- International Contract Law
- International Taxation
- International Arbitration

## PROFESSIONAL EXPERIENCE

*Specht & Partner Rechtsanwalt GmbH*
Managing Partner

*August 2001 - Present*
Vienna, Austria

*Law office of Dr. Leopold Specht*
Attorney at Law

*August 1993 – December 2001*
Vienna, Austria

## EDUCATION

*Harvard Law School*
S.J.D.

*June 1994*
Cambridge, MA, USA

*Harvard Law School*
LL.M.

*September 1987 – June 1988*
Cambridge, MA, USA

*University of Vienna*
J.D. Law

*September 1975 – March 1981*
Vienna, Austria

*University of Naples*
Chair of Comparative Legal Studies

*March 1980 – March 1981*
Naples, Italy

*University of Rome*

*October 1979 – February 1980*
Rome Italy

## LANGUAGES

- German
- English
- Russian
- Italian
- French

## PROFESSIONAL AND CIVIC ACTIVITIES

- Member of the Board of Directors of the Interdisciplinary Association of Comparative and Intercultural Law, Vienna (2009 to 2016)

Case 3:24-cv-00334 Document 32-6 Filed 06/04/24 Page 270 of 420 PageID #1824

- Vice-Chairman of the Supervisory Board of "Austro-Control GmbH" (Austrian state-owned air traffic controlling company) (2007-2018)

- Member of the Supervisory Board of "ÖBB Holding AG" (Austrian state-owned railroad company) (2007-2018)

- Member of the Austrian Constitutional Convention (2003 – 2004)

- Member of the Academic Council of the Institute of Global Law and Politics (former European Law Research Center), Harvard Law School, Cambridge, MA (since 1995)

- Member of the Austrian Bar Association (since 1991)

## EXPERIENCE AS ARBITRATOR

- Arbitrator at the International Court of Arbitration with the Chamber of Economics and Industry of the Russian Federation, Moscow: served as sole arbitrator, as chairman of arbitration panels and as arbitrator nominated by parties,

- Arbitrator with the ICC International Court of Arbitration, Paris, France: served as member of arbitration panels nominated by parties and as sole arbitrator

- Arbitrator with the International Arbitral Centre of the Austrian Federal Economic Chamber in Vienna: served as member of arbitration panels nominated by parties

- Arbitrator with the "Deutsches Institut für Schiedsgerichtsbarkeit" (DIS), Chairman

- Counsel and party representative in arbitration proceedings with the following institutional arbitrations:

  - ICSID: obtained the first arbitration award in sovereign arbitration against the Ukraine (2011)

  - International Arbitral Centre of the Austrian Federal Economic Chamber in Vienna

  - Arbitration Court of the Swiss Chambers' Arbitration Institution, Zurich, Switzerland

  - Arbitration Institute of the Finland Chamber of Commerce (FAI), Helsinki, Finland

  - Arbitration Institute of Stockholm Chamber of Commerce, Stockholm Sweden

  - London Court of International Arbitration, London, UK

  - ICC International Court of Arbitration, Paris, France

  - International Court of Arbitration with the Chamber of Commerce and Industry of the Russian Federation, Moscow, Russian Federation

  - Ad hoc arbitrations under Austrian law, Hungarian law, and the laws of England and Wales

3

**TEACHING**

- Harvard Law School, Cambridge, MA, USA; Institute for Global Law and Policy, Global Scholars Workshop in Doha, Bangkok, Madrid, Budapest, Stellenbosch (Legal Structure of Money; Institutional Framework of Global Capitalism; Jurisprudence of Finance; Law and Development) (since 2010)

- University of Turin, Italy, Faculty of Law, Visiting Professor (Jurisprudence of France) (since 2012)

- S.T.S. Summer School @ Harvard, Lecturer (2022)

- Academic Head of the "Laboratory for Law and Development", Higher School of Economics, Moscow, Russian Federation (2014 - 2021)

- Visiting Professor, Faculty of Law, Higher School of Economics, Moscow, Russian Federation (since 2014 - 2021)

- University of Perugia, Perugia, Italy, Comparative Law (2012)

- University of Turin, Turin, Italy, Law and Development, Post-Graduate Master Program (since 2008)

- Brown University, Watson Institute for International Relations, Providence, RI Visiting Professor, 2009, (Comparative Law; International Law; Legal Theory; Globalization)

- Summer Program for International and Comparative Business Law of the University of Economics of Vienna in cooperation with the Institute for Civil Law Legislation with the Administration of the President of the Russian Federation, Vienna, Austria (since 2007);

- University "La Sapienza", Rome, Italy (2004 - 2007), Visiting Professor (Comparative Law; International Law; Legal Theory; Globalization)

- University of Innsbruck, Austria (2003), Lecturer (Jurisprudence)

- Academy of Fine Arts, Vienna, Austria (2000-2002), Lecturer (Intellectual Property; Administrative Law)

- Northeastern University School of Law, Boston, MA (Autumn 1995), Visiting Professor (Public International Law)

- Harvard Law School, Cambridge, MA (1992-1994), Lecturer (Comparative Law)

- University of Innsbruck, Innsbruck, Austria (1989-1990), Lecturer (Legal Theory)

- University of Naples, Naples, Italy (1985), Visiting Professor (Comparative Law)

- Technical University of Vienna, Institute of Public Finance, Vienna, Austria (1984–1987) Lecturer (Legal Theory)

4

**PUBLICATIONS**

- Specht, Leopold: Europäische Sicherheitsarchitektur.  In: Heinz Gärtner (Hg.): die Ukraine im Krieg, ist Frieden möglich? Wien: LIT Verlag, 2022. p. 215ff.
- Specht, Leopold: *Redistribution and Entitlement: a Democratic Union*, In: Framing a New Progressive Narrative, Brussels, 2014
- Specht, Leopold: *Grenzen von Souveränität?* In: Michael Benedikt, Reinhold Knoll, Franz Schwediauer, Cornelius Zehetner (Hg.): Verdrängter Humanismus – verzögerte Aufklärung, Band VI, Philosophie in Österreich 1951 -2000, Wien, facultas.wuv 2010. S.215ff.
- Specht, Leopold: An Argument for Alternative Globalization. International Symposium on the International Legal Order. Theme 1: Economy, Prosperity, and Social Justice. In: Leiden Journal of International Law, Volume 16 (2003). S. 849ff;
- Specht, Leopold: *Property, Money and Transformation. An Anti-Necessitarian Prospective.* In: Hague Yearbook of International Law, Volume 13 (2000). S. 69ff;
- Specht, Leopold: Property as a Bundle of Rights. In: Kregel, Jan / Matzner, Egon / Percynski, Maciej: *After the Market Shock. Central and East-European Economies in Transition.* Aldershot et al.: Dartmouth 1994. S. 109ff;
- Kregel, Jan / Lushin, Andrei / Matzner, Egon / Specht, Leopold: The *Post-Shock Agenda. How to Make the Market – Forms of Property and Control.* In: Kregel, Jan / Matzner, Egon / Percynski, Maciej: After the Market Shock. Central and East-European Economies in Transition. Aldershot et al.: Dartmouth 1994. S. 109ff;
- Kennedy, Duncan / Specht, Leopold: *Limited Equity Housing Cooperatives as a Mode of Privatization.* In: Alexander, Gregory S. / Skapska, Grazyna (Hg.): A Fourth Way? Privatization, Property, and the Emergence of New Market Economies. New York-London: Routledge 1994. S. 267ff.
- Kennedy, David / Specht, Leopold: *Austrian Membership in the European Communities.* In: Harvard International Law Journal, Volume 31, Number 2 (1990). S. 407ff;
- Specht, Leopold: *Unbewaffnete Neutralität.* In: Dialog. Beiträge zur Friedensforschung, Band 19 (1990). S. 187ff;
- Specht, Leopold: *On the New Thinking. Legal Reform as Basis of Perestroika.* In: Quaderni, Numero 6 (1990). S. 129ff;
- Kennedy, David / Specht, Leopold: *Austria and the European Communities.* In: Common Market Law Review, Volume 26 (1989). S. 615ff;
- Specht, Leopold: *Das Recht als Steuerungsressource.* In: Kansainoikeus-Jus Gentium, Nummer 5 (1988). S. 162ff;
- Specht, Leopold: *Bemerkungen zur "Gehorsamsgrenze" im Recht.* In: Wiener Blätter zur Friedensforschung, Nummer 46/47 (1986). S. 62ff;
- Entacher, Edmund / Specht, Leopold: *Anmerkungen zum Konzept der Militärischen Landesverteidigung in Österreich.* In: Dialog. Beiträge zur Friedensforschung, Band 1 (1984). S. 152ff;
- Specht, Leopold: *Il Modello Austriaco di Difesa.* In: Accame, Falco et al.: Pace e Sicurezza. Problemi e Alternative. Mailand: Franco Angeli 1984. S. 191ff;

# EXHIBIT G

# SHAREHOLDER AND SECURITIES FRAUD RESUME



MotleyRice ®
LLC

# INTRODUCTION

**Founded as a trial lawyers' firm with a complex litigation focus by Ron Motley, Joe Rice and nearly 50 other lawyers, Motley Rice LLC has become one of the nation's largest plaintiffs' law firms.**

Motley Rice LLC ("Motley Rice") is led by lawyers who received their training and trial experience in complex litigation involving in-depth investigations, discovery battles and multi-week trials.

From asbestos and tobacco to counter-terrorism and human rights cases, Motley Rice attorneys have shaped developments in U.S. jurisprudence over several decades. Shareholder litigation has earned an increasing portion of our firm's focus in recent years as threats to global retirement security have increased. Motley Rice seeks to create a better, more secure future for pensioners, unions, government entities and institutional investors through improved corporate governance and accountability.

## APPROACH TO SECURITIES LITIGATION

As concerns about our global financial system have intensified, so has our focus on securities litigation as a practice area. As one presenter at the 2009 International Foundation of Employee Benefit Plans annual conference noted, "2008 likely will go down in history as one of the worst years for retirement security in the United States."

Our securities litigation philosophy is straightforward – obtain the best possible results for our clients and any class of investors we represent. Unlike some other firms, we are extremely selective about the cases that we recommend our clients pursue, recognizing that many securities fraud class action cases filed each year are unworthy of an institutional investor's involvement for a variety of reasons.

Our attorneys have substantial experience analyzing securities cases and advising institutional investor clients, whether to seek lead-plaintiff appointment (alone or with a similarly-minded group), remain an absent class member, or consider an opt-out case based on the particular factual and legal circumstances of the case.

When analyzing new filings, our attorneys draw upon their securities, business, and litigation experience, which is supplemented by our in-house team of paralegals and business analysts. In addition, the firm has developed close working relationships with widely-respected forensic accountants and expert witnesses, whose involvement at the earliest stages of complex cases can be critical to determining the best course of action. If Motley Rice believes that a case deserves an institutional investor's involvement, we provide our clients with a detailed written analysis of potential claims and loss-recoupment strategies.

Motley Rice attorneys have secured important corporate governance reforms and returned money to shareholders in shareholder derivative cases, served as lead or co-lead counsel in several significant, multi-million dollar securities fraud class actions, and taken leadership roles in cases involving fiduciaries who failed to maximize shareholder value and fulfill disclosure obligations in a variety of merger and acquisition cases.



# OUR BACKGROUND IN COMPLEX LITIGATION

Motley Rice attorneys have been at the forefront of some of the most significant and monumental civil actions over the last 30 years. Our experience in complex trial litigation includes class actions and individual cases involving securities and consumer fraud, occupational disease and toxic tort, medical drugs and devices, environmental damage, terrorist attacks and human rights abuses.

## Tobacco Master Settlement Agreement

In the 1990s, Motley Rice attorneys and more than half of the states' attorneys general took on the tobacco industry. Armed with evidence acquired from whistleblowers, individual smokers' cases and tobacco liability class actions, the attorneys led the campaign in the courtroom and at the negotiation table to recoup state healthcare funds and exact marketing restrictions from cigarette manufacturers. The effort resulted in significant restrictions on cigarette marketing to children and culminated in the $246 billion Master Settlement Agreement, the largest civil settlement in U.S. history.

## Asbestos Litigation

From the beginning, our lawyers were integral to the story of how "a few trial lawyers and their asbestos-afflicted clients came out . . . to challenge giant asbestos corporations and uncover the greatest and longest business cover-up of an epidemic disease, caused by a product, in American history."[1] In addition to representing thousands of workers and family members impacted by asbestos, Motley Rice has represented numerous public entities, and litigated claims alleging various insurers of asbestos defendants engaged in unfair settlement practices in connection with the resolution of underlying asbestos personal injury claims. This litigation resulted in, among other things, an eleven-state settlement with Travelers Insurance Company.

## Anti-Terrorism and Human Rights

In *In re Terrorist Attacks on September 11, 2001*, Motley Rice attorneys brought a landmark lawsuit against the alleged private and state sponsors of al Qaeda and Osama bin Laden in an action filed on behalf of more than 6,500 family members, survivors, and those killed on 9/11—including the representation of more than 900 firefighters and their families. In prosecuting this action, Motley Rice has undertaken a global investigation into terrorism financing.

Our attorneys also initiated the *In re September 11 Litigation* and negotiated settlements for 56 families that opted out of the Victim Compensation Fund that far exceeded existing precedents at the time for wrongful death cases against the airline industry.

## BP PLC Oil Spill Litigation

In April 2010, the Deepwater Horizon disaster spilled approximately 4.9 million gallons of oil into the water, killed 11 oil rig workers, devastated the Gulf's natural resources and profoundly harmed the economic and emotional well-being of hundreds of thousands of people. The Deepwater Horizon Economic and Property Damages Settlement is the largest civil class action settlement in U.S. history. Motley Rice co-founder Joseph Rice is a Plaintiffs' Steering Committee member and served as one of the primary negotiators of that Settlement and the Medical Benefits Settlement. In addition, Rice led negotiations in the $1.028 billion settlement between the PSC and Halliburton Energy Services for its alleged role in the oil spill. Motley Rice attorneys continue to hold leadership roles in the litigation and are currently working to ensure that all qualifying oil spill victims are fairly compensated.

## Volkswagen 'Clean Diesel' Litigation

In 2015, Volkswagen Group's admission that it had programmed more than 11 million vehicles to cheat emissions tests and bypass standards sparked worldwide outrage. Motley Rice co-founder Joe Rice served as one of the lead negotiators in the nearly $15 billion settlement deal reached in 2016 for U.S. owners and lessees of 2.0-liter TDI vehicles, the largest auto-related consumer class action settlement in U.S. history. Rice and other Motley Rice attorneys also helped recover up to $4.4 billion with regards to affected 3.0-liter vehicles.

## Transvaginal Mesh Litigation

Motley Rice attorneys represent thousands of women and have played a leading role in litigation alleging debilitating and life-altering complications caused by defective transvaginal mesh devices. In 2014, Joe Rice, with co-counsel, negotiated the original settlement deal reached in In re American Medical Systems, Inc., Pelvic Repair Systems Products Liability Litigation that numerous subsequent settlements with the manufacturer were modeled after.

## Opioid Litigation

At the forefront of litigation targeting the alleged overprescribing and deceptive marketing of addictive opioid painkillers, Motley Rice, led by attorney Linda Singer, the former Attorney General for the District of Columbia, serves as lead counsel for the first jurisdictions to file complaints in the most recent wave of litigation against pharmaceutical companies regarding the opioid crisis—the City of Chicago and Santa Clara County. In addition, the firm's co-founder Joe Rice serves as co-lead counsel in the *National Prescription Opiate Litigation* coordinated in the Northern District of Ohio. The firm represents 40 jurisdictions.

[1] Ralph Nader, commenting on the story told by the book *Outrageous Misconduct*.

Prior results do not guarantee a similar outcome.

## Securities Fraud Class Actions

***In re Twitter Inc. Securities Litigation,*** No. 3:16-cv-05314 (N.D.Cal.) Motley Rice, as lead counsel, negotiated a preliminary $809.5 million settlement in September 2021 for Twitter Inc. shareholders who allege they were misled about the social media network's daily user growth during 2015. Twitter executives announced toward the end of 2014 that they expected the company's number of active users would grow to more than half a billion in the intermediate term, and would reach heights of more than a billion long term. When the public, however, later learned that actual user growth was slower than anticipated, the company's price per share drastically declined.

***In re Citigroup Inc. Securities Litigation,*** No. 07 Civ. 9901 (SHS) (DCF) (S.D.N.Y.). Motley Rice served as co-counsel in this securities fraud action alleging that Citigroup responded to the widely-known financial crisis by concealing both the extent of its ownership of toxic assets—most prominently, collateralized debt obligations (CDO) backed by nonprime mortgages—and the risks associated with them. By alleged misrepresentations and omissions of what amounted to more than two years of income and an entire significant line of business, Citigroup allegedly artificially manipulated and inflated its stock prices throughout the class period. Citigroup's alleged actions caused its stock price to trade in a range of $42.56 to $56.41 per share for most of the class period. These disclosures helped place Citigroup in serious danger of insolvency, a danger that was averted only through a $300 billion dollar emergency government bailout. On August 1, 2013, the Court approved the settlement resolving all claims in the Citigroup action in exchange for payment of $590 million for the benefit of the class.

***Alaska Electrical Pension Fund v. Pharmacia Corp.,*** No. 03-1519 (D.N.J.). Motley Rice served as co-class counsel in federal securities fraud litigation alleging that the defendants misrepresented clinical trial results of Celebrex® to make its safety profile appear better than rival drugs. In January 2013, the lawsuit settled in mediation for $164 million.

***Bennett v. Sprint Nextel Corporation,*** No. 2:09-cv-02122-EFM-KMH (D. Kan.). As co-lead counsel, Motley Rice represented the PACE Industry Union-Management Pension Fund (PIUMPF) and two other institutional investors who purchased Sprint Nextel common stock between October 26, 2006 and February 27, 2008. The class action complaint alleged that the defendants made materially false and misleading statements regarding Sprint's business and financial results. As a result, the complaint alleged that Sprint stock traded at artificially inflated prices during the class period and that, when the market learned the truth, the value of Sprint's shares plummeted. In August 2015, the court granted final approval to a $131 million settlement.

***In re Barrick Gold Securities Litigation,*** No. 1:13-cv-03851-RMB (S.D.N.Y.). As sole lead counsel, Motley Rice represented Co-Lead Plaintiffs Union Asset Management Holding AG and LRI Invest S.A. in a class action on behalf of investors who purchased shares of Barrick Gold Corporation, the world's largest gold mining company. The suit alleged that Barrick Gold had fraudulently underreported the cost and the time to develop its Pascua-Lama gold mine on the border between Argentina and Chile, and misrepresented its compliance with applicable environmental regulations and the sufficiency of its internal controls. Barrick Gold eventually abandoned its development of the Pascua-Lama mine after an injunction was issued by a Chilean court following the company's failure to comply with environmental regulations, and causing Barrick Gold to take an impairment charge of over $5 billion. A $140 million settlement was reached, and received final approval in December 2016.

***Minneapolis Firefighters' Relief Association v. Medtronic, Inc.,*** No. 08-6324 (PAM/AJB) (D. Minn.). Motley Rice is co-lead counsel for a class of investors who purchased Medtronic common stock in this case that survived the defendants' motion to dismiss. The suit alleges that Medtronic engaged in a pervasive campaign of illegal off-label marketing in which the company advised doctors to use Medtronic's Infuse Bone Graft in ways not FDA-approved, leading to severe complications in patients. Medtronic's stock price dropped significantly after investors learned that the FDA and Department of Justice were investigating Medtronic's off-label marketing. The $85 million settlement was approved on Nov. 8, 2012.

***Cornwell v. Credit Suisse Group,*** No. 08 Civ. 3758 (VM) (S.D.N.Y.). Motley Rice served as co-counsel in an action against Credit Suisse Group alleging the defendants issued materially false and misleading statements regarding the company's business and financial results and failed to write down impaired securities containing mortgage-related debt. Subsequently, Credit Suisse's stock price relative to other market events declined 2.83 percent when impaired securities came to light. A $70 million settlement was approved in July 2011.

***In re Forest Laboratories, Inc. Securities Litigation,*** No. 05 Civ. 2827 (RMB) (S.D.N.Y.). Motley Rice represented PIUMPF in a securities fraud class action alleging that the company and its officers misrepresented the safety, efficacy, and side effects of several drugs. Motley Rice, in cooperation with other class counsel, helped the parties reach a $65 million settlement that was approved on May 15, 2009.

Case 3:24-cv-00384 Document 128-7 Filed 06/21/24 Page 278 of 420 PageID #9782

Prior results do not guarantee a similar outcome.  Motley Rice LLC • Attorneys at Law  **3**

# CASES

**City of Brockton Retirement System v. Avon Products, Inc.,** No. 11 Civ. 4665 (PGG) (S.D.N.Y.). Motley Rice serves as sole lead counsel representing lead plaintiffs in a class action on behalf of all persons who acquired Avon common stock between July 31, 2006 and Oct. 26, 2011. The action alleges that the defendants falsely assured investors they had effective internal controls and accounting systems, as required under the Foreign Corrupt Practices Act (FCPA). In October 2008, Avon disclosed that it had begun an investigation into possible FCPA violations in China in June 2008. The action alleges that, unbeknownst to investors, Avon had an illegal practice of paying bribes in violation of the FCPA extending as far back as 2004 and which continued even after its October 2008 disclosure. Despite its certifications of the effectiveness of its internal controls, Avon's internal controls were allegedly severely deficient, allowing the company to engage in millions of dollars of improper payments in more than a dozen countries. On August 24, 2016, the court approved a final settlement of $62 million.

**City of Sterling Heights General Employees' Retirement System v. Hospira, Inc.,** No. 11 C 8332 (N.D. Ill.). Motley Rice serves as co-lead counsel representing investors in this lawsuit against Hospira, the world's largest manufacturer of generic injectable pharmaceuticals, including generic acute-care and oncology injectables and integrated infusion therapy and medication management systems. The lawsuit alleges that Hospira and certain executive officers engaged in a fraudulent scheme to artificially inflate the company's stock price by concealing significant deteriorating conditions, manufacturing and quality control deficiencies at its largest manufacturing facility located in Rocky Mount, N.C., and the costly effects of these deficiencies on production capacity. These deteriorating conditions culminated in a series of regulatory actions by the FDA which the defendants allegedly misrepresented to their investors. The case settled for $60 million in 2014.

**Hill v. State Street Corporation,** No. 09-cv-12146-NG (D. Mass.). Motley Rice represented institutional investors as co-lead counsel against State Street. The action alleged that State Street defrauded institutional investors – including the state of California's two largest pension funds, California Public Employees' Retirement System (CalPERS) and California State Teachers' Retirement System (CalSTRS) — by misrepresenting its exposure to toxic assets and overcharging them for foreign exchange trades. On January 8, 2015, the court approved a $60 million settlement.

**In re Hewlett-Packard Co. Securities Litigation,** No. SACV 11-1404 AG (RNBx) (C.D. Cal.). Motley Rice served as co-lead counsel representing investors who purchased Hewlett-Packard common stock between November 22, 2010 and August 18, 2011. The lawsuit alleged that Hewlett-Packard misled investors about its ability to release over a hundred million webOS-enabled devices by the end of 2011. After Hewlett-Packard abandoned webOS development in August 2011, the company's stock price declined significantly. The court granted final approval to a $57 million settlement on September 15, 2014.

**KBC Asset Management NV v. 3D Systems Corp.,** No. 0:15-cv-02393-MGL (D.S.C.). Motley Rice served as co-lead counsel on behalf of Co-Lead Plaintiff KBC Asset Management NV in a securities fraud class action on behalf of investors who purchased the common stock of 3D Systems Corporation between October 29, 2013 and May 5, 2015. The suit alleged that 3D and its senior executives concealed material operating, manufacturing, and product quality problems resulting from the company's aggressive acquisition and product growth strategies while touting the company's ability to meet high demand for its direct metal 3D printers. The court denied defendants' motion to dismiss on July 25, 2016, and denied defendants' motion for reconsideration on February 24, 2017. Following discovery, the parties reached an agreement to settle the action for $50 million, which received final approval on June 25, 2018.

**South Ferry LP #2 v. Killinger,** No. C04-1599C-(W.D. Wash.) (regarding Washington Mutual). Motley Rice served as co-lead counsel on behalf of a class of investors who purchased WaMu common stock between April 15, 2003, and June 28, 2004. The suit alleged that WaMu misrepresented its ability to hedge risk and withstand changes in interest rates, as well as its integration of differing technologies resulting from various acquisitions. The Court granted class certification in January 2011 and approved the $41.5 million settlement on June 5, 2012.

**In re Dell, Inc. Securities Litigation,** No. A-06-CA-726-SS (W.D. Tex.). Motley Rice was appointed lead counsel for the lead plaintiff, Union Asset Management Holding AG, which sued on behalf of a class of purchasers of Dell common stock. The suit alleged that Dell and certain senior executives lied to investors and manipulated financial announcements to meet performance objectives that were tied to executive compensation. The defendants' alleged fraud ultimately caused the price of Dell's stock to decline by over 40 percent. After the case was dismissed by the district court, Motley Rice attorneys launched an appeal to the Fifth Circuit Court of Appeals. After fully briefing the case and oral arguments, the parties settled the case for $40 million.

**Freedman v. St. Jude Medical, Inc.,** No. 12-3070 (RHK/JJG) (D. Minn.). Motley Rice served as co-lead counsel representing co-lead plaintiff Första AP-fonden, a Swedish pension fund, in this securities fraud class action against St. Jude Medical, Inc., a manufacturer of medical devices for cardiac rhythm management and the treatment of atrial fibrillation. This action alleged that defendants made false and misleading statements and concealed material information relating to the safety, durability, and manufacturing processes of the company's new generation of cardiac rhythm management devices marketed under the name "Durata." A $39.5 million settlement was approved in November 2016.

Motley Rice LLC • Attorneys at Law                    Prior results do not guarantee a similar outcome.

*Hatamian v. Advanced Micro Devices, Inc.,* **No. 4:14-cv-00226-YGR (N.D. Cal.).** Motley Rice served as co-lead counsel representing Lead Plaintiffs KBC Asset Management NV and Arkansas Teacher Retirement System in this securities fraud class action on behalf of investors that purchased AMD common stock between April 4, 2011, and October 18, 2012. AMD, a multinational semiconductor manufacturer, allegedly misrepresented and concealed problems affecting the production, launch, demand, and sales of its new "Llano" microprocessor. These problems allegedly led AMD to miss the critical sales period for Llano-based computers and ultimately take a $100 million write-down of by-then obsolete Llano inventory, causing AMD's stock price to fall, and damaging the company's investors. The court granted class certification on March 16, 2016. For the next two years, Class Counsel obtained and reviewed approximately 2.5 million pages of documents; participated in 34 depositions of fact, expert, and confidential witnesses; retained industry and financial experts; briefed competing motions for summary judgment; and engaged in multiple mediations with defendants. On March 6, 2018, the court approved a $29.5 million settlement.

*Ross v. Career Education Corp.* No. 1:12-cv-00276 (N.D. Ill.). On April 16, 2014, the U.S. District Court for the Northern District of Illinois issued an order granting final judgment and dismissing with prejudice *Ross v. Career Education Corp.* Motley Rice served as co-lead counsel in the lawsuit, which alleged that Career Education and certain of its executive officers violated the federal securities laws by misleading the company's investors about its placement practices and reporting. The court approved a final settlement of $27.5 million.

*In re MBNA Corporation Securities Litigation,* No. 05-CV-00272-GMS (D. Del.). Motley Rice served as co-lead counsel on behalf of investors who purchased MBNA common stock. The suit alleged that MBNA manipulated its financial statements in violation of GAAP, and MBNA executives sold over one million shares of stock based on inside information for net proceeds of more than $50 million, knowing these shares would drop in value once MBNA's true condition was revealed to the market. The case was settled with many motions pending. The $25 million settlement was approved on October 6, 2009.

*Bodner v. Aegerion Pharmaceuticals, Inc., et al.,* **14-cv-10105 (D.Mass.)** Motley Rice served as co-lead counsel on behalf of investors who purchased Aegerion common stock. The suit alleged that Aegerion issued false and misleading statements and failed to disclose, among other things, that (i) the Company illegally marketed the drug JUXTAPID beyond its FDA-approved label, and (ii) the Company was experiencing a higher than expected drop-out rate of patients taking JUXTAPID. A $22.25 million settlement was approved on November 30, 2017.

*Welmon v. Chicago Bridge & Iron Co., N.V.,* No. 06-CV-01283 (JES) (S.D.N.Y). Motley Rice represented the co-lead plaintiff in this case that alleged that the defendants issued numerous materially false and misleading statements which caused CB&I's securities to trade at artificially inflated prices. The litigation resulted in a $10.5 million settlement that was approved on June 3, 2008.

*In re NPS Pharmaceuticals, Inc. Securities Litigation,* No. 2:06-cv-00570-PGC-PMW (D. Utah). Motley Rice represented the lead plaintiff as sole lead counsel in a class action brought on behalf of stockholders of NPS Pharmaceuticals, Inc., concerning the drug PREOS. NPS claimed that PREOS would be a "billion dollar drug" that could effectively treat "millions of women around the world who have osteoporosis." The complaint alleged fraudulent misrepresentations regarding PREOS's efficacy, market potential, prospects for FDA approval and dangers of hypercalcimic toxicity. The case settled after the lead plaintiff moved for class certification and the parties engaged in document production and protracted settlement negotiations. The $15 million settlement was approved on June 18, 2009.

*In re Synovus Financial Corp.,* No. 1:09-cv-01811 (N.D. Ga.). Motley Rice and our client, Sheet Metal Workers' National Pension Fund, serve as court-appointed co-lead counsel and co-lead plaintiff for investors in Synovus Financial Corp. The lawsuit alleges that the bank artificially inflated its stock price by concealing its troubled lending relationship with the Sea Island Company, a resort real estate and hospitality company to whom Synovus allegedly made hundreds of millions of dollars of "insider loans" with "little more than a handshake" facilitated by personal relationships among certain senior executives and board members. In 2014, the court approved a final settlement of $11.75 million.

*In re Molson Coors Brewing Co. Securities Litigation,* No. 1:05-cv-00294 (D. Del.). Motley Rice served as co-lead counsel for co-lead plaintiffs Drywall Acoustic Lathing and Insulation Local 675 Pension Fund and Metzler Investment GmbH in litigation against Molson Coors Brewing Co. and several of its officers and directors. The lawsuit alleged that, following the February 9, 2005, merger of Molson, Inc. and the Adolph Coors Company, the defendants fraudulently misrepresented the financial and operational performance of the combined company prior to reporting a net loss for the first quarter of 2005. Following protracted negotiations, the parties reached a $6 million settlement in May 2009.

Prior results do not guarantee a similar outcome. Motley Rice LLC • Attorneys at Law **5**

# CASES

*Marsden v. Select Medical Corporation,* No. 04-cv-4020 (E.D. Pa.). Motley Rice served as co-lead counsel on behalf of stockholders of Select Medical, a healthcare provider specializing in long-term care hospital facilities. The suit alleged that Select Medical exploited its business structure to improperly maximize Medicare reimbursements, misled investors and that the company's executives engaged in massive insider trading for proceeds of over $100 million. A $5 million settlement was reached and approved on April 15, 2009.

## Shareholder Derivative Litigation

**Walgreens / Controlled Substances Violations:** *In re Walgreen Co. Derivative Litigation.* On October 4, 2013, Motley Rice filed a consolidated complaint for a group of institutional investors against the board of directors of Walgreen Co. The complaint alleges that Walgreen's board engaged in a scheme to maximize revenues by encouraging the company's pharmacists to fill improper or suspicious prescriptions for Schedule-II drugs, particularly oxycodone, in Florida. The complaint followed the June 2013 announcement of an $80 million settlement between Walgreens and the Drug Enforcement Administration relating to the misconduct. A settlement was approved in December 2014, in which Walgreens agreed to, among other things, extended compliance-related commitments, including maintaining a Department of Pharmaceutical Integrity.

*Manville Personal Injury Settlement Trust v. Gemunder,* No. 10-CI-01212 (Ky. Cir. Ct.) (regarding Omnicare, Inc.). On April 14, 2010, Motley Rice, sole lead counsel in this action, filed a shareholder derivative complaint on behalf of plaintiff Manville Personal Injury Settlement Trust. Plaintiff's claims stem from a November 3, 2009, announcement by the U.S. Department of Justice that Omnicare, Inc. had agreed to pay $98 million to settle state and federal investigations into three kickback schemes through which the company paid or solicited payments in violation of state and federal anti-kickback laws. The court denied the defendants' motions to dismiss in their entireties on April 27, 2011. The defendants sought an interlocutory appeal, which was denied on October 6, 2011. Following significant discovery, which included plaintiff's counsel's review and analysis of approximately 1.4 million pages of documents, the parties reached agreement on a settlement, which received final approval from the court on October 28, 2013. Under the settlement, a $16.7 million fund (less court awarded fees and costs) will be created to be used over a four year period by Omnicare to fund certain corporate governance measures and provide funding for the company's compliance committee in connection with the performance of its duties. Additionally, the settlement calls for Omnicare to adopt and/ or maintain corporate governance measures relating to, among other things, employee training and ensuring the appropriate flow of information to the compliance committee.

*Service Employees International Union v. Hills,* No. A0711383 (Ohio Ct. Com. Pl.) (regarding Chiquita Brands International, Inc.). In this shareholder derivative litigation, SEIU retained Motley Rice to bring an action on behalf of Chiquita Brands International. The plaintiff alleged that the defendants breached their fiduciary duties by paying bribes to terrorist organizations in violation of U.S. and Columbian law. In October 2010, the plaintiffs resolved their state court action as part of a separate federal derivative claim.

*Mercier v. Whittle,* No. 2008-CP-23-8395 (S.C. Ct. Com. Pl.) (regarding the South Financial Group). This shareholder derivative action was brought on behalf of South Financial Group, Inc., following the company's decision to apply for federal bailout money from the Troubled Asset Relief Program (TARP) while allegedly accelerating the retirement of its former chairman and CEO to protect his multi-million dollar golden parachute, which would be prohibited under TARP. The litigation was settled prior to trial and achieved, among other benefits, payment back to the company from chairman Whittle, increased board independence and enhanced shareholder rights.

*Manville Personal Injury Settlement Trust v. Farmer,* No. A 0806822 (Ohio Ct. Com. Pl.) (regarding Cintas Corporation). In this shareholder derivative action brought on behalf of Cintas Corporation, the plaintiff alleged that the defendants breached their fiduciary duties by, among other things, failing to cause the company to comply with applicable worker safety laws and regulations. In November 2009, the court approved a settlement agreement that provided for the implementation of corporate governance measures designed to increase the flow of employee safety information to the company's board; ensure the company's compliance with a prior agreement between itself and OSHA relating to workplace safety violations; and secure the attendance of the company's chief health and safety officer at shareholder meetings.

## Corporate Takeover Litigation

*In re The Shaw Group, Inc., Shareholders Litigation,* No. 614399 (19th Jud. Dist. La.). Motley Rice attorneys served as co-lead counsel in the class action brought by our client, a European asset management company, on behalf of the public shareholders of The Shaw Group, Inc. The lawsuit challenged Shaw's proposed sale to Chicago Bridge & Iron Company N.V. in a transaction valued at approximately $3.04 billion. The plaintiffs alleged that the defendants breached their fiduciary duties to Shaw's shareholders by agreeing to a transaction that was financially unfair and the result of an improper sales process, which the defendants pursued at a time when Shaw's stock was poised for significant growth. The plaintiffs also alleged that the transaction offered substantial benefits to Shaw insiders not shared with the company's public shareholders. In December 2012, the parties reached a settlement with two components. Shaw agreed to make certain additional disclosures to shareholders of financial analyses indicating a potential share

Case 3:24-cv-00384  Document 128-7  Filed 06/21/24  Page 281 of 342 PageID #: 9735

Prior results do not guarantee a similar outcome.

price impact of certain alternative transactions of as much as $19.00 per share versus the status quo. To provide a remedy for Shaw shareholders who believed the company was worth more than CB&I was paying for it, the settlement contained a second component – universal appraisal rights for all Shaw shareholders who properly dissented from the proposed merger, and the opportunity for Shaw dissenters to pursue that remedy on a class-wide basis. The court granted final approval of the settlement on June 28, 2013.

*In re Coventry Health Care, Inc. Securities Litigation,* No. 7905-CS (Del. Ch. ). Motley Rice represented three public pension funds as court-appointed sole lead counsel in a shareholder class action challenging the $7.2 billion acquisition of Coventry Health Care, Inc., by Aetna, Inc. The plaintiffs alleged that the defendants breached their fiduciary duties to Coventry's shareholders through a flawed sales process involving a severely conflicted financial advisor and at a time when the company was poised for remarkable growth as a result of recent government healthcare reforms. The case settled for improvements to the deal's terms and enhanced disclosures.

*In re Allion Healthcare, Inc. Shareholders Litigation,* No. 5022-cc (Del. Ch.). Motley Rice attorneys served as co-lead counsel representing a group of institutional shareholders in their challenge to the going-private buy-out of Allion Healthcare, Inc., by private equity firm H.I.G. Capital, LLC, and a group of insider stockholders led by the company's CEO, who controlled about 41 percent the company's shares. The shareholders alleged that the CEO used his stock holdings and influence over board members to accomplish the buyout at the expense of Allion's public shareholders. After a lengthy mediation, the shareholders succeeded in negotiating a settlement resulting in a $4 million increase in the merger consideration available to shareholders. In January 2011, the Delaware Court of Chancery approved the settlement.

*In re RehabCare Group, Inc. Shareholders Litigation,* No. 6197-VCL (Del. Ch.). Motley Rice represented institutional shareholders in their challenge to the acquisition of healthcare provider RehabCare Group, Inc., by Kindred Healthcare, Inc. As co-lead counsel, Motley Rice uncovered important additional facts about the relationship between RehabCare, Kindred, and the exclusive financial advisor for the transaction, as well as how those relationships affected the process RehabCare's board of directors undertook to sell the company. After extensive discovery, the parties reached a settlement in which RehabCare agreed to make a $2.5 million payment for the benefit of RehabCare shareholders. In addition, RehabCare and Kindred agreed to waive certain standstill agreements with potential higher bidders for the company; lower the merger agreement's termination fee from $26 million to $13 million to encourage any

potential higher bidders; eliminate the requirement that Kindred have a three-business day period during which it has the right to match any superior proposal; and make certain additional public disclosures about the proposed merger. The Delaware Court of Chancery granted final approval of the settlement on Sept. 8, 2011.

*In re Atheros Communications Inc. Shareholder Litigation,* No. 6124-VCN (Del. Ch.). In this action involving Qualcomm Incorporated's proposed acquisition of Atheros Communications, Inc., for approximately $3.1 billion, Motley Rice served as co-lead counsel representing investors alleging that, among other things, Atheros' preliminary proxy statement was materially misleading to the company's shareholders, who were responsible for voting on the proposed acquisition. In March 2011, the Court issued a preliminary injunction delaying the shareholder vote, ruling that Atheros' proxy statement was materially misleading because, even though the proxy stated that the company's CEO "had not had any discussions with Qualcomm regarding the terms of his potential employment," it failed to disclose that he in fact "had overwhelming reason to believe he would be employed by Qualcomm after the transaction closed." The proxy also failed to inform shareholders of an almost entirely contingent $24 million fee to the company's financial adviser, Qatalyst Partners, LLP.

*In re Winn-Dixie Stores, Inc. Shareholder Litigation,* No. 16-2011-CA-010616 (Fla. 4th Cir. Ct.). Motley Rice served as co-lead counsel in litigation challenging the $560 million buyout of Winn-Dixie Stores, Inc. by BI-LO, LLC, achieving a settlement that allows for shareholders to participate in a $9 million common fund or $2.5 million opt-in appraisal proceeding.

*Maric Capital Master Fund, Ltd. v. PLATO Learning, Inc.,* No. 5402-VCS (Del. Ch.). The firm's institutional investor client won a partial preliminary injunction against the proposed acquisition of PLATO Learning, Inc., by a private equity company. In its ruling, the Delaware Court of Chancery found that the target company's proxy statement was misleading to its shareholders and omitted material information. The court's opinion has since been published and has been cited by courts and the legal media.

*In re Lear Corporation Shareholder Litigation,* No. 2728-N (Del. Ch.). In this deal case, Motley Rice helped thwart a merger out of line with shareholder interests. Motley Rice represented an institutional investor in this case and, along with Delaware co-counsel, was appointed co-chair of the Plaintiffs' Executive Committee. Motley Rice and its co-counsel conducted expedited discovery and the briefing. The court ultimately granted in part and denied in part the plaintiffs' motion for a preliminary injunction. In granting the injunction, the court found a reasonable probability of success in the plaintiffs' disclosure claim concerning the Lear CEO's conflict of interest in securing his retirement through the proposed takeover. Lear shareholders overwhelmingly rejected the merger.

Case 3:24-cv-00384 Document 128-7 Filed 06/21/24 Page 282 of 420 PageID #: 9436

# CASES

*Helaba Invest Kapitalanlagegesellschaft mbH v. Fialkow,* No. 2683-VCL (Del. Ch.) (regarding National Home Health Care Corp.). This action was brought on behalf of the shareholders of National Home Health Care Corporation in response to the company's November 2006 announcement that it had entered into a merger agreement with affiliates of Angelo Gordon. The matter settled prior to trial and was approved on April 18, 2008. The defendants agreed to additional consideration and proxy disclosures for the class.

*Schultze Asset Management, LLC v. Washington Group International, Inc.,* No. 3261-VCN (Del. Ch.). This action followed Washington Group's announcement that it had agreed to be acquired by URS Corporation. The action alleged that Washington Group and its board of directors breached their fiduciary duties by failing to maximize shareholder value, choosing financial projections that unfairly undervalued the company and pursuing a flawed decision-making process. Motley Rice represented the parties, which ultimately settled the lawsuit with Washington Group. Washington Group agreed to make further disclosures to its shareholders regarding the proposed alternative transactions it had rejected prior to its accepting URS's proposal and agreed to make disclosures regarding how the company was valued in the proposed transaction with URS. These additional disclosures prompted shareholders to further question the fairness of the URS proposal. Ultimately, URS increased its offer for Washington Group to the benefit of minority stockholders.

*In re The DirecTV Group, Inc. Shareholder Litigation,* No. 4581-VCP (Del. Ch. ). As court-appointed co-lead counsel, Motley Rice attorneys represented a group of institutional investors on behalf of the minority shareholders of DirecTV Group. A settlement was reached and approved by the court on Nov. 30, 2009. It provided for material changes to the merger agreement and the governing documents of the post-merger DirectTV.

## State Law Securities Cases

*Kellerman v. Marion Bass Securities Corp.,* No. 01-L 000457 (Ill. 3d Jud. Cir. Madison Cty.) Motley Rice represented a class of municipal bondholders in a state law class action concerning tax-free revenue bonds that were sold during 1996-1998 to build nursing homes in Indiana, Wisconsin and Michigan. The plaintiffs alleged that the funds raised from bondholders were funneled to a Ponzi scheme, causing the bonds to default. Motley Rice reached settlements with the trustee banks, accountants, and lawyers involved in the bond offerings, resulting in a $7.8 million recovery for bondholders.

*Brown v. Charles Schwab & Co.,* No. 2:07-cv-03852-DCN (D.S.C.). Motley Rice attorneys served as class counsel in this case, one of the first to interpret the civil liabilities provision of the Uniform Securities Act of 2002. The U.S. District Court for the District of South Carolina certified a class of investors with claims against broker-dealer Charles Schwab & Co., Inc., for its role in allegedly aiding the illegal sale of securities as part of a $66 million Ponzi scheme. A subclass of 38 plaintiffs in this case reached a settlement agreement with Schwab under which they receive approximately $5.7 million, an amount representing their total unrecovered investment losses plus attorneys' fees.

## Opt-Out/Individual Actions

*In re Vivendi Universal, S.A. Securities Litigation,* No. 02 Civ. 5571 (S.D.N.Y.). In this action, Motley Rice represents more than 20 foreign institutional investors who were excluded from the class. The firm's clients include the Swedish public pension fund Första AP-fonden (AP1), one of five buffer funds in the Swedish pay-as-you-go pension system. In light of a recent Supreme Court ruling preventing foreign clients from gaining relief, Motley Rice has worked with institutional investor plaintiffs to file suit in France. *The French action is pending. In re Merck & Co., Inc., Securities Derivative & "ERISA" Litigation,* MDL No. 1658 (SRC) (D.N.J.). Motley Rice and co-counsel represented several foreign institutional investors who opted out of the federal securities fraud class action against Merck & Co., Inc., related to misrepresentations and omissions about the company's blockbuster drug, Vioxx. Private settlements were reached in these cases in 2016.

Prior results do not guarantee a similar outcome.

# ACCOLADES FOR THE FIRM



**2022 Plaintiff Firm of the Year**
**2022 Impact Case Award:** *Twitter*
*Benchmark Litigation*



**Practice Group of the Year**
*Law360*
2021 Securities
2021 • 2020 • 2019 • 2015 Product Liability
2018 Consumer Protection



**"Best Law Firm"**
*U.S. News – Best Lawyers®*
2021 Hartford, CT Metro ranked Tier 1 in Banking/Finance
**Nationally ranked** in Mass tort litigation / class actions–plaintiffs
2024 • 2023 • 2022 • 2021 • 2020 • 2019 • 2018 • 2017 • 2016 •
2015 • 2014 • 2013 • 2012 • 2011 • 2010



**Chambers USA**
Product Liability: Plaintiffs – Nationwide, Band 1
2022 • 2021

**"Elite Trial Lawyers"**
*The National Law Journal*
*Law Firm of the Year*
2021 Government Representation
2021 Mass Torts | Pharmaceuticals
2020 Insurance Liability
2019  Bankruptcy Law

***The Legal 500***
***United States***
**Litigation editions**
Product liability, mass tort and
class action - plaintiff: TIER 1
2022 • 2021 • 2020 • 2019 • 2018 • 2017 • 2016 • 2015 • 2014 •
2013 • 2012 • 2011 • 2009 • 2007



**Securities Class Action Services Top 50**
*Institutional Shareholder Services*
2022 • 2017 • 2016 • 2015 • 2014 • 2011 • 2010 • 2009

*For full methodologies and selection criteria, visit www.motleyrice.com/award-methodology*

Please remember that every case is different. Although they endorse certain lawyers, *The Legal 500 United States* and *Chambers USA* and other similar organizations listed above are not Motley Rice clients. Any result we achieve for one client in one matter does not necessarily indicate similar results can be obtained for other clients.

# OUR LEGACY:

## Ronald L. Motley (1944–2013)

EDUCATION:
J.D., University of South Carolina School of Law, 1971
B.A., University of South Carolina, 1966

Ron Motley fought for greater justice, accountability and recourse, and has been widely recognized as one of the most accomplished and skilled trial lawyers in the U.S. During a career that spanned more than four decades, his persuasiveness before a jury and ability to break new legal and evidentiary ground brought to justice two once-invincible giant industries whose malfeasance took the lives of millions of Americans— asbestos and tobacco. Armed with a combination of legal and trial skills, personal charisma, nose-to-the-grindstone hard work and record of success, Ron built Motley Rice into one of the nation's largest plaintiffs' law firms.

Noted for his role in spearheading the historic litigation against the tobacco industry, Ron served as lead trial counsel for 26 State Attorneys General in the lawsuits. His efforts to uncover corporate and scientific wrongdoing resulted in the Master Settlement Agreement, the largest civil settlement in U.S. history and in which the tobacco industry agreed to reimburse states for smoking-related health care costs.

Through his pioneering discovery and collaboration, Ron revealed asbestos manufacturers and the harmful and disabling effects of occupational, environmental and household asbestos exposure. He represented thousands of asbestos victims and achieved numerous trial breakthroughs, including the class actions and mass consolidations of *Cimino, et al. v. Raymark, et al.* (U.S.D.C. TX); *Abate, et al. v. ACandS, et al.* (Baltimore); and *In re Asbestos Personal Injury Cases* (Mississippi).

In 2002, Ron once again advanced cutting-edge litigation as lead counsel for *In re Terrorist Attacks on September 11, 2001*, MDL #1570, a lawsuit filed by more than 6,500 family members, survivors and those who lost their lives. The suit seeks justice and ultimately bankruptcy for al Qaeda's financiers, including many individuals, banks, corporations and charities that provided resources and monetary aid. He also served as lead counsel in numerous individual aviation security liability and damages cases under the *In re September 11 Litigation* filed against the aviation and aviation security industries by victims' families.

Ron brought the landmark case of *Oran Almog v. Arab Bank* against the alleged financial sponsors of Hamas and other terrorist organizations in Israel and was a firm leader in the BP Deepwater Horizon litigation and claims efforts involving people and businesses in Gulf Coast communities suffering as a result of the oil spill. Two settlements were reached with BP, one of which is the largest civil class action settlement in U.S. history.

Recognized as an AV®-rated attorney by Martindale-Hubbell®, Ron served on the AAJ Board of Governors from 1977 to 2012 and was chair of its Asbestos Litigation Group from 1978 to 2012. In 2002, Ron founded the Mark Elliott Motley Foundation, Inc., in loving memory of his son to help meet the health, education and welfare needs of children and young adults in the Charleston, S.C. community.

## PUBLICATIONS:

- Ron authored or co-authored more than two dozen publications, including:
- "Decades of Deception: Secrets of Lead, Asbestos and Tobacco" (*Trial Magazine*, October 1999)
- "Asbestos Disease Among Railroad Workers: 'Legacy of the Laggin' Wagon'" (*Trial Magazine*, December 1981)
- "Asbestos and Lung Cancer" (*New York State Journal of Medicine*, June 1980; Volume 80: No.7, New York State Medical Association, New York)
- "Occupational Disease and Products Liability Claims" (*South Carolina Trial Lawyers Bulletin*, September and October 1976)

## FEATURED IN:

- Shackelford, Susan. "Major Leaguer" *(South Carolina Super Lawyers*, April 2008)
- Senior, Jennifer. "A Nation Unto Himself" (*The New York Times*, March 2004)
- Freedman, Michael. "Turning Lead into Gold," (*Forbes*, May 2001)
- Zegart, Dan. *Civil Warriors: The Legal Siege on the Tobacco Industry* (Delacorte Press, 2000)
- Ansen, David. "Smoke Gets in Your Eyes" (*Newsweek*, 1999)
- Mann, Michael & Roth, Eric. "The Insider" (Blue Lion Entertainment, November 5, 1999)
- Brenner, Marie. "The Man Who Knew Too Much" (*Vanity Fair*, May 1996)
- Reisig, Robin. "The Man Who Took on Manville" (*The American Lawyer*, January 1983)

## AWARDS AND ACCOLADES:

Ron won widespread honors for his ability to win justice for his clients and for his seminal impact on the course of civil litigation. For his trial achievements, *BusinessWeek* characterized Ron's courtroom skills as "dazzling" and *The National Law Journal* ranked him, "One of the most influential lawyers in America."

**South Carolina Association for Justice**
**2013** Founders' Award

**American Association for Justice**
**2010** Lifetime Achievement Award
**2007** David S. Shrager President's Award
**1998** Harry M. Philo Trial Lawyer of the Year

***The Trial Lawyer Magazine***
**2012** inducted into Trial Lawyer Hall of Fame
**2011** *The Roundtable: America's 100 Most Influential Trial Lawyers*

***The Best Lawyers in America*®**
**1993–2013** mass tort litigation/class actions – plaintiffs, personal injury litigation – plaintiffs product liability litigation – plaintiffs

***Best Lawyers*®**
**2012** Charleston, SC "Lawyer of the Year" mass tort litigation/ class actions – plaintiffs
**2010** Charleston, SC "Lawyer of the Year" personal injury

Prior results do not guarantee a similar outcome.

Case 3:24-cv-00334 Document 236-7 Filed 06/04/24 Page 285 of 420 PageID #: 1989

*Benchmark Plaintiff*
**2012–2013** National "Litigation Star": civil rights/human rights, mass tort/product liability, securities
**2012–2013** South Carolina "Litigation Star": human rights, product liability, securities, toxic tort

*SC Lawyers Weekly*
**2011** Leadership in Law Honoree

*The Legal 500 United States*
**2011–2013** Mass tort and class action: plaintiff representation – toxic tort

*Chambers USA*
**2007, 2010–2012** Product liability and mass torts: plaintiffs. "...An accomplished trial lawyer and a formidable opponent."

**2008–2013** *South Carolina Super Lawyers*® list
**2008** *Top 10 South Carolina Super Lawyers* list
**2008, 2009, 2011, 2012** *Top 25 South Carolina Super Lawyers* list

*The Lawdragon™ 500*
**2005–2012** *Leading Lawyers in America* list – plaintiffs'

**National Association of Attorneys General**
**1998** President's Award—for his "courage, legal skills and dedication to our children and the public health of our nation."

**The Campaign for Tobacco-Free Kids**
**1999** Youth Advocates of the Year Award

## ASSOCIATIONS:
**American Association for Justice**
**South Carolina Association for Justice**
**American Bar Association**
**South Carolina Bar Association**
**Civil Justice Foundation**
**Inner Circle of Advocates**
**International Academy of Trial Lawyers**

# THE FIRM'S MEMBERS
## *Joseph F. Rice*

LICENSED IN: DC, SC
ADMITTED TO PRACTICE BEFORE:
U.S. Supreme Court
U.S. Court of Appeals for the Third, Fourth and Fifth Circuits
U.S. District Court for the District of Nebraska and the District of South Carolina
EDUCATION:
J.D., University of South Carolina School of Law, 1979 (The Joseph F. Rice School of Law as of 2023)
B.S., University of South Carolina, 1976

Motley Rice co-founder Joe Rice is recognized as a skillful and innovative negotiator of complex litigation settlements, having served as the lead negotiator in some of the largest civil actions our courts have seen in the last 30 years. *Corporate Legal Times* reported that national defense counsel and legal scholars described Joe as one of the nation's "five most feared and respected plaintiffs' lawyers in corporate America." As the article notes, "For all his talents as a shrewd negotiator ... Rice has earned most of his respect from playing fair and remaining humble." His alma mater, the University of South Carolina School of Law, rebranded in his honor in November 2023, and is now known as the Joseph F. Rice School of Law.

Joe was recognized by some of the nation's best-regarded defense lawyers as being "the smartest dealmaker they ever sat across the table from," *Thomson Reuters* has reported. Professor Samuel Issacharoff of the New York University School of Law, a well-known professor and expert in class actions and complex litigation, has commented that he is "the best strategic thinker on the end stages of litigation that I've ever seen."

Since beginning to practice law in 1979, Joe has continued to reinforce his reputation as a skillful negotiator, including through his involvement structuring some of the most significant resolutions of asbestos liabilities on behalf of those injured by asbestos-related products. He negotiates for the firm's clients at all levels, including in securities and consumer fraud, anti-terrorism, human rights, environmental, and medical drug and device cases, as well as catastrophic injury and wrongful death cases. He is recognized as an AV Preeminent® rated attorney in Martindale-Hubbell®.

## National Prescription Opiate MDL:
Joe is co-lead counsel in the National Prescription Opiate MDL aimed at combatting the alleged over-distribution and deceptive marketing of prescription opioids. Joe, as Chair of the opioid Negotiating Committee, worked with the committee and the Attorney General Committee to reach over $51 billion in settlements for communities nationwide with defendants in the opioid supply chain. Motley Rice continues to represent dozens of governmental entities, including the first jurisdictions to file cases in the current wave of litigation.

## AFFF MDL:
Joe was added in August 2023 as a co-lead counsel in *In re Aqueous Film-Forming Foams Products Liability Litigation*, MDL No. 2873 in U.S. District Court for the District of South Carolina, where he litigates for public water systems and other

plaintiffs who allege toxic AFFF contamination of drinking water in hundreds of water providers' water supply, as well as groundwater near military bases, airports, and other sites where firefighting foams were used. Communities near these sites have allegedly suffered a heightened need for medical monitoring, personal injuries, property damage, and economic losses due to the discharge of toxic AFFF chemicals into the environment.

### Marine Corps Base Camp Lejeune:
Joe serves on a court-appointed Resolution Committee that will help keep victim concerns and interests front and center in a multipronged effort to resolve claims filed through the VA and the Department of the Navy, as well as cases pending in the court system. Victims include service members, their families and civilians who lived and worked at Camp Lejeune between Aug. 1, 1953 and Dec. 31, 1987 and were exposed to toxic water sources that are believed to cause birth defects, cancer and other life-altering diseases.

### Vehicle Recalls:
Joe served as a lead negotiator in the $15 billion Volkswagen Diesel Emissions Fraud class action settlement for 2.0-liter vehicles, the largest auto-related consumer class action settlement in U.S. history, as well as for the 3.0-liter settlement. Under his leadership, Motley Rice also helped negotiate a pair of Takata bankruptcy resolutions that secured funds for victims harmed by the company's deadly, explosive airbags. Joe also serves as a member of the Plaintiffs' Executive Committee for *In re General Motors LLC Ignition Switch Litigation*, and was appointed to the Plaintiffs' Steering Committee for *In re Chrysler-Dodge-Jeep Ecodiesel Marketing, Sales Practices, and Products Liability Litigation*.

### Medical Drugs and Devices:
Joe led negotiations on behalf of thousands of women alleging complications and severe health effects caused by transvaginal mesh and sling products, including litigation in five MDLs in West Virginia. He also served as a member of the Plaintiffs ' Steering Committee for the Lipitor® MDL, filed for patients who alleged the cholesterol drug caused their Type 2 diabetes.

### BP Oil Spill:
Joe served as a co-lead negotiator for the Plaintiffs' Steering Committee in the two settlements with BP, one of which is the largest civil class action settlement in U.S. history. The Economic and Property Damages Rule 23 Class Action Settlement is estimated to make payments totaling between $7.8 billion and $18 billion to class members. Joe was also one of the lead negotiators of the $1.028 billion settlement reached between the Plaintiffs' Steering Committee and Halliburton Energy Services, Inc., for Halliburton's role in the disaster.

### 9/11:
Joe held a crucial role in executing strategic mediations and/or resolutions on behalf of 56 families of 9/11 victims who opted out of the government-created September 11 Victim Compensation Fund. In addition to providing answers, accountability and recourse to victims' families, the resulting settlements with

multiple defendants shattered a settlement matrix developed and utilized for decades. The litigation also helped provide public access to evidence uncovered for the trial.

### Tobacco:
As lead private counsel for 26 jurisdictions, including numerous State Attorneys General, Joe was integral to crafting and negotiating the landmark Master Settlement Agreement, in which the tobacco industry agreed to reimburse states for smoking-related health costs. This remains the largest civil settlement in U.S. history.

### Asbestos:
Joe held leadership and negotiating roles involving the bankruptcies of several large organizations, including AWI, Federal Mogul, Johns Manville, Celotex, Garlock, W.R. Grace, Babcock & Wilcox, U.S. Gypsum, Owens Corning and Pittsburgh Corning. He has also worked on numerous Trust Advisory Committees. Today, he maintains a critical role in settlements involving asbestos manufacturers emerging from bankruptcy and has been recognized for his work in structuring significant resolutions in complex personal injury litigation for victims injured by asbestos-related products. Joe has served as co-chair of Perrin Conferences' Asbestos Litigation Conference, the largest national asbestos-focused conference.

### Securities and Consumer Fraud:
Investment funds often seek Joe's guidance on litigation strategies to increase shareholder value, enhance corporate governance reforms and recover assets. He was an integral part of the shareholder derivative action against Omnicare, Inc., *Manville Personal Injury Settlement Trust v. Gemunder*, which resulted in a significant settlement for shareholders as well as new corporate governance policies.

Joe serves on the Board of Advisors for Emory University's Institute for Complex Litigation and Mass Claims, which facilitates bipartisan discussion of ways to improve the civil justice system through the hosting of judicial seminars, bar conferences, academic programs, and research. In 1999 and 2000, he served on the faculty at Duke University School of Law as a Senior Lecturing Fellow, and has taught classes on the art of negotiating at the University of South Carolina School of Law, Duke University School of Law and Charleston School of Law.

In 2013, he and the firm created the Ronald L. Motley Scholarship Fund at The University of South Carolina School of Law in memory and honor of his co-founding Motley Rice member and friend, Ron Motley.

### AWARDS AND ACCOLADES:
*Chambers USA*
**2019–2021** Product Liability: Plaintiffs – Nationwide, Band 1
**2016, 2018** Product Liability: Plaintiffs – Nationwide, Band 2

**Best Lawyers®**
**2013** "Lawyer of the Year" Charleston, SC: Mass tort litigation/class actions – plaintiffs
**2007–2024** Mass tort litigation/class actions – plaintiffs; Personal injury litigation – plaintiffs
**2024** Corporate Governance Law; Government Relations Practice; Product Liability Litigation

Prior results do not guarantee a similar outcome.

*South Carolina Super Lawyers*® list
**2008–2021** Class action/mass torts; Securities litigation; General litigation

**Lawdragon**
**2016, 2018–2022** Lawdragon 500
**2019–2023** Lawdragon 500 Plaintiff Consumer Lawyers
**2019–2024** Lawdragon 500 Plaintiff Financial Lawyers

**South Carolina Association for Justice**
**2018** Founders' Award

**Law360**
**2015** "Product Liability MVP"

*Benchmark Litigation*
**2012–2013** National "Litigation Star": mass tort/product liability
**2012–2017** South Carolina "Litigation Star": environmental, mass tort/product liability

*The Legal 500 United States*
**2011–2012, 2014–2021** Legal 500 Leading Lawyer list Dispute resolution – product liability, mass tort and class action – toxic tort – plaintiff

**The National Trial Lawyers**
**2020** Elite Trial Lawyers Lifetime Achievement Award
**2014** Litigation Trailblazers
**2010** Top 100 Trial Lawyers™ – South Carolina

*SC Lawyers Weekly*
**2018** Hall of Fame honoree
**2012** Leadership in Law Award

**National Association of Attorneys General**
**1998** President's Award

**University of South Carolina School of Law Alumni Association**
**2011** Platinum Compleat Lawyer Award

**MUSC Children's Hospital**
**2010** Johnnie Dodds Award: in honor of his longtime support of the annual Bulls Bay Golf Challenge Fundraiser and continued work on behalf of our community's children

**University of South Carolina**
**2011** Garnet Award: in recognition of Joe and his family for their passion for and devotion to Gamecock athletics

**SC Junior Golf Association Programs**
**2011** Tom Fazio Service to Golf Award: in recognition of promotional efforts

## COMMUNITY INVOLVEMENT:
**Dee Norton Lowcountry Children's Center**, Co-chair for inaugural Campaign for the Next Child
**First Tee of Greater Charleston**, Board of Advisors
**American Heart Association of the Lowcountry**, 2018 Heart Walk Chair

## ASSOCIATIONS:
**American Association for Justice**
**American Bar Association**
**American Inns of Court**
**American Constitution Society for Law and Policy**
**South Carolina Association for Justice**

## *Andrew P. Arnold*

LICENSED IN: NY, SC
ADMITTED TO PRACTICE BEFORE:
U.S. District Court for the Southern District of New York
EDUCATION:
J.D., with honors, University of North Carolina School of Law, 2013
B.A., with highest honors, University of North Carolina at Chapel Hill, 2002

Andrew Arnold focuses his practice on representing institutional investors in securities fraud class actions and individuals and governmental entities harmed by corporate wrongdoing in mass tort actions.

Andrew is a member of the firm's team representing dozens of states, counties, cities, towns, and townships in litigation targeting the alleged deceptive marketing and over-distribution of highly addictive opioid drugs, a contended cause of the nationwide opioid crisis.

Andrew joined Motley Rice co-founder Joe Rice in settlement negotiations in the Volkswagen Diesel Emissions Fraud class action on behalf of consumers whose vehicles were allegedly designed to bypass regulations. The $15 billion settlement for 2.0-liter vehicles is the largest consumer auto-related consumer class action settlement in U.S. history. He was also a part of the Motley Rice negotiating team that helped secure resolutions with major U.S. auto manufacturers on behalf of Takata airbag victims.

Andrew also oversees the firm's Market Monitor portfolio monitoring service offered to public pension funds, unions, and other institutional investors. The service cross-references newly filed securities actions, ongoing litigation, and recent settlements with each client's portfolio to help trustees fulfill their fiduciary duties by recovering funds lost due to fraud.

Prior to joining Motley Rice, Andrew practiced commercial litigation and investor-state dispute settlement in the Washington, D.C. office of a large international law firm. Before entering the legal field, he worked as a software developer and database administrator for eight years, primarily in the health care industry.

## AWARDS AND ACCOLADES:
**Best Lawyers**®
**2021–2024** *Ones to Watch* list: Litigation – Securities

# TEAM BIOS:

## Frederick C. Baker

LICENSED IN: NY, SC
ADMITTED TO PRACTICE BEFORE:
U.S. Court of Appeals for the First, Second, Third, Fourth, Fifth, Tenth and Eleventh Circuits
U.S. District Court for the Southern District of New York and the District of South Carolina
EDUCATION:
J.D. / LL.M., Duke University School of Law, 1993
B.A., University of North Carolina at Chapel Hill, 1985

A veteran litigator with strong roots in complex litigation, Fred Baker works on a broad range of environmental, medical costs recovery, consumer and products liability cases and holds numerous leadership roles within the firm. He represents individuals, institutional investors, and governmental entities in a wide variety of cases.

Fred leads the firm's tobacco litigation, and was a member of the legal team that litigated the groundbreaking tobacco litigation on behalf of several State Attorneys General. Fred has also participated in the litigation of individual tobacco cases, entity tobacco cases and a tobacco class action.

In addition to his tobacco casework, Fred is part of the opioid litigation team which represents dozens of governmental entities, including states, cities, towns, counties and townships in litigation targeting the alleged misrepresentation and fraudulent distribution of harmful and addictive opioids by manufacturers and distributors.

Fred was also a key member of the firm's representation of people and businesses in Gulf Coast communities suffering as a result of the BP Deepwater Horizon oil spill. He held a central role in the negotiation process involving the two settlements reached with BP, one of which is the largest civil class action settlement in U.S. history. In addition, his environmental experience also includes representing a state government in a case against poultry integrators that alleged poultry waste polluted natural resources.

Fred has served as counsel in a number of class actions, including the two class action settlements arising out of the 2005 Graniteville train derailment chlorine spill. He was also closely involved in the litigation surrounding the statutory direct action settlement reached in the Manville bankruptcy court and a related West Virginia unfair trade practices insurance class action.

Fred began practicing with Motley Rice attorneys in 1994 and chairs the firm's attorney hiring committee.

### AWARDS AND ACCOLADES:

**Best Lawyers®** Charleston, SC
**2020–2024** Mass tort litigation / class actions – plaintiffs
**2024** Personal injury litigation – plaintiffs

**Lawdragon**
**2019** Lawdragon 500 Plaintiff Financial Lawyers

**South Carolina Lawyers Weekly**
**2016** Leadership in Law Honoree

## Louis M. Bograd

LICENSED IN: DC, KY
ADMITTED TO PRACTICE BEFORE:
U.S. Supreme Court; U.S. Court of Appeals for the First, Third, Fourth, Fifth, Sixth, Eighth, Ninth, Tenth, and D.C. Circuits; U.S. District Court for the District of Columbia
EDUCATION:
J.D., Yale Law School, 1984
A.B., Princeton University, 1981

Louis Bograd is a nationally recognized authority on issues of federal preemption, drug and device litigation, and jurisdiction. He has devoted much of his professional career to litigating appeals on complex issues involving products liability, Medicaid lien reimbursements, constitutional rights, and civil liberties. At Motley Rice, Lou continues his focus on appellate issues and mass torts, further enhancing the firm's active and growing complex litigation practice. Lou serves as co-chair of the Law & Briefing Committee for the *National Prescription Opiate* MDL, which is focused on combatting the alleged deceptive marketing and over-distribution of opioids.

Prior to joining Motley Rice, Lou served as an appellate advocate and Chief Litigation Counsel for the Center for Constitutional Litigation where he led work in mass torts, the Class Action Fairness Act, and dispositive motions concerning consumer protection and products liability. Lou argued for plaintiffs before the U.S. Supreme Court regarding federal preemption of claims against generic drug manufacturers in *Pliva, Inc. v. Mensing* and has also participated in numerous other Supreme Court cases as counsel for petitioners, respondents, and amici curiae.

Lou has spoken on various legal topics at many seminars, CLE programs, and legal conferences across the country sponsored by, among others, the American Association for Justice, state trial lawyers associations, and Mass Torts Made Perfect. Lou has also presented at judicial education programs sponsored by the Pound Institute, the Brookings Institution, the American Enterprise Institute, the Northwestern University School of Law, and the George Mason University School of Law.

Lou's legal career began at Arnold & Porter LLP in Washington, D.C., where he managed and directed work on transfusion-associated HIV/AIDS cases on behalf of the American Red Cross. He subsequently served on the American Civil Liberties Union Foundation's national legal staff and as the legal director of the Alliance for Justice. Lou has also taught advanced torts and products liability law as an Adjunct Professor at the University of Kentucky College of Law.

### SELECTED PUBLICATIONS:

- Louis M. Bograd & Andre M. Mura, *Buckman Stops Here! Limits on Preemption of State Tort Claims Involving Allegations of Fraud on the PTO or the FDA*, 41 Rutgers L. J. 309 (2009)
- Louis M. Bograd, *Be Careful What You Wish For: Drugmakers, the First Amendment, and Preemption*, 51 TRIAL 24 (Nov. 2015)
- Louis M. Bograd, *Preemption's Uncertain Path*, 47 TRIAL 20 (Nov. 2011)
- Louis M. Bograd, *W(h)ither Preemption?*, 45 TRIAL 24 (Nov. 2009)
- Louis M. Bograd, *Taking on Big Pharma- and the FDA*, 43 TRIAL 30 (Mar. 2007)

Motley Rice LLC • Attorneys at Law    Prior results do not guarantee a similar outcome.
Case 3:24-cv-00304   Document 23-7   Filed 06/04/24   Page 290 of 420 PageID #: 2093

## AWARDS AND ACCOLADES:
**Best Lawyers®** Washington, DC
**2024** Mass tort litigation / class actions – plaintiffs

## ASSOCIATIONS:
**American Association for Justice** Chair, Preemption Litigation Group; Member, Legal Affairs Committee

## Max N. Gruetzmacher

LICENSED IN: SC
ADMITTED TO PRACTICE BEFORE:
U.S. Court of Appeals for the Ninth Circuit; U.S. District Court for the District of South Carolina, and the Northern District of Illinois
EDUCATION:
J.D., Marquette University Law School, 2008
B.A., University of Wisconsin-Madison, 2004

Max Gruetzmacher focuses his practice on securities and consumer fraud, representing large public pension funds, unions and other institutional investors in securities and consumer fraud class actions and shareholder derivative suits, as well as consumers, businesses, and governmental entities in other types of complex civil litigation.

Max also brings substantial experience counseling the firm's attorneys and clients with respect to e-discovery strategy throughout the various stages of litigation, from pre-filing through trial.

Prior to joining the firm, Max gained experience in a variety of legal practice areas, including defense of pharmaceutical mass torts cases, of banks in mortgage-backed securities cases, and in appellate criminal defense.

### AWARDS AND ACCOLADES:
The National Trial Lawyers
**2022** Rising Stars of the Plaintiffs Bar

*Charleston Regional Business Journal*
**2022** Forty Under 40

### ASSOCIATIONS:
**South Carolina Bar Association**
**Charleston County Bar Association**

## Serena P. Hallowell

LICENSED IN: NY
ADMITTED TO PRACTICE BEFORE:
U.S. Court of Appeals for the First, Ninth, and Eleventh Circuits; U.S. District Court for the Northern District of Illinois, and the Southern and Eastern Districts of New York
EDUCATION:
J.D., Boston University School of Law, 2003
B.A., Occidental College, 1999

With nearly 20 years of complex litigation and securities experience, Serena Hallowell has been recognized by her peers as a leader in the plaintiffs' securities bar and a Plaintiffs' Lawyer "Trailblazer" in 2019 by *National Law Journal* for her work in securities opt-out litigation. As lead of Motley Rice's direct-action litigation efforts, and a leader of the firm's securities fraud team, Serena litigates for some of the world's largest institutional investors, including pension funds, hedge funds, mutual funds, family offices, and other large institutional investors. She also regularly advises institutional investors and public entities regarding recovery opportunities in connection with fraud-related conduct.

Prior to her time at Motley Rice, Serena was the head of a direct-action practice and member of the securities class action group as a partner of a large securities law firm in New York. In that capacity, she was a key member of several litigation teams that achieved multi-million settlements for clients, aggregating close to $500 million. Notable cases Serena was a leading/key member of prior to joining Motley Rice include:

- *In re Barrick Gold Securities Litigation* ($140 million settlement*)
- *In re Computer Sciences Corp. Securities Litigation* ($97.5 million settlement*)("rocket docket" jurisdiction and estimated to be the third largest all cash settlement in the Fourth Circuit)
- *Public Employees' Retirement System of Mississippi v. Endo* ($50 million settlement*) (state court Section 11 action believed to be the largest class settlement obtained pursuant to the Securities Act of 1933 in connection with a secondary public offering)
- *In re Intuitive Surgical Securities Litigation*, No. 5:13-cv-01920 (N.D. Cal.) ($42.5 million settlement* for the class, including the Employees' Retirement System of the State of Hawaii)
- *In re NII Holdings, Inc. Securities Litigation* ($41.5 million settlement*) ("rocket docket" jurisdiction where settlement was obtained even after company filed bankruptcy)

Serena has also led opt-out cases against companies, including Valeant Pharmaceuticals, Perrigo Company, and Teva Pharmaceuticals for a variety of institutional investors seeking to recoup losses stemming from alleged fraud-related conduct. With respect to Valeant, Serena and her team pursued claims under the New Jersey RICO statute, and was the first opt-out plaintiff to successfully defeat a motion to dismiss those claims. Certain Valeant actions have since been resolved and Serena continues to prosecute matters on behalf of others.

Serena was selected to *The National Law Journal's* "Elite Women of the Plaintiffs Bar" in 2020 for having consistently excelled in high stakes matters on behalf of plaintiffs. She was also recognized by them as a Plaintiffs' Lawyer "Trailblazer" in 2019 in part for her work on behalf of opt-out plaintiffs. 2020–2022 *Chambers USA* reports recognized her in the area of New York securities litigation for plaintiffs and legal publication *Law360* named her as a "Securities MVP" in 2019.

Serena is a frequent speaker in legal circles throughout the country on matters related to securities litigation and diversity and inclusion in the legal and financial sectors. She uses her platform to champion women's rights and promote diversity in the financial realm, including advocating for women and minority-led investment firms.

In 2022, Serena was invited to join *Law360's* Securities Editorial Advisory Board. Serena is also an active member of the National Association of Public Pension Attorneys (NAPPA), where she currently serves on both the NAPPA Securities Litigation Committee and the NAPPA Fiduciary & Governance Committee.

# TEAM BIOS:

Serena has performed *pro bono* work for immigrant detainees through the American Immigrant Representation Project, in addition to volunteering with the Securities Arbitration Clinic at Brooklyn Law School, among other positions. She is conversational in Hindi and Urdu.

## SELECTED PUBLICATIONS:

- *'Justices Should Acknowledge ESG's Importance to Investors'* Law360 (June 2021)
- *'Don't Forget the "E" and the "S" in ESG: Securities Lawsuits Are No Longer Only About Corporate Governance'* NAPPA Report (October 2021)
- *'Mutual Funds Should Consider Shareholder Litigation,'* Law360 (Oct. 8, 2019)
- *'Around the World in a Decade: The Evolving Landscape of Securities Litigation Post-Morrison,'* NAPPA (Nov. 26, 2019)
- *'Emulex Highlights Greater Scrutiny of Issues at High Court,'* Law360 (April 25, 2019)
- *'China Agritech's Positive Implications for Plaintiffs,'* Law360 (July 3, 2018)
- *'Direct Actions: A Path to Recovery for Foreign Purchases of Securities,'* The NAPPA Report (Oct. 31, 2017) *'Investor Recovery Strategies Following ANZ Securities,'* Law360 (July 12, 2017)
- *'Does 'Dukes' Require Full 'Daubert' Scrutiny at Class Certification?'* New York Law Journal (Nov. 25, 2011)

## AWARDS AND ACCOLADES:

**Super Lawyers**
**2022** New York Metro Super Lawyers – Securities

*Chambers USA*
**2020**–**2022** Litigation: Securities: Plaintiffs – New York, Up and Coming

**Benchmark Litigation**
**2020**–**2021** Future Star

**National Law Journal**
**2020** Elite Women of the Plaintiffs' Bar
**2019** Plaintiffs' Lawyers Trailblazers

**Lawdragon 500**
**2019**–**2021** Leading Plaintiff Financial Lawyers
**2019**–**2020** Leading Lawyers in America

**Law360**
**2019** Securities MVP
**2016** Rising Star

**The Legal 500**
**2016**–**2017** Recommended in the Field of Securities Litigation

## ASSOCIATIONS:

**New York City Bar Association, Securities Litigation Committee**
**Federal Bar Council**
**South Asian Bar Association**
**National Association of Public Pension Attorneys**
**National Association of Women Lawyers**

## *Mathew P. Jasinski*

LICENSED IN: CT, NY
ADMITTED TO PRACTICE BEFORE:
U.S. Supreme Court; U.S. Court of Appeals for the First, Second, Third, and Federal Circuits; U.S. District Court for the District of Connecticut and Southern District of New York
EDUCATION:
J.D. *with high honors*, University of Connecticut School of Law, 2006
B.A. *summa cum laude*, University of Connecticut, 2003

Mathew Jasinski represents consumers, businesses, and governmental entities in class action and complex cases involving consumer protection, unfair trade practices, commercial, environmental and securities litigation. He also represents whistleblowers in *qui tam* cases under the False Claims Act.

Mathew's litigation experience includes all aspects of trial work, from case investigation to appeal. He has represented plaintiffs in class actions involving such claims as breach of contract and unfair trade practices. He has experience in complex commercial cases regarding claims of fraud and breach of fiduciary duty and has represented an institutional investor in its efforts to satisfy a judgment obtained against the operator of a Ponzi scheme. Mathew obtained a seven-figure arbitration award in a case involving secondary liability for an investment advisor's conduct under the Uniform Securities Act. Please remember that every case is different. Any result we achieve for one client in one matter does not necessarily indicate similar results can be obtained for other clients.

Mathew also serves the firm's appellate group, having argued cases in the U.S. Courts of Appeals for the First and Second Circuits, the Connecticut Appellate Court, and the Connecticut Supreme Court. He also has worked on numerous appeals before other state and federal appellate courts across the country.

Prior to joining Motley Rice in 2009, Mathew practiced complex commercial and business litigation at a large defense firm. He began his legal career as a law clerk for Justice David M. Borden (ret.) of the Connecticut Supreme Court. During law school, Mathew served as executive editor of the *Connecticut Law Review* and judging director of the Connecticut Moot Court Board. He placed first in various moot court and mock court competitions, including the Boston region mock trial competition of the American Association for Justice. As an undergraduate, Mathew served on the board of associate directors for the University of Connecticut's honors program and was recognized with the Donald L. McCullough Award for his student leadership.

Mathew continues to demonstrate civic leadership in the local Hartford community. He is vice chairman of the board of directors for the Hartford Symphony Orchestra, a deacon of the Asylum Hill Congregational Church, and a commissioner of the Hartford Parking Authority. Previously, Mathew served on the

Case 3:24-cv-00334 Document 32-67 Filed 06/04/24 Page 298 of 420 PageID #2095

Prior results do not guarantee a similar outcome.

city's Charter Revision Commission and its Young Professionals Task Force, an organization focused on engaging young professionals and positioning them for future business and community leadership.

### PUBLISHED WORKS:

"On the Causes and Consequences of and Remedies for Interstate Malapportionment of the U.S. House of Representatives" (Jasinski and Ladewig, *Perspectives on Politics,* Vol. 6, Issue 1, March 2008)

"Hybrid Class Actions: Bridging the Gap Between the Process Due and the Process that Functions" (Jasinski and Narwold), *The Brief,* Fall 2009

### AWARDS AND ACCOLADES:

**Super Lawyers®**
**2013**–**2021** *Connecticut Super Lawyers Rising Stars* list
Business litigation; Class action/mass torts; Appellate

**Lawdragon**
**2019**–**2021** Lawdragon 500 Plaintiff Financial Lawyers

***Connecticut Law Tribune***
**2018 "**New Leaders in Law"

***Hartford Business Journal***
**2009** "Forty Under 40"

### ASSOCIATIONS:

**American Association for Justice**
**American Bar Association**
**Connecticut Bar Association**
**Oliver Ellsworth Inn of Court**
**Phi Beta Kappa**

*For full Super Lawyers selection methodology visit: www. superlawyers.com/about/selection_process.html For current year CT data visit: www.superlawyers.com/ connecticut/selection_details.html*

### Marlon E. Kimpson

LICENSED IN: SC
ADMITTED TO PRACTICE BEFORE:
U.S. District Court for the District of South Carolina, Eastern District of Michigan
EDUCATION:
J.D., University of South Carolina School of Law, 1999
B.A., Morehouse College, 1991

Marlon Kimpson represents victims of corporate malfeasance, from investors in securities fraud cases to consumers harmed by large data and privacy breaches, as well as people injured or killed in catastrophic incidents. Building upon the firm's relationships with unions and governmental entities, Marlon represents individuals, state and municipality pension funds, multi-employer plans, unions and other institutional investors in securities fraud class actions and in mergers and acquisition cases, seeking asset recovery and improved corporate governance. Marlon's advocacy and leadership extends beyond the courtroom, including his appointment by President Biden in 2023 to serve on the White House Advisory Committee for Trade Policy and Negotiations.

Marlon litigated securities cases including: *In re Atheros Communications, Inc., Shareholder Litigation; In re Celera Corporation Shareholder Litigation; In re RehabCare Group, Inc. Shareholders Litigation; In re Coventry Healthcare, Inc., Shareholder Litigation; and In re Big Lots, Inc., Shareholder Litigation.* In 2020, Marlon, as local counsel, helped negotiate a $192 million settlement* for institutional investors in *In re SCANA Corporation Securities Litigation*, a complex securities fraud matter related to alleged misrepresentations and omissions concerning the design, construction, and abandonment of SCANA's nuclear construction project in South Carolina. It is the largest securities class action recovery ever obtained in the District of South Carolina, the fifth largest securities class action recovery in the history of the Fourth Circuit, and among the top 100 securities class action recoveries nationwide. In 2017, he helped secure a $16 million settlement* to resolve shareholders' claims in *Epstein v. World Acceptance Corp. et al.*, which alleged that World Acceptance misled investors about its lending practices and compliance with federal law. Marlon now represents shareholders in a federal derivative suit that alleges Wells Fargo and a number of the bank's executives breached their fiduciary duty by failing to address alleged discriminatory lending and hiring practices that negatively affected minority borrowers and employees.

Outside of his securities work, Marlon is co-lead counsel and a member of the Plaintiffs' Steering Committee for multidistrict litigation, *In re: Blackbaud Inc. Customer Data Security Breach Litigation*, filed in the District of South Carolina for consumers affected by a 2020 ransomware attack and resulting data breach that targeted software company Blackbaud. Marlon has been retained by Charleston County School District to represent it against social media platforms such as Meta, Instagram, Snapchat, and Tik Tok, which allegedly designed defective products that encourage addictive behavior in adolescents and result in emotional and physical harms, including death.

Marlon also represents dozens of governmental entities, including states, counties, cities, towns, and townships in litigation targeting the alleged deceptive marketing and over-distribution of highly addictive opioid drugs, a contended cause of the nationwide opioid crisis. His work includes helping to secure over $500 million* for opioid abatement in the State of South Carolina.

Marlon started his legal career litigating cases on behalf of worker's harmed by asbestos exposures across the country. He has also represented victims of catastrophic personal injury, wrongful death and aviation disasters, including commercial and charter aviation cases with clients, defendants and accidents involving multiple countries. He was also instrumental in the Deepwater Horizon BP oil spill settlements claims programs on behalf of people and businesses.

Marlon is a former South Carolina State Senator for District 42 and represented citizens of Charleston and Dorchester Counties for nearly a decade. A frequent speaker, Marlon has presented at seminars and conferences across the country, including the Public Funds Summit, the National Association of State Treasurers, the South Carolina Black Lawyers' Association,

the National Conference on Public Employee Retirement Systems (NCPERS) and the National Association of Securities Professionals (NASP).

After five years in commercial banking, Marlon entered the field of law and served as a law clerk to Judge Matthew J. Perry of the U.S. District Court of South Carolina. His legal work and volunteer service also earned him the University of South Carolina School of Law bronze Compleat Award in 1999.

Marlon is active in his community and served on the Board of Directors for the Peggy Browning Fund. He has also held leadership roles with the University of South Carolina Board of Visitors, the Charleston Black Lawyers Association and the South Carolina Election Commission. In 2017, the American Association of Justice Minority Caucus awarded Marlon with its Johnnie L. Cochran, Jr. Soaring Eagle Award reserved for lawyers of color who have made outstanding contributions to the legal profession and paved the way for others. In 2018, Marlon was chosen as a Leadership in Law Honoree by *South Carolina Lawyers Weekly*. He is a lifetime member of the NAACP and a member of Sigma Pi Phi Boulé and Omega Psi Phi Fraternity, Inc.

## AWARDS AND ACCOLADES:

**Best Lawyers®**
**2015–2023**  Mass tort litigation/class actions – plaintiffs

**Lawdragon**
**2019–2023**  Lawdragon 500 Plaintiff Consumer Lawyers
**2019–2021**  Lawdragon 500 Plaintiff Financial Lawyers

**South Carolina Lawyers Weekly**
**2018** Leadership in Law Honoree

**American Association for Justice**
**2017** Johnnie L. Cochran, Jr. Soaring Eagle Award

**Benchmark Plaintiff**
**2012**  National "Litigation Star": mass tort/product liability
**2012–2014**  South Carolina "Litigation Star": environmental, mass tort, securities

**Coastal Conservation League**
**2016**  Coastal Stewardship Award

**United Food and Commercial Workers**
**2016** Legislative Activist of the Year

## ASSOCIATIONS:
**American Association for Justice**
**South Carolina Association for Justice**
**National Association of Public Pension Attorneys**
**American Bar Association**
**National Bar Association**

## Gregg S. Levin

LICENSED IN: DC, MA, SC
ADMITTED TO PRACTICE BEFORE:
U.S. Court of Appeals for the First, Second, Third, Fourth, Fifth, Seventh, Ninth and Eleventh Circuits
U.S. District Court for the District of Colorado, Northern District of Illinois, District of Massachusetts, and the Eastern District of Michigan
EDUCATION:
J.D., Vanderbilt University School of Law, 1987
B.A. *magna cum laude*, University of Rochester, 1984

With more than three decades of legal experience, Gregg Levin represents domestic and foreign institutional investors and union pension funds in corporate governance, directorial misconduct and securities fraud matters. His investigative, research and writing skills have supported Motley Rice as lead or co-lead counsel in numerous securities and shareholder derivative actions, including cases involving HP, Avon, and Cintas Corporation. Gregg manages complaint and brief writing for class action deal cases, shareholder derivative suits and securities fraud class actions.

Prior to joining Motley Rice, Gregg was an associate with Grant & Eisenhofer in Delaware, where he represented institutional investors in securities fraud actions and shareholder derivative actions in federal and state courts across the country, including the WorldCom, Telxon and Global Crossing cases. He also served as corporate counsel to a Delaware Valley-based retail corporation from 1996-2003, where he handled corporate compliance matters and internal investigations.

In 2019, Gregg was appointed as a Vice President of the Institute for Law and Economic Policy, a foundation whose goals include supplementing the resource-limited SEC by educating the public on the importance of private securities fraud litigation in maintaining corporate accountability. Since its inception in the 1990s, the institute has presented and published papers that have been cited in more than 60 federal cases, including several in the U.S. Supreme Court. Appearing in the media to discuss a variety of securities matters, Gregg has also presented in educational forums, including at the Ethics and Transparency in Corporate America Webinar held by the National Association of State Treasurers.

## PUBLISHED WORKS:

Gregg is a published author on corporate governance and accountability issues, having written significant portions of the treatise *Shareholder Activism Handbook* (Aspen Publishers, November 2005), as well as several other articles of interest to institutional investors, including:

- "*In re Cox Communications:* A Suggested Step in the Wrong Direction" (*Bank and Corporate Governance Law Reporter,* September 2005)
- "Does Corporate Governance Matter to Investment Returns?" (*Corporate Accountability Report*, September 23, 2005)

Case 3:24-cv-00334   Document 32-7   Filed 05/24/24   Page 290 of 420 PageID #: 2097

Prior results do not guarantee a similar outcome.

- "*In re Walt Disney Co. Deriv. Litig.* and the Duty of Good Faith under Delaware Corporate Law" (*Bank and Corporate Governance Law Reporter*, September 2006)
- "Proxy Access Takes Center Stage: The Second Circuit's Decision in American Federation of State County and Municipal Employees, Employees Pension Plan v. American International Group, Inc." (*Bloomberg Law Reports*, February 5, 2007)
- "Investor Litigation in the U.S. -- The System is Working" (*Securities Reform Act Litigation Reporter*, February 2007)

## AWARDS AND ACCOLADES:
**Best Lawyers®**  Charleston, S.C.
**2024** Mass tort litigation / class actions – plaintiffs

**Law360**
**2022** "Securities MVP"

***South Carolina Lawyers Weekly***
**2022**  Leadership in Law Honoree

**Lawdragon**
**2019**  Lawdragon 500 Plaintiff Financial Lawyers


## Joshua Littlejohn

LICENSED IN: SC
ADMITTED TO PRACTICE BEFORE:
U.S. Court of Appeals for the Third and Fourth Circuits; U.S. District Court for the District of Colorado, District of South Carolina
EDUCATION:
J.D., Charleston School of Law, 2007
B.A., University of North Carolina at Asheville, 1999

With a broad base of experience in complex litigation—including securities fraud, corporate governance, whistleblower cases under Dodd-Frank and the False Claims Act, and catastrophic injury and death cases—Josh Littlejohn is one of several lawyers leading Motley Rice's securities litigation team, particularly in cases involving healthcare and e-commerce.

Josh represents public pension funds, unions and other institutional investors in both federal and state courts. He also represents people with catastrophic personal injuries and corporate whistleblowers. Josh works directly with clients and has been involved in all aspects of the litigation process, including case evaluation, fact and expert discovery, resolution and trial.

Throughout his career Josh has been involved in numerous complex securities matters including serving as lead or co-lead counsel against Alexion Pharmaceuticals; Amazon; Intel Corporation; Riot Blockchain; Wells Fargo & Company; 3D Systems Corporation; St. Jude Medical, Inc.; Omnicare; and numerous others. Along with other Motley Rice lawyers, Josh was South Carolina liaison counsel in a securities fraud class action that settled in 2020 filed by investors against SCANA Corporation over its failed nuclear reactor project. Josh regularly reviews and analyzes new securities fraud, shareholder derivative, and SEC whistleblower matters on behalf of our clients and the firm. He is currently part of the Motley Rice team evaluating cases related to exposure to contaminated ground water in Camp Lejeune, North Carolina.

In addition to securities and personal injury matters, Josh is a member of the Motley Rice team that evaluates and litigates violations of the federal False Claims Act and Anti-kickback Statute on behalf of corporate whistleblowers.

Aside from various securities and whistleblower matters, Josh was a part of the Motley Rice negotiating team that helped secure a resolution with a major U.S. auto manufacturer on behalf of Takata airbag victims. Early in his career, Josh worked on discovery in mass tort litigation against large drug manufacturers.

## AWARDS AND ACCOLADES:
**Lawdragon**
**2019**  Lawdragon 500 Plaintiff Financial Lawyers

**Super Lawyers®**
**2013–2017**  *South Carolina Super Lawyers Rising Star* list Securities litigation; Class action/mass torts; General litigation

## ASSOCIATIONS:
**American Bar Association**
**South Carolina Association for Justice**


## Donald A. Migliori

LICENSED IN: MA, MN, NY, RI, SC
ADMITTED TO PRACTICE BEFORE:
U.S. Court of Appeals for the First, Fourth, and Eleventh Circuits; U.S. District Court for the District of Rhode Island, District of Massachusetts, and Northern, Southern and Eastern Districts of New York
EDUCATION:
M.A./J.D., Syracuse University, 1993
A.B., Brown University, 1988

Building upon his experience in complex asbestos cases, the historic tobacco lawsuits and the September 11, 2001 terrorist attacks litigation, Don Migliori is a multifaceted litigator who can navigate both the courtroom and the negotiating table. He represents victims of defective medical devices and drugs, occupational diseases, terrorism, aviation disasters, antitrust, and securities and consumer fraud in mass torts and other cutting-edge litigation that spans the country.

Don serves in leadership roles for a number of multidistrict litigations, including being a key member of Motley Rice's team that represents dozens of cities, towns, counties and townships in the *National Prescription Opiate* MDL against opioid manufacturers and distributors. He also represents states in similarly filed litigation. He played a significant role in negotiations on behalf of tens of thousands of women allegedly harmed by pelvic mesh/sling products and served as co-liaison counsel in the N.J. Bard pelvic mesh litigation in Atlantic County. Hundreds of cases have been filed in federal and state courts against multiple defendants.

He is also co-lead counsel for *In re Ethicon Physiomesh Flexible Composite Hernia Mesh Products Liability Litigation*, a member of the Plaintiffs' Steering Committee for *In re Bard IVC Filters Products Liability Litigation*, as well as the Depuy®

# TEAM BIOS:

Orthopaedics, Inc. ASR™ and Pinnacle® Hip Implant MDLs. Don has litigated against both Ethicon, a Johnson & Johnson subsidiary, and C.R. Bard previously in pelvic mesh litigation and also against C.R. Bard in the Composix® Kugel® hernia mesh multidistrict litigation, *In re Kugel Mesh Hernia Patch Products Liability Litigation*, the first MDL before the federal court of Rhode Island. Don also serves as co-lead plaintiffs' counsel and liaison counsel in the federal MDL, and as liaison counsel for the Composix® Kugel® Mesh lawsuits consolidated in Rhode Island state court on behalf of thousands of individuals alleging injury by the hernia repair patch.

As liaison counsel for all wrongful death and personal injury cases in the September 11th aviation security litigation, Don played a central role in the extensive discovery, mediations and settlements of more than 50 cases of aviation liability and damages against numerous defendants. He also represented families of the victims who opted out of the Victim Compensation Fund to seek greater answers, accountability and recourse. Additionally, he manages associated litigation as a lead attorney for *In re Terrorist Attacks on September 11, 2001,* MDL #1570, a groundbreaking case designed to bankrupt the financiers of al Qaeda.

Don contributed his experience in connection with the commencement of and strategy for shareholder derivative litigation brought on behalf Chiquita Brands International, Inc., alleging the defendants breached their fiduciary duties by paying bribes to terrorist organizations in violation of U.S. and Columbian law. He also served as trial counsel for PACE Industry Union-Management Pension Fund in a securities case against Forest Laboratories, Inc., and was involved in the initial liability discovery and trial strategy in an ongoing securities fraud class action involving Household International, Inc.

Don began working with Motley Rice attorneys in 1997 on behalf of the State Attorneys General in the historic lawsuit against Big Tobacco, resulting in the largest civil settlement in U.S. history. He tried several noteworthy asbestos cases on behalf of mesothelioma victims, including the state of Indiana's first contractor liability verdict and first premises liability verdict for wrongful exposure to asbestos. He continues to manage asbestos cases and actively litigates mesothelioma lawsuits and individual tobacco cases in the courtroom.

Don is a frequent speaker at legal seminars across the country and has appeared on numerous television and radio programs, as well as in print media to address legal issues related to terrorist financing, aviation security, class action litigation, premises liability and defective medical devices. A "Distinguished Practitioner in Residence" at Roger Williams University School of Law for the 2010-2011 academic year, Don taught mass torts as an adjunct professor for more than 10 years. Don is an AV® rated attorney by Martindale-Hubbell®.

## AWARDS AND ACCOLADES:

***Chambers USA***
**2021** Product Liability: Plaintiffs – Nationwide, Band 3

**Best Lawyers®** Charleston, SC
**2020** "Lawyer of the Year" Mass tort litigation/class actions – plaintiffs
**2011–2024** Mass tort litigation/class actions – plaintiffs

***Super Lawyers®*** lists
**2018–2021** *South Carolina Super Lawyers***:** Class action/ mass torts; Personal Injury – products: plaintiff; Aviation and aerospace
**2009–2017** *Rhode Island Super Lawyers*
**2012–2013** *Top 10 Rhode Island Super Lawyers* lists

**The National Trial Lawyers**
**2010–present** Top 100 Trial Lawyers™: Rhode Island

**Lawdragon**
**2018–2023** Lawdragon 500
**2019–2023** Lawdragon 500 Plaintiff Consumer Lawyers
**2019–2021** Lawdragon 500 Plaintiff Financial Lawyers
**2010** Lawdragon 3,000

***Rhode Island Lawyers Weekly***
**2020** Leader in the Law
**2011** Lawyer of the Year

***Massachusetts Lawyers Weekly***
**2011** Lawyers of the Year

**Benchmark Plaintiff**
**2012–2014** Rhode Island "Litigation Star": human rights and product liability

***Providence Business News***
**2005** Forty Under 40

## ASSOCIATIONS:
**Law360 Product Liability Editorial Advisory Board,** 2019, 2021
**American Association for Justice,** Board of Governors; former Executive Committee member
**American Bar Association**
**Rhode Island Association for Justice,** former President
**The Fellows of the American Bar Foundation**

Case 3:24-cv-00334 Document 32-7 Filed 06/04/24 Page 295 of 420 PageID #2099 Prior results do not guarantee a similar outcome.

## Christopher F. Moriarty

LICENSED IN: SC
ADMITTED TO PRACTICE BEFORE:
U.S. Court of Appeals for the First, Second, Third, Fourth, Fifth, Ninth, and Tenth Circuits; U.S. District Court for the Northern District of Illinois, the Eastern District of Michigan, and the District of South Carolina
EDUCATION:
J.D., Duke University School of Law, 2011
M.A., Trinity College, University of Cambridge, 2007
Bar Vocational Course (Very Competent), Inns of Court School of Law, 2006
Graduate Diploma in Law (Commendation), BPP Law School, London, 2005
B.A., Trinity College, University of Cambridge, 2003

Christopher Moriarty litigates securities fraud and other complex litigation in the United States and consults institutional investors on opportunities to seek recovery in securities-related actions. His securities fraud class action practice encompasses every aspect of litigation, from case-starting to settlement. Notable securities fraud class actions in which he served as part of the lead counsel team include:

- *In re Twitter Inc. Securities Litigation*, No. 16-cv-05314-JST (N.D. Cal.) ($809.5 million recovery*);
- *In re Barrick Gold Securities Litigation*, No. 13-cv-03851 (S.D.N.Y.) ($140 million recovery*);
- *City of Brockton Retirement System v. Avon Products, Inc.*, 11 Civ. 4655 (PGG) (S.D.N.Y.) ($62 million recovery*);. *Hill v. State Street Corp.*, No. 09-cv-12136-GAO (D. Mass.) ($60 million recovery*);
- *In re Hewlett-Packard Co. Securities Litigation*, No. 11-cv-1404 (RNBx) (C.D. Cal.) ($57 million recovery*)
- *KBC Asset Management NV v. 3D Systems Corp.*, No. 15-cv-02393-MGL (D.S.C.) ($50 million recovery*);
- *In re Medtronic, Inc. Securities Litigation*, No. 0:13-cv-0168 (D. Minn.) ($43 million recovery*);
- *Första AP-Fonden and Danske Invest Management A/S v. St. Jude Medical, Inc.*, Civil No. 12-3070 (JNE/HB) (D. Minn.) ($39.25 million recovery*);
- *Ross v. Career Education Corp.*, No. 12-cv-00276 (N.D. Ill.) ($27.5 million recovery*); and
- *KBC Asset Management NV v. Aegerion Pharmaceuticals, Inc.*, No. 14-cv-10105-MLW (D. Mass.) ($22.25 million recovery*).

Christopher has also represented investors in direct actions under federal securities laws, in shareholder derivative litigation, and in antitrust class actions; whistleblowers in proceedings before the U.S. Securities and Exchange Commission; and relators in qui tam litigation. In the international context, Christopher serves as U.S. counsel to the Stichting Petrobras Compensation Foundation in the Netherlands, which represents the interests of investors who traded in Petrobras securities outside the United States and who suffered losses as a result of an alleged long-running fraud and bribery scheme perpetrated by Petrobras and certain of its related entities and former executives.

In addition to his securities practice, Christopher represents dozens of governmental entities in litigation against several pharmaceutical drug manufacturers, distributors, and pharmacies in connection with the opioid epidemic. As part of that, he served as one of Washington State's litigation and trial counsel in its action against the "Big Three" distributors of prescription opioids that resulted in a $518 million settlement after trial. He also successfully briefed and argued the oppositions to numerous motions to dismiss in the State of Alaska's action against numerous opioid manufacturers.*

As part of his pro bono practice, Christopher has drafted *amicus curiae* briefs in approximately 20 constitutional law cases before the U.S. Supreme Court (which has cited his work) and the federal courts of appeal. Outside of his legal practice, Christopher serves on the Board of Directors of Operation Sight, a non-profit that provides free cataract surgery and other services to those in need.

Christopher was called to the Bar in England and Wales by the Honourable Society of the Middle Temple in 2008.

### SELECT PUBLICATIONS:
Christopher F. Moriarty, *Supreme Court Rules That Securities Act Time Bar Is Not Subject to American Pipe Tolling*, Class Action & Derivative Suits Newsletter, American Bar Association (Oct. 3, 2017)

### SELECT PRESENTATIONS:
Panelist, Experts: Communicating Complex Ideas and Issues in Litigation Consistent with Messaging Trends, American Bar Association Litigation Section Annual Conference (May 6, 2022)

### AWARDS AND ACCOLADES:
**South Carolina Super Lawyers® Rising Stars** list
**2016–2021** Securities litigation

### ASSOCIATIONS:
**South Carolina Association for Justice**
**American Bar Association**
**South Carolina Bar Association**
**Charleston County Bar Association**

## William H. Narwold

LICENSED IN: CT, DC, NY, SC
ADMITTED TO PRACTICE BEFORE:
U.S. Supreme Court, U.S. Court of Appeals for the First, Second, Third, Fourth, Fifth, Sixth, Eighth, Ninth, Tenth, Eleventh, D.C., and Federal Circuits, U.S. District Court for the District of Connecticut, Eastern District of Michigan, Eastern and Southern Districts of New York, District of South Carolina
EDUCATION:
J.D. cum laude, University of Connecticut School of Law, 1979
B.A., Colby College, 1974

Bill Narwold has advocated for corporate accountability and fiduciary responsibility for nearly 40 years, representing consumers, governmental entities, unions and institutional investors. He litigates complex securities fraud, shareholder rights and consumer fraud lawsuits, as well as matters involving unfair trade practices, antitrust violations and whistleblower/ qui tam claims.

Case 3:24-cv-00344   Document 32-67   Filed 06/21/24   Page 298 of 430 PageID # 2000

# TEAM BIOS:

Bill leads Motley Rice's securities and consumer fraud litigation teams and False Claim Act practice. He is also active in the firm's appellate practice. His experience includes being involved in more than 200 appeals before the U.S. Supreme Court, U.S. Courts of Appeal and multiple state courts.

Prior to joining Motley Rice in 2004, Bill directed corporate, securities, financial, and other complex litigation on behalf of private and commercial clients for 25 years at Cummings & Lockwood in Hartford, Connecticut, including 10 years as managing partner. Prior to his work in private practice, he served as a law clerk for the Honorable Warren W. Eginton of the U.S. District Court, District of Connecticut from 1979-1981.

Bill often acts as an arbitrator and mediator both privately and through the American Arbitration Association. He is a frequent speaker on legal matters, including class actions. Named one of 11 lawyers "who made a difference" by *The Connecticut Law Tribune*, Bill is recognized as an AV® rated attorney by Martindale-Hubbell®.

Bill has served the Hartford community with past involvements including the Greater Hartford Legal Assistance Foundation, Lawyers for Children America, and as President of the Connecticut Bar Foundation. For more than twenty years, Bill served as a Director and Chairman of Protein Sciences Corporation, a biopharmaceutical company in Meriden, Connecticut.

## AWARDS AND ACCOLADES:

**Connecticut Law Tribune**
**2022** Connecticut Legal Awards *"Distinguished Leaders"* list

**Best Lawyers®**
**2013, 2015, 2017, 2019, 2023** Hartford, Conn. "Lawyer of the Year": Litigation–Banking and Finance
**2005–2024** Litigation–Banking and Finance; Mergers and acquisitions; Securities
**2022–2024** Antitrust Law

**Super Lawyers®**
**2009–2022** *Connecticut Super Lawyers and New England Super Lawyers*® lists
Securities litigation; Class action/mass torts

**Lawdragon**
**2019–2021** Lawdragon 500 Plaintiff Financial Lawyers

**Connecticut Bar Foundation**
**2008** Legal Services Leadership Award

## ASSOCIATIONS:

**American Bar Association**
**Connecticut Bar Foundation,** Past President
**Taxpayers Against Fraud**
**University of Connecticut Law School Foundation,** past Board of Trustees member

*For full Super Lawyers selection methodology visit: www.superlawyers.com/about/selection_process.html*
*For current year CT data visit: www.superlawyers.com/connecticut/selection_details.html*

## William S. Norton

LICENSED IN: MA, NY, SC
ADMITTED TO PRACTICE BEFORE:
U.S. Supreme Court; U.S. Court of Appeals for the First, Second, Third, Fourth and Ninth Circuits; U.S. District Court for the District of Colorado, Northern District of Illinois, District of Massachusetts, Eastern and Southern Districts of New York, and District of South Carolina
EDUCATION:
J.D., Boston University School of Law, 2004
B.A./B.S. *magna cum laude*, University of South Carolina, 2001

Bill Norton litigates securities fraud, corporate governance, False Claims Act, SEC whistleblower and other complex class action, consumer, and commercial matters. Bill has represented institutional and individual investors in securities fraud and shareholders actions before federal, state, and appellate courts throughout the country. He has also represented whistleblowers before the U.S. Securities and Exchange Commission through the Dodd-Frank Whistleblower Program and *qui tam* relators in actions under the False Claims Act.

### Securities Fraud Litigation

Bill represents institutional investors as a member of the lead counsel teams in litigation involving Alexion Pharmaceuticals, Inc., Amazon.com, Inc., Intel Corporation, Qualcomm Inc., Seagate Technology Holdings plc, and Sotera Health Company. His previous securities fraud matters include:

- *In re SCANA Corporation Securities Litigation* ($192.5 million recovery as Liaison Counsel*)
- *Bennett v. Sprint Nextel Corp.* ($131 million recovery*)
- *City of Brockton Retirement System v. Avon Products, Inc.* ($62 million recovery*)
- *Hill v. State Street Corporation* ($60 million recovery*)
- *City of Sterling Heights General Employees' Retirement System v. Hospira, Inc.* ($60 million recovery*)
- *In re Hewlett-Packard Company Securities Litigation* ($57 million recovery*)
- *In re Medtronic, Inc. Securities Litigation* ($43 million recovery*)
- *Hatamian v. Advanced Micro Devices, Inc.* ($29.5 million recovery*)
- *Ross v. Career Education Corporation* ($27.5 million recovery*)

### Shareholder Derivative Litigation

Bill has represented shareholders in derivative actions, including:

- *Manville Personal Injury Settlement Trust v. Gemunder* ($16.7 million payment and significant corporate governance reforms*)
- *In re Walgreen Co. Derivative Litigation* (corporate governance reforms concerning compliance with Controlled Substances Act*)

### Merger and Acquisition Litigation

Bill has represented institutional shareholders in corporate M&A litigation, including:

- *In re Allion Healthcare, Inc. Shareholders Litigation* ($4 million payment to shareholders*)
- *In re RehabCare Group, Inc., Shareholders Litigation* ($2.5 million payment, modification of merger agreement, and additional disclosures to shareholders*)

Prior results do not guarantee a similar outcome.

- *In re Atheros Communications Shareholder Litigation* (preliminary injunction delaying shareholder vote and requiring additional disclosures to shareholders in $3.1 billion merger*)
- *Maric Capital Master Fund, Ltd. v. PLATO Learning, Inc.* (preliminary injunction requiring additional disclosures to shareholders in $143 million private-equity buyout*)

### Other Commercial, Consumer Fraud, and Whistleblower Matters

Bill has represented clients in a variety of commercial, consumer fraud, and whistleblower matters, including:

- Satellite retailers in class action against EchoStar Corporation ($83 million recovery*)
- Municipal bondholders in class action concerning alleged Ponzi scheme ($7.8 million recovery*)
- A *qui tam* whistleblower in appeal, resulting in reinstatement of claim for employment retaliation*
- Consumers in class action against DirecTV regarding early cancellation fees
- German bank in litigation concerning collateralized debt obligations
- Investors in actions concerning variable life insurance policies funneled to the Madoff Ponzi scheme

Before joining Motley Rice, Bill practiced securities and commercial litigation in the New York office of an international law firm. In law school, Bill served as an Editor of the *Boston University Law Review* and was a G. Joseph Tauro Distinguished Scholar. He worked as a law clerk in the United States Attorney's Office for the District of Massachusetts, represented asylum seekers at Greater Boston Legal Services, and studied law at the University of Oxford. Before law school, Bill worked for the United States Attorney's Office for the District of South Carolina and volunteered with the Neighborhood Legal Assistance Program of Charleston. He graduated Phi Beta Kappa from the University of South Carolina Honors College. Bill is recognized as an AV®-rated attorney by Martindale-Hubbell®.

### AWARDS AND ACCOLADES:

**Lawdragon**
**2019** Lawdragon 500 Plaintiff Financial Lawyers

**Super Lawyers®**
**2013–2019** *South Carolina Super Lawyers Rising Stars* list
Securities litigation; Class action/mass torts; General litigation

### ASSOCIATIONS:

**Federal Bar Association**
**American Bar Association**
**American Association for Justice**
**New York State Bar Association**
**South Carolina Bar Association**
**Charleston County Bar Association**

## *Lance Oliver*

LICENSED IN: AL, DC, FL, SC
ADMITTED TO PRACTICE BEFORE:
U.S. Court of Appeals for the District of Columbia, Fifth and the Eleventh Circuits; U.S. District Court for the District of Columbia, Middle and Southern Districts of Florida, and the Northern District of Illinois
EDUCATION:
J.D., Duke University School of Law, 2004
B.A., Samford University, 2001

Lance Oliver is a trial lawyer who litigates class actions, mass torts, and other complex matters. He has experience with all phases of litigation from filing the complaint, trying the case, and pursuing appeals. His practice focuses on securities and consumer fraud class actions, tobacco litigation, and defective products.

Lance has recently acted as lead trial counsel in a number of *Engle* progeny cases in Florida, representing smokers and their families against tobacco manufacturers. He argued a successful appeal to the Fourth District Court of Appeals in Florida, securing a verdict for a smoker's widow in a wrongful death suit against tobacco giants Philip Morris and R.J. Reynolds in *Philip Morris USA Inc. et al. v. Marchese*. He also served as counsel in *Berger v. Philip Morris USA Inc.,* which resulted in a verdict for a client who fell victim at a young age to the manufacturer's marketing campaigns targeting children.

Lance has also devoted a substantial amount of time to litigating securities fraud class actions, and has served as co-lead counsel for the class in many securities fraud cases including *Alaska Electrical Pension Fund, et al. v. Pharmacia Corp., et al.,* a securities fraud class action that resulted in a settlement for plaintiffs. More recently, Lance selected the jury as co-trial counsel for the end-payor class in *In re Solodyn (Minocycline Hydrochloride) Antitrust Litigation,* a pay-for-delay antitrust litigation.

Prior to joining Motley Rice in 2007, Lance served as an associate in the Washington, D.C., office of a national law firm, where he worked on complex products liability litigation at both the trial and appellate levels.

Lance is a member of the National Conference on Public Employee Retirement Systems (NCPERS) and the International Foundation of Employee Benefit Plans (IFEBP). After graduating from Duke Law School, he served as a law clerk to the Honorable James Hughes Hancock of the U.S. District Court, Northern District of Alabama. He is recognized as an AV® rated attorney by Martindale-Hubbell®. Lance is the Board of Directors Vice Chair of the Dee Norton Child Advocacy Center and the former Chair of the American Lung Association Local Leadership Board for Charleston.

### AWARDS AND ACCOLADES:

**Benchmark Litigation**
**2022** Plaintiff Litigator of the Year
**2022** Impact Case Award

***South Carolina Lawyers Weekly***
**2021** Leadership in Law Honoree

Prior results do not guarantee a similar outcome.

# TEAM BIOS:

**Lawdragon**
**2019–2021** Lawdragon 500 Plaintiff Financial Lawyers

*South Carolina Super Lawyers® Rising Stars* list
**2013–2018** Securities litigation; Class action/mass torts

**The National Trial Lawyers**
**2016** Top 100 Trial Lawyers™ South Carolina:

## ASSOCIATIONS:
**American Bar Association**

## Meghan S. B. Oliver

LICENSED IN: DC, SC, VA
ADMITTED TO PRACTICE BEFORE:
U.S. Court of Appeals for the Federal Circuit, U.S. District Court for the District of South Carolina
EDUCATION:
J.D., University of Virginia School of Law, 2004
B.A. with distinction, University of Virginia, 2000

Meghan Oliver's practice focuses on complex litigation and class actions, including work on securities fraud cases, general commercial litigation, and consumer fraud litigation.

She is actively involved in various class actions, including several against health insurers for drug and equipment overcharges, and one alleging that the Administrative Office of the U.S. Courts charges more for PACER services than is authorized by statute (*Nat'l Veterans Legal Services Program v. United States*, Case No. 16-745-ESH). She also represents large public pension funds, unions, and institutional investors in securities fraud class actions, including *In re Twitter, Inc. Securities Litigation*, No. 3:16-cv-05315-JST-SK and *In re Qualcomm Inc. Securities Litigation*, No. 17-CV-00121-JAH-WVG.

Additionally, Meghan helps to lead litigation filed for a class consisting of more than a million tax return preparers alleging the IRS charged unauthorized user fees for the issuance and renewal of preparer tax identification numbers, (*Steele v. United States*, Case No. 1:14-cv-1523-RCL).

She has also worked on several antitrust matters in the past, including *In re North Sea Brent Crude Oil Futures Litigation, In re Libor-Based Financial Instruments Antitrust Litigation*, and generic drug cases involving "reverse payment" agreements.

Prior to joining Motley Rice, Meghan worked as a business litigation and antitrust associate in Washington, D.C. There, she assisted in the trial of a multidistrict litigation antitrust case and assisted in multiple corporate internal investigations. She is a member of Phi Beta Kappa.

## AWARDS AND ACCOLADES:
**National Law Journal**
**2022** Litigation Trailblazer

**Lawdragon**
**2019–2021** Lawdragon 500 Plaintiff Financial Lawyers

## ASSOCIATIONS:
**American Bar Association**

## Michael J. Pendell

LICENSED IN: CT, NY
ADMITTED TO PRACTICE BEFORE:
U.S. District Court for the District of Connecticut, Southern and Eastern Districts of New York
EDUCATION:
J.D., *summa cum laude*, Albany Law School, 2007
B.A., *cum laude*, Emerson College, 2000

Michael Pendell is a trial lawyer who represents people affected by corporate wrongdoing, including whistleblowers, people harmed by tobacco, prescription medications, dangerous medical devices, and victims of international terrorism. He also represents pension fund trustees and other institutional investors in securities, consumer fraud, and other complex class actions.

Michael served as trial counsel in a number of prescription opioid lawsuits representing dozens of governmental entities, including states, cities, and counties in litigation against several pharmaceutical drug manufacturers and distributors for the alleged deceptive marketing and distribution of highly addictive prescription opioids.

A former Naval Reservist who served in a security unit, Michael litigates on behalf of victims of foreign terrorism and international human rights abuses. Michael, along with other Motley Rice attorneys, is pursuing a civil action against the financiers and supporters of the September 11, 2001, terrorist attacks.

Michael represents personal injury clients, including people allegedly harmed by tobacco products and thousands alleging harm by dangerous medical devices. He served as trial counsel in the *Engle*-progeny litigation in Florida for smokers and families of deceased smokers against tobacco manufacturers. In transvaginal mesh litigation, he represented women implanted with Ethicon Gynecare Prolift transvaginal mesh devices claiming serious injuries and complications from the devices.

Michael represents institutional and individual investors in claims involving securities fraud. He played a central role on the litigation team that obtained a seven-figure arbitration award in a case involving secondary liability for an investment advisor's conduct under the Uniform Securities Act. Michael also represents clients in complex commercial cases regarding claims of fraud, breach of contract, and tortuous interference, as well as representing whistleblowers in multiple cases involving the False Claims Act, including litigation filed against Afognak Native Corp., alleging Small Business Administration regulatory violations.

Prior to joining Motley Rice. Michael was an associate with a Connecticut-based law firm, where he litigated in both federal and state courts in commercial and construction law, media and administrative law, personal injury defense and labor and employment matters. He previously taught business law to B.A. and MBA candidates as an adjunct professor at Albertus Magnus College.

Case 3:24-cv-00334 Document 32-7 Filed 06/04/24 Page 299 of 420 PageID #: 2803
Prior results do not guarantee a similar outcome.

Michael served as a legal intern for the Honorable Randolph F. Treece of the U.S. District Court for the Northern District of New York and as a law clerk for the Major Felony Unit of the Albany County District Attorney's Office. He served as the executive editor for the New York State Bar Association Government Law & Policy Journal and senior editor for the Albany Law Review, which published his 2008 article entitled, "How Far is Too Far? The Spending Clause, the Tenth Amendment, and the Education State's Battle Against Unfunded Mandates."

As of January 2023, Michael serves on the Board of Directors for the Special Olympics of Connecticut.

## AWARDS AND ACCOLADES:
**Lawdragon**
**2019–2021** Lawdragon 500 Plaintiff Financial Lawyers

**Super Lawyers®**
**2013–2018** *Connecticut Super Lawyers Rising Stars* list
Securities litigation; Business litigation; Personal injury – products: plaintiff

## ASSOCIATIONS:
**American Association for Justice**
**Connecticut Bar Association**
**New York State Bar Association**

\* Prior results do not guarantee a similar outcome. For full *Super Lawyers* selection methodology visit: www.superlawyers.com/about/selection_process.html For CT-specific methodology visit: www.superlawyers.com/connecticut/selection_details.html

# SENIOR COUNSEL

## *Rebecca M. Katz*

LICENSED IN: NY
ADMITTED TO PRACTICE BEFORE:
U.S. Court of Appeals for the Second Circuit; U.S. District Courts for the Southern, Eastern, and Western Districts of New York
EDUCATION:
J.D., Hofstra University School of Law, 1990
B.S., Hofstra University, 1987

As the head of Motley Rice's SEC whistleblower team, Rebecca Katz has dedicated over 30 years to representing defrauded investors and protecting whistleblowers who expose corporate misconduct.

Rebecca has successfully represented both U.S. and international clients in navigating the intricacies of the SEC whistleblower process—from filing the initial complaint through the final award stage. In addition to her renowned whistleblower work, Rebecca has experience litigating complex securities fraud cases, and has held senior leadership and partnership roles at two New York plaintiffs' litigation firms.

Formerly senior counsel for the SEC's Enforcement Division, Rebecca has been at the forefront of the field since the inception of the SEC Whistleblower Program under the Dodd-Frank Act in 2010. She has secured approximately 12% of the $1.3 billion in total awards as of 2022, including the second largest award ever granted to a whistleblower.\* Rebecca also represented two former financial advisers who alleged a brokerage firm made misleading statements related to a struggling investment product. The SEC ruled in favor of the whistleblowers and awarded them the maximum award percentage allowed.\*

Guiding senior executives, mid-level managers and junior staff across a range of industries through the complex and dynamic whistleblower legal landscape, Rebecca provides strategic legal counsel to ensure—above all—strict whistleblower confidentiality and protection in reporting fraud to government enforcement agencies from the SEC and the DOJ to the IRS and CTFC.

Rebecca is a frequently speaker at legal conferences nationwide and provides insight on numerous issues involving the SEC whistleblower program and securities litigation for national and local media outlets, including *The Wall Street Journal, The New York Times, Reuters, Bloomberg Law, The National Law Journal,* and *Law360*, among others.

Rebecca serves on the Financial Fraud Committee for Taxpayers Against Fraud (TAF), a public interest, non-profit organization dedicated to defending and empowering whistleblowers who expose fraud in government and in financial markets.

A published author and former faculty member at the Practising Law Institute's Securities Litigation & Enforcement Institute (both in the U.S. and UK), Rebecca has lectured at the Fordham University School of Law's Eugene P. and Delia S. Murphy Conference on Corporate Law – Corporations, Investors and the Securities Markets. Rebecca was a member of the *Hofstra Law Review* while completing her law degree from Hofstra University School of Law.

## AWARDS AND ACCOLADES:
**Best Lawyers®** New York, NY
**2017–2024** Mass tort litigation / class actions – plaintiffs

*Super Lawyers®* lists
**2008–2010, 2013–2023** New York Metro Super Lawyers – Securities

**Hofstra University, Maurice A. Deane School of Law**
**2019** Outstanding Woman in Law honoree

*Benchmark Plaintiff*
**2014** Top 150 Women in Litigation list: New York – securities
**2013–2014** New York "Litigation Star" securities

## ASSOCIATIONS:
**American Association for Justice**
**Taxpayers Against Fraud (TAF)**, Member – Financial Fraud Committee

# TEAM BIOS:

## ASSOCIATES

### Elizabeth A. Camputaro

LICENSED IN: SC
ADMITTED TO PRACTICE BEFORE:
U.S. Court of Appeals for the Federal and Fourth Circuits; U.S. District Court for the District of South Carolina
EDUCATION:
J.D. *magna cum laude*, Charleston School of Law, 2008
B.A., Columbia College, 2004

Elizabeth Camputaro is part of the team representing county and municipal governments in litigation involving opioid manufacturers and distributors for their alleged deceptive marketing and fraudulent distribution of highly addictive opioids.

In addition, Elizabeth has several years of experience representing institutional investors in complex securities fraud and shareholder derivative matters, including serving on litigation teams in class action suits filed against Medtronic, Inc, State Street Corp., Sprint Nextel Corp., and Advanced Micro Devices.

Prior to joining Motley Rice, Elizabeth served as a judicial law clerk for the Honorable Deadra L. Jefferson, Ninth Judicial Circuit. While in law school, Elizabeth was a member of the Federal Courts Law Review, contributed more than 100 hours of pro bono service, and served as a judicial extern for the Honorable Thomas L. Hughston, Ninth Judicial Circuit.

Active in her community, Elizabeth previously served on the South Carolina Bar Diversity Committee, and has served as an Election Commissioner for Beaufort and Summerville municipalities, Beaufort County Council Library Board Trustee, and international missionary with Project Medishare and One World Health.

### ASSOCIATIONS:
**American Bar Association**
**South Carolina Bar Association**
**Charleston Bar Association**

### Ebony Williams Bobbitt

LICENSED IN: SC, NC
EDUCATION:
J.D. *magna cum laude*, North Carolina Central University School of Law 2020
B.S., North Carolina Agricultural and Technical State University, 2012

Ebony Williams Bobbitt represents institutional investors and individuals in complex securities and consumer protection class actions that aspire to hold corporations accountable for alleged misconduct.

Ebony's casework includes litigating for U.S. tax return preparers who allege they were charged unlawful fees by the IRS to obtain their Preparer Tax Identification Numbers (PTIN) in *Adam Steele, et al. v. United States of America,* Case No. 1:14-cv-01523-RCL. She also represents a class of patients who allege Cigna Health and Life Insurance Co. fraudulently inflated copayments and coinsurance by overcharging for medical services and products, *Neufeld v. Cigna Health and Life Insurance Company et al.*, Case No. 3:17-cv-01693.

Ebony has a background in criminal justice and worked for several years as a legal assistant for the New Hanover District Attorney's Office and as a deputy clerk for the New Hanover County Board of Commissioners prior to pursuing her law degree. She gained additional legal experience while interning with the North Carolina Department of Justice during the summer of 2018 and is a former Motley Rice law clerk.

### Jessica C. Colombo

LICENSED IN: CT, NY
ADMITTED TO PRACTICE BEFORE:
U.S. Court of Appeals for the Second Circuit, U.S. District Court for the District of Connecticut
EDUCATION:
J.D. *with high honors*, University of Connecticut School of Law, 2017
B.A. *cum laude*, State University of New York at New Paltz, 2014

Jessica Colombo works to deter misconduct and fraud by representing individuals and institutional investors in complex securities and consumer protection class actions. In addition, Jessica's practice includes representing whistleblowers in cases involving the False Claims Act, and she contributes to the firm's appellate practice. She is also a part of the firm's team that represents dozens of governmental entities, including states, cities, towns, counties and townships in litigation against several pharmaceutical drug manufacturers and distributors for the alleged deceptive marketing and distribution of highly addictive prescription opioids.

Prior to joining Motley Rice, Jessica served as a law clerk to the Honorable Bethany J. Alvord of the Connecticut Appellate Court. She gained additional experience in complex consumer fraud and product liability litigation while serving as a Motley Rice law clerk in 2016. She also interned with the U.S. Attorney's Office for the District of Connecticut.

While completing her legal studies, Jessica served as Executive Editor of the *Connecticut Law Review*, a member of the Public Interest Law Group, and a volunteer with the International Refugee Assistance Project. She also represented criminal defendants in the University of Connecticut School of Law Criminal Trial Clinic. She received multiple CALI awards in Lawyering Process, Torts, Estate Plan/Tax Practice, and Trademark Law.

Jessica previously worked as a toll collector for the New York State Thruway Authority, where she was a member of the International Brotherhood of Teamsters, Local 72.

### ASSOCIATIONS:
**American Bar Association**
**Connecticut Bar Association**

Prior results do not guarantee a similar outcome.

### Neli Traykova Hines

LICENSED IN: DC, IL, SC
ADMITTED TO PRACTICE BEFORE:
U.S. District Court for the Northern District of Illinois
EDUCATION:
J.D., American University Washington College of Law, 2021
B.S., American University, 2016

Neli Traykova Hines pursues complex securities fraud class actions for institutional investors and individual shareholders who seek to recover losses caused by alleged corporate misconduct.

Neli contributed to the litigation and final approval of the $809.5 million settlement with Twitter Inc. in 2021. She litigates for investors who allege medical drug manufacturer AbbVie engaged in illegal kickbacks and other misconduct to boost sales for its immunosuppressant drug Humira. Neli's casework also includes representing investors in securities fraud actions against Chegg, Inc. and Upstart Holdings.

While completing her legal studies, Neli worked as an honors legal intern at the U.S. Securities and Exchange Commission where she assisted with enforcement actions. She was also a student attorney with the Entrepreneurship Law Clinic at American University, counseling small businesses on corporate structuring, taxation, financing and growth and succession planning. Neli was a member of the Business Law Review and competed internationally in mediation and negotiation competitions as a member of the Alternative Dispute Resolution Honor Society.

She acquired additional experience as a FOIA government information specialist and a contracts specialist for the U.S. government prior to law school.

Neli serves her community as a volunteer mediator through the Mediation and Meeting Center of Charleston.

#### ASSOCIATIONS:
**Washington D.C. Bar Association**
**South Carolina Bar Association**
**Charleston County Bar Association**

### Annie E. Kouba

LICENSED IN: SC
ADMITTED TO PRACTICE BEFORE:
U.S. District Court for the District of South Carolina
EDUCATION:
J.D., University of North Carolina School of Law, 2016
M.S.W., University of North Carolina School of Social Work, 2016
B.A., *magna cum laude*, Lenoir-Rhyne University, 2012

Annie Kouba is a trial lawyer with a diverse practice representing global terror victims, survivors of childhood sexual abuse, children and families coping with mental health challenges allegedly caused by social media platforms, as well as public clients and government entities.

She is a part of Motley Rice's team of attorneys that represents dozens of cities, towns, counties, and townships in the *National Prescription Opiate* MDL against opioid manufacturers, distributors, and pharmacies for alleged deceptive marketing, fraudulent distribution and other business practices that contributed to the opioid crisis. Annie also has experience in the courtroom as a part of the Motley Rice trial team representing individuals alleging harm by defective medical devices.

Prior to joining Motley Rice, Annie interned with the North Carolina Department of Justice in the Health and Human Services Division where she drafted criminal briefs for the N.C. Court of Appeals and N.C. Supreme Court and assisted the president of the American Association of Public Welfare Attorneys. She also interned with the EMILY's List Political Opportunity Program and has worked as a *voir dire* consultant.

Annie concentrated in Community, Management, and Policy Practice at the University of North Carolina's School of Social Work Master's program where she specialized in the intersection of public policy and the law. Through a practicum with the program, Annie interned with the Compass Center for Women and Families in the Financial Literacy Education Program, where she served as a certified counselor with The Benefit Bank.

While pursuing her studies at the University of North Carolina School of Law, Annie served as a published staff member on the *First Amendment Law Review* and as vice president of the Carolina Public Interest Law Organization. She also contributed more than 100 hours in the Pro Bono Program there, through which she prepared tax returns for low-income citizens and researched and provided social work policy and legal perspective related to minors' rights after sexual assault for a guidebook from the NC Coalition Against Sexual Assault.

Annie serves on the board of the Green Heart Project, a volunteer-assisted service-learning organization connecting children living in food deserts with school gardens, healthy produce, and mentors.

#### AWARDS AND ACCOLADES:
**Best Lawyers®**
**2024** *Ones to Watch* list: Litigation – Securities

**South Carolina Bar Leadership Academy**
Class of 2019

**National Law Journal**
**2023** Rising Stars of the Plaintiffs' Bar

#### ASSOCIATIONS:
**American Association for Justice**, Political Action Committee Task Force
**South Carolina Association for Justice**

# TEAM BIOS:

## Alexis N. Lilly

LICENSED IN: SC
EDUCATION:
J.D. *cum laude*, American University Washington College of Law, 2020
B.A. *magna cum laude*, The Ohio State University, 2017

Alexis Lilly protects public entities, institutional investors and individuals through complex litigation targeting corporate negligence and misconduct.

Alexis is a part of the firm's team that represents dozens of governmental entities, including states, counties, cities, towns, and townships in litigation targeting the alleged deceptive marketing and over-distribution of highly addictive opioid drugs, a contended cause of the nationwide opioid crisis.

A former Motley Rice law clerk, Alexis was the Technical Editor of the *American University Business Law Review*, Vol. 9, and served as a student attorney for American University Washington College of Law's Civil Advocacy Clinic in Washington, D.C., while completing her legal studies. She also assisted faculty as a Dean's Fellow for the school's Legal Rhetoric Department, served as a judicial intern for U.S. District Judge Rudolph Contreras of the U.S. District Court for D.C., and gained valuable experience as a law clerk for the U.S. Attorney's Office, District of Arizona.

## Ridge Mazingo

LICENSED IN: SC
EDUCATION:
J.D., University of North Carolina School of Law, 2022
B.A. *summa cum laude*, North Carolina State University, 2018

Ridge represents institutional investors in complex securities fraud litigation. Since joining Motley Rice, he supported the securities litigation team with the judicial approval process of a $809.5 million dollar settlement in a case, against the social media company Twitter for misleading shareholders. Ridge is also involved in securities litigation against Chegg, Inc. and Abbott Laboratories. As the son of two retired public-school educators, Ridge understands the importance of protecting pension fund investments so that hard-working men and women can retire with the dignity they deserve.

Ridge has also worked on various matters outside of the securities context representing clients in cases involving data breaches, catastrophic injury claims and anti-trust matters.

Prior to law school, Ridge gained valuable experience in state government as a Legislative Aide in the North Carolina House of Representatives and worked with a lobbying and consulting firm. While attending law school, Ridge was a member of the *North Carolina Law Review*, and held legal internships with the N.C. Department of Justice Consumer Protection Division and a mid-size regional firm focusing on civil defense and transactional matters.

Prior to college, Ridge was a Volunteer Firefighter for the Snow Hill Fire Department, where he received the 2011 Rookie of the Year commendation. Active in his community, Ridge volunteers with the Coastal Conservation League and the South Carolina Special Olympics.

## Meredith B. Weatherby

LICENSED IN: SC, TX
ADMITTED TO PRACTICE BEFORE:
U.S. District Court for the Northern, Southern, Eastern and Western Districts of Texas
EDUCATION:
J.D., University of Texas School of Law, 2011
B.A., *with distinction*, University of North Carolina, Chapel Hill, 2008

Meredith Weatherby develops and litigates securities fraud class actions and shareholder derivative suits on behalf of institutional investors.

Meredith represents unions, public pensions and institutional investors in federal courts throughout the country. Her casework includes representing clients in a number of cases related to high frequency trading (HFT), including the groundbreaking securities fraud litigation against NASDAQ and the New York Stock Exchange that was recently revived upon appeal to the U.S. Court of Appeals for the Second Circuit. She was also involved in the securities class action against Twitter Inc. Previously, Meredith was a member of the teams representing investors in securities fraud class actions filed against Advanced Micro Devices, Barrick Gold and SAC Capital, among others.

Meredith also has experience litigating medical malpractice and negligence suits in state court.

Prior to joining Motley Rice, Meredith gained trial and settlement experience as an associate at a Dallas, Texas, law firm working in business and construction litigation. While attending the University of Texas School of Law, she clerked for an Austin firm, represented victims in court as a student attorney in the UT Law Domestic Violence Clinic and was a Staff Editor of the *Review of Litigation* journal. During her undergraduate and law school career, Meredith studied abroad in Paris, France, Geneva, Switzerland and Puebla, Mexico.

### AWARDS AND ACCOLADES:
**Best Lawyers®**
**2021–2024** *Ones to Watch* list: Litigation – Securities

### ASSOCIATIONS:
**Charleston County Bar Association**

Prior results do not guarantee a similar outcome.

## Erin Casey Williams

LICENSED IN: SC
ADMITTED TO PRACTICE BEFORE:
United States Court of Appeals for the Second Circuit; U.S. District Court for the District of South Carolina, Eastern District of Michigan, and Northern District of Illinois
EDUCATION:
J.D., University of Illinois College of Law, 2014
B.S. with honors, University of Illinois at Urbana-Champaign, 2011

Erin Casey Williams protects the interests of institutional investors and consumers through complex securities litigation.

Erin is a member of Motley Rice's litigation teams representing investors in securities fraud class action cases. She supports the firm's efforts in matters involving Qualcomm Incorporated and Investment Technology Group, Inc.

Erin assisted in the development of deposition strategies and completed discovery with the Motley Rice securities team before joining the firm in 2017. Her previous experience includes litigating claims involving medical malpractice, wrongful death, personal injury and complex family law matters at a Charleston, S.C., law firm. She also researched and drafted memoranda regarding construction defects, insurance defense, and tort liability for a national litigation support agency.

While pursuing her law degree, Erin interned for the Federal Defender Program in Chicago in addition to working as a judicial extern for the Honorable Michael T. Mason of the U.S. District Court for the Northern District of Illinois. She served as an associate editor of the *University of Illinois Law Review* and the Community Service Chair of the Women's Law Society.

### AWARDS AND ACCOLADES:
**Best Lawyers®**
**2024** *Ones to Watch* list: Litigation – Securities

### ASSOCIATIONS:
**American Bar Association**
**South Carolina Bar Association**
**South Carolina Association for Justice**
**South Carolina Women Lawyers Association**
**Charleston County Bar Association**

# STAFF ATTORNEYS

## Vanessa A. Davis

LICENSED IN: SC
EDUCATION:
J.D., Charleston School of Law, 2013
B.A., College of Charleston, 2008

Vanessa Davis protects the rights of individual shareholders and institutional investors by litigating complex securities fraud class actions, in addition to her work advocating for state and local governments that seek to advance public health and safety interests.

Vanessa's practice includes representing Twitter shareholders in litigation that alleged the social media giant misrepresented its daily user growth in 2015 in order to inflate its stock price. The suit resulted in an $809.5 million proposed settlement in 2021 days before trial.

- Vanessa has additional experience in securities cases including:
- *Forsta AP-Fonden et al v. St. Jude Medical Inc et al* ($39.25 million settlement in 2016*)
- *Hatamian v. Advanced Micro Devices, Inc.* ($29.5 million settlement in 2017*)
- *KBC Asset Mgmt. v. 3D Systems Corp.* ($50 million settlement in 2018*)
- *In re CenturyLink Sales Practices & Securities Litigation* ($55 million settlement in 2021*)

Vanessa's work for state and local municipalities includes representing the City of Chicago in litigation alleging e-cigarette maker JUUL misled the public on the safety of its products while marketing to children. She is a part of Motley Rice's team of attorneys who represent dozens of governmental entities, including states, cities, towns, counties and townships in litigation against several pharmaceutical drug manufacturers and distributors for the alleged deceptive marketing of highly addictive opioids.

Prior to her work with Motley Rice, Vanessa represented clients in family court and clerked for an estate planning firm in Charleston, S.C. Vanessa also worked as a paralegal for a personal injury firm while completing her legal studies.

### ASSOCIATIONS:
**American Bar Association**
**Charleston County Bar Association**
**South Carolina Bar Association**

## Laura C. Rublee

LICENSED IN: SC
ADMITTED TO PRACTICE BEFORE: U.S. Court of Appeals for the Fourth Circuit; U.S. District Court for the Eastern and Western Districts of Virginia, and the Western District of North Carolina
EDUCATION:
J.D., Marshall-Wythe School of Law, College of William & Mary, 1985
B.A. *with distinction,* University of Virginia, 1977

Laura Rublee litigates for consumers, unions, public pensions and other institutional investors as a part of Motley Rice's securities and consumer fraud practice. Laura advances complex class actions that shine a light on alleged financial violations and corporate misconduct that negatively impact investors and consumers.

Laura's litigation experience includes representing a class of patients who allege Cigna Health and Life Insurance Co. fraudulently inflated copayments and coinsurance by overcharging for medical services and products, *Neufeld v. Cigna Health and Life Insurance Company et al*. She also represents more than a million tax return preparers who allege the IRS charged unauthorized user fees for the issuance and renewal of preparer tax identification numbers, *Steele v. United States*. Laura served on additional litigation teams in class action suits filed against Medtronic, Inc.; Sprint Nextel Corp.; and Twitter, Inc.

Prior results do not guarantee a similar outcome.

# TEAM BIOS:

Prior to joining Motley Rice, Laura worked for several years as an escrow officer in Texas where she assisted with real estate transactions. She has additional experience as a staff attorney and associate for defense firms in South Carolina and Virginia. She also has a background in biophysics, having worked as laboratory specialist for several years before pursuing a law degree.

**ASSOCIATIONS:**
**South Carolina Bar Association**

## SECURITIES LITIGATION PROFESSIONAL STAFF

### Ellie Kimmel
EDUCATION:
B.A., University of South Florida, 1993
Business Analyst Ellie Kimmel began working with Motley Rice attorneys in 2000. Prior to her work with the securities litigation team, she was a founding member of the firm's Central Research Unit and also supervised the firm's file management. She currently completes securities research and client portfolio analysis for the firm's securities cases.

Ellie has a diverse background that includes experience in education as well as the banking industry. She began her career in banking operations, where she served as an operations manager and business analyst in corporate banking support for 14 years. She then spent seven years teaching high school economics, Latin and history before joining Motley Rice.

### Evelyn Richards
EDUCATION:
A.S. *cum laude*, Computer Technology, Trident Technical College, 1995
J.D., University of South Carolina School of Law, 1989
B.A., English Literature and Religion, University of Virginia, 1986
Evelyn Richards joined Motley Rice in 2007. As a law clerk for the Securities and Consumer Fraud practice group, she plays a key role in supporting the securities litigation team through editing, cite-checking and Shepardizing complaints, briefs, and other legal documents. She also trains support staff on how to use The Bluebook.

Evelyn has over 25 years of experience in the legal field. As an Assistant Solicitor for the Ninth Circuit Solicitor's Office, she prosecuted child abuse and neglect and criminal cases. She also worked as a programmer/analyst for a few years. Prior to joining Motley Rice, Evelyn worked as an administrator for a large telecom, corporate and litigation firm, supervising all office operations, including human resources and accounting procedures. She also served as office manager for a small worker's compensation law office, where she managed trust and operating accounts and provided information technology support.

Evelyn's diverse background in information technology, management, programming and analysis adds great depth to the resources provided to Motley Rice clients.

### Joshua Welch
EDUCATION:
M.B.A., The Citadel, 2017
B.S. with honors, The College of Charleston, 2015
As a Financial Analyst with the securities litigation team, Joshua Welch is responsible for monitoring client portfolios, analyzing investor losses, and conducting research on companies facing allegations of securities fraud. He also assists in submitting claims for securities class action settlements.

Joshua holds a Master of Business Administration degree from The Citadel, where he worked as a graduate assistant. As an undergraduate, he double-majored in Accounting and Business Administration.

Prior results do not guarantee a similar outcome.



**www.motleyrice.com**
**1 800.768.4026**

28 BRIDGESIDE BLVD.
MT. PLEASANT, SC 29464

**SC | RI | CT | NY | WV | DC | NJ | PA**

William H. Narwold (CT, DC, NY, SC) is the attorney responsible for this
communication. Prior results do not guarantee a similar outcome.
Motley Rice LLC, a South Carolina Limited Liability Company, is engaged in the
New Jersey practice of law through Motley Rice New Jersey LLC. Esther Berezofsky
attorney responsible for New Jersey practice.

*PD: 11.13.2023*

# EXHIBIT H

Case 3:24-cv-00334 Document 32-8 Filed 05/21/24 Page 307 of 420 PageID #: 2891

# Robbins Geller Rudman & Dowd LLP

# Firm Resume

Case 3:24-cv-00334 Document 32-68 Filed 06/04/24 Page 308 of 420 PageID #: 2802

# TABLE OF CONTENTS

INTRODUCTION......................................................................................................... 1

PRACTICE AREAS AND SERVICES.......................................................................... 2
    Securities Fraud............................................................................................ 2

PROMINENT CASES, PRECEDENT-SETTING DECISIONS, AND JUDICIAL COMMENDATIONS... 9
    Prominent Cases.......................................................................................... 9
    Precedent-Setting Decisions....................................................................... 18
    Additional Judicial Commendations............................................................ 24

ATTORNEY BIOGRAPHIES......................................................................................... 32
    Partners....................................................................................................... 32

# Introduction

Robbins Geller Rudman & Dowd LLP ("Robbins Geller" or the "Firm") is a 200-lawyer firm with offices in Boca Raton, Chicago, Manhattan, Melville, Nashville, San Diego, San Francisco, Philadelphia, Washington, D.C., and Wilmington (www.rgrdlaw.com). The Firm is actively engaged in complex litigation, emphasizing securities, consumer, antitrust, insurance, healthcare, human rights, and employment discrimination class actions. The Firm's unparalleled experience and capabilities in these fields are based upon the talents of its attorneys, who have successfully prosecuted thousands of class action lawsuits and numerous individual cases, recovering billions of dollars.

This successful track record stems from our experienced attorneys, including many who came to the Firm from federal or state law enforcement agencies. The Firm also includes several dozen former federal and state judicial clerks.

The Firm is committed to practicing law with the highest level of integrity in an ethical and professional manner. We are a diverse firm with lawyers and staff from all walks of life. Our lawyers and other employees are hired and promoted based on the quality of their work and their ability to treat others with respect and dignity.

We strive to be good corporate citizens and work with a sense of global responsibility. Contributing to our communities and environment is important to us. We often take cases on a *pro bono* basis and are committed to the rights of workers, and to the extent possible, we contract with union vendors. We care about civil rights, workers' rights and treatment, workplace safety, and environmental protection. Indeed, while we have built a reputation as the finest securities and consumer class action law firm in the nation, our lawyers have also worked tirelessly in less high-profile, but no less important, cases involving human rights and other social issues.

# Practice Areas and Services

## Securities Fraud

As recent corporate scandals demonstrate clearly, it has become all too common for companies and their executives – often with the help of their advisors, such as bankers, lawyers, and accountants – to manipulate the market price of their securities by misleading the public about the company's financial condition or prospects for the future. This misleading information has the effect of artificially inflating the price of the company's securities above their true value. When the underlying truth is eventually revealed, the prices of these securities plummet, harming those innocent investors who relied upon the company's misrepresentations.

Robbins Geller is the leader in the fight to protect investors from corporate securities fraud. We utilize a wide range of federal and state laws to provide investors with remedies, either by bringing a class action on behalf of all affected investors or, where appropriate, by bringing individual cases.

The Firm's reputation for excellence has been repeatedly noted by courts and has resulted in the appointment of Firm attorneys to lead roles in hundreds of complex class-action securities and other cases. In the securities area alone, the Firm's attorneys have been responsible for a number of outstanding recoveries on behalf of investors. Currently, Robbins Geller attorneys are lead or named counsel in hundreds of securities class action or large institutional-investor cases. Some notable current and past cases include:

- ***In re Enron Corp. Sec. Litig.***, No. H-01-3624 (S.D. Tex.). Robbins Geller attorneys and lead plaintiff The Regents of the University of California aggressively pursued numerous defendants, including many of Wall Street's biggest banks, and successfully obtained settlements in excess of ***$7.2 billion*** for the benefit of investors. ***This is the largest securities class action recovery in history***.

- ***Jaffe v. Household Int'l, Inc.***, No. 02-C-05893 (N.D. Ill.). As sole lead counsel, Robbins Geller obtained a record-breaking settlement of ***$1.575 billion*** after 14 years of litigation, including a six-week jury trial in 2009 that resulted in a securities fraud verdict in favor of the class. In 2015, the Seventh Circuit Court of Appeals upheld the jury's verdict that defendants made false or misleading statements of material fact about the company's business practices and financial results, but remanded the case for a new trial on the issue of whether the individual defendants "made" certain false statements, whether those false statements caused plaintiffs' losses, and the amount of damages. The parties reached an agreement to settle the case just hours before the retrial was scheduled to begin on June 6, 2016. ***The $1.575 billion settlement, approved in October 2016, is the largest ever following a securities fraud class action trial, the largest securities fraud settlement in the Seventh Circuit and the eighth-largest settlement ever in a post-PSLRA securities fraud case.*** According to published reports, the case was just the seventh securities fraud case tried to a verdict since the passage of the PSLRA.

- ***In re Valeant Pharms. Int'l, Inc. Sec. Litig.***, No. 3:15-cv-07658 (D.N.J.). As sole lead counsel, Robbins Geller attorneys obtained a $1.2 billion settlement in the securities case that *Vanity Fair* reported as "the corporate scandal of its era" that had raised "fundamental questions about the functioning of our health-care system, the nature of modern markets, and the slippery slope of ethical rationalizations." The settlement resolves claims that defendants made false and misleading statements regarding Valeant's business and financial performance during the class period, attributing Valeant's dramatic growth in revenues and profitability to "innovative new marketing approaches" as part of a business model that was low risk and "durable and sustainable." *Valeant* is the largest securities class action settlement against a pharmaceutical manufacturer and the ninth largest ever.

- ***In re Am. Realty Cap. Props., Inc. Litig.***, No. 1:15-mc-00040 (S.D.N.Y.).  As sole lead counsel, Robbins Geller attorneys zealously litigated the case arising out of ARCP's manipulative accounting practices and obtained a $1.025 billion settlement.  For five years, the litigation team prosecuted nine different claims for violations of the Securities Exchange Act of 1934 and the Securities Act of 1933, involving seven different stock or debt offerings and two mergers.  The recovery represents the highest percentage of damages of any major PSLRA case prior to trial and includes the largest personal contributions by individual defendants in history.

- ***In re UnitedHealth Grp. Inc. PSLRA Litig.***, No. 06-CV-1691 (D. Minn.).  Robbins Geller represented the California Public Employees' Retirement System ("CalPERS") and demonstrated its willingness to vigorously advocate for its institutional clients, even under the most difficult circumstances.  The Firm obtained an $895 million recovery on behalf of UnitedHealth shareholders, and former CEO William A. McGuire paid $30 million and returned stock options representing more than three million shares to the shareholders, bringing the total recovery for the class to over $925 million, the largest stock option backdating recovery ever, and ***a recovery that is more than four times larger than the next largest options backdating recovery***.  Moreover, Robbins Geller obtained unprecedented corporate governance reforms, including election of a shareholder-nominated member to the company's board of directors, a mandatory holding period for shares acquired by executives via option exercise, and executive compensation reforms that tie pay to performance.

- ***Alaska Elec. Pension Fund v. CitiGroup, Inc. (In re WorldCom Sec. Litig.)***, No. 03 Civ. 8269 (S.D.N.Y.).  Robbins Geller attorneys represented more than 50 private and public institutions that opted out of the class action case and sued WorldCom's bankers, officers and directors, and auditors in courts around the country for losses related to WorldCom bond offerings from 1998 to 2001.  The Firm's attorneys recovered more than $650 million for their clients, substantially more than they would have recovered as part of the class.

- ***Luther v. Countrywide Fin. Corp.***, No. 12-cv-05125 (C.D. Cal.).  Robbins Geller attorneys secured a $500 million settlement for institutional and individual investors in what is the largest RMBS purchaser class action settlement in history, and one of the largest class action securities settlements of all time.  The unprecedented settlement resolves claims against Countrywide and Wall Street banks that issued the securities.  The action was the first securities class action case filed against originators and Wall Street banks as a result of the credit crisis.  As co-lead counsel Robbins Geller forged through six years of hard-fought litigation, oftentimes litigating issues of first impression, in order to secure the landmark settlement for its clients and the class.

- ***In re Wachovia Preferred Sec. & Bond/Notes Litig.***, No. 09-cv-06351 (S.D.N.Y.).  On behalf of investors in bonds and preferred securities issued between 2006 and 2008, Robbins Geller and co-counsel obtained a significant settlement with Wachovia successor Wells Fargo & Company and Wachovia auditor KPMG LLP.  ***The total settlement – $627 million – is one of the largest credit-crisis settlements involving Securities Act claims and one of the 25 largest securities class action recoveries in history***. The settlement is also one of the biggest securities class action recoveries arising from the credit crisis. The lawsuit focused on Wachovia's exposure to "pick-a-pay" loans, which the bank's offering materials said were of "pristine credit quality," but which were actually allegedly made to subprime borrowers, and which ultimately massively impaired the bank's mortgage portfolio.  Robbins Geller served as co-lead counsel representing the City of Livonia Employees' Retirement System, Hawaii Sheet Metal Workers Pension Fund, and the investor class.

- ***In re Cardinal Health, Inc. Sec. Litig.***, No. C2-04-575 (S.D. Ohio).  As sole lead counsel representing Cardinal Health shareholders, Robbins Geller obtained a recovery of $600 million for investors on behalf of the lead plaintiffs, Amalgamated Bank, the New Mexico State Investment Council, and the California Ironworkers Field Trust Fund.  At the time, the $600 million settlement was the tenth-

largest settlement in the history of securities fraud litigation and is the largest-ever recovery in a securities fraud action in the Sixth Circuit.

- ***AOL Time Warner Cases I & II***, JCCP Nos. 4322 & 4325 (Cal. Super. Ct., Los Angeles Cnty.). Robbins Geller represented The Regents of the University of California, six Ohio state pension funds, Rabo Bank (NL), the Scottish Widows Investment Partnership, several Australian public and private funds, insurance companies, and numerous additional institutional investors, both domestic and international, in state and federal court opt-out litigation stemming from Time Warner's disastrous 2001 merger with Internet high flier America Online. After almost four years of litigation involving extensive discovery, the Firm secured combined settlements for its opt-out clients totaling over $629 million just weeks before The Regents' case pending in California state court was scheduled to go to trial. The Regents' gross recovery of $246 million is the largest individual opt-out securities recovery in history.

- ***In re HealthSouth Corp. Sec. Litig.***, No. CV-03-BE-1500-S (N.D. Ala.). As court-appointed co-lead counsel, Robbins Geller attorneys obtained a combined recovery of $671 million from HealthSouth, its auditor Ernst & Young, and its investment banker, UBS, for the benefit of stockholder plaintiffs. The settlement against HealthSouth represents one of the larger settlements in securities class action history and is considered among the top 15 settlements achieved after passage of the PSLRA. Likewise, the settlement against Ernst & Young is one of the largest securities class action settlements entered into by an accounting firm since the passage of the PSLRA.

- ***Jones v. Pfizer Inc.***, No. 1:10-cv-03864 (S.D.N.Y.). Lead plaintiff Stichting Philips Pensioenfonds obtained a $400 million settlement on behalf of class members who purchased Pfizer common stock during the January 19, 2006 to January 23, 2009 class period. The settlement against Pfizer resolves accusations that it misled investors about an alleged off-label drug marketing scheme. As sole lead counsel, Robbins Geller attorneys helped achieve this exceptional result after five years of hard-fought litigation against the toughest and the brightest members of the securities defense bar by litigating this case all the way to trial.

- ***In re Dynegy Inc. Sec. Litig.***, No. H-02-1571 (S.D. Tex.). As sole lead counsel representing The Regents of the University of California and the class of Dynegy investors, Robbins Geller attorneys obtained a combined settlement of $474 million from Dynegy, Citigroup, Inc., and Arthur Andersen LLP for their involvement in a clandestine financing scheme known as Project Alpha. Most notably, the settlement agreement provides that Dynegy will appoint two board members to be nominated by The Regents, which Robbins Geller and The Regents believe will benefit all of Dynegy's stockholders.

- ***In re Qwest Commc'ns Int'l, Inc. Sec. Litig.***, No. 01-cv-1451 (D. Colo.). In July 2001, the Firm filed the initial complaint in this action on behalf of its clients, long before any investigation into Qwest's financial statements was initiated by the SEC or Department of Justice. After five years of litigation, lead plaintiffs entered into a settlement with Qwest and certain individual defendants that provided a $400 million recovery for the class and created a mechanism that allowed the vast majority of class members to share in an additional $250 million recovered by the SEC. In 2008, Robbins Geller attorneys recovered an additional $45 million for the class in a settlement with defendants Joseph P. Nacchio and Robert S. Woodruff, the CEO and CFO, respectively, of Qwest during large portions of the class period.

- ***Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.***, No. 1:09-cv-03701 (S.D.N.Y.). Robbins Geller attorneys served as lead counsel for a class of investors and obtained court approval of a $388 million recovery in nine 2007 residential mortgage-backed securities offerings issued by J.P. Morgan. The settlement represents, on a percentage basis, the largest recovery ever achieved in an MBS purchaser class action. The result was achieved after more than five years of hard-fought litigation and an extensive investigation.

- ***Smilovits v. First Solar, Inc.***, No. 2:12-cv-00555 (D. Ariz.).  As sole lead counsel, Robbins Geller obtained a $350 million settlement in *Smilovits v. First Solar, Inc.*  The settlement, which was reached after a long legal battle and on the day before jury selection, resolves claims that First Solar violated §§10(b) and 20(a) of the Securities Exchange Act of 1934 and SEC Rule 10b-5.  The settlement is the fifth-largest PSLRA settlement ever recovered in the Ninth Circuit.

- ***NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.***, No. 1:08-cv-10783 (S.D.N.Y.). As sole lead counsel, Robbins Geller obtained a $272 million settlement on behalf of Goldman Sachs' shareholders.  The settlement concludes one of the last remaining mortgage-backed securities purchaser class actions arising out of the global financial crisis.  The remarkable result was achieved following seven years of extensive litigation.  After the claims were dismissed in 2010, Robbins Geller secured a landmark victory from the Second Circuit Court of Appeals that clarified the scope of permissible class actions asserting claims under the Securities Act of 1933 on behalf of MBS investors.  Specifically, the Second Circuit's decision rejected the concept of "tranche" standing and concluded that a lead plaintiff in an MBS class action has class standing to pursue claims on behalf of purchasers of other securities that were issued from the same registration statement and backed by pools of mortgages originated by the same lenders who had originated mortgages backing the lead plaintiff's securities.

- ***Schuh v. HCA Holdings, Inc.***, No. 3:11-cv-01033 (M.D. Tenn.).  As sole lead counsel, Robbins Geller obtained a groundbreaking $215 million settlement for former HCA Holdings, Inc. shareholders – the largest securities class action recovery ever in Tennessee.  Reached shortly before trial was scheduled to commence, the settlement resolves claims that the Registration Statement and Prospectus HCA filed in connection with the company's massive $4.3 billion 2011 IPO contained material misstatements and omissions.  The recovery achieved represents more than 30% of the aggregate classwide damages, far exceeding the typical recovery in a securities class action.

- ***In re AT&T Corp. Sec. Litig.***, MDL No. 1399 (D.N.J.).  Robbins Geller attorneys served as lead counsel for a class of investors that purchased AT&T common stock.  The case charged defendants AT&T and its former Chairman and CEO, C. Michael Armstrong, with violations of the federal securities laws in connection with AT&T's April 2000 initial public offering of its wireless tracking stock, one of the largest IPOs in American history.  After two weeks of trial, and on the eve of scheduled testimony by Armstrong and infamous telecom analyst Jack Grubman, defendants agreed to settle the case for $100 million.

- ***Silverman v. Motorola, Inc.***, No. 1:07-cv-04507 (N.D. Ill.).  The Firm served as lead counsel on behalf of a class of investors in Motorola, Inc., ultimately recovering $200 million for investors just two months before the case was set for trial.  This outstanding result was obtained despite the lack of an SEC investigation or any financial restatement.

- ***City of Pontiac Gen. Emps.' Ret. Sys. v. Wal-Mart Stores, Inc.***, No. 5:12-cv-05162 (W.D. Ark.). Robbins Geller attorneys and lead plaintiff City of Pontiac General Employees' Retirement System achieved a $160 million settlement in a securities class action case arising from allegations published by *The New York Times* in an article released on April 21, 2012 describing an alleged bribery scheme that occurred in Mexico.  The case charged that Wal-Mart portrayed itself to investors as a model corporate citizen that had proactively uncovered potential corruption and promptly reported it to law enforcement, when in truth, a former in-house lawyer had blown the whistle on Wal-Mart's corruption years earlier, and Wal-Mart concealed the allegations from law enforcement by refusing its own in-house and outside counsel's calls for an independent investigation.  Robbins Geller "achieved an exceptional [s]ettlement with skill, perseverance, and diligent advocacy," said Judge Hickey when granting final approval.

- ***Bennett v. Sprint Nextel Corp.***, No. 2:09-cv-02122 (D. Kan.). As co-lead counsel, Robbins Geller obtained a $131 million recovery for a class of Sprint investors. The settlement, secured after five years of hard-fought litigation, resolved claims that former Sprint executives misled investors concerning the success of Sprint's ill-advised merger with Nextel and the deteriorating credit quality of Sprint's customer base, artificially inflating the value of Sprint's securities.

- ***In re LendingClub Sec. Litig.***, No. 3:16-cv-02627 (N.D. Cal.). Robbins Geller attorneys obtained a $125 million settlement for the court-appointed lead plaintiff Water and Power Employees' Retirement, Disability and Death Plan of the City of Los Angeles and the class. The settlement resolved allegations that LendingClub promised investors an opportunity to get in on the ground floor of a revolutionary lending market fueled by the highest standards of honesty and integrity. The settlement ranked among the top ten largest securities recoveries ever in the Northern District of California.

- ***Knurr v. Orbital ATK, Inc.***, No. 1:16-cv-01031 (E.D. Va.). In the *Orbital* securities class action, Robbins Geller obtained court approval of a $108 million recovery for the class. The Firm succeeded in overcoming two successive motions to dismiss the case, and during discovery were required to file ten motions to compel, all of which were either negotiated to a resolution or granted in large part, which resulted in the production of critical evidence in support of plaintiffs' claims. Believed to be the fourth-largest securities class action settlement in the history of the Eastern District of Virginia, the settlement provides a recovery for investors that is more than ten times larger than the reported median recovery of estimated damages for all securities class action settlements in 2018.

- ***Hsu v. Puma Biotechnology***, No. SACV15-0865 (C.D. Cal.). After a two-week jury trial, Robbins Geller attorneys won a complete plaintiffs' verdict against both defendants on both claims, with the jury finding that Puma Biotechnology, Inc. and its CEO, Alan H. Auerbach, committed securities fraud. The Puma case is only the fifteenth securities class action case tried to a verdict since the Private Securities Litigation Reform Act was enacted in 1995.

- ***Marcus v. J.C. Penney Co., Inc.***, No. 13-cv-00736 (E.D. Tex.). Robbins Geller attorneys obtained a $97.5 million recovery on behalf of J.C. Penney shareholders. The result resolves claims that J.C. Penney and certain officers and directors made misstatements and/or omissions regarding the company's financial position that resulted in artificially inflated stock prices. Specifically, defendants failed to disclose and/or misrepresented adverse facts, including that J.C. Penney would have insufficient liquidity to get through year-end and would require additional funds to make it through the holiday season, and that the company was concealing its need for liquidity so as not to add to its vendors' concerns.

- ***Monroe County Employees' Retirement System v. The Southern Company***, No. 1:17-cv-00241 (N.D. Ga.). As lead counsel, Robbins Geller obtained an $87.5 million settlement in a securities class action on behalf of plaintiffs Monroe County Employees' Retirement System and Roofers Local No. 149 Pension Fund. The settlement resolves claims for violations of the Securities Exchange Act of 1934 stemming from defendants' issuance of materially misleading statements and omissions regarding the status of construction of a first-of-its-kind "clean coal" power plant in Kemper County, Mississippi. Plaintiffs alleged that these misstatements caused The Southern Company's stock price to be artificially inflated during the class period. Prior to resolving the case, Robbins Geller uncovered critical documentary evidence and deposition testimony supporting plaintiffs' claims. In granting final approval of the settlement, the court praised Robbins Geller for its "hard-fought litigation in the Eleventh Circuit" and its "experience, reputation, and abilities of [its] attorneys," and highlighted that the firm is "well-regarded in the legal community, especially in litigating class-action securities cases

- ***Chicago Laborers Pension Fund v. Alibaba Grp. Holding Ltd.***, No. CIV535692 (Cal. Super. Ct., San Mateo Cnty.). Robbins Geller attorneys and co-counsel obtained a $75 million settlement in the Alibaba Group Holding Limited securities class action, resolving investors' claims that Alibaba violated the Securities Act of 1933 in connection with its September 2014 initial public offering. Chicago Laborers Pension Fund served as a plaintiff in the action.

- ***Luna v. Marvell Tech. Grp., Ltd.***, No. 3:15-cv-05447 (N.D. Cal.). In the *Marvell* litigation, Robbins Geller attorneys represented the Plumbers and Pipefitters National Pension Fund and obtained a $72.5 million settlement. The case involved claims that Marvell reported revenue and earnings during the class period that were misleading as a result of undisclosed pull-in and concession sales. The settlement represents approximately 24% to 50% of the best estimate of classwide damages suffered by investors who purchased shares during the February 19, 2015 through December 7, 2015 class period.

- ***Garden City Emps.' Ret. Sys. v. Psychiatric Sols., Inc.***, No. 3:09-cv-00882 (M.D. Tenn.). In the *Psychiatric Solutions* case, Robbins Geller represented lead plaintiff and class representative Central States, Southeast and Southwest Areas Pension Fund in litigation spanning more than four years. Psychiatric Solutions and its top executives were accused of insufficiently staffing their in-patient hospitals, downplaying the significance of regulatory investigations and manipulating their malpractice reserves. Just days before trial was set to commence, attorneys from Robbins Geller achieved a $65 million settlement that was the fourth-largest securities recovery ever in the district and one of the largest in a decade.

- ***Plumbers & Pipefitters Nat'l Pension Fund v. Burns***, No. 3:05-cv-07393 (N.D. Ohio). After 11 years of hard-fought litigation, Robbins Geller attorneys secured a $64 million recovery for shareholders in a case that accused the former heads of Dana Corp. of securities fraud for trumpeting the auto parts maker's condition while it actually spiraled toward bankruptcy. The Firm's Appellate Practice Group successfully appealed to the Sixth Circuit Court of Appeals twice, reversing the district court's dismissal of the action.

- ***Villella v. Chemical and Mining Company of Chile Inc.***, No. 1:15-cv-02106 (S.D.N.Y.) Robbins Geller attorneys, serving as lead consel, obtained a $62.5 million settlement against Sociedad Química y Minera de Chile S.A. ("SQM"), a Chilean mining company. The case alleged that SQM violated the Securities Exchange Act of 1934 by issuing materially false and misleading statements regarding the company's failure to disclose that money from SQM was channeled illegally to electoral campaigns for Chilean politicians and political parties as far back as 2009. SQM had also filed millions of dollars' worth of fictitious tax receipts with Chilean authorities in order to conceal bribery payments from at least 2009 through fiscal 2014. Due to the company being based out of Chile and subject to Chilean law and rules, the Robbins Geller litigation team put together a multilingual litigation team with Chilean expertise. Depositions are considered unlawful in the country of Chile, so Robbins Geller successfully moved the court to compel SQM to bring witnesses to the United States.

- ***In re BHP Billiton Ltd. Sec. Litig.***, No. 1:16-cv-01445 (S.D.N.Y.). As lead counsel, Robbins Geller obtained a $50 million class action settlement against BHP, a Australian-based mining company that was accused of failing to disclose significant safety problems at the Fundão iron-ore dam, in Brazil. The Firm achieved this result for lead plaintiffs City of Birmingham Retirement and Relief System and City of Birmingham Firemen's and Policemen's Supplemental Pension System, on behalf of purchasers of the American Depositary Shares ("ADRs") of defendants BHP Billiton Limited and BHP Billiton Plc (together, "BHP") from September 25, 2014 to November 30, 2015.

- ***In re St. Jude Med., Inc. Sec. Litig.***, No. 0:10-cv-00851 (D. Minn.). After four and a half years of litigation and mere weeks before the jury selection, Robbins Geller obtained a $50 million settlement on

behalf of investors in medical device company St. Jude Medical. The settlement resolves accusations that St. Jude Medical misled investors by utilizing heavily discounted end-of-quarter bulk sales to meet quarterly expectations, which created a false picture of demand by increasing customer inventory due of St. Jude Medical devices. The complaint alleged that the risk of St. Jude Medical's reliance on such bulk sales manifested when it failed to meet its forecast guidance for the third quarter of 2009, which the company had reaffirmed only weeks earlier.

- ***Deka Investment GmbH v. Santander Consumer USA Holdings Inc.***, No. 3:15-cv-02129 (N.D. Tex.). Robbins Geller and co-counsel secured a $47 million settlement in a securities class action against Santander Consumer USA Holdings Inc. ("SCUSA"). The case alleges that SCUSA, 2 of its officers, 10 of its directors, as well as 17 underwriters of its January 23, 2014 multi-billion dollar IPO violated §§11, 12(a)(2), and 15 of the Securities Act of 1933 as a result of their negligence in connection with misrepresentations in the prospectus and registration statement for the IPO ("Offering Documents"). The complaint also alleged that SCUSA and two of its officers violated §§10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 as a result of their fraud in issuing misleading statements in the IPO Offering Documents as well as in subsequent statements to investors.

- ***Snap Inc. Securities Cases***, JCCP No. 4960 (Cal. Super. Ct., Los Angeles Cnty). Robbins Geller, along with co-counsel, reached a settlement in the Snap, Inc. securities class action, providing for the payment of $32,812,500 to eligible settlement class members. The securities class action sought remedies under §§11, 12(a)(2) and 15 of the Securities Act of 1933. The case alleged that Snap, certain Snap officers and directors, and the underwriters for Snap's Initial Public Offering ("IPO") were liable for materially false and misleading statements and omissions in the Registration Statement for the IPO, related to trends and uncertainties in Snap's growth metrics, a potential patent-infringement action, and stated risk factors.

Robbins Geller's securities practice is also strengthened by the existence of a strong appellate department, whose collective work has established numerous legal precedents. The securities practice also utilizes an extensive group of in-house economic and damage analysts, investigators, and forensic accountants to aid in the prosecution of complex securities issues.

# Prominent Cases, Precedent-Setting Decisions, and Judicial Commendations

## Prominent Cases

Over the years, Robbins Geller attorneys have obtained outstanding results in some of the most notorious and well-known cases, frequently earning judicial commendations for the quality of their representation.

- ***In re Enron Corp. Sec. Litig.***, No. H-01-3624 (S.D. Tex.). Investors lost billions of dollars as a result of the massive fraud at Enron. In appointing Robbins Geller lawyers as sole lead counsel to represent the interests of Enron investors, the court found that the Firm's zealous prosecution and level of "insight" set it apart from its peers. Robbins Geller attorneys and lead plaintiff The Regents of the University of California aggressively pursued numerous defendants, including many of Wall Street's biggest banks, and successfully obtained settlements in excess of ***$7.2 billion*** for the benefit of investors. ***This is the largest securities class action recovery in history***.

  The court overseeing this action had utmost praise for Robbins Geller's efforts and stated that "[t]he experience, ability, and reputation of the attorneys of [Robbins Geller] is not disputed; it is one of the most successful law firms in securities class actions, if not the preeminent one, in the country." *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 586 F. Supp. 2d 732, 797 (S.D. Tex. 2008).

  The court further commented: "[I]n the face of extraordinary obstacles, the skills, expertise, commitment, and tenacity of [Robbins Geller] in this litigation cannot be overstated. Not to be overlooked are the unparalleled results, . . . which demonstrate counsel's clearly superlative litigating and negotiating skills." *Id.* at 789.

  The court stated that the Firm's attorneys "are to be commended for their zealousness, their diligence, their perseverance, their creativity, the enormous breadth and depth of their investigations and analysis, and their expertise in all areas of securities law on behalf of the proposed class." *Id.*

  In addition, the court noted, "This Court considers [Robbins Geller] 'a lion' at the securities bar on the national level," noting that the Lead Plaintiff selected Robbins Geller because of the Firm's "outstanding reputation, experience, and success in securities litigation nationwide." *Id.* at 790.

  The court further stated that "Lead Counsel's fearsome reputation and successful track record undoubtedly were substantial factors in . . . obtaining these recoveries." *Id.*

  Finally, Judge Harmon stated: "As this Court has explained [this is] an extraordinary group of attorneys who achieved the largest settlement fund ever despite the great odds against them." *Id.* at 828.

- ***Jaffe v. Household Int'l, Inc.***, No. 02-C-05893 (N.D. Ill). As sole lead counsel, Robbins Geller obtained a record-breaking settlement of ***$1.575 billion*** after 14 years of litigation, including a six-week jury trial in 2009 that resulted in a securities fraud verdict in favor of the class. In 2015, the Seventh Circuit Court of Appeals upheld the jury's verdict that defendants made false or misleading statements of material fact about the company's business practices and financial results, but remanded the case for a new trial on the issue of whether the individual defendants "made" certain false statements, whether those false statements caused plaintiffs' losses, and the amount of damages. The parties reached an agreement to settle the case just hours before the retrial was scheduled to begin on June 6, 2016. ***The $1.575 billion settlement, approved in October 2016, is the largest ever***

*following a securities fraud class action trial, the largest securities fraud settlement in the Seventh Circuit and the eighth-largest settlement ever in a post-PSLRA securities fraud case.* According to published reports, the case was just the seventh securities fraud case tried to a verdict since the passage of the PSLRA.

In approving the settlement, the Honorable Jorge L. Alonso noted the team's "skill and determination" while recognizing that "Lead Counsel prosecuted the case vigorously and skillfully over 14 years against nine of the country's most prominent law firms" and "achieved an exceptionally significant recovery for the class." The court added that the team faced "significant hurdles" and "uphill battles" throughout the case and recognized that "[c]lass counsel performed a very high-quality legal work in the context of a thorny case in which the state of the law has been and is in flux." The court succinctly concluded that the settlement was "a spectacular result for the class." *Jaffe v. Household Int'l, Inc.*, No. 02-C-5892, 2016 U.S. Dist. LEXIS 156921, at *8 (N.D. Ill. Nov. 10, 2016); *Jaffe v. Household Int'l, Inc.*, No. 02-C-05893, Transcript at 56, 65 (N.D. Ill. Oct. 20, 2016).

- *In re Valeant Pharms. Int'l, Inc. Sec. Litig.*, No. 3:15-cv-07658 (D.N.J.). As sole lead counsel, Robbins Geller attorneys obtained a $1.2 billion settlement in the securities case that *Vanity Fair* reported as "the corporate scandal of its era" that had raised "fundamental questions about the functioning of our health-care system, the nature of modern markets, and the slippery slope of ethical rationalizations." The settlement resolves claims that defendants made false and misleading statements regarding Valeant's business and financial performance during the class period, attributing Valeant's dramatic growth in revenues and profitability to "innovative new marketing approaches" as part of a business model that was low risk and "durable and sustainable." *Valeant* is the largest securities class action settlement against a pharmaceutical manufacturer and the ninth largest ever.

- *In re Am. Realty Cap. Props., Inc. Litig.*, No. 1:15-mc-00040 (S.D.N.Y.). As sole lead counsel, Robbins Geller attorneys zealously litigated the case arising out of ARCP's manipulative accounting practices and obtained a $1.025 billion settlement. For five years, the litigation team prosecuted nine different claims for violations of the Securities Exchange Act of 1934 and Securities Act of 1933, involving seven different stock or debt offerings and two mergers. The recovery represents the highest percentage of damages of any major PSLRA case prior to trial and includes the largest personal contributions by individual defendants in history.

  In approving the settlement, the Honorable Alvin K. Hellerstein lauded the Robbins Geller litigation team, noting: "My own observation is that plaintiffs' representation is adequate and that the role of lead counsel was fulfilled in an extremely fine fashion by [Robbins Geller]. At every juncture, the representations made to me were reliable, the arguments were cogent, and the representation of their client was zealous."

- *In re UnitedHealth Grp. Inc. PSLRA Litig.*, No. 06-CV-1691 (D. Minn.). In the *UnitedHealth* case, Robbins Geller represented the California Public Employees' Retirement System ("CalPERS") and demonstrated its willingness to vigorously advocate for its institutional clients, even under the most difficult circumstances. For example, in 2006, the issue of high-level executives backdating stock options made national headlines. During that time, many law firms, including Robbins Geller, brought shareholder derivative lawsuits against the companies' boards of directors for breaches of their fiduciary duties or for improperly granting backdated options. Rather than pursuing a shareholder derivative case, the Firm filed a securities fraud class action against the company on behalf of CalPERS. In doing so, Robbins Geller faced significant and unprecedented legal obstacles with respect to loss causation, *i.e.*, that defendants' actions were responsible for causing the stock losses. Despite these legal hurdles, Robbins Geller obtained an $895 million recovery on behalf of the UnitedHealth shareholders. Shortly after reaching the $895 million settlement with UnitedHealth, the remaining corporate defendants, including former CEO William A. McGuire, also settled. McGuire paid

$30 million and returned stock options representing more than three million shares to the shareholders. The total recovery for the class was over $925 million, the largest stock option backdating recovery ever, and ***a recovery that is more than four times larger than the next largest options backdating recovery***. Moreover, Robbins Geller obtained unprecedented corporate governance reforms, including election of a shareholder-nominated member to the company's board of directors, a mandatory holding period for shares acquired by executives via option exercise, and executive compensation reforms that tie pay to performance.

- ***Alaska Elec. Pension Fund v. CitiGroup, Inc. (In re WorldCom Sec. Litig.)***, No. 03 Civ. 8269 (S.D.N.Y.). Robbins Geller attorneys represented more than 50 private and public institutions that opted out of the class action case and sued WorldCom's bankers, officers and directors, and auditors in courts around the country for losses related to WorldCom bond offerings from 1998 to 2001. The Firm's clients included major public institutions from across the country such as CalPERS, CalSTRS, the state pension funds of Maine, Illinois, New Mexico, and West Virginia, union pension funds, and private entities such as AIG and Northwestern Mutual. Robbins Geller attorneys recovered more than $650 million for their clients, substantially more than they would have recovered as part of the class.

- ***Luther v. Countrywide Fin. Corp.***, No. 12-cv-05125 (C.D. Cal.). Robbins Geller attorneys secured a $500 million settlement for institutional and individual investors in what is the largest RMBS purchaser class action settlement in history, and one of the largest class action securities settlements of all time. The unprecedented settlement resolves claims against Countrywide and Wall Street banks that issued the securities. The action was the first securities class action case filed against originators and Wall Street banks as a result of the credit crisis. As co-lead counsel Robbins Geller forged through six years of hard-fought litigation, oftentimes litigating issues of first impression, in order to secure the landmark settlement for its clients and the class.

In approving the settlement, Judge Mariana R. Pfaelzer repeatedly complimented plaintiffs' attorneys, noting that it was "beyond serious dispute that Class Counsel has vigorously prosecuted the Settlement Actions on both the state and federal level over the last six years." Judge Pfaelzer also commented that "[w]ithout a settlement, these cases would continue indefinitely, resulting in significant risks to recovery and continued litigation costs. It is difficult to understate the risks to recovery if litigation had continued." *Me. State Ret. Sys. v. Countrywide Fin. Corp.*, No. 2:10-CV-00302, 2013 U.S. Dist. LEXIS 179190, at *44, *56 (C.D. Cal. Dec. 5, 2013).

Judge Pfaelzer further noted that the proposed $500 million settlement represents one of the "largest MBS class action settlements to date. Indeed, this settlement easily surpasses the next largest . . . MBS settlement." *Id*. at *59.

- ***In re Wachovia Preferred Sec. & Bond/Notes Litig.***, No. 09-cv-06351 (S.D.N.Y.). In litigation over bonds and preferred securities, issued by Wachovia between 2006 and 2008, Robbins Geller and co-counsel obtained a significant settlement with Wachovia successor Wells Fargo & Company ($590 million) and Wachovia auditor KPMG LLP ($37 million). ***The total settlement − $627 million − is one of the largest credit-crisis settlements involving Securities Act claims and one of the 25 largest securities class action recoveries in history***. The settlement is also one of the biggest securities class action recoveries arising from the credit crisis.

  As alleged in the complaint, the offering materials for the bonds and preferred securities misstated and failed to disclose the true nature and quality of Wachovia's mortgage loan portfolio, which exposed the bank and misled investors to tens of billions of dollars in losses on mortgage-related assets. In reality, Wachovia employed high-risk underwriting standards and made loans to subprime borrowers, contrary to the offering materials and their statements of "pristine credit quality." Robbins Geller served as co-lead counsel representing the City of Livonia Employees' Retirement System, Hawaii Sheet Metal Workers Pension Fund, and the investor class.

- ***In re Cardinal Health, Inc. Sec. Litig.***, No. C2-04-575 (S.D. Ohio). As sole lead counsel representing Cardinal Health shareholders, Robbins Geller obtained a recovery of $600 million for investors. On behalf of the lead plaintiffs, Amalgamated Bank, the New Mexico State Investment Council, and the California Ironworkers Field Trust Fund, the Firm aggressively pursued class claims and won numerous courtroom victories, including a favorable decision on defendants' motion to dismiss. *In re Cardinal Health, Inc. Sec. Litigs.*, 426 F. Supp. 2d 688 (S.D. Ohio 2006). At the time, the $600 million settlement was the tenth-largest settlement in the history of securities fraud litigation and is the largest-ever recovery in a securities fraud action in the Sixth Circuit. Judge Marbley commented: "[T]his is an extraordinary settlement relative to all the other settlements in cases of this nature and certainly cases of this magnitude. . . . This was an outstanding settlement. . . . [I]n most instances, if you've gotten four cents on the dollar, you've done well. You've gotten twenty cents on the dollar, so that's been extraordinary. *In re Cardinal Health, Inc. Sec. Litig.*, No. 2:04-CV-575, Transcript at 16, 32 (S.D. Ohio Oct. 19, 2007). Judge Marbley further stated:

  > The quality of representation in this case was superb. Lead Counsel, [Robbins Geller], are nationally recognized leaders in complex securities litigation class actions. The quality of the representation is demonstrated by the substantial benefit achieved for the Class and the efficient, effective prosecution and resolution of this action. Lead Counsel defeated a volley of motions to dismiss, thwarting well-formed challenges from prominent and capable attorneys from six different law firms.

  *In re Cardinal Health Inc. Sec. Litigs.*, 528 F. Supp. 2d 752, 768 (S.D. Ohio 2007).

- ***AOL Time Warner Cases I & II***, JCCP Nos. 4322 & 4325 (Cal. Super. Ct., Los Angeles Cnty.). Robbins Geller represented The Regents of the University of California, six Ohio state pension funds, Rabo Bank (NL), the Scottish Widows Investment Partnership, several Australian public and private funds, insurance companies, and numerous additional institutional investors, both domestic and international, in state and federal court opt-out litigation stemming from Time Warner's disastrous 2001 merger with Internet high flier America Online. Robbins Geller attorneys exposed a massive and sophisticated accounting fraud involving America Online's e-commerce and advertising revenue. After almost four years of litigation involving extensive discovery, the Firm secured combined settlements for its opt-out clients totaling over $629 million just weeks before The Regents' case pending in California state court was scheduled to go to trial. The Regents' gross recovery of $246 million is the largest individual opt-out securities recovery in history.

- ***Abu Dhabi Commercial Bank v. Morgan Stanley & Co.***, No. 1:08-cv-07508-SAS-DCF (S.D.N.Y.), and ***King County, Washington v. IKB Deutsche Industriebank AG***, No. 1:09-cv-08387-SAS (S.D.N.Y.).  The Firm represented multiple institutional investors in successfully pursuing recoveries from two failed structured investment vehicles, each of which had been rated "AAA" by Standard & Poors and Moody's, but which failed fantastically in 2007.  The matter settled just prior to trial in 2013.  This result was only made possible after Robbins Geller lawyers beat back the rating agencies' longtime argument that ratings were opinions protected by the First Amendment.

- ***In re HealthSouth Corp. Sec. Litig.***, No. CV-03-BE-1500-S (N.D. Ala.).  As court-appointed co-lead counsel, Robbins Geller attorneys obtained a combined recovery of $671 million from HealthSouth, its auditor Ernst & Young, and its investment banker, UBS, for the benefit of stockholder plaintiffs.  The settlement against HealthSouth represents one of the larger settlements in securities class action history and is considered among the top 15 settlements achieved after passage of the PSLRA.  Likewise, the settlement against Ernst & Young is one of the largest securities class action settlements entered into by an accounting firm since the passage of the PSLRA.  HealthSouth and its financial advisors perpetrated one of the largest and most pervasive frauds in the history of U.S. healthcare, prompting Congressional and law enforcement inquiry and resulting in guilty pleas of 16 former HealthSouth executives in related federal criminal prosecutions.  In March 2009, Judge Karon Bowdre commented in the *HealthSouth* class certification opinion: "The court has had many opportunities since November 2001 to examine the work of class counsel and the supervision by the Class Representatives.  The court finds both to be far more than adequate."  *In re HealthSouth Corp. Sec. Litig.*, 257 F.R.D. 260, 275 (N.D. Ala. 2009).

- ***In re Facebook Biometric Info. Privacy Litig.,*** No. 3:15-cv-03747 (N.D. Cal.).  Robbins Geller served as co-lead class counsel in a cutting-edge certified class action, securing a record-breaking $650 million all-cash settlement, the largest privacy settlement in history.  The case concerned Facebook's alleged privacy violations through its collection of its users' biometric identifiers without informed consent through its "Tag Suggestions" feature, which uses proprietary facial recognition software to extract from user-uploaded photographs the unique biometric identifiers (*i.e.*, graphical representations of facial features, also known as facial geometry) associated with people's faces and identify who they are.  The Honorable James Donato called the settlement "a groundbreaking settlement in a novel area" and praised the unprecedented 22% claims rate as "pretty phenomenal" and "a pretty good day in class settlement history."

- ***In re Dynegy Inc. Sec. Litig.***, No. H-02-1571 (S.D. Tex.).  As sole lead counsel representing The Regents of the University of California and the class of Dynegy investors, Robbins Geller attorneys obtained a combined settlement of $474 million from Dynegy, Citigroup, Inc., and Arthur Andersen LLP for their involvement in a clandestine financing scheme known as Project Alpha.  Given Dynegy's limited ability to pay, Robbins Geller attorneys structured a settlement (reached shortly before the commencement of trial) that maximized plaintiffs' recovery without bankrupting the company.  Most notably, the settlement agreement provides that Dynegy will appoint two board members to be nominated by The Regents, which Robbins Geller and The Regents believe will benefit all of Dynegy's stockholders.

- ***Jones v. Pfizer Inc.***, No. 1:10-cv-03864 (S.D.N.Y.).  Lead plaintiff Stichting Philips Pensioenfonds obtained a $400 million settlement on behalf of class members who purchased Pfizer common stock during the January 19, 2006 to January 23, 2009 class period.  The settlement against Pfizer resolves accusations that it misled investors about an alleged off-label drug marketing scheme.  As sole lead counsel, Robbins Geller attorneys helped achieve this exceptional result after five years of hard-fought litigation against the toughest and the brightest members of the securities defense bar by litigating this case all the way to trial.

In approving the settlement, United States District Judge Alvin K. Hellerstein commended the Firm, noting that "[w]ithout the quality and the toughness that you have exhibited, our society would not be as good as it is with all its problems.  So from me to you is a vote of thanks for devoting yourself to this work and doing it well. . . .  You did a really good job.  Congratulations."

- ***In re Qwest Commc'ns Int'l, Inc. Sec. Litig.***, No. 01-cv-1451 (D. Colo.).  Robbins Geller attorneys served as lead counsel for a class of investors that purchased Qwest securities.  In July 2001, the Firm filed the initial complaint in this action on behalf of its clients, long before any investigation into Qwest's financial statements was initiated by the SEC or Department of Justice.  After five years of litigation, lead plaintiffs entered into a settlement with Qwest and certain individual defendants that provided a $400 million recovery for the class and created a mechanism that allowed the vast majority of class members to share in an additional $250 million recovered by the SEC.  In 2008, Robbins Geller attorneys recovered an additional $45 million for the class in a settlement with defendants Joseph P. Nacchio and Robert S. Woodruff, the CEO and CFO, respectively, of Qwest during large portions of the class period.

- ***Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.***, No. 1:09-cv-03701 (S.D.N.Y.).  Robbins Geller attorneys served as lead counsel for a class of investors and obtained court approval of a $388 million recovery in nine 2007 residential mortgage-backed securities offerings issued by J.P. Morgan.  The settlement represents, on a percentage basis, the largest recovery ever achieved in an MBS purchaser class action.  The result was achieved after more than five years of hard-fought litigation and an extensive investigation.  In granting approval of the settlement, the court stated the following about Robbins Geller attorneys litigating the case: "[T]here is no question in my mind that this is a very good result for the class and that the plaintiffs' counsel fought the case very hard with extensive discovery, a lot of depositions, several rounds of briefing of various legal issues going all the way through class certification."

- ***Smilovits v. First Solar, Inc.***, No. 2:12-cv-00555 (D. Ariz.).  As sole lead counsel, Robbins Geller obtained a $350 million settlement in *Smilovits v. First Solar, Inc.*  The settlement, which was reached after a long legal battle and on the day before jury selection, resolves claims that First Solar violated §§10(b) and 20(a) of the Securities Exchange Act of 1934 and SEC Rule 10b-5.  The settlement is the fifth-largest PSLRA settlement ever recovered in the Ninth Circuit.

- ***NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.***, No. 1:08-cv-10783 (S.D.N.Y.).  As sole lead counsel, Robbins Geller obtained a $272 million settlement on behalf of Goldman Sachs' shareholders.  The settlement concludes one of the last remaining mortgage-backed securities purchaser class actions arising out of the global financial crisis.  The remarkable result was achieved following seven years of extensive litigation.  After the claims were dismissed in 2010, Robbins Geller secured a landmark victory from the Second Circuit Court of Appeals that clarified the scope of permissible class actions asserting claims under the Securities Act of 1933 on behalf of MBS investors.  Specifically, the Second Circuit's decision rejected the concept of "tranche" standing and concluded that a lead plaintiff in an MBS class action has class standing to pursue claims on behalf of purchasers of other securities that were issued from the same registration statement and backed by pools of mortgages originated by the same lenders who had originated mortgages backing the lead plaintiff's securities.

In approving the settlement, the Honorable Loretta A. Preska of the Southern District of New York complimented Robbins Geller attorneys, noting:

> Counsel, thank you for your papers.  They were, by the way, extraordinary papers in support of the settlement, and I will particularly note Professor Miller's declaration in which he details the procedural aspects of the case and then speaks of

plaintiffs' counsel's success in the Second Circuit essentially changing the law.

I will also note what counsel have said, and that is that this case illustrates the proper functioning of the statute.

\*        \*        \*

Counsel, you can all be proud of what you've done for your clients. You've done an extraordinarily good job.

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, No. 1:08-cv-10783, Transcript at 10-11 (S.D.N.Y. May 2, 2016).

- ***Schuh v. HCA Holdings, Inc.***, No. 3:11-cv-01033 (M.D. Tenn.). As sole lead counsel, Robbins Geller obtained a groundbreaking $215 million settlement for former HCA Holdings, Inc. shareholders – the largest securities class action recovery ever in Tennessee. Reached shortly before trial was scheduled to commence, the settlement resolves claims that the Registration Statement and Prospectus HCA filed in connection with the company's massive $4.3 billion 2011 IPO contained material misstatements and omissions. The recovery achieved represents more than 30% of the aggregate classwide damages, far exceeding the typical recovery in a securities class action. At the hearing on final approval of the settlement, the Honorable Kevin H. Sharp described Robbins Geller attorneys as "gladiators" and commented: "Looking at the benefit obtained, the effort that you had to put into it, [and] the complexity in this case . . . I appreciate the work that you all have done on this." *Schuh v. HCA Holdings, Inc.*, No. 3:11-CV-01033, Transcript at 12-13 (M.D. Tenn. Apr. 11, 2016).

- ***Silverman v. Motorola, Inc.***, No. 1:07-cv-04507 (N.D. Ill.). The Firm served as lead counsel on behalf of a class of investors in Motorola, ultimately recovering $200 million for investors just two months before the case was set for trial. This outstanding result was obtained despite the lack of an SEC investigation or any financial restatement. In May 2012, the Honorable Amy J. St. Eve of the Northern District of Illinois commented: "The representation that [Robbins Geller] provided to the class was significant, both in terms of quality and quantity." *Silverman v. Motorola, Inc.*, No. 07 C 4507, 2012 U.S. Dist. LEXIS 63477, at \*11 (N.D. Ill. May 7, 2012), *aff'd*, 739 F.3d 956 (7th Cir. 2013).

In affirming the district court's award of attorneys' fees, the Seventh Circuit noted that "no other law firm was willing to serve as lead counsel. Lack of competition not only implies a higher fee but also suggests that most members of the securities bar saw this litigation as too risky for their practices." *Silverman v. Motorola Sols., Inc.*, 739 F.3d 956, 958 (7th Cir. 2013).

- ***In re AT&T Corp. Sec. Litig.***, MDL No. 1399 (D.N.J.). Robbins Geller attorneys served as lead counsel for a class of investors that purchased AT&T common stock. The case charged defendants AT&T and its former Chairman and CEO, C. Michael Armstrong, with violations of the federal securities laws in connection with AT&T's April 2000 initial public offering of its wireless tracking stock, one of the largest IPOs in American history. After two weeks of trial, and on the eve of scheduled testimony by Armstrong and infamous telecom analyst Jack Grubman, defendants agreed to settle the case for $100 million. In granting approval of the settlement, the court stated the following about the Robbins Geller attorneys handling the case:

Lead Counsel are highly skilled attorneys with great experience in prosecuting complex securities action[s], and their professionalism and diligence displayed during [this] litigation substantiates this characterization. The Court notes that Lead Counsel displayed excellent lawyering skills through their consistent preparedness during court proceedings, arguments and the trial, and their well-written and thoroughly researched

submissions to the Court. Undoubtedly, the attentive and persistent effort of Lead Counsel was integral in achieving the excellent result for the Class.

*In re AT&T Corp. Sec. Litig.*, MDL No. 1399, 2005 U.S. Dist. LEXIS 46144, at *28-*29 (D.N.J. Apr. 25, 2005), *aff'd*, 455 F.3d 160 (3d Cir. 2006).

- ***In re Dollar Gen. Corp. Sec. Litig.***, No. 01-CV-00388 (M.D. Tenn.). Robbins Geller attorneys served as lead counsel in this case in which the Firm recovered $172.5 million for investors. The *Dollar General* settlement was the largest shareholder class action recovery ever in Tennessee.

- ***Carpenters Health & Welfare Fund v. Coca-Cola Co.***, No. 00-CV-2838 (N.D. Ga.). As co-lead counsel representing Coca-Cola shareholders, Robbins Geller attorneys obtained a recovery of $137.5 million after nearly eight years of litigation. Robbins Geller attorneys traveled to three continents to uncover the evidence that ultimately resulted in the settlement of this hard-fought litigation. The case concerned Coca-Cola's shipping of excess concentrate at the end of financial reporting periods for the sole purpose of meeting analyst earnings expectations, as well as the company's failure to properly account for certain impaired foreign bottling assets.

- ***Schwartz v. TXU Corp.***, No. 02-CV-2243 (N.D. Tex.). As co-lead counsel, Robbins Geller attorneys obtained a recovery of over $149 million for a class of purchasers of TXU securities. The recovery compensated class members for damages they incurred as a result of their purchases of TXU securities at inflated prices. Defendants had inflated the price of these securities by concealing the fact that TXU's operating earnings were declining due to a deteriorating gas pipeline and the failure of the company's European operations.

- ***In re Doral Fin. Corp. Sec. Litig.***, 05 MDL No. 1706 (S.D.N.Y.). In July 2007, the Honorable Richard Owen of the Southern District of New York approved the $129 million settlement, finding in his order:

  > The services provided by Lead Counsel [Robbins Geller] were efficient and highly successful, resulting in an outstanding recovery for the Class without the substantial expense, risk and delay of continued litigation. Such efficiency and effectiveness supports the requested fee percentage.
  >
  > Cases brought under the federal securities laws are notably difficult and notoriously uncertain. . . . Despite the novelty and difficulty of the issues raised, Lead Plaintiffs' counsel secured an excellent result for the Class.
  >
  > . . . Based upon Lead Plaintiff's counsel's diligent efforts on behalf of the Class, as well as their skill and reputations, Lead Plaintiff's counsel were able to negotiate a very favorable result for the Class. . . . The ability of [Robbins Geller] to obtain such a favorable partial settlement for the Class in the face of such formidable opposition confirms the superior quality of their representation . . . .

  *In re Doral Fin. Corp. Sec. Litig.*, No. 1:05-md-01706, Order at 4-5 (S.D.N.Y. July 17, 2007).

- ***In re Exxon Valdez***, No. A89 095 Civ. (D. Alaska), and ***In re Exxon Valdez Oil Spill Litig.***, No. 3 AN 89 2533 (Alaska Super. Ct., 3d Jud. Dist.). Robbins Geller attorneys served on the Plaintiffs' Coordinating Committee and Plaintiffs' Law Committee in this massive litigation resulting from the Exxon Valdez oil spill in Alaska in March 1989. The jury awarded hundreds of millions in compensatory damages, as well as $5 billion in punitive damages (the latter were later reduced by the U.S. Supreme Court to $507 million).

- ***Mangini v. R.J. Reynolds Tobacco Co.***, No. 939359 (Cal. Super. Ct., San Francisco Cnty.). In this case, R.J. Reynolds admitted that "the *Mangini* action, and the way that it was vigorously litigated, was an early, significant and unique driver of the overall legal and social controversy regarding underage smoking that led to the decision to phase out the Joe Camel Campaign."

- ***Does I v. The Gap, Inc.***, No. 01 0031 (D. N. Mar. I.). In this groundbreaking case, Robbins Geller attorneys represented a class of 30,000 garment workers who alleged that they had worked under sweatshop conditions in garment factories in Saipan that produced clothing for top U.S. retailers such as The Gap, Target, and J.C. Penney. In the first action of its kind, Robbins Geller attorneys pursued claims against the factories and the retailers alleging violations of RICO, the Alien Tort Claims Act, and the Law of Nations based on the alleged systemic labor and human rights abuses occurring in Saipan. This case was a companion to two other actions: ***Does I v. Advance Textile Corp.***, No. 99 0002 (D. N. Mar. I.), which alleged overtime violations by the garment factories under the Fair Labor Standards Act and local labor law, and ***UNITE v. The Gap, Inc.***, No. 300474 (Cal. Super. Ct., San Francisco Cty.), which alleged violations of California's Unfair Practices Law by the U.S. retailers. These actions resulted in a settlement of approximately $20 million that included a comprehensive monitoring program to address past violations by the factories and prevent future ones. The members of the litigation team were honored as Trial Lawyers of the Year by the Trial Lawyers for Public Justice in recognition of the team's efforts in bringing about the precedent-setting settlement of the actions.

- ***Hall v. NCAA (Restricted Earnings Coach Antitrust Litigation)***, No. 94-2392 (D. Kan.). Robbins Geller attorneys were lead counsel and lead trial counsel for one of three classes of coaches in these consolidated price-fixing actions against the National Collegiate Athletic Association. On May 4, 1998, the jury returned verdicts in favor of the three classes for more than $70 million.

- ***In re Prison Realty Sec. Litig.***, No. 3:99-0452 (M.D. Tenn.). Robbins Geller attorneys served as lead counsel for the class, obtaining a $105 million recovery.

- ***In re Honeywell Int'l, Inc. Sec. Litig.***, No. 00-cv-03605 (D.N.J.). Robbins Geller attorneys served as lead counsel for a class of investors that purchased Honeywell common stock. The case charged Honeywell and its top officers with violations of the federal securities laws, alleging the defendants made false public statements concerning Honeywell's merger with Allied Signal, Inc. and that defendants falsified Honeywell's financial statements. After extensive discovery, Robbins Geller attorneys obtained a $100 million settlement for the class.

- ***Schwartz v. Visa Int'l***, No. 822404-4 (Cal. Super. Ct., Alameda Cnty.). After years of litigation and a six-month trial, Robbins Geller attorneys won one of the largest consumer protection verdicts ever awarded in the United States. Robbins Geller attorneys represented California consumers in an action against Visa and MasterCard for intentionally imposing and concealing a fee from their cardholders. The court ordered Visa and MasterCard to return $800 million in cardholder losses, which represented 100% of the amount illegally taken, plus 2% interest. In addition, the court ordered full disclosure of the hidden fee.

- ***Thompson v. Metro. Life Ins. Co.***, No. 00-cv-5071 (S.D.N.Y.). Robbins Geller attorneys served as lead counsel and obtained $145 million for the class in a settlement involving racial discrimination claims in the sale of life insurance.

- ***In re Prudential Ins. Co. of Am. Sales Pracs. Litig.***, MDL No. 1061 (D.N.J.). In one of the first cases of its kind, Robbins Geller attorneys obtained a settlement of $4 billion for deceptive sales practices in connection with the sale of life insurance involving the "vanishing premium" sales scheme.

## Precedent-Setting Decisions

- ***Stoyas v. Toshiba Corp.***, 896 F.3d 933 (9th Cir. 2018), *cert. denied*, 588 U.S. __ (2019). In July 2018, the Ninth Circuit ruled in plaintiffs' favor in the *Toshiba* securities class action. Following appellate briefing and oral argument by Robbins Geller attorneys, a three-judge Ninth Circuit panel reversed the district court's prior dismissal in a unanimous, 36-page opinion, holding that Toshiba ADRs are a "security" and the Securities Exchange Act of 1934 could apply to those ADRs that were purchased in a domestic transaction. *Id.* at 939, 949. The court adopted the Second and Third Circuits' "irrevocable liability" test for determining whether the transactions were domestic and held that plaintiffs must be allowed to amend their complaint to allege that the purchase of Toshiba ADRs on the over-the-counter market was a domestic purchase and that the alleged fraud was in connection with the purchase.

- ***Cyan, Inc. v. Beaver Cnty. Emps. Ret. Fund***, No. 15-1439 (U.S.). In March 2018, the U.S. Supreme Court ruled in favor of investors represented by Robbins Geller, holding that state courts continue to have jurisdiction over class actions asserting violations of the Securities Act of 1933. The court's ruling secures investors' ability to bring Securities Act actions when companies fail to make full and fair disclosure of relevant information in offering documents. The court confirmed that the Securities Litigation Uniform Standards Act of 1998 was designed to preclude securities class actions asserting violations of state law – not to preclude securities actions asserting federal law violations brought in state courts.

- ***Mineworkers' Pension Scheme v. First Solar Inc.***, 881 F.3d 750 (9th Cir. 2018), *cert. denied*, 588 U.S. __ (2019). In January 2018, the Ninth Circuit upheld the district court's denial of defendants' motion for summary judgment, agreeing with plaintiffs that the test for loss causation in the Ninth Circuit is a general "proximate cause test," and rejecting the more stringent revelation of the fraudulent practices standard advocated by the defendants. The opinion is a significant victory for investors, as it forecloses defendants' ability to immunize themselves from liability simply by refusing to publicly acknowledge their fraudulent conduct.

- ***In re Quality Sys., Inc. Sec. Litig.***, No. 15-55173 (9th Cir.). In July 2017, Robbins Geller's Appellate Practice Group scored a significant win in the Ninth Circuit in the *Quality Systems* securities class action. On appeal, a three-judge Ninth Circuit panel unanimously reversed the district court's prior dismissal of the action against Quality Systems and remanded the case to the district court for further proceedings. The decision addressed an issue of first impression concerning "mixed" future and present-tense misstatements. The appellate panel explained that "non-forward-looking portions of mixed statements are not eligible for the safe harbor provisions of the PSLRA . . . . Defendants made a number of mixed statements that included projections of growth in revenue and earnings based on the state of QSI's sales pipeline." The panel then held *both* the non-forward-looking and forward-looking statements false and misleading and made with scienter, deeming them actionable. Later, although defendants sought rehearing by the Ninth Circuit sitting *en banc*, the circuit court denied their petition.

- ***Local 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.***, No. CV-10-J-2847-S (N.D. Ala.). In the *Regions Financial* securities class action, Robbins Geller represented Local 703, I.B. of T. Grocery and Food Employees Welfare Fund and obtained a $90 million settlement in September 2015 on behalf of purchasers of Regions Financial common stock during the class period. In August 2014, the Eleventh Circuit Court of Appeals affirmed the district court's decision to certify a class action based upon alleged misrepresentations about Regions Financial's financial health before and during the recent economic recession, and in November 2014, the U.S. District Court for the Northern District of Alabama denied defendants' third attempt to avoid plaintiffs' motion for class certification.

- ***Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund***, No. 13-435 (U.S.). In March 2015, the U.S. Supreme Court ruled in favor of investors represented by Robbins Geller that investors asserting a claim under §11 of the Securities Act of 1933 with respect to a misleading statement of opinion do not, as defendant Omnicare had contended, have to prove that the statement was subjectively disbelieved when made. Rather, the court held that a statement of opinion may be actionable either because it was not believed, or because it lacked a reasonable basis in fact. This decision is significant in that it resolved a conflict among the federal circuit courts and expressly overruled the Second Circuit's widely followed, more stringent pleading standard for §11 claims involving statements of opinion. The Supreme Court remanded the case back to the district court for determination under the newly articulated standard. In August of 2016, upon remand, the district court applied the Supreme Court's new test and denied defendants' motion to dismiss in full.

- ***NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.***, 693 F.3d 145 (2d Cir. 2012). In a securities fraud action involving mortgage-backed securities, the Second Circuit rejected the concept of "tranche" standing and found that a lead plaintiff has class standing to pursue claims on behalf of purchasers of securities that were backed by pools of mortgages originated by the same lenders who had originated mortgages backing the lead plaintiff's securities. The court noted that, given those common lenders, the lead plaintiff's claims as to its purchases implicated "the same set of concerns" that purchasers in several of the other offerings possessed. The court also rejected the notion that the lead plaintiff lacked standing to represent investors in different tranches.

- ***In re VeriFone Holdings, Inc. Sec. Litig.***, 704 F.3d 694 (9th Cir. 2012). The panel reversed in part and affirmed in part the dismissal of investors' securities fraud class action alleging violations of §§10(b), 20(a), and 20A of the Securities Exchange Act of 1934 and SEC Rule 10b-5 in connection with a restatement of financial results of the company in which the investors had purchased stock.

  The panel held that the third amended complaint adequately pleaded the §10(b), §20A, and Rule 10b-5 claims. Considering the allegations of scienter holistically, as the U.S. Supreme Court directed in *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S 27, 48-49 (2011), the panel concluded that the inference that the defendant company and its chief executive officer and former chief financial officer were deliberately reckless as to the truth of their financial reports and related public statements following a merger was at least as compelling as any opposing inference.

- ***Fox v. JAMDAT Mobile, Inc.***, 185 Cal. App. 4th 1068 (2010). Concluding that Delaware's shareholder ratification doctrine did not bar the claims, the California Court of Appeal reversed dismissal of a shareholder class action alleging breach of fiduciary duty in a corporate merger.

- ***In re Constar Int'l Inc. Sec. Litig.***, 585 F.3d 774 (3d Cir. 2009). The Third Circuit flatly rejected defense contentions that where relief is sought under §11 of the Securities Act of 1933, which imposes liability when securities are issued pursuant to an incomplete or misleading registration statement, class certification should depend upon findings concerning market efficiency and loss causation.

- ***Matrixx Initiatives, Inc. v. Siracusano***, 563 U.S 27 (2011), *aff'g* 585 F.3d 1167 (9th Cir. 2009). In a securities fraud action involving the defendants' failure to disclose a possible link between the company's popular cold remedy and a life-altering side effect observed in some users, the U.S. Supreme Court unanimously affirmed the Ninth Circuit's (a) rejection of a bright-line "statistical significance" materiality standard, and (b) holding that plaintiffs had successfully pleaded a strong inference of the defendants' scienter.

- ***Alaska Elec. Pension Fund v. Flowserve Corp.***, 572 F.3d 221 (5th Cir. 2009). Aided by former U.S. Supreme Court Justice O'Connor's presence on the panel, the Fifth Circuit reversed a district

court order denying class certification and also reversed an order granting summary judgment to defendants. The court held that the district court applied an incorrect fact-for-fact standard of loss causation, and that genuine issues of fact on loss causation precluded summary judgment.

- ***In re F5 Networks, Inc., Derivative Litig.***, 207 P.3d 433 (Wash. 2009). In a derivative action alleging unlawful stock option backdating, the Supreme Court of Washington ruled that shareholders need not make a pre-suit demand on the board of directors where this step would be futile, agreeing with plaintiffs that favorable Delaware case law should be followed as persuasive authority.

- ***Lormand v. US Unwired, Inc.***, 565 F.3d 228 (5th Cir. 2009). In a rare win for investors in the Fifth Circuit, the court reversed an order of dismissal, holding that safe harbor warnings were not meaningful when the facts alleged established a strong inference that defendants knew their forecasts were false. The court also held that plaintiffs sufficiently alleged loss causation.

- ***Institutional Inv'rs Grp. v. Avaya, Inc.***, 564 F.3d 242 (3d Cir. 2009). In a victory for investors in the Third Circuit, the court reversed an order of dismissal, holding that shareholders pled with particularity why the company's repeated denials of price discounts on products were false and misleading when the totality of facts alleged established a strong inference that defendants knew their denials were false.

- ***Alaska Elec. Pension Fund v. Pharmacia Corp.***, 554 F.3d 342 (3d Cir. 2009). The Third Circuit held that claims filed for violation of §10(b) of the Securities Exchange Act of 1934 were timely, adopting investors' argument that because scienter is a critical element of the claims, the time for filing them cannot begin to run until the defendants' fraudulent state of mind should be apparent.

- ***Rael v. Page***, 222 P.3d 678 (N.M. Ct. App. 2009). In this shareholder class and derivative action, Robbins Geller attorneys obtained an appellate decision reversing the trial court's dismissal of the complaint alleging serious director misconduct in connection with the merger of SunCal Companies and Westland Development Co., Inc., a New Mexico company with large and historic landholdings and other assets in the Albuquerque area. The appellate court held that plaintiff's claims for breach of fiduciary duty were direct, not derivative, because they constituted an attack on the validity or fairness of the merger and the conduct of the directors. Although New Mexico law had not addressed this question directly, at the urging of the Firm's attorneys, the court relied on Delaware law for guidance, rejecting the "special injury" test for determining the direct versus derivative inquiry and instead applying more recent Delaware case law.

- ***Lane v. Page***, No. 06-cv-1071 (D.N.M. 2012). In May 2012, while granting final approval of the settlement in the federal component of the Westland cases, Judge Browning in the District of New Mexico commented:

  > Class Counsel are highly skilled and specialized attorneys who use their substantial experience and expertise to prosecute complex securities class actions. In possibly one of the best known and most prominent recent securities cases, Robbins Geller served as sole lead counsel – *In re Enron Corp. Sec. Litig.*, No. H-01-3624 (S.D. Tex.). *See* Report at 3. The Court has previously noted that the class would "receive high caliber legal representation" from class counsel, and throughout the course of the litigation the Court has been impressed with the quality of representation on each side. *Lane v. Page*, 250 F.R.D. at 647.

*Lane v. Page*, 862 F. Supp. 2d 1182, 1253-54 (D.N.M. 2012).

In addition, Judge Browning stated: "'Few plaintiffs' law firms could have devoted the kind of time, skill, and financial resources over a five-year period necessary to achieve the pre- and post-Merger benefits obtained for the class here.' . . . [Robbins Geller is] both skilled and experienced, and used those skills and experience for the benefit of the class [Robbins Geller is] both skilled and experienced, and used those skills and experience for the benefit of the class." *Id.* at 1254.

- *Luther v. Countrywide Home Loans Servicing LP*, 533 F.3d 1031 (9th Cir. 2008). In a case of first impression, the Ninth Circuit held that the Securities Act of 1933's specific non-removal features had not been trumped by the general removal provisions of the Class Action Fairness Act of 2005.

- *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049 (9th Cir. 2008). The Ninth Circuit upheld defrauded investors' loss causation theory as plausible, ruling that a limited temporal gap between the time defendants' misrepresentation was publicly revealed and the subsequent decline in stock value was reasonable where the public had not immediately understood the impact of defendants' fraud.

- *In re WorldCom Sec. Litig.*, 496 F.3d 245 (2d Cir. 2007). The Second Circuit held that the filing of a class action complaint tolls the limitations period for all members of the class, including those who choose to opt out of the class action and file their own individual actions without waiting to see whether the district court certifies a class – reversing the decision below and effectively overruling multiple district court rulings that *American Pipe* tolling did not apply under these circumstances.

- *In re Merck & Co. Sec., Derivative & ERISA Litig.*, 493 F.3d 393 (3d Cir. 2007). In a shareholder derivative suit appeal, the Third Circuit held that the general rule that discovery may not be used to supplement demand-futility allegations does not apply where the defendants enter a voluntary stipulation to produce materials relevant to demand futility without providing for any limitation as to their use. In April 2007, the Honorable D. Brooks Smith praised Robbins Geller partner Joe Daley's efforts in this litigation:

  > Thank you very much Mr. Daley and a thank you to all counsel. As Judge Cowen mentioned, this was an exquisitely well-briefed case; it was also an extremely well-argued case, and we thank counsel for their respective jobs here in the matter, which we will take under advisement. Thank you.

  *In re Merck & Co., Inc. Sec., Derivative & ERISA Litig.*, No. 06-2911, Transcript at 35:37-36:00 (3d Cir. Apr. 12, 2007).

- *Alaska Elec. Pension Fund v. Brown*, 941 A.2d 1011 (Del. 2007). The Supreme Court of Delaware held that the Alaska Electrical Pension Fund, for purposes of the "corporate benefit" attorney-fee doctrine, was presumed to have caused a substantial increase in the tender offer price paid in a "going private" buyout transaction. The Court of Chancery originally ruled that Alaska's counsel, Robbins Geller, was not entitled to an award of attorney fees, but Delaware's high court, in its published opinion, reversed and remanded for further proceedings.

- *Crandon Cap. Partners v. Shelk*, 157 P.3d 176 (Or. 2007). Oregon's Supreme Court ruled that a shareholder plaintiff in a derivative action may still seek attorney fees even if the defendants took actions to moot the underlying claims. The Firm's attorneys convinced Oregon's highest court to take the case, and reverse, despite the contrary position articulated by both the trial court and the Oregon Court of Appeals.

- ***In re Qwest Commc'ns Int'l***, 450 F.3d 1179 (10th Cir. 2006). In a case of first impression, the Tenth Circuit held that a corporation's deliberate release of purportedly privileged materials to governmental agencies was not a "selective waiver" of the privileges such that the corporation could refuse to produce the same materials to non-governmental plaintiffs in private securities fraud litigation.

- ***In re Guidant S'holders Derivative Litig.***, 841 N.E.2d 571 (Ind. 2006). Answering a certified question from a federal court, the Supreme Court of Indiana unanimously held that a pre-suit demand in a derivative action is excused if the demand would be a futile gesture. The court adopted a "demand futility" standard and rejected defendants' call for a "universal demand" standard that might have immediately ended the case.

- ***Denver Area Meat Cutters v. Clayton***, 209 S.W.3d 584 (Tenn. Ct. App. 2006). The Tennessee Court of Appeals rejected an objector's challenge to a class action settlement arising out of Warren Buffet's 2003 acquisition of Tennessee-based Clayton Homes. In their effort to secure relief for Clayton Homes stockholders, the Firm's attorneys obtained a temporary injunction of the Buffet acquisition for six weeks in 2003 while the matter was litigated in the courts. The temporary halt to Buffet's acquisition received national press attention.

- ***DeJulius v. New Eng. Health Care Emps. Pension Fund***, 429 F.3d 935 (10th Cir. 2005). The Tenth Circuit held that the multi-faceted notice of a $50 million settlement in a securities fraud class action had been the best notice practicable under the circumstances, and thus satisfied both constitutional due process and Rule 23 of the Federal Rules of Civil Procedure.

- ***In re Daou Sys.***, 411 F.3d 1006 (9th Cir. 2005). The Ninth Circuit sustained investors' allegations of accounting fraud and ruled that loss causation was adequately alleged by pleading that the value of the stock they purchased declined when the issuer's true financial condition was revealed.

- ***Barrie v. Intervoice-Brite, Inc.***, 397 F.3d 249 (5th Cir.), *reh'g denied and opinion modified*, 409 F.3d 653 (5th Cir. 2005). The Fifth Circuit upheld investors' accounting-fraud claims, holding that fraud is pled as to both defendants when one knowingly utters a false statement and the other knowingly fails to correct it, even if the complaint does not specify who spoke and who listened.

- ***City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.***, 399 F.3d 651 (6th Cir. 2005). The Sixth Circuit held that a statement regarding objective data supposedly supporting a corporation's belief that its tires were safe was actionable where jurors could have found a reasonable basis to believe the corporation was aware of undisclosed facts seriously undermining the statement's accuracy.

- ***Ill. Mun. Ret. Fund v. Citigroup, Inc.***, 391 F.3d 844 (7th Cir. 2004). The Seventh Circuit upheld a district court's decision that the Illinois Municipal Retirement Fund was entitled to litigate its claims under the Securities Act of 1933 against WorldCom's underwriters before a state court rather than before the federal forum sought by the defendants.

- ***Nursing Home Pension Fund, Local 144 v. Oracle Corp.***, 380 F.3d 1226 (9th Cir. 2004). The Ninth Circuit ruled that defendants' fraudulent intent could be inferred from allegations concerning their false representations, insider stock sales and improper accounting methods.

- ***Southland Sec. Corp. v. INSpire Ins. Sols. Inc.***, 365 F.3d 353 (5th Cir. 2004). The Fifth Circuit sustained allegations that an issuer's CEO made fraudulent statements in connection with a contract announcement.

- ***Smith v. Am. Family Mut. Ins. Co.***, 289 S.W.3d 675 (Mo. Ct. App. 2009). Capping nearly a decade of hotly contested litigation, the Missouri Court of Appeals reversed the trial court's judgment

notwithstanding the verdict for auto insurer American Family and reinstated a unanimous jury verdict for the plaintiff class.

- ***Troyk v. Farmers Grp., Inc.***, 171 Cal. App. 4th 1305 (2009).  The California Court of Appeal held that Farmers Insurance's practice of levying a "service charge" on one-month auto insurance policies, without specifying the charge in the policy, violated California's Insurance Code.

- ***Lebrilla v. Farmers Grp., Inc.***, 119 Cal. App. 4th 1070 (2004).  Reversing the trial court, the California Court of Appeal ordered class certification of a suit against Farmers, one of the largest automobile insurers in California, and ruled that Farmers' standard automobile policy requires it to provide parts that are as good as those made by vehicle's manufacturer.  The case involved Farmers' practice of using inferior imitation parts when repairing insureds' vehicles.

- ***In re Monumental Life Ins. Co.***, 365 F.3d 408, 416 (5th Cir. 2004).  The Fifth Circuit Court of Appeals reversed a district court's denial of class certification in a case filed by African-Americans seeking to remedy racially discriminatory insurance practices.  The Fifth Circuit held that a monetary relief claim is viable in a Rule 23(b)(2) class if it flows directly from liability to the class as a whole and is capable of classwide "'computation by means of objective standards and not dependent in any significant way on the intangible, subjective differences of each class member's circumstances.'"

- ***Dent v. National Football League***, No. 15-15143 (9th Cir.).  In September 2018, the United States Court of Appeals for the Ninth Circuit issued an important decision reversing the district court's previous dismissal of the *Dent v. National Football League* litigation, concluding that the complaint brought by NFL Hall of Famer Richard Dent and others should not be dismissed on labor-law preemption grounds.  The case was remanded to the district court for further proceedings.

- ***Kwikset Corp. v. Superior Court***, 51 Cal. 4th 310 (2011).  In a leading decision interpreting the scope of Proposition 64's new standing requirements under California's Unfair Competition Law (UCL), the California Supreme Court held that consumers alleging that a manufacturer has misrepresented its product have "lost money or property" within the meaning of the initiative, and thus have standing to sue under the UCL, if they "can truthfully allege that they were deceived by a product's label into spending money to purchase the product, and would not have purchased it otherwise." *Id*. at 317.  *Kwikset* involved allegations, proven at trial, that defendants violated California's "Made in the U.S.A." statute by representing on their labels that their products were "Made in U.S.A." or "All-American Made" when, in fact, the products were substantially made with foreign parts and labor.

- ***Safeco Ins. Co. of Am. v. Superior Court***, 173 Cal. App. 4th 814 (2009).  In a class action against auto insurer Safeco, the California Court of Appeal agreed that the plaintiff should have access to discovery to identify a new class representative after her standing to sue was challenged.

- ***Consumer Privacy Cases***, 175 Cal. App. 4th 545 (2009).  The California Court of Appeal rejected objections to a nationwide class action settlement benefiting Bank of America customers.

- ***Koponen v. Pac. Gas & Elec. Co.***, 165 Cal. App. 4th 345 (2008).  The Firm's attorneys obtained a published decision reversing the trial court's dismissal of the action, and holding that the plaintiff's claims for damages arising from the utility's unauthorized use of rights-of-way or easements obtained from the plaintiff and other landowners were not barred by a statute limiting the authority of California courts to review or correct decisions of the California Public Utilities Commission.

- ***Sanford v. MemberWorks, Inc.***, 483 F.3d 956 (9th Cir. 2007).  In a telemarketing-fraud case, where the plaintiff consumer insisted she had never entered the contractual arrangement that defendants said bound her to arbitrate individual claims to the exclusion of pursuing class claims, the

Ninth Circuit reversed an order compelling arbitration – allowing the plaintiff to litigate on behalf of a class.

- **Ritt v. Billy Blanks Enters.**, 870 N.E.2d 212 (Ohio Ct. App. 2007). In the Ohio analog to the *West* case, the Ohio Court of Appeals approved certification of a class of Ohio residents seeking relief under Ohio's consumer protection laws for the same telemarketing fraud.

- **Haw. Med. Ass'n v. Haw. Med. Serv. Ass'n**, 148 P.3d 1179 (Haw. 2006). The Supreme Court of Hawaii ruled that claims of unfair competition were not subject to arbitration and that claims of tortious interference with prospective economic advantage were adequately alleged.

- **Branick v. Downey Sav. & Loan Ass'n**, 39 Cal. 4th 235 (2006). Robbins Geller attorneys were part of a team of lawyers that briefed this case before the Supreme Court of California. The court issued a unanimous decision holding that new plaintiffs may be substituted, if necessary, to preserve actions pending when Proposition 64 was passed by California voters in 2004. Proposition 64 amended California's Unfair Competition Law and was aggressively cited by defense lawyers in an effort to dismiss cases after the initiative was adopted.

- **McKell v. Wash. Mut., Inc.**, 142 Cal. App. 4th 1457 (2006). The California Court of Appeal reversed the trial court, holding that plaintiff's theories attacking a variety of allegedly inflated mortgage-related fees were actionable.

- **West Corp. v. Superior Court**, 116 Cal. App. 4th 1167 (2004). The California Court of Appeal upheld the trial court's finding that jurisdiction in California was appropriate over the out-of-state corporate defendant whose telemarketing was aimed at California residents. Exercise of jurisdiction was found to be in keeping with considerations of fair play and substantial justice.

- **Kruse v. Wells Fargo Home Mortg., Inc.**, 383 F.3d 49 (2d Cir. 2004), and **Santiago v. GMAC Mortg. Grp., Inc.**, 417 F.3d 384 (3d Cir. 2005). In two groundbreaking federal appellate decisions, the Second and Third Circuits each ruled that the Real Estate Settlement Practices Act prohibits marking up home loan-related fees and charges.

## Additional Judicial Commendations

Robbins Geller attorneys have been praised by countless judges all over the country for the quality of their representation in class-action lawsuits. In addition to the judicial commendations set forth in the Prominent Cases and Precedent-Setting Decisions sections, judges have acknowledged the successful results of the Firm and its attorneys with the following plaudits:

- On October 5, 2022, at the final approval hearing of the settlement, the Honorable Paul A. Fioravanti, Jr. stated: "The settlement achieved here is, in short, impressive. . . . This litigation was hard fought. The issues were complex. . . . Plaintiffs' lead counsel here are among the most highly respected practitioners in this Court with a reputation for exacting substantial awards for the classes that they represent. . . . Again, the benefit was outstanding. . . . Counsel, this was an interesting case. I know you worked really hard on it. Fantastic result. The fee was well deserved." *City of Warren Gen. Emps.' Ret. Sys. v. Roche*, No. 2019-0740-PAF, Transcript at 26-29 (Del. Ch. Oct. 5, 2022).

- On February 4, 2021, in granting final approval of the settlement, the Honorable Mark H. Cohen of the United States District Court for the Northern District of Georgia stated: "Lead Counsel successfully achieved a greater-than-average settlement 'in the face of significant risks.'" Robbins Geller's "hard-

fought litigation in the Eleventh Circuit" and "[i]n considering the experience, reputation, and abilities of the attorneys, the Court recognize[d] that Lead Counsel is well-regarded in the legal community, especially in litigating class-action securities cases." *Monroe County Employees' Retirement System v. The Southern Company*, No. 1:17-cv-00241, Order at 8-9 (N.D. Ga. Feb. 4, 2021).

- On December 18, 2020, at the final approval hearing of the settlement, the Honorable Yvonne Gonzalez Rogers of the United States District Court for the Northern District of California commended Robbins Geller, stating: "Counsel performed excellent work in not only investigating and analyzing the core of the issues, but in negotiating and demanding the necessary reforms to prevent malfeasance for the benefit of the shareholders and the consumers. The Court complements counsel for its excellence." *In re RH S'holder Derivative Litig.*, No. 4:18-cv-02452-YGR, Order and Final Judgment at 3 (N.D. Cal. Dec. 18, 2020).

- On October 23, 2020, at the final approval hearing of the settlement, the Honorable P. Kevin Castel of the United States District Court for the Southern District of New York praised the firm, "[Robbins Geller] has been sophisticated and experienced." He also noted that: "[ T]he quality of the representation . . . was excellent. The experience of counsel is also a factor. Robbins Geller certainly has the extensive experience and they were litigating against national powerhouses . . . ." *City of Birmingham Ret. & Relief Sys. v. BRF S.A.*, No. 18 Civ. 2213 (PKC), Transcript at 12-13, 18 (S.D.N.Y. Oct. 23, 2020).

- In May 2020, in granting final approval of the settlement, the Honorable Mark L. Wolf praised Robbins Geller: "[T]he class has been represented by excellent honorable counsel . . . . [T]he fund was represented by experienced, energetic, able counsel, the fund was engaged and informed, and the fund followed advice of experienced counsel. Counsel for the class have been excellent, and I would say honorable." Additionally, Judge Wolf noted, "I find that the work that's been done primarily by Robbins Geller has been excellent and honorable and efficient. . . . [T]his has been a challenging case, and they've done an excellent job." *McGee v. Constant Contact, Inc.*, No. 1:15-cv-13114-MLW, Transcript at 21, 31, 61 (D. Mass. May 27, 2020).

- In December 2019, the Honorable Margo K. Brodie noted in granting final approval of the settlement that "[Robbins Geller and co-counsel] have also demonstrated the utmost professionalism despite the demands of the extreme perseverance that this case has required, litigating on behalf of a class of over 12 million for over fourteen years, across a changing legal landscape, significant motion practice, and appeal and remand. Class counsel's pedigree and efforts alone speak to the quality of their representation." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 1:05-md-01720-MKB-JO, Memorandum & Order (E.D.N.Y. Dec. 16, 2019).

- In October 2019, the Honorable Claire C. Cecchi noted that Robbins Geller is "capable of adequately representing the class, both based on their prior experience in class action lawsuits and based on their capable advocacy on behalf of the class in this action." The court further commended the Firm and co-counsel for "conduct[ing] the [l]itigation . . . with skill, perseverance, and diligent advocacy." *Lincoln Adventures, LLC v. Those Certain Underwriters at Lloyd's, London Members*, No. 2:08-cv-00235-CCC-JAD, Order at 4 (D.N.J. Oct. 3, 2019); *Lincoln Adventures, LLC v. Those Certain Underwriters at Lloyd's, London Members of Syndicates*, No. 2:08-cv-00235-CCC-JAD, Order Awarding Attorneys' Fees and Expenses/Charges and Service Awards at 3 (D.N.J. Oct. 3, 2019).

- In June 2019, the Honorable T.S. Ellis, III noted that Robbins Geller "achieved the [$108 million] [s]ettlement with skill, perseverance, and diligent advocacy." At the final approval hearing, the court further commended Robbins Geller by stating, "I think the case was fully and appropriately litigated [and] you all did a very good job. . . . [T]hank you for your service in the court. . . . [You're] first-class

lawyers . . . ." *Knurr v. Orbital ATK, Inc.*, No. 1:16-cv-01031, Order Awarding Attorneys' Fees and Expenses at 3 (E.D. Va. June 7, 2019); *Knurr v. Orbital ATK, Inc.*, No. 1:16-cv-01031, Transcript at 28-29 (E.D. Va. June 7, 2019).

- In June 2019, in granting final approval of the settlement, the Honorable John A. Houston stated: Robbins Geller's "skill and quality of work was extraordinary . . . . I'll note from the top that this has been an aggressively litigated action." *In re Morning Song Bird Food Litig.*, No. 3:12-cv-01592-JAH-AGS, Transcript at 4, 9 (S.D. Cal. June 3, 2019).

- In May 2019, in granting final approval of the settlement, the Honorable Richard H. DuBois stated: Robbins Geller is "highly experienced and skilled" for obtaining a "fair, reasonable, and adequate" settlement in the "interest of the [c]lass [m]embers" after "extensive investigation." *Chicago Laborers Pension Fund v. Alibaba Grp. Holding Ltd.*, No. CIV535692, Judgment and Order Granting Final Approval of Class Action Settlement at 3 (Cal. Super. Ct., San Mateo Cnty. May 17, 2019).

- In April 2019, the Honorable Kathaleen St. J. McCormick noted: "[S]ince the inception of this litigation, plaintiffs and their counsel have vigorously prosecuted the claims brought on behalf of the class. . . . When Vice Chancellor Laster appointed lead counsel, he effectively said: Go get a good result. And counsel took that to heart and did it. . . . The proposed settlement was the product of intense litigation and complex mediation. . . . [Robbins Geller has] only built a considerable track record, never burned it, which gave them the credibility necessary to extract the benefits achieved." *In re Calamos Asset Mgmt., Inc. S'holder Litig.*, No. 2017-0058-JTL, Transcript at 87, 93, 95, 98 (Del. Ch. Apr. 25, 2019).

- In April 2019, the Honorable Susan O. Hickey noted that Robbins Geller "achieved an exceptional [s]ettlement with skill, perseverance, and diligent advocacy." *City of Pontiac Gen. Emps.' Ret. Sys. v. Wal-Mart Stores, Inc.*, No. 5:12-cv-5162, Order Awarding Attorneys' Fees and Expenses at 3 (W.D. Ark. Apr. 8, 2019).

- In January 2019, the Honorable Margo K. Brodie noted that Robbins Geller "has arduously represented a variety of plaintiffs' groups in this action[,] . . . [has] extensive antitrust class action litigation experience . . . [and] negotiated what [may be] the largest antitrust settlement in history." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. 11, 34 (E.D.N.Y. 2019).

- On December 20, 2018, at the final approval hearing for the settlement, the court lauded Robbins Geller's attorneys and their work: "[T]his is a pretty extraordinary settlement, recovery on behalf of the members of the class. . . . I've been very impressed with the level of lawyering in the case . . . and with the level of briefing . . . and I wanted to express my appreciation for that and for the work that everyone has done here." The court concluded, "your clients were all blessed to have you, [and] not just because of the outcome." *Duncan v. Joy Global, Inc.*, No. 16-CV-1229, Transcript at 12, 20-21 (E.D. Wis. Dec. 20, 2018).

- In October 2017, the Honorable William Alsup noted that Robbins Geller and lead plaintiff "vigorously prosecuted this action." *In re LendingClub Sec. Litig.*, No. 3:16-cv-02627-WHA, Order at 13 (N.D. Cal. Oct. 20, 2017).

- On November 9, 2018, in granting final approval of the settlement, the Honorable Jesse M. Furman commented: "[Robbins Geller] did an extraordinary job here. . . . [I]t is fair to say [this was] probably the most complicated case I have had since I have been on the bench. . . . I cannot really imagine how complicated it would have been if I didn't have counsel who had done as admirable [a] job in briefing it and arguing as you have done. You have in my view done an extraordinary service to the class. . . . I think you have done an extraordinary job and deserve thanks and commendation for that." *Alaska Elec. Pension Fund v. Bank of Am. Corp.*, No. 1:14-cv-07126-JMF-OTW, Transcript at 27-28 (S.D.N.Y. Nov. 9, 2018).

- On September 12, 2018, at the final approval hearing of the settlement, the Honorable William H. Orrick of the Northern District of California praised Robbins Geller's "high-quality lawyering" in a case that "involved complicated discovery and complicated and novel legal issues," resulting in an "excellent" settlement for the class. The "lawyering . . . was excellent" and the case was "very well litigated." *In re Lidoderm Antitrust Litig.*, No. 14-MDL-02521-WHO, Transcript at 11, 14, 22 (N.D. Cal. Sept. 12, 2018).

- On March 31, 2017, in granting final approval of the settlement, the Honorable Gonzalo P. Curiel hailed the settlement as "extraordinary" and "all the more exceptional when viewed in light of the risk" of continued litigation. The court further commended Robbins Geller for prosecuting the case on a *pro bono* basis: "Class Counsel's exceptional decision to provide nearly seven years of legal services to Class Members on a *pro bono* basis evidences not only a lack of collusion, but also that Class Counsel are in fact representing the best interests of Plaintiffs and the Class Members in this Settlement. Instead of seeking compensation for fees and costs that they would otherwise be entitled to, Class Counsel have acted to allow maximum recovery to Plaintiffs and Class Members. Indeed, that Eligible Class Members may receive recovery of 90% or greater is a testament to Class Counsel's representation and dedication to act in their clients' best interest." In addition, at the final approval hearing, the court commented that "this is a case that has been litigated – if not fiercely, zealously throughout." *Low v. Trump Univ., LLC*, 246 F. Supp. 3d 1295, 1302, 1312 (S.D. Cal. 2017), *aff'd*, 881 F.3d 1111 (9th Cir. 2018); *Low v. Trump University LLC and Donald J. Trump*, No. 10-cv-0940 GPC-WVG, and *Cohen v. Donald J. Trump*, No. 13-cv-2519-GPC-WVG, Transcript at 7 (S.D. Cal. Mar. 30, 2017).

- In January 2017, at the final approval hearing, the Honorable Kevin H. Sharp of the Middle District of Tennessee commended Robbins Geller attorneys, stating: "It was complicated, it was drawn out, and a lot of work clearly went into this [case] . . . . I think there is some benefit to the shareholders that are above and beyond money, a benefit to the company above and beyond money that changed hands." *In re Community Health Sys., Inc. S'holder Derivative Litig.*, No. 3:11-cv-00489, Transcript at 10 (M.D. Tenn. Jan. 17, 2017).

- In November 2016, at the final approval hearing, the Honorable James G. Carr stated: "I kept throwing the case out, and you kept coming back. . . . And it's both remarkable and noteworthy and a credit to you and your firm that you did so. . . . [Y]ou persuaded the Sixth Circuit. As we know, that's no mean feat at all." Judge Carr further complimented the Firm, noting that it "goes without question or even saying" that Robbins Geller is very well-known nationally and that the settlement is an excellent result for the class. He succinctly concluded that "given the tenacity and the time and the effort that [Robbins Geller] lawyers put into [the case]" makes the class "a lot better off." *Plumbers & Pipefitters Nat'l Pension Fund v. Burns*, No. 3:05-cv-07393-JGC, Transcript at 4, 10, 14, 17 (N.D. Ohio Nov. 18, 2016).

- In September 2016, in granting final approval of the settlement, Judge Arleo commended the "vigorous and skilled efforts" of Robbins Geller attorneys for obtaining "an excellent recovery." Judge Arleo added that the settlement was reached after "contentious, hard-fought litigation" that ended with "a very, very

good result for the class" in a "risky case."  *City of Sterling Heights Gen. Emps.' Ret. Sys. v. Prudential Fin., Inc.*, No. 2:12-cv-05275-MCA-LDW, Transcript of Hearing at 18-20 (D.N.J. Sept. 28, 2016).

- In August 2015, at the final approval hearing for the settlement, the Honorable Karen M. Humphreys praised Robbins Geller's "extraordinary efforts" and "excellent lawyering," noting that the settlement "really does signal that the best is yet to come for your clients and for your prodigious labor as professionals. . . .  I wish more citizens in our country could have an appreciation of what this [settlement] truly represents."  *Bennett v. Sprint Nextel Corp.*, No. 2:09-cv-02122-EFM-KMH, Transcript at 8, 25 (D. Kan. Aug. 12, 2015).

- In August 2015, the Honorable Judge Max O. Cogburn, Jr. noted that "plaintiffs' attorneys were able [to] achieve the big success early" in the case and obtained an "excellent result."  The "extraordinary" settlement was because of "good lawyers . . . doing their good work."  *Nieman v. Duke Energy Corp.*, No. 3:12-cv-456, Transcript at 21, 23, 30 (W.D.N.C. Aug. 12, 2015).

- In July 2015, in approving the settlement, the Honorable Douglas L. Rayes of the District of Arizona stated: "Settlement of the case during pendency of appeal for more than an insignificant amount is rare. The settlement here is substantial and provides favorable recovery for the settlement class under these circumstances."  He continued, noting, "[a]s against the objective measures of . . . settlements [in] other similar cases, [the recovery] is on the high end."  *Teamsters Local 617 Pension & Welfare Funds v. Apollo Grp., Inc.*, No. 2:06-cv-02674-DLR, Transcript at 8, 11 (D. Ariz. July 28, 2015).

- In June 2015, at the conclusion of the hearing for final approval of the settlement, the Honorable Susan Richard Nelson of the District of Minnesota noted that it was "a pleasure to be able to preside over a case like this," praising Robbins Geller in achieving "an outstanding [result] for [its] clients," as she was "very impressed with the work done on th[e] case."  *In re St. Jude Med., Inc. Sec. Litig.*, No. 0:10-cv-00851-SRN-TNL, Transcript at 7 (D. Minn. June 12, 2015).

- In May 2015, at the fairness hearing on the settlement, the Honorable William G. Young noted that the case was "very well litigated" by Robbins Geller attorneys, adding that "I don't just say that as a matter of form. . . . I thank you for the vigorous litigation that I've been permitted to be a part of."  *Courtney v. Avid Tech., Inc.*, No. 1:13-cv-10686-WGY, Transcript at 8-9 (D. Mass. May 12, 2015).

- In January 2015, the Honorable William J. Haynes, Jr. of the Middle District of Tennessee described the settlement as a "highly favorable result achieved for the Class" through Robbins Geller's "diligent prosecution . . . [and] quality of legal services."  The settlement represents the fourth-largest securities recovery ever in the Middle District of Tennessee and one of the largest in more than a decade.  *Garden City Emps.' Ret. Sys. v. Psychiatric Sols., Inc.*, No. 3:09-cv-00882, 2015 U.S. Dist. LEXIS 181943, at *6-*7 (M.D. Tenn. Jan. 16, 2015).

- In September 2014, in approving the settlement for shareholders, Vice Chancellor John W. Noble noted "[t]he litigation caused a substantial benefit for the class.  It is unusual to see a $29 million recovery."  Vice Chancellor Noble characterized the litigation as "novel" and "not easy," but "[t]he lawyers took a case and made something of it."  The court commended Robbins Geller's efforts in obtaining this result: "The standing and ability of counsel cannot be questioned" and "the benefits achieved by plaintiffs' counsel in this case cannot be ignored."  *In re Gardner Denver, Inc. S'holder Litig.*, No. 8505-VCN, Transcript at 26-28 (Del. Ch. Sept. 3, 2014).

- In May 2014, at the conclusion of the hearing for final approval of the settlement, the Honorable Elihu M. Berle stated: "I would finally like to congratulate counsel on their efforts to resolve this case, on excellent work – it was the best interest of the class – and to the exhibition of professionalism. So I do thank you for all your efforts." *Liberty Mutual Overtime Cases*, No. JCCP 4234, Transcript at 20:1-5 (Cal. Super. Ct., Los Angeles Cnty. May 29, 2014).

- In March 2014, Ninth Circuit Judge J. Clifford Wallace (presiding) expressed the gratitude of the court: "Thank you. I want to especially thank counsel for this argument. This is a very complicated case and I think we were assisted no matter how we come out by competent counsel coming well prepared. . . . It was a model of the type of an exercise that we appreciate. Thank you very much for your work . . . you were of service to the court." *Eclectic Properties East, LLC v. The Marcus & Millichap Co.*, No. 12-16526, Transcript (9th Cir. Mar. 14, 2014).

- In February 2014, in approving a settlement, Judge Edward M. Chen noted the "very substantial risks" in the case and recognized Robbins Geller had performed "extensive work on the case." *In re VeriFone Holdings, Inc. Sec. Litig.*, No. C-07-6140, 2014 U.S. Dist. LEXIS 20044, at *5, *11-*12 (N.D. Cal. Feb. 18, 2014).

- In August 2013, in granting final approval of the settlement, the Honorable Richard J. Sullivan stated: "Lead Counsel is to be commended for this result: it expended considerable effort and resources over the course of the action researching, investigating, and prosecuting the claims, at significant risk to itself, and in a skillful and efficient manner, to achieve an outstanding recovery for class members. Indeed, the result – and the class's embrace of it – is a testament to the experience and tenacity Lead Counsel brought to bear." *City of Livonia Emps. Ret. Sys. v. Wyeth*, No. 07 Civ. 10329, 2013 U.S. Dist. LEXIS 113658, at *13 (S.D.N.Y. Aug. 7, 2013).

- In July 2013, in granting final approval of the settlement, the Honorable William H. Alsup stated that Robbins Geller did "excellent work in this case," and continued, "I look forward to seeing you on the next case." *Fraser v. Asus Comput. Int'l*, No. C 12-0652, Transcript at 12:2-3 (N.D. Cal. July 11, 2013).

- In June 2013, in certifying the class, U.S. District Judge James G. Carr recognized Robbins Geller's steadfast commitment to the class, noting that "plaintiffs, with the help of Robbins Geller, have twice successfully appealed this court's orders granting defendants' motion to dismiss." *Plumbers & Pipefitters Nat'l Pension Fund v. Burns*, 292 F.R.D. 515, 524 (N.D. Ohio 2013).

- In November 2012, in granting appointment of lead plaintiff, Chief Judge James F. Holderman commended Robbins Geller for its "substantial experience in securities class action litigation" and commented that the Firm "is recognized as 'one of the most successful law firms in securities class actions, if not the preeminent one, in the country.' *In re Enron Corp. Sec.*, 586 F. Supp. 2d 732, 797 (S.D. Tex. 2008) (Harmon, J.)." He continued further that, "'Robbins Geller attorneys are responsible for obtaining the largest securities fraud class action recovery ever [*$7.2* billion in *Enron*], as well as the largest recoveries in the Fifth, Sixth, Eighth, Tenth and Eleventh Circuits.'" *Bristol Cnty. Ret. Sys. v. Allscripts Healthcare Sols., Inc.*, No. 12 C 3297, 2012 U.S. Dist. LEXIS 161441, at *21 (N.D. Ill. Nov. 9, 2012).

- In June 2012, in granting plaintiffs' motion for class certification, the Honorable Inge Prytz Johnson noted that other courts have referred to Robbins Geller as "'one of the most successful law firms in securities class actions . . . in the country.'" *Local 703, I.B. v. Regions Fin. Corp.*, 282 F.R.D. 607, 616 (N.D. Ala. 2012) (quoting *In re Enron Corp. Sec. Litig.*, 586 F. Supp. 2d 732, 797 (S.D. Tex. 2008)), *aff'd in part and vacated in part on other grounds*, 762 F.3d 1248 (11th Cir. 2014).

- In June 2012, in granting final approval of the settlement, the Honorable Barbara S. Jones commented that "class counsel's representation, from the work that I saw, appeared to me to be of the highest quality." *In re CIT Grp. Inc. Sec. Litig.*, No. 08 Civ. 6613, Transcript at 9:16-18 (S.D.N.Y. June 13, 2012).

- In March 2012, in granting certification for the class, Judge Robert W. Sweet referenced the *Enron* case, agreeing that Robbins Geller's "'clearly superlative litigating and negotiating skills'" give the Firm an "'outstanding reputation, experience, and success in securities litigation nationwide,'" thus, "'[t]he experience, ability, and reputation of the attorneys of [Robbins Geller] is not disputed; it is one of the most successful law firms in securities class actions, if not the preeminent one, in the country.'" *Billhofer v. Flamel Techs., S.A.*, 281 F.R.D. 150, 158 (S.D.N.Y. 2012).

- In March 2011, in denying defendants' motion to dismiss, Judge Richard Sullivan commented: "Let me thank you all. . . . [The motion] was well argued . . . and . . . well briefed . . . . I certainly appreciate having good lawyers who put the time in to be prepared . . . ." *Anegada Master Fund Ltd. v. PxRE Grp. Ltd.*, No. 08-cv-10584, Transcript at 83 (S.D.N.Y. Mar. 16, 2011).

- In January 2011, the court praised Robbins Geller attorneys: "They have gotten very good results for stockholders. . . . [Robbins Geller has] such a good track record." *In re Compellent Techs., Inc. S'holder Litig.*, No. 6084-VCL, Transcript at 20-21 (Del. Ch. Jan. 13, 2011).

- In August 2010, in reviewing the settlement papers submitted by the Firm, Judge Carlos Murguia stated that Robbins Geller performed "a commendable job of addressing the relevant issues with great detail and in a comprehensive manner . . . . The court respects the [Firm's] experience in the field of derivative [litigation]." *Alaska Elec. Pension Fund v. Olofson*, No. 08-cv-02344-CM-JPO (D. Kan.) (Aug. 20, 2010 e-mail from court re: settlement papers).

- In June 2009, Judge Ira Warshawsky praised the Firm's efforts in *In re Aeroflex, Inc. S'holder Litig.*: "There is no doubt that the law firms involved in this matter represented in my opinion the cream of the crop of class action business law and mergers and acquisition litigators, and from a judicial point of view it was a pleasure working with them." *In re Aeroflex, Inc. S'holder Litig.*, No. 003943/07, Transcript at 25:14-18 (N.Y. Sup. Ct., Nassau Cnty. June 30, 2009).

- In March 2009, in granting class certification, the Honorable Robert Sweet of the Southern District of New York commented in *In re NYSE Specialists Sec. Litig.*, 260 F.R.D. 55, 74 (S.D.N.Y. 2009): "As to the second prong, the Specialist Firms have not challenged, in this motion, the qualifications, experience, or ability of counsel for Lead Plaintiff, [Robbins Geller], to conduct this litigation. Given [Robbins Geller's] substantial experience in securities class action litigation and the extensive discovery already conducted in this case, this element of adequacy has also been satisfied."

- In June 2008, the court commented, "Plaintiffs' lead counsel in this litigation, [Robbins Geller], has demonstrated its considerable expertise in shareholder litigation, diligently advocating the rights of Home Depot shareholders in this Litigation. [Robbins Geller] has acted with substantial skill and professionalism in representing the plaintiffs and the interests of Home Depot and its shareholders in prosecuting this case." *City of Pontiac Gen. Emps.' Ret. Sys. v. Langone*, No. 2006-122302, Findings of Fact in Support of Order and Final Judgment at 2 (Ga. Super. Ct., Fulton Cnty. June 10, 2008).

- In a December 2006 hearing on the $50 million consumer privacy class action settlement in *Kehoe v. Fidelity Fed. Bank & Tr.*, No. 03-80593-CIV (S.D. Fla.), United States District Court Judge Daniel T.K. Hurley said the following:

> First, I thank counsel. As I said repeatedly on both sides, we have been very, very fortunate. We have had fine lawyers on both sides. The issues in the case are significant issues. We are talking about issues dealing with consumer protection and privacy. Something that is increasingly important today in our society. . . . I want you to know I thought long and hard about this. I am absolutely satisfied that the settlement is a fair and reasonable settlement. . . . I thank the lawyers on both sides for the extraordinary effort that has been brought to bear here . . . .

*Kehoe v. Fidelity Fed. Bank & Tr.*, No. 03-80593-CIV, Transcript at 26, 28-29 (S.D. Fla. Dec. 7, 2006).

- In *Stanley v. Safeskin Corp.*, No. 99 CV 454 (S.D. Cal.), where Robbins Geller attorneys obtained $55 million for the class of investors, Judge Moskowitz stated:

> I said this once before, and I'll say it again. I thought the way that your firm handled this case was outstanding. This was not an easy case. It was a complicated case, and every step of the way, I thought they did a very professional job.

*Stanley v. Safeskin Corp.*, No. 99 CV 454, Transcript at 13 (S.D. Cal. May 25, 2004).

# Attorney Biographies

## Mario Alba Jr. | Partner

Mario Alba is a partner in the Firm's Melville office.  He is a member of the Firm's Institutional Outreach Team, which provides advice to the Firm's institutional clients, including numerous public pension systems and Taft-Hartley funds throughout the United States, and consults with them on issues relating to corporate fraud in the U.S. securities markets, as well as corporate governance issues and shareholder litigation.  Some of Alba's institutional clients are currently involved in securities cases involving Clarivate plc, Dentsply Sirona Inc., Generac Holdings Inc., Acadia Healthcare Company, Inc., Green Dot Corporation, Waste Management, Inc., Amgen, Inc., Virtu Financial, Inc., The Walt Disney Company, Daimler, and National Instruments Corporation.

Alba's institutional clients are/were also involved in other types of class actions, namely, *In re National Prescription Opiate Litigation*, *In re Epipen (Epinephrine Injection, USP) Marketing, Sales Practices and Antitrust Litigation* ($609 million total recovery), *Forth v. Walgreen Co.*, and *In re Humira (Adalimumab) Antitrust Litigation*.

Alba has served as lead counsel in numerous cases and is responsible for initiating, investigating, researching, and filing securities and consumer fraud class actions.  He has recovered hundreds of millions of dollars in numerous actions, including cases against BHP Billiton Limited ($50 million recovery), BRF S.A. ($40 million recovery), L3 Technologies, Inc. ($34.5 million recovery), Impax Laboratories Inc. ($33 million recovery), Reckitt Benckiser Group plc ($19.6 million recovery), Super Micro Computer, Inc. ($18.25 million recovery), and NBTY, Inc. ($16 million recovery).

Alba has lectured at numerous institutional investor conferences throughout the United States on various shareholder issues, including at the Opal Public Funds Summit, Koried Plan Sponsor Educational Institute, Georgia Association of Public Pension Trustees (GAPPT) Annual Conference, Illinois Public Pension Fund Association, the New York State Teamsters Conference, the American Alliance Conference, and the TEXPERS/IPPFA Joint Conference at the New York Stock Exchange, among others.

### Education
B.S., St. John's University, 1999; J.D., Hofstra University School of Law, 2002

### Honors / Awards
Best Lawyer in America: One to Watch, *Best Lawyers®*, 2024; Super Lawyer, *Super Lawyers Magazine*, 2022-2023; Rising Star, *Super Lawyers Magazine*, 2012-2013, 2016-2017; B.S., Dean's List, St. John's University, 1999; Selected as participant in Hofstra Moot Court Seminar, Hofstra University School of Law

# Michael Albert | Partner

Michael Albert is a partner in the Firm's San Diego office, where his practice focuses on complex securities litigation. Albert is a member of the Firm's Lead Plaintiff Advisory Team, which advises institutional investors in connection with lead plaintiff motions, and assists them in securing appointment as lead plaintiff. He is also part of the Firm's SPAC Task Force, which is dedicated to rooting out and prosecuting fraud on behalf of injured investors in special purpose acquisition companies.

Albert has been a member of litigation teams that have successfully recovered hundreds of millions of dollars for investors in securities class actions, including: *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.* ($272 million recovery), *City of Pontiac General Employees' Retirement Systems v. Wal-Mart Stores, Inc.* ($160 million recovery), and *In re LendingClub Securities Litigation* ($125 million recovery). Albert was also a member of the litigation team that recently obtained a $85 million cash settlement in a consumer class action against Scotts Miracle-Gro.

## Education

B.A., University of Wisconsin-Madison, 2010; J.D., University of Virginia School of Law, 2014

## Honors / Awards

Rising Star, *Super Lawyers Magazine,* 2020-2024; Leading Litigator in America, *Lawdragon*, 2024; 500 X – The Next Generation, *Lawdragon*, 2023; Managing Board Member, *Virginia Tax Review*, University of Virginia School of Law

# Matthew I. Alpert | Partner

Matthew Alpert is a partner in the Firm's San Diego office and focuses on the prosecution of securities fraud litigation. He has helped recover over $800 million for individual and institutional investors financially harmed by corporate fraud. Alpert's current cases include securities fraud cases against Under Armour (D. Md.), PayPal (D.N.J.), and Beyond Meat (C.D. Cal.). Most recently, Alpert and a team of Robbins Geller attorneys obtained a $1.21 billion settlement in *In re Valeant Pharms. Int'l, Inc. Sec. Litig.* (D.N.J.), a case that *Vanity Fair* reported as "the corporate scandal of its era" that had raised "fundamental questions about the functioning of our health-care system, the nature of modern markets, and the slippery slope of ethical rationalizations." This is the largest securities class action settlement against a pharmaceutical manufacturer and the ninth largest ever. Alpert was also a member of the litigation team that successfully obtained class certification in a securities fraud class action against Regions Financial, a class certification decision which was substantively affirmed by the United States Court of Appeals for the Eleventh Circuit in *Local 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*, 762 F.3d 1248 (11th Cir. 2014). Upon remand, the United States District Court for the Northern District of Alabama granted class certification again, rejecting defendants' post-*Halliburton II* arguments concerning stock price impact.

Some of Alpert's previous cases include: the individual opt-out actions of the AOL Time Warner class action – *Regents of the Univ. of Cal. v. Parsons* (Cal. Super. Ct., Los Angeles Cnty.) and *Ohio Pub. Emps. Ret. Sys. v. Parsons* (Ohio. Ct. of Common Pleas, Franklin Cnty.) (total settlement over $600 million); *Local 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.* (N.D. Ala.) ($90 million settlement); *In re MGM Mirage Sec. Litig.* (D. Nev.) ($75 million); *In re CIT Grp. Inc. Sec. Litig.* (S.D.N.Y.) ($75 million settlement); *Luna v. Marvell Tech. Grp., Ltd.* (N.D. Cal.) ($72.5 million settlement); *Deka Investment GmbH v. Santander Consumer USA Holdings Inc.* (N.D. Tex.) ($47 million settlement); *In re Bridgestone Sec. Litig.* (M.D. Tenn.) ($30 million settlement); *In re Walter Energy, Inc. Sec. Litig.* (N.D. Ala.) ($25 million); *City of Hialeah Emps.' Ret. Sys. & Laborers Pension Trust Fund for N. Cal. v. Toll Brothers, Inc.* (E.D. Pa.) ($25 million settlement); *In re Molycorp, Inc. Sec. Litig.* (D. Colo.) ($20.5 million settlement); *In re Banc of California Sec. Litig.* (C.D. Cal.) ( $19.75 million); *Zimmerman v. Diplomat Pharmacy, Inc.* (E.D. Mich.) ($14.1 million); *Batwin v. Occam Networks, Inc.* (C.D. Cal.) ($13.9 million settlement); *Int'l Brotherhood of Elec. Workers Local 697 Pension Fund v. Int'l Game Tech.* (D. Nev.) ($12.5 million settlement); *Kmiec v. Powerwave Techs. Inc.* (C.D. Cal.) ($8.2 million); *In re Sunterra Corp. Sec. Litig.* (D. Nev.) ($8 million settlement); and *Luman v. Anderson* (W.D. Mo.) ($4.25 million settlement).

## Education
B.A., University of Wisconsin at Madison, 2001; J.D., Washington University, St. Louis, 2005

## Honors / Awards
Rising Star, *Super Lawyers Magazine*, 2015-2019

# Darryl J. Alvarado | Partner

Darryl Alvarado is a partner in the Firm's San Diego office. He focuses his practice on securities fraud and other complex civil litigation. Alvarado was a member of the trial team in *Smilovits v. First Solar, Inc.*, which recovered $350 million for aggrieved investors. The *First Solar* settlement, reached on the eve of trial after more than seven years of litigation and an interlocutory appeal to the U.S. Supreme Court, is the fifth-largest PSLRA recovery ever obtained in the Ninth Circuit. Alvarado recently litigated *Monroe County Employees' Retirement System v. The Southern Company*, which recovered $87.5 million for investors after more than three years of litigation. The settlement resolved securities fraud claims stemming from defendants' issuance of misleading statements and omissions regarding the construction of a first-of-its-kind "clean coal" power plant in Kemper County, Mississippi. Alvarado helped secure $388 million for investors in J.P. Morgan residential mortgage-backed securities in *Fort Worth Employees' Retirement Fund v. J.P. Morgan Chase & Co.* That settlement is, on a percentage basis, the largest recovery ever achieved in an RMBS class action. He was also a member of a team of attorneys that secured $95 million for investors in Morgan Stanley-issued RMBS in *In re Morgan Stanley Mortgage Pass-Through Certificates Litigation*.

Alvarado was a member of a team of lawyers that obtained landmark settlements, on the eve of trial, from the major credit rating agencies and Morgan Stanley arising out of the fraudulent ratings of bonds issued by the Cheyne and Rhinebridge structured investment vehicles in *Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Incorporated* and *King County, Washington v. IKB Deutsche Industriebank AG*. He was integral in obtaining several precedent-setting decisions in those cases, including defeating the rating agencies' historic First Amendment defense and defeating the ratings agencies' motions for summary judgment concerning the actionability of credit ratings. Alvarado was also a member of a team of attorneys responsible for obtaining for aggrieved investors $27 million in *In re Cooper Companies Securities Litigation*, $19.5 million in *City of Pontiac General Employees' Retirement System v. Lockheed Martin Corporation*, and comprehensive corporate governance reforms to address widespread off-label marketing and product safety violations in *In re Johnson & Johnson Derivative Litigation*.

## Education

B.A., University of California, Santa Barbara, 2004; J.D., University of San Diego School of Law, 2007

## Honors / Awards

Best Lawyer in America: One to Watch, *Best Lawyers®*, 2023-2024; Rising Star, *Super Lawyers Magazine*, 2015-2022; 40 & Under Hot List, *Benchmark Litigation*, 2018-2021; Top 40 Under 40, *Daily Journal*, 2021; "Outstanding Young Attorneys," *San Diego Daily Transcript*, 2011

# X. Jay Alvarez | Partner

Jay Alvarez is a partner in the Firm's San Diego office. He focuses his practice on securities fraud litigation and other complex litigation. Alvarez's notable cases include *In re Qwest Commc'ns Int'l, Inc. Sec. Litig.* ($400 million recovery), *In re Coca-Cola Sec. Litig.* ($137.5 million settlement), *In re St. Jude Medical, Inc. Sec. Litig.* ($50 million settlement), and *In re Cooper Cos. Sec. Litig.* ($27 million recovery). Most recently, Alvarez was a member of the litigation team that secured a historic recovery on behalf of Trump University students in two class actions against President Donald J. Trump. The settlement provides $25 million to approximately 7,000 consumers. This result means individual class members are eligible for upwards of $35,000 in restitution. He represented the class on a *pro bono* basis.

Prior to joining the Firm, Alvarez served as an Assistant United States Attorney for the Southern District of California from 1991-2003. As an Assistant United States Attorney, he obtained extensive trial experience, including the prosecution of bank fraud, money laundering, and complex narcotics conspiracy cases. During his tenure as an Assistant United States Attorney, Alvarez also briefed and argued numerous appeals before the Ninth Circuit Court of Appeals.

## Education
B.A., University of California, Berkeley, 1984; J.D., University of California, Berkeley, Boalt Hall School of Law, 1987

## Honors / Awards
Leading Plaintiff Financial Lawyer, *Lawdragon*, 2019-2020

# Dory P. Antullis | Partner

Dory Antullis is a partner in the Firm's Boca Raton office. Her litigation practice focuses on complex class actions, covering consumer fraud, public nuisance, environmental litigation, privacy litigation, pharmaceuticals, RICO, and antitrust litigation. Antullis also works with the Firm's settlement department, negotiating and documenting intricate, high-stakes settlements.

Antullis is a core member of the Firm's opioids team, leading the effort on behalf of cities, counties, and third-party payors around the country in *In re Nat'l Prescription Opiate Litig.*, No. 1:17-md-02804 (N.D. Ohio). In addition to serving on several committees in the MDL, she was a member of the winning trial team on behalf of the People of the State of California in San Francisco's bellwether case against Allergan, Teva, Walgreens, and others in the prescription opioid supply chain. Together with a trial win against Walgreens, the case has resulted in settlements valued at over $350 million. Antullis was also part of a small group of lawyers who negotiated and drafted settlement documents for the national opioid settlements with major distributors, manufacturers, and pharmacies – now totaling more than $50 billion.

Antullis has also been an integral part of Robbins Geller's history of successful privacy and data breach class action cases. She is currently serving as Interim Co-Lead Class Counsel in *In re Luxottica of America, Inc. Data Breach Litig.*, No. 1:20-cv-00908 (S.D. Ohio), and Liaison Counsel in *DeSue v. 20/20 Eye Care Network, Inc.*, No. 21-cv-61275 (S.D. Fla.) ($3 million class settlement). Antullis's heavy lifting at every stage of the litigation in *In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, No. 5:16-md-02752 (N.D. Cal.), helped to secure a $117.5 million recovery in the largest data breach in history. Antullis successfully defeated two rounds of dispositive briefing, worked with leadership and computer privacy and damages experts to plan a winning strategy for the case, and drafted an innovative motion for class certification that immediately preceded a successful mediation with defendants in that litigation. Antullis also provided meaningful "nuts-and-bolts" support in other data breach class actions, including *In re Am. Med. Collection Agency, Inc., Customer Data Sec. Breach Litig.*, No. 2:19-md-02904 (D.N.J.) (representing class of LabCorp customers), and *In re Solara Med. Supplies Customer Data Breach Litig.*, No. 3:19-cv-02284 (S.D. Cal.) ($5.06 million settlement). And she currently represents consumers in state and federal court against North Broward Hospital District for a 2021 data breach.

## Education
B.A., Rice University, 1999; J.D., Columbia Law School, 2003

## Honors / Awards
Leading Plaintiff Consumer Lawyer, *Lawdragon*, 2022-2024; Leading Litigator in America, *Lawdragon*, 2024; National Merit Scholar, Rice University; Golden Key National Honor Society, Rice University; Nominated for *The Rice Undergraduate* academic journal, Rice University; Michael I. Sovern Scholar, Columbia Law School; Hague Appeal for Peace, Committee for a Just and Effective Response to 9/11, Columbia Law School; Columbia Mediation and Political Asylum Clinics, Columbia Law School; Harlem Tutorial Program, Columbia Law School; Journal of Eastern European Law, Columbia Law School; Columbia Law Women's Association, Columbia Law School

# Stephen R. Astley | Partner

Stephen Astley is a partner in the Firm's Boca Raton office. Astley devotes his practice to representing institutional and individual shareholders in their pursuit to recover investment losses caused by fraud. He has been lead counsel in numerous securities fraud class actions across the country, helping secure significant recoveries for his clients and investors. He was on the trial team that recovered $60 million on behalf of investors in *City of Sterling Heights Gen. Emps.' Ret. Sys. v. Hospira, Inc.* Other notable representations include: *In re ADT Inc. S'holder Litig.* (Fla. Cir. Ct., 15th Jud. Cir.) ($30 million settlement); *In re Red Hat, Inc. Sec. Litig.* (E.D.N.C.) ($20 million settlement); *Eshe Fund v. Fifth Third Bancorp* (S.D. Ohio) ($16 million); *City of St. Clair Shores Gen. Emps.' Ret. Sys. v. Lender Processing Servs., Inc.* (M.D. Fla.) ($14 million); and *In re Synovus Fin. Corp.* (N.D. Ga.) ($11.75 million).

Prior to joining the Firm, Astley was with the Miami office of Hunton & Williams, where he concentrated his practice on class action defense, including securities class actions and white collar criminal defense. Additionally, he represented numerous corporate clients accused of engaging in unfair and deceptive practices. Astley was also an active duty member of the United States Navy's Judge Advocate General's Corps where he was the Senior Defense Counsel for the Naval Legal Service Office Pearl Harbor Detachment. In that capacity, Astley oversaw trial operations for the Detachment and gained substantial first-chair trial experience as the lead defense counsel in over 75 courts-martial and administrative proceedings. Additionally, from 2002-2003, Astley clerked for the Honorable Peter T. Fay, U.S. Court of Appeals for the Eleventh Circuit.

### Education

B.S., Florida State University, 1992; M. Acc., University of Hawaii at Manoa, 2001; J.D., University of Miami School of Law, 1997

### Honors / Awards

J.D., *Cum Laude*, University of Miami School of Law, 1997; United States Navy Judge Advocate General's Corps., Lieutenant

# A. Rick Atwood, Jr. | Partner

Rick Atwood is a partner in the Firm's San Diego office. As a recipient of the *California Lawyer* Attorney of the Year ("CLAY") Award for his work on behalf of shareholders, he has successfully represented shareholders in securities class actions, merger-related class actions, and shareholder derivative suits in federal and state courts in more than 30 jurisdictions. Through his litigation efforts at both the trial and appellate levels, Atwood has helped recover billions of dollars for public shareholders, including the largest post-merger common fund recoveries on record. He is also part of the Firm's SPAC Task Force, which is dedicated to rooting out and prosecuting fraud on behalf of injured investors in special purpose acquisition companies. Atwood is also part of the Firm's Delaware Practice Group.

Atwood was a key member of the litigation team in *In re Kinder Morgan, Inc. S'holders Litig.*, where he helped obtain an unprecedented $200 million common fund for former Kinder Morgan shareholders, the largest merger & acquisition class action recovery in history. In *In re Dole Food Co., Inc. S'holder Litig.*, which went to trial in the Delaware Court of Chancery on claims of breach of fiduciary duty on behalf of Dole Food Co., Inc. shareholders, Atwood helped obtain $148 million, the largest trial verdict ever in a class action challenging a merger transaction.

Atwood also led the litigation team that obtained an $89.4 million recovery for shareholders in *In re Del Monte Foods Co. S'holders Litig.*, after which the Delaware Court of Chancery stated that "it was only through the effective use of discovery that the plaintiffs were able to 'disturb[ ] the patina of normalcy surrounding the transaction.'" The court further commented that "Lead Counsel engaged in hard-nosed discovery to penetrate and expose problems with practices that Wall Street considered 'typical.'" One Wall Street banker even wrote in *The Wall Street Journal* that "'Everybody does it, but Barclays is the one that got caught with their hand in the cookie jar . . . . Now everybody has to rethink how we conduct ourselves in financing situations.'" Atwood's other significant opinions include *Goldstein v. Denner* ($84 million recovery), *Brown v. Brewer* ($45 million recovery), and *In re Prime Hosp., Inc. S'holders Litig.* ($25 million recovery).

## Education

B.A., University of Tennessee, Knoxville, 1987; B.A., Katholieke Universiteit Leuven, Belgium, 1988; J.D., Vanderbilt School of Law, 1991

## Honors / Awards

Best Lawyer in America, *Best Lawyers®*, 2023-2024; Leading Plaintiff Financial Lawyer, *Lawdragon*, 2019-2023; Recommended Lawyer, *The Legal 500*, 2017-2019; M&A Litigation Attorney of the Year in California, *Corporate International*, 2015; Super Lawyer, *Super Lawyers Magazine*, 2014-2017; Attorney of the Year, *California Lawyer*, 2012; B.A., Great Distinction, Katholieke Universiteit Leuven, Belgium, 1988; B.A., Honors, University of Tennessee, Knoxville, 1987; Authorities Editor, *Vanderbilt Journal of Transnational Law*, 1991

# Aelish M. Baig | Partner

Aelish Marie Baig is a partner in the Firm's San Francisco office and specializes in consumer and securities fraud actions. Baig has litigated a number of cases through jury trial, resulting in multi-million and billion dollar awards and settlements for her clients.

Baig was one of the originators of the national opioid litigation, filing among the earliest complaints against the opioid industry defendants and working on all aspects of that litigation. In 2022, Baig served as co-trial counsel in a federal bench trial in San Francisco in a case selected as a bellwether in the national multi-district opioid litigation. The team achieved combined settlements of over $350 million for San Francisco and contributed to securing more than $50 billion for local governments nationwide to be used for abatement of the national opioid epidemic. For her work in co-leading the trial team and securing a historic trial result against Walgreens for the City and County of San Francisco, she was honored by *The National Law Journal* as one of the "Elite Women of the Plaintiffs Bar" and she received "California Lawyer Attorney of the Year" by the *Daily Journal*.

Baig was also appointed to leadership in the *Juul* ($1.7 billion settlement) and *McKinsey* ($230 million settlement) MDL litigations. She represents numerous local and state governments and school districts across the country that have filed federal cases against opioids, McKinsey, Juul, and/or social media defendants. Baig has also prosecuted securities fraud and derivative actions obtaining millions of dollars in recoveries against corporations such as Wells Fargo, Celera, Pall, and Prudential.

## Education

B.A., Brown University, 1992; J.D., Washington College of Law at American University, 1998

## Honors / Awards

Leading Plaintiff Consumer Lawyer, *Lawdragon*, 2022-2024; Leading Commercial Litigator, *Daily Journal*, 2024; Leading Lawyer in America, *Lawdragon*, 2020-2024; Best Lawyer in America, *Best Lawyers®*, 2024; Class Action/Mass Tort Litigation Trailblazer, *The National Law Journal*, 2023; Recommended Lawyer, *The Legal 500*, 2023; Leading Plaintiff Financial Lawyer, *Lawdragon*, 2019-2023; Elite Women of the Plaintiffs Bar, Elite Trial Lawyers, *The National Law Journal*, 2023; Plaintiffs' Lawyers Trailblazer, *The National Law Journal*, 2021, 2023; California Lawyer Attorney of the Year (CLAY), *Daily Journal*, 2023; Best Lawyer in America: One to Watch, *Best Lawyers®*, 2021-2023; Best Lawyer in Northern California: One to Watch, *Best Lawyers®*, 2021; Featured in "Lawyer Limelight" series, *Lawdragon*, 2020; Litigation Trailblazer, *The National Law Journal*, 2019; California Trailblazer, *The Recorder*, 2019; Super Lawyer, *Super Lawyers Magazine*, 2012-2013; J.D., *Cum Laude*, Washington College of Law at American University, 1998; Senior Editor, *Administrative Law Review*, Washington College of Law at American University

# Randall J. Baron | Partner

Randy Baron is a partner in the Firm's San Diego office. He specializes in securities litigation, corporate takeover litigation, and breach of fiduciary duty actions. For almost two decades, Baron has headed up a team of lawyers whose accomplishments include obtaining instrumental rulings both at injunction and trial phases, and establishing liability of financial advisors and investment banks. With an in-depth understanding of merger and acquisition and breach of fiduciary duty law, an ability to work under extreme time pressures, and the experience and willingness to take a case through trial, he has been responsible for recovering more than a billion dollars for shareholders.

Notable achievements over the years include: *In re Kinder Morgan, Inc. S'holders Litig.* (Kan. Dist. Ct., Shawnee Cnty.), where Baron obtained an unprecedented $200 million common fund for former Kinder Morgan shareholders, the largest merger & acquisition class action recovery in history; *In re Dole Food Co., Inc. S'holder Litig.* (Del. Ch.), where he went to trial in the Delaware Court of Chancery on claims of breach of fiduciary duty on behalf of Dole Food Co., Inc. shareholders and obtained $148 million, the largest trial verdict ever in a class action challenging a merger transaction; and *In re Rural/Metro Corp. S'holders Litig.* (Del. Ch.), where Baron and co-counsel obtained nearly $110 million total recovery for shareholders against Royal Bank of Canada Capital Markets LLC. In *In re Del Monte Foods Co. S'holders Litig.* (Del. Ch.), he exposed the unseemly practice by investment bankers of participating on both sides of large merger and acquisition transactions and ultimately secured an $89 million settlement for shareholders of Del Monte. Baron was one of the lead attorneys representing about 75 public and private institutional investors that filed and settled individual actions in *In re WorldCom Sec. Litig.* (S.D.N.Y.), where more than $657 million was recovered, the largest opt-out (non-class) securities action in history. Most recently, Baron successfully obtained a partial settlement of $60 million in *In re Tesla Motors, Inc. S'holder Litig.*, a case that alleged that the members of the Tesla Board of Directors breached their fiduciary duties, unjustly enriched themselves, and wasted corporate assets in connection with their approval of Tesla's acquisition of SolarCity Corp. in 2016.

## Education
B.A., University of Colorado at Boulder, 1987; J.D., University of San Diego School of Law, 1990

## Honors / Awards
Fellow, Advisory Board, Litigation Counsel of America (LCA); Rated Distinguished by Martindale-Hubbell; Best Lawyer in America, *Best Lawyers®*, 2019-2024; Hall of Fame, *The Legal 500*, 2020-2023; Leading Lawyer, *Chambers USA*, 2016-2023; Leading Plaintiff Financial Lawyer, *Lawdragon*, 2019-2023; Lawyer of the Year: Derivatives and Futures Law, *Best Lawyers®*, 2023; Litigation Star, *Benchmark Litigation*, 2016-2019, 2023; Plaintiffs' Lawyer Trailblazer, *The National Law Journal*, 2022; Leading Lawyer in America, *Lawdragon*, 2011, 2017-2019, 2021-2022; Southern California Best Lawyer, *Best Lawyers®*, 2019-2021; Super Lawyer, *Super Lawyers Magazine*, 2014-2016, 2018-2020; National Practice Area Star, *Benchmark Litigation*, 2019-2020; Local Litigation Star, *Benchmark Litigation*, 2018, 2020; Leading Lawyer, *The Legal 500*, 2014-2019; California Star, *Benchmark Litigation*, 2019; State Litigation Star, *Benchmark Litigation*, 2019; Winning Litigator, *The National Law Journal*, 2018; Titan of the Industry, *The American Lawyer*, 2018; Recommended Lawyer, *The Legal 500*, 2017; Mergers & Acquisitions Trailblazer, *The National Law Journal*, 2015-2016; Litigator of the Week, *The American Lawyer*, October 16, 2014; Attorney of the Year, *California Lawyer*, 2012; Litigator of the Week, *The American Lawyer*, October 7, 2011; J.D., *Cum Laude*, University of San Diego School of Law, 1990

# James E. Barz | Partner

Jim Barz is a partner with the Firm and manages the Firm's Chicago office. Barz is an experienced trial lawyer who has been lead counsel in dozens of evidentiary and contested hearings, tried 18 cases to verdict, and argued 9 cases in the Seventh Circuit. Barz is a registered CPA, former federal prosecutor, and an adjunct professor at Northwestern University School of Law from 2008 to 2024, teaching courses on trial advocacy and class action litigation.

Barz has represented investors in securities fraud class actions that have resulted in recoveries of over $2 billion. Barz was the lead counsel in *In re Valeant Pharms. Int'l, Inc. Sec. Litig.*, and secured a $1.21 billion recovery for investors, a case that *Vanity Fair* reported as "the corporate scandal of its era." This is the largest securities class action settlement against a pharmaceutical manufacturer and the ninth largest securities class action settlement ever. Barz was recognized as a Litigator of the Week by *The American Lawyer* for his work in the case.

Barz has also secured substantial recoveries for investors in *HCA* ($215 million, M.D. Tenn.); *Motorola* ($200 million, N.D. Ill.); *Exelon* ($173 million, N.D. Ill.); *Sprint* ($131 million, D. Kan.); *Orbital ATK* ($108 million, E.D. Va.); *Walgreens* ($105 million, N.D. Ill.); *Psychiatric Solutions* ($65 million, M.D. Tenn.); *Hospira* ($60 million, N.D. Ill.); and other matters. Barz also handles whistleblower, antitrust, and pro bono matters and was recently honored by the Judges of the United States District Court for the Northern District of Illinois with an Award for Excellence in Pro Bono Service in 2021.

## Education

B.B.A., Loyola University Chicago, School of Business Administration, 1995; J.D., Northwestern University School of Law, 1998

## Honors / Awards

Super Lawyer, *Super Lawyers Magazine*, 2018-2024; Leading Plaintiff Financial Lawyer, *Lawdragon*, 2019-2023; Best Lawyer in America: One to Watch, *Best Lawyers®*, 2023; Midwest Trailblazer, *The American Lawyer*, 2022; Award for Excellence in Pro Bono Service, United States District Court for the Northern District of Illinois, 2021; Litigator of the Week, *The American Lawyer*, 2021; Leading Lawyer, Law Bulletin Media, 2018; B.B.A., *Summa Cum Laude*, Loyola University Chicago, School of Business Administration, 1995; J.D., *Cum Laude*, Northwestern University School of Law, 1998

# Lea Malani Bays | Partner

Lea Malani Bays is a partner in the Firm's San Diego office.  She focuses on e-discovery issues, from preservation through production, and provides counsel to the Firm's multi-disciplinary e-discovery team consisting of attorneys, forensic analysts, and database professionals.  Through her role as counsel to the e-discovery team, Bays is very familiar with the various stages of e-discovery, including identification of relevant electronically stored information, data culling, predictive coding protocols, privilege, and responsiveness reviews, as well as having experience in post-production discovery through trial preparation.  Through speaking at various events, she is also a leader in shaping the broader dialogue on e-discovery issues.

Bays was recently part of the litigation team that earned the approval of a $131 million settlement in favor of plaintiffs in *Bennett v. Sprint Nextel Corp.*  The settlement, which resolved claims arising from Sprint Corporation's ill-fated merger with Nextel Communications in 2005, represents a significant recovery for the plaintiff class, achieved after five years of tireless effort by the Firm.  Prior to joining Robbins Geller, Bays was a Litigation Associate at Kaye Scholer LLP's New York office.  She has experience in a wide range of litigation, including complex securities litigation, commercial contract disputes, business torts, antitrust, civil fraud, and trust and estate litigation.

## Education

B.A., University of California, Santa Cruz, 1997; J.D., New York Law School, 2007

## Honors / Awards

Leading Lawyer, *Chambers USA*, 2019-2022; J.D., *Magna Cum Laude*, New York Law School, 2007; Executive Editor, *New York Law School Law Review*; Legal Aid Society's Pro Bono Publico Award; NYSBA Empire State Counsel; Professor Stephen J. Ellmann Clinical Legal Education Prize; John Marshall Harlan Scholars Program, Justice Action Center

# Alexandra S. Bernay | Partner

Xan Bernay is a partner in the Firm's San Diego office, where she specializes in antitrust and unfair competition class-action litigation. She has also worked on some of the Firm's largest securities fraud class actions, including the *Enron* litigation, which recovered an unprecedented $7.2 billion for investors. Bernay currently serves as co-lead counsel in *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*, in which a settlement of $5.5 billion was upheld by the Second Circuit Court of Appeals. This case was brought on behalf of millions of U.S. merchants against Visa and MasterCard and various card-issuing banks, challenging the way these companies set and collect tens of billions of dollars annually in merchant fees. The settlement is believed to be the largest antitrust class action settlement of all time.

Additionally, Bernay is involved in *In re Remicade Antitrust Litig.*, a large case that settled for $25 million involving anticompetitive conduct in the biosimilars market, where the Firm was sole lead counsel for the end-payor plaintiffs. She is also part of the litigation team in *In re American Airlines/JetBlue Antitrust Litig.* pending in the Eastern District of New York. That case is brought on behalf of airline passengers who overpaid for tickets because of alleged anticompetitive conduct between American and JetBlue. She is also a member of the team in *In re Dealer Mgmt. Sys. Antitrust Litig.* (N.D. Ill.), which involves anticompetitive conduct related to dealer management systems on behalf of auto dealerships across the country. Another representative case is against Lloyd's of London. That action is a massive civil RICO case against the insurance company and its syndicates.

Bernay has also had experience in large consumer class actions, including *In re Checking Account Overdraft Litig.*, which case was brought on behalf of bank customers who were overcharged for debit card transactions and resulted in more than $500 million in settlements with major banks that manipulated customers' debit transactions to maximize overdraft fees. She also helped try to verdict a case against one of the world's largest companies who was sued on behalf of consumers. Her more recent trial experience includes a jury trial related to foreign exchange trading against one of the largest banks in the world, where the jury found that plaintiffs had proved a conspiracy as to a large network of banks. She was responsible for many of the successful trial motions in the case.

## Education

B.A., Humboldt State University, 1997; J.D., University of San Diego School of Law, 2000

## Honors / Awards

Super Lawyer, *Super Lawyers Magazine*, 2023-2024; Outstanding Antitrust Litigation Achievement in Private Law Practice, American Antitrust Institute, 2023; Distinguished Alumni, Forever Humboldt Alumni Association, 2023; Leading Plaintiff Financial Lawyer, *Lawdragon*, 2019-2023; Litigator of the Week, *Global Competition Review*, October 1, 2014

# Kenneth J. Black | Partner

Kenneth Black is a partner in the Firm's San Francisco office, where his practice focuses on complex securities litigation and shareholder derivative litigation. Before joining the Firm, Black was a Sanctions Investigator at the Office of Foreign Assets Control, U.S. Treasury Department, where he investigated and assembled the evidentiary cases against targets of U.S. financial sanctions, and tracked the finances and assets of those targets.

### Education

B.A., University of Michigan, 2004; M.A., American University, 2007; J.D., University of Michigan School of Law, 2013

### Honors / Awards

Leading Litigator in America, *Lawdragon*, 2024; 500 X – The Next Generation, *Lawdragon*, 2023; Comments Editor, *Michigan Journal of Private Equity & Venture Capital Law*, University of Michigan School of Law

# Erin W. Boardman | Partner

Erin Boardman is a partner in the Firm's Melville office, where her practice focuses on representing individual and institutional investors in class actions brought pursuant to the federal securities laws. She has been involved in the prosecution of numerous securities class actions that have resulted in millions of dollars in recoveries for defrauded investors, including: *Medoff v. CVS Caremark Corp.* (D.R.I.) ($48 million recovery); *Construction Laborers Pension Tr. of Greater St. Louis v. Autoliv Inc.* (S.D.N.Y.) ($22.5 million recovery); *In re Gildan Activewear Inc. Sec. Litig.* (S.D.N.Y.) (resolved as part of a $22.5 million global settlement); *In re L.G. Phillips LCD Co., Ltd., Sec. Litig.* (S.D.N.Y.) ($18 million recovery); *In re Giant Interactive Grp., Inc. Sec. Litig.* (S.D.N.Y.) ($13 million recovery); *In re Coventry HealthCare, Inc. Sec. Litig.* (D. Md.) ($10 million recovery); *Lenartz v. American Superconductor Corp.* (D. Mass.) ($10 million recovery); *Dudley v. Haub* (D.N.J.) ($9 million recovery); *Hildenbrand v. W Holding Co.* (D.P.R.) ($8.75 million recovery); *In re Doral Fin. Corp. Sec. Litig.* (D.P.R.) ($7 million recovery); and *Van Dongen v. CNinsure Inc.* (S.D.N.Y.) ($6.625 million recovery). During law school, Boardman served as Associate Managing Editor of *the Journal of Corporate, Financial and Commercial Law*, interned in the chambers of the Honorable Kiyo A. Matsumoto in the United States District Court for the Eastern District of New York, and represented individuals on a *pro bono* basis through the Workers' Rights Clinic.

### Education

B.A., State University of New York at Binghamton, 2003; J.D., Brooklyn Law School, 2007

### Honors / Awards

Super Lawyer, *Super Lawyers Magazine*, 2022-2023; Leading Plaintiff Financial Lawyer, *Lawdragon*, 2022-2023; Rising Star, *Super Lawyers Magazine*, 2015-2018; B.A., *Magna Cum Laude*, State University of New York at Binghamton, 2003

# Douglas R. Britton | Partner

Doug Britton is a partner in the Firm's San Diego office. His practice focuses on securities fraud and corporate governance. Britton has been involved in settlements exceeding $1 billion and has secured significant corporate governance enhancements to improve corporate functioning. Notable achievements include *In re WorldCom, Inc. Sec. & "ERISA" Litig.*, where he was one of the lead partners that represented a number of opt-out institutional investors and secured an unprecedented recovery of $651 million; *In re SureBeam Corp. Sec. Litig.*, where he was the lead trial counsel and secured an impressive recovery of $32.75 million; and *In re Amazon.com, Inc. Sec. Litig.*, where he was one of the lead attorneys securing a $27.5 million recovery for investors.

## Education

B.B.A., Washburn University, 1991; J.D., Pepperdine University School of Law, 1996

## Honors / Awards

J.D., *Cum Laude*, Pepperdine University School of Law, 1996

# Luke O. Brooks | Partner

Luke Brooks is a partner in the Firm's securities litigation practice group in the San Diego office. He focuses primarily on securities fraud litigation on behalf of individual and institutional investors, including state and municipal pension funds, Taft-Hartley funds, and private retirement and investment funds. Brooks served as trial counsel in *Jaffe v. Household International* in the Northern District of Illinois, a securities class action that obtained a record-breaking $1.575 billion settlement after 14 years of litigation, including a six-week jury trial in 2009 that resulted in a verdict for plaintiffs. Other prominent cases recently prosecuted by Brooks include *Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*, in which plaintiffs recovered $388 million for investors in J.P. Morgan residential mortgage-backed securities, and a pair of cases – *Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.* ("Cheyne") and *King County, Washington, et al. v. IKB Deutsche Industriebank AG* ("Rhinebridge") – in which plaintiffs obtained a settlement, on the eve of trial in Cheyne, from the major credit rating agencies and Morgan Stanley arising out of the fraudulent ratings of bonds issued by the Cheyne and Rhinebridge structured investment vehicles. *Reuters* described the settlement as a "landmark" deal and emphasized that it was the "first time S&P and Moody's have settled accusations that investors were misled by their ratings." An article published in *Rolling Stone* magazine entitled "The Last Mystery of the Financial Crisis" similarly credited Robbins Geller with uncovering "a mountain of evidence" detailing the credit rating agencies' fraud. Most recently, Brooks served as lead counsel in *Smilovits v. First Solar, Inc.,* and obtained a $350 million settlement on the eve of trial. The settlement is fifth-largest PSLRA settlement ever recovered in the Ninth Circuit.

## Education

B.A., University of Massachusetts at Amherst, 1997; J.D., University of San Francisco, 2000

## Honors / Awards

Leading Plaintiff Financial Lawyer, *Lawdragon*, 2019-2023; Litigation Star, *Benchmark Litigation*, 2023; Local Litigation Star, *Benchmark Litigation*, 2017-2018, 2020; California Star, *Benchmark Litigation*, 2019; State Litigation Star, *Benchmark Litigation*, 2019; Recommended Lawyer, *The Legal 500*, 2017-2018; Member, *University of San Francisco Law Review*, University of San Francisco

# Spencer A. Burkholz | Partner

Spence Burkholz is a partner in the Firm's San Diego office and a member of the Firm's Management Committee. He has over 25 years of experience in prosecuting securities class actions and private actions on behalf of large institutional investors. Burkholz was one of the lead trial attorneys in *Jaffe v. Household International* in the Northern District of Illinois, a securities class action that obtained a record-breaking $1.575 billion settlement after 14 years of litigation, including a six-week jury trial in 2009 that resulted in a verdict for plaintiffs. Burkholz has also recovered billions of dollars for injured shareholders in cases such as *Enron* ($7.2 billion), *WorldCom* ($657 million), *Countrywide* ($500 million), *Qwest* ($445 million), *Wells Fargo* ($300 million), *McKesson* ($141 million), and *Cardinal Health* ($109 million).

## Education

B.A., Clark University, 1985; J.D., University of Virginia School of Law, 1989

## Honors / Awards

Rated AV Preeminent by Martindale-Hubbell; Titan of the Plaintiffs Bar, *Law360*, 2024; Leading Lawyer in America, *Lawdragon*, 2018-2024; Best Lawyer in America, *Best Lawyers®*, 2018-2024; Top Plaintiff Lawyer, *Daily Journal*, 2017, 2023; Leading Plaintiff Financial Lawyer, *Lawdragon*, 2019-2023; Litigation Star, *Benchmark Litigation*, 2023; Top 20 Trial Lawyer in California, *Benchmark Litigation*, 2019, 2023; Plaintiffs' Lawyer Trailblazer, *The National Law Journal*, 2020, 2022; Top Lawyer in San Diego, *San Diego Magazine*, 2013-2022; Southern California Best Lawyer, *Best Lawyers®*, 2018-2021; Super Lawyer, *Super Lawyers Magazine*, 2015-2016, 2020; Top 100 Trial Lawyer, *Benchmark Litigation*, 2018-2020; National Practice Area Star, *Benchmark Litigation*, 2020; Local Litigation Star, *Benchmark Litigation*, 2015-2018, 2020; Lawyer of the Year, *Best Lawyers®*, 2020; Recommended Lawyer, *The Legal 500*, 2017-2019; California Star, *Benchmark Litigation*, 2019; State Litigation Star, *Benchmark Litigation*, 2019; Plaintiff Attorney of the Year, *Benchmark Litigation*, 2018; B.A., *Cum Laude*, Clark University, 1985; *Phi Beta Kappa*, Clark University, 1985

# Michael G. Capeci | Partner

Michael Capeci is a partner in the Firm's Melville office. His practice focuses on prosecuting complex securities class action lawsuits in federal and state courts. Throughout his tenure with the Firm, Capeci has played an integral role in the teams prosecuting cases such as: *In re BHP Billiton Ltd. Sec. Litig.* ($50 million recovery); *Galestan v. OneMain Holdings, Inc.* ($9 million recovery); *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC* ($14 million recovery); *City of Pontiac General Emps.' Ret. Sys. v. Lockheed Martin Corp.* ($19.5 million recovery); and *Plumbers and Pipefitters Local Union No. 630 Pension-Annuity Tr. Fund v. Arbitron Inc.* ($7 million recovery). Capeci is currently prosecuting numerous cases in federal and state courts alleging violations of the Securities Exchange Act of 1934 and the Securities Act of 1933. Recently, Michael led the litigation team that achieved the first settlement of a 1933 Act claim in New York state court, *In re EverQuote, Inc. Sec. Litig.* ($4.75 million recovery), following the U.S. Supreme Court's landmark decision in *Cyan, Inc. v. Beaver Cnty. Emps. Ret. Fund* in 2018.

### Education

B.S., Villanova University, 2007; J.D., Hofstra University School of Law, 2010

### Honors / Awards

Super Lawyer, *Super Lawyers Magazine*, 2022-2023; 500 X – The Next Generation, *Lawdragon*, 2023; Rising Star, *Super Lawyers Magazine*, 2014-2021; J.D., *Cum Laude,* Hofstra University School of Law, 2010

# Jennifer N. Caringal | Partner

Jennifer Caringal is a partner in the Firm's San Diego office, where her practice focuses on complex securities litigation. Jennifer is a member of the Firm's Lead Plaintiff Advisory Team, which advises institutional investors in connection with lead plaintiff motions, and assists them in securing appointment as lead plaintiff. She is also part of the Firm's SPAC Task Force, which is dedicated to rooting out and prosecuting fraud on behalf of injured investors in special purpose acquisition companies.

Caringal served as lead counsel in *In re Am. Realty Cap. Props., Inc. Litig.*, a case arising out of ARCP's manipulative accounting practices, and obtained a $1.025 billion recovery. For five years, she and the litigation team prosecuted nine different claims for violations of the Securities Exchange Act of 1934 and the Securities Act of 1933, involving seven different stock or debt offerings and two mergers. The recovery represents the highest percentage of damages of any major PSLRA case prior to trial and includes the largest personal contributions by individual defendants in history.

### Education

B.A., University of Illinois, 2006; J.D., Washington University in St. Louis, School of Law, 2012

### Honors / Awards

Best Lawyer in America: One to Watch, *Best Lawyers®*, 2021-2024; 500 X – The Next Generation, *Lawdragon*, 2023; Leading Plaintiff Financial Lawyer, *Lawdragon*, 2022-2023; They've Got Next: The 40 Under 40, *Bloomberg Law*, 2022; Rising Star, *Super Lawyers Magazine*, 2021-2022; Best Lawyer in Southern California: One to Watch, *Best Lawyers®*, 2021

# Rachel A. Cocalis | Partner

Rachel Cocalis is a partner in the Firm's San Diego office. She represents pension funds and class members in securities fraud class actions. Cocalis was on the team of Robbins Geller attorneys who obtained a $97.5 million recovery in *Marcus v. J.C. Penney Company, Inc.*

Most recently, Cocalis was a key member of the Robbins Geller litigation team in *Monroe County Employees' Retirement System v. The Southern Company* in which a $87.5 million settlement was reached after three years of litigation. The settlement resolved claims for violations of the Securities Exchange Act of 1934 stemming from defendants' issuance of materially misleading statements and omissions regarding the status of construction of a first-of-its-kind "clean coal" power plant that was designed to transform coal into synthetic gas that could then be used to fuel the power plant. Cocalis was also on the litigation team that obtained a settlement of up to $85 million in *In re Morning Song Bird Food Litigation*, resolving claims that Scotts Miracle-Gro knowingly sold wild bird food treated with pesticides that are hazardous to birds.

### Education

B.A., Princeton University, 2010; J.D., University of California, Hastings College of the Law, 2016

### Honors / Awards

J.D., *magna cum laude*, University of California, Hastings College of the Law, 2016; B.A., High Honors, Princeton University, 2010

# Brian E. Cochran | Partner

Brian Cochran is a partner in the Firm's San Diego and Chicago offices. He focuses his practice on complex securities, shareholder, consumer protection, and ERISA litigation. Cochran specializes in case investigation and initiation and lead plaintiff issues arising under the Private Securities Litigation Reform Act of 1995. He has developed dozens of cases under the federal securities laws and recovered billions of dollars for injured investors and consumers. Several of Cochran's cases have pioneered new ground, such as cases on behalf of cryptocurrency investors and in blank check companies (a.k.a "SPACs"), and sparked follow-on governmental investigations into corporate malfeasance.

Cochran was a member of the litigation team that achieved a $1.21 billion settlement in the *Valeant Pharmaceuticals* securities litigation. Cochran also developed the *Dynamic Ledger* securities litigation, one of the first cases to challenge a cryptocurrency issuer's failure to register under the federal securities laws, which settled for $25 million. In addition, Cochran was part of the team that secured a historic $25 million settlement on behalf of Trump University students, which Cochran prosecuted on a *pro bono* basis. Other notable recoveries include: *Rite Aid Merger* ($192.5 million); *Exelon* ($173 million); *Micro Focus* ($107.5 million); *Walgreens* ($105 million); *Scotts Miracle-Gro* (up to $85 million); *Psychiatric Solutions* ($65 million); *SQM Chemical & Mining Co. of Chile* ($62.5 million); *GE ERISA* ($61 million); *Grubhub* ($42 million); *Big Lots* ($38 million); *Credit Suisse* ($32.5 million); *GoHealth* ($29.5 million); *Reckitt Benckiser* ($19.6 million); *DouYu* ($15 million); *REV Group* ($14.25 million); *Fifth Street Finance* ($14 million); *Third Avenue Management* ($14 million); *LJM* ($12.85 million); *Sealed Air* ($12.5 million); *Camping World* ($12.5 million); *FTS International* ($9.875 million); and *JPMorgan ERISA* ($9 million).

### Education
A.B., Princeton University, 2006; J.D., University of California at Berkeley School of Law, Boalt Hall, 2012

### Honors / Awards
500 X – The Next Generation, *Lawdragon*, 2023; Next Generation Partner, *The Legal 500*, 2020-2023; Rising Star, *Super Lawyers Magazine*, 2020-2022; 40 & Under Hot List, *Benchmark Litigation*, 2021; Rising Star, *The Legal 500*, 2019; A.B., with Honors, Princeton University, 2006; J.D., Order of the Coif, University of California at Berkeley School of Law, Boalt Hall, 2012

# Sheri M. Coverman | Partner

Sheri Coverman is a partner in the Firm's Boca Raton office. Her practice focuses on complex class actions, including securities, corporate governance, and consumer fraud litigation.

Coverman is a member of the Firm's Institutional Outreach Team, which provides advice to the Firm's institutional clients, including numerous public pension systems and Taft-Hartley funds throughout the United States, on issues related to corporate fraud, shareholder litigation, and corporate governance issues. Coverman frequently addresses trustees regarding their options for seeking redress for losses due to violations of securities laws and assists in ongoing litigation involving many Firm clients. Coverman's institutional clients are also involved in other types of class actions, namely: *In re National Prescription Opiate Litigation*.

### Education
B.A., University of Florida, 2008; J.D., University of Florida Levin College of Law, 2011

# Desiree Cummings | Partner

Desiree Cummings is a partner with the Firm and is based in the Manhattan office. Cummings focuses her practice on complex securities litigation, consumer and privacy litigation, and breach of fiduciary duty actions and is part of the Firm's Delaware Practice Group.

Before joining Robbins Geller, Cummings spent several years prosecuting securities fraud as an Assistant Attorney General with the New York State Office of the Attorney General's Investor Protection Bureau. As an Assistant Attorney General, Cummings was instrumental in the office's investigation and prosecution of J.P. Morgan and Goldman Sachs in connection with the marketing, sale and issuance of residential mortgage-backed securities, resulting in recoveries worth over $1.6 billion for the State of New York. In connection with investigating and prosecuting securities fraud as part of a federal and state RMBS Working Group, Cummings was awarded the Louis J. Lefkowitz Award for Exceptional Service. Cummings began her career as a litigator at Paul, Weiss, Rifkind, Wharton & Garrison LLP where she spent several years representing major financial institutions, a pharmaceutical manufacturer, and public and private companies in connection with commercial litigations and state and federal regulatory investigations.

At Robbins Geller, Cummings represents institutional and individual investors in securities and breach of fiduciary duty cases. Cummings also represents consumers and serves on the Plaintiffs' Steering Committee in *In re Blackbaud Inc. Customer Data Security Breach Litigation*, a data breach multi-district litigation pending in the United States District Court for the District of South Carolina.

## Education

B.A., Binghamton University, 2001, *cum laude*; J.D., University of Michigan Law School, 2004

## Honors / Awards

Leading Plaintiff Consumer Lawyer, *Lawdragon*, 2023-2024; Leading Lawyer in America, *Lawdragon*, 2023-2024; Leading Litigator in America, *Lawdragon*, 2024; 500 X – The Next Generation, *Lawdragon*, 2023; Leading Plaintiff Financial Lawyer, *Lawdragon*, 2022-2023; Louis J. Lefkowitz Award for Exceptional Service, New York State Office of the Attorney General, 2012

# Joseph D. Daley | Partner

Joseph Daley is a partner in the Firm's San Diego office, serves on the Firm's Securities Hiring Committee, and is a member of the Firm's Appellate Practice Group. Precedents include: *Fikes Wholesale, Inc. v. Visa U.S.A., Inc.*, 62 F.4th 704 (2d Cir. 2023); *City of Birmingham Ret. & Relief Sys. v. Davis*, 806 F. App'x 17 (2d Cir. 2020); *City of Providence v. Bats Glob. Mkts., Inc.*, 878 F.3d 36 (2d Cir. 2017); *DeJulius v. New Eng. Health Care Emps. Pension Fund*, 429 F.3d 935 (10th Cir. 2005); *Frank v. Dana Corp.* ("*Dana I*"), 547 F.3d 564 (6th Cir. 2008); *Frank v. Dana Corp.* ("*Dana II*"), 646 F.3d 954 (6th Cir. 2011*); Freidus v. Barclays Bank PLC*, 734 F.3d 132 (2d Cir. 2013); *In re HealthSouth Corp. Sec. Litig.*, 334 F. App'x 248 (11th Cir. 2009*); In re Merck & Co. Sec., Derivative & ERISA Litig.*, 493 F.3d 393 (3d Cir. 2007); *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130 (9th Cir. 2017); *In re Qwest Commc'ns Int'l*, 450 F.3d 1179 (10th Cir. 2006); *Luther v. Countrywide Home Loans Servicing LP*, 533 F.3d 1031 (9th Cir. 2008); *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145 (2d Cir. 2012); *Rosenbloom v. Pyott* ("*Allergan*"), 765 F.3d 1137 (9th Cir. 2014); *Silverman v. Motorola Solutions, Inc.*, 739 F.3d 956 (7th Cir. 2013); *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167 (9th Cir. 2009), *aff'd*, 563 U.S. 27 (2011); and *Southland Sec. Corp. v. INSpire Ins. Solutions Inc.*, 365 F.3d 353 (5th Cir. 2004). Daley is admitted to practice before the U.S. Supreme Court, as well as before 12 U.S. Courts of Appeals around the nation.

## Education

B.S., Jacksonville University, 1981; J.D., University of San Diego School of Law, 1996

## Honors / Awards

Best Lawyer in America, *Best Lawyers®*, 2024; Seven-time Super Lawyer, *Super Lawyers Magazine*; Appellate Moot Court Board, Order of the Barristers, University of San Diego School of Law; Best Advocate Award (Traynore Constitutional Law Moot Court Competition), First Place and Best Briefs (Alumni Torts Moot Court Competition and USD Jessup International Law Moot Court Competition)

# Stuart A. Davidson | Partner

Stuart Davidson is a partner in the Firm's Boca Raton office. His practice focuses on complex consumer class actions, including cases involving deceptive and unfair trade practices, privacy and data breach issues, and antitrust violations. He has served as class counsel in some of the nation's most significant privacy and consumer cases, including: *In re Facebook Biometric Information Privacy Litigation*, No. 3:15-cv-03747-JD (N.D. Cal.) ($650 million recovery in a cutting-edge class action concerning Facebook's alleged privacy violations through its collection of user's biometric identifiers without informed consent); *In re Yahoo! Inc. Customer Data Security Breach Litigation*, No. 5:16-md-02752-LHK (N.D. Cal.) ($117.5 million recovery in the largest data breach in history); *Kehoe v. Fidelity Federal Bank & Trust*, No. 9:03-cv-80593-DTKH (S.D. Fla.) ($50 million recovery in Driver's Privacy Protection Act case on behalf of half-a-million Florida drivers against a national bank); *In re Sony Gaming Networks & Customer Data Security Breach Litigation*, No. 3:11-md-02258-AJB-MDD (S.D. Cal.) (settlement valued at $15 million concerning the massive data breach of Sony's PlayStation Network); and *In re Solara Medical Supplies Data Breach Litigation*, No. 3:19-cv-02284-H-KSC (S.D. Cal.) ($5 million all-cash settlement for victims of healthcare data breach).

Davidson currently serves as Plaintiffs' Co-Lead Counsel in *In re American Medical Collection Agency, Inc. Customer Data Security Breach Litigation*, No. 2:19-md-02904-MCA-MAH (D.N.J.) (representing class of LabCorp customers), *In re Independent Living Systems Data Breach Litigation*, No. 1:23-cv-21060-KMW (S.D. Fla.), *Garner v. Amazon.com, Inc.*, No. 2:21-cv-00750-RSL (W.D. Wash.) (alleging Amazon's illegal wiretapping through Alexa-enabled devices), *In re American Financial Resources, Inc. Data Breach Litigation*,

No. 2:22-cv-01757-MCA-JSA (D.N.J.), *In re Fortra Tile Transfer Software Data Security Breach Litigation*, No. 1:24-md-03090-RAR (S.D. Fla.) (representing Aetna patients), on Plaintiffs' Executive Committee in *In re Lakeview Loan Servicing Data Breach Litigation*, No. 1:22-cv-20955-DPG (S.D. Fla.), and on Plaintiffs' Steering Committee in *In re FTX Cryptocurrency Exchange Collapse Litigation*, No. 1:23-md-03076-KMM (S.D. Fla.). Davidson also currently represents the State of Arkansas in a major antitrust enforcement action, *State of Arkansas ex rel. Griffin v. Syngenta Crop Protection AG*, No. 4:22-cv-01287-BSM (E.D. Ark.).

Davidson also spearheaded several aspects of *In re EpiPen (Epinephrine Injection, USP) Marketing, Sales Practices & Antitrust Litigation*, No. 2:17-md-02785-DDC-TJJ (D. Kan.) ($609 million total recovery achieved weeks prior to trial in certified class action alleging antitrust claims involving the illegal reverse payment settlement to delay the generic EpiPen, which allowed the prices of the life-saving EpiPen to rise over 600% in 9 years), served as Co-Lead Class Counsel in three cases brought against Genworth Life Insurance Company on behalf of long-term care insureds, *Skochin v. Genworth Life. Ins. Co.*, No. 3:19-cv-00049-REP (E.D. Va.); *Halcom v. Genworth Life Ins. Co.*, No. 3:21-cv-00019-REP (E.D. Va.); and *Haney v. Genworth Life Ins. Co.*, No. 3:22-cv-00055-REP (E.D. Va.), recovering hundreds of millions of dollars in cash damages for policyholders, and served as Plaintiffs' Co-Lead Counsel in *In re NHL Players' Concussion Injury Litigation*, No. 0:14-md-02551-SRN-BRT (D. Minn.) (representing retired National Hockey League players in multidistrict litigation suit against the NHL regarding injuries suffered due to repetitive head trauma and concussions), and in *In re Pet Food Products Liability Litigation*, No. 1:07-cv-02867-NLH-AMD (D.N.J.) ($24 million recovery in multidistrict consumer class action on behalf of thousands of aggrieved pet owners nationwide against some of the nation's largest pet food manufacturers, distributors, and retailers). He also served as Plaintiffs' Co-Lead Counsel in *In re UnitedGlobalCom, Inc. Shareholder Litigation*, C.A. No. 1012-VCS (Del. Ch.) ($25 million recovery weeks before trial); *In re Winn-Dixie Stores, Inc. Shareholder Litigation*, No. 16-2011-CA-010616 (Fla. Cir. Ct.) ($11.5 million recovery for former Winn-Dixie shareholders following the corporate buyout by BI-LO); and *In re AuthenTec, Inc. Shareholder Litigation*, No. 5-2012-CA-57589 (Fla. Cir. Ct.) ($10 million recovery for former AuthenTec shareholders following a merger with Apple). The latter two cases are the two largest merger and acquisition recoveries in Florida history.

Davidson is a former lead assistant public defender in the Felony Division of the Broward County, Florida Public Defender's Office. During his tenure at the Public Defender's Office, he tried over 30 jury trials and defended individuals charged with major crimes ranging from third-degree felonies to life and capital felonies.

## Education
B.A., State University of New York at Geneseo, 1993; J.D., Nova Southeastern University Shepard Broad College of Law, 1996

## Honors / Awards
Leading Plaintiff Consumer Lawyer, *Lawdragon*, 2022-2024; Leading Lawyer in America, *Lawdragon*, 2023-2024; Leading Litigator in America, *Lawdragon*, 2024; Recommended Lawyer, *The Legal 500*, 2023; Leading Plaintiff Financial Lawyer, *Lawdragon*, 2020-2023; Litigation Star, *Benchmark Litigation*, 2023; Outstanding Antitrust Litigation Achievement in Private Law Practice, American Antitrust Institute, 2022; Super Lawyer, *Super Lawyers Magazine*, 2021-2022; One of "Florida's Most Effective Lawyers" in the Privacy category, American Law Media, 2020; J.D., *Summa Cum Laude*, Nova Southeastern University Shepard Broad College of Law, 1996; Associate Editor, *Nova Law Review*, Book Awards in Trial Advocacy, International Law, and Criminal Pretrial Practice

# Jason C. Davis | Partner

Jason Davis is a partner in the Firm's San Francisco office where he practices securities class actions and complex litigation involving equities, fixed-income, synthetic, and structured securities issued in public and private transactions. Davis was on the trial team in *Jaffe v. Household Int'l, Inc.*, a securities class action that obtained a record-breaking $1.575 billion settlement after 14 years of litigation, including a six-week jury trial in 2009 that resulted in a verdict for plaintiffs. Most recently, he was part of the litigation team in *Luna v. Marvell Tech. Grp., Ltd.*, resulting in a $72.5 million settlement that represents approximately 24% to 50% of the best estimate of classwide damages suffered by investors.

Before joining the Firm, Davis focused on cross-border transactions, mergers and acquisitions at Cravath, Swaine and Moore LLP in New York.

### Education

B.A., Syracuse University, 1998; J.D., University of California at Berkeley, Boalt Hall School of Law, 2002

### Honors / Awards

B.A., *Summa Cum Laude*, Syracuse University, 1998; International Relations Scholar of the year, Syracuse University; Teaching fellow, examination awards, Moot court award, University of California at Berkeley, Boalt Hall School of Law

# Mark J. Dearman | Partner

Mark Dearman is a partner in the Firm's Boca Raton office, where his practice focuses on consumer fraud, securities fraud, mass torts, antitrust, and whistleblower litigation.

Dearman, along with other Robbins Geller attorneys, is currently leading the effort on behalf of cities and counties around the country in *In re National Prescription Opiate Litigation*, No. 1:17-md-02804 (N.D. Ohio). He was appointed to the Plaintiffs' Steering Committee in *In re Zantac (Ranitidine) Products Liability Litigation*, No. 9:20-md-02924 (S.D. Fla.), and as Chair of the Plaintiffs' Executive Committee in *In re Apple Inc. Device Performance Litigation*, No. 5:18-md-02827 (N.D. Cal.), Dearman, along with co-counsel, obtained a $310 million settlement. His other recent representative cases include serving as class counsel in *In re Juul Labs, Inc., Marketing, Sales Practices, and Products Liability Litigation*, No. 3:19-md-02913 (N.D. Cal.); *In re McKinsey & Co., Inc. National Prescription Opiate Consultant Litigation*, No. 3:21-md-02996 (N.D. Cal.); *In re Facebook Biometric Information Privacy Litigation*, No. 3:15-cv-03747 (N.D. Cal.) ($650 million recovery in a class action concerning Facebook's alleged privacy violations through its collection of user's biometric identifiers without informed consent); *In re EpiPen (Epinephrine Injection, USP) Marketing, Sales Practices & Antitrust Litigation*, No. 2:17-md-02785 (D. Kan.) ($609 million total recovery achieved weeks prior to trial in certified class action alleging antitrust claims involving the illegal reverse payment settlement to delay the generic EpiPen); *In re FieldTurf Artificial Turf Sales & Marketing Practices Litigation*, No. 3:17-md-02779 (D.N.J.); *In re Sony Gaming Networks & Customer Data Security Breach Litigation*, 903 F. Supp. 2d 942 (S.D. Cal. 2012); *In re Volkswagen "Clean Diesel" Marketing, Sales Practices, & Products Liability Litigation*, 2016 U.S. Dist. LEXIS 1357 (N.D. Cal. Jan. 5, 2016); *In re Aluminum Warehousing Antitrust Litigation*, 95 F. Supp. 3d 419 (S.D.N.Y. 2015); *In re Liquid Aluminum Sulfate Antitrust Litigation*, No. 2:16-md-2687 (D.N.J.); *In re Winn-Dixie Stores, Inc. Shareholder Litigation*, No. 16-2011-CA-010616 (Fla. 4th Jud. Cir. Ct., Duval Cnty.); *Gemelas v. Dannon Co. Inc.*, No. 1:08-cv-00236 (N.D. Ohio); and *In re AuthenTec, Inc. Shareholder Litigation*, No. 05-2012-CA-57589 (Fla. 18th Jud. Cir. Ct., Brevard Cnty.).

## Education

B.A., University of Florida, 1990; J.D., Nova Southeastern University, 1993

## Honors / Awards

AV rated by Martindale-Hubbell; Leading Plaintiff Consumer Lawyer, *Lawdragon*, 2022-2024; Leading Lawyer in America, *Lawdragon*, 2023-2024; Leading Litigator in America, *Lawdragon*, 2024; Best Lawyer in America, *Best Lawyers®*, 2024; Recommended Lawyer, *The Legal 500*, 2023; Leading Plaintiff Financial Lawyer, *Lawdragon*, 2020-2023; Super Lawyer, *Super Lawyers Magazine*, 2014-2020; In top 1.5% of Florida Civil Trial Lawyers in *Florida Trend's* Florida Legal Elite, 2004, 2006

# Kathleen B. Douglas | Partner

Kathleen Douglas is a partner in the Firm's Boca Raton office. She focuses her practice on securities fraud class actions and consumer fraud. Most recently, Douglas and a team of Robbins Geller attorneys obtained a $1.21 billion settlement in *In re Valeant Pharms. Int'l, Inc. Sec. Litig.*, a case that *Vanity Fair* reported as "the corporate scandal of its era" that had raised "fundamental questions about the functioning of our health-care system, the nature of modern markets, and the slippery slope of ethical rationalizations." This is the largest securities class action settlement against a pharmaceutical manufacturer and the ninth largest ever.

Douglas was also a key member of the litigation team in *In re UnitedHealth Grp. Inc. PSLRA Litig.*, in which she and team of Robbins Geller attorneys achieved a substantial $925 million recovery. In addition to the monetary recovery, UnitedHealth also made critical changes to a number of its corporate governance policies, including electing a shareholder-nominated member to the company's Board of Directors. Likewise, in *Nieman v. Duke Energy Corp.*, she and a team of attorneys obtained a $146.25 million recovery, which is the largest recovery in North Carolina for a case involving securities fraud and is one of the five largest recoveries in the Fourth Circuit. In addition, Douglas was a member of the team of attorneys that represented investors in *Knurr v. Orbital ATK, Inc.*, which recovered $108 million for shareholders and is believed to be the fourth-largest securities class action settlement in the history of the Eastern District of Virginia. Douglas has served as class counsel in several class actions brought on behalf of Florida emergency room physicians. These cases were against some of the nation's largest Health Maintenance Organizations and settled for substantial increases in reimbursement rates and millions of dollars in past damages for the class.

## Education
B.S., Georgetown University, 2004; J.D., University of Miami School of Law, 2007

## Honors / Awards
Leading Plaintiff Consumer Lawyer, *Lawdragon*, 2023-2024; Best Lawyer in America: One to Watch, *Best Lawyers®*, 2024; 40 & Under Hot List, *Benchmark Litigation*, 2021; Rising Star, *Super Lawyers Magazine*, 2012-2017; B.S., *Cum Laude*, Georgetown University, 2004

# Travis E. Downs III | Partner

Travis Downs is a partner in the Firm's San Diego office. His areas of expertise include prosecution of shareholder and securities litigation, including complex shareholder derivative actions. Downs is a member of the Firm's Delaware Practice Group. Downs led a team of lawyers who successfully prosecuted over 65 stock option backdating derivative actions in federal and state courts across the country, resulting in hundreds of millions in financial givebacks for the plaintiffs and extensive corporate governance enhancements, including annual directors elections, majority voting for directors, and shareholder nomination of directors. Notable cases include: *In re Community Health Sys., Inc. S'holder Derivative Litig.* ($60 million in financial relief and unprecedented corporate governance reforms); *In re Marvell Tech. Grp. Ltd. Derivative Litig.* ($54 million in financial relief and extensive corporate governance enhancements); *In re McAfee, Inc. Derivative Litig.* ($30 million in financial relief and extensive corporate governance enhancements); *In re Affiliated Computer Servs. Derivative Litig.* ($30 million in financial relief and extensive corporate governance enhancements); *In re KB Home S'holder Derivative Litig.* ($30 million in financial relief and extensive corporate governance enhancements); *In re Juniper Networks Derivative Litig.* ($22.7 million in financial relief and extensive corporate governance enhancements); *In re Nvidia Corp. Derivative Litig.* ($15 million in financial relief and extensive corporate governance enhancements); and *City of Pontiac Gen. Emps.' Ret. Sys. v. Langone* (achieving landmark corporate governance reforms for investors).

Downs was also part of the litigation team that obtained a $67 million settlement in *City of Westland Police & Fire Ret. Sys. v. Stumpf*, a shareholder derivative action alleging that Wells Fargo participated in the mass-processing of home foreclosure documents by engaging in widespread robo-signing, and a $250 million settlement in *In re Google, Inc. Derivative Litig.*, an action alleging that Google facilitated in the improper advertising of prescription drugs. Downs is a frequent speaker at conferences and seminars and has lectured on a variety of topics related to shareholder derivative and class action litigation.

### Education

B.A., Whitworth University, 1985; J.D., University of Washington School of Law, 1990

### Honors / Awards

Rated AV Preeminent by Martindale-Hubbell; Best Lawyer in America, *Best Lawyers®*, 2018-2024; Recommended Lawyer, *The Legal 500*, 2023; Leading Plaintiff Financial Lawyer, *Lawdragon*, 2019-2023; Top 100 Leaders in Law Honoree, *San Diego Business Journal*, 2022; Top Lawyer in San Diego, *San Diego Magazine*, 2013-2022; Southern California Best Lawyer, *Best Lawyers®*, 2018-2021; Super Lawyer, *Super Lawyers Magazine*, 2008; B.A., Honors, Whitworth University, 1985

# Daniel S. Drosman | Partner

Dan Drosman is a partner in the Firm's San Diego office and a member of the Firm's Management Committee. He focuses his practice on securities fraud and other complex civil litigation and has obtained significant recoveries for investors in cases such as *Morgan Stanley*, *Cisco Systems*, *The Coca-Cola Company*, *Petco*, *PMI*, and *America West*. Drosman served as lead trial counsel in *Jaffe v. Household International* in the Northern District of Illinois, a securities class action that obtained a record-breaking $1.575 billion settlement after 14 years of litigation, including a six-week jury trial in 2009 that resulted in a verdict for plaintiffs. Drosman also helped secure a $388 million recovery for investors in J.P. Morgan residential mortgage-backed securities in *Fort Worth Employees' Retirement Fund v. J.P. Morgan Chase & Co.* On a percentage basis, that settlement is the largest recovery ever achieved in an RMBS class action. Drosman also served as lead counsel in *Smilovits v. First Solar, Inc.,* and obtained a $350 million settlement on the eve of trial. The

settlement is fifth-largest PSLRA settlement ever recovered in the Ninth Circuit.

Most recently, Drosman led a team of Robbins Geller attorneys to a record-breaking $809.5 million settlement in *In re Twitter, Inc. Sec. Litig.,* which settled the day before trial was set to commence. The settlement is the largest securities fraud class action recovery in the Ninth Circuit in the last decade and one of the top 20 shareholder class action settlements of all time. Drosman was part of the Robbins Geller litigation team in *Monroe County Employees' Retirement System v. The Southern Company* in which an $87.5 million settlement was reached after three years of litigation. The settlement resolved claims for violations of the Securities Exchange Act of 1934 stemming from defendants' issuance of materially misleading statements and omissions regarding the status of construction of a first-of-its-kind "clean coal" power plant that was designed to transform coal into synthetic gas that could then be used to fuel the power plant. In another recent case, Drosman and the Robbins Geller litigation team obtained a $62.5 million settlement in *Villella v. Chemical and Mining Company of Chile Inc.*, which alleged that Sociedad Química y Minera de Chile S.A. ("SQM") violated the Securities Exchange Act of 1934 by issuing materially false and misleading statements regarding the Company's failure to disclose that money from SQM was channeled illegally to electoral campaigns for Chilean politicians and political parties as far back as 2009. SQM had also filed millions of dollars' worth of fictitious tax receipts with Chilean authorities in order to conceal bribery payments from at least 2009 through fiscal year 2014.

In a pair of cases – *Abu Dhabi Commercial Bank, et al. v. Morgan Stanley & Co. Inc.* ("*Cheyne*" litigation) and *King County, Washington, et al. v. IKB Deutsche Industriebank AG* ("*Rhinebridge*" litigation) – Drosman led a group of attorneys prosecuting fraud claims against the credit rating agencies, where he is distinguished as one of the few plaintiffs' counsel to defeat the rating agencies' traditional First Amendment defense and their motions for summary judgment based on the mischaracterization of credit ratings as mere opinions not actionable in fraud.

Before joining the Firm, Drosman served as an Assistant District Attorney for the Manhattan District Attorney's Office, and an Assistant United States Attorney in the Southern District of California, where he investigated and prosecuted violations of the federal narcotics, immigration, and official corruption law.

## Education
B.A., Reed College, 1990; J.D., Harvard Law School, 1993

## Honors / Awards
Leading Lawyer in America, *Lawdragon*, 2018-2024; Lawyer of the Year, *Best Lawyers®*, 2022, 2024; Best Lawyer in America, *Best Lawyers®*, 2019-2024; Recommended Lawyer, *The Legal 500*, 2017-2018, 2023; Leading Plaintiff Financial Lawyer, *Lawdragon*, 2019-2023; Litigation Star, *Benchmark Litigation*, 2023; West Trailblazer, *The American Lawyer*, 2022; Top Plaintiff Lawyer, *Daily Journal*, 2022; Plaintiff Litigator of the Year, *Benchmark Litigation*, 2022; Titan of the Plaintiffs Bar, *Law360*, 2022; Southern California Best Lawyers, *The Wall Street Journal*, 2021; Southern California Best Lawyer, *Best Lawyers®*, 2019-2021; Super Lawyer, *Super Lawyers Magazine*, 2017-2020; Top 100 Lawyer, *Daily Journal*, 2017; Department of Justice Special Achievement Award, Sustained Superior Performance of Duty; B.A., Honors, Reed College, 1990; *Phi Beta Kappa*, Reed College, 1990

# Thomas E. Egler | Partner

Thomas Egler is a partner in the Firm's San Diego office and focuses his practice on representing clients in major complex, multidistrict litigations, such as *Lehman Brothers*, *Countrywide Mortgage Backed Securities*, *WorldCom*, *AOL Time Warner*, and *Qwest*. He has represented institutional investors both as plaintiffs in individual actions and as lead plaintiffs in class actions.

Most recently, along with co-counsel and a team of Robbins Geller attorneys, Egler led the effort on behalf of cities and counties around the country in *In re National Prescription Opiate Litigation*. In 2022, Egler served on the team of counsel in a federal bench trial in San Francisco in a case that had been selected as a bellwether in the multidistrict litigation. The team achieved combined settlements of nearly $70 million for San Francisco and more than $50 billion nationally from multiple pharmaceutical companies who were defendants in the national litigation. The Honorable Charles R. Breyer of the Northern District of California ruled that Walgreens, the only defendant remaining in the San Francisco case, was liable for its role in the opioid crisis in San Francisco.

Egler also has been a Lawyer Representative to the Ninth Circuit Judicial Conference from the Southern District of California, is a member of the Hon. William B. Enright Inn of Court in San Diego, and in the past has served on the Executive Board of the San Diego chapter of the Association of Business Trial Lawyers. Before joining the Firm, Egler was a law clerk to the Honorable Donald E. Ziegler, Chief Judge, United States District Court, Western District of Pennsylvania.

## Education

B.A., Northwestern University, 1989; J.D., The Catholic University of America, Columbus School of Law, 1995

## Honors / Awards

Leading Lawyer in America, *Lawdragon*, 2024; Best Lawyer in America, *Best Lawyers®*, 2024; Super Lawyer, *Super Lawyers Magazine*, 2017-2018; Associate Editor, *Catholic University Law Review*

# Alan I. Ellman | Partner

Alan Ellman is a partner in the Firm's Melville office, where he concentrates his practice on prosecuting complex securities fraud cases on behalf of institutional investors. Most recently, Ellman was on the team of Robbins Geller attorneys who obtained a $34.5 million recovery in *Patel v. L-3 Communications Holdings, Inc.*, which represents a high percentage of damages that plaintiffs could reasonably expect to be recovered at trial and is more than eight times higher than the average settlement of cases with comparable investor losses. He was also on the team of attorneys who recovered in excess of $34 million for investors in *In re OSG Sec. Litig.*, which represented an outsized recovery of 93% of bond purchasers' damages and 28% of stock purchasers' damages. The creatively structured settlement included more than $15 million paid by a bankrupt entity.

Ellman was also on the team of Robbins Geller attorneys who achieved final approval in *Curran v. Freshpet, Inc.,* which provides for the payment of $10.1 million for the benefit of eligible settlement class members. Additionally, he was on the team of attorneys who obtained final approval of a $7.5 million recovery in *Plymouth County Retirement Association v. Advisory Board Company*. In 2006, Ellman received a Volunteer and Leadership Award from Housing Conservation Coordinators (HCC) for his *pro bono* service defending a client in Housing Court against a non-payment action, arguing an appeal before the Appellate Term, and staffing HCC's legal clinic. He also successfully appealed a *pro bono* client's criminal sentence before the Appellate Division.

## Education

B.S., B.A., State University of New York at Binghamton, 1999; J.D., Georgetown University Law Center, 2003

## Honors / Awards

Super Lawyer, *Super Lawyers Magazine*, 2017-2023; Pro Bono Publico Award, *Casa Cornelia Law Center*, 2021-2022; Rising Star, *Super Lawyers Magazine*, 2014-2015; B.S., B.A., *Cum Laude*, State University of New York at Binghamton, 1999

# Jason A. Forge | Partner

Jason Forge is a partner in the Firm's San Diego office. He specializes in complex investigations, litigation, and trials. As a federal prosecutor and private practitioner, Forge has conducted and supervised scores of jury and bench trials in federal and state courts, including the month-long trial of a defense contractor who conspired with Congressman Randy "Duke" Cunningham in the largest bribery scheme in congressional history. He recently obtained approval of a $160 million recovery in the first successful securities fraud case against Wal-Mart Stores, Inc. in *City of Pontiac General Employees' Retirement System v. Wal-Mart Stores, Inc.* In addition, Forge was a member of the Firm's trial team in *Hsu v. Puma Biotechnology, Inc.*, a securities fraud class action that resulted in a verdict in favor of investors after a two-week jury trial.

After the trial victory over Puma Biotechnology and Alan Auerbach, Forge joined a Robbins Geller litigation team that had defeated 12 motions for summary judgment against 40 defendants and was about to depose 17 experts in the home stretch to trial. Forge and the team used these depositions to disprove a truth-on-the-market argument that nine defense experts had embraced. Soon after the last of these expert depositions, the Robbins Geller team secured a $1.025 billion settlement from American Realty Capital Properties and other defendants that included a record $237 million contribution from individual defendants and represented more than twice the recovery rate obtained by several funds that had opted out of the class.

Forge was a key member of the litigation team that secured a historic recovery on behalf of Trump University students in two class actions against President Donald J. Trump. The settlement refunds over 90% of the money thousands of students paid to "enroll" in Trump University. He represented the class on a *pro bono* basis. Forge has also successfully defeated motions to dismiss and obtained class certification against several prominent defendants, including the first federal RICO case against Scotts Miracle-Gro, which recently settled for up to $85 million. He was a member of the litigation team that obtained a $125 million settlement in *In re LendingClub Securities Litigation*, a settlement that ranked among the top ten largest securities recoveries ever in the Northern District of California.

In a case against another prominent defendant, Pfizer Inc., Forge led an investigation that uncovered key documents that Pfizer had not produced in discovery. Although fact discovery in the case had already closed, the district judge ruled that the documents had been improperly withheld and ordered that discovery be reopened, including reopening the depositions of Pfizer's former CEO, CFO, and General Counsel. Less than six months after completing these depositions, Pfizer settled the case for $400 million.

## Education

B.B.A., The University of Michigan Ross School of Business, 1990; J.D., The University of Michigan Law School, 1993

## Honors / Awards

Leading Lawyer in America, *Lawdragon*, 2022-2024; Recommended Lawyer, *The Legal 500*, 2023; Leading Plaintiff Financial Lawyer, *Lawdragon*, 2019-2023; Best Lawyer in America, *Best Lawyers®*, 2019-2023; Litigation Star, *Benchmark Litigation*, 2023; Southern California Best Lawyer, *Best Lawyers®*, 2019-2021; Local Litigation Star, *Benchmark Litigation*, 2020; Plaintiffs' Lawyer Trailblazer, *The National Law Journal*, 2018; Top 100 Lawyer, *Daily Journal*, 2017; Litigator of the Year, *Our City San Diego,* 2017; Two-time recipient of one of Department of Justice's highest awards: Director's Award for Superior Performance by Litigation Team; numerous commendations from Federal Bureau of Investigation (including commendation from FBI Director Robert Mueller III), Internal Revenue Service, and Defense Criminal Investigative Service; J.D., *Magna Cum Laude*, Order of the Coif, The University of Michigan Law School, 1993; B.B.A., High Distinction, The University of Michigan Ross School of Business, 1990

# William J. Geddish | Partner

William Geddish is a partner with the Firm and is based in the Melville office, where his practice focuses on complex securities litigation.  Before joining the Firm, he was an associate in the New York office of a large international law firm, where his practice focused on complex commercial litigation.

Since joining the Firm, Geddish has played a significant role in the following litigations: *In re Barrick Gold Sec. Litig.* ($140 million recovery); *Scheufele v. Tableau Software, Inc.* ($95 million recovery); *Landmen Partners, Inc. v. The Blackstone Grp., L.P.* ($85 million recovery); *In re Jeld-Wen Holding, Inc. Sec. Litig.* ($40 million recovery); *City of Austin Police Ret. Sys. v. Kinross Gold Corp.* ($33 million recovery); *City of Roseville Emps' Ret. Sys. v. EnergySolutions, Inc.* ($26 million recovery); *Beaver Cnty. Emps' Ret. Fund v. Tile Shop Holdings, Inc.* ($9.5 million recovery); and *Barbara Marciano v. Schell & Kampeter, Inc.* ($2 million recovery).

### Education

B.A., Sacred Heart University, 2006, J.D., Hofstra University School of Law, 2009

### Honors / Awards

Best Lawyer in America: One to Watch, *Best Lawyers®*, 2024; Rising Star, *Super Lawyers Magazine*, 2013-2023; 500 X – The Next Generation, *Lawdragon*, 2023; J.D., *Magna Cum Laude*, Hofstra University School of Law, 2009; Gina Maria Escarce Memorial Award, Hofstra University School of Law

# Paul J. Geller | Partner

Paul Geller is a founding partner of Robbins Geller and head of the Firm's Consumer Practice Group.  Over the last 30 years, Geller has served as lead counsel in some of the country's most high-profile consumer, antitrust, and securities class actions and has recovered billions for communities, consumers, and investors harmed by corporate abuse.

Before devoting his practice to the representation of consumers and investors, Geller defended companies in high-stakes class action and multi-district litigation, providing him with an invaluable perspective from "both sides of the 'v.'"  An experienced trial lawyer, he has tried bench and jury trials on behalf of plaintiffs and defendants and has argued before numerous state, federal, and appellate courts throughout the United States.

Geller's ability to earn respect and trust from all sides in difficult negotiations has been recognized by the bar and legal publications.  *Chambers* notes that "Paul's ability to generate respect from the other side and knowledge of how to close a deal are extraordinary."

He serves as a key leader of the nationwide litigation against the companies responsible for the U.S. opioid addiction crisis.  He played a key role in negotiating and architecting the complex settlements that resulted in over $50 billion being paid to communities across the country struggling with the fallout of the opioid crisis.

He has also successfully litigated and negotiated precedent-setting class recoveries in multiple practice areas, including data privacy, antitrust, products liability, and securities cases.

- **Facebook Data Privacy Case** – **$650 Million**: He secured the then-largest privacy class action settlement in history – a $650 million recovery in a cutting-edge class action against Facebook.  The case concerned Facebook's use of biometric identifiers through its "tag" feature, which Geller's team challenged under a new biometric privacy law that had never before been applied in a class action.  The

federal judge that presided over the case called it a "landmark result" and a "major win for consumers." In addition to the monetary recovery, Facebook disabled the tag feature altogether, deleting 1 billion facial profiles and discontinuing the related facial recognition program.

- **Volkswagen "Clean Diesel" Case** – **$17 Billion**: Geller was a member of the leadership team representing consumers in the massive Volkswagen "Clean Diesel" emissions case. The San Francisco legal newspaper *The Recorder* labeled the group that was appointed in that case, which settled for more than $17 billion, a "class action dream team."
- **"EpiPen" Antitrust Case** – **$609 Million**: As lead counsel, Geller secured a recovery of $609 million for overcharged purchasers of the "EpiPen" device in a nationwide class action alleging that the manufacturer and marketer of the EpiPen engaged in anti-competitive and unfair business conduct in their sale and marketing of the auto-injector device. The American Antitrust Institute honored Geller and the litigation team for Outstanding Antitrust Litigation Achievement in Private Law Practice for this result.

## Education

B.S., University of Florida, 1990; J.D., Emory University School of Law, 1993

## Honors / Awards

Rated AV by Martindale-Hubbell; Fellow, Litigation Counsel of America (LCA) Proven Trial Lawyers; Global Plaintiff Lawyer, *Lawdragon*, 2024; Leading Plaintiff Consumer Lawyer, *Lawdragon*, 2022-2024; Leading Lawyer in America, *Lawdragon*, 2006-2007, 2009-2024; Leading Litigator in America, *Lawdragon*, 2024; Best Lawyer in America*, Best Lawyers®*, 2017-2024; Super Lawyer, *Super Lawyers Magazine*, 2007-2023; Recommended Lawyer, *The Legal 500*, 2016, 2019, 2023; Leading Lawyer, *Chambers USA*, 2021-2023; Leading Plaintiff Financial Lawyer, *Lawdragon*, 2019-2023; Outstanding Antitrust Litigation Achievement in Private Law Practice, American Antitrust Institute, 2022; South Trailblazer, *The American Lawyer*, 2022; Class Action MVP, *Law360*, 2022; Florida Best Lawyer in America, *Best Lawyers®*, 2017-2021; One of "Florida's Most Effective Lawyers" in the Privacy category, American Law Media, 2020; Legend, *Lawdragon*, 2020; Plaintiffs' Lawyer Trailblazer, *The National Law Journal*, 2018; Lawyer of the Year*, Best Lawyers®*, 2018; Attorney of the Month, *Attorney At Law*, 2017; Featured in "Lawyer Limelight" series, *Lawdragon*, 2017; Top Rated Lawyer, South Florida's Legal Leaders, *Miami Herald*, 2015; Litigation Star, *Benchmark Litigation*, 2013; "Legal Elite," *Florida Trend Magazine*; One of "Florida's Most Effective Lawyers," American Law Media*;* One of Florida's top lawyers in *South Florida Business* Journal; One of the Nation's Top "40 Under 40," *The National Law Journal*; One of Florida's Top Lawyers, *Law & Politics*; Editor, *Emory Law Journal*; Order of the Coif, Emory University School of Law

## Robert D. Gerson | Partner

Robert Gerson is a partner in the Firm's Melville office, where he practices securities fraud litigation and other complex matters.

Since joining the Firm, Gerson has played a significant role in prosecuting numerous high-stakes investor litigations. Most recently, Gerson was a key member of the team representing a class of shareholders in the Dell Class V Stockholders Litigation, which settled for $1 billion in cash – a record in the Delaware Chancery Court and the largest settlement in U.S. state court history. Other notable cases Gerson has played a critical role in at the Firm include: *UA Local 13 & Employers Group Insurance Fund v. Sealed Air Corp.* ($12.5 million recovery); *In re PPDAI Group Sec. Litig.* ($9 million recovery); and *Sponn v. Emergent BioSolutions Inc.* ($6.5 million recovery).

### Education

B.A., University of Maryland, 2006; J.D., New York Law School, 2009

### Honors / Awards

Best Lawyer in America: One to Watch, *Best Lawyers®*, 2024; Super Lawyer, *Super Lawyers Magazine*, 2021-2023; 500 X – The Next Generation, *Lawdragon*, 2023; Rising Star, *Super Lawyers Magazine*, 2015-2020

## Jonah H. Goldstein | Partner

Jonah Goldstein is a partner in the Firm's San Diego office and is responsible for prosecuting complex securities cases and obtaining recoveries for investors. He also represents corporate whistleblowers who report violations of the securities laws. Goldstein has achieved significant settlements on behalf of investors including in *In re HealthSouth Sec. Litig.* (over $670 million recovered against HealthSouth, UBS and Ernst & Young), *In re Cisco Sec. Litig.* (approximately $100 million), and *Marcus v. J.C. Penney Company, Inc.* ($97.5 million recovery). Goldstein also served on the Firm's trial team in *In re AT&T Corp. Sec. Litig.*, MDL No. 1399 (D.N.J.), which settled after two weeks of trial for $100 million, and aided in the $65 million recovery in *Garden City Emps.' Ret. Sys. v. Psychiatric Solutions, Inc.*, the fourth-largest securities recovery ever in the Middle District of Tennessee and one of the largest in more than a decade. Most recently, he was part of the litigation team in *Luna v. Marvell Tech. Grp., Ltd.*, resulting in a $72.5 million settlement that represents approximately 24% to 50% of the best estimate of classwide damages suffered by investors. Before joining the Firm, Goldstein served as a law clerk for the Honorable William H. Erickson on the Colorado Supreme Court and as an Assistant United States Attorney for the Southern District of California, where he tried numerous cases and briefed and argued appeals before the Ninth Circuit Court of Appeals.

### Education

B.A., Duke University, 1991; J.D., University of Denver College of Law, 1995

### Honors / Awards

Recommended Lawyer, *The Legal 500*, 2018-2019; Comments Editor, *University of Denver Law Review*, University of Denver College of Law

# Benny C. Goodman III | Partner

Benny Goodman is a partner in the Firm's San Diego office. He primarily represents plaintiffs in shareholder actions on behalf of aggrieved corporations. Goodman has recovered hundreds of millions of dollars in shareholder derivative actions pending in state and federal courts across the nation. Most recently, he led a team of lawyers in litigation brought on behalf of Community Health Systems, Inc., resulting in a $60 million payment to the company, the largest recovery in a shareholder derivative action in Tennessee and the Sixth Circuit, as well as best-in-class value-enhancing corporate governance reforms that included two shareholder-nominated directors to the Community Health Board of Directors.

Similarly, Goodman recovered a $25 million payment to Lumber Liquidators and numerous corporate governance reforms, including a shareholder-nominated director, in *In re Lumber Liquidators Holdings, Inc. S'holder Derivative Litig.* In *In re Google Inc. S'holder Derivative Litig.*, Goodman achieved groundbreaking corporate governance reforms designed to mitigate regulatory and legal compliance risk associated with online pharmaceutical advertising, including among other things, the creation of a $250 million fund to help combat rogue pharmacies from improperly selling drugs online.

## Education

B.S., Arizona State University, 1994; J.D., University of San Diego School of Law, 2000

## Honors / Awards

Super Lawyer, *Super Lawyers Magazine*, 2018-2024; Best Lawyer in America: One to Watch, *Best Lawyers®*, 2024; Leading Plaintiff Financial Lawyer, *Lawdragon*, 2019-2021; Recommended Lawyer, *The Legal 500*, 2017

# Elise J. Grace | Partner

Elise Grace is a partner in the San Diego office and counsels the Firm's institutional clients on options to secure premium recoveries in securities litigation both within the United States and internationally. Grace is a frequent lecturer and author on securities and accounting fraud, and develops annual MCLE and CPE accredited educational programs designed to train public fund representatives on practices to protect and maximize portfolio assets, create long-term portfolio value, and best fulfill fiduciary duties. Grace has routinely been named a Recommended Lawyer by *The Legal 500* and named a Leading Plaintiff Financial Lawyer by *Lawdragon*. Grace has prosecuted various significant securities fraud class actions, as well as the AOL Time Warner state and federal securities opt-out litigations, which resulted in a combined settlement of over $629 million for defrauded investors. Before joining the Firm, Grace practiced at Clifford Chance, where she defended numerous Fortune 500 companies in securities class actions and complex business litigation.

## Education

B.A., University of California, Los Angeles, 1993; J.D., Pepperdine School of Law, 1999

## Honors / Awards

Securities Litigation Lawyer of the Year, *Lawyer Monthly*, 2023; Leading Plaintiff Financial Lawyer, *Lawdragon*, 2019-2023; Recommended Lawyer, *The Legal 500*, 2016-2017; J.D., *Magna Cum Laude*, Pepperdine School of Law, 1999; American Jurisprudence Bancroft-Whitney Award – Civil Procedure, Evidence, and Dalsimer Moot Court Oral Argument; Dean's Academic Scholarship Recipient, Pepperdine School of Law; B.A., *Summa Cum Laude*, University of California, Los Angeles, 1993; B.A., *Phi Beta Kappa*, University of California, Los Angeles, 1993

# Tor Gronborg | Partner

Tor Gronborg is a partner in the Firm's San Diego office and a member of the Firm's Management Committee. He often lectures on topics such as the Federal Rules of Civil Procedure and electronic discovery. Gronborg has served as lead or co-lead counsel in numerous securities fraud cases that have collectively recovered more than $4.4 billion for investors. Most recently, Gronborg and a team of Robbins Geller attorneys obtained an $809 million settlement in *In re Twitter, Inc. Sec. Litig.*, a case that did not settle until the day before trial was set to commence.

In addition to *Twitter*, Gronborg's work has included significant recoveries against corporations such as Valeant Pharmaceuticals ($1.21 billion), Cardinal Health ($600 million), Motorola ($200 million), Duke Energy ($146.25 million), Sprint Nextel Corp. ($131 million), and Prison Realty ($104 million), to name a few. Gronborg was also a member of the Firm's trial team in *Hsu v. Puma Biotechnology, Inc.*, No. SACV15-0865 (C.D. Cal.), a securities fraud class action that resulted in a verdict in favor of investors after a two-week jury trial and ultimately settled for 100% of the claimed damages plus prejudgment interest.

On three separate occasions, Gronborg's pleadings have been upheld by the federal Courts of Appeals (*Broudo v. Dura Pharms., Inc.*, 339 F.3d 933 (9th Cir. 2003), *rev'd on other grounds*, 544 U.S. 336 (2005); *In re Daou Sys.*, 411 F.3d 1006 (9th Cir. 2005); *Staehr v. Hartford Fin. Servs. Grp.,* 547 F.3d 406 (2d Cir. 2008)).

## Education

B.A., University of California, Santa Barbara, 1991; Rotary International Scholar, University of Lancaster, U.K., 1992; J.D., University of California, Berkeley, 1995

## Honors / Awards

Leading Lawyer in America, *Lawdragon*, 2022-2024; Best Lawyer in America, *Best Lawyers®*, 2022-2024; Recommended Lawyer, *The Legal 500*, 2023; Leading Plaintiff Financial Lawyer, *Lawdragon*, 2019-2023; Litigation Star, *Benchmark Litigation*, 2023; West Trailblazer, *The American Lawyer*, 2022; Super Lawyer, *Super Lawyers Magazine,* 2013-2022; Plaintiffs' Lawyer Trailblazer, *The National Law Journal*, 2019; Moot Court Board Member, University of California, Berkeley; AFL-CIO history scholarship, University of California, Santa Barbara

# Ellen Gusikoff Stewart | Partner

Ellen Stewart is a partner in the Firm's San Diego office, and is a member of the Firm's Summer Associate Hiring Committee.  She currently practices in the Firm's settlement department, negotiating and documenting complex securities, merger, ERISA, and derivative action settlements.  Notable recent settlements include: *Evanston Police Pension Fund v. McKesson Corp.* (N.D. Cal. 2023) ($141 million); *In re Twitter Inc. Sec. Litig.* (N.D. Cal. 2022) ($809.5 million); *In re Facebook Biometric Info. Privacy Litig.* (N.D. Cal. 2021) ($650 million); *In re Am. Realty Cap. Props., Inc. Litig.* (S.D.N.Y. 2020) ($1.025 billion); *Klein v. Altria Group, Inc.* (E.D. Va. 2022) ($90 million); *KBC Asset Management v. 3D Systems Corp.* (D.S.C. 2018) ($50 million); and *Luna v. Marvell Tech. Grp.* (N.D. Cal. 2018) ($72.5 million).

Stewart has served on the Federal Bar Association Ad Hoc Committee for the revisions to the Settlement Guidelines for the Northern District of California, was a contributor to the Guidelines and Best Practices – Implementing 2018 Amendments to Rule 23 Class Action Settlement Provisions manual of the Bolch Judicial Institute at the Duke University School of Law, and speaks at conferences around country on current settlement and notice issues.

## Education

B.A., Muhlenberg College, 1986; J.D., Case Western Reserve University, 1989

## Honors / Awards

Rated Distinguished by Martindale-Hubbell

# Robert Henssler | Partner

Bobby Henssler is a partner in the Firm's San Diego office, where he focuses his practice on securities fraud and other complex civil litigation. He has obtained significant recoveries for investors in cases such as *Enron*, *Blackstone*, and *CIT Group*. Henssler is currently leading a team of attorneys prosecuting fraud claims against Under Armour and the company's former CEO.

Most recently, Henssler and a team of Robbins Geller attorneys a $1.21 billion settlement in *In re Valeant Pharms. Int'l, Inc. Sec. Litig.*, a case that *Vanity Fair* reported as "the corporate scandal of its era" that had raised "fundamental questions about the functioning of our health-care system, the nature of modern markets, and the slippery slope of ethical rationalizations." This is the largest securities class action settlement against a pharmaceutical manufacturer and the ninth largest ever.

Henssler was also lead counsel in *Schuh v. HCA Holdings, Inc.*, which resulted in a $215 million recovery for shareholders, the largest securities class action recovery ever in Tennessee. The recovery achieved represents more than 30% of the aggregate classwide damages, far exceeding the typical recovery in a securities class action. Henssler also led the litigation teams in *Marcus v. J.C. Penney Company, Inc.* ($97.5 million recovery), *Landmen Partners Inc. v. The Blackstone Group L.P.* ($85 million recovery), *In re Novatel Wireless Sec. Litig.* ($16 million recovery), *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC* ($14 million settlement), and *Kmiec v. Powerwave Technologies, Inc.* ($8.2 million settlement), to name a few.

## Education

B.A., University of New Hampshire, 1997; J.D., University of San Diego School of Law, 2001

## Honors / Awards

Leading Litigator in America, *Lawdragon*, 2024; Leading Plaintiff Financial Lawyer, *Lawdragon*, 2020-2023; California Lawyer of the Year, *Daily Journal*, 2022; Plaintiffs' Lawyer Trailblazer, *The National Law Journal*, 2020; Recommended Lawyer, *The Legal 500*, 2018-2019

# Steven F. Hubachek | Partner

Steve Hubachek is a partner in the Firm's San Diego office. He is a member of the Firm's appellate group, where his practice concentrates on federal appeals. He has more than 25 years of appellate experience, has argued over 100 federal appeals, including 3 cases before the United States Supreme Court and 7 cases before en banc panels of the Ninth Circuit Court of Appeals. Prior to his work with the Firm, Hubachek joined Perkins Coie in Seattle, Washington, as an associate. He was admitted to the Washington State Bar in 1987 and was admitted to the California State Bar in 1990, practicing for many years with Federal Defenders of San Diego, Inc. He also had an active trial practice, including over 30 jury trials, and was Chief Appellate Attorney for Federal Defenders.

### Education

B.A., University of California, Berkeley, 1983; J.D., University of California College of the Law, San Francisco, 1987

### Honors / Awards

AV rated by Martindale-Hubbell; Top Lawyer in San Diego, *San Diego Magazine*, 2014-2022; Super Lawyer, *Super Lawyers Magazine,* 2007-2009, 2019-2021; Assistant Federal Public Defender of the Year, National Federal Public Defenders Association, 2011; Appellate Attorney of the Year, San Diego Criminal Defense Bar Association, 2011 (co-recipient); President's Award for Outstanding Volunteer Service, Mid City Little League, San Diego, 2011; E. Stanley Conant Award for exceptional and unselfish devotion to protecting the rights of the indigent accused, 2009 (joint recipient); *The Daily Transcript* Top Attorneys, 2007; J.D., *Cum Laude*, Order of the Coif, Thurston Honor Society, University of California College of the Law, San Francisco, 1987

# James I. Jaconette | Partner

James Jaconette is one of the founding partners of the Firm and is located in its San Diego office. He manages cases in the Firm's securities class action and shareholder derivative litigation practices. He has served as one of the lead counsel in securities cases with recoveries to individual and institutional investors totaling over $8 billion. He also advises institutional investors, including hedge funds, pension funds, and financial institutions. Landmark securities actions in which he contributed in a primary litigating role include *In re Informix Corp. Sec. Litig.*, and *In re Dynegy Inc. Sec. Litig.* and *In re Enron Corp. Sec. Litig.*, where he represented lead plaintiff The Regents of the University of California. Most recently, Jaconette was part of the trial team in *Schuh v. HCA Holdings, Inc.*, which resulted in a $215 million recovery for shareholders, the largest securities class action recovery ever in Tennessee. The recovery achieved represents more than 30% of the aggregate classwide damages, far exceeding the typical recovery in a securities class action.

### Education

B.A., San Diego State University, 1989; M.B.A., San Diego State University, 1992; J.D., University of California Hastings College of the Law, 1995

### Honors / Awards

Leading Plaintiff Financial Lawyer, *Lawdragon*, 2019-2023; J.D., *Cum Laude*, University of California Hastings College of the Law, 1995; Associate Articles Editor, *Hastings Law Journal*, University of California Hastings College of the Law; B.A., with Honors and Distinction, San Diego State University, 1989

# J. Marco Janoski Gray | Partner

Marco Janoski is a partner in the Firm's San Diego office. His practice focuses on complex securities litigation and class actions. An experienced litigator, Janoski has secured record-setting recoveries for investors, including trial verdicts and large recoveries secured on the eve of trial.

In 2023, Janoski served on the litigation teams in two securities fraud cases that are among the top ten securities recoveries of the year: *In re Envision Healthcare Corporation Securities Litigation* ($177.5 million recovery, pending court approval) and *Louisiana Sheriffs' Pension & Relief Fund v. Cardinal Health, Inc.* ($109 million recovery). He served on the Firm's trial team in *In re Twitter, Inc. Securities Litigation* and helped secure an $809.5 million recovery for investors. The *Twitter* case settled the day before trial was set to commence in 2021 and is the largest securities fraud class action recovery in the Ninth Circuit in the last decade. Likewise, he and a team of Firm lawyers secured a $350 million settlement on the eve of trial in 2020 in *Smilovits v. First Solar, Inc.,* the fifth-largest PSLRA settlement ever recovered in the Ninth Circuit at the time. Janoski also served on the Firm's trial team in *Hsu v. Puma Biotechnology, Inc.*, a securities fraud class action that resulted in a verdict in favor of investors after a two-week jury trial in federal court.

## Education

Universidad Complutense de Madrid, 2010-2011; B.A., University of California, Santa Barbara, 2011; J.D., University of California College of the Law, San Francisco (formerly UC Hastings), 2015

## Honors / Awards

Rising Star, *Super Lawyers Magazine*, 2024; Leading Litigator in America, *Lawdragon*, 2024; 500 X – The Next Generation, *Lawdragon*, 2023; Leading Plaintiff Financial Lawyer, *Lawdragon*, 2023; J.D., *Magna Cum Laude,* University of California College of the Law, San Francisco (formerly UC Hastings), 2015

# Rachel L. Jensen | Partner

Rachel Jensen is a partner in the Firm's San Diego office who specializes in securities fraud, consumer fraud, RICO, and antitrust actions. Jensen has developed a 20-year track record of success in crafting impactful business reforms and helping to recover billions of dollars on behalf of working families, businesses, and government entities.

Jensen was one of the lead attorneys representing Trump University students nationwide in high-profile litigation that yielded nearly 100% of the "tuition" students paid, and did so on a *pro bono* basis. As court-appointed Plaintiffs' Steering Committee member in the Fiat Chrysler EcoDiesel litigation, Jensen helped obtain an $840 million global settlement for concealed defeat devices in over 100,000 vehicles. Jensen also represented drivers against Volkswagen in one of the most brazen corporate frauds in recent history, helping recover $17 billion for emissions cheating in "clean" diesel vehicles.

As reported in *The Washington Post*, in 2022, Jensen served as co-lead trial counsel in a *qui tam* case against a bus manufacturer to enforce a "good jobs" U.S. employment plan in a $500 million procurement contract with LA Metro. The settlement included a historic multi-state community benefits agreement with workforce development programs, fair hiring, and equity measures in Ontario, California and Anniston, Alabama. A video about the case can be viewed here: https://fightforthefuture.rgrdlaw.com/. In another landmark case, Jensen worked tirelessly on behalf of California passengers to stop Greyhound from subjecting them to discriminatory immigration raids; since then, Greyhound has stopped allowing border patrol aboard without a warrant.

Among other recoveries, Jensen has played significant roles in *In re LendingClub Sec. L* million securities fraud settlement ranked among top 10 in N.D. Cal. at the time); *Negrete v. Allianz Life Ins. Co. of N. Am.* (C.D. Cal.) ($250 million to senior citizens targeted for deferred annuities that would not mature in their lifetimes); *In re Morning Song Bird Food Litig.* (S.D. Cal.) ($85 million in refunds for wild-bird food treated with pesticides hazardous to birds); *City of Westland Police & Fire Ret. Sys. v. Stumpf* (N.D. Cal.) ($67 million in homeowner down-payment assistance and credit counseling for cities hit by foreclosure crisis and computer integration for mortgage servicing in "robo-signing" case); *In re Mattel, Inc., Toy Lead Paint Prods. Liab. Litig.* (C.D. Cal.) ($50 million in refunds and quality assurance reforms for toys made in China with lead and magnets); and *In re Checking Account Overdraft Litig.* (S.D. Fla.) ($500 million recovered from banks for manipulating debit transactions to maximize overdraft fees).

Before joining the practice, Jensen clerked for the late Honorable Warren J. Ferguson on the Ninth Circuit Court of Appeals; associated with Morrison & Foerster LLP in San Francisco; and worked abroad in Arusha, Tanzania as a law clerk in the Office of the Prosecutor at the International Criminal Tribunal for Rwanda ("ICTR") and the International Criminal Tribunal for the Former Yugoslavia ("ICTY"), located in The Hague, Netherlands.

## Education

B.A., Florida State University, 1997; University of Oxford, International Human Rights Law Program at New College, Summer 1998; J.D., Georgetown University Law School, 2000

## Honors / Awards

Super Lawyer, *Super Lawyers Magazine*, 2016-2024; Leading Plaintiff Consumer Lawyer, *Lawdragon*, 2022-2024; Legend, *Lawdragon*, 2024; Leading Lawyer in America, *Lawdragon*, 2017-2024; Best Lawyer in America, *Best Lawyers®*, 2024; Leading Plaintiff Financial Lawyer, *Lawdragon*, 2019-2023; Best Lawyer in America: One to Watch, *Best Lawyers®*, 2021-2023; Best Lawyer in Southern California: One to Watch, *Best Lawyers®*, 2021; Top Woman Lawyer, *Daily Journal*, 2017, 2020; California Trailblazer, *The Recorder*, 2019; Plaintiffs' Lawyer Trailblazer, *The National Law Journal*, 2018; Rising Star, *Super Lawyers Magazine,* 2015; Nominated for 2011 Woman of the Year, *San Diego Magazine*; Editor-in-Chief, *First Annual Review of Gender and Sexuality Law*, Georgetown University Law School; Dean's List 1998-1999; B.A., *Cum Laude*, Florida State University's Honors Program, 1997; *Phi Beta Kappa*

# Chad Johnson | Partner

Chad Johnson, a former Deputy Attorney General for the State of New York, is the Managing Partner of the Firm's Manhattan office. Johnson has been litigating securities cases and fiduciary duty actions for over 30 years and is one of the leaders of the Firm's Delaware Practice Group. Johnson's background includes decades as a plaintiffs' lawyer, a securities-fraud prosecutor, and as a defense lawyer. Johnson's cases in the private sector have recovered more than $9 billion for investors.

Johnson previously was the head of New York's securities fraud unit and served as Deputy Attorney General for the State of New York. In that role, Johnson helped recover billions of dollars and make new law favorable to investors. As a senior member of the Attorney General's Office for the State of New York, Johnson pursued cases against Wall Street fraudsters.

In the private sector, Johnson represents investors in securities and breach of fiduciary duty cases, including representing investors in direct or "opt-out" actions and in class actions. Johnson represents some of the world's largest and most sophisticated asset managers, public pension funds, and sovereign wealth funds. Johnson also represents whistleblowers.

Johnson's cases have resulted in some of the largest recoveries for shareholders on record. This includes $1 billion recently recovered for shareholders in the Dell Class V litigation, which is nearly four times the next-largest comparable recovery in the Delaware Court of Chancery. Johnson also directed other securities cases that resulted in massive recoveries for shareholders, including in: *WorldCom* (more than $6 billion recovered for shareholders); *Wachovia* ($627 million recovered for shareholders); *Williams* ($311 million recovered for shareholders); and *Washington Mutual* ($208 million recovered for shareholders).

While a Deputy Attorney General for the State of New York and Chief of the New York Investor Protection Bureau, Johnson helped recover $16.65 billion from Bank of America and $13 billion from JP Morgan Chase for toxic residential mortgage-backed securities (RMBS) created and sold by those banks.

Johnson has successfully tried cases in federal and state courts, in the Delaware Court of Chancery, and in arbitration tribunals in the United States and overseas. Johnson also advises institutional and other investors about how best to enforce their rights as shareholders in the United States and abroad.

## Education
B.A., University of Michigan, 1989; J.D., Harvard Law School, 1993

## Honors / Awards
J.D., *Cum Laude*, Harvard Law School, 1993; B.A.*,* High Distinction, University of Michigan, 1989

# Evan J. Kaufman | Partner

Evan Kaufman is a partner in the Firm's Melville office. He has recovered hundreds of millions of dollars for class members in securities, ERISA, and complex class actions.

Kaufman served as lead counsel in the *SandRidge Energy* securities litigation and obtained a $35.75 million global settlement, including $21.8 million for SandRidge common stock purchasers. As lead counsel in the *TD Banknorth* litigation, Kaufman and the Firm achieved a $50 million recovery after successfully objecting to a $3 million settlement submitted to the court on behalf of the class. The court in the *TD Banknorth* litigation stated: "This is one of the cases – there's probably been a half a dozen since I've been a judge that I handled which have – really through the sheer diligence and effort of plaintiffs' counsel – resulted in substantial awards for plaintiffs, after overcoming serious procedural and other barriers . . . it appears plainly from the papers that you and your co-counsel have diligently, and at great personal expense and through the devotion of many thousands of hours of your time, prosecuted this case to a successful conclusion."

Kaufman served as co-lead class counsel on behalf of 212,000 participants in General Electric's 401(k) plan and obtained $61 million for the class, which was the largest recovery ever in an ERISA case alleging a retirement plan improperly offered proprietary funds. During the *GE ERISA* final settlement approval hearing, the court stated: "[T]his has been a hard-fought case" which "presented interesting and difficult issues" and that "everyone did a great job." Kaufman served as lead counsel or as an integral part of the team in other ERISA actions, including on behalf of participants in the retirement plans of Invesco, JP Morgan, and Wakemed.

Kaufman also achieved notable results in numerous other securities class actions, including recovering $26 million in the *EnergySolutions* litigation, and in cases against Lockheed Martin, State Street, Fidelity, Warner Chilcott, Talkspace, Third Avenue Management, and Giant Interactive, among others.

In the *Third Avenue Management* litigation, when approving the $14.25 million settlement obtained by Kaufman and the Firm, the court commended the parties for their "wisdom" and "diligence" and concluded that "lead counsel diligently and with quality represented the interests of the class." In the *Giant Interactive* litigation, the court acknowledged the efforts of Kaufman and the Firm in achieving the favorable settlement for the class: "The Court also recognizes the diligence and hard work of plaintiffs' counsel in achieving such a settlement, particularly in light of the fact that this case (unlike many other securities class actions) was independently developed by plaintiffs' counsel, as opposed to following, or piggybacking on, a regulatory investigation or settlement."

## Education
B.A., University of Michigan, 1992; J.D., Fordham University School of Law, 1995

## Honors / Awards
Super Lawyer, *Super Lawyers Magazine,* 2013-2015, 2017-2020, 2023; Member, *Fordham International Law Journal*, Fordham University School of Law

# Ashley M. Kelly | Partner

Ashley Kelly is a partner in the Firm's San Diego office, where she represents large institutional and individual investors as a member of the Firm's antitrust and securities fraud practices. Her work is primarily federal and state class actions involving the federal antitrust and securities laws, common law fraud, breach of contract, and accounting violations. Kelly's case work has been in the financial services, oil & gas, e-commerce, and technology industries. In addition to being an attorney, she is a Certified Public Accountant. Kelly was an important member of the litigation team that obtained a $500 million settlement on behalf of investors in *Luther v. Countrywide Fin. Corp.*, which was the largest residential mortgage-backed securities purchaser class action recovery in history.

## Education

B.S., Pennsylvania State University, 2005; J.D., Rutgers University-Camden, 2011

## Honors / Awards

Best Lawyer in America: One to Watch, *Best Lawyers®*, 2024; 500 X – The Next Generation, *Lawdragon*, 2023; Rising Star, *Super Lawyers Magazine*, 2016, 2018-2021

# David A. Knotts | Partner

David Knotts is a partner in the Firm's San Diego office. He focuses his practice on securities class action litigation in the context of mergers and acquisitions, representing both individual shareholders and institutional investors. Knotts is also part of the Firm's Delaware Practice Group. Knotts has significant trial experience in high-stakes corporate litigation.

Knotts has been counsel of record for shareholders on a number of significant recoveries in courts throughout the country, including serving as one of the lead litigators on *Chabot v. Walgreens Boots Alliance, Inc.*, which culminated in a $192.5 million recovery for a class of Rite Aid investors. The *Walgreens* settlement was approved by the Middle District of Pennsylvania in February 2024 and resulted in the second largest securities recovery in Pennsylvania federal court history. That recovery represents a rarity in securities fraud litigation, whereby target-company investors obtained a significant cash recovery from an unaffiliated acquirer based on allegations that the acquirer issued misleading statements during the pendency of a merger.

In addition, Knotts served among lead counsel in *In re Rural/Metro Corp. S'holders Litig.*, which resulted in a groundbreaking $110 million post-trial recovery affirmed by the Delaware Supreme Court, as well as *In re Del Monte Foods Co. S'holders Litig.* ($89.4 million), *Websense* ($40 million), *In re Onyx S'holders Litig.* ($30 million), *Harman* ($28 million), and *Joy Global* ($20 million). *Websense* and *Onyx* are both believed to be the largest post-merger class settlements in California state court history. When Knotts presented the settlement as lead counsel for the stockholders in *Joy Global*, the United States District Court for the Eastern District of Wisconsin noted that "this is a pretty extraordinary settlement, recovery on behalf of the members of the class. . . . [I]t's always a pleasure to work with people who are experienced and who know what they are doing." In addition to ongoing litigation work, Knotts has taught a full-semester course on M&A litigation at the University of California Berkeley School of Law.

Before joining Robbins Geller, Knotts was an associate at one of the largest law firms in the world and represented corporate clients in various aspects of state and federal litigation, including major antitrust matters, trade secret disputes, and unfair competition claims.

## Education

B.S., University of Pittsburgh, 2001; J.D., Cornell Law School, 2004

## Honors / Awards

40 & Under Hot List, *Benchmark Litigation*, 2018, 2020-2021; Next Generation Partner, *The Legal 500*, 2019-2021; Recommended Lawyer, *The Legal 500*, 2017-2019; Wiley W. Manuel Award for Pro Bono Legal Services, State Bar of California; Casa Cornelia Inns of Court; J.D., *Cum Laude*, Cornell Law School, 2004

# Laurie L. Largent | Partner

Laurie Largent is a partner in the Firm's San Diego, California office. Her practice focuses on securities class action and shareholder derivative litigation and she has helped recover millions of dollars for injured shareholders. Largent was part of the litigation team that obtained a $265 million recovery in *In re Massey Energy Co. Sec. Litig.*, in which Massey was found accountable for a tragic explosion at the Upper Big Branch mine in Raleigh County, West Virginia. She also helped obtain $67.5 million for Wyeth shareholders in *City of Livonia Emps.' Ret. Sys. v. Wyeth*, settling claims that the defendants misled investors about the safety and commercial viability of one of the company's leading drug candidates. Most recently, Largent was on the team that secured a $64 million recovery for Dana Corp. shareholders in *Plumbers & Pipefitters Nat'l Pension Fund v. Burns*, in which the Firm's Appellate Practice Group successfully appealed to the Sixth Circuit Court of Appeals twice, reversing the district court's dismissal of the action. Some of Largent's other cases include: *In re Sanofi-Aventis Sec. Litig.* (S.D.N.Y.) ($40 million); *In re Bridgepoint Educ., Inc. Sec. Litig.* (S.D. Cal.) ($15.5 million); *Ross v. Abercrombie & Fitch Co.* (S.D. Ohio) ($12 million); *Maiman v. Talbott* (C.D. Cal.) ($8.25 million); *In re Cafepress Inc. S'holder Litig.* (Cal. Super. Ct., San Mateo Cnty.) ($8 million); and *Krystek v. Ruby Tuesday, Inc.* (M.D. Tenn.) ($5 million). Largent's current cases include securities fraud cases against Dell, Inc. (W.D. Tex.) and Banc of California (C.D. Cal.).

Largent is a past board member on the San Diego County Bar Foundation and the San Diego Volunteer Lawyer Program. She has also served as an Adjunct Business Law Professor at Southwestern College in Chula Vista, California.

## Education

B.B.A., University of Oklahoma, 1985; J.D., University of Tulsa, 1988

## Honors / Awards

Leading Plaintiff Financial Lawyer, *Lawdragon*, 2019-2023; Board Member, San Diego County Bar Foundation, 2013-2017; Board Member, San Diego Volunteer Lawyer Program, 2014-2017

# Kevin A. Lavelle | Partner

Kevin Lavelle is a partner in the Firm's San Diego office, where his practice focuses on complex securities litigation.

Lavelle has served on numerous litigation teams and helped obtain over $500 million for investors. His work includes several significant recoveries against corporations, including HCA Holdings, Inc. ($215 million); Altria Group and JUUL Labs ($90 million); Endo Pharmaceuticals ($63 million); and Intercept Pharmaceuticals ($55 million), among others.

## Education

B.A., College of the Holy Cross, 2008; J.D., Brooklyn Law School, 2013

## Honors / Awards

500 X – The Next Generation, *Lawdragon*, 2023; J.D., *Cum Laude*, Brooklyn Law School, 2013; B.A., *Cum Laude*, College of the Holy Cross, 2008

## Nathan R. Lindell  |  Partner

Nate Lindell is a partner in the Firm's San Diego office, where his practice focuses on representing aggrieved investors in complex civil litigation.  He has helped achieve numerous significant recoveries for investors, including: *In re Enron Corp. Sec. Litig.* ($7.2 billion recovery); *In re HealthSouth Corp. Sec. Litig.* ($671 million recovery); *Luther v. Countrywide Fin. Corp.* ($500 million recovery); *Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.* ($388 million recovery); *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.* ($272 million recovery); *In re Morgan Stanley Mortg. Pass-Through Certificates Litig.* ($95 million recovery); *Massachusetts Bricklayers & Masons Tr. Funds v. Deutsche Alt-A Sec., Inc.* ($32.5 million recovery); *City of Ann Arbor Emps.' Ret. Sys. v. Citigroup Mortg. Loan Trust Inc.* ($24.9 million recovery); *Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.* ($21.2 million recovery); and *Genesee Cnty. Emps.' Ret. Sys. v. Thornburg Mortg., Inc.* ($11.25 million recovery).  In October 2016, Lindell successfully argued in front of the New York Supreme Court, Appellate Division, First Judicial Department, for the reversal of an earlier order granting defendants' motion to dismiss in *Phoenix Light SF Limited v. Morgan Stanley*.

Lindell was also a member of the litigation team responsible for securing a landmark victory from the Second Circuit Court of Appeals in its precedent-setting *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.* decision, which dramatically expanded the scope of permissible class actions asserting claims under the Securities Act of 1933 on behalf of mortgage-backed securities investors, and ultimately resulted in a $272 million recovery for investors.

### Education
B.S., Princeton University, 2003; J.D., University of San Diego School of Law, 2006

### Honors / Awards
Rising Star, *Super Lawyers Magazine,* 2015-2017; Charles W. Caldwell Alumni Scholarship, University of San Diego School of Law; CALI/AmJur Award in Sports and the Law

## Ting H. Liu  |  Partner

Ting Liu is a partner in the Firm's San Diego office, where she represents large institutional and individual investors.  Her practice focuses on complex securities litigation. Liu was a member of the trial team that obtained a $350 million settlement on the eve of trial in *Smilovits v. First Solar, Inc.*, the fifth-largest PSLRA settlement ever recovered in the Ninth Circuit.  She was also a member of the Firm's trial team in *Hsu v. Puma Biotechnology, Inc.*, a securities fraud class action that resulted in a verdict in favor of investors after a two-week jury trial.

### Education
B.A., University of Washington, 2012; J.D., University of San Diego School of Law, 2015

### Honors / Awards
Rising Star, *Super Lawyers Magazine*, 2023-2024

# Ryan Llorens | Partner

Ryan Llorens is a partner in the Firm's San Diego office. Llorens' practice focuses on litigating complex securities fraud cases. He has worked on a number of securities cases that have resulted in significant recoveries for investors, including: *In re HealthSouth Corp. Sec. Litig.* ($670 million); *AOL Time Warner* ($629 million); *In re AT&T Corp. Sec. Litig.* ($100 million); *In re Fleming Cos. Sec. Litig.* ($95 million); and *In re Cooper Cos., Inc. Sec Litig.* ($27 million).

## Education

B.A., Pitzer College, 1997; J.D., University of San Diego School of Law, 2002

## Honors / Awards

Rising Star, *Super Lawyers Magazine,* 2015

# Andrew S. Love | Partner

Andrew Love is a partner in the Firm's San Francisco office and a member of the Firm's Appellate Practice Group. His practice focuses primarily on appeals of securities fraud class actions. Love has successfully briefed and argued cases on behalf of defrauded investors and consumers in several U.S. Courts of Appeal, as well as in the California appellate courts. Recent published cases include *New England Carpenters Guaranteed Annuity Pension Funds v. DeCarlo*, 80 F.4th 158 (2d Cir. 2023), *Stafford v. Rite Aid Corp.*, 998 F.3d 862 (9th Cir. 2021), *Constr. Indus. & Laborers Joint Pension Tr. v. Carbonite, Inc.*, 22 F.4th 1 (1st Cir. 2021), and *Friedman v. AARP, Inc.*, 855 F.3d 1047 (9th Cir. 2017). He was also co-counsel in *Cyan, Inc. v. Beaver Cnty. Emps. Ret. Fund*, 138 S. Ct. 1061 (2018).

Before joining the Firm and for more than two decades, Love represented inmates on California's death row in appellate and habeas corpus proceedings, successfully arguing capital cases in both the California Supreme Court and the Ninth Circuit. He co-chaired the Capital Case Defense Seminar (2004-2013), recognized as the largest conference for death penalty practitioners in the country. Additionally, he was on the faculty of the National Institute for Trial Advocacy's Post-Conviction Skills Seminar. Love is a member of the California Academy of Appellate Lawyers.

## Education

University of Vermont, 1981; J.D., University of San Francisco School of Law, 1985

## Honors / Awards

J.D., *Cum Laude*, University of San Francisco School of Law, 1985; McAuliffe Honor Society, University of San Francisco School of Law, 1982-1985

# Erik W. Luedeke | Partner

Erik Luedeke is a partner in the Firm's San Diego office, where he represents individual and institutional investors in breach of fiduciary duty and securities fraud litigation in state and federal courts nationwide. Luedeke is a member of the Firm's Delaware Practice Group. As corporate fiduciaries, directors and officers are duty-bound to act in the best interest of the corporation and its shareholders. When they fail to do so they breach their fiduciary duty and may be held liable for harm caused to the corporation. Luedeke's shareholder derivative practice focuses on litigating breach of fiduciary duty and related claims on behalf of corporations and shareholders injured by wayward corporate fiduciaries. Notable shareholder derivative actions in which he recently participated and the recoveries he helped to achieve include *In re Community Health Sys., Inc. S'holder Derivative Litig.* ($60 million in financial relief and unprecedented corporate governance reforms), *In re Lumber Liquidators Holdings, Inc. S'holder Derivative Litig.* ($26 million in financial relief plus substantial governance), and *In re Google Inc. S'holder Derivative Litig.* ($250 million in financial relief to fund substantial governance).

Luedeke's practice also includes the prosecution of complex securities class action cases on behalf of aggrieved investors. Luedeke was a member of the litigation team in *Jaffe v. Household Int'l, Inc.*, No. 02-C-5893 (N.D. Ill.), that resulted in a record-breaking $1.575 billion settlement after 14 years of litigation, including a six-week jury trial ending in a plaintiffs' verdict. He was also a member of the litigation teams in *In re UnitedHealth Grp. Inc. PSLRA Litig.*, No. 06-CV-1691 (D. Minn.) ($925 million recovery), and *In re Questcor Pharms., Inc. Sec. Litig.*, No. 8:12-cv-01623 (C.D. Cal.) ($38 million recovery).

## Education

B.S./B.A., University of California Santa Barbara, 2001; J.D., University of San Diego School of Law, 2006

## Honors / Awards

Rising Star, *Super Lawyers Magazine,* 2015-2017; Student Comment Editor, *San Diego International Law Journal*, University of San Diego School of Law

# Christopher H. Lyons | Partner

Christopher Lyons is a partner in the Firm's Nashville and Wilmington offices, and manages the Wilmington office. He focuses his practice on representing institutional and individual investors in merger-related class action litigation and in complex securities litigation. Lyons has been a significant part of litigation teams that have achieved substantial recoveries for investors. Notable cases include *Bioverativ* (*Goldstein v. Denner*) ($84 million partial settlement, remaining claims set for trial), *CoreCivic* (*Grae v. Corrections Corporation of America*) ($56 million recovered), *Good Technology* ($52 million recovered for investors in a privately held technology company), *Nissan* ($36 million recovered), *Blackhawk Network Holdings* ($29.5 million recovered), and *The Fresh Market* (*Morrison v. Berry*) ($27.5 million recovered). His *pro bono* work includes representing individuals who are appealing denial of necessary medical benefits by TennCare (Tennessee's Medicaid program), through the Tennessee Justice Center.

Both during and before his time at Robbins Geller, Lyons has litigated extensively in Delaware courts, having tried cases on behalf of both plaintiffs and defendants in the Delaware Court of Chancery. Before joining Robbins Geller, Lyons practiced at a prominent Delaware law firm, where he mostly represented corporate officers and directors defending against breach of fiduciary duty claims in the Delaware Court of Chancery and in the Delaware Supreme Court. Before that, he clerked for Vice Chancellor J. Travis Laster of the Delaware Court of Chancery. Lyons now applies the expertise he gained from those experiences to help investors uncover wrongful conduct and recover the money and other remedies to which they are rightfully entitled.

## Education

B.A., Colorado College, 2006; J.D., Vanderbilt University Law School, 2010

## Honors / Awards

Best Lawyer in America: One to Watch, *Best Lawyers®*, 2022-2024; Rising Star, *Super Lawyers Magazine*, 2018-2020, 2022-2023; 500 X – The Next Generation, *Lawdragon*, 2023; 40 & Under Hot List, *Benchmark Litigation*, 2021; B.A., Distinction in International Political Economy, Colorado College, 2006; J.D., Law & Business Certificate, Vanderbilt University Law School, 2010

# Noam Mandel | Partner

Noam Mandel is a partner in the Firm's Manhattan office. Mandel has extensive experience in all aspects of litigation on behalf of investors, including securities law claims, corporate derivative actions, fiduciary breach class actions, and appraisal litigation. Mandel has represented investors in federal and state courts throughout the United States and has significant experience advising investors concerning their interests in litigation and investigating and prosecuting claims on their behalf.

Mandel has served as counsel in numerous outstanding securities litigation recoveries, including in *In re Nortel Networks Corporation Securities Litigation* ($1.07 billion shareholder recovery), *Ohio Public Employees Retirement System v. Freddie Mac* ($410 million shareholder recovery), and *In re Satyam Computer Services, Ltd. Securities Litigation* ($150 million shareholder recovery). Mandel has also served as counsel in notable fiduciary breach class and derivative actions, particularly before the Court of Chancery of the State of Delaware. These actions include the groundbreaking fiduciary duty litigation challenging the CVS/Caremark merger (*Louisiana Municipal Police Employees' Retirement System v. Crawford*), which resulted in more than $3.3 billion in additional consideration for Caremark shareholders. Mandel also served as counsel in *In re Dell Technologies Inc. Class V Stockholders Litigation*, which resulted in a $1 billion recovery for stockholders.

## Education

B.S., Georgetown University, School of Foreign Service, 1998; J.D., Boston University School of Law, 2002

## Honors / Awards

J.D., *Cum Laude*, Boston University School of Law, 2002; Member, *Boston University Law Review*, Boston University School of Law

# Mark T. Millkey | Partner

Mark Millkey is a partner in the Firm's Melville office. He has significant experience in the areas of securities and consumer litigation, as well as in federal and state court appeals.

During his career, Millkey has worked on a major consumer litigation against MetLife that resulted in a benefit to the class of approximately $1.7 billion, as well as a securities class action against Royal Dutch/Shell that settled for a minimum cash benefit to the class of $130 million and a contingent value of more than $180 million. Since joining Robbins Geller, he has worked on securities class actions that have resulted in more than $1.5 billion in settlements.

## Education

B.A., Yale University, 1981; M.A., University of Virginia, 1983; J.D., University of Virginia, 1987

## Honors / Awards

Super Lawyer, *Super Lawyers Magazine*, 2013-2023

# David W. Mitchell | Partner

David Mitchell is a partner in the Firm's San Diego office and focuses his practice on antitrust and securities fraud litigation. He is a former federal prosecutor who has tried nearly 20 jury trials. As head of the Firm's Antitrust and Competition Law Practice Group, he has served as lead or co-lead counsel in numerous cases and has helped achieve substantial settlements for shareholders. His most notable antitrust cases include *Dahl v. Bain Cap. Partners, LLC*, obtaining more than $590 million for shareholders, and *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*, in which a settlement of $5.5 billion was approved in the Eastern District of New York. This case was brought on behalf of millions of U.S. merchants against Visa and MasterCard and various card-issuing banks, challenging the way these companies set and collect tens of billions of dollars annually in merchant fees. The settlement is believed to be the largest antitrust class action settlement of all time.

Additionally, Mitchell served as co-lead counsel in the ISDAfix Benchmark action against 14 major banks and broker ICAP plc, obtaining $504.5 million for plaintiffs. Currently, Mitchell serves as court-appointed lead counsel in *In re Aluminum Warehousing Antitrust Litig.*, *City of Providence, Rhode Island v. BATS Global Markets Inc.*, *In re SSA Bonds Antitrust Litig.*, *In re Remicade Antitrust Litig.*, and *In re 1-800 Contacts Antitrust Litig.*

## Education

B.A., University of Richmond, 1995; J.D., University of San Diego School of Law, 1998

## Honors / Awards

Member, Enright Inn of Court; Super Lawyer, *Super Lawyers Magazine*, 2016-2024; Leading Lawyer in America, *Lawdragon*, 2020-2024; Best Lawyer in America, *Best Lawyers®*, 2018-2024; Leading Plaintiff Financial Lawyer, *Lawdragon*, 2019-2023; Top 50 Lawyers in San Diego, *Super Lawyers Magazine*, 2021; Southern California Best Lawyer, *Best Lawyers®*, 2018-2021; Honoree, Outstanding Antitrust Litigation Achievement in Private Law Practice, American Antitrust Institute, 2018; Antitrust Trailblazer, *The National Law Journal*, 2015; "Best of the Bar," *San Diego Business Journal*, 2014

# Danielle S. Myers | Partner

Danielle Myers is a partner in the Firm's San Diego office and focuses her practice on complex securities litigation. Myers is one of the partners who oversees the Portfolio Monitoring Program® and provides legal recommendations to the Firm's institutional investor clients on their options to maximize recoveries in securities litigation, both within the United States and internationally, from inception to settlement.

Myers advises the Firm's clients in connection with lead plaintiff applications and has helped secure appointment of the Firm's clients as lead plaintiff and the Firm's appointment as lead counsel in hundreds of securities class actions, which cases have yielded more than $4 billion for investors, including 2018-2023 recoveries in *In re Valeant Pharms. Int'l, Inc. Sec. Litig.*, No. 3:15-cv-07658 (D.N.J.) ($1.2 billion); *In re Am. Realty Cap. Props., Inc. Litig.*, No. 1:15-mc-00040 (S.D.N.Y.) ($1.025 billion); *In re Twitter Inc. Sec. Litig.*, No. 4:16-cv-05314 (N.D. Cal.) ($809.5 million); *Smilovits v. First Solar, Inc.*, No. 2:12-cv-00555 (D. Ariz.) ($350 million); *Flynn v. Exelon Corp.*, No. 1:19-cv-08209 (N.D. Ill.) ($173 million); *City of Pontiac Gen. Ret. Sys. v. Wal-Mart Stores, Inc.*, No. 5:12-cv-5162 (W.D. Ark.) ($160 million); *Evellard v. LendingClub Corp.*, No. 3:16-cv-02627 (N.D. Cal.) ($125 million); *La. Sheriffs' Pension & Relief Fund v. Cardinal Health, Inc.*, No. 2:19-cv-03347 (S.D. Ohio) ($109 million); *Knurr v. Orbital ATK, Inc.*, No. 1:16-cv-01031 (E.D. Va.) ($108 million); *In re Novo Nordisk Sec. Litig.*, No 3:17-cv-00209 (D.N.J.) ($100 million); *Karinski v. Stamps.com, Inc.*, No. 2:19-cv-01828 (C.D. Cal.) ($100 million); and *Marcus v. J.C. Penney Co., Inc.*, No. 6:13-cv-00736 (E.D. Tex.) ($97.5 million). Myers is also a frequent presenter on securities fraud and corporate governance reform at conferences and events around the world.

## Education

B.A., University of California at San Diego, 1997; J.D., University of San Diego, 2008

## Honors / Awards

Global Plaintiff Lawyer, *Lawdragon*, 2024; Leading Lawyer in America, *Lawdragon*, 2022-2024; Leading Lawyer, *The Legal 500*, 2020-2023; Leading Plaintiff Financial Lawyer, *Lawdragon*, 2022-2023; Best Lawyer in America: One to Watch, *Best Lawyers®*, 2021-2023; Future Star, *Benchmark Litigation,* 2019-2020, 2023; Top 100 Leaders in Law Honoree, *San Diego Business Journal*, 2022; Best Lawyer in Southern California: One to Watch, *Best Lawyers®*, 2021; Next Generation Lawyer, *The Legal 500*, 2017-2019; Recommended Lawyer, *The Legal 500*, 2019; Rising Star, *Super Lawyers Magazine*, 2015-2018; One of the "Five Associates to Watch in 2012," *Daily Journal*; Member, *San Diego Law Review*; CALI Excellence Award in Statutory Interpretation

# Eric I. Niehaus | Partner

Eric Niehaus is a partner in the Firm's San Diego office, where his practice focuses on complex securities and derivative litigation. His efforts have resulted in numerous multi-million dollar recoveries to shareholders and extensive corporate governance changes. Notable examples include: *In re NYSE Specialists Sec. Litig.* (S.D.N.Y.); *In re Novatel Wireless Sec. Litig.* (S.D. Cal.); *Batwin v. Occam Networks, Inc.* (C.D. Cal.); *Commc'ns Workers of Am. Plan for Employees' Pensions and Death Benefits v. CSK Auto Corp.* (D. Ariz.); *Marie Raymond Revocable Trust v. Mat Five* (Del. Ch.); and *Kelleher v. ADVO, Inc.* (D. Conn.). He most recently prosecuted a case against Stamps.com in the Central District of California that resulted in a $100 million settlement for shareholders of the company's stock. Before joining the Firm, Niehaus worked as a Market Maker on the American Stock Exchange in New York and the Pacific Stock Exchange in San Francisco.

### Education

B.S., University of Southern California, 1999; J.D., California Western School of Law, 2005

### Honors / Awards

Rising Star, *Super Lawyers Magazine*, 2015-2016; J.D., *Cum Laude*, California Western School of Law, 2005; Member, *California Western Law Review*

# Erika Oliver | Partner

Erika Oliver is a partner in the Firm's San Diego office. Before joining the Firm, Erika served as a judicial law clerk to the Honorable Anthony J. Battaglia of the Southern District of California. At the Firm, her practice focuses on complex securities litigation. Most recently, Erika and Luke Brooks defeated defendants' motion to dismiss securities fraud claims arising from purchases on Israel's Tel Aviv Stock Exchange in *In re Teva Sec. Litig.* (D. Conn.). Erika was also a member of the litigation teams of Robbins Geller attorneys that successfully recovered hundreds of millions of dollars for investors in securities class actions, including *In re Novo Nordisk Sec. Litig.* (D.N.J.) ($100 million recovery), *Fleming v. Impax Labs. Inc.* (N.D. Cal.) ($33 million recovery), and *In re Banc of California Sec. Litig.* (C.D. Cal.) ($19.75 million recovery).

### Education

B.S., San Diego State University, 2009; J.D., University of San Diego School of Law, 2015

### Honors / Awards

Rising Star, *Super Lawyers Magazine*, 2024; Leading Litigator in America, *Lawdragon*, 2024; Best Lawyer in America: One to Watch, *Best Lawyers®*, 2021-2024; Top 40 Under 40, *Daily Journal*, 2023; 500 X – The Next Generation, *Lawdragon*, 2023; Rising Star, *Law360*, 2023; Leading Plaintiff Financial Lawyer, *Lawdragon*, 2023; Best Lawyer in Southern California: One to Watch, *Best Lawyers®*, 2021; J.D., *Magna Cum Laude*, University of San Diego School of Law, 2015; B.S., *Cum Laude*, San Diego State University, 2009

# Lucas F. Olts | Partner

Luke Olts is a partner in the Firm's San Diego office, where his practice focuses on securities litigation on behalf of individual and institutional investors. Olts recently served as lead counsel in *In re Facebook Biometric Info. Privacy Litig.*, a cutting-edge class action concerning Facebook's alleged privacy violations through its collection of users' biometric identifiers without informed consent that resulted in a $650 million settlement. Olts has focused on litigation related to residential mortgage-backed securities, and has served as lead counsel or co-lead counsel in some of the largest recoveries arising from the collapse of the mortgage market. For example, he was a member of the team that recovered $388 million for investors in J.P. Morgan residential mortgage-backed securities in *Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*, and a member of the litigation team responsible for securing a $272 million settlement on behalf of mortgage-backed securities investors in *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.* Olts also served as co-lead counsel in *In re Wachovia Preferred Sec. & Bond/Notes Litig.*, which recovered $627 million under the Securities Act of 1933. He also served as lead counsel in *Siracusano v. Matrixx Initiatives, Inc.*, in which the U.S. Supreme Court unanimously affirmed the decision of the Ninth Circuit that plaintiffs stated a claim for securities fraud under §10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5. Olts also served on the litigation team in *In re Deutsche Bank AG Sec. Litig.,* in which the Firm obtained *a* $18.5 million settlement in a case against Deutsche Bank and certain of its officers alleging violations of the Securities Act of 1933. Before joining the Firm, Olts served as a Deputy District Attorney for the County of Sacramento, where he tried numerous cases to verdict, including crimes of domestic violence, child abuse, and sexual assault.

### Education

B.A., University of California, Santa Barbara, 2001; J.D., University of San Diego School of Law, 2004

### Honors / Awards

Global Plaintiff Lawyer, *Lawdragon*, 2024; Future Star, *Benchmark Litigation*, 2018-2020, 2023; Next Generation Lawyer, *The Legal 500*, 2017; Top Litigator Under 40, *Benchmark Litigation*, 2017; Under 40 Hotlist, *Benchmark Litigation*, 2016

# Steven W. Pepich | Partner

Steve Pepich is a partner in the Firm's San Diego office. His practice has focused primarily on securities class action litigation, but has also included a wide variety of complex civil cases, including representing plaintiffs in mass tort, royalty, civil rights, human rights, ERISA, and employment law actions. Pepich has participated in the successful prosecution of numerous securities class actions, including: *Carpenters Health & Welfare Fund v. Coca-Cola Co.* ($137.5 million recovery); *In re Fleming Cos. Inc. Sec. & Derivative Litig.* ($95 million recovered); *In re Boeing Sec. Litig.*($92 million recovery); *In re Louisiana-Pacific Corp. Sec. Litig.* ($65 million recovery); *Haw. Structural Ironworkers Pension Trust Fund v. Calpine Corp.* ($43 million recovery); *In re Advanced Micro Devices Sec. Litig.* ($34 million recovery); and *Gohler v. Wood*, ($17.2 million recovery). Pepich was a member of the plaintiffs' trial team in *Mynaf v. Taco Bell Corp.*, which settled after two months of trial on terms favorable to two plaintiff classes of restaurant workers for recovery of unpaid wages. He was also a member of the plaintiffs' trial team in *Newman v. Stringfellow* where, after a nine-month trial in Riverside, California, all claims for exposure to toxic chemicals were ultimately resolved for $109 million.

### Education

B.S., Utah State University, 1980; J.D., DePaul University, 1983

# Daniel J. Pfefferbaum | Partner

Daniel Pfefferbaum is a partner in the Firm's San Francisco office, where his practice focuses on complex securities litigation.  He has been a member of litigation teams that have recovered more than $250 million for investors, including: *City of Westland Police & Fire Ret. Sys. v. Metlife Inc.* ($84 million recovery); *Garden City Emps.' Ret. Sys. v. Psychiatric Sols., Inc.* ($65 million recovery*); In re PMI Grp., Inc. Sec. Litig.* ($31.25 million recovery); *Xiang v. Inovalon Holdings, Inc.* ($17 million recovery); *Cunha v. Hansen Natural Corp.* ($16.25 million recovery); *In re Accuray Inc. Sec. Litig.* ($13.5 million recovery); *Twinde v. Threshold Pharms., Inc.* ($10 million recovery); *In re Impax Labs. Inc. Sec. Litig.* ($9 million recovery); and *In re Ubiquiti Networks, Inc.* ($6.8 million recovery).  Pfefferbaum was a member of the litigation team that secured a historic recovery on behalf of Trump University students in two class actions against President Donald J. Trump.  The settlement provides $25 million to approximately 7,000 consumers.  This result means individual class members are eligible for upwards of $35,000 in restitution.  He represented the class on a *pro bono* basis.

## Education

B.A., Pomona College, 2002; J.D., University of San Francisco School of Law, 2006; LL.M. in Taxation, New York University School of Law, 2007

## Honors / Awards

Future Star, *Benchmark Litigation*, 2018-2020, 2023; 40 & Under Hot List, *Benchmark Litigation*, 2016-2020; Top 40 Under 40, *Daily Journal*, 2017; Rising Star, *Super Lawyers Magazine*, 2013-2017

# Theodore J. Pintar | Partner

Ted Pintar is a partner in the Firm's San Diego office. Pintar has over 20 years of experience prosecuting securities fraud actions and derivative actions and over 15 years of experience prosecuting insurance-related consumer class actions, with recoveries in excess of $1 billion. He was part of the litigation team in the AOL Time Warner state and federal court securities opt-out actions, which arose from the 2001 merger of America Online and Time Warner. These cases resulted in a global settlement of $618 million. Pintar was also on the trial team in *Knapp v. Gomez*, which resulted in a plaintiff's verdict. Pintar has successfully prosecuted several RICO cases involving the deceptive sale of deferred annuities, including cases against Allianz Life Insurance Company of North America ($250 million), American Equity Investment Life Insurance Company ($129 million), Midland National Life Insurance Company ($80 million), and Fidelity & Guarantee Life Insurance Company ($53 million). He has participated in the successful prosecution of numerous other insurance and consumer class actions, including: (i) actions against major life insurance companies such as Manufacturer's Life ($555 million initial estimated settlement value) and Principal Mutual Life Insurance Company ($380+ million), involving the deceptive sale of life insurance; (ii) actions against major homeowners insurance companies such as Allstate ($50 million) and Prudential Property and Casualty Co. ($7 million); (iii) actions against automobile insurance companies such as the Auto Club and GEICO; and (iv) actions against Columbia House ($55 million) and BMG Direct, direct marketers of CDs and cassettes. Pintar and co-counsel recently settled a securities class action for $32.8 million against Snap, Inc. in *Snap Inc. Securities Cases,* a case alleging violations of the Securities Act of 1933. Additionally, Pintar has served as a panelist for numerous Continuing Legal Education seminars on federal and state court practice and procedure.

## Education

B.A., University of California, Berkeley, 1984; J.D., University of Utah College of Law, 1987

## Honors / Awards

Rated AV Preeminent by Martindale-Hubbell; Top Lawyer in San Diego, *San Diego Magazine*, 2013-2022; Super Lawyer, *Super Lawyers Magazine*, 2014-2017; CAOC Consumer Attorney of the Year Award Finalist, 2015; Note and Comment Editor, *Journal of Contemporary Law*, University of Utah College of Law; Note and Comment Editor, *Journal of Energy Law and Policy*, University of Utah College of Law

## Ashley M. Price | Partner

Ashley Price is a partner in the Firm's San Diego office. Her practice focuses on complex securities litigation. Price served as lead counsel in *In re Am. Realty Cap. Props., Inc. Litig.*, a case arising out of ARCP's manipulative accounting practices, and obtained a $1.025 billion recovery. For five years, she and the litigation team prosecuted nine different claims for violations of the Securities Exchange Act of 1934 and the Securities Act of 1933, involving seven different stock or debt offerings and two mergers. The recovery represents the highest percentage of damages of any major PSLRA case prior to trial and includes the largest personal contributions by individual defendants in history.

Most recently, Price was a key member of the Robbins Geller litigation team in *Monroe County Employees' Retirement System v. The Southern Company* in which an $87.5 settlement was reached after three years of litigation. The settlement resolved claims for violations of the Securities Exchange Act of 1934 stemming from defendants' issuance of materially misleading statements and omissions regarding the status of construction of a first-of-its-kind "clean coal" power plant that was designed to transform coal into synthetic gas that could then be used to fuel the power plant.

### Education

B.A., Duke University, 2006; J.D., Washington University in St. Louis, School of Law, 2011

### Honors / Awards

Best Lawyer in America: One to Watch, *Best Lawyers®*, 2023-2024; 500 X – The Next Generation, *Lawdragon*, 2023; Leading Plaintiff Financial Lawyer, *Lawdragon*, 2023; 40 & Under Hot List, *Benchmark Litigation*, 2021; Rising Star, *Super Lawyers Magazine*, 2016-2021

## Willow E. Radcliffe | Partner

Willow Radcliffe is a partner in the Firm's San Francisco office, where she concentrates her practice in securities class action litigation in federal court. She has been significantly involved in the prosecution of numerous securities fraud claims, including actions filed against Pfizer, Inc. ($400 million recovery), CoreCivic (*Grae v. Corrections Corporation of America*) ($56 million recovery), Flowserve Corp. ($55 million recovery), Santander Consumer USA Holdings Inc. ($47 million), NorthWestern Corp. ($40 million recovery), Ashworth, Inc. ($15.25 million recovery), and Allscripts Healthcare Solutions, Inc. ($9.75 million recovery). Additionally, Radcliffe has represented plaintiffs in other complex actions, including a class action against a major bank regarding the adequacy of disclosures made to consumers in California related to access checks. Before joining the Firm, she clerked for the Honorable Maria-Elena James, Magistrate Judge for the United States District Court for the Northern District of California.

### Education

B.A., University of California, Los Angeles 1994; J.D., Seton Hall University School of Law, 1998

### Honors / Awards

Best Lawyer in America: One to Watch, *Best Lawyers®*, 2021-2024; Leading Plaintiff Financial Lawyer, *Lawdragon*, 2019-2023; Best Lawyer in Northern California: One to Watch, *Best Lawyers®*, 2021; Plaintiffs' Lawyer Trailblazer, *The National Law Journal*, 2020; J.D., *Cum Laude*, Seton Hall University School of Law, 1998; Most Outstanding Clinician Award; Constitutional Law Scholar Award

# Frank A. Richter | Partner

Frank Richter is a partner in the Firm's Chicago office, where he focuses on shareholder, antitrust, and class action litigation.

Richter was an integral member of the Robbins Geller team that secured a $1.21 billion settlement in *In re Valeant Pharms. Int'l, Inc. Sec. Litig.* (D.N.J.), which is the ninth-largest securities class action settlement in history and the largest ever against a pharmaceutical manufacturer. In addition to *Valeant*, Richter has been a member of litigation teams that have secured hundreds of millions of dollars in securities class action settlements throughout the country, including in *HCA* ($215 million, E.D. Tenn.), *Sprint* ($131 million, D. Kan.), *Orbital ATK* ($108 million, E.D. Va.), *Dana Corp.* ($64 million, N.D. Ohio), *Diplomat* ($15.5 million, N.D. Ill.), *LJM Funds* ($12.85 million, N.D. Ill.), and *Camping World* ($12.5 million, N.D. Ill.).

Richter also works on antitrust matters, including serving on the Plaintiffs' Steering Committee in *In re Dealer Mgmt. Sys. Antitrust Litig.* (N.D. Ill.), and he represents plaintiffs as local counsel in class action and derivative shareholder litigation in Illinois state and federal courts.

## Education

B.A., Truman State University, 2007; M.M., DePaul University School of Music, 2009; J.D., DePaul University College of Law, 2012

## Honors / Awards

500 X – The Next Generation, *Lawdragon*, 2023; Rising Star, *Super Lawyers Magazine*, 2017-2022; 40 & Under Hot List, *Benchmark Litigation*, 2021; J.D., S*umma Cum Laude*, Order of the Coif, CALI Award for highest grade in seven courses, DePaul University College of Law, 2012

# Darren J. Robbins | Partner

Darren Robbins is a founding partner of Robbins Geller Rudman & Dowd LLP. Over the last two decades, Robbins has served as lead counsel in more than 100 securities class actions and has recovered billions of dollars for investors. Robbins served as lead counsel in *In re Am. Realty Cap. Props., Inc. Litig.*, a securities class action arising out of improper accounting practices, recovering more than $1 billion for class members. The *American Realty* settlement represents the largest recovery as a percentage of damages of any major class action brought pursuant to the Private Securities Litigation Reform Act of 1995 and resolved prior to trial. The $1+ billion settlement included the largest personal contributions ($237.5 million) ever made by individual defendants to a securities class action settlement.

Robbins also led Robbins Geller's prosecution of wrongdoing related to the sale of residential mortgage-backed securities (RMBS) prior to the global financial crisis, including an RMBS securities class action against Goldman Sachs that yielded a $272 million recovery for investors. Robbins served as co-lead counsel in connection with a $627 million recovery for investors in *In re Wachovia Preferred Securities & Bond/Notes Litig.*, one of the largest securities class action settlements ever involving claims brought solely under the Securities Act of 1933.

One of the hallmarks of Robbins' practice has been his focus on corporate governance reform. In *UnitedHealth*, a securities fraud class action arising out of an options backdating scandal, Robbins represented lead plaintiff CalPERS and obtained the cancellation of more than 3.6 million stock options held by the company's former CEO and secured a record $925 million cash recovery for shareholders. He also negotiated sweeping corporate governance reforms, including the election of a shareholder-nominated director to the company's board of directors, a mandatory holding period for shares acquired via option exercise, and compensation reforms that tied executive pay to performance. Recently, Robbins led a shareholder derivative action brought by several pension funds on behalf of Community Health Systems, Inc. that yielded a $60 million payment to Community Health as well as corporate governance reforms that included two shareholder-nominated directors, the creation and appointment of a Healthcare Law Compliance Coordinator, the implementation of an executive compensation clawback in the event of a restatement, the establishment of an insider trading controls committee, and the adoption of a political expenditure disclosure policy.

## Education

B.S., University of Southern California, 1990; M.A., University of Southern California, 1990; J.D., Vanderbilt Law School, 1993

## Honors / Awards

Top 10 Lawyers in San Diego, *Super Lawyers Magazine*, 2024; Best Lawyer in America, *Best Lawyers®*, 2010-2024; Hall of Fame, *The Legal 500*, 2023; Leading Lawyer, *Chambers USA*, 2014-2023; Lawyer of the Year: Litigation – Securities, *Best Lawyers®*, 2023; Litigation Star, *Benchmark Litigation*, 2023; Leading Lawyer, *The Legal 500*, 2020-2022; California Lawyer of the Year, *Daily Journal*, 2022; Top 50 Lawyers in San Diego, *Super Lawyers Magazine*, 2015, 2021; Litigator of the Week, *The American Lawyer*, 2021; Southern California Best Lawyer, *Best Lawyers®*, 2012-2021; Local Litigation Star, *Benchmark Litigation*, 2013-2018, 2020; Recommended Lawyer, *The Legal 500*, 2011, 2017, 2019; Benchmark California Star, *Benchmark Litigation*, 2019; State Litigation Star, *Benchmark Litigation*, 2019; Lawyer of the Year, *Best Lawyers®*, 2017; Influential Business Leader, *San Diego Business Journal*, 2017; Litigator of the Year, *Our City San Diego,* 2017; One of the Top 100 Lawyers Shaping the Future, *Daily Journal*; One of the "Young Litigators 45 and Under," *The American Lawyer*; Attorney of the Year, *California Lawyer*; Managing Editor, *Vanderbilt Journal of Transnational Law*, Vanderbilt Law School

# Robert J. Robbins | Partner

Robert Robbins is a partner in the Firm's Boca Raton office. He focuses his practice on investigating securities fraud, initiating securities class actions, and helping institutional and individual shareholders litigate their claims to recover investment losses caused by fraud. Representing shareholders in all aspects of class actions brought pursuant to the federal securities laws, Robbins provides counsel in numerous securities fraud class actions across the country, helping secure significant recoveries for investors.

Recently, Robbins was a key member of the Robbins Geller litigation team that secured a $1.21 billion settlement in *In re Valeant Pharms. Int'l, Inc. Sec. Litig.*, a case that *Vanity Fair* reported as "the corporate scandal of its era" that had raised "fundamental questions about the functioning of our health-care system, the nature of modern markets, and the slippery slope of ethical rationalizations." This is the ninth largest securities class action settlement ever and the largest against a pharmaceutical manufacturer. Robbins has also been a member of Robbins Geller litigation teams responsible for securing hundreds of millions of dollars in securities class action settlements, including: *Hospira* ($60 million recovery); *3D Systems* ($50 million); *CVS Caremark* ($48 million recovery); *Baxter International* ($42.5 million recovery); *Grubhub* ($42 million); *R.H. Donnelley* ($25 million recovery); *Spiegel* ($17.5 million recovery); *TECO Energy* ($17.35 million recovery); *AFC Enterprises* ($17.2 million recovery); *Accretive Health* ($14 million recovery); *Lender Processing Services* ($14 million recovery); *Lexmark Int'l* ($12 million); *Imperial Holdings* ($12 million recovery); *Mannatech* ($11.5 million recovery); *Newpark Resources* ($9.24 million recovery); *CURO Group* ($8.98 million); *Gilead Sciences* ($8.25 million recovery); *TCP International* ($7.175 million recovery); *Cryo Cell International* ($7 million recovery); *Gainsco* ($4 million recovery); and *Body Central* ($3.425 million recovery).

## Education

B.S., University of Florida, 1999; J.D., University of Florida College of Law, 2002

## Honors / Awards

Leading Litigator in America, *Lawdragon*, 2024; Best Lawyer in America: One to Watch, *Best Lawyers®*, 2024; Leading Plaintiff Financial Lawyer, *Lawdragon*, 2019-2023; Rising Star, *Super Lawyers Magazine*, 2015-2017; J.D., High Honors, University of Florida College of Law, 2002; Member, *Journal of Law and Public Policy*, University of Florida College of Law; Member, *Phi Delta Phi*, University of Florida College of Law; *Pro bono* certificate, Circuit Court of the Eighth Judicial Circuit of Florida; Order of the Coif

# David A. Rosenfeld | Partner

David Rosenfeld, a partner in the Firm's Melville office, has focused his legal practice for more than 20 years in the area of securities litigation. He has argued in courts throughout the country, has been appointed lead counsel in dozens of securities fraud lawsuits, and has successfully recovered hundreds of millions of dollars for defrauded shareholders.

Rosenfeld works on all stages of litigation, including drafting pleadings, arguing motions, and negotiating settlements. Most recently, he led the teams of Robbins Geller attorneys in recovering $95 million for shareholders of Tableau Software, Inc., $90 million for shareholders of Altria Group, Inc., $40 million for shareholders of BRF S.A, $20 million for shareholders of Grana y Montero (where shareholders recovered more than 90% of their losses), and $34.5 million for shareholders of L-3 Communications Holdings, Inc.

Rosenfeld also led the Robbins Geller team in recovering in excess of $34 million for investors in Overseas Shipholding Group, which represented an outsized recovery of 93% of bond purchasers' damages and 28% of stock purchasers' damages. The creatively structured settlement included more than $15 million paid by a bankrupt entity. Rosenfeld also led the effort that resulted in the recovery of nearly 90% of losses for investors in Austin Capital, a sub-feeder fund of Bernard Madoff. In connection with this lawsuit, Rosenfeld met with and interviewed Madoff in federal prison in Butner, North Carolina.

Rosenfeld has also achieved remarkable recoveries against companies in the financial industry. In addition to being appointed lead counsel in the securities fraud lawsuit against First BanCorp ($74.25 million recovery), he recovered $70 million for investors in Credit Suisse Group and $14 million for Barclays investors.

## Education
B.S., Yeshiva University, 1996; J.D., Benjamin N. Cardozo School of Law, 1999

## Honors / Awards
Future Star, *Benchmark Litigation*, 2016-2020, 2023; Super Lawyer, *Super Lawyers Magazine*, 2014-2023; Recommended Lawyer, *The Legal 500*, 2018; Rising Star, *Super Lawyers Magazine*, 2011-2013

# Robert M. Rothman | Partner

Robert Rothman is a partner in the Firm's Melville office and a member of the Firm's Management Committee. He has recovered well in excess of $1 billion on behalf of victims of investment fraud, consumer fraud, and antitrust violations.

Recently, Rothman served as lead counsel in *In re Am. Realty Cap. Props., Inc. Litig.* where he obtained a $1.025 billion cash recovery on behalf of investors. Rothman and the litigation team prosecuted nine different claims for violations of the Securities Exchange Act of 1934 and the Securities Act of 1933, involving seven different stock or debt offerings and two mergers. The recovery represents the highest percentage of damages ever obtained in a major PSLRA case before trial and includes the largest personal contributions by individual defendants in history. Additionally, Rothman has recovered hundreds of millions of dollars for investors in cases against First Bancorp, Doral Financial, Popular, iStar, Autoliv, CVS Caremark, Fresh Pet, The Great Atlantic & Pacific Tea Company (A&P), NBTY, Spiegel, American Superconductor, Iconix Brand Group, Black Box, OSI Pharmaceuticals, Gravity, Caminus, Central European Distribution Corp., OneMain Holdings, The Children's Place, CNinsure, Covisint, FleetBoston Financial, Interstate Bakeries, Hibernia Foods, Jakks Pacific, Jarden, Portal Software, Ply Gem Holdings, Orion Energy, Tommy Hilfiger, TD Banknorth, Teletech, Unitek, Vicuron, Xerium, W Holding, and dozens of others.

Rothman also represents shareholders in connection with going-private transactions and tender offers. For example, in connection with a tender offer made by Citigroup, Rothman secured an increase of more than $38 million over what was originally offered to shareholders. He also actively litigates consumer fraud cases, including a case alleging false advertising where the defendant agreed to a settlement valued in excess of $67 million.

## Education

B.A., State University of New York at Binghamton, 1990; J.D., Hofstra University School of Law, 1993

## Honors / Awards

Global Plaintiff Lawyer, *Lawdragon*, 2024; Super Lawyer, *Super Lawyers Magazine*, 2011, 2013-2023; Leading Plaintiff Financial Lawyer, *Lawdragon*, 2022-2023; Northeast Trailblazer, *The American Lawyer*, 2022; New York Trailblazer, *New York Law Journal*, 2020; Dean's Academic Scholarship Award, Hofstra University School of Law; J.D., with Distinction, Hofstra University School of Law, 1993; Member, *Hofstra Law Review*, Hofstra University School of Law

# Samuel H. Rudman | Partner

Sam Rudman is a founding member of the Firm, a member of the Firm's Management Committee, and manages the Firm's New York offices. His 26-year securities practice focuses on recognizing and investigating securities fraud, and initiating securities and shareholder class actions to vindicate shareholder rights and recover shareholder losses. Rudman is also part of the Firm's SPAC Task Force, which is dedicated to rooting out and prosecuting fraud on behalf of injured investors in special purpose acquisition companies. A former attorney with the SEC, Rudman has recovered hundreds of millions of dollars for shareholders, including a $200 million recovery in *Motorola*, a $129 million recovery in *Doral Financial*, an $85 million recovery in *Blackstone*, a $74 million recovery in *First BanCorp*, a $65 million recovery in *Forest Labs,* a $62.5 million recovery in *SQM*, a $50 million recovery in *TD Banknorth*, a $48 million recovery in *CVS Caremark*, a $34.5 million recovery in *L-3 Communications Holdings*, a $32.8 million recovery in *Snap, Inc.*, and a $18.5 million recovery in *Deutsche Bank.*

## Education

B.A., Binghamton University, 1989; J.D., Brooklyn Law School, 1992

## Honors / Awards

Super Lawyer, *Super Lawyers Magazine*, 2007-2023; Top 10 Most Influential Securities Litigation Attorney in New York, *Business Today*, 2023; Recommended Lawyer, *The Legal 500*, 2018-2019, 2023; Leading Lawyer, *Chambers USA*, 2014-2023; Leading Plaintiff Financial Lawyer, *Lawdragon*, 2019-2023; Litigation Star, *Benchmark Litigation*, 2013, 2017-2019, 2023; Leading Lawyer in America, *Lawdragon*, 2016-2022; New York Trailblazer, *New York Law Journal*, 2020; Plaintiffs' Lawyer Trailblazer, *The National Law Journal*, 2020; National Practice Area Star, *Benchmark Litigation*, 2019-2020; Local Litigation Star, *Benchmark Litigation*, 2013-2020; Dean's Merit Scholar, Brooklyn Law School; Moot Court Honor Society, Brooklyn Law School; Member, *Brooklyn Journal of International Law*, Brooklyn Law School

# Joseph Russello | Partner

Joseph Russello is a partner in the Firm's Melville office.  He began his career as a defense lawyer and now represents investors in securities class actions at the trial and appellate levels.

Rusello spearheaded the team that recovered $85 million in litigation against The Blackstone Group, LLC, a case that yielded a landmark decision from the Second Circuit Court of Appeals on "materiality" in securities actions.  *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706 (2d Cir. 2011).  He also led the team responsible for partially defeating dismissal and achieving a $50 million settlement in litigation against BHP Billiton, an Australia-based mining company accused of concealing safety issues at a Brazilian iron-ore dam. *In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65 (S.D.N.Y. 2017).

Recently, Rusello was co-counsel in a lawsuit against Allied Nevada Gold Corporation, recovering $14.5 million for investors after the Ninth Circuit Court of Appeals reversed two dismissal decisions.  *In re Allied Nev. Gold Corp. Sec. Litig.*, 743 F. App'x 887 (9th Cir. 2018).  He was also instrumental in obtaining a settlement and favorable appellate decision in litigation against SAIC, Inc., a defense contractor embroiled in a decade-long overbilling fraud against the City of New York. *Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85 (2d Cir. 2016).  Other notable recent decisions include: *In re Qudian Sec. Litig.*,189 A.D. 3d 449 (N.Y. App. Div., 1st Dep't 2020); *Kazi v. XP Inc.*, 2020 WL 4581569 (N.Y. Sup. Ct. Aug. 5, 2020); *In re Dentsply Sirona, Inc. S'holders Litig.*, 2019 WL 3526142 (N.Y. Sup. Ct. Aug. 2, 2019); and *Matter of PPDAI Grp. Sec. Litig.*, 64 Misc. 3d 1208(A), 2019 WL 2751278 (N.Y. Sup. Ct. 2019).  Other notable settlements include: *NBTY, Inc.* ($16 million); *LaBranche & Co., Inc.* ($13 million); *The Children's Place Retail Stores, Inc.* ($12 million); and *Prestige Brands Holdings, Inc.* ($11 million).

## Education
B.A., Gettysburg College, 1998; J.D., Hofstra University School of Law, 2001

## Honors / Awards
Super Lawyer, *Super Lawyers Magazine*, 2014-2020, 2023; Leading Plaintiff Financial Lawyer, *Lawdragon*, 2019-2023; *Law360* Securities Editorial Advisory Board, 2017-2022

# Scott H. Saham | Partner

Scott Saham is a partner in the Firm's San Diego office, where his practice focuses on complex securities litigation. He is licensed to practice law in both California and Michigan. Most recently, Saham was a member of the litigation team that obtained a $125 million settlement in *In re LendingClub Sec. Litig.*, a settlement that ranked among the top ten largest securities recoveries ever in the Northern District of California. He was also part of the litigation teams in *Schuh v. HCA Holdings, Inc.*, which resulted in a $215 million recovery for shareholders, the largest securities class action recovery ever in Tennessee, and *Luna v. Marvell Tech. Grp., Ltd.*, which resulted in a $72.5 million settlement that represents approximately 24% to 50% of the best estimate of classwide damages suffered by investors. He also served as lead counsel prosecuting the *Pharmacia* securities litigation in the District of New Jersey, which resulted in a $164 million recovery. Additionally, Saham was lead counsel in the *In re Coca-Cola Sec. Litig.* in the Northern District of Georgia, which resulted in a $137.5 million recovery after nearly eight years of litigation. He also obtained reversal from the California Court of Appeal of the trial court's initial dismissal of the landmark *Countrywide* mortgage-backed securities action. This decision is reported as *Luther v. Countrywide Fin. Corp.*, 195 Cal. App. 4th 789 (2011), and following this ruling that revived the action the case settled for $500 million.

## Education

B.A., University of Michigan, 1992; J.D., University of Michigan Law School, 1995

## Honors / Awards

Leading Plaintiff Financial Lawyer, *Lawdragon*, 2019-2023; Distinguished Pro Bono Attorney of the Year, *Casa Cornelia Law Center*, 2022

# Juan Carlos Sanchez | Partner

Juan Carlos "J.C." Sanchez is a partner in the Firm's San Diego office. He specializes in complex securities litigation and has extensive experience advising investors on their exposure to securities fraud and advising them on their litigation options for recovering losses. He has advised institutional and retail investors in more than 60 securities class actions that yielded more than $600 million in class-wide recoveries.

Sanchez was a key member of the litigation team that secured the largest shareholder derivative recovery ever in Tennessee and the Sixth Circuit and unprecedented corporate governance reforms in *In re Community Health Sys., Inc. S'holder Derivative Litig.* His representation of California passengers in a landmark consumer and civil rights case against Greyhound Lines, Inc. led to a ruling recognizing that transit passengers do not check their rights and dignity at the bus door. *Law360* honored Sanchez and the *Greyhound* litigation team as a Consumer Protection Group of the Year in 2019.

Before joining Robbins Geller, J.C. served as a judicial law clerk to the Honorable Nelva Gonzales Ramos of the U.S. District Court for the Southern District of Texas.

## Education

B.S., University of California, Davis, 2005; J.D., University of California, Berkeley School of Law (Boalt Hall), 2014

## Honors / Awards

Leading Litigator in America, *Lawdragon*, 2024; Leading Plaintiff Financial Lawyer, *Lawdragon*, 2023

# Vincent M. Serra | Partner

Vincent Serra is a partner in the Firm's Melville office and focuses his practice on complex securities, antitrust, consumer, and employment litigation. His efforts have contributed to the recovery of over a billion dollars on behalf of aggrieved plaintiffs and class members. Notably, Serra has contributed to several significant recoveries, including *Dahl v. Bain Cap. Partners, LLC* ($590.5 million recovery), an antitrust action against the world's largest private equity firms alleging collusive practices in multi-billion dollar leveraged buyouts, and *Samit v. CBS Corp.* ($14.75 million recovery), a securities action alleging that defendants made false and misleading statements about their knowledge of former CEO Leslie Moonves's exposure to the #MeToo movement.

Additionally, Serra was a member of the litigation team that obtained a $22.75 million settlement fund on behalf of route drivers in an action asserting violations of federal and state overtime laws against Cintas Corp. He was also part of the successful trial team in *Lebrilla v. Farmers Grp., Inc.*, which involved Farmers' practice of using inferior imitation parts when repairing insureds' vehicles. Other notable cases include *Alaska Elec. Pension Fund v. Pharmacia Corp.* ($164 million recovery), *In re Priceline.com Sec. Litig.* ($80 million recovery), and *In re DouYu Int'l Holdings Ltd. Sec. Litig* ($15 million recovery). Serra has litigated several actions against manufacturers and retailers for the improper marketing and sale of purportedly "flushable" wipes products. In *Commissioners of Public Works of the City of Charleston (d.b.a. Charleston Water System) v. Costco Wholesale Corp.*, Serra served as court-appointed class counsel in connection with a settlement that secured an unprecedented commitment of Kimberly-Clark to meet the national municipal wastewater standard for flushability, and recently secured similar settlements that will effectuate industry-wide improvements in manufacturer and retailers' flushable wipes products and "do not flush" labeling for non-flushable wipes intended to reduce wipes-related sewer impacts for wastewater utilities nationwide (pending final approval).

## Education

B.A., University of Delaware, 2001; J.D., California Western School of Law, 2005

## Honors / Awards

Best Lawyer in America: One to Watch, *Best Lawyers®*, 2024; Wiley W. Manuel Award for Pro Bono Legal Services, State Bar of California

# Sam S. Sheldon | Partner

Sam Sheldon is a partner in the Firm's San Diego office, where he focuses on securities fraud and other complex civil litigation. Before joining the Firm in January 2024, Sheldon served more than five years as a United States Magistrate Judge in the Southern District of Texas, primarily in Houston. He wrote opinions in almost every area of the law, including securities fraud, intellectual property, class actions, labor and employment, False Claims Act, and criminal law. Before taking the federal bench, Sheldon was a partner with Quinn Emanuel in the Washington, D.C. office and headed the firm's Health Care Practice Group. He represented plaintiffs in landmark cases brought under the federal False Claims Act.

Sheldon previously served as Chief of the Health Care Fraud Unit in the DOJ Criminal Division in Washington, D.C., where he oversaw the prosecution of federal health care fraud throughout the United States. He also was an Assistant United States Attorney in Texas. Earlier in his career, Sheldon was a partner with Cozen O'Connor in the San Diego office. Sheldon has tried 25 cases as a federal prosecutor and civil litigator. He received numerous awards for his successful federal prosecutions from the DOJ and other federal agencies including the Special Achievement Award presented by the United States Attorney General.

## Education

B.A., University of Southern California, 1992; M.A., University of Southern California, 1994; J.D., University of Houston Law Center, 1997

## Honors / Awards

Prosecutor Leadership Award presented by the Inspector General for the United States Department of Health and Human Services, 2013; Special Award from the Director of the FBI for excellent work with the Medicare Fraud Taskforce, 2013; Exceptional Service Award presented by the United States Assistant Attorney General, 2011; Special Achievement Award presented by the United States Attorney General for Sustained Superior Performance of Duty, 2010; International Achievement Award from the Assistant Director of the Department of Homeland Security for prosecuting the first illegal exportation of goods case in the Southern District of Texas (under 18 U.S.C. §554), 2010; Special Award from the Director of the FBI for prosecuting the first agricultural fraud case in the United States (under 7 U.S.C. §7711), 2009

# Arthur L. Shingler III | Partner

Arthur Shingler is a partner in the Firm's San Diego office. Shingler has successfully represented both public and private sector clients in hundreds of complex, multi-party actions with billions of dollars in dispute. Throughout his career, he has obtained outstanding results for those he has represented in cases generally encompassing shareholder derivative and securities litigation, unfair business practices and antitrust litigation, publicity rights and advertising litigation, ERISA litigation, and other insurance, health care, employment, and commercial disputes.

Representative matters in which Shingler has served as a core member of the litigation team or settlement counsel include, among others: *In re EpiPen (Epinephrine Injection, USP) Marketing, Sales Practices & Antitrust Litig.*, No. 2:17-md-02785 (D. Kan.) ($609 million total recovery achieved weeks prior to trial in certified class action alleging antitrust claims involving the illegal reverse payment settlement to delay the generic EpiPen, which allowed the prices of the life-saving EpiPen to rise over 600% in 9 years); *In re Remicade Antitrust Litig.*, No. 2:17-cv-04326 (E.D. Pa.) ($25 million recovery for indirect purchasers in antitrust action); *In re Liquid Aluminum Sulfate Antitrust Litig.*, No. 2:16-md-02687 (D.N.J.) (direct purchaser class settled in excess of $100 million); *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, No. 1:08-cv-10783 (S.D.N.Y.) ($272 million recovery); *In re Royal Dutch/Shell ERISA Litig.*, No. 3:04-cv-00374 (D.N.J.) ($90 million settlement); *In re Priceline.com Sec. Litig.*, No. 3:00-cv-01884 (D. Conn.) ($80 million settlement); *In re General Motors ERISA Litig.*, No. 05-71085 (E.D. Mich.) ($37.5 million settlement, in addition to significant revision of retirement plan administration); *Wood v. Ionatron, Inc.*, No. 4:06-cv-00354 (D. Ariz.) ($6.5 million settlement); *In re Lattice Semiconductor Corp. Derivative Litig.*, No. C 043327CV (Or. Cir. Ct., Wash. Cnty.) (corporate governance settlement, including substantial revision of board policies and executive management); *In re 360networks Class Action Sec. Litig.*, No. 1:02-cv-04837 (S.D.N.Y.) ($7 million settlement); and *Rothschild v. Tyco Int'l (US), Inc.*, 83 Cal. App. 4th 488 (2000) (shaped scope of California's Unfair Practices Act as related to limits of State's False Claims Act).

In addition, Shingler is currently working on behalf of plaintiffs in several class actions, including, for example, *In re National Prescription Opiate Litig.*, No. 1:17-md-02804 (N.D. Ohio), and *In re American Airlines/JetBlue Antitrust Litig.*, No. 1:22-cv-07374 (E.D.N.Y.).

## Education

B.A., Point Loma Nazarene College, 1989; J.D., Boston University School of Law, 1995

## Honors / Awards

B.A., *Cum Laude*, Point Loma Nazarene College, 1989

# Jessica T. Shinnefield | Partner

Jessica Shinnefield is a partner in the Firm's San Diego office. Currently, her practice focuses on initiating, investigating, and prosecuting securities fraud class actions. Shinnefield served as lead counsel in *In re Am. Realty Cap. Props., Inc. Litig.*, a case arising out of ARCP's manipulative accounting practices, and obtained a $1.025 billion recovery. For five years, she and the litigation team prosecuted nine different claims for violations of the Securities Exchange Act of 1934 and the Securities Act of 1933, involving seven different stock or debt offerings and two mergers. The recovery represents the highest percentage of damages of any major PSLRA case prior to trial and includes the largest personal contributions by individual defendants in history. Shinnefield also served as lead counsel in *Smilovits v. First Solar, Inc.,* and obtained a $350 million settlement on the eve of trial. The settlement is fifth-largest PSLRA settlement ever recovered in the Ninth Circuit.

Shinnefield was also a member of the litigation team prosecuting actions against investment banks and leading national credit rating agencies for their roles in structuring and rating structured investment vehicles backed by toxic assets in *Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Incorporated* and *King County, Washington v. IKB Deutsche Industriebank AG*. These cases were among the first to successfully allege fraud against the rating agencies, whose ratings have traditionally been protected by the First Amendment. Shinnefield also litigated individual opt-out actions against AOL Time Warner – *Regents of the Univ. of Cal. v. Parsons* and *Ohio Pub. Emps. Ret. Sys. v. Parsons* (recovery more than $600 million). Additionally, she litigated an action against Omnicare, in which she helped obtain a favorable ruling for plaintiffs from the United States Supreme Court. Shinnefield has also successfully appealed lower court decisions in the Second, Seventh, and Ninth Circuit Courts of Appeals.

## Education

B.A., University of California at Santa Barbara, 2001; J.D., University of San Diego School of Law, 2004

## Honors / Awards

Leading Plaintiff Financial Lawyer, *Lawdragon*, 2019-2023; Best Lawyer in America: One to Watch, *Best Lawyers®*, 2023; Future Star, *Benchmark Litigation*, 2023; Plaintiffs' Lawyers Trailblazer, *The National Law Journal*, 2021; Litigator of the Week, *The American Lawyer*, 2020; Rising Star, *Super Lawyers Magazine*, 2015-2019; 40 & Under Hot List, *Benchmark Litigation*, 2018-2019; B.A., *Phi Beta Kappa*, University of California at Santa Barbara, 2001

# Elizabeth A. Shonson | Partner

Elizabeth Shonson is a partner in the Firm's Boca Raton office. She concentrates her practice on representing investors in class actions brought pursuant to the federal securities laws. Shonson has litigated numerous securities fraud class actions nationwide, helping achieve significant recoveries for aggrieved investors. She was a member of the litigation teams responsible for recouping millions of dollars for defrauded investors, including: *In re Massey Energy Co. Sec. Litig.* (S.D. W.Va.) ($265 million); *Nieman v. Duke Energy Corp.* (W.D.N.C.) ($146.25 million recovery); *In re ADT Inc. S'holder Litig.* (Fla. Cir. Ct., 15th Jud. Cir.) ($30 million settlement); *Eshe Fund v. Fifth Third Bancorp* (S.D. Ohio) ($16 million); *City of St. Clair Shores Gen. Emps. Ret. Sys. v. Lender Processing Servs., Inc.* (M.D. Fla.) ($14 million); and *In re Synovus Fin. Corp.* (N.D. Ga.) ($11.75 million).

### Education

B.A., Syracuse University, 2001; J.D., University of Florida Levin College of Law, 2005

### Honors / Awards

Rising Star, *Super Lawyers Magazine*, 2016-2019; J.D., *Cum Laude*, University of Florida Levin College of Law, 2005; Editor-in-Chief, *Journal of Technology Law & Policy*; Phi Delta Phi; B.A., with Honors, *Summa Cum Laude*, Syracuse University, 2001; Phi Beta Kappa

# Trig Smith | Partner

Trig Smith is a partner in the Firm's San Diego office where he focuses his practice on complex securities litigation. He has been involved in the prosecution of numerous securities class actions that have resulted in over a billion dollars in recoveries for investors. His cases have included: *In re Cardinal Health, Inc. Sec. Litig.* ($600 million recovery); *Jones v. Pfizer Inc.* ($400 million recovery); *Silverman v. Motorola, Inc.* ($200 million recovery); and *City of Livonia Emps.' Ret. Sys. v. Wyeth* ($67.5 million). Most recently, he was a member of the Firm's trial team in *Hsu v. Puma Biotechnology, Inc.*, a securities fraud class action that resulted in a verdict in favor of investors after a two-week jury trial.

### Education

B.S., University of Colorado, Denver, 1995; M.S., University of Colorado, Denver, 1997; J.D., Brooklyn Law School, 2000

### Honors / Awards

Best Lawyer in America, *Best Lawyers®*, 2024; Member, *Brooklyn Journal of International Law*, Brooklyn Law School; CALI Excellence Award in Legal Writing, Brooklyn Law School

# Mark Solomon | Partner

Mark Solomon is a founding and managing partner of the Firm and leads its international litigation practice. Over the last 29 years, he has regularly represented United States and United Kingdom-based pension funds and asset managers in class and non-class securities litigation in federal and state courts throughout the United States. He was first admitted to the Bar of England and Wales as a Barrister (he is non-active) and is an active member of the Bars of Ohio, California, and various United States federal district and appellate courts.

Since 1993, Solomon has spearheaded the prosecution of many significant securities fraud cases. He has obtained multi-hundred million-dollar recoveries for plaintiffs in pre-trial settlements and significant corporate governance reforms designed to limit recidivism and promote appropriate standards. Prior to the most recent financial crisis, he was instrumental in obtaining some of the first mega-recoveries in the field in California and Texas, serving in the late 1990s and early 2000s as class counsel in *In re Informix Corp. Sec. Litig.* in the federal district court for the Northern District of California, and recovering $131 million for Informix investors; and serving as class counsel in *Schwartz v. TXU Corp.* in the federal district court for the Northern District of Texas, where he helped obtain a recovery of over $149 million for a class of purchasers of TXU securities as well as securing important governance reforms. He litigated and tried the securities class action *In re Helionetics, Inc. Sec. Litig.*, where he won a $15.4 million federal jury verdict in the federal district court for the Central District of California.

Solomon is currently counsel to a number of pension funds serving as lead plaintiffs in cases throughout the United States. He represents the UK's Norfolk Pension Fund in *Hsu v. Puma Biotechnology, Inc.* where, in the federal district court for the Central District of California, after three weeks of trial, the Fund obtained a jury verdict valued at over $54 million in favor of the class against the company and its CEO. Solomon also represents Norfolk Pension Fund in separate class actions currently pending against Apple Inc. and Apple executives in the federal district court for the Northern District of California and against Anadarko Petroleum Corporation and former Anadarko executives in the federal district court for the Southern District of Texas. He represented the British Coal Staff Superannuation Scheme and the Mineworkers' Pension Scheme in *Smilovits v. First Solar, Inc.* in the federal district court for the District of Arizona, in which the class recently recovered $350 million on the eve of trial. That settlement is the fifth-largest recovered in the Ninth Circuit since the advent in 1995 of statutory reforms to securities litigation that established the current legal regime. Solomon also represents the same coal industry funds in the recently filed class action against Citrix Inc. and Citrix executives in the federal district court for the Southern District of Florida, and he represents North East Scotland Pension Fund in a class action pending against Under Armour and Under Armour executives in the federal district court for the District of Maryland. In addition, he is currently representing Los Angeles County Employees Retirement Association in a class action pending against FirstEnergy and FirstEnergy executives in the federal district court for the Southern District of Ohio and he is representing Strathclyde Pension Fund in a class action pending against Bank OZK and its CEO in the federal district court for the Eastern District of Arkansas.

## Education

B.A., Trinity College, Cambridge University, England, 1985; L.L.M., Harvard Law School, 1986; Inns of Court School of Law, Degree of Utter Barrister, England, 1987

## Honors / Awards

Global Plaintiff Lawyer, *Lawdragon*, 2024; Leading Plaintiff Financial Lawyer, *Lawdragon*, 2019-2023; Super Lawyer, *Super Lawyers Magazine*, 2017-2018; Recommended Lawyer, *The Legal 500*, 2016-2017; Lizette Bentwich Law Prize, Trinity College, 1983 and 1984; Hollond Travelling Studentship, 1985; Harvard Law School Fellowship, 1985-1986; Member and Hardwicke Scholar of the Honourable Society of Lincoln's Inn

# Hillary B. Stakem  |  Partner

Hillary Stakem is a partner in the Firm's San Diego office, where her practice focuses on complex securities litigation.  Stakem was a member of the litigation team in *Jaffe v. Household Int'l, Inc.*, a securities class action that obtained a record-breaking $1.575 billion settlement after 14 years of litigation, including a six-week jury trial in 2009 that resulted in a verdict for plaintiffs.  She was also a member of the litigation teams that secured a $388 million recovery for investors in J.P. Morgan residential mortgage-backed securities in *Fort Worth Employees' Retirement Fund v. J.P. Morgan Chase & Co.*, and that obtained a $350 million settlement on the eve of trial in *Smilovits v. First Solar, Inc.*, the fifth-largest PSLRA settlement ever recovered in the Ninth Circuit.  Stakem also helped secure a $131 million recovery in favor of plaintiffs in *Bennett v. Sprint Nextel Corp*, a $100 million settlement for shareholders in *Karinski v. Stamps.com*, a $97.5 million recovery in *Marcus v. J.C. Penney Company, Inc.*, and an $87.5 million settlement in *Monroe County Employees' Retirement System v. The Southern Company.*

### Education

B.A., College of William and Mary, 2009; J.D., UCLA School of Law, 2012

### Honors / Awards

500 X – The Next Generation, *Lawdragon*, 2023; Rising Star, *Super Lawyers Magazine*, 2021-2022; 40 & Under Hot List, *Benchmark Litigation*, 2021; B.A., *Magna Cum Laude*, College of William and Mary, 2009

# Jeffrey J. Stein  |  Partner

Jeffrey Stein is a partner in the Firm's San Diego office, where he practices securities fraud litigation and other complex matters.  He was a member of the litigation team that secured a historic recovery on behalf of Trump University students in two class actions against President Donald J. Trump.  The settlement provides $25 million to approximately 7,000 consumers.  This result means individual class members are eligible for upwards of $35,000 in restitution.  Stein represented the class on a *pro bono* basis.

Before joining the Firm, Stein focused on civil rights litigation, with special emphasis on the First, Fourth, and Eighth Amendments.  In this capacity, he helped his clients secure successful outcomes before the United States Supreme Court and the Ninth Circuit Court of Appeals.

### Education

B.S., University of Washington, 2005; J.D., University of San Diego School of Law, 2009

# Christopher D. Stewart | Partner

Christopher Stewart is a partner in the Firm's San Diego office. His practice focuses on complex securities and shareholder derivative litigation. Stewart served as lead counsel in *In re Am. Realty Cap. Props., Inc. Litig.*, a case arising out of ARCP's manipulative accounting practices, and obtained a $1.025 billion recovery. For five years, he and the litigation team prosecuted nine different claims for violations of the Securities Exchange Act of 1934 and the Securities Act of 1933, involving seven different stock or debt offerings and two mergers. The recovery represents the highest percentage of damages of any major PSLRA case prior to trial and includes the largest personal contributions by individual defendants in history. Most recently, Stewart served as lead counsel in *Smilovits v. First Solar, Inc.,* and obtained a $350 million settlement on the eve of trial. The settlement is fifth-largest PSLRA settlement ever recovered in the Ninth Circuit.

He was also part of the litigation team that obtained a $67 million settlement in *City of Westland Police & Fire Ret. Sys. v. Stumpf*, a shareholder derivative action alleging that Wells Fargo participated in the mass-processing of home foreclosure documents by engaging in widespread robo-signing. Stewart also served on the litigation team in *In re Deutsche Bank AG Sec. Litig.*, in which the Firm obtained a $18.5 million settlement in a case against Deutsche Bank and certain of its officers alleging violations of the Securities Act of 1933.

### Education

B.S., Santa Clara University, 2004; M.B.A., University of San Diego School of Business Administration, 2009; J.D., University of San Diego School of Law, 2009

### Honors / Awards

Rising Star, *Super Lawyers Magazine*, 2015-2020; J.D., *Magna Cum Laude*, Order of the Coif, University of San Diego School of Law, 2009; Member, *San Diego Law Review*

# Sabrina E. Tirabassi | Partner

Sabrina Tirabassi is a partner in the Firm's Boca Raton office, where her practice focuses on complex securities litigation, including the Firm's lead plaintiff motion practice. In this role, Tirabassi remains at the forefront of litigation trends and issues arising under the Private Securities Litigation Reform Act of 1995. Further, Tirabassi has been an integral member of the litigation teams responsible for securing significant monetary recoveries on behalf of shareholders, including: *Villella v. Chemical and Mining Company of Chile Inc.*, No. 1:15-cv-02106 (S.D.N.Y.); *In re ADT Inc. S'holder Litig.,* No. 502018CA003494XXXXMB-AG (Fla. Cir. Ct., 15th Jud. Cir.); *KBC Asset Mgmt. NV v. Aegerion Pharms., Inc.*, No. 1:14-cv-10105-MLW (D. Mass.); *Sohal v. Yan,* No. 1:15-cv-00393-DAP (N.D. Ohio); *McGee v. Constant Contact, Inc.,* No. 1:15-cv-13114-MLW (D. Mass.); and *Schwartz v. Urban Outfitters, Inc.*, No. 2:13-cv-05978-MAK (E.D. Pa.).

### Education

B.A., University of Florida, 2000; J.D., Nova Southeastern University Shepard Broad College of Law, 2006, *Magna Cum Laude*

### Honors / Awards

Best Lawyer in America: One to Watch, *Best Lawyers®*, 2024; Rising Star, *Super Lawyers Magazine*, 2010, 2015-2018; J.D., *Magna Cum Laude*, Nova Southeastern University Shepard Broad College of Law, 2006

# Douglas Wilens | Partner

Douglas Wilens is a partner in the Firm's Boca Raton office. Wilens is a member of the Firm's Appellate Practice Group, participating in numerous appeals in federal and state courts across the country. Most notably, Wilens handled successful and precedent-setting appeals in *Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85 (2d Cir. 2016) (addressing duty to disclose under SEC Regulation Item 303 in §10(b) case), *Mass. Ret. Sys. v. CVS Caremark Corp.*, 716 F.3d 229 (1st Cir. 2013) (addressing pleading of loss causation in §10(b) case), and *Lormand v. US Unwired, Inc.*, 565 F.3d 228 (5th Cir. 2009) (addressing pleading of falsity, scienter, and loss causation in §10(b) case).

Before joining the Firm, Wilens was an associate at a nationally recognized firm, where he litigated complex actions on behalf of numerous professional sports leagues, including the National Basketball Association, the National Hockey League, and Major League Soccer. He has also served as an adjunct professor at Florida Atlantic University and Nova Southeastern University, where he taught undergraduate and graduate-level business law classes.

## Education

B.S., University of Florida, 1992; J.D., University of Florida College of Law, 1995

## Honors / Awards

Book Award for Legal Drafting, University of Florida College of Law; J.D., with Honors, University of Florida College of Law, 1995

# Shawn A. Williams | Partner

Shawn Williams, a founding partner of the Firm, is the managing partner of the Firm's San Francisco office and a member of the Firm's Management Committee. Williams specializes in complex commercial litigation focusing on securities litigation, and has served as lead counsel in a range of actions resulting in more than a billion dollars in recoveries. For example, Williams was among lead counsel in *In re Facebook Biometric Info. Privacy Litig.,* charging Facebook with violations of the Illinois Biometric Information Privacy Act, resulting in a $650 million recovery for injured Facebook users, the largest ever biometric class action.

Williams led the team of Robbins Geller attorneys in the investigation and drafting of comprehensive securities fraud claims in *Hefler v. Wells Fargo & Co.*, alleging widespread opening of unauthorized and undisclosed customer accounts. The *Hefler* action resulted in the recovery of $480 million for Wells Fargo investors. In *City of Westland Police & Fire Ret. Sys. v. Metlife, Inc.,* Williams led the Firm's team of lawyers alleging MetLife's failure to disclose and account for the scope of its use and non-use of the Social Security Administration Death Master File and its impact on MetLife's financial statements. The *Metlife* action resulted in a recovery of $84 million. Williams also served as lead counsel in the following actions resulting in significant recoveries: *Chicago Laborers Pension Fund v. Alibaba Grp. Holding Ltd.* ($75 million recovery); *In re Krispy Kreme Doughnuts, Inc. Sec. Litig.* ($75 million recovery); *In re Medtronic, Inc. Sec. Litig.* ($43 million recovery); *In re Cadence Design Sys., Inc. Sec. Litig.* ($38 million recovery); and *City of Sterling Heights Gen. Emps'. Ret. Sys. v. Prudential Fin., Inc.* ($33 million recovery).

Williams is also a member of the Firm's Shareholder Derivative Practice Group which has secured tens of millions of dollars in cash recoveries and comprehensive corporate governance reforms in a number of high-profile cases including: *In re McAfee, Inc. Derivative Litig.*; *In re Marvell Tech. Grp. Ltd. Derivative Litig.*; *In re KLA-Tencor Corp. S'holder Derivative Litig.*; *The Home Depot, Inc. Derivative Litig.*; and *City of Westland Police & Fire Ret. Sys. v. Stumpf (Wells Fargo & Co.)*.

Williams led multiple shareholder actions in which the Firm obtained favorable appellate rulings, including: *W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*, 845 F.3d 384 (8th Cir. 2016); *Knollenberg v. Harmonic, Inc.*, 152 F. App'x 674 (9th Cir. 2005); *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226 (9th Cir. 2004); *Lynch v. Rawls*, 429 F. App'x 641 (9th Cir. 2011); and *Barrie v. Intervoice-Brite, Inc.*, 409 F.3d 653 (5th Cir. 2005).

Before joining the Firm in 2000, Williams served for 5 years as an Assistant District Attorney in the Manhattan District Attorney's Office, where he tried over 20 cases to New York City juries.

## Education

B.A., The State of University of New York at Albany, 1991; J.D., University of Illinois, 1995

## Honors / Awards

Leading Lawyer in America, *Lawdragon*, 2018-2024; Best Lawyer in America, *Best Lawyers®*, 2022-2024; Super Lawyer, *Super Lawyers Magazine*, 2014-2017, 2020-2021, 2023; Recommended Lawyer, *The Legal 500*, 2023; Leading Plaintiff Financial Lawyer, *Lawdragon*, 2019-2023; Top Plaintiff Lawyer, *Daily Journal*, 2022; Most Influential Black Lawyers, *Savoy*, 2022; Legend, *Lawdragon*, 2022; Top 100 Lawyer, *Daily Journal*, 2019, 2021; California Trailblazer, *The Recorder*, 2019; Titan of the Plaintiffs Bar, *Law360*, 2019; Plaintiffs' Lawyer Trailblazer, *The National Law Journal*, 2019; Board Member, California Bar Foundation, 2012-2014

# Christopher M. Wood | Partner

Christopher Wood is the partner in charge of Robbins Geller Rudman & Dowd LLP's Nashville office, where his practice focuses on complex securities litigation. He has been a member of the litigation teams responsible for recovering hundreds of millions of dollars for investors, including: *In re Massey Energy Co. Sec. Litig.* ($265 million recovery); *In re VeriFone Holdings, Inc. Sec. Litig.* ($95 million recovery); *Garden City Emps.' Ret. Sys. v. Psychiatric Solutions, Inc.* ($65 million recovery); *Grae v. Corrections Corporation of America* ($56 million recovery); *In re Micron Tech., Inc. Sec. Litig.* ($42 million recovery); *Jackson Cnty. Emps.' Ret. Sys. v. Ghosn* ($36 million recovery); and *Winslow v. BancorpSouth, Inc.* ($29.5 million recovery).

Working together with the ACLU of Tennessee and Public Funds Public Schools (a national campaign founded by the Southern Poverty Law Center and Education Law Center), Wood is litigating an action challenging Tennessee's school voucher program, which diverts critically needed funds from public school students in Nashville and Memphis. Wood has also provided *pro bono* legal services through Tennessee Justice for Our Neighbors, Volunteer Lawyers & Professionals for the Arts, the Ninth Circuit's Pro Bono Program, and the San Francisco Bar Association's Volunteer Legal Services Program.

## Education

B.A., Vanderbilt University, 2003; J.D., University of San Francisco School of Law, 2006

## Honors / Awards

Best Lawyer in America: One to Watch, *Best Lawyers®*, 2023-2024; Future Star, *Benchmark Litigation*, 2023; 40 & Under Hot List, *Benchmark Litigation*, 2021; Rising Star, *Super Lawyers Magazine*, 2011-2013, 2015-2020

# Debra J. Wyman | Partner

Debra Wyman is a partner in the Firm's San Diego office. She specializes in securities litigation and has litigated numerous cases against public companies in state and federal courts that have resulted in over $2 billion in securities fraud recoveries. Wyman served as lead counsel in *In re Am. Realty Cap. Props., Inc. Litig.*, a case arising out of ARCP's manipulative accounting practices, and obtained a $1.025 billion recovery. For five years, she and the litigation team prosecuted nine different claims for violations of the Securities Exchange Act of 1934 and the Securities Act of 1933, involving seven different stock or debt offerings and two mergers. The recovery represents the highest percentage of damages of any major PSLRA case prior to trial and includes the largest personal contributions by individual defendants in history. Most recently, Wyman was part of the litigation team in *Monroe County Employees' Retirement System v. The Southern Company* in which an $87.5 settlement was reached after three years of litigation. The settlement resolved claims for violations of the Securities Exchange Act of 1934 stemming from defendants' issuance of materially misleading statements and omissions regarding the status of construction of a first-of-its-kind "clean coal" power plant that was designed to transform coal into synthetic gas that could then be used to fuel the power plant.

Wyman was also a member of the trial team in *Schuh v. HCA Holdings, Inc.*, which resulted in a $215 million recovery for shareholders, the largest securities class action recovery ever in Tennessee. The recovery achieved represents more than 30% of the aggregate classwide damages, far exceeding the typical recovery in a securities class action. Wyman prosecuted the complex securities and accounting fraud case *In re HealthSouth Corp. Sec. Litig.*, one of the largest and longest-running corporate frauds in history, in which $671 million was recovered for defrauded HealthSouth investors. She was also part of the trial team that litigated *In re AT&T Corp. Sec. Litig.*, which was tried in the United States District Court, District of New Jersey, and settled after only two weeks of trial for $100 million. Wyman was also part of the litigation team that secured a $64 million recovery for Dana Corp. shareholders in *Plumbers & Pipefitters National Pension Fund v. Burns*, in which the Firm's Appellate Practice Group successfully appealed to the Sixth Circuit Court of Appeals twice, reversing the district court's dismissal of the action.

## Education

B.A., University of California Irvine, 1990; J.D., University of San Diego School of Law, 1997

## Honors / Awards

Leading Lawyer in America, *Lawdragon*, 2020-2024; Leading Plaintiff Financial Lawyer, *Lawdragon*, 2019-2023; Litigation Star, *Benchmark Litigation*, 2023; Top 250 Women in Litigation, *Benchmark Litigation*, 2021; San Diego Litigator of the Year, *Benchmark Litigation*, 2021; Plaintiff Litigator of the Year, *Benchmark Litigation*, 2021; Top Woman Lawyer, *Daily Journal*, 2017, 2020; MVP, *Law360*, 2020; Litigator of the Week, *The American Lawyer*, 2020; Litigator of the Year, *Our City San Diego,* 2017; Super Lawyer, *Super Lawyers Magazine*, 2016-2017

# Jonathan Zweig | Partner

Jonathan Zweig is a partner with the Firm and is based in the Manhattan office.  Zweig's practice focuses primarily on complex securities litigation, corporate control cases, and breach of fiduciary duty actions on behalf of investors.  He is also part of the Firm's Delaware Practice Group.

Before joining Robbins Geller, Zweig served for over six years as an Assistant Attorney General with the New York State Office of the Attorney General's Investor Protection Bureau, where he prosecuted civil securities fraud actions and tried two major cases on behalf of the State.  On three occasions, Zweig was awarded the Louis J. Lefkowitz Award for Exceptional Service.

Zweig was previously a litigator at Davis Polk & Wardwell LLP.  Zweig also clerked for Judge Jacques L. Wiener, Jr. of the U.S. Court of Appeals for the Fifth Circuit, and Judge Sarah S. Vance of the U.S. District Court for the Eastern District of Louisiana.

## Education

B.A., Yale University, 2007; J.D., Harvard Law School, 2010

## Honors / Awards

500 X – The Next Generation, *Lawdragon*, 2023; Louis J. Lefkowitz Award for Exceptional Service, New York State Office of the Attorney General, 2015, 2020, 2021; J.D., *Magna Cum Laude*, Harvard Law School, 2010; B.A., *Summa Cum Laude*, Yale University, 2007