# Exhibit A

**REPLY OF DR. LEOPOLD SPECHT IN RESPONSE**

**TO THE EXPERT DECLARATION OF PROF. CHRIS THOMALE**

**DATED 4th JUNE 2024**

# TABLE OF CONTENTS

I.      RETAINMENT AND SCOPE OF THIS REPLY ............................................................. 3

II.     THE LEGAL AUTHORITY OF AUSTRIAN MANAGEMENT COMPANIES IN GENERAL AND OF ERSTE ASSET MANAGEMENT GMBH IN PARTICULAR TO BRING SUIT ON BEHALF OF THE FUNDS THEY MANAGE / IT MANAGES ............... 3

    A.      The Basic Concept of the Austrian Investment Fund ................................................. 3

    B.      The Disputed Issue ................................................................................................... 4

    C.      Section 52 of the Austrian Investment Fund Act (*InvFG 2011*) ................................. 4

    D.      Legal Literature expressly confirming that the Management Company has Legal Standing on behalf of Austrian Investment Funds................................................................. 6

    E.      The Austrian Investment Fund Act does not distinguish between Contractual Claims and Tort Claims................................................................................................................. 7

    F.      Legal Literature expressly confirming that Damage Claims are Fund Assets of which the Management Company disposes ...................................................................... 10

    G.      There are no "Illogical Distributive Effects" between Former and Current Unit Holders.................................................................................................................... 13

    H.      The Legal Assessment of the Austrian Financial Market Authority carries Considerable Weight.................................................................................................... 15

III.    CONCLUSION ................................................................................................................. 16

I, DR. LEOPOLD SPECHT, hereby declare as follows:

## I. RETAINMENT AND SCOPE OF THIS REPLY

In my Declaration in support of lead plaintiff's motion for consideration of related actions, appointment as lead plaintiff, and approval of lead plaintiff´s selection of lead counsel dated 21st May 2024 ("*my Declaration*"), I expressed my opinion as to whether, under applicable Austrian Law, Erste Asset Management GmbH ("*Erste AM*") has the legal authority to bring suit on behalf of the following funds

- Erste Responsible Stock America,
- Erste Responsible Stock Global,
- Erste WWF Stock Environment,
- Erste Green Invest and
- Erste Green Invest Mix

(hereinafter referred to as "Funds"). In my *Declaration*, I expressed my opinion, based on Austrian law, that Erste AM had and has sole authority to represent the Funds, and therefore to make investment decisions and to bring legal actions on behalf of these Funds, including in the United States to recover damages suffered by the Funds as a result of alleged fraudulent action by Shoals Technologies Group, Inc. ("*Shoals*") and several others.

I´ve been provided with a declaration of Prof. Chris Thomale (hereinafter referred to as "*Thomale*") dated 4th June 2024 which was submitted by proposed lead plaintiff Oklahoma Police Pension and Retirement System (hereinafter referred to as "*Thomale Declaration*").

I´ve been asked by the law firm of Motley Rice LLC, the legal representatives of Erste AM, to reply to the *Thomale Declaration* (this "*Reply*").

With respect to my personal qualifications and the materials examined in the preparation of this reply, I refer to the qualifications and materials enumerated in my *Declaration* of 21st May 2024.

## II. THE LEGAL AUTHORITY OF AUSTRIAN MANAGEMENT COMPANIES IN GENERAL AND OF ERSTE ASSET MANAGEMENT GMBH IN PARTICULAR TO BRING SUIT ON BEHALF OF THE FUNDS THEY MANAGE / IT MANAGES

### A. The Basic Concept of the Austrian Investment Fund

As explained in my *Declaration* dated 21st May 2024, the basic structure of an Austrian retail fund under the Austrian Investment Fund Act (InvFG 2011) is as follows:

The fund is a portfolio of assets which is divided into equal units evidenced by securities, which are referred to as "unit certificates". The fund is not a legal entity. The portfolio of assets is

jointly owned by the unit holders, i.e. the persons who own the "unit certificates". The Fund is managed by a management company which is solely entitled to dispose of the fund's assets and to exercise the rights resulting from these assets.

## B.    The Disputed Issue

*Thomale´s Declaration* disputes that the management company has the full and comprehensive authority to dispose of the fund's assets, and to sue on the fund's behalf. *Thomale* further argues that tort claims are different from dividend claims or other contractual claims and therefore do not belong to the fund's assets, but are to be considered as an asset belonging to the individual unit holder. *Thomale* argues that section 52 *InvFG* is designed to assure the efficient management of fund assets by professional managers. Since the pursuit of liability claims in tort does not fall within the core area of portfolio management or the core competence of fund management companies, he argues for a restrictive interpretation of section 52 InvFG.

I have conducted an additional research in view of *Thomale's Declaration* and found additional authority supporting my view that the law sets forth for a comprehensive power of the management company to assert all rights pertaining to the fund's assets. In particular, I have found one additional citation in Austrian legal literature expressly stating, that the management company has legal standing to sue on behalf of the fund's assets, and five citations expressly mentioning that damage claims are assets of a fund of which the management company disposes. All seven citations therefore diametrically contradict *Thomale´s* assertions that tort claims should be pursued by the unit holders individually, and not by the management company, and that the management company lacks legal standing on behalf of the fund´s assets. I therefore stand by my declaration in its entirety.

