UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| In re SHOALS TECHNOLOGIES GROUP, INC. SECURITIES LITIGATION | ) ) ) ) ) | Civil Action No. 3:24-cv-00334 |
| | | Judge Waverly D. Crenshaw, Jr. Magistrate Judge Alistair Newbern |
| This Document Relates To: | ) ) ) ) ) ) ) | CLASS ACTION |
| | | DEMAND FOR JURY TRIAL |

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS

- 1 -

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ...................................................................................................1

II.     JURISDICTION AND VENUE .............................................................................3

III.    PARTIES ................................................................................................................4

        A.      Plaintiffs ....................................................................................................4

        B.      1934 Act Defendants..................................................................................5

        C.      1934 & 1933 Acts Defendants ...................................................................9

        D.      1933 Act Defendants..................................................................................9

IV.     SHOALS' SCHEME AND COURSE OF CONDUCT..........................................12

V.      DEFENDANTS' VIOLATIONS OF THE 1934 ACT .........................................23

        A.      Defendants' Materially Misleading Statements and Omissions ............23

                1.      1Q22 Materially Misleading Statements and Omissions............23

                2.      2Q22 Materially Misleading Statements and Omissions............26

                3.      3Q22 Materially Misleading Statements and Omissions............28

                4.      December 2022 SPO Materially Misleading Statements and
                        Omissions....................................................................................30

                5.      4Q22 and FY22 Materially Misleading Statements and Omissions..........32

                6.      March 2023 SPO Materially Misleading Statements and Omissions........34

                7.      1Q23 Materially Misleading Statements and Omissions............36

                8.      2Q23 Materially Misleading Statements and Omissions............38

                9.      3Q23 Materially Misleading Statements and Omissions............41

                10.     4Q23 Materially Misleading Statements and Omissions............43

        B.      Shoals' Class Period Financial Statements Violated GAAP ................44

VI.     LOSS CAUSATION/ECONOMIC LOSS – 1934 CLAIMS ONLY ................56

VII.    VIOLATIONS OF THE 1933 ACT .....................................................................62

4918-5081-5490.v1

A. Shoals' SPO Offering Materials ....................................................................63

B. Shoals' Materially Untrue and Misleading SEC Filings Were Incorporated by Reference into the SPO Offering Materials .....................................65

C. The Underwriter Defendants' Materially Misleading Statements and Omissions....................................................................................................66

D. The Underwriter Defendants Failed to Exercise Due Diligence ..........................68

VIII. APPLICABILITY OF PRESUMPTION OF RELIANCE – 1934 CLAIMS ONLY........68

IX. CLASS ACTION ALLEGATIONS ................................................................70

COUNT I .....................................................................................................72

For Violation of §10(b) of the 1934 Act and SEC Rule 10b-5 Against the 1934 Act Defendants.......................................................................................72

COUNT II ...................................................................................................74

For Violation of §20(a) of the 1934 Act Against the 1934 Act Defendants.....................74

COUNT III ..................................................................................................74

For Violations of §20A of the 1934 Act Against Defendants Shoals and Whitaker .........74

COUNT IV...................................................................................................77

For Violation of §11 of the 1933 Act Against Shoals, Bardos, and the 1933 Act Defendants (excluding Solon)................................................................77

COUNT V ....................................................................................................79

For Violation of §12(a)(2) of the 1933 Act Against Shoals, Bardos, and the 1933 Act Defendants (excluding Solon).........................................................79

COUNT VI...................................................................................................80

For Violation of §15 of the 1933 Act Against Shoals, Solon, Bardos, and the Director Defendants ................................................................................80

PRAYER FOR RELIEF ....................................................................................81

JURY DEMAND ............................................................................................82

| DEFINED TERM | MEANING |
|---|---|
| Erste AM | Lead Plaintiff Erste Asset Management GmbH |
| KUAERP | Plaintiff Kissimmee Utility Authority Employees' Retirement Plan |
| Plaintiffs | Lead Plaintiff Erste AM and plaintiff KUAERP |
| Shoals or the Company | Shoals Technologies Group, Inc. |
| Director Defendants | Jason R. Whitaker ("Whitaker"), Brad Forth, Peter Wilver, Ty Daul, Toni Volpe, Lori Sundberg, Jeannette Mills, and Robert Julian |
| Underwriter Defendants | J.P. Morgan Securities LLC<br>Guggenheim Securities, LLC<br>Morgan Stanley & Co. LLC<br>UBS Securities LLC<br>Goldman Sachs & Co. LLC<br>Barclays Capital Inc.<br>Credit Suisse Securities (USA) LLC<br>Cowen and Company, LLC<br>Oppenheimer & Co. Inc.<br>Piper Sandler & Co.<br>Roth Capital Partners, LLC<br>Johnson Rice & Company L.L.C.<br>Northland Securities, Inc. |
| §20A Defendants | Shoals and Whitaker |
| 1934 Act Individual Defendants | Whitaker, Kevin Hubbard, Dominic Bardos ("Bardos"), Jeffery Tolnar, and Brandon Moss |
| 1934 Act Defendants | Shoals and the 1934 Act Individual Defendants |
| 1933 Act Defendants | Dean Solon[1], the Director Defendants, and the Underwriter Defendants |
| Solicitor-Seller Defendants | Shoals, Whitaker, Bardos, and the 1933 Act Defendants |
| Shoals Common Stock | Shoals Class A common stock |
| SPO | Secondary Public Offering |
| December 2022 SPO | Shoals' December 2022 SPO |
| March 2023 SPO | Shoals' March 2023 SPO |
| SPOs | Shoals' December 2022 and March 2023 SPOs |
| SPO Registration Statement | Shoals' registration statement for the December 2022 SPO, filed on Form S-3 with the SEC on November 30, 2022 |
| December 2022 SPO Prospectus | Shoals' Prospectus Supplement, filed on Form 424B5 with the SEC on December 5, 2022 |
| March 2023 SPO Prospectus | Shoals' Prospectus Supplement, filed on Form 424B5 with the SEC on March 7, 2023 |
| SPO Offering Materials | SPO Registration Statement and Prospectus through which |

---

[1] Defendant Dean Solon is only a 1933 Act defendant to the extent the Plaintiffs allege he violated §15 of the 1933 Act.

4918-5081-5490.v1

| DEFINED TERM | MEANING |
|---|---|
|  | Shoals accomplished the December 2022 SPO |
| 1933 Act | Securities Act of 1933, 15 U.S.C. §77a *et seq.* |
| 1934 Act | Securities Exchange Act of 1934, 15 U.S.C. §78a *et seq.* |
| AES | Applied Energy Services |
| ASC | Accounting Standards Codification |
| AWG | American wire gauge |
| BLA | Big Lead Assembly |
| Board | Shoals' Board of Directors |
| CEO | Chief Executive Officer |
| CFO | Chief Financial Officer |
| Class Period | May 16, 2022 and May 7, 2024, inclusive |
| Class | Consisting of all persons who purchased or otherwise acquired Shoals Common Stock during the Class Period and were harmed thereby |
| CTO | Chief Technology Officer |
| EBOS | Electrical Balance of Systems |
| FASB | Financial Accounting Standards Board |
| FY | Shoals fiscal year |
| GAAP | Generally Accepted Accounting Principles |
| NASDAQ | National Association of Security Dealers Automated Quotations |
| Q | Shoals fiscal quarter |
| SEC | United States Securities and Exchange Commission |

4918-5081-5490.v1

Lead Plaintiff Erste Asset Management GmbH ("Erste AM") and plaintiff Kissimmee Utility Authority Employees' Retirement Plan ("KUAERP") (collectively, "Plaintiffs"), on behalf of themselves and all others similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' consolidated complaint against defendants, allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of certain United States Securities & Exchange Commission ("SEC") filings by Shoals Technologies Group, Inc. ("Shoals" or the "Company"), Company press releases and earning calls, court filings in related litigation, and analyst and media reports about the Company.

## I. INTRODUCTION

1. This is a securities class action brought on behalf of purchasers of Shoals' Common Stock between May 16, 2022 and May 7, 2024, inclusive (the "Class Period"), including those purchasers of Shoals Common Stock directly in the Company's December 2022 secondary public offering (the "December 2022 SPO"), seeking to pursue remedies under §§10(b), 20(a), and 20A of the Securities Exchange Act of 1934 (the "1934 Act") and §§11, 12(a)(2), and 15 of the Securities Act of 1933 (the "1933 Act") against Shoals, certain of the Company's senior officers and directors, and the underwriters for the December 2022 SPO.

2. The 1933 Act protects investors and the United States capital markets by preventing companies and their officers, directors, and underwriters from issuing shares to investors by means of incomplete and inaccurate offering documents. To accomplish this, the 1933 Act imposes an exacting duty on those participating in public securities offerings – here, Shoals' December 2022 SPO – to disclose material facts in a complete and accurate manner. These duties come from the 1933 Act itself and from the regulations of the SEC, including Item 303 of SEC Regulation S-K (17 C.F.R. §229.303(b)(2)(ii)), and Item 105 of SEC Regulation S-K (17 C.F.R. §229.105).

- 1 -

3.      Here, Plaintiffs allege that the SPO Registration Statement and the prospectus through which Shoals accomplished the December 2022 SPO ("December 2022 SPO Prospectus") (collectively the "SPO Offering Materials," discussed further below) violated the disclosure requirements imposed by the 1933 Act by inadequately disclosing, or failing to disclose at all, adverse facts regarding how: (i) Shoals had used wiring in a substantial portion of its wire harnesses which, when installed, exhibited excessive "shrinkback" whereby the insulating material surrounding wires at connection points contracted, leaving live wires exposed and creating serious risks of fire, injury, or death to Shoals' customers; (ii) as a result, Shoals was liable for millions of dollars in undisclosed warranty remediation costs, which have continued to escalate, but which the Company has recently estimated will cost it at least $73 million and as much as $160 million; and (iii) consequently, Shoals' business, finances, operations, and reputation have suffered substantial harm and disruption, materially impairing the Company's ability to compete, and resulting in loss of market share, and a substantial and steady decline in the price of its Common Stock.

4.      Defendants' failure to disclose the adverse facts detailed herein enabled Shoals and its founder and former Chief Executive Officer ("CEO"), defendant Dean Solon ("Solon"), to accomplish two SPOs (one in December 2022 and one in March 2023), which together raised over $1 billion in proceeds by selling 54.4 million shares of Shoals Common Stock ("Common Stock"). The SPOs also generated more than $31 million in underwriting fees for the Underwriter Defendants.

5.      The 1934 Act protects investors by prohibiting fraudulent, material misstatements in connection with the sale or purchase of securities. Here, Plaintiffs allege that the 1934 Act Individual Defendants (defined below) knowingly or at least recklessly misled Shoals' public investors (including Plaintiffs and the Class (defined below)) through materially false and

misleading statements published in the Company's SEC filings, spoken by the 1934 Act Individual Defendants (defined below) during quarterly earnings calls, and made in Company presentations that the 1934 Act Individual Defendants discussed and presented to investors during the Company's quarterly earnings calls. Shoals' financial statements were also misleading because they violated the generally accepted accounting principles ("GAAP") adopted by the SEC – including GAAP Accounting Standards Codification ("ASC") 450 and 460 – by failing to follow GAAP's rules for incurring and reporting a loss contingency – *i.e.*, Shoals' warranty liabilities related to its defective products – despite that liability being both probable and reasonably estimable.

6.     While during the Class Period defendants Solon, Shoals, and Jason R. Whitaker ("Whitaker") were able to unload over $1 billion, $42 million, and $14 million, respectively, of their own shares of Shoals Common Stock at favorable prices, Plaintiffs and other Class members who purchased Shoals shares at inflated prices – including investors who purchased shares in the December 2022 SPO – have suffered hundreds of millions of dollars of harm as the truth about, and impact associated with, Shoals' defective products, warranty liability, loss of reputation, and competitive harms have entered the market.

7.     This action seeks to recover for such losses.

## II.     JURISDICTION AND VENUE

8.     The claims asserted herein arise under and pursuant to §§10(b), 20(a), and 20A of the 1934 Act (15 U.S.C. §§78j(b), 78t(a), and 78t-1), SEC Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5), and §§11, 12(a)(2), and 15 of the 1933 Act (15 U.S.C. §§77k, 77l(a)(2), and 77o).

9.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act (15 U.S.C. §78aa) and §22 of the 1933 Act (15 U.S.C. §77v).

- 3 -

10.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b) and §27 of the 1933 Act (15 U.S.C. §78aa).  A substantial amount of the acts and omissions giving rise to the claims at issue occurred in this District.  Shoals' corporate headquarters is located in this District and defendants are subject to personal jurisdiction in this District.

11.     In connection with the acts and omissions alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the National Association of Security Dealers Automated Quotations Global Market ("NASDAQ").

## III.    PARTIES

### A.    Plaintiffs

12.     Lead Plaintiff Erste AM is an Austrian asset management company with billions of Euros of assets under management.  Erste AM purchased Shoals publicly traded Common Stock during the Class Period and has been damaged thereby, as set forth in its certification filed on May 21, 2024.  *See* ECF 23-4; ECF 23-5.  Additionally, as alleged below in Count III, Erste AM purchased Shoals Common Stock at artificially inflated prices contemporaneously with defendant Whitaker – Shoals' CEO during part of the Class Period – and Shoals.

13.     Plaintiff KUAERP provides benefits for full-time employees of the Kissimmee Utility Authority and their eligible beneficiaries.  KUAERP manages over $130 million in assets on behalf of over 500 plan participants.  KUAERP purchased Shoals publicly traded Common Stock during the Class Period, including directly in the December 2022 SPO, and has been damaged thereby, as set forth in its certification filed in *Kissimmee Utility Authority Employees' Retirement Plan v. Shoals Technologies Group, Inc., et al.*, No. 3:24-cv-00598 (M.D. Tenn.) (the "*Kissimee* Action") on May

- 4 -

13, 2024.  *See Kissimee* Action, ECF 1 at 47.[2]  Additionally, as alleged below in Count III, KUAERP purchased Shoals Common Stock at artificially inflated prices contemporaneously with defendants Whitaker and Shoals.

**B.    1934 Act Defendants**

14.    Defendant Shoals is a provider of electrical balance of systems ("EBOS") solutions used in solar, storage, and electrical vehicle ("EV") charging infrastructure.  The Company is headquartered in Portland, Tennessee.  Shoals Common Stock is listed on the NASDAQ under the ticker symbol "SHLS."

15.    Defendant Whitaker began working at Shoals in October 2009 as the Company's Chief Technology Officer ("CTO"), then eventually was promoted to the position of CTO and President in September 2017, and finally, in January 2020, ascended to the role of Shoals' CEO, until announcing his resignation in December 2022 before formally stepping down in March 2023.[3] Defendant Whitaker also served as a member of Shoals' Board of Directors (the "Board") from January 2021 until March 2023.  According to Shoals' 2021 Proxy Statements (filed with the SEC on March 22, 2022 on Schedule 14A), the Company touted "Whitaker's extensive senior leadership experience and ***comprehensive knowledge of our business and perspective of our day-to-day operations***" as to what qualified him to serve as a director of Shoals' Board.  As the Company's CEO, defendant Whitaker represented Shoals on numerous earnings conference calls with analysts and investors, wherein he discussed the Company's quarterly and yearly financial results and responded to analyst questions – as well as sitting down for interviews and/or question-and-answer

---

[2]    The *Kissimee* Action was consolidated with the above-entitled litigation on May 24, 2024.  *See Kissimee* Action, ECF 16.

[3]    As some analysts noted, announcement of Whitaker's departure was "unexpected[]," "relatively fast," and "sudden," coming approximately seven months after the resignation of the Company's Chief Financial Officer ("CFO"), Philip Garton.

sessions like he did with the firms Guggenheim, Roth Capital Partners, and Cowen in 2022. As detailed below, Whitaker made several materially misleading statements and omissions to investors during quarterly conference calls and also signed Shoals' quarterly and yearly financial statements for 1Q22 through 4Q22 and FY22 (including the SPO Offering Materials) and signed the SPO Registration Statement (defined below), alleged to have contained and/or incorporated material misrepresentations in violation of GAAP and federally required disclosure obligations.[4] Moreover, between August 18, 2022 and March 14, 2023, while in the possession of nonpublic, material information about the shrinkback problems described more fully below – defendant Whitaker dumped over 565,000 shares of Shoals Common Stock (more than 33% of his entire holdings) for gross proceeds totaling more than $14.4 million.

16.     Defendant Kevin Hubbard ("Hubbard") served as Shoals' Interim CFO from May 2022 until October 2022. Prior to his role as Interim CFO, Hubbard served as Shoals' outside financial reporting consultant, was a former partner at BDO USA, LLP ("BDO"), and was BDO's Natural Resources Practice Leader. Defendant Hubbard is a member of the American Institute of Certified Public Accountants and the Texas Society of Certified Public Accountants, and has a Bachelor's degree in Accounting from the University of Houston – Clear Lake.[5] As detailed below,

---

[4]     As used herein, "FY" means the Company's fiscal year and "Q" means the Company's fiscal quarter.

[5]     According to the website of the firm at which defendant Hubbard is now a partner since leaving Shoals (where he previously served as an outside consultant for the Company), defendant Hubbard:

> [H]as over 20 years of public accounting experience servicing both public and privately held companies. His clients rely on him as a trusted business advisor for a wide range of financial matters including assisting with initial public offerings, secondary offerings, and private placement of debt and equity.
>
> . . . He has extensive knowledge of exploration and production (E&P), oilfield service and equipment, and terminal and pipeline companies. [Hubbard's] industry experience also includes manufacturing and distribution, and private equity.

