# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | |
|---|---|
| **In re SHOALS TECHNOLOGIES GROUP, INC. SECURITIES LITIGATION** | ) **Civil Action No. 3:24-cv-00334** |
| | ) |
| | ) **CLASS ACTION** |
| | ) |
| **This Document Relates To: All Actions** | ) **Judge Waverly D. Crenshaw, Jr.** |
| | ) |
| | ) **Magistrate Judge Alistair Newbern** |
| | ) |
| | ) **MEMORANDUM OF LAW IN SUPPORT** |
| | ) **OF DEFENDANTS' MOTION TO** |
| | ) **DISMISS CONSOLIDATED** |
| | ) **COMPLAINT** |

**CONTENTS**

I.    INTRODUCTION ....................................................................................................1

II.   FACTUAL ALLEGATIONS ...................................................................................3

      A.    Shoals Builds Innovative Electrical Wiring Harness Systems for Solar
            Fields............................................................................................................3

      B.    In 2022, Shoals Learns of and Investigates Instances of Exposed
            Conductors, Initially Believing Issue Was Caused by Its Customers'
            Installation...................................................................................................4

      C.    In 2023, as Shoals Continues to Investigate and Learns About More
            Impacted Customers, Shoals Concludes—And Discloses in Its Q1 2023
            10-Q—the Root Cause Was Shrinkback From Defective Wire Covered by
            Its Warranty .................................................................................................5

      D.    The Next Quarter, After Continued Investigation, Shoals Discloses
            Increased Warranty Reserve Estimate ........................................................6

      E.    Shoals Pursues Recovery From Wire-Supplier Prysmian and Continues to
            Disclose Quarterly Updates to Warranty Reserve Estimate .....................6

III.  PLAINTIFFS FAIL TO PLEAD AN EXCHANGE ACT CLAIM.....................7

      A.    Plaintiffs Do Not Allege an Actionable Misstatement or Omission.......8

            1.    Plaintiffs Do Not Allege Falsity With Particularity.....................8

            2.    Plaintiffs Do Not Allege a GAAP Violation.................................9

            3.    Statements Discussing Shoals' Warranty Reserves Are Protected
                  Forward-Looking Statements.....................................................16

            4.    Shoals' Warranty Risk Disclosures Are Not Actionable...........18

            5.    "Safety," "Reliability" and "Cost-Saving" Statements Are Not
                  Actionable ...................................................................................18

            6.    Plaintiffs Have Not Alleged a Fraudulent Scheme ...................22

      B.    Plaintiffs Do Not Allege the Required Strong Inference of Scienter....................22

            1.    Plaintiffs Do Not Allege Scienter as to the Individual Exchange
                  Act Defendants............................................................................23

            2.    Plaintiffs Do Not Allege Scienter as to Shoals .........................27

i

   3.  The More Compelling Inference Is Good Faith, Not Fraud .......................28

 C.  Plaintiffs Do Not Plead Loss Causation...................................................29

IV. KUAERP FAILS TO PLEAD A SECURITIES ACT CLAIM.........................................31

 A.  KUAERP Does Not Allege an Actionable Misstatement.......................31

 B.  KUAERP Lacks Standing to Assert Securities Act Claims...................32

 C.  KUAERP Does Not Adequately Allege a Direct Sale or Solicitation.................33

V. PLAINTIFFS' SECTION 20A, 20(A), AND 15 CLAIMS FAIL .....................................34

VI. CONCLUSION...........................................................................................................35

# TABLE OF AUTHORITIES

## CASES

*Barnes v. Edison Int'l,*
  2022 WL 822191 (9th Cir. Mar. 18, 2022) ............................................................... 36

*Bondali v. Yum! Brands, Inc.,*
  620 F. App'x 483 (6th Cir. 2015) ............................................................................... 20

*Byrd v. Visalus, Inc.,*
  2018 WL 1637948 (E.D. Mich. Apr. 5, 2018) ........................................................... 25

*Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.,*
  394 F.3d 126 (3d Cir. 2004) ....................................................................................... 23

*Chapman v. Mueller Water Prods., Inc.,*
  466 F. Supp. 3d 382 (S.D.N.Y. 2020) ................................................................. passim

*City of Livonia Emps.' Ret. Sys. v. Boeing Co.,*
  711 F.3d 754 (7th Cir. 2013) ................................................................................. 17, 32

*City of Pontiac Gen. Emps.' Ret. Sys. v. Stryker Corp.,*
  865 F. Supp. 2d 811 (W.D. Mich. 2012) .............................................................. 18, 22

*City of Taylor Gen. Emps. Ret. Sys. v. Magna Int'l Inc.,*
  967 F. Supp. 2d 771 (S.D.N.Y. 2013) ........................................................................ 28

*Cullen v. RYVYL Inc.,*
  2024 WL 898206 (S.D. Cal. Mar. 1, 2024) ............................................................... 37

*D.E.&J. Ltd. P'ship v. Conaway,*
  133 F. App'x 994 (6th Cir. 2005) .......................................................................... 33, 35

*Dailey v. Medlock,*
  551 F. App'x 841 (6th  Cir. 2014) .............................................................................. 24

*Doshi v. Gen. Cable Corp.,*
  386 F. Supp. 3d 815 (E.D. Ky. 2019) ......................................................................... 17

*Doshi v. Gen. Cable Corp.,*
  823 F.3d 1032 (6th Cir. 2016) .................................................................................... 25

*Fla. Carpenters Reg. Council Pension Plan v. Eaton Corp.,*
  964 F. Supp. 2d 875 (N.D. Ohio 2013) ...................................................................... 25

*Grillo v. Tempur-Pedic Int'l, Inc.,*
  553 F. Supp. 2d 809 (E.D. Ky. 2008) ............................................................. 27, 28, 33

*Gruhn v. Tween Brands, Inc.*,
2009 WL 1542795 (S.D. Ohio June 2, 2009)...................................................... 27

*Helwig v. Vencor, Inc.*,
251 F.3d 540 (6th Cir. 2001) ............................................................................. 26

*Hess v. Am. Phys. Cap., Inc.*,
2005 WL 459638 (W.D. Mich. Jan. 11, 2005) ............................................. 16, 19

*Howard v. Arconic Inc.*,
395 F. Supp. 3d 516 (W.D. Pa. 2019) ................................................................ 21

*In re 3M Co. Sec. Litig.*,
2021 WL 4482987 (D. Minn. Sept. 30, 2021)..................................................... 15

*In re Advance Auto Parts, Inc., Sec. Litig.*,
2020 WL 599543 (D. Del. Feb. 7, 2020)............................................................. 41

*In re Almost Fam., Inc. Sec. Litig.*,
2012 WL 443461 (W.D. Ky. Feb. 10, 2012).................................................. 34, 35

*In re Bare Escentuals, Inc. Sec. Litig.*,
745 F. Supp. 2d 1052 (N.D. Cal. 2010).............................................................. 38

*In re Century Aluminum Co. Sec. Litig.*,
729 F.3d 1104 (9th Cir. 2013) ........................................................................... 37

*In re Comshare Inc. Sec. Litig.*,
183 F.3d 542 (6th Cir. 1999) ................................................................. 8, 10, 25

*In re Diebold Sec. Litig.*,
2008 WL 3927467 (N.D. Ohio Aug. 22, 2008)................................................... 14

*In re EveryWare Global, Inc. Sec. Litig.*,
175 F. Supp. 3d 837 (S.D. Ohio 2016)......................................................... 29, 30

*In re Fed.-Mogul Corp. Sec. Litig.*,
166 F. Supp. 2d 559 (E.D. Mich. 2001) ............................................................. 21

*In re Ferro Corp. Sec. Litig.*,
2007 WL 1691358 (N.D. Ohio June 11, 2007) ................................................ 8, 24

*In re FirstEnergy Corp.*,
2022 WL 681320 (S.D. Ohio March 7, 2022)..................................................... 39

*In re Ford Motor Sec. Litig.*,
381 F.3d 563 (6th Cir. 2004) ....................................................................... 12, 21

*In re Huntington Bancshares Inc. Sec. Litig.*,
   674 F. Supp. 2d 951 (S.D. Ohio 2009) ............................................................................ passim

*In re Initial Pub. Offering Sec. Litig.*,
   399 F. Supp. 2d 261 (S.D.N.Y. 2005) ................................................................................ 34

*In re KBC Asset Mgmt. N.V.*,
   572 F. App'x 356 (6th Cir. 2014) ...................................................................................... 33

*In re Keithley Instruments, Inc. Sec. Litig.*,
   268 F. Supp. 2d 887 (N.D. Ohio 2002) ........................................................................ 13, 14

*In re Kindred Healthcare, Inc. Sec. Litig.*,
   299 F. Supp. 2d 724 (W.D. Ky. 2004) .......................................................................... 18, 20

*In re Nat'l Century Fin. Enters., Inc. Fin. Inv. Litig.*,
   553 F. Supp. 2d 902 (S.D. Ohio 2008) ............................................................................. 41

*In re NVIDIA Corp. Sec. Litig.*,
   768 F.3d 1046 (9th Cir. 2014) ......................................................................................... 29

*In re Omnicare, Inc. Sec. Litig.*,
   769 F.3d 455 (6th Cir. 2014) ........................................................................................... 31

*In re Splash Tech. Holdings, Inc. Sec. Litig.*,
   2000 WL 1727405 (N.D. Cal. Sept. 29, 2000) ................................................................. 41

*In re TransDigm Grp., Inc. Sec. Litig.*,
   440 F. Supp. 3d 740 (N.D. Ohio 2020) ............................................................................ 40

*In re Venator Materials PLC Sec. Litig.*,
   547 F. Supp. 3d 624 (S.D. Tex. 2021) .............................................................................. 39

*In re Wash. Prime Grp., Inc. Sec. Litig.*,
   2024 WL 1307103 (S.D. Ohio Mar. 27, 2024) ............................................................ 33, 35

*J&R Mktg., SEP v. Gen. Motors Corp.*,
   549 F.3d 384 (6th Cir. 2008) ........................................................................................... 40

*Joyce v. Amazon.com, Inc.*,
   2023 WL 8370101 (W.D. Wash. Dec. 4, 2023) ................................................................ 29

*Kolominsky v. Root, Inc.*,
   100 F.4th 675 (6th Cir. 2024) ................................................................................ 19, 20, 35

*Kolominsky v. Root, Inc.*,
   667 F. Supp. 3d 685 (S.D. Ohio 2023) .......................................................................... 28, 36

v

*Krim v. PcOrder.com, Inc.*,
    402 F.3d 489 (5th Cir. 2025) ........................................................................... 37

*Lansing Automakers' Fed. Credit Union v. MCG Portfolio Mgmt. Corp.*,
    1991 WL 238974 (W.D. Mich. Sept. 12, 1991) ...................................................... 40

*Lu v. Align Tech., Inc.*,
    417 F. Supp. 3d 1266 (N.D. Cal. 2019) ........................................................... 10, 16

*Lubbers v. Flagstar Bancorp. Inc.*,
    162 F. Supp. 3d 571 (E.D. Mich. 2016) .................................................................. 8

*Macquarie Infrastructure Corp. v. Moab Partners, LP*,
    601 U.S. 257 (2024) ............................................................................................ 23

*Malin v. XL Cap. Ltd.*,
    499 F. Supp. 2d 117 (D. Conn. 2007) ................................................................... 30

*Nicholson v. N-Viro Int'l Corp.*,
    2007 WL 2994452 (N.D. Ohio Oct. 12, 2007) ........................................................ 9

*Norfolk Cnty. Ret. Sys. v. Tempur-Pedic Int'l., Inc.*,
    22 F. Supp. 3d 669 (E.D. Ky. 2014) ...................................................................... 3

