**Shoals Technologies Group, Inc.**
**Notes to Consolidated Financial Statements**

The non-controlling interests on the consolidated statements of operations represented a portion of earnings or loss attributable to the economic interests in the Company's former subsidiary, Shoals Parent LLC, formerly held by the Continuing Equity Owners. Non-controlling interests on the consolidated balance sheets represented the portion of net assets of the Company attributable to the Continuing Equity Owners, based on the portion of the LLC Interests owned by such unit holders. As of July 1, 2023, the Company, along with wholly-owned subsidiary Shoals Intermediate Parent, owned 100% of Shoals Parent LLC. Effective December 31, 2023, Shoals Parent LLC merged with and into Shoals Intermediate Parent with Shoals Intermediate Parent as the surviving corporation. See "Entity Simplification" in Note 1.

**Use of Estimates**

The preparation of consolidated financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenue and expenses during the reporting period. Actual results could differ materially from those estimates. Significant estimates include revenue recognition, allowance for credit losses, useful lives of property, plant and equipment and other intangible assets, impairment of long-lived assets, allowance for obsolete or slow moving inventory, payable pursuant to the TRA, valuation allowance on deferred tax assets, equity-based compensation expense and warranty liability.

**Cash and Cash Equivalents**

The Company considers cash and cash equivalents to include cash on hand, cash held in demand deposit accounts, and all highly liquid financial instruments purchased with a maturity of three months or less.

**Restricted Cash**

Restricted cash is included with cash and cash equivalents when reconciling the beginning-of-period and end-of-period total amounts shown on the consolidated statements of cash flows. Restricted cash is restricted as to withdrawal or use. Prior to the termination of the TRA, tax distributions paid by Shoals Parent LLC to the Company were restricted under the LLC Agreement for future payments under the TRA and totaled $4.6 million as of December 31, 2021. There was no restricted cash as of December 31, 2022 or December 31, 2023.

A reconciliation of cash, cash equivalents and restricted cash to the consolidated statements of cash flows is as follows (in thousands):

| | As of December 31, | | |
|---|---|---|---|
| | 2023 | 2022 | 2021 |
| Cash and cash equivalents | $ 22,707 | $ 8,766 | $ 5,006 |
| Restricted cash included in other current assets | — | — | — |
| Restricted cash included in other assets | — | — | 4,551 |
| Total cash, cash equivalents and restricted cash | $ 22,707 | $ 8,766 | $ 9,557 |

**Accounts Receivable and Allowance for Credit Losses**

Accounts receivable is comprised of amounts billed to customers, net of an allowance for credit losses. The allowance for credit losses is estimated by management and is based on historical experience, current conditions and reasonable forecasts. Periodically, management reviews the accounts receivable balances of its



Case 3:24-cv-00334 Document 86-13 Filed 02/18/25 Page 1 of 78 PageID #: 2316

customers and adjusts the allowance based on current circumstances and charges off uncollectible receivables when all attempts to collect have failed, although collection efforts may continue.

**Unbilled Receivables**

Unbilled receivables arise when the Company recognizes revenue for amounts which cannot yet be billed under terms of the contract with the customer.

**Inventory**

Inventories consist of raw materials, work in process, and finished goods. Inventories are stated at the lower of cost or net realizable value. Cost is calculated using the first-in first-out method. Provisions are made to reduce excess or obsolete inventories to their estimated net realizable values.

**Property, Plant, and Equipment**

Property, plant, and equipment acquired in acquisitions are recorded at fair value at the date of acquisition; all other property, plant and equipment are recorded at cost, net of accumulated depreciation. Improvements, betterments and replacements which significantly extend the life of an asset are capitalized. Depreciation is computed using the straight-line method over the estimated useful lives of the respective assets. Repair and maintenance costs are expensed as incurred.

A gain or loss on the sale of property, plant and equipment is calculated as the difference between the cost of the asset disposed of, net of accumulated depreciation, and the sales proceeds received. A gain or loss on an asset disposal is recognized in the period that the sale occurs.

**Impairment of Long-Lived Assets**

When events, circumstances or operating results indicate that the carrying values of long-lived assets might not be recoverable through future operations, the Company prepares projections of the undiscounted future cash flows expected to result from the use of the assets and their eventual disposition. If the projections indicate that the recorded amounts are not expected to be recoverable, such amounts are reduced to estimated fair value. Fair value is estimated based upon internal evaluation of each asset that includes quantitative analyses of net revenue and cash flows, review of recent sales of similar assets and market responses based upon discussions in connection with offers received from potential buyers. Management determined there was no impairment for the years ended December 31, 2023, 2022 and 2021.

**Goodwill**

Goodwill is assessed using either a qualitative assessment or quantitative approach to determine whether it is more likely than not that the fair value of the reporting unit is less than the carrying amount. The qualitative assessment evaluates factors including macroeconomic conditions, industry-specific and company-specific considerations, legal and regulatory environments, and historical performance. If the Company determines that it is more likely than not that the fair value of a reporting unit is less than its carrying value, a quantitative assessment is performed. Otherwise, no further assessment is required. The quantitative approach compares the estimated fair value of the reporting units to its carrying amount, including goodwill. Impairment is indicated if the estimated fair value of the reporting unit is less than the carrying amount of the reporting unit, and an impairment charge is recognized for the differential.

The Company completes its annual goodwill impairment test as of October 1 each year. For the years ended December 31, 2023, 2022 and 2021, the Company performed a qualitative assessment of its goodwill and determined no impairment. Since the Company's formation on May 9, 2017, the Company has not had any goodwill impairment.

### Amortizable and Other Intangible Assets

The Company amortizes identifiable intangible assets consisting of customer relationships, developed technology, trade names, backlog and noncompete agreements because these assets have finite lives. The Company's intangible assets with finite lives are amortized on a straight-line basis over the estimated useful lives. The basis of amortization approximates the pattern in which the assets are utilized over their estimated useful lives. The Company reviews for impairment indicators of finite-lived intangibles, as described in the "Impairment of Long-Lived Assets" significant accounting policy.

### Deferred Offering Costs

Deferred offering costs consist primarily of registration fees, filing fees, listing fees, specific legal and accounting costs and transfer agent fees, which are direct and incremental fees related to the IPO and secondary offerings.

### Deferred Financing Costs

Costs incurred to issue debt are capitalized and recorded net of the related debt and amortized using the effective interest method as a component of interest expense over the terms of the related debt agreement.

### Revenue Recognition

The Company recognizes revenue primarily from the sale of EBOS systems and components. The Company determines its revenue recognition through the following steps: (i) identification of the contract or contracts with a customer, (ii) identification of the performance obligations within the contract, (iii) determination of the transaction price, (iv) allocation of the transaction price to the performance obligations within the contract, and (v) recognition of revenue as the performance obligation has been satisfied.

The Company's contracts with customers predominately are accounted for as one performance obligation, as the majority of the obligations under the contracts relate to a single project. For each contract entered into, the Company determines the transaction price based on the consideration expected to be received. The transaction price identified is allocated to each distinct performance obligation to deliver a good or service based on the relative standalone selling prices. Management has concluded that the prices negotiated with each individual customer are representative of the standalone selling price of the product.

The Company primarily recognizes revenue over time as a result of the continuous transfer of control of its product to the customer using the output method based on units manufactured. This continuous transfer of control to the customer is supported by clauses in the contracts that provide rights to payment of the transaction price associated with work performed to date on products that do not have an alternative use to the Company. Management believes that recognizing revenue using the output method based on units manufactured best depicts the extent of transfer of control to the customer.

In certain instances the promised goods do have an alternative use. In these instances revenue is recognized when the customer obtains control of the product. Contracts of this nature typically include customer acceptance clauses, which results in revenue recognition occurring upon customer acceptance.

Depending on the size of project, the manufacturing process generally takes from less than one week to four months to complete production. The accounting for each contract involves a judgmental process of estimating total sales, costs, and profit for each performance obligation. Cost of revenue is recognized based on the unit of production. The amount reported as revenue is determined by adding a proportionate amount of the estimated profit to the amount reported as cost of revenue.

The Company has elected to adopt certain practical expedients and exemptions as allowed under the new revenue recognition guidance such as (i) recording sales commissions as incurred because the



Case 3:24-cv-00334 Document 86-13 Filed 02/18/25 Page 3 of 78 PageID #: 2318

amortization period is less than one year, (ii) excluding any collected sales tax amounts from the calculation of revenue, and (iii) accounting for shipping and handling activities that are incurred after the customer has obtained control of the product as fulfillment costs rather than a separate service provided to the customer for which consideration would need to be allocated (see Shipping and Handling).

**Shipping and Handling**

The Company accounts for shipping and handling related to contracts with customers as costs to fulfill its promise to transfer the associated products. Accordingly, payment by the Company's customers for shipping and handling costs for delivery of the Company's products are recorded as a component of revenue in the accompanying consolidated statements of operations. Shipping and handling expenses are included as a component of cost of revenue as incurred and totaled $5.2 million, $7.0 million and $5.2 million for the years ended December 31, 2023, 2022 and 2021, respectively.

**Concentrations**

The Company has cash deposited at certain financial institutions which, at times, may exceed the limits provided by the Federal Deposit Insurance Corporation ("FDIC"). The Company has not experienced any losses on such amount and believes it is not subject to significant credit risk related to cash balances. As of December 31, 2023, $22.3 million of the Company's bank balances were in excess of FDIC insurance limits.

The Company had the following revenue concentrations representing approximately 10% or more of revenue for the years ended December 31, 2023, 2022 and 2021 and related accounts receivable concentrations as of December 31, 2023 and 2022:

| | 2023 | | 2022 | | 2021 |
|---|---|---|---|---|---|
| | Revenue % | Accounts Receivable % | Revenue % | Accounts Receivable % | Revenue % |
| Customer A | 36.3 % | 37.5 % | 7.0 % | 8.4 % | 18.3 % |
| Customer B | 5.5 % | 3.9 % | 6.3 % | 5.1 % | 11.3 % |
| Customer C | 0.2 % | 3.8 % | 6.0 % | 12.6 % | 10.0 % |

**Fair Value**

Fair value is defined as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. The Company follows a fair value hierarchy which requires the Company to maximize the use of observable inputs and minimize the use of unobservable inputs when measuring fair value. Three levels of inputs may be used to measure fair value, as follows:

- **Level 1 –** Quoted prices in active markets for identical assets or liabilities.
- **Level 2 –** Observable inputs other than Level 1 prices, such as quoted prices for similar assets or liabilities; quoted prices in markets that are not active; or other inputs that are observable or can be corroborated by observable market data for substantially the full term of the assets or liabilities.
- **Level 3 –** Unobservable inputs that are supported by little or no market activity that are significant to the fair value of the assets or liabilities.

The fair values of the Company's cash and cash equivalents, accounts receivable, and accounts payable approximate their carrying values due to their short maturities. The carrying value of the Company's



Case 3:24-cv-00334 Document 86-13 Filed 02/18/25 Page 4 of 78 PageID #: 2319

long-term debt approximates fair value and is considered level 2, as it is based on current market rates at which the Company could borrow funds with similar terms.

The Company follows the provisions of Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") Topic 820-10 for nonfinancial assets and liabilities measured at fair value on a nonrecurring basis. As it relates to the Company, this applies to certain nonfinancial assets and liabilities acquired in business combinations.

**Income Taxes**

*Pre-IPO Income Taxes*

Shoals Parent LLC was treated as a partnership and was not subject to federal income tax; rather, Shoals Parent LLC's taxable income was passed through to its members and subject to federal income tax at the member level.

Shoals Parent LLC and its subsidiary LLCs were generally not subject to state income tax; however, Shoals Technologies Group, LLC and Shoals Technologies, LLC paid various state and franchise taxes.

*Post-IPO Income Taxes*

The Company is taxed as a corporation for U.S. federal and state income tax purposes. Prior to July 1, 2023, the Company's sole material asset was Shoals Parent LLC, which was a limited liability company that was taxed as a partnership for US federal and certain state and local income tax purposes. Shoals Parent LLC's net taxable income and related tax credits, if any, were passed through to its members and included in the member's tax returns.

The Company accounts for income taxes using the asset and liability method. Under this method, deferred tax assets and liabilities are recognized for the estimated future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax basis. Deferred tax assets and liabilities are calculated by applying existing tax laws and the rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect of a change in tax rates on deferred tax assets and liabilities is recognized in the year of the enacted rate change.

In assessing the realizability of deferred tax assets, management considers whether it is more-likely-than-not that the deferred tax assets will be realized. In making such a determination, the Company considers all available positive and negative evidence, including future reversals of existing taxable temporary differences, projected future taxable income, tax-planning strategies, carryback potential if permitted under the tax law, and results of recent operations.

The Company accounts for uncertainty in income taxes using a recognition and measurement threshold for tax positions taken or expected to be taken in a tax return, which are subject to examination by federal and state taxing authorities. The tax benefit from an uncertain tax position is recognized when it is more likely than not that the position will be sustained upon examination by taxing authorities based on the technical merits of the position. The amount of the tax benefit recognized is the largest amount of the benefit that has a greater than 50% likelihood of being realized upon ultimate settlement. The effective tax rate and the tax basis of assets and liabilities reflect management's estimates of the ultimate outcome of various tax uncertainties. The Company recognizes penalties and interest related to uncertain tax positions within the income tax expense financial statement caption in the accompanying consolidated statements of operations. The Company did not have any material interest and penalties during the years ended December 31, 2023, 2022 and 2021.



Case 3:24-cv-00334 Document 86-13 Filed 02/18/25 Page 5 of 78 PageID #: 2320

The Company files U.S. federal and certain state income tax returns. The income tax returns of the Company are subject to examination by U.S. federal and state taxing authorities for various time periods, depending on each jurisdictions' rules, beginning generally after the income tax returns are filed.

**Product Warranty**

The Company offers an assurance type warranty for its products against manufacturer defects and does not contain a service element. For these assurance type warranties, a provision for estimated future costs related to warranty expense is recorded when they are probable and reasonably estimable. This provision is based on historical information on the nature, frequency and average cost of claims for each product line. When little or no experience exists for an immature product line, the estimate is based on comparable product lines. Specific liabilities are established once an issue is identified with the amounts for such liabilities based on the estimated cost of correction. These estimates are re-evaluated on an ongoing basis using best-available information and revisions to estimates are made as necessary. As of December 31, 2023 and 2022 our estimated warranty liability was $54.9 million and $0.6 million, respectively.

**Acquisition Accounting**

The Company accounts for its business acquisitions under the acquisition method of accounting in ASC 805. The excess of the purchase price over the estimated fair values of the net assets acquired is recorded as goodwill. Determining the fair value of assets acquired and liabilities assumed requires management's judgment and often involves the use of significant estimates and assumptions, including assumptions with respect to future cash inflows and outflows, discount rates, asset lives, and market multiples amongst other items.

**Equity-Based Compensation**

The Company recognizes equity-based compensation expense based on the equity award's grant date fair value. The determination of the fair value of equity awards issued to employees of the Company is based upon the closing market price of the Company's common stock on the day prior to the grant date. Equity-based compensation expense related to performance stock units is recognized if it is probable that the performance condition will be satisfied. The Company accounts for forfeitures as they occur. The grant date fair value of each unit is amortized on a straight-line basis over the requisite service period, including those units with graded vesting. However, the amount of equity-based compensation at any date is at least equal to the portion of the grant date fair value of the award that is vested.

**Earnings (Loss) per Share ("EPS")**

Basic EPS is computed by dividing net income (loss) available to common stockholders by the weighted average shares outstanding during the period. Diluted EPS takes into account the potential dilution that could occur if securities or other contracts to issue shares, such as unvested restricted stock units, were exercised and converted into shares. Diluted EPS is computed by dividing net income (loss) available to common stockholders by the weighted average shares outstanding during the period, increased by the number of additional shares that would have been outstanding if the potential shares had been issued and were dilutive.

**Segment Reporting**

ASC 280 ("Segment Reporting") establishes standards for reporting information about operating segments. Operating segments are defined as components of an enterprise about which separate financial information is available that is evaluated regularly by the chief operating decision maker in deciding how to allocate resources and in assessing performance. The Company manages its business on the basis of one operating and reportable segment and derives revenues from selling its product.



Case 3:24-cv-00334 Document 86-13 Filed 02/18/25 Page 6 of 78 PageID #: 2321

**Advertising Expenses**

Advertising expenses are expensed as incurred. Advertising expenses for the years ended December 31, 2023, 2022 and 2021 were not material to our consolidated financial statements.

**Research and Development Expenses**

Research and development expenses are expensed as incurred. Research and development expenses for the years ended December 31, 2023, 2022 and 2021 were not material to our consolidated financial statements.

**New Accounting Standards**

*Adopted*

In October 2021, the FASB issued ASU 2021-08, *Business Combinations (Topic 805) Accounting for Contract Assets and Contract Liabilities from Contracts with Customers*. This ASU requires that contract assets and contract liabilities acquired in a business combination be recognized and measured in accordance with Topic 606. At the acquisition date, an acquirer should account for the related revenue contracts in accordance with Topic 606 as if it had originated the contracts. This guidance is effective for fiscal years beginning after December 15, 2022, including interim periods within that fiscal year. The adoption of this standard on January 1, 2023 did not have an impact on the Company's consolidated financial statements.

*Not Yet Adopted*

In October 2023, the FASB issued ASU 2023-06 Disclosure Improvements: Codification Amendments in Response to the SEC's Disclosure Update and Simplification Initiative. This ASU amends the disclosure or presentation requirements related to various subtopics in the FASB Accounting Standards Codification. For SEC registrants, the effective date for each amendment will be the date on which the SEC's removal of that related disclosure requirement from Regulation S-X or Regulation S-K becomes effective, with early adoption prohibited. The Company will monitor the removal of various requirements from the current regulations in order to determine when to adopt the related amendments, but does not anticipate the adoption of the new guidance will have a material impact on the Company's consolidated financial statements. The Company will continue to evaluate the impact of this guidance on its consolidated financial statements.

In November 2023, the FASB issued ASU 2023-07, Segment Reporting (Topic 280): Improvements to Reportable Segment Disclosures, which modifies the disclosure and presentation requirements of reportable segments. The amendments in the update require the disclosure of significant segment expenses that are regularly provided to the chief operating decision maker ("CODM") and included within each reported measure of segment profit and loss. The amendments also require disclosure of all other segment items by reportable segment and a description of its composition. Additionally, the amendments require disclosure of the title and position of the CODM and an explanation of how the CODM uses the reported measure(s) of segment profit or loss in assessing segment performance and deciding how to allocate resources. This update is effective for annual periods beginning after December 15, 2023, and interim periods within fiscal years beginning after December 15, 2024. Early adoption is permitted. The Company is currently evaluating the impact that this guidance will have on the presentation of its consolidated financial statements.

In December 2023, the FASB issued ASU 2023-09, Income Taxes (Topic 740): Improvements to Income Tax Disclosures, which expands disclosures in an entity's income tax rate reconciliation table and disclosures regarding cash taxes paid both in the U.S. and foreign jurisdictions. The update will be effective for annual periods beginning after December 15, 2024. The Company is currently evaluating the impact that this guidance will have on the presentation of its consolidated financial statements.



Case 3:24-cv-00334 Document 86-13 Filed 02/18/25 Page 7 of 78 PageID #: 2322

Management does not believe that any other recently issued, but not yet effective, accounting standards, if currently adopted, would have a material effect on the Company's consolidated financial statements.

## 3. Acquisition of ConnectPV

On August 26, 2021, the Company acquired 100% of the common stock of ConnectPV, Inc ("ConnectPV"). The acquisition of ConnectPV was accounted for as a business combination using the acquisition method of accounting. The aggregate purchase price was $13.8 million in cash (net of $0.8 million cash acquired) and 209,437 shares of Class A common stock valued at $6.5 million.

The cash portion of the purchase price was funded by borrowing under our Revolving Credit Facility (as defined in Note 10 - Long-Term Debt). The purchase price paid has been allocated to record the acquired assets and assumed liabilities based upon their estimated fair value. When determining the fair values of the assets acquired and assumed liabilities, management made significant estimates, judgements and assumptions. Management estimated that consideration paid exceeded the fair value of the net assets acquired. Therefore, goodwill of $19.8 million was recorded. The goodwill recognized was primarily attributable to the workforce and synergies related to the Company's EBOS solutions and components business that are expected to arise from the ConnectPV acquisition.

The following table is the balance sheet of ConnectPV as of the acquisition date, August 26, 2021, and includes the estimated fair value of the assets acquired and assumed liabilities. The estimated fair value allocated to certain property, plant and equipment, identifiable intangible assets and goodwill was determined based on a combination of market, cost and income approaches with the assistance of a third-party valuation firm (in thousands):

| **Purchase Price Allocation** | | |
|---|---|---|
| Cash and cash equivalents | $ | 849 |
| Accounts receivable | | 5,382 |
| Inventory | | 4,273 |
| Other current assets | | 1,583 |
| Total current assets | | 12,087 |
| Property, plant and equipment | | 438 |
| Goodwill | | 19,765 |
| Other intangible assets | | 1,600 |
| Total Assets | | 33,890 |
| Accounts payable | | 9,440 |
| Accrued expenses | | 2,655 |
| Debt | | 1,537 |
| Total liabilities | | 13,632 |
| Net assets acquired | $ | 20,258 |

The Company expensed acquisition-related costs of $2.3 million which are included in general and administrative expenses in the consolidated statement of operations for the year ended December 31, 2021. The goodwill and acquisition costs are not deductible for tax purposes.

