UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| In re SHOALS TECHNOLOGIES GROUP, INC. SECURITIES LITIGATION | ) ) ) ) | Civil Action No. 3:24-cv-00334 |
| | | Judge Waverly D. Crenshaw, Jr. Magistrate Judge Alistair Newbern |
| This Document Relates To: | ) ) ) ) ) | CLASS ACTION |

PLAINTIFFS' MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................... 1

FACTUAL ALLEGATIONS ...................................................................................... 2

ARGUMENT ............................................................................................................. 5

I.  The Complaint Alleges Falsity with Particularity ............................................ 6

    A.  Defendants' "Performance, Quality, Reliability" and "Safety" Statements Misled Investors ................................................................... 6

        1.  Defendants' Misstatements Were Material ...................................... 6

        2.  Defendants Failed to Speak Truthfully and Accurately to Investors ................... 7

    B.  Plaintiffs Adequately Plead Defendants' Violations of GAAP ................. 10

    C.  The PSLRA's Safe Harbor Provides No Protection to Defendants ............ 14

    D.  Defendants Misled Investors by Warning About Future Risks that Had Actually Already Materialized ................................................................ 15

II.  The Complaint Alleges a Strong Inference of Scienter .................................. 17

    A.  The Relevant *Helwig* Factors Support a Finding of Scienter ................... 18

        1.  Defendants' Public Statements Diverged from Internal Reports ...... 18

        2.  Whitaker and Solon's Stock Sales Strongly Support Scienter .......... 19

        3.  Defendants' Disclosure of the BLA Defect Was Made on the Heels of Misstatements Made in the SPOs ................................ 21

        4.  Defendants Disregarded Negative Information Contradicting Their Statements ......................................................... 22

        5.  Defendants Were Motivated by Self-Interest to Save Their Salaries and Jobs ................................................................. 23

        6.  The Remaining *Helwig* Factors Are Irrelevant ............................ 23

    B.  Additional Allegations Support Scienter ................................................ 24

    C.  The Most Compelling Inference Is Defendants Acted Knowingly or Recklessly ............................................................................................. 25

III.  The Complaint Alleges a Fraudulent Scheme in Violation of Rule 10b-5(a) & (c) ............ 27

IV.  The Complaint Alleges Loss Causation ......................................................... 28

V.  The Complaint Adequately Alleges Violations of §§15, 20(a) and 20A ............... 31

VI.  Plaintiffs Plead Claims Under the 1933 Act ................................................. 31

    A.  The 1933 Act Claims Are Governed by Rule 8(a) .................................. 31

    B.  KUAERP Pleads Actionable Misstatements ........................................... 34

    C.  KUAERP Has Standing to Assert 1933 Act Claims ................................ 35

    D.    KUAERP Adequately Alleges Defendants' Direct Sales and Solicitations ................35

CONCLUSION..................................................................................................................35

# TABLE OF AUTHORITIES

**CASES**

*AIG Global Securities Lending Corp. v. Bank of America Securities, LLC*,
2005 WL 2385854 (S.D.N.Y. 2005) ........................................................................... 21

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)] ........................................................................... 10

*Beach v. Healthways, Inc.*,
2009 WL 650408 (M.D. Tenn. Mar. 9, 2009) ........................................................................... 31

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ........................................................................... 5, 10

*Bond v. Clover Health Investments, Corp.*,
587 F. Supp. 3d 641 (M.D. Tenn. 2022) ........................................................................... passim

*Bondali v. Yum! Brands, Inc.*,
620 F. App'x 483 (6th Cir. Aug. 20, 2015) ........................................................................... 16

*City of Livonia Employees' Retirement System & Local 295 v. Boeing Co.*,
711 F.3d 754 (7th Cir. 2013) ........................................................................... 26

*City of Monroe Employees Retirement System v. Bridgestone Corp.*,
399 F.3d 651 (6th Cir. 2005) ........................................................................... 18

*D.E.&J Ltd. Partnership v. Conaway*,
133 F. App'x 994 (6th Cir. 2005) ........................................................................... 21, 31

*D.E.&J Ltd. Partnership v. Conaway*,
284 F. Supp. 2d 719 (E.D. Mich. 2003) ........................................................................... 21

*Dura Pharmaceuticals, Inc. v. Broudo*,
544 U.S. 336 (2005) ........................................................................... 6

*Envision Healthcare Corp. Securities Litigation*,
2022 WL 4551876 (M.D. Tenn. Sept. 29, 2022) ........................................................................... 18

*Flynn v. Sientra, Inc.*,
2016 WL 3360676 (C.D. Cal. June 9, 2016) ........................................................................... 35

*Franchi v. SmileDirectClub, Inc.*,
633 F. Supp. 3d 1046 (M.D. Tenn. 2022) ........................................................................... 15, 20, 21, 23

*Frank v. Dana Corp.*,
547 F.3d 564 (6th Cir. 2008) ........................................................................... 17

*Frank v. Dana Corp.*,
646 F.3d 954 (6th Cir. 2011) ........................................................................... 17, 18, 23

*Garden City Employees' Retirement System v. Psychiatric Solutions, Inc.*,
2011 WL 1335803 (M.D. Tenn. Mar. 31, 2011) ........................................................................... 19, 25, 27

*Grae v. Corrections Corp. of America*,
2017 WL 6442145 (M.D. Tenn. Dec. 18, 2017) ........................................................................... 6, 7, 18, 26

iii

*Helwig v. Vencor, Inc.*,
  251 F.3d 540 (6th Cir. 2001) ...................................................................... 6, 9, 18

*Herman & MacLean v. Huddleston*,
  459 U.S. 375 (1983) ......................................................................................... 34

*Hogrobrooks v. Educational Credit Management Corp.*,
  2013 WL 12284467 (W.D. Tenn. Apr. 5, 2013) ............................................ 25

*In re Almost Family, Inc. Securities Litigation*,
  2012 WL 443461 (W.D. Ky. Feb. 10, 2012) .................................................. 30

*In re Alphabet, Inc. Securities Litigation*,
  1 F.4th 687 (9th Cir. 2021) ............................................................................ 16

*In re Apple Inc. Securities Litigation*,
  678 F. Supp. 3d 1147 (N.D. Cal. 2023) ......................................................... 26

*In re Cardinal Health Inc. Securities Litigations*,
  426 F. Supp. 2d 688 (S.D. Ohio 2006) .......................................................... 20

*In re CMS Energy Securities Litigation*,
  2005 WL 8154422 (E.D. Mich. Jan. 7, 2005) ............................................... 19

*In re Comshare, Inc. Securities Litigation*,
  183 F.3d 542 (6th Cir. 1999) .......................................................................... 17

*In re Concord EFS, Inc. Securities Litigation*,
  2004 WL 7390451 (W.D. Tenn. Jan. 7, 2004) .............................................. 16

*In re CytRx Corp. Securities Litigation*,
  2015 WL 5031232 (C.D. Cal. July 13, 2015) ................................................ 32

*In re Employee Solutions Securities Litigation*,
  1998 WL 1031506 (D. Ariz. Sept. 22, 1998) ................................................ 14

*In re Envision Healthcare Corp. Securities Litigation*,
  2019 WL 6168254 (M.D. Tenn. Nov. 19, 2019) ..................................... passim

*In re FirstEnergy Corp. Securities Litigation*,
  2022 WL 681320 (S.D. Ohio Mar. 7, 2022) .......................................... passim

*In re FirstEnergy Corp. Securities Litigation*,
  316 F. Supp. 2d 581 (N.D. Ohio 2004) ..................................................... 15, 34

*In re Ford Motor Co. Securities Litigation*,
  381 F.3d 563 (6th Cir. 2004) .......................................................................... 12

*In re Home Point Capital Inc. Securities Litigation*,
  2022 WL 18932069 (E.D. Mich. Oct. 5, 2022) ............................................. 34

*In re Initial Public Offering Securities Litigation*,
  399 F. Supp. 2d 261 (S.D.N.Y. 2005) ........................................................... 30

*In re KBC Asset Management N.V. v. Eaton Corp.*,
  572 F. App'x 356 (6th Cir. 2014) .................................................................. 30

iv

*In re LDK Solar Securities Litigation*,
584 F. Supp. 2d 1230 (N.D. Cal. 2008) ..................................................... 14

*In re Omnicare, Inc. Securities Litigation*,
769 F.3d 455 (6th Cir. 2014) ................................................................... 6

*In re Sirrom Capital Corp. Securities Litigation*,
84 F. Supp. 2d 933 (M.D. Tenn. 1999) ..................................................... 33

*In re SmarTalk Teleservices, Inc. Securities Litigation*,
124 F. Supp. 2d 527 (S.D. Ohio 2000) ..................................................... 20

*In re Upstart Holdings, Inc. Securities Litigation*,
2023 WL 6379810 (S.D. Ohio Sept. 29, 2023) ........................................... 20

*In re Washington Prime Group, Inc. Securities Litigation*,
2024 WL 1307103 (S.D. Ohio Mar. 27, 2024) ........................................... 29

*Indiana Public Retirement System v. AAC Holdings, Inc.*,
2021 WL 1316705 (M.D. Tenn. Apr. 8, 2021) ............................... 9, 12, 25

*Jackson County Employees' Retirement System v. Ghosn*,
510 F. Supp. 3d 583 (M.D. Tenn. 2020) ............................................ 28, 31

*Kolominsky v. Root, Inc.*,
100 F.4th 675 (6th Cir. 2024) ................................................ 16, 31, 32, 33

*Kolominsky v. Root, Inc.*,
667 F. Supp. 3d 685 (S.D. Ohio 2023) ..................................................... 33

*Leff v. CIP Corp.*,
540 F. Supp. 857 (S.D. Ohio 1982) ......................................................... 20

*Little v. Crossville, Inc.*,
2021 WL 5198102 (M.D. Tenn. Nov. 9, 2021) ........................................... 34

*Lorenzo v. Securities & Exchange Commission*,
587 U.S. 71 (2019) ............................................................................... 27

*Modern Holdings, LLC v. Corning Inc.*,
2015 WL 1481457 (E.D. Ky. Mar. 31, 2015) ............................................... 5

*Ohio Public Employees Retirement System v. Federal Home Loan Mortgage Corp.*,
830 F.3d 376 (6th Cir. 2016) ............................................................ 28, 30

*Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*,
575 U.S. 175 (2015) ....................................................................... 7, 9, 11

*Padilla v. Community Health Systems, Inc.*,
2022 WL 3452318 (M.D. Tenn. Aug. 17, 2022) ................................. passim

*Pappas v. Qutoutiao Inc.*,
2024 WL 4588491 (2d Cir. Oct. 28, 2024) ................................................ 32

*Pinter v. Dahl*,
486 U.S. 622 (1988) ............................................................................... 35

*Ross v. Abercrombie & Fitch Co.*,
501 F. Supp. 2d 1102 (S.D. Ohio 2007) ................................................................. 20

*Schnall v. Annuity & Life Re (Holdings), Ltd.*,
2004 WL 367644 (D. Conn. Feb. 22, 2004) ............................................................ 14

*Securities & Exchange Commission v. Brincat*,
2001 WL 1662099 (N.D. Ill. Dec. 6, 2001) ............................................................ 27

*Securities & Exchange Commission v. Platforms Wireless International Corp.*,
617 F.3d 1072 (9th Cir. 2010) ................................................................................ 27

*Slack Technologies, LLC v. Pirani*,
598 U.S. 759 (2023) ................................................................................................ 35

*St. Clair County Employees' Retirement System v. Acadia Healthcare Co.*,
2021 WL 195370 (M.D. Tenn. Jan. 20, 2021) ................................................... 21, 25

*St. Clair County Employees' Retirement System v. Acadia Healthcare Co.*,
2022 WL 4598044 (M.D. Tenn. Sept. 30, 2022) ..................................................... 30

