# EXHIBIT A

| | | |
|---|---|---|
| SHOALS TECHNOLOGIES GROUP, LLC, | ) ) ) | |
| Plaintiff, | ) ) | Case No.: 3:23-cv-01153 |
| v. | ) ) | Judge Campbell |
| PRYSMIAN CABLES AND SYSTEMS USA, LLC | ) ) | Magistrate Judge Holmes |
| Defendant. | ) ) ) ) ) | |

## FIRST AMENDED COMPLAINT

Plaintiff Shoals Technologies Group, LLC files this First Amended Complaint against Defendant Prysmian Cables and Systems USA, LLC, and states as follows:

## INTRODUCTION

1. This is an action to recover for damages caused by defective wire Defendant Prysmian Cables and Systems USA, LLC ("Prysmian") manufactured between approximately 2019 and approximately 2022 and sold to Plaintiff Shoals Technologies Group, LLC ("Shoals"), and Prysmian's subsequent refusals to accept responsibility and compensate Shoals for the damages that Shoals has incurred and will continue to incur due to defectively manufactured wire.

2. As described in more detail below, Shoals used Prysmian's wire to manufacture certain products. However, after those products were shipped to solar fields, Shoals started receiving complaints from the solar fields, and despite Prysmian's insistence otherwise, it became evident over time that the Prysmian wire is defectively manufactured such that the wire is unable to conform to industry standards and expectations, product specifications or product warranties.

1

Specifically, the wire's insulation contracts—a phenomenon commonly known as "insulation shrinkback"—to an unacceptable degree, leaving the wire's conductor exposed, which can lead to decreased performance and safety hazards. When Shoals initiated this litigation, unacceptable levels of insulation shrinkback in Prysmian wire had been reported in at least twenty solar fields. The number of solar fields with reported shrinkback in Prysmian wire has increased since then.

3. While Shoals ultimately discontinued its use of Prysmian wire, Shoals has, as a direct and proximate result of Prysmian's conduct, expended millions of dollars in remedial measures, and will continue to incur substantially more in damages as it continues to address issues that arise in the solar fields.

### PARTIES

4. At all times relevant hereto, Shoals was and is a Tennessee limited liability company with its principal place of business in Portland, Tennessee. Shoals' sole member is Shoals Intermediate Parent, Inc., a Delaware corporation.

5. At all times relevant hereto, Prysmian is and was a Delaware limited liability company with its principal place of business in Highland Heights, Kentucky. Prysmian's sole member is GK Technologies, Inc., a New Jersey Corporation with its headquarters in Highland Heights, Kentucky.

6. Prysmian is the surviving entity of a formal merger between General Cable Industries, Inc. ("General Cable") and Prysmian Cable and Systems USA, LLC.[1] *See* Certificate of Merger, attached as **Exhibit A**.

---

[1] *Prysmian Group announces formal entity merger between General Cable Industries and Prysmian Cables and Systems USA, LLC in the United States*, available at https://na.prysmiangroup.com/press-release/prysmian-group-announces-legal-entity-integration-and-finalizes-rebranding-with-general-cable-in-the-united-states.

7.     As the surviving entity, Prysmian is the successor in liability for actions undertaken by General Cable prior to the merger and it is liable for actions taken thereafter.[2]

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between the parties,[3] and the amount in controversy significantly exceeds $75,000.

9.     This Court has personal jurisdiction over each of the parties.  Prysmian is subject to personal jurisdiction in Tennessee and this Court based on its regular and systematic contacts with this State, including entering into contracts with Tennessee companies and shipping product to Tennessee.  Prysmian is also subject to personal jurisdiction in this state due to its wrongful actions, including but not limited to its intentional or reckless misconduct directed at Shoals, and because Shoals incurred injuries and harm sustained in this State, as set forth herein.  Furthermore, Prysmian is registered with the Tennessee Secretary of State to do business in the state of Tennessee and can be served with process at CT Corporation System, 300 Montvue Road, Knoxville, Tennessee 37919-5546.

10.     Venue is proper in this Court under 28 U.S.C. § 1391.  Prysmian has transacted business in the Middle District of Tennessee, and a substantial part of the events or omissions

---

[2] Because Prysmian is the entity responsible for General Cable's actions both prior to and after the companies' formal merger, this Complaint will refer to both entities collectively as "Prysmian."

[3] The parties in this case are limited liability companies.  Their citizenship is thus determined by the citizenship of each of their members rather than the state in which they are organized. *See Delay v. Rosenthal Collins Grp., LLC*, 585 F.3d 1003, 1005 (6th Cir. 2009); *Mendy v. Adams*, 2023 WL 4190532, at *4 (M.D. Tenn. June 25, 2023). Shoals' sole member is a citizen of Delaware, and Prysmian's sole member is a citizen of New Jersey and Kentucky. Complete diversity therefore exists here.

giving rise to Shoals' claims occurred in or were directed toward Shoals in the Middle District of Tennessee.

<u>**FACTUAL ALLEGATIONS**</u>

11.     Shoals is a leading provider of electrical balance of system ("EBOS") solutions for solar power generation, battery storage, and electrical vehicle charging infrastructure throughout the United States and abroad.  In the context of solar power generation, Shoals' EBOS solutions encompass all the components necessary to transport electric current produced by solar panels to an inverter, allowing the current to be delivered to the power grid or an energy storage solution safely and efficiently.

12.     Shoals' EBOS products require a number of specialized component parts, including photovoltaic wire, which is produced for the interconnection wiring of grounded and ungrounded solar panel systems.  These polymer-insulated copper wires act as conductors, intended to carry high voltages of electricity in a safe and efficient manner.

13.     Because these photovoltaic wires carry electricity, the copper conductor must be insulated in order to ensure proper operation and safety.

14.     Shoals prioritizes obtaining quality photovoltaic wires for these reasons.  Shoals purchases these wires from a number of different suppliers to manufacture its EBOS products.

15.     With much of the wire it purchases from various suppliers, Shoals manufactures custom wire harnesses that are used to aggregate electricity from multiple solar panels and deliver that electricity to inverters where it is then delivered to the power grid or a battery storage solution. These wire harnesses are typically produced using ten-gauge (10 AWG) or twelve-gauge (12 AWG) wire where the gauge of the wire is an indication of the wire's thickness. Typically, Shoals builds these harnesses in pairs, with a red-wire harness being used for positive connections, and a

black-wire harness being used for negative connections. Part of the manufacturing process in creating the wire harnesses involves placing tee joints or in-line fuses (collectively hereinafter "T-Junctions") at set intervals along the length of the wire. These T-Junctions allow the wire harnesses to be connected to the solar panels and are a critical component of Shoals' EBOS solutions.

**Shoals' Purchase of Photovoltaic Wire from Prysmian**

16.     Prysmian manufactures a number of specialty wires, including without limitation a photovoltaic wire called "SunGen Photovoltaic Wire." Shoals has purchased SunGen Photovoltaic wires from Prysmian for many years for use in its wire harnesses. Initially, these purchases included orders for black 10 AWG and 12 AWG wire ("Prysmian black wire"). In or around 2014 or 2015, Shoals began purchasing red 10 AWG and 12 AWG wire ("Prysmian red wire," collectively with Prysmian black wire, "Prysmian wire") from Prysmian. Here, the colors red and black refer to the color of polymer insulation on these wires.

17.     During the time Shoals purchased wire from Prysmian, Prysmian held itself out "as a leader in the cable and wire industry" with a "breadth of product and application engineering expertise to meet" each customer's specific needs.[4] It also specifically pointed to its "over one hundred years of experience in developing advanced materials and compounds that deliver ground-breaking and environmentally-sound cabling innovations" in its marketing materials, and claimed its products "set the benchmark for utilities."[5]

18.     During the time Shoals purchased wire from Prysmian, Prysmian issued specification sheets for its SunGen Photovoltaic Wire to potential customers, including Shoals. An

---

[4] General Cable website, *available at* https://web.archive.org/web/20201024170404
/https://www.generalcable.com/na/us-can/products-solutions/energy

[5] *Id.*

example of one such specification sheet from June 2017 is attached hereto as **Exhibit B**. The specification sheet for SunGen Photovoltaic Wire described itself as "spec 5851." *See id.*

19. Prysmian's specification sheet expressly marketed the SunGen Photovoltaic Wire for "interconnection wiring of grounded and ungrounded photovoltaic power systems." *See id.*

20. The same specification sheet stated that SunGen Photovoltaic Wire could handle up to 2000 volts of electricity. *See id.* ("Single conductor, sunlight-resistant, direct burial photovoltaic wire rated 90°C wet or dry, 2000 V for interconnection wiring of grounded and ungrounded photovoltaic power systems").

