# APPENDIX C

**Appendix C: Plaintiffs' Purported Scienter Allegations Cited in Opposition Footnote 9**

| AC Paragraph | Allegation Plaintiffs Assert Supports Scienter in Opposition Footnote 9 |
|---|---|
| 15 | Defendant Whitaker began working at Shoals in October 2009 as the Company's Chief Technology Officer ("CTO"), then eventually was promoted to the position of CTO and President in September 2017, and finally, in January 2020, ascended to the role of Shoals' CEO, until announcing his resignation in December 2022 before formally stepping down in March 2023.[3] Defendant Whitaker also served as a member of Shoals' Board of Directors (the "Board") from January 2021 until March 2023. According to Shoals' 2021 Proxy Statements (filed with the SEC on March 22, 2022 on Schedule 14A), the Company touted "Whitaker's extensive senior leadership experience and ***comprehensive knowledge of our business and perspective of our day-to-day operations***" as to what qualified him to serve as a director of Shoals' Board. As the Company's CEO, defendant Whitaker represented Shoals on numerous earnings conference calls with analysts and investors, wherein he discussed the Company's quarterly and yearly financial results and responded to analyst questions – as well as sitting down for interviews and/or question-and-answer sessions like he did with the firms Guggenheim, Roth Capital Partners, and Cowen in 2022. As detailed below, Whitaker made several materially misleading statements and omissions to investors during quarterly conference calls and also signed Shoals' quarterly and yearly financial statements for 1Q22 through 4Q22 and FY22 (including the SPO Offering Materials) and signed the SPO Registration Statement (defined below), alleged to have contained and/or incorporated material misrepresentations in violation of GAAP and federally required disclosure obligations.[4] Moreover, between August 18, 2022 and March 14, 2023, while in the possession of nonpublic, material information about the shrinkback problems described more fully below – defendant Whitaker dumped over 565,000 shares of Shoals Common Stock (more than 33% of his entire holdings) for gross proceeds totaling more than $14.4 million.<br><br>FN3 As some analysts noted, announcement of Whitaker's departure was "unexpected[]," "relatively fast," and "sudden," coming approximately seven months after the resignation of the Company's Chief Financial Officer ("CFO"), Philip Garton.<br><br>FN4 As used herein, "FY" means the Company's fiscal year and "Q" means the Company's fiscal quarter. |
| 20 | Defendants referenced above in §III.B. are referred to herein as the "1934 Act Individual Defendants." Each of the 1934 Act Individual Defendants was directly involved in the management and day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, services, products, and present and future business prospects during the time of their employment with the Company. In addition, the 1934 Act Individual Defendants were involved in drafting, producing, reviewing, and disseminating the misleading statements and information alleged herein, were aware of, or recklessly disregarded, the misleading statements being issued regarding the Company, and approved or ratified |

| AC Paragraph | Allegation Plaintiffs Assert Supports Scienter in Opposition Footnote 9 |
|---|---|
| | these statements, in violation of the federal securities laws. Finally, each 1934 Act Individual Defendant was provided with copies of the documents alleged herein to be misleading before or shortly after their issuance (*e.g.*, Company press releases and SEC filings), participated in conference calls with investors during which misleading statements were made, and had the ability and opportunity to prevent their issuance or cause them to be corrected. |
| 51 | According to FE1, by June 2022, Shoals was aware of at least four to five other solar fields that were experiencing the same issues as the one in Phoenix. FE1 reported that these problems caused internal panic at the Company, and were well-known internally, including by Whitaker. |
| 54 | FE2 also reported that Shoals was aware of at least four or five other very large scale utility projects similar to the one in Phoenix that reported exposed wire by June 2022. FE2 reported that Shoals agreed to replace the wiring at the Phoenix solar field at a cost of $3.5 million to $4 million. FE1 reported that with the other customers who reported exposed wires to Shoals, the Company was facing expenses of over $15 million by June 2022. FE1's and FE2's reports regarding the number of solar sites with exposed wire, and Shoals' response to reports of exposed wire is consistent with Defendant Prysmian's Answer and Affirmative Defenses to Plaintiff Shoals' First Amended Complaint, *Shoals Techs. Grp., LLC v. Prysmian Cables & Sys. USA, LLC*, No. 3:23-cv-01153 (M.D. Tenn. Jan. 1, 2025), ECF 60 (the "Answer"), which alleges that by December 2022, Shoals was aware of at least *eight* solar sites where exposed wires had been reported:<br><br>To the extent Shoals is alleging it incurred remediation costs, then Prysmian [Cables and Systems USA, LLC] denies that Shoals did not understand this before "summer and fall of 2023"; such allegation is belied by Shoals' internal response to reported exposed conductor as early as March 2022, including conducting site visits to inspect reported exposed conductor, engaging third-party testing companies to analyze its harnesses and composition of its own T-Connector overmold, engaging one of Prysmian's primary competitors to test Prysmian's cable for shrinkback, and reaching its own conclusion that the exposed conductor was caused by improper installation methods. Prysmian further states that, as of December 2022, Shoals informed Prysmian that it was aware of reported exposed conductor at eight solar sites.<br><br>Indeed, Shoals was aware of adhesion and molding issues on its connector produced *since at least 2020*. This is also confirmed by the Answer, which alleges that "Shoals was previously aware of adhesion and molding issues on its connector products between at least 2020 and 2023, which may have caused or contributed to exposed conductors." |
| 55 | FE3 is a former Shoals Plant Quality Manager who worked for the Company between December 2023 and July 2024. FE3 reported that he/she was made aware of the shrinkback issues immediately upon joining the Company. FE3 reported that Shoals had not been doing any internal testing for shrinkback issues prior to the disputes with |

