# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

IN RE: SHOALS TECHNOLOGIES          )
GROUP, INC. SECURITIES LITIGATION   )          NO. 3:24-cv-00334
                                    )

## <u>MEMORANDUM OPINION</u>

In this securities class action, Erste Asset Management GmbH ("Erste AM"), Kissimmee Utility Authority Employees' Retirement Plan ("KUAERP"), and other putative class plaintiffs purchased Shoals Technology Group, Inc.'s ("Shoals") common stock between May 16, 2022 and May 7, 2024 ("class period"). Some putative class members purchased Shoals stock for $40.00; however, by May 7, 2024, it was trading for less than $8.00. (Doc. No. 82 ¶ 75). Plaintiffs attribute this precipitous decline to the company's public disclosure that one of its key products was defective and, as a result, it owed between $73 million and $160 million in warranty costs. (Id. ¶¶ 47, 170). Plaintiffs maintain that Shoals and its senior officers and directors knew about the product defect before the class period but continued to make false public statements about its products, including that they are safe and reliable and that they could be installed by anyone. (E.g., id. § 41). Plaintiffs also allege that Defendants omitted accrued or reasonably certain warranty costs from public filings. (E.g., id. § 40). Plaintiffs filed this lawsuit, asserting that Shoals, its officers and directors, and certain underwriters—by and through misrepresentations, material omissions, or negligent certifications—violated §§ 10(b), 20(a), and 20A of the Securities Exchange Act of 1934 (see 15 U.S.C. §§ 78j, 78t, 78t-1) and §§ 11, 12(a)(2), and 15 of the Securities Act of 1933 (see 15 U.S.C. §§ 77k, 77l, 77o).

Defendants have moved to dismiss Plaintiffs' securities claims. (Doc. No. 84). First, Defendants argue that Plaintiffs' § 10(b) (Exchange Act) claim fails because: (1) Plaintiffs do not

allege falsity with particularity; (2) Plaintiffs do not allege a strong inference of scienter—*i.e.*, an intent to defraud investors; and (3) Plaintiffs fail to allege loss causation—*i.e.*, that the challenged statements caused their claimed losses.  (Doc. No. 85 at 7–29).  Second, Defendants argue that Plaintiffs' §§ 11 and 12(a)(2) (Securities Act) claims fail because: (1) KUAERP fails to allege that the secondary public offering ("SPO") registration statement, its incorporated statements, and prospectuses contained an actionable misstatement; (2) KUAERP lacks statutory standing because it did not trace its purchases to a particular offering document or statutory seller; and (3) KUAERP did not allege sufficient facts that any Defendant was a statutory seller within the meaning of §12.  (Id. at 31–34).  Third, Defendants assert that Plaintiffs' §§ 15 and 20(a) control-person claims and § 20A insider trading claims necessarily fail because Plaintiffs failed to plead any predicate Exchange Act or Securities Act claims, failed to plead intent, and failed to allege sufficient facts to establish that any Defendant was a control person.  (Id. at 34–35).

Plaintiffs oppose dismissal.  (Doc. No. 91).  First, Plaintiffs argue they have sufficiently pleaded a § 10(b) (Exchange Act) claim by: (1) adequately alleging numerous misstatements to investors about core aspects of Shoals' business and about the underlying drivers of its success and reputation, (id. at 6–17); (2) establishing scienter by alleging that (a) Defendants' public statements do not match their internal reports or other negative information they received; (b) two company leaders significantly divested before sharing the bad information with the public; and (c) Defendants were motivated to hide the defect from the public to save their jobs, salaries, and bonuses, (id. at 17–27); and (3) alleging that Defendants' ultimate disclosure of the product defect and substantial warranty costs immediately led to steep declines in Shoals' stock price, (id. at 28–31).  Second, Plaintiffs assert they have sufficiently pleaded their §§ 11 and 12(a)(2) (Securities Act) claims because: (1) KUAERP has standing after purchasing "Shoals Common Stock directly

in the December 2022 SPO"; and (2) KUAERP directly purchased Shoals Common Stock based on Defendants' solicitations. (Id. at 31–35). And third, Plaintiffs argue that their §§ 15 and 20(a) control-person claims and Section 20A insider trading claims survive for the same reasons their Exchange Act and Securities Act claims survive. (Id. at 35).

Defendants' Motion to Dismiss is fully briefed and ripe for decision. For the reasons that follow, it will be granted in part and denied in part.

## I.    BACKGROUND

The following facts from the Amended Complaint are accepted as true:[1]

- Dean Solon founded Shoals and served either as President or CEO between November 1996 and December 2019. (Doc. No. 82 ¶ 31). He also served on the board of directors until February 2022. (Id.). Solon was a controlling shareholder of the Company during the Class Period and prior to the December 2022 Second Public Offering ("SPO"), Solon owned nearly 34% of the combined voting power of Shoals stock. (Id.). Solon also had the right to nominate a director to the board of directors. (Id.).

- Jason Whitaker joined Shoals as the Chief Technology Officer in October 2009, became President in September 2017, and served as CEO from January 2020 to March 2023. (Id. ¶ 15).

- Kevin Hubbard served as Shoals' Interim CFO from May 2022 until October 2022. (Id. ¶ 16).

- Dominic Bardos is Shoals' CFO, serving in that role since October 2022. (Id. ¶ 17).

- Jeffery Tolnar served as Shoals' Interim CEO from March 2023 until July 2023 and has served as the Company's President since December 2022. (Id. ¶ 18).

- Brandon Moss has served as Shoals' CEO since July 2023. (Id. ¶ 19).

- Brad Forth, Peter Wilver, Ty Daul, Toni Volpe, Lori Sundberg, Jeannette Mills, and Robert Julian served on Shoals' board of directors at the time of the December 2022 second public offering. (Id. ¶¶ 23–29).

---

[1] "When considering a motion to dismiss, [courts] must accept as true all factual allegations." England v. DENSO Int'l Am. Inc., 136 F.4th 632, 636 (6th Cir. 2025).

3

- Shoals manufactures and sells electrical balance of systems ("EBOS") solutions used in solar, storage, and electrical vehicle charging infrastructure. (Id. ¶ 14).

- Shoals' EBOS provides components necessary for the transfer of electrical power produced by solar panels to intermediate locations within a solar project and ultimately to the power grid. (Id. ¶ 36).

- Shoals uses a proprietary EBOS system, which it dubs a "combine-as-you-go" solution, that the Company claims offers "several advantages" over conventional EBOS systems using "homerun" wiring architecture. (Id.). Shoals' combine-as-you-go solution uses specialized wire harnesses to connect multiple strings of solar panels to Shoals' proprietary above-ground feeder cable known as a "Big Lead Assembly" ("BLA"). (Id.).

- Shoals' BLAs require several specialized component parts, including photovoltaic wire, which is produced for the interconnection wiring of grounded and ungrounded solar panel systems. Shoals takes photovoltaic wire, which it purchases from suppliers, and manufactures custom wire harnesses that are used to aggregate electricity from multiple solar panels and deliver that electricity to inverters where it is then delivered to the power grid or a battery storage solution. (Id. ¶ 45).

- Shoals builds these harnesses in pairs, with a red-wire harness being used for positive connections, and a black-wire harness being used for negative connections. Part of the manufacturing process in creating the wire harnesses involves placing tee joints or in-line fuses ("T-Junctions") at set intervals along the length of the wire. These T-Junctions allow the wire harnesses to be connected to the solar panels and are a critical component of the BLA. (Id. ¶ 46).

- Shoals represented to its customers and investors that the BLA reduces the installation costs for solar energy projects by 43%, which represents approximately 29% of total installation costs, because the BLA "can be installed by anyone." (Id. ¶ 37).

- The Company also represented that its BLA provided greater reliability and lower maintenance costs than competitors' conventional EBOS systems. (Id. ¶¶ 37, 41).

- Shoals offers its customers an assurance type warranty that protects against manufacturer defects. (Id. ¶ 40).

