UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| In re SHOALS TECHNOLOGIES GROUP, INC. SECURITIES LITIGATION | ) ) ) | Civil Action No. 3:24-cv-00334 |
| | ) | Judge Waverly D. Crenshaw, Jr. |
| This Document Relates To: All Actions | ) ) | Magistrate Judge Alistair Newbern |
| | ) ) | <u>CLASS ACTION</u> |
| | ) ) | <u>JURY DEMAND</u> |
| | ) | |

<u>**DEFENDANT SHOALS TECHNOLOGIES GROUP, INC.'S
AND THE SHOALS INDIVIDUAL DEFENDANTS'
ANSWER TO AMENDED CONSOLIDATED COMPLAINT**</u>

Defendants Shoals Technologies Group, Inc. ("Shoals" or the "Company"), Dominic Bardos, Jason R. Whitaker, Jeffrey Tolnar, Kevin Hubbard, Brad Forth, Peter Wilver, Ty Daul, Toni Volpe, Lori Sundberg, Jeannette Mills, Robert Julian, and Dean Solon[1] (the "Individual Defendants," and together with Shoals, "Defendants"), through their undersigned counsel, respectfully submit their Answer to the Amended Consolidated Complaint, filed by Lead Plaintiff Erste Asset Management GmbH ("Erste AM") and plaintiff Kissimmee Utility Authority Employees' Retirement Plan ("KUAERP") (collectively, "Plaintiffs"), on February 4, 2025. All references to "Defendants" refer only to those Defendants who remain in the case for the particular claims at issue in Plaintiffs' specific allegations. *See* Dkt. 100 at 34-35 (identifying the claims that may proceed against which Defendants). For example, to the extent the allegations pertain to Plaintiffs' claims other than the Section 15 claim, "Defendants" does not include Defendant Solon.

Defendants deny that they violated the federal securities laws. They deny that they made any false or misleading statements, that they caused Plaintiffs any recoverable damages, and that they acted negligently or with the requisite fraudulent intent. Defendants also deny that they controlled any person who violated the federal securities laws. In sum, Defendants deny any and every allegation that suggests or implies that any public statement was false or misleading or they otherwise engaged in improper or illegal conduct. Accordingly, Plaintiffs are not entitled to any relief for any of the claims they assert.

More specifically, Defendants deny all allegations in the Amended Consolidated Complaint except as specifically admitted herein, and any factual averment admitted herein is admitted only to the specific fact alleged and not as to any conclusions, characterizations,

---

[1] Defendant Dean Solon is only a Defendant to the extent Plaintiffs allege he violated Section 15 of the 1933 Act.

1

implications, innuendos, or speculation contained in any averment or in the Amended Consolidated Complaint as a whole. Moreover, except to the extent expressly admitted herein, Defendants specifically deny all allegations contained in the Amended Consolidated Complaint's headings, footnotes, appendices, table of contents, table of abbreviations, or images. Unless otherwise defined, capitalized terms refer to the capitalized terms defined in the Amended Consolidated Complaint, but any such use is not an acknowledgement or admission of any characterization Plaintiffs may ascribe to the capitalized terms. With respect to any purported document cited to or quoted in the Amended Consolidated Complaint, Defendants do not admit that the documents are relevant or admissible in this action, and Defendants reserve all objections regarding admissibility. The Amended Consolidated Complaint contains purported excerpts from, and references to, a number of documents and third-party publications, and Defendants refer to the respective documents and third-party publications for their contents.

Defendants' allegations are made upon information and belief and may change subject to further investigation. Defendants expressly reserve the right to amend their Answer, or seek leave to amend their Answer, and to modify and/or assert all claims, defenses, counterclaims, and third-party claims permitted by law.

### Plaintiffs' Preamble

Lead Plaintiff Erste Asset Management GmbH ("Erste AM") and plaintiff Kissimmee Utility Authority Employees' Retirement Plan ("KUAERP") (collectively, "Plaintiffs"), on behalf of themselves and all others similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' amended consolidated complaint against defendants, allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiffs' attorneys, which included,

among other things, a review of certain United States Securities & Exchange Commission ("SEC") filings by Shoals Technologies Group, Inc. ("Shoals" or the "Company"), Company press releases and earning calls, court filings in related litigation, and analyst and media reports about the Company.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations and deny them on that basis.

## I.     INTRODUCTION

1.     This is a securities class action brought on behalf of purchasers of Shoals' Common Stock between May 16, 2022 and May 7, 2024, inclusive (the "Class Period"), including those purchasers of Shoals Common Stock directly in the Company's December 2022 secondary public offering (the "December 2022 SPO"), seeking to pursue remedies under §§10(b), 20(a), and 20A of the Securities Exchange Act of 1934 (the "1934 Act") and §§11, 12(a)(2), and 15 of the Securities Act of 1933 (the "1933 Act") against Shoals, certain of the Company's senior officers and directors, and the underwriters for the December 2022 SPO.

**ANSWER:**  Defendants admit that Plaintiffs purport to bring a securities class action on behalf of all persons who purportedly purchased or otherwise acquired Shoals Common Stock between May 16, 2022 and May 7, 2024, including those who purchased Shoals Common Stock in the Company's December 2022 secondary public offering.  Defendants further admit that Plaintiffs seek to bring claims under Sections 10(b), 20(a), and 20A of the 1934 Act and Sections 11, 12(a)(2), and 15 of the 1933 Act against Shoals, certain of the Company's senior officers and directors, and underwriters for the December 2022 SPO.  Except as expressly admitted, Defendants deny the remaining allegations.

2.     The 1933 Act protects investors and the United States capital markets by preventing companies and their officers, directors, and underwriters from issuing shares to investors by means

of incomplete and inaccurate offering documents. To accomplish this, the 1933 Act imposes an exacting duty on those participating in public securities offerings – here, Shoals' December 2022 SPO – to disclose material facts in a complete and accurate manner. These duties come from the 1933 Act itself and from the regulations of the SEC, including Item 303 of SEC Regulation S-K (17 C.F.R. §229.303(b)(2)(ii)), and Item 105 of SEC Regulation S-K (17 C.F.R. §229.105).

**ANSWER:** The allegations in this paragraph set forth legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations.

3. Here, Plaintiffs allege that the SPO Registration Statement and the prospectus through which Shoals accomplished the December 2022 SPO ("December 2022 SPO Prospectus") (collectively the "SPO Offering Materials," discussed further below) violated the disclosure requirements imposed by the 1933 Act by inadequately disclosing, or failing to disclose at all, adverse facts regarding how: (i) Shoals had used wiring in a substantial portion of its wire harnesses which, when installed, exhibited excessive "shrinkback" whereby the insulating material surrounding wires at connection points contracted, leaving live wires exposed and creating serious risks of fire, injury, or death to Shoals' customers; (ii) as a result, Shoals was liable for millions of dollars in undisclosed warranty remediation costs, which have continued to escalate, but which the Company has recently estimated will cost it at least $73 million and as much as $160 million; and (iii) consequently, Shoals' business, finances, operations, and reputation have suffered substantial harm and disruption, materially impairing the Company's ability to compete, and resulting in loss of market share, and a substantial and steady decline in the price of its Common Stock.

**ANSWER:** Defendants deny the allegations.

4. Defendants' failure to disclose the adverse facts detailed herein enabled Shoals and its founder and former Chief Executive Officer ("CEO"), defendant Dean Solon ("Solon"), to accomplish two SPOs (one in December 2022 and one in March 2023), which together raised over

4

$1 billion in proceeds by selling 54.4 million shares of Shoals Common Stock ("Common Stock"). The SPOs also generated more than $31 million in underwriting fees for the Underwriter Defendants.

**ANSWER:** With regard to the second sentence in this paragraph, Defendants admit that on December 5, 2022, Shoals filed with the SEC a prospectus supplement on Form 424B5 and that on March 7, 2023, Shoals filed with the SEC a Preliminary Prospectus Supplement to the November 30, 2022 Prospectus, which are publicly available and which disclosed the commissions for the Underwriter Defendants. Defendants refer to the prospectus supplements for their complete contents. Except as expressly admitted, Defendants deny the remaining allegations.

5. The 1934 Act protects investors by prohibiting fraudulent, material misstatements in connection with the sale or purchase of securities. Here, Plaintiffs allege that the 1934 Act Individual Defendants (defined below) knowingly or at least recklessly misled Shoals' public investors (including Plaintiffs and the Class (defined below)) through materially false and misleading statements published in the Company's SEC filings, spoken by the 1934 Act Individual Defendants (defined below) during quarterly earnings calls, and made in Company presentations that the 1934 Act Individual Defendants discussed and presented to investors during the Company's quarterly earnings calls. Shoals' financial statements were also misleading because they violated the generally accepted accounting principles ("GAAP") adopted by the SEC – including GAAP Accounting Standards Codification ("ASC") 450 and 460 – by failing to follow GAAP's rules for incurring and reporting a loss contingency – *i.e.*, Shoals' warranty liabilities related to its defective products – despite that liability being both probable and reasonably estimable.

5

**ANSWER:** With regard to the first sentence in this paragraph, the allegations set forth legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations. Except as expressly admitted, Defendants deny the remaining allegations.

6. While during the Class Period defendants Solon, Shoals, and Jason R. Whitaker ("Whitaker") were able to unload over $1 billion, $42 million, and $14 million, respectively, of their own shares of Shoals Common Stock at favorable prices, Plaintiffs and other Class members who purchased Shoals shares at inflated prices – including investors who purchased shares in the December 2022 SPO – have suffered hundreds of millions of dollars of harm as the truth about, and impact associated with, Shoals' defective products, warranty liability, loss of reputation, and competitive harms have entered the market.

**ANSWER:** Defendants deny the allegations.

7. This action seeks to recover for such losses.

**ANSWER:** Defendants admit that Plaintiffs purport to bring a securities class action to recover for alleged losses. Except as expressly admitted, Defendants deny the remaining allegations.

## II. JURISDICTION AND VENUE

8. The claims asserted herein arise under and pursuant to §§10(b), 20(a), and 20A of the 1934 Act (15 U.S.C. §§78j(b), 78t(a), and 78t-1), SEC Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5), and §§11, 12(a)(2), and 15 of the 1933 Act (15 U.S.C. §§77k, 77l(a)(2), and 77o).

**ANSWER:** Defendants admit that the Amended Consolidated Complaint purports to assert claims arising under Sections 10(b), 20(a), and 20A of the 1934 Act, SEC Rule 10b-5 promulgated thereunder, and Sections 11, 12(a)(2), and 15 of the 1933 Act. Except as expressly admitted, Defendants deny the remaining allegations.

6

9.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act (15 U.S.C. §78aa) and §22 of the 1933 Act (15 U.S.C. §77v).

**ANSWER:** Defendants admit the allegations.

10.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b) and §27 of the 1933 Act (15 U.S.C. §78aa). A substantial amount of the acts and omissions giving rise to the claims at issue occurred in this District. Shoals' corporate headquarters is located in this District and defendants are subject to personal jurisdiction in this District.

**ANSWER:** Defendants admit that venue is proper in this District pursuant to 28 U.S.C. §1391(b) and §27 of the 1933 Act, and that the Company's headquarters are located in this District at 1400 Shoals Way, Portland, TN 37148.  Defendants do not dispute personal jurisdiction in this matter. Except as expressly admitted, Defendants deny the remaining allegations.

11.     In connection with the acts and omissions alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the National Association of Security Dealers Automated Quotations Global Market ("NASDAQ").

**ANSWER:** Defendants deny the allegations.

### III.     PARTIES

#### A.     Plaintiffs

12.     Lead Plaintiff Erste AM is an Austrian asset management company with billions of Euros of assets under management. Erste AM purchased Shoals publicly traded Common Stock during the Class Period and has been damaged thereby, as set forth in its certification filed on May 21, 2024. *See* ECF 23-4; ECF 23-5. Additionally, as alleged below in Count III, Erste AM

purchased Shoals Common Stock at artificially inflated prices contemporaneously with defendant Whitaker – Shoals' CEO during part of the Class Period – and Shoals.

**ANSWER:** With regard to the first sentence in this paragraph, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations and deny them on that basis. With regard to the second sentence in this paragraph, Defendants admit that Lead Plaintiff Erste AM filed a Certification on May 21, 2024 (Dkt. No. 23-4; 23-5) that purports to reflect records of purchases of Shoals Common Stock by Lead Plaintiff's funds, but Defendants lack knowledge or information sufficient to form a belief as to the veracity of those records, and on that basis deny the allegations. Except as expressly admitted, Defendants deny the remaining allegations.

13.     Plaintiff KUAERP provides benefits for full-time employees of the Kissimmee Utility Authority and their eligible beneficiaries. KUAERP manages over $130 million in assets on behalf of over 500 plan participants. KUAERP purchased Shoals publicly traded Common Stock during the Class Period, including directly in the December 2022 SPO, and has been damaged thereby, as set forth in its certification filed in *Kissimee Utility Authority Employees' Retirement Plan v. Shoals Technologies Group, Inc., et al.*, No. 3:24-cv-00598 (M.D. Tenn.) (the "*Kissimee Action*") on May 13, 2024. See *Kissimee* Action, ECF 1 at 47.[2] Additionally, as alleged below in Count III, KUAERP purchased Shoals Common Stock at artificially inflated prices contemporaneously with defendants Whitaker and Shoals.

**ANSWER:** With regard to the first and second sentences in this paragraph, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations and deny them on that basis. Defendants further deny that KUAERP purchased Shoals Common Stock

---

[2] The *Kissimee* Action was consolidated with the above-entitled litigation on May 24, 2024. *See Kissimee* Action, ECF 16.

directly in the December 2022 SPO. With regard to the third sentence in this paragraph, Defendants admit that KUAERP filed a certification in *Kissimmee Utility Authority Employees' Retirement Plan v. Shoals Technologies Group, Inc., et al.*, No. 3:24-cv-00598 (M.D. Tenn.) on May 13, 2024 (Dkt. 1 at 47) that purports to reflect records of purchases of Shoals Common Stock by Plaintiff, but Defendants lack knowledge or information sufficient to form a belief as to the veracity of those records, and on that basis deny the allegations in the third sentence. With regard to footnote 2, Defendants admit the allegations. Except as expressly admitted, Defendants deny the remaining allegations.

### B. 1934 Act Defendants

14. Defendant Shoals is a provider of electrical balance of systems ("EBOS") solutions used in solar, storage, and electrical vehicle ("EV") charging infrastructure. The Company is headquartered in Portland, Tennessee. Shoals Common Stock is listed on the NASDAQ under the ticker symbol "SHLS."

**ANSWER:** Defendants admit the allegations.

15. Defendant Whitaker began working at Shoals in October 2009 as the Company's Chief Technology Officer ("CTO"), then eventually was promoted to the position of CTO and President in September 2017, and finally, in January 2020, ascended to the role of Shoals' CEO, until announcing his resignation in December 2022 before formally stepping down in March 2023.[3] Defendant Whitaker also served as a member of Shoals' Board of Directors (the "Board") from January 2021 until March 2023. According to Shoals' 2021 Proxy Statements (filed with the SEC on March 22, 2022 on Schedule 14A), the Company touted "Whitaker's extensive senior

---

[3] As some analysts noted, announcement of Whitaker's departure was "unexpected[]," "relatively fast," and "sudden," coming approximately seven months after the resignation of the Company's Chief Financial Officer ("CFO"), Philip Garton.

9

leadership experience and ***comprehensive knowledge of our business and perspective of our day-to-day operations***" as to what qualified him to serve as a director of Shoals' Board. As the Company's CEO, defendant Whitaker represented Shoals on numerous earnings conference calls with analysts and investors, wherein he discussed the Company's quarterly and yearly financial results and responded to analyst questions – as well as sitting down for interviews and/or question-and-answer sessions like he did with the firms Guggenheim, Roth Capital Partners, and Cowen in 2022. As detailed below, Whitaker made several materially misleading statements and omissions to investors during quarterly conference calls and also signed Shoals' quarterly and yearly financial statements for 1Q22 through 4Q22 and FY22 (including the SPO Offering Materials) and signed the SPO Registration Statement (defined below), alleged to have contained and/or incorporated material misrepresentations in violation of GAAP and federally required disclosure obligations.[4] Moreover, between August 18, 2022 and March 14, 2023, while in the possession of nonpublic, material information about the shrinkback problems described more fully below – defendant Whitaker dumped over 565,000 shares of Shoals Common Stock (more than 33% of his entire holdings) for gross proceeds totaling more than $14.4 million.

**ANSWER:**  With regard to the first sentence in this paragraph, Defendants admit that Whitaker began working at Shoals in October 2009 as the Company's CTO and was promoted to the position of CTO and President in September 2017.  Defendants further admit that Whitaker became the Company's CEO in January 2020 and aver that Whitaker announced his medical retirement in November 2022 and formally stepped down as CEO in March 2023.  With regard to footnote 3, Defendants lack knowledge or information sufficient to form a belief as to the truth of the

---

[4] As used herein, "FY" means the Company's fiscal year and "Q" means the Company's fiscal quarter.

allegations regarding statements purportedly made by "some analysts" and deny the allegations on that basis. With regard to the second sentence in this paragraph, Defendants admit that Whitaker served on the Company's Board from January 2021 until March 2023. With regard to the third sentence in this paragraph, Defendants admit that Shoals filed with the SEC a Proxy Statement on March 22, 2022, which is publicly available and contains the language quoted in this paragraph. Defendants refer to the Proxy Statement for its complete contents. With regard to the fourth sentence in this paragraph, Defendants admit that Whitaker spoke on various Shoals earnings calls during his time as CEO. With regard to footnote 4, Defendants admit that Plaintiffs purport to refer to the Company's fiscal year as "FY" and the Company's fiscal quarter as "Q." Except as expressly admitted, Defendants deny the remaining allegations.

16.   Defendant Kevin Hubbard ("Hubbard") served as Shoals' Interim CFO from May 2022 until October 2022. Prior to his role as Interim CFO, Hubbard served as Shoals' outside financial reporting consultant, was a former partner at BDO USA, LLP ("BDO"), and was BDO's Natural Resources Practice Leader. Defendant Hubbard is a member of the American Institute of Certified Public Accountants and the Texas Society of Certified Public Accountants, and has a Bachelor's degree in Accounting from the University of Houston – Clear Lake.[5] As detailed below,

---

[5] According to the website of the firm at which defendant Hubbard is now a partner since leaving Shoals (where he previously served as an outside consultant for the Company), defendant Hubbard:

> [H]as over 20 years of public accounting experience servicing both public and privately held companies. His clients rely on him as a trusted business advisor for a wide range of financial matters including assisting with initial public offerings, secondary offerings, and private placement of debt and equity.
>
> . . . He has extensive knowledge of exploration and production (E&P), oilfield service and equipment, and terminal and pipeline companies. [Hubbard's] industry experience also includes manufacturing and distribution, and private equity.

defendant Hubbard appeared on quarterly conference calls with defendant Whitaker where the latter made materially misleading statements and omissions to investors. Defendant Hubbard also signed Shoals' quarterly financial statements for 1Q22 and 2Q22, alleged to have contained material misrepresentations in violation of GAAP and federally required disclosure obligations. As the Company's interim CFO, defendant Hubbard also represented Shoals in question-and-answer sessions with analysts from Roth Capital Partners in 2022.

**ANSWER:** With regard to the first sentence in this paragraph, Defendants admit that Hubbard served as Shoals' Interim CFO from May 2022 until October 2022. With regard to the second sentence in this paragraph, Defendants admit that prior to his role as the Company's Interim CFO, Hubbard served as Shoals' outside financial reporting consultant, was a former partner at BDO, and was BDO's Natural Resources Practice Leader. With regard to the third sentence in this paragraph, Defendants admit that Hubbard is a member of the American Institute of Certified Public Accountants and the Texas Society of Certified Public Accountants, and has a Bachelor's degree in Accounting from the University of Houston – Clear Lake. With regard to footnote 5, Defendants admit that the website for Ham, Langston & Brezina, LLP is publicly available and contains the language quoted in this paragraph. Defendants refer to the website for its complete contents. With regard to the sixth sentence in this paragraph, Defendants aver that the phrase "question-and-answer sessions with analysts from Roth Capital Partners in 2022" is vague and ambiguous and deny the allegations on that basis. Except as expressly admitted, Defendants deny the remaining allegations.

17. Defendant Dominic Bardos ("Bardos") has served as Shoals' CFO since October 2022. According to Shoals' website, defendant Bardos joined the Company with "over 30 years of global finance and accounting experience across multiple industries," experience that "also

includes leadership positions in financial planning & analysis, strategic sourcing, supply chain, and customer service operations in large organizations." Defendant Bardos has an M.B.A. in Finance and a Bachelor's degree in Management from the University of Memphis, Fogelman College of Business & Economics. As detailed below, defendant Bardos appeared on quarterly conference calls with other Shoals C-suite executives who are named defendants herein, where both they and he made materially misleading statements and omissions to investors. Defendant Bardos also signed Shoals' quarterly and yearly financial statements for 3Q22 and FY22, in addition to Shoals' quarterly and yearly financial statements for FY23 (including the SPO Offering Materials).

**ANSWER:** With regard to the first sentence in this paragraph, Defendants admit that Bardos has served as Shoals' CFO since October 2022. With regard to the second sentence in this paragraph, Defendants admit that Shoals' website is publicly available and contains the language quoted in this paragraph. With regard to the third sentence in this paragraph, Defendants admit that Bardos has an M.B.A. in Finance and a Bachelor's degree in Management from the University of Memphis, Fogelman College of Business & Economics. With regard to the fifth sentence in this paragraph, Defendants admit that Bardos signed Shoals' Form 10-Q for the quarter ended September 30, 2022, filed with the SEC on November 14, 2022; Shoals' Form 10-K for the year ended December 31, 2022, filed with the SEC on February 28, 2023; and Shoals' Form 10-K for the year ended December 31, 2023, filed with the SEC on February 28, 2024. Except as expressly admitted, Defendants deny the remaining allegations.

18.     Defendant Jeffery Tolnar ("Tolnar") served as Shoals' Interim CEO from March 2023 until July 2023, and has served as the Company's President since December 2022. Defendant Tolnar holds a Bachelors in Electrical Engineering Technology from Youngstown State University

and an M.B.A. from Baker University. According to the Shoals' website, "[i]n this role, [Tolnar] and his team are responsible for company growth, operational excellence, technology development and product innovation." As the Company's Interim CEO, defendant Tolnar represented Shoals on numerous earnings conference calls with analysts and investors, wherein he discussed the Company's quarterly and yearly financial results and responded to analyst questions – as well as sitting down for interviews and/or question-and-answer sessions like he did with analysts from Cowen and Roth Capital Partners in 2022 and 2023. As detailed below, during those quarterly conference calls, defendant Tolnar and other Shoals C-suite executives who are named defendants herein made materially misleading statements and omissions to investors. Defendant Tolnar also signed Shoals' quarterly financial statements for 1Q23.

**ANSWER:**  With regard to the first sentence in this paragraph, Defendants admit that Tolnar served as Shoals' Interim CEO from March 2023 until July 2023, and has served as the Company's President since December 2022.  With regard to the second sentence in this paragraph, Defendants admit that Tolnar holds a Bachelor's in Electrical Engineering Technology from Youngstown State University and an M.B.A. from Baker University.  With regard to the third sentence in this paragraph, Defendants admit that Shoals' website is publicly available and contains the language quoted in this paragraph.  With regard to the fourth sentence in this paragraph, Defendants admit that Tolnar spoke on various Shoals earnings calls as Interim CEO.  Defendants aver that the phrase "sitting down for interviews and/or question-and-answer sessions like he did with analysts from Cowen and Roth Capital Partners in 2022 and 2023" is vague and ambiguous and deny the allegations on that basis.  With regard to the sixth sentence in this paragraph, Defendants admit that Tolnar signed Shoals' Form 10-Q for the quarter ended March 30, 2023, filed with the SEC on May 8, 2023.  Except as expressly admitted, Defendants deny the remaining allegations.

14

19.     Defendant Brandon Moss ("Moss") has served as Shoals' CEO since July 2023. According to the Shoals' website, defendant Moss "has over 20 years' experience in the electrical industry" and prior to his role with Shoals, "most recently served as Group President at Southwire Company, a global leader in wire and cable manufacturing." The website also touts that throughout his career, defendant Moss "has demonstrated success in developing corporate strategy, managing autonomous business units, business development, M&A and has led global manufacturing and supply chains." Defendant Moss has an M.B.A. from Wake Forest University and a Bachelor's degree in Marketing from Miami University. As the Company's CEO, defendant Moss represented Shoals on numerous earnings conference calls with analysts and investors, wherein he discussed the Company's quarterly and yearly financial results and responded to analyst questions – as well as sitting down for interviews and/or question-and-answer sessions like he did with analysts from Morgan Stanley, Roth Capital Partners, and Guggenheim in 2023 and 2024. As detailed below, during those quarterly conference calls, defendant Moss and other Shoals C-suite executives who are named defendants herein made materially misleading statements and omissions to investors. Defendant Moss also signed Shoals' quarterly financial statements for 2Q23, 3Q23, and FY23.

**ANSWER:**  Defendant Moss was dismissed as a Defendant in the Court's September 30, 2025 Order Granting in Part and Denying in Part Defendants' Motion to Dismiss.  For that reason, no response is required for the allegations in this paragraph.  To the extent there are any remaining allegations, Defendants deny them.

20.     Defendants referenced above in §III.B. are referred to herein as the "1934 Act Individual Defendants." Each of the 1934 Act Individual Defendants was directly involved in the management and day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations,

15

services, products, and present and future business prospects during the time of their employment with the Company. In addition, the 1934 Act Individual Defendants were involved in drafting, producing, reviewing, and disseminating the misleading statements and information alleged herein, were aware of, or recklessly disregarded, the misleading statements being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws. Finally, each 1934 Act Individual Defendant was provided with copies of the documents alleged herein to be misleading before or shortly after their issuance (*e.g.*, Company press releases and SEC filings), participated in conference calls with investors during which misleading statements were made, and had the ability and opportunity to prevent their issuance or cause them to be corrected.

