# EXHIBIT C

| | |
|---|---|
| In re SHOALS TECHNOLOGIES GROUP, INC. SECURITIES LITIGATION | ) Civil Action No. 3:24-cv-00334 |
| | ) |
| | ) Judge William L. Campbell, Jr. |
| | ) Magistrate Judge Barbara D. Holmes |
| This Document Relates To: | ) |
| | ) CLASS ACTION |
| | ) |
| | ) DEMAND FOR JURY TRIAL |

## EXPERT REPORT OF JONAH B. GELBACH

- 1 -

# TABLE OF CONTENTS

**Page**

I.  Introduction .......................................................................................................1

II.  Qualifications and Compensation ...................................................................2

III.  Summary of My Conclusions .........................................................................4

IV.  Relevant Allegations and Factual Background ...............................................5

    A.  The Class .................................................................................................5

    B.  Defendants ...............................................................................................5

    C.  Allegations ...............................................................................................7

V.  Market Efficiency ..........................................................................................13

VI.  Market Efficiency Evidence ..........................................................................16

    A.  First *Cammer* Factor: Average Weekly Trading Volume .....................16

    B.  Second *Cammer* Factor: The Number of Analysts Who Followed Shoals ...........17

    C.  Third *Cammer* Factor: Market Makers ................................................18

    D.  Fourth *Cammer* Factor: S-3 Registration Eligibility ...........................20

    E.  Fifth *Cammer* Factor: Cause-and-Effect Relationship Between Events and Stock Price ...........................................................................21

    F.  Krogman Market Efficiency Indicators ................................................32

    G.  Additional Market Efficiency Factors ..................................................34

    H.  Conclusion as to Market Efficiency ......................................................36

VII.  Damages Calculation for 1934 Act and 10b-5 Claims ..................................37

    A.  Calculating 1934 Act Damages Available for a Share Purchased By A Class Member During the Analysis Period Can Be Done On A Classwide Basis ...........................................................................39

    B.  Fundamental Valuation Tools of Financial Economics Can Be Used to Measure Sources of a Share's Artificial Price Inflation ........................40

    C.  An Event Study May Be Used to Measure the Market's Valuation of New Information ............................................................................43

4938-0318-1705.v1

D.     Damages Under Section 20A Can Be Calculated Using Only Information in Objective Trading Records and Market Prices ..................................................44

E.     Traditional Tools of Financial Economics May Be Used to Address Confounding Information ......................................................................46

F.     Summary of Opinions About Calculation of Available Damages for 1934 Act Violations ......................................................................47

VIII.   Damages Calculation for 1933 Act Violations ..................................................48

A.     Violation of Section 11 of the 1933 Act ..................................................48

B.     Violation of Section 15 of the 1933 Act ..................................................49

C.     Conclusion With Respect to 1933 Act Damages ..................................................49

IX.    Further Work ..................................................................................................50

4938-0318-1705.v1

## I. Introduction

1. I have been retained by Robbins Geller Rudman & Dowd LLP and Motley Rice LLC ("Counsel") in the case of *In re Shoals Technologies Group, Inc. Sec. Litig.*, No. 3:24-cv-00334 (M.D. Tenn.).

2. I have been asked by Counsel to analyze whether the Class A common stock (the "Shoals Stock") of Shoals Technologies Group, Inc. ("Shoals," or "Company") traded in an efficient market during the period between May 16, 2022 and November 12, 2024, inclusive (the "Analysis Period"). The scope of my engagement includes determining whether, under the theories of liability advanced by plaintiffs Erste AM and KUAERP ("Lead Plaintiffs" or "Plaintiffs"), damages in this matter can be calculated using a common methodology for all Class members.

3. To make these determinations, I analyzed the market for Shoals Stock, the price behavior of Shoals Stock, and the factors that are generally accepted indicators of market efficiency for a publicly traded security. I examined Company press releases, SEC filings, the daily prices of Shoals Stock, its trading volume, the performance of the overall stock market, the performance of Shoals' industry sector, performance of peer firms, equity analyst reports covering Shoals published during the Analysis Period, and other pertinent data and documents. I also read the Amended Complaint filed on February 4, 2025 (the "Complaint") and the Court's Order granting in part and denying in part Defendants' motion to dismiss. For purposes of this report I have assumed the Complaint's allegations of fact to be true and generally will not qualify factual statements as "alleged" unless there is special need for clarity. Appendix B hereto lists the documents and data I considered or relied on in preparing this report.

4. This report presents my methodology, findings, and conclusions.

- 1 -

5.	My work in this matter is ongoing.  I reserve the right to amend, refine, or supplement my analyses and opinions in the event that I become aware of additional information, evidence, arguments, or analyses that bear on my work in this matter.

**II.	Qualifications and Compensation**

6.	I am an economist and the Herman F. Selvin Professor of Law at the University of California Berkeley School of Law.

7.	The opinions I offer in this report are founded on my extensive expertise in economics and in econometrics, which is a term used by economists to refer to statistical methods used for the study of issues in economics.

8.	A copy of my *curriculum vitae* (CV) is attached to this report as Appendix A.  This CV is dated January 19, 2026 and is current to the best of my knowledge, including a list of what I believe to be all scholarly publications I have authored throughout my career, including in the previous 10 years.  I offer the following facts in this report for convenience and emphasis:

(a)	I have both a JD (received from Yale in 2013) and a Ph.D. in economics (received from MIT in 1998).

(b)	For the first 12 years of my career, I was appointed as a professor of economics at two universities.

(i)	In 1998, I was hired as an Assistant Professor in the Department of Economics at the University of Maryland at College Park ("Maryland").

(ii)	In 2004, Maryland awarded me tenure, and I was a tenured Associate Professor on the Maryland faculty for the academic years 2005-2006 and 2006-2007.

(iii)	In 2007, I accepted an offer to move to the Department of Economics in the Eller College of Management at the University of Arizona ("Arizona").  I was a tenured Associate Professor at Arizona from then until 2010, when I resigned to pursue my J.D. at Yale.

- 2 -

(c)     At both Maryland and Arizona, I taught doctoral-level courses that either focused principally on econometric methods or made substantial use of them.

(d)     At all times since I completed my J.D. in 2013, I have been a tenured professor, first at the law school of the University of Pennsylvania (2013-2019) and then at the University of California at Berkeley (2019-present).

(e)     At all times since I received my Ph.D. in economics from MIT in 1998, I have been fully or partially engaged in the professional use of statistical methods and economic reasoning. (This was true including the academic years between 2010 and 2013, when I was a law student and also engaged in scholarly and professional activities using statistical methods and economic reasoning.)

(f)     From 2016-2021, I was a Co-Editor of the Journal of Law, Economics, & Organization, with a principal focus on submitted articles using quantitative empirical (*i.e.*, statistical) methods.

(g)     I was a Director of the American Law and Economics Association between 2017 and 2020. Candidates for Director are nominated by the existing Board and elected by the membership at large. The ALEA is the primary association of scholars who work in the area of law and economics, which includes the area of law and finance.

(h)     I regularly receive and fulfill requests to provide peer review reports for journals regarding submitted articles that use econometric or statistical methods.

(i)     I have published many articles using statistical methods, as well as several articles that contribute new methods and are highly cited by applied statisticians in many fields of study (*i.e.*, not simply economics).

- 3 -

(j)     Several of my published papers focus directly on statistical inference in the single-firm event study context that is the subject of many securities litigation cases, including this one.[1]

(k)     The opinions I offer in this report are founded on my expertise in statistics and/or econometrics.

9.     I am being paid $1,300 per hour for my work in this case.  My compensation is not contingent on my findings or on the outcome of this matter.

## III.     Summary of My Conclusions

10.     It is my opinion that during the Analysis Period, Shoals Stock traded on a semi-strong form efficient market.

(a)     The Stock is traded on the Nasdaq exchange, and it meets every criterion I am aware of courts considering regarding semi-strong form market efficiency.

(b)     The event study evidence I develop below indicates that on news dates, Shoals Stock returns are much more likely to have a substantial magnitude, as would be expected on days when the market learns new information that causes investors to update their beliefs about the company's value.

(c)     The event study evidence is robust to alternative specifications, including a data-driven one based on recent research of mine using a machine learning algorithm to create a custom index for Shoals Stock.

(d)     I therefore conclude that Shoals Stock traded on a semi-strong form efficient market during the period I analyzed.

---

[1]     *See* Appendix A.

4938-0318-1705.v1

11. It is also my opinion that damages in this matter can be calculated on a class-wide basis. The only individual information necessary to do so can be obtained from objective stock trading records.

## IV. Relevant Allegations and Factual Background

### A. The Class

12. I understand that the proposed Class in this matter includes all persons who purchased or otherwise acquired Shoals Stock between May 16, 2022 and May 7, 2024, inclusive.[2]

### B. Defendants

13. Shoals is a publicly-traded company based in Portland, Tennessee. Shoals describes itself as "a leading provider of electrical balance of system ('EBOS') solutions for solar energy projects in the United States. EBOS encompasses all of the components that are necessary to carry the electric current produced by solar panels to an inverter and ultimately to the power grid. EBOS components are mission-critical products that have a high consequence of failure, including lost revenue, equipment damage, fire damage, and even serious injury or death. EBOS components that we produce include cable assemblies, inline fuses, combiners, disconnects, recombiners, wireless monitoring systems, junction boxes, transition enclosures and splice boxes."[3] The Shoals Stock is listed on the Nasdaq; its ticker symbol is "SHLS."

14. It is my understanding that Plaintiffs have named several individuals and entities as additional defendants. Those defendants are:

(a) Mr. Whitaker served as the Company's President beginning in September 2017, and also served as CEO from January 2020 until "announcing his resignation in December

---

[2] Complaint, ¶199.

[3] *See* https://investors.shoals.com/overview/default.aspx (accessed on December 26, 2025).

- 5 -

2022 before formally stepping down in March 2023."[4]  He was also a member of the Shoals Board

of Directors ("Board") from January 2021 until March 2023.[5]

(b)     Mr. Hubbard served as the Company's Interim CFO from May 2022 until

October 2022.[6]

(c)     Mr. Bardos became the Company's CFO in October 2022 and served

throughout the Class Period in that role.[7]

(d)     Mr. Tolnar served as the Company's Interim CEO between March and July

2023, and has been the Company's President since December 2022.[8]

(e)     Mr. Moss has served as Shoals' CEO since July 2023.[9]

(f)     The following individual defendants were Shoals directors at the time of the

December 2022 SPO: Brad Forth, Peter Wilver, Toni Volpe, Lori Sundberg, Jeannette Mills, Robert

Julian.[10]

(g)     Mr. Solon founded Shoals in 1996 and served as the Company's CEO and

President from November 1996 until December 2019.  Thereafter, Solon served as a director of the

Company until February 2022.  Mr. Solon was a controlling shareholder of the Company during the

---

[4]     Complaint, ¶15.

[5]     *Id.*

[6]     *Id.*, ¶16.

[7]     *Id.*, ¶17.

[8]     *Id.*, ¶18.

[9]     *Id.*, ¶19.

[10]    *Id.*, ¶¶23-29.

- 6 -

Class Period, and prior to the December 2022 SPO, Solon owned nearly 34% of the combined voting power of Shoals stock.[11]

(h) The following defendants served as underwriters for the December 2022 SPO: J.P. Morgan Securities LLC, Guggenheim Securities, LLC, Morgan Stanley & Co. LLC, UBS Securities LLC, Goldman Sachs & Co. LLC, Barclays Capital Inc., Credit Suisse Securities (USA) LLC, Cowen and Company, LLC, Oppenheimer & Co. Inc., Piper Sandler & Co., Roth Capital Partners, LLC, Johnson Rice & Company L.L.C., and Northland Securities, Inc.[12]

## C. Allegations

15. I understand Plaintiffs assert that Defendants violated §§10(b), 20(a), and 20A of the Exchange Act and SEC Rule 10b-5 promulgated thereunder, and §§11, 12(a)(2), and 15 of the Securities Act.

16. Plaintiffs allege that between May 16, 2022 and May 7, 2024, Defendants engaged in a scheme of wrongful conduct which included issuing materially false and/or misleading statements about: (i) the purportedly superior quality and reliability of Shoals' products; (ii) the ability of Shoals' products to be installed by anyone; and (iii) Shoals' warranty liability arising from remediation for defective wiring.[13] The Court summarized Plaintiffs' allegations as follows:

> Some putative class members purchased Shoals stock for $40.00; however, by May 7, 2024, it was trading for less than $8.00. (Doc. No. 82 ¶75). Plaintiffs attribute this precipitous decline to the company's public disclosure that one of its key products was defective and, as a result, it owed between $73 million and $160 million in warranty costs. (*Id.* ¶¶47, 170). Plaintiffs maintain that Shoals and its senior officers and directors knew about the product defect before the class period but continued to make false public statements about its products, including that they are safe and reliable and that they could be installed by anyone. (*E.g.*, *id.* §41). Plaintiffs also

---

[11]   *Id.*, ¶31.

[12]   *Id.*, ¶33.

[13]   *Id.*, ¶¶36-154, 174-192.

4938-0318-1705.v1

allege that Defendants omitted accrued or reasonably certain warranty costs from public filings. (*E.g.*, *id.* §40).[14]

17. It is my understanding that Plaintiffs claim that during the Class Period, Defendants repeatedly told investors that the Company's main electrical balance of systems ("EBOS") product[15], the Big Lead Assembly ("BLA"), offered certain advantages to its customers over other conventional EBOS products offered by Shoals' competitors, including lower installation costs, improved safety and reliability, and lower risk of failure.[16] Plaintiffs allege that Defendants told investors that the competitive advantage its products provided would drive increased market share for Shoals' products, and would lead the Company to "new records for revenue, gross profit, net income, adjusted EBITDA and adjusted net income."[17]

18. According to Plaintiffs, while Defendants were publicly touting the superiority of its BLA product, internally they were receiving reports of excessive "shrinkback" – wires pulling out or away from layers of insulation – exposing electrified wiring to the elements and posing a significant safety hazard.[18] Plaintiffs allege that despite numerous customer complaints of shrinkback in the Company's BLA product, and despite growing warranty costs being incurred to remediate the defective product, Defendants did not timely disclose the BLA defect; instead, they misled investors about the Company's exposure to warranty claims and associated remediation costs by telling investors that Shoals may face such claims, rather than disclosing that Shoals already was facing

---

[14] MTD Opinion at 1.

[15] Plaintiffs allege that Shoals generates most of its revenue selling EBOS solutions which are wiring components for solar panels and other applications. Complaint, ¶¶14, 36, 38.

[16] *Id.*, ¶37.

[17] *Id.*, ¶¶37, 43.

[18] *Id.*, ¶47.

- 8 -

those claims.[19]  Plaintiffs claim that Defendants waited more than a year after discovering the shrinkback defect to disclose its existence and the already substantial remediation costs incurred, in part to complete the December 2022 Secondary Public Offering of Shoals Stock on December 5, 2022.[20]  According to Plaintiffs, Defendants' delay in disclosing the shrinkback problem and the reported BLA product defect, their downplaying the issue, and their refusal to disclose either the costs paid or the known scope of the problem, violated GAAP.[21]

19.  Plaintiffs allege that Defendants revealed the truth about the shrinkback issue, and its impacts on the Company, in a series of disclosures between August 2023 and November 2024.[22]

20.  On August 1, 2023, in connection with reporting its 2Q23 results, Shoals issued a press release revealing that it was recording a $9.4 million warranty expense to reflect costs primarily related to BLA defects.  As a result, the 2Q23 press release reported that the Company's quarterly gross margins declined sequentially to 42.4% from 45.9% in the prior quarter.  During the corresponding 2Q23 conference call, Mr. Bardos stated that the warranty expense incurred within the quarter was "adequate to do the remediation required."[23]  The price of Shoals Stock fell from $26.11 per share on August 1, 2023 to $24.51 per share, an approximate 6% decline.[24]

---

[19]  *Id.*, ¶¶130-54.

[20]  *Id.*, ¶¶179-80.  Plaintiffs allege that the offering documents repeated statements touting the "reliability and safety" of Shoals' EBOS products and failed to mention the spiraling shrinkback defect labilities.  *Id.*, ¶¶47, 184.

[21]  *Id.*, ¶¶111, 130-54.

[22]  *Id.*, ¶¶155-73.

[23]  *Id.*, ¶¶70, 113, 116.

[24]  Yahoo! price data.

- 9 -

21. On November 7, 2023, Shoals reported its 3Q23 results and issued a press release disclosing that it had booked $50.2 million in warranty expenses for the quarter related to the shrinkback issue. The release also disclosed that Shoals had determined that a range of potential loss related to the shrinkback issue was $59.7 million to $184.9 million with the upper end of the range being $125.2 million higher than the Company recorded for the previous quarter.[25] The same day, Shoals published a 3Q23 Investor Presentation, which provided a "WARRANTY LIABILITY UPDATE," stating that "it is believed that approximately 300 sites may have harnesses made with this wire, representing about 30% of the total amount of Shoals' harnesses manufactured during the same timeframe"; Mr. Moss reiterated these facts during the Company's 3Q23 conference call.[26] On this news, the price of Shoals Stock fell from $16.23 per share on November 7, 2023 to $12.95 per share on November 9, 2023, or approximately 20%, over a two-day trading period.[27]

22. On February 28, 2024, Shoals issued a press release announcing the Company's 4Q23 and FY23 financial results. That release disclosed that growth in Shoals' backlog and awarded orders had materially deteriorated, falling sequentially by $2 million, to $631.3 million, down from $633.3 million in the prior quarter. In addition, the February 23, 2024 release issued disappointing financial guidance for 1Q24 and FY24, including quarterly revenue guidance of $90 million to $100 million, revealing that quarterly revenue was projected to decline sequentially by more than $35 million at the midpoint of the range. The February 23, 2024 release also provided 2024 annual revenue guidance for the Company of $480 million to $520 million, which at the midpoint was

---

[25] *Id.*, ¶¶120, 160.

[26] *Id.*, ¶¶121, 161.

[27] Yahoo! Price data.

- 10 -

approximately 19% below consensus analyst estimates of approximately $620 million.[28] The same

day, Shoals also disclosed in a 4Q23 Investor Presentation that "[i]nitial[ly], shrinkback issues were

found on at least 20 sites of the approximately 300 sites that have had the defective Prysmian red

wire" but that Shoals had been "informed that approximately 10 incremental [*i.e.*, additional] sites

[had] experienced shrinkback."[29] On this news, the price of Shoals Stock declined more than 16%

from $15.39 per share on February 28, 2024 to $12.83 per share on February 29, 2024.[30]

23.     On May 7, 2024, the last day of the Class Period, Shoals revealed that the Company's

backlog and awarded orders had fallen more than $16 million on a sequential basis to $615.2 million

and that the Company had suffered "unprecedented" project cancellations and several order delays

during 1Q24. The Company also admitted in its 1Q24 Form 10-Q that the Company's estimate of

shrinkback and warranty costs "may increase" and that such increase "may be material."[31] On this

news, the price of Shoals Stock declined from $8.80 per share on May 7, 2024 to $7.51 per share on

May 8, 2024, or approximately 15%.[32]

24.     On November 12, 2024, Shoals filed with the SEC a quarterly report on Form 10-Q

for the quarter ended September 30, 2024 ("3Q24 Form 10-Q"). In the Company's 3Q24 Form 10-

Q, Shoals announced that it had increased the lower end of its estimated loss due to warranty liability

by $13.3 million, with the estimated minimum liability now $73 million. Further, Shoals reported

that the Company's backlog and reported orders were down 5.8% from the same quarter last year,

---

[28]  *Id.*, ¶¶126, 164.

[29]  *Id.*, ¶¶127, 165.

[30]  Yahoo! data.

[31]  Complaint, ¶167.

[32]  Yahoo! data.

4938-0318-1705.v1

and a 7.1% sequential decrease from the previous quarter.[33] On this news, the price of Shoals Stock fell approximately 16% from $5.77 on November 11, 2024 to $4.85 per share on November 12, 2024.[34]

25. On February 18, 2025 Defendants filed a consolidated motion to dismiss contending that the Complaint did not properly state a claim and should be dismissed.[35]

26. In resolving the Defendants' motion to dismiss, the Court determined that some claims and Defendants were to be dismissed, and that other claims could proceed as follows:

- Plaintiffs' §10(b) Exchange Act claims may proceed against Shoals, Whitaker, Hubbard, Bardos, and Tolnar; however, the §10(b) claim against Moss must be dismissed.

- Plaintiffs' §11 Securities Act claims against Shoals, Bardos, Forth, Wilver, Daul, Volpe, Sundberg, Mills, Julian, J.P. Morgan Securities, Guggenheim Securities, Morgan Stanley, Goldman Sachs, Barclays, Credit Suisse, Cowen & Co., Oppenheimer & Co., Piper Sandler & Co., Roth Capital Partners, Johnson Rice & Co., and Northland Securities may proceed.

- Plaintiffs' §12 Securities Act claims must be dismissed.

- Plaintiffs' §20A insider trading claims against Shoals and Whitaker may proceed.

- Plaintiffs' §§15 and 20(a) claims against Hubbard, Bardos, Moss, and the Director Defendants must be dismissed; however, Plaintiffs' §20(a) claims against Whitaker and Tolnar and §15 claims against Shoals and Solon may proceed.[36]

---

[33] Complaint, ¶170.

[34] Yahoo! data.

[35] Defendants' MTD Brief at 1-3.

[36] MTD Opinion at 35.

- 12 -

## V. Market Efficiency

27. I understand that Plaintiffs in this case invoke the "fraud-on-the-market" presumption of reliance, and I understand that courts allow this presumption when plaintiffs can demonstrate that a stock trades on an efficient market on the trading dates in the Analysis Period.[37]

28. The Supreme Court wrote in 1988's *Basic v. Levinson* decision that:

> The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business.[38]

29. In 2015, the Supreme Court wrote in *Halliburton II* that "all that *Basic* requires" for the presumption of reliance is that "false statements affect [share price], and cause loss."[39]

30. For companies whose stock is traded on major stock exchanges such as the Nasdaq, it is widely accepted among economists that share price responds when new information about the company is made public. This response will tend to be in the direction of the news: when the public receives positive news about a company, its share price rises, and when the public receives negative news about a company, its share price falls. In addition, this response will tend to occur relatively quickly for securities traded in markets that are liquid and characterized by a substantial volume of trading.