## C.    Section 52 of the Austrian Investment Fund Act (*InvFG 2011*)

§ 52 InvFG 2011 reads as follows:

### Power of disposal of the assets of a UCITS [1]

*"Only the management company shall be authorized to dispose of assets belonging to a UCITS managed by it and to exercise the rights to such assets; in doing so, the management company acts in its own name for the account of the unit holders. The management company shall safeguard the unit holders' interests, use the care and diligence of a prudent director within the meaning of Section 84 (1) of the Stock*

---

[1] The German wording of the headline to § 52 InvFG 2011 reads: "Verfügungsrecht über das Vermögen der OGAW". "Verfügungsrecht über", if translated literally, would be in English: "right to dispose over". This is not only an awkward translation, it does also not communicate the substance of the provision, which is the right to exercise all rights in connection with the assets of a Fund. Therefore, I prefer the translation: "right to dispose of the assets". This translation is supported by the wording of the provision itself, which stipulates the powers – and, indeed, obligation – of the Fund Manager to "exercise the rights to such assets…".

> *Company Act and observe the provisions of this Federal Law and the regulations adopted pursuant to this Federal Law as well as the Fund rules."* [emphasis added][2]

The wording of this provision could not be clearer in conferring the <u>exclusive right</u> to dispose of the assets pertaining to the fund and to exercise <u>the rights relating to these assets upon the management company</u>. This *verbatim* interpretation follows from the wording "*only the management company shall be authorized*". Further, the Austrian Investment Fund Act 2011 is a quite comprehensive body of rules (200 sections) and regulates only the ordinary and alternative investment funds, whereas real estate investment funds are regulated in a separate statute. It contains very specific provisions and draws a clear distinction between the tasks and obligations of, for example, the management company and the custodian bank (depositary bank), see sections 39 through 45 InvFG 2011, and contains very specific regulations concerning the relationship between a feeder-fund and a master-fund, see sections 93 through 113 InvFG 2011. Given how detailed these provisions are, *Thomale´s* argument that the legislator wished to limit the management company's authority, runs against the clear wording of the law ("*only the management company is authorized...*") *Thomale's* position – that the unit holders would have standing, is highly implausible, at best. Had the legislator wished to restrict the management companies' authority to dispose of the fund's assets and to exercise the rights to such assets, it would have enacted appropriate provisions and would have stated limitations to the management companies' powers. And, the legislator would have clarified who should, instead of the management company, be authorized to exercise such powers. There are of course no such provisions, and *Thomale* is unable to cite any.

Also, the explanatory notes submitted to parliament when the statute was first enacted in 1963, expressly refer to the sole power to management companies to manage funds. As mentioned in my Declaration, the Austrian Federal Government pointed out, that "*the savers*", as the unit holders were also referred to, "*lack time and usually also the necessary qualifications for such a management*". And further: "*The unit-holders have neither individually nor jointly the right of disposal; […] The investment company [now called: management company] <u>exercises all the rights arising from fund assets</u>*". The explanatory notes expressly support my interpretation that the management company has the exclusive right to dispose of the fund's assets and to exercise all rights arising from the fund assets. (Explanatory Notes to InvFG 1963). The authority to exercise all rights includes both out of court measures and the assertion of rights in court, i.e. by bringing (or defending against) a legal action. Therefore, the right so sue and to be sued on behalf of the fund is clearly covered by the explanatory notes of the federal government of 1963. *Thomale*'s interpretation, that the management company does not have the right to bring legal actions on behalf of the funds' assets, is not only unsupported by the statute's plain wording. It contradicts the explanatory notes.

---

[2] In German: Verfügungsrecht über das Vermögen des OGAW: "Nur die Verwaltungsgesellschaft ist berechtigt, über die Vermögenswerte eines von ihr verwalteten OGAW zu verfügen und die Rechte an den Vermögenswerten auszuüben; sie handelt dabei im eigenen Namen auf Rechnung der Anteilinhaber. Sie hat die Interessen der Anteilinhaber zu wahren, die Sorgfalt eines ordentlichen Geschäftsleiters im Sinne von § 84 Abs. 1 AktG anzuwenden und die Bestimmungen dieses Bundesgesetzes und der auf der Grundlage dieses Bundesgesetzes erlassenen Verordnungen sowie die Fondsbestimmungen einzuhalten."

The explanatory notes are submitted by the Austrian Federal Government to the Parliament together with the statute which the government wishes to have voted upon by Parliament. Since the government was supported at all relevant times, when the original statute and its revisions were voted on by Parliament, by a parliamentary majority, the explanatory notes reflect the will of the legislator and are a foremost source of interpretation.

In addition, also the explanatory notes to the 1993 amendment of the statute fully support my interpretation of that statute, as they state:

*"Only the investment company is entitled to dispose of the assets held by investment funds. It alone can assert the rights arising from the fund assets. The joint ownership of the unit-holders does not give them any possibility whatsoever to influence the management of the assets."*

*Thomale's* interpretation is at odds, and diametrically contradicts the authoritative (authentic) interpretation by the Austrian Federal Government. If only the management company has the power to assert the rights arising from the fund assets, this certainly includes the authority to assert these rights in court.