- 6 -

defendant Hubbard appeared on quarterly conference calls with defendant Whitaker where the latter made materially misleading statements and omissions to investors. Defendant Hubbard also signed Shoals' quarterly financial statements for 1Q22 and 2Q22, alleged to have contained material misrepresentations in violation of GAAP and federally required disclosure obligations. As the Company's interim CFO, defendant Hubbard also represented Shoals in question-and-answer sessions with analysts from Roth Capital Partners in 2022.

17.     Defendant Dominic Bardos ("Bardos") has served as Shoals' CFO since October 2022. According to Shoals' website, defendant Bardos joined the Company with "over 30 years of global finance and accounting experience across multiple industries," experience that "also includes leadership positions in financial planning & analysis, strategic sourcing, supply chain, and customer service operations in large organizations." Defendant Bardos has an M.B.A. in Finance and a Bachelor's degree in Management from the University of Memphis, Fogelman College of Business & Economics. As detailed below, defendant Bardos appeared on quarterly conference calls with other Shoals C-suite executives who are named defendants herein, where both they and he made materially misleading statements and omissions to investors. Defendant Bardos also signed Shoals' quarterly and yearly financial statements for 3Q22 and FY22, in addition to Shoals' quarterly and yearly financial statements for FY23 (including the SPO Offering Materials).

18.     Defendant Jeffery Tolnar ("Tolnar") served as Shoals' Interim CEO from March 2023 until July 2023, and has served as the Company's President since December 2022. Defendant Tolnar holds a Bachelors in Electrical Engineering Technology from Youngstown State University and an M.B.A. from Baker University. According to the Shoals' website, "[i]n this role, [Tolnar] and his team are responsible for company growth, operational excellence, technology development and product innovation." As the Company's Interim CEO, defendant Tolnar represented Shoals on

numerous earnings conference calls with analysts and investors, wherein he discussed the Company's quarterly and yearly financial results and responded to analyst questions – as well as sitting down for interviews and/or question-and-answer sessions like he did with analysts from Cowen and Roth Capital Partners in 2022 and 2023. As detailed below, during those quarterly conference calls, defendant Tolnar and other Shoals C-suite executives who are named defendants herein made materially misleading statements and omissions to investors. Defendant Tolnar also signed Shoals' quarterly financial statements for 1Q23.

19. Defendant Brandon Moss ("Moss") has served as Shoals' CEO since July 2023. According to the Shoals' website, defendant Moss "has over 20 years' experience in the electrical industry" and prior to his role with Shoals, "most recently served as Group President at Southwire Company, a global leader in wire and cable manufacturing." The website also touts that throughout his career, defendant Moss "has demonstrated success in developing corporate strategy, managing autonomous business units, business development, M&A and has led global manufacturing and supply chains." Defendant Moss has an M.B.A. from Wake Forest University and a Bachelor's degree in Marketing from Miami University. As the Company's CEO, defendant Moss represented Shoals on numerous earnings conference calls with analysts and investors, wherein he discussed the Company's quarterly and yearly financial results and responded to analyst questions – as well as sitting down for interviews and/or question-and-answer sessions like he did with analysts from Morgan Stanley, Roth Capital Partners, and Guggenheim in 2023 and 2024. As detailed below, during those quarterly conference calls, defendant Moss and other Shoals C-suite executives who are named defendants herein made materially misleading statements and omissions to investors. Defendant Moss also signed Shoals' quarterly financial statements for 2Q23, 3Q23, and FY23.

20.     Defendants referenced above in §III.B. are referred to herein as the "1934 Act Individual Defendants." Each of the 1934 Act Individual Defendants was directly involved in the management and day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, services, products, and present and future business prospects during the time of their employment with the Company.  In addition, the 1934 Act Individual Defendants were involved in drafting, producing, reviewing, and disseminating the misleading statements and information alleged herein, were aware of, or recklessly disregarded, the misleading statements being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.  Finally, each 1934 Act Individual Defendant was provided with copies of the documents alleged herein to be misleading before or shortly after their issuance (*e.g.*, Company press releases and SEC filings), participated in conference calls with investors during which misleading statements were made, and had the ability and opportunity to prevent their issuance or cause them to be corrected.

21.     The 1934 Act Individual Defendants, together with Shoals, are referred to herein as the "1934 Act Defendants."

**C.     1934 & 1933 Acts Defendants**

22.     The only defendants alleged to have violated both the 1934 Act and 1933 Act are defendants Shoals, Whitaker, and Bardos.  Defendants Whitaker and Bardos signed the SPO Registration Statement and solicited investors for the December 2022 SPO and otherwise participated in the December 2022 SPO for their own financial benefit and/or the financial benefit of Shoals.

**D.     1933 Act Defendants**

23.     Defendant Brad Forth ("Forth") served as Chairman of the Company at the time of the December 2022 SPO.

4918-5081-5490.v1

24.     Defendant Peter Wilver ("Wilver") served as a director of the Company at the time of the December 2022 SPO.

25.     Defendant Ty Daul ("Daul") served as a director of the Company at the time of the December 2022 SPO.

26.     Defendant Toni Volpe ("Volpe") served as a director of the Company at the time of the December 2022 SPO.

27.     Defendant Lori Sundberg ("Sundberg") served as a director of the Company at the time of the December 2022 SPO.

28.     Defendant Jeannette Mills ("Mills") served as a director of the Company at the time of the December 2022 SPO.

29.     Defendant Robert Julian ("Julian") served as a director of the Company at the time of the December 2022 SPO.

30.     Defendants referenced above in ¶¶23-29, along with defendant Whitaker, are collectively referred to herein as the "Director Defendants."

31.     Defendant Solon founded Shoals in 1996 and served as the Company's CEO and President from November 1996 until December 2019.  Thereafter, Solon served as a director of the Company until February 2022.  Defendant Solon was a controlling shareholder of the Company during the Class Period and prior to the December 2022 SPO, Solon owned nearly 34% of the combined voting power of Shoals stock.  Solon was also party to a Stockholders Agreement, which gave him the right to nominate a director to Shoals' Board.  Solon had control over the Company by way of share ownership and ability to nominate a director.  Solon had control over the December 2022 SPO as the vast majority of the shares being offered in the December 2022 and March 2023

- 10 -

SPOs were Solon's shares. In both of the SPOs, Solon, **_sold over 52 million shares of Shoals Common Stock for more than $1 billion in gross offering proceeds_**.

32.     The following defendants served as underwriters in the December 2022 SPO, in which they participated in the offer and sale of Shoals' Common Stock to the investing public:

| Underwriter | Number of Shares |
|---|---|
| **December 2022 SPO** | |
| J.P. Morgan Securities LLC | 7,770,000 |
| Guggenheim Securities, LLC | 7,350,000 |
| Morgan Stanley & Co. LLC | 3,640,000 |
| UBS Securities LLC | 2,240,000 |
| Goldman Sachs & Co. LLC | 1,600,000 |
| Barclays Capital Inc. | 800,000 |
| Credit Suisse Securities (USA) LLC | 800,000 |
| Cowen and Company, LLC | 400,000 |
| Oppenheimer & Co. Inc. | 400,000 |
| Piper Sandler & Co. | 400,000 |
| Roth Capital Partners, LLC | 400,000 |
| Johnson Rice & Company L.L.C. | 100,000 |
| Northland Securities, Inc. | 100,000 |

33.     Defendants J.P. Morgan Securities LLC, Guggenheim Securities, LLC, Morgan Stanley & Co. LLC, UBS Securities LLC, Goldman Sachs & Co. LLC, Barclays Capital Inc., Credit Suisse Securities (USA) LLC, Cowen and Company, LLC, Oppenheimer & Co. Inc., Piper Sandler & Co., Roth Capital Partners, LLC, Johnson Rice & Company L.L.C., and Northland Securities, Inc. (collectively referred to herein as the "Underwriter Defendants"), are all investment banking houses with operations in the United States. Each of the Underwriter Defendants served as underwriters for the December 2022 SPO. The Underwriter Defendants purported to conduct a due diligence investigation in connection with the SPOs and gained access to information regarding the Company, its business, operations, financial results, and prospects. The Underwriter Defendants solicited investors and participated in the sale and offering of Shoals Common Stock in the December 2022 SPO and otherwise participated in the December 2022 SPO for their own financial benefit, sharing

over $23 million in underwriting discounts and commissions for the December 2022 SPO, which included a full exercise of the underwriters' overallotment option.

34. Solon, the Director Defendants (referenced above in ¶¶23-30), and the Underwriter Defendants (referenced above in ¶¶32-33), are collectively referred to herein as the "1933 Act Defendants."[6] Plaintiffs do not allege that the 1933 Act Defendants acted fraudulently (*i.e.*, knowingly or recklessly). Instead, Plaintiffs' 1933 Act claims *against these specific defendants*, which are based solely on strict liability and sound in negligence, allege that these defendants acted, at most, negligently by failing to conduct adequate due diligence when signing the SPO Offering Materials and underwriting the December 2022 SPO.

35. The Director Defendants and defendant Bardos signed the SPO Registration Statement and solicited investors for the December 2022 SPO and otherwise participated in the December 2022 SPO for their own financial benefit and/or the financial benefit of Shoals and Solon.

## IV. SHOALS' SCHEME AND COURSE OF CONDUCT

36. Founded in 1996, Shoals is a provider of EBOS solutions and components for solar, battery storage, and EV charging applications. Shoals' EBOS provides components necessary for the transfer of electrical power produced by solar panels to intermediate locations within a solar project and ultimately to the power grid. Shoals employs a proprietary EBOS system, which it dubs a "combine-as-you-go" solution, that the Company claims offers "several advantages" over conventional EBOS systems using "homerun" wiring architecture. In contrast to conventional EBOS systems, Shoals' combine-as-you-go solution uses specialized wire harnesses to connect

---

[6] Plaintiffs only allege that Solon violated §15 of the 1933 Act. So to the extent that defendant Solon is included in the definition of the 1933 Act Defendants, it is only regarding his violation of §15.

4918-5081-5490.v1

multiple strings of solar panels to Shoals' proprietary above-ground feeder cable known as a "Big Lead Assembly" ("BLA"). The BLA is Shoals' core combine-as-you-go product.

37. Shoals claims that its proprietary wire system requires fewer wires and wire connections than other offerings and eliminates altogether the need for other materials utilized in homerun wiring architecture, which the Company states results in lower labor and material costs. Of particular importance to investors, Shoals asserted that BLA reduces the installation costs for solar energy projects by 43%, which represents approximately 29% of total installation costs. And, according to Shoals, unlike homerun wiring architecture, which requires specialized and expensive laborers, BLA "can be installed by anyone." In addition, Shoals purports that its proprietary solutions have greater reliability and lower maintenance costs than conventional EBOS systems. All of these features, according to Shoals, provided the Company with a competitive advantage, driving its growth and increasing its market share.

38. Shoals generates the majority of its revenue from the sale of "system solutions," which are complete EBOS systems that employ several of the Company's EBOS components. Shoals also generates revenue from the sale of individual EBOS components, as well as other components used for battery storage and EV charging applications. In FY22, Shoals derived approximately 88% and 22% of its revenue from the sale of system solutions and from the sale of components, respectively. During the Class Period, Shoals' combine-as-you-go system solutions carried higher margins than its other products and was therefore the most profitable source of revenue for the Company.

39. Shoals provides investors with measures of client demand and anticipated future business through two operational metrics: (i) backlog; and (ii) awarded orders. The Company defines "backlog" as "signed purchase orders or contractual minimum purchase commitments with

- 13 -

take-or-pay provisions." "Awarded orders" is defined as orders that Shoals is in the "process of documenting a contract but for which a contract has not yet been signed." Shoals often reports its backlog and awarded orders through a single monetary figure representing the total sum of future expected revenue. Accordingly, Shoals' backlog and awarded orders are each important indicators of the Company's future financial, operational, and business performance.

40.     Shoals offers its customers an assurance type warranty that protects against manufacturer defects. The Company purported to account for warranty liabilities by recording a reserve provision for estimated future costs related to warranty remediation expenses. Since Shoals' initial public offering in January 2021, until the revelations detailed herein, the Company recorded only modest amounts in warranty-related reserves. For example, for FY21 and FY22, Shoals' estimated accrued warranty reserve was $100,000 and $600,000, respectively.

41.     Throughout the Class Period, the 1934 Act Defendants emphasized to investors the purported "quality," "reliability," and "safety" of Shoals' EBOS products and claimed these purported advantages were critical to the Company's ability to generate business. For example, speaking during an August 2022 conference call, defendant Whitaker emphasized the "performance, quality, reliability, [and] installation savings" of Shoals' offerings and represented that these benefits served as a launch pad for the Company's "long-term" relationships with its clients, stating in pertinent part as follows:

> Components revenue increased 97% year-over-year, driven by increases in shipments of battery storage products as well as shipments of solar products to a significant number of new customers. New customers projects are typically designed to timeline systems and they generally start the relationship with Shoals by buying components that will work with these types of systems.
>
> Re-fixing the performance, quality, reliability, installation savings and customer service that Shoals offers, they become open to trying our combine-as-you-go architecture and buy the BLA. Once customers make the transition, this usually marks the start of a long-term relationship.

- 14 -

42.     The Company's SEC filings likewise highlighted the "several advantages" that Shoals' products purportedly enjoyed over conventional EBOS systems with claims that Shoals' combine-as-you-go system had "greater reliability," "lower maintenance costs," and "lower[] material and shipping costs" as compared to competing products.

43.     Due in substantial part to the "value proposition" that Shoals' products purported to offer, the 1934 Act Defendants claimed throughout the Class Period that demand for Shoals' products was "robust" and "continue[d] to grow," and the 1934 Act Defendants highlighted the Company's "record" breaking revenue and earnings.  For example, in connection with Shoals' 4Q22 earnings announcement, the Company boasted that it had "set new records for revenue, gross profit, net income, adjusted EBITDA and adjusted net income" for both the fourth quarter and full year 2022.  Further emphasizing Shoals' performance, defendant Whitaker represented that Shoals was "commercially, operationally and financially" the strongest "it ha[d] ever been."

44.     Unbeknownst to investors, however, during and prior to the Class Period, Shoals' customers were suffering from a massive, undisclosed problems with their BLAs.

45.     Shoals' BLAs require a number of specialized component parts, including photovoltaic wire, which is produced for the interconnection wiring of grounded and ungrounded solar panel systems.  Shoals takes photovoltaic wire, which it purchases from suppliers, and manufactures custom wire harnesses that are used to aggregate electricity from multiple solar panels and deliver that electricity to inverters where it is then delivered to the power grid or a battery storage solution.

46.     Typically, Shoals builds these harnesses in pairs, with a red-wire harness being used for positive connections, and a black-wire harness being used for negative connections.  Part of the manufacturing process in creating the wire harnesses involves placing tee joints or in-line fuses ("T-

Junctions") at set intervals along the length of the wire. These T-Junctions allow the wire harnesses to be connected to the solar panels and are a critical component of the BLA.

47.     However, by no later than March 2022, Shoals began receiving reports of excessive shrinkback in its harnesses. As depicted in the following photo, insulation on the photovoltaic wires of BLAs red-wire harness had begun to shrinkback from the T-Junctions, causing live and dangerous wires to be exposed.



48.     These initial reports were confirmed by a Shoals executive who examined the wire in one customer's solar field in Phoenix, Arizona in approximately March 2022, and discovered exposed bare copper conductor around T-Junctions. More reports would soon follow.

49.     FE1 is a former Shoals Project Manager and Sales Manager who worked for the Company, including between 2016 and June 2022. FE1 described himself as the guy that they called when something went wrong.

50.     FE1 reported that Shoals received a report of exposed wire in a customer's solar field in Phoenix in March 2022. The Company, and specifically Whitaker and Ben Macias ("Macias")

- 16 -

(Macias at the time served as Senior Vice President, Sales and Marketing and was promoted to Chief Revenue Officer in December 2022), sent FE1 in April 2022 to that customer's solar field for an onsite investigation of that exposed wire. FE1 personally observed that the customer's insulation had pulled away from the connectors and T-Junctions. FE1 reported that he/she determined that the issue was an installation error, and that Shoals immediately replaced the product on that site, which took about 6 weeks and cost $3.5 to $4 million. FE1 reported that in addition to the initial report from Phoenix, there was a sister project close by just outside of Phoenix. According to FE1, that project also started to show similar issues with exposed wire just weeks later.

51.     According to FE1, by June 2022, Shoals was aware of at least four to five other solar fields that were experiencing the same issues as the one in Phoenix. FE1 reported that these problems caused internal panic at the Company, and were well-known internally, including by Whitaker.

52.     FE1 also reported that Shoals provided poor installation instructions to its customers. For example, FE1 described the installation manual as being only a few pages long, with no recommendations on how tight to pull wires or how to attach them. FE1 reported that they brought this to the attention of the President of the Company, but nothing was done about it.

53.     FE2 is a former Shoals Business Development Manager who worked for the Company between 2017 and 2023. FE2 indicated that he/she also visited the Phoenix site described by FE1 along with Shoals' Research and Development Manager, Lee Morgan ("Morgan"). FE2 reported that Morgan examined the exposed wire and Morgan told FE2 that Morgan believed it was an installation issue. FE2 reported that Macias also visited the Phoenix site at a different time and evaluated the wiring. FE2 reported that Macias also believed the problems at the Phoenix site were caused by an installation issue. FE2 reported that he participated in several calls with the client and

4918-5081-5490.v1

owner in Phoenix, in which Macias also participated. FE2 reported that Macias told the client and owner that Shoals believed that this was an installation issue.