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015) ...................................................................................... 11, 12

*Pinter v. Dahl*,
    486 U.S. 622 (1988) ............................................................................................ 39

*Pittman v. Unum Grp.*,
    861 F. App'x 51 (6th Cir. 2021) ................................................................. 8, 28, 32

*Plymouth Cnty. Ret. Assoc. v. ViewRay*,
    556 F. Supp. 3d 772 (N.D. Ohio 2021), *aff'd*, 2022 WL 3972478 (6th Cir. Sept. 1, 2022) 20, 27

*Police & Fire Ret. Sys. City of Detroit v. Argo Grp. Int'l Holdings, Ltd.*,
    2024 WL 5089970 (S.D.N.Y. Dec. 12, 2024) ................................................... 15, 18

*Rosenzweig v. Azurix Corp.*,
    332 F.3d 854 (5th Cir. 2003) ............................................................................... 39

*Slack Techs., LLC v. Pirani*,
    598 U.S. 759 (2023) ............................................................................................ 37

*Stein v. U.S. Xpress Enters., Inc.*,
    2020 WL 3584800 (E.D. Tenn. June 30, 2020) ................................................ 22, 30

*Teamsters Loc. 237 Welfare Fund v. ServiceMaster Glob. Holdings, Inc.*,
  83 F.4th 514 (6th Cir. 2023) ........................................................................... 24, 31, 32

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
  551 U.S. 308 (2007) ........................................................................................... 3, 25, 26

*W. Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*,
  495 F. Supp. 3d 622 (N.D. Ill. 2020), *aff'd sub nom. Nat'l Elevator Indus. Pension Fund v.
  Conagra Brands, Inc.*, 2022 WL 1449184 (7th Cir. May 9, 2022) ........................................... 38

*Woolgar v. Kingstone Cos.*,
  477 F. Supp. 3d 193 (S.D.N.Y. 2020) ............................................................................ 10

*Zurich Ins. v. Logitrans, Inc.*,
  297 F.3d 528 (6th Cir. 2002) ...................................................................................... 8

## STATUTES

15 U.S.C. § 77l(a)(2) ...................................................................................................... 31

15 U.S.C. § 78t ............................................................................................................... 34

15 U.S.C. § 78t ............................................................................................................... 34

15 U.S.C. § 78u-4 ................................................................................................... passim

15 U.S.C. § 78u-5 ........................................................................................................... 16

## RULES

Fed. R. Civ. P. 8 ............................................................................................................. 33

Fed. R. Civ. P. 9 ........................................................................................................ 8, 33

Rule 10b-5 ....................................................................................................................... 7

**<u>Table of Abbreviations</u>**

| | |
|---|---|
| AC | Plaintiffs' Amended Consolidated Class Action Complaint, Dkt. 82 |
| BLA | Big Lead Assembly |
| Class Period | May 16, 2022 through May 7, 2024, inclusive |
| Defendants | Shoals, Individual Defendants, and Underwriter Defendants |
| Director Defendants | Jason R. Whitaker, Brad Forth, Peter Wilver, Ty Daul, Toni Volpe, Lori Sundberg, Jeannette Mills, and Robert Julian |
| EBOS | Electrical Balance of Systems |
| Erste AM | Lead Plaintiff Erste Asset Management GmbH |
| Exchange Act | Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.* |
| Exchange Act Defendants | Shoals, Jason Whitaker, Kevin Hubbard, Dominic Bardos, Jeffrey Tolnar, Brandon Moss |
| Exchange Act Individual Defendants | Jason Whitaker, Kevin Hubbard, Dominic Bardos, Jeffrey Tolnar, Brandon Moss |
| FE | Former employee |
| FLS | Forward-looking statements |
| GAAP | Generally Accepted Accounting Principles |
| Individual Defendants | Dominic Bardos, Jason R. Whitaker, Jeffrey Tolnar, Brandon Moss, Kevin Hubbard, Brad Forth, Peter Wilver, Ty Daul, Toni Volpe, Lori Sundberg, Jeanette Mills, Robert Julian, and Dean Solon |
| KUAERP | Plaintiff Kissimmee Utility Authority Employees' Retirement Plan |
| Plaintiffs | Lead Plaintiff Erste Asset Management GmbH[1] and Kissimmee Utility Authority Employees' Retirement Plan |
| Prysmian | Prysmian Cables and Systems USA, LLC |
| PSLRA | Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4 *et seq.* |
| Rule 12(b)(6) | Federal Rule of Civil Procedure 12(b)(6) |
| Section 12 | Section 12(a)(2) of the Securities Act |
| Securities Act | Securities Act of 1933, 15 U.S.C. § 77a *et seq.* |

---

[1] Lead Plaintiff Erste AM did not purchase shares in the SPO and does not bring any Securities Act Claims. *See* AC ¶¶ 230-250 (only KUAERP alleging Counts IV-VI).

| | |
|---|---|
| Securities Act Defendants | Dean Solon,[2] the Director Defendants, the Underwriter Defendants, Shoals, and Dominic Bardos |
| Section 12 Defendants | Shoals, Bardos, the Director Defendants, and the Underwriter Defendants |
| Shoals or the Company | Shoals Technologies Group, Inc. |
| SPO | Secondary Public Offering |
| SPOs | Shoals' December 2022 and March 2023 SPOs |
| TRA | Tax Receivable Agreement |
| Underwriter Defendants | J.P. Morgan Securities LLC; Guggenheim Securities, LLC; Morgan Stanley & Co. LLC; UBS Securities LLC; Goldman Sachs & Co. LLC; Barclays Capital Inc.; Credit Suisse Securities (USA) LLC; Cowen and Company, LLC; Oppenheimer & Co. Inc.; Piper Sandler & Co.; Roth Capital Partners, LLC; Johnson Rice & Company L.L.C.; Northland Securities, Inc |

---

[2] Solon is a Securities Act Defendant only to the extent Plaintiffs allege he violated Section 15 of the 1933 Act. AC at iii n.1.

## I.     INTRODUCTION

Shoals is an innovative public company that provides custom electrical wiring harness systems for utility solar energy projects.  When Shoals first learned that the copper conductor on certain wiring harnesses sold to a customer and delivered to a solar field was becoming exposed, it responded promptly and appropriately.  Shoals investigated the exposed conductor issue, eventually determining the issue was caused by excessive insulation shrinkback in wire supplied by one particular supplier.  Shoals analyzed the impact the issue could have on the Company's financials, and updated investors on the risks and estimated probable costs for remediation once it had sufficient information to do so.  Yet Plaintiffs bring this action to punish the Company and other Defendants for failing to predict the future scope and cost of the issue—despite the Company's repeated warnings that warranty costs are difficult to predict and subject to material changes.  Plaintiffs challenge statements the Company made while it was investigating the exposed conductor issue, despite alleging that the issue's root cause is still a "debate" within the industry, and is the subject of litigation that Shoals filed against one of its wire suppliers.  Plaintiffs' theory of fraud is not just implausible—it flies in the face of established precedent that asks companies to do exactly what Shoals did here:  consider their reserve estimates based on the information available, and disclose revised estimates to the investing public as new information becomes available.  The AC is deficient for several reasons and should be dismissed with prejudice.

***First***, Plaintiffs do not allege falsity with particularity.  The gravamen of Plaintiffs' claims is that Shoals failed to comply with GAAP when estimating and disclosing its potential liability for the exposed conductor issue.  Plaintiffs further challenge numerous statements relating to the safety, reliability, and cost-effectiveness of Shoals' products based on the same allegations about the disclosure of the issue.  But the AC contains no particularized allegations to suggest any of the challenged statements were false or misleading at the time made.  Moreover, the warranty reserve

1

statements are non-actionable opinions, other statements are mere puffery on which no reasonable investor would rely, and still others are protected by the safe harbor for forward-looking statements under the federal securities laws. None of the challenged statements is actionable, and the AC should be dismissed in its entirety on this ground alone.

*Second*, Plaintiffs' Exchange Act claims fail for the additional reason that Plaintiffs do not allege a strong inference of scienter—*i.e.*, an intent to defraud investors. Plaintiffs point to one individual's stock sales, made pursuant to a 10b5-1 plan in the lead-up to his medical retirement, but Plaintiffs do not allege any information to suggest that the trades were suspicious, as is required to support a strong inference of scienter. And the lack of sales by the other four Exchange Act Individual Defendants undermines any inference of scienter. Plaintiffs' remaining allegations are the type of generic allegations about executives that courts routinely reject as insufficient to plead scienter. The more compelling, non-fraudulent inference is the obvious one: the Company was investigating—and then disclosing—a developing issue related to a supplier's defective product.

*Third*, the Exchange Act claims should be dismissed because Plaintiffs fail to allege loss causation—*i.e.*, that the challenged statements caused their claimed losses. Plaintiffs seem to allege that Shoals' later-increased reserves and disclosures about impacted sites "corrected" Shoals' prior disclosures. But the later disclosures are not ***corrective***; they reflect ***new*** information as more customers identified exposed conductors and Shoals continued its investigation.

*Fourth*, aside from failing to plead falsity for the December 2022 offering documents, Plaintiff KUAERP's Securities Act claims fail because KUAERP lacks standing to bring them, and its Section 12 claim must be dismissed because Plaintiffs do not allege that any Section 12 Defendant is a statutory seller under the applicable pleading standards.

2

***Finally***, having failed to plead any Exchange Act or Securities Act claims, Plaintiffs' Section 20(a) and 15 control-person claims and Section 20A insider trading claims necessarily fail. No set of facts would allow Plaintiffs to state a claim, and because they have already amended their complaint, the AC should be dismissed with prejudice.

## II.    FACTUAL ALLEGATIONS

### A.    Shoals Builds Innovative Electrical Wiring Harness Systems for Solar Fields

Founded in 1996, Shoals is a leading provider of EBOS solutions for solar and battery storage. AC ¶¶ 14, 31. EBOS encompasses all components necessary to carry the electric current produced by solar panels to an inverter and ultimately to a power grid. Ex. 4 at 2.[3] Shoals offers its customers several solutions, including a "combine-as-you-go" system using specialized, above-ground wire harnesses connected to a BLA that is "installable by general labor" rather than requiring licensed electricians. *Id.* at 3.

Since Shoals became a public company in January 2021, it has publicly disclosed a number of risks associated with investing in the Company. Ex. 2 at 7. For instance, Shoals warned investors beginning before the Class Period that EBOS components "have a high consequence of failure." Ex. 1 at 2, 23–24. As a result, "a fault in the wiring of an EBOS system, whether as a result of product malfunctions, defects or improper installation, may cause electrical failures in solar energy projects." *Id.* at 23–24. Shoals further warned investors that, although Shoals conducts quality-assurance processes on its products (*id.* at 17), which meet ***Shoals'*** "stringent

---

[3] In ruling on a motion to dismiss, the Court "must consider" the AC "in its entirety," which includes "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007). The Exhibits attached to this Motion are incorporated by reference in the AC, subject to judicial notice, or both. *See Norfolk Cnty. Ret. Sys. v. Tempur-Pedic Int'l., Inc.*, 22 F. Supp. 3d 669, 675 (E.D. Ky. 2014) (court considers "full texts of SEC filings, prospectuses" and "other documents referenced in the complaint, regardless of whether they are attached").

quality requirements," its products may nevertheless contain "undetected errors or defects[.]" *Id.* at 24. To that end, Shoals disclosed that its products "require significant technological and production process expertise," and thus Shoals depends on a "limited number of vendors and suppliers." *Id.* at 17.