**Pro Forma Financial Information (Unaudited)**

The pro forma information below gives effect to the ConnectPV acquisition as if it had been completed on the first day of each period presented. The pro forma results of operations are presented for informational purposes only. As such, they are not necessarily indicative of the Company's results had the acquisition been completed on the first day of each period presented, nor do they intend to represent the Company's future results. The pro forma information does not reflect any cost savings from operating efficiencies or synergies that could result from the acquisition and does not reflect additional revenue opportunities following the acquisition. The pro forma information includes adjustments to record the assets and liabilities associated with the acquisition at their respective fair values, based on available information and to give effect to the financing for the acquisition (in thousands):

| | Year Ended December 31, | |
|---|---|---|
| | 2021 | |
| Revenue | $ | 229,709 |
| Net income | $ | 3,305 |

## 4. Accounts Receivable

Accounts receivable, net consists of the following (in thousands):

| | December 31, | | | |
|---|---|---|---|---|
| | 2023 | | 2022 | |
| Accounts receivable | $ | 107,877 | $ | 51,061 |
| Less: allowance for credit losses | | (759) | | (486) |
| Accounts receivable, net | $ | 107,118 | $ | 50,575 |

## 5. Inventory

Inventory, net consists of the following (in thousands):

| | December 31, | | | |
|---|---|---|---|---|
| | 2023 | | 2022 | |
| Raw materials | $ | 57,608 | $ | 73,970 |
| Work in process | | 1,111 | | 1,023 |
| Finished goods | | 654 | | 785 |
| Allowance for obsolete or slow-moving inventory | | (6,569) | | (2,924) |
| Inventory, net | $ | 52,804 | $ | 72,854 |

The following table presents the change in the allowance for obsolete or slow-moving inventory balances (in thousands):



Case 3:24-cv-00334 Document 86-13 Filed 02/18/25 Page 9 of 78 PageID #: 2324

| | December 31, | |
|---|---|---|
| | 2023 | 2022 |
| Allowance balance, beginning of year | $ (2,924) | $ (897) |
| Provision | (5,041) | (2,073) |
| Write offs | 1,396 | 46 |
| Allowance balance, end of year | $ (6,569) | $ (2,924) |

## 6. Property, Plant and Equipment

Property, plant, and equipment, net consists of the following (in thousands):

| | Estimated Useful Lives (Years) | December 31, | |
|---|---|---|---|
| | | 2023 | 2022 |
| Land | N/A | $ 840 | $ 840 |
| Building and land improvements | 5-40 | 13,134 | 9,031 |
| Machinery and equipment | 3-5 | 17,528 | 12,371 |
| Furniture and fixtures | 3-7 | 2,766 | 1,787 |
| Vehicles | 5 | 125 | 125 |
| | | 34,393 | 24,154 |
| Less: accumulated depreciation | | (9,557) | (7,284) |
| Property, plant and equipment, net | | $ 24,836 | $ 16,870 |

Depreciation expense for the years ended December 31, 2023, 2022 and 2021 was $2.6 million, $1.9 million and $1.7 million, respectively. During the years ended December 31, 2023, 2022 and 2021, $2.0 million, $1.5 million and $1.5 million, respectively, of depreciation expense was allocated to cost of revenue and $0.6 million, $0.4 million and $0.2 million, respectively, of depreciation expense was allocated to operating expenses.

## 7. Goodwill and Other Intangible Assets

### Goodwill

As of December 31, 2023 and 2022, goodwill totaled $69.9 million. Changes in the carrying amount of goodwill during the years ended December 31, 2023 and 2022 are shown below (in thousands):

| | Goodwill |
|---|---|
| Balance at December 31, 2021 | $ 69,436 |
| Adjustments related to finalization of working capital in the acquisition of ConnectPV | 505 |
| Balance at December 31, 2022 | 69,941 |
| Adjustments | — |
| Balance at December 31, 2023 | $ 69,941 |



Case 3:24-cv-00334 Document 86-13 Filed 02/18/25 Page 10 of 78 PageID #: 2325

**Other Intangible Assets**

Other intangible assets, net consisted of the following (in thousands):

| | Estimated Useful Lives (Years) | December 31, 2023 | December 31, 2022 |
|---|---|---|---|
| Amortizable: | | | |
| Costs: | | | |
| Customer relationships | 13 | $ 53,100 | $ 53,100 |
| Developed technology | 13 | 34,600 | 34,600 |
| Trade names | 13 | 11,900 | 11,900 |
| Backlog | 1 | 600 | 600 |
| Noncompete agreements | 5 | 2,000 | 2,000 |
| Total amortizable intangibles | | 102,200 | 102,200 |
| Accumulated amortization: | | | |
| Customer relationships | | 27,135 | 22,925 |
| Developed technology | | 17,522 | 14,860 |
| Trade names | | 6,275 | 5,230 |
| Backlog | | 600 | 600 |
| Noncompete agreements | | 2,000 | 2,000 |
| Total accumulated amortization | | 53,532 | 45,615 |
| Total other intangible assets, net | | $ 48,668 | $ 56,585 |

Amortization expense related to intangible assets amounted to $7.9 million, $8.7 million and $8.4 million for the years ended December 31, 2023, 2022 and 2021, respectively. Estimated future annual amortization expense for other intangible assets, net are as follows (in thousands):

| For the Year Ended December 31, | Amortization Expense |
|---|---|
| 2024 | $ 7,585 |
| 2025 | 7,585 |
| 2026 | 7,585 |
| 2027 | 7,585 |
| 2028 | 7,585 |
| Thereafter | 10,743 |
| | $ 48,668 |



Case 3:24-cv-00334 Document 86-13 Filed 02/18/25 Page 11 of 78 PageID #: 2326

## 8. Accrued Expenses and Other

Accrued expenses and other consists of the following (in thousands):

| | December 31, | |
|---|---|---|
| | 2023 | 2022 |
| Accrued compensation | $ 10,796 | $ 4,917 |
| Accrued interest | 5,934 | 7,226 |
| Other accrued expenses | 6,177 | 5,179 |
| Total accrued expenses and other | $ 22,907 | $ 17,322 |

## 9. Warranty Liability

*General Warranty*

The Company offers an assurance type warranty for its products against manufacturer defects which does not contain a service element. For these assurance type warranties, a provision for estimated future costs related to warranty expense is recorded when they are probable and reasonably estimable. As of December 31, 2023 and December 31, 2022 our estimated general warranty liability was approximately zero and $0.1 million, respectively. The Company recorded total warranty expense related to general warranty matters of $0.4 million, $0.1 million, and zero for the years ended December 31, 2023, 2022 and 2021, respectively.

*Wire* Insulation *Shrinkback Warranty*

The Company has been notified by certain customers that a subset of wire harnesses used in its EBOS solutions is presenting unacceptable levels of pull back of wire insulation at connection points ("wire insulation shrinkback"). Based upon the Company's ongoing assessment, the Company currently believes the wire insulation shrinkback is related to defective red wire manufactured by Prysmian Cables and Systems USA, LLC ("Prysmian"). As of December 31, 2023, based on the Company's continued analysis, which included better visibility into the scope of affected sites and potential solutions, including identification, repair and replacement of harnesses, the Company determined that a potential range of loss was both probable and reasonably estimable and updated its estimate of potential losses from previously provided estimates. Based on the Company's continued analysis of information available as of the date of this Annual Report, the estimate of potential losses remains unchanged from the estimate provided as of September 30, 2023. As no amount within the current range of loss appears to be a better estimate than any other amount, the Company recorded a warranty liability and related expense representing the low end of the range of potential loss of $59.7 million. The high-end of the range of potential loss is $184.9 million, which is $125.2 million higher than the amount we have recorded. As of December 31, 2023, our recorded warranty liability related to this matter was $54.9 million.

The estimated range is based on several assumptions, including the potential magnitude of EPC's labor cost to identify and perform the repair and replacement of impacted harnesses, estimated failure rates, materials replacement cost, planned remediation method, inspection costs, and other various assumptions, and as additional information becomes available, the Company may increase or decrease its estimated warranty liability from its current estimate, and such increase or decrease may be material. The Company does not maintain insurance for product warranty and has commenced a lawsuit against Prysmian, as discussed in more detail under Wire Insulation Shrinkback Litigation section of Note 16 - Commitments and Contingencies. Because the lawsuit against Prysmian is ongoing, potential recovery from Prysmian is not considered probable as defined in ASC 450, and has not been considered in our estimate of the warranty liability as of December 31, 2023.



Case 3:24-cv-00334 Document 86-13 Filed 02/18/25 Page 12 of 78 PageID #: 2327

The Company recorded total warranty expense related to this matter of $59.2 million, $0.5 million, and zero for the years ended December 31, 2023, 2022 and 2021, respectively.

Warranty liability, which includes both general warranty and wire insulation shrinkback warranty, consists of the following (in thousands):

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2023 | 2022 | 2021 |
| Warranty liability, beginning of period | $ 560 | $ 60 | $ — |
| Warranty expense | 59,556 | 500 | 60 |
| Payments | (5,202) | — | — |
| Warranty liability, end of period | 54,914 | 560 | 60 |
| Less: current portion | 31,099 | 560 | 60 |
| Warranty liability, net current portion | $ 23,815 | $ — | $ — |

**10. Long-Term Debt**

Long-term debt consists of the following (in thousands):

| | December 31, | |
|---|---|---|
| | 2023 | 2022 |
| Term Loan Facility | $ 143,750 | $ 195,250 |
| Revolving Credit Facility | 40,000 | 48,000 |
| Less: deferred financing costs | (2,305) | (4,187) |
| Total debt, net of deferred financing costs | 181,445 | 239,063 |
| Less: current portion | (2,000) | (2,000) |
| Long-term debt, net current portion | $ 179,445 | $ 237,063 |

The aggregate amounts of principal maturities on the Company's long-term debt is as follows (in thousands):

| For the Year Ended December 31, | |
|---|---|
| 2024 | $ 2,000 |
| 2025 | 2,000 |
| 2026 | 179,750 |
| | $ 183,750 |

**Senior Secured Credit Agreement**

On November 25, 2020 Shoals Holdings LLC, a former subsidiary of the Company, entered into a senior secured credit agreement (as amended, the "Senior Secured Credit Agreement"), consisting of (i) a $350.0 million senior secured six-year term loan facility (the "Term Loan Facility"), (ii) a $30.0 million senior secured delayed draw term loan facility, which matures concurrently with the six-year Term Loan Facility (the "Delayed Draw Term Loan Facility") and (iii) an uncommitted super senior first out revolving credit facility (the "Revolving Credit Facility").



Case 3:24-cv-00334 Document 86-13 Filed 02/18/25 Page 13 of 78 PageID #: 2328

In December 2020, Shoals Holdings LLC entered into two amendments to the Senior Secured Credit Agreement in order to obtain a $100.0 million increase (the "Revolver Upsize") to the Revolving Credit Facility and modify the terms of the interest rate and prepayment premium. As part of the first amendment the Company repaid and terminated all outstanding commitments under the Delayed Draw Term Loan Facility.

On January 29, 2021, the Company used proceeds from the IPO to repay $150.0 million of outstanding borrowings under the Term Loan Facility. The repayment of a portion of the borrowings under the Term Loan Facility resulted in a $16.0 million loss on debt repayment as the result of the $11.3 million prepayment premium and $4.7 million write-off of a portion of the deferred financing costs.

On May 2, 2022, Shoals Holdings LLC entered into an amendment to the Senior Secured Credit Agreement in order to increase the amount available for borrowing under the Revolving Credit Facility from $100.0 million to $150.0 million. The amendment also set forth Secured Overnight Financing Rate ("SOFR") as the benchmark rate and amended the financial covenant such that, commencing with September 30, 2022, its Consolidated First Lien Secured Leverage Ratio (as defined in the Senior Secured Credit Agreement) shall not exceed 6.50:1.00.

On December 27, 2023, the Company used proceeds from the Revolving Credit Facility to make a $50.0 million voluntary prepayment of outstanding borrowings under the Term Loan Facility.

As of December 31, 2023, the outstanding balance of the Term Loan Facility was $143.8 million. The balance of the Term Loan Facility is presented in the accompanying consolidated balance sheets net of deferred financing fees of $2.3 million and $4.2 million as of December 31, 2023 and 2022, respectively. The deferred financing fees are being amortized using the effective interest method. The effective interest rate as of December 31, 2023 and 2022, was 11.05% and 7.06%, respectively. As of December 31, 2023, the Revolving Credit Facility balance was $40.0 million and the Company had $109.7 million of availability under the Revolving Credit Facility.

Following the internal reorganization described under "Entity Simplification" in Note 1, on February 7, 2024, Shoals Intermediate Parent became the borrower under the Senior Secured Credit Agreement.

*Interest Rate*

The interest rates applicable to the loans under the Term Loan Facility are based on a rate of interest determined by reference to either: (i) a base rate plus an applicable margin equal to 4.75%, or (ii) a SOFR rate plus an applicable margin equal to, 5.75%.

The interest rates applicable to the loans under the Revolving Credit Facility are based on a rate of interest determined by reference to either (i) a base rate plus an applicable margin equal to 2.25% or (ii) a SOFR rate plus an applicable margin equal to 3.25%.

As of December 31, 2023, interest rates on the Term Loan Facility was SOFR plus 5.75%, or 11.28%, and the Revolving Credit Facility was SOFR plus 3.25%, or 8.76%.

*Guarantees and Security*

The obligations under the Senior Secured Credit Agreement are guaranteed by Shoals Intermediate Parent's wholly owned domestic subsidiaries other than certain immaterial subsidiaries and other excluded subsidiaries. The obligations under the Senior Secured Credit Agreement are secured by a first priority security interest in substantially all of Shoals Intermediate Parent's and the guarantors' existing and future property and assets, including accounts receivable, inventory, equipment, general intangibles, intellectual property, investment property, other personal property, material owned real property, cash and proceeds of the foregoing.

*Prepayments and Amortization*

Loans under the Revolving Credit Facility and Term Loan Facility may be voluntarily prepaid, at Shoals Intermediate Parent's option, in whole, or in part, in each case without premium or penalty.

Notwithstanding anything to the contrary in the preceding paragraph, in the event that, on or after December 30, 2020 but prior to February 28, 2021, Shoals Holdings LLC made any prepayment (including with respect to any acceleration) of any loans under the Term Loan Facility, Shoals Holdings LLC would pay a premium on such prepayments made up to $150.0 million of the principal amount of such loans prepaid in an amount equal to 7.50% multiplied by the principal amount of such loans prepaid, which, if applicable, would be in lieu of any applicable prepayment premium set forth in the Senior Secured Credit Agreement; provided that no amortization payments or mandatory prepayments required under the Senior Secured Credit Agreement would be subject to the prepayment premium set forth in this paragraph. On January 29, 2021, the Company used proceeds from the IPO to repay $150.0 million of outstanding borrowings under the Term Loan Facility resulting in a prepayment premium of $11.3 million.

The Senior Secured Credit Agreement requires mandatory prepayments, but not permanent reductions of commitments thereunder, for excess cash flow, asset sales, subject to a right of reinvestment, and refinancing facilities.

The Term Loan Facility amortizes in equal quarterly installments in aggregate annual amounts equal to 1.00% per annum of the original principal amount of the loans funded thereunder. There is no scheduled amortization under the Revolving Credit Facility.

*Restrictive Covenants and Other Matters*

The Senior Secured Credit Agreement contains affirmative and negative covenants that are customary for financings of this type, including covenants that restrict our incurrence of indebtedness, incurrence of liens, dispositions, investments, acquisitions, restricted payments, and transactions with affiliates.

The Senior Secured Credit Agreement also includes customary events of default, including the occurrence of a change of control.

The Revolving Credit Facility also includes a Consolidated Leverage Ratio financial covenant that is tested on the last day of each fiscal quarter. To remain in compliance with the financial covenant, Shoals Intermediate Parent shall not permit the Consolidated Leverage Ratio, as of the last day of any quarter, to be greater than 6.50 to 1.00.

As of December 31, 2023, the Company was in compliance with all the required covenants.

## 11. Earnings (Loss) per Share ("EPS")

Basic EPS of Class A common stock is computed by dividing net income (loss) attributable to the Company by the weighted average number of shares of Class A common stock outstanding during the period. Diluted EPS of Class A common stock is computed similarly to basic EPS except the weighted average shares outstanding are increased to include additional shares from the exchange of Class B common stock under the if-converted method and the assumed exercise of any common stock equivalents using the treasury stock method, if dilutive. The Company's restricted/performance stock units are considered common stock equivalents for this purpose.

All earnings prior to and up to January 26, 2021, the date of the IPO, were entirely allocable to non-controlling interests and, as a result, EPS information is not applicable for reporting periods prior to this date.



Case 3:24-cv-00334 Document 86-13 Filed 02/18/25 Page 15 of 78 PageID #: 2330

Consequently, only the net income (loss) allocable to Shoals Technologies Group, Inc. from the period subsequent to January 26, 2021 is included in the net income (loss) attributable to the stockholders of Class A common stock for the period ended December 31, 2021.

Basic and diluted EPS of Class A common stock have been computed as follows (in thousands, except per share amounts):

| | Year Ended December 31, 2023 | Year Ended December 31, 2022 | Period from January 27, 2021 to December 31, 2021 |
|---|---|---|---|
| Numerator: | | | |
| Net income (loss) attributable to Shoals Technologies Group, Inc. - basic | $ 39,974 | $ 127,611 | $ (327) |
| Reallocation of net income attributable to non-controlling interests from the assumed exchange of Class B common stock | — | 15,402 | — |
| Net income (loss) attributable to Shoals Technologies Group, Inc. - diluted | $ 39,974 | $ 143,013 | $ (327) |
| Denominator: | | | |
| Weighted average shares of Class A common stock outstanding - basic | 164,165 | 114,495 | 99,269 |
| Effect of dilutive securities: | | | |
| Restricted / performance stock units | 339 | 308 | — |
| Class B common stock | — | 52,828 | — |
| Weighted average shares of Class A common stock outstanding - diluted | 164,504 | 167,631 | 99,269 |
| | | | |
| Earnings (Loss) per share of Class A common stock - basic | $ 0.24 | $ 1.11 | $ ( 0.00 ) |
| Earnings (Loss) per share of Class A common stock - diluted | $ 0.24 | $ 0.85 | $ ( 0.00 ) |

For the period from January 27, 2021 to December 31, 2021 and the year ended December 31, 2023, the reallocation of net income attributable to non-controlling interest from the assumed exchange of Class B common stock has been excluded along with the dilutive effect of Class B common stock to the weighted average shares of Class A common stock outstanding – dilutive, as they were antidilutive.

## 12. Equity-Based Compensation

### 2021 Long-Term Incentive Plan

The Shoals Technologies Group, Inc. 2021 Long-Term Incentive Plan (the “2021 Incentive Plan”) became effective on January 26, 2021. The 2021 Incentive Plan authorized 8,768,124 new shares, subject to adjustment pursuant to the 2021 Incentive Plan.

*Restricted Stock Units*

During the years ended December 31, 2023 and 2022, and for the period from January 27, 2021 to December 31, 2021, the Company granted 413,873, 727,001, and 1,701,306 restricted stock units (“RSUs”), respectively, to certain employees, officers and directors of the Company. The RSUs had grant date fair values



Case 3:24-cv-00334 Document 86-13 Filed 02/18/25 Page 16 of 78 PageID #: 2331

ranging from $14.45 to $28.26, $10.42 to $25.82, and $21.50 to $34.60, respectively, during the years ended December 31, 2023 and 2022 and for the period from January 27, 2021 to December 31, 2021. The RSUs generally vest ratably over either 3 or 4 years, except for some officer and employee grants for bonuses which immediately vested or vest over 1 year. There were a limited number of awards with immediate vesting.

Activity under the 2021 Incentive Plan for RSUs was as follows:

| | Restricted Stock Units | Weighted Average Price |
|---|---|---|
| Outstanding, December 31, 2020 | — | $ — |
| Granted | 1,701,306 | $ 27.61 |
| Vested | (44,724) | $ 28.60 |
| Forfeited | (23,738) | $ 29.46 |
| Outstanding, December 31, 2021 | 1,632,844 | $ 27.55 |
| Granted | 727,001 | $ 13.78 |
| Vested | (559,336) | $ 26.05 |
| Forfeited | (63,534) | $ 25.56 |
| Outstanding, December 31, 2022 | 1,736,975 | $ 22.34 |
| Granted | 413,873 | $ 24.78 |
| Vested | (887,996) | $ 21.39 |
| Forfeited | (91,386) | $ 23.05 |
| Outstanding, December 31, 2023 | 1,171,466 | $ 23.87 |

*Performance Stock Units*

During the years ended December 31, 2023 and 2022, the Company granted an aggregate of 205,585 and 256,305 Performance Stock Units (“PSUs”), respectively, to certain executives. The PSUs cliff vest after 3 years upon meeting certain revenue and gross profit targets and contain certain modifiers which could increase or decrease the ultimate number of Class A common stock issued to the executives. The PSUs were valued using the market value of the Class A common stock on the grant date ranging from $26.55 to $28.26 and $10.42 to $20.58, respectively, during the years ended December 31, 2023 and 2022.

Activity under the 2021 Incentive Plan for PSUs was as follows:

| | Performance Stock Units | Weighted Average Price |
|---|---|---|
| Outstanding, December 31, 2021 | — | $ — |
| Granted | 256,305 | $ 11.89 |
| Vested | — | $ — |
| Forfeited | — | $ — |
| Outstanding, December 31, 2022 | 256,305 | $ 11.89 |
| Granted | 205,585 | $ 27.75 |
| Vested | (67,101) | $ 11.86 |
| Forfeited | (101,323) | $ 13.08 |
| Outstanding, December 31, 2023 | 293,466 | $ 22.59 |



Case 3:24-cv-00334 Document 86-13 Filed 02/18/25 Page 17 of 78 PageID #: 2332

During the years ended December 31, 2023, 2022 and 2021, the Company recognized $20.9 million, $16.1 million, and $11.3 million, respectively, in equity-based compensation. As of December 31, 2023, the Company had $20.8 million of unrecognized compensation costs which is expected to be recognized over a weighted average period of 1.5 years.