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) ....................................................................................... 5, 17, 26

*United States, ex rel. Marlar v. BWXT Y-12, L.L.C.*,
525 F.3d 439 (6th Cir. 2008) .................................................................................. 27

*Weiner v. Tivity Health, Inc.*,
365 F. Supp. 3d 900 (M.D. Tenn. 2019) ........................................................... passim

*Williams v. Duke Energy International, Inc.*,
681 F.3d 788 (6th Cir. 2012) .................................................................................... 5

*Winslow v. BancorpSouth, Inc.*,
2011 WL 7090820 (M.D. Tenn. Apr. 26, 2011) ..................................................... 14

*Winslow v. BancorpSouth, Inc.*,
2012 WL 214635 (M.D. Tenn. Jan. 24, 2012) ........................................................ 14

*Zaller v. Fred's Inc.*,
560 F. Supp. 3d 1146 (W.D. Tenn. 2021) .......................................................... 8, 22

*Zwick Partners, LP v. Quorum Health Corp.*,
2018 WL 2933406 (M.D. Tenn. Apr. 19, 2018) ................................... 10, 11, 14, 22

## <u>STATUTES</u>

15 U.S.C. §78u-4(b)(1) ............................................................................................. 6

15 U.S.C. §78u-4(b)(2)(A) ........................................................................................ 6

## <u>RULES</u>

Fed. R. Civ. P. 9(b) ................................................................................. 5, 10, 32, 33

# TABLE OF DEFINITIONS AND ABBREVIATIONS

| Defined Term | Meaning |
|---|---|
| §20A Defendants | Shoals and Jason R. Whitaker ("Whitaker") |
| 1933 Act | Securities Act of 1933, 15 U.S.C. §77a *et seq.* |
| 1933 Act Defendants | Dean Solon ("Solon"), the Director Defendants, and the Underwriter Defendants |
| 1934 Act | Securities Exchange Act of 1934, 15 U.S.C. §78a *et seq.* |
| 1934 Act Individual Defendants | Whitaker, Kevin Hubbard, Dominic Bardos ("Bardos"), Jeffery Tolnar, and Brandon Moss |
| AES | Applied Energy Services |
| ASC | Accounting Standards Codification |
| AWG | American wire gauge |
| BLA | Big Lead Assembly |
| Board | Shoals' Board of Directors |
| CEO | Chief Executive Officer |
| CFO | Chief Financial Officer |
| Class | Consisting of all persons who purchased or otherwise acquired Shoals Common Stock during the Class Period and were harmed thereby |
| Class Period | May 16, 2022 through May 7, 2024, inclusive |
| Complaint, Compl., and "¶__" | Plaintiffs' Amended Consolidated Complaint for Violations of the Federal Securities Law (ECF No. 82) and paragraphs of the Complaint |
| CTO | Chief Technology Officer |
| December 2022 SPO | Shoals' December 2022 SPO |
| December 2022 SPO Prospectus | Shoals' Prospectus Supplement, filed on Form 424B5 with the SEC on December 5, 2022 |
| Defendants | Shoals and the 1934 Act Individual Defendants |
| Director Defendants | Whitaker, Brad Forth, Peter Wilver, Ty Daul, Toni Volpe, Lori Sundberg, Jeannette Mills, and Robert Julian |
| EBOS | Electrical Balance of Systems |
| Erste AM | Lead Plaintiff Erste Asset Management GmbH |
| FASB | Financial Accounting Standards Board |
| FY | Fiscal Year |
| GAAP | Generally Accepted Accounting Principles |
| KUAERP | Plaintiff Kissimmee Utility Authority Employees' Retirement Plan |
| March 2023 SPO | Shoals' March 2023 SPO |
| March 2023 SPO Prospectus | Shoals' Prospectus Supplement, filed on Form 424B5 with the SEC on March 7, 2023 |
| Motion or Mot. | Memorandum of Law in Support of Defendants' Motion to Dismiss Consolidated Complaint (ECF No. 85) |
| Mot. Ex. | Exhibits to Motion (ECF Nos. 86-1–15) |

| DEFINED TERM | MEANING |
|---|---|
| NASDAQ | National Association of Security Dealers Automated Quotations |
| Plaintiffs | Lead Plaintiff Erste AM and plaintiff KUAERP |
| Prysmian | Prysmian Cables & Sys. USA, LLC |
| Q | Shoals fiscal quarter |
| SEC | United States Securities and Exchange Commission |
| Shoals Common Stock | Shoals Class A common stock |
| Shoals or the Company | Shoals Technologies Group, Inc. |
| Solicitor-Seller Defendants | Shoals, Whitaker, Bardos, and the 1933 Act Defendants |
| SPO | Secondary Public Offering |
| SPO Offering Materials | SPO Registration Statement and Prospectus through which Shoals accomplished the December 2022 SPO |
| SPO Registration Statement | Shoals' registration statement for the December 2022 SPO, filed on Form S-3 with the SEC on November 30, 2022 |
| SPOs | Shoals' December 2022 and March 2023 SPOs |
| Underwriter Defendants | J.P. Morgan Securities LLC<br>Guggenheim Securities, LLC<br>Morgan Stanley & Co. LLC<br>UBS Securities LLC<br>Goldman Sachs & Co. LLC<br>Barclays Capital Inc.<br>Credit Suisse Securities (USA) LLC<br>Cowen and Company, LLC<br>Oppenheimer & Co. Inc.<br>Piper Sandler & Co.<br>Roth Capital Partners, LLC<br>Johnson Rice & Company L.L.C.<br>Northland Securities, Inc. |

# INTRODUCTION

In December 2022 and March 2023, the officers and directors of Shoals caused the Company to sell 54.4 million shares in two SPOs at artificially inflated prices, permitting Company insiders to pocket more than $1 billion from investors. The Company and its insiders knew of a dangerous and costly defect affecting Shoals' core revenue-generating product: a wiring harness used to connect large-scale solar panel fields, i.e., the BLA. Unbeknownst to investors was that, since March 2022, a growing number of customers had complained to Shoals that the wiring connecting the BLAs in their solar fields had been suffering unacceptable amounts of "insulation shrinkback." Specifically, the insulation surrounding the BLA's wiring had contracted and pulled away at key connection points, leaving live, electrified wires exposed to the elements, causing at least one damaging fire, and creating serious risks of injury or death. ¶61. Defendants delayed disclosing Shoals' shrinkback problems to the market, instead telling investors the Company "may" face exposure to warranty claims from its customers related to defective products. ¶¶80, 86, 91, 95, 100, 105. However, only after Defendants cashed out from the SPOs did they tell the market—in a series of piecemeal disclosures—about the BLA problem, and that Shoals was potentially liable for millions of dollars in undisclosed warranty remediation costs, eventually disclosing those costs totaled as much as $160 million. ¶¶136-41. As a result, Shoals' business, finances, operations, and reputation have suffered substantial harm and disruption, materially impairing the Company's ability to compete, resulting in "unprecedented" project cancellations, order delays, lost market share, and a substantial and steady decline in stock price.[1]

---

[1]    In the March 2023 SPO, Shoals sold 24.5 million shares for $24.70 per share. ¶103. By May 8, 2024 (the day after the Class Period ends), those same shares traded at only $7.51 per share, ¶164, and by November 12, 2024, those shares traded at just $4.85 per share, ¶171.

Urging the Court to ignore these damning allegations, Defendants suggest that Shoals was merely "playing a 'constant game of catch-up' with an evolving issue," in the hopes the Court will credit their self-serving narrative instead of the well-pled allegations in the Complaint. Mot. 7, 28, 35. The Complaint, however, lays out in sufficient detail the allegations underlying Plaintiffs' 1934 Act claims—supported by first-hand accounts from former Shoals managers and particulars set forth in Shoals' lawsuit with its wiring supplier. Separately, Plaintiffs' 1933 Act allegations— a *different* set of strict liability and negligence-based claims brought against a *different* set of defendants—easily satisfy the applicable notice-pleading standard of Rule 8(a) (and the higher Rule 9(b) standard Defendants incorrectly contend applies).

## FACTUAL ALLEGATIONS

***Defendants promoted Shoals' EBOS products as safer, more reliable, and less costly***. Shoals generates most of its revenue selling wiring components for solar panels (and other applications) known as "EBOS" solutions. ¶¶14, 36, 38. During the Class Period, Shoals' executives repeatedly told investors that its main EBOS product, the BLA, offered several competitive advantages over other conventional EBOS products, including lower installation costs, improved safety and reliability, and lower risk of failure. ¶37. For example, Shoals stated that its BLA products were "more reliable than competing solutions," "can be installed by anyone," have "less potential for failure," and "reduce labor costs, improve safety, increase reliability and reduce maintenance expenses." ¶¶78-79, 84. Shoals similarly claimed that "our solutions are especially attractive as they take less time to install and are installable by general labor [as opposed to certified electricians]," "our interconnect harness and BLA will have significantly fewer connections, and, as a result, fewer failure points," which "contributes to higher reliability . . . compared to conventional [EBOS]." ¶¶89, 101, 42. Defendants touted Shoals products' qualities

as competitive advantages that would drive increased market share, leading to "new records for revenue, gross profit, net income, adjusted EBITDA and adjusted net income."  ¶¶37, 43.

***Defendants received reports about a costly product defect***.  While Defendants hyped the increased safety and reliability (and lower costs) of Shoals' products, they began internally receiving reports of excessive "shrinkback"—or wires pulling out or away from layers of insulation—exposing electrified wiring to the elements.  ¶47.  Shoals' suppliers informed the Company of this shrinkback defect "***as early as March 2022***."  ¶54.  Left unabated, those exposed wires posed Shoals' customers significant risks of property damage and injury, including (as had already occurred) fire.  ¶¶61, 72.  In April 2022, Whitaker and others instructed a former Shoals manager ("FE1") to personally inspect a solar field in Phoenix.  ¶50.  FE1 reported that he had observed insulation pulling back from the T-junction connector (possibly because of installation error) and that another solar field near Phoenix had experienced similar issues.  *Id*.  FE1 also explained that by ***June 2022*** at least four or five other solar fields with Shoals' wiring harnesses had exposed wires.  ¶51.  Shoals' longtime supplier of wires for BLA T-junctions, Prysmian, responded to Shoals' federal lawsuit against it by alleging that "***as of December 2022***, Shoals informed Prysmian that it was aware of reported exposed conductors at ***eight solar sites***."  ¶54.

Remediation for the shrinkback defect came at a significant cost.  ¶54.  Another former Shoals manager, FE2, explained that the Company agreed to replace defective wiring at the Phoenix location at a cost of $3.5 to $4 million and that by summer 2022, the Company faced remediation costs of over $15 million.  *Id*.  Despite repeated customer complaints and growing warranty costs, Defendants did not disclose the defect, and, in violation of GAAP, misled investors about the Company's exposure to warranty claims and associated remediation costs by "warning" that Shoals "may" face such claims, rather than disclosing that Shoals already was facing those

claims. ¶¶130-54. Indeed, it was not until May 2023—***more than a year*** following FE1's initial inspection of the Phoenix solar field—that Shoals first disclosed the existence of the shrinkback defect. ¶111. Even then, rather than acknowledge the already substantial costs incurred—i.e., $15 million as of June 2022—Defendants downplayed the issue and refused to disclose the costs paid to date, or the known scope of the problem, stating that "while it is probable that the Company will incur costs related to the repair or replacement of the impacted wire harnesses, it is not possible to reasonably estimate those costs." *Id.*

Defendants finally disclosed Shoals' first remediation cost estimate—$9.4 million—in August 2023, which was far lower than the $15 million already incurred nearly a year earlier, according to FE1. ¶¶54, 113. When analysts asked about the $9.4 million estimate, Bardos stated, "[t]he charge that we booked in the quarter, we believe, is adequate to do the remediation required, that's why we booked it." ¶116. Despite these assurances, the next quarter, Shoals' warranty expenses ballooned to more than $50 million, a greater than ***five-fold increase***. ¶120. Shoals revealed that as many as 300 sites may have products with the defect and that the high end of the range for future warranty liabilities was $189.9 million, a staggering increase from the mere $9.4 million in remediation costs reported the prior quarter. *Id.* As Shoals' warranty liabilities increased, Defendants retreated from their initial installation error theory—likely due to their prior claims that Shoals' products "can be installed by anyone"—shifting blame to Prysmian, Shoals' sole supplier of certain cable wires for the BLA. ¶¶56, 67-68.