21. Prysmian also certified that its SunGen Photovoltaic Wire complied with certain industry standards on its specification sheet. For example, Prysmian represented that its SunGen Photovoltaic Wire complied with Underwriter Laboratories ("UL") 4703 Type PV, UL File # E343277, and UL 44 Type RHW-2, UL File # E39406. *See id.* The specification sheet also represented the wire was rated to 90º C and was deformation-resistant at high temperatures.

22. Shoals' representatives relied upon Prysmian's specification sheets in purchasing SunGen Photovoltaic Wire from Prysmian. Shoals' representatives ordered SunGen Photovoltaic Wire from Prysmian in reliance upon the representations included on Prysmian's specification sheet to ensure that the wire would be capable of meeting the needs of Shoals' customers and end users. Shoals would not have purchased SunGen Photovoltaic Wire if Prysmian's specification sheet failed to state explicitly that its wire complied with UL standards.

23. Prysmian knew that Shoals relied upon Prysmian's representations within its specification sheet. Prysmian learned how Shoals utilized its SunGen Photovoltaic Wire during various meetings with Shoals' representatives. For example, Prysmian representatives visited Shoals' headquarters—where Shoals produces the T-Junctions and manufactures the wire

6

harnesses—in Portland, Tennessee to reinforce its commercial relationship with Shoals on at least one occasion in 2018. Prysmian's sales representatives also checked in with Shoals' sales representatives on a regular basis to discuss wire sales. Shoals and Prysmian developed an extensive working relationship over the years, such that Prysmian knew how Shoals used its wire.

24. Prysmian sent Shoals a weekly email containing the prices ("weekly price sheets") for Prysmian black wire and Prysmian red wire. These weekly price sheets explicitly incorporated Prysmian's specification sheet by describing the wire as complying with "spec 5851." An example of one such weekly price sheet is attached hereto as **Exhibit C**; *see also* Exhibit B.

25. Shoals issued purchase orders for wire to Prysmian, and Prysmian accepted the orders by sending order acknowledgements and/or shipping the ordered wire, usually to Shoals' corporate headquarters in Tennessee. Each accepted purchase order established separate contracts between the parties for each transaction over time.

26. To the extent Prysmian attempted to introduce terms and conditions, those terms and conditions were not accepted or agreed to by Shoals. Furthermore, to the extent any such proposed terms and conditions materially altered the terms of the parties' agreements, they cannot and did not bind Shoals.

27. With its shipments of wire to Shoals, Prysmian would typically include a certificate of compliance, certifying that the wire "was manufactured and tested in the Willimantic, CT facility in accordance with the referenced customer purchase order and meets all applicable standards." An example of one such certification of compliance is attached hereto as **Exhibit D**.

28. Shoals began issuing purchase orders to Prysmian referencing Shoals' formal terms and conditions in November 2021 (the "2021 Terms and Conditions," attached hereto as **Exhibit E**). The purchase orders Shoals issued to and were accepted by Prysmian from that point forward

7

expressly indicated that the 2021 Terms and Conditions applied to the transactions contemplated by the orders.

29. In the 2021 Terms and Conditions, Prysmian expressly warranted to Shoals that its products would:

> be free from defects in design, workmanship, and materials, (b) be selected, designed, manufactured, and assembled by Supplier based upon Purchaser's and its OEM Customer's stated use and be fit for the purposes intended by Purchaser and its OEM Customers, (c) conform to all applicable laws, orders, regulations, and standards in countries where the Products are to be sold, (d) be free of all third party rights, liens and encumbrances, and (e) not infringe or contribute to the infringement of any U.S. or foreign patent or patent right or other third party proprietary right (including any patent, trademark, copyright, industrial design rights or other proprietary right or trade secret) ('IP Rights').

*See* Exhibit E § 7.

30. The 2021 Terms and Conditions defined the warranty period for Prysmian's products, including the SunGen Photovoltaic Wire, as "the longest of (x) the warranty provided by Purchaser to the OEM Customer, (y) the warranty period provided by the OEM Customer to the end-user/purchaser in which the Product is incorporated, or (z) any warranty period provided by applicable law." *See id.* Shoals' warranty period is typically five years.

31. The 2021 Terms and Conditions also specified that Prysmian's SunGen Photovoltaic Wire, including Prysmian red and black wire, would comply with certain minimum quality standards. Specifically, Prysmian's wire (1) "must be certified to UL" and (2) "must conform with the dimensional and performance specifications published in Supplier product portfolios, datasheets, etc." *See id.* § 9.

32. The same document also imposed certain requirements on Prysmian as a supplier for Shoals, including that Prysmian shall (1) "participate in key measurable meetings with [Shoals] as needed" and (2) "maintain Product traceability through their own supply chain up to and including finished goods." *See id.* Furthermore, Prysmian agreed that it would, "at no cost" to

8

Shoals, "assist [Shoals]in evaluating and resolving any detected quality problems" and "cooperate with [Shoals] to identify and or remedy any defect, default, claim of defect or other problem or quality issue relating to the Products (and related systems and components)." *See id.*

33. The 2021 Terms and Conditions also provided that Prysmian shall indemnify Shoals "against any and all losses, damages, liens, liabilities, costs and expenses (including reasonable attorneys' fees and expenses, as incurred) arising in connection" with any causes of actions or claims arising out of, among other things, "(1) [Prysmian's] breach of its obligations, covenants, representations or warranties" outlined in the 2021 Terms and Conditions and (2) any negligent act, willful omission or willful misconduct of [Prysmian], its employees or any individuals involved in the fulfillment of [Prysmian's] obligations under these Terms or any Order." *See id.* § 8.

34. Finally, the 2021 Terms and Conditions explicitly outlined Shoals' remedies if Prysmian breaches its obligations. *See id.* § 12. Under these terms, Prysmian is obligated to reimburse Shoals:

> [F]or any incidental, consequential or other damages (including lost profits) caused by [Prysmian's] breach of these Terms or for supplying nonconforming Products, including without limitation, costs, expenses, and losses incurred directly or indirectly by [Shoals]:
>
> a. In inspecting, sorting, storing, reworking, repairing or replacing the nonconforming Products;
>
> b. Resulting from production interruptions;
>
> c. Customer field service actions or other corrective service actions;
>
> d. Resulting from personal injury, death or property damage caused by the nonconforming Products. [Shoals'] damages include reasonable attorneys' fees and other professional fees, settlements and judgments incurred by [Shoals] and other costs associated with [Shoals'] administrative time, labor, and materials.
>
> e. In any action brought by [Shoals] to enforce [Prysmian's] obligations in connection with the production or delivery of Products or transition support, or for possession of property, [Prysmian] acknowledges and agrees that monetary damages are not a sufficient remedy for any actual, anticipatory or threatened breach of these Terms

and/or any Order and that, in addition to all other rights and remedies that [Shoals] may have, [Shoals] shall be entitled to specific performance and injunctive equitable relief as a remedy for any such breach, plus [Shoals'] reasonable attorneys' fees.

*See id.*

35. Prysmian manufactured and delivered wire pursuant to purchase orders that explicitly incorporated the 2021 Terms and Conditions by reference.

## Prysmian Wire and Industry Standards

36. To the extent a wire experiences insulation shrinkback when in service, the shrinkback mechanism is a gradual process that occurs when the insulating material around the conductor contracts. The wire at issue in this case has a polymer insulation covering copper conductor.

37. UL 44, to which Prysmian's specification sheet represented its wire complied, references a test method in UL 2556 to quantify the amount of acceptable insulation shrinkback in wire.

38. Internally, Prysmian has tested its photovoltaic wire, including the wire at issue, using a UL 2556 shrinkback test method, consistent with industry expectations.

39. Under the UL 2556 test method specifically referenced by UL 44, the polymer insulation on the conductor of a 5 meter wire sample should not contract by more than 0.16% (or 4 mm at each end).[6] Insulation shrinkback of more than this is considered unacceptable and

---

[6] Under UL 44, "[n]o exposed end of the conductor shall exceed 3 mm (0.12 in) in length after 24 [hours] when subjected to the test, Shrinkback, in UL 2556, CSA C22.2 No. 2556, or NMX-J-556-ANCE. As an option, if the exposed conductor length exceeds 3 mm (0.12 in), it shall not exceed 4 mm (0.16 in) in length after 7 [days]." *See* UL 44 § 5.21 (excerpt attached hereto as **Exhibit F**). According to UL 2556, the total sample length is 5 m (16 ft). *See* UL 2556 § 7.4.3 (excerpt attached as **Exhibit G**). The total allowable percent insulation shrinkback on a 5 meter sample is calculated by dividing the total allowable insulation shrinkback (8 mm, i.e., 4 mm at each end) by the total sample length. This results in a maximum allowable insulation shrinkback of 0.16% on a 5 meter sample. *See* Exhibit F; Exhibit G.

10

nonconforming to the UL 44 standard.

40. In addition to the test method referenced by UL 44, Insulated Cable Engineers Association ("ICEA") includes a commonly used test method for measuring insulation shrinkback ("ICEA Test"), which is applicable to stranded wire insulated with cross-linked polyethylene, like the Prysmian wire at issue in this case.