2

| AC Paragraph | Allegation Plaintiffs Assert Supports Scienter in Opposition Footnote 9 |
|---|---|
|  | Prysmian Cables and Systems USA, LLC ("Prysmian"). Instead, Shoals relied solely on the suppliers to provide appropriate documentation and test results to show that the wires were meeting the proper requirements. FE3 reported that there were no quality controls, checks or testing done with respect to wiring received from suppliers. FE3 reported that such testing did not begin until approximately December 2023. FE3's reports are consistent with the Answer, which alleges that:<br><br>[A]s of the date Shoals filed this lawsuit, Shoals did not have a formal or objective adhesion quality testing protocol or wire inspection protocol in place to certify that its molded connector products sufficiently adhered to its suppliers' wire and verify the integrity and quality of its manufactured harnesses. Shoals also acknowledged in internal communications that it did not conduct regular supplier audits after its initial qualification process. |
| 67 | On May 8, 2023, Shoals filed with the SEC a quarterly report on Form 10-Q for the quarter ended March 31, 2023 ("1Q23 Form 10-Q"). Over a year after first being made aware of the BLA defects, Shoals finally provided a minimal, albeit misleading, disclosure regarding the BLA defects, stating:<br><br>The Company has been notified by certain customers that a subset of wire harnesses used in its EBOS solutions is presenting excessive pull back of wire insulation at connection points ("shrinkback"). Based upon the Company's initial assessment, the Company believes the shrinkback is related to a subset of specific colored wire provided by one specific supplier. While it is probable that the Company will incur costs related to the repair or replacement of the impacted wire harnesses, based on the limited information available as of the date of this Quarterly Report, including the scope of affected sites, potential solutions and the possibility of recovery from the wire supplier, it is not possible to reasonably estimate those costs. |
| 92(b) | The statements set forth above in ¶¶88-91 were materially misleading or omitted material information necessary to make them not misleading (that was unbeknownst to investors) for the following reasons:<br><br>(b) While the 1934 Act Defendants touted the cost savings and lower maintenance costs compared to competing products, they knew that defects with their BLAs were widespread. Remediating defective wire harnesses did not result in cost savings and lower maintenance costs and would in fact lead to increased installation costs associated with their replacement. |
| 96(b) | The statements set forth above in ¶¶93-95 were materially misleading or omitted material information necessary to make them not misleading (that was unbeknownst to investors) for the following reasons:<br><br>… |