- By at least March 2022, Shoals learned of a problem with its BLA at a customer's solar field in Phoenix, Arizona. (Id. ¶ 47). Specifically, the insulation on the photovoltaic wires of the BLA's red-wire harness began to shrink back from the T-Junctions, causing live and dangerous wires to be exposed. (Id.). Leaving live wires exposes creates serious risk of fire or electrocution. (Id. ¶ 3).

4

- Company employees examined the BLA located in Phoenix in March 2022, and discovered exposed bare copper conductor around T-Junctions. (Id. ¶ 48). Again, because the protective coating had pulled away from the copper conductor, Shoals' customers and the public were exposed to a live wire that could cause fire or electrical shock. (Id.).

- Those employees believed the issue was caused by an installation error and Shoals replaced the product at the Phoenix site at a cost of approximately $4 million. (Id.).

- On May 16, 2022, Shoals published its 1Q22 Investor Presentation that said its "products are more reliable than competing solutions" and "can be installed by anyone." (Id. ¶ 78). The 1Q22 Presentation further represented that Shoals' product increased the "speed [of] installation, reduce[d] errors, and ma[d]e the system installable by general labor rather than requiring licensed electricians." (Id. ¶ 78).

- By June 2022, Shoals knew of at least four other large-scale utility projects (i.e., solar fields) that were experiencing the same dangerous issues as the one in Phoenix. (Id. ¶¶ 50, 54).

- By June 2022, Shoals was facing warranty coverage expenses over $15 million. (Id. ¶ 54).

- An employee reported that by June 2022 these mounting problems caused "internal panic" at the Company, and were well-known by all the senior executives, including Jason Whitaker. (Id. ¶ 51).

- Also, on August 15, 2022, Shoals issued a press release announcing the Company's financial results for the quarter ended June 30, 2022 ("2Q22 Release"). The 2Q22 Release highlighted the purported "safety" and "reliability" of Shoals' products, representing that "[s]ince its founding in 1996, the Company has introduced innovative technologies and systems solutions that allow its customers to substantially increase installation efficiency and safety while improving system performance and reliability." (Id. ¶ 82).

- On August 15, 2022, Jason Whitaker met with market analysts and in response to a question he said "BLA can reduce labor costs, improve safety, increase reliability and reduce maintenance expenses." (Id.).

- On August 16, 2022, Shoals filed with the SEC a quarterly report on Form 10-Q for the quarter ended June 30, 2022 ("2Q22 Form 10-Q"), which was signed by Defendants Whitaker and Hubbard. (Id. ¶ 86). The 2Q22 Form 10-Q did not include any product warranty accrual or disclosure related to the BLA defect; but instead, generally stated that "Shoals may face warranty, indemnity and product liability claims arising from defective products." (Id.).

5

- On November 14, 2022, Shoals held a conference call with market analysts when Jason Whitaker made the following statement:

  > In addition, the prevailing wage provision of the IRA is expected to compound wage pressure in the U.S. market, which further reinforces the value proposition of our combine-as-you-go system. From day 1, we set out to create products that can be installed by anyone as a response to the disproportionately high cost of installing EBOS, which can be equal to or in excess of the cost of the product itself. In environments where labor is more expensive, our solutions are especially attractive as they take less time to install and are installable by general labor. We anticipate the prevailing wage provision will provide a significant tailwind for years to come.

  (Id. ¶ 89).

- On November 14, 2022, Shoals filed a quarterly report on Form 10-Q with the SEC. (Id. ¶ 91). This report did not include any product warranty accrual or disclosure related to the BLA defect. (Id.).

- On November 30, 2022, Shoals announced that it was conducting a secondary offering of 20 million shares of Shoals Common Stock (which would later be increased to 26 million shares), that was being sold in an underwritten public offering. Of those 26 million shares, 24 million shares were being sold by Solon and his affiliates, and the remaining 2 million shares were being sold by the Company. (Id. ¶ 63).

- The SPO Registration Statement and the SPO Prospectus both emphasized the safety and reliability and the installation benefits of Shoals' products. (Id. ¶ 94).

- The December 2022 SPO closed on December 6, 2022, and Solon earned over $515 million, and Shoals earned over $42 million from the sale. (Id. ¶ 65).

- By December 2022, the Company knew of at least eight solar sites where dangerous exposed wires had been reported. (Id. ¶ 54).

- Despite an alleged "internal panic," Shoals continued to project confidence to the public in the lead-up to the December 2022 SPO and March 2023 SPO.

- On March 7, 2023, Shoals announced it was conducting another secondary offering of over 24.5 million shares of Shoals Common Stock, which were being sold in an underwritten public offering by Solon. (Id. ¶¶ 66, 103).

6

- The SPO Registration Statement for the March 2023 SPO continued to highlight the safety and reliability of Shoals' products, and did not report any warranty accrual or make any disclosure related to the BLA defect. (Id. ¶¶ 104–105).

- The March 2023 SPO closed on March 10, 2023, with Solon obtaining over $594 million from the sale. (Id. ¶¶ 66, 103).

- Between December 2023 and March 2023, Solon decreased his holdings of Shoals Common Stock from approximately 34% of outstanding shares, to approximately 2% of the outstanding shares, liquidating almost his entire position in the Company. Solon cashed out to the tune of $1,109,000,000. (Id. ¶ 66).

- Shoals did not acknowledge any product defect (or the resulting warranty costs) until it filed a quarterly report with the SEC on May 8, 2023. (Id. ¶ 67).

- This May 8, 2023 report stated:

  > The Company has been notified by certain customers that a subset of wire harnesses used in its EBOS solutions is presenting excessive pull back of wire insulation at connection points ("shrinkback"). Based upon the Company's initial assessment, the Company believes the shrinkback is related to a subset of specific colored wire provided by one specific supplier. While it is probable that the Company will incur costs related to the repair or replacement of the impacted wire harnesses, based on the limited information available as of the date of this Quarterly Report, including the scope of affected sites, potential solutions and the possibility of recovery from the wire supplier, it is not possible to reasonably estimate those costs.

  (Id. ¶ 111).

- Despite reporting the known defect, the 10-Q filed on May 8, 2023 stated the Company only had $400,000 in accrued warranty liability as of March 31, 2023. (Id. ¶¶ 69, 110).

- On August 1, 2023, Shoals reported $9.4 million in warranty expenses, which were primarily related to the BLA defects. (Id. ¶¶ 70, 118).

- During a call with analysts on August 1, 2023, Defendant Bardos represented that the $9.4 million in warranty expenses reported in the

August 1st 10-Q was "adequate to do the remediation requirement." (Id. ¶ 116).

- On November 7, 2023, Shoals announced an additional $50 million in BLA warranty expenses. (Id. ¶¶ 71, 120–21).

- Shoals also announced that 30% of its wire harnesses manufactured from 2020 to 2022 had been impacted by BLA defects and that ultimate remediation costs could reach as high as $185 million. (Id.).

- Following these disclosures, Shoals' common stock dropped from over $40.00 per share to less than $8.00 per share. (Id. ¶ 75).

## II.    LEGAL STANDARDS

A motion to dismiss securities fraud claims potentially implicates three different standards.

### A.  Rules 8 and 12

In most civil actions, the Federal Rules of Civil Procedure require only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. Rule Civ. Proc. 8(a)(2). That short statement must be "plausible" when "measured against the elements" of a claim. See Darby v. Childvine, Inc., 964 F.3d 440, 444 (6th Cir. 2020). In other words, a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. at 678.

Courts generally construe factual allegations in the light most favorable to the plaintiff, accept them as true, and draw all reasonable inferences in the plaintiff's favor. See Wilburn v. United States, 616 F. App'x 848, 852 (6th Cir. 2015). Courts must distinguish between allegations that are "well-pled" under Rule 8, and "naked assertions." See Iqbal, 556 U.S. at 678. Rule 8

8

"does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." Id. at 678–79.

When faced with a Rule 12(b)(6) motion, the Court's inquiry is limited to the content of the complaint, although it may also consider matters of public record, orders, items appearing in the record of the case, and exhibits attached to or incorporated by reference into the complaint. See Amini v. Oberlin College, 259 F.3d 493, 502 (6th Cir. 2001).