**ANSWER:** With regard to the first sentence in this paragraph, Defendants admit that Plaintiffs purport to characterize the Defendants in Section III.B as the "1934 Act Individual Defendants." Except as expressly admitted, Defendants deny the remaining allegations.

21. The 1934 Act Individual Defendants, together with Shoals, are referred to herein as the "1934 Act Defendants."

**ANSWER:** Defendants admit that Plaintiffs purport to refer to the 1934 Act Individual Defendants together with Shoals as the "1934 Act Defendants." Except as expressly admitted, Defendants deny the remaining allegations.

C. **1934 & 1933 Acts Defendants**

22. The only defendants alleged to have violated both the 1934 Act and 1933 Act are defendants Shoals, Whitaker, and Bardos. Defendants Whitaker and Bardos signed the SPO Registration Statement and solicited investors for the December 2022 SPO and otherwise participated in the December 2022 SPO for their own financial benefit and/or the financial benefit of Shoals.

**ANSWER:** Defendants admit that Plaintiffs purport to bring claims under both the 1934 Act and 1933 Act against Shoals, Whitaker, and Bardos. Except as expressly admitted, Defendants deny the remaining allegations.

    **D.**     **1933 Act Defendants**

23.     Defendant Brad Forth ("Forth") served as Chairman of the Company at the time of the December 2022 SPO.

**ANSWER:** Defendants admit the allegations.

24.     Defendant Peter Wilver ("Wilver") served as a director of the Company at the time of the December 2022 SPO.

**ANSWER:** Defendants admit the allegations.

25.     Defendant Ty Daul ("Daul") served as a director of the Company at the time of the December 2022 SPO.

**ANSWER:** Defendants admit the allegations.

26.     Defendant Toni Volpe ("Volpe") served as a director of the Company at the time of the December 2022 SPO.

**ANSWER:** Defendants admit the allegations.

27.     Defendant Lori Sundberg ("Sundberg") served as a director of the Company at the time of the December 2022 SPO.

**ANSWER:** Defendants admit the allegations.

28.     Defendant Jeannette Mills ("Mills") served as a director of the Company at the time of the December 2022 SPO.

**ANSWER:** Defendants admit the allegations.

29.     Defendant Robert Julian ("Julian") served as a director of the Company at the time of the December 2022 SPO.

**ANSWER:** Defendants admit the allegations.

30. Defendants referenced above in ¶¶23-29, along with defendant Whitaker, are collectively referred to herein as the "Director Defendants."

**ANSWER:** Defendants admit that Plaintiffs purport to refer to the defendants referenced in Paragraphs 23-29, along with Whitaker, as the "Director Defendants." Except as expressly admitted, Defendants deny the remaining allegations.

31. Defendant Solon founded Shoals in 1996 and served as the Company's CEO and President from November 1996 until December 2019. Thereafter, Solon served as a director of the Company until February 2022. Defendant Solon was a controlling shareholder of the Company during the Class Period and prior to the December 2022 SPO, Solon owned nearly 34% of the combined voting power of Shoals stock. Solon was also party to a Stockholders Agreement, which gave him the right to nominate a director to Shoals' Board. Solon had control over the Company by way of share ownership and ability to nominate a director. Solon had control over the December 2022 SPO as the vast majority of the shares being offered in the December 2022 and March 2023 SPOs were Solon's shares. In both of the SPOs, Solon, ***sold over 52 million shares of Shoals Common Stock for more than $1 billion in gross offering proceeds***.

**ANSWER:** With regard to the first sentence in this paragraph, Defendants admit that Solon founded Shoals in 1996 and served as the Company's CEO and President from November 1996 until December 2019. With regard to the second sentence in this paragraph, Defendants admit that Solon served as a director of the Company until February 2022. With regard to the fourth sentence in this paragraph, Defendants admit that Solon was a party to a Stockholders Agreement under which Solon had the right to nominate a director to Shoals' Board. Except as expressly admitted, Defendants deny the remaining allegations.

32.     The following defendants served as underwriters in the December 2022 SPO, in which they participated in the offer and sale of Shoals' Common Stock to the investing public:

| Underwriter | Number of Shares |
|---|---|
| December 2022 SPO | |
| J.P. Morgan Securities LLC | 7,770,000 |
| Guggenheim Securities, LLC | 7,350,000 |
| Morgan Stanley & Co. LLC | 3,640,000 |
| UBS Securities LLC | 2,240,000 |
| Goldman Sachs & Co. LLC | 1,600,000 |
| Barclays Capital Inc. | 800,000 |
| Credit Suisse Securities (USA) LLC | 800,000 |
| Cowen and Company, LLC | 400,000 |
| Oppenheimer & Co. Inc. | 400,000 |
| Piper Sandler & Co. | 400,000 |
| Roth Capital Partners, LLC | 400,000 |
| Johnson Rice & Company L.L.C. | 100,000 |
| Northland Securities, Inc. | 100,000 |

**ANSWER:** Defendants admit that on November 30, 2022, Shoals filed with the SEC a registration statement on Form S-3, and that on December 5, 2022, Shoals filed with the SEC a prospectus supplement on Form 424B5, which are publicly available and which disclosed the Underwriter Defendants' roles in the December 2022 SPO. Defendants refer to the registration statement and prospectus supplement for their complete contents. Except as expressly admitted, Defendants deny the remaining allegations.

33.     Defendants J.P. Morgan Securities LLC, Guggenheim Securities, LLC, Morgan Stanley & Co. LLC, UBS Securities LLC, Goldman Sachs & Co. LLC, Barclays Capital Inc., Credit Suisse Securities (USA) LLC, Cowen and Company, LLC, Oppenheimer & Co. Inc., Piper Sandler & Co., Roth Capital Partners, LLC, Johnson Rice & Company L.L.C., and Northland Securities, Inc. (collectively referred to herein as the "Underwriter Defendants"), are all investment banking houses with operations in the United States. Each of the Underwriter Defendants served as underwriters for the December 2022 SPO. The Underwriter Defendants purported to conduct a

due diligence investigation in connection with the SPOs and gained access to information regarding the Company, its business, operations, financial results, and prospects. The Underwriter Defendants solicited investors and participated in the sale and offering of Shoals Common Stock in the December 2022 SPO and otherwise participated in the December 2022 SPO for their own financial benefit, sharing over $23 million in underwriting discounts and commissions for the December 2022 SPO, which included a full exercise of the underwriters' overallotment option.

**ANSWER:**  With regard to the first sentence in this paragraph, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations and deny them on that basis. With regard to the second sentence in this paragraph, Defendants admit that on November 30, 2022, Shoals filed with the SEC a registration statement on Form S-3, and that on December 5, 2022, Shoals filed with the SEC a prospectus supplement on Form 424B5, which are publicly available and which disclosed the Underwriter Defendants' roles in the December 2022 SPO. Defendants refer to the registration statement and prospectus supplement for their complete contents.  With regard to the third and fourth sentences in this paragraph, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations and deny them on that basis.  Except as expressly admitted, Defendants deny the remaining allegations.

34.     Solon, the Director Defendants (referenced above in ¶¶23-30), and the Underwriter Defendants (referenced above in ¶¶32-33), are collectively referred to herein as the "1933 Act Defendants."[6] Plaintiffs do not allege that the 1933 Act Defendants acted fraudulently (i.e., knowingly or recklessly). Instead, Plaintiffs' 1933 Act claims *against these specific defendants*, which are based solely on strict liability and sound in negligence, allege that these defendants

---

[6] Plaintiffs only allege that Solon violated §15 of the 1933 Act. So to the extent that defendant Solon is included in the definition of the 1933 Act Defendants, it is only regarding his violation of §15.

acted, at most, negligently by failing to conduct adequate due diligence when signing the SPO Offering Materials and underwriting the December 2022 SPO.

**ANSWER:** With regard to the first sentence in this paragraph, Defendants admit that Plaintiffs purport to refer to Solon, the Director Defendants, and the Underwriter Defendants collectively as the "1933 Act Defendants." With regard to footnote 6, Defendants admit that Plaintiffs only allege that Solon violated Section 15 of the 1933 Act. Except as expressly admitted, Defendants deny the remaining allegations.

35. The Director Defendants and defendant Bardos signed the SPO Registration Statement and solicited investors for the December 2022 SPO and otherwise participated in the December 2022 SPO for their own financial benefit and/or the financial benefit of Shoals and Solon.

**ANSWER:** Defendants admit that the Director Defendants and Bardos signed the November 30, 2022 registration statement. Except as expressly admitted, Defendants deny the remaining allegations.

## IV. SHOALS' SCHEME AND COURSE OF CONDUCT

36. Founded in 1996, Shoals is a provider of EBOS solutions and components for solar, battery storage, and EV charging applications. Shoals' EBOS provides components necessary for the transfer of electrical power produced by solar panels to intermediate locations within a solar project and ultimately to the power grid. Shoals employs a proprietary EBOS system, which it dubs a "combine-as-you-go" solution, that the Company claims offers "several advantages" over conventional EBOS systems using "homerun" wiring architecture. In contrast to conventional EBOS systems, Shoals' combine-as-you-go solution uses specialized wire harnesses to connect multiple strings of solar panels to Shoals' proprietary above-ground feeder cable known as a "Big Lead Assembly" ("BLA"). The BLA is Shoals' core combine-as-you-go product.

21

**ANSWER:** Defendants admit the allegations.

37. Shoals claims that its proprietary wire system requires fewer wires and wire connections than other offerings and eliminates altogether the need for other materials utilized in homerun wiring architecture, which the Company states results in lower labor and material costs. Of particular importance to investors, Shoals asserted that BLA reduces the installation costs for solar energy projects by 43%, which represents approximately 29% of total installation costs. And, according to Shoals, unlike homerun wiring architecture, which requires specialized and expensive laborers, BLA "can be installed by anyone." In addition, Shoals purports that its proprietary solutions have greater reliability and lower maintenance costs than conventional EBOS systems. All of these features, according to Shoals, provided the Company with a competitive advantage, driving its growth and increasing its market share.

**ANSWER:** Defendants aver that the paragraph purports to summarize statements made by Shoals without specifying when or how the statements were made. Defendants thus lack information sufficient to form a belief as to the truth of the allegations and deny them on that basis. Except as expressly admitted, Defendants deny the remaining allegations.

38. Shoals generates the majority of its revenue from the sale of "system solutions," which are complete EBOS systems that employ several of the Company's EBOS components. Shoals also generates revenue from the sale of individual EBOS components, as well as other components used for battery storage and EV charging applications. In FY22, Shoals derived approximately 88% and 22% of its revenue from the sale of system solutions and from the sale of components, respectively. During the Class Period, Shoals' combine-as-you-go system solutions carried higher margins than its other products and was therefore the most profitable source of revenue for the Company.

**ANSWER:** With regard to the first sentence in this paragraph, Defendants admit that Shoals derives the majority of its revenue from selling "system solutions," which are complete EBOS systems that include several of Shoals' products. With regard to the second sentence in this paragraph, Defendants admit that Shoals generates revenue from the sale of individual EBOS components, battery storage components, and EV charging applications. With regard to the third sentence in this paragraph, Defendants admit the allegations. With regard to the fourth sentence in this paragraph, Defendants admit that Shoals' combine-as-you-go system solutions carry higher margins than its other products. Except as expressly admitted, Defendants deny the remaining allegations.

39. Shoals provides investors with measures of client demand and anticipated future business through two operational metrics: (i) backlog; and (ii) awarded orders. The Company defines "backlog" as "signed purchase orders or contractual minimum purchase commitments with take-or-pay provisions." "Awarded orders" is defined as orders that Shoals is in the "process of documenting a contract but for which a contract has not yet been signed." Shoals often reports its backlog and awarded orders through a single monetary figure representing the total sum of future expected revenue. Accordingly, Shoals' backlog and awarded orders are each important indicators of the Company's future financial, operational, and business performance.

**ANSWER:** With regard to the first sentence in this paragraph, Defendants admit that Shoals provides investors with the metrics of its backlog and awarded orders for a certain period. With regard to the second and third sentences in this paragraph, Defendants aver that the paragraph purports to quote statements made by Shoals without specifying when or how the statement was made. Defendants thus lack information sufficient to form a belief as to the truth of the allegations and deny them on that basis. With regard to the fourth sentence in this paragraph, Defendants aver

that the phrases "often" and "single monetary figure" are vague and ambiguous and deny the allegations on that basis. With regard to the fifth sentence in this paragraph, Defendants aver that the phrases "important indicators" and "future financial, operational, and business performance" are vague and ambiguous and deny the allegations on that basis. Except as expressly admitted, Defendants deny the remaining allegations.

40. Shoals offers its customers an assurance type warranty that protects against manufacturer defects. The Company purported to account for warranty liabilities by recording a reserve provision for estimated future costs related to warranty remediation expenses. Since Shoals' initial public offering in January 2021, until the revelations detailed herein, the Company recorded only modest amounts in warranty-related reserves. For example, for FY21 and FY22, Shoals' estimated accrued warranty reserve was $100,000 and $600,000, respectively.

**ANSWER:** With regard to the first sentence in this paragraph, Defendants admit that Shoals offers customers an assurance type warranty that protects against manufacturer defects and does not contain a service element. With regard to the second sentence in this paragraph, Defendants aver that Shoals records a provision for estimated future costs related to warranty expense when they are probable and reasonably estimable. With regard to the third sentence in this paragraph, Defendants aver that the phrases "revelations" and "modest amounts" are vague and ambiguous and deny the allegations on that basis. With regard to the fourth sentence in this paragraph, Defendants admit that Shoals disclosed that its estimated accrued warranty reserve was $100,000 as of December 31, 2021, and $600,000 as of December 31, 2022. Except as expressly admitted, Defendants deny the remaining allegations.

41. Throughout the Class Period, the 1934 Act Defendants emphasized to investors the purported "quality," "reliability," and "safety" of Shoals' EBOS products and claimed these

purported advantages were critical to the Company's ability to generate business. For example, speaking during an August 2022 conference call, defendant Whitaker emphasized the "performance, quality, reliability, [and] installation savings" of Shoals' offerings and represented that these benefits served as a launch pad for the Company's "long-term" relationships with its clients, stating in pertinent part as follows:

> Components revenue increased 97% year-over-year, driven by increases in shipments of battery storage products as well as shipments of solar products to a significant number of new customers. New customers projects are typically designed to timeline systems and they generally start the relationship with Shoals by buying components that will work with these types of systems.

> Re-fixing the performance, quality, reliability, installation savings and customer service that Shoals offers, they become open to trying our combine-as-you-go architecture and buy the BLA. Once customers make the transition, this usually marks the start of a long-term relationship.

**ANSWER:** With regard to the first sentence of this paragraph, Defendants aver that the sentence purports to summarize statements made by the 1934 Act Defendants without specifying when or how the statements were made. Defendants thus lack information sufficient to form a belief as to the truth of the allegations and deny them on that basis. With regard to the second sentence in this paragraph, Defendants admit that the Company held an earnings call on August 15, 2022, and Defendants refer to the call for its complete contents. Except as expressly admitted, Defendants deny the remaining allegations.

42. The Company's SEC filings likewise highlighted the "several advantages" that Shoals' products purportedly enjoyed over conventional EBOS systems with claims that Shoals' combine-as-you-go system had "greater reliability," "lower maintenance costs," and "lower[] material and shipping costs" as compared to competing products.

**ANSWER:** Defendants aver that the paragraph purports to summarize statements made by Shoals without specifying when or how the statements were made. Defendants thus lack information sufficient to form a belief as to the truth of the allegations and deny the allegations on that basis.

43. Due in substantial part to the "value proposition" that Shoals' products purported to offer, the 1934 Act Defendants claimed throughout the Class Period that demand for Shoals' products was "robust" and "continue[d] to grow," and the 1934 Act Defendants highlighted the Company's "record" breaking revenue and earnings. For example, in connection with Shoals' 4Q22 earnings announcement, the Company boasted that it had "set new records for revenue, gross profit, net income, adjusted EBITDA and adjusted net income" for both the fourth quarter and full year 2022. Further emphasizing Shoals' performance, defendant Whitaker represented that Shoals was "commercially, operationally and financially" the strongest "it ha[d] ever been."

**ANSWER:** With regard to the first sentence in this paragraph, Defendants aver that the paragraph purports to summarize statements made by the 1934 Act Defendants without specifying when or how the statements were made. Defendants thus lack information sufficient to form a belief as to the truth of the allegations and deny the allegations on that basis. With regard to the second and third sentences in this paragraph, Defendants admit that the Company issued a press release on February 28, 2023, which is publicly available and contains the language quoted in this paragraph. Defendants refer to the press release for its complete contents. Except as expressly admitted, Defendants deny the remaining allegations.

44. Unbeknownst to investors, however, during and prior to the Class Period, Shoals' customers were suffering from a massive, undisclosed problems with their BLAs.

**ANSWER:** Defendants deny the allegations.

45. Shoals' BLAs require a number of specialized component parts, including photovoltaic wire, which is produced for the interconnection wiring of grounded and ungrounded

solar panel systems. Shoals takes photovoltaic wire, which it purchases from suppliers, and manufactures custom wire harnesses that are used to aggregate electricity from multiple solar panels and deliver that electricity to inverters where it is then delivered to the power grid or a battery storage solution.

**ANSWER:** Defendants admit the allegations.

46. Typically, Shoals builds these harnesses in pairs, with a red-wire harness being used for positive connections, and a black-wire harness being used for negative connections. Part of the manufacturing process in creating the wire harnesses involves placing tee joints or in-line fuses ("T-Junctions") at set intervals along the length of the wire. These T-Junctions allow the wire harnesses to be connected to the solar panels and are a critical component of the BLA.

**ANSWER:** Defendants admit the allegations.

47. However, by no later than March 2022, Shoals began receiving reports of excessive shrinkback in its harnesses. As depicted in the following photo, insulation on the photovoltaic wires of BLAs red-wire harness had begun to shrinkback from the T-Junctions, causing live and dangerous wires to be exposed.

27



**ANSWER:** With regard to the first sentence in this paragraph, Defendants other than Solon admit that in March 2022, Shoals received a report of exposed bare copper conductor in a red-wire harness at a customer's solar field. With regard to the first sentence in this paragraph, Solon lacks information sufficient to form a belief as to the truth of the allegations and denies the allegations on that basis. With regard to the second sentence in this paragraph, Defendants aver that the paragraph purports to characterize a photo without specifying when or where the photo was taken. Defendants thus lack information sufficient to form a belief as to the truth of the allegations and deny the allegations on that basis. Except as expressly admitted, Defendants deny the remaining allegations.

      48.     These initial reports were confirmed by a Shoals executive who examined the wire in one customer's solar field in Phoenix, Arizona in approximately March 2022, and discovered exposed bare copper conductor around T-Junctions. More reports would soon follow.

**ANSWER:** With regard to the first sentence of this paragraph, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding statements

purportedly made by "a Shoals executive" and deny the allegations on that basis. With regard to the second sentence of this paragraph, Defendants aver that the phrase "[m]ore reports would soon follow" is vague and ambiguous and deny the allegations on that basis. Except as expressly admitted, Defendants deny the remaining allegations.

49. FE1 is a former Shoals Project Manager and Sales Manager who worked for the Company, including between 2016 and June 2022. FE1 described himself as the guy that they called when something went wrong.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding statements purportedly made by FE1 and deny the allegations in this paragraph on that basis.

50. FE1 reported that Shoals received a report of exposed wire in a customer's solar field in Phoenix in March 2022. The Company, and specifically Whitaker and Ben Macias ("Macias") (Macias at the time served as Senior Vice President, Sales and Marketing and was promoted to Chief Revenue Officer in December 2022), sent FE1 in April 2022 to that customer's solar field for an onsite investigation of that exposed wire. FE1 personally observed that the customer's insulation had pulled away from the connectors and T-Junctions. FE1 reported that he/she determined that the issue was an installation error, and that Shoals immediately replaced the product on that site, which took about 6 weeks and cost $3.5 to $4 million. FE1 reported that in addition to the initial report from Phoenix, there was a sister project close by just outside of Phoenix. According to FE1, that project also started to show similar issues with exposed wire just weeks later.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding statements purportedly made by FE1 and deny the allegations in this paragraph on that basis.

51.     According to FE1, by June 2022, Shoals was aware of at least four to five other solar fields that were experiencing the same issues as the one in Phoenix. FE1 reported that these problems caused internal panic at the Company, and were well-known internally, including by Whitaker.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding statements purportedly made by FE1 and deny the allegations in this paragraph on that basis.

52.     FE1 also reported that Shoals provided poor installation instructions to its customers. For example, FE1 described the installation manual as being only a few pages long, with no recommendations on how tight to pull wires or how to attach them. FE1 reported that they brought this to the attention of the President of the Company, but nothing was done about it.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding statements purportedly made by FE1 and deny the allegations in this paragraph on that basis.

53.     FE2 is a former Shoals Business Development Manager who worked for the Company between 2017 and 2023. FE2 indicated that he/she also visited the Phoenix site described by FE1 along with Shoals' Research and Development Manager, Lee Morgan ("Morgan"). FE2 reported that Morgan examined the exposed wire and Morgan told FE2 that Morgan believed it was an installation issue. FE2 reported that Macias also visited the Phoenix site at a different time and evaluated the wiring. FE2 reported that Macias also believed the problems at the Phoenix site

were caused by an installation issue. FE2 reported that he participated in several calls with the client and owner in Phoenix, in which Macias also participated. FE2 reported that Macias told the client and owner that Shoals believed that this was an installation issue.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding statements purportedly made by FE2 and deny the allegations in this paragraph on that basis.

54.    FE2 also reported that Shoals was aware of at least four or five other very large scale utility projects similar to the one in Phoenix that reported exposed wire by June 2022. FE2 reported that Shoals agreed to replace the wiring at the Phoenix solar field at a cost of $3.5 million to $4 million. FE1 reported that with the other customers who reported exposed wires to Shoals, the Company was facing expenses of over $15 million by June 2022. FE1's and FE2's reports regarding the number of solar sites with exposed wire, and Shoals' response to reports of exposed wire is consistent with Defendant Prysmian's Answer and Affirmative Defenses to Plaintiff Shoals' First Amended Complaint, *Shoals Techs. Grp., LLC v. Prysmian Cables & Sys. USA, LLC*, No. 3:23-cv-01153 (M.D. Tenn. Jan. 1, 2025), ECF 60 (the "Answer"), which alleges that by December 2022, Shoals was aware of at least ***eight*** solar sites where exposed wires had been reported:

> To the extent Shoals is alleging it incurred remediation costs, then Prysmian [Cables to Systems USA, LLC] denies that Shoals did not understand this before "summer and fall of 2023"; such allegation is belied by Shoals' internal response to reported exposed conductor as early as March 2022, including conducting site visits to inspect reported exposed conductor, engaging third-party testing companies to analyze its harnesses and composition of its own T-Connector overmold, engaging one of Prysmian's primary competitors to test Prysmian's cable for shrinkback, and reaching its own conclusion that the exposed conductor was caused by improper installation methods. Prysmian further states that, as of December 2022, Shoals informed Prysmian that it was aware of reported exposed conductor at eight solar sites.

31

Indeed, Shoals was aware of adhesion and molding issues on its connector produced **since at least 2020**. This is also confirmed by the Answer, which alleges that "Shoals was previously aware of adhesion and molding issues on its connector products between at least 2020 and 2023, which may have caused or contributed to exposed conductors."

**ANSWER:** With regard to the first, second, and third sentences in this paragraph, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding statements purportedly made by FE1 and FE2 and deny the allegations in this paragraph on that basis. With regard to the third sentence in this paragraph, Defendants admit that Prysmian Cables & Systems USA, LLC filed an Answer and Affirmative Defenses to Plaintiff Shoals' First Amended Complaint in *Shoals Techs. Grp., LLC v. Prysmian Cables & Sys. USA, LLC*, No. 3:23-cv-01153 (M.D. Tenn. Jan. 1, 2025), ECF 60, which is publicly available and contains the language quoted in this paragraph. Defendants refer to the answer for its complete contents. Except as expressly admitted, Defendants deny the remaining allegations.

55. FE3 is a former Shoals Plant Quality Manager who worked for the Company between December 2023 and July 2024. FE3 reported that he/she was made aware of the shrinkback issues immediately upon joining the Company. FE3 reported that Shoals had not been doing any internal testing for shrinkback issues prior to the disputes with Prysmian Cables and Systems USA, LLC ("Prysmian"). Instead, Shoals relied solely on the suppliers to provide appropriate documentation and test results to show that the wires were meeting the proper requirements. FE3 reported that there were no quality controls, checks or testing done with respect to wiring received from suppliers. FE3 reported that such testing did not begin until approximately December 2023. FE3's reports are consistent with the Answer, which alleges that:

> [A]s of the date Shoals filed this lawsuit, Shoals did not have a formal or objective adhesion quality testing protocol or wire inspection protocol in place to certify that

32

its molded connector products sufficiently adhered to its suppliers' wire and verify the integrity and quality of its manufactured harnesses. Shoals also acknowledged in internal communications that it did not conduct regular supplier audits after its initial qualification process.

**ANSWER:** With regard to the first through seventh sentences in this paragraph, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding statements purportedly made by FE3 and deny the allegations in this paragraph on that basis. With regard to the seventh sentence in this paragraph, Defendants admit that Prysmian Cables & Systems USA, LLC filed an Answer and Affirmative Defenses to Plaintiff Shoals' First Amended Complaint in *Shoals Techs. Grp., LLC v. Prysmian Cables & Sys. USA, LLC*, No. 3:23-cv-01153 (M.D. Tenn. Jan. 1, 2025), ECF 60, which is publicly available and contains the language quoted in this paragraph. Defendants refer to the answer for its complete contents. Except as expressly admitted, Defendants deny the remaining allegations.