31. Financial economists have considered three different notions of market efficiency:[40]

---

[37] *Basic Inc. v. Levinson*, 485 U.S. 224 at 244 (1988) ("In an open and developed market, the dissemination of material misrepresentations or withholding of material information typically affects the price of the stock, and purchasers generally rely on the price of the stock as a reflection of its value.").

[38] *Id.*

[39] *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 272 (2014).

[40] *See* Eugene F. Fama, *Efficient Capital Markets: A Review of Theory and Empirical Work,* 25 J. Fin. 383, 383, 416 (1970); John Y. Campbell, Andrew W. Lo, and A. Craig MacKinlay, THE ECONOMETRICS OF FINANCIAL MARKETS 22 (1997).

(a)     Weak form efficiency, which means that a stock's price cannot be reliably predicted using historical information on stock prices.

(b)     Semi-strong form efficiency, which means that stock prices adjust relatively quickly to fully reflect newly public information.

(c)     Strong form efficiency, which means that stock prices adjust to fully reflect all information, including that which is not made public.

32.     Thus, a security that trades on a semi-strong form efficient market meets the notion of efficiency described in *Basic* and reiterated in *Halliburton II.*

33.     Given the liquidity and volume of trading on major national stock exchanges such as the Nasdaq, prices for stocks traded on these exchanges generally will respond relatively quickly to new information.

34.     In my opinion, the fact that Shoals Stock traded on the Nasdaq on all trading dates relevant to this litigation suggests a strong likelihood that the market for Shoals Stock was efficient during this period.  In this report, I supplement that initial opinion with an array of information about additional factors that courts have used in considering the question of whether a security trades on an efficient market.

35.     In *Cammer v. Bloom*, the court offered five additional "facts which . . . might give rise to an inference that" such a company "traded in an efficient market."  *Cammer*, at 1285-1286. These five "*Cammer* factors" are:

(a)     Average weekly trading volume.  *Cammer* at 1285.

(b)     The number of analysts who follow and report on the company's stock. *Cammer* at 1285.

(c)     How many market makers the company's stock has.  *Cammer* at 1286.

- 14 -

(d)     Whether the company is eligible to file a Form S-3 registration statement.

*Cammer* at 1286.

(e)     Whether "empirical facts show[] a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price."

*Cammer*, at 1286.

36.     In *Krogman v. Sterritt*, the court considered three additional factors:

(i)     The size of the company's market capitalization.  *Krogman* at 478.

(ii)    The size of the stock's bid-ask spread.  *Krogman* at 478.

(iii)   The firm's float, which is the percentage of its shares held by the public rather than by insiders.  *Krogman* at 478.

37.     Courts have also discussed the following additional factors:

(a)     The number of institutional investors that owned shares in a stock whose market efficiency is under consideration.[41]

(b)     Whether the stock's price exhibits autocorrelation.[42]

(c)     Whether there is evidence that short sales are constrained.[43]

38.     For each of the factors just described, the evidence indicates that during the Analysis Period, Shoals Stock satisfied the test in question.  I therefore conclude that all the evidence points to one conclusion: that the Stock traded on an efficient market during the Analysis Period.

---

[41]   *See*, *e.g., Cosby v. KPMG LLP*, 2020 WL 3548379, at *20 (E.D. Tenn. June 29, 2020).

[42]   *See, e.g.*, *In re DVI Inc. Sec. Litig.*, 249 F.R.D. 196, 213 (E.D. Pa. 2008).

[43]   *See, e.g.*, *Schleicher v. Wendt*, 618 F.3d 679, 685 (7th Cir. 2010).

- 15 -

## VI.    Market Efficiency Evidence

39.    This Part of my report presents and evaluates evidence regarding the efficiency-related factors just described.  I consider the five *Cammer* factors, the three *Krogman* factors, and additional factors related to institutional ownership and short-selling constraints.

### A.    First *Cammer* Factor: Average Weekly Trading Volume

40.    The first *Cammer* factor is average weekly trading volume.  *Cammer*, at 1285.  In *Cammer*, the court explained that "the reason" high weekly trading volume "suggests there is an efficient market is because it implies significant investor interest in the company," and this "interest, in turn, implies a likelihood that many investors are executing trades on the basis of newly available or disseminated corporate information."  *Cammer* at 1286.

41.    To address this issue, I downloaded data from Yahoo! on daily trading volume for Shoals Stock.  I then summed daily trading volume within calendar weeks to arrive at weekly trading volume.

42.    In weeks that started or ended during the Analysis Period, Shoals Stock's average weekly trading volume was 13.7% of its shares outstanding,[44] more than 6 times the figure *Cammer* describes as triggering a strong presumption of market efficiency.

43.    Figure 1 plots Shoals Stock's weekly trading volume for each week between the week ending May 23, 2021 and the week ending December 29, 2024 (this period strictly contains the

---

[44]    I obtained the shares outstanding values from the Company's press releases announcing its quarterly financial results; the number of shares outstanding is provided in a table titled "Condensed Consolidated Balance Sheets (Unaudited)" in each of these releases.  In some quarters, the table reports shares outstanding as of the previous December; this is the figure I used for each such quarter.  For weeks with fewer than five trading days, I calculated weekly trading volume by multiplying the actual total trading volume for the week by 5/d, where d is the number of trading days for the week.  Thus, if July 4 was a weekday, then my weekly trading volume figure for the week containing that date would be 5/4=1.25 times the total trading volume that actually did occur in the 4 trading days of that week.

- 16 -

Analysis Period).  The figure shows that that the Stock's weekly trading volume always exceeded the 2% strong-presumption line.

44.     I conclude that weekly trading volume in the Stock during the Analysis Period was sufficient to meet the first *Cammer* factor.

Figure 1: Weekly Trading Volume for Shoals Stock, as Percentage of Shares Outstanding



### B.     Second *Cammer* Factor: The Number of Analysts Who Followed Shoals

45.     The second *Cammer* factor is the "number of securities analysts [who] followed and reported on a company's stock during the class period."  *Cammer*, at 1285.[45]  The logic of considering this factor is that analysts are likely to review publicly available information and advise investors who follow these analysts as to the analysts' recommendations of whether to buy or sell the stock, which would, in turn, cause "the market price of the stock [to] be bid up or down to reflect" information that is newly public available.[46]

---

[45]   Attention to analyst coverage reflects a mechanism the Supreme Court pointed to in *Basic*: "For purposes of accepting the presumption of reliance in [*Basic*], we need only believe that market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices."  *Basic*, at 247, n.24.

[46]   *Cammer* at 1286.

4938-0318-1705.v1

46.     To address this issue, I requested Counsel provide me with analyst reports about the Company dated during the Analysis Period.  Counsel provided 298 such analyst reports.

47.     Examination of these reports revealed that numerous firms issued reports, including Barclays, Cantor Fitzgerald, Credit Suisse, Guggenheim, J.P. Morgan, Morgan Stanley, Northland Securities, Roth Capital Partners, Truist Securities, and UBS Equities.

48.     I examined numerous of these reports and found that they regularly discussed developments in the Company's financial position and business operations.  Such reports discussed the latest company-provided information about the shrinkback problem and resulting warranty costs; at least one also contained further investigation of matters relevant to this litigation.[47]  Reports regularly appeared on the dates when the Company released information about its financial results, and they provide analysis contextualizing these results.  The reports provide analysts' "price targets" for Shoals and adjust them as new information about the company's financial results and projections arrive.

49.     I conclude that there was sufficient analyst attention to the Shoals Stock during the Analysis Period to meet the second *Cammer* factor.

### C.     Third *Cammer* Factor: Market Makers

50.     The third *Cammer* factor is how many market makers the stock has.  *Cammer*, at 1286.  Having "market makers and arbitrageurs would ensure completion of the market mechanism," because "these individuals would react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level."[48]

---

[47]  *See, e.g.*, Roth MKM, August 11, 2023, *The Solar Snapshot — ENPH, UFLPA, FSLR, SHLS Warranty, SPWR, Domestic Content* at 1 (describing shrinkback-related outreach to Shoals customers).

[48]  *Cammer* at 1286-1287.

- 18 -

51.     The U.S. Securities and Exchange Commission ("SEC") defines a market maker as "a firm that stands ready to buy or sell a stock listed on an exchange at publicly quoted prices."[49]  The Nasdaq exchange defines a market maker for purposes of the Nasdaq exchange as "a N[asdaq] member firm that buys and sells securities at prices it displays in N[asdaq] for its own account (principal trades) and for customer accounts (agency trades)."[50]

52.     As *Cammer* explained: "The existence of market makers and arbitrageurs would ensure completion of the market mechanism; these individuals would react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level."[51]

53.     Shoals Stock was listed on the Nasdaq Global Select Market throughout the Analysis Period.  Nasdaq Rule 5315 requires that any firm listed on the Global Select Market must have at least three "registered and active Market Makers."[52]  In general, there are many market makers for stocks listed on the Nasdaq exchange; as of December 31, 2025, for example, Shoals Stock had 41 such market makers.[53]

---

[49]  *See*     https://www.investor.gov/introduction-investing/investing-basics/how-stock-markets-work/executing-order () (heading "Your Broker Has Options for Executing Your Trade") (accessed on January 2, 2026).

[50]  *See* https://www.nasdaqtrader.com/trader.aspx?id=marketmakerprocess ("Definition of a Market Maker") (accessed on January 2, 2026).

[51]  *Cammer*, at 1286-1287.

[52]  *See*                    Rule                    5315(e)(3 https://listingcenter.nasdaq.com/rulebook/nasdaq/rules/Nasdaq%205300%20Series (accessed on January 2, 2026).

[53]  *See* https://nasdaqtrader.com/Trader.aspx?id=DailyMPPositionReport (accessed on January 2, 2026).

4938-0318-1705.v1

54. Financial institutions that disclosed being market makers during the Analysis Period include: Credit Suisse;[54] Barclays;[55] J.P. Morgan;[56] Piper Sandler;[57] and Cantor Fitzgerald.[58]

55. I conclude that there were sufficiently many market makers during the Analysis Period for the Shoals Stock to meet the third *Cammer* factor.

### D. Fourth *Cammer* Factor: S-3 Registration Eligibility

56. The fourth *Cammer* factor is "whether the company is entitled to file an S-3 Registration Statement in connection with public offerings." *Cammer*, at 1286. The logic behind this factor is that the required elements for eligibility to file Form S-3 indicate that information about such firms is widely available because of the number of outstanding shares for these firms and their coverage by analysts; indeed, nearly a decade before *Cammer*, the SEC stated that eligibility to file Form S-3 "*is predicated on the Commission's belief that the market operates efficiently for these companies, i.e., that the disclosure in Exchange Act reports and other communications by the registrant, such as press releases, has already been disseminated and accounted for by the market place.*"[59]

---

[54] Credit Suisse, "Shoals Technologies: AD/CVD Exposure Limited in 2022; Reduce TP By $6 On Cost of Capital," May 17, 2022, at 8.

[55] Barclays, "Shoals Technologies: Playing the Waiting Game," August 16, 2022, at 3.

[56] J.P. Morgan, "Shoals: Meetings with Management, Updating Model for Accretive TRA Deal; PT Goes to $36," December 8, 2022, at 6.

[57] Piper Sandler, "Shoals Technologies Group, Inc. (SHLS): 2Q'23 Earnings Review: 2Q EBITDA Beat; Lighter Bookings Quarter," August 1, 2023, at 5.

[58] Cantor Fitzgerald, "Shoals Technologies Group, Inc. (SHLS): Quick Take: ITC Throws Out One of Two Asserted Patents, But Ruling Not Expected to Impact Cases in District Court," March 12, 2024, at 3.

[59] *Cammer* at 1284 (quoting SEC Securities Act Release No. 6331) (emphasis added in *Cammer* and preserved here).

4938-0318-1705.v1

57. Key requirements for an issuer's eligibility to file Form S-3 are that the issuer has been a reporting company for at least a year, that it be current in its SEC filings, and that it have a public float over $75 million.[60]

58. The Company's eligibility to file such a statement is demonstrated by the fact that it did file one on November 30, 2022,[61] including a signed certification from then-CEO Whitaker that Shoals "has reasonable grounds to believe that it meets all of the requirements for filing on Form S-3."[62] I am unaware of any reason to believe that certification was not well founded.

59. I conclude that the fourth *Cammer* factor was met during the Analysis Period.

**E.   Fifth *Cammer* Factor: Cause-and-Effect Relationship Between Events and Stock Price**

60. The fifth *Cammer* factor is whether "empirical facts show[] a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price." *Cammer*, at 1286.

61. To assess whether this factor is met, I employ an event study, which is a statistical technique for evaluating the direction and magnitude of a stock's response to events that may include price-relevant news about the stock.

---

[60] *See, e.g.*, Stephen J. Choi and A.C. Pritchard, SECURITIES REGULATION: CASES AND ANALYSIS, 6th Edition at 507 (2024). Form S-3, together with instructions, may be found at https://www.sec.gov/files/forms-3.pdf.

[61] Form S-3 Registration Statement (Shoals Technologies Group, Inc.) (November 30, 2022), at https://www.sec.gov/Archives/edgar/data/1831651/000119312522295435/d405864ds3asr.htm (accessed on January 2, 2026). *See also* Complaint, ¶93 (describing this filing).

[62] Shoals Form S-3 Registration Statement, footnote at II-5.

4938-0318-1705.v1

62.     Event studies "have a long history"[63] and are widely used by financial economists to assess market efficiency.  As one prominent economist has written, "event studies can give a clear picture of the speed of adjustment of prices to information,"[64] and they are "the cleanest evidence we have on efficiency."[65]  Others have written that the "general applicability of the event-study methodology has led to its wide use," including to measure "the effect of an event on the price of . . . common equity."[66] Event studies are frequently used by testifying expert witnesses on both the plaintiff and defendant sides in securities fraud litigation.[67]

63.     A first step in constructing an event study is to devise a statistical model, also known as a regression model, that relates the stock's daily return to daily returns for explanatory variables associated with the stock even in the absence of unusual events.[68] For example, daily returns for the S&P 500 index will capture variation in economy-wide conditions, such as those due to new information about the likelihood of recession, about interest rate changes, and so on.  Other variables can be included in the regression model to capture changes in conditions that operate specifically within a firm's industry.[69]

---

[63]   John Y. Campbell, Andrew W. Lo, and A. Craig MacKinlay, THE ECONOMETRICS OF FINANCIAL MARKETS 149 (1997).

[64]   Eugene F. Fama, *Efficient Capital Markets: II*, 46 J. Finance 1575, 1602 (1991).

[65]   Eugene F. Fama, *Efficient Capital Markets: II*, 46 J. Finance 1575, 1607 (1991).

[66]   John Y. Campbell, Andrew W. Lo, and A. Craig MacKinlay, THE ECONOMETRICS OF FINANCIAL MARKETS 149 (1997).

[67]   Brief of Testifying Economists as Amici Curiae in Support of Respondent, *Halliburton Co. v. Erica P. John Fund, Inc.*, No. 13-317 (U.S. Jan. 28, 2014), at 3.

[68]   I use the log return, which is a common approach to measuring daily stock returns.  For trading date $t$, the log return is defined as $\log P_t - \log P_{t-1}$, where $t - 1$ refers to the previous trading day.

[69]   *See, e.g.*, Jill E. Fisch, Jonah B. Gelbach, and Jonathan Klick, *The Logic and Limits of Event Studies in Securities Fraud Litigation*, 96 Tex. L. Rev. 553, 572 (2018).

- 22 -

64. The second step is to use data on daily returns to estimate this model's parameters (*e.g.*, the regression coefficient for the S&P 500 index). These parameters are then used to calculate the stock's expected return on each date under consideration (*i.e.*, both dates included in the estimation of the model and event dates the model will be used to assess).

65. The third step is to calculate the abnormal return for each date. The abnormal return equals the stock's actual return minus its expected return. In other words, the abnormal return is the component of the actual return that can't be attributed simply to daily variation of the S&P 500 or industry index. The abnormal return on a date thus includes the effects on the stock return of whatever non-predictable forces operated on that date. For this reason, abnormal returns can be used to assess whether movements in a stock's return are systematically different on dates with value-relevant news about the firm than on other dates.

66. One way to use an event study to assess the cause-and-effect relationship *Cammer* describes is to compare the abnormal returns from ordinary dates to abnormal returns from dates identified as potential "news dates" – dates when it is particularly likely that new, value-relevant information about a company was released to the market. If there is a "difference in price movement between the two sample sets," then "that is statistical evidence that the market incorporates new public information into the price of the stock."[70]

67. This is true even if "[n]ot every (or even most) of the predefined news dates in" the event study actually had an impact on share price, because "[t]here is no inherent reason why every news item included actually would contain 'new' material information that would alter expectations as to the stock's performance or value…*e.g.*, released earnings that simply meet pre-existing

---

[70] Brief of Testifying Economists as Amici Curiae in Support of Respondent, *Halliburton Co. v. Erica P. John Fund, Inc.*, No. 13-317 (U.S. Jan. 28, 2014), at 10.

- 23 -

guidance."[71] Thus, it is important to recognize that in the context of an event study, the term "value-relevant news," or just "news," refers to what might be called "new news" – information *that comes as a surprise to the market*. For example, when a company issues a surprise announcement that its financial position worsened over the preceding quarter, when the market expected the opposite, that will cause the company's share price to fall. But a press release containing only facts that were already well known to the investing public will not affect share price, because such facts already would have been incorporated in the stock's price, given that the stock trades on a semi-strong form efficient market. To put it more succinctly: in an efficient market, "non-news" will not affect the company's daily return.[72]

68.    Because regression model results include a degree of random variation, the abnormal return for a particular date will include both the effects of any news event that occurred on that date and the typical but unpredictable variation in stock's return that occurs even in the absence of such a news event. It is thus necessary to use statistical tests to determine whether abnormal returns are sufficiently unusual on news dates to support the inference that the market did respond to the news itself.

69.    In lay terms, such statistical tests boil down to testing whether the distribution of abnormal returns on identifiable news dates is systematically different from the distribution of

---

[71]   Brief of Testifying Economists as Amici Curiae in Support of Respondent, *Halliburton Co. v. Erica P. John Fund, Inc.*, No. 13-317 (U.S. Jan. 28, 2014), at 10.

[72]   This fact explains how misleading statements can both (1) be non-news statements in the economic sense and (2) cause the maintenance of price inflation, as is often at issue in securities litigation. For example, if a company announces that its financial position is just as investors had believed it to be, and if investors treat this statement as non-news, then the statement itself will have no impact on the stock's observed market return for that day. But if the truth is that the company's financial position is actually worse than investors had believed, the truth is that the firm's actual value will have fallen. Accordingly, a non-news statement that misleads by concealing a truth that would be news can have the effect of maintaining the stock's price at an artificially high level.

abnormal returns on ordinary dates.  Appendix C provides a detailed discussion of the approach I took to conduct this testing.  In the balance of this section, I discuss my event study findings in a more general way that does not require familiarity with the technical details of statistical methods.

70.  To identify potential news dates, I downloaded all press releases for the years 2022, 2023, and 2024 from the Shoals company website.[73]  I then determined the trading date on which the market had access to the content of these press releases.[74]  There were 56 press releases issued by Shoals during the Analysis Period, each of which I treat as a potential news date.  I refer to these 56 dates as "News Dates," and I refer to other trading days in the Analysis Period as "Non-News Dates."

71.  I considered three candidate models for the regression of Shoals daily returns, denoted Model I, Model II, and Model III.  All three models included an intercept.  What distinguished them was the other explanatory variables included.

(a)  Model I includes only one explanatory variable: the daily returns of the S&P 500 index.

(b)  Model II includes the S&P 500 as well as the returns of the Invesco Solar Exchange Traded Fund (the "Solar Industry Index").[75]  Thus, including the Solar Industry Index in the regression model can be expected to account for developments specific to solar-industry firms.[76]

---

[73]  *See* https://investors.shoals.com/news/default.aspx.

[74]  Counsel assisted me in this task by providing data regarding the earliest time and date on which each press release was publicized by a wire news service.  If this occurred before 3pm eastern time on a trading day, I treated the release date as the date Shoals issued the release; otherwise I treated the release date as the next trading day.

[75]  This index "is based on the MAC GlobalSolar Energy Index (Index)" and invests "at least 90% of its total assets in the securities, American depositary receipts (ADRs) and global depositary receipts (GDRs) that comprise the Index," which itself is composed "of companies in the solar energy industry."  Invesco Solar ETF fact sheet for Q3 2025, https://www.invesco.com/content/dam/invesco/us/en/product-documents/etf/fact-sheet/tan-invesco-

4938-0318-1705.v1

(c) Model III uses a machine learning algorithm to construct a custom index ("Custom Index") for Shoals based on the relationship, on Non-News Dates, between Shoals returns and those of potential peer firms.[77] These potential peer firms include individual firms in the Solar Industry Index as well as publicly traded firms that report to the SEC that they are in the same SIC code as Shoals.[78] Model III's Custom Index is a weighted average of the daily returns for a subset of these peer firms. The weights, and the particular peer firms that are selected, are developed using a data-driven algorithm. This means that, once I decided on the set of firms whose returns the algorithm would consider, the algorithm itself picks the weights and included firms without any exercise of discretion on my part. In addition to bringing a degree of objectivity, the Model III approach is advantageous in that it can in principle – and, here, does in practice – yield improved predictive performance of the event study regression model.

72. Table 1 reports the three regression models' parameter estimates.

73. The Model I coefficient for the S&P 500 indicates that Shoals returns are very highly associated with broader market developments, all else equal. A 1% increase in the market return is associated with roughly a 1.4% increase in Shoals.

---

solar-etf-fact-sheet.pdf, accessed on January 10, 2026. The MAC Solar Index "is calculated and administered by S&P Dow Jones Indices." MAC Global Solar Energy Stock Index, https://macsolarindex.com/ (accessed on January 10, 2026).

[76] Shoals Stock plays a part in this index, typically constituting between 2%-5% of the index by value. I calculated a modified version of the Solar Industry Index series intended to eliminate any direct influence of Shoals Stock in the Solar Industry Index.