## D. Legal Literature expressly confirming that the Management Company has Legal Standing on behalf of Austrian Investment Funds

In my Declaration of 21st May 2024, I have cited a paper by *Kammel/Thierrichter* which was published in 2011 in *Österreichisches Bankarchiv*. *Thomale* obviously refers to this paper and characterizes it as "*only sparse, partly outdated and only general scholarship, which does not even address the concrete issue at hand. I am not aware of any case law or authoritative academic writing supporting this contention.*"

This characterization is utterly unwarranted. *Österreichisches Bankarchiv* is the most renowned legal journal in the field of banking and capital markets law. All papers published in this journal are subject to a double-blind peer review. Prof. Armin Kammel is teaching banking and financial markets law at the Lauder Business School in Vienna. He also holds an honorary professorship at the *Donau Universität* Krems (Danube University Krems). Dr. Kammel was head of legal of the Association of Austrian Investment Companies[3], and one of the authors of the leading commentary on the Austrian Investment Fund Act, namely *Macher/Buchberger/Khalss/Oppitz*, *Kommentar zum Investmentfondgesetz*, (Commentary to the Austrian Investment Fund Act), first edition. Prof. Kammel has published in particular on banking and capital markets law and on investment funds, and is a certified court expert in the field of credit, banking and exchanges. The paper published by him and MMag. Maria Thierrichter is absolutely relevant to the point in question, namely the legal standing of a management company on behalf of the funds it manages.

*Kammel/Thierrichter* state the following:

*"According to the prevailing opinion, it is characteristic that the special assets [i.e. the fund] have no legal personality, from which follows, that they have no right of legal action, neither actively nor passively [i.e. neither to sue nor to be sued]. Since the entitlement or obligation of*

---

[3] in German: Vereinigung Österreichischer Investmentgesellschaften or VÖIG.

*the special assets as the subject of a legal dispute does not exist, the <u>management company acts</u> <u>as an indirect representative, i.e. in its own name and for the account of the unit holders. Thus,</u> <u>both the active and passive right of legal action for the investment Fund is vested in the</u> <u>management company</u> as the statutory representative".*[4]*[emphasis added]*

*Thomale's* assertion that I failed to cite pertinent academic literature in support of my view, is therefore clearly wrong.

The second citation expressly supporting the legal standing of the management company on behalf of the funds' assets is from Prof. Dr. Walther Kastner and other authors. Prof. Kastner was, in his time, the leading scholar on Austrian corporate law and was instrumental in drafting the Austrian Investment Fund Act of 1963. The paper by Kastner and other authors, describes the tasks of the management company and mention among other items:

"*<u>The investment company [since the 2011 revision called: management company]</u> therefore participates in general meetings on the basis of the fund´s own shares, it exercises the right to ask questions and to vote there, <u>it is authorised to bring an action for annulment or rescission,</u> it can pursue <u>claims for damages</u> in accordance with company law regulations, it must maintain ongoing business transactions with the custodian bank […]*".[5]

The legal actions mentioned are the actions provided for under Austrian law to challenge decisions by the general assembly (shareholders´ meeting). The authors mention this action by way of example in the context of the exercise of rights relating to a shareholders´ meeting. In any case, it follows that such suits are to be brought by the management company, and not by the individual unit holders.

This citation carries considerable weight due to Prof. Kastner's role in enacting the first Austrian Investment Fund Act. I am not aware of any legal literature questioning the management companies legal standing on behalf of the funds they manage.

**E.   The Austrian Investment Fund Act does not distinguish between Contractual Claims and Tort Claims**

---

[4] Kammel/Thierrichter, The concept of special assets against the background of investment Fund law, ÖBA 2011, 237, Page 6. In German: Kammel/Thierrichter, Der Begriff des Sondervermögens vor einem investmentfondsrechtlichen Hintergrund, ÖBA 2011, 237, Seite 6.

"Charakteristisch ist nach hM, dass dem Sondervermögen keine Rechtspersönlichkeit zukommt, was zur Folge hat, dass es weder aktiv noch passiv klagelegitimiert ist. Da somit die Berechtigung oder Verpflichtung des Sondervermögens als Gegenstand eines Rechtsstreits nicht gegeben ist, tritt die KAG als indirekter Stellvertreter, also im eigenen Namen und auf Rechnung der Anteilinhaber auf). Somit kommt die aktive wie auch passive Klagelegitimation für das Sondervermögen der KAG als gesetzlicher Vertreterin zu".