54.     FE2 also reported that Shoals was aware of at least four or five other very large scale utility projects similar to the one in Phoenix that reported exposed wire by June 2022. FE2 reported that Shoals agreed to replace the wiring at the Phoenix solar field at a cost of $3.5 to $4 million. FE1 reported that with the other customers who reported exposed wires to Shoals, the Company was facing expenses of over $15 million by June 2022.

55.     FE3 is a former Shoals Plant Quality Manager who worked for the Company between December 2023 and July 2024. FE3 reported that he/she was made aware of the shrinkback issues immediately upon joining the Company. FE3 reported that Shoals had not been doing any internal testing for shrinkback issues prior to the disputes with Prysmian Cables and Systems USA, LLC ("Prysmian"). Instead, Shoals relied solely on the suppliers to provide appropriate documentation and test results to show that the wires were meeting the proper requirements. FE3 reported that there were no quality controls, checks or testing done with respect to wiring received from suppliers. FE3 reported that such testing did not begin until approximately December 2023.

56.     While Shoals had initially concluded that the excessive shrinkback had been caused by installation issues, as problems mounted and more customers began to report similar issues, Shoals' exposure to ever-increasing warranty claims and reputational damage increased. As its exposure increased, Shoals sought to pin the blame on others – specifically the supplier of the red photovoltaic wire, Prysmian – a longtime supplier to Shoals, and which was also a competitor of Southwire Company, LLC, where defendant Moss had served as Group President until joining Shoals in July 2023.

- 18 -

57.     Prysmian was Shoals' sole supplier of the 10 and 12 American wire gauge ("AWG") red copper photovoltaic cable wire Shoals used in the manufacturing of the T-Junctions in its BLA product.  According to Prysmian, "Shoals confirmed, including in a meeting on April 5, 2023 with Prysmian, that Shoals exclusively used Prysmian cable in the application exhibiting Shoals' field issue, and that other manufacturer's cables were used only in different applications."

58.     Shoals and Prysmian had initially worked together to try to identify the cause of the BLA defects.  Indeed, in or about April 2002, Shoals provided Prysmian with 3 samples of Prysmian's 10 and 12 AWG black and red copper photovoltaic cable wire containing Shoals' T-Junctions.  At that time, Shoals conceded that Prysmian's wires were not defective and Shoals' installation or cable management issues at the site were likely the culprit.

59.     After additional Shoals' customers began complaining of similar issues, however, Shoals stopped cooperating with Prysmian.  Prysmian repeatedly requested samples from Shoals of T-Junctions with cable installed, as well as drone footage of impacted sites to conduct a root cause analysis, yet Shoals repeatedly ignored Prysmian's requests and repeatedly denied Prysmian meaningful opportunities to inspect the wires at issue.

60.     Yet, in spite of these spiraling problems with its signature product, and the warranty costs and reputational harm they were causing, the 1934 Act Defendants failed to provide any disclosure to Shoals' shareholders.

61.     Further, despite knowing that the exposed wire caused by the BLA defects could lead to death or serious injury, as well as property damage, Shoals said nothing to its customers, either. Indeed, at least one affected site reported property damage arising from a fire, which is believed to have ignited as a result of a defective Shoals harness.  But Shoals said nothing at this time.

- 19 -

62.     Rather than warning its customers and investors of the potentially fatal and financially crippling consequences of its defective BLAs at that time, Shoals, Whitaker, and Solon sought to cash out, selling over $1.1 billion in Shoals Common Stock to unsuspecting investors in two secondary offerings between November 2022 and March 2023.

63.     First, on November 30, 2022, Shoals announced that it was conducting a secondary offering of 20 million shares of Shoals Common Stock (which would later be increased to 26 million shares), that was being sold in an underwritten public offering. Of those 26 million shares, 24 million shares were being sold by Solon and his affiliates, and the remaining 2 million shares were being sold by the Company.

64.     The Company further announced that it was using the proceeds from its sale of shares to fund, in substantial part, a $58.1 million payment to terminate a Tax Receivable Agreement ("TRA"), which termination right was to expire on December 31, 2022. Analysts reacted positively to the TRA termination. A November 30, 2022, report from UBS noted: "We view announcement of the TRA termination as a positive development . . . . As of 3Q22 the estimated TRA liability on the balance sheet was $161mn with potential to grow significantly. . . . In our view, the TRA was an obstacle to many investors owing SHLs . . . ." A December 2, 2022, report from Barclays noted that the TRA "could have grown to $485mm . . . we are a bit perplexed at the low termination consideration."

65.     The December 2022 SPO closed on December 6, 2022, with Solon and its affiliated entities receiving over $515 million in gross proceeds as a result of a sale, and Shoals receiving over $42 million in gross proceeds as a result of the sale.

66.     Then, on March 7, 2023, Shoals announced that it was conducting another secondary offering of over 24.5 million shares of Shoals Common Stock, which were being sold in an

- 20 -

underwritten public offering by Solon and his affiliates. The March 2023 SPO closed on March 10, 2023, with Solon and his affiliated entities receiving over $594 million in gross proceeds as a result of a sale. In total, between November 2023 and March 2023, Solon decreased his holdings of Shoals Common Stock from over 30% of the Company, to approximately 2% of the outstanding shares, liquidating almost his entire position in the Company.

67.     On May 8, 2023, Shoals filed with the SEC a quarterly report on Form 10-Q for the quarter ended March 31, 2023 ("1Q23 Form 10-Q"). Over a year after first being made aware of the BLA defects, Shoals finally provided a minimal, albeit misleading, disclosure regarding the BLA defects, stating:

> The Company has been notified by certain customers that a subset of wire harnesses used in its EBOS solutions is presenting excessive pull back of wire insulation at connection points ("shrinkback"). Based upon the Company's initial assessment, the Company believes the shrinkback is related to a subset of specific colored wire provided by one specific supplier. While it is probable that the Company will incur costs related to the repair or replacement of the impacted wire harnesses, based on the limited information available as of the date of this Quarterly Report, including the scope of affected sites, potential solutions and the possibility of recovery from the wire supplier, it is not possible to reasonably estimate those costs.

68.     In fact, because Shoals only uses Prysmian cable wire for installing its T-Junction, the Company had already incurred millions of dollars in costs to replace the affected harnesses at the Phoenix site alone, and had complaints from numerous customers with failing T-Junctions which could cost the Company an additional tens of millions of dollars to replace. While Shoals blamed Prysmian for supplying defective wiring incorporated into the T-Junctions, the Company had been told by Prysmian no later than January 2023, that the wires in question had "been made with the same process and with the same materials since 2016."

69.     The 1Q23 Form 10-Q also materially misrepresented the scope of the problem, stating the Company only had $400,000 in accrued warranty liability at quarter end, *a $200,000 decrease from the prior quarter*.

- 21 -

70.     Then, on August 1, 2023, in connection with reporting its 2Q23 results, Shoals revealed that it was recording a $9.4 million warranty expense to reflect costs primarily related to BLA defects, offsetting other claimed improvements in the Company's margin profile and causing its gross margins to decline sequentially to 42.4% from 45.9% in the prior quarter.  During the corresponding 2Q23 conference call, defendant Bardos sought to assuage investor concerns regarding the Company's warranty expense exposure, falsely stating that the warranty expense incurred within the quarter was "adequate to do the remediation required."

71.     Contrary to this representation, Shoals would go on to announce an additional $50 million in BLA warranty expenses the following quarter, representing a more than five-fold increase. Shoals would likewise disclose that 30% of its wire harnesses manufactured from 2020 to 2022 had been impacted by BLA defects, and that ultimate remediation costs could reach as high as $185 million.

72.     As would subsequently be revealed, the defective – and potentially dangerous – wire harnesses on so many of the Company's projects had also negatively impacted Shoals' customer relationships once Shoals warned its customers of the issue.  For example, a November 10, 2023 Roth MKM analyst report stated their "checks" with Shoals' customers "suggest that since receiving the safety notice from SHLS regarding shrinkback . . . , customers are likely scrambling to identify any instances of the issue.  ***Critical concerns we have heard include (1) Serious injury or death, (2) The exposed wiring may cause fire and property damage, and (3) PUCs may get involved with increased scrutiny***."

73.     In subsequent quarters, Shoals revealed dramatically deteriorating results, reflecting in part the effects of the BLA defects on the Company's customer relationships, and the materialization of the risks concealed by defendants' materially misleading misstatements and

- 22 -

omissions as detailed herein. In reporting its 4Q23 results, Shoals revealed a sequential quarterly decline of $2 million in the Company's backlog and awarded orders. The Company also issued disappointing revenue guidance for FY24 of $480 million to $520 million that was approximately 19% below consensus estimates at the midpoint.

74. Shoals' business further deteriorated in 1Q24, with backlog and awarded orders falling sequentially by over $16 million and the Company reducing its already disappointing guidance to a range of $440 million to $490 million due in part to an "unprecedented" customer cancellation and project delays. In a Form 10-Q quarterly report the Company filed with the SEC for 1Q24, Shoals has also disclosed that the Company "may increase" its estimated warranty liability a "material" amount.

75. As a result of these disclosures, the price of Shoals Common Stock has declined from a Class Period high of over $40 per share to less than $8 per share by the end of the Class Period, causing Plaintiffs and the Class to suffer hundreds of millions of dollars in losses and economic damages under the federal securities laws.

## V. DEFENDANTS' VIOLATIONS OF THE 1934 ACT

### A. Defendants' Materially Misleading Statements and Omissions

#### 1. 1Q22 Materially Misleading Statements and Omissions

76. The Class Period begins on May 16, 2022, with Shoals' issuance of a press release announcing the Company's financial results for the quarter ended March 31, 2022 ("1Q22 Release").[7] The 1Q22 Release highlighted the Company's year-over-year increases in revenue, margins, and profits. Underpinning the "record" revenue, skyrocketing profits and "[e]xpanded" margins was the market's belief that Shoals' products were superior. Indeed, the 1Q22 Release

---

[7] Each of Shoals' quarterly press releases were also filed with the SEC on a Form 8-K.

highlighted the purported "reliability and safety" of Shoals' "innovative products," representing that the "Company's mission . . . to provide innovative products that reduce the cost of installation while improving system performance, reliability and safety."

77. Also on May 16, 2022, Shoals held a conference call with analysts to discuss the Company's financial and operational results for 1Q22 hosted by defendants Whitaker and Hubbard. During the call, defendant Whitaker emphasized that "at our core, we really focus on **quality, reliability and safety**" of Shoals' products. Whitaker also claimed Company's focus on "quality and reliability" was generating "a lot of opportunities" for the Company, stating in pertinent part:

> And also, when you look at the case – the use case in the international market, obviously, the higher the labor, the higher the value proposition. But the reality is, even outside of that, there's a lot of opportunities. We're seeing places that have very low – or relatively low labor rates that we're seeing success with as well. **So there's more than just the labor aspect when you look at the quality and the reliability of our product offerings out there**.

78. On the day of Shoals' May 16, 2022 conference call with analysts, the Company published on its website a 1Q22 Investor Presentation ("1Q22 Presentation"). The 1Q22 Presentation began with a "COMPANY OVERVIEW" which stated that Shoals' "**products . . . are . . . more reliable than competing solutions**" and attributed its products' "**greater reliability**" to their "fewer connections and pre-terminated 'plug-n-play' connectors." The presentation extolled that Shoals' "factory . . . produce[s] **products with superior quality, reliability, and safety**." As a result, Shoals' "**products . . . can be installed by anyone**." The 1Q22 Presentation explained that Shoals' "Plug-n-Play Connectors" as "[s]imple push connectors [that] speed installation, **reduce errors and make the system installable by general labor rather than requiring licensed electricians**."

79. The 1Q22 Presentation emphasized that one of the key "ADVANTAGES" of Shoals' "COMBINE-AS-YOU-GO SYSTEM" was that it "*[i]ncreases safety and reliability*" through

- 24 -

"[p]re-terminated connectors" that were "[f]actory rather than field fabricated," resulting in "*[f]ewer failure points*" – resulting in "*LESS POTENTIAL FOR FAILURE*."

80.     On May 17, 2022, Shoals filed with the SEC a quarterly report on Form 10-Q for the quarter ended March 31, 2022 ("1Q22 Form 10-Q"), which was signed by defendants Whitaker and Hubbard.  As detailed below in §V.B., the 1Q22 Form 10-Q did not include any product warranty accrual or disclosure related to the BLA defect.  Instead, Shoals vaguely and misleadingly warned investors that "we may face warranty, indemnity and product liability claims arising from defective products."

81.     The statements set forth above in ¶¶76-80 were materially misleading or omitted material information necessary to make them not misleading (that was unbeknownst to investors) for the following reasons:

        (a)     Contrary to the 1934 Act Defendants' claims that Shoals' products were of "superior quality, reliability, and safety," and Shoals' products had "less potential for failure," Shoals had already received customer complaints regarding the BLA defect and had conducted a site inspection, in which the customer complaint of the BLA defect was verified.  There were no quality controls, checks, or testing on the wiring used in Shoals' products by anyone internally at Shoals before December 2023;

        (b)     While the 1934 Act Defendants touted the cost savings and lower maintenance costs compared to competing products, they had determined that installation issues had caused the BLA defect.  Remediating improperly installed defective wire harnesses did not result in cost savings and lower maintenance costs and would in fact lead to increased installation costs;

        (c)     As detailed below in §V.B., the 1934 Act Defendants' failure to properly account for and disclose the BLA defect rendered Shoals' 1Q22 financial statements, included in the

- 25 -

1Q22 Form 10-Q, materially false and misleading and in violation of GAAP. Specifically, the 1934 Act Defendants: (i) materially understated Shoals' warranty reserves with respect to the BLA defect; and (ii) failed to make required disclosures regarding the extent of costs associated with remediating the BLA defect; and

(d)     Contrary to the misleading warnings that "[Shoals] may face warranty, indemnity and product liability claims arising from defective products," the Company was already facing such claims arising from the BLA defect.

## 2.     2Q22 Materially Misleading Statements and Omissions

82.     On August 15, 2022, Shoals issued a press release announcing the Company's financial results for the quarter ended June 30, 2022 ("2Q22 Release"). The 2Q22 Release highlighted the purported "safety" and "reliability" of Shoals' products, representing that "[s]ince its founding in 1996, the Company has introduced innovative technologies and systems solutions that allow its customers to substantially increase installation efficiency and safety while improving system performance and reliability."

83.     Also on August 15, 2022, Shoals held a conference call with analysts to discuss the Company's financial and operational results for 2Q22, hosted by defendants Whitaker and Hubbard. During his prepared remarks, defendant Whitaker highlighted the "performance, quality, reliability, [and] installation savings" of Shoals' products and claimed these benefits were the basis of the Company's "long-term relationship[s]" with its clients, stating in pertinent part as follows:

> Re-fixing *the performance, quality, reliability, installation savings and customer service that Shoals offers, they become open to trying our combine-as-you-go architecture and buy the BLA*. Once customers make the transition, this usually marks the start of a long-term relationship.

- 26 -

84.     In response to a question from an analyst, defendant Whitaker emphasized the purported "value" of Shoals' products, including specifically their "quality" and "reliability," stating: "BLA can reduce labor costs, improve safety, increase reliability and reduce maintenance expenses."

85.     The same day, Shoals published a 2Q22 Investor Presentation, which contained the same materially false and misleading statements as its 1Q22 Presentation as set forth above in ¶79.

86.     On August 16, 2022, Shoals filed with the SEC a quarterly report on Form 10-Q for the quarter ended June 30, 2022 ("2Q22 Form 10-Q"), which was signed by defendants Whitaker and Hubbard.  As detailed below in §V.B., the 2Q22 Form 10-Q did not include any product warranty accrual or disclosure related to the BLA defect.  Instead, Shoals vaguely and misleadingly warned investors that "we may face warranty, indemnity and product liability claims arising from defective products."

87.     The statements set forth above in ¶¶82-86 were materially misleading or omitted material information necessary to make them not misleading (that was unbeknownst to investors) for the following reasons:

(a)     Contrary to the 1934 Act Defendants' claims that Shoals' products were of "superior quality, reliability, and safety," and Shoals' products had "less potential for failure," Shoals had already received customer complaints regarding the BLA defect and had conducted a site inspection, in which the customer complaint of the BLA defect was verified.  The estimate of remediation costs at the initial site inspection amounted to several million dollars, and Shoals had also identified several other sites in the country that were experiencing the same issues, which the cost to remediate was estimated to be over $15 million.  There were no quality controls, checks, or testing on the wiring used in Shoals' products by anyone internally at Shoals before December 2023;

4918-5081-5490.v1

(b)     While the 1934 Act Defendants touted the cost savings and lower maintenance costs compared to competing products, they had determined that installation issues had caused the BLA defect. Remediating improperly installed defective wire harnesses did not result in cost savings and lower maintenance costs and would in fact lead to increased installation costs;

(c)     As detailed below in §V.B., the 1934 Act Defendants' failure to properly account for and disclose the BLA defect rendered Shoals' 2Q22 financial statements, included in the 2Q22 Form 10-Q, materially false and misleading and in violation of GAAP. Specifically, the 1934 Act Defendants: (i) materially understated Shoals' warranty reserves with respect to the BLA defect; and (ii) failed to make required disclosures regarding the extent of costs associated with remediating the BLA defect; and

(d)     Contrary to the misleading warnings that "[Shoals] may face warranty, indemnity and product liability claims arising from defective products," the Company was already facing such claims arising from the BLA defect.

### 3.     3Q22 Materially Misleading Statements and Omissions

88.     On November 14, 2022, Shoals issued a press release disclosing the Company's financial results for the quarter ended September 30, 2022 ("3Q22 Release"). The 3Q22 Release highlighted the purported "safety" and "reliability" of Shoals' products, representing that "[s]ince its founding in 1996, the Company has introduced innovative technologies and systems solutions that allow its customers to substantially increase installation efficiency and safety while improving system performance and reliability."