Shoals further disclosed to investors that "defective components may give rise to warranty" claims, and the Company "bear[s] the risk of warranty claims long after [it has] sold products and recognized revenue." *Id.* at 24. While Shoals accounts for warranty reserves, it explained to investors the inherent uncertainty in estimating such reserves—especially considering its limited history with warranty claims. *Id.* Shoals disclosed its process for estimating warranty costs:

> While we do have accrued reserves for warranty claims, our estimated warranty costs for previously sold products may change to the extent future products are not compatible with earlier generation products under warranty. Our warranty accruals are based on our assumptions and we do not have a long history of making such assumptions. As a result, these assumptions could prove to be materially different from the actual performance of our systems, causing us to incur substantial unanticipated expense to repair or replace defective products in the future or to compensate customers for defective products. Our failure to accurately predict future claims could result in unexpected volatility and have a material adverse effect on, our financial condition.

*Id.*

### B. In 2022, Shoals Learns of and Investigates Instances of Exposed Conductors, Initially Believing Issue Was Caused by Its Customers' Installation

In March 2022, Shoals received a report of exposed bare copper conductor in a red-wire harness at a customer's solar field in Phoenix. AC ¶¶ 47–48, 111. Shoals investigated and initially believed the problem was caused by the customer's installation (for which Shoals is not responsible). *Id.* ¶¶ 37, 50, 52–53, 78. Nevertheless, Shoals agreed to replace that field's product. *Id.* ¶¶ 50, 54. A few months later, in June 2022, Shoals received additional reports of similar issues and began to investigate those too. *Id.* ¶ 51. Shoals continued to believe that the customers'

installation or cable management was the likely cause.  *Id.* ¶ 58.  Shoals worked with the wire

supplier for the affected sites, Prysmian, in trying to identify the root cause.  *Id.*

While its investigation of the first few customer reports and discussions with Prysmian

were ongoing (*id.* ¶ 136), Shoals initiated an SPO in early December 2022 to fund the termination

of a TRA.  *Id.* ¶¶ 64, 93.  Analysts reacted positively to the TRA termination.  *Id.* ¶ 64.

C.  **In 2023, as Shoals Continues to Investigate and Learns About More Impacted Customers, Shoals Concludes—And Discloses in Its Q1 2023 10-Q—the Root Cause Was Shrinkback From Defective Wire Covered by Its Warranty**

After the SPO, Shoals continued to learn more about the exposed conductor issue from

newly identified sites, more testing, and discussions with Prysmian—who continued to deny

responsibility.  *Id.* ¶¶ 67–68.  With the new information, Shoals began to suspect that the cause

may have been excessive pull back, or "shrinkback" from defective Prysmian wire (which is

covered under Shoals' warranty to its customers), rather than a customer installation issue (which

is not covered under Shoals' warranty to its customers, *see id.* ¶ 40).  *Id.* ¶ 68.  Shoals disclosed in

its 2022 10-K filed on February 28, 2023, that it had estimated $600,000 in warranty reserves—

an immaterial amount that did not require a specific disclosure—while continuing to warn that the

failure to accurately predict future warranty claims could have a material adverse effect on its

financial condition.  AC ¶ 100; Ex. 4 at 20–21.  Shoals' investigation into the cause of the exposed

conductors continued over the next few months as additional customers reported similar issues.

AC ¶ 59.  In April 2023, Shoals confirmed that the affected sites exclusively used Prysmian cable

in the application exhibiting the issue.  *Id.* ¶ 57.  As a result (and despite Prysmian's assertions to

the contrary, *id.* ¶ 68), Shoals concluded the issue was shrinkback "related to a subset of specific

colored wire" provided by Prysmian, rather than installation issues as initially believed.  *Id.* ¶ 67.

Shoals therefore disclosed in its next 10-Q filed on May 8, 2023, that it was "probable that the

Company will incur costs related to the repair or replacement of the impacted wire harnesses."  *Id.*

5

But Shoals disclosed to investors that it could not reasonably estimate the amount of the warranty costs based on the limited information it had. *Id*. Not only did the Company lack historical warranty claim data, but it did not yet know the scope of affected sites, potential remedial solutions, or the possibility of recovering costs from Prysmian. *Id*. Because Shoals was "continuing its investigation," it warned investors it "expect[ed] to increase its estimated accrued warranty liability, which may be material." Ex. 5 at 15–16.

### D. The Next Quarter, After Continued Investigation, Shoals Discloses Increased Warranty Reserve Estimate

Shoals continued to investigate the issue with Prysmian in the following months. AC ¶ 116. In August 2023, Shoals disclosed that it estimated the "low end of the range of potential outcomes" to be $9.3 million based on the information available, but that it was still investigating the "scope of affected sites, potential solutions and the possibility of recovery" from Prysmian. *Id*. ¶ 144. Accordingly, Shoals was unable to estimate the high end. *Id*. Shoals again warned it may "increase its estimated warranty liability from its current accrual," which could be material. *Id*. ¶ 158(e) (analyst recognizing after Shoals' $9.3 million warranty charge that "there could be future accruals in forward quarters, which could continue to show up in gross margins").

### E. Shoals Pursues Recovery From Wire-Supplier Prysmian and Continues to Disclose Quarterly Updates to Warranty Reserve Estimate

On October 31, 2023, Shoals sued Prysmian to recover Shoals' damages associated with the defective wire. AC ¶ 123. Shoals referenced the lawsuit in its next quarterly filing days later. Ex. 10 at 21. In addition, the Company told investors that the ongoing investigation provided it with "better visibility into the scope of affected sites and potential solutions, including identification, repair and replacement of harnesses." AC ¶ 148. For instance, Shoals told investors it believed at the time that approximately 300 sites could have Prysmian wire (*id.* ¶ 121), but that the solar fields' size made identifying the affected wire time-consuming and costly. Ex. 11 at 6.

With the new information from its ongoing investigation (including third-party testing), Shoals disclosed in its 10-Q filed in November 2023 that it had revised the estimated range of potential warranty liability upwards to between $59.7 million and $184.9 million. Ex. 10 at 15; *see also* AC ¶¶ 121, 123. The Company continued to explain to investors how it estimated this range and again warned that the estimate could change. Ex. 11 at 7; Ex. 10 at 15.

When Shoals then learned that 10 additional sites with Prysmian wire were experiencing shrinkback—up from the 20 sites of which Shoals was aware in 2023 before filing suit against Prysmian—Shoals updated investors in its 2023 10-K, filed on February 28, 2024. AC ¶ 128. Shoals' estimated range of warranty liability and related expenses, which was based on Shoals' ongoing analysis and consideration of several assumptions, remained unchanged at $59.7 million to $184.9 million. *Id.* ¶ 152; *see also* Ex. 12 at 13–14. After further investigation and remediation work in 2024, Shoals narrowed its estimated range in November 2024 to between $73 million and $160 million. AC ¶¶ 136 n.14, 170. Shoals' investigation into the issue and its lawsuit against Prysmian remain ongoing.

Throughout the Class Period, Shoals' auditor conducted quarterly reviews of the Company's financials and annually issued clean audit opinions, and Shoals has never restated any of its financial statements. *See* Ex. 4 at F-2–F-3; Ex. 12 at F-2–F-3. Yet when Shoals reported disappointing results over the course of a few months (AC ¶¶ 155–173), Plaintiffs brought this fraud-by-hindsight action.

## III. PLAINTIFFS FAIL TO PLEAD AN EXCHANGE ACT CLAIM

To state a claim under Section 10(b) and Rule 10b-5 of the Exchange Act, Plaintiffs must adequately allege: (1) a material misrepresentation or omission, (2) scienter, (3) a connection with the purchase or sale of a security, (4) reliance, (5) economic loss, and (6) loss causation. *Pittman v. Unum Grp.*, 861 F. App'x 51, 53 (6th Cir. 2021). Pleading these elements requires Plaintiffs to

7

meet "vigorous" and "purposefully demanding" standards. *In re Ferro Corp. Sec. Litig.*, 2007 WL 1691358, at *9 (N.D. Ohio June 11, 2007); *Lubbers v. Flagstar Bancorp. Inc.*, 162 F. Supp. 3d 571, 576 (E.D. Mich. 2016).[4]  Rule 9(b) requires Plaintiffs to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).  The PSLRA, in turn, was enacted to screen out, at the pleading stage, suits based on "nothing more than a company's announcement of bad news, not evidence of fraud." *In re Comshare Inc. Sec. Litig.*, 183 F.3d 542, 548 (6th Cir. 1999).  The PSLRA thus imposes an "elephant-sized boulder blocking" securities suits. *Lubbers*, 162 F. Supp. 3d at 576.  To meet the PSLRA's exacting standards, Plaintiffs must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1)(B).

Here, Plaintiffs fail to plead the necessary elements of falsity, scienter, and loss causation.[5]

### A.    Plaintiffs Do Not Allege an Actionable Misstatement or Omission

#### 1.    Plaintiffs Do Not Allege Falsity With Particularity

Plaintiffs encounter a threshold problem, which requires dismissal:  they fail the PSLRA's mandate to identify with particularity "each statement alleged to have been misleading." *Id.* Indeed, it is unclear which statements Plaintiffs challenge, as the AC includes large block quotes from statements spanning nearly two years.  Plaintiffs bold and italicize some statements (*e.g.*, AC ¶¶ 77, 79, 89, 101) but not other similar statements (*id.* ¶¶ 88, 91, 114), leaving Defendants (and the Court) to guess which parts of which statements Plaintiffs challenge. *See Nicholson v. N-Viro Int'l Corp.*, 2007 WL 2994452, at *7 (N.D. Ohio Oct. 12, 2007) ("plaintiff must identify the exact

---

[4] Unless otherwise stated, all internal quotations and citations are omitted.  Defendants reserve the right to challenge at a later stage (if necessary) the standing of Plaintiff Erste Asset Management. *See Zurich Ins. v. Logitrans, Inc.*, 297 F.3d 528, 531 (6th Cir. 2002) (standing "may be brought up at any time in the proceeding"); *see* Dkt. 29 at 5–17, Dkt. 34 at 1–2.

[5] A summary of the statements Plaintiffs appear to challenge is attached as Appendix A.

statements within each public filing that the plaintiff contends are false and misleading"). As one example, Plaintiffs quote identical language from the same filing twice, bolding and italicizing certain sentences the first time (AC ¶ 111), but not the second (*id.* ¶ 140). Adding to the confusion, Plaintiffs appear to be challenging basic, indisputable facts, like the fact that Shoals held an investor call (*see, e.g.*, *id.* ¶¶ 115, 122), filed a complaint against Prysmian (*see id.* ¶ 123), and made public filings (*see, e.g.*, *id.* ¶¶ 93, 103, 126). Plaintiffs' pleading thus does not "specify each" alleged misleading statement. 15 U.S.C. § 78u-4(b)(1)(B). And by "failing to articulate *exactly* which statements Plaintiff[s] assert[] to be false or misleading, Plaintiff[s] in effect insulate[] the Complaint from review." *Lu v. Align Tech., Inc.*, 417 F. Supp. 3d 1266, 1275 (N.D. Cal. 2019) (emphasis in original). The AC should be dismissed in full on this basis alone.

### 2. Plaintiffs Do Not Allege a GAAP Violation

The heart of Plaintiffs' lawsuit is their allegation that the Exchange Act Defendants violated GAAP by "materially understat[ing] Shoals' warranty reserves with respect to the BLA defect," and "fail[ing] to make required disclosures regarding the extent of costs associated with remediating the BLA defect." AC ¶ 130; *see also id.* ¶¶ 80, 86, 91, 95, 97, 100, 105, 110–111, 113, 116, 118, 120–121, 123–124, 127–128, 134–155.