## 13. Stockholders' Equity

### Amendment and Restatement of Certificate of Incorporation

As discussed in Note 1 - Organization and Business, on January 26, 2021, the Company's certificate of incorporation was amended and restated to, among other things, provide for the (i) authorization of 1,000,000,000 shares of Class A common stock with a par value of $0.00001 per share; (ii) authorization of 195,000,000 shares of Class B common stock with a par value of $0.00001 per share; (iii) authorization of 5,000,000 shares of preferred stock that may be issued from time to time by the Company's Board of Directors in one or more series; and (iv) establishment of a classified board of directors, divided into three classes, the members of which will serve for staggered terms.

Holders of Class A common stock and Class B common stock (if any shares are outstanding) are entitled to one vote per share and, except as otherwise required, will vote together as a single class on all matters on which stockholders generally are entitled to vote. Holders of Class B common stock were not entitled to receive dividends and will not be entitled to receive any distributions upon the liquidation, dissolution or winding up of the Company. Shares of Class B common stock were only issued to the extent necessary to maintain the one-to-one ratio between the number of LLC Interests held by the Continuing Equity Owners and the number of shares of Class B common stock held by the Continuing Equity Owners. Shares of Class B common stock were transferable only together with an equal number of LLC Interests. Shares of Class B common stock were canceled on a one-for-one basis if the Company, at the election of a Continuing Equity Owner, redeemed or exchanged LLC Interests. As of December 31, 2023, there were no shares of Class B common stock nor LLC Interests outstanding, and no shares of Class B common stock are expected to be issued in the future.

### Initial Public Offering

As discussed in Note 1 - Organization and Business, on January 29, 2021, the Company closed an IPO of 11,550,000 shares of the Class A common stock at a public offering price of $25.00 per share. The Company received $278.8 million in proceeds, net of underwriting discounts and commissions, which was used to purchase 6,315,790 LLC Interests from Shoals Parent LLC and 5,234,210 LLC Interests from the founder and Class B unit holder in Shoals Parent LLC at a price per interest equal to the IPO price of the Class A common stock of $25.00 per share.

### Shoals Parent LLC Recapitalization

As noted above, in connection with the IPO, the limited liability company agreement of Shoals Parent LLC was amended and restated to, among other things, (i) provide for a new single class of common membership interests in Shoals Parent LLC, or the LLC Interests; (ii) exchange all of the then existing membership interests of the Continuing Equity Owners for LLC Interests (iii) exchange all the then existing membership interest of the Class A Shoals Equity Owners for LLC Interests and (iv) appoint the Company as the sole managing member of Shoals Parent LLC.

The amendment also required Shoals Parent LLC to maintain, at all times, (i) a one-to-one ratio between the number of shares of Class A common stock issued by the Company and the number of LLC Interests owned by the Company and (ii) a one-to-one ratio between the number of shares of Class B common

stock owned by the Continuing Equity Owners and the number of LLC Interests owned by the Continuing Equity Owners.

At the close of the IPO and through the second quarter of 2023, the Company had a majority economic interest in, was the sole managing member of, had the sole voting power in, and controlled the management of Shoals Parent LLC. On July 1, 2023, the Company contributed 100% of its LLC Interests to Shoals Intermediate Parent. Following the contribution, Shoals Parent LLC became a disregarded single member limited liability company, eliminating the Company's Up-C structure. Effective December 31, 2023, Shoals Parent LLC merged with and into Shoals Intermediate Parent with Shoals Intermediate Parent as the surviving corporation. See "Entity Simplification" in Note 1.

**Acquisition of Former Shoals Equity Owners**

On January 26, 2021, the Company acquired, by merger, an entity that was a member of Shoals Parent LLC, or the Class A Shoals Equity Owners, for which the Company issued 81,977,751 shares of Class A common stock as merger consideration. The only assets held by the Class A Shoals Equity Owners were 81,977,751 LLC Interests. Upon consummation of the Merger, the Company recognized the LLC Interests at carrying value, as the Merger is considered to be a transaction between entities under common control.

## 14. Non-Controlling Interests

As of the first quarter of 2023, the Company owned 100% of Shoals Parent LLC. The following table summarizes the effects of the changes in ownership in Shoals Parent LLC on equity for the years ended December 31, 2023, 2022, and 2021:

| | Year Ended December 31, 2023 | Year Ended December 31, 2022 | Period from January 27, 2021 to December 31, 2021 |
|---|---|---|---|
| Net income attributable to non-controlling interests | $ 2,687 | $ 15,402 | $ 1,596 |
| Transfers to non-controlling interests: | | | |
| Decrease as a result of the Organizational Transactions | — | — | (88,644) |
| Increase as a result of newly issued LLC Interests in IPO | — | — | 70,976 |
| Increase as a result of activity under equity-based compensation plan | 687 | 5,422 | 3,618 |
| Decrease from tax distributions to non-controlling interests | (2,628) | (7,762) | (4,837) |
| Reallocation of non-controlling interests | (10,361) | 6,604 | 7,240 |
| Change from net income attributable to non-controlling interests and transfers to non-controlling interests | $ (9,615) | $ 19,666 | $ (10,051) |

**Issuance of Additional LLC Interests**

Under the LLC Agreement, the Company was required to cause Shoals Parent LLC to issue additional LLC Interests to the Company when the Company issued additional shares of Class A common stock. Other than as it relates to the issuance of Class A common stock in connection with an equity incentive program, the Company contributed to Shoals Parent LLC net proceeds and property, if any, received by the Company with



Case 3:24-cv-00334 Document 86-13 Filed 02/18/25 Page 19 of 78 PageID #: 2334

respect to the issuance of such additional shares of Class A common stock. The Company caused Shoals Parent LLC to issue a number of LLC Interests equal to the number of shares of Class A common stock issued such that, at all times, the number of LLC Interests held by the Company was equal to the number of outstanding shares of Class A common stock. During the years ended December 31, 2023, 2022 and 2021, the Company caused Shoals Parent LLC to issue to the Company a total of 601,518, 480,116 and 40,665 LLC Interests, respectively, for the vesting of awards granted under the 2021 Long-Term Incentive Plan. On July 1, 2023, the Company contributed 100% of its LLC Interests in Shoals Parent LLC to its wholly-owned subsidiary, Shoals Intermediate. Following the contribution, Shoals Parent LLC became a disregarded single member limited liability company, eliminating the Up-C structure. Effective December 31, 2023, Shoals Parent LLC merged with and into Shoals Intermediate Parent with Shoals Intermediate Parent as the surviving corporation. See "Entity Simplification" in Note 1.

**Distributions for Taxes**

As a limited liability company (treated as a partnership for income tax purposes), Shoals Parent LLC did not incur significant federal, state or local income taxes, as these taxes were primarily the obligations of its members. As authorized by the LLC Agreement, Shoals Parent LLC was required to distribute cash, to the extent that Shoals Parent LLC had cash available, on a pro rata basis, to its members to the extent necessary to cover the members' tax liabilities, if any, with respect to each member's share of Shoals Parent LLC taxable earnings. Shoals Parent LLC made such tax distributions to its members quarterly, based on the single highest marginal tax rate applicable to its members applied to projected year-to-date taxable income. During the years ended December 31, 2023, 2022 and 2021, tax distributions to non-controlling LLC Interests holders were $2.6 million, $7.8 million and $4.8 million, respectively.

**Other Distributions**

Pursuant to the LLC Agreement, the Company had the right to determine when distributions would be made to LLC members and the amount of any such distributions. If the Company authorized a distribution, such distribution was made to the members of the LLC (including the Company) pro rata in accordance with the percentages of their respective LLC units.

## 15. Leases

Effective January 1, 2022, the Company adopted ASC 842 Leases using the modified retrospective approach. The Company elected the use of the package of practical expedients permitted under the transition guidance which allows the Company not to reassess whether a contract contains a lease, carry forward the historical lease classification and not reassess initial direct lease costs. The Company also elected to apply the short-term measurement and recognition exemption in which the right-of-use ("ROU") assets and lease liabilities are not recognized for short-term leases. Adoption of this standard resulted in recording of net operating lease ROU assets and corresponding operating lease liabilities of $1.2 million and $1.2 million, respectively. The standard did not materially affect the consolidated statements of operations and had no impact on the consolidated statements of cash flows.

The following table summarizes the balances as it relates to leases at the end of the period (in thousands):



Case 3:24-cv-00334 Document 86-13 Filed 02/18/25 Page 20 of 78 PageID #: 2335

**Shoals Technologies Group, Inc.**
**Notes to Consolidated Financial Statements**

| | Location on the Consolidated Balance Sheets | December 31, 2023 | December 31, 2022 |
|---|---|---|---|
| Right-of-use asset | Other assets | $ 2,871 | $ 4,060 |
| | | | |
| Lease liability, current portion | Accrued expenses and other | $ 1,140 | $ 1,162 |
| Lease liability, net current portion | Other long-term liabilities | 2,116 | 3,256 |
| Total lease liability | | $ 3,256 | $ 4,418 |

The Company determines if an arrangement is a lease at its inception. Operating lease right-of-use ("ROU") assets and lease liabilities are recognized at commencement date based on the present value of lease payments over the lease term. Operating lease ROU assets also include any initial direct costs and prepayments less lease incentives. Lease terms may include options to extend or terminate the lease when it is reasonably certain that the Company will exercise such options. As the Company's leases generally do not provide an implicit rate, the Company uses its collateralized incremental borrowing rate based on the information available at the lease commencement date, including lease term, in determining the present value of lease payments. Lease expense for these leases is recognized on a straight-line basis over the lease term.

Operating lease arrangements are comprised primarily of real estate and equipment agreements for which the ROU assets are included in other assets and the corresponding lease liabilities, depending on their maturity, are included in accrued expenses and other or other long-term liabilities in the consolidated balance sheets. The Company also elected to apply the practical expedient to consider non-lease components as a part of the lease. The Company's leases contain certain non-lease components for common area maintenance which are variable on a month to month basis and as such recorded as a variable lease expense as incurred.

The details of the Company's operating leases are as follows (in thousands):

| | Year Ended December 31, 2023 | Year Ended December 31, 2022 |
|---|---|---|
| Operating lease expense | $ 1,189 | $ 1,126 |
| Variable lease expense | 168 | 142 |
| Short-term lease expense | 61 | 177 |
| Total lease expense | $ 1,418 | $ 1,445 |

The following table presents the maturities of lease liabilities as of December 31, 2023 (in thousands):

| For the Year Ended December 31, | Operating Leases |
|---|---|
| 2024 | $ 1,261 |
| 2025 | 958 |
| 2026 | 950 |
| 2027 | 325 |
| Total lease payments | 3,494 |
| Less: Imputed lease interest | (238) |
| Total lease liabilities | $ 3,256 |



Case 3:24-cv-00334 Document 86-13 Filed 02/18/25 Page 21 of 78 PageID #: 2336

The Company’s weighted average remaining lease-term and weighted average discount rate are as follows:

| | Year Ended December 31, | |
|---|---|---|
| | 2023 | 2022 |
| Weighted average remaining lease-term | 3.0 years | 3.9 years |
| Weighted average discount rate | 4.5 % | 4.5 % |

Supplemental cash flow and other information related to operating leases are as follows (in thousands):

| | Year Ended December 31, | |
|---|---|---|
| | 2023 | 2022 |
| Operating cash flows from operating leases | $ 1,566 | $ 1,295 |
| Non-cash investing activities: | | |
| Lease liabilities arising from obtaining right-of-use assets | $ — | $ 5,229 |

## 16. Commitments and Contingencies

### Litigation

The Company is from time to time subject to legal proceedings and claims, which arise in the normal course of its business. In the opinion of management and legal counsel, except as disclosed below, the amount of losses or gains that may be sustained, if any, would not have a material effect on the financial position, results of operations or cash flows of the Company. The Company records legal costs associated with loss contingencies as incurred.

*Intellectual Property Litigation*

On May 4, 2023, the Company filed a patent infringement complaint with the U.S. International Trade Commission (“ITC”) against Hikam America, Inc., a corporation based in Chula Vista, California, and its related foreign entities (together, “Hikam”), and Voltage LLC, a limited liability company based in Chapel Hill, North Carolina, and a related foreign entity (together, “Voltage”). The complaint primarily requests that the ITC (i) investigate unlawful imports of certain photovoltaic connectors and components that the Company alleges infringe on two valid and enforceable patents owned by the Company related to improved connectors for solar panel arrays and (ii) issue a limited exclusion order and a cease and desist order against the Hikam respondents and the Voltage respondents to bar them from importing, marketing, distributing, selling, offering for sale, licensing, advertising, transferring, or otherwise using the infringing photovoltaic connectors and components in and into the United States. On July 19, 2023, the Company filed an amended complaint with the ITC, adding allegations that Voltage also infringes a third, recently-issued patent owned by the Company. Also on May 4, 2023, the Company filed complaints against Hikam in the U.S. District Court for the Southern District of California, and against Voltage in the U.S. District Court for the Middle District of North Carolina on the same subject matter. On June 28, 2023, the Company filed an amended complaint in the District Court action against Voltage alleging that they also infringe on a third, recently-issued patent owned by the Company. These complaints seek injunctive relief and damages for reasonable royalty and lost profits. The District Court actions have been stayed pending the final disposition of the ITC investigation. The Administrative Law Judge issued a Claim Construction Ruling on February 21, 2024. As a result of the Claim Construction Ruling, in order to streamline the case and focus our limited time during the evidentiary hearing and as recommended by the ITC's Investigative Attorney to preserve public resources, the Company filed an unopposed motion on February



Case 3:24-cv-00334 Document 86-13 Filed 02/18/25 Page 22 of 78 PageID #: 2337

26, 2024, and such motion was granted on February 28, 2024, to remove one of the three asserted patents covering duplicative subject matter against Voltage. An evidentiary hearing in the ITC investigation has been scheduled for March 18 through 22, 2024. The ITC has set a target date for completion of the investigation of November 12, 2024. The Company intends to vigorously pursue these actions. However, at this stage, the Company is unable to predict the outcome or impact on its business and financial results. The Company is accounting for this matter as a gain contingency, and will record any such gain in future periods if and when the contingency is resolved, in accordance with ASC 450 Contingencies.

*Wire Insulation Shrinkback Litigation*

On October 31, 2023, the Company filed a complaint in the U.S. District Court for the Middle District of Tennessee, Nashville Division, against Prysmian. The complaint alleges damages caused by defective red wire Prysmian sold the Company between 2020 through approximately 2022. The defective red wire has presented unacceptable levels of wire insulation shrinkback. The complaint includes, among other causes of action, product liability, breach of contract, breach of warranty, indemnity, and negligence claims. The Company seeks compensatory and punitive damages, recovery of all costs and expenses incurred by the Company in connection with the identification, repair and replacement of the defective wire, and other legal and equitable relief. The Company intends to vigorously pursue this action, and as the Company continues to assess this matter, it may, from time to time, amend, update or supplement the complaint to, among other things, increase the damages sought for various purposes, including in accordance with increases to the Company's estimated warranty liability and related expenses related to this matter. At this stage, the Company is unable to predict the outcome of this litigation or the impact on its business and financial results. The Company is accounting for this matter as a gain contingency, and will record any such gain in future periods if and when the contingency is resolved, in accordance with ASC 450 Contingencies.

**Surety Bonds**

The Company provides surety bonds to various parties as required for certain transactions initiated during the ordinary course of business to guarantee the Company's performance in accordance with contractual or legal obligations. As of December 31, 2023, the maximum potential payment obligation with regard to surety bonds was $27.6 million.

**Employee Benefit Plan**

The Company has a 401(k) retirement plan for substantially all of its employees based on certain eligibility requirements. Effective January 1, 2021 the Company began making matching contributions to the plan and may also provide discretionary contributions to the plan at the discretion of management. No such discretionary contributions have been made since inception of the plan. For the years ended December 31, 2023, 2022 and 2021, the Company made matching contributions totaling $0.5 million, $0.3 million and $0.2 million, respectively.

## 17. Income Taxes

The components of income before income taxes are as follows (in thousands):



Case 3:24-cv-00334 Document 86-13 Filed 02/18/25 Page 23 of 78 PageID #: 2338

**Shoals Technologies Group, Inc.**
**Notes to Consolidated Financial Statements**

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2023 | 2022 | 2021 |
| Domestic | $ 54,935 | $ 152,000 | $ 4,030 |
| Foreign | — | — | — |
| Income before income taxes | $ 54,935 | $ 152,000 | $ 4,030 |

The components of income tax expense are as follows (in thousands):

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2023 | 2022 | 2021 |
| Current income taxes: | | | |
| Federal | $ — | $ — | $ — |
| State | 915 | 554 | 631 |
| Foreign | — | — | — |
| Total current income taxes | 915 | 554 | 631 |
| Deferred income taxes: | | | |
| Federal | 10,146 | 13,639 | 397 |
| State | 1,188 | (5,233) | (1,873) |
| Foreign | — | — | — |
| Total deferred income taxes | 11,334 | 8,406 | (1,476) |
| Other tax expense | 25 | 27 | 931 |
| Income tax expense | $ 12,274 | $ 8,987 | $ 86 |

The differences between income taxes expected at the U.S. federal statutory income tax rate and the reported income tax expense are summarized as follows (in thousands):

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2023 | 2022 | 2021 |
| U.S. federal income taxes at statutory rate | $ 11,537 | $ 31,920 | $ 846 |
| State and local income tax, net of federal benefit | 1,811 | 4,786 | (1,380) |
| Permanent tax adjustments | 101 | (6) | 356 |
| Equity-based compensation | 447 | 685 | (14) |
| Non-deductible officers' compensation | 968 | 397 | — |
| Pre-IPO income | — | — | (562) |
| Non-controlling interests | (564) | (3,289) | (342) |
| Termination of TRA | — | (15,905) | 349 |
| Termination of Up-C structure | (2,347) | — | — |
| Remeasurement of deferred taxes | — | (6,775) | (1,939) |
| Change in valuation allowance | 988 | (1,983) | 1,983 |
| Other | (667) | (843) | 789 |
| Income tax expense | $ 12,274 | $ 8,987 | $ 86 |

**Shoals Technologies Group, Inc.**
**Notes to Consolidated Financial Statements**

The components of the deferred tax assets and liabilities are as follows (in thousands):

| | Year Ended December 31, | |
|---|---|---|
| | 2023 | 2022 |
| Deferred tax assets: | | |
| Investment in Shoals Parent | $ — | $ 284,729 |
| Inventory, net | 1,677 | — |
| Property, plant & equipment, net | 709 | — |
| Goodwill | 450,830 | — |
| Accrued expenses and other | 2,310 | — |
| Warranty liability | 12,824 | — |
| Net operating loss | 5,380 | 4,626 |
| Equity-based compensation | 2,869 | 2,030 |
| Other | 4,090 | 249 |
| Total deferred tax assets | 480,689 | 291,634 |
| Less valuation allowance | (988) | — |
| Total deferred tax assets, net | 479,701 | 291,634 |
| Deferred tax liabilities: | | |
| Other intangible assets, net | (10,636) | — |
| Other | (870) | — |
| Total deferred tax liabilities | (11,506) | — |
| Net deferred tax asset | $ 468,195 | $ 291,634 |

During the year ended December 31, 2023, the Company acquired the remaining non-controlling interest in Shoals Parent LLC and contributed 100% of its interest to its wholly-owned subsidiary Shoals Intermediate Parent, thereby eliminating the Company's Up-C structure. As a result of the contribution, Shoals Parent LLC ceased to be treated as a partnership for U.S. federal income tax purposes and became a single-member disregarded entity. Accordingly, the Company converted its outside basis differences in its investment in Shoals Parent LLC and remeasured its deferred taxes using the inside basis differences of Shoals Parent LLC's assets and liabilities. The conversion from outside to inside basis differences resulted in a net deferred tax benefit of approximately $5.1 million, which has been recorded in the accompanying consolidated statement of operations.

As of December 31, 2023, the Company has $23.7 million and $7.3 million federal and state net operating loss carryforwards, respectively. If not utilized, $23.7 million of the federal net operating loss can be carried forward indefinitely. If not utilized, $1.7 million of the state net operating loss can be carried forward indefinitely and $5.6 million will expire between 2036-2043.

At December 31, 2023, the Company determined that a valuation allowance related to land and other non-amortizable intangibles in the amount of $1.0 million was required, as it is not more-likely than not that these deferred tax assets would be realized.

In August 2022, the U.S. President signed into law the Inflation Reduction Act of 2022 (the "IRA"), which revised U.S. tax law by, among other things, including a new corporate alternative minimum tax (the "CAMT") of 15% on certain large corporations, imposing a 1% excise tax on stock buybacks, and providing incentives to address climate change, including the introduction of advanced manufacturing production tax credits. The provisions of the IRA are generally effective for tax years beginning after 2022. Given the complexities of the IRA, including recently issued guidance from the Internal Revenue Service and regulations from the U.S.



Case 3:24-cv-00334 Document 86-13 Filed 02/18/25 Page 25 of 78 PageID #: 2340

Treasury Department, we will continue to monitor these developments and evaluate the potential future impact to our results of operations.

As of December 31, 2023 and 2022, the Company has recorded $1.0 million of gross unrecognized tax benefits inclusive of interest and penalties, all of which, if recognized, would favorably impact the effective tax rate. We do not expect a significant change in our uncertain tax benefits in the next twelve months. The Company recognizes penalties and interest related to uncertain tax positions within the provision (benefit) for income taxes line in the accompanying consolidated statements of operations.

We are generally subject to tax examinations by U.S. federal and state tax authorities for years beginning after 2019 and 2018, respectively.