***Shoals publicly sells 54.4 million shares in two SPOs—without disclosing the defect***. However, before Shoals disclosed its shrinkback defect (and related warranty liabilities) to investors, the Company completed the December 2022 SPO on December 5, 2022, announcing that Shoals and Solon intended to sell 29.9 million of common stock for gross proceeds of

$665 million. ¶¶179-80. The offering documents repeated statements touting the "reliability and safety" of Shoals' EBOS products. ¶¶95, 105, 181. Noticeably absent, however, was any mention of the spiraling shrinkback defect liabilities that had been identified as early as March 2022. ¶¶47, 184. Instead, the Company misled investors with boilerplate "warnings" that the Company "*may* face warranty, indemnity and product liability claims arising from defective products." ¶183.

On March 7, 2023, Shoals completed the March 2023 SPO, in which Solon sold an additional 24.5 million shares of Shoals Common Stock for $594 million. ¶103. Defendants offered similar representations about "reliability and safety" and misleading boilerplate "warnings" about potential defects without mentioning their then-existing shrinkback problem. ¶¶103-06. Between the two SPOs, Solon reaped over $1 billion in insider sales. ¶31.

***When the shrinkback defect was finally disclosed, Shoals' stock price declined significantly***. In a series of disclosures between August 2023 and November 2024, Defendants finally disclosed the Company's BLA shrinkback defect and associated warranty liability exposure, resulting in devastating losses for Shoals' investors. ¶¶155-73.

## ARGUMENT

Rule 12(b)(6) requires a court to "consider the complaint in its entirety," "accept all factual allegations . . . as true" and construe them in the light most favorable to the plaintiff. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-24 (2007). A complaint "does not need detailed factual allegations," but "only enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). "Rule 9(b) does not require omniscience; rather the Rule requires that the circumstances of the fraud be pled with enough specificity to put defendants on notice as to the nature of the claim." *Williams v. Duke Energy Int'l, Inc.*, 681 F.3d 788, 803 (6th Cir. 2012); *Mod. Holdings, LLC v. Corning Inc.*, 2015 WL 1481457, at *14 (E.D. Ky. Mar. 31, 2015) (under Rule 9(b), "[a]bsolute particularity is . . . not

required"). The PSLRA requires a plaintiff to specify the alleged false statements, identify the "reasons why the statement is misleading" and "state with particularity facts giving rise to a strong inference that the defendant acted with" scienter. 15 U.S.C. §78u-4(b)(1), (2)(A). "Where a complaint alleges 'a complex and far-reaching fraudulent scheme,' . . . the complaint must also 'provide examples of specific' fraudulent conduct that are 'representative samples' of the scheme." *Bond v. Clover Health Invs., Corp.*, 587 F. Supp. 3d 641, 664 (M.D. Tenn. 2022).

## I. The Complaint Alleges Falsity with Particularity

The 1934 Act prohibits "the making of any 'untrue statement of material fact' or the omission of any material fact 'necessary in order to make the statements made . . . not misleading.'" *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341 (2005) (alteration in original). Corporate actors must "provide complete and non-misleading information with respect to subjects on which [they] undertake[] to speak." *Helwig v. Vencor, Inc.*, 251 F.3d 540, 561 (6th Cir. 2001). "[A] company may choose silence or speech elaborated by the factual basis as then known—but it may not choose half-truths." *Id.*; *see also Weiner v. Tivity Health, Inc.*, 365 F. Supp. 3d 900, 913 (M.D. Tenn. 2019) (similar).

### A. Defendants' "Performance, Quality, Reliability" and "Safety" Statements Misled Investors

#### 1. Defendants' Misstatements Were Material

"[C]ontext matters when analyzing materiality." *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 478 (6th Cir. 2014). The "Sixth Circuit has made clear that even superficially broad statements of corporate self-praise must be evaluated in context to determine if they convey more than just a generalized optimism." *Grae v. Corr. Corp. of Am.*, 2017 WL 6442145, at *14 (M.D. Tenn. Dec. 18, 2017) ("*CCA*") ("'[A] company's statements . . . must not be assessed in a vacuum (i.e., by plucking the statements out of their context to determine whether the words, taken per se,

6

are sufficiently 'vague' so as to constitute puffery.')"). Throughout the Class Period, Defendants repeatedly emphasized the importance of Shoals' products' performance, quality, reliability, and safety to the Company's success. *See*, *e.g.*, ¶¶41-43, 76-79, 83-84, 88, 94, 98, 101, 104, 107-08, 114, 181-82. For example, during a May 16, 2022 conference call with analysts, Whitaker emphasized that "at our core, we really focus on ***quality, reliability and safety***" of Shoals' products and this focus was generating "a lot of opportunities" for the Company." ¶77; *see also Bond*, 587 F. Supp. 3d at 670 ("[T]hat Clover Assistant worked well and drove growth was ***the core of Clover's pitch to investors***, and there is no reason for the court to assume that a reasonable investor would have ignored it simply because it also resembled, on some superficial level, empty corporate self-praise." (emphasis added)). Therefore, Defendants' argument that their repeated misstatements to investors about core aspects of Shoals' business and the underlying drivers of its success and reputation should be disregarded as mere puffery should be rejected. Mot. 19; *see also CCA*, 2017 WL 6442145, at *18 (falsity and materiality pled when plaintiff pled defendants "***repeatedly claimed*** or suggested that the company's history of quality services had gained it the faith and esteem of its government partners, when . . . the perceived low quality of its services was leading one of its most important client relationships to the brink of collapse." (emphasis added)).

## 2.    Defendants Failed to Speak Truthfully and Accurately to Investors

As this Court has held, once "a company has chosen to speak on an issue—even an issue it had no independent obligation to address—it cannot omit material facts related to that issue so as to make its disclosure misleading." *Weiner*, 365 F. Supp. 3d at 913. Moreover, "[a] speaker must provide 'the whole truth' . . . ***literal accuracy is not enough***." *Padilla v. Cmty. Health Sys., Inc.*, 2022 WL 3452318, at *19 (M.D. Tenn. Aug. 17, 2022) (alteration in original) (emphasis added) (quoting *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 192 (2015)). Here, when Defendants chose to extoll the quality, safety, reliability, and cost

savings as driving sales of BLA, they were required to —but failed to— disclose the whole truth, including the growing problem of excess shrinkback, which they had known of "as early as March 2022." ¶54. Instead, Defendants concealed and delayed acknowledging that the BLA had dangerous and costly defects. ¶47. Additionally, remediation would cost millions of dollars to replace per site—with the list of affected sites continuing to grow. ¶¶50-54. Two former managers confirmed that Shoals "was aware of at least four to five other solar fields that were experiencing the same issues as the initial site in Phoenix" with remediation costs likely to exceed $15 million by June 2022. ¶54. And, according to Prysmian's Answer to the lawsuit filed by Shoals, by December 2022, at least eight sites required remediation. *Id.*

Defendants' arguments that the Court should not rely on FE3 (*see* Mot. 20) are not well taken. First, there is no requirement that a confidential witness be employed by the company "during the Class Period itself." *Bond*, 587 F. Supp. 3d at 667. Defendants also ignore that FE3 was a Plant Quality Control Manager whose job it was to know about quality controls and a "person in [his] position would possess the information alleged." *Id.*; *see also Zaller v. Fred's Inc.*, 560 F. Supp. 3d 1146, 1168 n.5 (W.D. Tenn. 2021). FE3 was thus aware of the shrinkback issues when he joined the Company and that "there were no quality controls, checks, or testing done with respect to wiring received from suppliers." ¶55. This account is corroborated by Prysmian's allegation that "Shoals did not have a formal or objective adhesion quality testing protocol or wire inspection protocol in place to certify that its molded connector products sufficiently adhered to its suppliers' wire and verify the integrity and quality of its manufactured harnesses." *Id.*; *see also Padilla*, 2022 WL 3452318, at *36 ("Many of the statements made by the confidential witnesses are (at least ostensibly) corroborated by other information alleged in the Amended Complaint."); *Bond*, 587 F. Supp. 3d at 668 ("[M]any of the CWs' statements describing

problems at Clover **were echoed** by the Hindenburg Report, **which corroborated** that the trends that these CWs witnessed continued into the Class Period." (emphases added)).

Defendants also contend the Company's statements that its products could be installed by general labor and had fewer failure points are both literally true and unrelated to shrinkback. Mot. 21. But statements that are true can still mislead. *See, e.g.*, *Omnicare*, 575 U.S. at 192; *Bond*, 587 F. Supp. 3d at 671; *Padilla*, 2022 WL 3452318, at *20. Those statements regarding labor and alleged failure points were also inextricably tied to the false and misleading representations regarding the lower costs, "superior quality," "reliability," and "safety" of the Company's products. ¶¶78, 101. Those statements omitted key facts of which Defendants were aware (i.e., the growing and costly defect issues that they believed were caused by installation issues) and that, in turn, suggested the products were *not* so reliable and safe that they could actually "be installed by anyone." Similarly, whether it was technically true that there were "fewer failure points" is irrelevant. Defendants' statements omitted that those "fewer points" were failing and causing increased costs to maintain, making them, at best, actionable "half-truths." *Helwig*, 251 F.3d at 561; *see also Ind. Pub. Ret. Sys. v. AAC Holdings, Inc.*, 2021 WL 1316705, at *15 (M.D. Tenn. Apr. 8, 2021) ("[A]lthough Defendants' statements concerning what *could happen* were technically true, they implied that any such disruption or adverse impact on business had not yet occurred while omitting the fact that these things in fact were already occurring.").

Finally, Defendants claim their misstatements "touting Shoals' product advantages" are simply representations made in the context of warning investors of the products' risks. Mot. 21. Even if true, their statements created a misleading impression because, while they were hailing the lower costs and the increased safety and reliability of Shoals' products, Defendants knew (or were reckless in not knowing) that the Company **already** was incurring millions of dollars in

9

remediation costs due to this shrinkback defect. Thus, these purported warnings did not "dispel[]

the false impressions created by Defendants' alleged misrepresentations." *Zwick Partners, LP v.

Quorum Health Corp.*, 2018 WL 2933406, at *10 (M.D. Tenn. Apr. 19, 2018).

### B. Plaintiffs Adequately Plead Defendants' Violations of GAAP

GAAP "are the basic postulates and broad principles of accounting pertaining to business

enterprises, approved by the Financial Accounting Standards Board of the American Institute of

Certified Public Accountants ('AICPA') and its successor entities." *Bond*, 587 F. Supp. 3d at 662.

Here, the Court need not decide whether Defendants have "complied with relevant accounting

standards," but only determine if Plaintiffs have satisfied "the applicable pleading requirements

set forth in [*Ashcroft v. ]Iqbal*[, 556 U.S. 662 (2009)] and *Twombly*, Fed. R. Civ. P. 9(b), and the

PSLRA." *Padilla*, 2022 WL 3452318, at *20.

Plaintiffs allege that Shoals' financial statements violated GAAP, specifically Financial

Accounting Standards Board ASC 450, which governs the disclosures of a "loss contingency."