41. Internally, Prysmian has tested its photovoltaic wire, including the wire at issue, according to the ICEA Test and ICEA standards, and it has acknowledged the effectiveness of the test.

42. Per the ICEA Test requirement, an 18 inch wire exhibiting more than 100 mils[7] of insulation shrinkback after three testing cycles fails the ICEA Test. 100 mils of insulation shrinkback is equivalent to 0.55% insulation shrinkback on an 18 inch long wire sample. *See* ICEA §§ 4.3.4 & 9.10 (excerpt attached as **Exhibit H**).

43. Insulation shrinkback less than the UL 44 and ICEA Test standards is within acceptable industry standards and test methodology, but insulation shrinkback over and above those amounts is unacceptable ("unacceptable amount of insulation shrinkback"). Moreover, Prysmian has acknowledged in internal communications that its wire should not exhibit shrinkback of more than 3 mm on either end of a 12 inch piece of wire. Wire experiencing an unacceptable amount of insulation shrinkback can expose the copper conductor, which can result in decreased system performance in the field and safety hazards.

44. Prysmian is aware of, and has investigated, the phenomenon of insulation shrinkback for years. In fact, Prysmian has known that its wire insulation may shrinkback an

---

[7] A mil is a unit of measurement equal to one-thousandth of an inch, or 0.001 inch. *See* Merriam-Webster Dictionary, *available at* https://www.merriam-webster.com/dictionary/mil (last visited October 31, 2023).

unacceptable amount at least as far back as 2016. Prysmian never told Shoals this. At all times when selling wire to Shoals, Prysmian knew or should have known of the need to have processes and tests in place to prevent unacceptable insulation shrinkback, especially in light of its express representation in its specification sheet that its wire complied with UL 44 and other industry standards.

45. Stranded wire should not exhibit unacceptable amounts of insulation shrinkback due to the interstitial interaction between the stranded wire and the polymer insulation.

46. Stranded wire exhibiting an unacceptable amount of insulation shrinkback does not comply with accepted industry performance or Prysmian's own internal standards, nor does it comply with the pattern and practice between Prysmian and Shoals.

47. Defective wire exhibiting an unacceptable amount of insulation shrinkback does not comply with UL 44 or UL 4703[8], and therefore does not conform to the standards outlined in Prysmian's own specification sheet. *See* Exhibit B. Such wire is therefore not merchantable.

48. Defective wire exhibiting an unacceptable amount of insulation shrinkback likewise fails to conform with Shoals' 2021 Terms and Conditions, which expressly call for products to "be free from defects in design, workmanship, and materials," "be selected, designed, manufactured, and assembled by [Prysmian] based upon [Shoals'] and its OEM Customer's stated use and be fit for the purposes intended by [Shoals] and its OEM Customers," and "conform to all applicable laws, orders, regulations, and standards in countries where the Products are to be sold." *See* Exhibit E § 7.

---

[8] UL 4703 § 5.3 outlines the requirements for photovoltaic wire, and specifically incorporates the construction and materials requirements contained in UL 44. *See* UL 4703 § 5.3 (excerpt attached hereto as **Exhibit I**). As a result, any wire that does not conform with UL 44 also fails to conform with UL 4703.

<u>**Discovery of the Insulation Shrinkback Defect in Prysmian Wire**</u>

49.    In March 2022, Shoals' sales team first received a report from a customer that there was exposed copper conductor on harnesses made with Prysmian red wire installed in the customer's solar field. Shoals notified Prysmian, and a Shoals sales representative, representatives from Prysmian, and a third-party consultant went to the field to examine the wire.  Upon examination, Shoals and Prysmian discovered exposed bare copper conductor around T-Junctions.

50.    Prysmian conducted tests on harnesses made with Prysmian red wire that had exhibited exposed conductor in the field.  Prysmian conducted different tests to investigate the root cause of the exposed conductor, including relying on testing methodologies and standards under UL 4703 and UL 44 for determining the necessary thickness of wire insulation and testing for tensile strength, elongation, and deformation. However, Prysmian conducted these initial insulation shrinkback tests using something it called the "GC Method" test— a test Shoals subsequently learned was made up by Prysmian—rather than using test methods referenced in UL 44, ICEA, or otherwise accepted in the industry and even though Prysmian certifies that its product is in compliance with UL 44.  Thereafter, Prysmian provided Shoals with a report that indicated the Prysmian red wire "passed" the "GC Method" test and that Prysmian could not find "any anomalies with these cable's [*sic*] samples." *See* Prysmian Report, attached hereto as **Exhibit K**, at 5 & 10.

51.    Despite reporting to Shoals that its testing did not identify any anomalies, Prysmian had in fact conducted separate internal testing on its red 10 AWG photovoltaic wire that had not been put into use, and that testing revealed unacceptable levels of shrinkback on red wire samples. Prysmian withheld this information from Shoals.

52. Instead, in April 2022, Prysmian issued a report to Shoals, explaining, "[s]tring tension is believed to be the primary cause of conductor exposure of the insulated wire from the end of the overmold." *See* April 11, 2022 Site Visit Report, attached hereto as **Exhibit J**, at 1-2. Prysmian described this as a wire management or installation issue. *See id.* at 1.

53. Prysmian in fact knew long before March of 2022 that at least some of its wire had exhibited unacceptable shrinkback, but Prysmian did not disclose this to Shoals.

54. Relying upon Prysmian's reports, including Prysmian's representations that its red wire passed Prysmian's internal testing and that the root cause of the exposed conductor was not related to Prysmian red wire's design and/or manufacture, and unaware of Prysmian's material omissions, Shoals continued to purchase Prysmian red wire.

55. In addition, at its own expense and to support its customer, Shoals replaced affected harnesses at the site where exposed conductor on Prysmian wire had first been reported. The replacement harnesses were made with Prysmian red wire and installed at this site using different installation methods to address concerns Prysmian had raised related to wire management and installation.

56. As described below, a few of Shoals' other customers reported similar instances of copper conductor exposure on Prysmian wire in the field following Prysmian's April 2022 report.

57. In July 2022, a customer provided Shoals with a report indicating that testing showed Prysmian's wire from one solar site shrunk back a significant amount more than comparable wire from another manufacturer. When presented with the report, Prysmian denied responsibility, responding instead that the wrong shrinkback test had been used, and it had not seen unacceptable levels of shrinkback in samples removed from sites or from its ongoing production. This was false.

14

58.     In late 2022, the Shoals sales representative involved in the March 2022 customer complaint began to suspect, but still did not fully understand, that Prysmian was being less than forthcoming regarding the purported lack of issues with its wire, and that the exposed copper conductor in Prysmian wire at the few sites Shoals understood to be experiencing the issue at that time might be due to defects in the wire and not the way in which the Shoals product was installed by various third parties, as Prysmian had represented to Shoals.

59.     For example, in late 2022, the same Shoals sales representative learned the Prysmian red wire harnesses that were re-installed at the initial site where shrinkback had been reported were *once again* exhibiting exposed copper conductor, despite the re-installation eliminating the initial wire management concerns raised by Prysmian.

60.     Shoals spent considerable resources starting in 2022 and continuing well into 2023 to understand the possible cause and the extent of the issues.

61.     During this time period, Prysmian continued to falsely refute any suggestion that its wire had shrinkback issues, despite knowing that its internal testing showed unacceptable shrinkback in its wire, that it had implemented—and was actively analyzing—various material and process changes to try to address this shrinkback issue, and a number of its other customers had complained about the issue over the years.  Prysmian never told Shoals about these tests, material and process changes, or complaints.  However, Prysmian finally recommended on December 22, 2022, that Shoals stop using Prysmian red wire while the issue was further investigated.

62.     Prysmian and Shoals met in January of 2023, and Prysmian presented the slide deck attached hereto as **Exhibit L** to Shoals during this meeting.  The report presented the results of internal testing Prysmian had done.  In particular, the report showed the results of Prysmian wire tests performed in a manner analogous to the ICEA Test procedure, rather than the "GC Method"

15

test Prysmian had previously utilized. After only two oven cycles, the insulation shrinkback on field samples exceeded shrinkback of 100 mils.

63. While Prysmian's representatives acknowledged during the January meeting that the field samples did not pass the utilized test, Prysmian nonetheless continued to deny that there was a problem with its wire and questioned whether Shoals' harness design or installation methods were causing the issue.

64. In its January presentation, Prysmian claimed that Prysmian red wire "has been made with the same process and with the same materials since 2016," and it downplayed the effects that changes in materials and processes played on shrinkback. Yet Prysmian's suggestion at the conclusion of the presentation that Shoals substitute Prysmian red wire for other Prysmian wire while the issue was further investigated demonstrates that Prysmian was aware that something in the materials or production process it used for its wire was causing the wire to exhibit unacceptable levels of insulation shrinkback. In internal communications, Prysmian had already acknowledged as much, but it never told Shoals this.