3

| AC Paragraph | Allegation Plaintiffs Assert Supports Scienter in Opposition Footnote 9 |
|---|---|
|  | (b) While the 1934 Act Defendants touted the cost savings and lower maintenance costs compared to competing products, they knew that defects with their BLAs were widespread. Remediating defective wire harnesses did not result in cost savings and lower maintenance costs and would in fact lead to increased installation costs associated with their replacement. |
| 134 | *Shoals filed its 1Q22 Form 10-Q on May 17, 2022*. As of this date, the BLA defect and associated remediation costs represented a material loss contingency under ASC 450. By no later than March 2022, Shoals had received an initial customer complaint regarding the BLA defect and had conducted a site inspection in Phoenix, Arizona, in which the customer complaint of the defect was verified. Thereafter, "Shoals, at its own expense, and to support its customer, replaced affected harnesses" at the affected sites. According to FEs 1 and 2, the estimate of remediation costs at the initial site amounted to several million dollars. FE1 also explained that in addition to the initial report from Phoenix, there was a sister project close by just outside of Phoenix that also started to show similar issues with exposed wire just weeks later. FEs 1 and 2 also explained that the Company was soon made aware of four or five other sites in the country that were experiencing the same issues. The Company would later acknowledge that the actual minimum costs to remediate the BLA defect across all affected sites was at least $73 million.[10] Despite these facts and circumstances, the 1934 Act Defendants failed to record any specific warranty reserves or make any disclosures related to the BLA defect in its 1Q22 Form 10-Q. Instead, Shoals vaguely and misleadingly warned investors that "we *may* face warranty, indemnity and product liability claims arising from defective products." Meanwhile, Shoals had a warranty reserve of $600,000 or less, as of 1Q22.[11] Shoals' failure to accrue for and/or disclose the BLA defect violated GAAP. Specifically, by May 17, 2022, it was "probable" that Shoals would incur significant remediation costs related to the BLA defect and the initial costs could be "reasonably estima[ted]" as the Company had already inspected numerous affected sites and started remediation at those sites. Thus, Shoals was required under ASC 450 to record a warranty accrual for the costs that could be reasonably estimated. In addition, even if the total remediation costs could not yet be reasonably estimated, there was clearly a "more than remote" chance that Shoals would incur material remediation costs related to the BLA defect. Thus, Shoals was required under ASC 450 to disclose the specific nature of the warranty loss contingency and either estimate "the possible loss or range of loss" or "state[] that such an estimate c[ould] []not be made."<br><br>FN 10  On November 12, 2024, Shoals revealed that estimated remediation costs would be at least $73 million and could be as high as $160 million.<br><br>FN 11 Shoals did not specifically disclose its warranty reserve as of 1Q22. However, subsequent disclosures revealed that Shoals' warranty reserve was only $100,000 as of December 31, 2021, and only $600,000 as of December 31, 2022. |

4

| AC Paragraph | Allegation Plaintiffs Assert Supports Scienter in Opposition Footnote 9 |
|---|---|
| 135 | *Shoals filed its 2Q22 Form 10-Q on August 16, 2022*. As of this date, the BLA defect and associated remediation costs represented a material loss contingency under ASC 450. After the initial customer complaints, Shoals had continued to investigate the BLA defect and had conducted numerous additional site inspections which further verified the defect was not an isolated incident. According to FEs 1 and 2, by June 2022, Shoals was aware of at least four to five other solar fields that were experiencing the same issues as the initial site in Phoenix. Shoals continued to replace the defective harnesses at customer sites at its own expense. According to FE2, the estimate of remediation costs across these sites likely amounted to more than $15 million. In total, the Company would later acknowledge that the actual minimum costs to remediate the BLA defect across all affected sites was at least $73 million.[12] Despite these facts and circumstances, the 1934 Act Defendants failed to record any specific warranty reserves or make any disclosures related to the BLA defect in its 1Q22 Form 10-Q. Instead, Shoals vaguely and misleadingly warned investors that "we *may* face warranty, indemnity and product liability claims arising from defective products." <br><br> Meanwhile, Shoals had a warranty reserve of $600,000, or less, as of 2Q22.[13] Shoals' failure to accrue for and/or disclose the BLA defect violated GAAP. Specifically, by August 16, 2022, it was "probable" that Shoals would incur significant remediation costs related to the BLA defect and the initial costs could be "reasonably estima[ted]" as the Company had already inspected numerous affected sites and started remediation at those sites. Thus, Shoals was required under ASC 450 to record a warranty accrual for the costs that could be "reasonably estimated." In addition, even if total remediation costs could not yet be reasonably estimated, there was clearly a "more than remote" chance that Shoals would incur material remediation costs related to the BLA defect. Thus, Shoals was required under ASC 450 to disclose the specific nature of the warranty loss contingency and either estimate "the possible loss or range of loss" or "state[] that such an estimate c[ould] []not be made." <br><br> FN12 On November 12, 2024, Shoals revealed that estimated remediation costs would be at least $73 million and could be as high as $160 million. <br><br> FN13 Shoals did not specifically disclose its warranty reserve as of 2Q22. However, subsequent disclosures revealed that Shoals' warranty reserve was only $100,000 as of December 31, 2021, and only $600,000 as of December 31, 2022. |
| 138 | *Shoals filed its FY22 Form 10-K on February 28, 2023*. As of this date, the BLA defect and associated remediation costs represented a material loss contingency under ASC 450. Shoals has admitted that by late 2022, "numerous other . . . customers began reporting similar instances of copper conductor exposure in the field" and contended that "[i]n or around November 2022, Shoals came to understand that the root cause of the exposed copper conductor is due to unacceptable amounts of insulation shrinkback." Shoals was also aware that the BLA defect impacted a wide |