### B. Rule 9(b)

Claims that sound in fraud must meet Rule 9(b)'s heightened pleading standard. This Rule requires a plaintiff to "state with particularity the circumstances constituting fraud[.]" Fed. R. Civ. P. 9(b). Generally, Rule 9(b) requires a plaintiff "(1) to specify the allegedly fraudulent statements; (2) to identify the speaker; (3) to plead when and where the statements were made; and (4) to explain what made the statements fraudulent." Republic Bank & Tr. Co. v. Bear Stearns & Co., 683 F.3d 239, 247 (6th Cir. 2012). But "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

### C. Private Securities Litigation Reform Act

Under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), a complaint asserting a securities violation "shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A); see also Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 312 (2007). The PSLRA requires that "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15

9

U.S.C. § 78u-4(b)(1)(B); In re TransDigm Grp., Inc. Sec. Litig., 440 F. Supp. 3d 740, 760 (N.D. Ohio 2020).

Where a plaintiff fails to meet these standards, "the court shall, on the motion of any defendant, dismiss the complaint." 15 U.S.C. § 78u-4(b)(3)(A). In determining whether to dismiss, courts must consider "plausible opposing inferences" that favor the defendant. See Doshi v. Gen. Cable Corp., 823 F.3d 1032, 1039 (6th Cir. 2016). The PSLRA's requirements are intended to be an "elephant-sized boulder" in the way of private securities fraud cases. See In re Omnicare, Inc. Sec. Litig., 769 F.3d 455, 461 (6th Cir. 2014). They limit "fishing expeditions," help "protect[ ] defendants' reputations from allegations of fraud," and narrow "potentially wide-ranging discovery to relevant matters." Republic Bank & Tr. Co. v. Bear Stearns & Co., 683 F.3d 239, 247 (6th Cir. 2012).

### III. ANALYSIS

#### A. Section § 10(b) (Exchange Act) Claim.

Under § 10(b) of the Exchange Act of 1934, it is unlawful to "use or employ, in connection with the purchase or sale of any security" a "manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange Commission ("SEC")] may prescribe." 15 U.S.C. § 78j(b). The Exchange Act defines "security" broadly to include, among other things, stocks, bonds, debentures, a variety of other instruments, or, "in general, any instrument commonly known as a 'security.'" 15 U.S.C. § 78c(a)(10). The SEC's implementing regulation, Rule 10b-5, further interprets the statutory language to render it unlawful to do any of the following when purchasing or selling a security:

> (1) Employ any device, scheme, or artifice to defraud;

(2) Make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made not misleading; or

(3) Engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

See 17 C.F.R. § 240.10b-5 (2014).

Plaintiffs assert that Shoals along with its executives—namely, Whitaker, Hubbard, Bardos, Tolnar, and Moss—made untrue statements of material fact or omitted material facts from public filings and statements. To adequately plead a § 10(b) claim against these Defendants, Plaintiffs must allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 37–38 (2011); Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 341–42 (2005). Defendants move to dismiss Plaintiffs' § 10(b) claims, arguing that Plaintiffs fail to allege the first, second, and sixth elements—*i.e.*, materiality; scienter; and loss causation. (Doc. No. 84).

### 1. Plaintiffs adequately allege a *material* misrepresentation or omission.

A misrepresentation is material "only if there is a substantial likelihood that a reasonable investor would have viewed the misrepresentation as having significantly altered the total mix of information made available." Basic Inc. v. Levinson, 485 U.S. 224, 232 (1988); Public Sch. Teachers Pension & Ret. Fund v. Ford Motor Co., 381 F.3d 563, 570 (6th Cir. 2004). Misrepresentations are immaterial "only if they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their unimportance." Id. The materiality requirement assumes investors can "grasp the probabilistic significance of opinion

statements" and filter out essentially useless information that a reasonable investor "would not consider significant, even as part of a larger 'mix' of factors to consider in making his investment decision." Strougo v. Tivity Health, Inc., 779 F. Supp. 3d 951, 962 (M.D. Tenn. 2025).

Materiality is generally a mixed question of law and fact and is decided as a matter of law only when "reasonable minds could not differ on" the statement's importance. See Litwin v. Blackstone Grp., L.P., 634 F.3d 706, 717 (2d Cir. 2011). However, sometimes courts can grant motions to dismiss on materiality where the statements are vague, are obvious hyperbole, or are "rosy affirmations." Public Sch. Teachers Pension & Ret. Fund, 381 F.3d at 570–71. "Rosy affirmations"—which are also referred to as "puffery"—are statements of corporate optimism that are simply too general to induce a reasonable investor's reliance on them. See City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG, 752 F.3d 173, 183 (2d Cir. 2014).

The Supreme Court last addressed materiality in Matrixx Initiatives—a case with facts similar, although not identical to this one. 563 U.S. at 38. In that case, the manufacturer of Zicam, a popular over-the-counter-cold medicine, continued to make optimistic statements about its best-selling product despite having received reports that Zicam caused some users to lose their sense of smell. Id. at 31–34. Specifically, between 1999 and 2004, Matrixx had been contacted by three different medical doctors whose patients had lost their sense of smell, and by 2004 there were at least four lawsuits alleging Zicam caused anosmia. Id. Despite this, in October 2003, Matrixx stated that Zicam was "poised for growth in the upcoming cough and cold season" and that the company had "very strong momentum." Id. at 33. In November 2003, Matrixx filed a Form 10-Q warning investors of the potential "material adverse effect" that could result from product liability claims but failing to disclose that two lawsuits had already been filed alleging that Zicam caused anosmia. Id. In January 2004, despite a growing list of product liability lawsuits, Matrixx

12

predicted an 80% increase in revenue.  Id.  A month after its bullish announcement about revenue growth, Matrixx's stock fell from over $13 per share to $9.94 per share after: (1) the FDA announced it was looking into allegations that Zicam caused anosmia, and (2) the television show Good Morning America ran a feature story about the product liability allegations.  Id. at 34–35.  In response, Matrixx continued to make public statements denying any scientific proof that Zicam caused anosmia.  Id.

In the follow-up § 10(b) lawsuit by Matrixx shareholders, Matrixx argued that it had no obligation to report a handful of anecdotal reports suggesting that Zicam caused anosmia, especially where the science was unsettled.  Id. at 40–47.  The Supreme Court disagreed, holding that "the complaint allege[d] facts suggesting a significant risk to the commercial viability of Matrixx's leading product [and therefore] [i]t is substantially likely that a reasonable investor would have viewed this information as having significantly altered the total mix of information made available."  Id. at 47.

Here, Plaintiffs allege three categories of misrepresentations or omissions that they claim are *material*: (1) statements that Shoals' products can be installed by anyone; (2) the failure to report (or underreporting) significant warranty liability; and (3) statements about the superior quality and reliability of Shoals' products.  (See generally Doc. No. 82).  Regarding the second category of alleged misrepresentations, Defendants argue that Shoals had no obligation to report warranty liability because the cost of future warranty claims are difficult to estimate, especially when the situation is evolving, and a third-party supplier could have been liable for the defect instead of Shoals.  (Doc. No. 85 at 14–17).  Additionally, Defendants assert that forward-looking statements about warranty liability are shielded by the PSLRA's safe harbor provision and therefore cannot serve as a material misrepresentation or omission.  Id. at 16 (citing 15 U.S.C. §

13

78u-5(c)(1)).  Regarding the third category of alleged misrepresentations, Defendants argue that statements about the quality and reliability of their product were mere "puffery" and were by definition immaterial.  (Id. at 19).  Based on these arguments, Defendants assert the Amended Complaint should be dismissed for failure to identify a material misstatement.[2]

### a. Statements about installation benefits

Plaintiffs allege that Shoals repeatedly represented that its BLA could "be installed by anyone."  (E.g., Doc. No. 82 ¶¶ 37, 41).  Shoals allegedly made these representations about the "installation" benefits of its BLA on May 16, 2022 (id. ¶ 78); August 15, 2022 (id. ¶ 82); November 14, 2022 (id. ¶ 89); February 28, 2023 (id. ¶ 97); May 8, 2023 (id. ¶¶ 107–08).  Plaintiffs then allege that these statements were false or, at least, Shoals and its executives believed them to be false at the time they were made.  In this case, much like the Mattrix case, Plaintiffs allege that Shoals learned of a major problem with its BLA—which was Shoals' top revenue generator, (id. ¶ 38)—but continued to mislead the public about the product's virtues.