56. While Shoals had initially concluded that the excessive shrinkback had been caused by installation issues, as problems mounted and more customers began to report similar issues, Shoals' exposure to ever-increasing warranty claims and reputational damage increased. As its exposure increased, Shoals sought to pin the blame on others – specifically the supplier of the red photovoltaic wire, Prysmian – a longtime supplier to Shoals, and which was also a competitor of Southwire Company, LLC, where defendant Moss had served as Group President until joining Shoals in July 2023.

**ANSWER:** Defendants deny the allegations.

57. Prysmian was Shoals' sole supplier of the 10 and 12 American wire gauge ("AWG") red copper photovoltaic cable wire Shoals used in the manufacturing of the T-Junctions in its BLA product. According to Prysmian, "Shoals confirmed, including in a meeting on April

33

5, 2023 with Prysmian, that Shoals exclusively used Prysmian cable in the application exhibiting Shoals' field issue, and that other manufacturer's cables were used only in different applications."

**ANSWER:** Defendants deny the allegations.

58. Shoals and Prysmian had initially worked together to try to identify the cause of the BLA defects. Indeed, in or about April 2002, Shoals provided Prysmian with 3 samples of Prysmian's 10 and 12 AWG black and red copper photovoltaic cable wire containing Shoals' T- Junctions. At that time, Shoals conceded that Prysmian's wires were not defective and Shoals' installation or cable management issues at the site were likely the culprit.

**ANSWER:** With regard to the first and second sentences in this paragraph, Defendants other than Solon admit that Shoals was relying on Prysmian starting in and about March-April 2022 in believing that installation or cable management issues were the likely cause of exposed conductor at a solar field, and that Prysmian received three samples of harnesses containing Prysmian's 10 AWG photovoltaic wire in or around April 2022. With regard to the first and second sentences in this paragraph, Solon lacks sufficient information to form a belief as to the truth of the allegations and denies the allegations on that basis. Except as expressly admitted, Defendants deny the remaining allegations.

59. After additional Shoals' customers began complaining of similar issues, however, Shoals stopped cooperating with Prysmian. Prysmian repeatedly requested samples from Shoals of T-Junctions with cable installed, as well as drone footage of impacted sites to conduct a root cause analysis, yet Shoals repeatedly ignored Prysmian's requests and repeatedly denied Prysmian meaningful opportunities to inspect the wires at issue.

**ANSWER:** Defendants deny the allegations.

60.     Yet, in spite of these spiraling problems with its signature product, and the warranty costs and reputational harm they were causing, the 1934 Act Defendants failed to provide any disclosure to Shoals' shareholders.

**ANSWER:**  Defendants deny the allegations.

61.     Further, despite knowing that the exposed wire caused by the BLA defects could lead to death or serious injury, as well as property damage, Shoals said nothing to its customers, either. Indeed, at least one affected site reported property damage arising from a fire, which is believed to have ignited as a result of a defective Shoals harness. But Shoals said nothing at this time.

**ANSWER:**  Defendants deny the allegations.

62.     Rather than warning its customers and investors of the potentially fatal and financially crippling consequences of its defective BLAs at that time, Shoals, Whitaker, and Solon sought to cash out, selling over $1.1 billion in Shoals Common Stock to unsuspecting investors in two secondary offerings between November 2022 and March 2023.

**ANSWER:**  Defendants deny the allegations.

63.     First, on November 30, 2022, Shoals announced that it was conducting a secondary offering of 20 million shares of Shoals Common Stock (which would later be increased to 26 million shares), that was being sold in an underwritten public offering. Of those 26 million shares, 24 million shares were being sold by Solon and his affiliates, and the remaining 2 million shares were being sold by the Company.

**ANSWER:**   With regard to the first sentence in this paragraph, Defendants admit that on November 30, 2022, Shoals issued a press release, which is publicly available.  Defendants refer to the press release for its complete contents.  With regard to the second sentence in this paragraph,

Defendants aver that the phrase "his affiliates" is vague and ambiguous and deny the allegations on that basis. Except as expressly admitted, Defendants deny the remaining allegations.

64.     The Company further announced that it was using the proceeds from its sale of shares to fund, in substantial part, a $58.1 million payment to terminate a Tax Receivable Agreement ("TRA"), which termination right was to expire on December 31, 2022. Analysts reacted positively to the TRA termination. A November 30, 2022, report from UBS noted: "We view announcement of the TRA termination as a positive development. . . . As of 3Q22 the estimated TRA liability on the balance sheet was $161mn with potential to grow significantly. . . . In our view, the TRA was an obstacle to many investors owing SHLs . . . ." A December 2, 2022, report from Barclays noted that the TRA "could have grown to $485mm . . . we are a bit perplexed at the low termination consideration."

**ANSWER:**   With regard to the first sentence in this paragraph, Defendants admit that on November 30, 2022, Shoals issued a press release, which is publicly available. Defendants refer to the press release for its complete contents. With regard to the second sentence in this paragraph, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding statements purportedly made by "[a]nalysts" and deny the allegations in the second sentence on that basis. With regard to the third and fourth sentences in this paragraph, Defendants aver that the analyst reports referenced and quoted in part in this paragraph are publicly available. Defendants refer to the analyst reports for their complete contents. Except as expressly admitted, Defendants deny the remaining allegations.

65.     The December 2022 SPO closed on December 6, 2022, with Solon and its affiliated entities receiving over $515 million in gross proceeds as a result of a sale, and Shoals receiving over $42 million in gross proceeds as a result of the sale.

**ANSWER:** Defendants admit that the December 2022 SPO closed on December 6, 2022. Defendants aver that the phrases "its affiliated entities" and "gross proceeds" are vague and ambiguous and deny them on that basis. Except as expressly admitted, Defendants deny the remaining allegations.

66.     Then, on March 7, 2023, Shoals announced that it was conducting another secondary offering of over 24.5 million shares of Shoals Common Stock, which were being sold in an underwritten public offering by Solon and his affiliates. The March 2023 SPO closed on March 10, 2023, with Solon and his affiliated entities receiving over $594 million in gross proceeds as a result of a sale. In total, between November 2023 and March 2023, Solon decreased his holdings of Shoals Common Stock from over 30% of the Company, to approximately 2% of the outstanding shares, liquidating almost his entire position in the Company.

**ANSWER:** With regard to the first sentence in this paragraph, Defendants admit that on March 7, 2023, Shoals issued a press release, which is publicly available. Defendants refer to the press release for its complete contents. With regard to the second sentence in this paragraph, Defendants aver that the phrases "affiliated entities" and "gross proceeds" are vague and ambiguous and deny them on that basis. With regard to the third sentence in this paragraph, Defendants aver that the phrase "liquidating almost his entire position in the Company" is vague and ambiguous and deny the allegations on that basis. Except as expressly admitted, Defendants deny the remaining allegations.

67.     On May 8, 2023, Shoals filed with the SEC a quarterly report on Form 10-Q for the quarter ended March 31, 2023 ("1Q23 Form 10-Q"). Over a year after first being made aware of the BLA defects, Shoals finally provided a minimal, albeit misleading, disclosure regarding the BLA defects, stating:

The Company has been notified by certain customers that a subset of wire harnesses used in its EBOS solutions is presenting excessive pull back of wire insulation at connection points ("shrinkback"). Based upon the Company's initial assessment, the Company believes the shrinkback is related to a subset of specific colored wire provided by one specific supplier. While it is probable that the Company will incur costs related to the repair or replacement of the impacted wire harnesses, based on the limited information available as of the date of this Quarterly Report, including the scope of affected sites, potential solutions and the possibility of recovery from the wire supplier, it is not possible to reasonably estimate those costs.

**ANSWER:** With regard to the first and second sentences in this paragraph, Defendants admit that on May 8, 2023, the Company filed with the SEC a Form 10-Q for the quarter ended March 31, 2023, which is publicly available and contains the language quoted in this paragraph. Defendants refer to the Form 10-Q for its complete contents. Except as expressly admitted, Defendants deny the remaining allegations.

68. In fact, because Shoals only uses Prysmian cable wire for installing its T-Junction, the Company had already incurred millions of dollars in costs to replace the affected harnesses at the Phoenix site alone, and had complaints from numerous customers with failing T-Junctions which could cost the Company an additional tens of millions of dollars to replace. While Shoals blamed Prysmian for supplying defective wiring incorporated into the T-Junctions, the Company had been told by Prysmian no later than January 2023, that the wires in question had "been made with the same process and with the same materials since 2016."

**ANSWER:** With regard to the second sentence in this paragraph, Defendants aver that the paragraph purports to summarize statements made by Prysmian without specifying when or how the statements were made. Defendants thus lack information sufficient to form a belief as to the truth of the allegations and deny them on that basis. Except as expressly admitted, Defendants deny the remaining allegations.

38

69.     The 1Q23 Form 10-Q also materially misrepresented the scope of the problem, stating the Company only had $400,000 in accrued warranty liability at quarter end, *a $200,000 decrease from the prior quarter*.

**ANSWER:**  Defendants deny the allegations.

70.     Then, on August 1, 2023, in connection with reporting its 2Q23 results, Shoals revealed that it was recording a $9.4 million warranty expense to reflect costs primarily related to BLA defects, offsetting other claimed improvements in the Company's margin profile and causing its gross margins to decline sequentially to 42.4% from 45.9% in the prior quarter. During the corresponding 2Q23 conference call, defendant Bardos sought to assuage investor concerns regarding the Company's warranty expense exposure, falsely stating that the warranty expense incurred within the quarter was "adequate to do the remediation required."

**ANSWER:**  With regard to the first sentence in this paragraph, Defendants deny that the allegations are consistent with Shoals' Form 10-Q, filed on August 1, 2023, and refer to the Form 10-Q for the statements made and their full context. With regard to the second sentence, Defendants admit that the Company held an earnings call on August 1, 2023, and refer to the call for its complete contents.  Except as expressly admitted, Defendants deny the remaining allegations.

71.     Contrary to this representation, Shoals would go on to announce an additional $50 million in BLA warranty expenses the following quarter, representing a more than five-fold increase. Shoals would likewise disclose that 30% of its wire harnesses manufactured from 2020 to 2022 had been impacted by BLA defects, and that ultimate remediation costs could reach as high as $185 million.

**ANSWER:** Defendants aver that this paragraph purports to summarize statements made by Shoals without specifying when or how the statements were made. Defendants thus lack information sufficient to form a belief as to the truth of the allegations and deny the allegations on that basis.

72. As would subsequently be revealed, the defective – and potentially dangerous – wire harnesses on so many of the Company's projects had also negatively impacted Shoals' customer relationships once Shoals warned its customers of the issue. For example, a November 10, 2023 Roth MKM analyst report stated their "checks" with Shoals' customers "suggest that since receiving the safety notice from SHLS regarding shrinkback . . . , customers are likely scrambling to identify any instances of the issue. ***Critical concerns we have heard include (1) Serious injury or death, (2) The exposed wiring may cause fire and property damage, and (3) PUCs may get involved with increased scrutiny***."

**ANSWER:** With regard to the second sentence in this paragraph, Defendants aver that the analyst report referenced and quoted is publicly available. Defendants refer to the analyst report for its complete contents. Except as expressly admitted, Defendants deny the remaining allegations.

73. In subsequent quarters, Shoals revealed dramatically deteriorating results, reflecting in part the effects of the BLA defects on the Company's customer relationships, and the materialization of the risks concealed by defendants' materially misleading misstatements and omissions as detailed herein. In reporting its 4Q23 results, Shoals revealed a sequential quarterly decline of $2 million in the Company's backlog and awarded orders. The Company also issued disappointing revenue guidance for FY24 of $480 million to $520 million that was approximately 19% below consensus estimates at the midpoint.

**ANSWER:** With regard to the second sentence in this paragraph, Defendants admit that the Company reported its 4Q23 results in its Form 10-K, filed on February 28, 2024, which is publicly

available.  Defendants refer to the Form 10-K for its complete contents.  With regard to the third sentence in this paragraph, Defendants aver that the phrase "consensus estimates at the midpoint" is vague and ambiguous and deny the allegations on that basis.  Except as expressly admitted, Defendants deny the remaining allegations.

74.    Shoals' business further deteriorated in 1Q24, with backlog and awarded orders falling sequentially by over $16 million and the Company reducing its already disappointing guidance to a range of $440 million to $490 million due in part to an "unprecedented" customer cancellation and project delays. In a Form 10-Q quarterly report the Company filed with the SEC for 1Q24, Shoals has also disclosed that the Company "may increase" its estimated warranty liability a "material" amount.

**ANSWER:**  With regard to the first sentence in this paragraph, Defendants aver that the sentence purports to summarize and quote statements by Shoals without specifying when and how the statements were made.  Defendants thus lack knowledge or information sufficient to form a belief as to the truth of the allegations and deny the allegations on that basis.  With regard to the second sentence in this paragraph, Defendants admit that on May 7, 2024, Shoals filed with the SEC a Form 10-Q, which is publicly available and contains the language quoted in this paragraph. Defendants refer to the Form 10-Q for its complete contents.  Except as expressly admitted, Defendants deny the remaining allegations.

75.    As a result of these disclosures, the price of Shoals Common Stock has declined from a Class Period high of over $40 per share to less than $8 per share by the end of the Class Period, causing Plaintiffs and the Class to suffer hundreds of millions of dollars in losses and economic damages under the federal securities laws.

41

**ANSWER:** Defendants aver that the prices of Shoals stock are publicly available. Except as expressly admitted, Defendants deny the remaining allegations.

## V. DEFENDANTS' VIOLATIONS OF THE 1934 ACT

### A. Defendants' Materially Misleading Statements and Omissions

#### 1. 1Q22 Materially Misleading Statements and Omissions

76. The Class Period begins on May 16, 2022, with Shoals' issuance of a press release announcing the Company's financial results for the quarter ended March 31, 2022 ("1Q22 Release").[7] The 1Q22 Release highlighted the Company's year-over-year increases in revenue, margins, and profits. Underpinning the "record" revenue, skyrocketing profits and "[e]xpanded" margins was the market's belief that Shoals' products were superior. Indeed, the 1Q22 Release highlighted the purported "reliability and safety" of Shoals' "innovative products," representing that the "Company's mission . . . to provide innovative products that reduce the cost of installation while improving system performance, reliability and safety."

**ANSWER:** With regard to the first sentence, Defendants admit that Plaintiffs purport to represent a class for a period beginning on May 16, 2022. Defendants further admit that on May 16, 2022, Shoals issued a press release, which is publicly available and contains the language quoted in this paragraph. Defendants refer to the press release for its complete contents. With regard to footnote 7, Defendants admit that during the purported class period, Shoals issued a press release each quarter announcing its financial results for the quarter and that these press releases were exhibits to Form 8-Ks that Shoals filed with the SEC. Except as expressly admitted, Defendants deny the remaining allegations.

---

[7] Each of Shoals' quarterly press releases were also filed with the SEC on a Form 8-K.

77.     Also on May 16, 2022, Shoals held a conference call with analysts to discuss the Company's financial and operational results for 1Q22 hosted by defendants Whitaker and Hubbard. During the call, defendant Whitaker emphasized that "at our core, we really focus on *quality, reliability and safety*" of Shoals' products. Whitaker also claimed Company's focus on "quality and reliability" was generating "a lot of opportunities" for the Company, stating in pertinent part:

> And also, when you look at the case – the use case in the international market, obviously, the higher the labor, the higher the value proposition. But the reality is, even outside of that, there's a lot of opportunities. We're seeing places that have very low – or relatively low labor rates that we're seeing success with as well. *So there's more than just the labor aspect when you look at the quality and the reliability of our product offerings out there*.

**ANSWER:**  Defendants admit that on May 16, 2022, Shoals held a conference call, and that Whitaker and Hubbard spoke on the call.  Defendants refer to the call for its complete contents. Except as expressly admitted, Defendants deny the remaining allegations.

78.     On the day of Shoals' May 16, 2022 conference call with analysts, the Company published on its website a 1Q22 Investor Presentation ("1Q22 Presentation"). The 1Q22 Presentation began with a "COMPANY OVERVIEW" which stated that Shoals' "*products…are…more reliable than competing solutions*" and attributed its products' "*greater reliability*" to their "fewer connections and pre-terminated 'plug-n-play' connectors." The presentation extolled that Shoals' "factory…produce[s] *products with superior quality, reliability, and safety*." As a result, Shoals' "*products…can be installed by anyone*." The 1Q22 Presentation explained that Shoals' "Plug-n-Play Connectors" as "[s]imple push connectors [that] speed installation, *reduce errors and make the system installable by general labor rather than requiring licensed electricians*."

**ANSWER:** Defendants admit that on May 16, 2022, Shoals published on its website an investor presentation for the first quarter of 2022, which is publicly available and contains the language quoted in this paragraph. Defendants refer to the investor presentation for its complete contents. Except as expressly admitted, Defendants deny the remaining allegations.

79. The 1Q22 Presentation emphasized that one of the key "ADVANTAGES" of Shoals' "COMBINE-AS-YOU-GO SYSTEM" was that it "*[i]ncreases safety and reliability*" through "[p]re-terminated connectors" that were "[f]actory rather than field fabricated," resulting in "*[f]ewer failure points*" – resulting in "***LESS POTENTIAL FOR FAILURE***."

**ANSWER:** Defendants admit that on May 16, 2022, Shoals published on its website an investor presentation for the first quarter of 2022, which is publicly available and contains the language quoted in this paragraph. Defendants refer to the investor presentation for its complete contents. Except as expressly admitted, Defendants deny the remaining allegations.

80. On May 17, 2022, Shoals filed with the SEC a quarterly report on Form 10-Q for the quarter ended March 31, 2022 ("1Q22 Form 10-Q"), which was signed by defendants Whitaker and Hubbard. As detailed below in §V.B., the 1Q22 Form 10-Q did not include any product warranty accrual or disclosure related to the BLA defect. Instead, Shoals vaguely and misleadingly warned investors that "we may face warranty, indemnity and product liability claims arising from defective products."

**ANSWER:** Defendants admit that on May 17, 2022, Shoals filed with the SEC a quarterly report on Form 10-Q for the quarter ended March 31, 2022, which is publicly available and contains the language quoted in this paragraph. Defendants further admit that Whitaker and Hubbard signed the Form 10-Q. Defendants refer to the Form 10-Q for its complete contents. Except as expressly admitted, Defendants deny the remaining allegations.

44

81.     The statements set forth above in ¶¶76-80 were materially misleading or omitted material information necessary to make them not misleading (that was unbeknownst to investors) for the following reasons:

(a)     Contrary to the 1934 Act Defendants' claims that Shoals' products were of "superior quality, reliability, and safety," and Shoals' products had "less potential for failure," Shoals had already received customer complaints regarding the BLA defect and had conducted a site inspection, in which the customer complaint of the BLA defect was verified. There were no quality controls, checks, or testing on the wiring used in Shoals' products by anyone internally at Shoals before December 2023;

(b)     While the 1934 Act Defendants touted the cost savings and lower maintenance costs compared to competing products, they had determined that installation issues had caused the BLA defect. Remediating improperly installed defective wire harnesses did not result in cost savings and lower maintenance costs and would in fact lead to increased installation costs;

(c)     As detailed below in §V.B., the 1934 Act Defendants' failure to properly account for and disclose the BLA defect rendered Shoals' 1Q22 financial statements, included in the 1Q22 Form 10-Q, materially false and misleading and in violation of GAAP. Specifically, the 1934 Act Defendants: (i) materially understated Shoals' warranty reserves with respect to the BLA defect; and (ii) failed to make required disclosures regarding the extent of costs associated with remediating the BLA defect; and

(d)     Contrary to the misleading warnings that "[Shoals] may face warranty, indemnity and product liability claims arising from defective products," the Company was already facing such claims arising from the BLA defect.

45

**ANSWER:** Defendants deny the allegations.

## 2. 2Q22 Materially Misleading Statements and Omissions

82.     On August 15, 2022, Shoals issued a press release announcing the Company's financial results for the quarter ended June 30, 2022 ("2Q22 Release"). The 2Q22 Release highlighted the purported "safety" and "reliability" of Shoals' products, representing that "[s]ince its founding in 1996, the Company has introduced innovative technologies and systems solutions that allow its customers to substantially increase installation efficiency and safety while improving system performance and reliability."

**ANSWER:** Defendants admit that on August 15, 2022, Shoals issued a press release, which is publicly available and contains the language quoted in this paragraph. Defendants refer to the press release for its complete contents. Except as expressly admitted, Defendants deny the remaining allegations.

83.     Also on August 15, 2022, Shoals held a conference call with analysts to discuss the Company's financial and operational results for 2Q22, hosted by defendants Whitaker and Hubbard. During his prepared remarks, defendant Whitaker highlighted the "performance, quality, reliability, [and] installation savings" of Shoals' products and claimed these benefits were the basis of the Company's "long-term relationship[s]" with its clients, stating in pertinent part as follows:

> Re-fixing ***the performance, quality, reliability, installation savings and customer service that Shoals offers, they become open to trying our combine-as-you-go architecture and buy the BLA***. Once customers make the transition, this usually marks the start of a long-term relationship.

**ANSWER:** Defendants admit that on August 15, 2022, Shoals held a conference call, and that Whitaker and Hubbard spoke on the call. Defendants refer to the call for its complete contents. Except as expressly admitted, Defendants deny the remaining allegations.

46

84.     In response to a question from an analyst, defendant Whitaker emphasized the purported "value" of Shoals' products, including specifically their "quality" and "reliability," stating: "BLA can reduce labor costs, improve safety, increase reliability and reduce maintenance expenses."

**ANSWER:** Defendants admit that on August 15, 2022, Shoals held a conference call. Defendants refer to the call for its complete contents. Except as expressly admitted, Defendants deny the remaining allegations.

85.     The same day, Shoals published a 2Q22 Investor Presentation, which contained the same materially false and misleading statements as its 1Q22 Presentation as set forth above in ¶79.

**ANSWER:** Defendants admit that Shoals published on its website an investor presentation on August 15, 2022, which is publicly available. Defendants refer to the investor presentation for its complete contents. Except as expressly admitted, Defendants deny the remaining allegations.

86.     On August 16, 2022, Shoals filed with the SEC a quarterly report on Form 10-Q for the quarter ended June 30, 2022 ("2Q22 Form 10-Q"), which was signed by defendants Whitaker and Hubbard. As detailed below in §V.B., the 2Q22 Form 10-Q did not include any product warranty accrual or disclosure related to the BLA defect. Instead, Shoals vaguely and misleadingly warned investors that "we may face warranty, indemnity and product liability claims arising from defective products."

**ANSWER:** Defendants admit that on August 16, 2022, Shoals filed with the SEC a Form 10-Q for the quarter ended June 30, 2022, which is publicly available and contains the language quoted in this paragraph. Defendants refer to the Form 10-Q for its complete contents. Defendants further admit that Whitaker and Hubbard signed the Form 10-Q. Except as expressly admitted, Defendants deny the remaining allegations.

87. The statements set forth above in ¶¶82-86 were materially misleading or omitted material information necessary to make them not misleading (that was unbeknownst to investors) for the following reasons:

(a) Contrary to the 1934 Act Defendants' claims that Shoals' products were of "superior quality, reliability, and safety," and Shoals' products had "less potential for failure," Shoals had already received customer complaints regarding the BLA defect and had conducted a site inspection, in which the customer complaint of the BLA defect was verified. The estimate of remediation costs at the initial site inspection amounted to several million dollars, and Shoals had also identified several other sites in the country that were experiencing the same issues, which the cost to remediate was estimated to be over $15 million. There were no quality controls, checks, or testing on the wiring used in Shoals' products by anyone internally at Shoals before December 2023;

(b) While the 1934 Act Defendants touted the cost savings and lower maintenance costs compared to competing products, they had determined that installation issues had caused the BLA defect. Remediating improperly installed defective wire harnesses did not result in cost savings and lower maintenance costs and would in fact lead to increased installation costs;

(c) As detailed below in §V.B., the 1934 Act Defendants' failure to properly account for and disclose the BLA defect rendered Shoals' 2Q22 financial statements, included in the 2Q22 Form 10-Q, materially false and misleading and in violation of GAAP. Specifically, the 1934 Act Defendants: (i) materially understated Shoals' warranty reserves with respect to the BLA defect; and (ii) failed to make required disclosures regarding the extent of costs associated with remediating the BLA defect; and

48

(d)    Contrary to the misleading warnings that "[Shoals] may face warranty, indemnity and product liability claims arising from defective products," the Company was already facing such claims arising from the BLA defect.

**ANSWER:**  Defendants deny the allegations.

### 3.    3Q22 Materially Misleading Statements and Omissions

88.    On November 14, 2022, Shoals issued a press release disclosing the Company's financial results for the quarter ended September 30, 2022 ("3Q22 Release"). The 3Q22 Release highlighted the purported "safety" and "reliability" of Shoals' products, representing that "[s]ince its founding in 1996, the Company has introduced innovative technologies and systems solutions that allow its customers to substantially increase installation efficiency and safety while improving system performance and reliability."

**ANSWER:**  Defendants admit that on November 14, 2022, Shoals issued a press release, which is publicly available and contains the language quoted in this paragraph.  Defendants refer to the press release for its complete contents.   Except as expressly admitted, Defendants deny the remaining allegations.

89.    Also on November 14, 2022, Shoals held a conference call with analysts to discuss the Company's financial and operational results for 3Q22, hosted by defendants Whitaker and Bardos. During his prepared remarks, defendant Whitaker highlighted the purported "value proposition" offered by Shoals' combine-as-you-go system, which he claimed as enabling Shoals to capitalize on favorable market trends, stating in pertinent part as follows:

> In addition, the prevailing wage provision of the IRA is expected to compound wage pressure in the U.S. market, which further reinforces the value proposition of our combine-as-you-go system. From day 1, we set out to create products that can be installed by anyone as a response to the disproportionately high cost of installing EBOS, which can be equal to or in excess of the cost of the product itself. ***In environments where labor is more expensive, our solutions are especially attractive as they take less time to install and are installable by general***

49

*labor. We anticipate the prevailing wage provision will provide a significant tailwind for years to come*.