[77] I discuss the construction of the Custom Index in Appendix C. This approach is based on one suggested in my scholarly research, Andrew Baker and Jonah B. Gelbach, *Machine Learning and Predicted Returns for Event Studies in Securities Litigation*, 5 J. L. Fin. & Accounting 231 (2021).

[78] Shoals reports that its SIC code is 3674. I obtained a list of publicly traded semiconductors and related devices companies for this code from the Fintel website, at https://fintel.io/industry/list/semiconductors-and-related-devices.

4938-0318-1705.v1

**Table 1: Regression Model Coefficient Estimates for Models I, II & III.**
**(Estimation based on Non-News Dates only)**

| Coefficient | Model I | Model II | Model III |
|---|---|---|---|
| S&P 500 | 1.4021 | 0.1213 | – |
| | (0.144) | (0.129) | |
| TAN (ex SHLS) | – | 1.0956 | – |
| | | (0.056) | |
| Custom Index | – | – | 1.0353 |
| | | | (0.056) |
| Intercept | -0.0018 | -0.0004 | 0.0014 |
| | (0.002) | (0.001) | (0.002) |
| R-Squared | 0.142 | 0.490 | 0.636 |
| RMSE | 0.036 | 0.028 | 0.022 |

74. The Model II results show that most of this effect is captured by the Company's industry. With both the S&P 500 and the Solar Industry Index both included, a 1% increase in the Solar Industry Index is, *ceteris paribus*, associated with roughly a 1.1% increase in the Shoals return, whereas a 1% increase in the S&P 500 is associated with a *ceteris paribus* increase in Shoals Stock of only about one-tenth that size; further, the Model II coefficient on the S&P 500 index is very imprecisely estimated, so that at conventional scholarly levels of statistical significance, it would not lead to rejection of the null hypothesis that the S&P 500 index has a true Model II coefficient of 0.

75. The Model III estimates show that the LASSO algorithm created an index that has close to a one-for-one relationship with the Shoals Stock return, such that a 1% increase in the Custom Index return is associated with a 1.04% increase in the Shoals return.

76. To assess model fit, I use the R-squared statistic, which measures the share of variation in Shoals daily returns that is explained by variation in the explanatory variables. Model I is worst, with an R-squared of only 0.142. Model II improves over this substantially, raising R-squared to 0.490. Model III offers a noticeable improvement over Model II, with R-squared of

4938-0318-1705.v1

0.636.  Thus, whereas Model II is able to explain about half the variation in Shoals daily returns using the S&P 500 and industry index variables, Model III's custom index is enough to increase the explained share to nearly two-thirds of Shoals Stock return's variation.

77.     Another useful measure of regression model fit is the root-mean square error, or RMSE, which is the average value of the squared abnormal return based on the model.  A model with a lower RMSE thus has lower variability of abnormal returns on Non-News Dates, making it more likely that actual news event effects will be detected when comparing abnormal returns for News Dates and Non-News Dates.  The last row of Table 3 reports the RMSE for each of the three models,[79] which were 0.036, 0.028, and 0.022.  Thus, Model I has the most variable abnormal returns as measured by RMSE, and Model II reduces that variability by nearly a fourth.  Model III reduces RMSE by roughly 20% relative to Model II and by more than a third relative to Model I.[80]

78.     Next, I use the Model I, Model II, and Model III parameter results to compare the distributions of abnormal returns for News Dates and Non-News Dates.

79.     On a date when no share price-relevant news occurred, there will be only low probability that an abnormal return's absolute value will exceed certain threshold values, known as "critical values" (*see* Appendix C).  These critical values can be determined for each of Model I, Model II, and Model III.

---

[79]   For Model I and Model II, I calculate the RMSE using estimated abnormal returns for all Non-News Dates.  There are 572 of these dates.  For Model III, I take an alternative approach.  To avoid overfitting related to the fact that the set of return variables included in the Custom Index are selected using the LASSO procedure in a first step estimation, I calculate the RMSE using a set of 201 observations that were held out from the LASSO step.

[80]   These performance improvements are broadly in line with findings in Andrew Baker and Jonah B. Gelbach, *Machine Learning and Predicted Returns for Event Studies in Securities Litigation*, 5 J. L. Fin. & Accounting 231 (2021).

- 28 -

80.     Row 1 of Table 2 reports the expectation of the number of abnormal returns' absolute values, among 56 dates on which no value-relevant news occurred, that would be expected to exceed the critical values for probability levels 10%, 5%, and 1%. The corresponding expectations are 5.6, 2.8, and 0.56.

81.     The next three rows of the Table are based on the commonly made assumption that abnormal returns have what statisticians call a normal probability distribution (in lay terms, this is essentially a bell curve). Under that assumption, there is a widely known formula for the 10%, 5%, and 1% critical values.[81] Using this formula, I calculated the 10%, 5%, and 1% critical values for each of Model I, Model II, and Model III. I then counted the number of times each model's abnormal returns exceeded the applicable critical value and reported these counts in Table 2.

(a)     Row 2 of Table 2 reports the actual number of the 56 News Dates for which the Model I abnormal return's absolute value exceeds the three critical values. These numbers are 18, 14, and 10 – much more frequent than the expectations of 5.6, 2.8, and 0.56. The Model I empirical evidence therefore suggests that the News Dates' abnormal returns do not come from the same distribution as Non-News Dates' abnormal returns.

(b)     Row 3 of Table 2 reports the actual number of the 56 News Dates for which the Model II abnormal return's absolute value exceeds the three critical values. These numbers are 17, 16, and 12 – much more frequent than the expectations of 5.6, 2.8, and 0.56. The Model II empirical evidence therefore suggests that the News Dates' abnormal returns do not come from the same distribution as Non-News Dates' abnormal returns.

(c)     Row 4 of Table 2 reports the actual number of the 56 News Dates for which the Model III abnormal return's absolute value exceeds the three critical values. These numbers are

---

[81]     *See* Appendix C.

- 29 -

19, 15, and 13 – much more frequent than the expectations of 5.6, 2.8, and 0.56. The Model III empirical evidence therefore suggests that the News Dates' abnormal returns do not come from the same distribution as Non-News Dates' abnormal returns.

**Table 2: Number of News Dates on Which Abnormal Returns Exceed Critical Values**
**(based on assumption of normally distributed abnormal returns)**

|  |  | 10% | 5% | 1% |
|---|---|---|---|---|
| **Row 1** | *Expectation* | 5.6 | 2.8 | 0.56 |
| **Row 2** | Model I | 18 | 14 | 10 |
| **Row 3** | Model II | 17 | 16 | 12 |
| **Row 4** | Model III | 19 | 15 | 13 |

82.     In sum, Table 2 suggests that regardless of which model I use, News Dates' abnormal returns do not come from the same probability distribution as Non-News Dates' abnormal returns. This evidence supports the conclusion that Shoals Stock responds to news promptly, supporting the conclusion that it trades on a semi-strong form efficient market. In particular, there are many more "right-tail," *i.e.*, large, abnormal returns among News Dates than among Non-News Dates.

83.     One limitation of the approach in Table 2 is that it relies on the assumption that abnormal returns have a normal probability distribution. As I discuss in Appendix C, it is clear that the Model I and Model II abnormal returns do not have such a distribution.

84.     To address this concern, I used the "Sample Quantiles" approach, which I developed in my scholarly work,[82] and which is robust to non-normality. The Sample Quantiles approach allows me to provide evidence analogous to that in Table 2, but without relying on the dubious assumption that all three models' abnormal returns come from a normal distribution.

85.     I report the Sample Quantiles approach results in Table 3. Although the precise numbers in these results differ from those reported in Table 2, they yield the same substantive

---

[82]   Jonah B. Gelbach, Eric Helland, Jonathan Klick, *Valid Inference in Single-Firm, Single-Event Studies*, 15 Am. L. & Econ. Rev. 495 (2013).

4938-0318-1705.v1

conclusion: the pattern of abnormal returns on News Dates is quite different from what would be expected if the abnormal returns for these dates came from the same probability distribution as abnormal returns on Non-News Dates. In particular, there are many more "right-tail," *i.e.*, large, abnormal returns among News Dates than among Non-News Dates.

**Table 3: Number of News Dates on Which Abnormal Returns Exceed Critical Values, Based on Sample Quantiles approach**

|  |  | 10% | 5% | 1% |
|---|---|---|---|---|
| **Row 1** | *Expectation* | 5.6 | 2.8 | 0.56 |
| **Row 2** | Model I | 14 | 10 | 7 |
| **Row 3** | Model II | 16 | 13 | 8 |
| **Row 4** | Model III | 14 | 14 | 12 |

86. One question is how strong the evidence is against the hypothesis that abnormal returns on News Dates and Non-News Dates come from different probability distributions. To answer this question, I used a formal statistical procedure known as Fisher's exact test. This allows me to determine the statistical significance level at which it is possible to reject the hypothesis that abnormal returns for News Dates and Non-News Dates come from the same distribution. Applying this test, I found that:

(a) For Model I, the hypothesis that abnormal returns for News Dates and Non-News Dates come from the same distribution is rejected at the 0.01% significance level.

(b) For Model II, the hypothesis that abnormal returns for News Dates and Non-News Dates come from the same distribution is rejected at the 0.01% significance level.

(c) For Model III, the hypothesis that abnormal returns for News Dates and Non-News Dates come from the same distribution is rejected at the 0.01% significance level.

87. Rejecting the null hypothesis that abnormal returns for News Dates and Non-News Dates come from the same distribution at the 0.01% significance level provides powerful evidence

- 31 -

against that null hypothesis. I conclude that abnormal returns come from a different distribution for News Dates and Non-News Dates.

88.     In sum, all of the evidence I have considered in this section points to one firm conclusion. During the Analysis Period Shoals Stock responded to news on the trading date when the news broke. In other words, during the Analysis Period, there was a cause and effect relationship between news about Shoals Stock and the Company's Stock price.

89.     I conclude that the fifth *Cammer* factor was met during the Analysis Period.

**F.     Krogman Market Efficiency Indicators**

90.     In *Krogman*, the court offered three additional factors to consider.

91.     First, *Krogman* determined that "[m]arket capitalization, calculated as the number of shares multiplied by the prevailing share price, may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations."[83] Although Shoals may be characterized as a small-cap stock,[84] it is nevertheless a company of substantial financial size, with market capitalization during the Analysis Period exceeding $800 million on all dates during the Analysis Period. I conclude that the first *Krogman* factor is satisfied.

92.     Second, *Krogman* pointed to the bid-ask spread, which "is the difference between the price at which investors are willing to buy the stock and the price at which current stockholders are willing to sell their shares… A large bid-ask spread is indicative of an inefficient market, because it

---

[83]   *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (2001).

[84]   For example, Nasdaq's Chief Economist has suggested as a general rule that as of 2024, the category of small-cap stocks includes those with market capitalization between $200 million and $2 billion. Phil Mackintosh, *How Big Is a Small-Cap Stock?*, https://www.nasdaq.com/articles/how-big-small-cap-stock (accessed on January 7, 2026).

- 32 -

suggests that the stock is too expensive to trade."[85]  Using bid and ask values collected by the London Stock Exchange Group, I calculated the quoted spread, which equals the ask value minus the bid value.  I then calculated the effective spread as the quoted spread divided by the midpoint of the ask and bid values, with this ratio then multiplied by 100%.  During the Analysis Period, Shoals Stock's average effective spread was 0.05%, which is low, indicating that SHLS trades in a liquid, low-cost market.[86]  I conclude that the second *Krogman* factor is satisfied.

93.     Third, *Krogman* stated that a firm's float, "the percentage of shares held by the public, rather than insiders," indicates market efficiency because "the prices of stocks that have greater holdings by insiders are less likely to accurately reflect all available information about the security" due to the fact that "insiders may have private information that is not yet reflected in stock prices."[87]  In other words, insiders might trade on their private information, causing a stock's value to diverge from what publicly available news suggests.  I constructed the free-float percentage by dividing data on the number of free-float shares[88] by the number of shares outstanding.  I found that the minimum value of the free-float percentage over the Analysis Period was 96%.  I conclude that the third *Krogman* factor is satisfied.

---

[85]  *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001). *See also* Hendrik Bessembinder and Kumar Venkataraman, *Bid-Ask Spreads*, in ENCYCLOPEDIA OF QUANTITATIVE FINANCE, ed.  Rama Cont (2010) (https://onlinelibrary.wiley.com/doi/10.1002/9780470061602.eqf18003).

[86]  Even the maximum observed spread for the Stock was only 0.20%.  By way of comparison, a widely cited study of stock market liquidity found that the effective spread for Dow Jones stocks was roughly 0.60% in the 1980s, and fell "dramatically" to about 0.20% over the ensuing two decades.  Charles M. Jones, *A Century of Stock Market Liquidity and Trading Costs* (May 23, 2002) (https://ssrn.com/abstract=313681).

[87]  *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (2001).

[88]  End-of-month numbers of free float shares came from the London Stock Exchange Group.

- 33 -

## G. Additional Market Efficiency Factors

94. Courts have also found that the holding of a substantial percentage of a company's stock by institutional investors supports a finding of an efficient market, because when that is the case, institutional investors "have likely acted as arbitrageurs and facilitated the efficiency of the market."[89]

(a) On May 17, 2022, during the Analysis Period, Yahoo! reported that Shoals Stock was held by 276 covered institutions, and a list of 10 "Top Institutional Holders" by themselves accounted for over 60% of Shoals Stock's holdings.[90]

(b) On November 15, 2023, still during the Analysis Period, Yahoo! reported that Shoals Stock was held by 425 covered institutions, and a list of 10 "Top Institutional Holders" accounted for 49% of Shoals Stock's holdings.[91]

---

[89] *In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 280 (S.D.N.Y. 2008).

[90] *See* https://web.archive.org/web/20220517175439/https://finance.yahoo.com/quote/SHLS/holders/ (accessed on January 2, 2026). This page also reported that 103.75% of the Stock was owned by institutional holders. This is mathematically impossible, but such reports can occur due to delays in the reporting of changes in institutional holdings, as well as because of accounting for short sales; *see, e.g.*, Richard Loth, "How Can Institutional Holdings Be More Than 100%?" May 10, 2022, https://www.investopedia.com/ask/answers/07/institutional_holdings.asp (accessed on January 3, 2026).

[91] *See* https://web.archive.org/web/20231115174849/https://finance.yahoo.com/quote/SHLS/holders/ (accessed on January 2, 2026). This page also reported that 109.89% of the Stock was owned by institutional holders. This is mathematically impossible, but such reports can occur due to delays in the reporting of changes in institutional holdings, as well as because of accounting for short sales; *see, e.g.*, Richard Loth, "How Can Institutional Holdings Be More Than 100%?" May 10, 2022, https://www.investopedia.com/ask/answers/07/institutional_holdings.asp (accessed on January 3, 2026).

- 34 -

(c) These statistics indicate that a substantial percentage of Shoals Stock was owned by institutional investors during the Analysis Period, supporting the conclusion of an efficient market.

95. Courts have also considered the degree of autocorrelation in stock returns.[92] Autocorrelation refers to the correlation of a stock's returns with the stock's past return values, so it is a measure of the predictability of future returns. If future returns were predictable from past returns, then arbitrageurs could profit by constructing trading strategies based on observable past-return information. In a market without significant limitations on trading, the occurrence of such arbitrage would be expected to cause the autocorrelation to disappear. Thus, how close autocorrelation is to 0 is one measure of how a stock's market can be expected to react to publicly available information. I applied several statistical tests that can be used to assess the presence of autocorrelation, and each showed no evidence.[93]

96. A final characteristic that courts have found bears on market efficiency is whether there are constraints on short selling, because, as one court put it: "Short sellers play a role in aligning prices with information under any version of the efficient capital market hypothesis."[94]

97. One measure of short selling constraints is the extent to which market players with short positions in a stock fail to deliver.[95] The SEC defines *threshold securities* as follows:

> Threshold securities are equity securities that have an aggregate fail to deliver position for:

---

[92] *See, e.g.*, *In re DVI Inc. Sec. Litig.*, 249 F.R.D. 196, 213 (E.D. Pa. 2008).

[93] *See* Appendix D for details.

[94] *Schleicher*, 618 F.3d at 685.

[95] Failure to deliver happens when an investor who has borrowed shares to sell them (making the investor "short" the stock) are subsequently unable to acquire shares to cover the short position on the contractually specified timeline.

- 35 -

- Five consecutive settlement days at a registered clearing agency (https://www.sec.gov/divisions/marketreg/mrclearing.shtml) (*e.g.*, National Securities Clearing Corporation (https://www.sec.gov/cgi-bin/goodbye.cgi?www.nscc.com/index.html) (NSCC));

- totaling 10,000 shares or more; and

- equal to at least 0.5% of the issuer's total shares outstanding.[96]

98. The SEC provides links to fails-to-deliver data on its website.[97] I downloaded these data and isolated the rows that provide information for Shoals Stock.

99. In the 628 trading days of the Analysis Period, there was one run of at least 5 trading days when Shoals Stock had 10,000 or more shares that failed to deliver.[98] However, none of these trading days had a fails to deliver quantity of at least 0.5% of Shoals Stock's shares outstanding.[99] Accordingly, there were no days during the Analysis Period when Shoals Stock met the SEC definition of a threshold.

100. This evidence indicates that any constraints on short selling were limited, further supporting the conclusion that the market for Shoals Stock was efficient.

**H. Conclusion as to Market Efficiency**

101. As already described, based on the evidence presented in sections A-G above, I have reached the following conclusions:

---

[96] SEC, Threshold Securities, https://www.investor.gov/introduction-investing/investing-basics/glossary/threshold-securities (accessed on January 8, 2026).

[97] SEC, Fails-to-Deliver Data, https://www.sec.gov/data-research/sec-markets-data/fails-deliver-data (accessed on January 9, 2026).

[98] This run lasted 9 trading days, from November 22, 2022 through December 5, 2022 (inclusive). There were an additional 35 days on which at least 10,000 shares failed to deliver, but none of these days met the SEC's criterion of occurring as part of a run of at least 5 consecutive such days.

[99] In fact, there were *no* such trading days during the Class Period; the maximum percentage during the Class Period of shares outstanding that failed to deliver was 0.1781%, less than half the SEC's required level of 0.5% (which must be attained for 5 consecutive days).

- 36 -

(a) The first *Cammer* factor, that average trading volume be great enough, is met.

(b) The second *Cammer* factor, that there be a sufficient number of analysts following Shoals Stock, is met.

(c) The third *Cammer* factor, that there be sufficiently many market makers in Shoals Stock, is met.

(d) The fourth *Cammer* factor, that the company be eligible to file a Form S-3 registration statement in connection with public offerings, is met.

(e) The fifth *Cammer* factor, that there be a cause and effect relationship between news about Shoals and prompt adjustment of the Stock price, is met.

(f) The first *Krogman* factor, that Shoals have substantial market capitalization, is met.

(g) The second *Krogman* factor, that Shoals have a small bid-ask spread, is met.

(h) The third *Krogman* factor, that Shoals have a high percentage of shares held by the public rather than insiders, is met.

(i) A substantial percentage of Shoals Stock is held by institutional investors.

(j) The evidence indicates that there is not significant autocorrelation in Shoals Stock returns.

(k) The evidence indicates a lack of constraints on short selling in Shoals Stock.

102. It is my opinion that during the Analysis Period, Shoals Stock traded on a semi-strong form efficient market, such that value-relevant information about the Company was promptly incorporated into its share price.

## VII. Damages Calculation for 1934 Act and 10b-5 Claims

103. Counsel asked me to opine whether it will be possible to calculate damages on a classwide basis for the 1934 Act Defendants' violations of the 1934 Act and Rule 10b-5 that have

- 37 -

not been dismissed, using a common methodology that is consistent with Plaintiffs' theory of liability. As I discuss in this Part, it is my opinion that it is possible to do so.

104. I note that I have not been asked to conduct a loss causation analysis or damages calculation, and I have not yet conducted such analyses.

105. The Complaint advances the liability theory that the 1934 Act Defendants' scheme, misrepresentations and/or omissions caused Shoals Stock to trade at an artificially inflated price on dates that include the period from the beginning of the Analysis Period through the corrective disclosure that occurred on November 12, 2024. I understand that Plaintiffs allege they suffered losses as a result of (1) purchasing Shoals Stock when its price was artificially inflated, and either (2) selling Shoals Stock after some or all of the artificial inflation had been removed from Shoals Stock's price, or (3) retaining Shoals Stock through the final corrective disclosure that removed artificial inflation from Shoals Stock's price.

106. I understand that on the basis of these and related allegations, Plaintiffs seek damages from the 1934 Act Defendants for violations of §10(b) of the 1934 Act, SEC Rule 10b-5, §20(a), and §20(A) of the 1934 Act.

107. The calculation of available damages can be done using widely used, traditional tools of financial economics, which will be deployed in the same way for every share purchased by class members in this litigation. The result will be a single classwide formula, such that the only individualized information necessary to determine damages for individual class members will be information about their trading history, which can be obtained from objective trading data and fed into the classwide formula by a claims administrator without the need for any individualized adjudication of the available damages amount.

- 38 -

**A.** **Calculating 1934 Act Damages Available for a Share Purchased By A Class Member During the Analysis Period Can Be Done On A Classwide Basis**

108. Counsel asked me to evaluate whether per-share damages can be assessed for all Class members under §10(b) of the 1934 Act and SEC Rule 10b-5 using a classwide methodology that is consistent with Lead Plaintiff's theory of liability. The answer is yes, based on the "out-of-pocket" method of calculating damages, which I understand is widely accepted. Damages are calculated formulaically under this approach, as the artificial inflation in the share price at the time of purchase minus the artificial inflation in the share price at the time of sale. For shares that were not sold before the final corrective disclosure, damages are limited by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), based on a 90-day "lookback period."[100] The PSLRA limitation is statutorily prescribed: "the award of damages to the plaintiff shall not exceed the difference between the purchase . . . price paid . . . by the plaintiff for the subject security and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market."[101]

109. Thus, the only individualized information necessary to measure damages available for each share purchased during the Class Period is basic trading data: the share's purchase price and date; whether the share was sold within 90 days of the market's incorporation into the Shoals Stock price of the information in the corrective disclosure issued on November 12, 2024; and the sale

---

[100] The PSLRA Look-Back Period is "the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market," 15 U.S.C. §78u-4(e)(1)

[101] 15 U.S.C. §78u-4(e)(1).