[5]Kastner/Sixt/Mayer/Feyl, JBl 1963, S.552, Die Kapitalanlagegesellschaft nimmt daher an Hauptversammlungen auf Grund fondseigener Aktien teil, sie übt dort das Frage- und Stimmrecht aus, sie ist zur Erhebung einer Nichtigkeits- oder Anfechtungsklage berechtigt, sie kann Schadenersatzansprüche nach gesellschaftsrechtlichen Vorschriften verfolgen, sie hat den laufenden Geschäftsverkehr mit der Depotbank zu pflegen,

*Thomale* argues that claims brought against *Shoals* are, from an Austrian perspective, claims under tort law, which is not contested. He further explains that Austrian law differentiates between tort claims and claims arising from contractual liability. This is a matter of course under Austrian law, at least since the third major revision of the Civil Code in 1916 [6]. He goes on to extensively quote legal sources confirming this distinction, as if *Thomale´s Declaration* would hinge on *that* point

*Thomale* argues, in section IX. of his declaration, that the distinction between tort claims on the one hand, and contractual claims on the other hand – which is not controversial as a matter of Austrian law – would have a bearing on whether these claims are to be regarded as belonging to the fund, or belonging exclusively to the unit holders, and whether the management company or the individual unit holders would have legal standing to pursue such claims in court. While this distinction is not controversial under Austrian law, I disagree with the conclusions drawn by *Thomale* from this basic distinction, and I completely disagree with *Thomale's* conclusion that tort claims do not belong to the fund's assets and that the management company does not have standing to enforce them in court.

*Thomale* argues, in para 68 of his declaration, that "*unit holders have a particularly strong right, in rem, to tort claims that accrue to them as a compensation for the loss they have suffered. Those claims are not to be assigned to a third party like the management company without the explicit consent of the individual unit holders.*" He differentiates between e.g. claims for dividends and tort claims resulting from the holding of a particular security. However, in both cases the claim exists only because (i) a particular person owns unit certificates of a particular fund and (ii) a specific security has been bought, either before or after, on behalf of the fund (and therefore, as the fund is not a legal entity, on behalf of the unit holders). Neither a claim for dividend nor a tort claim would exist, if the investor in question would not have acquired the unit certificate(s) of that specific fund, or the management company would not have bought the specific security on behalf of the fund. In both cases, the security must have been held at a specific date (the record date for the dividends) or during a particular period of time (during which the tort occurred). In both cases the claim depends on the holding of a particular security at a particular time, and in both cases the claim can be later on separated from the ownership of the security in question and assigned to a third party, as a matter of law. I fail to see what a "*particularly strong right*" to tort claims might be, and the pertinent legal literature does not enlighten us on this point elaborate on such a category. *Thomale* fails to cite any sources in support of his assertion. Further, the notion that tort claims are not to be assigned to a third party without consent of the injured party (as *Thomale* seems to argue in para 68 of his declaration) is in clear contradiction to one of the most applied provisions of Austrian insurance law, namely section 67 of the Austrian Insurance Contract Act[7]. This provision provides for an assignment of the injured party´s claim against the tortfeasor to the insurance company, to the extent that the insurance company compensates the injured party (insured person) for losses he incurred. An explicit consent of the injured parties is not needed[8]. Further, as tort claims connected to the holding of specific securities belong to the fund's assets, an

---

[6] RGBl 1916/69 (Austro-Hungarian Imperial Law Gazette 1916 no. 69)

[7] In German: § 67 Versicherungsvertragsgesetz 1958, BGBl 1959/2, as amended.

[8] § 67 Versicherungsvertragsgesetz:

assignment from the unit holder to the management company is neither necessary nor possible. As explained, the unit holders do not dispose of the fund's assets and therefore cannot assign them. The management company disposes of the fund's assets in its own name but in behalf of the fund's unit holders, and therefore needs no assignment to assert tort claims against the tortfeasor.

Neither section 52 nor section 57 *InvFG 2011* distinguish between dividend claims and tort claims.

Section 52 InvFG 2011 authorizes the management company to dispose of assets belonging to a UCITS (i.e. a fund) managed by it and to exercise all rights relating to such assets. The law clearly does not differentiate between contractual rights and tort claims. Rather, all assets belonging to the fund (and therefore to the unit holders), whether acquired by the management company on behalf of the fund or deriving from the holding of a security (such as dividend claims or tort claims connected to a security) are deemed to belong to the fund's assets and are disposed of by the management company. As the law does not mention a limitation[9] or exclusion of certain rights, the exception for tort claims argued by *Thomale,* is entirely arbitrary and unsupported by the law, and by legal literature.

Section 57 InvFG 2011, sets forth the method of calculating the value of the unit (represented by the units' certificates). Its states that the total value of the UCITS [i.e. the fund] shall be determined "*by the management company in accordance with the fund rules on the basis of the respective market prices of the securities, money market instruments and subscription rights belonging to the UCITS, plus the value of the financial assets belonging to the UCITS according to section 67 (1), cash, balances held, <u>claims as well as other rights</u>, less liabilities. If no market price or no current market price is available for a security, the market value that is appropriate on the basis of careful assessment, taking into account the overall circumstances, shall be used.*" This provision expressly mentions "*claims as well as other rights*", without any differentiation, as belonging to the fund's assets. Again, *Thomale's* argument, that tort claims should be excluded from the fund's assets, looks flawed.

*Thomale* argues that sections 52 and 57 52 InvFG 2011 do not "*identify which conditions have to be fulfilled in order for a given asset to belong to the fund*". However, it is abundantly clear from the Austrian investment Fund Act that whenever an investor buys a unit certificate, the purchase price flows towards and belongs to the fund, and all assets bought from these monies also belong to the fund, and whenever the fund's assets are sold, the proceeds belong to the fund. It goes without saying that also claims resulting from the ownership of these securities, such as dividend claims, proceeds from the sale of subscription rights, or tort claims, also belong to the fund's assets. The example of dividend claims is repeatedly cited in Austrian legal literature, but there is absolutely no reason why proceeds from subscription rights or tort claims should be treated differently.