89.     Also on November 14, 2022, Shoals held a conference call with analysts to discuss the Company's financial and operational results for 3Q22, hosted by defendants Whitaker and Bardos. During his prepared remarks, defendant Whitaker highlighted the purported "value

4918-5081-5490.v1

proposition" offered by Shoals' combine-as-you-go system, which he claimed as enabling Shoals to capitalize on favorable market trends, stating in pertinent part as follows:

> In addition, the prevailing wage provision of the IRA is expected to compound wage pressure in the U.S. market, which further reinforces the value proposition of our combine-as-you-go system. From day 1, we set out to create products that can be installed by anyone as a response to the disproportionately high cost of installing EBOS, which can be equal to or in excess of the cost of the product itself. ***In environments where labor is more expensive, our solutions are especially attractive as they take less time to install and are installable by general labor. We anticipate the prevailing wage provision will provide a significant tailwind for years to come***.

90. The same day, Shoals published a 3Q22 Investor Presentation, which contained the same materially false and misleading statements as its 1Q22 Presentation as set forth above in ¶79.

91. Also that day, Shoals filed with the SEC a quarterly report on Form 10-Q for the quarter ended September 30, 2022 ("3Q22 Form 10-Q"), which was signed by defendants Whitaker and Bardos. As detailed below in §V.B., the 3Q22 Form 10-Q did not include any product warranty accrual or disclosure related to the BLA defect. Instead, Shoals vaguely and misleadingly warned investors that "we may face warranty, indemnity and product liability claims arising from defective products."

92. The statements set forth above in ¶¶88-91 were materially misleading or omitted material information necessary to make them not misleading (that was unbeknownst to investors) for the following reasons:

(a) Contrary to the 1934 Act Defendants' claims that Shoals' products were of "superior quality, reliability, and safety," and Shoals' products had "less potential for failure," Shoals had already received customer complaints regarding the BLA defect and had conducted a site inspection, in which the customer complaint of the BLA defect was verified. The estimate of remediation costs at the initial site inspection amounted to several million dollars, and Shoals had also identified several other sites in the country that were experiencing the same issues, which the

- 29 -

cost of remediation was estimated to be over $15 million. There were no quality controls, checks, or testing on the wiring used in Shoals' products by anyone internally at Shoals before December 2023;

(b)     While the 1934 Act Defendants touted the cost savings and lower maintenance costs compared to competing products, they knew that defects with their BLAs were widespread. Remediating defective wire harnesses did not result in cost savings and lower maintenance costs and would in fact lead to increased installation costs associated with their replacement;

(c)     As detailed below in §V.B., the 1934 Act Defendants' failure to properly account for and disclose the BLA defect rendered Shoals' 3Q22 financial statements, included in the 3Q22 Form 10-Q, materially false and misleading and in violation of GAAP. Specifically, the 1934 Act Defendants: (i) materially understated Shoals' warranty reserves with respect to the BLA defect; and (ii) failed to make required disclosures regarding the extent of costs associated with remediating the BLA defect; and

(d)     Contrary to the misleading warnings that "[Shoals] may face warranty, indemnity and product liability claims arising from defective products," the Company was already facing such claims arising from the BLA defect.

### 4.     December 2022 SPO Materially Misleading Statements and Omissions

93.     On November 30, 2022, Shoals filed with the SEC (on Form S-3) a registration statement for the SPOs, which was also declared effective on that date (the "SPO Registration Statement"). On December 5, 2022, Shoals filed with the SEC (on Form 424B5) a prospectus supplement, which incorporated and formed part of the SPO Registration Statement, *i.e.*, the December 2022 SPO Prospectus. In the December 2022 SPO, Shoals and defendant Solon collectively sold 29.9 million shares of Shoals Common Stock at $22.25 per share, which included a

full exercise of the underwriters' overallotment option, for over $665 million in gross offering proceeds.

94.    The SPO Registration Statement highlighted the purported "safety" and "reliability" of Shoals' products, representing that the Company's "mission" was to provide products that improved the "reliability and safety" of client projects.

95.    The SPO Registration Statement also incorporated by reference the 3Q22 Form 10-Q. As detailed below in §V.B., the 3Q22 Form 10-Q did not include any product warranty accrual or disclosure related to the BLA defect.  Instead, Shoals vaguely and misleadingly warned investors that "we may face warranty, indemnity and product liability claims arising from defective products."

96.    The statements set forth above in ¶¶93-95 were materially misleading or omitted material information necessary to make them not misleading (that was unbeknownst to investors) for the following reasons:

        (a)    Contrary to the 1934 Act Defendants' claims that Shoals' products were of "superior quality, reliability, and safety," and Shoals' products had "less potential for failure," Shoals had already received customer complaints regarding the BLA defect and had conducted a site inspection, in which the customer complaint of the BLA defect was verified.  The estimate of remediation costs at the initial site inspection amounted to several million dollars, and Shoals had also identified several other sites in the country that were experiencing the same issues, which the cost of remediation was estimated to be over $15 million.  There were no quality controls, checks, or testing on the wiring used in Shoals' products by anyone internally at Shoals before December 2023;

        (b)    While the 1934 Act Defendants touted the cost savings and lower maintenance costs compared to competing products, they knew that defects with their BLAs were widespread.

- 31 -

Remediating defective wire harnesses did not result in cost savings and lower maintenance costs and would in fact lead to increased installation costs associated with their replacement;

(c)     As detailed below in §V.B., the 1934 Act Defendants' failure to properly account for and disclose the BLA defect rendered Shoals' 3Q22 financial statements, included in the 3Q22 Form 10-Q, materially false and misleading and in violation of GAAP.  Specifically, the 1934 Act Defendants: (i)  materially understated Shoals' warranty reserves with respect to the BLA defect; and (ii)  failed to make required disclosures regarding the extent of costs associated with remediating the BLA defect; and

(d)     Contrary to the misleading warnings that "[Shoals] may face warranty, indemnity and product liability claims arising from defective products," the Company was already facing such claims arising from the BLA defect.

### 5.     4Q22 and FY22 Materially Misleading Statements and Omissions

97.     On February 28, 2023, Shoals issued a press release announcing the Company's financial results for its fourth fiscal quarter and year ended December 31, 2022 ("4Q22 Release"). The 4Q22 Release quoted defendant Whitaker who represented that Shoals was "commercially, operationally, and financially" the strongest "it ha[d] ever been," stating in pertinent part as follows:

> The strength of demand for our products is underscored by the $428.6 million of backlog and awarded orders that we ended the year with, which represented growth of 43% compared to the same time last year.  As a matter of fact, in just the first few weeks of the new year, ***backlog and awarded orders has hit another record high yet again***, as we have continued to win new customers.  I am incredibly proud of what Shoals has accomplished over the past several years and that ***I will leave the Company commercially, operationally and financially stronger than it has ever been*** . . . .

98.     The 4Q22 Release highlighted the purported "safety" and "reliability" of Shoals' products, representing that "[s]ince its founding in 1996, the Company has introduced innovative

- 32 -

technologies and systems solutions that allow its customers to substantially increase installation efficiency and safety while improving system performance and reliability."

99.     The same day, Shoals published a 4Q22 Investor Presentation, which contained the same materially false and misleading statements as its 1Q22 Presentation as set forth above in ¶79.

100.     That same day, Shoals filed with the SEC an annual report on Form 10-K for its fiscal year ended December 31, 2022 ("FY22 Form 10-K"), which was signed by defendants Whitaker and Bardos, among others.  The FY22 Form 10-K stated that Shoals' provision for accrued warranty liability was $600,000 as of December 31, 2022.  As detailed below in §V.B., the FY22 Form 10-K did not include any specific product warranty accrual or disclosure related to the BLA defect. Instead, Shoals vaguely and misleading warned investors that "we may face warranty, indemnity and product liability claims arising from defective products."

101.     The FY22 Form 10-K further represented that Shoals' use of "interconnect harnesses" and BLA as part of its combine-as-you-go architecture resulted in "greater reliability" and "lower maintenance costs" as compared to conventional "homerun" systems, stating in pertinent part as follows:

> Connection points are often the source of failure in EBOS systems and must be inspected regularly. ***A solar energy project that uses our interconnect harness and BLA will have significantly fewer connections and, as a result, fewer failure points to inspect*** and maintain than the same project would using a conventional homerun system. ***We believe fewer potential failure points contributes to higher reliability and lower maintenance costs for solar energy projects that use our combine-as-you-go system when compared to a conventional homerun system***.

102.     The statements set forth above in ¶¶97-101 were materially misleading or omitted material information necessary to make them not misleading (that was unbeknownst to investors) for the following reasons:

(a)     Contrary to the 1934 Act Defendants' claims that Shoals' products were of "superior quality, reliability, and safety," and Shoals' products had "less potential for failure,"

- 33 -

Shoals had already received customer complaints regarding the BLA defect and had conducted a site inspection, in which the customer complaint of the BLA defect was verified. The estimate of remediation costs at the initial site inspection amounted to several million dollars, and Shoals had also identified several other sites in the country that were experiencing the same issues, which the cost of remediation was estimated to be over $15 million. There were no quality controls, checks, or testing on the wiring used in Shoals' products by anyone internally at Shoals before December 2023;

(b)     While the 1934 Act Defendants touted the cost savings and lower maintenance costs compared to competing products, they knew that defects with their BLAs were widespread. Remediating defective wire harnesses did not result in cost savings and lower maintenance costs and would in fact lead to increased installation costs associated with their replacement;

(c)     As detailed below in §V.B., the 1934 Act Defendants' failure to properly account for and disclose the BLA defect rendered Shoals' FY22 financial statements, included in the FY22 Form 10-K, materially false and misleading and in violation of GAAP. Specifically, the 1934 Act Defendants: (i) materially understated Shoals' warranty reserves with respect to the BLA defect; and (ii) failed to make required disclosures regarding the extent of costs associated with remediating the BLA defect; and

(d)     Contrary to the misleading warnings that "[Shoals] may face warranty, indemnity and product liability claims arising from defective products," the Company was already facing such claims arising from the BLA defect.

### 6.     March 2023 SPO Materially Misleading Statements and Omissions

103.     On March 7, 2023, Shoals filed with the SEC (on Form 424B5) a SPO Prospectus, ("March 2023 SPO Prospectus"), which incorporated and formed part of the SPO Registration

- 34 -

Statement. In the March 2023 SPO, defendant Solon collectively sold 24.5 million shares of Shoals Common Stock at $24.70 per share, for over $594 million in gross offering proceeds.

104.     The SPO Registration Statement highlighted the purported "safety" and "reliability" of Shoals' products.

105.     The SPO Registration Statement also incorporated by reference the 3Q22 Form 10-Q. As detailed below in §V.B., the 3Q22 Form 10-Q did not include any product warranty accrual or disclosure related to the BLA defect. Instead, Shoals vaguely and misleadingly warned investors that "we may face warranty, indemnity and product liability claims arising from defective products."

106.     The statements set forth above in ¶¶103-105 were materially misleading or omitted material information necessary to make them not misleading (that was unbeknownst to investors) for the following reasons:

(a)     Contrary to the 1934 Act Defendants' claims regarding "safety" and "reliability," Shoals had already received customer complaints regarding the BLA defect and had conducted a site inspection, in which the customer complaint of the BLA defect was verified. The estimate of remediation costs at the initial site inspection amounted to several million dollars, and Shoals had also identified several other sites in the country that were experiencing the same issues, which the cost of remediation was estimated to be over $15 million. There were no quality controls, checks, or testing on the wiring used in Shoals' products by anyone internally at Shoals before December 2023;

(b)     While the 1934 Act Defendants touted the cost savings and lower maintenance costs compared to competing products, they knew that defects with their BLAs were widespread. Remediating defective wire harnesses did not result in cost savings and lower maintenance costs and would in fact lead to increased installation costs associated with their replacement;

- 35 -

(c)     As detailed below in §V.B., the 1934 Act Defendants' failure to properly account for and disclose the BLA defect rendered Shoals' 3Q22 financial statements, included in the 3Q22 Form 10-Q, materially false and misleading and in violation of GAAP.  Specifically, the 1934 Act Defendants: (i) materially understated Shoals' warranty reserves with respect to the BLA defect; and (ii) failed to make required disclosures regarding the extent of costs associated with remediating the BLA defect; and

(d)     Contrary to the misleading warnings that "[Shoals] may face warranty, indemnity and product liability claims arising from defective products," the Company was already facing such claims arising from the BLA defect.

### 7.     1Q23 Materially Misleading Statements and Omissions

107.    On May 8, 2023, Shoals issued a press release announcing the Company's financial results for the quarter ended March 31, 2023 ("1Q23 Release").  The 1Q23 Release highlighted the purported "safety" and "reliability" of Shoals' products, representing that "[s]ince its founding in 1996, the Company has introduced innovative technologies and systems solutions that allow its customers to substantially increase installation efficiency and safety while improving system performance and reliability."

108.    Also on May 8, 2023, Shoals held a conference call with analysts to discuss the Company's financial and operational results for the 1Q23, hosted by defendants Tolnar and Bardos. Defendant Tolnar highlighted the purported "safety" and "reliability" of Shoals' products, claiming the Company had "invested millions of dollars" over the "last 27 years" to develop its EBOS solutions that "significantly increased installation efficiency and safety" and "improving system performance and reliability for the utility scale solar" market, among others.

109.    The same day, Shoals published a 1Q23 Investor Presentation, which contained the same materially false and misleading statements as its 1Q22 Presentation as set forth above in ¶79.

110.     On May 8, 2023 Shoals also filed its 1Q23 Form 10-Q with the SEC, which was signed by defendants Tolnar and Bardos.  The 1Q23 Form 10-Q stated that Shoals' provision for accrued warranty liability was $400,000 as of March 31, 2023.

111.     In addition, the 1Q23 Form 10-Q included the following disclosure regarding the BLA defect:

> The Company has been notified by certain customers that a subset of wire harnesses used in its EBOS solutions is presenting excessive pull back of wire insulation at connection points ("shrinkback").  ***Based upon the Company's initial assessment, the Company believes the shrinkback is related to a subset of specific colored wire provided by one specific supplier.  While it is probable that the Company will incur costs related to the repair or replacement of the impacted wire harnesses, based on the limited information available as of the date of this Quarterly Report, including the scope of affected sites, potential solutions and the possibility of recovery from the wire supplier, it is not possible to reasonably estimate those costs***.  The Company is continuing its investigation of this matter to determine a course of action, and has substantially ceased use of the related wire from this supplier.

112.     The statements set forth above in ¶¶107-111 were materially misleading or omitted material information necessary to make them not misleading (that was unbeknownst to investors) for the following reasons:

(a)     Contrary to the 1934 Act Defendants' claims that Shoals' products were of "superior quality, reliability, and safety," and Shoals' products had "less potential for failure," Shoals had already received customer complaints regarding the BLA defect and had conducted a site inspection, in which the customer complaint of the BLA defect was verified.  The estimate of remediation costs at the initial site inspection amounted to several million dollars, and Shoals had also identified several other sites in the country that were experiencing the same issues, which the cost of remediation was estimated to be over $15 million.  There were no quality controls, checks, or testing on the wiring used in Shoals' products by anyone internally at Shoals before December 2023;

(b)     While the 1934 Act Defendants touted the cost savings and lower maintenance costs compared to competing products, they knew that defects with their BLAs were widespread. Remediating defective wire harnesses did not result in cost savings and lower maintenance costs and would in fact lead to increased installation costs associated with their replacement; and

(c)     As detailed below in §V.B., the 1934 Act Defendants' failure to properly account for and disclose the BLA defect rendered Shoals' 1Q23 financial statements, included in the 1Q23 Form 10-Q, materially false and misleading and in violation of GAAP. Specifically, the 1934 Act Defendants: (i) materially understated Shoals' warranty reserves with respect to the BLA defect; and (ii) failed to make required disclosures regarding the extent of costs associated with remediating the BLA defect including an estimate of the possible loss or range of loss related to the BLA defect as required by GAAP.

## 8.     2Q23 Materially Misleading Statements and Omissions

113.     On August 1, 2023, Shoals issued a press release announcing the Company's financial results for the quarter ended June 30, 2023 ("2Q23 Release"). The 2Q23 Release and a related earnings call unexpectedly revealed that Shoals was recording a $9.4 million warranty expense primarily due to the BLA defect. As a result, the 2Q23 Release reported that Shoals' quarterly gross profit margin had declined sequentially to 42.4% from approximately 46% reported in the prior quarter.

114.     The 2Q23 Release quoted defendant Tolnar who highlighted Shoals' purported "outstanding performance" and the "records for revenue and earnings" purportedly achieved during the quarter and claimed that demand for Shoals' products was "robust" and "remained strong." In announcing these results, the 2Q23 Release highlighted the purported "safety" and "reliability" of Shoals' products.

- 38 -

115.    On August 1, 2023, Shoals held a conference call with analysts to discuss the Company's financial and operational results for 2Q23, hosted by defendants Moss, Bardos, and Tolnar.

116.    During the call, an analyst from Oppenheimer inquired regarding the scope of the warranty expense issue, including the number of customers and shipments impacted, as well as how long these issues had occurred:

> [Oppenheimer analyst:] Can you talk a little bit about the wire ratio, what the nature of the technical problem was? And how expensive it was in terms of the number of customers, the number of shipments and how much time it was spread over?

> [Bardos:] So a couple of things. Let me take that one on first, Colin. So this is an open investigation. We've communicated pretty much everything we can. In our Q, you'll see information about the wire issue that was limited to one of our suppliers in the subset of our products.