To start, the alleged "failure to follow GAAP is, by itself, insufficient to state a securities fraud claim." *In re Huntington Bancshares Inc. Sec. Litig.*, 674 F. Supp. 2d 951, 973 (S.D. Ohio 2009) (citing *In re Comshare*, 183 F.3d at 553). Plaintiffs must instead allege facts showing the challenged statement was false when made. *Id.* Pleading an actionable claim is even more difficult here, where Shoals' warranty reserves are opinion statements. AC ¶¶ 40, 87(a) (acknowledging that warranty reserves are accounting estimates); *see Chapman v. Mueller Water Prods., Inc.*, 466 F. Supp. 3d 382, 398 (S.D.N.Y. 2020) (reserves are opinion statements); *see also Woolgar v. Kingstone Cos.*, 477 F. Supp. 3d 193, 222 (S.D.N.Y. 2020) (same). To be actionable, Plaintiffs

9

must allege with particularity that the Exchange Act Defendants' opinions (1) contain embedded statements of fact that are false; (2) "omit[] material facts" underlying the basis for the opinion "if those facts conflict with what a reasonable investor would take from the statement itself"; or (3) were not genuinely believed. *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 184–86, 188–89 (2015).

Plaintiffs cannot meet this burden. The AC contains no particularized allegations that— ***based on the information available at the time***—Shoals' reserve-related statements contained false statements of fact, or that Shoals had a duty to disclose more about the shrinkback issue or did not genuinely believe its estimates. The accounting standard governing warranty reserve estimates, ASC 450, states that an "estimated loss from a loss contingency shall be accrued" when "both the following conditions are met": (a) "[i]nformation available before the financial statements are issued . . . indicates that it is probable that . . . a liability had been incurred at the date of the financial statements," and (b) the amount of loss can be "reasonably estimated." AC ¶ 132; ASC 450-20-25-2. "Probable" is defined as "[t]he future event or events are likely to occur." AC ¶ 132. If a loss cannot be "reasonably estimated," but it is still "reasonably possible," ASC 450 requires disclosure of the "nature of the contingency" and "[a]n estimate of the possible loss or range of loss or a statement that such an estimate cannot be made." *Id.*

*Omnicare*, taken together with ASC 450, thus requires Plaintiffs to plead either specific information showing the reserve amounts were probable and reasonably estimable before disclosure (or supported an amount different than that disclosed), that Shoals omitted material information underlying its warranty reserve calculations, or that the Exchange Act Defendants did not genuinely believe the estimated reserve disclosures. 575 U.S. at 184–86, 188. None of these allegations is present here.

a. *Plaintiffs Do Not Allege False Embedded Statements of Fact*

Plaintiffs allege that Shoals' public filings contained false or misleading statements because they: (a) warned Shoals "may face" warranty claims before Shoals disclosed the shrinkback issue (AC ¶¶ 80, 86, 91, 95, 100, 105, 134–136, 138); (b) stated costs were not reasonably estimable (*id.* ¶ 140); and (c) "understated" Shoals' warranty reserve (*id.* ¶¶ 144–154). Plaintiffs fail to allege facts supporting that any of these categories were false or misleading.

***First***, Plaintiffs challenge the statement that Shoals "may face" warranty liability, claiming the "requirements for accrual and/or disclosure of the BLA defect under ASC 450" were met "no later than May 17, 2022"—*i.e.*, two months after the initial customer report. *Id.* ¶ 133. The AC does not come close to pleading specific allegations in support of this conclusory claim. Plaintiffs point to FE accounts about a customer complaint in March 2022 at a single site where Shoals offered to replace the affected harnesses to "support its customer"; a "sister project" identified "weeks later" with "similar issues"; and "four or five other sites" (out of 300 total sites) with the "same issues" identified "by June 2022" (*after* Shoals filed its 1Q Form 10-Q). *Id.* ¶¶ 134–135. But Plaintiffs acknowledge that FE1 and FE2 both corroborated that the Company first believed the exposed conductor issues stemmed from the customer's installation, not a product defect that would trigger Shoals' warranty liability (or a corresponding warranty reserve). *See id.* ¶¶ 50, 53–54; *see, e.g.*, *In re Ford Motor Sec. Litig.*, 381 F.3d 563, 572 (6th Cir. 2004) (rejecting argument that defendants should have recorded loss contingency where it was "reasonable to expect" another party could cover costs). Plaintiffs' own allegations thus support Shoals' assessment that it was ***not "probable"*** it would be liable for the issue at the limited number of then-known sites.

***Second***, the AC does not support Plaintiffs' claim that remediation costs were "reasonably estimable" "no later than May 17, 2022." AC ¶ 133. Plaintiffs' argument hinges on the FEs' purported belief that because they estimate the initial site replacement "cost $3.5 to $4 million,"

11

the estimated cost for the other sites "likely amounted to more than $15 million." *Id.* ¶¶ 134–135; *see also id.* ¶ 54. But the FEs' conclusory views "lack[] critical context" and highlight why Plaintiffs' reliance on FEs does not support falsity. *In re Keithley Instruments, Inc. Sec. Litig.*, 268 F. Supp. 2d 887, 899 (N.D. Ohio 2002). To start, Plaintiffs cannot even decide which FE offered this hindsight-driven guess as to what the remediation for the other sites could cost. *Compare* AC ¶ 54 (FE1 estimated $15 million) *with id.* ¶ 135 (FE2 estimated $15 million). Neither is reliable. FE1 left Shoals in June 2022, a mere three months after the issue at the first site was first reported (*id.* ¶ 49), and solidly within the time period during which Shoals believed the issue to be caused by faulty installation. *Id.*; *see Huntington Bancshares*, 674 F. Supp. 2d at 964 (discounting FE allegations when FE was not at company during relevant time period). Further, FE1 provides no facts to support the suggestion that these problems caused internal panic at the Company (*see* AC ¶ 51), but regardless, Shoals' urgency in addressing a customer issue does not mean its warranty reserves were inaccurate. *See Chapman*, 466 F. Supp. 3d at 400 (FE allegations that certain products "required repair or replacement" did not speak to adequacy of reserve).

Similarly, FE2 alleges zero details to support the conclusory assertion that Shoals agreed to replace harnesses at customer sites—in fact, the only affected site about which FE2 purports to have firsthand knowledge was the first. *See* AC ¶¶ 53–54; *see In re Diebold Sec. Litig.*, 2008 WL 3927467, at *7 (N.D. Ohio Aug. 22, 2008) (discounting FE statements where plaintiffs failed to provide "how each [FE] had personal knowledge of the information alleged"). Indeed, Shoals could repair, rather than replace, affected wire. *See* AC ¶ 140. Even if Shoals did undertake full field replacements at all those fields, the FEs do not provide ***any*** facts to back up the $15 million figure, as they do not allege that the number of harnesses at the other fields was similar to the Phoenix field, or that the mode of repair would be the same, such that the cost would be similar.

12

*Id.* ¶ 54; *see In re Keithley*, 268 F. Supp. 2d at 899 (dismissing where import of alleged problems at company were "suggested in a wholly conclusory fashion"). Nor do the FEs state whether Shoals or the customer was to bear ultimate financial responsibility for any replacements Shoals provided to customers, which is particularly notable given Plaintiffs admit the issue was first believed to be caused by the customer's installation. *See* AC ¶¶ 50, 134 (alleging only that Shoals fronted cost to immediately replace certain affected harnesses "to support its customer").

*Third*, Plaintiffs fail to allege any facts contradicting the ranges the Company estimated for its warranty liability once it determined a loss was probable and reasonably estimable. *See id.* ¶¶ 118, 128, 144–145, 148–149, 152–153. Indeed, there are zero allegations that any Exchange Act Defendants "had any information . . . that was not reflected in the reserves." *See Huntington Bancshares*, 674 F. Supp. 2d at 963. The FEs do not help Plaintiffs here either: none had any involvement in estimating Shoals' reserves (or even accounting more generally). *Id.* at 964 (theory that defendants knew reserves were inadequate unsupported where no FE was involved in estimating reserves); *Police & Fire Ret. Sys. City of Detroit v. Argo Grp. Int'l Holdings, Ltd.*, 2024 WL 5089970, at *7 (S.D.N.Y. Dec. 12, 2024) (similar). Moreover, the Company's evolving disclosures and reserve estimates support that Shoals was considering and disclosing material new information as it continued to investigate and as the dispute with its supplier evolved. *See* App. B (chart showing Shoals' evolving disclosures).

At bottom, Plaintiffs' theory is one of "underestimation in hindsight" (*Chapman*, 466 F. Supp. 3d at 404), given that Shoals ultimately announced in November 2024 that the low-end of its warranty estimate had changed to $73 million. *See* AC ¶ 135. Plaintiffs simply take that post-Class Period estimate, developed based on many months of investigation and actual remediation costs (*i.e.*, information Shoals did not have at the time of the challenged statements), and assert

13

that Shoals' earlier estimated reserves were insufficient. *Id.* ¶¶ 135–136, 138, 145, 149, 150, 153–154. But later increases in accounting estimates do not demonstrate earlier estimates were inaccurate. *See In re 3M Co. Sec. Litig.*, 2021 WL 4482987, at *10 (D. Minn. Sept. 30, 2021) (later increases in accruals cannot be used to demonstrate earlier statements were inaccurate); *Chapman*, 466 F. Supp. 3d at 403 (explaining that the "law is well-settled that where a claim is based on the timing of an accounting [event], it is not sufficient to simply allege the [event] should have occurred earlier"); *Huntington Bancshares*, 674 F. Supp. 2d at 964–65 ("Huntington may have incorrectly believed it had adequate reserves, but the mere fact that those reserves eventually proved to be inadequate does not mean a false statement was made."). And for good reason: "[if] Plaintiffs were able to state a claim for securities fraud by alleging that [Shoals] carried out its responsibilities and made an adjustment, then no company discharging its responsibilities would be free from a securities suit[.]" *Chapman*, 466 F. Supp. 3d at 404.

Finally, Plaintiffs' GAAP-violation theory is further "undermined by the fact that [Shoals'] independent auditor" reviewed the warranty reserve and determined the Company's financial statements were materially accurate. *Woolgar*, 477 F. Supp. 3d at 228–29; *see* Ex. 4 at F-2–F-3; Ex. 12 at F-2–F-3. The Company has not restated any of its financials. *See Hess v. Am. Phys. Cap., Inc.*, 2005 WL 459638, at *11 (W.D. Mich. Jan. 11, 2005) (complaint did not allege any "red flags" signaling accounting errors). Accordingly, Plaintiffs allege no facts that then-available information contradicted Shoals' evolving estimates and disclosures about the shrinkback issue.

     b.  *Plaintiffs Do Not Allege Omitted Information Made the Opinion Statements Misleading*

Plaintiffs likewise do not allege that the Exchange Act Defendants omitted information making any opinion about the warranty reserves misleading. *See Chapman*, 466 F. Supp. 3d at 404. To the extent Plaintiffs' theory is that the Exchange Act Defendants had a duty to disclose

14

their ongoing investigation into an evolving issue before May 2023, that theory is contradicted by Plaintiffs' acknowledgement that Shoals first believed the exposed conductor was an issue with customer installation. AC ¶¶ 50, 53, 56. Moreover, "[t]here is no duty of total corporate transparency—no rule that every hitch or glitch, every pratfall, in a company's operations must be disclosed in 'real time,' forming a running commentary, a baring of the corporate innards, day and night." *City of Livonia Emps.' Ret. Sys. v. Boeing Co.*, 711 F.3d 754, 759 (7th Cir. 2013); *see also Doshi v. Gen. Cable Corp.*, 386 F. Supp. 3d 815, 832 (E.D. Ky. 2019) (no duty to disclose "potential consequence of [defendant's] actions . . . until it was virtually certain to occur").