## 18. Payable Pursuant to the Tax Receivable Agreement

The Company had a TRA with the Founder, a “related party,” and a former equity owner of Shoals Investment CTB (the “TRA Owners”) that provided for the payment by the Company to the TRA Owners (or their permitted assignees) of 85% of the amount of the benefits, if any, that the Company actually realized or was deemed to realize as a result of (i) the Company’s allocable share of existing tax basis acquired in connection with the Organizational Transactions (including Blocker’s share of existing tax basis) and increases to such allocable share of existing tax basis, (ii) certain increases in the tax basis of assets of Shoals Parent LLC and its subsidiaries resulting from purchases or exchanges of LLC Interests, and (iii) certain other tax benefits related to the Company entering into the TRA, including those attributable to payments made under the TRA. These contractual payment obligations were obligations of the Company and not of Shoals Parent LLC. The Company’s payable pursuant to the TRA was determined on an undiscounted basis in accordance with ASC 450, *Contingencies*, since the contractual payment obligations were deemed to be probable and reasonably estimable. For purposes of the TRA, the benefit deemed realized by the Company was computed by comparing the actual income tax liability of the Company (calculated with certain assumptions) to the amount of such taxes that the Company would have been required to pay had there been no increase to the tax basis of the assets of Shoals Parent LLC as a result of the purchases or exchanges, and had the Company not entered into the TRA.

When estimating the expected tax rate to use in order to determine the tax benefit expected to be recognized from the Company’s increased tax basis as a result of exchanges of LLC Interests by the TRA Owners, the Company continuously monitored changes in its overall tax posture, including changes resulting from new legislation and changes as a result of new jurisdictions in which the Company was subject to tax.

On November 29, 2022, the Company entered into an amendment to the TRA (the “TRA Amendment”), dated as of January 29, 2021, pursuant to which the parties thereto agreed to grant the Company a right to terminate the TRA until December 31, 2022 (the “TRA Termination Right”) in exchange for a termination consideration of $58.0 million, payable in cash. The Company reassessed the liability related to the payable pursuant to the TRA at the TRA Amendment date and concluded it was probable that the expected payments related to the payable pursuant to the TRA had changed. As a result of this change, the Company remeasured the payable pursuant to the TRA to $58.0 million on the TRA Amendment date, resulting in a gain on the termination of the TRA of $110.9 million. As part of the evaluation to determine if the gain should be recognized as income in the consolidated statement of operations or a stockholder contribution the Company concluded the termination of the TRA was negotiated in an arm’s length transaction with the majority owner of the TRA, a third party, and both the third party and the related party received the same value based upon ownership percentage, and therefore, the gain should be recorded in the consolidated statement of operations. The Company exercised its TRA Termination Right, and the TRA was terminated on December 6, 2022.

The following table reflects the changes to the Company's payable pursuant to the TRA (in thousands):

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2023 | 2022 | 2021 |
| Beginning balance | $ — | $ 156,374 | $ — |
| Additions to TRA: | | | |
| Exchange of LLC Interests for Class A common stock | — | 7,761 | 140,293 |
| Merger of Shoals investment CTB | — | — | 14,418 |
| Adjustment for change in estimated effective income tax rate | — | 6,675 | 1,663 |
| Adjustment related to TRA termination | — | (112,810) | — |
| Early termination payment of TRA | — | (58,000) | — |
| Payable pursuant to TRA | $ — | $ — | $ 156,374 |

## 19. Revenue Recognition

*Disaggregation of revenue*

Based on Topic 606 provisions, the Company disaggregates its revenue from contracts with customers based on product type. Revenue by product type is disaggregated between system solutions and components. System solutions are contracts under which the Company provides multiple products typically in connection with the design and specification of an entire EBOS system. Components represents sales of individual components.

The following table presents the Company's revenue disaggregated by product type (in thousands):

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2023 | 2022 | 2021 |
| System solutions | $ 398,384 | $ 254,415 | $ 155,818 |
| Components | 90,555 | 72,525 | 57,394 |
| Total revenue | $ 488,939 | $ 326,940 | $ 213,212 |

*Contract Balances*

The timing of revenue recognition, billings and cash collections results in billed accounts receivable, unbilled receivables, retainage, and deferred revenue on the consolidated balance sheets, recorded on a contract-by-contract basis at the end of each reporting period.

The Company's contract balances consist of the following (in thousands):

| | Location on the Consolidated Balance Sheets | December 31, 2023 | December 31, 2022 |
|---|---|---|---|
| Billed accounts receivable | Accounts receivable, net | $ 102,232 | $ 48,571 |
| Retainage | Accounts receivable, net | $ 4,886 | $ 2,004 |
| Unbilled receivables | Unbilled receivables | $ 40,136 | $ 16,713 |
| Deferred revenue | Deferred revenue | $ 22,228 | $ 23,259 |



Case 3:24-cv-00334 Document 86-13 Filed 02/18/25 Page 27 of 78 PageID #: 2342

The majority of the Company's contract amounts are billed as work progresses in accordance with agreed-upon contractual terms, which generally coincide with the shipment of one or more phases of the project. Billing sometimes occurs subsequent to revenue recognition, resulting in unbilled receivables. The changes in unbilled receivables relate to fluctuations in the timing of billings for the Company's revenue recognized over-time. As of December 31, 2021, billed accounts receivable and unbilled receivables were $26.7 million and $13.5 million, respectively.

Certain contracts contain retainage provisions. Retainage represents a contract asset for the portion of the contract price earned by the Company for work performed but held for payment by the customer as a form of security until the Company obtains specified milestones. The Company typically bills retainage amounts as work is performed. Retainage provisions are not considered a significant financing component because they are intended to protect the customer in the event that some or all of the obligations under the contract are not completed. The changes in retainage relate to fluctuations in the timing of retainage billings and achievement of specified milestones. As of December 31, 2021, retainage was $4.8 million.

The Company also receives deferred revenue in the form of customer deposits. The customer deposits are short term as the related performance obligations are typically fulfilled within 12 months. The changes in deferred revenue relate to fluctuations in the timing of customer deposits and completion of performance obligations. During the year ended December 31, 2023, $22.1 million, or 95% of deferred revenue recorded as of December 31, 2022, was recognized in revenue. During the year ended December 31, 2022, $1.8 million, or 100% of deferred revenue recorded as of December 31, 2021, was recognized in revenue.

## 20. Related Party Transactions

Our Founder was a party to the TRA and received approximately 45% of the TRA Termination Consideration. See Note 18 - Payable Pursuant to the Tax Receivable Agreement.

As part of the LLC Agreement we were required to pay tax distributions to the non-controlling interest holders, some of which were considered related parties at the time of distribution. See Note 14 - Non-Controlling Interests.

## 21. Subsequent Events

*Prepayment of Term Loan Facility*

On January 19, 2024, the Company used proceeds from the Revolving Credit Facility to make a $100.0 million voluntary prepayment of outstanding borrowings under the Term Loan Facility.

*Execution of Operating Lease Agreement*

On February 7, 2024 the Company entered into a lease agreement. The commencement date of the lease is February 7, 2024 and the rent commencement date is the earlier of (i) the date upon which a certificate of occupancy is issued to the tenant, or (ii) August 1, 2024. Under the terms of the lease agreement, the lease term is 140 months from the rent commencement date, with the right to extend the lease term for up to 3 periods of 5 years each. Annualized rent during the first 12 months following the rent commencement date is $4.9 million, with annual escalators throughout the remaining lease term.



Case 3:24-cv-00334 Document 86-13 Filed 02/18/25 Page 28 of 78 PageID #: 2343

**SHOALS TECHNOLOGIES GROUP, INC.**
**2021 LONG-TERM INCENTIVE PLAN**

**RESTRICTED STOCK UNIT GRANT NOTICE**

Pursuant to the terms and conditions of the Shoals Technologies Group, Inc. 2021 Long-Term Incentive Plan, as amended from time to time (the "**Plan**"), Shoals Technologies Group, Inc., a Delaware corporation (the "**Company**"), hereby grants to the individual listed below ("**you**" or the "**Participant**") the number of restricted stock units (the "**RSUs**") set forth below. This award of RSUs (this "**Award**") is subject to the terms and conditions set forth herein, in the Restricted Stock Unit Agreement attached hereto as Exhibit A (the "**Agreement**") and in the Plan, each of which is incorporated herein by reference. Capitalized terms used but not defined herein shall have the meanings set forth in the Plan.

| | |
|---|---|
| **Type of Award:** | Restricted Stock Units |
| **Participant:** | [●] |
| **Date of Grant:** | [●] |
| **Vesting Commencement Date:** | [●] |
| **Total Number of Restricted Stock Units:** | [●] |
| **Vesting Schedule:** | Subject to Sections 3 and 6 of the Agreement, the Plan and the other terms and conditions set forth herein, the RSUs shall vest according to the following schedule, subject to your continued employment or service with the Company or an Affiliate from the Date of Grant through each such vesting date (each, a "Vesting Date"):<br>Vesting Date<br>Percentage of RSUs That Vest<br><br>First Anniversary of the Vesting Commencement Date<br>33.33%<br><br>Second Anniversary of the Vesting Commencement Date<br>33.33%<br><br>Third Anniversary of the Vesting Commencement Date<br>33.34% |

By your signature below, you agree to be bound by the terms and conditions of the Plan, the Agreement and this Restricted Stock Unit Grant Notice (this "**Grant Notice**"). You acknowledge that you have reviewed the Agreement, the Plan and this Grant Notice in their entirety and fully understand all provisions of the Agreement, the Plan and this Grant Notice. You hereby agree to accept as binding, conclusive and final all decisions or interpretations of the Committee regarding any questions or determinations arising under the Agreement, the Plan or this Grant Notice. This Grant Notice may be executed in one or more counterparts (including portable document format (.pdf) and facsimile counterparts), each of which shall be deemed to be an original, but all of which together shall constitute one and the same agreement.

Notwithstanding any provision in this Grant Notice or the Agreement to the contrary, if you fail to execute and deliver this Grant Notice to the Company within ninety (90) days following the Date of Grant set forth above, then this Award will terminate automatically without any further action by the Company, and this Grant Notice and the Agreement will be null and void. This Grant Notice can be executed by you and delivered to the Company, subject to the exclusive discretion of the Company, by either (i) executing this Grant Notice manually and delivering the executed original, postmarked within ninety (90) days following the Date of Grant, to 1400 Shoals Way, Portland, TN 37148, Attn: Total Reward, (ii) sending an electronic copy of the executed Grant Notice to human.resources@shoals.com, or (iii) through the online grant agreement procedure with the Company's designated broker-dealer.

***[Signature Page Follows]***



---

**IN WITNESS WHEREOF**, the Company has caused this Grant Notice to be executed by an officer thereunto duly authorized, and the Participant has executed this Grant Notice, effective for all purposes as provided above.

**SHOALS TECHNOLOGIES GROUP, INC.**

By:________________________________
Name: [●]
Title: [●]

___________
Date

**PARTICIPANT**

________________________________

Name: [●]

___________
Date

Signature Page to
Restricted Stock Unit Grant Notice

**EXHIBIT A**

**RESTRICTED STOCK UNIT AGREEMENT**

This Restricted Stock Unit Agreement (together with the Grant Notice to which this Agreement is attached, this "**Agreement**") is made as of the Date of Grant set forth in the Grant Notice to which this Agreement is attached by and between Shoals Technologies Group, Inc., a Delaware corporation (the "**Company**"), and [●] (the "**Participant**"). Capitalized terms used but not specifically defined herein shall have the meanings specified in the Plan or the Grant Notice.

**1.** **Award**. In consideration of the Participant's past and/or continued employment with, or service to, the Company or an Affiliate and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, effective as of the Date of Grant set forth in the Grant Notice (the "**Date of Grant**"), the Company hereby grants to the Participant the number of RSUs set forth in the Grant Notice on the terms and conditions set forth in the Grant Notice, this Agreement and the Plan, which is incorporated herein by reference as a part of this Agreement. In the event of any inconsistency between the Plan and this Agreement, the terms of the Plan shall control. To the extent vested, each RSU represents the right to receive one Share, subject to the terms and conditions set forth in the Grant Notice, this Agreement and the Plan. Unless and until the RSUs have become vested in the manner set forth in the Grant Notice, the Participant will have no right to receive any Shares or other payments in respect of the RSUs. Prior to settlement of this Award, the RSUs and this Award represent an unsecured obligation of the Company, payable only from the general assets of the Company.

**2.** **Vesting of RSUs**. Except as otherwise set forth in Sections 3 or 6 hereof, the RSUs shall vest in accordance with the vesting schedule set forth in the Grant Notice. Unless and until the RSUs have vested in accordance with such vesting schedule, the Participant will have no right to receive any dividends or other distribution with respect to the RSUs.

**3.** **Termination and Forfeiture of RSUs**.

(a) Upon the Participant's Termination of Service, any RSUs that remain unvested as of such date of Termination of Service (and all rights arising from such RSUs and from being a holder thereof) will automatically and immediately terminate as of such date without any further action by the Company and will be forfeited without further notice and at no cost to the Company.

(b) Notwithstanding the foregoing,

(i) upon the Participant's Termination of Service by the Company or an Affiliate without Cause, the portion of the RSUs which would have vested on the first Vesting Date to occur following such Termination of Service shall immediately vest as of the date of such Termination of Service and be settled pursuant to Section 5 hereof, and any and all then-unvested RSUs (and all rights arising from such RSUs and from being a holder thereof) will terminate automatically without any further action by the Company and will be forfeited without further notice and at no cost to the Company;

(ii) upon the Participant's Termination of Service due to death or Disability, any RSUs that remain unvested as of such date of Termination of Service shall immediately vest as of such date and be settled pursuant to Section 5 hereof;

(iii) upon the Participant's Termination of Service due to Retirement (as defined below), a prorated portion of the RSUs which would have vested on the first Vesting Date to occur following such Termination of Service (such Vesting Date, the "Applicable Vesting Date") shall immediately vest as of the date of such Termination of Service and be settled pursuant to Section 5 hereof, with such portion determined by multiplying the number of RSUs which would have vested on the Applicable Vesting Date by a fraction, (A) the numerator of which equals the number of calendar days that the Participant was employed by the Company or an Affiliate during the period commencing as of the most recent Vesting Date to occur prior to such Termination of Service (or, if no Vesting Date has occurred prior to such Termination of Service, commencing as of the Vesting Commencement Date) and ending on the Applicable Vesting Date (the "Applicable Vesting Period"), and (B) the denominator of which equals the total number of calendar days in the Applicable Vesting Period, and any and all then-unvested RSUs (and all rights arising from such RSUs and from being a holder thereof) will terminate automatically without any further action by the Company and will be forfeited without further notice and at no cost to the Company. For purposes of this Agreement, "Retirement" shall mean a Termination of Service due to the Participant's resignation so long as, at the time of such Termination of Service, (x) the Participant has attained age 62 and five (5) years of service with the Company or an Affiliate and (y) no event has occurred that would be grounds for the Participant's Termination of Service by the Company or an Affiliate for Cause; or

(iv) upon the occurrence of a Change in Control,

(A) to the extent the RSUs are not continued, assumed or substituted by the surviving entity in connection with such Change in Control, any RSUs that remain unvested as of the date of consummation of such Change in Control shall immediately vest as of such date and be settled pursuant to Section 5 hereof; or

(B) to the extent the RSUs are continued, assumed or substituted by the surviving entity in connection with such Change in Control, in the event that the Participant incurs a Termination of Service (x) by the Company or an Affiliate without Cause or (y) by the Participant for Good Reason (as defined below), in each case, within the twenty-four (24) month period following the date of consummation of such Change in Control, any RSUs that remain unvested as of such date of Termination of Service shall immediately vest as of such date and be settled pursuant to Section 5 hereof. For purposes of this Agreement, "Good Reason" shall mean, (A) in the case where there is an employment agreement, consulting agreement, change in control agreement or similar agreement in effect between the Company or an Affiliate and the Participant as of the Date of Grant that defines "Good Reason" (or words of like import), "Good Reason" as defined under such agreement, or (B) in the case where there is no employment agreement, consulting agreement, change in control agreement or similar agreement in effect between the Company or an Affiliate and the Participant as of the Date of Grant (or where there is such an agreement but it does not define "Good Reason" (or words of like import)), "Good Reason" shall mean (i) a material diminution in the Participant's base salary or authority, duties and responsibilities with the Company or any of its Affiliates; provided, however, that if the Participant is serving as an officer or member of the board of directors (or similar governing body) of the Company or any of its Affiliates or any other entity in which the Company or any of its Affiliates holds an equity interest, in no event shall the removal of the Participant as an officer or board member, regardless of the reason for such removal, constitute Good Reason; or (ii) the relocation of the geographic location of the Participant's principal place of employment by more than fifty (50) miles from the location of the Participant's principal place of employment as of the Date of Grant. Notwithstanding the foregoing, any assertion by the Participant of a termination for Good Reason shall not be effective unless all of the following conditions are satisfied: (1) the condition described in (i) or (ii) of the foregoing sentence giving rise to the Participant's termination of employment must have arisen without the Participant's

consent; (2) the Participant must provide written notice to the Board of the existence of such condition(s) within thirty (30) days after the initial occurrence of such condition(s); (3) the condition(s) specified in such notice must remain uncorrected for thirty (30) days following the Board's receipt of such written notice; and (4) the date of the Participant's termination of employment must occur within sixty (60) days after the initial occurrence of the condition(s) specified in such notice. Further and notwithstanding the foregoing, no suspension of the Participant or a reduction in the Participant's authority, duties and responsibilities in conjunction with any leave required, or other action taken, by the Company as part of any investigation into alleged wrongdoing by the Participant shall give rise to Good Reason.

**4.** **Dividend Equivalents**. In the event that the Company declares and pays a dividend in respect of its outstanding Shares and, on the record date for such dividend, the Participant holds RSUs granted pursuant to this Agreement that have yet not been settled pursuant to Section 5 hereof, the Company shall record the amount of such dividend in a bookkeeping account and pay to the Participant an amount in cash equal to the cash dividends the Participant would have received if the Participant was the holder of record, as of such record date, of a number of Shares equal to the number of RSUs held by the Participant that have not yet been settled pursuant to Section 5 as of such record date, with such payment to be made on the date on which such RSUs are settled in accordance with Section 5 (the "**Dividend Equivalents**"). For purposes of clarity, if the RSUs (or any portion thereof) are forfeited by the Participant pursuant to the terms of this Agreement, then the Participant shall also forfeit the Dividend Equivalents, if any, accrued with respect to such forfeited RSUs. No interest will accrue on the Dividend Equivalents between the declaration and payment of the applicable dividends and the settlement of the Dividend Equivalents.

**5.** **Settlement of RSUs**. As soon as administratively practicable following the vesting of any portion of the RSUs pursuant to Sections 2 or 3 hereof, but in no event later than thirty (30) days after the applicable vesting date, the Company shall deliver to the Participant a number of Shares equal to the number of such vested RSUs. All Shares issued hereunder shall be delivered either by delivering one or more certificates for such Shares to the Participant or by entering such Shares in book-entry form, as determined by the Committee in its sole discretion. The value of Shares shall not bear any interest owing to the passage of time. Neither this Section 5 nor any action taken pursuant to or in accordance with this Agreement shall be construed to create a trust or a funded or secured obligation of any kind.

**6.** **Restrictive Covenants**. Notwithstanding any provision in this Agreement or the Plan to the contrary, in the event the Committee determines that Participant has failed to abide by any of the restrictive covenants set forth on Appendix I attached hereto or contained in any other agreement by and between the Company or any Affiliate and Participant (collectively, the "**Restrictive Covenants**"), which Restrictive Covenants are hereby incorporated by reference as if fully set forth herein, then all RSUs that have not been settled pursuant to Section 5 hereof as of the date of such determination (and all rights arising from such RSUs and from being a holder thereof) will terminate automatically without any further action by the Company and will be forfeited without further notice and at no cost to the Company.

**7.** **Tax Withholding**. To the extent that the receipt, vesting or settlement of this Award results in compensation income or wages to the Participant for federal, state, local and/or foreign tax purposes, the Participant shall make arrangements satisfactory to the Company regarding the payment of, any income tax, social insurance contribution or other applicable taxes that are required to be withheld in respect of this Award, which arrangements include the delivery of cash or cash equivalents, Shares (including previously owned Shares (which is not subject to any pledge or other security interest), net settlement, a broker-assisted sale, or other cashless withholding or reduction of the amount of shares otherwise issuable or delivered

pursuant to this Award), other property, or any other legal consideration the Committee deems appropriate. If such tax obligations are satisfied through net settlement or the surrender of previously owned Shares, the maximum number of Shares that may be so withheld (or surrendered) shall be the number of Shares that have an aggregate Fair Market Value on the date of withholding or surrender equal to the aggregate amount of such tax liabilities determined based on the greatest withholding rates for federal, state, local and/or foreign tax purposes, including payroll taxes, that may be utilized without creating adverse accounting treatment for the Company with respect to this Award, as determined by the Committee. Any fraction of a Share required to satisfy such tax obligations shall be disregarded and the amount due shall be paid instead in cash to the Participant. The Participant acknowledges that there may be adverse tax consequences upon the receipt, vesting or settlement of this Award or disposition of the underlying shares and that the Participant has been advised, and hereby is advised, to consult a tax advisor. The Participant represents that the Participant is in no manner relying on the Board, the Committee, the Company or an Affiliate or any of their respective managers, directors, officers, employees or authorized representatives (including attorneys, accountants, consultants, bankers, lenders, prospective lenders and financial representatives) for tax advice or an assessment of such tax consequences.

**8.** **Employment Relationship**. For purposes of this Agreement, Participant shall be considered to be employed by the Company or an Affiliate as long as Participant remains an employee of any of the Company, an Affiliate or a corporation or other entity (or a parent or subsidiary of such corporation or other entity) assuming or substituting a new award for this Award.

**9.** **Non-Transferability**. During the lifetime of the Participant, the RSUs may not be sold, pledged, assigned or transferred in any manner other than by will or the laws of descent and distribution, unless and until the Shares underlying the RSUs have been issued, and all restrictions applicable to such shares have lapsed. Neither the RSUs nor any interest or right therein shall be liable for the debts, contracts or engagements of the Participant or his or her successors in interest or shall be subject to disposition by transfer, alienation, anticipation, pledge, encumbrance, assignment or any other means, whether such disposition be voluntary or involuntary or by operation of law by judgment, levy, attachment, garnishment or any other legal or equitable proceedings (including bankruptcy), and any attempted disposition thereof shall be null and void and of no effect, except to the extent that such disposition is permitted by the preceding sentence.