¶131.[2] ASC 450 requires that a company accrue a charge to income when (1) the company has

information indicating it was probable (i.e., that "[t]he future event or events is likely to occur")

that a liability had been incurred before the financial statements were issued, and (2) the amount

of the loss can be reasonably estimated. ¶132. When the loss cannot be estimated but its

occurrence is nonetheless "reasonably possible," meaning "the chance of the future event or events

occurring is more than remote but less than likely," ASC 450 requires a comprehensive disclosure

of the potential loss, including an indication of the "nature of the contingency" and "[a]n estimate

of the possible loss or a range of loss or a statement that such an estimate cannot be made." *Id.*

---

[2]    ASC 450 defines "loss contingency" as "[a]n existing condition, situation, or set of
circumstances involving uncertainty as to [a] possible loss to an entity that will ultimately be
resolved when one or more future events occur or fail to occur." ¶131 n.9.

Defendants' contention that Plaintiffs' GAAP allegations are inactionable "opinions" misses the mark. Mot. 9. Focusing almost entirely on the adequacy of the "reserve estimates," Defendants give only passing reference to the heart of the Complaint's allegations: Defendants failed to provide the disclosure, mandated by GAAP, of the existence of the BLA product defect and the related potential losses the Company faced. ¶¶80, 86, 91, 95, 100, 134-54. Defendants' "reserve estimates" and their omission of the required disclosures were not opinions—but even if they were, they are actionable. *See Zwick*, 2018 WL 2933406, at *5-6 (holding opinion actionable if it does not "fairly align[] with the information in the [defendant]'s possession at the time" (quoting *Omnicare*, 575 U.S. at 188-89)). Here, Defendants had received reports of the shrinkback problem by no later than March 2022 and Shoals was aware of at least eight solar sites where shrinkback and exposed wiring were present in its BLA product by December 2022. ¶¶47-48, 50, 54. The Complaint further alleges that as more sites reported shrinkback problems, thereby increasing Shoal's exposure to remediation costs, the Company claimed Prysmian's wire was defective and ended up suing Prysmian in October 2023. ¶¶54, 56, 58, 147.

Despite this information, the Company's SEC filings for each quarter and year end in FY22 failed to accrue a loss contingency specifically associated with the BLA shrinkback or provide the disclosure of the nature of the loss and a range of loss or a statement that an estimate of that loss could not be made, as required by GAAP. ¶¶80, 86, 91, 95, 100, 105, 134-39. Instead, Defendants merely stated that Shoals "***may*** face warranty, indemnity and product liability claims arising from defective products." ¶¶134-36, 138; *see also* ¶¶80, 86, 91, 95, 100, 105. GAAP, however, required Shoals to book a loss contingency when it was "probable" (i.e., when "the future events were likely to occur") it would face "claims under warranties relating to goods or services that have been sold." ¶132. The Complaint alleges that the "warranty, indemnity and product liability claims arising

from defective products" that Defendants "warned" about were not just "probable" they had ***already occurred*** and were costing the Company millions to remediate. But regardless of whether Defendants could provide an estimate, GAAP still required that they disclose the nature of the loss associated with the defect given "the chance of the future event or events occurring" was clearly "more than remote." *Id.*[3]

Even if Defendants' "warnings" were opinions (they were not), "[a] statement couched as an opinion can still be misleading if it omits material facts about the basis for the opinion." *AAC*, 2021 WL 1316705, at *15. In *AAC*, Judge Richardson rejected the same arguments Defendants make here concerning "warnings" about conditions that "could" impact the defendant company, finding instead that, even if "statements concerning what *could happen* were technically true, they implied that any such disruption or adverse impact on business had not yet occurred while omitting the fact that these things in fact were already occurring." *Id.* Also, like here, the plaintiff in *AAC* alleged the defendants already knew the company was facing the conditions being "warned" about and, as such, had "sufficiently alleged that the statements in these 'opinions' were false and misleading via both embedded false statements and omission of material facts." *Id.* at *16.

When Defendants finally, and belatedly, disclosed the shrinkback issue in Shoals' 1Q23 Form 10-Q, they still did not record a specific reserve related to any losses, but instead ***lowered by a third*** the general warranty reserve of $600,000 that had been recorded at the end of FY22. ¶¶140-

---

[3]     Defendants' argument that they are absolved from recording a loss contingency when it was "reasonable to expect" another party would pay the cost is meritless. *See* Mot. 11, 14-15. Under that rationale, Shoals would never have recorded any loss contingency because Prysmian would be responsible for the loss. But Defendants ***did*** record a loss contingency, even after they had alleged Prysmian supplied defective wire, and ***increased*** that loss contingency after Shoals sued Prysmian for damages associated with the shrinkback in Shoals' BLA product. ¶¶59, 70-71, 143-54. Defendants' reliance on *In re Ford Motor Co. Securities Litigation* is misplaced because Bridgestone was responsible ***by statute*** for the loss related to a recall of defective tires, thereby excusing Ford's obligation to record a loss contingency. 381 F.3d 563, 572 (6th Cir. 2004).

41. By May 2023, when Shoals filed its 1Q23 Form 10-Q and first disclosed Shoals' BLA product defect, Defendants had already known about the shrinkback problem for ***over a year***, faced at least $15 million in remediation costs, and purportedly identified the "root cause" of the defect "in or around November 2022" (***seven months earlier***), making identifying the scope of the affected products possible. ¶¶110-11, 138, 142. Thus, Defendants' 1Q23 ASC 450 disclosure was, at best, misleading.[4] Moreover, Plaintiffs allege that Defendants' delay in disclosing the scope and cost of the problem to the Company was not because the situation was evolving, as Defendants contend (Mot. 13, 15), but rather to enable Defendants to sell $1.1 billion of their Shoals stock. ¶¶62-63, 65-66, 93, 95, 103, 105. Regardless, GAAP still required the disclosure of the BLA product defect, even if the situation was evolving and the associated loss could not be estimated. ¶132.

Finally, when Defendants eventually recorded a specific reserve amount for the shrinkback loss in August 2023, those reserve estimates were materially understated. The Complaint's allegations are not "underestimation in hindsight." Mot. 13.[5] Instead, Defendants, who had known about the defect since March 2022 (more than a year before the defect was disclosed), knew the product was installed in 300 customer sites and had determined the "root cause" of the defect in November 2022—***nine months*** before they booked one penny in a related reserve—giving them ample time to assess the scope of the loss contingency. ¶¶47, 50, 53-54, 138.[6]

---

[4]    Defendants' arguments that there is "no duty of total corporate transparency" and that the consequences the Company faced from the BLA product defect had to be "virtually certain to occur" before there was a duty to disclose (Mot. 15) are contrary to GAAP and controlling authority that confirms a duty to speak truthfully when one speaks on a subject. Defendants' cases do not address whether that duty to speak was present and thus are inapplicable. *Id.*

[5]    Unlike here, the plaintiffs in each of the cases Defendants cite where "warranty reserve" statements were found to be inactionable opinions had failed to sufficiently allege that the defendant omitted material facts underlying the basis for the reserve. *See* Mot. 9, 14, 16.

[6]    Defendants rely on both the lack of a restatement and the clean audit opinion to absolve themselves from liability for GAAP violations. *See* Mot. 14. Neither argument is persuasive, and the cases they rely upon are distinguishable. *See In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230,

**C.      The PSLRA's Safe Harbor Provides No Protection to Defendants**

Misstatements concerning both the adequacy and amount of Shoals' warranty reserves[7] are not protected forward-looking statements.  First, when viewed in their proper context—and not in the "abstract"—Defendants' misstatements about the Company's "[warranty] reserves and their adequacy are not per se forward-looking."  *Winslow v. BancorpSouth, Inc.*, 2011 WL 7090820, at *18 (M.D. Tenn. Apr. 26, 2011) (citation omitted), *R. & R. adopted by* 2012 WL 214635 (M.D. Tenn. Jan. 24, 2012).  This is because "[s]tatements regarding loss reserves are not projections, they are directed to 'the then-present state of the Company's financial condition.'"  *Schnall v. Annuity & Life Re (Holdings), Ltd.*, 2004 WL 367644, at *8 (D. Conn. Feb. 22, 2004) (citation omitted); *see also In re Emp. Sols. Sec. Litig.*, 1998 WL 1031506, at *4 (D. Ariz. Sept. 22, 1998) ("I agree with plaintiffs that ESI's statements about reserves are best seen as statements of historical fact.").  For example, when Bardos misleadingly represented to investors in August 2023 that Shoals' warranty reserve was "adequate to do the remediation required," that statement was based on, and conveyed, then-present facts discussed (albeit misleadingly) in the previous quarter's 10-Q filed in May 2023.  ¶116; *see also* ¶111 ("The Company has been notified by certain customers that a subset of wire harnesses used in its EBOS solutions is presenting excessive pull back of wire insulation at connection points ('shrinkback')."); *id.* ("***Based upon the Company's initial assessment* . . . .**"); *id.* ("***based on the limited information available as of the date of this Quarterly Report***") (emphases added).   When Defendants misleadingly understated the Company's warranty reserve in Shoals' SEC filings during the Class Period (*see*, *e.g.*, ¶¶130, 133,

---

1245 (N.D. Cal. 2008) ("[T]he lack of a restatement did not mean that [Defendants] only engaged in legitimate conduct.").  Indeed, GAAP violation allegations have been found sufficiently pleaded without a restatement having been issued in several cases in this District.  *See*, *e.g.*, *Zwick*, 2018 WL 2933406, at *6; *Padilla*, 2022 WL 3452318, at *19-20; *Bond*, 587 F. Supp. 3d at 674.

[7]      *See* ¶¶40, 56, 60, 69-71, 74, 80, 86, 91, 95, 100, 105, 110, 113, 116, 118, 120-21, 123-24, 128, 130, 133-42, 144-46, 148-50, 152-54, 186.

145, 149, 153), those misrepresentations also conveyed (and were based in part on) then-present and historical facts, thereby constituting actionable misstatements ineligible for protection under the safe harbor. *See Padilla*, 2022 WL 3452318, at *38.

Second, Shoals' boilerplate and vague cautionary language—such as purportedly warning investors about Defendants' implied inexperience of "making assumptions for warranty accruals" as well as potential negative consequences if the Company failed to "accurately estimate potential losses" (Mot. 17)—also does not bring these misstatements under the protection of the safe harbor. *See Weiner*, 365 F. Supp. 3d at 912. Moreover, the safe harbor's protection is unavailable because none of the purported cautionary language disclosed that Defendants knew—or were reckless in not knowing—that the risks allegedly being warned about had already come to fruition. *See Franchi v. SmileDirectClub, Inc.*, 633 F. Supp. 3d 1046, 1075 (M.D. Tenn. 2022) ("Defendants cannot be immunized by risk disclosures 'where the risk allegedly disclosed has already occurred' but such actual occurrence has not been disclosed."). Finally, even if this Court were to determine that the warranty reserve statements qualify as forward-looking, the same facts showing that Defendants had the requisite scienter (*see infra* §II) are also sufficient to meet the "actual knowledge" standard applicable to the safe harbor. *See In re FirstEnergy Corp. Sec. Litig.*, 316 F. Supp. 2d 581, 596 (N.D. Ohio 2004) ("Taken together, the facts of the complaint suggest the Defendants had actual knowledge of the problems at Davis Besse. In such a situation, vague and insipid cautionary language is insufficient to afford the statements protection under PSLRA's safe harbor provision.").

### D. Defendants Misled Investors by Warning About Future Risks that Had Actually Already Materialized

Courts throughout the country—including this one—have held that a defendant's misleading cautionary language can also constitute an actionable misstatement. *See, e.g.*, *Weiner*,

365 F. Supp. 3d at 908-10; *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 704 n.6 (9th Cir. 2021). Additionally, in the non-binding, unpublished decision Defendants cite (*see* Mot. 18), the Sixth Circuit held that "there may be circumstances" when a company's purported risk disclosures that something "may" negatively impact the company when it was already doing so "might support Section 10(b) liability." *Weiner*, 365 F. Supp. 3d at 909-10 (quoting *Bondali v. Yum! Brands, Inc.*, 620 F. App'x 483, 491 (6th Cir. Aug. 20, 2015)).[8]  Defendants claim that their purported risk disclosures are not actionable because: (1) they are protected forward-looking statements; and (2) the Complaint insufficiently details why they are materially misleading.  They are wrong.