65. Prysmian conducted additional internal testing in January and February 2023, and the testing again showed unacceptable levels of shrinkback. Prysmian did not share this with Shoals.

66. Instead, in subsequent discussions during this time period, Prysmian continued to represent to Shoals that its cables were not the root cause of the shrinkback issue and that the PV wire supplied to nine projects at which shrinkback had been reported at that time was free of any defects "and manufactured to the required UL specification for photovoltaic wires requested by Shoals." Prysmian knew these representations were false when they made them.

16

Case 3:23-cv-00343   Document 95-1   Filed 12/24/24   Page 17 of 48 PageID #: 6292

67. While Prysmian continued to deny any responsibility and refused to accept a return of the Prysmian red wire Shoals had on hand, Shoals received in the first quarter of 2023 additional reports of exposed copper conductor from three customers. In an effort to gather more information, Shoals engaged a third party to inspect the customers' sites.

68. At the same time, Shoals worked to remediate the issues with its customers, but without more information about the failure rate of Prysmian's wire, Shoals' ability to offer a comprehensive solution to its customers was limited.

69. In the second quarter of 2023, Shoals received notice of potential shrinkback on Prysmian wire from another customer. Shoals continued its inspections of the sites of reported issues but did not have information sufficient to accurately predict a failure rate at identified sites nor to predict what other sites may be impacted. Because Shoals did not know the full extent of the issue—and because Prysmian continued to deny liability—Shoals continued to work with its customers on identifying shrinkback throughout the summer of 2023.

70. At some point, Shoals came to understand that Prysmian's purported GC Method test allows for more insulation shrinkback than the standards contained in UL 44 and the ICEA Test. In fact, the GC Method test appears to allow for 3 mm of shrinkback on each end of a 12 inch wire sample (2.4% of that sample length), which substantially exceeds the limits of either UL 44 or the ICEA Test.[9]

---

[9] According to the GC Method, the total sample length is 12 inches with 1 inch stripped at each end. The total allowable percent insulation shrinkback on the sample length is calculated by dividing the total allowable insulation shrinkback (6 mm, i.e., 3 mm at each end) by the total sample length (10 inches of insulation, i.e., 12 inches with 1 inch removed at each end). *See* **Exhibit K** at 5. This results in maximum allowable insulation shrinkback of 2.4% of the sample length.

17

71. Shoals did not know when it purchased wire from Prysmian that Prysmian's own unique testing protocol allows for significantly more insulation shrinkback than that allowed by the UL or ICEA standards. If Shoals had known this, it would not have purchased wire from Prysmian, because it is not compatible with Shoals' design, violates the representations in Prysmian's specification sheets, and results in exposed copper conductor in the field.

72. Prysmian came up with its own unique testing protocol and insulation shrinkback requirement rather than undertaking a valid scientific analysis, such as utilizing recognized standardized testing employed by UL or ICEA, to avoid admitting that its defective wire was the source of the unacceptable levels of insulation shrinkback Shoals was observing in the field.

73. In the summer and fall of 2023, Shoals learned more about the breadth of shrinkback at sites from its site inspections. Shoals also continued to receive more reports of shrinkback on Prysmian wire from additional customers. This new information led Shoals to believe that it might incur substantially more in remediation costs than previously estimated. Shoals continued to work with its customers to remediate the issues without assistance from Prysmian.

74. Even though Shoals uses the same type of wire from other manufacturers in its harnesses, which are produced in the same manner, placed in the same applications, and installed in the same way as those utilizing Prysmian red wire, Shoals has not received reports from solar fields of unacceptable amounts of insulation shrinkback in harnesses that were manufactured with wire from any wire manufacturer other than Prysmian.

**Causes of the Insulation Shrinkback Defect in Prysmian Wire**

75. It is well known in the cable and wire industry that unacceptable levels of insulation shrinkback may develop in the polymer insulation due to poorly controlled wire manufacturing

processes.  In particular, excessive shrinkback can result from inconsistent cooling or excessive stress during the manufacturing process, changes in line speed, inconsistent or incomplete cross-linking during the curing process, improper formulation of the polymer insulation, or any combination thereof.  Since at least 2016, Prysmian has analyzed all of these variables and made formulation and process changes in its continued attempts to correct its wire insulation shrinkback issue.

76.     Prysmian intentionally or recklessly took inappropriate actions or failed to take appropriate actions to utilize proper formulations and control its manufacturing process, and thus recklessly departed from industry practice in its production process, which caused Prysmian wire sold to Shoals to be defective with unacceptable amounts of insulation shrinkback.

77.     Given that Prysmian knew about shrinkback for years prior to 2022 and understood a number of variables that caused it, along with the fact that it kept this information from Shoals, Prysmian's failures to correct its formulation controls and manufacturing processes constitute deliberate, intentional, or reckless choices by Prysmian. This constitutes a departure from standard industry practice and was done with knowledge that such actions or failures to act compromised the integrity of its photovoltaic wire and could harm Shoals, Shoals' customers, and the end users of Shoals' products.

**Defective Prysmian Wire Forced Shoals to Incur Substantial Damages**

78.     Per Prysmian's recommendation, Shoals stopped purchasing Prysmian wire in late 2022 and has since stopped using Prysmian wire in any of its products.

79.     As of the filing of this First Amended Complaint, Shoals is aware of unacceptable amounts of insulation shrinkback occurring in more than thirty solar fields where Shoals' wire harnesses are installed.  The wire experiencing unacceptable insulation shrinkback at those sites is

solely wire manufactured by Prysmian, and it is believed that this wire was manufactured between approximately 2019 and approximately 2022.

80.     Shoals' products using Prysmian wire manufactured between approximately 2019 and approximately 2022 are believed to have been used at approximately 300 solar field sites nationwide.  Due to the defect in Prysmian wire and the harm it has caused and will continue to cause, Shoals was forced to notify its customers and end users of its products of the potential for insulation shrinkback on Prysmian wire in its products. Shoals has also asked customers and end users to provide feedback on their sites.  An example of one such notification is attached hereto as **Exhibit M**. Since sending this letter, Shoals has gradually learned of other customers and/or end users experiencing unacceptable amounts of insulation shrinkback in Prysmian wire.  Sending such a notification, while necessary in light of the circumstances, has damaged Shoals' reputation and is likely to cause Shoals to incur significant damages to remedy additional instances of unacceptable insulation shrinkback.

81.     Shoals also expects that at least some of these sites will incur property damage as a result of the insulation shrinkback defect.  In fact, at least one affected site reported property damage arising from a fire in 2023, which is believed to have ignited as a result of contact with an exposed conductor in Prysmian red wire.

82.     Investigating the extent of the Prysmian insulation shrinkback issue at the sites with known issues has been costly.  For example, Shoals had to hire third parties to investigate and to conduct on-the-ground monitoring and drone imaging to investigate the Prysmian insulation shrinkback issue. In addition to inspecting certain projects with known issues, Shoals had to conduct full-field inspections for some customers that encountered shrinkback.

20

83. Furthermore, Shoals now has an excess of Prysmian wire that it purchased but cannot use due to concerns over Prysmian's production processes and the quality of the wire. In addition to the costs of the wire, Shoals has incurred damages for having to store this wire. Prysmian has refused to accept the return of this wire.

84. Remediation of the Prysmian insulation shrinkback issue is also costly. As explained above, Shoals incurred significant costs to remediate the issues at some sites. In addition, several solar sites demanded Shoals reimburse them for the costs incurred to repair and replace harnesses in their fields. Shoals has also worked with customers and end users to replace affected product, as well as schedule inspections. Remediation is, and will continue to be, expensive, and also has required, and will continue to require, Shoals to expend resources that could be utilized elsewhere in its business.

85. As of the time of this filing, Shoals has already incurred millions of dollars in damages, and while the full extent of Shoals' damages are still unknown, it is possible Shoals could expend $73 million or more to remedy Prysmian's defective wire. Furthermore, Shoals has experienced reputational damage and the loss of prospective customers and revenue because of the defective Prysmian wire.

86. Prysmian continues to intentionally and recklessly evade responsibility and insist that its wire is safe, non-defective, and in conformity with its representations of quality, despite clear evidence to the contrary.

87. For instance, on November 8, 2023, Prysmian issued a press release, stating "We are aware that Shoals is having significant problems with its harnesses and connectors, and the lawsuit apparently was filed as an effort to shift responsibility for its product problems to Prysmian."

88. When it made this statement, Prysmian had long been aware of shrinkback problems with its wire, its own internal testing prior to the Complaint showed its wire was experiencing unacceptable shrinkback, and Prysmian had identified problems with its formulation and production process that caused shrinkback. In other words, Prysmian knew its statement was false.

89. Prysmian made this false statement recklessly and with the intent of damaging Shoals' reputation, injuring Shoals' credibility in the marketplace, and drawing attention away from the defect Prysmian knew its wire to have.