5

| AC Paragraph | Allegation Plaintiffs Assert Supports Scienter in Opposition Footnote 9 |
|---|---|
| | timeframe of customer installations, dating as far back as FY20. The Company would later acknowledge that the actual minimum costs to remediate the BLA defect across all affected sites was at least $73 million.[16] Despite these facts and circumstances, the 1934 Act Defendants failed to record any specific warranty reserves or make any disclosures related to the BLA defect in its FY22 Form 10-K. Instead, Shoals vaguely and misleadingly warned investors that "we *may* face warranty, indemnity and product liability claims arising from defective products." Meanwhile, Shoals' total warranty reserve was only $600,000 as of December 31, 2022.<br><br>FN16 On November 12, 2024, Shoals revealed that estimated remediation costs would be at least $73 million and could be as high as $160 million. |
| 142 | Shoals' failure to properly accrue for and/or disclose the true scope of the BLA defect violated GAAP. Specifically, by May 8, 2023, the 1934 Act Defendants acknowledged that it was "probable" that Shoals would incur significant remediation costs related to the BLA defect, but claimed the costs could not be "reasonably estima[ted]" and thus the 1934 Act Defendants did not record any specific warranty accrual or disclose an estimate of the "the possible loss or range of loss," in accordance with ASC 450. However, unbeknownst to investors, the Company had: (i) known about the BLA defect for over 12 months; (ii) already started remediating numerous affected sites; and (iii) purportedly identified the "root cause" of the defect, which should have made it possible to identify the total population of affected sites. Thus, by May 2023, the 1934 Act Defendants knew, or were reckless in not knowing, a reasonable estimate, or at the very minimum, an estimate of the "the possible loss or range of loss" associated with remediating the BLA defect. |
| 146 | Shoals' failure to properly accrue for and/or disclose the true scope of the BLA defect violated GAAP. Specifically, by August 1, 2023, the 1934 Act Defendants acknowledged that it was "probable" that Shoals would incur significant remediation costs related to the BLA defect, but accrued less than $10 million and failed to disclose an estimate of the "the possible loss or range of loss," in accordance with ASC 450. Unbeknownst to investors, the Company had: (i) known about the BLA defect for over 12 months; (ii) already started remediating numerous affected sites; and  iii) identified the purported "root cause" of the defect, which should have made it possible to identify the total population of affected sites. Thus, by August 2023, the 1934 Act Defendants knew, or were reckless in not knowing, a reasonable estimate of remediation costs (to accrue for), or at the very minimum, an estimate of the "the possible loss or range of loss" associated with remediating the BLA defect. |
| 150 | Shoals' failure to properly accrue for and/or disclose the true scope of the BLA defect violated GAAP. Specifically, by November 7, 2023, the 1934 Act Defendants acknowledged that it was "probable" that Shoals would incur significant remediation costs related to the BLA defect, but accrued just $56 million in warranty reserves. As alleged herein, the 1934 Act Defendants knew, or were reckless in not knowing, that remediation costs associated with remediating the BLA defect would total over $70 million, at a minimum. |

6

| AC Paragraph | Allegation Plaintiffs Assert Supports Scienter in Opposition Footnote 9 |
|---|---|
| 184 | The statements above in ¶¶181-185 were untrue statements of material fact when made or omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading, in violation of the 1933 Act. Specifically, the statements referenced above in ¶¶181-185 were materially false and/or misleading when made because they failed to disclose the following adverse facts pertaining to the Company's business, operations, and financial condition, which were known to defendants or recklessly disregarded by them as follows: (a) by the time the statements in the SPO Offering Materials were made, several of Shoals' customers had identified and expressed concerns regarding the BLA defects; (b) that Shoals' ability to competitively differentiate its products through representations regarding the reliability, safety, or quality of its offerings had become materially impaired; (c) that, as a result, Shoals' business and operations were acutely exposed to material, undisclosed risks of reputational harm, warranty claims, and other negative impacts to the Company's business, financial results, and prospects; and (d) that defective BLAs had negatively impacted the Company's sales, customer relationships, and financial results and that defendants' representations regarding Shoals' business, sales, and prospects were materially misleading. |
| 206 | During the Class Period, the 1934 Act Defendants disseminated or approved one or more of the statements as specified above in §V., which they knew or recklessly disregarded contained material misrepresentations and/or failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. |
| 209 | Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. |
| 210 | As a result of the conduct, dissemination of the materially false or misleading information, and/or failure to disclose material facts, as set forth above, the market price of Shoals Common Stock was artificially inflated during the Class Period. In ignorance of the fact that the market price of Shoals Common Stock was artificially inflated, and relying directly or indirectly on the false and misleading statements, or upon the integrity of the market in which Shoals Common Stock traded, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants (but not disclosed in defendants' public statements during the Class Period), Plaintiffs and the other Class members purchased or otherwise acquired Shoals Common Stock during the Class Period at artificially high prices and were damaged thereby. |