Defendants concede in their Opposition that "Shoals believed the issue [with the BLA] to be a customer installation issue …."  (Doc. No. 85 at 28).  This concession dovetails with Plaintiffs' allegations that Shoals believed that the shrink back problem was caused by faulty installation, not a manufacturing defect with the wiring.[3]  From these allegations, one can easily infer that Shoals

---

[2] Importantly, Defendants' Motion to Dismiss does not meaningfully challenge the first category of alleged misstatements—i.e., that Shoals' BLA could be installed by anyone.

[3] (Doc. No. 82 ¶ 50) ("FE1 reported that he/she determined that the issue was an installation error, and that Shoals immediately replaced the product on that site, which took about 6 weeks and cost $3.5 to $4 million."); (id. ¶ 53) ("FE2 reported that [Shoals' Research and Development Manager, Lee Morgan] examined the exposed wire and Morgan told FE2 that Morgan believed it was an installation issue. FE2 reported that [Ben Macias, Shoals' Vice President of Sale and Marketing] also visited the Phoenix site at a different time and evaluated the wiring. FE2 reported that Macias also believed the problems at the Phoenix site were caused by an installation issue."); (id. ¶ 54) ("Shoals' internal response to reported exposed conductor as early as March 2022, include[ed]

14

knew about a significant and costly problem with its BLA and thought the problem was caused by improper installation methods. Nevertheless, it continued to represent to prospective investors that its product was better and more cost-effective than its competitors' because Shoals' BLA could be "installed by anyone." (E.g., Doc. No. 82 ¶ 78) (1Q22 Investor Presentation states that "Shoals' products . . . can be installed by anyone" and that the "speed [of] installation, reduce[d] errors, and ma[d]e the system installable by general labor rather than requiring licensed electricians."). Given the growing shrink back problem and that Shoals was internally blaming the problem on customer installation, Shoals could no longer honestly believe that its product could be safely installed by "anyone." Consistent with the Supreme Court's decision in Matrixx Initiatives, 563 U.S. at 47, this Court finds that Shoals' alleged statements about the installation benefits of its BLA, as set forth in the Amended Complaint, were material misrepresentations within the meaning of § 10(b) and Rule 10b–5.

**b. Statements or omissions about warranty costs**.

Additionally, Plaintiffs allege that by June 2022 Shoals had already expended $4 million on warranty costs at a customer site in Phoenix, Arizona (Doc. No. 82 § 50), and that Shoals knew it was facing additional warranty expenses of around $15 million. (Id. ¶ 54). Although Shoals argues that it was still estimating the full scope of potential warranty liability and that any warranty projections were forward-looking, this argument ignores Plaintiffs' allegations that Shoals and its executives shielded the market from learning about real, calculable liabilities that had already accrued. A reasonable investor would likely have reasoned that $4 million in expended warranty

---

conducting site visits to inspect reported exposed conductor, engaging third-party testing companies to analyze its harnesses and composition of its own T-Connector overmold, engaging one of Prysmian's primary competitors to test Prysmian's cable for shrinkback, and reaching its own conclusion that the exposed conductor was caused by improper installation methods.").

repairs and another $15 million in projected warranty costs would have "significantly altered the total mix of information [] available." Public Sch. Teachers Pension & Ret. Fund, 381 F.3d at 570. Therefore, simply reporting that Shoals "may face warranty, indemnity and product liability claims arising from defective products," was a statement (or omission) that likely misled investors. (Id. ¶ 95).

Thus, Defendants' statements or omissions about warranty costs—as set forth in the Amended Complaint—are material, at least at this stage.

### c. Statements about the reliability and safety of Shoals' products.

Finally, Defendants argue that general statements about the "reliability and safety" of Shoals' product are mere puffery and cannot be material. (Doc. No. 85 at 19). This argument may prove meritorious. See, e.g., In re Stratasys Ltd. S'holder Sec. Litig., 864 F.3d 879, 882 (8th Cir. 2017) (statements that a product offers "unmatched speed, reliability, quality and connectivity" are puffery). However, the Court need not resolve the "puffery" issue because it can rely on the other alleged misstatements and omissions discussed above when denying Defendants' Motion to Dismiss Plaintiffs' § 10(b) claim.

In sum, Plaintiffs have sufficiently pled material misrepresentations or omissions to sustain their § 10(b) claim against Shoals, Whitaker, Hubbard, Bardos, and Tolnar.[4] However, the § 10(b) claim against Moss must be dismissed. Plaintiffs only allege that Moss made statements on August

---

[4] Plaintiffs' allegations about Defendants' installation-related misstatements satisfy Rule 9(b)'s and the PSLRA's who, what, when, where, and how requirements. See Frank v. Dana Corp., 547 F.3d 564, 570 (6th Cir. 2008) (Rule 9(b)'s particularity requirement requires a plaintiff to identify (1) the alleged fraudulent statements, (2) the speaker of the statements, (3) where and when statements were made, and (4) why statements were fraudulent). So do their allegations about Defendants' alleged statements failing to disclose accrued or reasonably certain warranty expenses.

16

1, 2023, September 30, 2023, November 7, 2023, and December 31, 2023. (Doc. No. 82 ¶¶ 115–18, 122–24, 128, 161). None of these statements contain the misrepresentations or omissions discussed above. Instead, Moss's statements appear to disclose the BLA defect to the public and update investors on accrued and estimated warranty costs. It is not obvious from the face of the Amended Complaint or the parties briefs how Moss's limited statements were materially false or misleading, so the § 10(b) claim against him cannot proceed on these allegations.

### 2. Plaintiffs sufficiently allege an intent to defraud investors.

Defendants argue that dismissal is appropriate because Plaintiffs have failed to allege that Shoals, Whitaker, Hubbard, Bardos or Tolnar acted with the requisite scienter. (Doc. No. 85 at 23–27). Plaintiffs argue that the Amended Complaint sufficiently alleges scienter because of the voluminous stock sales by Shoals' founder, Solon, and its CEO, Whitaker, around the time the Company learned that its most profitable product was suffering from a shrink back problem. (Doc. No. 91 at 18–23). Plaintiffs further allege that the Company's executives made knowingly false statements to save their jobs, salaries, and the value of their stock options. (Id.). At this stage, Plaintiffs have met their burden.

Scienter "is the lynchpin of most" Section 10(b) claims. Albert Fadem Tr. v. American Elec. Power Co., 334 F. Supp. 2d 985, 1006 (S.D. Ohio 2004). Like materiality, scienter involves "[m]ixed questions of law and fact," and is "peculiarly within the province of the trier of fact[.]" Tivity Health, Inc., 779 F. Supp. 3d at 966–67 (quoting SEC v. Merch. Cap., LLC, 483 F.3d 747, 766 (11th Cir. 2007)). To allege scienter, a plaintiff must demonstrate that each defendant "had a mental state embracing intent to deceive, manipulate or defraud" or acted with a reckless disregard for the truth. Omnicare, 769 F.3d at 472; SEC v. Coffey, 493 F.2d 1304, 1314 (6th Cir. 1973). "Recklessness is . . . highly unreasonable conduct which is an extreme departure from the standards

17

of ordinary care," where the "danger . . . must at least be so obvious that any reasonable man would have known of it." Frank v. Dana Corp., 646 F.3d 954, 959 (6th Cir. 2011) (internal citations and quotation marks omitted). Recklessness requires something more than negligence and is "akin to conscious disregard," and "typically require[s] multiple, obvious red flags, demonstrating an egregious refusal to see the obvious, or to investigate the doubtful." Doshi, 823 F. 3d at 1039 (internal citations and quotation marks omitted).

"[T]he Supreme Court set forth a three-part test . . . to determine the sufficiency of a plaintiff's scienter allegations." Dougherty v. Esperion Therapeutics, Inc., 905 F.3d 971, 979 (6th Cir. 2018) (citing Tellabs, 551 U.S. at 322). This inquiry requires lower courts to: (1) "accept all factual allegations in the complaint as true"; (2) "consider the complaint in its entirety" to determine "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter"; and then (3) "take into account plausible opposing inferences" to decide whether "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Tellabs, 551 U.S. at 322–24.