**ANSWER:** Defendants admit that on November 14, 2022, Shoals held a conference call, and that Whitaker and Bardos spoke on the call. Defendants refer to the call for its complete contents. Except as expressly admitted, Defendants deny the remaining allegations.

90. The same day, Shoals published a 3Q22 Investor Presentation, which contained the same materially false and misleading statements as its 1Q22 Presentation as set forth above in ¶79.

**ANSWER:** Defendants admit that Shoals published on its website an investor presentation on November 14, 2022, which is publicly available. Defendants refer to the investor presentation for its complete contents. Except as expressly admitted, Defendants deny the remaining allegations.

91. Also that day, Shoals filed with the SEC a quarterly report on Form 10-Q for the quarter ended September 30, 2022 ("3Q22 Form 10-Q"), which was signed by defendants Whitaker and Bardos. As detailed below in §V.B., the 3Q22 Form 10-Q did not include any product warranty accrual or disclosure related to the BLA defect. Instead, Shoals vaguely and misleadingly warned investors that "we may face warranty, indemnity and product liability claims arising from defective products."

**ANSWER:** Defendants admit that on November 14, 2022, Shoals filed with the SEC a quarterly report for the quarter ended September 30, 2022, which is publicly available and contains the language quoted in this paragraph. Defendants further admit that Whitaker and Bardos signed the Form 10-Q. Defendants refer to the Form 10-Q for its complete contents. Except as expressly admitted, Defendants deny the remaining allegations.

92. The statements set forth above in ¶¶88-91 were materially misleading or omitted material information necessary to make them not misleading (that was unbeknownst to investors) for the following reasons:

(a)    Contrary to the 1934 Act Defendants' claims that Shoals' products were of "superior quality, reliability, and safety," and Shoals' products had "less potential for failure," Shoals had already received customer complaints regarding the BLA defect and had conducted a site inspection, in which the customer complaint of the BLA defect was verified. The estimate of remediation costs at the initial site inspection amounted to several million dollars, and Shoals had also identified several other sites in the country that were experiencing the same issues, which the cost of remediation was estimated to be over $15 million. There were no quality controls, checks, or testing on the wiring used in Shoals' products by anyone internally at Shoals before December 2023;

(b)    While the 1934 Act Defendants touted the cost savings and lower maintenance costs compared to competing products, they knew that defects with their BLAs were widespread. Remediating defective wire harnesses did not result in cost savings and lower maintenance costs and would in fact lead to increased installation costs associated with their replacement;

(c)    As detailed below in §V.B., the 1934 Act Defendants' failure to properly account for and disclose the BLA defect rendered Shoals' 3Q22 financial statements, included in the 3Q22 Form 10-Q, materially false and misleading and in violation of GAAP. Specifically, the 1934 Act Defendants: (i) materially understated Shoals' warranty reserves with respect to the BLA defect; and (ii) failed to make required disclosures regarding the extent of costs associated with remediating the BLA defect; and

(d)    Contrary to the misleading warnings that "[Shoals] may face warranty, indemnity and product liability claims arising from defective products," the Company was already facing such claims arising from the BLA defect.

51

**ANSWER:** Defendants deny the allegations.

####    4.    December 2022 SPO Materially Misleading Statements and Omissions

93.    On November 30, 2022, Shoals filed with the SEC (on Form S-3) a registration statement for the SPOs, which was also declared effective on that date (the "SPO Registration Statement"). On December 5, 2022, Shoals filed with the SEC (on Form 424B5) a prospectus supplement, which incorporated and formed part of the SPO Registration Statement, i.e., the December 2022 SPO Prospectus. In the December 2022 SPO, Shoals and defendant Solon collectively sold 29.9 million shares of Shoals Common Stock at $22.25 per share, which included a full exercise of the underwriters' overallotment option, for over $665 million in gross offering proceeds.

**ANSWER:**   With regard to the first sentence in this paragraph, Defendants admit that on November 30, 2022, Shoals filed with the SEC a registration statement on Form S-3, which is publicly available.  Defendants refer to the registration statement for its complete contents.  With regard to the second sentence in this paragraph, Defendants admit that on December 5, 2022, Shoals filed with the SEC a prospectus supplement on Form 424B5.  Defendants refer to the prospectus supplement for its complete contents.  Except as expressly admitted, Defendants deny the remaining allegations.

94.    The SPO Registration Statement highlighted the purported "safety" and "reliability" of Shoals' products, representing that the Company's "mission" was to provide products that improved the "reliability and safety" of client projects.

**ANSWER:** Defendants admit that on November 30, 2022, Shoals filed with the SEC a registration statement, which is publicly available and contains the language quoted in this paragraph. Defendants refer to the registration statement for its complete contents.  Except as expressly admitted, Defendants deny the remaining allegations.

52

95. The SPO Registration Statement also incorporated by reference the 3Q22 Form 10-Q. As detailed below in §V.B., the 3Q22 Form 10-Q did not include any product warranty accrual or disclosure related to the BLA defect. Instead, Shoals vaguely and misleadingly warned investors that "we may face warranty, indemnity and product liability claims arising from defective products."

**ANSWER:** Defendants admit that on November 30, 2022, Shoals filed with the SEC a registration statement, which is publicly available and contains the language quoted in this paragraph, and which incorporated by reference Shoals' Form 10-Q for the quarter ended September 30, 2022. Defendants refer to the registration statement and Shoals' Form 10-Q for the quarter ended September 30, 2022 for their complete contents. Except as expressly admitted, Defendants deny the remaining allegations.

96. The statements set forth above in ¶¶93-95 were materially misleading or omitted material information necessary to make them not misleading (that was unbeknownst to investors) for the following reasons:

(a) Contrary to the 1934 Act Defendants' claims that Shoals' products were of "superior quality, reliability, and safety," and Shoals' products had "less potential for failure," Shoals had already received customer complaints regarding the BLA defect and had conducted a site inspection, in which the customer complaint of the BLA defect was verified. The estimate of remediation costs at the initial site inspection amounted to several million dollars, and Shoals had also identified several other sites in the country that were experiencing the same issues, which the cost of remediation was estimated to be over $15 million. There were no quality controls, checks, or testing on the wiring used in Shoals' products by anyone internally at Shoals before December 2023;

(b)     While the 1934 Act Defendants touted the cost savings and lower maintenance costs compared to competing products, they knew that defects with their BLAs were widespread. Remediating defective wire harnesses did not result in cost savings and lower maintenance costs and would in fact lead to increased installation costs associated with their replacement;

(c)     As detailed below in §V.B., the 1934 Act Defendants' failure to properly account for and disclose the BLA defect rendered Shoals' 3Q22 financial statements, included in the 3Q22 Form 10-Q, materially false and misleading and in violation of GAAP. Specifically, the 1934 Act Defendants: (i) materially understated Shoals' warranty reserves with respect to the BLA defect; and (ii) failed to make required disclosures regarding the extent of costs associated with remediating the BLA defect; and

(d)     Contrary to the misleading warnings that "[Shoals] may face warranty, indemnity and product liability claims arising from defective products," the Company was already facing such claims arising from the BLA defect.

**ANSWER:** Defendants deny the allegations.

### 5.     4Q22 and FY22 Materially Misleading Statements and Omissions

97.     On February 28, 2023, Shoals issued a press release announcing the Company's financial results for its fourth fiscal quarter and year ended December 31, 2022 ("4Q22 Release"). The 4Q22 Release quoted defendant Whitaker who represented that Shoals was "commercially, operationally, and financially" the strongest "it ha[d] ever been," stating in pertinent part as follows:

> The strength of demand for our products is underscored by the $428.6 million of backlog and awarded orders that we ended the year with, which represented growth of 43% compared to the same time last year. As a matter of fact, in just the first few weeks of the new year, ***backlog and awarded orders has hit another record high yet again***, as we have continued to win new customers. I am

54

incredibly proud of what Shoals has accomplished over the past several years and that ***I will leave the Company commercially, operationally and financially stronger than it has ever been*** . . . .

**ANSWER:** Defendants admit that on February 28, 2023, Shoals issued a press release, which is publicly available and contains the language quoted in this paragraph. Defendants refer to the press release for its complete contents. Except as expressly admitted, Defendants deny the remaining allegations.

98. The 4Q22 Release highlighted the purported "safety" and "reliability" of Shoals' products, representing that "[s]ince its founding in 1996, the Company has introduced innovative technologies and systems solutions that allow its customers to substantially increase installation efficiency and safety while improving system performance and reliability."

**ANSWER:** Defendants admit that on February 28, 2023, Shoals issued a press release, which is publicly available and contains the language quoted in this paragraph. Defendants refer to the press release for its complete contents. Except as expressly admitted, Defendants deny the remaining allegations.

99. The same day, Shoals published a 4Q22 Investor Presentation, which contained the same materially false and misleading statements as its 1Q22 Presentation as set forth above in ¶79.

**ANSWER:** Defendants admit that on February 28, 2023, Shoals published on its website an investor presentation, which is publicly available. Defendants refer to the investor presentation for its complete contents. Except as expressly admitted, Defendants deny the remaining allegations.

100. That same day, Shoals filed with the SEC an annual report on Form 10-K for its fiscal year ended December 31, 2022 ("FY22 Form 10-K"), which was signed by defendants Whitaker and Bardos, among others. The FY22 Form 10-K stated that Shoals' provision for accrued warranty liability was $600,000 as of December 31, 2022. As detailed below in §V.B., the

55

FY22 Form 10-K did not include any specific product warranty accrual or disclosure related to the BLA defect. Instead, Shoals vaguely and misleading warned investors that "we may face warranty, indemnity and product liability claims arising from defective products."

**ANSWER:** With regard to the first sentence in this paragraph, Defendants admit that on February 28, 2023, Shoals filed with the SEC a Form 10-K for the year ended December 31, 2022, which is publicly available. Defendants further admit that Whitaker and Bardos signed the Form 10-K. With regard to the second sentence in this paragraph, Defendants admit that the Form 10-K disclosed that Shoals' estimated accrued warranty reserve was $600,000 as of December 31, 2022. Defendants refer to the Form 10-K for its complete contents. Except as expressly admitted, Defendants deny the remaining allegations.

101. The FY22 Form 10-K further represented that Shoals' use of "interconnect harnesses" and BLA as part of its combine-as-you-go architecture resulted in "greater reliability" and "lower maintenance costs" as compared to conventional "homerun" systems, stating in pertinent part as follows:

> Connection points are often the source of failure in EBOS systems and must be inspected regularly. *A solar energy project that uses our interconnect harness and BLA will have significantly fewer connections and, as a result, fewer failure points to inspect* and maintain than the same project would using a conventional homerun system. *We believe fewer potential failure points contributes to higher reliability and lower maintenance costs for solar energy projects that use our combine-as- you-go system when compared to a conventional homerun system*.

**ANSWER:** Defendants admit that on February 28, 2023, Shoals filed with the SEC a Form 10-K for the year ended December 31, 2022, which is publicly available and contains the language quoted in this paragraph. Defendants refer to the Form 10-K for its complete contents. Except as expressly admitted, Defendants deny the remaining allegations.

56

102.    The statements set forth above in ¶¶97-101 were materially misleading or omitted material information necessary to make them not misleading (that was unbeknownst to investors) for the following reasons:

(a)    Contrary to the 1934 Act Defendants' claims that Shoals' products were of "superior quality, reliability, and safety," and Shoals' products had "less potential for failure," Shoals had already received customer complaints regarding the BLA defect and had conducted a site inspection, in which the customer complaint of the BLA defect was verified. The estimate of remediation costs at the initial site inspection amounted to several million dollars, and Shoals had also identified several other sites in the country that were experiencing the same issues, which the cost of remediation was estimated to be over $15 million. There were no quality controls, checks, or testing on the wiring used in Shoals' products by anyone internally at Shoals before December 2023;

(b)    While the 1934 Act Defendants touted the cost savings and lower maintenance costs compared to competing products, they knew that defects with their BLAs were widespread. Remediating defective wire harnesses did not result in cost savings and lower maintenance costs and would in fact lead to increased installation costs associated with their replacement;

(c)    As detailed below in §V.B., the 1934 Act Defendants' failure to properly account for and disclose the BLA defect rendered Shoals' FY22 financial statements, included in the FY22 Form 10-K, materially false and misleading and in violation of GAAP. Specifically, the 1934 Act Defendants: (i) materially understated Shoals' warranty reserves with respect to the BLA defect; and (ii) failed to make required disclosures regarding the extent of costs associated with remediating the BLA defect; and

(d)    Contrary to the misleading warnings that "[Shoals] may face warranty, indemnity and product liability claims arising from defective products," the Company was already facing such claims arising from the BLA defect.

**ANSWER:** Defendants deny the allegations.

### 6.    March 2023 SPO Materially Misleading Statements and Omissions

103.    On March 7, 2023, Shoals filed with the SEC (on Form 424B5) a SPO Prospectus, ("March 2023 SPO Prospectus"), which incorporated and formed part of the SPO Registration Statement. In the March 2023 SPO, defendant Solon collectively sold 24.5 million shares of Shoals Common Stock at $24.70 per share, for over $594 million in gross offering proceeds.

**ANSWER:**  With regard to the first sentence in this paragraph, Defendants admit that on March 7, 2023, Shoals filed with the SEC a Preliminary Prospectus Supplement to the November 30, 2022 Prospectus, which is publicly available.  Defendants refer to the March 7, 2023 Preliminary Prospectus Supplement for its complete contents.  Except as expressly admitted, Defendants deny the remaining allegations.

104.    The SPO Registration Statement highlighted the purported "safety" and "reliability" of Shoals' products.

**ANSWER:**  Defendants admit that on March 7, 2023, Shoals filed with the SEC a Preliminary Prospectus Supplement, which is publicly available and contains the language quoted in this paragraph.  Defendants refer to the March 7, 2023 Preliminary Prospectus Supplement for its complete contents.  Except as expressly admitted, Defendants deny the remaining allegations.

105.    The SPO Registration Statement also incorporated by reference the 3Q22 Form 10-Q. As detailed below in §V.B., the 3Q22 Form 10-Q did not include any product warranty accrual or disclosure related to the BLA defect. Instead, Shoals vaguely and misleadingly warned

58

investors that "we may face warranty, indemnity and product liability claims arising from defective products."

**ANSWER:** Defendants admit that on March 7, 2023, Shoals filed with the SEC a Preliminary Prospectus Supplement, which is publicly available and contains the language quoted in this paragraph, and which incorporated Shoals' Form 10-Q for the quarter ended September 30, 2022. Defendants refer to the Preliminary Prospectus Supplement and Shoals' Form 10-Q for the quarter ended September 30, 2022 for their complete contents. Except as expressly admitted, Defendants deny the remaining allegations.

106.    The statements set forth above in ¶¶103-105 were materially misleading or omitted material information necessary to make them not misleading (that was unbeknownst to investors) for the following reasons:

(a)    Contrary to the 1934 Act Defendants' claims regarding "safety" and "reliability," Shoals had already received customer complaints regarding the BLA defect and had conducted a site inspection, in which the customer complaint of the BLA defect was verified. The estimate of remediation costs at the initial site inspection amounted to several million dollars, and Shoals had also identified several other sites in the country that were experiencing the same issues, which the cost of remediation was estimated to be over $15 million. There were no quality controls, checks, or testing on the wiring used in Shoals' products by anyone internally at Shoals before December 2023;

(b)    While the 1934 Act Defendants touted the cost savings and lower maintenance costs compared to competing products, they knew that defects with their BLAs were widespread. Remediating defective wire harnesses did not result in cost savings and lower

maintenance costs and would in fact lead to increased installation costs associated with their replacement;

(c)     As detailed below in §V.B., the 1934 Act Defendants' failure to properly account for and disclose the BLA defect rendered Shoals' 3Q22 financial statements, included in the 3Q22 Form 10-Q, materially false and misleading and in violation of GAAP. Specifically, the 1934 Act Defendants: (i) materially understated Shoals' warranty reserves with respect to the BLA defect; and (ii) failed to make required disclosures regarding the extent of costs associated with remediating the BLA defect; and

(d)     Contrary to the misleading warnings that "[Shoals] may face warranty, indemnity and product liability claims arising from defective products," the Company was already facing such claims arising from the BLA defect.

**ANSWER:**  Defendants deny the allegations.

### 7.     1Q23 Materially Misleading Statements and Omissions

107.     On May 8, 2023, Shoals issued a press release announcing the Company's financial results for the quarter ended March 31, 2023 ("1Q23 Release"). The 1Q23 Release highlighted the purported "safety" and "reliability" of Shoals' products, representing that "[s]ince its founding in 1996, the Company has introduced innovative technologies and systems solutions that allow its customers to substantially increase installation efficiency and safety while improving system performance and reliability."

**ANSWER:**  Defendants admit that on May 8, 2023, Shoals issued a press release, which is publicly available and contains the language quoted in this paragraph.  Defendants refer to the press release for its complete contents.   Except as expressly admitted, Defendants deny the remaining allegations.

60

108.    Also on May 8, 2023, Shoals held a conference call with analysts to discuss the Company's financial and operational results for the 1Q23, hosted by defendants Tolnar and Bardos. Defendant Tolnar highlighted the purported "safety" and "reliability" of Shoals' products, claiming the Company had "invested millions of dollars" over the "last 27 years" to develop its EBOS solutions that "significantly increased installation efficiency and safety" and "improving system performance and reliability for the utility scale solar" market, among others.

**ANSWER:**  Defendants admit that on May 8, 2023, Shoals held a conference call, and that Tolnar and Bardos spoke on the call.  Defendants refer to the call for its complete contents.  Except as expressly admitted, Defendants deny the remaining allegations.

109.    The same day, Shoals published a 1Q23 Investor Presentation, which contained the same materially false and misleading statements as its 1Q22 Presentation as set forth above in ¶79.

**ANSWER:**  Defendants admit that on May 8, 2023, Shoals published on its website an investor presentation, which is publicly available.  Defendants refer to the investor presentation for its complete contents.  Except as expressly admitted, Defendants deny the remaining allegations.

110.    On May 8, 2023 Shoals also filed its 1Q23 Form 10-Q with the SEC, which was signed by defendants Tolnar and Bardos. The 1Q23 Form 10-Q stated that Shoals' provision for accrued warranty liability was $400,000 as of March 31, 2023.

**ANSWER:**  Defendants admit that on May 8, 2023, Shoals filed with the SEC a Form 10-Q for the quarter ended March 31, 2023, which is publicly available.  Defendants further admit that Tolnar and Bardos signed the Form 10-Q.  Defendants further admit that Shoals disclosed that its estimated accrued warranty liability was $400,000 as of March 31, 2023.  Defendants refer to the Form 10-Q for its complete contents.  Except as expressly admitted, Defendants deny the remaining allegations.

111.    In addition, the 1Q23 Form 10-Q included the following disclosure regarding the BLA defect:

> The Company has been notified by certain customers that a subset of wire harnesses used in its EBOS solutions is presenting excessive pull back of wire insulation at connection points ("shrinkback"). ***Based upon the Company's initial assessment, the Company believes the shrinkback is related to a subset of specific colored wire provided by one specific supplier. While it is probable that the Company will incur costs related to the repair or replacement of the impacted wire harnesses, based on the limited information available as of the date of this Quarterly Report, including the scope of affected sites, potential solutions and the possibility of recovery from the wire supplier, it is not possible to reasonably estimate those costs***. The Company is continuing its investigation of this matter to determine a course of action, and has substantially ceased use of the related wire from this supplier.

**ANSWER:**  Defendants admit that on May 8, 2023, Shoals filed with the SEC a Form 10-Q for the quarter ended March 31, 2023, which is publicly available and contains the language quoted in this paragraph.  Defendants refer to the Form 10-Q for its complete contents.  Except as expressly admitted, Defendants deny the remaining allegations.

112.    The statements set forth above in ¶¶107-111 were materially misleading or omitted material information necessary to make them not misleading (that was unbeknownst to investors) for the following reasons:

(a)    Contrary to the 1934 Act Defendants' claims that Shoals' products were of "superior quality, reliability, and safety," and Shoals' products had "less potential for failure," Shoals had already received customer complaints regarding the BLA defect and had conducted a site inspection, in which the customer complaint of the BLA defect was verified. The estimate of remediation costs at the initial site inspection amounted to several million dollars, and Shoals had also identified several other sites in the country that were experiencing the same issues, which the cost of remediation was estimated to be over $15 million. There were no quality controls, checks,

or testing on the wiring used in Shoals' products by anyone internally at Shoals before December 2023;

(b) While the 1934 Act Defendants touted the cost savings and lower maintenance costs compared to competing products, they knew that defects with their BLAs were widespread. Remediating defective wire harnesses did not result in cost savings and lower maintenance costs and would in fact lead to increased installation costs associated with their replacement; and

(c) As detailed below in §V.B., the 1934 Act Defendants' failure to properly account for and disclose the BLA defect rendered Shoals' 1Q23 financial statements, included in the 1Q23 Form 10-Q, materially false and misleading and in violation of GAAP. Specifically, the 1934 Act Defendants: (i) materially understated Shoals' warranty reserves with respect to the BLA defect; and (ii) failed to make required disclosures regarding the extent of costs associated with remediating the BLA defect including an estimate of the possible loss or range of loss related to the BLA defect as required by GAAP.

**ANSWER:** Defendants deny the allegations.

### 8. 2Q23 Materially Misleading Statements and Omissions

113. On August 1, 2023, Shoals issued a press release announcing the Company's financial results for the quarter ended June 30, 2023 ("2Q23 Release"). The 2Q23 Release and a related earnings call unexpectedly revealed that Shoals was recording a $9.4 million warranty expense primarily due to the BLA defect. As a result, the 2Q23 Release reported that Shoals' quarterly gross profit margin had declined sequentially to 42.4% from approximately 46% reported in the prior quarter.

**ANSWER:** With regard to the first sentence in this paragraph, Defendants admit that on August 1, 2023, Shoals issued a press release, which is publicly available. With regard to the third

63

sentence in this paragraph, Defendants admit that the press release disclosed that Shoals' quarterly gross profit margin was 42.4% for the quarter ended June 30, 2023. Defendants refer to the press release for its complete contents. Except as expressly admitted, Defendants deny the remaining allegations.

114. The 2Q23 Release quoted defendant Tolnar who highlighted Shoals' purported "outstanding performance" and the "records for revenue and earnings" purportedly achieved during the quarter and claimed that demand for Shoals' products was "robust" and "remained strong." In announcing these results, the 2Q23 Release highlighted the purported "safety" and "reliability" of Shoals' products.

**ANSWER:** Defendants admit that on August 1, 2023, Shoals issued a press release, which is publicly available and contains the language quoted in this paragraph. Defendants refer to the press release for its complete contents. Except as expressly admitted, Defendants deny the remaining allegations.

115. On August 1, 2023, Shoals held a conference call with analysts to discuss the Company's financial and operational results for 2Q23, hosted by defendants Moss, Bardos, and Tolnar.

**ANSWER:** Defendants aver that Moss was dismissed as a Defendant in the Court's September 30, 2025 Order Granting in Part and Denying in Part Defendants' Motion to Dismiss, and therefore this challenged statement is no longer at issue. For that reason, no response to this paragraph is required. To the extent a response is required, Defendants admit that on August 1, 2023, Shoals held a conference call, and that Bardos and Tolnar spoke on the call. Defendants refer to the call for its complete contents. Except as expressly admitted, Defendants deny the remaining allegations.

64

116.    During the call, an analyst from Oppenheimer inquired regarding the scope of the warranty expense issue, including the number of customers and shipments impacted, as well as how long these issues had occurred:

> [Oppenheimer analyst:] Can you talk a little bit about the wire ratio, what the nature of the technical problem was? And how expensive it was in terms of the number of customers, the number of shipments and how much time it was spread over?

> [Bardos:] So a couple of things. Let me take that one on first, Colin. So this is an open investigation. We've communicated pretty much everything we can. In our Q, you'll see information about the wire issue that was limited to one of our suppliers in the subset of our products.

> **_The charge that we booked in the quarter, we believe, is adequate to do the remediation required, that's why we booked it_**. And we continue to explore this issue further. It is an ongoing open item for us, and we will continue to work with the supplier. We really can't disclose much about that. We certainly want to be very respectful of the supplier, and we're really taking our customer care first and foremost at heart. We are going to stand behind these products first to take care of our customers first and we'll deal with the supplier after that.

**ANSWER:**  Defendants aver that Moss was dismissed as a Defendant in the Court's September 30, 2025 Order Granting in Part and Denying in Part Defendants' Motion to Dismiss, and therefore this challenged statement is no longer at issue.  For that reason, no response to this paragraph is required.  To the extent a response is required, Defendants admit that on August 1, 2023, Shoals hosted an earnings call and refer to the call for its complete contents.  Except as expressly admitted, Defendants deny the remaining allegations.

117.    The same day, Shoals published a 2Q23 Investor Presentation, which contained the same materially false and misleading statements as its 1Q22 Presentation as set forth above in ¶79.

**ANSWER:**  Defendants aver that Moss was dismissed as a Defendant in the Court's September 30, 2025 Order Granting in Part and Denying in Part Defendants' Motion to Dismiss, and therefore this challenged statement is no longer at issue.  For that reason, no response to this paragraph is required.  To the extent a response is required, Defendants admit that on August 1, 2023, Shoals

published on its website an investor presentation, which is publicly available. Defendants refer to the investor presentation for its complete contents. Except as expressly admitted, Defendants deny the remaining allegations.

118.    On August 1, 2023, Shoals filed with the SEC a quarterly report on Form 10-Q for the quarter ended June 30, 2023 ("2Q23 Form 10-Q"), which was signed by defendants Moss and Bardos. The 2Q23 Form 10-Q included a disclosure regarding the BLA defect and stated that Shoals' provision for accrued warranty expense related to the BLA defect was $9.3 million as of June 30, 2023.