- 39 -

price, date, and time if the share was so sold. All of this individualized information is available via objective trading records.

110. Accordingly, each share's damage amount will be calculated using the same classwide formula. Once artificial price inflation has been measured, it will be possible to calculate damages for each purchased share in a way that can be administered formulaically, so that individualized information is limited to objective trading data that can be plugged into a classwide formula.

**B. Fundamental Valuation Tools of Financial Economics Can Be Used to Measure Sources of a Share's Artificial Price Inflation**

111. To calculate the components of the drop in artificial price inflation requires calculating artificial price inflation on each date in the Analysis Period. In some situations relevant to the current litigation, this can be done using traditional tools of financial economics known as fundamental valuation. For example, discounted cash flow (DCF) analysis and multiples-based valuation using measures of earnings and share price or a company's enterprise value[102] may be used to value some or all of the artificial price inflation that occurred due to Defendants' concealment or misrepresentation of the true facts.

112. DCF analysis is a method for determining the value on one date of money to be received or owed on future dates.[103] For example, given that the Company's warranty costs are

---

[102] Various measures of earnings may be used; a common one is earnings before interest, taxes, depreciation, and amortization, or EBITDA. Various measures of firm value may be used, including the share price and the enterprise value (which combines the value of the firm's equity, debt, and other financial categories).

[103] *See, e.g.*, Joshua Rosenbaum & Joshua Pearl, INVESTMENT BANKING: VALUATION, LBOS, M&A, AND IPOS, Chapter 3 (3rd Ed. 2020). DCF analysis can be viewed as a version of the present discounted value (PDV) method. For example, consider the value of a risk-free debt instrument that pays $1 million in a year and for which no interest payments are due before maturity. If the current risk-free simple interest rate is 10%, then the PDV of this instrument is $1 million divided by 1.10, or $909,090.90, because a person who lent out that amount of money for a year at

4938-0318-1705.v1

expected, as of date $t_1$, to occur in amount $W$ on some future date $t_2$, DCF analysis can be used to determine the resulting diminution of the firm's value on each date between $t_1$ and $t_2$. Assuming Plaintiffs prove their claims that the 1934 Act Defendants concealed an amount of warranty costs they expected to occur, then for each day at issue in this litigation, it will be possible to use DCF analysis to calculate the corresponding reduction in the firm's true value caused by keeping the truth about warranty costs from the public. Because the market was unaware of this reduction in Shoals firm value, it will not have priced the reduction in true value into Shoals Stock. Accordingly, on each day that a given amount of future warranty costs went undisclosed, the firm's overall market valuation would be artificially inflated by the discounted value of the undisclosed future warranty costs. The amount of price inflation will be the same for all shares at that time, because shares of Shoals Stock are fungible and it trades on a semi-strong form efficient market. The artificial price inflation per share can be found by dividing the discounted value of the undisclosed future warranty costs by the appropriate number of shares of Shoals Stock. These determinations would be made on a classwide basis and would not require any information specific to particular class members.

113. I emphasize that this is just one example of how DCF analysis might be used, and I do not mean to suggest that it is the only tool of financial analysis that could be used to measure the artificial price inflation caused by known but undisclosed future warranty costs (or by any other violation of the 1934 Act).

---

10% simple interest would wind up with $1 million in a year. DCF analysis can be used analogously to determine the PDV of companies' streams of revenues or costs (or their difference). DCF is used by some analysts to value companies. *See, e.g.*, Piper Sandler, September 9, 2024, "Shoals Outlines Refined Commercial Strategy & Resets Expectations at Analyst Day" at 1 (describing use of DCF to value Shoals); Morgan Stanley, March 1, 2023, "4Q22 Earnings Quick Take" at 2 (describing use of DCF to value Shoals).

4938-0318-1705.v1

114. Multiples-based valuation is a method commonly used, including by investment bankers[104] and by securities analysts such as those following Shoals,[105] to value a firm based on measures of its earnings. There are various earnings measures, and I have not decided which I would use if I did use multiples-based valuation. However, any measure of earnings involves some measure of the firm's revenues minus some version of its costs. As the Court explained in its order on the Company's Motion to Dismiss, the Company's "prior representations about the quality of its product [and] the ease of installation had been untrue."[106] The Company's misrepresentations and/or omissions regarding defective wires and warranty costs kept the market from knowing the extent of the harm the shrinkback defect had caused to the Company's client relationships and demand. This harm meant that the Company's future revenue would be lower than Shoals led the market to believe. Reductions in Shoals revenue would have translated into reductions in Shoals earnings.

115. I anticipate that with a fully developed record, it will be possible to determine the truth about any reduction in expected earnings that the Defendants knew at various dates after the Analysis Period began. That reduction in expected earnings could then be multiplied by an appropriate earnings multiple to calculate the amount by which the Company's overall true value was reduced by the adverse client effects of the shrinkback problem. Had the market known the truth, the Company's market value would have fallen by that amount. The artificial price inflation

---

[104] *See, e.g.*, Joshua Rosenbaum & Joshua Pearl, INVESTMENT BANKING: VALUATION, LBOS, M&A, AND IPOS, Chapter 1 (3rd Ed. 2020).

[105] *See, e.g.*, Barclays, August 3, 2023, "Puts and takes with the 2Q print" at 3 (describing price target for Shoals as "predicated on 23x our 2024 EPS estimate"); UBS, August 1, 2023, "2Q23: In-line results; FY23 guide maintained" at 1 (describing valuation of Shoals as based on "25x cumulative 3Q24-2Q25E adj EBITDA, less net debt").

[106] ECF No 100 (September 30, 2025) at 24.

4938-0318-1705.v1

per share associated with these adverse client effects of the shrinkback problem could then be found by dividing the reduction in overall true value by the appropriate number of shares of the Stock.

116. I emphasize that the foregoing presents just one example of how multiples-based valuation might be used, and I do not mean to suggest it is the only tool of financial analysis that could be used to measure the artificial price inflation caused by known but undisclosed damage to client relationships (or by any other violation of the 1934 Act).

### C. An Event Study May Be Used to Measure the Market's Valuation of New Information

117. In general, an event study may be used to measure the market's reaction to new information.

118. Corrective disclosures that reveal previously misrepresented and/or omitted facts about a company's business situation are one type of new information. Thus, the market's valuation of the impact of the new information in a corrective disclosure can be determined using an event study. For each date that the market learned additional information about the Company's true financial position that was previously obscured by the Company's fraud, misrepresentations and/or omissions, an event study is a tool that is potentially available to measure the share-price impact of that news. Both loss causation and the calculation of damages are generally amenable to measurement in whole or in part using event studies.[107] In some cases, it will be possible to use event study-based valuation of the share-price inflation associated with revelation of true information to "backcast" the share-price inflation that was operative on one or more dates before the corrective disclosure occurred.[108]

---

[107] Jill E. Fisch, Jonah B. Gelbach, and Jonathan Klick, *The Logic and Limits of Event Studies in Securities Fraud Litigation*, 96 Tex. L. Rev. 553, 555 (2018).

[108] For a simple example, suppose a company overstated its earnings on date $t_1$ and made no other misrepresentations or omissions between then and the date, $t_2$, when it made a truthful earnings

- 43 -

119.    I emphasize that this is just one example of how event studies might be used, and I do not mean to suggest that they are the only tool of financial analysis could be used to measure the artificial price inflation at issue in this litigation.

**D.    Damages Under Section 20A Can Be Calculated Using Only Information in Objective Trading Records and Market Prices**

120.    Counsel asked me to evaluate whether per-share damages related to alleged violations of §20A of the 1934 Act can be assessed on a classwide basis, using a common methodology consistent with Plaintiffs' theory of liability.  I understand that §20A applies to investors' losses when they purchased securities contemporaneously with the sale of securities by Defendants who possessed material, nonpublic information:

> Any person who violates any provision of this chapter or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable in an action in any court of competent jurisdiction to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased (where such violation is based on a sale of securities) or sold (where such violation is based on a purchase of securities) securities of the same class.[109]

121.    I understand that the §20A loss associated with a share purchased by a class member during the Class Period equals the difference between the purchase price the class member paid, and either the sale price the class member received (if the class member sold the share before the final corrective disclosure) or the value of the share following the November 12, 2024 corrective disclosure that eliminated remaining artificial price inflation (if the class member retained the share that long).

---

restatement that fully revealed the truth, then an event study measure of the impact of the $t_2$ disclosure could be used to measure share-price inflation on each date between the two dates.

[109]  15 U.S. Code §78t-1(a).

- 44 -

122.     A class member's total losses for purposes of §20A then equals the sum of that class member's losses for all affected shares.

123.     The actual loss experienced by each class member who suffered losses under §20A therefore will be calculable using only information from trading records and (for those who retain the share after the November 12, 2024 corrective disclosure eliminated all artificial price inflation) market prices.

124.     Damages under §20A are limited by the following statutory language:

> The total amount of damages imposed under subsection (a) shall not exceed the profit gained or loss avoided in the transaction or transactions that are the subject of the violation.[110]

125.     To calculate this statutory damage limitation for any proven §20A claims requires only the calculation of the profit gained or loss avoided by any Defendants found liable.  For an affected share, the loss avoided equals the decline in the price between the sale and the November 12, 2024 corrective disclosure that, according to Plaintiffs, eliminated remaining artificial price inflation.  The total loss avoided for a Defendant equals the sum of that Defendant's loss avoided over all affected shares.

126.     If a Defendant's losses avoided is less than the total §20A losses sustained by class members, then the total §20A damages for that Defendant will be limited to that Defendant's losses. These losses can then be divided among the affected class members on a *pro rata* basis.

127.     Implementing the damages limitation thus requires no individualized information other than what can be obtained via objective trading records, and it can be determined using a classwide formula that requires no individualized adjudication.

---

[110]  15 U.S. Code §78t-1(b)(1).

- 45 -

**E. Traditional Tools of Financial Economics May Be Used to Address Confounding Information**

128. One issue that must be addressed with event studies is the possibility that the market learned other value-relevant information – "confounding information" – about Shoals on the dates of corrective disclosures.

(a) By using a market index and industry index as in Model II of the event study conducted above, or by using a custom index based on the market index and peer firms as in Model III, it is possible to remove market and industry-specific sources of confounding information from event study-based valuation.

(b) With respect to Company-specific facts unrelated to fraud, it is possible to search news sources on the dates of corrective disclosures to rule out their existence. If any Company-specific facts (positive or negative) were located, other traditional tools of financial economics would be available to measure and adjust for them.

129. Whether it will be necessary to address confounding information in this litigation will depend on the nature of the record when it is fully developed. If addressing confounding information is necessary, though, traditional tools of financial economics will be available for that task.

130. Should it be necessary to disentangle information about multiple sources of fraud-driven loss, various tools of financial economics described above may be used in tandem to separately measure different components of artificial price inflation that affected Shoals Stock's market price on different dates. For example, if a corrective disclosure partially revealed previously hidden truths about *both* expected future warranty costs *and* harm to client relationships and demand, then DCF could be used to measure artificial price inflation related to misrepresentations of expected future warranty costs, and multiples-based valuation could be used to measure artificial price

- 46 -

inflation related to harm to client relationships and demand.  Or event studies might be paired with one or both of the DCF and multiples-based tools (or some other appropriate tool).  I emphasize that these are just examples of how traditional tools of financial economic analysis might be used together to disentangle information about multiple sources of fraud-driven loss, and I do not mean to suggest that they constitute the only such combinations that could be used to measure the artificial price inflation at issue in this litigation.

**F.      Summary of Opinions About Calculation of Available Damages for 1934 Act Violations**

131.    In sum, my opinion is that traditional tools of financial economics can be used to measure artificial price inflation on the dates relevant to this litigation.  All other information necessary to determine the damages available under federal securities law may be assembled via trading records of class members during the Analysis Period.  To calculate damages, these inputs will be used in a single, classwide formula that can be implemented by a claims administrator without the need to engage in individualized adjudication.

132.    Therefore, it is my opinion that it is possible to calculate damages for the 1934 Act claims in this matter on a classwide basis consistent with the Plaintiffs' theory of liability.

133.    Finally, I emphasize again that all the tools just described – DCF, multiples-based valuation, and event studies – are commonly used to measure aspects of firm value.  Market investors have no choice but to determine the value they place on a firm given the publicly available information.  To do so, they use the kind of information I have described above together with tools such as DCF, multiples-based valuation and event study-based reasoning.  Thus, the toolbox of financial economics tools that I plan to use reflects the same approach that investors use, and that market prices therefore reflect, every day.

- 47 -

## VIII. Damages Calculation for 1933 Act Violations

134. Counsel asked me to opine as to whether it will be possible to calculate damages on a classwide basis for the violations of the 1933 Act that have not been dismissed, using a common methodology that is consistent with Plaintiffs' theory of liability. For the reasons given in this Part of my report, it is my opinion that it will be possible to do so.

### A. Violation of Section 11 of the 1933 Act

135. Plaintiffs allege that certain defendants violated §11 of the 1933 Act in connection with the Company's registration statement for the December 2022 SPO (the "SPO Registration Statement"). Complaint ¶¶231-237. Plaintiffs further allege that class members "have sustained damages" as a result, because the "value of the Shoals Common Stock issued in the December 2022 SPO has declined substantially subsequent to and due to the 1933 Act Defendants' violations." Complaint ¶239.

136. I understand that, if the Plaintiffs prove these violations, the amount of available damages will be determined directly by a formula based on the following statutory language:

> damages . . . shall represent the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and (1) the value thereof as of the time such suit was brought; or (2) the price at which such security shall have been disposed of in the market before suit; or (3) the price at which such security shall have been disposed of after suit but before judgment if such damages shall be less than the damages representing the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and the value thereof as of the time such suit was brought.[111]

137. The formula implied by this language depends only on class members' purchase and sale prices and dates, the SPO offering price, class members' sale price (if they sold before judgment), and the value of Shoals Stock at the time litigation commenced. The SPO offering price and the value of Shoals Stock at the time the litigation commenced are both non-individualized, *i.e.*,

---

[111] 15 U.S.C. §77k(e).

- 48 -

4938-0318-1705.v1

Case 3:24-cv-00334    Document 127-3    Filed 01/21/26    Page 52 of 92 PageID #: 3067

classwide, information.  The variables involving individual information – class members' purchase and sale prices and dates – will be available in objective trading data.

138.    Therefore, it is my opinion that it is possible to calculate damages for proven violations of §11 of the 1933 Act on a classwide basis consistent with the Plaintiffs' theory of liability, such that the only individual information necessary to determine the §11 damages may be assembled via trading records of class members during the Analysis Period.  This individual information will enter damages calculation only through a single, classwide formula that can be implemented by a claims administrator without the need to engage in individualized adjudication.

### B.    Violation of Section 15 of the 1933 Act

139.    Plaintiffs allege violations of §15 of the 1933 Act.  I understand from counsel that §15 of the 1933 Act does not create a remedy but instead simply extends liability for violations of §§11 and 12 to persons who control other persons liable for such violations.

140.    Accordingly, although proof of §15 violations might affect which defendants are liable for damages, it would not affect any share's available damage amount.

### C.    Conclusion With Respect to 1933 Act Damages

141.    In sum, it is my opinion that it is possible to calculate available damages under the 1933 Act on a classwide basis consistent with Plaintiffs' theory of liability, such that the only individual information necessary to determine the §11 damages may be assembled via trading records of class members during the Analysis Period.

142.    This individual information will be input to calculate damages using a single, classwide formula that can be implemented by a claims administrator without the need to engage in individualized adjudication.

- 49 -

143.    These conclusions hold with respect to alleged violations of §11.  Violations of §15 could expand the set of defendants who are liable for damages, but such violations would not change the amount of damages available for any share.

## IX.    Further Work

144.    My work in this matter is ongoing.  I reserve the right to amend, refine, or supplement my analyses and opinions in the event that I become aware of additional information, evidence, arguments, or analyses that bear on my work in this matter.

145.    I declare under penalty of perjury that the foregoing expert report is true and correct to the best of my knowledge and belief.  The opinions expressed herein are based on my education, training, experience, and review of the materials provided to me.

DATED:  _1/21/2026_____

DocuSigned by:

_Jonah Gelbach_____
82C40149E642428...
Jonah B. Gelbach, Ph.D., J.D.
Herman F. Selvin Professor of Law
University of California at Berkeley School of Law

- 50 -

**APPENDIX A**
**JONAH B. GELBACH**
**CURRICULUM VITAE**
**JANUARY 19, 2026**
gelbach@berkeley.edu

## CURRENT APPOINTMENT

UNIVERSITY OF CALIFORNIA AT BERKELEY LAW SCHOOL
    Herman F. Selvin Professor of Law                                                     2022-present
    Professor of Law                                                           2019-2022

## PAST TENURE-LINE APPOINTMENTS

UNIVERSITY OF PENNSYLVANIA LAW SCHOOL
    Professor of Law                                                       2016-2019
    Associate Professor of Law (untenured)                  2013-2016

UNIVERSITY OF ARIZONA, ELLER COLLEGE OF MANAGEMENT
    Associate Professor of Economics (tenured)           2007-2010

UNIVERSITY OF MARYLAND AT COLLEGE PARK
    Associate Professor of Economics (tenured)           2005-2007
    Assistant Professor of Economics (untenured)        1998-2005

## VISITING APPOINTMENTS

GEORGETOWN UNIVERSITY LAW CENTER
    Visiting Professor of Law                                      Spring 2025

NYU SCHOOL OF LAW
    Visiting Professor of Law                                      2021-2022

FLORIDA STATE UNIVERSITY COLLEGE OF LAW
    Visiting Professor of Law and Economics              2006-2007

## EDUCATION

YALE LAW SCHOOL, J.D.                                                  2013
MASSACHUSETTS INSTITUTE OF TECHNOLOGY, Ph.D. (Economics)     1998
UNIVERSITY OF MASSACHUSETTS AT AMHERST, B.A. (Major: Economics)     1993

## EDITORSHIPS & BOARD MEMBERSHIPS

CO-EDITOR, JOURNAL OF LAW, ECONOMICS, AND ORGANIZATION     2016-2021
MEMBER, BOARD OF DIRECTORS, AMERICAN LAW AND ECONOMICS ASSOCIATION     2017-2020
SECTION CHAIR, AALS SECTION ON LAW AND ECONOMICS     2017-2018

**PUBLISHED OR FORTHCOMING ACADEMIC ARTICLES AND BOOK CHAPTERS**

1. *Validating Valuation: How Statistical Learning Can Cabin Expert Discretion in Valuation Disputes,* ___ JOURNAL OF CORPORATION LAW ___ (forthcoming 2026) (with Andrew Baker and Eric Talley)

2. *Codifying Plausibility Discovery: A Proposal to Amend Rule 12,* ___ CALIFORNIA LAW REVIEW ___ (forthcoming 2026)

3. *How a Rule 23(b)(2) Class Action Could Save Law Firms From Trump,* 78 STANFORD LAW REVIEW ONLINE (forthcoming 2025) (with Nora Freeman Engstrom and David Marcus)

4. *The Dynamic Dilemma: Dynamics and Disuniformity in Statutory Interpretation,* in RESEARCH HANDBOOK ON LAW AND TIME, edited by Frank Fagan & Saul Levmore, Edward Elgar Ltd., 73-108 (2025)

5. *Shedding Light on Secret Settlements: An Empirical Study of California's STAND Act,* 92 UNIVERSITY OF CHICAGO LAW REVIEW 103 (2025) (with Nora Freeman Engstrom, David Freeman Engstrom, Austin Peters, & Garrett Wen)

6. *Pulling Back the Curtain on the Federal Class Action,* 17 JOURNAL OF TORT LAW 117 (2024) (with Deborah Hensler)

7. *Secrecy by Stipulation,* 74 DUKE LAW JOURNAL 99 (2024) (with Nora Freeman Engstrom, David Freeman Engstrom, Austin Peters, & Aaron Schaffer-Neitz)

8. *Tailwiz: Empowering Domain Experts with Easy-to-Use, Task-Specific Natural Language Processing Models,* in **Proceedings of the Eighth Workshop on Data Management for End-to-End Machine Learning (DEEM '24) 12, 22 (Ass'n for Computing Mach. 2024)** (with Timothy Dai, Austin Peters, David Freeman Engstrom, and Daniel Kang)

9. *Beyond Transsubstantivity,* 26 N.Y.U. JOURNAL OF LEGISLATION AND PUBLIC POLICY 909 (2024)

10. *Free PACER,* in LEGAL TECH AND THE FUTURE OF CIVIL JUSTICE, edited by David Engstrom, Cambridge University Press (2023)

11. *Power and Statistical Significance in Securities Fraud Litigation,* 11 HARVARD BUSINESS LAW REVIEW 55 (2021) (with Jill E. Fisch)

12. *Legal Tech, Civil Procedure, and the Future of American Adversarialism,* 169 UNIVERSITY OF PENNSYLVANIA LAW REVIEW 1001 (2021) (with David F. Engstrom)

13. *Machine Learning and Predicted Returns for Event Studies in Securities Litigation,* 5 JOURNAL OF LAW, FINANCE, AND ACCOUNTING 231 (2020) (with Andrew Baker)

14. *Estimation Evidence,* 168 UNIVERSITY OF PENNSYLVANIA LAW REVIEW 549 (2020)

15. *A Bayesian Approach to Event Studies for Securities Litigation,* 176 JOURNAL OF INSTITUTIONAL & THEORETICAL ECONOMICS 86 (2020) (with Jenny Rae Hawkins)

16. *It's all relative: Explanationism and Probabilistic Evidence Theory.* 23 **International Journal of Evidence & Proof** 168-175 (2019).

17. *The Reduced Form of Litigation Selection Models and the Plaintiff's Win Rate,* 61 JOURNAL OF LAW AND ECONOMICS 125 (2018)

18. *Rethinking Judicial Review of High Volume Agency Adjudication,* 96 TEXAS LAW REVIEW 1097 (2018) (with David Marcus)

19. *What We Don't Know About Class Actions but Hope to Know Soon,* 87 **Fordham Law Review** 65 (2018) (with Deborah R. Hensler).