Austrian legal literature does only support the view that the authority of the management company is a full and comprehensive one.

---

[9] Except, of course, limitations *ratione materiae* relating to potentially risky transactions.

The commentaries to section 52 *InvFG 2011* mention limitations to the management companies' authority to dispose of the fund's assets. These limitations are, however, limitations *ratione materiae*, i.e. limitations concerning certain types of transactions that are potentially risky, but not limitations *ratione personae.* As I had explained in my declaration dated 21st May 2024, see paras 16 and 17, the management company is for example not entitled to take out a loan or to grant a loan on account of the fund (i.e. using the fund's assets), or to pledge or otherwise encumber, or assign the fund's assets. These limitations are contained in sections 74 through 84 *InvFG 2011*.

*Thomale's* assertion that the management companies' authority to dispose of the fund's assets would be limited with respect to tort claims, is not only not supported but in contradiction to pertinent academic writing (see section F, below).

Under Austrian law, the term *Schadenersatzanspruch*, which can be translated as claim for damages, claim for indemnification, claim for compensation or damage claim[10] includes both tort claims (*deliktische Schadenersatzansprüche)* and damage claims, arising from a contractual relationship (*vertragliche Schadenersatzansprüche).* As one of the leading commentaries to the Austrian Civil Code, which also contains the law of damages (including tort law), correctly explains:

Wittwer in Schwimann/Neumayr (eds.), Short Commentary to the Austrian Civil Code (2023) § 1295 ABGB Margin No 1

"As a general clause under tort law, Section 1295 Austrian Civil Code encompasses both non-contractual (i.e. tort claims) and contractual claims for damages".[11] Therefore damage claims under Austrian law always include, as a subcategory, tort claims.

**F.   Legal Literature expressly confirming that Damage Claims are Fund Assets of which the Management Company disposes**

All five citations in pertinent legal literature that mention damage claims concur in that such claims are assets belonging to the fund of which the management company is entitled to dispose of. As *Thomale´s Declaration* contradicts precisely this point, I shall quote all five passages:

Apathy/Iro/Koziol, Austrian Law on Banking Contracts, Volume VI (2007), Margin No 3/89:

 *"The scope of the management company's power of disposal is governed by Sections 3 seq. [now 52] Austrian Investment Fund Act; the unit holders have no influence on this.  Section 3 Austrian Investment Fund Act generally refers to disposals of the assets belonging to the investment fund and the rights arising from these assets. With this, it is made clear that the authorisation **extends to all assets belonging to the fund and the ancillary rights** associated with these, such as the right to subscribe to further securities, payment of interest and dividends, but also to any membership and termination rights **as well as claims for damages** and*

---

[10] according to Dietl/Lorenz, Dictionary of Legal, Commercial and Political Terms, fifth edition.

[11] Wittwer in Schwimann/Neumayr (Hrsg), ABGB Taschenkommentar6 (2023) § 1295 ABGB Rz 1.

„Als schadenersatzrechtliche Generalklausel erfasst § 1295 sowohl deliktische als auch vertragliche Schadenersatzansprüche"

*enrichment. This broad scope inevitably results from the transfer of the management **of the entire fund assets.***"[12]

The second citation is from a leading commentary which states the following:

Macher/Buchberger/Kalss/Oppitz, Investmentfondsgesetz (2008), § 3 Rz 26

"*Rights arising from assets:*
*In addition - as Oppitz correctly indicates - all ancillary rights associated with the assets, such as the subscription rights [for obtaining further securities], the payment of interests and dividends, as well as any membership and termination rights **as well as damage claims** and claims on account of unjust enrichment are included.*[13]"

The third citation is from a doctoral thesis published in 1995:

Sieberer, Das europäische Investmentrecht (1995), page. 206

"*In addition to securities, the investment fund also consists of subscription rights, money, credit balances, claims and other rights (§ 7 InvFG).*

*In this context, 'claims and other rights' are legal positions that are related to the managed securities and credit balances but do not themselves constitute an independent investment object alongside the securities. **Examples include claims for damages,** enrichment and insurance claims.*"[14]

---

[12]In German: Apathy/Iro/Koziol, Österreichisches Bankvertragsrecht, Band VI (2007), Rz 3/89 "Der Umfang der Verfügungsmacht der Investmentfondsgesellschaft richtet sich nach den §§ 3f InvFG; die Anteilsinhaber können darauf keinen Einfluss nehmen. § 3 InvFG spricht allgemein von Verfügungen über die Vermögenswerte, die zum Kapitalanlagefonds gehören, und die Rechte aus diesen Vermögenswerten. Damit ist klargestellt, dass sich die Befugnis auf alle zum Fonds gehörenden vermögensrechtlichen Positionen und die mit diesen zusammenhängenden Nebenrechten, wie zB auf Bezug weiterer Wertpapiere, Auszahlung von Zinsen und Dividenden, aber auch auf etwaige Mitgliedschafts- und Kündigungsrecht sowie auf Schadenersatz- und Bereicherungsansprüche erstreckt. Dieser weite Umfang ergibt sich zwangsläufig aus der Übertragung der Verwaltung des gesamten Fondsvermögens."