> **The charge that we booked in the quarter, we believe, is adequate to do the remediation required, that's why we booked it**. And we continue to explore this issue further. It is an ongoing open item for us, and we will continue to work with the supplier. We really can't disclose much about that. We certainly want to be very respectful of the supplier, and we're really taking our customer care first and foremost at heart. We are going to stand behind these products first to take care of our customers first and we'll deal with the supplier after that.

117.    The same day, Shoals published a 2Q23 Investor Presentation, which contained the same materially false and misleading statements as its 1Q22 Presentation as set forth above in ¶79.

118.    On August 1, 2023, Shoals filed with the SEC a quarterly report on Form 10-Q for the quarter ended June 30, 2023 ("2Q23 Form 10-Q"), which was signed by defendants Moss and Bardos. The 2Q23 Form 10-Q included a disclosure regarding the BLA defect and stated that Shoals' provision for accrued warranty expense related to the BLA defect was $9.3 million as of June 30, 2023.

119. The statements set forth above in ¶¶113-118 were materially misleading or omitted material information necessary to make them not misleading (that was unbeknownst to investors) for the following reasons:

(a) Contrary to the 1934 Act Defendants' claims that Shoals' products were of "superior quality, reliability, and safety," and Shoals' products had "less potential for failure," Shoals had already received customer complaints regarding the BLA defect and had conducted a site inspection, in which the customer complaint of the BLA defect was verified. The estimate of remediation costs at the initial site inspection amounted to several million dollars, and Shoals had also identified several other sites in the country that were experiencing the same issues, which the cost of remediation was estimated to be over $15 million. There were no quality controls, checks, or testing on the wiring used in Shoals' products by anyone internally at Shoals before December 2023;

(b) While the 1934 Act Defendants touted the cost savings and lower maintenance costs compared to competing products, they knew that defects with their BLAs were widespread. Remediating defective wire harnesses did not result in cost savings and lower maintenance costs and would in fact lead to increased installation costs associated with their replacement; and

(c) As detailed below in §V.B. the 1934 Act Defendants' failure to properly account for and disclose the BLA defect rendered Shoals' 2Q23 financial statements, included in the 2Q23 Form 10-Q, materially false and misleading and in violation of GAAP. Specifically, the 1934 Act Defendants: (i) materially understated Shoals' warranty reserves with respect to the BLA defect; and (ii) failed to make required disclosures regarding the extent of costs associated with remediating the BLA defect including an estimate of the possible loss or range of loss related to the BLA defect as required by GAAP.

## 9.    3Q23 Materially Misleading Statements and Omissions

120.    On November 7, 2023, Shoals issued a press release announcing the Company's financial results for the quarter ended September 30, 2023 ("3Q23 Release"). Despite assurances from defendant Bardos that the $9.4 million warranty expense incurred in the second quarter was "adequate" to cover shrinkback remediation costs, the 3Q23 Release surprisingly revealed that Shoals' shrinkback warranty expenses had ballooned in the quarter to more than $50 million – representing a greater than five-fold increase. As a result, the 3Q23 Release revealed that Shoals' quarterly gross profit had declined more than 60% to $14 million from $36 million in the prior-year quarter and that the Company had suffered a net loss of $9.8 million in the quarter compared to net income of $12.8 million in the prior-year period.

121.    The same day, Shoals published a 3Q23 Investor Presentation, which provided a "WARRANTY LIABILITY UPDATE," which stated that "it is believed that approximately 300 sites may have harnesses made with this wire, representing about 30% of the total amount of Shoals' harnesses manufactured during the same timeframe." The update further stated that "[a]t the end of [3Q23], the Company has recorded a warranty liability of $56.6 [million] and determined that the high end of the range is $184.9 [million]."

122.    On November 7, 2023, Shoals also held a conference call with analysts to discuss the Company's financial and operational results for the third quarter of 2023, hosted by defendants Moss and Bardos.

123.    In prepared remarks on the call, defendant Moss addressed the Company's position on the shrinkback issue:

> I'd like to take some time now to discuss where we stand on our investigation
> and remediation of the wire insulation shrinkback warranty issue. On October 31,
> we filed a complaint to recover for damages caused by defective wire that Prysmian
> Cables & Systems USA LLC sold to Shoals between 2020 and approximately 2022.
> Shoals has already expended millions of dollars in identification, repair and

replacement of defective wire and is seeking full recovery from Prysmian for those as well as future expenses related to the issue.

\*     \*     \*

Based on our own investigation and third-party testing, we determined that unacceptable amounts of insulation shrinkback were occurring on Prysmian wire purchased from 2020 through 2022.

\*     \*     \*

Shoals is committed to quality. Based on the information we have gathered to date, it is apparent that this insulation shrinkback issue is unique to the defective Prysmian wire and not from any other wire suppliers.

124.    That same day, Shoals filed with the SEC a quarterly report on Form 10-Q for the quarter ended September 30, 2023 ("3Q23 Form 10-Q"), which was signed by defendants Moss and Bardos. The 3Q23 Form 10-Q included a disclosure regarding the BLA defect and stated that Shoals' provision for accrued warranty expense related to the BLA defect was $56.6 million as of September 30, 2023.

125.    The statements set forth above in ¶¶120-124 were materially misleading or omitted material information necessary to make them not misleading (that was unbeknownst to investors) for the following reasons:

(a)    Contrary to the 1934 Act Defendants' statements touting Shoals "record" backlog and "strength of demand" in awarded orders, Shoals' sale of defective wire harnesses had negatively impacted the Company's customer relationships. The widespread use of defective wires in its projects had significantly damaged Shoals' reputational standing among its customers. As a result, the 1934 Act Defendants did not in fact believe, and had no basis to believe, that Shoals' backlog was in strong condition;

(b)    As detailed below in §V.B., the 1934 Act Defendants' failure to properly account for and disclose the BLA defect rendered Shoals' 3Q23 financial statements, included in the

- 42 -

3Q23 Form 10-Q, materially false and misleading and in violation of GAAP. Specifically, the warranty accrual and disclosure pertaining to the BLA defect in the 3Q23 Form 10-Q failed to reflect the actual minimum costs to remediate the BLA defect which totaled at least $73 million as of September 30, 2023; and

(c)     As would be subsequently revealed, the defective – and potentially dangerous – wire harnesses used on so many of the Company's projects negatively impacted Shoals' customer relationships after Shoals finally disclosed the issue to its customers. For example, a November 10, 2023 Roth MKM analyst report stated that the analysts' "checks" with Shoals' customers "suggest that since receiving the safety notice from SHLS regarding shrinkback . . . , customers are likely scrambling to identify any instances of the issue. ***Critical concerns we have heard include (1) Serious injury or death, (2) The exposed wiring may cause fire and property damage, and (3) PUCs may get involved with increased scrutiny***." According to the report and as acknowledged by Shoals, at least one affected site had already suffered property damage arising from a brush fire believed to have ignited as a result of contact with a defective, Shoals-installed wire harness.

### 10.     4Q23 Materially Misleading Statements and Omissions

126.    On February 28, 2024, Shoals issued a release announcing the Company's financial results for its fourth fiscal quarter and year ended December 31, 2023 ("4Q23 Release"). The 4Q23 Release revealed that growth in Shoals' backlog and awarded orders had materially deteriorated, falling sequentially by $2 million to $631.3 million, down from $633.3 million in the prior quarter. In addition, the 4Q23 Release issued disappointing financial guidance for 1Q24 and FY24. In particular, the 4Q23 Release issued quarterly revenue guidance of $90 million to $100 million, revealing that quarterly revenue was projected to decline sequentially by more than $35 million at the midpoint of the range. In addition, the 4Q23 Release provided 2024 annual revenue guidance for

- 43 -

the Company of $480 million to $520 million, which at the midpoint was approximately 19% below consensus analyst estimates of approximately $620 million.

127. The same day, Shoals published a 4Q23 Investor Presentation, which disclosed that "[i]nitially, shrinkback issues were found on at least 20 sites of the approximately 300 sites that may have had the defective Prysmian red wire" but that Shoals had been "informed that approximately 10 incremental [*i.e.*, additional] sites [had] experienced shrinkback."

128. That same day, Shoals filed with the SEC an annual report on Form 10-K for its fiscal year ended December 31, 2023 ("FY23 Form 10-K"), which was signed by defendants Moss and Bardos. The FY23 Form 10-K included a disclosure regarding the BLA defect and stated that Shoals' provision for accrued warranty expense related to the BLA defect was $54.9 million as of December 31, 2023.

129. The statements set forth above in ¶¶128-130 were materially misleading or omitted material information necessary to make them not misleading (that was unbeknownst to investors) for the following reason:

(a) As detailed below in §V.B., the 1934 Act Defendants' failure to properly account for and disclose the BLA defect rendered Shoals' FY23 financial statements, included in the FY23 Form 10-K, materially false and misleading and in violation of GAAP. Specifically, the warranty accrual and disclosure pertaining to the BLA defect in the FY23 Form 10-K failed to reflect the actual minimum costs to remediate the BLA defect which totaled at least $73 million as of December 31, 2023.

**B. Shoals' Class Period Financial Statements Violated GAAP**

130. As alleged herein, the 1934 Act Defendants' failure to properly account for and disclose the BLA defect rendered Shoals' Class Period financial statements materially false and

- 44 -

misleading and in violation of GAAP.[8]  Specifically, the 1934 Act Defendants: (i) materially understated Shoals' warranty reserves with respect to the BLA defect; and (ii) failed to make required disclosures regarding the extent of costs associated with remediating the BLA defect.

131.    Under GAAP, the Financial Accounting Standards Board ("FASB") ASC 460, *Guarantees* governs the accounting for "warranty obligations incurred in connection with the sale of goods or services."  In turn, ASC 460 states that because of the uncertainty surrounding claims that may be made under warranties, warranty obligations fall within the definition of a "loss contingency" as defined under ASC 450, *Contingencies*.[9]

132.    ASC 450 includes requirements for both disclosure of a loss contingency and the accrual of a loss contingency.  ASC 450 requires that an estimated loss from a loss contingency (here, Shoals' product warranty obligations), shall be accrued by a charge to income if both of the following conditions are met: (a) information available before the financial statements are issued indicates that it is probable that a liability had been incurred at the date of the financial statements (*i.e.*, it is probable that customers will make claims under warranties relating to goods or services that have been sold); and (b) the amount of loss can be reasonably estimated.  Under ASC 450, "probable" is defined as "[t]he future event or events are likely to occur."  If a loss contingency "cannot be reasonably estimated," ASC 450 requires comprehensive disclosure of the potential loss.  Specifically, ASC 450 requires that when a loss is at least "reasonably possible," the disclosure shall

---

[8]    GAAP constitutes those standards recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time, and are the common set of accounting principles, standards, and procedures that companies in the United States use to prepare their financial statements.  According to SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)), financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate.

[9]    ASC 450 defines a loss contingency as "[a]n existing condition, situation, or set of circumstances involving uncertainty as to [a] possible loss to an entity that will ultimately be resolved when one or more future events occur or fail to occur."

- 45 -

indicate the "nature of the contingency" and "[a]n estimate of the possible loss or range of loss or a statement that such an estimate cannot be made." Under ASC 450, "reasonably possible" is defined as, "[t]he chance of the future event or events occurring is more than remote but less than likely."

133. As detailed below, by no later than May 17, 2022, the date Shoals filed its 1Q22 Form 10-Q, the requirements for accrual and/or disclosure of the BLA defect under ASC 450 had been met. As a result, Shoals was required under GAAP to accurately account for and fully disclose the nature and scope of the BLA defect, and the corresponding remediation costs, in its Class Period SEC filings. However, as detailed below, in violation of ASC 450, the 1934 Act Defendants materially understated Shoals' warranty obligations and concealed the true scope of the BLA defect in the Company's Class Period SEC filings.

134. ***Shoals filed its 1Q22 Form 10-Q on May 17, 2022***. As of this date, the BLA defect and associated remediation costs represented a material loss contingency under ASC 450. By no later than March 2022, Shoals had received an initial customer complaint regarding the BLA defect and had conducted a site inspection in Phoenix, Arizona, in which the customer complaint of the defect was verified. Thereafter, "Shoals, at its own expense, and to support its customer, replaced affected harnesses" at the affected sites. According to FEs 1 and 2, the estimate of remediation costs at the initial site amounted to several million dollars. FE1 also explained that in addition to the initial report from Phoenix, there was a sister project close by just outside of Phoenix that also started to show similar issues with exposed wire just weeks later. FEs 1 and 2 also explained that the Company was soon made aware of four or five other sites in the country that were experiencing the same issues. The Company would later acknowledge that the actual minimum costs to remediate the

BLA defect across all affected sites was at least $73 million.[10]  Despite these facts and circumstances, the 1934 Act Defendants failed to record any specific warranty reserves or make any disclosures related to the BLA defect in its 1Q22 Form 10-Q.  Instead, Shoals vaguely and misleadingly warned investors that "we *may* face warranty, indemnity and product liability claims arising from defective products."  Meanwhile, Shoals had a warranty reserve of $600,000 or less, as of 1Q22.[11]  Shoals' failure to accrue for and/or disclose the BLA defect violated GAAP. Specifically, by May 17, 2022, it was "probable" that Shoals would incur significant remediation costs related to the BLA defect and the initial costs could be "reasonably estima[ted]" as the Company had already inspected numerous affected sites and started remediation at those sites.  Thus, Shoals was required under ASC 450 to record a warranty accrual for the costs that could be reasonably estimated.  In addition, even if the total remediation costs could not yet be reasonably estimated, there was clearly a "more than remote" chance that Shoals would incur material remediation costs related to the BLA defect.  Thus, Shoals was required under ASC 450 to disclose the specific nature of the warranty loss contingency and either estimate "the possible loss or range of loss" or "state[] that such an estimate c[ould] []not be made."

135.    ***Shoals filed its 2Q22 Form 10-Q on August 16, 2022***.  As of this date, the BLA defect and associated remediation costs represented a material loss contingency under ASC 450. After the initial customer complaints, Shoals had continued to investigate the BLA defect and had conducted numerous additional site inspections which further verified the defect was not an isolated incident.  According to FEs 1 and 2, by June 2022, Shoals was aware of at least four to five other

---

[10]    On November 12, 2024, Shoals revealed that estimated remediation costs would be at least $73 million and could be as high as $160 million.

[11]    Shoals did not specifically disclose its warranty reserve as of 1Q22.  However, subsequent disclosures revealed that Shoals' warranty reserve was only $100,000 as of December 31, 2021, and only $600,000 as of December 31, 2022.

4918-5081-5490.v1

solar fields that were experiencing the same issues as the initial site in Phoenix. Shoals continued to replace the defective harnesses at customer sites at its own expense. According to FE2, the estimate of remediation costs across these sites likely amounted to more than $15 million. In total, the Company would later acknowledge that the actual minimum costs to remediate the BLA defect across all affected sites was at least $73 million.[12] Despite these facts and circumstances, the 1934 Act Defendants failed to record any specific warranty reserves or make any disclosures related to the BLA defect in its 1Q22 Form 10-Q. Instead, Shoals vaguely and misleadingly warned investors that "we **may** face warranty, indemnity and product liability claims arising from defective products." Meanwhile, Shoals had a warranty reserve of $600,000, or less, as of 2Q22.[13] Shoals' failure to accrue for and/or disclose the BLA defect violated GAAP. Specifically, by August 16, 2022, it was "probable" that Shoals would incur significant remediation costs related to the BLA defect and the initial costs could be "reasonably estima[ted]" as the Company had already inspected numerous affected sites and started remediation at those sites. Thus, Shoals was required under ASC 450 to record a warranty accrual for the costs that could be "reasonably estimated." In addition, even if total remediation costs could not yet be reasonably estimated, there was clearly a "more than remote" chance that Shoals would incur material remediation costs related to the BLA defect. Thus, Shoals was required under ASC 450 to disclose the specific nature of the warranty loss contingency and either estimate "the possible loss or range of loss" or "state[] that such an estimate c[ould] []not be made."

---

[12]   On November 12, 2024, Shoals revealed that estimated remediation costs would be at least $73 million and could be as high as $160 million.

[13]   Shoals did not specifically disclose its warranty reserve as of 2Q22. However, subsequent disclosures revealed that Shoals' warranty reserve was only $100,000 as of December 31, 2021, and only $600,000 as of December 31, 2022.

136.    *Shoals filed its 3Q22 Form 10-Q on November 14, 2022*.  As of this date, the BLA defect and associated remediation costs represented a material loss contingency under ASC 450. Shoals has subsequently admitted that by late 2022, "numerous other . . . customers began reporting similar instances of copper conductor exposure in the field" and Shoals has contended that it believed "the root cause of the exposed copper conductor is due to unacceptable amounts of insulation shrinkback," which could have been present in *all* shoals sites which were installed in the prior several years using the same wire.  The Company would later acknowledge that the actual minimum costs to remediate the BLA defect across all affected sites was at least $73 million.[14] Despite these facts and circumstances, the 1934 Act Defendants failed to record any specific warranty reserves or make any disclosures related to the BLA defect in the Company's 3Q22 Form 10-Q.  Instead, Shoals vaguely and misleadingly warned investors that "we *may* face warranty, indemnity and product liability claims arising from defective products."  Meanwhile, Shoals had a total warranty reserve of $600,000 or less as of 3Q22.[15]

137.    Shoals' failure to accrue for and/or disclose the BLA defect violated GAAP. Specifically, by November 14, 2022, it was "probable" that Shoals would incur significant remediation costs related to the BLA defect and the costs could be "reasonably estima[ted]" as the Company had already started remediating numerous affected sites and the 1934 Act Defendants had purported to identify the "root cause" of the defect, which made it possible to identify the total population of affected sites.  Thus, Shoals was required under ASC 450 to record a warranty accrual for the remediation costs that could be reasonably estimated.  In addition, even if total remediation

---

[14]    On November 12, 2024, Shoals revealed that estimated remediation costs would be at least $73 million and could be as high as $160 million.