Once Shoals had information sufficient to conclude that the issue could be material, Shoals disclosed it, including the basis for its warranty reserve estimates, which is inherently subjective. *See* AC ¶ 240; Ex. 4 at F-19 ("This provision is based on historical information on the nature, frequency and average cost of claims for each product line. When little or no experience exists for an immature product line, the estimate is based on comparable product lines."). Shoals further warned investors that its warranty "estimates are reevaluated on an ongoing basis using best-available information and revisions to estimates are made as necessary." *Id*. These allegations fail to plead an omission.

        c.     *Plaintiffs Do Not Allege Any Exchange Act Defendant Did Not Genuinely Believe the Statements*

Plaintiffs do not allege facts plausibly showing the Exchange Act Defendants held anything but an "honest belief" that the warranty reserves were adequately estimated. *Chapman*, 466 F. Supp. 3d at 398. Plaintiffs do not "'specifically identify [any] reports or statements' that are contradictory" to the warranty reserves or "provide specific instances in which [the Exchange Act] Defendants received information that was contrary to their public declarations." *Id.* at 399. The FEs' allegations as to potential remediation costs do not contradict Defendants' genuine belief, as

the AC contains no allegations that the FEs reported to the Exchange Act Defendants or otherwise shared supposed remediation estimates with them. The "mere fact that [the Exchange Act Defendants] later revised reserves that [they] had previously deemed adequate 'provides absolutely no reasonable basis for concluding that [they] did not think reserves were adequate at the time.'" *Argo Grp. Int'l Holdings, Ltd.*, 2024 WL 5089970, at \*8; *see also infra* § III.B (discussing lack of scienter allegations).

### 3. Statements Discussing Shoals' Warranty Reserves Are Protected Forward-Looking Statements

The Exchange Act Defendants' statements about Shoals' warranty reserve estimates and financial guidance are projections of future events that are protected as forward-looking statements. *See* 15 U.S.C. § 78u-5(i)(1) (FLS include "a projection of . . . financial items" and "any statement of the assumptions underlying or relating to" the same); AC ¶¶ 110–111, 113, 116, 118, 120–121, 124, 126, 128, 140, 144–145, 148–149, 152–153. The reserve for future claims is a "constantly changing accumulation of numbers and processes" that can change with the "discovery of a single fact." *In re Kindred Healthcare, Inc. Sec. Litig.*, 299 F. Supp. 2d 724, 733–34 (W.D. Ky. 2004). The PSLRA immunizes the Exchange Act Defendants from liability for these FLS, so long as the statements are *either* (1) identified as forward-looking and accompanied by meaningful cautionary language, *or* (2) not made with "actual knowledge" of falsity. 15 U.S.C. § 78u-5(c)(1); *City of Pontiac Gen. Emps.' Ret. Sys. v. Stryker Corp.*, 865 F. Supp. 2d 811, 830 (W.D. Mich. 2012). Plaintiffs must overcome both prongs of the safe harbor to plead an actionable claim based on any FLS. Yet Plaintiffs cannot overcome either.[6]

---

[6] Likewise, the "bespeaks caution" doctrine protects forward-looking statements in Shoals' 2022 Prospectus that are accompanied by "meaningful cautionary language." *Kolominsky v. Root, Inc.*, 100 F.4th 675, 689 (6th Cir. 2024); *see* AC ¶¶ 183, 185–186. *See infra* § IV.A (failure to plead falsity requires dismissal of both Exchange Act and Securities Act claims).

16

As the filings challenged in the AC show, Shoals identified its statements as forward-looking and accompanied them with meaningful cautionary language. For example, Plaintiffs target Bardos's August 1, 2023 earnings call statement that "we believe [the charge we booked in the quarter] is adequate to do the remediation required[.]" AC ¶ 116. Assertions about the "adequacy of the Company's loss reserves" are forward-looking. *Hess*, 2005 WL 459638, at *7. Shoals began the earnings call by identifying that "management will be making projections or other forward-looking statements based on current expectations and assumptions, which are subject to risks and uncertainties." Ex. 6 at 4. And the call expressly incorporated "the risk factors described in [Shoals' public] filings," (*id.*), which included warnings that the Company "do[es] not have a long history of making" assumptions for warranty accruals, so management's "assumptions could prove to be materially different from the actual performance of [Shoals'] systems, causing [it] to incur substantial unanticipated expense to repair or replace defective products in the future or to compensate customers for defective products." Ex. 4 at 20.

Shoals' press releases (AC ¶¶ 113, 120) similarly identified FLS relating to the Company's "warranty, litigation and liability accruals and estimates of loss or gains." *E.g.*, Ex. 8 at 3. Shoals warned that if it failed to "accurately estimate the potential losses related to the wire insulation shrinkback matter, or fail[ed] to recover the costs and expenses incurred . . . [its] profit margins, financial results, business and prospects could be materially adversely impacted." Ex. 12 at 11, 14–15; *see also* Ex. 9. And Shoals continually updated its discussion about the factors impacting its estimate of its warranty liability. *See* App. B.

The second prong of the safe harbor provides an independent basis for dismissal: Plaintiffs do not plead that the Exchange Act Defendants had "actual knowledge" that the statements were false or misleading. *In re Kindred*, 299 F. Supp. 2d at 739. As explained below (*infra* § III.B),

17

Plaintiffs do not plead scienter, let alone meet the higher standard of "actual knowledge." *Plymouth Cnty. Ret. Assoc. v. ViewRay*, 556 F. Supp. 3d 772, 793 (N.D. Ohio 2021), *aff'd*, 2022 WL 3972478 (6th Cir. Sept. 1, 2022).

### 4. Shoals' Warranty Risk Disclosures Are Not Actionable

Plaintiffs allege that Shoals' risk disclosures "misleadingly warned" that the Company "may face warranty, indemnity and product liability claims arising from defective products" when it "was already facing such claims[.]" AC ¶¶ 80, 86, 91, 95, 100, 105, 134–136, 138, 183. But the Sixth Circuit recognizes that risk disclosures themselves are forward-looking and thus protected under either the PSLRA or the bespeaks caution doctrine. *See Kolominsky*, 100 F.4th at 689 (affirming dismissal of risk factor as inactionable); *see also Bondali v. Yum! Brands, Inc.*, 620 F. App'x 483, 491 (6th Cir. 2015) ("But, as several courts have concluded, cautionary statements are not actionable to the extent plaintiffs contend defendants should have disclosed risk factors 'are' affecting financial results rather than 'may' affect financial results."). Because Shoals' risk disclosures are themselves forward-looking, they fall "squarely within" either doctrine's protection. *Kolominsky*, 100 F.4th at 689; *see supra* § III.A.3.

Regardless, for the same reasons explained above for the other warranty-related statements, Plaintiffs have not adequately alleged facts showing the risk statements were false or misleading when made. Shoals disclosed the issue once it determined a material loss was probable, accrued a reserve once the amount was reasonably estimable, and updated the Company's disclosures as new information became known. AC ¶ 111; *see* App. B.

### 5. "Safety," "Reliability" and "Cost-Saving" Statements Are Not Actionable

Plaintiffs appear to challenge statements touching on "safety," "reliability" and "cost-savings," but do not adequately allege they are false or misleading for at least three reasons: (i) the statements are mere puffery; (ii) no alleged facts contradict the statements when made; and (iii) the

18

statements are not false or misleading given Shoals' robust disclosures on these same issues. *See, e.g.*, AC ¶¶ 76–79, 82–85, 88–90, 94, 97–99, 101, 104, 107–109, 114, 117; *see also id.* ¶¶ 181–182 (same for Securities Act claims).

***First***, these type of statements—that Shoals' products are of "superior quality, reliability, and safety" (AC ¶¶ 77–79, 83–84, 89, 94, 101, 104, 182)—are non-actionable "corporate optimism" or "mere puffing" on which no reasonable investor would rely. *See In re Ford Motor Co. Sec. Litig.*, 381 F.3d at 570–71 (dismissing as non-actionable corporate optimism statements that Ford has made "quality a top priority" and "Ford is a worldwide leader in automotive safety"); *Howard v. Arconic Inc.*, 395 F. Supp. 3d 516, 546, 549 (W.D. Pa. 2019) ("we supply and use safe and reliable products" non-actionable puffery). Statements that the BLA could "reduce labor costs" (AC ¶¶ 77, 84, 89) are likewise puffery. *See In re Fed.-Mogul Corp. Sec. Litig.*, 166 F. Supp. 2d 559, 563 (E.D. Mich. 2001) (statement that company was "on target to achieve projected 'synergies' and cost savings" dismissed as puffery); *Stein v. U.S. Xpress Enters., Inc.*, 2020 WL 3584800, at *16–17 (E.D. Tenn. June 30, 2020) (statements that company "[m]aintain[ed] flexibility through . . . conservative financial policies" and offered "more predictable revenue streams and greater asset productivity" dismissed as puffery).

***Second***, Plaintiffs do not allege with particularity that these statements are false. As with the warranty statements, Plaintiffs' theory is that Defendants failed to adequately disclose and reserve for the exposed conductor issue, later determined to be shrinkback from defective wire. *See* AC ¶¶ 81, 87, 92, 96, 102, 106, 112, 119, 125. That theory fails for the same reasons: Plaintiffs allege no particularized facts that contradict the statements made or that suggest the Exchange Act Defendants needed to say more earlier than they did. *See supra* § III.A.2.

19

Plaintiffs rely on allegations lifted from Prysmian's unverified Answer to Shoals' complaint in separate litigation that Shoals did not have certain formal adhesion testing protocols and FE3's allegations that Shoals did not test for shrinkback issues before its dispute with Prysmian and did not independently test wire received from suppliers. *See* AC ¶¶ 55, 81(a), 87(a), 92(a), 96(a), 102(a), 106(a), 112(a), 119(a). But Plaintiffs do not explain how protocols for testing the adhesion of Shoals' connectors have anything to do with identifying shrinkback in wire received from its suppliers. Moreover, FE3 did not even start working at Shoals until December 2023 (the middle of the Class Period) so has no firsthand knowledge about Shoals' testing for shrinkback or quality controls for wire from suppliers for the majority of the challenged statements. *See, e.g.*, *Stryker*, 865 F. Supp. 2d at 819, 825 (discrediting FE allegations about quality where FE started working at company in latter half of class period, after key disclosures). In any event, FE3's own purported statements make clear that Shoals received documentation and test results from its suppliers showing that wires met proper requirements. AC ¶ 55. That Shoals began to do its own **additional** testing in December 2023 shortly after Shoals sued its wire supplier does not make Shoals' prior safety and reliability statements false or misleading. *See Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 156 (3d Cir. 2004) (affirming dismissal where information provided by confidential sources was "generally consistent" with defendants' statements). Indeed, FE2's report of four to five impacted client sites by June 2022 and Prysmian's allegation of eight impacted sites by December 2022 (AC ¶ 54) contradict Plaintiffs' conclusory allegation that the issue was "widespread" by the time of the December 2022 SPO (*id.* ¶ 96(b)), considering that approximately 300 sites had the type of Prysmian wire at issue (*id.* ¶ 127).

Moreover, in trying to allege an omission of the shrinkback issue (as required in *Macquarie Infrastructure Corp. v. Moab Partners, LP*, 601 U.S. 257 (2024)), Plaintiffs challenge statements

20

that are unrelated to shrinkback. Paragraph 89 is a perfect example. Plaintiffs challenge Whitaker's statements discussing the Company's expectations that wage pressure in the U.S. labor market would be a "tailwind for years to come" because Shoals' products "take less time to install and are installable by general labor." AC ¶¶ 89, 92; *see also id.* ¶¶ 77–78, 84 (statements that Shoals' products can be installed with lower-cost general labor rather than higher-cost licensed electricians). But the fact that certain customers experienced shrinkback does not contradict Whitaker's true statement that the products can be installed with general labor. As another example, Plaintiffs challenge statements describing Shoals' systems as having "significantly fewer connections and, as a result, fewer failure points to inspect[.]" *Id.* ¶ 101; *see also id.* ¶ 78. Again, shrinkback at certain customer sites does not contradict the true fact that Shoals' electrical systems have fewer connections than other systems. *Id.* ¶ 102; *see also In re Ferro Corp.*, 2007 WL 1691358, at *19 (no falsity where plaintiff "simply compiled several series of statements (each of which contains multiple statements and long block quotes) and then pair[ed] each series of statements up against what is essentially the same conclusory list of omissions").