**10.** **Compliance with Applicable Law**. Notwithstanding any provision of this Agreement to the contrary, the issuance of Shares hereunder will be subject to compliance with all applicable requirements of Applicable Law with respect to such securities and with the requirements of any stock exchange or market system upon which the Shares may then be listed. No Shares will be issued hereunder if such issuance would constitute a violation of any Applicable Law or regulation or the requirements of any stock exchange or market system upon which the Shares may then be listed. In addition, Shares will not be issued hereunder unless (a) a registration statement under the Securities Act is in effect at the time of such issuance with respect to the shares to be issued or (b) in the opinion of legal counsel to the Company, the shares to be issued are permitted to be issued in accordance with the terms of an applicable exemption from the registration requirements of the Securities Act. The inability of the Company to obtain from any regulatory body having jurisdiction the authority, if any, deemed by the Company's legal counsel to be necessary for the lawful issuance and sale of any Shares hereunder will relieve the Company of any liability in respect of the failure to issue such shares as to which such requisite authority has not been obtained. As a condition to any issuance of Shares hereunder, the Company may require the Participant to satisfy any requirements that may be necessary or appropriate to evidence compliance with any Applicable Law or regulation and

to make any representation or warranty with respect to such compliance as may be requested by the Company.

**11.** **Rights as a Stockholder**. The Participant shall have no rights as a stockholder of the Company with respect to any Shares that may become deliverable hereunder unless and until the Participant has become the holder of record of such Shares, and no adjustments shall be made for dividends in cash or other property, distributions or other rights in respect of any such Shares, except as otherwise specifically provided for in the Plan or this Agreement.

**12.** **Execution of Receipts and Releases**. Any issuance or transfer of Shares or other property to the Participant or the Participant's legal representative, heir, legatee or distributee, in accordance with this Agreement shall be in full satisfaction of all claims of such Person hereunder. As a condition precedent to such payment or issuance, the Company may require the Participant or the Participant's legal representative, heir, legatee or distributee to execute (and not revoke within any time provided to do so) a release and receipt therefor in such form as it shall determine appropriate; provided, however, that any review period under such release will not modify the date of settlement with respect to vested RSUs.

**13.** **No Right to Continued Employment, Service or Awards**. Nothing in the adoption of the Plan, nor the award of the RSUs thereunder pursuant to the Grant Notice and this Agreement, shall confer upon the Participant the right to continued employment by, or a continued service relationship with, the Company or any Affiliate, or any other entity, or affect in any way the right of the Company or any such Affiliate, or any other entity to terminate such employment or other service relationship at any time. Unless otherwise provided in a written employment agreement or by Applicable Law, Participant's employment by the Company, or any such Affiliate, or any other entity shall be on an at-will basis, and the employment relationship may be terminated at any time by either Participant or the Company, or any such Affiliate, or other entity for any reason whatsoever, with or without cause or notice. Any question as to whether and when there has been a termination of such employment, and the cause of such termination, shall be determined by the Committee or its delegate, and such determination shall be final, conclusive and binding for all purposes. The grant of the RSUs is a one-time benefit that was made at the sole discretion of the Company and does not create any contractual or other right to receive a grant of restricted stock units or other Awards or any payment or benefits in the future, including any adjustment to wages, overtime, benefits or other compensation. Any future Awards will be granted at the sole discretion of the Company.

**14.** **Notices**. All notices and other communications under this Agreement shall be in writing and shall be delivered to the parties at the following addresses (or at such other address for a party as shall be specified by like notice):

If to the Company, unless otherwise designated by the Company in a written notice to the Participant (or other holder):

Shoals Technologies Group, Inc.
Attn: Chief Legal Officer
1400 Shoals Way
Portland, Tennessee 37148

If to the Participant, at the Participant's last known address on file with the Company.

Any notice that is delivered personally or by overnight courier or telecopier in the manner provided herein shall be deemed to have been duly given to the Participant when it is mailed by the Company or, if such notice is not mailed to the Participant, upon receipt by the Participant.

Any notice that is addressed and mailed in the manner herein provided shall be conclusively presumed to have been given to the party to whom it is addressed at the close of business, local time of the recipient, on the fourth day after the day it is so placed in the mail.

**15.** **Consent to Electronic Delivery; Electronic Signature**. In lieu of receiving documents in paper format, the Participant agrees, to the fullest extent permitted by law, to accept electronic delivery of any documents that the Company may be required to deliver (including, but not limited to, prospectuses, prospectus supplements, grant or award notifications and agreements, account statements, annual and quarterly reports and all other forms of communications) in connection with this and any other Award made or offered by the Company. Electronic delivery may be via a Company electronic mail system or by reference to a location on a Company intranet to which the Participant has access. The Participant hereby consents to any and all procedures the Company has established or may establish for an electronic signature system for delivery and acceptance of any such documents that the Company may be required to deliver, and agrees that his or her electronic signature is the same as, and shall have the same force and effect as, his or her manual signature.

**16.** **Agreement to Furnish Information**. The Participant agrees to furnish to the Company all information requested by the Company to enable it to comply with any reporting or other requirement imposed upon the Company by or under any applicable statute or regulation.

**17.** **Entire Agreement; Amendment**. This Agreement constitutes the entire agreement of the parties with regard to the subject matter hereof, and contains all the covenants, promises, representations, warranties and agreements between the parties with respect to the RSUs granted hereby; provided¸ however, that the terms of this Agreement shall not modify and shall be subject to the terms and conditions of any employment, consulting and/or severance agreement between the Company (or an Affiliate or other entity) and the Participant in effect as of the date a determination is to be made under this Agreement. Without limiting the scope of the preceding sentence, except as provided therein, all prior understandings and agreements, if any, among the parties hereto relating to the subject matter hereof are hereby null and void and of no further force and effect. The Committee may, in its sole discretion, amend this Agreement from time to time in any manner that is not inconsistent with the Plan; provided, however, that except as otherwise provided in the Plan or this Agreement, any such amendment that materially and adversely reduces the rights of the Participant shall be effective only if it is in writing and signed by both the Participant and an authorized officer of the Company.

**18.** **Severability and Waiver**. If a court of competent jurisdiction determines that any provision of this Agreement is invalid or unenforceable, then the invalidity or unenforceability of such provision shall not affect the validity or enforceability of any other provision of this Agreement, and all other provisions shall remain in full force and effect. Waiver by any party of any breach of this Agreement or failure to exercise any right hereunder shall not be deemed to be a waiver of any other breach or right. The failure of any party to take action by reason of such breach or to exercise any such right shall not deprive the party of the right to take action at any time while or after such breach or condition giving rise to such rights continues.

**19.** **Clawback**. The Participant's rights with respect to this Award shall in all events be subject to (a) all rights that the Company may have under any Company clawback policy or any other agreement or arrangement with the Participant, and (b) all rights and obligations that the Company may have regarding the clawback of "incentive-based compensation" under Section 10D of the Exchange Act and any applicable rules and regulations promulgated thereunder from time to time by the U.S. Securities and Exchange Commission, the listing standards of any national securities exchange or association on which the Company's securities

are listed, or any other Applicable Law, including, without limitation, the Shoals Technologies Group, Inc. Clawback and Recoupment Policy.

**20.** **Governing Law**. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED THEREIN, EXCLUSIVE OF THE CONFLICT OF LAWS PROVISIONS OF DELAWARE LAW.

**21.** **Successors and Assigns**. The Company may assign any of its rights under this Agreement without the Participant's consent. This Agreement will be binding upon and inure to the benefit of the successors and assigns of the Company. Subject to the restrictions on transfer set forth herein and in the Plan, this Agreement will be binding upon the Participant and the Participant's beneficiaries, executors, administrators and the Person(s) to whom the RSUs may be transferred by will or the laws of descent or distribution.

**22.** **Headings; References; Interpretation**. Headings are for convenience only and are not deemed to be part of this Agreement. The words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement. All references herein to Sections shall, unless the context requires a different construction, be deemed to be references to the Sections of this Agreement. The word "or" as used herein is not exclusive and is deemed to have the meaning "and/or." All references to "including" shall be construed as meaning "including without limitation." Unless the context requires otherwise, all references herein to a law, agreement, instrument or other document shall be deemed to refer to such law, agreement, instrument or other document as amended, supplemented, modified and restated from time to time to the extent permitted by the provisions thereof. All references to "dollars" or "$" in this Agreement refer to United States dollars. Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa. Neither this Agreement nor any uncertainty or ambiguity herein shall be construed or resolved against any party hereto, whether under any rule of construction or otherwise. On the contrary, this Agreement has been reviewed by each of the parties hereto and shall be construed and interpreted according to the ordinary meaning of the words used so as to fairly accomplish the purposes and intentions of the parties hereto.

**23.** **Counterparts**. The Grant Notice may be executed in one or more counterparts, each of which shall be deemed an original and all of which together shall constitute one instrument. Delivery of an executed counterpart of the Grant Notice by facsimile or portable document format (.pdf) attachment to electronic mail shall be effective as delivery of a manually executed counterpart of the Grant Notice.

**24.** **Section 409A**. Notwithstanding anything herein or in the Plan to the contrary, the RSUs granted pursuant to this Agreement are intended to be exempt from the applicable requirements of Section 409A of the Code and shall be limited, construed and interpreted in accordance with such intent. Nevertheless, to the extent that the Committee determines that the RSUs may not be exempt from Section 409A of the Code, then, if the Participant is deemed to be a "specified employee" within the meaning of Section 409A of the Code, as determined by the Committee, at a time when the Participant becomes eligible for settlement of the RSUs upon his "separation from service" within the meaning of Section 409A of the Code, then to the extent necessary to prevent any accelerated or additional tax under Section 409A of the Code, such settlement will be delayed until the earlier of: (a) the date that is six months following the Participant's separation from service and (b) the Participant's death. Notwithstanding the foregoing, the Company and its Affiliates make no representations that the RSUs provided under

this Agreement are exempt from or compliant with Section 409A of the Code and in no event shall the Company or any Affiliate be liable for all or any portion of any taxes, penalties, interest or other expenses that may be incurred by the Participant on account of non-compliance with Section 409A of the Code.

[*Remainder of Page Intentionally Blank*]

## APPENDIX I

### RESTRICTIVE COVENANTS

**1. Confidentiality**. In the course of Participant's employment or service with the Company, Participant will be provided with, and will have access to, Confidential Information (as defined below). In consideration of Participant's receipt and access to such Confidential Information, Participant shall comply with this Section 1.

(a) Both during Participant's employment or service with any member of the Company Group (as defined below) and thereafter, except as expressly permitted by this Agreement, Participant shall not disclose any Confidential Information to any person or entity and shall not use any Confidential Information except for the benefit of the Company Group. Participant acknowledges and agrees that Participant would inevitably use and disclose Confidential Information in violation of this Section 1 if Participant were to violate any of the covenants set forth in Section 2 of this Appendix I. Participant shall follow all Company Group policies and protocols regarding the security of all documents and other materials containing Confidential Information (regardless of the medium on which Confidential Information is stored). Except to the extent required for the performance of Participant's duties on behalf of the Company Group, Participant shall not remove from facilities of any member of the Company Group any information, property, equipment, drawings, notes, reports, manuals, invention records, computer software, customer information, or other data or materials that relate in any way to the Confidential Information, whether paper or electronic and whether produced by Participant or obtained by the Company Group. The covenants of this Section 1(a) shall apply to all Confidential Information, whether now known or later to become known to Participant during the period that Participant is employed by or affiliated with the Company or any other member of the Company Group. For purposes of this Appendix I, "**Company Group**" shall mean, collectively, the Company and its direct and indirect subsidiaries as may exist from time to time.

(b) Notwithstanding any provision of Section 1(a) of this Appendix I to the contrary, Participant may make the following disclosures and uses of Confidential Information:

(i) disclosures to other employees, officers or directors of a member of the Company Group who have a need to know the information in connection with the businesses of the Company Group;

(ii) disclosures to customers and suppliers when, in the reasonable and good faith belief of Participant, such disclosure is in connection with Participant's performance of Participant's duties under this Agreement and is in the best interests of the Company Group;

(iii) disclosures and uses that are approved in writing by the Board; or

(iv) disclosures to a person or entity that has (x) been retained by a member of the Company Group to provide services to one or more members of the Company Group and (y) agreed in writing to abide by the terms of a confidentiality agreement.

(c) Upon the Participant's Termination of Service, and at any other time upon request of the Company, Participant shall promptly and permanently surrender and deliver to the Company all documents (including electronically stored information) and all copies thereof and all other materials of any nature containing or pertaining to all Confidential Information and any other Company Group property (including any Company Group-issued computer, mobile device or other equipment) in Participant's possession, custody or control and Participant shall not retain any such documents or other materials or property of the Company Group. Within ten

(10) days of any such request, Participant shall certify to the Company in writing that all such documents, materials and property have been returned to the Company.

(d) "**Confidential Information**" means all confidential, competitively valuable, non-public or proprietary information that is conceived, made, developed or acquired by or disclosed to Participant (whether conveyed orally or in writing), individually or in conjunction with others, during the period that Participant is employed by or otherwise affiliated with the Company or any other member of the Company Group (whether during business hours or otherwise and whether on the Company's premises or otherwise) including: (i) technical information of any member of the Company Group, its affiliates, its investors, customers, vendors, suppliers or other third parties, including computer programs, software, databases, data, ideas, know-how, formulae, compositions, processes, discoveries, machines, inventions (whether patentable or not), designs, developmental or experimental work, techniques, improvements, work in process, research or test results, original works of authorship, training programs and procedures, diagrams, charts, business and product development plans, and similar items; (ii) information relating to any member of the Company Group's businesses or properties, products or services (including all such information relating to corporate opportunities, operations, future plans, methods of doing business, business plans, strategies for developing business and market share, research, financial and sales data, pricing terms, evaluations, opinions, interpretations, acquisition prospects, the identity of customers or acquisition targets or their requirements, the identity of key contacts within customers' organizations or within the organization of acquisition prospects, or marketing and merchandising techniques, prospective names and marks) or pursuant to which any member of the Company Group owes a confidentiality obligation; and (iii) other valuable, confidential information and trade secrets of any member of the Company Group, its affiliates, its customers or other third parties. Moreover, all documents, videotapes, written presentations, brochures, drawings, memoranda, notes, records, files, correspondence, manuals, models, specifications, computer programs, e-mail, voice mail, electronic databases, maps, drawings, architectural renditions, models and all other writings or materials of any type including or embodying any of such information, ideas, concepts, improvements, discoveries, inventions and other similar forms of expression are and shall be the sole and exclusive property of the Company or the other applicable member of the Company Group and be subject to the same restrictions on disclosure applicable to all Confidential Information pursuant to this Agreement. For purposes of this Agreement, Confidential Information shall not include any information that (A) is or becomes generally available to the public other than as a result of a disclosure or wrongful act of Participant or any of Participant's agents; (B) was available to Participant on a non-confidential basis before its disclosure by a member of the Company Group; (C) becomes available to Participant on a non-confidential basis from a source other than a member of the Company Group; *provided*, *however*, that such source is not bound by a confidentiality agreement with, or other obligation with respect to confidentiality to, a member of the Company Group; or (D) is required to be disclosed by Applicable Law.

(e) Notwithstanding the foregoing, nothing in this Agreement shall prohibit or restrict Participant from lawfully: (i) initiating communications directly with, cooperating with, providing information to, causing information to be provided to, or otherwise assisting in an investigation by, any governmental authority regarding a possible violation of any law; (ii) responding to any inquiry or legal process directed to Participant from any such governmental authority; (iii) testifying, participating or otherwise assisting in any action or proceeding by any such governmental authority relating to a possible violation of law; or (iv) making any other disclosures that are protected under the whistleblower provisions of any Applicable Law. Additionally, pursuant to the federal Defend Trade Secrets Act of 2016, an individual shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that: (A) is made (1) in confidence to a federal, state or local government official, either directly or indirectly, or to an attorney and (2) solely for the purpose of reporting or investigating a suspected violation of law; (B) is made to the individual's attorney in relation to a

lawsuit for retaliation against the individual for reporting a suspected violation of law; or (C) is made in a complaint or other document filed in a lawsuit or proceeding, if such filing is made under seal. Nothing in this Agreement requires Participant to obtain prior authorization before engaging in any conduct described in this paragraph, or to notify the Company that Participant has engaged in any such conduct.

**2. Non-Competition; Non-Solicitation**.

(a) The Company shall provide Participant access to Confidential Information for use only during the Participant's employment or service with any member of the Company Group, and Participant acknowledges and agrees that the Company Group will be entrusting Participant, in Participant's unique and special capacity, with developing the goodwill of the Company Group, and in consideration of the Company providing Participant with access to Confidential Information, clients and customers and as an express incentive for the Company to enter into this Agreement and employ Participant, Participant has voluntarily agreed to the covenants set forth in this Section 2. Participant agrees and acknowledges that the limitations and restrictions set forth herein, including geographical and temporal restrictions on certain competitive activities, are reasonable in all respects, do not interfere with public interests, will not cause Participant undue hardship, and are material and substantial parts of this Agreement intended and necessary to prevent unfair competition and to protect the Company Group's Confidential Information, goodwill and legitimate business interests.

(b) During the Prohibited Period (as defined below), Participant shall not, without the prior written approval of the Board, directly or indirectly, for Participant or on behalf of or in conjunction with any other person or entity of any nature:

(i) engage in or participate in (or prepare to engage in or participate in) the Business within the Market Area (each as defined below), which prohibition shall prevent Participant from directly or indirectly: (A) owning, investing in, controlling, managing, operating, participating in, lending Participant's name to, contributing to, providing assistance to or being an officer or director of, any person or entity engaged in or planning to engage in the Business in the Market Area, or (B) joining, becoming an employee or consultant of, or otherwise rendering services for or being affiliated with or engaged by, any person or entity engaged in, or planning to engage in, the Business in the Market Area in any capacity (with respect to this clause (B)) in which Participant's customer or client relationships, duties or responsibilities are the same as or similar to the customer or client relationships, duties or responsibilities that Participant had on behalf of any member of the Company Group;

(ii) appropriate or interfere with or attempt to appropriate or interfere with any Business Opportunity (as defined below) of, or relating to, any member of the Company Group located in the Market Area;

(iii) solicit, canvass, approach, encourage, entice or induce any customer, vendor or supplier of any member of the Company Group with whom Participant had contact (including oversight responsibility) or learned Confidential Information about during Participant's employment or service with any member of the Company Group to cease or lessen such customer's, vendor's or supplier's business with any member of the Company Group or otherwise adversely affect such relationship, or attempt to do any of the foregoing; or

(iv) solicit, canvass, approach, encourage, entice or induce any employee or contractor of any member of the Company Group to terminate his, her or its employment or engagement with any member of the Company Group, or hire or retain any such employee or contractor.

Notwithstanding the foregoing, nothing herein shall not limit Participant's ability to accept employment and perform work with any person or entity where (x) the services provided by Participant to such person or entity are not, and do not directly or indirectly benefit any division or business of such person or entity that is, in competition with the Business or any other material business in which a member of the Company Group has made a significant financial investment on or prior to the date of termination to be engaged in on or after such date and (y) Participant does not own more than 2% of the equity securities of such person or entity.

(c) Because of the difficulty of measuring economic losses to the Company Group as a result of a breach or threatened breach of the covenants set forth in Section 1 of this Appendix I and in this Section 2, and because of the immediate and irreparable damage that would be caused to the members of the Company Group for which they would have no other adequate remedy, the Company and each other member of the Company Group shall be entitled to enforce the foregoing covenants, in the event of a breach or threatened breach, by injunctions and restraining orders from any court of competent jurisdiction, without the necessity of showing any actual damages or that money damages would not afford an adequate remedy, and without the necessity of posting any bond or other security. The aforementioned equitable relief shall not be the Company's or any other member of the Company Group's exclusive remedy for a breach but instead shall be in addition to all other rights and remedies available to the Company and each other member of the Company Group at law and equity. Participant further agrees that Participant will not challenge the reasonableness or enforceability of any of the covenants set forth in this Section 2, and that Participant will reimburse the Company Group for all costs (including reasonable attorneys' fees) incurred in connection with any action to enforce any of the provisions of this Section 2 if Participant challenges the reasonableness or enforceability of any of the provisions of this Section 2.

(d) The covenants in this Section 2, and each provision and portion hereof, are severable and separate, and the unenforceability of any specific covenant (or portion thereof) shall not affect the provisions of any other covenant (or portion thereof). Moreover, in the event any arbitrator or court of competent jurisdiction shall determine that the scope, time or territorial restrictions set forth are unreasonable, then it is the intention of the parties that such restrictions be enforced to the fullest extent which such arbitrator or court deems reasonable, and this Agreement shall thereby be reformed.

(e) The following terms shall have the following meanings:

(i) "**Business**" shall mean the business and operations that are the same or similar to those performed by the Company and any other member of the Company Group for which Participant provides services or about which Participant obtains Confidential Information during the Participant's employment or service with any member of the Company Group, which business and operations include, but are not limited to, the design, manufacture, distribution, or sale of electrical wire harnesses, combiner boxes and junction boxes.

(ii) "**Business Opportunity**" shall mean any actual or potential commercial, investment or other business opportunity of any member of the Company Group or relating to the Business about which Participant learned Confidential Information during Participant's employment or service with any member of the Company Group.

(iii) "**Market Area**" shall mean (A) the United States and (B) the geographic area within a one hundred (100) mile radius of any location where, prior to the Participant's Termination of Service, any member of the Company Group conducts the Business or has plans to conduct the Business.

(iv) "**Prohibited Period**" shall mean the period during which Participant is employed by, or providing services to, any member of the Company Group and continuing for a period of twelve (12) months following the date that Participant is no longer employed by, or providing services to, any member of the Company Group.