First, "[a]ffirmative statements, even if 'forward-looking', ***are not protected by the safe harbor provision if they omit material facts***."  *In re Concord EFS, Inc. Sec. Litig.*, 2004 WL 7390451, at *12 (W.D. Tenn. Jan. 7, 2004) (emphasis added).  Here, the Complaint alleges that when Defendants misleadingly cautioned investors that Shoals "may" face "warranty, indemnity, and product liability claims arising from defective products," the Company omitted it was ***already*** facing such claims.  ¶¶80, 81(d), 86, 87(d), 91, 92(d), 95, 96(d), 100, 102(d), 105, 106(d); *see Padilla*, 2022 WL 3452318, at *38 (finding defendants' "statements were materially false and misleading because . . . ***they excluded relevant information*** and data from their bad-debt calculations" and that "[t]hese statements (***and the alleged omissions therefrom***) relate to matters of present or historical fact" because "one could determine" when "the statements were spoken, whether ***relevant evidence was excluded***" (emphases added)).  Second, the Complaint sufficiently details that Defendants' purported risk disclosures about ***potential*** warranty, liability, and product

---

[8]  Although *Kolominsky v. Root, Inc.* found that the "cautionary statement" before the court "fail[ed]" because it was not a "sham warning," the court did not categorically hold that a risk disclosure could never be an actionable misstatement.  *See* 100 F.4th 675, 689 (6th Cir. 2024).

liability claims were materially misleading because the Company was ***already*** facing such claims, and that exposure was growing. ¶¶47, 50-51, 54. *See* §I.C.

## II. The Complaint Alleges a Strong Inference of Scienter

"In examining scienter, [the court] must decide whether all of the facts alleged, *taken collectively*, meet the PSLRA's requirements. [T]he court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically.'" *Bond*, 587 F. Supp. 3d at 674 (alterations in original) (citations omitted) (quoting in part *Tellabs*, 551 U.S. at 322-23, 326). Separating each allegation "risks losing the forest for the trees." *Frank v. Dana Corp.*, 646 F.3d 954, 961 (6th Cir. 2011) ("*Dana II*"). A complaint survives "if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324.[9] "[W]here two equally compelling inferences can be drawn, one demonstrating scienter and the other supporting a nonculpable explanation, *Tellabs* instructs that the complaint should be permitted to move forward." *Weiner*, 365 F. Supp. 3d at 916 (quoting *Frank v. Dana Corp.*, 547 F.3d 564, 571 (6th Cir. 2008) ("*Dana I*")). Scienter may be alleged two ways: "[1] knowing and deliberate intent to manipulate, deceive, or defraud, and [2] recklessness." *Dana II*, 646 F.3d at 958-59. Recklessness is "highly unreasonable conduct which is an extreme departure from the standards of ordinary care." *In re Comshare, Inc. Sec. Litig.*, 183 F.3d 542, 549-50 (6th Cir. 1999). The Sixth Circuit has identified nine "***non-exhaustive***" factors—the

---

[9] Defendants' suggestion that the Court's scienter assessment should consider how many times the Complaint "use[s] the word 'scienter'" or whether the Complaint includes a "distinct scienter section," Mot. 23 n.7, should be rejected out-of-hand because such a superficial analysis would ignore (rather than consider) "*all* of the facts alleged" as courts are instructed to do by *Tellabs*. 551 U.S. 308 at 323. Defendants' argument also ignores that the Complaint does allege, among other things, what Defendants "knew" (¶¶92(b), 96(b), 142, 146, 150); what they "were aware of" (¶¶20, 51, 54-55, 67, 134-35, 138); what they had "comprehensive knowledge of" (¶15); what they had "actual knowledge of" (¶209); what was "known to" them (¶¶184, 210); and what they "recklessly disregarded" (¶¶20, 184, 206, 209-10).

"*Helwig* factors"—that courts consider when determining whether a strong inference of scienter has been pleaded. *Weiner*, 365 F. Supp. 3d at 913-914 (emphasis added) (citing *Helwig*, 251 F.3d at 552); *see also Dana II*, 646 F.3d at 958 n.2 (same).

### A.    The Relevant *Helwig* Factors Support a Finding of Scienter

The *Helwig* factors are "a non-exhaustive list of factors that do not necessarily establish scienter, but are 'usually relevant' to its analysis." *Dana II*, 646 F.3d at 959 n.2.  But the *Helwig* factors "are not a checklist of required showings." *In re FirstEnergy Corp. Sec. Litig.*, 2022 WL 681320, at *18 (S.D. Ohio Mar. 7, 2022); *see also Bond*, 587 F. Supp. 3d at 676 ("The *Helwig* factors . . . are not a checklist.").  Instead, they "point to fixed constellations of facts that courts have found probative of securities fraud." *Helwig*, 251 F.3d at 552; *see also In re FirstEnergy Corp. Sec. Litig.*, 2022 WL 681320, at *18 (S.D. Ohio Mar. 7, 2022).  Thus, there is no requirement that any number of *Helwig* factors be present to state a claim. *See, e.g.*, *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 685 (6th Cir. 2005); *CCA*, 2017 WL 6442145, at *20 (scienter adequately alleged when only two factors present).

### 1.    Defendants' Public Statements Diverged from Internal Reports

The second *Helwig* factor, "divergence between internal reports and external statements on the same subject," can be a "key factor" supporting a finding of that scienter is adequately pleaded. *Bridgestone*, 399 F.3d at 688; *see also Envision Healthcare Corp. Sec. Litig.*, 2022 WL 4551876, at *12 (M.D. Tenn. Sept. 29, 2022) (finding "strong inference of scienter" based "entirely on the alleged divergence between external statements and internal information").  Here, Defendants' statements regarding the "performance, quality, reliability, [and] installation savings" of Shoals' products (made in August 2022) and claims that Shoals' products had "fewer failure points" (made in February 2023) were contradicted by internal reports as early as March 2022 that shrinkback in the BLA product was present in at least two large utility customer solar fields and that, by

18

December 2022, these defects were present in "eight solar sites" at a potential remediation cost exceeding $15 million, with at least one customer reporting the defect caused "property damage arising from a fire."  ¶¶41, 47, 54, 61, 101.

### 2. Whitaker and Solon's Stock Sales Strongly Support Scienter

Whitaker and Solon's suspiciously timed stock sales (i.e., at a time when the defect was known but had not been disclosed to investors) support a strong inference of scienter.  Whitaker dumped over 565,000 shares of Shoals stock (more than 33% of his holdings) between August 18, 2022 and March 14, 2023, for $14.4 million, while he was in possession of material nonpublic information concerning the BLA's shrinkback defect, associated rising remediation costs, and increasing warranty claims liability.  ¶15.  The timing, amount, proportion, and overall circumstances of Whitaker's stock sales "give[s] rise to a serious inference of scienter."  *Garden City Emps.' Ret. Sys. v. Psychiatric Sols., Inc.*, 2011 WL 1335803, at *58 (M.D. Tenn. Mar. 31, 2011) (executive's sale of stock four months before negative newspaper report supported scienter); *see also In re CMS Energy Sec. Litig.*, 2005 WL 8154422, at *10 (E.D. Mich. Jan. 7, 2005) ("[CEO]'s sale of a significant amount of stock close in time to CMS' May 2002 disclosure of its round-trip trading practice is unusual and bolsters a finding of scienter on his part.").[10]

Defendants counter that Whitaker's stock sales were "normal and routine" because they were made "pursuant to a Rule 10b5-1 plan."  Mot. 24.  But, the plan itself is not part of the record—and "the existence of Rule 10b5-1 plans that have not been introduced into the record does not negate the inference of scienter at this early stage of the litigation."  *In re Upstart*

---

[10]     Defendants argue that because "only . . . one of the five Individual Exchange Act Defendants (Whitaker) are alleged to have engaged in suspicious insider stock sales," the other individuals' scienter is somehow negated.  Mot. 23.  To the contrary, the "absence of suspicious stock sales by other Officer Defendants does not negate their scienter."  *FirstEnergy*, 2022 WL 681320, at *19 n.22.

*Holdings, Inc. Sec. Litig.*, 2023 WL 6379810, at *21 (S.D. Ohio Sept. 29, 2023). And any trading plan defense requires a showing of good faith—a factual determination that the Court cannot resolve at this stage. *See id.*

Defendants also assert that the Complaint does not adequately plead that the "amount" of Whitaker's stock sales "was substantial enough . . . to suggest an incentive to commit fraud." Mot. 24. To the contrary, Whitaker's sales amounted to "more than 33% of his entire holdings," an amount substantial enough to incentivize fraud. ¶15; *see, e.g.*, *In re SmarTalk Teleservices, Inc. Sec. Litig.*, 124 F. Supp. 2d 527, 542 (S.D. Ohio 2000) (finding executives' sales of 11%, 27%, 37%, and 40% of their stock holdings "support a strong inference of scienter").[11] Additionally, Solon's stock sales, which are "massive by any measure"—more than 52 million shares for proceeds of over $1 billion—support scienter. *In re Cardinal Health Inc. Sec. Litigs.*, 426 F. Supp. 2d 688, 728 (S.D. Ohio 2006). Indeed, sales of fewer shares for less money adequately support scienter. *See, e.g.*, *SmileDirectClub*, 633 F. Supp. 3d at 1084 (finding strong inference of scienter when "insiders sold nearly 30 million shares . . . , allowing them to pocket $630 million").

While Defendants assert that Solon's sales cannot support scienter because he "was not on Shoals' board or in management during the Class Period" (Mot. 27), they ignore that until the December 2022 SPO, Solon was the Company's controlling shareholder (owning nearly 35% of the voting power of Shoals stock). ¶ 31.[12] Indeed, class period stock sales by non-defendant

---

[11]    While Defendants argue Whitaker retained most of his holdings (Mot. 24), this does not necessarily negate an inference of scienter. *See Ross v. Abercrombie & Fitch Co.*, 501 F. Supp. 2d 1102, 1117 (S.D. Ohio 2007) (weighing stock sales in favor of scienter even though "Defendants retained the majority of their holdings").

[12]    Courts routinely find control when shareholders own less than 50% of the outstanding stock. *See, e.g.*, *Leff v. CIP Corp.*, 540 F. Supp. 857, 867 (S.D. Ohio 1982) (holding 16%

corporate insiders also can be considered as part of the holistic scienter analysis. *See, e.g.*, *St. Clair Cnty. Emps.' Ret. Sys. v. Acadia Healthcare Co.*, 2021 WL 195370, at *7 (M.D. Tenn. Jan. 20, 2021) (considering stock sales by non-defendant corporate insider as one of many factors probative of scienter); *SmileDirectClub*, 633 F. Supp. 3d at 1088 ("[T]he Court finds it appropriate to consider the sales between SDC and sellers who are not Defendants herein."). Finally, two million of the shares sold in the December 2022 SPO were sold by the Company while Whitaker was CEO (¶¶15, 63), further supporting scienter. *See AIG Glob. Sec. Lending Corp. v. Bank of Am. Sec., LLC*, 2005 WL 2385854, at *9 (S.D.N.Y. 2005) ("[M]otive is adequately pleaded where the plaintiffs allege that the defendant [i.e., the Company] sold its own shares while at the same time misrepresenting corporate performance in order to inflate stock prices.").