90. This intentional and reckless conduct has caused Shoals significant reputational harm and other damages, including investigation, inspection, and remediation expenses.

**COUNT ONE**
**TENNESSEE PRODUCTS LIABILITY ACT**

91. Shoals realleges and incorporates by reference paragraphs 1 through 90 of this Complaint as though set forth in full herein.

92. Prysmian's wire was in a defective condition as defined in the Tennessee Liability Act ("TPLA") at the time it left Prysmian's control. *See* Tenn. Code Ann. § 29-28-101 *et seq*.

93. Prysmian's wire was unreasonably dangerous as defined in the TPLA at the time it left Prysmian's control, as it did not comply with UL or other industry standards. *See id.* Furthermore, the insulation shrinkback defect poses other dangers, including but not limited to the risk that any individual or property that comes in contact with it will be injured or damaged. In fact, Prysmian's defective wire is believed to have already caused at least one fire in a solar field.

94. The integrity of the Prysmian wire sold to Shoals from approximately 2019 through approximately 2022 was compromised at the time of production, before the wire left Prysmian's

22

control, and before Shoals obtained it. Prysmian failed to warn Shoals of the wire's defective condition.

95. Prysmian's manufacturing process and/or oversight failures have caused or will cause Shoals Technologies to incur significant damages, currently estimated to be $73 million or more, including but not limited to:

a. Expenses incurred by Shoals in connection with investigating Prysmian's defective products, inspecting customers' and end users' solar fields to identify instances of unacceptable amounts of insulation shrinkback, and replacing or repairing defective products for customers and end users who have experienced unacceptable amounts of insulation shrinkback in Prysmian wire;

b. Expenses incurred defending against, paying and/or settling claims asserted against Shoals, its customers, and/or end users related to the insulation shrinkback defect in Prysmian's wire;

c. Expenses incurred due to Prysmian's failure or refusal to accept the return of Prysmian wire, including but not limited to (1) the expenses incurred in storing it at Shoals' facility, and (2) the difference between the price Shoals paid for the wire, and the wire's value as scrap material;

d. Expenses incurred in replacing and repairing Shoals' customers' and/or end users' property, which was damaged as a result of Prysmian's defective wires; and,

e. Damages and injury to Shoals' good reputation in the industry, which has been tarnished by Prysmian's misconduct, resulting in lost sales.

23

96.     Shoals realleges and incorporates by reference paragraphs 1 through 95 of this Complaint as though set forth in full herein.

97.     Prysmian issued weekly price sheets to Shoals. These price sheets incorporated references to Prysmian's specification sheet for its SunGen Photovoltaic wire, which expressly represented that Prysmian's SunGen Photovoltaic wire, including Prysmian red and black wire, (1) was manufactured for "interconnection wiring of grounded and ungrounded photovoltaic power systems," (2) could safely handle up to 2000 volts of electricity, and (3) complied with both UL 4703 and 44.  Shoals relied on these representations in purchasing Prysmian wire.

98.     Shoals issued purchase orders for wire to Prysmian, and Prysmian accepted the orders by sending order acknowledgements and/or shipping the ordered wire.  Each accepted purchase order established separate contracts between the parties for each transaction over time.

99.     Shoals fully performed its obligations under the contracts by paying Prysmian in full for the products Shoals received.

100.    Prysmian materially breached the terms of these contracts by supplying Shoals with wire that was defective and did not comply with its own specification sheet, in that Prysmian wire exhibited unacceptable amounts of insulation shrinkback.

101.    Such wire violates Prysmian's contracts with Shoals because, among other things, the wire cannot safely interconnect the wiring of grounded and unground photovoltaic power systems or handle up to 2000 volts of electricity, nor does it comply with either UL 4703, UL 44, or other applicable standards.

24

102.     As the proximate result of Prysmian's breaches, Shoals has suffered or will suffer damages, including but not limited to the following:

a.  Expenses incurred by Shoals in connection with investigating Prysmian's defective products, inspecting customers' and end users' solar fields to identify instances of unacceptable amounts of insulation shrinkback, and replacing or repairing defective products for customers and end users who have experienced unacceptable amounts of insulation shrinkback in Prysmian wire;

b.  Expenses incurred defending against, paying and/or settling claims asserted against Shoals, its customers, and/or end users related to the insulation shrinkback defect in Prysmian's wire;

c.  Expenses incurred due to Prysmian's failure or refusal to accept the return of Prysmian wire, including but not limited to (1) the expenses incurred in storing it at Shoals' facility, and (2) the difference between the price Shoals paid for the wire, and the wire's value as scrap material;

d.  Expenses incurred in replacing and repairing Shoals' products, which was necessary because of Prysmian's defective wires; and,

e.  Damages and injury to Shoals' good reputation in the industry, which has been tarnished by Prysmian's misconduct, resulting in lost sales.

103.     Prysmian's breaches of its contracts with Shoals were committed with intentional or reckless disregard of Shoals' rights, particularly given that Prysmian, among other things, (1) had internal testing demonstrating unacceptable shrinkback problems with its wire, (2) did not inform Shoals of its longstanding knowledge that its wire exhibited unacceptable shrinkback or that its formulation and manufacturing process played a role in it, (3) provided defective wire to

Shoals knowing that Shoals was incorporating the wire into extensive EBOS projects across the country, (4) continued to intentionally or at least recklessly deny wrongdoing, (5) invented the so-called "GC Method" test in an effort to validate wire it knew did not meet its specified standards or industry standards, and (6) continued to mislead Shoals into believing Prysmian's defective wire is safe and merchantable, despite knowing or having reason to know that its wire was not safe and merchantable.

104.     Shoals is entitled to recover for its damages, including, without limitation, damages to its brand and punitive damages,[10] against Prysmian in an amount to be proven at trial but which, in any event, well exceeds the jurisdictional threshold of this Court.

**COUNT THREE**
**BREACH OF CONTRACT**
**SHOALS' 2021 TERMS AND CONDITIONS**

105.     Shoals realleges and incorporates by reference paragraphs 1 through 104 of this Complaint as though set forth in full herein.

106.     From approximately November 5, 2021 forward, Prysmian continued to issue weekly price sheets to Shoal that incorporated Prysmian's specification sheets.

107.     Shoals issued purchase orders for wire to Prysmian.  These purchase orders expressly incorporated Shoals' 2021 Terms and Conditions.  Prysmian accepted the orders by sending order acknowledgements and/or shipping the ordered wire.  Each accepted purchase order established separate contracts between the parties for each transaction over time.

---

[10] Tennessee law permits recovery of punitive damages in breach of contract cases if "a defendant acted either intentionally, fraudulently, maliciously, or recklessly." *Riad v. Erie Ins. Exchange*, 436 S.W.3d 256, 276 (Tenn. Ct. App. 2013); *see also Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 211 n.14 (Tenn. 2012).

108. Shoals fully performed its obligations under these contracts by paying Prysmian in full for the products Shoals received from Prysmian.

109. Prysmian materially breached the terms of these contracts, which incorporated Shoals' 2021 Terms and Conditions, as follows:

a. By supplying Prysmian wire that was not (1) "free from defects in design, workmanship, and materials," (2) "designed, manufactured, and assembled by [Prysmian] based upon [Shoals'] needs," (3) "fit for the purposes intended by [Shoals] and its OEM customers," and/or "conform[ing] to all applicable laws, orders, regulations, and standards in countries where the products [were] to be sold";

b. Providing Shoals with wire that failed to meet the minimum quality standards, including UL certification and Prysmian's "performance specifications published" in its specification sheets; and,

c. Declining to uphold its obligation to, at no cost to Shoals, "assist [Shoals] in evaluating and resolving any detected quality problems" and "cooperate with [Shoals] to identify and or remedy any defect, default, claim of defect or other problem or quality issue relating to the Products (and related systems and components)."

110. Prysmian's breaches have caused Shoals to incur damages as outlined below:

a. Costs incurred in "inspecting, sorting, storing, reworking, repairing or replacing the nonconforming" Prysmian wire, including expenses incurred due to Prysmian's failure or refusal to accept the return of Prysmian wire, which is included but not limited to (1) the expenses incurred in storing it at Shoals'

27

facility, and (2) the difference between the price Shoals paid for the wire, and the wire's value as scrap material;

b. Costs incurred as a result of production interruptions caused by the defective Prysmian wire;

c.  Expenses incurred as a result of Shoals' customers and/or end user's "field service actions or other corrective service actions"; and,

d. Costs resulting from reimbursing Shoals' customers and/or end users for "property damage caused by" Prysmian's wire, including "reasonable attorneys' fees and other professional fees, settlements and judgments incurred by [Shoals] and other costs associated with [Shoals'] administrative time, labor, and materials."