To aid in this inquiry, and to determine if there is a "strong inference of scienter" that is "cogent and at least as compelling as any opposing inference," id., the Sixth Circuit looks to "a non-exhaustive list of nine factors," Doshi, 823 F.3d at 1039–40. They include whether there are allegations of:

1. insider trading at a suspicious time or in an unusual amount;

2. divergence between internal reports and external statements on the same subject;

3. closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information;

18

4. evidence of bribery by a top company official;

5. existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit;

6. disregard of the most current factual information before making statements;

7. disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication;

8. the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and

9. the self-interested motivation of defendants in the form of saving their salaries or jobs.

Dougherty, 905 F.3d at 979 (quoting Omnicare, 769 F.3d at 473); see Helwig v. Vencor, Inc., 251 F.3d 540, 552 (6th Cir. 2001). A strong inference of scienter may be inferred from circumstantial evidence. Tellabs, 551 U.S. at 323. Courts "evaluate scienter by looking at 'all the allegations holistically.'" Pittman, 861 F. App'x at 54 (quoting Tellabs, 551 U.S. at 326).

As Defendants correctly point out, Plaintiffs largely rely on stock sales by Solon and Whitaker to create the required strong inference of scienter for every Defendant. (Doc. No. 85 at 23–27). Where Defendants go wrong, however, is suggesting that Solon's voluminous stock sales in December 2022 and March 2023 are irrelevant to the question of whether the Company, through its executives, intended to defraud investors by shielding investors from damaging information about the Company's leading product. (Id. at 27). Defendants suggest that because Solon no longer had an official role at Shoals, he was not an insider. (Id.) But before the December 2022 SPO, Solon owned nearly 34% of Shoals stock and controlled a seat on the board of directors. (Doc. No. 82 ¶ 31). Although Solon had resigned as CEO in 2019 and as a director in February 2022, he founded the Company, ran it for over 25 years, and remained a controlling shareholder.

19

(Id.).  Someone with over one-third of a company's corporate voting power fits the "traditional concept of a corporate insider."  Barris Indus., Inc. v. Bryan, 686 F. Supp. 125, 132 (E.D. Va. 1988).[5]  To suggest otherwise would elevate form over substance and ignore the substantial power that controlling shareholders, especially founders, can wield over their companies despite resigning from their official roles.

It is well-settled that "insider sales of stock may be evidence of scienter if the trades are unusual or suspicious in timing or amount."  In re Oxford Health Plans, Inc., 187 F.R.D. 133, 139 (S.D.N.Y. 1999) (citing Acito v. IMCERA Grp., Inc., 47 F.3d 47, 54 (2d Cir. 1995)); see also Konkol v. Diebold, Inc., 590 F.3d 390, 399 (6th Cir. 2009).  Stock sales by insiders "made a short time before a negative public announcement are suspiciously timed."  Id. Other "[f]actors considered in determining whether insider trading activity is unusual include the amount of profit from the sales, the portion of stockholdings sold, the change in volume of insider sales, and the number of insiders selling."  In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 74–75 (2d Cir. 2001). In this case, Solon sold 52 million shares of Shoals Common Stock for more than $1 billion between December 2022 and March 2023.  (Doc. No. 82 ¶ 31).  He decreased his holdings in the company he founded from 34% to 2%.  (Id. ¶ 66).  This precipitous decline in Solon's ownership interest suspiciously coincided with Shoals and its executives learning of significant shrink back problems that would cost the company millions of dollars in warranty claims and create untold damage to its reputation.  (Id. ¶¶ 48, 51, 54).  The Court will not turn a blind eye to this type of gamesmanship just because Solon was no longer Shoals' CEO or a director.  The volume of his

---

[5] By way of analogy, Section 16(b) of the Exchange Act treats anyone who owns more than 10 percent of the outstanding shares of a corporation as an insider.  Olagues v. Perceptive Advisors LLC, 902 F.3d 121, 123 (2d Cir. 2018) (citing 15 U.S.C. § 78p(a)(1), (b)).

sales was suspicious, as was the timing. All of this creates a strong inference that he knew about the shrink back problem and organized a massive sell-off before the investing public became aware of the problem.

Although Defendants offer a competing, non-fraudulent explanation for Whitaker's stock sales (totaling $4.3 million) between December and March 2023 (see Doc. No. 85 at 24) ("the sales were in the months leading up to [Whitaker's] medical retirement in March 2023"),[6] they offer no explanation for why Solon dumped over one billion-dollars in stock over the course of four months in the midst of a brewing corporate crisis. No competing inference is apparent from the face of the Amended Complaint. Because the Company's founder and its CEO sold significant shares of stock between December 2022 and March 2023—as the Company was coming to terms with the shrink back problem that would likely damage Shoals' reputation—one can easily infer a motivation to conceal and mislead.

Despite what seems like an obvious motivation to conceal bad news from the markets, Defendants argue that "the more compelling inference is good faith, not fraud." (Doc. No. 85 at 28). They assert that the alleged facts show that Shoals and its executives were playing a game of catch-up and were assessing the scope and cause of the problem. (Id.). They argue that "Shoals believed the issue to be a customer installation issue, which did not create a liability for the Company" and therefore, they had nothing to report. (Id.). But this clever after-the-fact narrative ignores that while "Shoals believed the issue to be a customer installation issue," it was simultaneously making statements that its BLA was more valuable and desirable because it could

---

[6] When considering whether there is an equally compelling inference of non-fraudulent intent, the court must rely on "the facts alleged" to draw such an inference. Tellabs, 551 U.S. at 322–24. Defendants have provided no cases to support the proposition that they can factually attack the Amended Complaint with information outside the four corners of the pleading.

be "installed by anyone." (<u>E.g.</u>, Doc. No. 82 ¶ 78). Defendants cannot have their cake and eat it too. Either Shoals knew its leading product was defective or the product could not be "installed by anyone." In other words, Defendants either concealed a defect or lied about the virtues of the product's installation process. Given this, the inference of fraud is just as strong (or stronger) than the competing inference of good faith, especially in the face of a billion-dollar sell-off by the Company's founder and largest shareholder.[7]

In sum, the Court can infer a strong inference of scienter based on the allegations in the Amended Complaint. <u>Tellabs</u>, 551 U.S. at 323. Therefore, Plaintiffs' §10(b) claims cannot be dismissed for lack of scienter.

### 3. Plaintiffs adequately allege that the purported misrepresentations or omissions caused their claimed losses.

"Loss causation is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." <u>Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.</u>, 830 F.3d 376, 384 (6th Cir. 2016). To state a claim for securities fraud, a plaintiff must prove "that the act or omission of the defendant alleged to violate" Rule 10b-5 "caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4). In other words, the "losses [must be] attributable to the revelation of the fraud and not the myriad other factors that affect a company's stock price." <u>Tivity Health, Inc.</u>, 779 F. Supp. 3d at 970 (quoting <u>In re Williams Sec. Litig.-WCG Subclass</u>, 558 F.3d 1130, 1137 (10th Cir. 2009)).

The requirement to prove loss causation is "not meant to impose a great burden upon a plaintiff." <u>Dura Pharms., Inc. v. Broudo</u>, 544 U.S. 336, 346–47 (2005). Rather, "it is meant to

---

[7] One can easily infer that Defendants were either instructed to or voluntarily covered up the mounting problems with the BLA so that Solon could cash-out and the Company could increase its cash-on-hand to weather the storm.

22

prevent disappointed shareholders from filing suit merely because their shares have lost value and then using discovery to determine whether the loss was due to fraud." Norfolk Cnty. Ret. Sys. v. Community Health Sys., Inc., 877 F.3d 687, 695 (6th Cir. 2017). At the pleading stage, a plaintiff need only "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." Dura Pharms., 544 U.S. at 347. The element of loss causation is not subject to the heightened pleading standards of Rule 9 or the PSLRA, but instead the notice pleading standard of Rule 8. Id. at 346.