**ANSWER:**  Defendants aver that Moss was dismissed as a Defendant in the Court's September 30, 2025 Order Granting in Part and Denying in Part Defendants' Motion to Dismiss, and therefore this challenged statement is no longer at issue. For that reason, no response to this paragraph is required. To the extent a response is required, Defendants admit that on August 1, 2023, Shoals filed with the SEC a quarterly report on Form 10-Q for the quarter ended June 30, 2023, which is publicly available. Defendants further admit that Bardos signed the Form 10-Q. With regard to the second sentence in this paragraph, Defendants admit that the Form 10-Q disclosed that "as of June 30, 2023, the Company has recorded a warranty liability of $9.3 million related to this matter, representing the low end of the range of potential outcomes." Defendants refer to the Form 10-Q for its complete contents. Except as expressly admitted, Defendants deny the remaining allegations.

119.    The statements set forth above in ¶¶113-118 were materially misleading or omitted material information necessary to make them not misleading (that was unbeknownst to investors) for the following reasons:

(a) Contrary to the 1934 Act Defendants' claims that Shoals' products were of "superior quality, reliability, and safety," and Shoals' products had "less potential for failure," Shoals had already received customer complaints regarding the BLA defect and had conducted a site inspection, in which the customer complaint of the BLA defect was verified. The estimate of remediation costs at the initial site inspection amounted to several million dollars, and Shoals had also identified several other sites in the country that were experiencing the same issues, which the cost of remediation was estimated to be over $15 million. There were no quality controls, checks, or testing on the wiring used in Shoals' products by anyone internally at Shoals before December 2023;

(b) While the 1934 Act Defendants touted the cost savings and lower maintenance costs compared to competing products, they knew that defects with their BLAs were widespread. Remediating defective wire harnesses did not result in cost savings and lower maintenance costs and would in fact lead to increased installation costs associated with their replacement; and

(c) As detailed below in §V.B. the 1934 Act Defendants' failure to properly account for and disclose the BLA defect rendered Shoals' 2Q23 financial statements, included in the 2Q23 Form 10-Q, materially false and misleading and in violation of GAAP. Specifically, the 1934 Act Defendants: (i) materially understated Shoals' warranty reserves with respect to the BLA defect; and (ii) failed to make required disclosures regarding the extent of costs associated with remediating the BLA defect including an estimate of the possible loss or range of loss related to the BLA defect as required by GAAP.

**ANSWER:** Defendants deny the allegations.

### 9. 3Q23 Materially Misleading Statements and Omissions

120. On November 7, 2023, Shoals issued a press release announcing the Company's financial results for the quarter ended September 30, 2023 ("3Q23 Release"). Despite assurances from defendant Bardos that the $9.4 million warranty expense incurred in the second quarter was "adequate" to cover shrinkback remediation costs, the 3Q23 Release surprisingly revealed that Shoals' shrinkback warranty expenses had ballooned in the quarter to more than $50 million – representing a greater than five-fold increase. As a result, the 3Q23 Release revealed that Shoals' quarterly gross profit had declined more than 60% to $14 million from $36 million in the prior-year quarter and that the Company had suffered a net loss of $9.8 million in the quarter compared to net income of $12.8 million in the prior-year period.

**ANSWER:** With regard to the first sentence in this paragraph, Defendants admit that on November 7, 2023, Shoals issued a press release, which is publicly available. With regard to the third sentence in this paragraph, Defendants admit that the press release disclosed that "[g]ross profit was $14.2 million, compared to $36.0 million in the prior-year period," and that "[n]et loss was $(9.8) million compared to net income of $12.8 million during the same period in the prior year." Defendants refer to the press release for its complete contents. Except as expressly admitted, Defendants deny the remaining allegations.

121. The same day, Shoals published a 3Q23 Investor Presentation, which provided a "WARRANTY LIABILITY UPDATE," which stated that "it is believed that approximately 300 sites may have harnesses made with this wire, representing about 30% of the total amount of Shoals' harnesses manufactured during the same timeframe." The update further stated that "[a]t the end of [3Q23], the Company has recorded a warranty liability of $56.6 [million] and determined that the high end of the range is $184.9 [million]."

**ANSWER:** With regard to the first sentence, Defendants admit that on November 7, 2023, Shoals published on its website an investor presentation, which is publicly available and contains the language quoted in this sentence. With regard to the second sentence, Defendants admit that on November 7, 2023, Shoals published on its website an investor presentation which disclosed, "[a]t the end of Q3, the Company has recorded a warranty liability of $56.6m and determined that the high end of the range is $184.9m." Defendants refer to the investor presentation for its complete contents. Except as expressly admitted, Defendants deny the remaining allegations.

122.    On November 7, 2023, Shoals also held a conference call with analysts to discuss the Company's financial and operational results for the third quarter of 2023, hosted by defendants Moss and Bardos.

**ANSWER:** Defendants aver that Moss was dismissed as a Defendant in the Court's September 30, 2025 Order Granting in Part and Denying in Part Defendants' Motion to Dismiss, and therefore this challenged statement is no longer at issue. For that reason, no response to this paragraph is required. To the extent a response is required, Defendants admit that on November 7, 2023, Shoals held a conference call, and that Bardos spoke on the call. Defendants refer to the call for its complete contents. Except as expressly admitted, Defendants deny the remaining allegations.

123.    In prepared remarks on the call, defendant Moss addressed the Company's position on the shrinkback issue:

> I'd like to take some time now to discuss where we stand on our investigation and remediation of the wire insulation shrinkback warranty issue. On October 31, we filed a complaint to recover for damages caused by defective wire that Prysmian Cables & Systems USA LLC sold to Shoals between 2020 and approximately 2022. Shoals has already expended millions of dollars in identification, repair and replacement of defective wire and is seeking full recovery from Prysmian for those as well as future expenses related to the issue.

*        *        *

69

Based on our own investigation and third-party testing, we determined that unacceptable amounts of insulation shrinkback were occurring on Prysmian wire purchased from 2020 through 2022.

\* \* \*

Shoals is committed to quality. Based on the information we have gathered to date, it is apparent that this insulation shrinkback issue is unique to the defective Prysmian wire and not from any other wire suppliers.

**ANSWER:** Defendants aver that Moss was dismissed as a Defendant in the Court's September 30, 2025 Order Granting in Part and Denying in Part Defendants' Motion to Dismiss, and therefore this challenged statement is no longer at issue. For that reason, no response to this paragraph is required. To the extent a response is required, Defendants admit that on November 7, 2023, Shoals held a conference call on November 7, 2023, and refer to the call for its complete contents. Except as expressly admitted, Defendants deny the remaining allegations.

124. That same day, Shoals filed with the SEC a quarterly report on Form 10-Q for the quarter ended September 30, 2023 ("3Q23 Form 10-Q"), which was signed by defendants Moss and Bardos. The 3Q23 Form 10-Q included a disclosure regarding the BLA defect and stated that Shoals' provision for accrued warranty expense related to the BLA defect was $56.6 million as of September 30, 2023.

**ANSWER:** Defendants aver that Moss was dismissed as a Defendant in the Court's September 30, 2025 Order Granting in Part and Denying in Part Defendants' Motion to Dismiss, and therefore this challenged statement is no longer at issue. For that reason, no response to this paragraph is required. To the extent a response is required, Defendants admit that on November 7, 2023, Shoals filed with the SEC a quarterly report on Form 10-Q for the quarter ended September 30, 2023, which is publicly available. Defendants further admit that Bardos signed the Form 10-Q. With regard to the second sentence in this paragraph, Defendants admit that the Form 10-Q disclosed that as of September 30, 2023, Shoals' "recorded warranty liability related to this matter was $56.6

70

million." Defendants refer to Form 10-Q for its complete contents. Except as expressly admitted, Defendants deny the remaining allegations.

125. The statements set forth above in ¶¶120-124 were materially misleading or omitted material information necessary to make them not misleading (that was unbeknownst to investors) for the following reasons:

(a) Contrary to the 1934 Act Defendants' statements touting Shoals "record" backlog and "strength of demand" in awarded orders, Shoals' sale of defective wire harnesses had negatively impacted the Company's customer relationships. The widespread use of defective wires in its projects had significantly damaged Shoals' reputational standing among its customers. As a result, the 1934 Act Defendants did not in fact believe, and had no basis to believe, that Shoals' backlog was in strong condition;

(b) As detailed below in §V.B., the 1934 Act Defendants' failure to properly account for and disclose the BLA defect rendered Shoals' 3Q23 financial statements, included in the 3Q23 Form 10-Q, materially false and misleading and in violation of GAAP. Specifically, the warranty accrual and disclosure pertaining to the BLA defect in the 3Q23 Form 10-Q failed to reflect the actual minimum costs to remediate the BLA defect which totaled at least $73 million as of September 30, 2023; and

(c) As would be subsequently revealed, the defective – and potentially dangerous – wire harnesses used on so many of the Company's projects negatively impacted Shoals' customer relationships after Shoals finally disclosed the issue to its customers. For example, a November 10, 2023 Roth MKM analyst report stated that the analysts' "checks" with Shoals' customers "suggest that since receiving the safety notice from SHLS regarding shrinkback…, customers are likely scrambling to identify any instances of the issue. **Critical**

71

*concerns we have heard include (1) Serious injury or death, (2) The exposed wiring may cause fire and property damage, and (3) PUCs may get involved with increased scrutiny*." According to the report and as acknowledged by Shoals, at least one affected site had already suffered property damage arising from a brush fire believed to have ignited as a result of contact with a defective, Shoals-installed wire harness.

**ANSWER:** Defendants deny the allegations.

### 10.    4Q23 Materially Misleading Statements and Omissions

126.    On February 28, 2024, Shoals issued a release announcing the Company's financial results for its fourth fiscal quarter and year ended December 31, 2023 ("4Q23 Release"). The 4Q23 Release revealed that growth in Shoals' backlog and awarded orders had materially deteriorated, falling sequentially by $2 million to $631.3 million, down from $633.3 million in the prior quarter. In addition, the 4Q23 Release issued disappointing financial guidance for 1Q24 and FY24. In particular, the 4Q23 Release issued quarterly revenue guidance of $90 million to $100 million, revealing that quarterly revenue was projected to decline sequentially by more than $35 million at the midpoint of the range. In addition, the 4Q23 Release provided 2024 annual revenue guidance for the Company of $480 million to $520 million, which at the midpoint was approximately 19% below consensus analyst estimates of approximately $620 million.

**ANSWER:** With regard to the first sentence in this paragraph, Defendants admit that on February 28, 2024, Shoals issued a press release, which is publicly available. With regard to the second sentence in this paragraph, Defendants admit that the press release disclosed that Shoals' "backlog and awarded orders as of December 31, 2023 were $631.3 million." With regard to the fourth sentence in this paragraph, Defendants admit that the press release disclosed that "[b]ased on current business conditions, business trends and other factors, for the quarter ending March 31, 2024, the Company expects . . . [r]evenue to be in the range of $90 million to $100 million." With

72

regard to the fifth sentence in this paragraph, Defendants admit that the press release disclosed that "[b]ased on current business conditions, business trends and other factors, for the full year 2024, the Company expects: . . . [r]evenue to be in the range of $480 million to $520 million." Defendants refer to the press release for its complete contents. Defendants further aver that the phrase "consensus analyst estimates" is vague and ambiguous and deny the allegations on that basis. Except as expressly admitted, Defendants deny the remaining allegations.

127.    The same day, Shoals published a 4Q23 Investor Presentation, which disclosed that "[i]nitially, shrinkback issues were found on at least 20 sites of the approximately 300 sites that may have had the defective Prysmian red wire" but that Shoals had been "informed that approximately 10 incremental [*i.e.*, additional] sites [had] experienced shrinkback."

**ANSWER:**  Defendants admit that on February 28, 2024, Shoals published on its website an investor presentation, which is publicly available and which disclosed, "Initially, shrinkback issues were found on at least 20 sites of the approximately 300 sites that may have had the defective Prysmian red wire.  In addition, after we filed our complaint and customer notices were issued to those approximately 300 sites, we were informed that approximately 10 incremental sites experienced shrinkback."  Defendants refer to the investor presentation for its complete contents. Except as expressly admitted, Defendants deny the remaining allegations.

128.    That same day, Shoals filed with the SEC an annual report on Form 10-K for its fiscal year ended December 31, 2023 ("FY23 Form 10-K"), which was signed by defendants Moss and Bardos. The FY23 Form 10-K included a disclosure regarding the BLA defect and stated that Shoals' provision for accrued warranty expense related to the BLA defect was $54.9 million as of December 31, 2023.

**ANSWER:** Defendants aver that Moss was dismissed as a Defendant in the Court's September 30, 2025 Order Granting in Part and Denying in Part Defendants' Motion to Dismiss, and therefore this challenged statement is no longer at issue. For that reason, no response to this paragraph is required. To the extent a response is required, Defendants admit that on February 28, 2024, Shoals filed with the SEC an annual report on Form 10-K for the year ended December 31, 2023, which is publicly available. Defendants further admit that Bardos signed the Form 10-K. With regard to the second sentence in this paragraph, Defendants admit that the Form 10-K disclosed that "[a]s of December 31, 2023, we recorded a warranty liability of $54.9 million related to this matter." Defendants refer to the Form 10-K for its complete contents. Except as expressly admitted, Defendants deny the remaining allegations.

129. The statements set forth above in ¶¶128-130 were materially misleading or omitted material information necessary to make them not misleading (that was unbeknownst to investors) for the following reason:

(a) As detailed below in §V.B., the 1934 Act Defendants' failure to properly account for and disclose the BLA defect rendered Shoals' FY23 financial statements, included in the FY23 Form 10-K, materially false and misleading and in violation of GAAP. Specifically, the warranty accrual and disclosure pertaining to the BLA defect in the FY23 Form 10-K failed to reflect the actual minimum costs to remediate the BLA defect which totaled at least $73 million as of December 31, 2023.

**ANSWER:** Defendants deny the allegations.

**B.    Shoals' Class Period Financial Statements Violated GAAP**

130. As alleged herein, the 1934 Act Defendants' failure to properly account for and disclose the BLA defect rendered Shoals' Class Period financial statements materially false and

74

misleading and in violation of GAAP.[8] Specifically, the 1934 Act Defendants: (i) materially understated Shoals' warranty reserves with respect to the BLA defect; and (ii) failed to make required disclosures regarding the extent of costs associated with remediating the BLA defect.

**ANSWER:** Defendants deny the allegations.

131. Under GAAP, the Financial Accounting Standards Board ("FASB") ASC 460, *Guarantees* governs the accounting for "warranty obligations incurred in connection with the sale of goods or services." In turn, ASC 460 states that because of the uncertainty surrounding claims that may be made under warranties, warranty obligations fall within the definition of a "loss contingency" as defined under ASC 450, *Contingencies*.[9]

**ANSWER:** Defendants admit that the Financial Accounting Standards Board ASC 460 and ASC 450 are publicly available and contain the language quoted in this paragraph and footnote 9, respectively. Defendants refer to ASC 460 and ASC 450 for their complete contents. Except as expressly admitted, Defendants deny the remaining allegations.

132. ASC 450 includes requirements for both disclosure of a loss contingency and the accrual of a loss contingency. ASC 450 requires that an estimated loss from a loss contingency (here, Shoals' product warranty obligations), shall be accrued by a charge to income if both of the following conditions are met: (a) information available before the financial statements are issued indicates that it is probable that a liability had been incurred at the date of the financial statements

---

[8] GAAP constitutes those standards recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time, and are the common set of accounting principles, standards, and procedures that companies in the United States use to prepare their financial statements. According to SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)), financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate.

[9] ASC 450 defines a loss contingency as "[a]n existing condition, situation, or set of circumstances involving uncertainty as to [a] possible loss to an entity that will ultimately be resolved when one or more future events occur or fail to occur."

(*i.e.*, it is probable that customers will make claims under warranties relating to goods or services that have been sold); and (b) the amount of loss can be reasonably estimated. Under ASC 450, "probable" is defined as "[t]he future event or events are likely to occur." If a loss contingency "cannot be reasonably estimated," ASC 450 requires comprehensive disclosure of the potential loss. Specifically, ASC 450 requires that when a loss is at least "reasonably possible," the disclosure shall indicate the "nature of the contingency" and "[a]n estimate of the possible loss or range of loss or a statement that such an estimate cannot be made." Under ASC 450, "reasonably possible" is defined as, "[t]he chance of the future event or events occurring is more than remote but less than likely."

**ANSWER:** Defendants admit that ASC 450 is publicly available and contains the language quoted in this paragraph. Defendants refer to ASC 450 for its complete contents. Except as expressly admitted, Defendants deny the remaining allegations.

133. As detailed below, by no later than May 17, 2022, the date Shoals filed its 1Q22 Form 10-Q, the requirements for accrual and/or disclosure of the BLA defect under ASC 450 had been met. As a result, Shoals was required under GAAP to accurately account for and fully disclose the nature and scope of the BLA defect, and the corresponding remediation costs, in its Class Period SEC filings. However, as detailed below, in violation of ASC 450, the 1934 Act Defendants materially understated Shoals' warranty obligations and concealed the true scope of the BLA defect in the Company's Class Period SEC filings.

**ANSWER:** Defendants deny the allegations.

134. ***Shoals filed its 1Q22 Form 10-Q on May 17, 2022***. As of this date, the BLA defect and associated remediation costs represented a material loss contingency under ASC 450. By no later than March 2022, Shoals had received an initial customer complaint regarding the BLA defect

76

and had conducted a site inspection in Phoenix, Arizona, in which the customer complaint of the defect was verified. Thereafter, "Shoals, at its own expense, and to support its customer, replaced affected harnesses" at the affected sites. According to FEs 1 and 2, the estimate of remediation costs at the initial site amounted to several million dollars. FE1 also explained that in addition to the initial report from Phoenix, there was a sister project close by just outside of Phoenix that also started to show similar issues with exposed wire just weeks later. FEs 1 and 2 also explained that the Company was soon made aware of four or five other sites in the country that were experiencing the same issues. The Company would later acknowledge that the actual minimum costs to remediate the BLA defect across all affected sites was at least $73 million.[10] Despite these facts and circumstances, the 1934 Act Defendants failed to record any specific warranty reserves or make any disclosures related to the BLA defect in its 1Q22 Form 10-Q. Instead, Shoals vaguely and misleadingly warned investors that "we **_may_** face warranty, indemnity and product liability claims arising from defective products." Meanwhile, Shoals had a warranty reserve of $600,000 or less, as of 1Q22.[11] Shoals' failure to accrue for and/or disclose the BLA defect violated GAAP. Specifically, by May 17, 2022, it was "probable" that Shoals would incur significant remediation costs related to the BLA defect and the initial costs could be "reasonably estima[ted]" as the Company had already inspected numerous affected sites and started remediation at those sites. Thus, Shoals was required under ASC 450 to record a warranty accrual for the costs that could be reasonably estimated. In addition, even if the total remediation costs could not yet be reasonably estimated, there was clearly a "more than remote" chance that Shoals would incur material

---

[10] On November 12, 2024, Shoals revealed that estimated remediation costs would be at least $73 million and could be as high as $160 million.

[11] Shoals did not specifically disclose its warranty reserve as of 1Q22. However, subsequent disclosures revealed that Shoals' warranty reserve was only $100,000 as of December 31, 2021, and only $600,000 as of December 31, 2022.

remediation costs related to the BLA defect. Thus, Shoals was required under ASC 450 to disclose the specific nature of the warranty loss contingency and either estimate "the possible loss or range of loss" or "state[] that such an estimate c[ould] []not be made."

**ANSWER:** With regard to the first sentence in this paragraph, Defendants admit that on May 17, 2022, Shoals filed with the SEC a quarterly report on Form 10-Q for the quarter ended March 31, 2022, which is publicly available. Defendants refer to the Form 10-Q for its complete contents. With regard to the fourth, fifth, and sixth sentences in this paragraph, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding statements purportedly made by FEs 1 and 2 and deny the allegations on that basis. With regard to footnote 10 in this paragraph, Defendants admit that on November 12, 2024, Shoals filed with the SEC a quarterly report on Form 10-Q for the quarter ended September 30, 2024, which is publicly available and which disclosed, "Based on additional information obtained, the Company has increased the low-end of the estimated range from $59.7 million to $73.0 million, and decreased the high-end of the estimated range from $184.9 million to $160.0 million." Defendants refer to the Form 10-Q for its complete contents. With regard to footnote 11 in this paragraph, Defendants admit that Shoals disclosed that its estimated accrued warranty reserve was $100,000 as of December 31, 2021, and $600,000 as of December 31, 2022. Except as expressly admitted, Defendants deny the remaining allegations.

135. ***Shoals filed its 2Q22 Form 10-Q on August 16, 2022***. As of this date, the BLA defect and associated remediation costs represented a material loss contingency under ASC 450. After the initial customer complaints, Shoals had continued to investigate the BLA defect and had conducted numerous additional site inspections which further verified the defect was not an isolated incident. According to FEs 1 and 2, by June 2022, Shoals was aware of at least four to

five other solar fields that were experiencing the same issues as the initial site in Phoenix. Shoals continued to replace the defective harnesses at customer sites at its own expense. According to FE2, the estimate of remediation costs across these sites likely amounted to more than $15 million. In total, the Company would later acknowledge that the actual minimum costs to remediate the BLA defect across all affected sites was at least $73 million.[12] Despite these facts and circumstances, the 1934 Act Defendants failed to record any specific warranty reserves or make any disclosures related to the BLA defect in its 1Q22 Form 10-Q. Instead, Shoals vaguely and misleadingly warned investors that "we *may* face warranty, indemnity and product liability claims arising from defective products." Meanwhile, Shoals had a warranty reserve of $600,000, or less, as of 2Q22.[13] Shoals' failure to accrue for and/or disclose the BLA defect violated GAAP. Specifically, by August 16, 2022, it was "probable" that Shoals would incur significant remediation costs related to the BLA defect and the initial costs could be "reasonably estima[ted]" as the Company had already inspected numerous affected sites and started remediation at those sites. Thus, Shoals was required under ASC 450 to record a warranty accrual for the costs that could be "reasonably estimated." In addition, even if total remediation costs could not yet be reasonably estimated, there was clearly a "more than remote" chance that Shoals would incur material remediation costs related to the BLA defect. Thus, Shoals was required under ASC 450 to disclose the specific nature of the warranty loss contingency and either estimate "the possible loss or range of loss" or "state[] that such an estimate c[ould] []not be made."

---

[12] On November 12, 2024, Shoals revealed that estimated remediation costs would be at least $73 million and could be as high as $160 million.

[13] Shoals did not specifically disclose its warranty reserve as of 2Q22. However, subsequent disclosures revealed that Shoals' warranty reserve was only $100,000 as of December 31, 2021, and only $600,000 as of December 31, 2022.

79

**ANSWER:** With regard to the first sentence in this paragraph, Defendants admit that on August 16, 2022, Shoals filed with the SEC a quarterly report on Form 10-Q for the quarter ended June 30, 2022, which is publicly available. Defendants refer to the Form 10-Q for its complete contents. With regard to the fourth and fifth sentence in this paragraph, Defendants lack knowledge of information sufficient to form a belief as to the truth of the allegations regarding statements purportedly made by FEs 1 and 2 and deny the allegations on that basis. With regard to footnote 12 in this paragraph, Defendants admit that on November 12, 2024, Shoals filed with the SEC a quarterly report on Form 10-Q for the quarter ended September 30, 2024, which is publicly available and which disclosed, "Based on additional information obtained, the Company has increased the low-end of the estimated range from $59.7 million to $73.0 million, and decreased the high-end of the estimated range from $184.9 million to $160.0 million." Defendants refer to the Form 10-Q for its complete contents. With regard to footnote 13 in this paragraph, Defendants admit that Shoals disclosed that its estimated accrued warranty reserve was $100,000 as of December 31, 2021, and $600,000 as of December 31, 2022. Except as expressly admitted, Defendants deny the remaining allegations.

136. ***Shoals filed its 3Q22 Form 10-Q on November 14, 2022***. As of this date, the BLA defect and associated remediation costs represented a material loss contingency under ASC 450. Shoals has subsequently admitted that by late 2022, "numerous other . . . customers began reporting similar instances of copper conductor exposure in the field" and Shoals has contended that it believed "the root cause of the exposed copper conductor is due to unacceptable amounts of insulation shrinkback," which could have been present in ***all*** shoals sites which were installed in the prior several years using the same wire. The Company would later acknowledge that the actual

80

minimum costs to remediate the BLA defect across all affected sites was at least $73 million.[14] Despite these facts and circumstances, the 1934 Act Defendants failed to record any specific warranty reserves or make any disclosures related to the BLA defect in the Company's 3Q22 Form 10-Q. Instead, Shoals vaguely and misleadingly warned investors that "we **may** face warranty, indemnity and product liability claims arising from defective products." Meanwhile, Shoals had a total warranty reserve of $600,000 or less as of 3Q22.[15]

**ANSWER:**   With regard to the first sentence in this paragraph, Defendants admit that on November 14, 2022, Shoals filed with the SEC a quarterly report on Form 10-Q for the quarter ended September 30, 2022, which is publicly available.  Defendants refer to the Form 10-Q for its complete contents.   With regard to footnote 14 in this paragraph, Defendants admit that on November 12, 2024, Shoals filed with the SEC a quarterly report on Form 10-Q for the quarter ended September 30, 2024, which is publicly available and which disclosed, "Based on additional information obtained, the Company has increased the low-end of the estimated range from $59.7 million to $73.0 million, and decreased the high-end of the estimated range from $184.9 million to $160.0 million."  Defendants refer to the Form 10-Q for its complete contents.  With regard to footnote 15 in this paragraph, Defendants admit that Shoals disclosed that its estimated accrued warranty reserve was $100,000 as of December 31, 2021, and $600,000 as of December 31, 2022. Except as expressly admitted, Defendants deny the remaining allegations.

137.    Shoals' failure to accrue for and/or disclose the BLA defect violated GAAP. Specifically, by November 14, 2022, it was "probable" that Shoals would incur significant

---

[14] On November 12, 2024, Shoals revealed that estimated remediation costs would be at least $73 million and could be as high as $160 million.