20. *Error Costs, Legal Standards of Proof and Statistical Significance*, 25 **SUPREME COURT ECONOMIC REVIEW** 1 (2017) (with Michelle M. Burtis and Bruce H. Kobayashi)

21. *The Logic and Limits of Event Studies in Securities Fraud Litigation*, 96 **TEXAS LAW REVIEW** 553 (2018) (with Jill E. Fisch and Jon Klick)

22. *American Pipe Tolling, Statutes of Repose, and Protective Filings: An Empirical Study*, 69 **STANFORD LAW REVIEW ONLINE** 92 (2017) (with David Freeman Engstrom)

23. *Crushed: Social Security Litigation in the Federal Courts*, 101 **JUDICATURE** 65 (2017) (with David Marcus)

24. *The Triangle of Law and The Role of Evidence in Class Action Litigation*, 165 **UNIVERSITY OF PENNSYLVANIA LAW REVIEW** 1807 (2017)

25. *Can Variation in Subgroups' Average Treatment Effects Explain Treatment Effect Heterogeneity? Evidence from a Social Experiment*, 99 **REVIEW OF ECONOMICS & STATISTICS** 683 (2017) (with Marianne Bitler and Hilary Hoynes)

26. *Empirical Law and Economics*, **OXFORD HANDBOOK** series, edited by Francesco Parisi (2017) (with Jonathan Klick)

27. *The Law and Economics of Proportionality in Discovery*, 50 **GEORGIA LAW REVIEW** 1093 (2016) (with Bruce Kobayashi)

28. *Can Simple Mechanism Design Results be Used to Implement the Proportionality Standard in Discovery?* 172 **JOURNAL OF INSTITUTIONAL & THEORETICAL ECONOMICS** 200 (2016)

29. *Material Facts in the Debate over* Twombly *and* Iqbal*,* 68 **STANFORD LAW REVIEW** 369 (2016)

30. *When Do Covariates Matter? And Which Ones, and How Much?* 34 **JOURNAL OF LABOR ECONOMICS** 509 (2016)

31. *Uncontrolled Experiments From the Laboratories of Democracy: Traditional Cash Welfare, Federalism, and Welfare Reform*, **The Law and Economics of Federalism**, edited by Jonathan Klick, Edward Elgar Publishing Ltd. (2017)

32. *Can We Learn Anything About Pleading Changes from Existing Data?,* 44 **INTERNATIONAL REVIEW OF LAW & ECONOMICS** 72 (2015)

33. *Can the Dark Arts of the Dismal Science Shed Light on the Empirical Reality of Civil Procedure?* 2 **STANFORD JOURNAL OF COMPLEX LITIGATION** 223 (2014)

34. *Rethinking Summary Judgment Empirics: The Life of the Parties*, 162 **UNIVERSITY OF PENNSYLVANIA LAW REVIEW** 1663 (2014)

35. *Expert Mining and Required Disclosure*, 81 **UNIVERSITY OF CHICAGO LAW REVIEW** 131 (2014)

36. *Valid Inference in Single-Firm, Single-Event Studies*, 15 **AMERICAN LAW & ECONOMICS REVIEW** 495 (2013) (with Eric Helland and Jonathan Klick)

37. Note, *Locking the Doors to Discovery? Assessing the Effects of* Twombly *and* Iqbal *on Access to Discovery*, 121 **YALE LAW JOURNAL** 2270 (2012)

38. *Robust Inference with Multiway Clustering*, 29 **JOURNAL OF BUSINESS & ECONOMIC STATISTICS** 238 (2011) (with A. Colin Cameron and Douglas L. Miller)

39. *Passive Discrimination: When Does It Make Sense to Pay Too Little?* 76 **UNIVERSITY OF CHICAGO LAW REVIEW** 797 (2009) (with Jonathan Klick and Lesley Wexler)

40. *Bootstrap-Based Improvements for Inference with Clustered Errors,* 90 **REVIEW OF ECONOMICS & STATISTICS** 414 (2008) (with A. Colin Cameron and Douglas L. Miller)

41.  *Distributional Impacts of the Self-Sufficiency Project*, 92 **JOURNAL OF PUBLIC ECONOMICS** 748 (2008) (with Marianne Bitler and Hilary Hoynes)

42.  *Welfare Reform and Children's Living Arrangements*, 41 **JOURNAL OF HUMAN RESOURCES** 1 (2006) (with Marianne Bitler and Hilary Hoynes)

43.  *What mean impacts miss: Distributional effects of welfare reform experiments*, 96 **AMERICAN ECONOMIC REVIEW** 988 (2006)  (with Marianne Bitler and Hilary Hoynes)

44.  *Are Less-Educated Women Crowding Less-Educated Men Out of the Labor Market?* in **BLACK MALES LEFT BEHIND**, 87 (Ronald B. Mincy, ed., 2006) (with Rebecca Blank)

45.  *Welfare Reform and Health*, 40 **JOURNAL OF HUMAN RESOURCES** 309 (2005) (with Marianne Bitler and Hilary Hoynes)

46.  *Migration, the Life Cycle, and State Benefits: How Low Is the Bottom?, 112 JOURNAL OF POLITICAL ECONOMY 1091 (2004)*

47.  The Impact of Welfare Reform on Marriage and Divorce, 41 **DEMOGRAPHY** 213 (2004) (with Marianne Bitler, Hilary Hoynes, and Madeline Zavodny)

48.  *Some Evidence on Race, Welfare Reform, and Household Income, 93 AMERICAN ECONOMIC REVIEW, PAPERS AND PROCEEDINGS OF THE ONE HUNDRED FIFTEENTH ANNUAL MEETING OF THE AMERICAN ECONOMIC ASSOCIATION, WASHINGTON, DC 293 (2003) (with Marianne Bitler and Hilary Hoynes)*

49.  *Public Schooling for Young Children and Maternal Labor Supply*, 92 **AMERICAN ECONOMIC REVIEW** 307 (2002)

50.  *Is More for the Poor Less for the Poor? The Politics of Means-Tested Targeting,* 2 **TOPICS IN ECONOMIC ANALYSIS & POLICY** (2002) (with Lant Pritchett)

51.  *Indicator Targeting in a Political Economy: Leakier Can Be Better, 4 JOURNAL OF POLICY REFORM 113 (with Lant Pritchett)*


## BOOK REVIEWS AND OTHER COMMENTS

1.  *The Importance of Base Rates in Differential Impact: A Bail Reform Case Study: Comment*, 181 **JOURNAL OF INSTITUTIONAL & THEORETICAL ECONOMICS** 156 (2025)

2.  *Comment* to Chapter 3, "Improving the Use of Demonstrations," by Robert R. Weathers II and Austin Nichols, in LESSONS FROM SSA DEMONSTRATIONS FOR DISABILITY POLICY AND FUTURE RESEARCH, Austin Nichols, Jeffrey Hemmeter, and Debra Goetz Engler, eds. (2021)

3.  *Maybe there Is No Bias in the Selection of Disputes for Litigation: Comment*, 174 **JOURNAL OF INSTITUTIONAL & THEORETICAL ECONOMICS** 171 (2018)

4.  *Debunking the Myth of the Copyright Troll Apocalypse,* 101 **IOWA LAW REVIEW BULLETIN** 43 (2016) (with Shyamkrishna Balganesh)

5.  *The Sheriff of Nottingham Hypothesis: A Tribute to Theodore Eisenberg: Comment,* 171 **JOURNAL OF INSTITUTIONAL & THEORETICAL ECONOMICS** 141 (2015)

6.  *Welfare Reform: Effects of a Decade of Change,* 44 **JOURNAL OF ECONOMIC LITERATURE** 1056 *(2006)*

## COURSES TAUGHT

UNIVERSITY OF CALIFORNIA AT BERKELEY SCHOOL OF LAW (2019-present)
> Doctrinal classes: Civil Procedure; Legislation & Statutory Interpretation; Evidence
> Seminar/workshop: Civil Procedure Scholarship Workshop; Public Access to Court Electronic Records;
> > Law, Economics & Business Workshop; Statutory Interpretation Theory; Civil
> > Procedure Stories; Interpretation in Constitutional and Statutory Law

GEORGETOWN LAW (Spring 2025)
> Seminar: Evidence Stories

NYU LAW (2021-2022)
> Doctrinal class: Procedure (Fall 2021)
> Seminar: Statutory Interpretation (Spring 2022)

UNIVERSITY OF PENNSYLVANIA LAW SCHOOL (2013-2019)
> Doctrinal classes: Civil Procedure; Legislation; Evidence
> Seminars: Theories of Statutory Interpretation; Advanced Topics in Procedure and Litigation;
> > Law, Economics & Psychology; Statutory Interpretation and Legislation; Public Law

UNIVERSITY OF PENNSYLVANIA FELS INSTITUTE OF GOVERNMENT (2018)
> *Executive MPA*: Economic Principles of Public Policy

UNIVERSITY OF ARIZONA (2007-2010)
> *Doctoral:* Linear Econometrics, Nonlinear Econometrics
> *Undergraduate:* Law & Economics; Individuals & Society (basic microeconomics)
> *Executive MBA:* Selected lectures in Strategy courses

FLORIDA STATE UNIVERSITY COLLEGE OF LAW (2006-2007)
> Law and Statistics; Law and Economics; Social Insurance;
> Writing Workshop in Empirical Law and Economics

UNIVERSITY OF MARYLAND (1998-2006)
> *Doctoral:* Empirical Microeconomics; Public Economics (both tax and social
> > insurance programs)
> *Undergraduate:* Introductory Microeconomics; Economics of the Gambling Industry

## LITIGATION WRITINGS

### LEAD AMICUS CURIAE/PRINCIPAL AUTHOR

Brief of Evidence and Civil Procedure Scholars as *Amici Curiae* in Support of Plaintiffs-Appellants, *In re NFL Sunday Ticket Antitrust Litigation*, Nos. 24-5493 and 24-5691 (CA9, January 16, 2025)

Brief for *Amicus Curiae* Jonah B. Gelbach in Support of Plaintiffs-Appellants, *In Re: Lipitor (Atorvastatin calcium) Marketing, Sales Practices and Products Liability Litigation*, Nos. 17-1140(L), 17-1136, 17-1137, 17-1189 (CA4, April 28, 2017)

Brief of *Amici Curiae* Civil Procedure Professors in Support of Respondents, *Tyson Foods, Inc. v. Bouaphakeo*, No. 14-1446 (U.S. Sept. 29, 2015), 2015 WL 5719742

### SIGNATORY TO AMICUS BRIEFS

Brief of Nora Freeman Engstrom, David Freeman Engstrom, Jonah B. Gelbach, Rose Carmen Goldberg, and Brianne Holland- Stergar as *Amici Curiae* Supporting the Appellant and Reversal, *Entropic Communications, LLC v. Charter Communications, Inc.*, No. 24-1896 (9th Cir., August 12, 2024)

Motion for Leave to File and Brief of Amici Curiae Professors of Civil Procedure in Support of Petitioners, *Morrissey v. Mayorkas*, No. 22-235 (U.S., October 13, 2022)

Brief Amicus Curiae of Professors of Civil Procedure in Support of Appellant Paul S. Morrissey and Reversal, *Morrissey v. Mayorkas*, No. 20-5024 (D.C. Cir., May 22, 2020)

Brief of 44 Election Law, Scientific Evidence, and Empirical Legal Scholars as *Amici Curiae* in Support of Appellees, No. 16-1161 (U.S., September 1, 2017), 2017 WL 3948430

Brief for Civil Procedure and Securities Law Professors as *Amici Curiae* in Support of Petitioner, *California Public Employees' Retirement System v. ANZ Securities, Inc., et al.*, No. 16-373 (U.S., March 6, 2017), 2017 WL 929693

Brief for Civil Procedure and Securities Law Professors as *Amici Curiae* in Support of Petition for a Writ of Certiorari, *DeKalb County Pension Fund v. Transocean Ltd., Robert L. Long, Jon A. Marshall, and Transocean Inc.*, No. 16-206 (U.S., September 14, 2016)

Brief of Amici Curiae Civil Procedure Scholars in Support of Petitioner on Petition for a Writ of Certiorari, *Kosilek v. O'Brien*, No. 14-1120 (U.S., April 15, 2015), 2015 WL 1776459

Brief of Civil Procedure and Securities Law Professors as *Amici Curiae* in Support of Petitioner, *Public Employees' Ret. Sys. of Mississippi v. IndyMac MBS, Inc., et al.*, No. 13-640 (U.S., May 28, 2014), 2014 WL 2361893

## GOVERNMENT CONSULTING

### SOCIAL SECURITY ADMINISTRATION

Member, Technical Expert Panel for the Claimant Representative Demonstration (April 2019)

### ADMINISTRATIVE CONFERENCE OF THE UNITED STATES

*A Study of Social Security Litigation in the Federal Courts*, Final Report (July 28, 2016) (with David Marcus) (led to formal ACUS recommendation to the Judicial Conference of the United States to develop special procedural rules for review of final administrative decisions taken pursuant to 42 U.S.C. § 405(g)), available at https://www.acus.gov/report/report-study-social-security-litigation-federal-courts

### UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

Provided pro bono consulting services to the District Court's Jury Committee for purposes of improving the racial representativeness of the qualified jury wheel (2016-2019)

**PRIVATE CONSULTING & EXPERT WORK (NON-CONFIDENTIAL ONLY)**

*In re La Twon Weaver*, No. HC 23947 (Cal. Super. Ct. S.D. Cnty.): Expert witness for habeas petitioner La Twon Weaver with respect to claims brought under the California Racial Justice Act.

   Publicly filed report:
   - Expert Report of Jonah B. Gelbach, *In re La Twon Weaver*, No. HC 23947 (Cal. Super. Ct. S.D. Cnty. Dec. 11, 2025).

*Skye Biologics Holdings LLC et al v. 1159424 Ontario Limited*, Court File No. CV-25-00746403-00CL (Ont. Sup. Ct. J. (Com. List): Provided expert opinion regarding U.S. procedural law and was cross-examined (similar to deposition) in November 2025.

Consultant to Arnold Ventures related to criminal justice research, September-December, 2023.

*In re Alphabet, Inc. Securities Litigation*, No. 4:18-cv-06245-JSW (N.D.C.A.): Expert witness for Lead Plaintiff State of Rhode Island, Office of the Rhode Island Treasurer on behalf of the Employees' Retirement System of Rhode Island.

   Publicly filed reports:

   - Rebuttal Expert Report of Professor Jonah B. Gelbach, August 14, 2023, Exhibit 1 to Declaration of Jason A. Forge in Support of Reply in Support of Lead Plaintiff's Motion to Certify Class, Appoint Class Counsel, and Appoint Class Counsel, ECF 199, No. 3:18-cv-06245-TLT (N.D. Cal. August 14, 2023)
   - Rebuttal Expert Report of Professor Jonah B. Gelbach, October 6, 2022, Exhibit C to Reply in Support of Lead Plaintiff's Motion to Certify Class, Appoint Class Representative, and Appoint Class Counsel, ECF 145-2, No. 4:18-cv-06245-JSW (N.D. Cal. October 6, 2022)

*Tavres v. Barnes & Noble, Inc.,* No. 3:19-cv-07655 (N.D.CA.): Served as expert witness for statistical analysis on behalf of plaintiff. Deposed in April 2021.

[Global Trade Secrets Misappropriation Litigation]: Provided advice on legal arguments and analysis.

*ATA Airlines, Inc., v. Federal Express Corporation*
   Provided economic and statistical advice to Haynes and Boone LLP (petitioner's counsel) for preparation of petition for rehearing *en banc* by the United States Court of Appeals for the Seventh Circuit. The petition appealed a three-judge panel's reversal of the $66 million damage award petitioner won at a jury trial (2012).

Baker McKenzie: Provided event study analysis related to a U.S. pharmaceutical firm (2012).

International Center for Law & Economics:
   Provided survey of statistical research on sugar-sweetened beverages (2010).

## REFEREEING AND PEER REVIEW SERVICE (SELECTED JOURNALS)

| | |
|---|---|
| American Economic Journal: Applied Economics | Journal of Law, Economics and Organization |
| American Economic Journal: Economic Policy | Journal of Legal Studies |
| American Economic Review | Journal of Political Economy |
| American Journal of Political Science | Nature: Computational Science |
| American Law and Economics Review | Quarterly Journal of Economics |
| Demography | Review of Economic Studies |
| Harvard Law Review | Review of Economics and Statistics |
| Journal of the American Statistical Association | Science |
| Journal of Econometrics | Stanford Law Review |
| Journal of Law and Economics | Yale Law Journal |

# APPENDIX B
# SOURCES CONSIDERED AND RELIED ON

In addition to the sources cited in the main body of my report and in Appendix C and Appendix D, the following is a list of the sources that I considered or relied on.

Court Documents

Amended Consolidated Complaint for Violations of the Federal Securities Laws (ECF 82)

Memorandum of Law in Support of Defendants' Motion to Dismiss Consolidated Complaint (ECF 85)

Memorandum Opinion (ECF 100)

Defendant Shoals Technologies Group, Inc.'s and the Shoals Individual Defendants' Answer to Amended Consolidated Complaint (ECF 114)

Underwriter Defendants' Answer and Affirmative Defenses to the Consolidated Amended Class Action Complaint (ECF 115)

Analyst Reports

RBC Capital Markets-SHLS USITC Determines Not to Review 739 Patent Ap…filed on April 21 2024
Northland Securities-Updating Estimates Heading into Q124 Results filed on May 3, 2024
Janney Montgomery Sc-SHLS Conversations We Are Having into the Print filed on May 6, 2024
Guggenheim Securities-SHLS Street Is Still Way Too High For 2025 filed on May 7, 2024
Truist Securities-In-Line 1Q Overshadowed by Guidance Reduction on P… filed on May 7, 2024
Morgan Stanley-Shoals Technologies Group 1Q24 Earnings First Gl…filed on May 7, 2024
Cantor Fitzgerald-1Q24 Review; Few Positives. Another Disappointing... filed on May 7, 2024
RBC Capital Markets-SHLS When It Rains, It Pours filed on May 7, 2024
Piper Sandler Company-1Q24 Earnings Review Project Delays Cancellati…filed on May 7, 2024
Roth MKM-SHLS Mixed Q1, Weak Q2, 2024 Lowered; Lowering Es…filed on May 7, 2024
UBS Equities-First Read Shoals Technologies Group Inc _1Q24 P…filed on May 8, 2024
Morgan Stanley-Shoals Technologies Group 1Q24 Earnings More Pro…filed on May 8, 2024
JPMorgan-Shoals 1Q Review Order Activity Remains Solid, Pr…filed on May 8, 2024
BNP Paribas Exane-SHOALS (+) Sweating thru stretched shipment time... filed on May 8, 2024
Guggenheim Securitie-SHLS The 2024 Bar Comes Down filed on May 8, 2024
Oppenheimer Co., I-SHLS Lower Guide Likely Marks NT Bottom filed on May 8, 2024
TD Cowen-Project Delays Persist; Guidance Reduced filed on May 8, 2024
Janney Montgomery Sc-SHLS FY24 Guidance Lowered as Project Push-Outs C…filed on May 8, 2024
Northland Securities-Q1 Miss, Revised Guidance Amidst Delays and Headwi…filed on May 8, 2024
Barclays-Shoals Technologies Soft quarter with weakening o… filed on May 8, 2024
Truist Securities-Looking to Prove Out Growth Pillars as Delays Cont…filed on May 8, 2024
Morgan Stanley-Shoals Technologies Group Takeaways from our Meet… filed on May 17, 2024
Morgan Stanley-Shoals Technologies Group Risk Reward Update filed on May 17, 2024
Oppenheimer Co., I-SHLS Takeaways From Marketing Meetings filed on June 7, 2024
Truist Securities-Announced $150MM Repurchase Authorization, Attract…filed on June 11, 2024

- 1 -

4923-8225-6265.v1

RBC Capital Markets-SHLS Announces $150mm share repurchase program an…filed on June 11, 2024

Barclays-Shoals Technologies Staff finds no infringement to…filed on June 14, 2024

JPMorgan-Shoals J.P. Morgan Energy Conference Takeaways filed on June 17, 2024

Barclays-Shoals Technologies Taking a look into the track…filed on June 20, 2024

UBS Equities-Shoals Technologies Group Inc _Updating Estimates_...filed on July 17, 2024

Barclays-Shoals Technologies Focus on ITC case outcome ove…filed on July 17, 2024

Ameresco I-BNP Paribas Exane-CLEAN PULSE #17 2Q24 Pressure Points (Part 2) -…filed on July 17, 2024

Roth MKM-SHLS Q224 Preview filed on August 5, 2024

Janney Montgomery Sc-SHLS 2Q24 Preview filed on August 6, 2024

Janney Montgomery Sc-SHLS 2Q Quick Take filed on August 6, 2024

Truist Securities-Solid 2Q Results + Backlog Growth Though Project D…filed on August 6, 2024

TD Cowen-Another Guide Down, Big Blattner Order; 337 Case a…filed on August 6, 2024

Roth MKM-SHLS Q2 BeatStrong Bookings Offset by 2024 Guide…filed on August 6, 2024

Piper Sandler Compan-2Q24 Review Cuts Guidance on Project Delays; Ann…filed on August 6, 2024

UBS Equities-Shoals Technologies Group Inc _2Q24 FY2024 revenue…filed on August 7, 2024

JPMorgan-Shoals Solid 2Q Results and Order Activity; Projec…filed on August 7, 2024

Guggenheim Securitie-SHLS First Look filed on August 7, 2024

Janney Montgomery Sc-SHLS 2Q Call Takeaways filed on August 7, 2024

Truist Securities-Making the Right Moves, but Delays Continue to Hit…filed on August 7, 2024

Oppenheimer Co., I-SHLS Establishing Realistic Growth Trajectory filed on August 7, 2024

RBC Capital Markets-SHLS Slipping Timelines filed on August 7, 2024

Barclays-Shoals Technologies 2024 outlook lowered with cha…filed on August 7, 2024

BNP Paribas Exane-SHOALS (=) Market Share Shrink Back Downgrade to…filed on August 7, 2024