[13] Macher/Buchberger/Kalss/Oppitz, Investmentfondsgesetz (2008), § 3 Rz 26
Rechte aus Vermögenswerten:

"Zudem sind – wie Oppitz richtig andeutet – alle mit den Vermögenswerten zusammenhängende Nebenrechte, wie etwa der Bezug weiterer Wertpapiere, die Auszahlung von Zinsen und Dividenden, als auch etwaige Mitgliedschafts- und Kündigungsrechte sowie Schadenersatz- und Bereicherungsansprüche umfasst."

[14] Sieberer, Das europäische Investmentrecht (1995), S. 206Das Sondervermögen besteht außer aus Wertpapieren auch aus Bezugsrechten, Geldbeträgen, Guthaben, Forderungen und sonstigen Rechten (§ 7 InvFG). Unter „Forderungen und sonstigen Rechten" sind in diesem Zusammenhang Rechtspositionen zu verstehen, die mit den verwalteten Papieren und Guthaben im Zusammenhang stehen, selbst aber kein selbstständiges Anlageobjekt neben den Wertpapieren bilden. Als Beispiele sind Schadenersatz-, Bereicherungs- und Versicherungsansprüche zu nennen.

The forth citation is from a monography by Dr. Heindl published in 1991, at the time of a major revision to the Austrian Investment Fund Act:

Heindl, Investmentfondsgesetz (1991), page 43 seq.

"*By using the term '**other rights'**, the legislator indicates that the principle of surrogation, which generally applies to trust assets, also applies to investment funds. Accordingly, compensation for a right belonging to the investment fund, **such as claims for damages**, enrichment and insurance claims, **is also part of the investment fund**. However, anything acquired on the basis of a right belonging to the investment fund is also part of the fund assets. For example, fruits such as dividends and interest from credit balances or fixed-interest securities. Also included are those 'rights arising from a legal transaction concluded for the account of the investment fund, such as the delivery of contractual items or payment.*

*However, the main significance of the principle of surrogation lies in the fact that the assets acquired by the investment company for the account of the investment fund become the property of the investors directly by law - without any further legal act between the investment company and the investors.*"[15]

The fifth and last citation is again from the paper published by Prof. Walther Kastner and others. It refers to damage claims as pertaining to the funds assets:

Kastner/Sixt/Mayer/Feyl, JBl 1963, page 552

*"The fund assets must not only consist of securities; as is evident from §§ 6 (1), 7 (1) and 21 (2), lit c and d, they may also include sums of money, credit balances, claims and other rights[16].*

*The investment company [now called: management company] alone is authorised to dispose of the assets of the fund and to exercise rights arising from these assets. Neither an individual co-owner nor the co-owners as a whole have such powers; nor can they be exercised by a trustee appointed for the co-owners. The investment company therefore participates in general meetings on the basis of the fund's own shares, it exercises the right to ask questions and vote there, it is authorised to bring an action for annulment or rescission, **it can pursue claims for***

---

[15] Heindl, Investmentfondsgesetz (1991), S. 43f, "Mit dem Begriff „sonstige Rechte" weist der Gesetzgeber darauf hin, dass das für Treugüter grundsätzlich geltende Surrogationsprinzip auch bei Kapitalanlagefonds zur Anwendung kommt. Demnach ist auch der Ersatz für ein zum Sondervermögen gehörendes Recht wie Schadenersatz-, Bereicherungs- und Versicherungsansprüche Bestandteil des Sondervermögens. Aber auch das, was aufgrund eines zum Sondervermögen gehörenden Rechtes erworben wurde, gehört zum Fondsvermögen. So zB Früchte wie Dividenden und Zinsen aus Guthaben oder festverzinslichen Wertpapieren. Ebenso sind diejenigen „Rechte erfasst, die sich aus einem für Rechnung des Sondervermögen abgeschlossenen Rechtsgeschäfts ergeben, wie zB Lieferung der Vertragsgegenstände oder Bezahlung.

Die wesentliche Bedeutung des Surrogationsprinzips liegt jedoch darin, dass die von der Kapitalanlagegesellschaft für Rechnung des Sondervermögens erworbenen Vermögenswerte unmittelbar kraft Gesetzes – ohne eines weiteren Rechtsaktes zwischen der Kapitalanlagegesellschaft und den Anlegern – in das Eigentum der Investmentsparer übergehen.

[16] e.g. subscription rights or claims for damages against bodies of a public limited company if shares in this company are part of the fund assets.

_**damages**_ *in accordance with company law regulations, it must maintain ongoing business transactions with the custodian bank, which manages the fund's accounts and redeems coupons; it exercises the subscription right or realises it, it subscribes, buys and sells the annual income statement and statement of assets and commissions the auditor elected by its annual general meeting to audit the annual report. It does all this as a trustee in its own name, but for the account of the co-owners."*[17]

*Thomale´s* assertions to the contrary are, without any doubt, utterly untenable.