[15]    Shoals did not specifically disclose its warranty reserve as of 3Q22, however, subsequent disclosures revealed that Shoals' warranty reserve was only $100,000 as of December 31, 2021, and only $600,000 as of December 31, 2022.

4918-5081-5490.v1

costs could not yet be reasonably estimated, there was clearly a "more than remote" chance that Shoals would incur material remediation costs related to the BLA defect. Thus, Shoals was required under ASC 450 to disclose the specific nature of the warranty loss contingency and either estimate "the possible loss or range of loss" or "state[] that such an estimate c[ould] []not be made."

138. **_Shoals filed its FY22 Form 10-K on February 28, 2023_**. As of this date, the BLA defect and associated remediation costs represented a material loss contingency under ASC 450. Shoals has admitted that by late 2022, "numerous other . . . customers began reporting similar instances of copper conductor exposure in the field" and contended that "[i]n or around November 2022, Shoals came to understand that the root cause of the exposed copper conductor is due to unacceptable amounts of insulation shrinkback." Shoals was also aware that the BLA defect impacted a wide timeframe of customer installations, dating as far back as FY20. The Company would later acknowledge that the actual minimum costs to remediate the BLA defect across all affected sites was at least $73 million.[16] Despite these facts and circumstances, the 1934 Act Defendants failed to record any specific warranty reserves or make any disclosures related to the BLA defect in its FY22 Form 10-K. Instead, Shoals vaguely and misleadingly warned investors that "we **_may_** face warranty, indemnity and product liability claims arising from defective products." Meanwhile, Shoals' total warranty reserve was only $600,000 as of December 31, 2022.

139. Shoals' failure to accrue for and/or disclose the BLA defect violated GAAP. Specifically, by February 28, 2023, it was "probable" that Shoals would incur significant remediation costs related to the BLA defect and the costs could be "reasonably estima[ted]" as the Company had already started remediating numerous affected sites and the 1934 Act Defendants had purportedly identified the "root cause" of the defect, which made it possible to identify the total

---

[16] On November 12, 2024, Shoals revealed that estimated remediation costs would be at least $73 million and could be as high as $160 million.

4918-5081-5490.v1

population of affected sites. Thus, Shoals was required under ASC 450 to record a warranty accrual for the remediation costs that could be reasonably estimated. In addition, even if total remediation costs could not yet be reasonably estimated, there was clearly a "more than remote" chance that Shoals would incur material remediation costs related to the BLA defect. Thus, Shoals was required under ASC 450 to disclose the specific nature of the warranty loss contingency and either estimate "the possible loss or range of loss" or "state[] that such an estimate c[ould] []not be made."

140. ***Shoals filed its 1Q23 Form 10-Q on May 8, 2023***. As of this date, the BLA defect and associated remediation costs represented a material loss contingency under ASC 450. By May 2023, Shoals and its supplier had conducted further testing and confirmed the BLA defect impacted a wide timeframe of customer installations, dating as far back as FY20. Shoals had also purportedly received further confirmation of the root cause of BLA defect, including contending that its supplier had lacked adequate controls over the manufacturing process. Despite these facts and circumstances, the 1934 Act Defendants failed to record any specific warranty reserves related to the BLA defect in its 1Q23 Form 10-Q. Shoals did disclose the BLA defect for the first time, stating:

> The Company has been notified by certain customers that a subset of wire harnesses used in its EBOS solutions is presenting excessive pull back of wire insulation at connection points ("shrinkback"). Based upon the Company's initial assessment, the Company believes the shrinkback is related to a subset of specific colored wire provided by one specific supplier. While it is probable that the Company will incur costs related to the repair or replacement of the impacted wire harnesses, based on the limited information available as of the date of this Quarterly Report, including the scope of affected sites, potential solutions and the possibility of recovery from the wire supplier, it is not possible to reasonably estimate those costs. The Company is continuing its investigation of this matter to determine a course of action, and has substantially ceased use of the related wire from this supplier. As additional information becomes available, the Company expects to increase its estimated accrued warranty liability, which may be material. The Company does not maintain insurance for product warranty, and as necessary, the Company intends to seek recovery from the third party supplier.

4918-5081-5490.v1

141.    Meanwhile, the 1934 Act Defendants actually **_decreased_** Shoals' total warranty reserve by a third during 1Q23 from $600,000 as of December 31, 2022, to just $400,000 as of March 31, 2023.

142.    Shoals' failure to properly accrue for and/or disclose the true scope of the BLA defect violated GAAP.  Specifically, by May 8, 2023, the 1934 Act Defendants acknowledged that it was "probable" that Shoals would incur significant remediation costs related to the BLA defect, but claimed the costs could not be "reasonably estima[ted]" and thus the 1934 Act Defendants did not record any specific warranty accrual or disclose an estimate of the "the possible loss or range of loss," in accordance with ASC 450.  However, unbeknownst to investors, the Company had: (i) known about the BLA defect for over 12 months; (ii) already started remediating numerous affected sites; and (iii) purportedly identified the "root cause" of the defect, which should have made it possible to identify the total population of affected sites.  Thus, by May 2023, the 1934 Act Defendants knew, or were reckless in not knowing, a reasonable estimate, or at the very minimum, an estimate of the "the possible loss or range of loss" associated with remediating the BLA defect.

143.    **_Shoals filed its 2Q23 Form 10-Q on August 1, 2023_**.  As of this date, the BLA defect and associated remediation costs represented a material loss contingency under ASC 450.

144.    For the first time, the 1934 Act Defendants recorded a specific warranty reserve related to the BLA defect in Shoals' 2Q23 Form 10-Q, stating:

> Based on the Company's analysis of information available as of the date of this Quarterly Report, the Company has determined that it has sufficient information to estimate the low end of the range of potential outcomes.  However, the Company continues to be unable to estimate the upper end of the range of potential outcomes based on the limited information available as of the date of this Quarterly Report, including the scope of affected sites, potential solutions and the possibility of recovery from the wire supplier.  No amount within the range of potential outcomes appears to be a better estimate than any other amount within the range.  Accordingly, as of June 30, 2023, the Company has recorded a warranty liability of $9.3 million related to this matter, representing the low end of the range of potential outcomes.

- 52 -

145.     However, Shoals' $9.3 million warranty reserve as of 2Q23 was materially understated.  The actual minimum costs to remediate the BLA defect totaled at least $73 million. Thus, as depicted in the chart below, Shoals' BLA defect warranty reserve was understated by 87% as of 2Q23.

|  | 2Q23 |
| --- | --- |
| Actual BLA defect remediation costs (minimum) | $73.0 million |
| BLA defect warranty reserve (as reported) | $9.3 million |
| % understated | 87.3% |

146.     Shoals' failure to properly accrue for and/or disclose the true scope of the BLA defect violated GAAP.  Specifically, by August 1, 2023, the 1934 Act Defendants acknowledged that it was "probable" that Shoals would incur significant remediation costs related to the BLA defect, but accrued less than $10 million and failed to disclose an estimate of the "the possible loss or range of loss," in accordance with ASC 450.  Unbeknownst to investors, the Company had: (i) known about the BLA defect for over 12 months; (ii) already started remediating numerous affected sites; and (iii) identified the purported "root cause" of the defect, which should have made it possible to identify the total population of affected sites.  Thus, by August 2023, the 1934 Act Defendants knew, or were reckless in not knowing, a reasonable estimate of remediation costs (to accrue for), or at the very minimum, an estimate of the "the possible loss or range of loss" associated with remediating the BLA defect.

147.     ***Shoals filed its 2Q23 Form 10-Q on November 7, 2023***.  As of this date, the BLA defect and associated remediation costs represented a material loss contingency under ASC 450. Shoals stated in an October 2023 court filing that "Shoals' products using Prysmian red wire that was sold to Shoals between 2020 and approximately 2022 are believed to have been used at approximately 300 solar field sites nationwide."

- 53 -

148.    The 1934 Act Defendants increased Shoals' warranty reserve related to the BLA defect in Shoals' 3Q23 Form 10-Q, stating:

> Based on the Company's continued analysis of information available as of the date of this Quarterly Report, which includes better visibility into the scope of affected sites and potential solutions, including identification, repair and replacement of harnesses, the Company has determined that a potential range of loss was both probable and reasonably estimable and has updated its estimate of potential losses from the estimate provided in the previous quarter.  However, as no amount within the current range of loss appears to be a better estimate than any other amount, the Company has recorded a warranty liability and related expense representing the low end of the range of potential loss of $59.7 million.  The high-end of the range of potential loss is $184.9 million, which is $125.2 million higher than the amount we recorded.  As of September 30, 2023, our recorded warranty liability related to this matter was $56.6 million.

149.    However, Shoals' $56.6 million warranty reserve was materially understated.  The actual minimum costs to remediate the BLA defect totaled at least $73 million, with at least $69.9 million in remediation costs remaining as of 3Q23.  Thus, as depicted in the chart below, Shoals' BLA defect warranty reserve was understated by nearly 20% as of 3Q23.

|  | 3Q23 |
|---|---|
| **Actual BLA defect remediation costs (minimum)** | $73.0 million |
| **Remediation costs remaining as of 3Q22** | $69.9 million[17] |
|  |  |
| **BLA defect warranty reserve (as reported)** | $56.6 million |
| **% understated** | 19.0% |

150.    Shoals' failure to properly accrue for and/or disclose the true scope of the BLA defect violated GAAP.  Specifically, by November 7, 2023, the 1934 Act Defendants acknowledged that it was "probable" that Shoals would incur significant remediation costs related to the BLA defect, but accrued just $56 million in warranty reserves.  As alleged herein, the 1934 Act Defendants knew, or were reckless in not knowing, that remediation costs associated with remediating the BLA defect would total over $70 million, at a minimum.

---

[17]   Note: remediation costs remaining is net of payments made through 3Q23.

4918-5081-5490.v1

151. ***Shoals filed its FY23 Form 10-K on February 28, 2024***. As of this date, the BLA defect and associated remediation costs represented a material loss contingency under ASC 450.

152. The 1934 Act Defendants failed to increase its Shoals' warranty reserve related to the BLA defect in Shoals' FY23 Form 10-K, stating:

> As of December 31, 2023, based on the Company's continued analysis, which included better visibility into the scope of affected sites and potential solutions, including identification, repair and replacement of harnesses, the Company determined that a potential range of loss was both probable and reasonably estimable and updated its estimate of potential losses from previously provided estimates. Based on the Company's continued analysis of information available as of the date of this Annual Report, the estimate of potential losses remains unchanged from the estimate provided as of September 30, 2023. As no amount within the current range of loss appears to be a better estimate than any other amount, the Company has recorded a warranty liability and related expense representing the low end of the range of potential loss of $59.7 million. The high-end of the range of potential loss is $184.9 million, which is $125.2 million higher than the amount we have recorded. As of December 31, 2023, the Company recorded a warranty liability of $54.9 million related to this matter.

153. Shoals' $54.9 million warranty reserve was materially understated. The actual minimum costs to remediate the BLA defect totaled at least $73 million, with at least $68.2 million in remediation costs remaining as of 4Q23. Thus, as depicted in the chart below, Shoals' BLA defect warranty reserve was understated by nearly 20% as of 4Q23.

| | 4Q23 |
|---|---|
| Actual BLA defect remediation costs (minimum) | $73.0 million |
| Remediation costs remaining as of 3Q22 | $68.2 million[18] |
| | |
| BLA defect warranty reserve (as reported) | $54.9 million |
| % understated | 19.5% |

154. Shoals' failure to properly accrue for and/or disclose the true scope of the BLA defect violated GAAP. Specifically, by February 28, 2024, the 1934 Act Defendants acknowledged that it was "probable" that Shoals would incur significant remediation costs related to the BLA defect, but

---

[18] Note: remediation costs remaining is net of payments made through 4Q23.

had accrued just $56 million in warranty reserves. As alleged herein, the 1934 Act Defendants knew, or were reckless in not knowing, that remediation costs associated with remediating the BLA defect would total over $70 million, at a minimum.

## VI. LOSS CAUSATION/ECONOMIC LOSS – 1934 CLAIMS ONLY

155. During the Class Period, as detailed herein, defendants engaged in a scheme to defraud and made materially untrue, false, and misleading statements and/or omitted material information concerning Shoals' business fundamentals and financial prospects. Defendants' wrongful course of conduct – which for the 1934 Act Defendants was fraudulent – had the effect of artificially inflating, maintaining, and manipulating the price of Shoals Common Stock and deceived Plaintiffs and the Class, causing purchases of Shoals Common Stock to suffer economic harm as the truth reached the market. When the circumstances concealed by defendants began to come out, it caused the price of Shoals Common Stock to fall as the prior artificial inflation came out of the stock price. As a result of their purchase or acquisition of Shoals Common Stock at inflated prices during the Class Period, and the decline in the price of Shoals Common Stock when the relevant truth began to be revealed, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws. The following paragraphs detail examples of instances, both during and after the Class Period, in which the relevant truth was partially revealed.

156. On August 1, 2023, Shoals unexpectedly revealed that Shoals was recording a $9.4 million warranty expense primarily due to the shrinkback issue. As a result, the 2Q23 Release reported that Shoals' quarterly gross profit margin had declined sequentially to 42.4% from approximately 46% reported in the prior quarter. But analysts and investors were still in the dark on just how pervasive this shrinkback problem was and the growing negative repercussions it would have on Shoals later on in the Class Period.

- 56 -

157. On this news, the price of Shoals Common Stock fell from $26.11 per share on August 1, 2023 to $24.51 per share on August 2, 2023, or approximately 6%, on above-average trading volume of over 6 million shares traded.

158. The financial impact and potential overhang for Shoals of the shrinkback problem did not go unnoticed by analysts.

(a) One analyst from Piper Sandler noted in an August 1, 2023 report that Shoals' "charge is well above the $0.5M increase in the warranty reserve balance during 2022" and that "[a]ccordingly, adjusting [gross margins] to account for excess warranty would imply 50% 2Q margins."

(b) Another analyst from UBS wrote in an August 1, 2023 report about the $9 million warranty charge for "potential wire shrinkage issues" and further noted that it was "[u]nclear if this issue will be an on-going issue."

(c) In an August 2, 2023 report, an analyst from Truist Securities wrote that "excluding the Company's $9.4MM warranty expense recorded during the quarter, SHLS would have achieved record GMs of >50%."

(d) An August 3, 2023 TD Cowen analyst report noted that "Shoals reported another quarter of solid results, hindered by a one-time warranty item related to a faulty wire component from one supplier."

(e) A Barclays analyst report published on August 3, 2023 noted:

**How much of a risk is this warranty issue**?: With the 1Q 10-Q, the company disclosed for the first time that it was notified by certain customers that a subset of wire harnesses were presenting excessive pull back of wire insulation at connection points and noted that it "expects to increase its estimated accrued warranty liability, which may be material." It also noted that it does not "maintain insurance for product warranty, and as necessary, the company intends to seek recovery from the third party supplier." The 2Q 10-Q states that it has "recorded a warranty liability of $9.3 million related to this matter, representing the low end of

the range of potential outcomes."  It may also "increase its estimated warranty liability from its current accrual, and such increase may be material."  We aren't sure what to make of this issue – we are inclined to think that there could be future accruals in forward quarters, which would continue to show up in gross margins, but also don't know how much the company will be able to recover from the supplier, which they have already stopped using.  Anecdotally, we have heard from channel checks that there is a bit of a debate going on around whether or not the issue is due to the wire or faulty installation.

159.  However, the price of Shoals Common Stock continued to be artificially inflated as the 1934 Act Defendants continued to make material misstatements and omissions and to conceal the full truth regarding the Company's business, operations, and financial results.

160.  On November 7, 2023, Shoals reported that it had booked $50.2 million in warranty expenses for the quarter related to the shrinkback issue – representing a greater than five-fold increase from the $9.4 million warranty expense incurred in 2Q23.  Shoals disclosed a range of potential loss related to the shrinkback issue of $59.7 million to $184.9 million, which was $125.2 million higher than the Company recorded for the previous quarter.

161.  The same day, Shoals published a 3Q23 Investor Presentation, which provided a "WARRANTY LIABILITY UPDATE," which stated that "it is believed that approximately 300 sites may have harnesses made with this wire, representing about 30% of the total amount of Shoals' harnesses manufactured during the same timeframe," facts reiterated by defendant Moss during the Company's 3Q23 conference call.

162.  On this news, the price of Shoals Common Stock fell from $16.23 per share on November 7, 2023 to $12.95 per share on November 9, 2023, or approximately 20%, over a two-day trading period, on above-average trading volume.  However, the price of Shoals Common Stock continued to be artificially inflated as defendants continued to make material misstatements and omissions and to conceal the full truth regarding the Company's business, operations, and financial results.

163. Analysts and investors were stunned by these disclosures in the Company's 3Q23 Release and earnings call concerning the magnitude of Shoals' potential loss related to wire insulation shrinkback.

(a) For example, on November 8, 2023, analysts at Barclays commented that the upper end of the revised warranty expense range was "higher than what most investors we spoke to were expecting."

(b) The same day, Guggenheim analysts wrote that Shoals "[w]arranty charge" was "well above what's been recognized to date . . . we expect this issue to continue hanging over the stock."

(c) In a November 7, 2023 report, analysts at Truist Securities also directly linked Shoals' sharp stock price decline to the revised warranty expense range and warranty charge, noting that the Company's 3Q23 results "were heavily impacted by a ~50mm warranty charge that drove unadjusted 3Q GMs well below our/street estimates."