*Finally*, Shoals did not "downplay" or hide potential risks associated with Shoals' products (*e.g.*, AC ¶¶ 61, 181); rather, the statements generally touting Shoals' product advantages were made in the context of Shoals' contemporaneous warnings to investors of the products' risks, including that its systems' components "have a high consequence of failure," that could result in "lost revenue, equipment damage, fire damage, and even serious injury or death." Ex. 2; *see also* Ex. 4. Shoals disclosed that "actual or perceived errors" or "defects . . . could result in the replacement or recall" of products. Ex. 4 at 20; *see Dailey v. Medlock*, 551 F. App'x 841, 848 (6th Cir. 2014) (rejecting theory that statement that bank was "well capitalized" was misleading given it extensively disclosed risks related to business).

6.       <u>Plaintiffs Have Not Alleged a Fraudulent Scheme</u>

Plaintiffs' conclusory assertion of a "scheme" does not allege falsity either, as Plaintiffs do not allege any "scheme" apart from the alleged misleading disclosures. *See generally* AC ¶¶ 36–75. Plaintiffs' scheme liability claim thus fails. *See Teamsters Loc. 237 Welfare Fund v. ServiceMaster Glob. Holdings, Inc.*, 83 F.4th 514, 525, 533 (6th Cir. 2023); *Byrd v. Visalus, Inc.*, 2018 WL 1637948, at *10 (E.D. Mich. Apr. 5, 2018) (dismissing where "Plaintiffs have not alleged any specific fraudulent acts apart from their alleged misstatements and omissions").

## B.     **Plaintiffs Do Not Allege the Required Strong Inference of Scienter**

The Exchange Act claims should be dismissed for the independent reason that Plaintiffs fail to meet the PSLRA's exacting requirements to plead the requisite "strong inference" of scienter, which requires an "intent to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 319, 321. To meet this pleading burden, Plaintiffs must allege with particularity that the Exchange Act Defendants committed "knowing and deliberate" fraud or acted recklessly. *Doshi v. Gen. Cable Corp.*, 823 F.3d 1032, 1039 (6th Cir. 2016). In this context, recklessness is "akin to conscious disregard," or "highly unreasonable conduct" that is an "extreme departure from the standards of ordinary care." *In re Comshare*, 183 F.3d at 550. Indeed, an inference of recklessness requires "multiple, obvious red flags," "egregious refusal[s] to see the obvious, or to investigate the doubtful." *Doshi*, 823 F.3d at 1039.

Pleading fraud "always required a high level of particularity, *see* Fed. R. Civ. P. 9(b), but the [PSLRA] requires an even higher standard for pleading scienter in securities-fraud cases." *Fla. Carpenters Reg. Council Pension Plan v. Eaton Corp.*, 964 F. Supp. 2d 875, 885 (N.D. Ohio 2013). The Supreme Court has held that, to qualify as "strong," the inference of scienter drawn from the particularized facts "must be more than merely plausible or reasonable—it must be cogent and ***at least as compelling as any opposing inference of nonfraudulent intent***." *Tellabs*, 551 U.S. at

22

324 (emphasis added). Plaintiffs fall far short of their burden to allege a strong inference of scienter for any of the Individual Exchange Act Defendants or Shoals.[7] The more plausible inference is that the Exchange Act Defendants were reacting in good faith to investigate and account for a new problem of unknown root cause, scope, and impact.

        1.    <u>Plaintiffs Do Not Allege Scienter as to the Individual Exchange Act Defendants</u>

Courts in the Sixth Circuit evaluate scienter through a non-exhaustive list of nine factors called the "*Helwig* factors."[8] The only *Helwig* factor Plaintiffs even try to allege is the first—stock sales—and only as to one of the five Individual Exchange Act Defendants (Whitaker). Plaintiffs' allegations as to Whitaker's stock sales fail, and they do not allege *any* individualized facts supporting scienter as to Hubbard, Bardos, Tolnar, or Moss.

        a.    <u>*Plaintiffs' Insider Trading Allegations As to Whitaker Fail*</u>

Whitaker's "mere sale of stock is not enough to lead the Court to infer scienter." *Grillo v. Tempur-Pedic Int'l, Inc.*, 553 F. Supp. 2d 809, 821 (E.D. Ky. 2008). And Plaintiffs do not allege that the other four Individual Exchange Act Defendants sold stock during the Class Period, which undercuts an inference of scienter. *See id.* (that "three of the eight individual Defendants sold no stock at all during the Class Period" weighed against inference of scienter); *Gruhn v. Tween*

---

[7] Tellingly, Plaintiffs use the word "scienter" only four times in the 80+ page AC, and they do not even include a distinct scienter section.

[8] The *Helwig* factors include: (1) insider trading at a suspicious time or amount; (2) divergence between internal reports and external statements on the same subject; (3) closeness in time of allegedly fraudulent statement or omission, and the later disclosure of inconsistent information; (4) evidence of bribery by a top company official; (5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit; (6) disregard of the most current factual information before making statements; (7) disclosure of accounting information in a way that its negative implications could be understood only by someone with a high degree of sophistication; (8) personal interest of certain directors of an impending sale of stock; and (9) the self-interested motivation of defendants in the form of saving their salaries or jobs. *Helwig v. Vencor, Inc.*, 251 F.3d 540, 552 (6th Cir. 2001) (en banc).

*Brands, Inc.*, 2009 WL 1542795, at *10 (S.D. Ohio June 2, 2009) (one insider's sales do not support strong inference of scienter where the rest of the "equally knowledgeable insiders act in a way inconsistent with the inference").

In any event, Plaintiffs do not allege specific facts showing that Whitaker's sales were suspicious. Although there is no "bright line" test to determine whether a defendant's stock sale is "suspicious," courts routinely consider: (1) whether the alleged trades were "normal or routine" for that particular insider; (2) whether the profits reaped were substantial enough relative to the insider's compensation to produce a suspicion that the insider might have had an incentive to commit fraud; and (3) whether in light of the insider's total stock holdings, the sales were unusual or suspicious. *Grillo*, 553 F. Supp. 2d at 821. Plaintiffs fail to address these factors, all three of which weigh strongly against scienter. ***First***, all but one of Whitaker's sales were normal and routine "pre-determined trades that took place at pre-determined times pursuant to a Rule 10b5-1 plan." *ViewRay*, 556 F. Supp. 3d at 800; *see* Ex. 14. In fact, the sales were in the months leading up to his medical retirement in March 2023. AC ¶ 15; Ex. 3 at S-3; *see, e.g.*, *City of Taylor Gen. Emps. Ret. Sys. v. Magna Int'l Inc.*, 967 F. Supp. 2d 771, 799 (S.D.N.Y. 2013) (most plausible inference was that defendant sold his stock as a "normal and expected" consequence of his retirement; citing cases). ***Second***, Plaintiffs allege no factual context to suggest the amount of the sales was substantial enough under the circumstances to suggest an incentive to commit fraud. ***Third***, Whitaker retained a majority of his shares, rendering the sales neither unusual nor suspicious. AC ¶ 15 (alleging sales of 565,000 shares); Ex. 14 at 19 (Whitaker's post-sales beneficial ownership of 1,134,705 shares). Accordingly, Plaintiffs do not allege a strong inference of Whitaker's scienter with respect to any of the Exchange Act claims, including the 20A claim. *See Grillo*, 553 F. Supp. 2d at 824 (dismissing 20A claims).

24

b.  *No Other Allegations Support a Strong Inference of Scienter*

As for the remaining Individual Exchange Act Defendants, Plaintiffs allege **no** particularized facts that any acted with scienter.  Plaintiffs simply allege that these Defendants were "directly involved in the management and day-to-day operations of the Company," "approved or ratified" public statements, and "participated in conference calls with investors."  AC ¶ 20.  Courts routinely reject these generic allegations—common to all executives—as insufficient.  *See Pittman*, 861 F. App'x at 55 ("fact that executives are intimately familiar with a core component of their business does little to suggest fraudulent intent"); *Kolominsky v. Root, Inc.*, 667 F. Supp. 3d 685, 713 (S.D. Ohio 2023), *aff'd,* 100 F.4th 675 (6th Cir. 2024) ("simply being in a high-level role with a company is insufficient to give rise to a finding of scienter"); *see also, e.g., Joyce v. Amazon.com, Inc.*, 2023 WL 8370101, at *14 (W.D. Wash. Dec. 4, 2023) ("mere fact that the Individual Defendants spoke about a topic does not provide support for a strong inference of scienter").

The FEs fail to support a strong inference of scienter as well.  None of the FEs is alleged to have interacted with any of the Individual Exchange Act Defendants.  At best, FE1 alleges that some unidentified person(s) reported to Shoals' President at an unidentified time that the installation manual was only a few pages long.  AC ¶ 52.  Plaintiffs do not identify who was President at the time, nor do they explain how a conversation about Shoals' installation manual contradicted any public statements.  *See In re EveryWare Global, Inc. Sec. Litig.*, 175 F. Supp. 3d 837, 860 (S.D. Ohio 2016).  FE1's purported statement that it was "well-known internally, including by Whitaker" (AC ¶ 51) that a few customers had reported experiencing exposed conductors by June 2022 likewise does not suggest that Whitaker or anyone else at Shoals knew anything contrary to their public statements.  Notably, FE1 left Shoals in June 2022 (*id.* ¶ 49)— before the vast majority of the Class Period—so he can offer no facts about what anyone knew at

25

the time most of the challenged statements were made. *See Huntington Bancshares*, 674 F. Supp. 2d at 964. To the contrary, FE1's belief that the customer's installation—not a product defect triggering Shoals' warranty liability—caused the exposed conductor (AC ¶ 50), supports that the Exchange Act Defendants did not believe in 2022 that the issue would have a material financial impact. *See In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1065 (9th Cir. 2014) (more compelling inference was that company "was investigating the extent of the problem, whether it was responsible for it, and if so, whether it would exhaust the reserve").

The other FEs offer ***no*** insight into what the Exchange Act Defendants "might have known and when," so they cannot support scienter. *Stein*, 2020 WL 3584800, at *40; *see also EveryWare*, 175 F. Supp. 3d at 852 (no scienter where majority of FEs had no "contact or interaction" with defendants). If anything, allegations that Shoals did not do additional testing ***supports*** that no one knew information contradicting the statements made. AC ¶ 55. The fact that the Company "later increased reserves" says nothing about what anyone at the Company knew at the time of the challenged statements. *Malin v. XL Cap. Ltd.*, 499 F. Supp. 2d 117, 148 (D. Conn. 2007).

As a last-ditch effort, Plaintiffs amended their complaint to add a conclusory allegation from Prysmian's unverified Answer that "Shoals was aware of adhesion and molding issues on its connector produced since at least 2020." AC ¶ 54. But Plaintiffs do not explain who was aware, how Shoals was aware, what precisely the issues were, or whether those issues even related to shrinkback (especially given that Plaintiffs allege Shoals did not previously test for shrinkback and the first customer report of what was later determined to be shrinkback was in March 2022, *id.* ¶¶ 47, 55). Plaintiffs instead copy directly from Prysmian's pleadings in its litigation against Shoals to claim that adhesion and molding issues "may have caused or contributed to exposed conductors." *Id.* ¶ 54. Prysmian raising a third potential root cause—installation, wire defect, or

26

adhesion/molding issues—likewise supports the non-fraudulent inference that Shoals was doing its best to investigate a complex and still-debated issue and estimate the potential impact.