(f) Participant undertakes and agrees that following the date that Participant is no longer employed by, or providing services to, any member of the Company Group and prior to entering into any relationship with any other party to serve as an officer, director, employee, consultant, partner, advisor, joint-venturer or in any other capacity with any other person or entity, Participant shall disclose to such other party the terms of the restrictive covenants set forth herein and hereby consents to the Company making any related disclosures.

**3. Ownership of Intellectual Property.**

(a) Participant agrees that the Company shall own, and Participant shall (and hereby does) assign, all right, title and interest relating to any and all inventions (whether or not patentable), discoveries, developments, improvements, innovations, works of authorship, mask works, designs, know-how, ideas, formulae, processes, techniques, data and information authored, created, contributed to, made or conceived or reduced to practice, in whole or in part, by Participant during the period in which Participant is or has been employed by or affiliated with the Company or any other member of the Company Group, whether or not registerable under U.S. law or the laws of other jurisdictions, that either (a) relate, at the time of conception, reduction to practice, creation, derivation or development, to any member of the Company Group's businesses or actual or anticipated research or development, or (b) were developed on any amount of the Company's or any other member of the Company Group's time or with the use of any member of the Company Group's equipment, supplies, facilities or Confidential Information (all of the foregoing collectively referred to herein as "**Company Intellectual Property**"), and Participant shall promptly disclose all Company Intellectual Property to the Company in writing. To support Participant's disclosure obligation herein, Participant shall keep and maintain adequate and current written records of all Company Intellectual Property made by Participant (solely or jointly with others) during the period in which Participant is or has been employed by or affiliated with the Company or any other member of the Company Group in such form as may be specified from time to time by the Company. These records shall be available to, and remain the sole property of, the Company at all times. For the elimination of doubt, the foregoing ownership and assignment provisions apply without limitation to patent rights, copyrights, trade secret rights, mask work rights, trademark rights, and all other intellectual and industrial property rights of any sort throughout the world.

(b) All of Participant's works of authorship and associated copyrights created during the period in which Participant is employed by or affiliated with the Company or any other member of the Company Group and in the scope of Participant's employment or engagement shall be deemed to be "works made for hire" within the meaning of the Copyright Act. To the extent any right, title and interest in and to Company Intellectual Property cannot be assigned by Participant to the Company, Participant shall grant, and does hereby grant, to the Company Group an exclusive, perpetual, royalty-free, transferable, irrevocable, worldwide license (with rights to sublicense through multiple tiers of sublicensees) to make, have made, use, sell, offer for sale, import, export, reproduce, practice and otherwise commercialize such rights, title and interest.

(c) Participant recognizes that this Agreement will not be deemed to require assignment of any invention or intellectual property that Participant developed entirely on Participant's own time without using the equipment, supplies, facilities, trade secrets, or Confidential Information of any member of the Company Group. In addition, this Agreement

does not apply to any invention that qualifies fully for protection from assignment to the Company under any specifically applicable state law or regulation.

(d) To the extent allowed by law, this Section 3 applies to all rights that may be known as or referred to as "moral rights," "artist's rights," "droit moral," or the like, including without limitation those rights set forth in 17 U.S.C. §106A (collectively, "**Moral Rights**"). To the extent Participant retain any Moral Rights under Applicable Law, Participant hereby ratifies and consents to any action that may be taken with respect to such Moral Rights by or authorized by the Company or any member of the Company Group, and Participant hereby waives and agrees not to assert any Moral Rights with respect to such Moral Rights. Participant shall confirm any such ratifications, consents, waivers, and agreements from time to time as requested by the Company.

(e) Participant shall perform, during and after the period in which Participant is or has been employed by or affiliated with the Company or any other member of the Company Group, all acts deemed necessary or desirable by the Company to permit and assist each member of the Company Group, at the Company's expense, in obtaining and enforcing the full benefits, enjoyment, rights and title throughout the world in the Company Intellectual Property and Confidential Information assigned, to be assigned, or licensed to the Company under this Agreement.. Such acts may include execution of documents and assistance or cooperation (i) in the filing, prosecution, registration, and memorialization of assignment of any applicable patents, copyrights, mask work, or other applications, (ii) in the enforcement of any applicable patents, copyrights, mask work, moral rights, trade secrets, or other proprietary rights, and (iii) in other legal proceedings related to the Company Intellectual Property or Confidential Information.

(f) In the event that the Company (or, as applicable, a member of the Company Group) is unable for any reason to secure Participant's signature to any document required to file, prosecute, register, or memorialize the assignment of any patent, copyright, mask work or other applications or to enforce any patent, copyright, mask work, moral right, trade secret or other proprietary right under any Confidential Information or Company Intellectual Property, Participant hereby irrevocably designates and appoints the Company and each of the Company's duly authorized officers and agents as Participant's agents and attorneys-in-fact to act for and on Participant's behalf and instead of Participant, (i) to execute, file, prosecute, register and memorialize the assignment of any such application, (ii) to execute and file any documentation required for such enforcement, and (iii) to do all other lawfully permitted acts to further the filing, prosecution, registration, memorialization of assignment, issuance, and enforcement of patents, copyrights, mask works, moral rights, trade secrets or other rights under the Confidential Information or Company Intellectual Property, all with the same legal force and effect as if executed by Participant. For the avoidance of doubt, the provisions of this Section 3(f) apply fully to all derivative works, improvements, renewals, extensions, continuations, divisionals, continuations in part, continuing patent applications, reissues, and reexaminations of all Company Intellectual Property.

(g) In the event that Participant enters into, on behalf of any member of the Company Group, any contracts or agreements relating to any Confidential Information or Company Intellectual Property, Participant shall assign such contracts or agreements to the Company (or the applicable member of the Company Group) promptly, and in any event, prior to Participant's Termination of Service. If the Company (or the applicable member of the Company Group) is unable for any reason to secure Participant's signature to any document required to assign said contracts or agreements, or if Participant does not assign said contracts or agreements to the Company (or the applicable member of the Company Group) prior to Participant's Termination of Service, Participant hereby irrevocably designates and appoints the Company (or the applicable member of the Company Group) and each of the Company's duly authorized officers and agents as Participant's agents and attorneys-in-fact to act for and on

Participant's behalf and instead of Participant to execute said assignments and to do all other lawfully permitted acts to further the execution of said documents.

**4.** **Non-Disparagement**. Subject to Section 1(e) above, Participant agrees that Participant will not, and will cause Participant' affiliates to not, make, publish, or communicate any disparaging or defamatory comments regarding any member of the Company Group or their current or former directors, officers, members, managers, partners, executives or direct or indirect owners (including equityholders).

**SHOALS TECHNOLOGIES GROUP, INC.**
**2021 LONG-TERM INCENTIVE PLAN**

**PERFORMANCE SHARE UNIT GRANT NOTICE**

Pursuant to the terms and conditions of the Shoals Technologies Group, Inc. 2021 Long-Term Incentive Plan, as amended from time to time (the "**Plan**"), Shoals Technologies Group, Inc., a Delaware corporation (the "**Company**"), hereby grants to the individual listed below ("**you**" or the "**Participant**") the number of performance-based restricted stock units (the "**PSUs**") set forth below. This award of PSUs (this "**Award**") is subject to the terms and conditions set forth herein, in the Performance Share Unit Agreement attached hereto as Exhibit A (the "**Agreement**") and in the Plan, each of which is incorporated herein by reference. Capitalized terms used but not defined herein shall have the meanings set forth in the Plan.

| | |
|---|---|
| **Type of Award:** | Restricted Stock Units, granted pursuant to Article VIII of the Plan, which vest subject to performance-vesting conditions as set forth below. |
| **Participant:** | [●] |
| **Date of Grant:** | [●] |
| **Target Number of Performance-Based Restricted Stock Units ("Target PSUs"):** | [●] |
| **Performance Period:** | The three fiscal-year period commencing as of January 1, [●] and ending on December 31, [●] (the "Performance Period"). |
| **Vesting Schedule:** | Subject to Sections 3 and 6 of the Agreement, the Plan and the other terms and conditions set forth herein, the PSUs shall vest based on achievement of the performance-vesting conditions set forth on Exhibit B attached hereto during the Performance Period, subject to your continued employment or service with the Company or an Affiliate from the Date of Grant through the Certification Date (as defined on Exhibit B). |

By your signature below, you agree to be bound by the terms and conditions of the Plan, the Agreement and this Performance Share Unit Grant Notice (this "**Grant Notice**"). You acknowledge that you have reviewed the Agreement, the Plan and this Grant Notice in their entirety and fully understand all provisions of the Agreement, the Plan and this Grant Notice. You hereby agree to accept as binding, conclusive and final all decisions or interpretations of the Committee regarding any questions or determinations arising under the Agreement, the Plan or this Grant Notice. This Grant Notice may be executed in one or more counterparts (including portable document format (.pdf) and facsimile counterparts), each of which shall be deemed to be an original, but all of which together shall constitute one and the same agreement.

Notwithstanding any provision in this Grant Notice or the Agreement to the contrary, if you fail to execute and deliver this Grant Notice to the Company within ninety (90) days following the Date of Grant set forth above, then this Award will terminate automatically without any further action by the Company, and this Grant Notice and the Agreement will be null and void. This Grant Notice can be executed by you and delivered to the Company, subject to the exclusive discretion of the Company, by either (i) executing this Grant Notice manually and

delivering the executed original, postmarked within ninety (90) days following the Date of Grant, to 1400 Shoals Way, Portland, TN 37148, Attn: Total Reward, (ii) sending an electronic copy of the executed Grant Notice to human.resources@shoals.com, or (iii) through the online grant agreement procedure with the Company's designated broker-dealer.

***[Signature Page Follows]***

**IN WITNESS WHEREOF**, the Company has caused this Grant Notice to be executed by an officer thereunto duly authorized, and the Participant has executed this Grant Notice, effective for all purposes as provided above.

**SHOALS TECHNOLOGIES GROUP, INC.**

By:_________________________________
Name: [●]
Title: [●]

___________
Date

**PARTICIPANT**

________________________________________

Name: [●]

___________
Date

**EXHIBIT A**

**PERFORMANCE SHARE UNIT AGREEMENT**

This Performance Share Unit Agreement (together with the Grant Notice to which this Agreement is attached, this "**Agreement**") is made as of the Date of Grant set forth in the Grant Notice to which this Agreement is attached by and between Shoals Technologies Group, Inc., a Delaware corporation (the "**Company**"), and [●] (the "**Participant**"). Capitalized terms used but not specifically defined herein shall have the meanings specified in the Plan or the Grant Notice.

**1.** **Award**. In consideration of the Participant's past and/or continued employment with, or service to, the Company or an Affiliate and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, effective as of the Date of Grant set forth in the Grant Notice (the "**Date of Grant**"), the Company hereby grants to the Participant the number of PSUs set forth in the Grant Notice on the terms and conditions set forth in the Grant Notice, this Agreement and the Plan, which is incorporated herein by reference as a part of this Agreement. In the event of any inconsistency between the Plan and this Agreement, the terms of the Plan shall control. To the extent vested, each PSU represents the right to receive one Share, subject to the terms and conditions set forth in the Grant Notice, this Agreement and the Plan. Unless and until the PSUs have become vested in the manner set forth in the Grant Notice, the Participant will have no right to receive any Shares or other payments in respect of the PSUs. Prior to settlement of this Award, the PSUs and this Award represent an unsecured obligation of the Company, payable only from the general assets of the Company.

**2.** **Vesting of PSUs**. Except as otherwise set forth in Sections 3 or 6 hereof, the PSUs shall vest in accordance with the vesting schedule set forth in the Grant Notice. Unless and until the PSUs have vested in accordance with such vesting schedule, the Participant will have no right to receive any dividends or other distribution with respect to the PSUs.

**3.** **Termination and Forfeiture of PSUs**.

(a) Upon the Participant's Termination of Service, any PSUs that remain unvested as of such date of Termination of Service (and all rights arising from such PSUs and from being a holder thereof) will automatically and immediately terminate as of such date without any further action by the Company and will be forfeited without further notice and at no cost to the Company.

(b) Notwithstanding the foregoing,

(i) upon the Participant's Termination of Service by the Company or an Affiliate without Cause, a prorated portion of the Target PSUs shall continue to be eligible to vest as of the Certification Date based on actual performance and be settled pursuant to Section 5 hereof, with such portion determined by multiplying the number of Target PSUs that performance-vest pursuant to the achievement of the performance-vesting conditions set forth on Exhibit B attached hereto during the Performance Period by a fraction, (A) the numerator of which equals the number of calendar days that the Participant was employed by the Company or an Affiliate during the Performance Period and (B) the denominator of which equals the total number of calendar days in the Performance Period, and any and all then-unvested PSUs (and all rights arising from such PSUs and from being a holder thereof) will terminate automatically without any further action by the Company and will be forfeited without further notice and at no cost to the Company;

(ii) upon the Participant's Termination of Service due to death or Disability, a prorated portion of the Target PSUs shall immediately vest as of the date of such Termination of Service and be settled pursuant to Section 5 hereof, with such portion determined by multiplying the number of Target PSUs by a fraction, (A) the numerator of which equals the number of calendar days that the Participant was employed by the Company or an Affiliate during the Performance Period and (B) the denominator of which equals the total number of calendar days in the Performance Period, and any and all then-unvested PSUs (and all rights arising from such PSUs and from being a holder thereof) will terminate automatically without any further action by the Company and will be forfeited without further notice and at no cost to the Company;

(iii) upon the Participant's Termination of Service due to Retirement (as defined below), a prorated portion of the Target PSUs shall continue to be eligible to vest as of the Certification Date based on actual performance and be settled pursuant to Section 5 hereof, with such portion determined by multiplying the number of Target PSUs that performance-vest pursuant to the achievement of the performance-vesting conditions set forth on Exhibit B attached hereto during the Performance Period by a fraction, (A) the numerator of which equals the number of calendar days that the Participant was employed by the Company or an Affiliate during the Performance Period and (B) the denominator of which equals the total number of calendar days in the Performance Period, and any and all unvested PSUs that do not remain eligible to vest in accordance with the foregoing (and all rights arising from such PSUs and from being a holder thereof) will terminate automatically without any further action by the Company and will be forfeited without further notice and at no cost to the Company. For purposes of this Agreement, "Retirement" shall mean a Termination of Service due to the Participant's resignation so long as, at the time of such Termination of Service, (x) the Participant has attained age 62 and five (5) years of service with the Company or an Affiliate and (y) no event has occurred that would be grounds for the Participant's Termination of Service by the Company or an Affiliate for Cause; or

(iv) upon the occurrence of a Change in Control, to the extent the PSUs are continued, assumed or substituted by the surviving entity in connection with such Change in Control, in the event that the Participant incurs a Termination of Service (x) by the Company or an Affiliate without Cause or (y) by the Participant for Good Reason (as defined below), in each case, within the twenty-four (24) month period following the date of consummation of such Change in Control, a number of PSUs equal to the Target PSUs shall immediately vest as of the date of such Termination of Service and be settled pursuant to Section 5 hereof, and, for the avoidance of doubt, the Participant's right to receive any additional PSUs under this Agreement will terminate automatically without any further action by the Company and will be forfeited without further notice and at no cost to the Company. For purposes of this Agreement, "Good Reason" shall mean, (A) in the case where there is an employment agreement, consulting agreement, change in control agreement or similar agreement in effect between the Company or an Affiliate and the Participant as of the Date of Grant that defines "Good Reason" (or words of like import), "Good Reason" as defined under such agreement, or (B) in the case where there is no employment agreement, consulting agreement, change in control agreement or similar agreement in effect between the Company or an Affiliate and the Participant as of the Date of Grant (or where there is such an agreement but it does not define "Good Reason" (or words of like import)), "Good Reason" shall mean (i) a material diminution in the Participant's base salary or authority, duties and responsibilities with the Company or any of its Affiliates; provided, however, that if the Participant is serving as an officer or member of the board of directors (or similar governing body) of the Company or any of its Affiliates or any other entity in which the Company or any of its Affiliates holds an equity interest, in no event shall the removal of the Participant as an officer or board member, regardless of the reason for such removal, constitute Good Reason; or (ii) the relocation of the geographic location of the Participant's principal place

of employment by more than fifty (50) miles from the location of the Participant's principal place of employment as of the Date of Grant. Notwithstanding the foregoing, any assertion by the Participant of a termination for Good Reason shall not be effective unless all of the following conditions are satisfied: (1) the condition described in (i) or (ii) of the foregoing sentence giving rise to the Participant's termination of employment must have arisen without the Participant's consent; (2) the Participant must provide written notice to the Board of the existence of such condition(s) within thirty (30) days after the initial occurrence of such condition(s); (3) the condition(s) specified in such notice must remain uncorrected for thirty (30) days following the Board's receipt of such written notice; and (4) the date of the Participant's termination of employment must occur within sixty (60) days after the initial occurrence of the condition(s) specified in such notice. Further and notwithstanding the foregoing, no suspension of the Participant or a reduction in the Participant's authority, duties and responsibilities in conjunction with any leave required, or other action taken, by the Company as part of any investigation into alleged wrongdoing by the Participant shall give rise to Good Reason.

**4.** **Dividend Equivalents**. In the event that the Company declares and pays a dividend in respect of its outstanding Shares and, on the record date for such dividend, the Participant holds PSUs granted pursuant to this Agreement that have not yet been settled pursuant to Section 5 hereof, the Company shall record the amount of such dividend in a bookkeeping account and pay to the Participant an amount in cash equal to the cash dividends the Participant would have received if the Participant was the holder of record, as of such record date, of a number of Shares equal to the number of PSUs held by the Participant that have not yet been settled pursuant to Section 5 hereof as of such record date, with such payment to be made on the date on which such PSUs are settled in accordance with Section 5 (the "**Dividend Equivalents**"). For purposes of clarity, if the PSUs (or any portion thereof) are forfeited by the Participant pursuant to the terms of this Agreement, then the Participant shall also forfeit the Dividend Equivalents, if any, accrued with respect to such forfeited PSUs. No interest will accrue on the Dividend Equivalents between the declaration and payment of the applicable dividends and the settlement of the Dividend Equivalents.

**5.** **Settlement of PSUs**. As soon as administratively practicable following the vesting of any portion of the PSUs pursuant to Sections 2 or 3, but in no event later than thirty (30) days after the applicable vesting date, the Company shall deliver to the Participant a number of Shares equal to the number of such vested PSUs. All Shares issued hereunder shall be delivered either by delivering one or more certificates for such Shares to the Participant or by entering such Shares in book-entry form, as determined by the Committee in its sole discretion. The value of Shares shall not bear any interest owing to the passage of time. Neither this Section 5 nor any action taken pursuant to or in accordance with this Agreement shall be construed to create a trust or a funded or secured obligation of any kind.

**6.** **Restrictive Covenants**. Notwithstanding any provision in this Agreement or the Plan to the contrary, in the event the Committee determines that Participant has failed to abide by any of the restrictive covenants set forth on Appendix I attached hereto or contained in any other agreement by and between the Company or any Affiliate and Participant (collectively, the "**Restrictive Covenants**"), which Restrictive Covenants are hereby incorporated by reference as if fully set forth herein, then all PSUs that have not been settled pursuant to Section 5 hereof as of the date of such determination (and all rights arising from such PSUs and from being a holder thereof) will terminate automatically without any further action by the Company and will be forfeited without further notice and at no cost to the Company.

**7.** **Tax Withholding**. To the extent that the receipt, vesting or settlement of this Award results in compensation income or wages to the Participant for federal, state, local and/or foreign tax purposes, the Participant shall make arrangements satisfactory to the Company

regarding the payment of, any income tax, social insurance contribution or other applicable taxes that are required to be withheld in respect of this Award, which arrangements include the delivery of cash or cash equivalents, Shares (including previously owned Shares (which is not subject to any pledge or other security interest), net settlement, a broker-assisted sale, or other cashless withholding or reduction of the amount of shares otherwise issuable or delivered pursuant to this Award), other property, or any other legal consideration the Committee deems appropriate. If such tax obligations are satisfied through net settlement or the surrender of previously owned Shares, the maximum number of Shares that may be so withheld (or surrendered) shall be the number of Shares that have an aggregate Fair Market Value on the date of withholding or surrender equal to the aggregate amount of such tax liabilities determined based on the greatest withholding rates for federal, state, local and/or foreign tax purposes, including payroll taxes, that may be utilized without creating adverse accounting treatment for the Company with respect to this Award, as determined by the Committee. Any fraction of a Share required to satisfy such tax obligations shall be disregarded and the amount due shall be paid instead in cash to the Participant. The Participant acknowledges that there may be adverse tax consequences upon the receipt, vesting or settlement of this Award or disposition of the underlying shares and that the Participant has been advised, and hereby is advised, to consult a tax advisor. The Participant represents that the Participant is in no manner relying on the Board, the Committee, the Company or an Affiliate or any of their respective managers, directors, officers, employees or authorized representatives (including attorneys, accountants, consultants, bankers, lenders, prospective lenders and financial representatives) for tax advice or an assessment of such tax consequences.

**8.** **Employment Relationship**. For purposes of this Agreement, Participant shall be considered to be employed by the Company or an Affiliate as long as Participant remains an employee of any of the Company, an Affiliate or a corporation or other entity (or a parent or subsidiary of such corporation or other entity) assuming or substituting a new award for this Award.

**9.** **Non-Transferability**. During the lifetime of the Participant, the PSUs may not be sold, pledged, assigned or transferred in any manner other than by will or the laws of descent and distribution, unless and until the Shares underlying the PSUs have been issued, and all restrictions applicable to such shares have lapsed. Neither the PSUs nor any interest or right therein shall be liable for the debts, contracts or engagements of the Participant or his or her successors in interest or shall be subject to disposition by transfer, alienation, anticipation, pledge, encumbrance, assignment or any other means, whether such disposition be voluntary or involuntary or by operation of law by judgment, levy, attachment, garnishment or any other legal or equitable proceedings (including bankruptcy), and any attempted disposition thereof shall be null and void and of no effect, except to the extent that such disposition is permitted by the preceding sentence.