### 3. Defendants' Disclosure of the BLA Defect Was Made on the Heels of Misstatements Made in the SPOs

The Complaint also alleges facts supporting the third *Helwig* factor: the closeness in time between the misstatements and subsequent disclosures of contradictory negative information. For example, in *D.E.&J Ltd. Partnership v. Conaway*, "just two months before the bankruptcy filing, [the defendant] continued to make positive statements concerning Kmart's earnings and business." 284 F. Supp. 2d 719, 744 (E.D. Mich. 2003), *aff'd* 133 F. App'x 994 (6th Cir. 2005). Moreover, "it was only four months prior to the bankruptcy that [defendants], signed [a misleading] Form 10–Q." *Id.* There, the court held that "[under] *Helwig*, this closeness in time between the allegedly false statements and the 'bad news' (of the bankruptcy filing) [was] evidence of [the defendants'] scienter." *Id.* Similarly, the court in *Zaller* found that "the temporal proximity *Helwig* factor" was supported by the "relative closeness in time" between the company's statement to investors that

---

ownership sufficient to allege control at pleadings stage and rejecting defense contention "that such a small percentage of ownership in CIP cannot constitute 'control'".

its corporate merger "has been working" and its admission—"less than three months" later—that "the merger would not go forward." 560 F. Supp. 3d at 1172.

Here, by December 2022, Defendants knew—or were reckless in not knowing—that Shoals had exposed wires at eight sites (and faced at least $15 million in remediation costs), ¶54, and yet that *same month*, Shoals issued its SPO Registration Statement to raise $665 million from the public markets by touting the purported "safety and reliability" of its products, ¶93. Just three months later, on March 7, 2023, Shoals raised another $594 million from the public markets. ¶¶66, 103-05. And, only two months later, on May 8, 2023 (1Q23), Defendants finally began to acknowledge the BLA defect, albeit without an estimate of remediation costs. ¶142; *see also Zwick*, 2018 WL 2933406, at *10 (finding strong inference of scienter when "Defendants had a significant *motive* to delay taking the impairments so they could secure $1.2 billion of financing needed for the spin off"). In each subsequent quarter, Shoals eked out one negative disclosure after another—trickling out the extent of its warranty liability due to the BLA's defects it had known about for more than a year. *See, e.g.*, ¶¶144, 148-49, 156, 160.

### 4. Defendants Disregarded Negative Information Contradicting Their Statements

"The sixth [*Helwig*] factor, 'disregard of the most current factual information before making statements,' favors Plaintiffs" because "Plaintiffs allege that Defendants 'knew or recklessly disregarded' the 'true facts' of their scheme when making external statements." *FirstEnergy*, 2022 WL 681320, at *21. As discussed above, by at least March 2022, Shoals began receiving reports of excessive shrinkback in its harnesses, ¶47, and conducted site visits to inspect exposed conductors, ¶54; in April 2022, Shoals met with Prysmian to discuss these issues and provided wire samples, ¶58; knew that the BLA product was installed at 300 customer sites, ¶121; allegedly determined by November 2022 that the cause of the BLA defect was Prysmian wire,

¶138; knew that *only* Prysmian wire was used in Shoals' defective BLA T-junctions, ¶57; and, by December 2022, Shoals informed Prysmian that it was aware of reported exposed conductor at eight solar sites, ¶54. Defendants disregarded this information, instead completing the December 2022 and March 2023 SPOs in which they asked the public to invest more than $1.2 billion based on the supposed "reliability and safety" of Shoals BLA products. ¶¶66, 93, 103-05.

### 5. Defendants Were Motivated by Self-Interest to Save Their Salaries and Jobs

"[T]he self-interested motivation of defendants in the form of saving their salaries or jobs" tends to support a finding of scienter," particularly "where a bonus is 'directly tied' to fraudulent metrics promoted by an executive." *SmileDirectClub*, 633 F. Supp. 3d at 1084, 1088; *Dana II*, 646 F.3d at 960, 962. Here, before Whitaker "sudden[ly] and "unexpected[ly]" resigned as CEO in March 2023, he dumped $14.4 million in stock (more than 33% of his holdings). ¶15 n.3. Whitaker's self-interested motivation to maintain his job as CEO until the Company completed its SPOs, allowing him (and Solon) to collectively sell over $1 billion in stock at inflated prices, explains why Whitaker chose to emphasize the "quality, reliability and safety" of Shoals' products while in possession of material nonpublic reports from customers about the mounting shrinkback problem. ¶¶54, 77.

### 6. The Remaining *Helwig* Factors Are Irrelevant

When a complaint sufficiently pleads scienter under a holistic review, as is the case here, ticking off all the *Helwig* factors is an unnecessary exercise. *See Bond*, 587 F. Supp. 3d at 676 ("[T]reating the *Helwig* factors as an ironclad set of requirements would not only be unsupported by the caselaw, but would make little, if any, sense, given that at least some of the factors are wholly irrelevant to many fraudulent schemes."). Given that "more than half of the *Helwig* factors involve situational circumstances with little bearing on many types of fraud," it is unremarkable that

factors four, five, seven and eight have "little bearing on . . . [the] fraud" alleged in this case. *Heritage Glob. Network L.A., Inc. v. Welch*, 2024 WL 695772, at *13 (M.D. Tenn. Feb. 20, 2024).[13] As Judge Trauger explained, "There is, for example, no defensible rationale in support of penalizing a plaintiff for failing to plead evidence of bribery in connection with a fraudulent scheme in which bribery played no role in the first place." *Bond*, 587 F. Supp. 3d at 676; *see also In re FirstEnergy*, 2022 WL 681320, at *21 (noting when certain factors are not present those "factors favor neither party").

### B.   Additional Allegations Support Scienter

The Complaint pleads several additional allegations that are relevant to the holistic scienter analysis under *Tellabs*.  As an initial matter, three former employees[14] provided firsthand accounts corroborating that the Company's management knew about exposed wires in March 2022, ¶48; had begun "an onsite investigation" in April 2022, ¶50; were "aware of at least four to five other solar fields that were experiencing the same issues" by June 2022, ¶¶51, 54; and that that "there were no quality controls, checks or testing done with respect to wiring received from suppliers" until approximately December 2023, ¶55.  "[T]hese confidential witness statements . . . can support an inference of scienter." *Padilla*, 2022 WL 3452318, at *36.[15]

---

[13]    However, as to factor number seven, Shoals did violate GAAP in reporting its warranty liabilities.  ¶¶130-54; *see also supra* §I.B.

[14]    FE1 is a former Shoals Project Manager and Sales Manager, ¶¶49-52; FE2 is a former Shoals Business Development Manager, ¶¶53-54; and FE3 is a former Shoals Plant Quality Manager, ¶55.

[15]    Defendants' attacks on the allegations attributed to FEs lack substance, demand the Court resolve factual issues, and are meant to be a distraction from the damning allegations attributed to them. Mot. 11-13, 20.  Plaintiffs "have provided the types of information that courts have typically required in concluding that pleadings based on [FE] statements were sufficient, such as the [FE]s' job descriptions and periods of employment, as well as specific allegations regarding how the [FE]s came to possess the information that they did." *Bond*, 587 F. Supp. 3d at 667.  Moreover, the information attributed to the FEs is, in large part, corroborated by filings made by both Shoals and Prysmian in their separate action concerning the allegedly defective Prysmian wire. *See* Decl. of Christopher M. Wood in Supp. of Pls.' Mem. of Law in Opp'n to Defs.' Mot. to Dismiss. *See*

Additionally, "[c]ourts may presume that high-level executives are aware of matter[s] related to their business's operations where the misrepresentations and omissions pertain to 'central, day-to-day operational matters.'" *In re Envision Healthcare Corp. Sec. Litig.*, 2019 WL 6168254, at *22 (M.D. Tenn. Nov. 19, 2019); *Psychiatric Sols.*, 2011 WL 1335803, at *57 (same). Here, Defendants include Shoals' CEOs and CFOs, ¶¶15-22, who presumably knew about "spiraling problems with its signature product," ¶60, that was "the most profitable source of revenue for the Company," ¶38.

Finally, that Whitaker announced his departure as CEO in December 2022 and officially stepped down in March 2023, ¶15, adds to the strong inference of his scienter because (1) his resignation coincided with the December 2022 SPO and March 2023 SPO, ¶¶65-66; (2) occurred amidst his March 2023 stock sales, ¶15; (3) analysts noted that his departure was "unexpected[]," "relatively fast," and "sudden," coming seven months after the CFO's resignation, ¶5 n.3; and (4) occurred at a time when the company was dealing with a growing and costly product defect, ¶54. *See AAC*, 2021 WL 1316705, at *10 (executive resignations "in combination with other factors—in connection with the holistic *Tellabs* standard" supported scienter); *Acadia*, 2021 WL 195370, at *7 (finding fact "Acadia's CEO and President were abruptly fired or resigned with no notice under highly unusual circumstances" supported scienter).

### C. The Most Compelling Inference Is Defendants Acted Knowingly or Recklessly

"The PSLRA does not require a plaintiff . . . to establish, at the complaint stage, that the scales tip decidedly in favor of a finding of scienter. Rather, the court must simply consider all possible inferences and determine whether 'the inference of scienter [is] at least as strong as any

---

*also Hogrobrooks v. Educ. Credit Mgmt. Corp.*, 2013 WL 12284467, at *1 n.1 (W.D. Tenn. Apr. 5, 2013) ("The Court takes judicial notice of pleadings in other court proceedings without converting a motion to dismiss to a motion for summary judgment.").

opposing inference.'" *CCA*, 2017 WL 6442145, at *21 (quoting *Tellabs*, 551 U.S. at 326) (second alteration in original).

Here, when considered collectively and holistically, the Complaint's allegations support a strong inference that Defendants consciously chose to hide the Company's growing BLA shrinkback problem, millions in remediation costs already incurred, and exposure to growing warranty liability costs, while Company insiders (including Whitaker and Solon) unloaded more than $1 billion of Shoals stock on unsuspecting investors (and personally pocketed the proceeds) through SPOs accompanied by misleading claims of "quality," "reliability," and "safety." ¶¶83, 94, 104. The SPO allowed the Company to fund, in substantial part, a $58.1 million payment to terminate a Tax Receivable Agreement ("TRA"), which was to expire on December 31, 2022. ¶64. Terminating the TRA was critically important to Shoals, as it was viewed as "an obstacle to many investors owing [Shoals stock]," and "could have grown to $485mm." *Id.*

Defendants claim that the more compelling inference is "good faith," and that they were merely "playing" a "game of catch-up" as to "exposed conductors at a few sites." Mot. 28 (quoting in part *Pittman v. Unum Grp.*, 861 F. App'x 51, 53 (6th Cir. 2021) and citing *City of Livonia Emps.' Ret. Sys. & Loc. 295 v. Boeing Co.*, 711 F.3d 754, 758 (7th Cir. 2013)).[16] Good faith, however, is a factual question. *See In re Apple Inc. Sec. Litig.*, 678 F. Supp. 3d 1147, 1156 (N.D. Cal. 2023) ("Though . . . evidence of good faith . . . can cut against a finding of scienter, such evidence is to be weighed by the jury."). Moreover, "good faith" is not an absolute defense to reckless misconduct, and Defendants' self-serving assertions are of no consequence. *See SEC v.*

---

[16]     In *Boeing*, after executives "predict[ed]" the timing of the "First Flight" of a developmental "plane that had not yet flown," the flight was later "canceled" due to an "anomaly." 711 F.3d at 757-58. Here, when Defendants spoke about the BLA, Shoals' primary revenue-generating EBOS product, ¶¶38, 60, that product had *already* been developed and sold to customers, and shrinkback defects had *already* widely occurred, resulting in warranty remediation costs, ¶¶50-54.

26

Case 3:24-cv-00334    Document 91    Filed 04/21/25    Page 35 of 48 PageID #: 2508

*Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1094-95 (9th Cir. 2010) ("If such a self-serving assertion [by a defendant] could be viewed as controlling, there would never be a successful prosecution or claim for fraud."); *SEC v. Brincat*, 2001 WL 1662099, at *1 (N.D. Ill. Dec. 6, 2001) ("[G]ood faith does not necessarily preclude a finding of recklessness.").