111. Prysmian's breaches of the contracts incorporating Shoals' 2021 Terms and Conditions were committed intentionally, maliciously, or at least recklessly, particularly given that Prysmian, among other things, (1) had internal testing demonstrating unacceptable shrinkback problems with its wire, (2) did not inform Shoals of its longstanding knowledge that its wire exhibited unacceptable shrinkback or that its formulation and manufacturing process played a role in it, (3) provided defective wire to Shoals knowing that Shoals was incorporating the wire into extensive EBOS projects across the country, (4) continued to intentionally or at least recklessly deny wrongdoing, (5) invented the so-called "GC Method" test in an effort to validate wire it knew did not meet its specified standards or industry standards, and (6) continued to mislead Shoals into

28

believing Prysmian's defective wire is safe and merchantable, despite knowing or having reason to know that its wire was not safe and merchantable.

112. Shoals is entitled to recover for its damages, including, without limitation, expenses it has incurred in inspections and remediation, damages to its brand, and punitive damages,[11] against Prysmian in an amount to be proven at trial but which, in any event, well exceeds the jurisdictional threshold of this Court.

## COUNT FOUR
## UNJUST ENRICHMENT (In the Alternative to Counts II and III)

113. Shoals realleges and incorporates by reference paragraphs 1 through 112 of this Complaint as though set forth in full herein.

114. In the alternative to Counts II & III, Shoals alleges that it conferred a benefit upon Prysmian, namely, the monetary value of the wire it ordered and paid for from Prysmian.

115. It would be inequitable for Prysmian to retain the full monetary value it received from these transactions when it provided defective, non-merchantable product to Shoals.

116. Shoals is entitled to recover for its damages against Prysmian in an amount to be proven at trial but which, in any event, well exceeds the jurisdictional threshold of this Court.

## COUNT FIVE
## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

117. Shoals realleges and incorporates by reference paragraphs 1 through 116 of this Complaint as though set forth in full herein.

118. In every contract or agreement there is an implied promise of good faith and fair dealing.

---

[11] *See Riad*, 436 S.W.3d at 276.

119.    Shoals and Prysmian entered into contracts from approximately 2019 until approximately 2022, including contracts governed by its 2021 Terms and Conditions.

120.    Shoals performed all of its obligations under the above-referenced contracts.

121.    All conditions required for Prysmian's performance under the above-referenced contracts occurred.

122.    Prysmian unfairly interfered with Shoals' right to receive the benefits of each of the above-referenced contracts by acting in bad faith and without fair dealing, including without limitation because Prysmian (1) had internal testing demonstrating unacceptable shrinkback problems with its wire, (2) did not inform Shoals of its longstanding knowledge that its wire exhibited unacceptable shrinkback or that its formulation and manufacturing process played a role in it, (3) provided defective wire to Shoals knowing that Shoals was incorporating the wire into extensive EBOS projects across the country, (4) continued to intentionally or at least recklessly deny wrongdoing, (5) invented the so-called "GC Method" test in an effort to validate wire it knew did not meet its specified standards or industry standards, and (6) continued to mislead Shoals into believing Prysmian's defective wire is safe and merchantable, despite knowing or having reason to know that its wire was not safe and merchantable.

123.    Shoals was harmed by Prysmian's conduct, and has suffered or will suffer damages due to Prysmian's breaches, including but not limited to the following:

a. Expenses incurred by Shoals in connection with investigating Prysmian's defective products, inspecting customers and end users' solar fields to identify instances of unacceptable amounts of insulation shrinkback, and replacing or repairing defective products for customers and/or end users whose sites have experienced unacceptable amounts of insulation shrinkback in Prysmian wire;

30

b. Expenses incurred defending against, paying and/or settling claims asserted against Shoals, its customers, and/or its end users related to the insulation shrinkback defect in Prysmian's wire;

c. Expenses incurred due to Prysmian's failure or refusal to accept the return of Prysmian wire, including but not limited to (1) the expenses incurred in storing it at Shoals' facility, and (2) the difference between the price Shoals paid for the wire, and the wire's value as scrap material;

d. Expenses incurred in replacing and repairing Shoals' customers' and/or end users' property, which was damaged as a result of Prysmian's defective wires; and,

e. Damages and injury to Shoals' good reputation in the industry, which has been tarnished by Prysmian's misconduct, resulting in lost sales.

124. Shoals is entitled to recover for its damages against Prysmian, in an amount to be proven at trial but which, in any event, well exceeds the jurisdictional threshold of this Court.

## COUNT SIX
## BREACH OF EXPRESS WARRANTY

125. Shoals realleges and incorporates by reference paragraphs 1 through 124 of this Complaint as though set forth in full herein.

126. Prysmian provided Shoals with conductor wire that no reasonable wire manufacturer would place on the market: the integrity of the insulation of this wire is compromised, rendering it fundamentally unsafe and unfit for its intended use, namely, conducting high voltages of electricity in a safe and efficient manner.

127. Prysmian breached the following express warranties of merchantability:

31

a. Prysmian's specification sheets, which represented that Prysmian's wire met industry standards, including UL 44 and UL 4703;

b. Industry standards generally required by manufacturers of similar products;

c. For purchase orders placed after November 5, 2021, the "Product Warranties" included in Shoals' 2021 Terms and Conditions, namely, the warranties representing that Prysmian would supply only wire that was (1) "free from defects in design, workmanship, and materials," (2) "designed, manufactured, and assembled by [Prysmian] based upon [Shoals'] needs," (3) "fit for the purposes intended by [Shoals] and its OEM customers," and/or "conform[ing] to all applicable laws, orders, regulations, and standards in countries where the products [were] to be sold"; and,

d. For purchase orders placed after November 5, 2021, the minimum "Quality" standards outlined in Shoals' 2021 Terms and Conditions, including the warranties representing that Prysmian's wire would (1) "be certified to UL" and (2) conform with the "performance specifications published in [Prysmian's] product portfolios, datasheets, etc."

128.  Shoals has suffered or will suffer damages due to Prysmian's breaches, including but not limited to the following:

a. Expenses incurred by Shoals in connection with investigating Prysmian's defective products, inspecting customers and end users' solar fields to identify instances of unacceptable amounts of insulation shrinkback, and replacing or repairing defective products for customers and/or end users whose sites have experienced unacceptable amounts of insulation shrinkback in Prysmian wire;

b. Expenses incurred defending against, paying and/or settling claims asserted against Shoals, its customers, and/or its end users related to the insulation shrinkback defect in Prysmian's wire;

c. Expenses incurred due to Prysmian's failure or refusal to accept the return of Prysmian wire, including but not limited to (1) the expenses incurred in storing it at Shoals' facility, and (2) the difference between the price Shoals paid for the wire, and the wire's value as scrap material;

d. Expenses incurred in replacing and repairing Shoals' customers' and/or end users' property, which was damaged as a result of Prysmian's defective wires; and,

e. Damages and injury to Shoals' good reputation in the industry, which has been tarnished by Prysmian's misconduct, resulting in lost sales.

129. Shoals is entitled to recover for its damages against Prysmian in an amount to be proven at trial but which, in any event, well exceeds the jurisdictional threshold of this Court.

## COUNT SEVEN
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

130. Shoals realleges and incorporates by reference paragraphs 1 through 129 of this Complaint as though set forth in full herein.

131. Prysmian provided Shoals with conductor wire that no reasonable manufacturer would place on the market: the integrity of the insulation of this wire is compromised, rendering it fundamentally unfit and unsafe for its intended use, namely, conducting high voltages of electricity in a safe and efficient manner.

132. In connection with Prysmian's sale of the photovoltaic wire to Shoals, Prysmian impliedly warranted that the photovoltaic wire would be of merchantable quality. *See* Tenn. Code

33

Ann. § 47-2-314. As such, Prysmian impliedly warranted the products would be usable, i.e., not inherently dangerous due to defective insulation that exhibits unacceptable amounts of insulation shrinkback.

133. Prysmian breached this implied warranty by supplying to Shoals photovoltaic wire with defective insulation that exhibits unacceptable amounts of insulation shrinkback, which rendered the photovoltaic wire dangerous and unfit, and thus, not merchantable.

134. Shoals has suffered or will suffer damages due to Prysmian's breaches, including but not limited to the following:

   a. Expenses incurred by Shoals in connection with investigating Prysmian's defective products, inspecting customers' and end users' solar fields to identify instances of unacceptable amounts of insulation shrinkback, and replacing or repairing defective products for customers and end users whose sites have experienced unacceptable amounts of insulation shrinkback in Prysmian wire;

   b. Expenses incurred defending against, paying and/or settling claims asserted against Shoals, its customers, and/or end users related to the insulation shrinkback defect in Prysmian's wire;

   c. Expenses incurred due to Prysmian's failure or refusal to accept the return of Prysmian wire, including but not limited to (1) the expenses incurred in storing it at Shoals' facility, and (2) the difference between the price Shoals paid for the wire, and the wire's value as scrap material;

   d. Expenses incurred in replacing and repairing Shoals' customers' and/or end users' property, which was damaged as a result of Prysmian's defective wires; and,

e. Damages and injury to Shoals' good reputation in the industry, which good reputation has been tarnished by Prysmian's misconduct, resulting in lost sales.