The Sixth Circuit recognizes two theories by which a plaintiff may plead loss causation: (1) a corrective disclosure; and (2) materialization of a concealed risk. Ohio Pub. Emps. Ret. Sys., 830 F.3d at 384–85. This first theory is the "easiest to prove because the stock price drop immediately follows the revelation of the fraud to the public." In re Envision Healthcare Corp. Sec. Litig., 2022 WL 4551876, at *10 (M.D. Tenn. Sept. 29, 2022) (citing In re KBC Asset Mgmt., 572 F. App'x. 356, 360 (6th Cir. 2014)). A plaintiff must show that an economic loss occurred after the truth behind the misrepresentation or omission became known to the market. See Indiana State Dist. Council of Laborers & Hod Carriers Pension & Welfare Fund v. Omnicare, Inc., 583 F.3d 935, 944 (6th Cir. 2009).

Here, the misrepresentations or omissions that were corrected were either: (1) statements about the true scope of accrued and reasonably foreseeable future warranty costs, or (2) statements that Shoals' BLA product could be installed by anyone. After years of extolling the quality and reliability of its BLA product and the ease of installation of that product (not to mention exceedingly low warranty costs), Shoals disclosed to the market that nearly 30% of Shoals' BLA harnesses were defective and that is warranty liability could top nearly $185 million. Implicit in Shoals' cryptic disclosures were an admission—either Shoals' product was unreliable, or its

product could not be installed by anyone. Either way the market quickly received the message that Shoals' prior representations about the quality of its product, the ease of installation had been untrue, and its low warranty cost estimates had been untrue. Specifically, after Shoals gradually disclosed the defect on May 8, August 1, and November 7, 2023, (Doc. No. 82 ¶¶ 69–71, 110, 116–18, 120–21), Shoals' common stock dropped from over $40 per share to less than $8 per share. (See id. ¶ 75); see also In re Envision Healthcare Corp. Sec. Litig., 2022 WL 4551876, at *10 ("A plaintiff need not rely on a single, complete disclosure; the truth may gradually be revealed through a series of partial disclosures.") (citing Norfolk Cty. Ret. Sys. v. Cmty. Health Sys., Inc., 877 F.3d 687, 695 (6th Cir. 2017)). At this stage, nothing more is required to meet the relatively modest burden of alleging loss causation.

Accordingly, this Court holds that Plaintiffs have adequately pleaded materiality, scienter, and loss causation for all of the Exchange Act Defendants except for Moss. Because Plaintiffs have not identified a material misstatement or omission made by Moss, the §10(b) claim against him will be dismissed. However, the Motion to Dismiss the §10(b) claims against the remaining Exchange Act Defendants will be denied.

## B. Sections 11 and 12(a)(2) Securities Act Claims.

Plaintiffs have brought a § 11 claim under the Securities Act of 1933 against Shoals, Bardos, Shoals' directors—Brad Forth, Peter Wilver, Ty Daul, Toni Volpe, Lori Sundberg, Jeannette Mills, and Robert Julian, and the underwriters of the SPOs— J.P. Morgan Securities, Guggenheim Securities, Morgan Stanley, Goldman Sachs, Barclays, Credit Suisse, Cowen & Co., Oppenheimer & Co., Piper Sandler & Co., Roth Capital Partners, Johnson Rice & Co., and Northland Securities. (Doc. No. 82 ¶ 231). Plaintiffs also bring a § 12 claim under the Securities Act against the aforementioned Defendants plus Whitaker. (Id. ¶ 242).

24

Plaintiffs argue that these Defendants are liable for material misrepresentations or omissions in the registration statement and prospectuses that preceded the December 2022 SPO. (E.g., id. ¶¶ 230–47). In response, Defendants assert that Plaintiffs' §§ 11 and 12 claims should be dismissed because they have not identified a material misrepresentation or omission in the registration statement or any prospectuses. (Doc. No. 85 at 31–32). They also argue that dismissal is appropriate because Plaintiffs have not alleged statutory standing because they have not (a) traced their shares to the challenged registration statement, or (b) shown that they purchased their stock directly from a particular Defendant; and (3) Plaintiffs' § 12 claim fails because they have not alleged that Defendants are statutory sellers. (Id. at 32–34).

"Claims brought under §§ 11 and 12(a)(2) of the Securities Act involve 'roughly parallel elements,'" with § 11 implicating the issuer's registration statement and § 12(a)(2) implicating the seller's prospectus or other oral communications related to the sale. In re Sanofi Sec. Litig., 87 F. Supp. 3d 510, 527 (S.D.N.Y. 2015) (quoting In re Morgan Stanley Info. Fund Sec. Litig., 592 F.3d 347, 359 (2d Cir. 2010)); see also Kolominsky v. Root, 100 F.4th 675, 684 (6th Cir. 2024). One other significant difference between the two provisions is that § 11 applies to: (1) anyone who signed the registration statement; (2) anyone who was a director or partner in the issuer at the time of the filing; (3) anyone who is named in the registration statement as being a director or partner; (4) anyone who has certified any part of the registration statement; and (5) any underwriter of the security. See 15 U.S.C. § 77k(a). By contrast, § 12 only applies to "statutory sellers." In re Morgan Stanley, 592 F.3d at 359. "An individual is a 'statutory seller'—and therefore a potential section 12(a)(2) defendant—if he: (1) 'passed title, or other interest in the security, to the buyer for value,' or (2) 'successfully solicit[ed] the purchase [of a security], motivated at least in part by a

desire to serve his own financial interests or those of the securities['] owner.'" Id. (quoting Pinter v. Dahl, 486 U.S. 622, 642, 647 (1988)).

Sections 11 and 12 require plaintiffs to allege that the registration statement or prospectus (1) "contained an untrue statement of a material fact" or (2) "omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." In re ProShares Tr. Sec. Litig., 728 F.3d 96, 101 (2d Cir. 2013); see also 15 U.S.C. §§ 77k and 77*l*(a)(2). Like Rule 10b-5 claims, §§ 11 and 12 claims require a showing of materiality—namely, a misleading statement or omission that would have been significant to a reasonable investor. Kolominsky, 667 F. Supp. 3d at 698 (citing Benzon v. Morgan Stanley Distribs., 420 F.3d 598, 609 (6th Cir. 2005)). Unlike Rule 10b-5 claims, however, "a plaintiff bringing [§§ 11 and 12] claims … need not plead scienter, reliance, or causation." In re Qudian Inc. Sec. Litig., 2019 WL 4735376, at *5 (S.D.N.Y. Sept. 27, 2019). "Issuers are subject to 'virtually absolute' liability under § 11, while the remaining potential defendants under []12(a)(2) may be held liable for mere negligence." In re Morgan Stanley, 592 F.3d at 359 (quoting Herman & MacLean v. Huddleston, 459 U.S. 375, 382 (1983)).

Moreover, where a plaintiff's §§ 11 and 12 claims do not sound in fraud, the plaintiff need not meet "the heightened pleading standard of Rule 9(b)." Rombach v. Chang, 355 F.3d 164, 171 (2d Cir. 2004). However, simply disclaiming "that [its] § 11 claims sound in fraud will not help [a] plaintiff avoid the strictures of Rule 9(b)." In re Arqit Quantum Inc. Sec. Litig., 774 F. Supp. 3d 505, 533 (E.D.N.Y. 2025). To benefit from "Rule 8's notice pleading standard" instead of Rule 9(b)'s heightened pleading standard, a plaintiff must "plead[] negligence, disclaim[] fraud, eschew[] language in its § 11 . . . claim[ ] implying fraud or the elements thereof, and separate[e] allegations supporting fraud claims from allegations supporting negligence claims." Id. (quoting

26

Pappas v. Qutoutiao Inc., 2024 WL 4588491, at *2 (2d Cir. Oct. 28, 2024)). When, after "thoroughly examining [a] complaint," a court finds that plaintiffs' "allegations would be evaluated under [FRCP] 8 if contained in a stand-alone complaint alleging violations only of the Securities Act[,] they will not be held to a higher standard because [plaintiffs] also exercised [their] right to sue [d]efendants for securities fraud under the Exchange Act." Id. "[T]he mere fact that a statement is misleading (as are all false statements, whether intentionally, negligently[,] or innocently made) does not make it fraudulent." Id. (citing In re Refco, Inc. Sec. Litig., 503 F. Supp. 2d 611, 632 (S.D.N.Y. 2007)). Although the parties hotly dispute whether Rule 8(a) or Rule 9(b)'s pleading requirements apply to the §§ 11 and 12 claims, the Court does not need to resolve this issue because Plaintiffs' claims that survive applying the higher standard and Plaintiffs' claims that fail founder even when the lower standard is applied.