[15] Shoals did not specifically disclose its warranty reserve as of 3Q22, however, subsequent disclosures revealed that Shoals' warranty reserve was only $100,000 as of December 31, 2021, and only $600,000 as of December 31, 2022.

remediation costs related to the BLA defect and the costs could be "reasonably estima[ted]" as the Company had already started remediating numerous affected sites and the 1934 Act Defendants had purported to identify the "root cause" of the defect, which made it possible to identify the total population of affected sites. Thus, Shoals was required under ASC 450 to record a warranty accrual for the remediation costs that could be reasonably estimated. In addition, even if total remediation costs could not yet be reasonably estimated, there was clearly a "more than remote" chance that Shoals would incur material remediation costs related to the BLA defect. Thus, Shoals was required under ASC 450 to disclose the specific nature of the warranty loss contingency and either estimate "the possible loss or range of loss" or "state[] that such an estimate c[ould] []not be made."

**ANSWER:** Defendants deny the allegations.

138. ***Shoals filed its FY22 Form 10-K on February 28, 2023***. As of this date, the BLA defect and associated remediation costs represented a material loss contingency under ASC 450. Shoals has admitted that by late 2022, "numerous other . . . customers began reporting similar instances of copper conductor exposure in the field" and contended that "[i]n or around November 2022, Shoals came to understand that the root cause of the exposed copper conductor is due to unacceptable amounts of insulation shrinkback." Shoals was also aware that the BLA defect impacted a wide timeframe of customer installations, dating as far back as FY20. The Company would later acknowledge that the actual minimum costs to remediate the BLA defect across all affected sites was at least $73 million.[16] Despite these facts and circumstances, the 1934 Act Defendants failed to record any specific warranty reserves or make any disclosures related to the BLA defect in its FY22 Form 10-K. Instead, Shoals vaguely and misleadingly warned investors

---

[16] On November 12, 2024, Shoals revealed that estimated remediation costs would be at least $73 million and could be as high as $160 million.

that "we may face warranty, indemnity and product liability claims arising from defective products." Meanwhile, Shoals' total warranty reserve was only $600,000 as of December 31, 2022.

**ANSWER:** With regard to the first sentence in this paragraph, Defendants admit that on February 28, 2023, Shoals filed with the SEC an annual report on Form 10-K for the year ended December 31, 2022, which is publicly available. Defendants refer to the Form 10-K for its complete contents. With regard to footnote 16 in this paragraph, Defendants admit that on November 12, 2024, Shoals filed with the SEC a quarterly report on Form 10-Q for the quarter ended September 30, 2024, which is publicly available and which disclosed, "Based on additional information obtained, the Company has increased the low-end of the estimated range from $59.7 million to $73.0 million, and decreased the high-end of the estimated range from $184.9 million to $160.0 million." Defendants refer to the Form 10-Q for its complete contents. Except as expressly admitted, Defendants deny the remaining allegations.

139. Shoals' failure to accrue for and/or disclose the BLA defect violated GAAP. Specifically, by February 28, 2023, it was "probable" that Shoals would incur significant remediation costs related to the BLA defect and the costs could be "reasonably estima[ted]" as the Company had already started remediating numerous affected sites and the 1934 Act Defendants had purportedly identified the "root cause" of the defect, which made it possible to identify the total population of affected sites. Thus, Shoals was required under ASC 450 to record a warranty accrual for the remediation costs that could be reasonably estimated. In addition, even if total remediation costs could not yet be reasonably estimated, there was clearly a "more than remote" chance that Shoals would incur material remediation costs related to the BLA defect. Thus, Shoals was required under ASC 450 to disclose the specific nature of the warranty loss contingency and

either estimate "the possible loss or range of loss" or "state[] that such an estimate c[ould] []not be made."

**ANSWER:** Defendants deny the allegations.

140. ***Shoals filed its 1Q23 Form 10-Q on May 8, 2023***. As of this date, the BLA defect and associated remediation costs represented a material loss contingency under ASC 450. By May 2023, Shoals and its supplier had conducted further testing and confirmed the BLA defect impacted a wide timeframe of customer installations, dating as far back as FY20. Shoals had also purportedly received further confirmation of the root cause of BLA defect, including contending that its supplier had lacked adequate controls over the manufacturing process. Despite these facts and circumstances, the 1934 Act Defendants failed to record any specific warranty reserves related to the BLA defect in its 1Q23 Form 10-Q. Shoals did disclose the BLA defect for the first time, stating:

> The Company has been notified by certain customers that a subset of wire harnesses used in its EBOS solutions is presenting excessive pull back of wire insulation at connection points ("shrinkback"). Based upon the Company's initial assessment, the Company believes the shrinkback is related to a subset of specific colored wire provided by one specific supplier. While it is probable that the Company will incur costs related to the repair or replacement of the impacted wire harnesses, based on the limited information available as of the date of this Quarterly Report, including the scope of affected sites, potential solutions and the possibility of recovery from the wire supplier, it is not possible to reasonably estimate those costs. The Company is continuing its investigation of this matter to determine a course of action, and has substantially ceased use of the related wire from this supplier. As additional information becomes available, the Company expects to increase its estimated accrued warranty liability, which may be material. The Company does not maintain insurance for product warranty, and as necessary, the Company intends to seek recovery from the third party supplier.

**ANSWER:** With regard to the first and sixth sentence in this paragraph, Defendants admit that on May 8, 2023, Shoals filed with the SEC a quarterly report on Form 10-Q for the quarter ended March 31, 2023, which is publicly available and contains the language quoted in the sixth sentence

of this paragraph. Defendants refer to the Form 10-Q for its complete contents. Except as expressly admitted, Defendants deny the remaining allegations.

141.    Meanwhile, the 1934 Act Defendants actually ***decreased*** Shoals' total warranty reserve by a third during 1Q23 from $600,000 as of December 31, 2022, to just $400,000 as of March 31, 2023.

**ANSWER:** Defendants admit that Shoals' estimated accrued warranty liability was $400,000 as of March 31, 2023 and $600,000 as of December 31, 2022. Except as expressly admitted, Defendants deny the remaining allegations.

142.    Shoals' failure to properly accrue for and/or disclose the true scope of the BLA defect violated GAAP. Specifically, by May 8, 2023, the 1934 Act Defendants acknowledged that it was "probable" that Shoals would incur significant remediation costs related to the BLA defect, but claimed the costs could not be "reasonably estima[ted]" and thus the 1934 Act Defendants did not record any specific warranty accrual or disclose an estimate of the "the possible loss or range of loss," in accordance with ASC 450. However, unbeknownst to investors, the Company had: (i) known about the BLA defect for over 12 months; (ii) already started remediating numerous affected sites; and (iii) purportedly identified the "root cause" of the defect, which should have made it possible to identify the total population of affected sites. Thus, by May 2023, the 1934 Act Defendants knew, or were reckless in not knowing, a reasonable estimate, or at the very minimum, an estimate of the "the possible loss or range of loss" associated with remediating the BLA defect.

**ANSWER:** Defendants deny the allegations.

143.    ***Shoals filed its 2Q23 Form 10-Q on August 1, 2023***. As of this date, the BLA defect and associated remediation costs represented a material loss contingency under ASC 450.

85

**ANSWER:** With regard to the first sentence in this paragraph, Defendants admit that on August 1, 2023, Shoals filed with the SEC a quarterly report on Form 10-Q for the quarter ended June 30, 2023, which is publicly available. Defendants refer to the Form 10-Q for its complete contents. Except as expressly admitted, Defendants deny the remaining allegations.

144. For the first time, the 1934 Act Defendants recorded a specific warranty reserve related to the BLA defect in Shoals' 2Q23 Form 10-Q, stating:

> Based on the Company's analysis of information available as of the date of this Quarterly Report, the Company has determined that it has sufficient information to estimate the low end of the range of potential outcomes. However, the Company continues to be unable to estimate the upper end of the range of potential outcomes based on the limited information available as of the date of this Quarterly Report, including the scope of affected sites, potential solutions and the possibility of recovery from the wire supplier. No amount within the range of potential outcomes appears to be a better estimate than any other amount within the range. Accordingly, as of June 30, 2023, the Company has recorded a warranty liability of $9.3 million related to this matter, representing the low end of the range of potential outcomes.

**ANSWER:** Defendants admit that on August 1, 2023, Shoals filed with the SEC a Form 10-Q for the quarter ended June 30, 2023, which is publicly available and contains the language quoted in this paragraph. Defendants refer to the Form 10-Q for its complete contents. Except as expressly admitted, Defendants deny the remaining allegations.

145. However, Shoals' $9.3 million warranty reserve as of 2Q23 was materially understated. The actual minimum costs to remediate the BLA defect totaled at least $73 million. Thus, as depicted in the chart below, Shoals' BLA defect warranty reserve was understated by 87% as of 2Q23.

|  | **2Q23** |
|---|---|
| **Actual BLA defect remediation costs (minimum)** | $73.0 million |
| **BLA defect warranty reserve (as reported)** | $9.3 million |
| **% understated** | 87.3% |

**ANSWER:** Defendants deny the allegations.

86

146. Shoals' failure to properly accrue for and/or disclose the true scope of the BLA defect violated GAAP. Specifically, by August 1, 2023, the 1934 Act Defendants acknowledged that it was "probable" that Shoals would incur significant remediation costs related to the BLA defect, but accrued less than $10 million and failed to disclose an estimate of the "the possible loss or range of loss," in accordance with ASC 450. Unbeknownst to investors, the Company had: (i) known about the BLA defect for over 12 months; (ii) already started remediating numerous affected sites; and (iii) identified the purported "root cause" of the defect, which should have made it possible to identify the total population of affected sites. Thus, by August 2023, the 1934 Act Defendants knew, or were reckless in not knowing, a reasonable estimate of remediation costs (to accrue for), or at the very minimum, an estimate of the "the possible loss or range of loss" associated with remediating the BLA defect.

**ANSWER:** Defendants deny the allegations.

147. ***Shoals filed its 2Q23 Form 10-Q on November 7, 2023***. As of this date, the BLA defect and associated remediation costs represented a material loss contingency under ASC 450. Shoals stated in an October 2023 court filing that "Shoals' products using Prysmian red wire that was sold to Shoals between 2020 and approximately 2022 are believed to have been used at approximately 300 solar field sites nationwide."

**ANSWER:** With regard to the first sentence in this paragraph, Defendants admit that on November 7, 2023, Shoals filed with the SEC a quarterly report on Form 10-Q for the quarter ended September 30, 2023, which is publicly available. Defendants refer to the Form 10-Q for its complete contents. With regard to the third sentence in this paragraph, Defendants aver that the sentence purports to characterize statements made by Shoals without specifying when or how the statement was made. Defendants thus lack information sufficient to form a belief as to the truth

of the allegations and deny them on that basis. Except as expressly admitted, Defendants deny the remaining allegations.

148. The 1934 Act Defendants increased Shoals' warranty reserve related to the BLA defect in Shoals' 3Q23 Form 10-Q, stating:

> Based on the Company's continued analysis of information available as of the date of this Quarterly Report, which includes better visibility into the scope of affected sites and potential solutions, including identification, repair and replacement of harnesses, the Company has determined that a potential range of loss was both probable and reasonably estimable and has updated its estimate of potential losses from the estimate provided in the previous quarter. However, as no amount within the current range of loss appears to be a better estimate than any other amount, the Company has recorded a warranty liability and related expense representing the low end of the range of potential loss of $59.7 million. The high-end of the range of potential loss is $184.9 million, which is $125.2 million higher than the amount we recorded. As of September 30, 2023, our recorded warranty liability related to this matter was $56.6 million.

**ANSWER:** Defendants admit that on November 7, 2023, Shoals filed with the SEC a Form 10-Q for the quarter ended September 30, 2023, which is publicly available and contains the language quoted in this paragraph. Defendants refer to the Form 10-Q for its complete contents. Except as expressly admitted, Defendants deny the remaining allegations.

149. However, Shoals' $56.6 million warranty reserve was materially understated. The actual minimum costs to remediate the BLA defect totaled at least $73 million, with at least $69.9 million in remediation costs remaining as of 3Q23. Thus, as depicted in the chart below, Shoals' BLA defect warranty reserve was understated by nearly 20% as of 3Q23.

|  | 3Q23 |
|---|---|
| **Actual BLA defect remediation costs (minimum)** | $73.0 million |
| **Remediation costs remaining as of 3Q22** | $69.9 million[17] |
|  |  |
| **BLA defect warranty reserve (as reported)** | $56.6 million |
| **% understated** | 19.0% |

---

[17] Note: remediation costs remaining is net of payments made through 3Q23.

**ANSWER:** Defendants deny the allegations.

150. Shoals' failure to properly accrue for and/or disclose the true scope of the BLA defect violated GAAP. Specifically, by November 7, 2023, the 1934 Act Defendants acknowledged that it was "probable" that Shoals would incur significant remediation costs related to the BLA defect, but accrued just $56 million in warranty reserves. As alleged herein, the 1934 Act Defendants knew, or were reckless in not knowing, that remediation costs associated with remediating the BLA defect would total over $70 million, at a minimum.

**ANSWER:** With respect to the second sentence, Defendants admit that by November 7, 2023, Shoals had "determined that a potential range of loss was both probable and reasonably estimable" and that Shoals' "recorded warranty liability related to this matter was $56.6 million," as disclosed in Shoals' Form 10-Q for the quarter ended September 30, 2023, filed with the SEC on November 7, 2023. Defendants refer to the Form 10-Q for its complete contents. Except as expressly admitted, Defendants deny the remaining allegations.

151. ***Shoals filed its FY23 Form 10-K on February 28, 2024***. As of this date, the BLA defect and associated remediation costs represented a material loss contingency under ASC 450.

**ANSWER:** With regard to the first sentence in this paragraph, Defendants admit that on February 28, 2024, Shoals filed with the SEC an annual report on Form 10-K for the year ended December 31, 2023. Defendants further admit that, "as of December 31, 2023, based on the Company's continued analysis, which included better visibility into the scope of affected sites and potential solutions, including identification, repair and replacement of harnesses, the Company determined that a potential range of loss was both probable and reasonably estimable and updated its estimate of potential losses from previously provided estimates," as Shoals disclosed in its Form 10-K on

89

February 28, 2024. Defendants refer to the Form 10-K for its complete contents. Except as expressly admitted, Defendants deny the remaining allegations.

152. The 1934 Act Defendants failed to increase its Shoals' warranty reserve related to the BLA defect in Shoals' FY23 Form 10-K, stating:

> As of December 31, 2023, based on the Company's continued analysis, which included better visibility into the scope of affected sites and potential solutions, including identification, repair and replacement of harnesses, the Company determined that a potential range of loss was both probable and reasonably estimable and updated its estimate of potential losses from previously provided estimates. Based on the Company's continued analysis of information available as of the date of this Annual Report, the estimate of potential losses remains unchanged from the estimate provided as of September 30, 2023. As no amount within the current range of loss appears to be a better estimate than any other amount, the Company has recorded a warranty liability and related expense representing the low end of the range of potential loss of $59.7 million. The high-end of the range of potential loss is $184.9 million, which is $125.2 million higher than the amount we have recorded. As of December 31, 2023, the Company recorded a warranty liability of $54.9 million related to this matter.

**ANSWER:** Defendants admit that on February 28, 2024, Shoals filed with the SEC a Form 10-K, which is publicly available and contains the language quoted in this paragraph. Defendants refer to the Form 10-K for its complete contents. Except as expressly admitted, Defendants deny the remaining allegations.

153. Shoals' $54.9 million warranty reserve was materially understated. The actual minimum costs to remediate the BLA defect totaled at least $73 million, with at least $68.2 million in remediation costs remaining as of 4Q23. Thus, as depicted in the chart below, Shoals' BLA defect warranty reserve was understated by nearly 20% as of 4Q23.

| | **4Q23** |
|---|---|
| **Actual BLA defect remediation costs (minimum)** | $73.0 million |
| **Remediation costs remaining as of 3Q22** | $68.2 million[18] |
| | |
| **BLA defect warranty reserve (as reported)** | $54.9 million |

---

[18] Note: remediation costs remaining is net of payments made through 4Q23.

| | % understated | 19.5% |
|---|---|---|

**ANSWER:** Defendants deny the allegations.

154. Shoals' failure to properly accrue for and/or disclose the true scope of the BLA defect violated GAAP. Specifically, by February 28, 2024, the 1934 Act Defendants acknowledged that it was "probable" that Shoals would incur significant remediation costs related to the BLA defect, but had accrued just $56 million in warranty reserves. As alleged herein, the 1934 Act Defendants knew, or were reckless in not knowing, that remediation costs associated with remediating the BLA defect would total over $70 million, at a minimum.

**ANSWER:** With regard to the second sentence, Defendants admit that, "as of December 31, 2023, based on the Company's continued analysis, which included better visibility into the scope of affected sites and potential solutions, including identification, repair and replacement of harnesses, the Company determined that a potential range of loss was both probable and reasonably estimable and updated its estimate of potential losses from previously provided estimates," and "as of December 31, 2023, the Company recorded a warranty liability of $54.9 million related to this matter," as Shoals disclosed in its Form 10-K on February 28, 2024. Defendants refer to the Form 10-K for its complete contents. Except as expressly admitted, Defendants deny the remaining allegations.

## VI.    LOSS CAUSATION/ECONOMIC LOSS – 1934 CLAIMS ONLY

155. During the Class Period, as detailed herein, defendants engaged in a scheme to defraud and made materially untrue, false, and misleading statements and/or omitted material information concerning Shoals' business fundamentals and financial prospects. Defendants' wrongful course of conduct – which for the 1934 Act Defendants was fraudulent – had the effect of artificially inflating, maintaining, and manipulating the price of Shoals Common Stock and deceived Plaintiffs and the Class, causing purchases of Shoals Common Stock to suffer economic

91

harm as the truth reached the market. When the circumstances concealed by defendants began to come out, it caused the price of Shoals Common Stock to fall as the prior artificial inflation came out of the stock price. As a result of their purchase or acquisition of Shoals Common Stock at inflated prices during the Class Period, and the decline in the price of Shoals Common Stock when the relevant truth began to be revealed, Plaintiffs and other members of the Class suffered economic loss, i.e., damages, under the federal securities laws. The following paragraphs detail examples of instances, both during and after the Class Period, in which the relevant truth was partially revealed.

**ANSWER:** Defendants deny the allegations.

156. On August 1, 2023, Shoals unexpectedly revealed that Shoals was recording a $9.4 million warranty expense primarily due to the shrinkback issue. As a result, the 2Q23 Release reported that Shoals' quarterly gross profit margin had declined sequentially to 42.4% from approximately 46% reported in the prior quarter. But analysts and investors were still in the dark on just how pervasive this shrinkback problem was and the growing negative repercussions it would have on Shoals later on in the Class Period.

**ANSWER:** With regard to the first and second sentences in this paragraph, Defendants admit that on August 1, 2023, Shoals issued a press release, which is publicly available and disclosed Shoals' estimated accrued warranty liability and quarterly gross profit margin. Defendants refer to the press release for its complete contents. Except as expressly admitted, Defendants deny the remaining allegations.

157. On this news, the price of Shoals Common Stock fell from $26.11 per share on August 1, 2023 to $24.51 per share on August 2, 2023, or approximately 6%, on above-average trading volume of over 6 million shares traded.

**ANSWER:** Defendants aver that the prices of Shoals stock are publicly available. Except as expressly admitted, Defendants deny the remaining allegations.

158. The financial impact and potential overhang for Shoals of the shrinkback problem did not go unnoticed by analysts.

    (a)    One analyst from Piper Sandler noted in an August 1, 2023 report that Shoals' "charge is well above the $0.5M increase in the warranty reserve balance during 2022" and that "[a]ccordingly, adjusting [gross margins] to account for excess warranty would imply 50% 2Q margins."

    (b)    Another analyst from UBS wrote in an August 1, 2023 report about the $9 million warranty charge for "potential wire shrinkage issues" and further noted that it was "[u]nclear if this issue will be an on-going issue."

    (c)    In an August 2, 2023 report, an analyst from Truist Securities wrote that "excluding the Company's $9.4MM warranty expense recorded during the quarter, SHLS would have achieved record GMs of >50%."

    (d)    An August 3, 2023 TD Cowen analyst report noted that "Shoals reported another quarter of solid results, hindered by a one-time warranty item related to a faulty wire component from one supplier."

    (e)    A Barclays analyst report published on August 3, 2023 noted:

> **How much of a risk is this warranty issue**?: With the 1Q 10-Q, the company disclosed for the first time that it was notified by certain customers that a subset of wire harnesses were presenting excessive pull back of wire insulation at connection points and noted that it "expects to increase its estimated accrued warranty liability, which may be material." It also noted that it does not "maintain insurance for product warranty, and as necessary, the company intends to seek recovery from the third party supplier." The 2Q 10-Q states that it has "recorded a warranty liability of $9.3 million related to this matter, representing the low end of the range of potential outcomes." It may also "increase its estimated warranty liability from its current accrual, and such increase may be material." We aren't

93

sure what to make of this issue – we are inclined to think that there could be future accruals in forward quarters, which would continue to show up in gross margins, but also don't know how much the company will be able to recover from the supplier, which they have already stopped using. Anecdotally, we have heard from channel checks that there is a bit of a debate going on around whether or not the issue is due to the wire or faulty installation.

**ANSWER:** With regard to the subparts in this paragraph, Defendants aver that the analyst reports referenced and quoted in part in this paragraph are publicly available. Defendants refer to the analyst reports for their complete contents. Except as expressly admitted, Defendants deny the remaining allegations.

159. However, the price of Shoals Common Stock continued to be artificially inflated as the 1934 Act Defendants continued to make material misstatements and omissions and to conceal the full truth regarding the Company's business, operations, and financial results.

**ANSWER:** Defendants deny the allegations.

160. On November 7, 2023, Shoals reported that it had booked $50.2 million in warranty expenses for the quarter related to the shrinkback issue – representing a greater than five-fold increase from the $9.4 million warranty expense incurred in 2Q23. Shoals disclosed a range of potential loss related to the shrinkback issue of $59.7 million to $184.9 million, which was $125.2 million higher than the Company recorded for the previous quarter.

**ANSWER:** Defendants admit that on November 7, 2023, Shoals filed with the SEC a Form 10-Q for the quarter ended September 30, 2023, which is publicly available and which disclosed that Shoals "recorded total warranty expense related to this matter of $50.2 million and $59.1 million for the three and nine months ended September 30, 2023, respectively." Defendants further admit that the Form 10-Q disclosed that the Company "has recorded warranty liability and related expense representing the low end of the range of potential loss of $59.7 million. The high-end of the range of potential loss is $184.9 million, which is $125.2 million higher than the amount we

recorded." Defendants refer to the Form 10-Q for its complete contents. Except as expressly admitted, Defendants deny the remaining allegations.

161. The same day, Shoals published a 3Q23 Investor Presentation, which provided a "WARRANTY LIABILITY UPDATE," which stated that "it is believed that approximately 300 sites may have harnesses made with this wire, representing about 30% of the total amount of Shoals' harnesses manufactured during the same timeframe," facts reiterated by defendant Moss during the Company's 3Q23 conference call.

**ANSWER:** Defendants aver that Moss was dismissed as a Defendant in the Court's September 30, 2025 Order Granting in Part and Denying in Part Defendants' Motion to Dismiss, and therefore this challenged statement is no longer at issue. For that reason, no response to this paragraph is required. To the extent a response is required, Defendants admit that on November 7, 2023, Shoals published on its website an investor presentation, which is publicly available and contains the language quoted in this paragraph. Defendants refer to the investor presentation for its complete contents. Except as expressly admitted, Defendants deny the remaining allegations.

162. On this news, the price of Shoals Common Stock fell from $16.23 per share on November 7, 2023 to $12.95 per share on November 9, 2023, or approximately 20%, over a two-day trading period, on above-average trading volume. However, the price of Shoals Common Stock continued to be artificially inflated as defendants continued to make material misstatements and omissions and to conceal the full truth regarding the Company's business, operations, and financial results.

**ANSWER:** With regard to the first sentence, Defendants aver that the prices of Shoals stock are publicly available. Except as expressly admitted, Defendants deny the remaining allegations.

163.    Analysts and investors were stunned by these disclosures in the Company's 3Q23 Release and earnings call concerning the magnitude of Shoals' potential loss related to wire insulation shrinkback.

(a)    For example, on November 8, 2023, analysts at Barclays commented that the upper end of the revised warranty expense range was "higher than what most investors we spoke to were expecting."

(b)    The same day, Guggenheim analysts wrote that Shoals "[w]arranty charge" was "well above what's been recognized to date…we expect this issue to continue hanging over the stock."

(c)    In a November 7, 2023 report, analysts at Truist Securities also directly linked Shoals' sharp stock price decline to the revised warranty expense range and warranty charge, noting that the Company's 3Q23 results "were heavily impacted by a ~50mm warranty charge that drove unadjusted 3Q GMs well below our/street estimates."

(d)    On November 10, 2023, a Barclays analyst report stated that "the upper end of the $60-$185mm *came as a surprise to investors* and has contributed to the underperformance of the stock."

**ANSWER:**  With regard to the subparts in this paragraph, Defendants aver that the analyst reports referenced and quoted in part in this paragraph are publicly available.  Defendants refer to the analyst reports for their complete contents.  Except as expressly admitted, Defendants deny the remaining allegations.

164.    On February 28, 2024, Shoals revealed that growth in Shoals' backlog and awarded orders declined, falling sequentially by $2 million to $631.3 million, down from $633.3 million in the prior quarter, materially impacting the Company's financial guidance for revenue.

**ANSWER:** Defendants admit that on February 28, 2024, Shoals filed with the SEC a Form 10-K, which is publicly available and which disclosed that "[a]s of December 31, 2023, [Shoals] had $631.3 million of backlog and awarded orders," which "decreased by .3% relative to September 30, 2023." Defendants refer to the Form 10-K for its complete contents. Except as expressly admitted, Defendants deny the remaining allegations.

165. The same day, Shoals also disclosed that "[i]nitial[ly], shrinkback issues were found on at least 20 sites of the approximately 300 sites that have had the defective Prysmian red wire" but that Shoals had been "informed that approximately 10 incremental [*i.e.*, additional] sites [had] experienced shrinkback."