Morgan Stanley-Shoals Technologies Group Consensus Cuts Continue filed on August 7, 2024

Northland Securities-Healthy Q2 Beat Offset by Weak Q3 Guidance and Cut…filed on August 8, 2024

Roth MKM-SHLS Section 337 Webinar with Norton Rose Fulbrig…filed on August 14, 2024

Guggenheim Securitie-SHLS Model Update - Price Target From $12 to $9 filed on August 14, 2024

Cantor Fitzgerald-Reviewing 2Q24; Customer Development Trends a Posi…filed on August 23, 2024

Roth MKM-SHLS Section 337 Webinar with Norton Rose Fulbrig…filed on August 23, 2024

RBC Capital Markets-SHLS Initial determination of patent infringement…filed on August 29, 2024

Barclays-Shoals Technologies Positive outcome against Volt…filed on September 2, 2024

Truist Securities-ITC Initial Determination a Positive for Shares Ah…filed on September 2, 2024

Guggenheim Securitie-SHLS Favorable ITC Outcome filed on September 3, 2024

JPMorgan-Shoals Positive Ruling in ITC Patent Case; Expect…filed on September 3, 2024

Janney Montgomery Sc-SHLS Favorable Initial Determination of Patent In…filed on September 3, 2024

Roth MKM-SHLS Initial Thoughts on Section 337 Initial Dete…filed on September 3, 2024

Roth MKM-SHLS Section 337 Webinar TODAY with Norton Rose F…filed on September 3, 2024

Cantor Fitzgerald-Initial Ruling Win Against Voltage in ITC Case. Re…filed on September 3, 2024

Jefferies-Solar picks shovels get rusty in a down FY25…filed on September 3, 2024

Roth MKM-SHLS Takeaways from Our Section 337 Webinar with…filed on September 4, 2024

Truist Securities-Shares Off on Voltage Release Citing ITC Victory o…filed on September 5, 2024

RBC Capital Markets-SHLS Investor Day and Manufacturing Tour Takeaway…filed on September 5, 2024

Truist Securities-Analyst Day Highlights Diversification Core Expa…filed on September 6, 2024

JPMorgan-Shoals Analyst Day Takeaways Encouraging Share Ga…filed on September 6, 2024

-Roth MKM-SHLS Analyst Day Takeaways filed on September 6, 2024

TD Cowen-Analyst Day Highlights Focus on International Ne…filed on September 6, 2024

Morgan Stanley-Shoals Technologies Group Turning a Corner filed on September 6, 2024

Barclays-Shoals Technologies Analyst Day Takeaways filed on September 6, 2024

Guggenheim Securitie-SHLS First-Ever Analyst Meeting Highlights Manage…filed on September 6, 2024

- 2 -

Jefferies-Big League Ambitions - Shoals Dreams Big at Inaugu…filed on September 6, 2024
Janney Montgomery Sc-SHLS Investor Day Takeaways filed on September 9, 2024
Piper Sandler Compan-Outlines Refined Commercial Strategy Resets Expe…filed on September 9, 2024
Jefferies-Same IP, New Markets â€" Seeking New Growth in Non…filed on September 12, 2024
Cantor Fitzgerald-Feeling More Positive Following RE+ Trade Show. Re…filed on September 16, 2024
Barclays-Shoals Technologies New filings made public for S…filed on September 25, 2024
Guggenheim Securitie-SHLS Trimming PT, But We Think 2025 Should Be Dec…filed on October 8, 2024
Morgan Stanley-Shoals Technologies Group Risk Reward Update filed on October 9, 2024
Barclays-Shoals Technologies 3Q Preview No near-term pain…filed on October 9, 2024
Wells Fargo Securiti-SHLS Initiating Coverage at Equal Weight with a P…filed on October 14, 2024
Janney Montgomery Sc-SHLS 3Q24 Earnings Preview Model Update; Fair V…filed on October 29, 2024
Roth MKM-SHLS Q324 Preview filed on November 11, 2024
Janney Montgomery Sc-ENVX, ENPH, FLNC, FSLR, NPWR, SHLS, SEDG filed on November 12, 2024
RBC Capital Markets-SHLS 3Q24 Quick Take - Revenue Beat, Adj EBITDA S…filed on November 12, 2024
Truist Securities-Transitory 3Q Results Mixed wSolid 4Q Guide as Qu…filed on November 12, 2024
Wells Fargo Securiti-SHLS Q3 Mixedâ€"2024 Rev Guidance Up, but EBITDA Do…filed on November 12, 2024
Guggenheim Securitie-SHLS First Look filed on November 12, 2024
Oppenheimer Co., I-Labor Dynamics in Focus filed on November 12, 2024
JPMorgan-Shoals Mixed 3Q Results and Guidance, Trimming PT…filed on November 12, 2024
Cantor Fitzgerald-3Q24 Review; Another Profitability Guide-Down. Ind…filed on November 12, 2024
Roth MKM-SHLS Mixed Q3, Healthy Q4, Likely Red Sweep = Unc…filed on November 12, 2024
Barclays-Shoals Technologies Solid quarter, but backlog up…filed on November 12, 2024
RBC Capital Markets-SHLS Backlog Disappoints but 4Q Shows Early Promi…filed on November 12, 2024
Piper Sandler Compan-3Q24 Review Quarterly Bookings and Margins Weigh…filed on November 12, 2024
TD Cowen-Strong Quoting Activity; Gross Margin Story Intact filed on November 12, 2024
TD Cowen-Project Delays Weigh on 2024 Guide; Stable Backlog…filed on February 26, 2024
JPMorgan-Shoals Takeaways from HQ Visit Investor Concerns…filed on March 26, 2024
Guggenheim Securitie-SHLS More Measured Expectations - Our Price Targe…filed on March 28, 2024
RBC Capital Markets-SHLS USITC Determines Not to Review 739 Patent Ap…filed on April 21, 2024
Barclays-Shoals Technologies Market share to be scrutinize…filed on April 8, 2024
Cantor Fitzgerald-ITC Throws Out One of Two Asserted Patents, But Ru…filed on March 12, 2024
Piper Sandler Compan-2Q23 Earnings Review 2Q EBITDA Beat; Lighter Boo…filed on August 1, 2023
UBS Equities-First Read Shoals Technologies Group Inc _2Q23 I…filed on August 1, 2023
JPMorgan-Shoals 2Q Results Beat Despite Charge, Visibility…filed on August 2, 2023
Oppenheimer Co., I-SHLS Solid Execution, Remain Constructive filed on August 2, 2023
UBS Equities-First Read Shoals Technologies Group Inc _Solid 3…filed on November 7, 2023
Truist Securities-Executing Where it Matters Expanding Future Grow…filed on August 2, 2023
TD Cowen-Solid Quarter; BLA+ Gaining Traction Internation…filed on August 2, 2023
Barclays-Shoals Technologies Puts and takes with the 2Q pr…filed on August 3, 2023
TD Cowen-Margins Drive Raised 23 EBITDA Guide; Warranty Is…filed on November 8, 2023
Oppenheimer Co., I-SHLS Cutting Estimates; Lower PT to $17 filed on February 29, 2024
Northland Securities-In-line Q4, Bottom-line Miss; Project Delays to Co…filed on February 29, 2024
Credit Suisse-SHLS Strong demand growth post UFLPA; Raise TP by…filed on January 17, 2023
Cantor Fitzgerald-2Q23 Review; Solid Beat, FY23E Guidance Unchanged;…filed on August 2, 2023
Roth Capital Partner-SHLS Webinar with CEO (Wed, Nov 30)…filed on November 22, 2022
UBS Equities-First Read Shoals Technologies Group Inc _3Q22 S…filed on November 14, 2022
Credit Suisse-SHLS Shoals Technologies-1Q22 First Impression filed on May 16, 2022
JPMorgan-Shoals Strong 2Q Results; ST and LT Outlooks Rem…filed on August 16, 2022

4923-8225-6265.v1

Roth Capital Partner-SHLS Takeaways from Our Webinar with Management filed on December 12, 2022

Piper Sandler Compan-4Q22 Earnings Review Delivers EBITDA Guidance Wi…filed on February 28, 2023

Piper Sandler Compan-2Q22 Earnings Review Solid Execution During Toug…filed on August 15, 2022

Barclays-Shoals Technologies Tailwinds to provide increase…filed on November 15, 2022

Barclays-Shoals Technologies Playing the waiting game filed on August 16, 2022

Northland Securities-Solid Q3 Beat w 44 QQ Backlog Increase  EV Tra…filed on November 15, 2022

Piper Sandler Compan-1Q23 Review Beat 1Q, Raises FY, Highlights Str…filed on May 8, 2023

Roth MKM-The Solar Snapshot_ENPHSEDG US Storage Price Lo…filed on June 26, 2023

Roth MKM-SHLS Q2 Beat, 2023 Maintained, Momentum Continuin…filed on August 1, 2023

Credit Suisse-SHLS Q4 takeaways filed on March 3, 2023

TD Cowen-1Q23 Preview Expect Solid Backlog Growth Cash F…filed on April 21, 2023

Roth MKM-SHLS Already Benefiting from its Section 337 Case filed on May 16, 2023

Roth Capital Partner-Invitation _ Webinar with SHLS (Tue, Sep 27) filed on September 26, 2022

Guggenheim Securitie-SHLS Solid Results, Fairly Valued filed on March 1, 2022

Morgan Stanley-Shoals Technologies Group 1Q23 Earnings Takeaways filed on May 9, 2023

Credit Suisse-SHLS Post TRA Model Update filed on December 9, 2022

Oppenheimer Co., I-SHLS Strong Beat Raise Quarter filed on May 9, 2023

Credit Suisse-SHLS Q1 Preview; Reiterate Outperform filed on May 2, 2023

Roth Capital Partner-SHLS Q322 Preview Webinar Takeaways filed on September 30, 2022

Roth MKM-The Solar Snapshot_US Resi, ENPHSEDG, NEM3, RUN...filed on June 11, 2023

Credit Suisse-SHLS Strong Q2, 2022 Reaffirmed; Increase TP $1 o…filed August 16, 2022

Credit Suisse-Utility Solar - Sizing 2023 - Ample Interconnectio…filed on June 23, 2022

Oppenheimer Co., I-SHLS Executing Against The Opportunity…filed on August 16, 2022

Truist Securities-Backlog Levels In Focus to Support 23 Growth Outl…filed on May 8, 2023

JPMorgan-Shoals Meetings with Management, Updating Model…filed on December 8, 2022

Roth MKM-SHLS Strong Q1 Beat, Robust Bookings, Taking 2023…filed on May 9, 2023

-Roth Capital Partner-Invitation _ Webinar with SHLS (Tue, Sep 27) filed on September 23, 2022

Northland Securities-Modest Q223 Beat; Reiterated Guide; Maintain OP R…filed on August 21, 2023

Roth Capital Partner-SHLS Webinar with Management (Fri, Jun 17) filed on May 19, 2022

Guggenheim Securitie-SHLS Reiterating Neutral Rating Following Convers…filed on December 9, 2022

Roth Capital Partner-SHLS Webinar with Management (Fri, Jun 17) filed on June 14, 2022

TD Cowen-Highlights from Investor Call Solid Setup Through…filed on March 28, 2023

UBS Equities-North America Alternative Energy _Raising PTs on t…filed on June 8, 2022

UBS Equities-First Read Shoals Technologies Group Inc _Simplif…filed on November 30, 2022

JPMorgan-Shoals Strong 3Q Results and Guidance, Accelerat…filed on November 15, 2022

Roth Capital Partner-SHLS Webinar to be Rescheduled filed on November 29, 2022

Barclays-Shoals Technologies Model Update filed on March 16, 2023

TD Cowen-Reiterates Guidance For 22; EV And BLA 2.0 On Dec…filed on August 16, 2022

Morgan Stanley-Clean Tech AMPS and SHLS 1Q22 Earnings Takeaways filed on May 17, 2022

Piper Sandler Compan-3Q22 Earnings Review Solid 3Q Results; Awarded P…filed on November 14, 2022

UBS Equities-First Read Shoals Technologies Group Inc _4Q22 4…filed on February 28, 2023

Roth MKM-The Solar Snapshot-ENPH, Domestic Content Guidan…filed on August 6, 2023

Guggenheim Securitie-SHLS On Target and Growing Rapidly filed on August 2, 2023

Truist Securities-Alternative Energy Weekly Wire filed on June 10, 2022

Barclays-Shoals Technologies Strong headline, but some que…filed on May 9, 2023

Cantor Fitzgerald-1Q Review; Strong Utility Scale Demand Continues a…filed on May 9, 2023

Roth Capital Partner-SHLS 2022 Guide Kept at Low End Despite Macro, 20… filed on May 17, 2022

Truist Securities-Founder Offering Brings Ownership Down to ~2, No…filed on March 8, 2023

TD Cowen-Watts Happening Thick of Earnings, Thoughts on SH…filed on May 5, 2023

- 4 -

4923-8225-6265.v1

Truist Securities-Utility-Scale Solar 2Q23 Preview-Global Tailwind…filed on July 24, 2023

TD Cowen-Upgrade to Outperform; BLA 2.0 and EV Opportunity…filed on September 16, 2022

Oppenheimer Co., I-SHLS Continued Steady Execution filed on March 1, 2023

Guggenheim Securitie-SHLS Reiterating Buy, Raising Estimates and Price…filed on June 21, 2022

Truist Securities-Strong 3Q Beat, 2022 Outlook Increased filed on November 14, 2022

Roth MKM-SHLS Q123 Preview filed on May 5, 2023

Roth Capital Partner-SHLS Q3 BeatLight Implied Q4, BacklogOrders Up;…filed on November 15, 2022

Truist Securities-1Q At Low End, 2022 Topline Revised Lower filed on May 16, 2022

TD Cowen-Strong Quarter and Outlook; Backlog Buoys Visibili…filed on November 14, 2022

Truist Securities-Textbook Beat Raise as Backlog Sees Notable Step…filed on May 8, 2023

Guggenheim Securitie-SHLS Downgrading from Buy to Neutral filed on September 9, 2022

Guggenheim Securitie-SHLS Strong Momentum Continues filed on August 16, 2022

Roth MKM-The Solar Snapshot _ TSLA, US Ute Scale Solar, SHL…filed on August 20, 2023

TD Cowen-Solid Beat Raise Quarter; BLA Plus Revenues in 2…filed on May 9, 2023

UBS Equities-First Read Shoals Technologies Group Inc_1Q22 ma…filed on May 17, 2022

Guggenheim Securitie-SHLS Reiterating Neutral Rating Following Convers…filed on October 3, 2022

Roth MKM-The Solar Snapshot_ENPH, SEDG, NXT, ARRY, FTCI…filed on July 11, 2023

Roth Capital Partner-SHLS Webinar TODAY with Management filed on June 17, 2022

Piper Sandler Compan-1Q22 Earnings Review Less Severe Guidance Revisi…filed on May 16, 2022

TD Cowen-Highlights from Meeting With Management filed on June 13, 2022

TD Cowen-4Q22 Preview Expect Healthy Revenues with Strong…filed on January 20, 2023

Guggenheim Securitie-SHLS Upgrading to Buy, $30 Price Target filed on May 9, 2023

Truist Securities-Upgrading SHLS to Buy from Hold filed on June 9, 2022

Credit Suisse-SHLS Beat and Raise; Reiterate Outperform filed on May 9, 2023

UBS Equities-Shoals Technologies Group Inc _Financial update po…filed on December 2, 2022

Barclays-Shoals Technologies Solid quarter, but backlog up…filed on March 1, 2023

Roth Capital Partner-SHLS Takeaways from Our Webinar with Management filed on June 27, 2022

Oppenheimer Co., I-SHLS Strong Execution; Raise PT to $41 filed on November 15, 2022

Morgan Stanley-Clean Tech AMPS and SHLS 2Q22 Earnings Takeaways filed on August 16, 2022

Roth Capital Partner-SHLS Webinar with Management (Fri, Jun 17) filed on June 10, 2022

JPMorgan-Shoals Meetings with Management Positive filed on May 11, 2023

Truist Securities-2Q Largely In-Line, FY Guidance Reiterated Modes…filed on August 1, 2023

Northland Securities-New CEO Appointed and 10GW MSA Awarded; Reiteratin…filed on June 15, 2023

Northland Securities-Q122 Beat, Reaffirmed Low-End Guidance; Reiterate…filed on May 17, 2022

Cantor Fitzgerald-Initiating Coverage With a Neutral Rating and $30 filed on January 25, 2023

JPMorgan-Shoals 1Q Review FY22 Guidance Reduced for ADC…filed on May 17, 2022

Roth MKM-The Solar Snapshot -- Domestic Content TOMORROW, J…filed on May 11, 2023

Truist Securities-Lowering 2022 Estimates on Clarity Received on Pro…filed on May 17, 2022

JPMorgan-Shoals J.P. Morgan Conference Takeaways – ALERT filed on June 22, 2022

Roth Capital Partner-SHLS Webinar TODAY with CEO filed on December 8, 2022

Truist Securities-Increasing Estimates Price Target Following Poli…filed on August 16, 2022

Roth MKM-Takeaways from Our Webinar with SHLS filed on May 17, 2023

Barclays-Shoals Technologies Risk in the 2023 guide; Downg…filed on May 2, 2023

Guggenheim Securitie-SHLS Strong Quarter and Improved Visibility filed on November 15, 2022

JPMorgan-Shoals Record 1Q Results and Record Visibility D…filed on May 9, 2023

Roth Capital Partner-Invitation _ Webinar TODAY with SHLS filed on September 27, 2022

Northland Securities-Solid Q123 Beat; Slight Guide Increase; Upgrading…filed on May 9, 2023

Morgan Stanley-Clean Tech SEDG + SHLS Earnings Quick Take filed on August 2, 2023

Cantor Fitzgerald-Upgrading Shoals to Overweight on Valuation, Widen…filed on September 5, 2023

- 5 -

Roth Capital Partner-SHLS Healthy Q222, 2022 Reiterated, Strong Execu…filed on August 16, 2022

Shoals Tec-Roth MKM-The Solar Snapshot _ ENPH, UFLPA, FSLR, SHLS Warra…filed on August 11, 2023

Northland Securities-Inline Q2 and H222 Guide; Potential for Buy-Side…filed on August 16, 2022

Credit Suisse-SHLS 2022 Low-end Raised; Strong Order Book filed on November 14, 2022

Credit Suisse-SHLS Stronger Demand Beyond UFLPA in 2023; Reduce…filed on July 24, 2022

Truist Securities-CEO Succession; Share Offering for TRA Termination filed on November 30, 2022

UBS Equities-First Read Shoals Technologies Group Inc _1Q23 O…filed on May 8, 2023

Roth MKM-SHLS Webinar with Interim CEO CFO (Tue, 516) filed on May 12, 2023

Oppenheimer Co., I-SHLS Solid Execution; Trimming EstimatesPT on Ma…filed on May 17, 2022

Morgan Stanley-Shoals Technologies Group 4Q22 Earnings Quick Tak…filed on March 1, 2023

Truist Securities-Utility-Scale Solar Growth Holds Strong as Margins…filed on May 8, 2023

Credit Suisse-SHLS ADCVD exposure limited in 2022; Reduce TP b…filed on May 17, 2022

Roth MKM-SHLS Webinar with Interim CEO CFO (Tue, May 16) filed on May 9, 2023

TD Cowen-Solid 4Q22 w Strong FY23 Outlook; January Booking…filed on March 1, 2023

Roth MKM-SHLS Q422 Preview filed on February 10, 2023

TD Cowen-22 Guidance Much Better Than Feared Amidst Turbul…filed on May 16, 2022

Truist Securities-Standout 4Q, Record Backlog Another Year of 50+…filed on March 1, 2023

Roth MKM-SHLS Q422 Beat with Inline 2023 Guide; Record Ba…filed on March 9, 2023

Northland Securities-Strong Q4 Beat Mixed 2023 Guide; Downgrading on…filed on March 1, 2023

JPMorgan-Shoals Strong 4Q Results, FY23 Guide Captures Ex…filed on March 1, 2023

Truist Securities-Favorable Outlook for High Margin Utility Scale Gr…filed on February 26, 2023

UBS Equities-First Read Shoals Technologies Group Inc _2Q22_R…filed on August 15, 2022

Barclays-Shoals Technologies The good and the bad filed on December 2, 2022

Roth Capital Partner-SHLS Webinar with CEO (Thu, Dec 8) filed on December 7, 2022

Guggenheim Securitie-SHLS Still A Buy, But Lowering Our Price Target t…filed on May 17, 2022

Roth MKM-SHLS Webinar TODAY with Interim CEO CFO (Tue, 5…filed on May 16, 2023

Roth Capital Partner-The Solar Snapshot - US Ute Module Pricing, FSLR,…filed on January 13, 2023

Roth MKM-SHLS Q223 Preview filed on July 26, 2023

Cantor Fitzgerald-Shoals Quantifies Warranty Liability Issue, But Co…filed on November 8, 2023

UBS Equities-Shoals Technologies Group Inc _4Q23 Expecting wea…filed on February 29, 2024

Morgan Stanley-Shoals Technologies Group 3Q23 Earnings Quick Ta…filed on November 8, 2023

Roth MKM-The Solar Snapshot _ SHLS, New Tariff, Mod Px, US…filed on November 10, 2023

Roth MKM-SHLS Webinar TODAY with Management (Wed, Dec 20) filed on December 20, 2023

Roth MKM-SHLS Shrinkback Complaint Lays Out Strong Case; C…filed on November 10, 2023

Barclays-Shoals Technologies Prysmians response to SHLSs…filed on December 19, 2023

Truist Securities-Mixed 4Q with 2024 Guide Well Below Ests; Project…filed on February 28, 2024

JPMorgan-Shoals Strong 3Q Results and Bookings, Additional…filed on November 8, 2023

Roth MKM-SHLS Webinar with Management (Wed, Dec 20) filed on December 14, 2023

Guggenheim Securitie-SHLS More modest outlook, but we still see value filed January 8, 2024

Roth MKM-SHLS Q323 Preview filed November 6, 2023

BNP Paribas Exane-SHOALS (+) Market Share Hiccups or Market Stagna…filed on February 29, 2024