**G.   There are no "Illogical Distributive Effects" between Former and Current Unit Holders**

*Thomale* argues that two main problems arise from the exclusive power of the management company to dispose of, litigate and enforce tort claims of investment funds. On the one hand, he argues that there would be an economically irrational result of "*depriving former unit holders of remediable losses while potentially granting a windfall profit to current unit holders*" (see *Thomale's Declaration,* para 96). On the other hand, he argues that the only economically efficient way of preventing some windfall for some unit holders to the detriment of others would be to leave tort claims within the disposition of unit holders themselves.

However, the asserted "*illogical distributive effect*" must be refuted for reasons that (i) the common interest of the unit holders is to be safeguarded by the management company, (ii) these risks are typically associated with this form of investment and (iii) the probability of investor lawsuits:

*Thomale* does not take into account that collective investment is the basic principle of Austrian investment funds. The intended collective effort entails that instead of the individual unit holder pursuing their individual interests, the collective interests of the entirety of the unity holders are to be pursued by the management company. The pursuit of the interests of investors is an essential obligation of the management company.

In addition to compliance with the necessary due diligence, Section 52 [former Section 3] Investment Fund Act provides for such protection of investors' interests. This is a special form

---

[17] Kastner/Sixt/Mayer/Feyl, JBl 1963, S.552, "Das Fondsvermögen braucht nicht bloß aus Wertpapieren zu bestehen; zu ihm können, wie aus den §§ 6 (1), 7(1) und 21 (2), lit c und d hervorgeht, auch Geldbeträge, Guthaben, Forderungen und sonstige Rechte17 gehören.

Die Investmentgesellschaft allein ist berechtigt, über die Vermögenswerte des Fonds zu verfügen und Rechte aus diesen Vermögenswerten auszuüben. Weder ein einzelner Miteigentümer noch deren Gesamtheit hat solche Befugnisse; sie können auch nicht etwa durch einen für die Miteigentümer bestellten Kurator ausgeübt werden. Die Kapitalanlagegesellschaft nimmt daher an Hauptversammlungen auf Grund fondseigener Aktien teil, sie übt dort das Frage- und Stimmrecht aus, sie ist zur Erhebung einer Nichtigkeits- oder Anfechtungsklage berechtigt, sie kann Schadenersatzansprüche nach gesellschaftsrechtlichen Vorschriften verfolgen, sie hat den laufenden Geschäftsverkehr mit der Depotbank zu pflegen, welche die Konten des Fonds führt, und Kupons zur Einlösung bringt; sie übt das Bezugsrecht aus oder verwertet es, sie zeichnet, kauft und verkauft die jährliche Ertragsrechnung und Vermögensaufstellung und beauftragt den von ihrer Haupt-(General-)versammlung alljährlich gewählten Abschlussprüfer mit der Prüfung des Rechenschaftsberichtes. Dies alles tut sie als Treuhänder im eigenen Namen, jedoch für Rechnung der Miteigentümer.*"*

of the general duty of the management company to safeguard the interests of third parties. This duty is reinforced by a fiduciary relationship: The management company, as trustee, has sole power to dispose of the assets entrusted to it and the unit holder continues to have an interest in maintaining and maximising the realisation of the assets. Whether the trustee has to identify exclusively with the interests of one person or with those of a majority of persons when fulfilling the duty to safeguard interests is irrelevant in cases where the interests to be safeguarded are the same. This also includes the form of investment in accordance with the Investment Fund Act.18

Furthermore, the argument that it is "*the only efficient way to prevent a simultaneous over- and under-compensation of unit holders is to leave claims in tort entirely with the co-owning unit holders*" (see *Thomale's Declaration*, para 100) is not conclusive from the point of view of economic soundness: Investing in an investment fund inherently involves the management company's discretion to buy or sell shares at any given time. This decision is tied to the risk of potential loss and the opportunity for gain. The daily price of a share in the fund is determined based on the fund's status at the time of calculation, reflecting its current value and performance.

Consequently, when a unit holder sells shares in a fund, the price is based on the value of fund's assets at the time of the sale. Those who hold onto their shares during periods of low value or loss and stay until the fund benefits, for example, from a successful legal claim, which increases the fund's assets, should be the ones to gain from this increase. Likewise, new unit holders who join the fund when its value is low should also be entitled to any future gains or face potential liabilities, reflecting the risk they took by investing during a downturn.

If one considers the risks of high fluctuations in value that are typically associated with investment funds consisting of shares in particular, it would appear to be economically fair to assign potentially high rewards to potentially high risks. In this sense, the problem of the timing of investment and disinvestment is inherent to the nature of the investment-construct itself. It is therefore a foreseeable, but nevertheless assessable and weighable risk for each individual unit holder. Consequently, those unit holders who newly invest might not reap unexpected gain, but rather benefit from a natural outcome of the fund's realisation of assets, while those unit holders who choose to disinvest, choose to forego an opportunity to make profit.

With regard to lawsuits, which are generally associated with high costs and time expenditure, it can be assumed that only a few individual shareholders would themselves initiate court proceedings connected to securities of an investment fund. From an economic perspective, it is realistic to assume that claims will only be brought if a management company has the legal standing to protect investors' interests.