(d) On November 10, 2023, a Barclays analyst report stated that "the upper end of the $60-$185mm *came as a surprise to investors* and has contributed to the underperformance of the stock."

164. On February 28, 2024, Shoals revealed that growth in Shoals' backlog and awarded orders declined, falling sequentially by $2 million to $631.3 million, down from $633.3 million in the prior quarter, materially impacting the Company's financial guidance for revenue.

165. The same day, Shoals also disclosed that "[i]nitial[ly], shrinkback issues were found on at least 20 sites of the approximately 300 sites that have had the defective Prysmian red wire" but that Shoals had been "informed that approximately 10 incremental [*i.e.*, additional] sites [had] experienced shrinkback."

166.    On this news, the price of Shoals Common Stock fell from $15.39 per share on February 28, 2024 to $12.83 per share on February 29, 2024, or more than 16%, on above-average trading volume of over 15.5 million shares traded.  However, the price of Shoals Common Stock continued to be artificially inflated as the 1934 Act Defendants continued to make material misstatements and omissions and to conceal the full truth regarding the Company's business, operations, and financial results.

167.    On May 7, 2024, Shoals revealed that the Company's business deterioration as a result of the fallout from the shrinkback issue was much more severe than previously disclosed. Specifically, the Company revealed that Shoals' backlog and awarded orders had fallen more than $16 million on a sequential basis to $615.2 million and that the Company had suffered "unprecedented" project cancellations and several order delays during 1Q24.  The Company also admitted in its 1Q24 Form 10-Q that the Company's estimate of shrinkback and warranty costs "may increase" and that such increase "may be material."

168.    On this news, the price of Shoals Common Stock fell from $8.80 per share on May 7, 2024 to $7.51 per share on May 8, 2024, or approximately 15%, on above-average trading volume of over 13 million shares traded.

169.    Analysts reacted quickly and negatively to Shoals' announcements of poor financial performance and continuing (and growing) shrinkback warranty problems.

(a)    For example, on May 6, 2024, analysts at Janney wrote: "We think investors are worried about derivative issues from warranty shrinkback including . . . [market] share loss potential, etc."

- 60 -

(b)      On May 7, 2024, analysts at Piper Sandler remarked, "almost everything went wrong in this update," which included "reduced revenues," "sequentially declining backlog," "[p]roject delays," "unusual cancellations," and "another shrinkback project identified."

(c)      On May 8, 2024, analysts with Barclays reported on Shoals' "[s]oft quarter with weakening outlook," noting that "[Shoals] sees de-bookings for the first time" and that Shoals' "'[u]nprecedented' de-booking" of "~$60 [million] of backlog/awarded orders that canceled/pushed back" had "offset [its] new bookings by half."

170.      Then, on November 12, 2024, just over five months after the Class Period ended, Shoals filed with the SEC a quarterly report on Form 10-Q for the quarter ended September 30, 2024 ("3Q24 Form 10-Q").  In the Company's 3Q24 Form 10-Q, Shoals announced that it had increased the lower end of its estimated loss due to warranty liability by $13.3 million to a new, higher range of $73 million to $160 million.  Further, Shoals reported that the Company's backlog and reported orders were down 5.8% from the same quarter last year, and a 7.1% sequential decrease from the previous quarter.

171.      On this news, the price of Shoals Common Stock fell from $5.77 on November 11, 2024 to $4.85 per share on November 12, 2024, or approximately 16%, on above-average trading volume.

172.      Analysts again reacted adversely to Shoals' 3Q24 disclosures.

(a)      For example, on November 12, 2024, Wells Fargo's analysts wrote: "Backlog & Awarded Orders Were Down Sequentially – Negative Reaction."

(b)      The same day, Cantor commented: "3Q24 Review; Another Profitability Guide-Down[,] . . . Lowering [Price Target] to $8."

(c)     The next day, UBS analysts reported: "3Q24: Profitability lower than expectations[,] . . . [w]e reduce our [price target] to $8 from $9."

173.     The decline in the price of Shoals Common Stock after the corrective disclosures came to light was a direct result of the revelation of the nature and extent of defendants' fraudulent misrepresentations to investors and the market.  The timing and magnitude of the price declines in Shoals Common Stock compared to the market and its peers negate any inference that the loss suffered by Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by Plaintiffs and the other Class members was a direct result of defendants' fraudulent scheme to artificially inflate the price of Shoals Common Stock and the subsequent significant decline in the value of Shoals Common Stock when defendants' prior misrepresentations and other fraudulent conduct were revealed.

## VII.     VIOLATIONS OF THE 1933 ACT

174.     Plaintiffs assert non-fraud-based claims pursuant to §§11, 12(a)(2), and 15 of the 1933 Act against defendants Shoals, Solon, Whitaker, and Bardos as well as the 1933 Act Defendants.

175.     The claims against Solon and the 1933 Act Defendants only are based on strict liability and negligence, and not on knowing or reckless conduct by or on behalf of Solon and the 1933 Act Defendants – *i.e.*, they do not allege, nor do they sound in, fraud – and Plaintiffs specifically disclaim any allegations of fraud, scienter, or recklessness in connection with these non-fraud claims.  During the Class Period, Shoals completed the December 2022 SPO:

| Date of Offering | Shares of Shoals Common Stock Offered | Proceeds |
|---|---|---|
| December 2022 | 26,000,000 | $578,500,000 |

- 62 -

176.    Plaintiffs' 1933 Act claims are based solely on the December 2022 SPO.

177.    As alleged herein, the relevant offering materials and documents incorporated therein contained untrue statements of material fact and/or omitted to state material facts required to be stated therein or necessary to make the statements not misleading at the time they were made.

178.    Each of the Underwriter Defendants acted as underwriters for, and participated in, the December 2022 SPO.  The SPO Offering Materials were negligently prepared and, as a result, contained untrue statements of material fact or omitted to state other facts necessary to make the statements made not misleading, and were not prepared in accordance with the laws, rules, and regulations governing their preparation.

A.      **Shoals' SPO Offering Materials**

179.    On November 30, 2022, Shoals filed the SPO Registration Statement with the SEC, which was declared effective on that date.  As noted above, each of the Director Defendants signed the SPO Registration Statement and was named as a "Director" in the SPO Registration Statement. *See supra* ¶35.  Similarly, each of the Underwriter Defendants was listed in one and/or both of the prospectuses filed in connection with the SPO Registration Statement.  *See supra* ¶32-33.

180.    On November 30, 2022, Shoals filed with the SEC a preliminary prospectus supplement announcing the public offering of 20 million shares of Shoals Common Stock.  On December 5, 2022, Shoals filed the December 2022 SPO Prospectus with the SEC, which increased the number of shares being sold from 20 million shares to 26 million shares.  The December 2022 SPO Prospectus incorporated and formed part of the SPO Registration Statement.  In the December 2022 SPO, Shoals and defendant Solon collectively sold 29.9 million shares of Shoals Common Stock at $22.25 per share, which included a full exercise of the underwriters' overallotment option, for over $665 million in gross offering proceeds.

181.    As stated above (*see supra* ¶3), the SPO Registration Statement and December 2022 SPO Prospectus make up the SPO Offering Materials.  The December 2022 SPO Prospectus informed investors that "[t]hese documents contain information you should consider when making your investment decision."  Yet, these SPO Offering Materials contained untrue statements of material fact and omitted material facts necessary to make the statements contained therein not false or misleading.  Among other things, each of the SPO Offering Materials: (i) touted the "reliability and safety" of Shoals' EBOS products; (ii) described their purported ability to avoid "failure" and "damage"; and (iii) downplayed (as merely hypothetical) the risks that Shoals could potentially experience "quality control problems," "defects or performance problems."[19]

182.    For example, the SPO Registration Statement touted the "reliability and safety" of its "mission-critical" products and their resulting ability to avoid "failure . . . equipment damage, fire damage, and even serious injury or death" as a competitive advantage.  Specifically, the SPO Registration Statement stated that because "EBOS components," which "encompasses all of the components that are necessary to carry the electric current produced by solar panels," are "mission-critical products[,] . . . we [Shoals] believe customers prioritize ***reliability and safety*** over price when selecting EBOS solutions."[20]

183.    The SPO Registration Statement also stated that "[s]ome of the key factors that could cause actual results to differ from our expectations include . . . [that] we ***may*** experience delays, disruptions or quality control problems in our manufacturing operations in part due to vendor concentration" and "defects or performance problems in our products ***could*** result in loss of

---

[19]   Each of the alleged untrue statements made in the SPO Registration Statement were also made – and appeared word-for-word – in the December 2022 SPO Prospectus (and vice versa).

[20]   This same claim of "reliability and safety" also appeared in Shoals' Quarterly Reports on Forms 10-Q for the quarterly periods ended March 31, 2022, June 30, 2022, and September 30, 2022 – which, as discussed below, were incorporated by reference into the SPO Offering Materials.

4918-5081-5490.v1

customers, reputational damage and decreased revenue, and we ***may*** face warranty, indemnity and product liability claims arising from defective products."[21]

184.    The statements above in ¶¶181-185 were untrue statements of material fact when made or omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading, in violation of the 1933 Act.   Specifically, the statements referenced above in ¶¶181-185 were materially false and/or misleading when made because they failed to disclose the following adverse facts pertaining to the Company's business, operations, and financial condition, which were known to defendants or recklessly disregarded by them as follows: (a) by the time the statements in the SPO Offering Materials were made, several of Shoals' customers had identified and expressed concerns regarding the BLA defects; (b) that Shoals' ability to competitively differentiate its products through representations regarding the reliability, safety, or quality of its offerings had become materially impaired; (c) that, as a result, Shoals' business and operations were acutely exposed to material, undisclosed risks of reputational harm, warranty claims, and other negative impacts to the Company's business, financial results, and prospects; and (d) that defective BLAs had negatively impacted the Company's sales, customer relationships, and financial results and that defendants' representations regarding Shoals' business, sales, and prospects were materially misleading.

### B.    Shoals' Materially Untrue and Misleading SEC Filings Were Incorporated by Reference into the SPO Offering Materials

185.    The SPO Registration Statement and December 2022 SPO Prospectus each "incorporate[d] by reference" several of Shoals' earlier filings with the SEC, including, among other filings, Shoals' Quarterly Reports on Forms 10-Q for the quarterly periods ended March 31, 2022,

---

[21]   These same "key factors" also appeared in Shoals' Quarterly Reports on Forms 10-Q for the quarterly periods ended March 31, 2022, June 30, 2022, and September 30, 2022 – which, as discussed below, were incorporated by reference into the SPO Offering Materials.

- 65 -

June 30, 2022, and September 30, 2022, filed with the SEC on May 17, 2022, August 16, 2022, and November 14, 2022, respectively.

186.     By incorporating by reference the Forms 10-Q, the SPO Registration Statement and the December 2022 SPO Prospectus contained untrue statements of material fact and/or omitted to state material facts required to be stated therein or necessary to make the statements made, as set forth in ¶¶181-185 above.

187.     These statements in the Forms 10-Q were materially untrue and contained material omissions because they failed to disclose that: (a) by the time the statements in the SPO Offering Materials were made, several of Shoals' customers had identified and expressed concerns regarding the BLA defects; (b) Shoals was facing tens of millions of dollars in shrinkback warranty liabilities; (c) Shoals had not booked a sufficient warranty expense provision to cover the remediation costs for the shrinkback issue; (d) Shoals' historical reported revenue, gross profit, and net income had been generated in substantial part through the sale of defective products posing a risk of injury, death, and fire damage to Shoals' customers; (e) Shoals' ability to competitively differentiate its products through representations regarding the reliability, safety, and quality of its offerings had become materially impaired; and (f) as a result, Shoals' business and operations were acutely exposed to material, undisclosed risks of reputational harm and negative impacts to the Company's business, financial results, and prospects.

**C.     The Underwriter Defendants' Materially Misleading Statements and Omissions**

188.     The Underwriter Defendants are investment banking houses that specialize in, among other things, underwriting public offerings of securities.  The Underwriter Defendants caused the SPO Offering Materials to be filed with the SEC and declared effective in connection with offers and sales thereof, including to Plaintiffs and the Class.

- 66 -

189.    The Underwriter Defendants authorized the information contained in the SPO Offering Materials to be provided to Plaintiffs and the Class, and therefore are liable for any untrue statements in those materials under the 1933 Act.  In that regard, according to the December 2022 SPO Prospectus:

> The underwriters . . . which participate in the distribution of the securities may be deemed to be underwriters under the Securities [*i.e.*, 1933] Act . . . .  Anyone deemed to be an underwriter under the Securities Act may be subject to statutory liabilities, including Sections 11, 12 and 17 of the Securities Act and Rule 10b-5 under the Securities Exchange Act of 1934 . . . .

The December 2022 SPO Prospectus identified J.P. Morgan Securities LLC, Guggenheim Securities, LLC, Morgan Stanley& Co. LLC, UBS Investment Bank, Goldman Sachs & Co. LLC, Barclays Capital Inc., and Credit Suisse (USA) LLC as the December 2022 SPO's "Joint Book-Running Managers."  The SPO Prospectus further identified Cowen and Company, LLC, Oppenheimer & Co. Inc., Piper Sandler & Co., Roth Capital Partners LLC,, Johnson Rice & Company L.L.C., Northland Capital Markets as "Co-Managers."

190.    The December 2022 SPO Prospectus also confirmed that the "Underwriters named in the prospectus supplement . . . are [the] only underwriters of the securities offered with such prospectus supplement" and that:

> We, the selling stockholders and the underwriter[s] have not authorized any other person to provide any information other than that contained or incorporated by reference in this prospectus supplement or in any free writing prospectus prepared by or on behalf of us.  We, the selling stockholders and the underwriter[s] take no responsibility for and can provide no assurance as to the reliability of, any information that others may give you.

191.    Because of their roles as underwriters of the December 2022 SPO, the Underwriter Defendants are responsible – under the 1933 Act – for the same untrue and misleading statements set forth above in ¶¶181-185.

- 67 -

Case 3:24-cv-00334    Document 75    Filed 12/09/24    Page 72 of 90 PageID #: 1478

**D.      The Underwriter Defendants Failed to Exercise Due Diligence**

192.      As the underwriters of the December 2022 SPO, representatives of the Underwriter Defendants assisted Solon, the principal selling stockholder, as well as Shoals, Whitaker, Bardos, and the Director Defendants who signed the SPO Registration Statement, by planning the SPO, and purportedly conducted an adequate and reasonable investigation into the business and operations of Shoals, an undertaking known as a "due diligence" investigation. The due diligence investigation was required of the Underwriter Defendants in order to participate in the December 2022 SPO. During the course of their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning Shoals' operations, risks, and financial prospects. Yet, the Underwriter Defendants were negligent by failing to conduct a reasonable degree of due diligence that would have detected a widespread "shrinkback" defect that was well underway and affecting the Company before the SPO.

**VIII.      APPLICABILITY OF PRESUMPTION OF RELIANCE – 1934 CLAIMS ONLY**

193.      Because of the 1934 Act Defendants' Class Period omissions, a class-wide presumption of reliance is appropriate pursuant to *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972).

194.      Plaintiffs' claims for securities fraud are also asserted, in part, under the fraud-on-the-market theory of reliance. The market price of Shoals Common Stock, including common stock regularly traded on the NASDAQ, was artificially inflated by the conduct and false and misleading statements and omissions complained of herein. The 1934 Act Defendants' conduct and material misstatements and omissions inflated the price of Shoals Common Stock both before and during the Class Period.

195.    The Class Period inflation in the price of Shoals Common Stock was eliminated when the financial conditions, business risks, and other information concealed by defendants' fraud was revealed to the market.  The information did not reach the market all at once but leaked out through several partial disclosures, each of which partially corrected the market price of Shoals Common Stock.

196.    At all relevant times, the market for Shoals Common Stock was an efficient market for the following reasons, among others:

(a)     Shoals Common Stock met the requirements for listing, and were listed and actively traded, on the NASDAQ, a highly efficient and automated market;

(b)     During the Class Period, a high volume of Shoals Common Stock traded on the NASDAQ;

(c)     As a regulated issuer, Shoals filed periodic public reports with the SEC and NASDAQ;

(d)     Shoals regularly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services, publications on its website and other internet sites, and other wide-ranging public disclosures, such as conference calls, communications with the financial press, and other similar reporting services;

(e)     During the Class Period, Shoals was followed by securities analysts employed by major brokerage firms.  Analysts employed by these and other firms regularly wrote reports based on the publicly available information disseminated by defendants about Shoals.  These reports were distributed to the sales force and certain customers of their respective brokerage firms; and

(f)     Shoals had substantial institutional ownership during the Class Period.  Each of these institutions regularly analyzed and reported on the publicly available information about Shoals and its operations.

197.     Through the foregoing mechanisms, the information publicly disseminated by defendants about Shoals and its operations, and the import thereof, became widely available to and was acted upon by investors in the marketplace, such that, as a result of their transactions in Shoals Common Stock, the information disseminated by defendants, including the false and misleading statements described above, became incorporated into and were reflected by the market price of Shoals publicly traded Common Stock.

198.     Under these circumstances, all purchasers of Shoals Common Stock during the Class Period suffered similar injury through their purchase of Shoals Common Stock at artificially inflated prices and their subsequent decline in value, and a presumption of reliance applies.

## IX.    CLASS ACTION ALLEGATIONS

199.     Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons who purchased or otherwise acquired Shoals Common Stock during the Class Period and were harmed thereby (the "Class"). Excluded from the Class are defendants and their immediate families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which defendants have or had a controlling interest.

200.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Shoals shares were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time, Plaintiffs believe that there are thousands of members in the proposed Class, if not more.  Record owners and other

- 70 -

members of the Class may be identified from records maintained by Shoals, its transfer agent, or securities' brokers, and may be notified of the pendency of this action electronically or by mail, using the form of notice similar to that customarily used in securities class actions.