2.    <u>Plaintiffs Do Not Allege Scienter as to Shoals</u>

Plaintiffs likewise do not allege Shoals acted with intent to defraud. Plaintiffs point to Shoals' sales in the SPO to fund the TRA termination as potential evidence of scienter. AC ¶ 31. But a corporation does not have a "state of mind." *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 474 (6th Cir. 2014) (company's own stock sales (versus an insider's) cannot support a strong inference of scienter). Instead, courts in the Sixth Circuit assess corporate scienter by considering the states of mind of: (1) the agent who "uttered or issued" the statement; (2) any agents who authorized, requested, commanded, furnished information for, prepared, reviewed, or approved the statement before it was made; or (3) any "high managerial agent" or board member who "ratified, recklessly disregarded, or tolerated the representation after its utterance." *Id.* at 476.

Plaintiffs fail to allege facts to support that the Exchange Act Defendants (the speakers), the Director Defendants (who signed certain challenged statements), or any other *Omnicare* individual acted with scienter. *See Bondali*, 620 F. App'x at 493. The allegations against the Exchange Act Defendants fail for the reasons set forth above. *See supra* § III.B.1. The AC has no allegations specific to the knowledge of the Director Defendants, nor of "anyone else who played a role in formulating the disclosures at issue in this case, let alone that they knew anything about their truthfulness." *ServiceMaster*, 83 F.4th at 532.

To the extent that Plaintiffs are trying to rely on Shoals' founder's (Dean Solon) stock sales in the SPOs to support corporate scienter, he does not fit any *Omnicare* category so his stock sales are irrelevant. 769 F.3d at 476. Solon was not on Shoals' board or in management during the Class Period (AC ¶ 31), and there are zero allegations that he knew anything about the exposed conductor issue or had anything to do with the SPO disclosures (or any others). Plaintiffs'

27

conclusory allegation that Solon somehow "was a controlling shareholder of the Company" fails as a matter of law. *Id.*; *infra* § V.

### 3. The More Compelling Inference Is Good Faith, Not Fraud

Plaintiffs' fraud-by-hindsight theory is far less compelling than the nonfraudulent explanation that flows from the AC: Shoals was playing a "constant game of catch-up" with an evolving issue and was updating its disclosures as it gained new information. *Pittman*, 861 F. App'x at 57 (company revisiting its reserve assumptions after warning investors it would do so was "hardly the sort of behavior one would expect from the perpetrator of securities fraud"); *see also Boeing*, 711 F.3d at 758 (more plausible inference was that defendants were working on an issue and hoped to "fix it"). As Shoals was alerted to exposed conductors at a few sites, Shoals investigated the root cause, including by hiring experts and working with the wire supplier. The Company sought to determine the scope (and thus probable cost) of the issue and who was responsible for it. At first, Shoals believed the issue to be a customer installation issue, which did not create a liability for the Company. After further time and investigation, Shoals ultimately concluded one of its largest vendors bore responsibility, and pursued recovery from that vendor. Even Plaintiffs' own pleadings acknowledge there is still a "debate" in the industry whether this complex and technical issue was due to "the wire or faulty installation," and Shoals remains in litigation with its wire supplier. AC ¶ 158(e).

All the while, Shoals timely updated investors, including disclosing when it believed a liability was reasonably possible but not yet estimable (*id.* ¶ 67), and then later "rais[ing] its reserves multiple times over a short period." *Pittman*, 861 F. App'x at 57; *see also* App. B. Nothing in Plaintiffs' allegations supports a more compelling inference of scienter. *See, e.g.*, *ServiceMaster*, 83 F.4th at 529 (more probable, non-fraudulent inference was that defendants did not disclose issue when they believed they had a workable solution, then reasonably promptly

disclosed after confronted with more issues); *see also Grillo*, 553 F. Supp. 2d at 822 (plaintiffs' "allegations regarding violations of GAAP and insider trading are not enough to be considered a strong inference of scienter" to overcome any opposing inference).

## C.    Plaintiffs Do Not Plead Loss Causation

The Exchange Act claims should be dismissed for the additional, independent reason that Plaintiffs fail to meet their burden to plead loss causation, *i.e.*, that the alleged fraud caused Plaintiffs' purported loss. 15 U.S.C. § 78u-4(b)(4); *see D.E.&J. Ltd. P'ship v. Conaway*, 133 F. App'x 994, 999–1000 (6th Cir. 2005). While it is unclear whether Plaintiffs are trying to allege a "corrective disclosure" or "materialization of the risk" theory of loss causation, *see In re Wash. Prime Grp., Inc. Sec. Litig.*, 2024 WL 1307103, at *12 (S.D. Ohio Mar. 27, 2024), it appears Plaintiffs are claiming that Shoals' disclosure of (1) updated estimates for its warranty liability, (2) the sites potentially impacted by shrinkback, and (3) its backlog and awarded orders, over five dates from August 1, 2023 to November 12, 2024, were "corrective disclosures." AC ¶¶ 156–171. Yet none of the later "disclosures" provided any information that was "corrective." *See In re KBC Asset Mgmt. N.V.*, 572 F. App'x 356, 362 (6th Cir. 2014) (no loss causation where "complaint does not identify sufficiently new evidence that was revealed to the market"). In fact, several are also alleged to be false statements. *See* AC ¶¶ 113, 120–121, 126–127, 136.

*First*, none of Shoals' updated estimated ranges for warranty liability "revealed" any fraud. AC ¶¶ 156 (Aug. 1, 2023), 160 (Nov. 7, 2023), 170 (Nov. 12, 2024). Shoals warned throughout the Class Period that its estimates were just that—estimates. *See supra* § II.A. And Shoals warned that the range would change, and such change could be material. *Id.* As the investigation continued, Shoals regularly revised the reserve and its disclosures about the issue to disclose **newly discovered facts**. *See In re Initial Pub. Offering Sec. Litig.*, 399 F. Supp. 2d 261, 266 (S.D.N.Y. 2005) ("[A] failure to meet earnings forecasts has a *negative* effect on stock prices, but not a

29

*corrective* effect."). Moreover, Plaintiffs admit Shoals disclosed the high end of the potential range of loss ($184.9 million) on November 7, 2023, so arguments that Shoals' stock remained artificially inflated after that date make no sense. AC ¶¶ 166, 167. Nor was it "corrective" when Shoals disclosed a year later in November 2024 that it was narrowing its estimated range of liability to $73 million to $160 million. *Id*. ¶¶ 136 n.14, 170.

***Second***, Shoals' statements that it believed that approximately 300 sites may have harnesses made with the relevant wiring (*id.* ¶ 160, Nov. 7, 2023) and that it later learned of additional sites experiencing shrinkback (*id.* ¶ 165, Feb. 28, 2024) likewise disclosed newly discovered facts, not wrongdoing. *See In re Almost Fam., Inc. Sec. Litig.*, 2012 WL 443461, at *11-12 (W.D. Ky. Feb. 10, 2012) (disclosure must reveal fraud). Again, Shoals had already disclosed the highest potential loss ($184.9 million) by November 7, 2023. AC ¶¶ 160–167.

***Third***, Plaintiffs do not allege a causal connection between Shoals' disclosures about its backlog and awarded orders (*id.* ¶ 164 (Feb. 28, 2024), *id.* ¶ 167 (May 7, 2024), *id.* ¶ 170 (Nov. 12, 2024)), and the challenged statements—because there is none. *See In re Wash. Prime*, 2024 WL 1307103, at *13 (complaint "must be dismissed if it does not establish what the causal connection might be between the loss and the misrepresentation").

At bottom, Plaintiffs' loss causation argument relies on Shoals' stock price dropping after the announcement of new information or disappointing financial results. That argument does not work in the Sixth Circuit. *See D.E.&J.*, 133 F. App'x at 1000–01 ("observation that a stock price dropped . . . is not the same as an allegation that a defendant's fraud caused the loss"). Because Plaintiffs have not sufficiently alleged that any disclosures revealed any fraud or misconduct that caused their loss, their Exchange Act claims must be dismissed. *In re Almost Fam*, 2012 WL 443461, at *13 (dismissing claims where plaintiffs failed to allege "any disclosure of fraud").

30

## IV.    KUAERP FAILS TO PLEAD A SECURITIES ACT CLAIM

### A.    KUAERP Does Not Allege an Actionable Misstatement

To state Sections 11 and 12(a)(2) claims, KUAERP must allege that the SPO Registration Statement or the statements incorporated therein "contained an untrue statement of a material fact or omitted to state a material fact . . . necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a); *see also* 15 U.S.C. § 77l(a)(2). These claims, too, must meet Rule 9(b)'s heightened pleading requirements because they "sound in fraud." *Kolominsky*, 100 F.4th at 684.

KUAERP tries to "disavow" any fraud allegations as to its Securities Act claims. AC ¶¶ 175, 232, 243. But "a party's disclaimer that it is not pleading fraud will not defeat [the court's] application of Rule 9(b), particularly when a securities fraud claim and the Sections 11 and 12(a)(2) claims rely on the same set of facts, as is true here." *Kolominsky*, 100 F.4th at 684. Instead, courts examine the "wording and imputations" in the entire complaint and determine whether the "gravamen" of the claims "sounds in fraud." *Root*, 667 F. Supp. 3d at 697. Although KUAERP tries to separate its Securities Act and Exchange Act claims, the "gravamen" of the AC tells a unified purported story grounded in alleged fraud. *Id.* Critically, *each* of the statements challenged under the Securities Act is also claimed to be fraudulent under the Exchange Act. *Compare* AC ¶¶ 181–187 *with* ¶¶ 93–96; *see also Barnes v. Edison Int'l*, 2022 WL 822191, at *1 (9th Cir. Mar. 18, 2022) (Securities Act claims that are "based on the same purportedly false or misleading statements, in the same filings, as the Exchange Act claim" sound in fraud). The AC alleges that statements challenged under the Securities Act were allegedly false and misleading for the *same reasons* it alleges those statements were purportedly fraudulent in violation of the Exchange Act. *Compare* AC ¶ 181 *with id.* ¶¶ 81, 87. Because Plaintiffs cannot "put the fraud genie back in the bottle" by disclaiming fraud after they alleged it, Plaintiffs' Securities Act claims must meet Rule 9(b)'s heightened pleading requirements. *Root*, 667 F. Supp. 3d at 697.

31

In any event, Plaintiffs' allegations do not plead falsity under **any** standard. Any challenged statements in the December 2022 offering documents related to Shoals' estimated warranty liability, or the safety, reliability, or cost-savings associated with Shoals' products, are not actionable and not rendered false or misleading by the purportedly omitted facts that existed **at the time of** the December 2022 SPO. *See supra* § III.A. Indeed, even FE1's and FE2's alleged statements suggest that as of early December 2022—when the SPO offering materials were filed— the exposed conductors were considered an installation issue experienced by a few customers, not a widespread issue or one that would trigger Shoals' warranty liability. *See* AC ¶¶ 50, 53.

### B. KUAERP Lacks Standing to Assert Securities Act Claims

KUAERP's Securities Act claims fail in any event because KUAERP lacks standing to assert them. Section 11 standing is limited to the narrow class of persons who can trace their shares to the challenged registration statement. *See Slack Techs., LLC v. Pirani*, 598 U.S. 759, 768 (2023). Doing so can be "virtually impossible" in the context of a secondary (non-initial) offering like the one challenged here, where there are fungible shares of stock registered pursuant to earlier registration statements already trading in the market and held at the stock depository. *Krim v. PcOrder.com, Inc.*, 402 F.3d 489, 498 (5th Cir. 2025). Section 12 standing is even more "restrictive"—KUAERP must show it purchased directly from the Securities Act Defendants. *Cullen v. RYVYL Inc.*, 2024 WL 898206, at *8 (S.D. Cal. Mar. 1, 2024).