**10.** **Compliance with Applicable Law**. Notwithstanding any provision of this Agreement to the contrary, the issuance of Shares hereunder will be subject to compliance with all applicable requirements of Applicable Law with respect to such securities and with the requirements of any stock exchange or market system upon which the Shares may then be listed. No Shares will be issued hereunder if such issuance would constitute a violation of any Applicable Law or regulation or the requirements of any stock exchange or market system upon which the Shares may then be listed. In addition, Shares will not be issued hereunder unless (a) a registration statement under the Securities Act is in effect at the time of such issuance with respect to the shares to be issued or (b) in the opinion of legal counsel to the Company, the shares to be issued are permitted to be issued in accordance with the terms of an applicable exemption from the registration requirements of the Securities Act. The inability of the Company to obtain from any regulatory body having jurisdiction the authority, if any, deemed by

the Company's legal counsel to be necessary for the lawful issuance and sale of any Shares hereunder will relieve the Company of any liability in respect of the failure to issue such shares as to which such requisite authority has not been obtained. As a condition to any issuance of Shares hereunder, the Company may require the Participant to satisfy any requirements that may be necessary or appropriate to evidence compliance with any Applicable Law or regulation and to make any representation or warranty with respect to such compliance as may be requested by the Company.

**11.** **Rights as a Stockholder**. The Participant shall have no rights as a stockholder of the Company with respect to any Shares that may become deliverable hereunder unless and until the Participant has become the holder of record of such Shares, and no adjustments shall be made for dividends in cash or other property, distributions or other rights in respect of any such Shares, except as otherwise specifically provided for in the Plan or this Agreement.

**12.** **Execution of Receipts and Releases**. Any issuance or transfer of Shares or other property to the Participant or the Participant's legal representative, heir, legatee or distributee, in accordance with this Agreement shall be in full satisfaction of all claims of such Person hereunder. As a condition precedent to such payment or issuance, the Company may require the Participant or the Participant's legal representative, heir, legatee or distributee to execute (and not revoke within any time provided to do so) a release and receipt therefor in such form as it shall determine appropriate; provided, however, that any review period under such release will not modify the date of settlement with respect to vested PSUs.

**13.** **No Right to Continued Employment, Service or Awards**. Nothing in the adoption of the Plan, nor the award of the PSUs thereunder pursuant to the Grant Notice and this Agreement, shall confer upon the Participant the right to continued employment by, or a continued service relationship with, the Company or any Affiliate, or any other entity, or affect in any way the right of the Company or any such Affiliate, or any other entity to terminate such employment or other service relationship at any time. Unless otherwise provided in a written employment agreement or by Applicable Law, Participant's employment by the Company, or any such Affiliate, or any other entity shall be on an at-will basis, and the employment relationship may be terminated at any time by either Participant or the Company, or any such Affiliate, or other entity for any reason whatsoever, with or without cause or notice. Any question as to whether and when there has been a termination of such employment, and the cause of such termination, shall be determined by the Committee or its delegate, and such determination shall be final, conclusive and binding for all purposes. The grant of the PSUs is a one-time benefit that was made at the sole discretion of the Company and does not create any contractual or other right to receive a grant of restricted stock units or other Awards or any payment or benefits in the future, including any adjustment to wages, overtime, benefits or other compensation. Any future Awards will be granted at the sole discretion of the Company.

**14.** **Notices**. All notices and other communications under this Agreement shall be in writing and shall be delivered to the parties at the following addresses (or at such other address for a party as shall be specified by like notice):

If to the Company, unless otherwise designated by the Company in a written notice to the Participant (or other holder):

Shoals Technologies Group, Inc.
Attn: Chief Legal Officer
1400 Shoals Way
Portland, Tennessee 37148

If to the Participant, at the Participant's last known address on file with the Company.

Any notice that is delivered personally or by overnight courier or telecopier in the manner provided herein shall be deemed to have been duly given to the Participant when it is mailed by the Company or, if such notice is not mailed to the Participant, upon receipt by the Participant. Any notice that is addressed and mailed in the manner herein provided shall be conclusively presumed to have been given to the party to whom it is addressed at the close of business, local time of the recipient, on the fourth day after the day it is so placed in the mail.

**15.** **Consent to Electronic Delivery; Electronic Signature**. In lieu of receiving documents in paper format, the Participant agrees, to the fullest extent permitted by law, to accept electronic delivery of any documents that the Company may be required to deliver (including, but not limited to, prospectuses, prospectus supplements, grant or award notifications and agreements, account statements, annual and quarterly reports and all other forms of communications) in connection with this and any other Award made or offered by the Company. Electronic delivery may be via a Company electronic mail system or by reference to a location on a Company intranet to which the Participant has access. The Participant hereby consents to any and all procedures the Company has established or may establish for an electronic signature system for delivery and acceptance of any such documents that the Company may be required to deliver, and agrees that his or her electronic signature is the same as, and shall have the same force and effect as, his or her manual signature.

**16.** **Agreement to Furnish Information**. The Participant agrees to furnish to the Company all information requested by the Company to enable it to comply with any reporting or other requirement imposed upon the Company by or under any applicable statute or regulation.

**17.** **Entire Agreement; Amendment**. This Agreement constitutes the entire agreement of the parties with regard to the subject matter hereof, and contains all the covenants, promises, representations, warranties and agreements between the parties with respect to the PSUs granted hereby; provided¸ however, that the terms of this Agreement shall not modify and shall be subject to the terms and conditions of any employment, consulting and/or severance agreement between the Company (or an Affiliate or other entity) and the Participant in effect as of the date a determination is to be made under this Agreement. Without limiting the scope of the preceding sentence, except as provided therein, all prior understandings and agreements, if any, among the parties hereto relating to the subject matter hereof are hereby null and void and of no further force and effect. The Committee may, in its sole discretion, amend this Agreement from time to time in any manner that is not inconsistent with the Plan; provided, however, that except as otherwise provided in the Plan or this Agreement, any such amendment that materially and adversely reduces the rights of the Participant shall be effective only if it is in writing and signed by both the Participant and an authorized officer of the Company.

**18.** **Severability and Waiver**. If a court of competent jurisdiction determines that any provision of this Agreement is invalid or unenforceable, then the invalidity or unenforceability of such provision shall not affect the validity or enforceability of any other provision of this Agreement, and all other provisions shall remain in full force and effect. Waiver by any party of any breach of this Agreement or failure to exercise any right hereunder shall not be deemed to be a waiver of any other breach or right. The failure of any party to take action by reason of such breach or to exercise any such right shall not deprive the party of the right to take action at any time while or after such breach or condition giving rise to such rights continues.

**19.** **Clawback**. The Participant's rights with respect to this Award shall in all events be subject to (a) all rights that the Company may have under any Company clawback policy or

any other agreement or arrangement with the Participant, and (b) all rights and obligations that the Company may have regarding the clawback of "incentive-based compensation" under Section 10D of the Exchange Act and any applicable rules and regulations promulgated thereunder from time to time by the U.S. Securities and Exchange Commission, the listing standards of any national securities exchange or association on which the Company's securities are listed, or any other Applicable Law, including, without limitation, the Shoals Technologies Group, Inc. Clawback and Recoupment Policy.

**20.** **Governing Law**. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED THEREIN, EXCLUSIVE OF THE CONFLICT OF LAWS PROVISIONS OF DELAWARE LAW.

**21.** **Successors and Assigns**. The Company may assign any of its rights under this Agreement without the Participant's consent. This Agreement will be binding upon and inure to the benefit of the successors and assigns of the Company. Subject to the restrictions on transfer set forth herein and in the Plan, this Agreement will be binding upon the Participant and the Participant's beneficiaries, executors, administrators and the Person(s) to whom the PSUs may be transferred by will or the laws of descent or distribution.

**22.** **Headings; References; Interpretation**. Headings are for convenience only and are not deemed to be part of this Agreement. The words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement. All references herein to Sections shall, unless the context requires a different construction, be deemed to be references to the Sections of this Agreement. The word "or" as used herein is not exclusive and is deemed to have the meaning "and/or." All references to "including" shall be construed as meaning "including without limitation." Unless the context requires otherwise, all references herein to a law, agreement, instrument or other document shall be deemed to refer to such law, agreement, instrument or other document as amended, supplemented, modified and restated from time to time to the extent permitted by the provisions thereof. All references to "dollars" or "$" in this Agreement refer to United States dollars. Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa. Neither this Agreement nor any uncertainty or ambiguity herein shall be construed or resolved against any party hereto, whether under any rule of construction or otherwise. On the contrary, this Agreement has been reviewed by each of the parties hereto and shall be construed and interpreted according to the ordinary meaning of the words used so as to fairly accomplish the purposes and intentions of the parties hereto.

**23.** **Counterparts**. The Grant Notice may be executed in one or more counterparts, each of which shall be deemed an original and all of which together shall constitute one instrument. Delivery of an executed counterpart of the Grant Notice by facsimile or portable document format (.pdf) attachment to electronic mail shall be effective as delivery of a manually executed counterpart of the Grant Notice.

**24.** **Section 409A**. Notwithstanding anything herein or in the Plan to the contrary, the PSUs granted pursuant to this Agreement are intended to be exempt from the applicable requirements of Section 409A of the Code and shall be limited, construed and interpreted in accordance with such intent. Nevertheless, to the extent that the Committee determines that the PSUs may not be exempt from Section 409A of the Code, then, if the Participant is deemed to be a "specified employee" within the meaning of Section 409A of the Code, as determined by the Committee, at a time when the Participant becomes eligible for settlement of the PSUs upon his

“separation from service” within the meaning of Section 409A of the Code, then to the extent necessary to prevent any accelerated or additional tax under Section 409A of the Code, such settlement will be delayed until the earlier of: (a) the date that is six months following the Participant’s separation from service and (b) the Participant’s death. Notwithstanding the foregoing, the Company and its Affiliates make no representations that the PSUs provided under this Agreement are exempt from or compliant with Section 409A of the Code and in no event shall the Company or any Affiliate be liable for all or any portion of any taxes, penalties, interest or other expenses that may be incurred by the Participant on account of non-compliance with Section 409A of the Code.

[*Remainder of Page Intentionally Blank*]

## APPENDIX I

## RESTRICTIVE COVENANTS

**1. Confidentiality**. In the course of Participant's employment or service with the Company, Participant will be provided with, and will have access to, Confidential Information (as defined below). In consideration of Participant's receipt and access to such Confidential Information, Participant shall comply with this Section 1.

(a) Both during Participant's employment or service with any member of the Company Group (as defined below) and thereafter, except as expressly permitted by this Agreement, Participant shall not disclose any Confidential Information to any person or entity and shall not use any Confidential Information except for the benefit of the Company Group. Participant acknowledges and agrees that Participant would inevitably use and disclose Confidential Information in violation of this Section 1 if Participant were to violate any of the covenants set forth in Section 2 of this Appendix I. Participant shall follow all Company Group policies and protocols regarding the security of all documents and other materials containing Confidential Information (regardless of the medium on which Confidential Information is stored). Except to the extent required for the performance of Participant's duties on behalf of the Company Group, Participant shall not remove from facilities of any member of the Company Group any information, property, equipment, drawings, notes, reports, manuals, invention records, computer software, customer information, or other data or materials that relate in any way to the Confidential Information, whether paper or electronic and whether produced by Participant or obtained by the Company Group. The covenants of this Section 1(a) shall apply to all Confidential Information, whether now known or later to become known to Participant during the period that Participant is employed by or affiliated with the Company or any other member of the Company Group. For purposes of this Appendix I, "**Company Group**" shall mean, collectively, the Company and its direct and indirect subsidiaries as may exist from time to time.

(b) Notwithstanding any provision of Section 1(a) of this Appendix I to the contrary, Participant may make the following disclosures and uses of Confidential Information:

(i) disclosures to other employees, officers or directors of a member of the Company Group who have a need to know the information in connection with the businesses of the Company Group;

(ii) disclosures to customers and suppliers when, in the reasonable and good faith belief of Participant, such disclosure is in connection with Participant's performance of Participant's duties under this Agreement and is in the best interests of the Company Group;

(iii) disclosures and uses that are approved in writing by the Board; or

(iv) disclosures to a person or entity that has (x) been retained by a member of the Company Group to provide services to one or more members of the Company Group and (y) agreed in writing to abide by the terms of a confidentiality agreement.

(c) Upon the Participant's Termination of Service, and at any other time upon request of the Company, Participant shall promptly and permanently surrender and deliver to the Company all documents (including electronically stored information) and all copies thereof and all other materials of any nature containing or pertaining to all Confidential Information and any other Company Group property (including any Company Group-issued computer, mobile device or other equipment) in Participant's possession, custody or control and Participant shall not retain any such documents or other materials or property of the Company Group. Within ten

(10) days of any such request, Participant shall certify to the Company in writing that all such documents, materials and property have been returned to the Company.

(d) "**Confidential Information**" means all confidential, competitively valuable, non-public or proprietary information that is conceived, made, developed or acquired by or disclosed to Participant (whether conveyed orally or in writing), individually or in conjunction with others, during the period that Participant is employed by or otherwise affiliated with the Company or any other member of the Company Group (whether during business hours or otherwise and whether on the Company's premises or otherwise) including: (i) technical information of any member of the Company Group, its affiliates, its investors, customers, vendors, suppliers or other third parties, including computer programs, software, databases, data, ideas, know-how, formulae, compositions, processes, discoveries, machines, inventions (whether patentable or not), designs, developmental or experimental work, techniques, improvements, work in process, research or test results, original works of authorship, training programs and procedures, diagrams, charts, business and product development plans, and similar items; (ii) information relating to any member of the Company Group's businesses or properties, products or services (including all such information relating to corporate opportunities, operations, future plans, methods of doing business, business plans, strategies for developing business and market share, research, financial and sales data, pricing terms, evaluations, opinions, interpretations, acquisition prospects, the identity of customers or acquisition targets or their requirements, the identity of key contacts within customers' organizations or within the organization of acquisition prospects, or marketing and merchandising techniques, prospective names and marks) or pursuant to which any member of the Company Group owes a confidentiality obligation; and (iii) other valuable, confidential information and trade secrets of any member of the Company Group, its affiliates, its customers or other third parties. Moreover, all documents, videotapes, written presentations, brochures, drawings, memoranda, notes, records, files, correspondence, manuals, models, specifications, computer programs, e-mail, voice mail, electronic databases, maps, drawings, architectural renditions, models and all other writings or materials of any type including or embodying any of such information, ideas, concepts, improvements, discoveries, inventions and other similar forms of expression are and shall be the sole and exclusive property of the Company or the other applicable member of the Company Group and be subject to the same restrictions on disclosure applicable to all Confidential Information pursuant to this Agreement. For purposes of this Agreement, Confidential Information shall not include any information that (A) is or becomes generally available to the public other than as a result of a disclosure or wrongful act of Participant or any of Participant's agents; (B) was available to Participant on a non-confidential basis before its disclosure by a member of the Company Group; (C) becomes available to Participant on a non-confidential basis from a source other than a member of the Company Group; *provided*, *however*, that such source is not bound by a confidentiality agreement with, or other obligation with respect to confidentiality to, a member of the Company Group; or (D) is required to be disclosed by Applicable Law.

(e) Notwithstanding the foregoing, nothing in this Agreement shall prohibit or restrict Participant from lawfully: (i) initiating communications directly with, cooperating with, providing information to, causing information to be provided to, or otherwise assisting in an investigation by, any governmental authority regarding a possible violation of any law; (ii) responding to any inquiry or legal process directed to Participant from any such governmental authority; (iii) testifying, participating or otherwise assisting in any action or proceeding by any such governmental authority relating to a possible violation of law; or (iv) making any other disclosures that are protected under the whistleblower provisions of any Applicable Law. Additionally, pursuant to the federal Defend Trade Secrets Act of 2016, an individual shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that: (A) is made (1) in confidence to a federal, state or local government official, either directly or indirectly, or to an attorney and (2) solely for the purpose of reporting or investigating a suspected violation of law; (B) is made to the individual's attorney in relation to a

lawsuit for retaliation against the individual for reporting a suspected violation of law; or (C) is made in a complaint or other document filed in a lawsuit or proceeding, if such filing is made under seal. Nothing in this Agreement requires Participant to obtain prior authorization before engaging in any conduct described in this paragraph, or to notify the Company that Participant has engaged in any such conduct.

**2. Non-Competition; Non-Solicitation**.

(a) The Company shall provide Participant access to Confidential Information for use only during the Participant's employment or service with any member of the Company Group, and Participant acknowledges and agrees that the Company Group will be entrusting Participant, in Participant's unique and special capacity, with developing the goodwill of the Company Group, and in consideration of the Company providing Participant with access to Confidential Information, clients and customers and as an express incentive for the Company to enter into this Agreement and employ Participant, Participant has voluntarily agreed to the covenants set forth in this Section 2. Participant agrees and acknowledges that the limitations and restrictions set forth herein, including geographical and temporal restrictions on certain competitive activities, are reasonable in all respects, do not interfere with public interests, will not cause Participant undue hardship, and are material and substantial parts of this Agreement intended and necessary to prevent unfair competition and to protect the Company Group's Confidential Information, goodwill and legitimate business interests.

(b) During the Prohibited Period (as defined below), Participant shall not, without the prior written approval of the Board, directly or indirectly, for Participant or on behalf of or in conjunction with any other person or entity of any nature:

(i) engage in or participate in (or prepare to engage in or participate in) the Business within the Market Area (each as defined below), which prohibition shall prevent Participant from directly or indirectly: (A) owning, investing in, controlling, managing, operating, participating in, lending Participant's name to, contributing to, providing assistance to or being an officer or director of, any person or entity engaged in or planning to engage in the Business in the Market Area, or (B) joining, becoming an employee or consultant of, or otherwise rendering services for or being affiliated with or engaged by, any person or entity engaged in, or planning to engage in, the Business in the Market Area in any capacity (with respect to this clause (B)) in which Participant's customer or client relationships, duties or responsibilities are the same as or similar to the customer or client relationships, duties or responsibilities that Participant had on behalf of any member of the Company Group;

(ii) appropriate or interfere with or attempt to appropriate or interfere with any Business Opportunity (as defined below) of, or relating to, any member of the Company Group located in the Market Area;

(iii) solicit, canvass, approach, encourage, entice or induce any customer, vendor or supplier of any member of the Company Group with whom Participant had contact (including oversight responsibility) or learned Confidential Information about during Participant's employment or service with any member of the Company Group to cease or lessen such customer's, vendor's or supplier's business with any member of the Company Group or otherwise adversely affect such relationship, or attempt to do any of the foregoing; or

(iv) solicit, canvass, approach, encourage, entice or induce any employee or contractor of any member of the Company Group to terminate his, her or its employment or engagement with any member of the Company Group, or hire or retain any such employee or contractor.

Notwithstanding the foregoing, nothing herein shall not limit Participant's ability to accept employment and perform work with any person or entity where (x) the services provided by Participant to such person or entity are not, and do not directly or indirectly benefit any division or business of such person or entity that is, in competition with the Business or any other material business in which a member of the Company Group has made a significant financial investment on or prior to the date of termination to be engaged in on or after such date and (y) Participant does not own more than 2% of the equity securities of such person or entity.

(c) Because of the difficulty of measuring economic losses to the Company Group as a result of a breach or threatened breach of the covenants set forth in Section 1 of this Appendix I and in this Section 2, and because of the immediate and irreparable damage that would be caused to the members of the Company Group for which they would have no other adequate remedy, the Company and each other member of the Company Group shall be entitled to enforce the foregoing covenants, in the event of a breach or threatened breach, by injunctions and restraining orders from any court of competent jurisdiction, without the necessity of showing any actual damages or that money damages would not afford an adequate remedy, and without the necessity of posting any bond or other security. The aforementioned equitable relief shall not be the Company's or any other member of the Company Group's exclusive remedy for a breach but instead shall be in addition to all other rights and remedies available to the Company and each other member of the Company Group at law and equity. Participant further agrees that Participant will not challenge the reasonableness or enforceability of any of the covenants set forth in this Section 2, and that Participant will reimburse the Company Group for all costs (including reasonable attorneys' fees) incurred in connection with any action to enforce any of the provisions of this Section 2 if Participant challenges the reasonableness or enforceability of any of the provisions of this Section 2.

(d) The covenants in this Section 2, and each provision and portion hereof, are severable and separate, and the unenforceability of any specific covenant (or portion thereof) shall not affect the provisions of any other covenant (or portion thereof). Moreover, in the event any arbitrator or court of competent jurisdiction shall determine that the scope, time or territorial restrictions set forth are unreasonable, then it is the intention of the parties that such restrictions be enforced to the fullest extent which such arbitrator or court deems reasonable, and this Agreement shall thereby be reformed.

(e) The following terms shall have the following meanings:

(i) "**Business**" shall mean the business and operations that are the same or similar to those performed by the Company and any other member of the Company Group for which Participant provides services or about which Participant obtains Confidential Information during the Participant's employment or service with any member of the Company Group, which business and operations include, but are not limited to, the design, manufacture, distribution, or sale of electrical wire harnesses, combiner boxes and junction boxes.

(ii) "**Business Opportunity**" shall mean any actual or potential commercial, investment or other business opportunity of any member of the Company Group or relating to the Business about which Participant learned Confidential Information during Participant's employment or service with any member of the Company Group.

(iii) "**Market Area**" shall mean (A) the United States and (B) the geographic area within a one hundred (100) mile radius of any location where, prior to the Participant's Termination of Service, any member of the Company Group conducts the Business or has plans to conduct the Business.

(iv) "**Prohibited Period**" shall mean the period during which Participant is employed by, or providing services to, any member of the Company Group and continuing for a period of twelve (12) months following the date that Participant is no longer employed by, or providing services to, any member of the Company Group.