### III. The Complaint Alleges a Fraudulent Scheme in Violation of Rule 10b-5(a) & (c)

Rule 10b-5 makes it unlawful for any person to "employ any device, scheme, or artifice to defraud" or to "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. §240.10b-5(a) & (c). Courts in this Circuit have long recognized that the "securities laws reach misleading conduct as well as misleading statements, so long as there is some mechanism by which that conduct misled investors." *Psychiatric Sols.*, 2011 WL 1335803, at *45. Likewise, the Supreme Court has made clear that "[t]hese provisions capture a wide range of conduct." *Lorenzo v. SEC*, 587 U.S. 71, 79 (2019). Plaintiffs do not have to spell out in detail every instance of Defendants' scheme but need only "'provide . . . examples of specific' fraudulent conduct that are 'representative samples' of the scheme.'" *Bond*, 587 F. Supp. 3d at 664 (quoting *United States, ex rel. Marlar v. BWXT Y-12, L.L.C.*, 525 F.3d 439, 445 (6th Cir. 2008)).

Here, in addition to disseminating false and misleading statements under Rule 10b-5(b), the Complaint alleges that Defendants engaged in deceptive *conduct* under Rule 10b-5(a) & (c) by causing Shoals to take part in two SPOs that allowed Solon to sell more than $1 billion in Shoals Common Stock at artificially inflated prices. ¶31. These offerings occurred long after Defendants first learned of the shrinkback defect, after Shoals had faced more than $15 million in remediation costs, and watched as that exposure grew each quarter. ¶¶54, 128, 150.

Defendants devote only six lines to the Complaint's scheme allegations, arguing that the scheme claim should be dismissed because "Plaintiffs do not allege any 'scheme' apart from the

alleged misleading disclosures."  Mot. 22.  Not so.  By failing to address the specific conduct allegations, Defendants concede them.  *Jackson County Employees' Retirement System v. Ghosn* is instructive.  There, the defendant "summarily assert[ed] that the Jackson County's Rule 10b-5(a) and (c) claim is premised solely on the alleged misstatements or omissions that form the basis of its Rule 10b-5(b) claim, *i.e.* the alleged qualitative misstatements in Nissan's Annual Reports, rather than 'a separate and distinct basis for scheme liability.'"  510 F. Supp. 3d 583, 610 n.7 (M.D. Tenn. 2020).  Having failed to develop the argument, the court "decline[d] to consider the sufficiency of Jackson County's scheme liability claim as to Kelly in ruling on his pending motion to dismiss" and allowed the claim to proceed.  *Id.*

## IV.    The Complaint Alleges Loss Causation

"Loss causation is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff."  *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 830 F.3d 376, 384 (6th Cir. 2016) ("*OPERS*").  Alleging loss causation "is 'not meant to impose a great burden upon a plaintiff,' but to 'provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind.'"  *Id.* at 376.  Indeed, loss causation is not subject to heightened pleading standards.  Plaintiffs need only plead a theory that is "plausible," and may do so by alleging "'that negative investor inferences,' drawn from a particular event or disclosure, 'caused the loss and were a foreseeable materialization of the risk concealed by the fraudulent statement.'"  *Id.* at 384-85.  "A plaintiff need not rely on a single, complete disclosure; the truth may gradually be revealed through a series of partial disclosures."  *Envision*, 2019 WL 6168254, at *24; *see also OPERS*, 830 F.3d at 385 ("We are mindful of the dangerous incentive that is created when the success of any loss causation argument is made contingent upon a defendant's acknowledgement that it misled investors.").

The Complaint more than meets these standards. Specifically, Plaintiffs allege that between August 1, 2023 and November 12, 2024, Defendants made a series of admissions regarding the shrinkback issue. ¶¶155-73. Those admissions constituted both "corrective disclosures," as they revealed the existence of the shrinkback issue which "defendants themselves previously concealed," and were the "materialization of a concealed risk," as the scope and scale of the shrinkback issue, as well as decreases in the Company's backlog, were "within the zone of risk concealed by the misrepresentations and omissions alleged." *Envision*, 2019 WL 6168254, at *24; ¶¶155-73.[17] Each of the disclosures caused immediate declines in Shoals' stock price, and were directly tied to revelations about shrinkback. *See, e.g.*, ¶158(a) ("Shoals' 'charge is well above the $0.5M increase in the warranty reserve balance during 2022.'"); ¶158(e) ("[T]he company disclosed for the first time that it was notified by certain customers that a subset of wire harnesses were presenting excessive pull back."); ¶164(d) ("[T]he upper end of the $60-$185mm came as a surprise to investors and has contributed to the underperformance of the stock.").

Defendants' loss causation contentions fail to provide any basis for dismissal. First, Defendants fail to address the entirety of the Complaint's loss causation allegations, including that Defendants failed to disclose the shrinkback issue ***at all*** until August 1, 2023, despite their knowledge of the issue beginning in March 2022. ¶¶47, 156-58. Because Defendants do not attempt to show a complete lack of loss causation, they are not entitled to dismissal. *See St. Clair Cnty. Emps.' Ret. Sys. v. Acadia Healthcare Co.*, 2022 WL 4598044, at *5 (M.D. Tenn. Sept. 30,

---

[17]     Defendants' reliance on *In re Washington Prime Group, Inc. Securities Litigation*, 2024 WL 1307103 (S.D. Ohio Mar. 27, 2024), for the proposition that Plaintiffs' loss causation theory is "unclear," is inapt. Mot. 29. Unlike here, the plaintiffs in *Washington Prime* did not allege a "materialization of the risk" theory in their complaint but raised it for the first time in their brief. 2024 WL 1307103, at *13.

2022) (by conceding one corrective disclosure "had an impact on Acadia's stock price," defendants "concede[d] they cannot rule out price impact during the Class Period completely").

Second, Defendants assert that Plaintiffs fail to plead loss causation because the alleged corrective disclosures did not disclose "fraud." Mot. 30.[18] This argument is irreconcilable with Sixth Circuit authority. *See, e.g.*, *OPERS*, 830 F.3d at 385. Thus, Defendants' contention that certain of their disclosures—i.e., the amount of the reserve and the number of sites experiencing shrinkback—disclosed "newly discovered facts," and "not wrongdoing," is unavailing. Mot. 29, 30. Under the "materialization of the risk" theory, these disclosures were squarely "within the zone of risk *concealed* by the misrepresentations and omissions alleged." *OPERS*, 830 F.3d at 384.

Finally, Defendants contend that the Complaint fails to plead a "causal connection between Shoals' disclosures about its backlog and awarded orders . . . and the challenged statements." Mot. 30. Defendants ignore that Plaintiffs allege: (i) Shoals' statements regarding its backlog were false as its sale of defective BLA had negatively impacted the Company's customer relationships, ¶125(a); (ii) "[t]he decline in the price of Shoals' Common Stock after the corrective disclosures came to light was a direct result of the revelation of the nature and extent of Defendants' fraudulent misrepresentations to investors and the market," ¶173; and (iii) "the Company's business deterioration as a result of the fallout from the shrinkback issue was much more severe than previously disclosed, citing specifically to an analyst report which tied Shoals'

---

[18] Defendants' reliance on non-precedential authority for the proposition that corrective disclosures must reveal new information does not refute that Plaintiffs have done so. *See In re Almost Family, Inc. Sec. Litig.*, 2012 WL 443461, at *13 (W.D. Ky. Feb. 10, 2012) (fraud not disclosed by corrective disclosures consisting of *Wall Street Journal* article that did not focus on defendant company and two announcements of investigations into the company); *see also In re Initial Pub. Offering Sec. Litig.*, 399 F. Supp. 2d 261, 266 (S.D.N.Y. 2005) (alleged "scheme to depress earnings estimates and drive up prices" not disclosed by "failure to meet earnings forecasts"); *In re KBC Asset Mgmt. N.V. v. Eaton Corp.*, 572 F. App'x 356, 362 (6th Cir. 2014) (disclosure of emails not corrective when emails released in a newspaper the month prior).

'[market] share loss potential,' to 'derivative issues from warranty shrinkback,'" ¶169(a) (alteration in original). These allegations do far more than merely "observ[e] that a stock price dropped." *D.E.&J. Ltd.*, 133 F. App'x at 1000–01.

## V.    The Complaint Adequately Alleges Violations of §§15, 20(a) and 20A

A plaintiff states a claim under §§ 15 and 20(a) by alleging that an individual controlled a corporation that committed primary securities violations. *See Envision*, 2019 WL 6168254, at *29. "Allegations of control are not averments of fraud and therefore need not be pleaded with particularity." *Ghosn*, 510 F. Supp. 3d at 618. "Whether a person is a controlling person is normally a question of fact that cannot be determined at the pleading stage." *Envision*, 2019 WL 6168254, at *30. Here, the defendants in question controlled Shoals,[19] "actually participated in the operations of the violator," and "possessed the power to control the specific transaction or activity upon which the primary violation is predicated." *Tivity*, 551 F. Supp. 3d at 853.[20]

## VI.    Plaintiffs Plead Claims Under the 1933 Act

### A.    The 1933 Act Claims Are Governed by Rule 8(a)

"[W]hen a 1933 Act plaintiff brings a Section 11 or 12(a)(2) claim that ***does*** **not** *rely on one unified course of fraudulent conduct* but, rather, *carefully distinguishes the fraud claims from other claims*," courts in the Sixth Circuit "apply the Rule 8(a) pleading standard to those non-fraud claims." *Kolominsky*, 100 F.4th at 683 (emphasis added) (citing cases). The Complaint does exactly that—alleging different claims against different defendants; noting the statements

---

[19]    *See* ¶¶31, 35, 179, 181, 251 (Shoals, Solon, Bardos, Director Defendants); ¶¶41, 43, 76-80, 82-86, 88-91, 93-95, 91-101, 103-05, 107-11, 113-18, 120-24, 128-30; 215-16 (1934 Act Defendants).

[20]    Additionally, dismissal of Plaintiffs' §20A claims (¶¶219-29) would be improper because Shoals' and Whitaker's failure to disclose nonpublic, material information prior to trading constitutes a violation of §10(b) of the 1934 Act. *See Envision*, 2019 WL 6168254, at *25; *see, e.g.*, ¶¶6, 44, 47-48, 50-51, 54. Furthermore, Plaintiffs have adequately alleged contemporaneity. ¶¶221-28. *See Beach v. Healthways, Inc.*, 2009 WL 650408, at *6 (M.D. Tenn. Mar. 9, 2009).

that were false and/or misleading for different reasons; segregating the 1933 Act and 1934 Act claims; and, disavowing fraud allegations for the 1933 Act claims.

The Complaint alleges that the Defendants engaged in a fraudulent scheme, and the 1933 Act Defendants then "negligently . . . fail[ed] to conduct adequate due diligence" to discover this scheme "when signing the SPO Offering Materials and underwriting the December 2022 SPO." ¶34; *see also* ¶¶192, 233, 234. Courts routinely accept this theory. *See, e.g.*, *In re CytRx Corp. Sec. Litig.*, 2015 WL 5031232, at *13 (C.D. Cal. July 13, 2015) ("Plaintiffs' theory of Securities Act liability is not based upon a unified course of fraudulent conduct," but rather certain defendants were allegedly "perpetuating . . . [a] promotion scheme" while other defendants only "failed to conduct adequate due diligence to discover said fraud and acted negligently in signing a Registration Statement with statements that were rendered false or misleading by the fraud's existence."); *Pappas v. Qutoutiao Inc.*, 2024 WL 4588491, at *3 (2d Cir. Oct. 28, 2024) (1933 Act claims against underwriters sounded in negligence because, "although the underlying conduct was alleged to have been intentional, [p]laintiff [did] not allege that the failure to disclose that conduct was either intentional or reckless"). The Complaint explicitly alleges that the Director Defendants, Solon, and the Underwriter Defendants did not engage in fraudulent activity. ¶¶34, 174-75, 232.