135. Shoals is entitled to recover for its damages against Prysmian, in an amount to be proven at trial but which, in any event, well exceeds the jurisdictional threshold of this Court.

<u>COUNT EIGHT</u>
<u>BREACH OF IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE</u>

136. Shoals realleges and incorporates by reference paragraphs 1 through 135 of this Complaint as though set forth in full herein.

137. Prysmian provided Shoals with conductor wire that no reasonable manufacturer would place on the market: the integrity of the insulation of this wire is compromised, rendering it fundamentally unfit and unsafe for its intended use, namely, conducting high voltages of electricity in a safe and efficient manner.

138. Prysmian knew Shoals was purchasing its SunGen photovoltaic wire for the particular purpose of utilizing it as a "single conductor" for the "interconnection wiring of grounded and ungrounded photovoltaic power system." *See* Exhibit B. This use was outlined in Prysmian's own specification sheets, and Prysmian knew Shoals was relying on it to manufacture and provide Shoals with photovoltaic wire suitable for this particular purpose.

139. Prysmian was also aware of the particular purpose for which Shoals purchased its Prysmian wire because Prysmian representatives visited Shoals' headquarters in Tennessee and communicated regularly with Shoals. Prysmian therefore knew or should have known how Shoals used its Prysmian wire in its production process, as well as how Shoals' customers and end users would utilize Shoals' final product in the solar field.

140. Furthermore, for purchase orders post-dating November 5, 2021, Prysmian expressly warranted that its Prysmian wire would be "designed, manufactured, and assembled by"

Prysmian based upon Shoals' "stated use and be fit for the purposes intended by" Shoals, Shoals' customers, and end users.  *See* Exhibit E § 7.

141.    Under Tennessee law, Prysmian impliedly warranted that the subject wire would be fit for that particular purpose.  *See* Tenn. Code Ann. § 47-2- 315.

142.    Prysmian breached this implied warranty by supplying photovoltaic wire that could not uphold the particular purpose outlined in its specification sheet and made clear to Prysmian's representatives during their communications with Shoals and visits to Shoals' headquarters in Tennessee.

143.    Shoals has suffered or will suffer damages due to Prysmian's breaches, including but not limited to the following:

    a.  Expenses incurred by Shoals in connection with investigating Prysmian's defective products, inspecting customers and end users' solar fields to identify instances of unacceptable amounts of insulation shrinkback, and replacing or repairing defective products for customers and end users whose sites have experienced unacceptable amounts of insulation shrinkback in Prysmian wire;

    b.  Expenses incurred defending against, paying and/or settling claims asserted against Shoals, its customers, and end users related to the insulation shrinkback defect in Prysmian's wire;

    c.  Expenses incurred due to Prysmian's failure or refusal to accept the return of Prysmian wire, including but not limited to (1) the expenses incurred in storing it at Shoals' facility, and (2) the difference between the price Shoals paid for the wire, and the wire's value as scrap material;

d. Expenses incurred in replacing and repairing Shoals' customers' and/or end users' property, which was damaged as a result of Prysmian's defective wires; and,

e. Damages and injury to Shoals' good reputation in the industry, which good reputation has been tarnished by Prysmian's misconduct, resulting in lost sales.

144. Shoals is entitled to recover for its damages against Prysmian, in an amount to be proven at trial but which, in any event, exceeds the jurisdictional threshold of this Court.

**COUNT NINE**
**EXPRESS INDEMNITY**

145. Shoals realleges and incorporates by reference paragraphs 1 through 144 of this Complaint as though set forth in full herein.

146. Shoals has incurred direct, out-of-pocket expenses and losses resulting from or related to Prysmian's supply of defective photovoltaic wires.

147. In the 2021 Terms and Conditions, Prysmian expressly agreed to indemnify Shoals "against any and all losses, damages, liens, liabilities, costs and expenses (including reasonable attorneys' fees and expenses, as incurred) arising in connection" with any causes of actions or claims arising out of, among other things, "(1) Supplier's breach of its obligations, covenants, representations or warranties" and "(2) any negligent act, willful omission or willful misconduct of Supplier, its employees or any individuals involved in the fulfillment of Supplier's obligations under these Terms or any Order." *See* Exhibit E § 8.

148. The 2021 Terms and Conditions go on to clarify that Prysmian shall also indemnify Shoals with respect to any damages incurred due to "injury to, or death of, persons or damage to real and tangible personal property caused by Supplier, its employees, or any individual involved

37

in any manner in the performance of the Services performed under these Terms or any Order." *See id.*

149. Shoals, in accordance with the 2021 Terms and Conditions, provided Prysmian "with prompt written notice" of these claims. *See id.*

150. Nonetheless, Prysmian has refused to indemnify Shoals and failed to uphold its express duty to indemnify Shoals for the current claims against it, and this behavior indicates Prysmian has no intention of indemnifying Shoals from future claims either.

151. Prysmian has therefore violated the indemnity provisions of the 2021 Terms and Conditions.

152. Shoals is entitled to full indemnification from Prysmian for such claims, expenses and losses, including but not limited to its attorneys' fees and other costs Shoals has incurred.

<u>**COUNT TEN**</u>
<u>**EQUITABLE INDEMNITY**</u>

153. Shoals realleges and incorporates by reference paragraphs 1 through 152 of this Complaint as though set forth in full herein.

154. Shoals has incurred direct, out-of-pocket expenses and losses and had claims asserted against it resulting from or related to Prysmian's supply of defective photovoltaic wires.

155. Prysmian, as the surviving entity after merging with General Cable, is the entity that manufactured and sold defective photovoltaic wires, and by law, it has an equitable obligation to defend and indemnify Shoals against such claims, expenses and losses. To date, Prysmian has failed and refused to defend and indemnify Shoals against such claims, expenses and losses.

156. As a matter of equity, Shoals is entitled to full indemnification from Prysmian for such claims, expenses and losses, including the attorneys' fees and other costs Shoals has incurred,

and will continue to incur, from defending itself against such claims. Nonetheless, Prysmian has declined to uphold its equitable duty.

<u>COUNT ELEVEN</u><br><u>INTENTIONAL MISREPRESENTATION</u>

157. Shoals realleges and incorporates by reference paragraphs 1 through 156 of this Complaint as though set forth in full herein.

158. Shoals engaged Prysmian as a supplier of photovoltaic wire based upon Prysmian's representations that its SunGen Photovoltaic Wire, including the Prysmian wire at issue, was (1) suitable for "interconnection wiring of grounded and ungrounded photovoltaic power systems," (2) could safely handle up to 2000 volts of electricity, and (3) complied with both UL 4703 and 44. *See* Exhibit B. Prysmian knew these representations were false when they were made.

159. Prysmian has also made a number of material misrepresentations and omissions regarding its knowledge of shrinkback and its causes, and the quality of its wire, some of which continue to this day. These misrepresentations and omissions include, but are not limited to, the following:

a. Prysmian's failure to disclose that it had long been aware that its wire had problems with unacceptable levels of shrinkback;

b. Prysmian's failure to disclose that is own internal testing that showed its wire exhibited unacceptable levels of shrinkback;

c. Prysmian's development of its misleading "GC Method" test, which it then utilized to misrepresent to Shoals that Prysmian wire was not defective and still merchantable and fit for its intended use; and,

39

d. Prysmian's continued failure to inform Shoals, as well as its other customers, that it knew its formulation and/or manufacturing processes contributed to excessive shrinkback.

160. Shoals justifiably relied on these material misrepresentations and omissions when it decided to purchase Prysmian wire, and when it decided to continue its commercial relationship with Prysmian after Shoals began discovering that Prysmian wire was exhibiting exposed copper conductor in the field.

161. Shoals would not have purchased Prysmian wire, or continued using Prysmian wire in its harnesses, including the harnesses it used in an effort to remediate shrinkback issues for its customers, if it had been aware of Prysmian's false representations and omissions of material information regarding unacceptable shrinkback problems with its wire and its longstanding knowledge of same.

162. As the proximate result of relying on Prysmian's intentional misrepresentations and/or omissions, Shoals has suffered or will suffer damages, including but not limited to the following:

a. Expenses incurred by Shoals in connection with investigating Prysmian's defective products, inspecting customers' and end users' solar fields to identify instances of unacceptable amounts of insulation shrinkback, and replacing or repairing defective products for customers and end users whose sites have experienced unacceptable amounts of insulation shrinkback in Prysmian wire;

b. Expenses incurred defending against, paying and/or settling claims asserted against Shoals, its customers, and end users related to the insulation shrinkback defect in Prysmian's wire;

Case 3:24-cv-00343 Document 25-1 Filed 02/24/25 Page 41 of 48 PageID #: 2566

c. Expenses incurred due to Prysmian's failure or refusal to accept the return of Prysmian wire, including but not limited to (1) the expenses incurred in storing it at Shoals' facility, and (2) the difference between the price Shoals paid for the wire, and the wire's value as scrap material;

d. Expenses incurred in replacing and repairing Shoals' customers' and/or end users' property, which was damaged as a result of Prysmian's defective wires; and,

e. Damages and injury to Shoals' good reputation in the industry, which has been tarnished by Prysmian's misconduct, resulting in lost sales.