## 1. The registration statement and prospectuses contained material misrepresentations or omissions.

Plaintiffs have identified a material omission in the December 2022 and March 2023 SPO registration statements and prospectuses—namely, the failure to report warranty costs that had already been paid or were reasonably foreseeable. (Doc. No. 82 ¶¶ 3, 93, 95, 103, 105, 183, 185–86). As discussed above, by June 2022, Shoals had already expended $4 million on warranty costs at a customer site in Phoenix, Arizona (id. § 50) and knew, at the least, about an additional $15 million in warranty expenses on the horizon. (Id. ¶ 54). Continuing to vaguely report that Shoals "may face warranty, indemnity and product liability claims arising from defective products," without disclosing accrued or reasonably certain warranty costs were material misstatements (or omissions) that misled investors. (Id. ¶¶ 95, 105). Therefore, for the purposes of the pending motion, the Court finds that the SPO registration statements and prospectuses contained materially misleading statements or omissions by failing to disclose mounting warranty costs.

27

### 2. Plaintiffs have sufficiently alleged statutory standing for their § 11 claim

"To have standing to bring suit under § 11, a plaintiff must have purchased stock in the offering at issue, or trace later-purchased stock back to that offering." Gaynor v. Miller, 273 F. Supp. 3d 848, 860 (E.D. Tenn. 2017); see also J & R Mktg., SEP v. Gen. Motors Corp., 549 F.3d 384, 390 (6th Cir. 2008); In re EveryWare Glob., Inc. Sec. Litig., 175 F. Supp. 3d 837, 864 (S.D. Ohio 2016). KUAERP pleads that it "purchased Shoals Common Stock directly in the December 2022 SPO," (Doc. No. 82 ¶ 238), and that it purchased shares at the SPO price of $22.25 on December 2, 2022, (id. ¶¶ 13, 180, 222). (See Doc. No. 91 at 35). At the pleading stage, this allegation is sufficient to show that KUAERP can trace its stock purchases to the December 2022 SPO and the alleged misstatements in the registration statement. But see In re Century Aluminum Co. Sec. Litig., 729 F.3d 1104, 1108 (9th Cir. 2013) (holding that allegations that a plaintiff purchased stock on the same day as a public offering is insufficient to establish standing).[8]

Moreover, as noted above, § 11 applies to: (1) anyone who signed the registration statement; (2) anyone who was a director or partner in the issuer at the time of the filing; (3) anyone who is named in the registration statement as being a director or partner; (4) anyone who has certified any part of the registration statement; and (5) any underwriter of the security. See 15

---

[8] The Sixth Circuit has not adopted the stringent statutory standing test the Ninth Circuit articulated in In re Century Aluminum Co. Sec. Litig. Absent Sixth Circuit precedent requiring this Court to impose such a stringent standard at the pleading stage, it will decline to do so. See, e.g., In re Ariad Pharms., Inc., 98 F. Supp. 3d 147, 167–69 (D. Mass. 2015) (declining to follow Century Aluminum and adhering to the previous rule, finding that other post-Twombly/Iqbal district court decisions were more persuasive); In re Mun. Mortg. & Equity, LLC, Sec. & Derivative Litig., 876 F.Supp.2d 616, 657–58 (D. Md. 2012) ("It may well be that [the plaintiff] will be unable to prove that he bought directly in the offering or that he can trace his shares to the offering. However, inasmuch as the allegations present a plausible claim, they are adequate."); In re Wachovia Equity Sec. Litig., 753 F. Supp. 2d 326, 373 (S.D.N.Y. 2011) ("The pleading requirement for Section 11 standing is satisfied by general allegations that plaintiff purchased pursuant to or traceable to [a] false registration statement].").

U.S.C. § 77k(a). Plaintiffs allege that the Director Defendants and Bardos signed the SPO registration statement (Doc. No. 82 ¶¶ 35, 179) and that the Underwriter Defendants underwrote the SPO, (id. ¶¶ 32–33, 179, 188–92). Assuming this is true, these Defendants are strictly liable for any material misstatements or omissions in the December 2022 and March 2023 SPO registration statements. See Herman & MacLean v. Huddleston, 459 U.S. 375, 382 (1983) (holding liability against the issuer of the security "is virtually absolute, even for innocent misstatements" and, therefore, a plaintiff is not required to plead scienter); see also Ho v. Duoyuan Glob. Water, Inc., 887 F. Supp. 2d 547, 577 (S.D.N.Y. 2012).

In sum, Plaintiffs have traced their stock purchases to the relevant SPOs and have sued people and entities who were "issuers" within the meaning of 15 U.S.C. § 77k(a). Nothing more is required at this stage.

### 3. Plaintiffs have not sufficiently traced their stock purchases to a statutory seller and, therefore, their § 12 claims fail.

Section 12 standing differs from § 11 standing because under § 12 a plaintiff can only sue a "statutory seller"—i.e., the person from whom the plaintiff purchased the security or the person who solicited the plaintiff to purchase the security. In re Lehman Bros. Sec. & Erisa Litig., 799 F. Supp. 2d 258, 310 (S.D.N.Y. 2011). Thus, alleging traceability sufficient for § 12 standing is a more rigorous exercise than alleging § 11 standing. See Gaynor, 273 F. Supp. 3d at 861.

A "statutory seller" is one who "either transferred title to the purchaser or successfully solicited the transfer for financial gain." Pinter, 486 U.S. at 642. In other words, Section 12(a) "imposes liability on only the buyer's immediate seller; remote purchasers are precluded from bringing actions against remote sellers." Id. at 644 n.21.

29

Plaintiffs allege that as part of the December 2022 SPO, Solon and his affiliates sold 24 million shares and Shoals sold 2 million shares.[9] (Doc. No. 82 § 63). The Court will assume that Solon and Shoals were statutory sellers (although Plaintiffs have not brought a § 12 claim against Solon) for the purposes of the SPOs. Plaintiffs further allege that JP Morgan underwrote 7,770,000 shares; Guggenheim Securities underwrote 7,350,000 shares; Morgan Stanley underwrote 3,640,000 shares; UBS Securities underwrote 2,240,000 shares; Goldman Sachs underwrote 1,600,000 shares; Barclays Capital underwrote 800,000 shares; Credit Suisse underwrote 800,000 shares; Cowen & Co. underwrote 400,000 shares; Oppenheimer & Co. underwrote 400,000 shares; Piper Sandler underwrote 400,000 shares; Roth Capital underwrote 400,000 shares; Johnson Rice & Co. underwrote 100,000 shares; and Northland Securities, Inc. underwrote 100,000 shares. (Id. ¶ 32). The Court will also assume, without deciding, that these underwriters were statutory sellers under § 12's solicitation prong. Next, Plaintiffs allege that Whitaker sold 13,020 shares on December 13, 2022; 5,532 shares on January 25, 2023; and 181,541 shares on March 14, 2023. (Id. ¶ 222). Because these sales postdated the SPO and also postdated KUAERP's purchase of 220 shares on December 6, 2022, (id.), and because there are no other concrete allegations about Whitaker's solicitation activities, the Court cannot divine how Whitaker was a statutory seller. Likewise, Plaintiffs only allege that the Director Defendants and Bardos signed the SPO Registration Statement. (Id. ¶ 35). Because these Defendants' alleged activities only pertain the registration statement, not the prospectuses, they cannot be statutory sellers for the purposes of Plaintiffs' § 12 claims. Therefore, the § 12 claims against Whitaker, Bardos, and the Director Defendants must be dismissed because Plaintiffs have not shown that they are statutory sellers.