**ANSWER:** Defendants admit that on February 28, 2024, Shoals published on its website an investor presentation, which is publicly available and which disclosed, "Initially, shrinkback issues were found on at least 20 sites of the approximately 300 sites that may have had the defective Prysmian red wire. In addition, after we filed our complaint and customer notices were issued to those approximately 300 sites, we were informed that approximately 10 incremental sites experienced shrinkback." Defendants refer to the investor presentation for its complete contents. Except as expressly admitted, Defendants deny the remaining allegations.

166. On this news, the price of Shoals Common Stock fell from $15.39 per share on February 28, 2024 to $12.83 per share on February 29, 2024, or more than 16%, on above-average trading volume of over 15.5 million shares traded. However, the price of Shoals Common Stock continued to be artificially inflated as the 1934 Act Defendants continued to make material misstatements and omissions and to conceal the full truth regarding the Company's business, operations, and financial results.

**ANSWER:** With regard to the first sentence, Defendants aver that the prices of Shoals stock are publicly available. Except as expressly admitted, Defendants deny the remaining allegations.

167. On May 7, 2024, Shoals revealed that the Company's business deterioration as a result of the fallout from the shrinkback issue was much more severe than previously disclosed. Specifically, the Company revealed that Shoals' backlog and awarded orders had fallen more than $16 million on a sequential basis to $615.2 million and that the Company had suffered "unprecedented" project cancellations and several order delays during 1Q24. The Company also admitted in its 1Q24 Form 10-Q that the Company's estimate of shrinkback and warranty costs "may increase" and that such increase "may be material."

**ANSWER:** With regard to the second sentence in this paragraph, Defendants aver that the allegations purport to summarize statements made by Shoals without specifying where or how the statements were made. Defendants thus lack information sufficient to form a belief as to the truth of the allegations and deny them on that basis. With regard to the third sentence in this paragraph, Defendants admit that on May 7, 2024, Shoals filed with the SEC a Form 10-Q, which is publicly available and contains the language quoted in this paragraph. Defendants refer to the Form 10-Q for its complete contents. Except as expressly admitted, Defendants deny the remaining allegations.

168. On this news, the price of Shoals Common Stock fell from $8.80 per share on May 7, 2024 to $7.51 per share on May 8, 2024, or approximately 15%, on above-average trading volume of over 13 million shares traded.

**ANSWER:** Defendants aver that the prices of Shoals stock are publicly available. Except as expressly admitted, Defendants deny the remaining allegations.

169.     Analysts reacted quickly and negatively to Shoals' announcements of poor financial performance and continuing (and growing) shrinkback warranty problems.

(a)     For example, on May 6, 2024, analysts at Janney wrote: "We think investors are worried about derivative issues from warranty shrinkback including…[market] share loss potential, etc."

(b)     On May 7, 2024, analysts at Piper Sandler remarked, "almost everything went wrong in this update," which included "reduced revenues," "sequentially declining backlog," "[p]roject delays," "unusual cancellations," and "another shrinkback project identified."

(c)     On May 8, 2024, analysts with Barclays reported on Shoals' "[s]oft quarter with weakening outlook," noting that "[Shoals] sees de-bookings for the first time" and that Shoals' "'[u]nprecedented' de-booking" of "~$60 [million] of backlog/awarded orders that canceled/pushed back" had "offset [its] new bookings by half."

**ANSWER:** With regard to the subparts in this paragraph, Defendants aver that the analyst reports referenced and quoted in part in this paragraph are publicly available. Defendants refer to the analyst reports for their complete contents. Except as expressly admitted, Defendants deny the remaining allegations.

170.     Then, on November 12, 2024, just over five months after the Class Period ended, Shoals filed with the SEC a quarterly report on Form 10-Q for the quarter ended September 30, 2024 ("3Q24 Form 10-Q"). In the Company's 3Q24 Form 10-Q, Shoals announced that it had increased the lower end of its estimated loss due to warranty liability by $13.3 million to a new, higher range of $73 million to $160 million. Further, Shoals reported that the Company's backlog and reported orders were down 5.8% from the same quarter last year, and a 7.1% sequential decrease from the previous quarter.

**ANSWER**:  Defendants admit that on November 12, 2024, Shoals filed with the SEC a quarterly report on Form 10-Q for the quarter ended September 30, 2024, which is publicly available and which disclosed, "Based on additional information obtained, the Company has increased the low-end of the estimated range from $59.7 million to $73.0 million, and decreased the high-end of the estimated range from $184.9 million to $160.0 million."  Defendants further admit that the Form 10-Q disclosed that, "As of September 30, 2024, backlog and awarded orders decreased by 5.8% relative to the same date last year and decreased by 7.1% relative to June 30, 2024, as a result of previously disclosed project delays."  Defendants refer to the Form 10-Q for its complete contents. Except as expressly admitted, Defendants deny the remaining allegations.

171.    On this news, the price of Shoals Common Stock fell from $5.77 on November 11, 2024 to $4.85 per share on November 12, 2024, or approximately 16%, on above-average trading volume.

**ANSWER:**  Defendants aver that the prices of Shoals stock are publicly available.  Except as expressly admitted, Defendants deny the remaining allegations.

172.    Analysts again reacted adversely to Shoals' 3Q24 disclosures.

(a)    For example, on November 12, 2024, Wells Fargo's analysts wrote: "Backlog & Awarded Orders Were Down Sequentially – Negative Reaction."

(b)    The same day, Cantor commented: "3Q24 Review; Another Profitability Guide-Down[,]…Lowering [Price Target] to $8."

(c)    The next day, UBS analysts reported: "3Q24: Profitability lower than expectations[,]…[w]e reduce our [price target] to $8 from $9."

**ANSWER:**  With regard to the subparts in this paragraph, Defendants aver that the analyst reports referenced and quoted in part in this paragraph are publicly available.  Defendants refer to the

analyst reports for their complete contents. Except as expressly admitted, Defendants deny the remaining allegations.

173. The decline in the price of Shoals Common Stock after the corrective disclosures came to light was a direct result of the revelation of the nature and extent of defendants' fraudulent misrepresentations to investors and the market. The timing and magnitude of the price declines in Shoals Common Stock compared to the market and its peers negate any inference that the loss suffered by Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Plaintiffs and the other Class members was a direct result of defendants' fraudulent scheme to artificially inflate the price of Shoals Common Stock and the subsequent significant decline in the value of Shoals Common Stock when defendants' prior misrepresentations and other fraudulent conduct were revealed.

**ANSWER:** Defendants deny the allegations.

## VII. VIOLATIONS OF THE 1933 ACT

174. Plaintiffs assert non-fraud-based claims pursuant to §§11, 12(a)(2), and 15 of the 1933 Act against defendants Shoals, Solon, Whitaker, and Bardos as well as the 1933 Act Defendants.

**ANSWER:** Defendants admit that Plaintiffs purport to assert claims under Section 11 against Shoals, Bardos, Forth, Wilver, Daul, Volpe, Sundberg, Mills, Julian, J.P. Morgan Securities, Guggenheim Securities, Morgan Stanley, Goldman Sachs, Barclays, Credit Suisse, Cowen & Co., Oppenheimer & Co., Piper Sandler & Co., Roth Capital Partners, Johnson Rice & Co., and Northland Securities. Defendants further admit that Plaintiffs purport to assert claims under Section 15 against Hubbard, Bardos, Moss, Whitaker, Forth, Wilver, Daul, Volpe, Sundberg, Mills, Julian, Shoals, and Solon. Defendants aver that Plaintiffs' Section 12 claims against all

101

Defendants and Section 15 claims against Defendants Hubbard, Bardos, Moss, Whitaker, Forth, Wilver, Daul, Volpe, Sundberg, Mills, and Julian were dismissed in the Court's September 30, 2025 Order Granting in Part and Denying in Part Defendants' Motion to Dismiss. Except as expressly admitted, Defendants deny the remaining allegations.

175. The claims against Solon and the 1933 Act Defendants only are based on strict liability and negligence, and not on knowing or reckless conduct by or on behalf of Solon and the 1933 Act Defendants – *i.e.*, they do not allege, nor do they sound in, fraud – and Plaintiffs specifically disclaim any allegations of fraud, scienter, or recklessness in connection with these non- fraud claims. During the Class Period, Shoals completed the December 2022 SPO:

| Date of Offering | Shares of Shoals Common Stock Offered | Proceeds |
|---|---|---|
| December 2022 | 26,000,000 | $578,500,000 |

**ANSWER:** Defendants deny the allegations.

176. Plaintiffs' 1933 Act claims are based solely on the December 2022 SPO.

**ANSWER:** Defendants admit that Plaintiffs purport to bring their 1933 Act claims solely based on the December 2022 SPO. Except as expressly admitted, Defendants deny the remaining allegations.

177. As alleged herein, the relevant offering materials and documents incorporated therein contained untrue statements of material fact and/or omitted to state material facts required to be stated therein or necessary to make the statements not misleading at the time they were made.

**ANSWER:** Defendants deny the allegations.

178. Each of the Underwriter Defendants acted as underwriters for, and participated in, the December 2022 SPO. The SPO Offering Materials were negligently prepared and, as a result, contained untrue statements of material fact or omitted to state other facts necessary to make the

statements made not misleading, and were not prepared in accordance with the laws, rules, and regulations governing their preparation.

**ANSWER:** With regard to the first sentence in this paragraph, Defendants admit that on November 30, 2022, Shoals filed with the SEC a registration statement on Form S-3, and that on December 5, 2022, Shoals filed with the SEC a prospectus supplement on Form 424B5, which are publicly available and which disclosed the Underwriter Defendants' roles in the December 2022 SPO. Defendants refer to the registration statement and prospectus supplement for their complete contents. Except as expressly admitted, Defendants deny the remaining allegations.

<h4 align="center">A.    Shoals' SPO Offering Materials</h4>

179. On November 30, 2022, Shoals filed the SPO Registration Statement with the SEC, which was declared effective on that date. As noted above, each of the Director Defendants signed the SPO Registration Statement and was named as a "Director" in the SPO Registration Statement. *See supra* ¶35. Similarly, each of the Underwriter Defendants was listed in one and/or both of the prospectuses filed in connection with the SPO Registration Statement. *See supra* ¶32-33.

**ANSWER:** With regard to the first sentence in this paragraph, Defendants admit that on November 30, 2022, Shoals filed with the SEC a registration statement, which is publicly available and which was signed by the Director Defendants. With regard to the second sentence in this paragraph, Defendants aver that the phrase "listed in one and/or both of the prospectuses" is vague and ambiguous and deny the allegations on that basis. Except as expressly admitted, Defendants deny the remaining allegations.

180. On November 30, 2022, Shoals filed with the SEC a preliminary prospectus supplement announcing the public offering of 20 million shares of Shoals Common Stock. On December 5, 2022, Shoals filed the December 2022 SPO Prospectus with the SEC, which increased the number of shares being sold from 20 million shares to 26 million shares. The

103

December 2022 SPO Prospectus incorporated and formed part of the SPO Registration Statement. In the December 2022 SPO, Shoals and defendant Solon collectively sold 29.9 million shares of Shoals Common Stock at $22.25 per share, which included a full exercise of the underwriters' overallotment option, for over $665 million in gross offering proceeds.

**ANSWER:**  With regard to the first sentence in this paragraph, Defendants admit that on November 30, 2022, Shoals filed with the SEC a preliminary prospectus supplement, which is publicly available.  Defendants refer to the preliminary prospectus supplement for its complete contents.  With regard to the second and third sentences in this paragraph, Defendants admit that on December 5, 2022, Shoals filed with the SEC a prospectus supplement on Form 424B5. Defendants refer to the prospectus supplement for its complete contents.  Except as expressly admitted, Defendants deny the remaining allegations.

181.    As stated above (*see supra* ¶3), the SPO Registration Statement and December 2022 SPO Prospectus make up the SPO Offering Materials. The December 2022 SPO Prospectus informed investors that "[t]hese documents contain information you should consider when making your investment decision." Yet, these SPO Offering Materials contained untrue statements of material fact and omitted material facts necessary to make the statements contained therein not false or misleading. Among other things, each of the SPO Offering Materials: (i) touted the "reliability and safety" of Shoals' EBOS products; (ii) described their purported ability to avoid "failure" and "damage"; and (iii) downplayed (as merely hypothetical) the risks that Shoals could potentially experience "quality control problems," "defects or performance problems."[19]

---

[19] Each of the alleged untrue statements made in the SPO Registration Statement were also made – and appeared word-for-word – in the December 2022 SPO Prospectus (and vice versa).

**ANSWER:** With regard to the first, second, and fourth sentences and footnote 19 in this paragraph, Defendants admit that on November 30, 2022, Shoals filed with the SEC a registration statement on Form S-3 and that on December 5, 2022, Shoals filed with the SEC a prospectus supplement on Form 424B5, which are publicly available and contain the language quoted in this paragraph. Defendants refer to the registration statement and prospectus supplement for their complete contents. Except as expressly admitted, Defendants deny the remaining allegations.

182. For example, the SPO Registration Statement touted the "reliability and safety" of its "mission-critical" products and their resulting ability to avoid "failure…equipment damage, fire damage, and even serious injury or death" as a competitive advantage. Specifically, the SPO Registration Statement stated that because "EBOS components," which "encompasses all of the components that are necessary to carry the electric current produced by solar panels," are "mission- critical products[,]…we [Shoals] believe customers prioritize ***reliability and safety*** over price when selecting EBOS solutions."[20]

**ANSWER:** With regard to the first and second sentences in this paragraph, Defendants admit that on November 30, 2022, Shoals filed a registration statement, which is publicly available and contains the language quoted in this paragraph. Defendants refer to the Registration Statement for its complete contents. With regard to footnote 20, Defendants aver that the phrase "this same claim" is vague and ambiguous and deny the allegations on that basis. Except as expressly admitted, Defendants deny the remaining allegations.

---

[20] This same claim of "reliability and safety" also appeared in Shoals' Quarterly Reports on Forms 10-Q for the quarterly periods ended March 31, 2022, June 30, 2022, and September 30, 2022 – which, as discussed below, were incorporated by reference into the SPO Offering Materials.

183.    The SPO Registration Statement also stated that "[s]ome of the key factors that could cause actual results to differ from our expectations include…[that] we *may* experience delays, disruptions or quality control problems in our manufacturing operations in part due to vendor concentration" and "defects or performance problems in our products *could* result in loss of customers, reputational damage and decreased revenue, and we *may* face warranty, indemnity and product liability claims arising from defective products."[21]

**ANSWER:**  Defendants admit that on November 30, 2022, Shoals filed a registration statement, which is publicly available and contains the language quoted in this paragraph.  Defendants refer to the Registration Statement for its complete contents.  With regard to footnote 21, Defendants aver that the phrase "these same 'key factors'" is vague and ambiguous and deny the allegations on that basis.  Except as expressly admitted, Defendants deny the remaining allegations.

184.    The statements above in ¶¶181-185 were untrue statements of material fact when made or omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading, in violation of the 1933 Act. Specifically, the statements referenced above in ¶¶181-185 were materially false and/or misleading when made because they failed to disclose the following adverse facts pertaining to the Company's business, operations, and financial condition, which were known to defendants or recklessly disregarded by them as follows: (a) by the time the statements in the SPO Offering Materials were made, several of Shoals' customers had identified and expressed concerns regarding the BLA defects; (b) that Shoals' ability to competitively differentiate its products through representations regarding the reliability, safety, or quality of its offerings had become materially impaired; (c) that, as a result, Shoals'

---

[21] These same "key factors" also appeared in Shoals' Quarterly Reports on Forms 10-Q for the quarterly periods ended March 31, 2022, June 30, 2022, and September 30, 2022 – which, as discussed below, were incorporated by reference into the SPO Offering Materials.

business and operations were acutely exposed to material, undisclosed risks of reputational harm, warranty claims, and other negative impacts to the Company's business, financial results, and prospects; and (d) that defective BLAs had negatively impacted the Company's sales, customer relationships, and financial results and that defendants' representations regarding Shoals' business, sales, and prospects were materially misleading.

**ANSWER:** Defendants deny the allegations.

**B.     Shoals' Materially Untrue and Misleading SEC Filings Were Incorporated by Reference into the SPO Offering Materials**

185.    The SPO Registration Statement and December 2022 SPO Prospectus each "incorporate[d] by reference" several of Shoals' earlier filings with the SEC, including, among other filings, Shoals' Quarterly Reports on Forms 10-Q for the quarterly periods ended March 31, 2022, June 30, 2022, and September 30, 2022, filed with the SEC on May 17, 2022, August 16, 2022, and November 14, 2022, respectively.

**ANSWER:** Defendants admit that the November 30, 2022 registration statement on Form S-3 and December 5, 2022 prospectus supplement on Form 424B5 incorporated by reference Shoals' Quarterly reports on Forms 10-Q for the quarterly periods ended March 31, 2022, June 30, 2022, and September 30, 2022, filed with the SEC on May 17, 2022, August 16, 2022, and November 14, 2022, respectively.  Except as expressly admitted, Defendants deny the remaining allegations.

186.    By incorporating by reference the Forms 10-Q, the SPO Registration Statement and the December 2022 SPO Prospectus contained untrue statements of material fact and/or omitted to state material facts required to be stated therein or necessary to make the statements made, as set forth in ¶¶181-185 above.

**ANSWER:** Defendants deny the allegations.

187. These statements in the Forms 10-Q were materially untrue and contained material omissions because they failed to disclose that: (a) by the time the statements in the SPO Offering Materials were made, several of Shoals' customers had identified and expressed concerns regarding the BLA defects; (b) Shoals was facing tens of millions of dollars in shrinkback warranty liabilities; (c) Shoals had not booked a sufficient warranty expense provision to cover the remediation costs for the shrinkback issue; (d) Shoals' historical reported revenue, gross profit, and net income had been generated in substantial part through the sale of defective products posing a risk of injury, death, and fire damage to Shoals' customers; (e) Shoals' ability to competitively differentiate its products through representations regarding the reliability, safety, and quality of its offerings had become materially impaired; and (f) as a result, Shoals' business and operations were acutely exposed to material, undisclosed risks of reputational harm and negative impacts to the Company's business, financial results, and prospects.

**ANSWER:** Defendants deny the allegations.

### C. The Underwriter Defendants' Materially Misleading Statements and Omissions

188. The Underwriter Defendants are investment banking houses that specialize in, among other things, underwriting public offerings of securities. The Underwriter Defendants caused the SPO Offering Materials to be filed with the SEC and declared effective in connection with offers and sales thereof, including to Plaintiffs and the Class.

**ANSWER:** Defendants admit that the Underwriter Defendants offer investment banking services. Defendants aver that the phrases "specialize in," "caused the SPO Offering Materials to be filed with the SEC," and "declared effective in connection with offers and sales thereof" are vague and ambiguous and deny the allegations on that basis. Except as expressly admitted, Defendants deny the remaining allegations.

189.    The Underwriter Defendants authorized the information contained in the SPO Offering Materials to be provided to Plaintiffs and the Class, and therefore are liable for any untrue statements in those materials under the 1933 Act. In that regard, according to the December 2022 SPO Prospectus:

> The underwriters…which participate in the distribution of the securities may be deemed to be underwriters under the Securities [*i.e.*, 1933] Act…Anyone deemed to be an underwriter under the Securities Act may be subject to statutory liabilities, including Sections 11, 12 and 17 of the Securities Act and Rule 10b-5 under the Securities Exchange Act of 1934 . . . .

The December 2022 SPO Prospectus identified J.P. Morgan Securities LLC, Guggenheim Securities, LLC, Morgan Stanley& Co. LLC, UBS Investment Bank, Goldman Sachs & Co. LLC, Barclays Capital Inc., and Credit Suisse (USA) LLC as the December 2022 SPO's "Joint Book-Running Managers." The SPO Prospectus further identified Cowen and Company, LLC, Oppenheimer & Co. Inc., Piper Sandler & Co., Roth Capital Partners LLC, Johnson Rice & Company L.L.C., Northland Capital Markets as "Co-Managers."

**ANSWER:**  With regard to the second, third, and fourth sentences in this paragraph, Defendants admit that on November 30, 2022, Shoals filed with the SEC a registration statement, which is publicly available and contains the language quoted in this paragraph.  Defendants refer to the Registration Statement for its complete contents.  Except as expressly admitted, Defendants deny the remaining allegations.

190.    The December 2022 SPO Prospectus also confirmed that the "Underwriters named in the prospectus supplement…are [the] only underwriters of the securities offered with such prospectus supplement" and that:

> We, the selling stockholders and the underwriter[s] have not authorized any other person to provide any information other than that contained or incorporated by reference in this prospectus supplement or in any free writing prospectus prepared by or on behalf of us. We, the selling stockholders and the underwriter[s]

109

take no responsibility for and can provide no assurance as to the reliability of, any information that others may give you.

**ANSWER:** Defendants admit that on December 5, 2022, Shoals filed a prospectus supplement, which is publicly available and contains the language quoted in this paragraph. Defendants refer to the prospectus supplement for its complete contents. Except as expressly admitted, Defendants deny the remaining allegations.

191. Because of their roles as underwriters of the December 2022 SPO, the Underwriter Defendants are responsible – under the 1933 Act – for the same untrue and misleading statements set forth above in ¶¶181-185.

**ANSWER:** Defendants deny the allegations.

### D. The Underwriter Defendants Failed to Exercise Due Diligence

192. As the underwriters of the December 2022 SPO, representatives of the Underwriter Defendants assisted Solon, the principal selling stockholder, as well as Shoals, Whitaker, Bardos, and the Director Defendants who signed the SPO Registration Statement, by planning the SPO, and purportedly conducted an adequate and reasonable investigation into the business and operations of Shoals, an undertaking known as a "due diligence" investigation. The due diligence investigation was required of the Underwriter Defendants in order to participate in the December 2022 SPO. During the course of their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning Shoals' operations, risks, and financial prospects. Yet, the Underwriter Defendants were negligent by failing to conduct a reasonable degree of due diligence that would have detected a widespread "shrinkback" defect that was well underway and affecting the Company before the SPO.

**ANSWER:** With regard to the first and third sentences in this paragraph, Defendants admit that the Underwriter Defendants conducted due diligence into the business and operation of Shoals.

Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph and deny them on that basis. Except as expressly admitted, Defendants deny the remaining allegations.

## VIII. APPLICABILITY OF PRESUMPTION OF RELIANCE – 1934 CLAIMS ONLY

193. Because of the 1934 Act Defendants' Class Period omissions, a class-wide presumption of reliance is appropriate pursuant to *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972).

**ANSWER:** Defendants deny the allegations.

194. Plaintiffs' claims for securities fraud are also asserted, in part, under the fraud-on-the market theory of reliance. The market price of Shoals Common Stock, including common stock regularly traded on the NASDAQ, was artificially inflated by the conduct and false and misleading statements and omissions complained of herein. The 1934 Act Defendants' conduct and material misstatements and omissions inflated the price of Shoals Common Stock both before and during the Class Period.

**ANSWER:** Defendants deny the allegations.

195. The Class Period inflation in the price of Shoals Common Stock was eliminated when the financial conditions, business risks, and other information concealed by defendants' fraud was revealed to the market. The information did not reach the market all at once but leaked out through several partial disclosures, each of which partially corrected the market price of Shoals Common Stock.

**ANSWER:** Defendants deny the allegations.

196. At all relevant times, the market for Shoals Common Stock was an efficient market for the following reasons, among others:

(a)     Shoals Common Stock met the requirements for listing, and were listed and actively traded, on the NASDAQ, a highly efficient and automated market;

(b)     During the Class Period, a high volume of Shoals Common Stock traded on the NASDAQ;

(c)     As a regulated issuer, Shoals filed periodic public reports with the SEC and NASDAQ;

(d)     Shoals regularly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services, publications on its website and other internet sites, and other wide-ranging public disclosures, such as conference calls, communications with the financial press, and other similar reporting services;

(e)     During the Class Period, Shoals was followed by securities analysts employed by major brokerage firms. Analysts employed by these and other firms regularly wrote reports based on the publicly available information disseminated by defendants about Shoals. These reports were distributed to the sales force and certain customers of their respective brokerage firms; and

(f)     Shoals had substantial institutional ownership during the Class Period. Each of these institutions regularly analyzed and reported on the publicly available information about Shoals and its operations.

**ANSWER:** Defendants deny the allegations.

197.    Through the foregoing mechanisms, the information publicly disseminated by defendants about Shoals and its operations, and the import thereof, became widely available to and was acted upon by investors in the marketplace, such that, as a result of their transactions in Shoals

Common Stock, the information disseminated by defendants, including the false and misleading statements described above, became incorporated into and were reflected by the market price of Shoals publicly traded Common Stock.

**ANSWER:** Defendants deny the allegations.

198.    Under these circumstances, all purchasers of Shoals Common Stock during the Class Period suffered similar injury through their purchase of Shoals Common Stock at artificially inflated prices and their subsequent decline in value, and a presumption of reliance applies.

**ANSWER:** Defendants deny the allegations.

## IX.    CLASS ACTION ALLEGATIONS

199.    Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons who purchased or otherwise acquired Shoals Common Stock during the Class Period and were harmed thereby (the "Class"). Excluded from the Class are defendants and their immediate families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which defendants have or had a controlling interest.

**ANSWER:** Defendants admit that Plaintiffs purport to bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons who purchased or otherwise acquired Shoals Common Stock during the Class Period. Defendants further admit that excluded from Plaintiffs' purported class are Defendants and their immediate families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which defendants have or had a controlling interest. Except as expressly admitted, Defendants deny the remaining allegations.

200. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Shoals shares were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time, Plaintiffs believe that there are thousands of members in the proposed Class, if not more. Record owners and other members of the Class may be identified from records maintained by Shoals, its transfer agent, or securities' brokers, and may be notified of the pendency of this action electronically or by mail, using the form of notice similar to that customarily used in securities class actions.

**ANSWER:** Defendants deny the allegations.

201. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law complained of herein.