Roth MKM-SHLS Section 337 Update _ A Win for SHLS But Also…filed on March 3, 2024

Morgan Stanley-Array Technologies 3Q23 Earnings Quick Take (=-…filed on November 8, 2023

Northland Securities-Downgrading on Macro Environment and Fewer Connect…filed on October 5, 2023

Northland Securities-Q3 Preview; Upside Likely; Maintaining MP on Other…filed on November 6, 2023

Barclays-Shoals Technologies More disclosure than usual filed on November 8, 2023

Oppenheimer Co., I-SHLS Solid Results, Warranty Risk Remains filed on November 8, 2023

Guggenheim Securitie-SHLS Weak Outlook Balanced By Strong Backlog-Re…filed on February 29, 2024

Barclays-Shoals Technologies Digging into the complaint ag…filed on November 10, 2023

Guggenheim Securitie-SHLS Undervalued Even With All The Uncertainty filed on November 8, 2023

BNP Paribas Exane-SHOALS (+) Best Way to Play US Large Scale Solar…filed on October 20, 2023

Roth MKM-The Solar Snapshot _ SHLS, CPUC in 2024, UFLPA, Bi…filed on November 20, 2023

Morgan Stanley-Shoals Technologies Group 4Q23 Earnings Project…filed on February 29, 2024

Truist Securities-Mixed 3Q Impacted by Warranty Charge wMeaningful…filed on November 7, 2023

Truist Securities-Core EBOS Performance Remains Impresive Despite NT…filed on November 8, 2023

BNP Paribas Exane-SHOALS (+) How Warranted are Warranty Concerns filed on November 9, 2023

Roth MKM-SHLS Webinar with Management (Wed, Dec 20) filed on December 4, 2023

Roth MKM-SHLS Q4 Miss, Weak Q12024 Guide due to _Transito…filed on February 28, 2024

Roth MKM-SHLS Q423 Preview filed on February 21, 2024

BNP Paribas Exane-SHOALS (+) Model Update Following Underwhelming…filed on February 29, 2024

Truist Securities-Utility-Scale Delays Strike Again, Longer-Term Set…filed on February 28, 2024

Roth MKM-SHLS Large Warranty Expense Offset by Strong Fund…filed on November 8, 2023

Roth MKM-The Solar Snapshot _ TSLA, US Inverter Inventory O…filed on February 11, 2024

Piper Sandler Compan-4Q23 Earnings Review Guides to Flat Revenues on…filed on February 28, 2024

Barclays-Shoals Technologies Another utility-scale name pl…filed on March 5, 2024

Roth MKM-The Solar Snapshot _ NOVA, US Resi, TSLA, SHLS, US…filed on December 10, 2023

Guggenheim Securitie-SHLS First Look At 3Q23 Results filed on November 8, 2023

Northland Securities-Slight Q3 Beat; Largely Reiterated Guide; Maintain…filed on November 15, 2023

JPMorgan-Shoals 4Q Review Strong Orders and Pipeline Thoug…filed on February 29, 2024

Sunrun Inc-BNP Paribas Exane-US CLEAN ENERGY 4Q23 Model Updates; SHLS Clarifi…filed on March 12, 2024

Cantor Fitzgerald-Starting to Feel Industry-Wide Challenges. Project…filed on February 28, 2024

Janney Montgomery Sc-SHLS Initiating Coverage with BUY Rating and $20…filed on January 19, 2024

RBC Capital Markets-SHLS Project Delays Weigh on the Outlook filed on February 28, 2024

BNP Paribas Exane-ARRAY SHOALS Utility Scale Still Scaling; ARRY…filed on November 8, 2023

Barclays-Shoals Technologies Thoughts into the 3Q print filed on October 13, 2023

Janney Montgomery Sc-SHLS 2024 Guide Below Street Expectations filed on February 29, 2024

Barclays-Shoals Technologies Attractive RiskReward Upgra…filed on January 22, 2024

4923-8225-6265.v1

<u>Cases</u>

*Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69 (S.D.N.Y. 2015)

<u>Shoals Investor Presentations and Similar</u>

Q3 Earnings Report, November 2024
Shoals 2024 Investor Day, September 5, 2024
Q2 Earnings Report, August 2024
Q1 2024 Investor Presentation, May 2024
Q4 2023 Investor Presentation, February 2024
Q3 2023 Investor Presentation, November 2023
Q2 2023 Investor Presentation, August 2023
Q1 2023 Investor Presentation, May 2023
Q4 2022 Investor Presentation, February 2023

<u>Publications in Academic Journals or Books</u>

Elizabeth Blankespoor, Ed deHaan and Ivan Marinovic, *Disclosure Processing Costs, Investors' Information Choice, and Equity Market Outcomes: A Review*, 70 J. Accounting & Econ., Issues 2-3 (2020)

Alon Brav and J. B. Heaton, Event Studies in Securities Litigation: Low Power, Confounding Effects, and Bias, 93 Wash. U. L. Rev. 583 (2015)

Bessembinder, H., Venkataraman, K.: *Bid-Ask Spreads: Measuring Trade Execution Costs In Financial Markets*. In: Encyclopedia of Quantitative Finance, pp. 184–190 (2010)

<u>Working Papers and White Papers</u>

Kristin M. Feitzinger, *Estimating Recoverable Damages In Rule 10b-5 Securities Class Actions*, https://www.cornerstone.com/wp-content/uploads/2014/01/Estimating-Recoverable-Damages-in-Rule-10b-5-Securities-Class-Actions.pdf

Catherine J. Galley, Erin E. McGlogan, Daniel J. Tyukody, Jason L. Krajcer, *Limiting Rule 10b-5 Damages Claims*, https://www.cornerstone.com/wp-content/uploads/2014/04/Limiting-Rule-10b-5-Damages-Claims.pdf

David I. Tabak and Frederick C. Dunbar, *Materiality And Magnitude: Event Studies In The Courtroom*, NERA Working Paper #34, April 1999

<u>Shoals Press Releases</u>

Shoals press releases posted at https://investors.shoals.com/news/default.aspx for the years 2022, 2023, and 2024

"Shoals Technologies Group, Inc. Announces Closing of Initial Public, Offering," January 29, 2021

<u>Books</u>

Stephen J. Choi & A.C. Pritchard, SECURITIES REGULATION: CASES AND ANALYSIS 6th Edition (2024)

Morris H. DeGroot and Mark J. Schervish, PROBABILITY AND STATISTICS 3rd Edition (2002)

- 8 -

E.L. Lehmann and Joseph P. Romano, TESTING STATISTICAL HYPOTHESES 3rd Edition (2005)

Thomas Lee Hazen, SECURITIES REGULATION IN A NUTSHELL 13th Edition (2025)

<u>Shoals SEC Filings</u>

8-K dated August 1, 2023

10-K For the fiscal year ended December 31, 2022

10-K For the fiscal year ended December 31, 2023

10-K For the fiscal year ended December 31, 2024

S-3 filed with the Securities and Exchange Commission on November 30, 2022

<u>Webpages</u>

Nasdaq, "Daily MP Position Report,"
https://nasdaqtrader.com/Trader.aspx?id=DailyMPPositionReport

OSHA, "Description for 3674: Semiconductors and Related Devices," https://www.osha.gov/sic-manual/3674

SEC, "Executing an Order," https://www.investor.gov/introduction-investing/investing-basics/how-stock-markets-work/executing-order

Nasdaq, "How to Become a Market Maker,"
https://www.nasdaqtrader.com/trader.aspx?id=marketmakerprocess

- 9 -

## APPENDIX C
## EVENT STUDY DETAILS

**A.     Event Study Evidence on the Shoals Stock Return's Response to News**

1.     I downloaded closing price data on Shoals Stock closing prices from Yahoo! Finance including for the period May 13, 2022 through November 12, 2024.[1]

2.     I downloaded closing price data for the S&P 500 for the same period.

3.     I downloaded closing price data for the Invesco Solar Index Exchange Traded Fund as a measure of industry conditions.  This index is referred to in the main text of my report as the Solar Industry Index.  It is traded on the NYSE Arca exchange with ticker 'TAN'.[2]

4.     I used a machine learning algorithm to generate a custom index ("Custom Index") based on data-driven techniques.  In doing this, I allowed the algorithm to select from among tickers that are part of the TAN index, as well as firms that report the same SIC code to the SEC as does Shoals.  In all, over 100 tickers were eligible for inclusion in the index (it selected many fewer for inclusion, as I discuss below).  This data-driven machine learning approach is one I co-developed in my scholarship.[3]

---

[1]   For stocks that pay dividends or experience a split, it is necessary to use the adjusted closing prices provided by Yahoo!  Because adjusted and unadjusted closing prices were the same for SHLS on every day for which I obtained closing prices, I infer that none of these adjustment-requiring events occurred.

[2]   The Solar Industry Index "is based on the MAC GlobalSolar Energy Index (Index)," investing "at least 90% of its total assets in the securities, American depositary receipts (ADRs) and global depositary receipts (GDRs) that comprise the Index," which itself includes "companies in the solar energy industry."  Invesco Solar ETF fact sheet for Q3 2025, https://www.invesco.com/content/dam/invesco/us/en/product-documents/etf/fact-sheet/tan-invesco-solar-etf-fact-sheet.pdf, accessed on January 10, 2026.  The MAC Solar Index "is calculated and administered by S&P Dow Jones Indices."  MAC Global Solar Energy Stock Index, https://macsolarindex.com/ (accessed on January 10, 2026).

[3]   Andrew Baker and Jonah B. Gelbach, *Machine Learning and Predicted Returns for Event Studies in Securities Litigation*, 5 J. L. Fin. & Accounting 231 (2021).

- 1 -

5. In all my analysis of stock returns, the measure of the return I used is the log daily return, *i.e.*, for Shoals Stock, $r_t = \ln\left(\frac{P_t}{P_{t-1}}\right) = \ln P_t - \ln P_{t-1}$, where $P_t$ is the date-$t$ closing price for the Stock; for each explanatory variable involving returns, I used the corresponding log return for that variable. This is commonly done in event studies.

6. For the estimation window, I used all "Non-News Dates" in the Analysis Period defined in the main text of my report.[4] Non-News Dates are all such dates other than "News Dates." News Dates are defined as the dates on which Shoals issued press releases, except that if the press release was not issued earlier than 3pm Eastern on a trading day, the next trading day after the release was issued is coded as a News Date.

7. In all, I coded 56 News Dates during the Analysis Period, and there are 572 Non-News Dates.

8. News Dates are an objectively reasonable baseline for conducting the event study here, which will involve comparisons of News Dates to Non-News Dates in assessing semi-strong form market efficiency.

**B.    Regression Model Specifications**

9. I considered three candidate regression models, denoted Model I, Model II, and Model III. What distinguished the specifications was the explanatory variables included.

10. Model I includes only one explanatory variable: the daily returns of the S&P 500 index.

---

[4]   This approach is in line with the observation that "[w]hen multiple events are studied, the estimation window may cover the periods around the event windows, including the period(s) between event windows," David I. Tabak & Frederick C. Dunbar, Materiality and Magnitude: Event Studies in the Courtroom, National Economic Research Associates Working Paper #34, April 1999 at 9 (available at https://www.nera.com/content/dam/nera/publications/archive1/3841.pdf).

- 2 -

11. Model II includes the S&P 500 and the Solar Industry Index.[5]

12. Model III involves three steps.

(a) In the first step, I use a machine language procedure known as LASSO to select among similar-industry stocks whose returns best predict Shoals returns.[6]

(i) The stocks I considered for selection represent two partially overlapping sets of companies. The first set is stocks in TAN for which Yahoo! Finance had non-missing data throughout the Analysis Period.[7] The second set includes companies that disclosed the same SIC code to the SEC that Shoals does, namely, SIC 3674.[8] I also made the S&P 500 available for selection.

(ii) The LASSO procedure is known as a "penalized" version of ordinary least squares, with the penalty operating to force an explanatory variable to have a coefficient of 0 unless the best non-zero coefficient value for that variable adds enough explanatory power to

---

[5] Shoals Stock is part of the TAN index. To avoid contaminating my estimates, I calculated a modified version of the TAN series designed to eliminate the influence of Shoals Stock that is otherwise present in TAN.

[6] This is an approach developed in my scholarly publication work; *see* Andrew Baker and Jonah B. Gelbach, *Machine Learning and Predicted Returns for Event Studies in Securities Litigation*, 5 J. L. Fin. & Accounting 231 (2021).

[7] Stocks might have had missing data because they weren't listed until after the Analysis Period began, because they were de-listed before the Analysis Period ended, or because Yahoo does not follow them (as with foreign-listed stocks).

[8] This code is titled "Semiconductors and Related Devices," and the SIC manual describes firms in this code as follows: "Establishments primarily engaged in manufacturing semiconductors and related solid- state devices. Important products of this industry are semiconductor diodes and stacks, including rectifiers, integrated microcircuits (semiconductor networks), transistors, solar cells, and light sensing and emitting semi-conductor (solid-state) devices." OSHA SIC Manual, Description for 3674: Semiconductors and Related Devices, https://www.osha.gov/sic-manual/3674 (accessed on January 10, 2026).

- 3 -

overcome the penalty. LASSO is thus well suited to selecting which variables should be included in a regression model when it is uncertain which really belong in the model.

(b)      In the second step, I used the coefficients from the LASSO procedure to create a custom index for Shoals Stock. Let $\hat{\beta}_j^{LASSO}$ be the first-step LASSO coefficient estimate for explanatory variable $j$.[9] Then the custom index value for date $t$ is $\hat{c}_t = \sum_{j=0}^{K} X_{jt}\hat{\beta}_j^{LASSO}$.

(c)      In the third step, I carried out a standard regression model like those in Models I and II, except that the only explanatory variable included is the custom index $\hat{c}_t$ just described (I also included a constant).

13.      LASSO is a well-known and widely used approach to regressor selection,[10] and it has the capacity to perform better than Model I or Model II in predicting Shoals Stock returns.

(a)      An index like the Solar Industry Index is not designed to optimize the prediction of returns for any stock, so although it can be expected to pick up industry factors that affect Shoals, there is no reason to think it does so as effectively as it might.

(b)      A natural alternative approach would seem to be to simply take all stocks that might be similar to Shoals Stock in their response to industry developments, and add them to the regression model.

(c)      But there are two problems with that approach. One problem is that the OLS estimator then will use up statistical information estimating coefficients on each variable, which can lead to a substantial increase in the variance of the coefficient estimates for companies whose returns actually are closely associated with Shoals stock. The other problem is that including all available

---

[9]      Here I let variable 0 be the intercept term, so that $X_{0t} = 1$ for all dates.

[10]      Trevor Hastie, Robert Tibshirani, and Jerome Friedman, THE ELEMENTS OF STATISTICAL LEARNING 68-69, 94 (2009, 2nd ed).

- 4 -

variables in OLS estimation of a regression model can cause overfitting, which means that the estimator tends to identify statistical relationships that aren't durable, simply because of happenstance in the pattern of stock returns that occurred in the observed set of returns in the estimation window.

(d)     Penalized regression approaches, including LASSO, solve the overfitting problem by adding a penalty to the estimator that increases when the coefficient estimates increase in size. The structure of the LASSO penalization function is naturally geared in the direction of keeping an explanatory variable's coefficient estimate at 0 unless that variable's return has substantial explanatory power in predicting the focal stock's return level. LASSO is thus well suited to selecting among a large number of potential explanatory variables.[11]

14.     Using LASSO means that information on a better set of stocks will be used to calculate the estimated expected return in an event study. The ultimate payoff of this improvement is a reduction in the RMSE, which is also the estimated standard deviation of the daily abnormal return. That will increase the statistical power of tests involving abnormal returns, such as those considered below.

15.     Table 1 reports the list of tickers whose daily returns are included in Model III's LASSO variable-selection step. In addition to the listed variables, I included a constant and the S&P 500 in this step (I excluded the TAN-ex-SHLS index).

---

[11]   The approach favored in Baker & Gelbach, *supra* note, is to use elastic net, which is a machine learning algorithm that includes LASSO as a special case but can also be more flexible in the way it penalizes overfitting. There is a particular parameter in the elastic net procedure such that if that parameter is 1, elastic net yields identical results to LASSO. When I used elastic net in the first step, the (data-driven) algorithm in fact selected the value 1 for this parameter. Thus, the LASSO results described here are also the elastic net results.

4925-8119-7961.v1

**Table 1: Tickers of Returns That Are Included in LASSO Selection Step**

| In Both TAN Index & SIC 3674 | In TAN Index, But different SIC | In SIC 3674, But Not in TAN |
|---|---|---|
| CSIQ, DQ, ENPH, FSLR, JKS, SEDG | ARRY, CWEN, HASI, RNW, RUN | AAOI, ADI, AIP, ALGM, AMAT, AMBA, AMD, AMKR, AOSL, ASX, ATEYY, ATOM, AUOTY, AVGO, AXTI, BEEM, CNCN, CRDO, CRUS, DIOD, FJTSY, FORM, FTCI, GFS, GSIT, HIMX, HNHPF, HYSR, ICHR, IFNNY, IMOS, INDI, INTC, IPGP, IPWR, KLIC, KOPN, KYOCY, LEDS, LPTH, LSCC, LTDH, MAXN, MCHP, MMATQ, MOBX, MPWR, MRAM, MRVL, MTLK, MTSI, MTST, MU, MX, MXL, NLST, NVDA, NVEC, NVTS, NXPI, ON, OPTI, OPVS, OSIS, PENG, PLAB, POET, POWI, PRSO, PXLW, QRVO, QUIK, RBCN, RMBS, RNECY, ROHCY, SGLN, SIMO, SITM, SKYT, SLAB, SMTC, SNRY, SODI, SPCB, SPIEF, SQNS, STM, SWKS, SYNA, TSEM, TSM, TXN, TYGO, UCTT, UMC, VIAOY, VIAV, VLN, XOVR |

16. Table 2 reports the list of tickers for which the LASSO coefficient estimate was non-zero, together with the estimated coefficient values.

(a) There are 17 tickers with non-zero coefficients, indicating that the LASSO algorithm worked effectively to rule out the overwhelming majority of the more than 100 tickers whose returns were available for selection.

(b) In estimating the LASSO coefficients, I used a randomly drawn subset of 371 of the Non-News Dates; such a random subset is known as a training data set.[12] The reason to restrict attention to a training data set is so that the third step estimates below can be based only on the remaining observations in the data, which are known as the test set. This is a well-known

---

[12] I chose 371 because that left 201 test-set Non-News Dates to use to compute sample quantiles of the abnormal returns; the test set is described momentarily.

4925-8119-7961.v1

approach to avoiding any model overfitting that would arise if I used the same data to select variables for inclusion and to evaluate the performance of the OLS third step.

(c) The coefficient estimates in Table 2 show that the LASSO algorithm assigned one company, solar tracker manufacturer Array Technologies, Inc., a particularly large coefficient – 0.358, which is roughly two-thirds of the sum of the other companies' coefficients.[13]

(d) Notably, the LASSO algorithm did not put any weight on the S&P 500 index. Given the ability to predict Shoals returns with individual companies, the LASSO algorithm determined that the S&P 500 index had sufficiently limited predictive power to make it worth including in the model.

**Table 2: Tickers of Returns That Have
Non-Zero Elastic Net/LASSO Coefficient Estimates**

| Ticker | Company Name | Coefficient |
|---|---|---|
| ARRY | Array Technologies, Inc. | 0.358 |
| ENPH | Enphase Energy, Inc. | 0.088 |
| GFS | GLOBALFOUNDRIES Inc. | 0.070 |
| BEEM | Beam Global | 0.066 |
| FTCI | FTC Solar, Inc. | 0.063 |
| JKS | JinkoSolar Holding Co., Ltd. | 0.054 |
| VIAV | Viavi Solutions Inc. | 0.048 |
| DIOD | Diodes Incorporated | 0.047 |
| HASI | HA Sustainable Infrastructure Capital, Inc. | 0.034 |
| RUN | Sunrun Inc. | 0.026 |
| MAXN | Maxeon Solar Technologies, Ltd. | 0.026 |
| SODI | Solitron Devices, Inc. | 0.023 |
| CSIQ | Canadian Solar Inc. | 0.017 |
| AAOI | Applied Optoelectronics, Inc. | 0.006 |
| MTLK | Metalink Ltd. | -0.002 |
| RNECY | Renesas Electronics Corporation | -0.003 |
| ROHCY | ROHM Co., Ltd. | -0.028 |

---

[13] The total of all coefficients is 0.893; the total for non-ARRY companies was 0.535.

4925-8119-7961.v1

17.     Model III's third step involves creating a *Custom Index*, as I will refer to it, by multiplying the estimated coefficients in Table 2 by the corresponding ticker's return for each date $t$ and adding together the resultant products.

18.     As I discuss below, Model III yields a noticeable reduction in the RMSE compared to Model II; Model III yields an even larger improvement over Model I than does Model II.

## C.     Regression Model Results

19.     Table 3 reports the coefficient estimates from the regression of Shoals Stock returns on the explanatory variables included in Model I, Model II, and Model III.

20.     The Model I coefficient on the S&P 500 indicates that Shoals returns are very highly associated with broader market developments, all else equal.  A 1% increase in the market return is associated with roughly a 1.4% increase in Shoals.

21.     The Model II results show that most of this effect is captured by the Company's industry, as captured by the TAN-ex-SHLS index.  With both the S&P 500 and the Solar Industry Index both included, a 1% increase in the Solar Industry Index is, *ceteris paribus*, associated with roughly a 1.1% increase in the Shoals return, whereas a 1% increase in the S&P 500 is associated with a *ceteris paribus* increase in Shoals Stock of only about one-tenth that size; further, the Model II coefficient on the S&P 500 index is very imprecisely estimated, so that at conventional scholarly levels of statistical significance, it would not lead to rejection of the null hypothesis that the S&P 500 index has a true Model II coefficient of 0.