Conversely, *Thomale* argues that the most rational and economically sound interpretation of Section 52 Investment Fund Act would be that tort claims would remain with unit holders and the filing of a lawsuit within their discretion. This would mean that the decision to file a tort claim lies with each individual unit holder and would consequently be the norm. If such would be indeed the norm, it leaves to question why *Thomale* considers each unit holder filing a separate lawsuit be "*an extreme case*" (see *Thomale's Declaration*, para 101).

---

18 see also Heindl, The Austrian Investment Fund Act, 1991, P 97f.

The consideration of the most economical way of protecting the interest of investors is exactly what the legislator intended by authorizing only the management company to pursue the collective interests of the unit holders within the meaning of Section 52 Investment Fund Act. The economically sound reasoning underlying interpretation of Section 52 is one of the motives for the legislator's choice of wording of said Section 52 provision: the management company is obliged to file amongst others tort claims/securities fraud claims. Therefore, considering that the management company is obliged by Section 52 to manage the fund assets and its related rights in the best interest of the investors, it is in the interest of the co-owners' tort claims result in proceeding of the fund as such.

To conclude, Professor *Thomale's* interpretation of Section 52 is narrow and economically unsound. Contrary to Thomale´s opinion, unit holders benefit collectively when the management company pursues tort claims. Additionally, there is no unfair or illogical distribution effect. It is fair that unit holders who stay in the fund until a securities fraud claim is successfully enforced should benefit from that success, while those who disinvest earlier do not participate in a later gain.

## H. The Legal Assessment of the Austrian Financial Market Authority carries Considerable Weight

Because I received *Thomale's Declaration* only last week, it gave me a few working days to rebut *Thomale's* view. A similar question arose in 2021/2022 in connection with a class action certification concerning Alexion Pharmaceuticals, Inc. At that time, Erste AM obtained through Professor Karollus a confirmation letter by the Austrian Financial Market Authority ("FMA") dated 10 November 2021, explicitly confirming that Erste AM has legal standing to sue on behalf of certain funds which had acquired Alexion shares. I know that the Austrian Financial Market Authority has issued similar letters in previous cases. I am confident that I would have obtained such a letter for the class action which is under consideration against Shoals, if I had a few more weeks, as the FMA is used to conduct its legal matters without undue haste.

However, the principle stands that Austrian management companies have legal standing to sue on behalf of the funds they manage, and this has been expressly confirmed for Erste AM by the FMA on an earlier occasion. FMA´s letter obtained at the occasion of the Alexion case, directly contradicts *Thomale's Declaration* that Austrian management companies lack standing on behalf of their funds, as litigation does not belong, as he argues, to the core activities of a management company. *Thomale* was already involved in the 2021/2022 proceedings concerning Alexion and could not explain why FMA took a view that diametrically contradicted his assertions. He mentioned that this letter does not have binding force as an administrative decision, but nonetheless the authority's view carries considerable weight.

I would like to point out that the establishment of a fund requires approval by the FMA and that all management companies must be licensed by the FMA, as their competent regulatory authority. FMA has to also approve the fund rules [1] which regulate the investment principles

and other aspects of operation of a fund. FMA is, in the Austrian context, the functional equivalent of the U.S. Securities and Exchange Commission, and has far reaching powers. These powers include the right to conduct inquiries, to impose administrative penalties, to revoke licenses, to prohibit certain transactions or even the continuation of a fund's business, in part or in its entirety. Therefore, FMA's confirmation letter is of great significance.

## III. CONCLUSION

In his conclusions, *Thomale* asserts (in para 104) that it would be "*highly unlikely that an Austrian court would find Section 52 InvFG 2011 to confer any right to asset management companies to sue with respect to divisible claims in tort of individual unit holders*." I question what the basis of this assertion is. *Thomale* is a German law professor teaching now for a number of years in Vienna. In his "additional information to CV" (appendix B to *Thomale's Declaration*) he lists his involvement in litigation. Of these mostly German court proceedings only one case is/was pending before an Austrian court. This was the case mentioned under h) before the Commercial Court of Vienna (*Handelsgericht Wien*). I have litigated numerous cases before Austrian Courts since 1991, on all levels of jurisdiction up to the Austrian Supreme Court. I have no doubt that an Austrian court would confirm Erste AM´s right to sue on behalf of the funds it manages, on the basis of (i) the plain reading of section 52 InvFG 2011, (ii) the explanatory notes of the Austrian Government, of (iii) legal literature expressly confirming the management companie´s right to sue and (iv) the letter by the Austrian Financial Market Authority dated 10 November 2021 confirming Erste AM´s right to sue in an analogous case.

Accordingly, based on the foregoing, it is my opinion that Erste AM has statutory authority and legal capacity to pursue this lawsuit on behalf of the Funds. The right to dispose of the assets of a UCITS includes the right to conduct legal proceedings in relation to all assets of the respective fund. Therefore, only Erste AM is entitled to initiate legal proceedings pertaining to the Funds' assets.

Erste AM is the appropriate party to bring the lawsuit on behalf of the Funds.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and accurately sets forth my opinions on the matters discussed.

Vienna, 11 June 2024

Dr. Leopold Specht, LL.M, SJ.D.
Specht &Partner Rechtsanwalt GmbH
Rooseveltplatz 4-5 / 8
A-1090 Vienna, Austria
T. + 43 1/219 68 69
leopold.specht@specht-partner.com