201.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law complained of herein.

202.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation.

203.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

            (a)    whether the federal securities laws were violated by defendants' acts as alleged herein;

            (b)    whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business and operations of Shoals;

            (c)    whether the price of Shoals Common Stock was artificially inflated during the Class Period; and

            (d)    to what extent the members of the Class have sustained damages and the proper measure of damages.

204.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of

individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violation of §10(b) of the 1934 Act and SEC Rule 10b-5
### Against the 1934 Act Defendants

205. Plaintiffs incorporate §§I.-IV., VIII.-IX. by reference.

206. During the Class Period, the 1934 Act Defendants disseminated or approved one or more of the statements as specified above in §V., which they knew or recklessly disregarded contained material misrepresentations and/or failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

207. Defendants violated §10(b) of the 1934 Act and SEC Rule 10b-5 promulgated thereunder in that they:

      (a)     employed devices, schemes, and artifices to defraud;

      (b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

      (c)     engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Shoals Common Stock during the Class Period.

208. Defendants, individually and together, directly and indirectly, by the use of the means and instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal the truth and/or adverse material information about Shoals' business, operations, and financial condition as specified herein.

- 72 -

209. Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them.

210. As a result of the conduct, dissemination of the materially false or misleading information, and/or failure to disclose material facts, as set forth above, the market price of Shoals Common Stock was artificially inflated during the Class Period. In ignorance of the fact that the market price of Shoals Common Stock was artificially inflated, and relying directly or indirectly on the false and misleading statements, or upon the integrity of the market in which Shoals Common Stock traded, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants (but not disclosed in defendants' public statements during the Class Period), Plaintiffs and the other Class members purchased or otherwise acquired Shoals Common Stock during the Class Period at artificially high prices and were damaged thereby.

211. Plaintiffs and the Class, in reliance on the integrity of the market, paid artificially inflated prices for Shoals Common Stock, and suffered losses when the relevant truth was revealed. Plaintiffs and the Class would not have purchased Shoals Common Stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by these defendants' misleading statements.

212. As a direct and proximate result of these defendants' wrongful conduct, Plaintiffs and the other Class members suffered damages in connection with their Class Period transactions in Shoals Common Stock.

213. By reason of the foregoing, defendants named in this Count have violated §10(b) of the 1934 Act and SEC Rule 10b-5.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against the 1934 Act Defendants

214.     Plaintiffs incorporate §§I.-IV., VIII.-IX. by reference.

215.     Defendants were controlling persons of Shoals within the meaning of §20(a) of the 1934 Act.  By virtue of their high-level positions as officers and/or directors of Shoals, their ownership and contractual rights, participation in and awareness of the Company's operations, and intimate knowledge of the statements filed by the Company with the SEC and/or disseminated to the investing public, these defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the allegedly false and misleading statements.

216.     In particular, each of these defendants had direct or supervisory responsibility over the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions and business practices giving rise to the securities violations as alleged in Count I, and exercised that power.

217.     As a direct and proximate result of these defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases and acquisitions of Shoals Common Stock during the Class Period when the relevant truth was revealed.

218.     By reason of the foregoing, the defendants named in this Count violated §20(a) of the 1934 Act.

## COUNT III

### For Violations of §20A of the 1934 Act
### Against Defendants Shoals and Whitaker

219.     Plaintiffs repeat and reallege each and every allegation contained above in §§I.-IV., VIII.-IX. as if fully set forth herein.  Count III is brought pursuant to §20A of the 1934 Act against

defendants Shoals and Whitaker (collectively, "§20A Defendants"), on behalf of Plaintiffs, and other members of the Class who were damaged by the §20A Defendants' insider trading.

220.    As detailed herein, the §20A Defendants were was in possession of material, non-public information concerning Shoals. The §20A Defendants took advantage of their possession of material, non-public information regarding Shoals to obtain millions of dollars in insider trading profits traded contemporaneously with Plaintiffs during the Class Period.

221.    The §20A Defendants' sales of Shoals Common Stock were made contemporaneously with Plaintiffs' purchases of Shoals Common Stock during the Class Period.

222.    For example, on December 6, 13, and 14, 2022, the §20A Defendants sold the following shares of Shoals Common Stock for proceedings totaling over $40 million:

| Defendant | Date of Sale | Amount | Price |
|---|---|---|---|
| Shoals | 12/6/2022 | 2,000,000 | 22.25 |

| Defendant | Date of Sale | Amount | Price |
|---|---|---|---|
| Whitaker | 12/13/2022 | 13,020 | $25.37 |
|  | 12/14/2022 | 8,333 | $26.50 |

223.    On December 6, 2022, plaintiff KUAERP purchased the following shares of Shoals Common Stock:

| Plaintiff | Date of Purchase | Amount | Price |
|---|---|---|---|
| KUAERP | 12/06/2022 | 220 | $23.73 |

224.    On December 16, 2022, Lead Plaintiff Erste AM purchased the following shares of Shoals Common Stock:

| Plaintiff | Date of Purchase | Amount | Price |
|---|---|---|---|
| Erste AM | 12/16/2022 | 120,692 | $26.55 |

- 75 -

225.    Additionally, on January 25, 2023, defendant Whitaker sold the following shares of Shoals Common Stock for total proceeds of excess of $151,000:

| Defendant | Date of Sale | Amount | Price |
|---|---|---|---|
| Whitaker | 01/25/2023 | 5,532 | $27.43 |

226.    On January 25, 2023, Lead Plaintiff Erste AM and plaintiff KUAERP purchased the following shares of Shoals Common Stock:

| Plaintiff | Date of Purchase | Amount | Price |
|---|---|---|---|
| Erste AM | 01/25/2023 | 49,894 | $27.97 |
| KUAERP | 01/25/2023 | 460 | $27.69 |

227.    Lastly, on March 14, 2023, defendant Whitaker sold the following shares of Shoals Common Stock for total proceeds of excess of $3.8 million:

| Defendant | Date of Sale | Amount | Price |
|---|---|---|---|
| Whitaker | 03/14/2023 | 181,541 | $21.16 |

228.    On the same day, plaintiff KUAERP purchased the following shares of Shoals Common Stock:

| Plaintiff | Date of Purchase | Amount | Price |
|---|---|---|---|
| KUAERP | 03/14/2023 | 600 | $21.39 |

229.    Plaintiffs, who purchased shares of Shoals Common Stock contemporaneously with sales by the §20A Defendants, suffered damages because: (i) in reliance on the integrity of the market, they paid artificially inflated prices as a result of the violations of §§10(b) and 20(a) of the 1934 Act as alleged herein; and (ii) they would not have purchased Shoals Common Stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated by the false or misleading statements and concealment alleged herein.

- 76 -

## COUNT IV

**For Violation of §11 of the 1933 Act**
**Against Shoals, Bardos, and the 1933 Act Defendants (excluding Solon)**

230.    KUAERP incorporates §§I.-III.D., VII., IX. by reference.

231.    KUAERP asserts this Count on behalf of itself and the Class against Shoals, Bardos, and the 1933 Act Defendants.

232.    Section 11 of the 1933 Act does not require a showing of scienter or fraudulent intent, and Plaintiffs disavow all averments of fraud for purposes of this Count against the 1933 Act Defendants.

233.    The SPO Registration Statement was negligently prepared and as a result inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein including as required by Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(b)(2)(ii), and Item 105 of SEC Regulation S-K, 17 C.F.R. §229.105.

234.    As set forth herein, the SPO Registration Statements failed to disclose material adverse facts which existed at the time of the December 2022 SPO, including:

(a)    by the time the statements in the SPO Offering Materials were made, several of Shoals' customers had identified and expressed concerns regarding the BLA defects;

(b)    that, as a result of (a) above, Shoals was facing tens of millions of dollars in shrinkback warranty liabilities;

(c)    that Shoals had not booked a sufficient warranty expense provision to cover the remediation costs for the shrinkback issue;

- 77 -

(d)     that Shoals' historical reported revenue, gross profit, and net income had been generated in substantial part through the sale of defective products posing a risk of injury, death, and fire damage to Shoals' customers;

(e)     that Shoals' ability to competitively differentiate its products through representations regarding the reliability, safety, and quality of its offerings had become materially impaired; and

(f)     that, as a result of (a)-(e) above, Shoals' business and operations were acutely exposed to material, undisclosed risks of reputational harm and negative impacts to the Company's business, financial results, and prospects.

235.    The 1933 Act Defendants are strictly liable to KUAERP and the Class for the misstatements and omissions contained in the SPO Registration Statement.

236.    None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the SPO Registration Statements that are herein alleged to be materially false and misleading were true and without omissions of any material facts and were not misleading.

237.    By reason of the conduct herein alleged, each defendant named herein violated, and/or controlled a person who violated, §11 of the 1933 Act.

238.    KUAERP purchased Shoals Common Stock directly in the December 2022 SPO as detailed herein.

239.    KUAERP and the Class have sustained damages.  The value of the Shoals Common Stock issued in the December 2022 SPO has declined substantially subsequent to and due to the 1933 Act Defendants' violations.

- 78 -

240.    At the time of their purchases of Shoals Common Stock, KUAERP and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein.  Less than one year has elapsed from the time that KUAERP discovered or reasonably could have discovered the facts upon which this complaint is based to the time that this action commenced. Less than three years has elapsed between the time that the securities upon which this Count is brought were offered to the public.

## COUNT V

### For Violation of §12(a)(2) of the 1933 Act
### Against Shoals, Bardos, and the 1933 Act Defendants (excluding Solon)

241.    KUAERP incorporates §§I.-III.D., VII., IX. by reference.

242.    KUAERP assert this Count on behalf of itself and the Class against Shoals, Whitaker, Bardos, and the 1933 Act Defendants (collectively, the "Solicitor-Seller Defendants").

243.    Section 12(a)(2) of the 1933 Act does not require a showing of scienter or fraudulent intent, and KUAERP disavows all averments of fraud against the Solicitor-Seller Defendants for purposes of this Count.

244.    By means of the defective December 2022 SPO Prospectus and other conduct alleged herein, the Solicitor-Seller Defendants promoted and sold the Shoals Common Stock sold in the December 2022 SPO to KUAERP and other members of the Class.

245.    The December 2022 SPO Prospectus contained untrue statements of material fact and concealed and failed to disclose material facts, as detailed above.  The defendants named herein owed KUAERP and the other members of the Class who purchased Shoals Common Stock pursuant to the December 2022 SPO Prospectus the duty to make a reasonable and diligent investigation of the statements contained in the December 2022 SPO Prospectus to ensure that such statements were

4918-5081-5490.v1

true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. These defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the December 2022 SPO Prospectus as set forth above.

246.     KUAERP did not know, nor in the exercise of reasonable diligence could KUAERP have known, of the untruths and omissions contained in the December 2022 SPO Prospectus at the time KUAERP acquired Shoals Common Stock.

247.     By reason of the conduct alleged herein, the Solicitor-Seller Defendants violated §12(a)(2) of the 1933 Act. As a direct and proximate result of such violations, KUAERP and the other members of the Class who purchased Shoals Common Stock pursuant to the December 2022 SPO Prospectus sustained substantial damages in connection with their purchases of Shoals Common Stock. Accordingly, KUAERP and the other members of the Class who hold Shoals Common Stock issued pursuant to the December 2022 SPO Prospectus have the right to rescind and recover the consideration paid for their shares, and hereby tender their Shoals Common Stock to defendants sued herein. Class members who have sold their Shoals Common Stock seek damages to the extent permitted by law.

### COUNT VI

**For Violation of §15 of the 1933 Act
Against Shoals, Solon, Bardos, and the Director Defendants**

248.     KUAERP incorporates §§I.-III.D., VII., IX. by reference.

249.     KUAERP asserts this Count on behalf of itself and the Class against Shoals, Solon, Bardos, and the Director Defendants.

250.     Section 15 of the 1933 Act does not require a showing of scienter or fraudulent intent, and KUAERP disavows all averments of fraud against these Defendants for purposes of this Count.

- 80 -

251.     Solon, Bardos, and the Director Defendants acted as controlling persons of Shoals within the meaning of §15 of the 1933 Act.  By reason of their positions with the Company, agreements and course of dealings with the Company, and/or their ownership of Shoals stock, and/or their status as, or ability to nominate directors, Solon, Bardos, and the Director Defendants had the power and authority to cause Shoals to engage in the wrongful conduct complained of herein, including the December 2022 SPO, and were culpable participants in the violations of law described herein.  Shoals controlled Solon, Bardos, and the Director Defendants who were the Company's employees, directors, and/or shareholders at the time of the December 2022 SPO.  By reason of such conduct, these defendants are liable pursuant to §15 of the 1933 Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

A.     Determining that this action is a proper class action and certifying Plaintiffs as Class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Class Counsel;

B.     Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Awarding such other and further relief as the Court may deem just and proper.

- 81 -

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

DATED: December 9, 2024

Respectfully submitted,

ROBBINS GELLER RUDMAN
  & DOWD LLP
CHRISTOPHER M. WOOD, #032977
HENRY S. BATOR, #040431

CHRISTOPHER M. WOOD

200 31st Avenue North
Nashville, TN 37203
Telephone: 615/244-2203
cwood@rgrdlaw.com
hbator@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
DARREN J. ROBBINS
DEBRA J. WYMAN (*pro hac vice pending*)
MATTHEW I. ALPERT (*pro hac vice pending*)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
darrenr@rgrdlaw.com
dmyers@rgrdlaw.com

Lead Counsel for Lead Plaintiff

MOTLEY RICE LLC
GREGG S. LEVIN (*pro hac vice*)
WILLIAM S. NORTON (*pro hac vice*)
CHRISTOPHER F. MORIARTY (*pro hac vice*)
28 Bridgeside Boulevard
Mount Pleasant, SC 29464
Telephone: 843/216-9000
glevin@motleyrice.com
bnorton@motleyrice.com
cmoriarty@motleyrice.com

- 82 -

BARRETT JOHNSTON MARTIN
  & GARRISON, PLLC
JERRY E. MARTIN, #20193
200 31st Avenue North
Nashville, TN  37203
Telephone: 615/244-2202
jmartin@barrettjohnston.com

Local Counsel

KLAUSNER, KAUFMAN, JENSEN &
LEVINSON, P.A.
ROBERT D. KLAUSNER
SEAN M SENDRA
7080 Northwest 4th Street
Plantation, FL  33317
Telephone: 954/916-1202
bob@robertdklausner.com
sean@robertdklausner.com

Additional Counsel for Plaintiff Kissimmee
Utility Authority Employees' Retirement Plan

4918-5081-5490.v1

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on December 9, 2024, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ CHRISTOPHER M. WOOD
CHRISTOPHER M. WOOD

ROBBINS GELLER RUDMAN
    & DOWD LLP
200 31st Avenue North
Nashville, TN 37203
Telephone: 615/244-2203
cwood@rgrdlaw.com

# Mailing Information for a Case 3:24-cv-00334 Westchester Putnam Counties Heavy & Highway Laborers Local 60 Benefits Fund v. Shoals Technologies Group, Inc. et al

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Matthew Isaac Alpert**
  malpert@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Rachel A. Avan**
  ravan@saxenawhite.com

- **Henry Scattergood Bator**
  hbator@rgrdlaw.com

- **Margaret V. Dodson**
  margaret.dodson@bassberry.com

- **Marco A. Duenas**
  mduenas@saxenawhite.com,6316794420@filings.docketbird.com,jjoseph@saxenawhite.com

- **Agnes Dunogue**
  agnes.dunogue@aoshearman.com

- **Dan Gold**
  dan.gold@aoshearman.com

- **Renatta A. Gorski**
  renatta.gorski@lw.com,r-gorski-5640@ecf.pacerpro.com,chefiling@lw.com

- **Lester R. Hooker**
  lhooker@saxenawhite.com

- **Michele D. Johnson**
  michele.johnson@lw.com

- **Benjamin Klebanoff**
  benjamin.klebanoff@aoshearman.com,managing-attorney-5081@ecf.pacerpro.com,courtalert@shearman.com,manattyoffice@shearman.com

- **Britt K. Latham**
  blatham@bassberry.com,renatta.gorski@lw.com,lauren.fane@lw.com,heather.waller@lw.com,llewis@bassberry.com,lbilbrey@bassberry.com,christian.beveridge@lw.

- **Gregg S. Levin**
  glevin@motleyrice.com,lmclaughlin@motleyrice.com,erichards@motleyrice.com,kweil@motleyrice.com

- **Jerry E. Martin**
  jmartin@barrettjohnston.com,mmcgraw@barrettjohnston.com,mfazio@barrettjohnston.com,lvandrasik@barrettjohnston.com,shyatt@barrettjohnston.com,jmartin@rg

- **Christopher F. Moriarty**
  cmoriarty@motleyrice.com,jlittlejohn@motleyrice.com,bnorton@motleyrice.com

- **William S. Norton**
  bnorton@motleyrice.com

- **Mozianio S. Reliford , III**
  treliford@polsinelli.com,mmillan@polsinelli.com,nashvilledocketing@polsinelli.com

- **James Gerard Stranch , IV**
  gstranch@stranchlaw.com,complexlit@stranchlaw.com

- **Heather A. Waller**
  heather.waller@lw.com,chefiling@lw.com,heather-waller-8915@ecf.pacerpro.com

- **Christopher M. Wood**
  cwood@rgrdlaw.com,CWood@ecf.courtdrive.com,e_file_sd@rgrdlaw.com,bengfelt@rgrdlaw.com

- **Debra J. Wyman**
  debraw@rgrdlaw.com,e_file_sd@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)