KUAERP does not satisfy either pleading burden, alleging only that it purchased "Shoals Common Stock directly in the December 2022 SPO." AC ¶ 238. This type of conclusory allegation is insufficient. *See, e.g., In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1107– 09 (9th Cir. 2013) (finding insufficient allegation that plaintiff purchased "directly traceable to" offering). Further, according to KUAERP's factual allegations, the December 2022 SPO closed on December 6, 2022 (AC ¶ 65; Ex. 3), but KUAERP did not purchase any shares on or after this

date at the $22.25 per-share SPO price. AC ¶ 93; *see id.* ¶ 13 (pointing to KUAERP's certification filed with Dkt. 1, which reflects (i) a purchase for $22.25 on 12/2/22 before the SPO closed, and (ii) a purchase on 12/6/22 at $23.73, which was not the SPO price); *W. Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*, 495 F. Supp. 3d 622, 669 (N.D. Ill. 2020), *aff'd sub nom. Nat'l Elevator Indus. Pension Fund v. Conagra Brands, Inc.*, 2022 WL 1449184 (7th Cir. May 9, 2022) (no standing for (i) lead plaintiff that "did not make any purchases on the SPO date or at the SPO price," or for (ii) named plaintiffs that purchased on the SPO date at the SPO price and alleged they had purchased shares in the SPO, but without information as to whether they purchased stock directly from an underwriter and where there was a significant amount of outstanding stock at the time of the SPO). Moreover, KUAERP sues 13 Underwriter Defendants but fails to allege from which of the 13 underwriters it supposedly purchased SPO shares. KUAERP fails to meet its burden to establish Securities Act standing.

### C.    KUAERP Does Not Adequately Allege a Direct Sale or Solicitation

KUAERP's Section 12 claims should be dismissed because KUAERP fails to allege with particularity that the Section 12 Defendants were "statutory sellers" as required to establish liability under Section 12(a)(2). *See In re Bare Escentuals, Inc. Sec. Litig.*, 745 F. Supp. 2d 1052, 1073 (N.D. Cal. 2010) (mere assertion that defendants are statutory sellers insufficient). KUAERP must allege that the Section 12 Defendants directly passed title to it in the December 2022 SPO, or actively solicited that sale. *See Pinter v. Dahl*, 486 U.S. 622, 642-43 (1988). KUAERP does not allege either with particularity. Instead, KUAERP relies on conclusory, boilerplate allegations—*see, e.g.*, AC ¶¶ 34, 35—which do not come close to the specificity Rule 9 requires or even the Rule 8 standard.

KUAERP alleges the Director Defendants and Bardos signed the December 2022 SPO Registration Statement. *See id.* ¶ 35. But these allegations are insufficient to establish a defendant

as a statutory seller under Section 12(a)(2). *See In re FirstEnergy Corp.*, 2022 WL 681320, at *38 (S.D. Ohio March 7, 2022) ("statutory-seller element is not met" where complaint "rest[s] on the signatures" of the registration statement); *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 871 (5th Cir. 2003) (signing registration statement did not constitute solicitation).

And as to the Underwriter Defendants, KUAERP fails to identify which, if any, of the 13 Underwriter Defendants sold KUAERP shares and otherwise includes only insufficient allegations that the Underwriter Defendants "solicited investors and participated in the sale and offering of Shoals Common Stock in the December 2022 SPO." AC ¶ 33; *see, e.g., In re Venator Materials PLC Sec. Litig.*, 547 F. Supp. 3d 624, 669–70 (S.D. Tex. 2021) (dismissing complaint that "lacks direct allegations as to who purchased what securities and from which underwriter"). Because KUAERP fails to allege with specificity that the Section 12 Defendants are in fact statutory sellers, its Section 12(a)(2) claims against these Defendants must be dismissed.

## V. PLAINTIFFS' SECTION 20A, 20(A), AND 15 CLAIMS FAIL

Because Plaintiffs fail to plead primary Exchange Act or Securities Act violations, Plaintiffs' "control person" claims under Section 20(a) and Section 15, and their insider trading allegations under Section 20A must be dismissed.[9] *See* 15 U.S.C. § 78t; 15 U.S.C. § 78t-1(a); *J&R Mktg., SEP v. Gen. Motors Corp.*, 549 F.3d 384, 398 (6th Cir. 2008); *In re TransDigm Grp., Inc. Sec. Litig.*, 440 F. Supp. 3d 740, 773 (N.D. Ohio 2020).

Even if Plaintiffs did state primary violations, Plaintiffs do not sufficiently allege any Defendant was a "control person." To start, an individual is not a "control person" simply because they are an officer or director. *See, e.g., Lansing Automakers' Fed. Credit Union v. MCG Portfolio*

---

[9] Plaintiffs' Section 20A "insider trading" claims further fail because Plaintiffs make no effort to plead any facts about Shoals' or Whitaker's intent other than the conclusory assertions that they traded on "inside" information. *See supra* § III.B (no scienter).

34

*Mgmt. Corp.*, 1991 WL 238974, at *2–3 (W.D. Mich. Sept. 12, 1991). Plaintiffs do not allege any particular facts to show that any of these Defendants controlled any person in making the challenged statements. At most, Plaintiffs allege the unremarkable—and insufficient—fact that some owned less than a majority of Shoals stock. AC ¶ 251; *see In re Nat'l Century Fin. Enters., Inc. Fin. Inv. Litig.*, 553 F. Supp. 2d 902, 912–13 (S.D. Ohio 2008) ("[m]any courts follow the general rule that a person's status as [a] . . . shareholder, absent more, is not enough to trigger liability under § 20"); *see also In re Splash Tech. Holdings, Inc. Sec. Litig*., 2000 WL 1727405, at *16 (N.D. Cal. Sept. 29, 2000) (defendant did not control officers merely because it controlled 20% of the company). Plaintiffs allege Solon had the power to nominate ***one*** of Shoals' eight directors, *e.g.*, AC ¶ 31, but that too is not enough to plead Solon had the "power to control the general business affairs" of Shoals (let alone the allegedly fraudulent disclosures), especially given that Solon was not an officer or director at any time during the Class Period. *In re Nat'l Century*, 553 F. Supp. 2d at 913–14); *see also In re Advance Auto Parts, Inc., Sec. Litig.*, 2020 WL 599543, at *9–10 (D. Del. Feb. 7, 2020) (dismissing where plaintiffs "merely allege[d] that the defendant[s] owned a minority stock interest and selected a minority number of directors" and did not allege they "controlled the drafting or publishing" or reviewed or signed challenged statements). Plaintiffs' control person claims should be dismissed.

## VI.    CONCLUSION

The AC is the type of fraud-by-hindsight securities class action the PSLRA was enacted to prevent. For the reasons discussed, the AC should be dismissed with prejudice.

DATED:  February 18, 2025

BASS, BERRY & SIMS
BRITT K. LATHAM
MARGARET V. DODSON


*/s/ Britt K. Latham*
BRITT K. LATHAM

21 Platform South, Suite 3500
Nashville, TN  37201
Telephone:  615/742-6200
615/742-6293 (fax)
blatham@bassberry.com
margaret.dodson@bassberry.com

LATHAM & WATKINS LLP
MICHELE D. JOHNSON
(admitted *pro hac vice*)
650 Town Center Drive, 20th Floor
Costa Mesa, CA  92626
Telephone:  714/540-1235
714/755-8290 (fax)
michele.johnson@lw.com

LATHAM & WATKINS LLP
HEATHER A. WALLER
(admitted *pro hac vice*)
RENATTA A. GORSKI
(admitted *pro hac vice*)
330 North Wabash Avenue, Suite 2800
Chicago, IL  60611
Telephone:  312/876-7700
617/993-9767 (fax)
heather.waller@lw.com
renatta.gorski @lw.com

*Counsel for Defendants Shoals Technologies
Group, Inc,, Jason R. Whitaker, Jeffrey Tolnar,
Brandon Moss, Kevin Hubbard, Dominic Bardos,
Brad Forth, Peter Wilver, Ty Daul, Toni Volpe,
Lori Sundberg, Jeanette Mills, Robert Julian,
Dean Solon, Solon Holdco I, LLC and Solon
Holdco II, LLC*

36

POLSINELLI PC
MOZIANIO S. RELIFORD, III

*/s/ Mozianio S. Reliford, III*

501 Commerce Street, Suite 1300
Nashville, TN 37203
Tel.: (615) 252-3948
treliford@polsinelli.com

ALLEN OVERY SHEARMAN STERLING US
LLP
AGNÈS DUNOGUÉ
(admitted *pro hac vice*)
BENJAMIN KLEBANOFF
(admitted *pro hac vice*)
599 Lexington Avenue
New York, NY 10022-6069
Tel.: (212) 848-4000
agnes.dunogue@aoshearman.com
benjamin.klebanoff@aoshearman.com

DAN GOLD
(admitted *pro hac vice*)
The Link at Uptown, 2601 Olive Street,
17th Floor
Dallas, TX 75201
Tel.: (214) 271-5777
dan.gold@aoshearman.com

*Counsel for the Underwriter Defendants*

\* \* \* \*

*Filer's Attestation: Pursuant to the Court's CM/ECF Manual regarding signatures, Britt K. Latham hereby attests that concurrence in the filing of this document has been obtained.*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on February 18, 2025, the foregoing was filed electronically with the Clerk of the Court. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the filing receipt, which includes the following:

James Gerard Stranch, IV
Stranch, Jennings & Garvey, PLLC
223 Rosa L. Parks Avenue
Suite 200
Nashville, TN 37203
gstranch@stranchlaw.com

Rachel A. Avan
Marco A. Dueñas
Saxena White P.A.
10 Bank Street
Suite 882
White Plains, NY 10606
ravan@saxenawhite.com
mduenas@saxenawhite.com

Jerry E. Martin
Barrett Johnston Martin & Garrison, LLC
200 31st Avenue North
Nashville, TN 37203
jmartin@barrettjohnston.com

Christopher M. Wood
Henry Scattergood Bator
Robbins Geller Rudman
& Dowd LLP
200 31st Avenue North
Nashville, TN 37203
cwood@rgrdlaw.com
hbator@rgrdlaw.com

Debra J. Wyman
Matthew Isaac Alpert
Robbins Geller Rudman & Dowd LLP
655 W Broadway, Suite 1900
San Diego, CA 92101
debraw@rgrdlaw.com
malpert@rgrdlaw.com

Lester R. Hooker
Saxena White P.A.
5200 Town Center Circle
Suite 601
Boca Raton, FL 33486
lhooker@saxenawhite.com

Gregg S. Levin
Christopher F. Moriarty
William S. Norton
Motley Rice LLC
28 Bridgeside Boulevard
Mount Pleasant, SC 29464
glevin@motleyrice.com
cmoriarty@motleyrice.com
bnorton@motleyrice.com

Agnès Dunogué
Dan Gold
Benjamin Klebanoff
Allen Overy Shearman Sterling US LLP
599 Lexington Avenue
New York, NY 10022-6069
agnes.dunogue@aoshearman.com
dan.gold@aoshearman.com
benjamin.klebanoff@aoshearman.com

Mozianio S. Reliford, III
Polsinelli PC
501 Commerce Street, Suite 1300
Nashville, TN 37203
treliford@polsinelli.com

*/s/ Britt K. Latham*