(f) Participant undertakes and agrees that following the date that Participant is no longer employed by, or providing services to, any member of the Company Group and prior to entering into any relationship with any other party to serve as an officer, director, employee, consultant, partner, advisor, joint-venturer or in any other capacity with any other person or entity, Participant shall disclose to such other party the terms of the restrictive covenants set forth herein and hereby consents to the Company making any related disclosures.

**3. Ownership of Intellectual Property**.

(a) Participant agrees that the Company shall own, and Participant shall (and hereby does) assign, all right, title and interest relating to any and all inventions (whether or not patentable), discoveries, developments, improvements, innovations, works of authorship, mask works, designs, know-how, ideas, formulae, processes, techniques, data and information authored, created, contributed to, made or conceived or reduced to practice, in whole or in part, by Participant during the period in which Participant is or has been employed by or affiliated with the Company or any other member of the Company Group, whether or not registerable under U.S. law or the laws of other jurisdictions, that either (a) relate, at the time of conception, reduction to practice, creation, derivation or development, to any member of the Company Group's businesses or actual or anticipated research or development, or (b) were developed on any amount of the Company's or any other member of the Company Group's time or with the use of any member of the Company Group's equipment, supplies, facilities or Confidential Information (all of the foregoing collectively referred to herein as "**Company Intellectual Property**"), and Participant shall promptly disclose all Company Intellectual Property to the Company in writing. To support Participant's disclosure obligation herein, Participant shall keep and maintain adequate and current written records of all Company Intellectual Property made by Participant (solely or jointly with others) during the period in which Participant is or has been employed by or affiliated with the Company or any other member of the Company Group in such form as may be specified from time to time by the Company. These records shall be available to, and remain the sole property of, the Company at all times. For the elimination of doubt, the foregoing ownership and assignment provisions apply without limitation to patent rights, copyrights, trade secret rights, mask work rights, trademark rights, and all other intellectual and industrial property rights of any sort throughout the world.

(b) All of Participant's works of authorship and associated copyrights created during the period in which Participant is employed by or affiliated with the Company or any other member of the Company Group and in the scope of Participant's employment or engagement shall be deemed to be "works made for hire" within the meaning of the Copyright Act. To the extent any right, title and interest in and to Company Intellectual Property cannot be assigned by Participant to the Company, Participant shall grant, and does hereby grant, to the Company Group an exclusive, perpetual, royalty-free, transferable, irrevocable, worldwide license (with rights to sublicense through multiple tiers of sublicensees) to make, have made, use, sell, offer for sale, import, export, reproduce, practice and otherwise commercialize such rights, title and interest.

(c) Participant recognizes that this Agreement will not be deemed to require assignment of any invention or intellectual property that Participant developed entirely on Participant's own time without using the equipment, supplies, facilities, trade secrets, or Confidential Information of any member of the Company Group. In addition, this Agreement

---

does not apply to any invention that qualifies fully for protection from assignment to the Company under any specifically applicable state law or regulation.

(d) To the extent allowed by law, this Section 3 applies to all rights that may be known as or referred to as "moral rights," "artist's rights," "droit moral," or the like, including without limitation those rights set forth in 17 U.S.C. §106A (collectively, "**Moral Rights**"). To the extent Participant retain any Moral Rights under Applicable Law, Participant hereby ratifies and consents to any action that may be taken with respect to such Moral Rights by or authorized by the Company or any member of the Company Group, and Participant hereby waives and agrees not to assert any Moral Rights with respect to such Moral Rights. Participant shall confirm any such ratifications, consents, waivers, and agreements from time to time as requested by the Company.

(e) Participant shall perform, during and after the period in which Participant is or has been employed by or affiliated with the Company or any other member of the Company Group, all acts deemed necessary or desirable by the Company to permit and assist each member of the Company Group, at the Company's expense, in obtaining and enforcing the full benefits, enjoyment, rights and title throughout the world in the Company Intellectual Property and Confidential Information assigned, to be assigned, or licensed to the Company under this Agreement.. Such acts may include execution of documents and assistance or cooperation (i) in the filing, prosecution, registration, and memorialization of assignment of any applicable patents, copyrights, mask work, or other applications, (ii) in the enforcement of any applicable patents, copyrights, mask work, moral rights, trade secrets, or other proprietary rights, and (iii) in other legal proceedings related to the Company Intellectual Property or Confidential Information.

(f) In the event that the Company (or, as applicable, a member of the Company Group) is unable for any reason to secure Participant's signature to any document required to file, prosecute, register, or memorialize the assignment of any patent, copyright, mask work or other applications or to enforce any patent, copyright, mask work, moral right, trade secret or other proprietary right under any Confidential Information or Company Intellectual Property, Participant hereby irrevocably designates and appoints the Company and each of the Company's duly authorized officers and agents as Participant's agents and attorneys-in-fact to act for and on Participant's behalf and instead of Participant, (i) to execute, file, prosecute, register and memorialize the assignment of any such application, (ii) to execute and file any documentation required for such enforcement, and (iii) to do all other lawfully permitted acts to further the filing, prosecution, registration, memorialization of assignment, issuance, and enforcement of patents, copyrights, mask works, moral rights, trade secrets or other rights under the Confidential Information or Company Intellectual Property, all with the same legal force and effect as if executed by Participant. For the avoidance of doubt, the provisions of this Section 3(f) apply fully to all derivative works, improvements, renewals, extensions, continuations, divisionals, continuations in part, continuing patent applications, reissues, and reexaminations of all Company Intellectual Property.

(g) In the event that Participant enters into, on behalf of any member of the Company Group, any contracts or agreements relating to any Confidential Information or Company Intellectual Property, Participant shall assign such contracts or agreements to the Company (or the applicable member of the Company Group) promptly, and in any event, prior to Participant's Termination of Service. If the Company (or the applicable member of the Company Group) is unable for any reason to secure Participant's signature to any document required to assign said contracts or agreements, or if Participant does not assign said contracts or agreements to the Company (or the applicable member of the Company Group) prior to Participant's Termination of Service, Participant hereby irrevocably designates and appoints the Company (or the applicable member of the Company Group) and each of the Company's duly authorized officers and agents as Participant's agents and attorneys-in-fact to act for and on

Participant's behalf and instead of Participant to execute said assignments and to do all other lawfully permitted acts to further the execution of said documents.

**4.** **Non-Disparagement**. Subject to Section 1(e) above, Participant agrees that Participant will not, and will cause Participant' affiliates to not, make, publish, or communicate any disparaging or defamatory comments regarding any member of the Company Group or their current or former directors, officers, members, managers, partners, executives or direct or indirect owners (including equityholders).



Exhibit 10.24

December 12, 2022
Jeffery Tolnar
4407 Westlawn Dr.
Nashville, TN 37209

Re : Formal Employment Offer Dear Jeff,

On behalf of Shoals Technologies Group, I am pleased to present you with the following summary of the terms of your formal employment offer. Neither you nor the Company shall be bound by the terms set forth in this letter until this letter is fully executed.

Your position will be President for Shoals Technologies Group, commencing as early as practical on or before January 1, 2023. The position will report directly to the Chief Executive Officer. Below are the basic terms of your compensation package.

- Annual base salary of $415,000
- Annual bonus target of 75%, which is contingent upon achievement of mutually agreed upon milestones that will be both individual and Company in nature and determined by the Company.
- 2023 equity grant of $800,000, with a grant price at fair market value of the company effective and vesting in equal installments over 3 years.
- Four (4) weeks of paid time *off* (PTO) effective January 1, 2023.
- Full participation in the Company's health benefits plan (medical, dental, vision) and 401k plan in accordance with Company policies.
- In accordance with your initial offer, severance of three months shall be provided upon termination by the company without cause. As a more broad Executive Severance policy is implemented, if greater than current policy, it will supercede current severance offering.
- Confidentiality: You recognize that you will not, at any time during or after the term of employment, other than in the ordinary course of performing your duties for the Company, make use of or divulge to any other person, firm or corporation any trade or business secret, process, method or means, or any other confidential information concerning the business or policies of the Company, which he may have learned in connection with his employment ("Confidential Information"). For purposes of this Agreement, a "trade or business secret, process, method or means, or any other confidential

information" shall mean and include written information reasonably treated as confidential or as a trade secret by the Company. Your obligation will not apply to any information which (i) is known publicly (including information known publicly within the relevant trade or industry); (ii) is in the public domain or hereafter enters the public domain without the fault of Executive; (iii) is known to you prior to his receipt of such information from the Company, as evidenced by your written records; or (iv) is hereafter disclosed to you by a third party not under an obligation of confidence to the Company.

- Non-Compete/Non-Solicit - Moreover, the parties recognize that during the course of your employment with the Company you may develop important relationships with customers and others having valuable business relationships with the Company. During your employment and for a period of one year following the date on which your employment ends for any reason, (the "Restricted Period"), you agree to the following below non-competition and non-solicitation restrictions:
  - engage in or participate in (or prepare to engage in or participate in) the business within the area the Company operates ("Market Area"), which prohibition shall prevent you from directly or indirectly: (A) owning, investing in, controlling, managing, operating, participating in, lending your name to, contributing to, providing assistance to or being an officer or director of, any person or entity engaged in or planning to engage in the business of the Company in the Market Area, or (B) joining, becoming an employee or consultant of, or otherwise rendering services for or being affiliated with or engaged by, any person or entity engaged in, or planning to engage in, the business of the Company in the Market Area in any capacity (with respect to this clause (B)) in which your customer or client relationships, duties or responsibilities are the same as or similar to the customer or client relationships, duties or responsibilities that you had on behalf of any member of the Company;
  - appropriate or interfere with or attempt to appropriate or interfere with any business opportunity of, or relating to, any member of the Company located in the Market Area;
  - solicit, canvass, approach, encourage, entice or induce any customer, vendor or supplier of any member of the Company with whom you had contact (including oversight responsibility) or learned Confidential Information about during your employment with any member of the Company to cease or lessen such customer's, vendor's or supplier's business with any member of the Company or otherwise adversely affect such relationship, or attempt to do any of the foregoing; or
  - solicit, canvass, approach, encourage, entice or induce any employee or contractor of any member of the Company to terminate his, her or its employment or engagement with any member of the Company, or hire or retain any such employee or contractor.

---

We look forward to having you assume the President role at Shoals Technologies Group and hope to create a long-term business partnership with you. We ask for your response to this summary of terms by executing this agreement.

Sincerely,

Jason Whitaker, CEO Shoals Technologies Group

Agreed and accepted:
/s/ Jeffery Tolnar
Jeffery Tolnar

**Subsidiaries of the Registrant**
Active subsidiaries as of December 31, 2023:

| Company Name | Jurisdiction of Organization |
|---|---|
| Shoals Intermediate Parent, Inc. | Delaware |
| Shoals Technologies Group, LLC | Tennessee |
| Shoals International, LLC | Delaware |
| Shoals Energy Spain, S.L. | Spain |

Consent of Independent Registered Public Accounting Firm

We hereby consent to the incorporation by reference in the Registration Statement on Form S-8 (No. 333-252579) and Form S-3ASR (No. 333-268610) of Shoals Technologies Group, Inc. (the Company) of our reports dated February 28, 2024, relating to the consolidated financial statements, and the effectiveness of the Company's internal control over financial reporting, which appear in this Form 10-K.

/s/ BDO USA, P.C.

Austin, Texas

February 28, 2024

**CERTIFICATION BY CHIEF EXECUTIVE OFFICER PURSUANT TO**

**RULE 13a-14(a) AND 15d-14(a) UNDER THE EXCHANGE ACT**

I, Brandon Moss, certify that:

1. I have reviewed this Annual Report on Form 10-K of Shoals Technologies Group, Inc.;
2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
    a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
    b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
    c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
    d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and
5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
    a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
    b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

**EXHIBIT 31.1**

/s/ Brandon Moss

Brandon Moss
Chief Executive Officer

Date: February 28, 2024

EXHIBIT 31.2

**CERTIFICATION BY CHIEF FINANCIAL OFFICER PURSUANT TO**
**RULE 13a-14(a) AND 15d-14(a) UNDER THE EXCHANGE ACT**

I, Dominic Bardos, certify that:

1. I have reviewed this Annual Report on Form 10-K of Shoals Technologies Group, Inc.;
2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
    a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
    b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
    c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
    d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and
5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
    a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
    b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

/s/ Dominic Bardos

Dominic Bardos
Chief Financial Officer

Date: February 28, 2024

**EXHIBIT 32.1**

**CERTIFICATION**
**PURSUANT TO 18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report on Form 10-K of Shoals Technologies Group, Inc. (the “Company”) for the year ended December 31, 2023 as filed with the Securities and Exchange Commission on the date hereof (the “Report”), Brandon Moss, as Chief Executive Officer of the Company, and Dominic Bardos, as Chief Financial Officer, each hereby certifies, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to the best of his knowledge:

1. The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and
2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: February 28, 2024

/s/ Brandon Moss

Brandon Moss
Chief Executive Officer
(Principal Executive Officer)

/s/ Dominic Bardos

Dominic Bardos
Chief Financial Officer
(Principal Financial and Accounting Officer)

**SHOALS TECHNOLOGIES GROUP, INC.**

**CLAWBACK AND RECOUPMENT POLICY**

**PURPOSE**

Shoals Technologies Group, Inc., a Delaware corporation (the "Company"), believes that it is in the best interests of the Company and its shareholders to create and maintain a culture that emphasizes integrity and accountability and that reinforces the Company's pay-for-performance compensation philosophy. The Company's Board of Directors (the "Board") has therefore adopted this policy, which provides for the recoupment of certain executive compensation in the event that the Company is required to prepare an accounting restatement of its financial statements due to material noncompliance with any financial reporting requirement under the federal securities laws (this "Policy"). This Policy is designed to comply with Section 10D of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), the rules promulgated thereunder, and the listing standards of the national securities exchange on which the Company's securities are listed.

**ADMINISTRATION**

This Policy shall be administered by the Compensation Committee of the Board (the "Compensation Committee"). Any determinations made by the Compensation Committee shall be final and binding on all affected individuals.

**COVERED EXECUTIVES**

This Policy applies to the Company's current and former executive officers (as determined by the Compensation Committee in accordance with Section 10D of the Exchange Act, the rules promulgated thereunder, and the listing standards of the national securities exchange on which the Company's securities are listed) and such other senior executives or employees who may from time to time be deemed subject to this Policy by the Compensation Committee (collectively, the "Covered Executives"). This Policy shall be binding and enforceable against all Covered Executives.

**RECOUPMENT; ACCOUNTING RESTATEMENT**

In the event that the Company is required to prepare an accounting restatement of its financial statements due to the Company's material noncompliance with any financial reporting requirement under the securities laws, including any required accounting restatement (i) to correct an error in previously issued financial statements that is material to the previously issued financial statements, or (ii) that would result in a material misstatement if the error were corrected in the current period or left uncorrected in the current period (each an "Accounting Restatement"), the Compensation Committee will reasonably promptly require reimbursement or forfeiture of the Overpayment (as defined below) received by any Covered Executive (x) after beginning service as a Covered Executive, (y) who served as a Covered Executive at any time during the performance period for the applicable Incentive-Based Compensation (as defined below), and (z) during the three (3) completed fiscal years immediately preceding the date on which the Company is required to prepare an Accounting Restatement and any transition period (that results from a change in the Company's fiscal year) within or immediately following those three (3) completed fiscal years.

**INCENTIVE-BASED COMPENSATION**

For purposes of this Policy, "Incentive-Based Compensation" means any compensation that is granted, earned, or vested based wholly or in part upon the attainment of a financial reporting measure, including, but not limited to: (i) non-equity incentive plan awards that are earned solely or in part by satisfying a financial reporting measure performance goal; (ii) bonuses paid from a bonus pool, where the size of the pool is determined solely or in part by satisfying a financial reporting measure performance goal; (iii) other cash awards based on satisfaction of a financial reporting measure performance goal; (iv) restricted stock, restricted stock units, stock options, stock appreciation rights, and performance share units that are granted or vest solely or in part based on satisfaction of a financial reporting measure performance goal; and (v) proceeds from the sale of shares acquired through an incentive plan that were granted or vested solely or in part based on satisfaction of a financial reporting measure performance goal.

Compensation that would not be considered Incentive-Based Compensation includes, but is not limited to: (i) salaries; (ii) bonuses paid solely based on satisfaction of subjective standards, such as demonstrating leadership, and/or completion of a specified employment period; (iii) non-equity incentive plan awards earned solely based on satisfaction of strategic or operational measures; (iv) wholly time-based equity awards; and (v) discretionary bonuses or other compensation that is not paid from a bonus pool that is determined by satisfying a financial reporting measure performance goal.

A financial reporting measure is: (i) any measure that is determined and presented in accordance with the accounting principles used in preparing financial statements, or any measure derived wholly or in part from such measure, such as revenues, EBITDA, or net income or (ii) stock price and total shareholder return. Financial reporting measures include, but are not limited to: revenues; net income; operating income; profitability of one or more reportable segments; financial ratios (e.g., accounts receivable turnover and inventory turnover rates); net assets or net asset value per share; earnings before interest, taxes, depreciation and amortization; funds from operations and adjusted funds from operations; liquidity measures (e.g., working capital, operating cash flow); return measures (e.g., return on invested capital, return on assets); earnings measures (e.g., earnings per share); sales per square foot or same store sales, where sales is subject to an accounting restatement; revenue per user, or average revenue per user, where revenue is subject to an accounting restatement; cost per employee, where cost is subject to an accounting restatement; any of such financial reporting measures relative to a peer group, where the Company's financial reporting measure is subject to an accounting restatement; and tax basis income.

**OVERPAYMENT: AMOUNT SUBJECT TO RECOVERY**

The amount to be recovered will be the amount of Incentive-Based Compensation received that exceeds the amount of Incentive-Based Compensation that otherwise would have been received had it been determined based on the restated amounts, and must be computed without regard to any taxes paid (the "Overpayment"). Incentive-Based Compensation is deemed "received" in the Company's fiscal period during which the financial reporting measure specified in the incentive-based compensation award is attained, even if the vesting, payment or grant of the incentive-based compensation occurs after the end of that period.

For Incentive-Based Compensation based on stock price or total shareholder return, where the amount of erroneously awarded compensation is not subject to mathematical recalculation directly from the information in the Accounting Restatement, the amount must be based on a reasonable estimate of the effect of the Accounting Restatement on the stock price or total shareholder return upon which the Incentive-Based Compensation was received, and the Company must maintain documentation of the determination of that reasonable estimate and provide such documentation to the exchange on which the Company's securities are listed.

**METHOD OF RECOUPMENT**

The Compensation Committee will determine, in its sole discretion, the method or methods for recouping any Overpayment hereunder which may include, without limitation:

- requiring reimbursement of cash Incentive-Based Compensation previously paid;
- seeking recovery of any gain realized on the vesting, exercise, settlement, sale, transfer, or other disposition of any equity-based awards granted as Incentive-Based Compensation;
- offsetting any or all of the Overpayment from any compensation otherwise owed by the Company to the Covered Executive;
- cancelling outstanding vested or unvested equity awards; and/or
- taking any other remedial or recovery action permitted by law, as determined by the Compensation Committee.

**LIMITATION ON RECOVERY; NO ADDITIONAL PAYMENTS**

The right to recovery will be limited to Overpayments received during the three (3) completed fiscal years prior to the date on which the Company is required to prepare an Accounting Restatement and any transition period (that results from a change in the Company's fiscal year) within or immediately following those three (3) completed fiscal years. In no event shall the Company be required to award Covered Executives an additional payment if the restated or accurate financial results would have resulted in a higher Incentive-Based Compensation payment.

**NO INDEMNIFICATION**

The Company shall not indemnify any Covered Executives against the loss of any incorrectly awarded Incentive-Based Compensation.

**INTERPRETATION**

The Compensation Committee is authorized to interpret and construe this Policy and to make all determinations necessary, appropriate, or advisable for the administration of this Policy. It is intended that this Policy be interpreted in a manner that is consistent with the requirements of Section 10D of the Exchange Act and the applicable rules or standards adopted by the Securities and Exchange Commission or any national securities exchange on which the Company's securities are listed.

**EFFECTIVE DATE**

This Policy shall be effective as of the date it is adopted by the Board (the "Effective Date") and shall apply to Incentive-Based Compensation (including Incentive-Based Compensation granted pursuant to arrangements existing prior to the Effective Date). Notwithstanding the foregoing, this Policy shall only apply to Incentive-Based Compensation received (as determined pursuant to this Policy) on or after the effective date of NASDAQ Listing Rule 5608.

**AMENDMENT; TERMINATION**

The Board may amend this Policy from time to time in its discretion. The Board may terminate this Policy at any time.

**OTHER RECOUPMENT RIGHTS**

The Board intends that this Policy will be applied to the fullest extent of the law. The Compensation Committee may require that any employment or service agreement, cash-based bonus plan or program, equity award agreement, or similar agreement entered into on or after the adoption of this Policy shall, as a condition to the grant of any benefit thereunder, require a Covered Executive to agree to abide by the terms of this Policy. Any right of recoupment under this Policy is in addition to, and not in lieu of, any other remedies or rights of recoupment that may be available to the Company pursuant to the terms of any similar policy in any employment agreement, equity award agreement, cash-based bonus plan or program, or similar agreement and any other legal remedies available to the Company.

**IMPRACTICABILITY**

The Compensation Committee shall recover any Overpayment in accordance with this Policy except to the extent that the Compensation Committee determines such recovery would be impracticable because:

(A) The direct expense paid to a third party to assist in enforcing this Policy would exceed the amount to be recovered;

(B) Recovery would violate home country law of the Company where that law was adopted prior to November 28, 2022; or

(C) Recovery would likely cause an otherwise tax-qualified retirement plan, under which benefits are broadly available to employees of the Company, to fail to meet the requirements of 26 U.S.C. 401(a)(13) or 26 U.S.C. 411(a) and regulations thereunder.

**SUCCESSORS**

This Policy shall be binding and enforceable against all Covered Executives and their beneficiaries, heirs, executors, administrators or other legal representatives.