Defendants' contention that Rule 9(b) applies to the 1933 Act claims is wrong, and the law they rely on inapplicable. *See* Mot. 31. Unlike in *Kolominsky*, the Complaint here does not allege a "unified course of fraudulent conduct" across the 1933 Act and 1934 Act claims; rather, it "separated fraud claims from other claims by alleging some fraudulent and some non-fraudulent conduct." 100 F.4th at 683 n.3. Moreover, the claims in *Kolominsky* arose out of statements leading up to and contained in a single IPO, unlike here, where Plaintiffs allege that Defendants engaged in a fraudulent scheme for months before the SPO Offerings. *See Kolominsky v. Root,*

*Inc.*, 667 F. Supp. 3d 685, 692 (S.D. Ohio 2023), *aff'd*, 100 F.4th 675. But even if Defendants are correct that Rule 9(b) applies, the Complaint's allegations still meet Rule 9(b)'s heightened standards for the reasons discussed *supra* at §I.

Defendants' assertion that the Complaint alleges the "same reasons" as to why the 1933 Act and 1934 Act were materially misleading is wrong. Mot. 31. Despite some overlap in the relevant paragraphs, the Complaint clearly distinguishes between strict liability/negligence and scienter for the 1933 Act and 1934 Act claims. *Compare, e.g.*, ¶184(b) (1933 Act) (statements in SPO Offering Materials were false and/or misleading because "Shoals' ability to competitively differentiate its products through representations regarding the reliability, safety, or quality of its offerings had become materially impaired"), *with* ¶96(b) (1934 Act) (statements in SPO Offering Materials were false and/or misleading because, "[w]hile the 1934 Act Defendants touted the cost savings and lower maintenance costs compared to competing products, ***they knew*** that defects with their BLAs were widespread" (emphasis added)). Defendants also ignore that the Complaint cites GAAP violations as grounds that the SPO Offering Materials were materially misleading only under the 1934 Act claims. Plaintiffs allege similarly distinct reasons under the 1933 Act and 1934 Act for why statements in Shoals' 1Q22, 2Q22, and 3Q22 were false and/or misleading. *Compare* ¶187, *with* ¶¶81(c)-(d), 87(c)-(d), 92 (c)-(d).[21]

---

[21] The Complaint also structurally separates the 1933 Act and 1934 Act claims (Compl. §§V, VII), and disclaims fraud for the 1933 Act claims. *See* ¶¶34, 174-75, 232; *see also In re Sirrom Cap. Corp. Sec. Litig.*, 84 F. Supp. 2d 933, 938 (M.D. Tenn. 1999) ("Plaintiffs' Section 11 claims do not mention fraud, except to expressly exclude any allegations which might sound in fraud. ***Plaintiffs speak in terms of Defendants' failure to make a reasonable investigation or possess reasonable grounds for the belief*** that the statements contained in the Registration Statement and Prospectus were true." (emphasis added)).

## B.    KUAERP Pleads Actionable Misstatements

"Section 11(a) of the Securities Act of 1933 gives a buyer of securities a right of action against an issuer or designated individuals for an untrue statement of material fact or omission of a material fact in a registration statement for a public offering."  *In re Home Point Cap. Inc. Sec. Litig.*, 2022 WL 18932069, at *4 (E.D. Mich. Oct. 5, 2022).  Moreover, "[l]iability against the issuer of the security 'is virtually absolute, even for innocent misstatements' and, therefore, a plaintiff is not required to plead scienter."  *Envision*, 2019 WL 6168254, at *27 (quoting *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983)).

Here, each of the SPO Offering Materials (which incorporated by reference Shoals' other earlier SEC filings, ¶185) promoted Shoals' BLA product by (i) touting its purported "reliability and safety" and ability to avoid "failure" and "damage"; and (ii) downplayed (as hypothetical) the risks that the product could experience "quality control problems" or "defects or performance problems"—without disclosing the BLA shrinkback defects already being reported by customers, resulting in tens of millions of dollars in warranty liabilities and increased risks of injury, death, and fire damage.  ¶¶181, 234.  Defendants concede as much.  By not addressing the distinct reasons the Complaint alleges that the SPO Offering Materials were materially misleading (*see* Mot. 31), Defendants waive any argument that Plaintiffs fail to plead actionable misstatements under the 1933 Act and cannot raise this issue on reply.  *See Little v. Crossville, Inc.*, 2021 WL 5198102, at *2 (M.D. Tenn. Nov. 9, 2021) ("Raising the issue for the first time in a reply brief does not suffice.").  Defendants' throwaway contention that the BLA defects were not a "widespread issue or one that would trigger Shoals' warranty liability" (Mot. 32) is a "question of fact that cannot be decided on Defendants' motion to dismiss."  *FirstEnergy*, 316 F. Supp. 2d at 602.

### C.     KUAERP Has Standing to Assert 1933 Act Claims

"To bring a claim under §11, the securities held by the plaintiff must be traceable to the particular registration statement alleged to be false or misleading." *Slack Techs., LLC v. Pirani*, 598 U.S. 759, 768 (2023). KUAERP pleads that it "purchased Shoals Common Stock directly in the December 2022 SPO," ¶238, and that it purchased shares at the SPO price of $22.25 on December 2, 2022, ¶¶13, 180, 222. Nothing more is required. *See Flynn v. Sientra, Inc.*, 2016 WL 3360676, at *18 (C.D. Cal. June 9, 2016) (citing cases).[22]

### D.     KUAERP Adequately Alleges Defendants' Direct Sales and Solicitations

Relying on out-of-circuit authority requiring different standards of proof than this Circuit, the 1933 Act Defendants argue the Complaint fails to plead that the Solicitor-Seller Defendants are statutory sellers under §12(a)(2) of the 1933 Act. *See* Mot. 33-34. Not so. "A statutory seller is one who 'either transferred title to the purchaser or successfully solicited the transfer for financial gain.'" *Envision*, 2019 WL 6168254, at *28. Here, the Complaint alleges that the Solicitor-Seller Defendants signed the SPO Registration Statement and solicited investors for the December 2022 SPO. ¶¶ 22, 33, 35, 241-247. Nothing more is required to state a claim.[23]

### CONCLUSION

The Motion should be denied in its entirety.

---

[22]     Defendants' reliance on inapposite caselaw ignores that KUAERP alleged that it directly participated in the offering ***and*** purchased at the offering price. Defendants cite no authority—from the Sixth Circuit or otherwise—for their argument that KUAERP must allege which Underwriter Defendant it purchased SPO shares from. *See* Mot. 33.

[23]     Indeed, in *In re FirstEnergy Corp.*, cited by Defendants, the court found one defendant was a statutory seller because the plaintiffs alleged he had signed and solicited the registration statement, but found the other defendants were not when "[p]laintiffs appear[ed] to rest on the signatures." 2022 WL 681320, at *38 (discussing *Pinter v. Dahl*, 486 U.S. 622, 647 (1988)).

DATED: April 21, 2025

ROBBINS GELLER RUDMAN
  & DOWD LLP
CHRISTOPHER M. WOOD, #032977

s/ Christopher M. Wood
CHRISTOPHER M. WOOD

200 31st Avenue North
Nashville, TN  37203
Telephone:  615/244-2203
cwood@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
DEBRA J. WYMAN (*pro hac vice*)
MATTHEW I. ALPERT (*pro hac vice*)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
debraw@rgrdlaw.com
malpert@rgrdlaw.com

MOTLEY RICE LLC
GREGG S. LEVIN (*pro hac vice*)
WILLIAM S. NORTON (*pro hac vice*)
CHRISTOPHER F. MORIARTY (*pro hac vice*)
28 Bridgeside Boulevard
Mount Pleasant, SC  29464
Telephone:  843/216-9000
glevin@motleyrice.com
bnorton@motleyrice.com
cmoriarty@motleyrice.com

Lead Counsel for Lead Plaintiff

BARRETT JOHNSTON MARTIN
  & GARRISON, PLLC
JERRY E. MARTIN, #20193
200 31st Avenue North
Nashville, TN  37203
Telephone:  615/244-2202
jmartin@barrettjohnston.com

Local Counsel

- 36 -

KLAUSNER, KAUFMAN, JENSEN
  & LEVINSON, P.A.
ROBERT D. KLAUSNER
SEAN M SENDRA
7080 Northwest 4th Street
Plantation, FL  33317
Telephone: 954/916-1202
bob@robertdklausner.com
sean@robertdklausner.com

Additional Counsel for Plaintiff Kissimmee
Utility Authority Employees' Retirement Plan

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on April 21, 2025, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ Christopher M. Wood
CHRISTOPHER M. WOOD


ROBBINS GELLER RUDMAN
& DOWD LLP
200 31st Avenue North
Nashville, TN  37203
Telephone:  615/244-2203
615/432-2398 (fax)


Email:  cwood@rgrdlaw.com

- 1 -

# Mailing Information for a Case 3:24-cv-00334 Westchester Putnam Counties Heavy & Highway Laborers Local 60 Benefits Fund v. Shoals Technologies Group, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Matthew Isaac Alpert**
  malpert@rgrdlaw.com,e_file_sd@rgrdlaw.com,MAlpert@ecf.courtdrive.com

- **Rachel A. Avan**
  ravan@saxenawhite.com

- **Margaret V. Dodson**
  margaret.dodson@bassberry.com

- **Marco A. Duenas**
  mduenas@saxenawhite.com,6316794420@filings.docketbird.com,jjoseph@saxenawhite.com

- **Agnes Dunogue**
  agnes.dunogue@aoshearman.com

- **Dan Gold**
  dan.gold@aoshearman.com

- **Renatta A. Gorski**
  renatta.gorski@lw.com,r-gorski-5640@ecf.pacerpro.com,chefiling@lw.com

- **Lester R. Hooker**
  lhooker@saxenawhite.com

- **Michele D. Johnson**
  michele.johnson@lw.com

- **Benjamin Klebanoff**
  benjamin.klebanoff@aoshearman.com,managing-attorney-5081@ecf.pacerpro.com,courtalert@shearman.com,manattyoffice@shearman.com

- **Britt K. Latham**
  blatham@bassberry.com,renatta.gorski@lw.com,lauren.fane@lw.com,heather.waller@lw.com,llewis@bassberry.com,lbilbrey@bassberry.com,christian.beveridge@lw.

- **Gregg S. Levin**
  glevin@motleyrice.com,lmclaughlin@motleyrice.com,erichards@motleyrice.com,kweil@motleyrice.com

- **Jerry E. Martin**
  jmartin@barrettjohnston.com,jfrye@barrettjohnston.com,mmcgraw@barrettjohnston.com,mfazio@barrettjohnston.com,lvandrasik@barrettjohnston.com,shyatt@barre

- **Christopher F. Moriarty**
  cmoriarty@motleyrice.com,jlittlejohn@motleyrice.com,bnorton@motleyrice.com

- **William S. Norton**
  bnorton@motleyrice.com

- **Mozianio S. Reliford , III**
  treliford@polsinelli.com,mmillan@polsinelli.com,nashvilledocketing@polsinelli.com

- **James Gerard Stranch , IV**
  gstranch@stranchlaw.com,complexlit@stranchlaw.com

- **Heather A. Waller**
  heather.waller@lw.com,chefiling@lw.com,heather-waller-8915@ecf.pacerpro.com

- **Christopher M. Wood**
  cwood@rgrdlaw.com,CWood@ecf.courtdrive.com,e_file_sd@rgrdlaw.com,bengfelt@rgrdlaw.com

- **Debra J. Wyman**
  debraw@rgrdlaw.com,e_file_sd@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- `(No manual recipients)`