163. Prysmian's misrepresentations, omissions, and misconduct were intentional, willful, and malicious, committed with the intent to harm Shoals, and/or made recklessly. Consequently, Shoals is entitled to punitive damages against Prysmian.

164. Prysmian's November 2023 press release, which is still publicly available on its website, evidences Prysmian's intentional, willful, and reckless conduct. In the release, Prysmian said, "We are aware that Shoals is having significant problems with its harnesses and connectors, and the lawsuit apparently was filed as an effort to shift responsibility for its product problems to Prysmian."

165. Prysmian knows this is not true. To the contrary, when it made this statement, Prysmian had long been aware of unacceptable shrinkback problems with its wire, it had identified problems with its formulation and production process that caused unacceptable shrinkback, and its own internal testing showed its wire was experiencing unacceptable shrinkback.

166. Prysmian made this false statement intentionally, willfully, and recklessly and with the intent of damaging Shoals' reputation, injuring Shoals' credibility in the marketplace, and drawing attention away from the defect Prysmian knew its wire to have.

167. Shoals is entitled to recover for its damages against Prysmian, including punitive damages, in an amount to be proven at trial but which, in any event, well exceeds the jurisdictional threshold of this Court.

**COUNT TWELVE**
**NEGLIGENCE**

168. Shoals realleges and incorporates by reference paragraphs 1 through 167 of this Complaint as though set forth in full herein.

169. Prysmian owed its customer, Shoals, a duty to produce photovoltaic wire in a reasonable fashion without defects.

170. A reasonably prudent manufacturer of photovoltaic wires would have ensured that its manufacturing process produced photovoltaic wire that was safe for its intended use and otherwise not defective.

171. Prysmian breached this duty by utilizing a manufacturing process and/or oversight process that was contrary to industry practice and produced defective wire.

172. Prysmian continues to breach this duty by failing to adopt adequate testing for insulation shrinkback or notify its customers of the insulation shrinkback defect with its wire.

173. Prysmian also breached its duty to warn Shoals of the wire's defective condition.

174. These breaches proximately caused, and continue to cause, injuries to Shoals, including without limitation, its costs incurred to remedy Prysmian's defective wire incorporated into its customers' and end users' solar fields.

Case 3:23-cv-00343 Document 95-1 Filed 12/24/25 Page 43 of 48 PageID #: 2568

175. Shoals has incurred and continues to incur damages as a result of Prysmian's negligence for any property damage or injury caused by Prysmian's defective product.

176. Shoals is entitled to recover for its damages against Prysmian in an amount to be proven at trial but which, in any event, well exceeds the jurisdictional threshold of this Court.

**COUNT THIRTEEN**
**GROSS NEGLIGENCE**

177. Shoals realleges and incorporates by reference paragraphs 1 through 176 of this Complaint as though set forth in full herein.

178. Prysmian owed its customer, Shoals, a duty to produce photovoltaic wire in a reasonable fashion.

179. A reasonably prudent manufacturer of photovoltaic wires would have ensured that its manufacturing process produced photovoltaic wire that was safe for its intended use and was otherwise not defective.

180. Prysmian breached this duty by intentionally, or at least recklessly, failing to monitor its manufacturing process and/or changing its manufacturing process.

181. Prysmian continues to breach this duty by intentionally, or at least recklessly, failing to adopt adequate testing for insulation shrinkback or notify its customers of the insulation shrinkback defect within its wire.

182. Given its longstanding knowledge of unacceptable shrinkback problems with its wire, Prysmian also intentionally, or at least recklessly, breached its duty to warn Shoals of the wire's defective condition.

183. These breaches proximately caused, and continue to cause, injuries to Shoals, including without limitation its costs incurred to remedy Prysmian's defective wire incorporated into its customers' and end users' solar fields.

184. Shoals has incurred and continues to incur damages as a result of Prysmian's gross negligence due to property damage caused by Prysmian's defective product.

185. Prysmian's misconduct was intentional or reckless, committed with the intent to harm Shoals, and/or with reckless disregard of Shoals' rights. Consequently, Shoals is entitled to punitive damages against Prysmian.

186. Shoals is entitled to recover for its damages against Prysmian, including punitive damages, in an amount to be proven at trial but which, in any event, well exceeds the jurisdictional threshold of this Court.

<u>COUNT FOURTEEN</u>
<u>STRICT LIABILITY</u>

187. Shoals realleges and incorporates by reference paragraphs 1 through 186 of this Complaint as though set forth in full herein.

188. Prysmian manufactured and sold photovoltaic wire, including the defective wire discussed herein, in an unreasonably dangerous condition, i.e., the integrity of its photovoltaic wire was unsuitable due to failures in its production process.

189. This rendered the photovoltaic wire unreasonably dangerous, due to the human safety risk of encountering an exposed conductor and due to the fire risk of an exposed conductor.

190. Prysmian knew that its photovoltaic wire would be incorporated into Shoals' EBOS projects across the country, yet it failed to warn Shoals of the wire's defective condition.

191. Prysmian is therefore liable for the property damage that has occurred or will occur as a result of the defective wire, as well as any physical injury that may arise due to this defective wire.

192. Shoals has incurred and continues to incur expenses relating to property damage caused by the defective Prysmian wire.

44

193.  Shoals is entitled to recover for its damages against Prysmian, in an amount to be proven at trial but which, in any event, exceeds the jurisdictional threshold of this Court.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, premises considered, Shoals prays:

a)  That proper process issue to be served upon the Defendant requiring them to answer this Complaint within the time prescribed by law;

b)  That Shoals be afforded the opportunity to present its claims, as alleged herein;

c)  That a judgment be awarded to Shoals and against Defendant for compensatory damages in an amount to be proven at trial, as to each of the above Counts;

d)  That a judgment be awarded to Shoals and against Defendant for punitive damages on Shoals' intentional breach of contract claims (Counts Two and Three), intentional misrepresentation claim (Count Eleven), and gross negligence claim (Count Thirteen);

e)  That a judgment be awarded to Shoals and against Defendant for all costs and expenses, including attorneys' fees, incurred by Shoals as permitted under the 2021 Terms and Conditions and/or as permitted by applicable law in an amount to be proven at trial as to each of the above Counts; and

f)  That Shoals be awarded all other costs, prejudgment and post-judgment interest, and such other legal and equitable relief to which it is justly entitled.

DATED: December 4, 2024

                                                     Respectfully submitted,

*/s/ Jessalyn H. Zeigler*

Jessalyn H. Zeigler (TN Bar No. 016139)
Jeffrey Gibson (TN Bar No. 026321)
Courtney A. Hunter (TN Bar No. 038014)
**BASS, BERRY, & SIMS PLC**
150 Third Avenue South Suite 2800
Nashville, TN 37201
(615) 742-6289
jzeigler@bassberry.com
jgibson@bassberry.com
courtney.hunter@bassberry.com

*/s/James B. Manley, Jr.*

James B. Manley, Jr. (*pro hac pending*)
Jill C. Kuhn (*pro hac pending*)
**Troutman Pepper Hamilton Sanders LLP**
600 Peachtree Street, N.E., Suite 3000
Atlanta, GA 30308
(404) 885-3000
Jim.Manley@Troutman.com
Jill.Kuhn@Troutman.com

*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 4, 2024, a copy of the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing upon the following:

Lucas T. Elliot (BPR # 037084)
Elle G. Kern (BPR # 034301)
FROST BROWN TODD LLP
150 3rd Avenue South, Suite 1900
Nashville, TN 37201
Telephone: (615) 251-5550
lelliot@fbtlaw.com
ekern@fbtlaw.com

Cullen G. Pick (admitted *pro hac vice*)
David J. Levy (admitted *pro hac vice*)
Morgan, Lewis & Bockius
1000 Louisiana
Suite 4000
Houston, TX 77002
Telephone: (713) 890-5000
cullin.pick@morganlewis.com
david.levy@morganlewis.com

Deanne Miller (admitted *pro hac vice*)
Morgan, Lewis & Bockius LLP
300 South Grand Avenue
22nd Floor
Los Angeles, CA 90071
Telephone: (213) 612-2500
deanne.miller@morganlewis.com

*Attorneys for Defendant Prysmian Cables and Systems USA, LLC*

/s/ Jessalyn H. Zeigler

47