---

[9] For the March 2023 SPO, Solon was the sole seller of Shoals' common stock. (Doc. No. 82 ¶ 66).

Even though Shoals and the Underwriter Defendants could plausibly be statutory sellers, Plaintiffs' § 12 claims nonetheless fail because Plaintiffs have not adequately traced their stock purchases to these Defendants. Of the 26,000,000 shares that were sold in the December 2022 SPO, Shoals only sold 2,000,000 of those shares. Given that the overwhelming number of shares were sold by Solon, the Court cannot infer that KUAERP purchased its 220 shares directly from Shoals. Assuming there was a direct purchase, it is far more likely that KUAERP bought its shares from Solon (who it has not sued under § 12). Likewise, there were thirteen underwriters, and they underwrote varying numbers of shares. It is impossible to infer that KUAERP purchased shares that were underwritten by one underwriter as opposed to another. Because Plaintiffs have made no effort to trace their stock purchases to a particular seller or solicitor, they have not adequately pleaded statutory standing for their § 12 claims. Accordingly, Defendants' Motion to Dismiss must be granted as to Plaintiffs' § 12 claims.

### C. Section 20A insider trading claims.

Plaintiffs assert § 20A insider trading claims against Shoals and Whitaker. (Doc. No. 82 ¶¶ 219–29). Section 20A of the Exchange Act provides that an insider who trades stock "while in possession of material, nonpublic information" is liable to those who traded contemporaneously with the insider. 15 U.S.C. § 78t-1(a). All claims under Section 20A are derivative, requiring proof of a separate underlying §10(b) violation. See In re Advanta, 180 F.3d 525, 541 (3d Cir. 1999) (citing Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co., 32 F.3d 697, 703 (2d Cir. 1994)). Once a plaintiff establishes a predicate §10(b) violation, they must also show: "(1) trading by a corporate insider; (2) a plaintiff who traded contemporaneously with the insider; and (3) that the insider traded while in possession of material nonpublic information, and thus is liable for an

independent violation of the Exchange Act." <u>Barnard v. Verizon Commc'ns, Inc.</u>, 2011 WL 294027, at *7 (E.D. Pa. Jan. 31, 2011), <u>aff'd</u>, 451 F. App'x 80 (3d Cir. 2011).

Defendants' primary argument for dismissal of the § 20A claims is that Plaintiffs failed to plead the predicate §10(b) violation. (Doc. No. 85 at 34). Because the Court has already found that Plaintiffs adequately pleaded a §10(b) claim under the Exchange Act, that argument can be quickly rejected. Defendants' only alternative ground for dismissing the § 20A claims is limited to a single sentence in footnote 9 of their Opposition brief. (<u>Id.</u>). Specifically, Defendants argue that Plaintiffs have not shown Shoals' or Whitaker's "intent" when trading their stocks. (<u>Id.</u>). This argument also fails because Plaintiffs have shown that Shoals and Whitaker traded shares and that they did so while in possession of material, nonpublic information. The Court has already found there are sufficient allegations to create an inference that these Defendants made material representations or withheld material information from the public so that they and Solon could sell stocks before the public discovered the magnitude of the problems the Company was facing. <u>See</u> <u>supra</u> (III)(A)(2). Under these circumstances, Plaintiffs' § 20A claims survive Defendants' Motion to Dismiss.

### D. Sections 15 and 20(a) and control-person claims.

Sections 15 and 20(a) impose legal responsibility on any "controlling person" in a company for Rule 10b–5 violations. Section 15 provides:

> Every person who, by or through stock ownership, agency, or otherwise . . . controls any person liable under section[ ] 77k . . . shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

32

15 U.S.C. § 77o.  Similarly, § 20(a) provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such control person is liable unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).  Plaintiffs assert § 15 claims against Shoals, Solon, Bardos, and the Director Defendants and § 20(a) claims against Whitaker, Hubbard, Bardos, Tolnar and Moss.

"The term 'control' means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405; see also Ellison v. American Image Motor Co. Inc., 36 F.Supp.2d 628, 638–39 (S.D.N.Y. 1999) (discussing who can be a control person).  Although directed at different types of "control persons," § 15 of the 1933 Act and § 20(a) of the 1934 Act are interpreted in the same manner.  See Abbott v. Equity Group, Inc., 2 F.3d 613, 619 n.15 (5th Cir. 1993).  To state a claim for control person liability a plaintiff must allege that a predicate violation was committed by a controlled person and that the defendant directly or indirectly controlled the violator.  See Klein v. General Nutrition Companies, Inc., 186 F.3d 338, 344 (3d Cir. 1999); see also PR Diamonds, Inc. v. Chandler, 364 F.3d 671, 696 (6th Cir. 2004) (overruled on other grounds).  A plaintiff needs to allege some facts beyond a defendant's position or title that show the defendant had actual power or control over the controlled person.  Dennis v. General Imaging, Inc., 918 F.2d 496, 509–10 (5th Cir. 1990); In re Alstom SA, 406 F. Supp. 2d 433, 502 (S.D.N.Y. 2005); Zurich Cap. Markets Inc. v. Coglianese, 332 F. Supp. 2d 1087, 1111 (N.D. Ill. 2004).

First, Plaintiffs cannot state a control-person claim against Moss, because they did not adequately plead a predicate Exchange Act violation against him. Moreover, Plaintiffs' allegations against Hubbard, Bardos, and the Director Defendants never move beyond these individuals' titles or basic responsibilities.[10] Although Plaintiffs have adequately alleged that Hubbard, Bardos, and the Director Defendants were violators, they have not alleged how these individuals had sufficient power to control other violators. Therefore, the §§ 15 and 20(a) claims against Hubbard, Bardos, Moss, and the Director Defendants must be dismissed.

Plaintiffs' § 20(a) claims against Whitaker and Tolnar and their § 15 claims against Shoals and Solon present a different story, however. Whitaker and Tolnar, respectively, served as Shoals' CEO. The Court is willing to infer, especially at the motion to dismiss stage, that a Company's chief corporate officer has the "power to direct or cause the direction of the management and policies of" the company. See, e.g., Rochez Bros. v. Rhoades, 527 F.2d 880, 891 (3d Cir. 1975) (company's CEO and president was a controlling person where he ran the day-to-day business activities and had the power to influence company policies). Based on Plaintiffs' allegations, Shoals and Solon are also almost certainly "control people." Shoals and Solon owned large amounts of stock and almost certainly had the power to influence the Company's decision-making. See supra (III)(A)(2). At this stage, Plaintiffs have alleged enough to allow the § 20(a) claims to proceed against Whitaker and Tolnar and to allow the § 15 claims to proceed against Shoals and Solon.

## IV.    CONCLUSION

For the reasons stated herein, the Motion to Dismiss will be resolved as follows:

---

[10] Without additional allegations beyond an individual's title or responsibilities, the Court cannot infer that a CFO or an individual director has the "power to direct or cause the direction of the management and policies of" a company.

34

- Plaintiffs' § 10(b) Exchange Act claims may proceed against Shoals, Whitaker, Hubbard, Bardos, and Tolnar; however, the § 10(b) claim against Moss must be dismissed.

- Plaintiffs' § 11 Securities Act claims against Shoals, Bardos, Forth, Wilver, Daul, Volpe, Sundberg, Mills, Julian, J.P. Morgan Securities, Guggenheim Securities, Morgan Stanley, Goldman Sachs, Barclays, Credit Suisse, Cowen & Co., Oppenheimer & Co., Piper Sandler & Co., Roth Capital Partners, Johnson Rice & Co., and Northland Securities may proceed.

- Plaintiffs' § 12 Securities Act claims must be dismissed.

- Plaintiffs' § 20A insider trading claims against Shoals and Whitaker may proceed.

- Plaintiffs' §§ 15 and 20(a) claims against Hubbard, Bardos, Moss, and the Director Defendants must be dismissed; however, Plaintiffs' § 20(a) claims against Whitaker and Tolnar and § 15 claims against Shoals and Solon may proceed.

An appropriate order will issue.

_____
WAVERLY D. CRENSHAW, JR.
UNITED STATES DISTRICT JUDGE