**ANSWER:** Defendants deny the allegations.

202. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation.

**ANSWER:** Defendants deny the allegations.

203. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by defendants' acts as alleged herein;

(b) whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business and operations of Shoals;

114

(c)    whether the price of Shoals Common Stock was artificially inflated during the Class Period; and

(d)    to what extent the members of the Class have sustained damages and the proper measure of damages.

**ANSWER:** Defendants deny the allegations.

204.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**ANSWER:** Defendants deny the allegations.

**COUNT I**

**For Violation of §10(b) of the 1934 Act and SEC Rule 10b-5
Against the 1934 Act Defendants**

205.    Plaintiffs incorporate §§I.-IV., VIII.-IX. by reference.

**ANSWER:** Defendants repeat and reassert their answers to every allegation contained in §§I.-IV., VIII.-IX. as if fully set forth herein.

206.    During the Class Period, the 1934 Act Defendants disseminated or approved one or more of the statements as specified above in §V., which they knew or recklessly disregarded contained material misrepresentations and/or failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

**ANSWER:** Defendants deny the allegations.

115

207.     Defendants violated §10(b) of the 1934 Act and SEC Rule 10b-5 promulgated thereunder in that they:

(a)     employed devices, schemes, and artifices to defraud;

(b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Shoals Common Stock during the Class Period.

**ANSWER:** Defendants deny the allegations.

208.     Defendants, individually and together, directly and indirectly, by the use of the means and instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal the truth and/or adverse material information about Shoals' business, operations, and financial condition as specified herein.

**ANSWER:** Defendants deny the allegations.

209.     Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them.

**ANSWER:** Defendants deny the allegations.

210.     As a result of the conduct, dissemination of the materially false or misleading information, and/or failure to disclose material facts, as set forth above, the market price of Shoals Common Stock was artificially inflated during the Class Period. In ignorance of the fact that the market price of Shoals Common Stock was artificially inflated, and relying directly or indirectly on the false and misleading statements, or upon the integrity of the market in which Shoals

Common Stock traded, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants (but not disclosed in defendants' public statements during the Class Period), Plaintiffs and the other Class members purchased or otherwise acquired Shoals Common Stock during the Class Period at artificially high prices and were damaged thereby.

**ANSWER:** Defendants deny the allegations.

211. Plaintiffs and the Class, in reliance on the integrity of the market, paid artificially inflated prices for Shoals Common Stock, and suffered losses when the relevant truth was revealed. Plaintiffs and the Class would not have purchased Shoals Common Stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by these defendants' misleading statements.

**ANSWER:** Defendants deny the allegations.

212. As a direct and proximate result of these defendants' wrongful conduct, Plaintiffs and the other Class members suffered damages in connection with their Class Period transactions in Shoals Common Stock.

**ANSWER:** Defendants deny the allegations.

213. By reason of the foregoing, defendants named in this Count have violated §10(b) of the 1934 Act and SEC Rule 10b-5.

**ANSWER:** Defendants deny the allegations.

**COUNT II**

**For Violation of §20(a) of the 1934 Act
Against the 1934 Act Defendants**

214. Plaintiffs incorporate §§I.-IV., VIII.-IX. by reference.

**ANSWER:** Defendants repeat and reassert their answers to every allegation contained in §§I.-IV., VIII.-IX. as if fully set forth herein.

117

215. Defendants were controlling persons of Shoals within the meaning of §20(a) of the 1934 Act. By virtue of their high-level positions as officers and/or directors of Shoals, their ownership and contractual rights, participation in and awareness of the Company's operations, and intimate knowledge of the statements filed by the Company with the SEC and/or disseminated to the investing public, these defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the allegedly false and misleading statements.

**ANSWER:** Defendants deny the allegations.

216. In particular, each of these defendants had direct or supervisory responsibility over the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions and business practices giving rise to the securities violations as alleged in Count I, and exercised that power.

**ANSWER:** Defendants deny the allegations.

217. As a direct and proximate result of these defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases and acquisitions of Shoals Common Stock during the Class Period when the relevant truth was revealed.

**ANSWER:** Defendants deny the allegations.

218. By reason of the foregoing, the defendants named in this Count violated §20(a) of the 1934 Act.

**ANSWER:** Defendants deny the allegations.

## COUNT III

### For Violations of §20A of the 1934 Act
### Against Defendants Shoals and Whitaker

219.    Plaintiffs repeat and reallege each and every allegation contained above in §§I.-IV., VIII.-IX. as if fully set forth herein. Count III is brought pursuant to §20A of the 1934 Act against defendants Shoals and Whitaker (collectively, "§20A Defendants"), on behalf of Plaintiffs, and other members of the Class who were damaged by the §20A Defendants' insider trading.

**ANSWER:** With regard to the first sentence in this paragraph, Defendants repeat and reassert their answers to every allegation contained in §§I.-IV., VIII.-IX. as if fully set forth herein. Except as expressly admitted, Defendants deny the remaining allegations.

220.    As detailed herein, the §20A Defendants were was in possession of material, non- public information concerning Shoals. The §20A Defendants took advantage of their possession of material, non-public information regarding Shoals to obtain millions of dollars in insider trading profits traded contemporaneously with Plaintiffs during the Class Period.

**ANSWER:** Defendants deny the allegations.

221.    The §20A Defendants' sales of Shoals Common Stock were made contemporaneously with Plaintiffs' purchases of Shoals Common Stock during the Class Period.

**ANSWER:** Defendants deny the allegations.

222.    For example, on December 6, 13, and 14, 2022, the §20A Defendants sold the following shares of Shoals Common Stock for proceedings totaling over $40 million:

| Defendant | Date of Sale | Amount | Price |
|---|---|---|---|
| Shoals | 12/6/2022 | 2,000,000 | 22.25 |

| Defendant | Date of Sale | Amount | Price |
|---|---|---|---|
| Whitaker | 12/13/2022 | 13,020 | $25.37 |
| | 12/14/2022 | 8,333 | $26.50 |

119

**ANSWER:** Defendants admit the allegations.

223. On December 6, 2022, plaintiff KUAERP purchased the following shares of Shoals Common Stock:

| Plaintiff | Date of Purchase | Amount | Price |
|---|---|---|---|
| KUAERP | 12/06/2022 | 220 | $23.73 |

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph and deny them on that basis.

224. On December 16, 2022, Lead Plaintiff Erste AM purchased the following shares of Shoals Common Stock:

| Plaintiff | Date of Purchase | Amount | Price |
|---|---|---|---|
| Erste AM | 12/16/2022 | 120,692 | $26.55 |

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph and deny them on that basis.

225. Additionally, on January 25, 2023, defendant Whitaker sold the following shares of Shoals Common Stock for total proceeds of excess of $151,000:

| Defendant | Date of Sale | Amount | Price |
|---|---|---|---|
| Whitaker | 01/25/2023 | 5,532 | $27.43 |

**ANSWER:** Defendants aver that the sales and prices of Shoals common stock are publicly available. Except as expressly admitted, Defendants deny the remaining allegations.

226. On January 25, 2023, Lead Plaintiff Erste AM and plaintiff KUAERP purchased the following shares of Shoals Common Stock:

| Plaintiff | Date of Purchase | Amount | Price |
|---|---|---|---|
| Erste AM | 01/25/2023 | 49,894 | $27.97 |
| KUAERP | 01/25/2023 | 460 | $27.69 |

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph and deny them on that basis.

120

227. Lastly, on March 14, 2023, defendant Whitaker sold the following shares of Shoals Common Stock for total proceeds of excess of $3.8 million:

| Defendant | Date of Sale | Amount | Price |
|---|---|---|---|
| Whitaker | 03/14/2023 | 181,541 | $21.16 |

**ANSWER:** Defendants aver that the sales and prices of Shoals common stock are publicly available. Except as expressly admitted, Defendants deny the remaining allegations.

228. On the same day, plaintiff KUAERP purchased the following shares of Shoals Common Stock:

| Plaintiff | Date of Purchase | Amount | Price |
|---|---|---|---|
| KUAERP | 03/14/2023 | 600 | $21.39 |

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph and deny them on that basis. Except as expressly admitted, Defendants deny the remaining allegations.

229. Plaintiffs, who purchased shares of Shoals Common Stock contemporaneously with sales by the §20A Defendants, suffered damages because: (i) in reliance on the integrity of the market, they paid artificially inflated prices as a result of the violations of §§10(b) and 20(a) of the 1934 Act as alleged herein; and (ii) they would not have purchased Shoals Common Stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated by the false or misleading statements and concealment alleged herein.

**ANSWER:** Defendants deny the allegations.

### COUNT IV

### For Violation of §11 of the 1933 Act
### Against Shoals, Bardos, and the 1933 Act Defendants (excluding Solon)

230. KUAERP incorporates §§I.-III.D., VII., IX. by reference.

**ANSWER:** Defendants repeat and reassert their answers to every allegation contained in §§I.-III.D., VII., IX. as if fully set forth herein.

231.    KUAERP asserts this Count on behalf of itself and the Class against Shoals, Bardos, and the 1933 Act Defendants.

**ANSWER:** Defendants admit that KUAERP purports to assert Count IV on behalf of itself and the purported Class against Shoals, Bardos, and the 1933 Act Defendants. Except as expressly admitted, Defendants deny the remaining allegations.

232.    Section 11 of the 1933 Act does not require a showing of scienter or fraudulent intent, and Plaintiffs disavow all averments of fraud for purposes of this Count against the 1933 Act Defendants.

**ANSWER:** Defendants deny the allegations.

233.    The SPO Registration Statement was negligently prepared and as a result inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein including as required by Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(b)(2)(ii), and Item 105 of SEC Regulation S-K, 17 C.F.R. §229.105.

**ANSWER:** Defendants deny the allegations.

234.    As set forth herein, the SPO Registration Statements failed to disclose material adverse facts which existed at the time of the December 2022 SPO, including:

(a)    by the time the statements in the SPO Offering Materials were made, several of Shoals' customers had identified and expressed concerns regarding the BLA defects;

(b)    that, as a result of (a) above, Shoals was facing tens of millions of dollars in shrinkback warranty liabilities;

(c)     that Shoals had not booked a sufficient warranty expense provision to cover the remediation costs for the shrinkback issue;

(d)     that Shoals' historical reported revenue, gross profit, and net income had been generated in substantial part through the sale of defective products posing a risk of injury, death, and fire damage to Shoals' customers;

(e)     that Shoals' ability to competitively differentiate its products through representations regarding the reliability, safety, and quality of its offerings had become materially impaired; and

(f)     that, as a result of (a)-(e) above, Shoals' business and operations were acutely exposed to material, undisclosed risks of reputational harm and negative impacts to the Company's business, financial results, and prospects.

**ANSWER:** Defendants deny the allegations.

235.     The 1933 Act Defendants are strictly liable to KUAERP and the Class for the misstatements and omissions contained in the SPO Registration Statement.

**ANSWER:** Defendants deny the allegations.

236.     None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the SPO Registration Statements that are herein alleged to be materially false and misleading were true and without omissions of any material facts and were not misleading.

**ANSWER:** Defendants deny the allegations.

237.     By reason of the conduct herein alleged, each defendant named herein violated, and/or controlled a person who violated, §11 of the 1933 Act.

**ANSWER:** Defendants deny the allegations.

238.    KUAERP purchased Shoals Common Stock directly in the December 2022 SPO as detailed herein.

**ANSWER:** Defendants admit that KUAERP filed a certification in *Kissimmee Utility Authority Employees' Retirement Plan v. Shoals Technologies Group, Inc., et al.*, No. 3:24-cv-00598 (M.D. Tenn.) on May 13, 2024 (Dkt. 1 at 47) that purports to reflect records of purchases of Shoals Common Stock by Plaintiff, but Defendants lack knowledge or information sufficient to form a belief as to the veracity of those records, and on that basis deny the allegations.

239.    KUAERP and the Class have sustained damages. The value of the Shoals Common Stock issued in the December 2022 SPO has declined substantially subsequent to and due to the 1933 Act Defendants' violations.

**ANSWER:** Defendants deny the allegations.

240.    At the time of their purchases of Shoals Common Stock, KUAERP and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein. Less than one year has elapsed from the time that KUAERP discovered or reasonably could have discovered the facts upon which this complaint is based to the time that this action commenced. Less than three years has elapsed between the time that the securities upon which this Count is brought were offered to the public.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph and deny them on that basis.

**COUNT V**

**For Violation of §12(a)(2) of the 1933 Act**
**Against Shoals, Bardos, and the 1933 Act Defendants (excluding Solon)**

241.    KUAERP incorporates §§I.-III.D., VII., IX. by reference.

124

**ANSWER:** Plaintiffs' Section 12 claim was dismissed in the Court's September 30, 2025 Order Granting in Part and Denying in Part Defendants' Motion to Dismiss. For that reason, no response is required for the allegations in this paragraph. To the extent a response is required, Defendants deny the allegations.

242. KUAERP assert this Count on behalf of itself and the Class against Shoals, Whitaker, Bardos, and the 1933 Act Defendants (collectively, the "Solicitor-Seller Defendants").

**ANSWER:** Plaintiffs' Section 12 claim was dismissed in the Court's September 30, 2025 Order Granting in Part and Denying in Part Defendants' Motion to Dismiss. For that reason, no response is required for the allegations in this paragraph. To the extent a response is required, Defendants deny the allegations.

243. Section 12(a)(2) of the 1933 Act does not require a showing of scienter or fraudulent intent, and KUAERP disavows all averments of fraud against the Solicitor-Seller Defendants for purposes of this Count.

**ANSWER:** Plaintiffs' Section 12 claim was dismissed in the Court's September 30, 2025 Order Granting in Part and Denying in Part Defendants' Motion to Dismiss. For that reason, no response is required for the allegations in this paragraph. To the extent a response is required, Defendants deny the allegations.

244. By means of the defective December 2022 SPO Prospectus and other conduct alleged herein, the Solicitor-Seller Defendants promoted and sold the Shoals Common Stock sold in the December 2022 SPO to KUAERP and other members of the Class.

**ANSWER:** Plaintiffs' Section 12 claim was dismissed in the Court's September 30, 2025 Order Granting in Part and Denying in Part Defendants' Motion to Dismiss. For that reason, no response

is required for the allegations in this paragraph. To the extent a response is required, Defendants deny the allegations.

245. The December 2022 SPO Prospectus contained untrue statements of material fact and concealed and failed to disclose material facts, as detailed above. The defendants named herein owed KUAERP and the other members of the Class who purchased Shoals Common Stock pursuant to the December 2022 SPO Prospectus the duty to make a reasonable and diligent investigation of the statements contained in the December 2022 SPO Prospectus to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. These defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the December 2022 SPO Prospectus as set forth above.

**ANSWER:** Plaintiffs' Section 12 claim was dismissed in the Court's September 30, 2025 Order Granting in Part and Denying in Part Defendants' Motion to Dismiss. For that reason, no response is required for the allegations in this paragraph. To the extent a response is required, Defendants deny the allegations.

246. KUAERP did not know, nor in the exercise of reasonable diligence could KUAERP have known, of the untruths and omissions contained in the December 2022 SPO Prospectus at the time KUAERP acquired Shoals Common Stock.

**ANSWER:** Plaintiffs' Section 12 claim was dismissed in the Court's September 30, 2025 Order Granting in Part and Denying in Part Defendants' Motion to Dismiss. For that reason, no response is required for the allegations in this paragraph. To the extent a response is required, Defendants deny the allegations.

247. By reason of the conduct alleged herein, the Solicitor-Seller Defendants violated §12(a)(2) of the 1933 Act. As a direct and proximate result of such violations, KUAERP and the other members of the Class who purchased Shoals Common Stock pursuant to the December 2022 SPO Prospectus sustained substantial damages in connection with their purchases of Shoals Common Stock. Accordingly, KUAERP and the other members of the Class who hold Shoals Common Stock issued pursuant to the December 2022 SPO Prospectus have the right to rescind and recover the consideration paid for their shares, and hereby tender their Shoals Common Stock to defendants sued herein. Class members who have sold their Shoals Common Stock seek damages to the extent permitted by law.

**ANSWER:** Plaintiffs' Section 12 claim was dismissed in the Court's September 30, 2025 Order Granting in Part and Denying in Part Defendants' Motion to Dismiss. For that reason, no response is required for the allegations in this paragraph. To the extent a response is required, Defendants deny the allegations.

## COUNT VI

### For Violation of §15 of the 1933 Act
### Against Shoals, Solon, Bardos, and the Director Defendants

248. KUAERP incorporates §§I.-III.D., VII., IX. by reference.

**ANSWER:** Defendants repeat and reassert their answers to every allegation contained in §§I.-IV., VII., IX. as if fully set forth herein.

249. KUAERP asserts this Count on behalf of itself and the Class against Shoals, Solon, Bardos, and the Director Defendants.

**ANSWER:** Defendants admit that KUAERP purports to assert claims under Section 15 against Hubbard, Bardos, Moss, Whitaker, Forth, Wilver, Daul, Volpe, Sundberg, Mills, Julian, Shoals, and Solon. Defendants aver that the Section 15 claims against Defendants Hubbard, Bardos, Moss,

127

Whitaker, Forth, Wilver, Daul, Volpe, Sundberg, Mills, and Julian were dismissed in the Court's September 30, 2025 Order Granting in Part and Denying in Part Defendants' Motion to Dismiss. Except as expressly admitted, Defendants deny the remaining allegations.

250. Section 15 of the 1933 Act does not require a showing of scienter or fraudulent intent, and KUAERP disavows all averments of fraud against these Defendants for purposes of this Count.

**ANSWER:** Defendants deny the allegations.

251. Solon, Bardos, and the Director Defendants acted as controlling persons of Shoals within the meaning of §15 of the 1933 Act. By reason of their positions with the Company, agreements and course of dealings with the Company, and/or their ownership of Shoals stock, and/or their status as, or ability to nominate directors, Solon, Bardos, and the Director Defendants had the power and authority to cause Shoals to engage in the wrongful conduct complained of herein, including the December 2022 SPO, and were culpable participants in the violations of law described herein. Shoals controlled Solon, Bardos, and the Director Defendants who were the Company's employees, directors, and/or shareholders at the time of the December 2022 SPO. By reason of such conduct, these defendants are liable pursuant to §15 of the 1933 Act.

**ANSWER:** Defendants deny the allegations.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

A. Determining that this action is a proper class action and certifying Plaintiffs as Class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Class Counsel;

B.     Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Awarding such other and further relief as the Court may deem just and proper.

**ANSWER**: To the extent any response is required to Plaintiffs' prayer for relief, Defendants deny each and every allegation contained herein.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

**ANSWER**: Defendants admit that Plaintiffs purport to demand a trial by jury.  Defendants demand a trial by jury on all triable issues.  Defendants reserve the right to amend their Answer as necessary once the precise nature of the relevant circumstances or events is determined through discovery.

## AFFIRMATIVE DEFENSES

By asserting these defenses, Defendants do not concede that they bear the burden of proof on any defense.  Nothing stated herein is intended, or shall be construed, as an acknowledgment that any particular issue or subject matter is relevant to the allegations.  Defendants further reserve the right to assert additional affirmative defenses.  Defendants also adopt and incorporate by reference any applicable defense pleaded by any other Defendant in this action not expressly set forth herein.

## First Affirmative Defense

Plaintiffs' claims against Defendants are barred, in whole or in part, because Plaintiffs lack standing to assert their claims against Defendants.

## Second Affirmative Defense

Plaintiffs and members of the putative class would have acquired Shoals stock even if, when acquired, they had known of the allegedly untrue statements of material fact, omissions of material fact, or misleading statements or other wrongful conduct upon which Defendants' purported liability rests.

## Third Affirmative Defense

Certain matters alleged to be the subject of misrepresentations and omissions were publicly disclosed or were in the public domain, and as such were available to Plaintiffs, members of the putative class, and/or the securities markets.

## Fourth Affirmative Defense

Plaintiffs' claims are not actionable to the extent that the alleged untrue statements of material fact, omissions of material fact, misleading statements, and/or other challenged statements made by Defendants fall within the Safe Harbor provisions of the Reform Act, as codified at 15 U.S.C. § 77z-2(c).

## Fifth Affirmative Defense

Under principles of contribution and indemnity, persons or entities other than Defendants, including but not limited to Prysmian Group, are wholly or partially responsible for the purported damages, if any, Plaintiffs and putative class members have sustained.

## Sixth Affirmative Defense

Any damages sustained by Plaintiffs or any member of the putative class must be rendered and/or barred in proportion to the wrongful or negligent conduct of persons or entities other than Defendants under the principles of equitable allocation, recoupment, set-off, and comparative fault.

## Seventh Affirmative Defense

Plaintiffs and members of the putative class have failed to mitigate any damages they may have suffered.

## Eighth Affirmative Defense

Any recovery for damages allegedly incurred by Plaintiffs and members of the putative class, if any, is limited to the percentage of responsibility of Defendants in proportion to the total fault of all persons, whether or not named as parties to this action, who caused or contributed to Plaintiffs' alleged damages, if any, pursuant to the proportionate liability provisions of the Private Securities Litigation Reform Act of 1995, as codified at 15 U.S.C. § 78u-4(f)(3)(A). The acts and practices of persons or entities not associated with Defendants and ongoing economic events constitute independent intervening and superseding causes of the alleged harm, if any, suffered by Plaintiffs or members of the putative class, relieving Defendants of any liability.

## Ninth Affirmative Defense

Any damages attributed to a purported loss in value of Shoals securities is a result of Plaintiffs' failure to take reasonable steps to reduce their damages when they first learned or should have learned of any alleged misstatement or omission.

## Tenth Affirmative Defense

Defendants exercised reasonable care and acted in good faith, including good faith conformity with applicable Securities and Exchange Commission rules, regulations, and orders, and also did not directly or indirectly induce the act or acts constituting the alleged violations or causes of action. Defendants are therefore not subject to liability under the federal securities laws.

## Eleventh Affirmative Defense

Plaintiffs' claims are barred, in whole or in part, because Plaintiffs and/or other members of the putative class had actual or constructive knowledge of the risks involved and thus assumed the risk that the value of Shoals stock would decline if such risks materialized.

## Twelfth Affirmative Defense

Each and every one of Defendants alleged to be a control person acted in good faith and did not directly or indirectly induce any acts constituting the alleged violations and causes of action.

## Thirteenth Affirmative Defense

Plaintiffs' claims against Defendants are barred, in whole or in part, because the purported misstatements or omission alleged in the Complaint did not affect the market price of Shoals securities owned by Plaintiffs or other members of the putative class.

## Fourteenth Affirmative Defense

Plaintiffs' claims and those of the putative class are barred to the extent they are based on allegations of corporate mismanagement that are not actionable under the federal securities laws. Regardless, Plaintiffs' purported claims and those of the putative class would not be actionable because Defendants acted within their reasonable business judgment.

132

**Fifteenth Affirmative Defense**

Plaintiffs' claims and those of the putative class are barred to the extent Defendants were in possession of any of the information Plaintiffs claim Defendants failed to disclose, and Defendants did not assimilate and comprehend the significance of that information.

**Sixteenth Affirmative Defense**

Plaintiffs' claims and those of the putative class are barred in whole or in part, because certain stock sales made by §20A Defendants referenced in the Complaint occurred pursuant to pre-established trading programs under SEC Rule 10b5-1. 17 C.F.R. 240.10b5-1(c)(A).

**Seventeenth Affirmative Defense**

Plaintiffs' claims and those of the putative class are barred in whole or in part because, within the meaning of 15 U.S.C. § 77k(b), Defendants had, after reasonable investigation, reasonable grounds to believe, and did believe, at the time that the Registration Statement(s) in question became effective, that all statements therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

\*     \*     \*

Defendants have insufficient knowledge or information upon which to form a belief as to whether there may be additional affirmative defenses available to them. Defendants expressly reserve the right to plead additional affirmative and other defenses that may become available or apparent during this litigation and/or required by any amendments to the Supplemented Amended Complaint.

WHEREFORE, Defendants pray that this Court enter judgment as follows:

1.     That judgment be entered in favor of Defendants;

2.      That Plaintiffs and the purported plaintiff class take nothing from Defendants

by their Supplemented Amended Complaint, and that the same be dismissed with prejudice;

3.      For costs, attorneys' fees, expert witness fees, and court hearing fees incurred

herein;

4.      For such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Defendants hereby demand a jury trial on all issues so

triable in this action.


DATED: November 13, 2025            BASS, BERRY & SIMS
                                    BRITT K. LATHAM
                                    MARGARET V. DODSON


                                            */s/ Britt K. Latham*
                                    BRITT K. LATHAM

                                    21 Platform Way South, Suite 3500
                                    Nashville, TN  37201
                                    Telephone:  615/742-6200
                                    615/742-6293 (fax)
                                    blatham@bassberry.com
                                    margaret.dodson@bassberry.com

                                    LATHAM & WATKINS LLP
                                    MICHELE D. JOHNSON
                                    (admitted *pro hac vice*)
                                    650 Town Center Drive, 20th Floor
                                    Costa Mesa, CA  92626
                                    Telephone:  714/540-1235
                                    714/755-8290 (fax)
                                    michele.johnson@lw.com

134

LATHAM & WATKINS LLP
HEATHER A. WALLER
(admitted *pro hac vice*)
RENATTA A. GORSKI
(admitted *pro hac vice*)
330 North Wabash Avenue, Suite 2800
Chicago, IL  60611
Telephone:  312/876-7700
617/993-9767 (fax)
heather.waller@lw.com
renatta.gorski@lw.com

*Counsel for Defendants Shoals Technologies Group, Inc., Jason R. Whitaker, Jeffrey Tolnar, Kevin Hubbard, Dominic Bardos, Brad Forth, Peter Wilver, Ty Daul, Toni Volpe, Lori Sundberg, Jeannette Mills, Robert Julian, and Dean Solon*

135

## CERTIFICATE OF SERVICE

I certify that on November 13, 2025, the foregoing was filed electronically with the Clerk of Court. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's electronic filing system.

*/s/ Britt K. Latham*