4925-8119-7961.v1

**Table 3: Regression Model Coefficient Estimates for Models I & II**
**(Estimation window is set of Non-News Dates)**

| Coefficient | Model I | Model II | Model III |
|---|---|---|---|
| **S&P 500** | 1.4021 | 0.1213 | *Not Included* |
| | (0.144) | (0.129) | |
| **Solar Industry Index** | *Not Included* | 1.0956 | *Not Included* |
| | | (0.056) | |
| **Custom Index** | *Not Included* | *Not Included* | 1.0353 |
| | | | (0.056) |
| **Intercept** | -0.0018 | -0.0004 | 0.0014 |
| | (0.002) | (0.001) | (0.002) |
| **R-Squared** | 0.142 | 0.490 | 0.636 |
| **RMSE** | 0.036 | 0.028 | 0.022 |
| *Note:* **Estimated standard errors reported in parentheses below regression coefficient estimates.** | | | |

22. The Model III estimates show that the LASSO algorithm created an index that has close to a one-for-one relationship with the Shoals Stock return, such that a 1% increase in the Custom Index return is associated with a 1.04% increase in the Shoals return.

23. To assess model fit, I use the R-squared statistic, which measures the share of variation in Shoals daily returns that is explained by variation in the explanatory variables. Model I is worst, with an R-squared of only 0.142. Model II improves over this substantially, raising R-squared to 0.490. Model III offers a noticeable improvement over Model II, with R-squared of 0.636. Thus, whereas Model II is able to explain about half the variation in Shoals daily returns using the S&P 500 and industry index variables, Model III's custom index is enough to increase the explained share to nearly two-thirds of Shoals Stock return's variation.

24. Another useful measure of regression model fit is the root-mean squared error, or RMSE, which is the average value of the squared abnormal return based on the model. A model with a lower RMSE thus has lower variability of abnormal returns on Non-News Dates, making it

4925-8119-7961.v1

more likely that actual news event effects will be detected when comparing abnormal returns for News Dates and Non-News Dates.

25. The last row of Table 3 reports the RMSE for each of the three models,[14] which were 0.036, 0.028, and 0.022. Thus, Model I has the most variable abnormal returns as measured by RMSE, and Model II reduces that variability by nearly a fourth. Model III reduces RMSE by roughly 20% relative to Model II and by more than a third relative to Model I.[15]

### D. Comparing The Abnormal Returns Distributions For News and Non-News Dates

26. We can think of the abnormal return for date $t$ as including two separate components: the typical random variation returns have around their expected value on any date, and a news-event effect, if one is present.

(a) I will refer to the random variation part of the abnormal return as $v_t$.

(b) I will refer to the news-event effect part of the abnormal return as $\gamma_t$ (pronounced "gamma t").

(c) Thus, we may write $\epsilon_t = v_t + \gamma_t$.

(d) On Non-News Dates, the news-event effect is zero by construction, so on these dates, $\gamma_t = 0$. The distribution of abnormal returns for Non-News Dates is thus simply the distribution of the essentially random component of the abnormal return, $v_t$.

---

[14] For Model I and Model II, I calculate the RMSE using estimated abnormal returns for all Non-News Dates. There are 572 of these dates. For Model III, I take an alternative approach. To avoid overfitting related to the fact that the set of return variables included in the Custom Index are selected using the LASSO procedure in a first step estimation, I calculate the RMSE using only the 201 test-set observations.

[15] This is in line with the finding in Andrew Baker and Jonah B. Gelbach, *Machine Learning and Predicted Returns for Event Studies in Securities Litigation*, 5 J. L. Fin. & Accounting 231 (2021).

4925-8119-7961.v1

(e)     But on News Dates, abnormal returns include both the random component $v_t$ and the news event effect $\gamma_t$.

27.     For each model described above, I therefore construct tests of whether Shoals Stock responds to news on the effective News Dates by (a) calculating estimated abnormal returns for the 56 identified News Dates; and (b) comparing features of their distribution with the same features of the distribution of non-news date estimated abnormal returns.

28.     Intuitively, if the Shoals Stock price did not respond to news on an effective news date $t$, then $\gamma_t = 0$, and the abnormal return for that date comes from the same distribution as the abnormal returns for Non-News Dates. Comparing the estimated abnormal returns for News Dates and Non-News Dates thus is a way to assess whether the $\gamma_t$ values are, as a group, non-zero.

29.     In doing so, it is important to bear in mind that the news event effect $\gamma_t$ might be either positive (if the news represented an unexpectedly positive development from investors' point of view) or negative (if the news was an unexpectedly negative development). Thus, it would not make sense to compare the mean of the estimated abnormal returns on news and Non-News Dates. The mean on Non-News Dates will be 0 by construction, and the mean on News Dates also could be 0, even if they come from a different overall distribution from Non-News Dates, if positive and negative news events offset each other. This example shows the importance of using comparisons that are sensitive to the presence of any pattern of news event effects.

30.     A first approach is to ask how frequently the news-date estimated abnormal returns are large enough to reject the null hypothesis of a systematic news event (*i.e.*, that $\gamma_t = 0$) based on the assumption that non-news date abnormal returns are normally distributed. Under that null hypothesis, the estimated abnormal return $\hat{\epsilon}_t$ will have an approximate normal distribution with mean 0 and estimated standard deviation equal to the RMSE of the model. This means the product

- 11 -

of the model's RMSE and quantiles of the standard normal distribution may be used as critical values for rejecting the null hypothesis, at specified levels of statistical significance. Conventional significance levels used in academic scholarship include 0.10, 0.05, and 0.01, for which the critical values in a two-sided test are 1.64, 1.96, and 2.58.[16] Thus, the null hypothesis that the news event effect was 0 for date $t$ is rejected at the 10% level if the absolute value of abnormal return for that date exceeds 1.64 times the RMSE, at the 5% level if the absolute value of the abnormal return for that date exceeds 1.96 times the RMSE, and at the 1% level if the absolute value of the abnormal return for that date exceeds 2.58 times the RMSE.

31.     The top row of Table 4 reports the number of News Dates for which the Model I abnormal return's absolute value exceeds each critical value.

(a)     18 News Dates have abnormal returns whose absolute values exceed the 10% normal critical value, compared to the expectation of 5.6.

(b)     14 News Dates have abnormal returns whose absolute values exceed the 5% normal critical value, compared to the expectation of 2.8.

(c)     10 News Dates have abnormal returns whose absolute values exceed the 1% normal critical value, compared to an expected number of 0.56.

32.     The table shows similar results for Model II.

(a)     17 News Dates have abnormal returns whose absolute values exceed the 10% normal critical value, compared to the expectation of 5.6.

---

[16]   I have argued in my own scholarship that these conventional significance levels may be too demanding in litigation where the relevant standard of proof is the preponderance of the evidence. Jonah B. Gelbach, *Estimation Evidence*, 168 U. Pa. L. Rev. 549 (2020). Because the evidence in favor of news event effects is overwhelming even when I use these rigorous standards, I leave this issue aside for purposes of the current report and simply use conventional scholarly significance levels.

- 12 -

(b)     16 News Dates have abnormal returns whose absolute values exceed the 5% normal critical value, compared to the expectation of 2.8.

(c)     12 News Dates have abnormal returns whose absolute values exceed the 1% normal critical value, compared to an expected number of 0.56.

33.     The table shows similar results for Model III.

(a)     19 News Dates have abnormal returns whose absolute values exceed the 10% normal critical value, compared to the expectation of 5.6.

(b)     15 News Dates have abnormal returns whose absolute values exceed the 5% normal critical value, compared to the expectation of 2.8.

(c)     13 News Dates have abnormal returns whose absolute values exceed the 1% normal critical value, compared to an expected number of 0.56.

**Table 4: Number of News-Date Abnormal Returns Whose Absolute Values Exceed Normal Critical Values for Significance at 10%, 5%, and 1% Levels**

|  | 10% | 5% | 1% |
|---|---|---|---|
| **Model I** | 18 | 14 | 10 |
| **Model II** | 17 | 16 | 12 |
| **Model III** | 19 | 15 | 13 |
| *Expected* | 5.6 | 2.8 | 0.56 |

34.     These results show that under the assumption that Non-News Dates abnormal returns have a normal distribution, the evidence is very different from what would be expected if the News and Non-News Dates' abnormal returns come from the same probability distribution.

35.     But if the Non-News Dates' abnormal returns do not come from a normal distribution, then the results in Table 4 would not provide a basis for a valid test of whether abnormal returns on the News Dates and Non-News Dates come from different probability distributions. It is thus important to assess whether the Non-News Dates' abnormal returns *do* come from a normal distribution.

- 13 -

36.     A test known as the Kolmogorov-Smirnov test is available to test the normal distribution assumption.

(a)     For Model I, the Kolmogorov-Smirnov test rejects the hypothesis of normality with a p-value of 0.003, *i.e.*, the evidence is highly inconsistent with normality.

(b)     For Model II, the Kolmogorov-Smirnov test again rejects the hypothesis of normality, with a p-value of 0.001, *i.e.*, the evidence is highly inconsistent with normality.

(c)     For Model III, the Kolmogorov-Smirnov test does not reject the hypothesis of normality at conventional scholarly levels of statistical significance, as the p-value is 0.228.[17]

37.     When a random variable has a non-normal distribution, it is generally inappropriate to base statistical testing on comparisons involving critical values that are based on the normal distribution.  This is a point that I have demonstrated using both statistical theory and empirical evidence, in my scholarly work.[18]

38.     Fortunately, it is unnecessary for abnormal returns on Non-News Dates to be generated by a normal distribution.  My scholarly work also shows how to use sample quantiles in place of the normal distribution's critical values.[19]

---

[17]   Nevertheless, the test set abnormal returns based on Model III exhibit some noticeable departures from normality; for example, whereas the 0.025 quantile under normality equals -1.96 units of standard deviation, the corresponding sample quantile for the test set observations is -2.18 units of standard deviation.  Perhaps there really is substantial non-normality for the Model III abnormal returns, but the Kolmogorov-Smirnov did not reject due to some combination of a relatively small test set sample size of 201 and a relatively small true departure from normality.  Whatever the explanation, nothing in my conclusions about the event study results turns on the question of normality of the Model III abnormal returns' normality or lack thereof.

[18]   Jonah B. Gelbach, Eric Helland, and Jonathan Klick, *Valid Inference in Single-Firm, Single-Event Studies*, 15 Am. L. & Econ. Rev. 495 (2013).

[19]   Jonah B. Gelbach, Eric Helland, and Jonathan Klick, *Valid Inference in Single-Firm, Single-Event Studies*, 15 Am. L. & Econ. Rev. 495 (2013).

- 14 -

39. Table 5 reports the number of the 56 News Dates for which the absolute value of estimated abnormal returns exceed the sample quantiles of the non-news date abnormal returns. This table again shows that news date estimated abnormal returns are substantially more likely to have high-magnitude values than would be expected if they came from the same distribution as non-news date abnormal returns.

**Table 5: Number of News-Date Abnormal Returns Whose Absolute Values Exceed Sample Quantile Critical Values for Significance at 10%, 5%, and 1% Levels**

|  | 10% | 5% | 1% |
|---|---|---|---|
| **Model I** | 14 | 10 | 7 |
| **Model II** | 16 | 13 | 8 |
| **Model III** | 14 | 14 | 12 |
| *Expected* | 5.6 | 2.8 | 0.39 |

40. Model I generates substantial numbers of News Dates with estimated abnormal returns scores that have high absolute values.

(a) 14 News Dates have abnormal returns whose absolute values exceed the 10% sample quantile, compared to the expectation of 5.6.

(b) 10 News Dates have abnormal returns whose absolute values exceed the 5% sample quantile, compared to the expectation of 2.8.

(c) 7 News Dates have abnormal returns whose absolute values exceed the 1% sample quantile, compared to an expected number of 0.56.

41. The table shows similar results for Model II: it also generates substantial numbers of News Dates with Z scores that have high absolute values.

(a) 16 News Dates have abnormal returns whose absolute values exceed the 10% sample quantile, compared to the expectation of 5.6.

(b) 13 News Dates have abnormal returns whose absolute values exceed the 5% sample quantile, compared to the expectation of 2.8.

- 15 -

(c)     8 News Dates have abnormal returns whose absolute values exceed the 1% sample quantile, compared to an expected number of 0.56.

42.     The table shows that Model III also generates substantial numbers of News Dates with Z scores that have high absolute values.

(a)     14 News Dates have abnormal returns whose absolute values exceed the 10% sample quantile, compared to the expectation of 5.6.

(b)     14 News Dates have abnormal returns whose absolute values exceed the 5% sample quantile, compared to the expectation of 2.8.

(c)     12 News Dates have abnormal returns whose absolute values exceed the 1% sample quantile, compared to an expected number of 0.56.

43.     Accordingly, these results show that even without assuming that the Non-News Dates abnormal returns have a normal distribution, the evidence is very different from what I would expect if the news and Non-News Dates' abnormal returns come from the same probability distribution. The results in Table 5 thus provide strong evidence that Shoals Stock returns respond to the company's news on the effective News Dates, consistent with the existence of a semi-strong form efficient market in Shoals Stock.

44.     One remaining question is whether the Table 5 results might be explicable simply as what might reasonably occur due to random variation in abnormal returns when we observe 56 of them. Even if the abnormal returns from News Dates and Non-News Dates did come from the same distribution, there would be some random variation in the number of News Date abnormal returns that exceed the sample quantile critical values for statistical significance at the 10%, 5%, and 1% levels. To determine whether the apparently large departure from expectation of the Model I, Model

- 16 -

II, and Model III statistics in Table 5, I used a formal statistical procedure known as Fisher's exact test, based on information set forth in Table 6.

(a) The top row of Table 6 reports the number of Non-News Dates for which the absolute value of the abnormal return falls into each of four intervals. The first interval is 0 through the product of the RMSE and 1.64; the second interval is the product of the RMSE and 1.64 through the product of the RMSE and 1.96; the third interval is the product of the RMSE and 1.96 through the product of the RMSE and 2.58; and the fourth interval consists of all values at least as great as the product of the RMSE and 2.58.[20]

(b) The second row reports the number of News Dates for which the absolute value of the abnormal return score falls into each of these intervals.

(c) It is important to remember that the numbers for news and Non-News Dates are not directly comparable. For Models I and II, there are more than 10 times as many Non-News Dates (572) as News Dates (56) represented in the table; for Model III, there are nearly 4 times as many Non-News Dates (201) as News Dates (56). It is therefore striking that both Models II and III generate more News Date abnormal returns that appear in the table's highest interval than they generate Non-News Date abnormal returns in this interval. This is a clear demonstration that News Dates are much more likely to have high-valued abnormal returns.

---

[20] In all cases, the left side of the interval is included and the right side is excluded, *i.e.*, a value of exactly 1.64 would fall into the second interval, not the first. The interval cutoffs correspond to the 0.95, 0.975, and 0.995 quantiles for the absolute value of a random variable that has a standard normal distribution. Although I have shown that there is strong evidence against normality of the Z scores for Models I and II, the cutoff values used for the intervals in Table 8 still yield a meaningful test, because the same cutoffs are used for both the news and Non-News Dates, and because even with non-normality, these cutoffs are located in the right tail of the distribution of the absolute value of abnormal returns for Non-News Dates.

- 17 -

**Table 6: Contingency Table Test for Distributional Difference**

| | [1] | [2] | [3] | [4] | P-Value |
|---|---|---|---|---|---|
| *Model I* | | | | | |
| **Non-News Dates** | 526 | 17 | 14 | 15 | 0.0001 |
| **News Dates** | 38 | 4 | 4 | 10 | |
| | | | | | |
| *Model II* | | | | | |
| **Non-News Dates** | 520 | 23 | 18 | 11 | 0.0001 |
| **News Dates** | 39 | 1 | 4 | 12 | |
| | | | | | |
| *Model III* | | | | | |
| **Non-News Dates** | 181 | 6 | 9 | 5 | 0.0001 |
| **News Dates** | 37 | 4 | 2 | 13 | |

45. For each of the three Models, the last column of Table 6 reports the p-value from a contingency table test of the null hypothesis that the numbers in the Non-News Dates and News Dates rows represent draws from the same underlying distribution (whether normal or not) of the absolute values of abnormal returns.

46. The p-values are 0.0001 for all three of Model I, Model II, and Model III, which is equivalent to evidence that rejects the null hypothesis that abnormal returns for News Dates and Non-News Dates come from the same distribution at the 0.01% significance level. This is powerful evidence against that null hypothesis. I conclude that abnormal returns come from a different distribution for News Dates and Non-News Dates. All three p-values are very low by conventional standards, so this is powerful evidence that the news date abnormal returns and non-news date abnormal returns come from different distributions.

- 18 -

1.      In connection with determining whether a stock trades on an efficient market, some

courts have considered the degree of autocorrelation in stock returns.[1]  Autocorrelation refers to the

correlation of a Stock's returns with the Stock's past return values, so it is a measure of the

predictability of future returns.[2]  If future returns were predictable from past returns, then

arbitrageurs could profit by constructing trading strategies based on observable past-return

information.  In a market without significant limitations on trading, the occurrence of such arbitrage

would be expected to cause the autocorrelation to disappear relatively promptly.[3]  Thus, how close

---

[1]      *See, e.g.*, *In re DVI Inc. Sec. Litig.*, 249 F.R.D. 196, 213 (E.D. Pa. 2008).

[2]      The magnitude of first-order autocorrelation is the coefficient $\gamma$ in the relationship $r_t = \gamma r_{t-1} + u_t$, where $r_t$ is the daily return and $u_t$ is a random term with mean $E[u_t]$.  When $\gamma = 0$, this relationship simplifies to $r_t = u_t$, which is the equation for a time series that is known as a random walk with drift equal to $E[u_t]$; when additionally $E[u_t] = 0$, the time series is known simply as a random walk (or as one without drift or zero drift).  William H. Greene, ECONOMETRIC ANALYSIS 1026-1027 (2018, 8th ed.).

[3]      Suppose that a stock's coefficient of first-order autocorrelation (the correlation between one day's returns and the following day's) were 0.20.  That would mean that if the stock had a return of 1% on day $t$, then on day $t + 1$, the stock's return would, on average, be 0.2%; if the stock had a return of -1% on day $t$, then on day $t + 1$, the stock's return would, on average, be -0.2%.  In such a situation, trading by arbitrageurs can be expected to push the stock's price up on days that are about to end with positive returns (arbitrageurs want to hold the stock on the next day) and push price down on days that are about to end with negative returns (arbitrageurs would rather borrow a share of the stock to sell that day and buy it back at a discount the next day).  As a result, the stock's price will rise on already-positive days (fall on already-negative days).  That will cause returns to rise on already-positive days (to fall on already-negative days), with the consequence that the return will be lower than previously expected on the day after a positive return (higher than previously expected on the day after a negative return).  Because this fact will be true until the amount of arbitrage causes the elimination of the autocorrelation that induces arbitrage, it follows that in a frictionless market, arbitrage could be expected to continue until there is zero autocorrelation.  Consequently, persistent autocorrelation in daily returns indicates long-term predictability that is inconsistent with an efficient market.  Conversely, in an efficient market, autocorrelation can be expected to be 0.  The mechanism just described is why a weak-form efficient market has zero predictability of future prices from the values of past ones.  In real-world markets there are nonzero trading costs, so that arbitraging autocorrelation won't be profitable if the degree of autocorrelation is low enough; still, in a highly

- 1 -

autocorrelation is to 0 is one measure of how a stock's market can be expected to react to publicly available information.

2.      For a return with no autocorrelation, a parameter called the coefficient of first-order autocorrelation must by definition equal zero.[4]   The observed coefficient of first-order autocorrelation was -0.006 for the Stock's returns during the Analysis Period when news dates are excluded from consideration; this estimate is substantively indistinguishable from 0.[5]

3.      The Durbin-Watson (DW) test can be used as a statistical test for the presence of autocorrelation of stock returns.  When the DW test statistic is less than 2 or greater than 4, that indicates presence of autocorrelation.[6]  During the Analysis Period, the Stock's log returns have a DW test statistic of 2.008 when news dates are excluded from consideration, indicating no evidence of autocorrelation.[7]

4.      Because the DW test has some "major shortcomings," an alternative approach known as a Lagrange multiplier (LM) test is often used.[8]  I applied this test to the Shoals log returns for the Analysis Period and found that the test provided no reason to think there is autocorrelation.

5.      An additional approach, which is substantively equivalent to but statistically different from testing based on the coefficient of first-order autocorrelation, is to test for the presence of a unit

---

liquid market with low transaction costs, the degree of autocorrelation can be expected to be approximately 0.

[4]      A return with perfect autocorrelation would have a coefficient of 1.

[5]      Even including news dates – which, as a purely statistical matter, should cause some negative autocorrelation via regression to the mean – the observed coefficient of first-order autocorrelation is small in magnitude, taking the value -0.037.

[6]      *See* Greene 8th Edition at 1000-1001 for a discussion of the Durbin-Watson test.

[7]      When news dates are included, the DW test statistic is 2.071.

[8]      Greene 8th Edition at 1000-1001.

4938-0475-5081.v1

root in the Stock's daily price. When there is a unit root, day-to-day changes in a stock's price level will be indistinguishable from statistical noise unless there is news about the stock's value on a given day.[9] A standard way to test for a unit root is to use the augmented Dicky-Fuller test.[10] Results from applying this test to Shoals Stock prices indicate that a unit root would not be rejected at anywhere near conventional significance levels. This result further supports the conclusion that there is no autocorrelation in daily returns for Shoals Stock.

---

[9] Here the distinction between the stock's price and its return is important. If $p_t$ is the stock's log price on day $t$, then presence of a unit root means that we can write the relationship of the stock's log price over time as $p_t = p_{t-1} + u_t$, or $p_t - p_{t-1} = u_t$, where $u_t$ is a random term. Because the daily return is the difference of log prices, this implies $r_t = u_t$—our equation for a random walk with drift, as discussed in footnote 3 above. Observe further that this equation is equivalent to $r_t = \gamma r_{t-1} + u_t$ when it is known that the coefficient $\gamma$ equals 0. In other words, presence of a unit root in the stock's (log) price is mathematically equivalent to zero first-order autocorrelation in the (log) return. Accordingly, a test for a unit root in the daily price is substantively equivalent to a test that the return's coefficient of first-order autocorrelation is 0. For very technical reasons, statistical complexities arise in testing for a unit root, so these two types of tests are statistically distinct inquiries.

[10] *See* Greene 8th Edition at 1035-1038 for a discussion of the augmented Dickey-Fuller test.

4938-0475-5081.v1